```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3    JAMIE LEIGH JONES,            .
      PLAINTIFF,                    .
 4                                  . H-07-CV-2719
           v.                      . HOUSTON, TEXAS
 5                                  . JUNE 30, 2011
                                    . 8:15 A.M.
 6    HALLIBURTON COMPANY D/B/A     .
      KBR KELLOGG BROWN & ROOT      .
 7    (KBR); KELLOGG BROWN & ROOT .
      SERVICES, INC.;               .
 8    DEFENDANTS.                   .
      . . . . . . . . . . . . . .   .
 9

10                    TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE KEITH P. ELLISON
11                 UNITED STATES DISTRICT JUDGE

12
      A P P E A R A N C E S:
13
      FOR THE PLAINTIFFS:
14
           Lannie Todd Kelly
15         Heidi Olsen Vicknair
           The Kelly Law Firm PC
16         One Riverway
           Suite 1150
17         Richmond, Texas 77056

18         Ron Estefan
           Attorney at Law
19         One Riverway
           Suite 1150
20         Richmond, Texas 77056

21         Stephanie Marie Morris
           The Law Office of Stephanie M. Morris, PLLC
22         27 S. Darington Street
           West Chester, Pennsylvania 19382
23

24    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
25                              - - - - -
```

1    A P P E A R A N C E S:   (Continued)

2    FOR DEFENDANT KBR:

3         Joanne Vorpahl
          Susan Cates
4         Blake Runions
          Stephanie Holcombe
5         Daniel K. Hedges
          Porter & Hedges
6         1000 Main Street
          36th Floor
7         Houston, Texas 77002

8    FOR DEFENDANT CHARLES BORTZ:

9         Andrew T. McKinney, IV
          Sharon Cullen
10        Brandon Mullen
          McKinney Cooper LLP
11        Three Riverway
          Suite 500
12        Houston, Texas 77056

13   OFFICIAL COURT REPORTER:

14        Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
15        515 Rusk Street
          Houston, Texas  77002

16

17                                - - - - -

18

19

20

21

22

23

24

25

1                                    INDEX

2                                                           PAGE

3     WITNESSES

4     Jamie Armstrong

5         Direct Examination by Ms. Cates                   5

6         Cross-Examination by Mr. Kelly                    7

7         Cross-Examination by Mr. McKinney                21

8     Joseph Kallan Daigle

9         Redirect Examination by Mr. Estefan             38

10    Thomas King

11        Direct Examination by Mr. Estefan               40

12        Cross-Examination by Mr. McKinney               49

13        Cross-Examination by Mr. Hedges                 58

14    Dwight Steward

15        Direct Examination by Mr. Estefan               77

16        Cross-Examination by Mr. McKinney               87

17        Voir Dire Examination by Mr. McKinney          115

18        Cross-Examination by Mr. McKinney              133

19        Cross-Examination by Mr. Hedges                164

20    Dawn Nelson

21        Direct Examination by Mr. Kelly                169

22        Cross-Examination by Ms. Cullen                196

23        Cross-Examination by Mr. Hedges                220

24        Redirect Examination by Mr. Kelly              223

25                           - - - - -

Cheryll K. Barron, CSR, CM, FCRR                   713.250.5585

1              P R O C E E D I N G S

2       *(Jury not present)*

3              MS. CATES:  Your Honor, can I say one thing?  The

4       parties agreed on sort of an introductory sentence you might

08:16   5       say for Jamie Armstrong, if that's okay.

6              THE COURT:  Are we going to do her first?

7              MS. CATES:  Yes.

8              THE CASE MANAGER:  Yes, she's on the screen.

9       *(Jury present)*

08:17   10             THE COURT:  Thank you.  Please be seated.

11             Before we resume Mr. Daigle's testimony, we're

12      going to have another witness testify in absentia, Ms. Jamie

13      Armstrong.  You've already heard Ms. Jamie Armstrong testify by

14      deposition in this case.  She is being presented by video this

08:17   15      morning on a very limited scope.  Okay.

16             MS. CATES:  Do we need to swear in the witness?

17             THE COURT:  Yes.  Ms. Loewe will do that, swear in the

18      witness.

19             THE CASE MANAGER:  Do you solemnly swear the testimony

08:18   20      you're about to give in the matter now before the Court will be

21      the truth, the whole truth, and nothing but the truth?

22             THE WITNESS:  I do.

23             THE COURT:  You may inquire.

24             MS. CATES:  Thank you, your Honor.

08:18   25      ///

08:18  1                    **JAMIE ARMSTRONG, DULY SWORN, TESTIFIED:**

       2                          **DIRECT EXAMINATION**

       3     BY MS. CATES:

       4     Q.  Hi, Ms. Armstrong.  My name is Susan Cates, and I represent

08:18  5     KBR.  We've never spoken, have we?

       6     A.  No.  We have not.

       7     Q.  And you understand that today we're in the trial of Jamie

       8     Leigh Jones versus KBR?

       9     A.  That's correct.

08:18  10    Q.  So, when I go back to July of 2005, you were in the

       11    containerized housing unit with Ms. Jones on July 28, 2005.  Is

       12    that correct?

       13    A.  That is correct.  That is correct.

       14    Q.  And did you understand at that time that she was alleging

08:18  15    that she had been raped by numerous people?

       16    A.  Yes.

       17    Q.  And did you understand that it was a sensitive situation?

       18    A.  Yes.

       19    Q.  Was your tone or tenor or means of communication of the

08:19  20    type that we would expect of a decent person dealing with

       21    somebody who was possibly a rape victim?

       22    A.  Yes.

       23    Q.  Did you threaten or intimidate Ms. Jones in any way in that

       24    containerized housing unit?

08:19  25    A.  No, I did not.

_Cheryll K. Barron, CSR, CM, FCRR_                          _713.250.5585_

08:19  1    Q.  Just so that you understand, Ms. Armstrong, Jamie Leigh

       2    Jones, has taken the stand in this trial; and she swore under

       3    oath to tell the truth during her testimony.  And under oath in

       4    this trial, Jamie Leigh Jones testified that you, in connection

08:19  5    with intimidating her to give a statement, said, quote, "You

       6    better be careful because another girl was raped and she was

       7    buried over here."

       8           Did you make that statement to Jamie Leigh Jones?

       9    A.  No, ma'am, I did not.

08:20 10    Q.  Did you threaten Jamie Leigh Jones in any way by saying

      11    that a rape victim was buried in Iraq?

      12    A.  No, ma'am, I did not.

      13    Q.  Did you say anything to Jamie Leigh Jones about anyone

      14    murdering or burying a rape victim?

08:20 15    A.  No, I did not.

      16    Q.  Ms. Armstrong, did you threaten Jamie Leigh Jones' life in

      17    any way?

      18    A.  No, I did not.

      19    Q.  Did you hear anyone else threaten Jamie Leigh Jones' life

08:20 20    that day or any other day?

      21    A.  No, I did not.

      22           MS. CATES:  Thank you, Ms. Armstrong.

      23           THE WITNESS:  You're welcome.

      24           MR. McKINNEY:  I have no questions, your Honor.

08:21 25           THE COURT:  Okay.  Mr. Kelly.

08:21   1                        **CROSS-EXAMINATION**

        2   BY MR. KELLY:

        3   Q.   If you had threatened Ms. Jones, naturally you would come

        4   before this Court and admit it to us all, wouldn't you?

08:21   5   A.   That is correct.

        6   Q.   What Ms. Jones actually told you, Ms. Armstrong, was that

        7   she didn't know how many people had raped her.  Isn't that

        8   true?

        9   A.   That is correct.

08:21  10   Q.   You told us in your deposition -- and we've heard that --

       11   that you took care of all of Jamie's needs while she was in the

       12   trailer, right?

       13   A.   That is correct.

       14   Q.   You told us that she was free to come and go as she

08:21  15   pleased, true?

       16   A.   True.

       17   Q.   And she was free, for instance, to go back to her own room

       18   by herself if she wanted to, true?

       19   A.   Yes, she -- yes, that is true.

08:22  20   Q.   She didn't really even need you for that purpose, did she?

       21   A.   No, she did not.

       22   Q.   Now, you claimed that you brought her food in the trailer,

       23   didn't you?

       24   A.   Yes, sir.

08:22  25   Q.   What food did you bring her?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:22   1   A.   It was food from our dining facilities.   So, chances were

        2   probably a sandwich, boxed juice, bottled water, some fruit

        3   maybe.

        4   Q.   I notice that you used the word "probably."   You don't

08:22   5   really remember what food you brought her, do you?

        6   A.   Not the exact food types, no.   I do remember bringing her

        7   food to go.

        8   Q.   Okay.   The fact that Jamie remembers specifically that the

        9   first food that she had was a kiwi when Heidi McMichael from

08:22  10   the State Department took her to the DFAC, that doesn't -- you

       11   don't have that kind of recall of what you did, do you?

       12   A.   No, sir.   I just remember going to the dining facility and

       13   getting a to-go container, getting food and drinks as well.

       14   Q.   The fact that Jamie specifically remembers that kiwi in

08:23  15   light of everything else that happened to her that day sort of

       16   makes that a significant event, doesn't it?

       17   A.   It could.

       18   Q.   You know, you may not be aware of this; but did you know

       19   that Jamie never puts her hair in a towel because it breaks

08:23  20   when she does?

       21        MS. CATES:   Your Honor, I'm happy to let Ms. Armstrong

       22   testify; but at the same time, the parties had agreed and I

       23   think the Court had ordered that she come here on a limited

       24   basis.   We've already played her deposition.   We've gone over

08:24  25   all these questions.

08:24  1          MR. KELLY:  It goes to credibility.

       2          MS. CATES:  She's overseas.  It's late at night where

       3   she is.  I just don't know that we need to rehash her entire

       4   deposition.

08:24  5          THE COURT:  No, ma'am.  Let me ask, ma'am -- can you

       6   hear me?

       7          THE CASE MANAGER:  They can hear you, but they can't

       8   see you.

       9          MR. ESTEFAN:  She can only see you, Judge, if you're

08:24 10   at that mike.

      11          THE COURT:  Hello.  My name is Keith Ellison.  I've

      12   been the judge presiding at this trial.  Can you hear me all

      13   right?

      14          THE WITNESS:  Yes, I can.

08:24 15          THE COURT:  Thank you very much for your availability.

      16          Can you think of anything that you've said that

      17   might have caused Ms. Jones to believe you said that anyone

      18   else who had claimed to have been a rape victim was mistreated

      19   or in any way harmed by the employer?

08:24 20          THE WITNESS:  No, sir, there's nothing that I said.

      21          THE COURT:  Did you mention -- were you aware of

      22   anyone else who had claimed rape in the camp?

      23          THE WITNESS:  No, I was not.

      24          THE COURT:  Okay.  Yeah.  Let's let Mr. Kelly finish,

08:25 25   but I think we ought to limit ourselves to the specific point

08:25  1  in dispute.  I don't think we can properly ask her to stay for

2  a lengthy deposition.

3  　　　　MR. KELLY:  Your Honor, I don't intend to be lengthy;

4  but I can impeach this witness.

08:25  5  　　　　THE COURT:  You can, but I don't think you're anywhere

6  close to doing that with talking about food.  I really don't.

7  　　　　MR. KELLY:  I'm beyond food, your Honor.

8  BY MR. KELLY:

9  Q.  You testified that you saw Jamie's hair in a towel, didn't

08:25  10  you?

11  A.  Yes, I did.

12  Q.  But you didn't know at that time that Jamie doesn't put her

13  hair in a towel because it breaks, did you?

14  A.  No, sir, I did not.

08:25  15  Q.  Now, you said that you went to Jamie's room to get her

16  clothing and supplies, right?

17  　　　　MS. CATES:  I just reassert the same objection.

18  A.  That is correct.

19  BY MR. KELLY:

08:26  20  Q.  You know, we heard from William Goodgine.  You know who he

21  is, right?

22  A.  Yes, I do.

23  Q.  And William Goodgine has testified that Jamie's room was

24  locked down tight like a crime scene and no one could get in.

08:26  25  A.  Actually, William Goodgine and I went together to pick up

08:26  1    some items to take back to her.

2    Q.  Any reason in your mind why William Goodgine wouldn't have

3    told us that?

4    A.  No, sir.

08:26  5    Q.  Any reason in your mind why when I specifically asked

6    William Goodgine if you could have gotten into Jamie's room,

7    his answer was:  Not Jamie Armstrong, not anybody?

8            MS. CATES:  Your Honor, I object.  I don't think

9    William Goodgine testified to that at all.  This exceeds the

08:26  10    scope of even the deposition that was played in this case.

11           THE COURT:  And I don't think you can impeach her with

12    something somebody else said.  There are conflicting memories.

13           MR. KELLY:  Your Honor, I understand; but if it was

14    locked down tight as a crime scene, then there's no way this

08:26  15    witness could have gotten into Jamie's room.

16           THE COURT:  That's right, but I think she and

17    Mr. Goodgine have differing memories.  That happens after six

18    years.

19           MS. CATES:  Well, she just said they went together, so

08:27  20    he let her.  I mean, who knows?  I just think this is exceeding

21    the scope.

22    BY MR. KELLY:

23    Q.  They sealed the room for evidence, right?

24    A.  I'm sorry?

08:27  25    Q.  They sealed Jamie's room for evidence, didn't they?

08:27  1    A.  I do not know.

2    Q.  Did you bring Jamie a bra and underwear?

3    A.  I know I brought her clothes and shampoo and things for her

4    contacts.  I don't specifically remember undergarments.  I

08:27  5    think they would have been included.

6    Q.  Do you remember Kristen Rumba asking you if you got the

7    poor girl a bra?

8    A.  I don't remember that specific question, no.

9         MS. CATES:  Your Honor --

08:28  10   BY MR. KELLY:

11   Q.  Were you present when Jamie was flown out on the Little

12   Bird?

13   A.  Yes, I was.  I was in the bird before Jamie.

14   Q.  A Little Bird is not a military aircraft, is it?

08:28  15   A.  No, sir, it is not.

16   Q.  And the way that you get strapped into a Little Bird is

17   with a belay, right?

18   A.  I don't remember being strapped into the Little Bird but

19   holding on to something on the side.

08:28  20   Q.  And the non-military aircraft can fly under different rules

21   than the military aircraft, true?

22   A.  I would not know.

23   Q.  These are the aircraft that are typically used by KBR

24   management, aren't they?

08:28  25   A.  I'm sorry.  I don't understand your question.

08:28    1   Q.  Does KBR management usually fly on the Little Birds?

2   A.  No, sir.

3   Q.  Okay.  Who normally flies on the Little Birds?

4   A.  I would guess security because that's who arranged the

08:29    5   Little Bird.

6   Q.  Okay.  You recall being asked about Jamie seeing Bortz in

7   the bed at one part of the statement and then not seeing -- not

8   seeing Jamie in another part of the statement.  Do you recall

9   that at your deposition?

08:29   10   A.  I recall at one point Jamie said that she had woken up with

11   Charles Bortz next to her.

12   Q.  Actually, what she said was Charles Bortz was in the room.

13   Isn't that right?

14         THE COURT:  We've had -- I mean, we've had conflicting

08:29   15   stories on that.

16         MR. KELLY:  But, your Honor, if this witness has

17   testified untruthfully, I think I'm entitled to show the jury

18   that.

19         THE COURT:  I think on these details that it's not a

08:30   20   question that I've seen of untruthfulness.  It's a question of

21   differing memories.  I would be more worried if everyone's

22   testimony harmonized perfectly.

23         MR. KELLY:  I agree, your Honor; however, it doesn't

24   and I think that there's been ample implication by the defense

08:30   25   that when Ms. Jones' memory -- Ms. Jones', who was drugged,

08:30   1  memory doesn't comport exactly with what somebody said, the

        2  implication is she's lying.

        3          THE COURT:  I don't think that's the implication at

        4  all.

08:30   5          MR. McKINNEY:  Judge, if I may be heard on this?

        6  Aside from the fact that this is not even remotely impeachment

        7  evidence, it's simply asking the same question that Mr. Kelly

        8  asked this witness in her deposition presented to the jury

        9  already once.  It's been asked and answered.  We have another

08:30   10 witness on the stand.  This witness was called for the limited

        11 purpose of addressing Ms. Jones' recently recovered memory

        12 regarding this unusual statement that Ms. Jones made.  And I

        13 think that it's just time to bring all of this to an end.

        14         THE COURT:  Okay.  Let's wind it down.  You can ask a

08:31   15 few more questions, but let's wind it down.

        16         MR. KELLY:  I'm pretty much there anyway, your Honor.

        17 BY MR. KELLY:

        18 Q.  Mr. Goodgine has testified that he asked for the statement

        19 from Jamie.  Is that true?

08:31   20         MS. CATES:  Your Honor, I object.  I don't think --

        21 A.  He may have had a similar statement if he was a security

        22 investigator, but I asked for a statement in a human resources

        23 capacity.

        24 BY MR. KELLY:

08:31   25 Q.  I understand.  So, you wanted the statement from Jamie?

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

08:31   1    A.  In a human resources capacity.

2    Q.  I understand.  It wasn't Jamie Jones' request to make a

3    statement to you.  Isn't that true?

4    A.  That is true.

08:31   5    Q.  In fact, you told her that it was important to make the

6    statement, didn't you?

7    A.  That is correct.

8    Q.  You told her it was important to KBR to have this

9    statement, right?

08:31  10    A.  That is correct.

11    Q.  Are you aware of a prior rape victim who was killed and

12    buried in Iraq?

13           THE COURT:  I think I asked her that question.

14    A.  No, sir, I am not.

08:32  15    BY MR. KELLY:

16    Q.  You knew at the time that you met with Jamie Jones that she

17    was distraught, true?

18    A.  I knew that she was upset, yes.

19    Q.  You knew that she didn't want to give a statement at that

08:32  20    time, didn't you?

21    A.  She never -- she never denied wanting to give a statement.

22    Q.  In fact, you had to write part of her statement because she

23    was so distraught she couldn't do it herself.  Isn't that true?

24    A.  Sir, I offered to write her statement to make the situation

08:32  25    easier.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:32  1   Q.  Because she was distraught, right?

2   A.  Because she was tired.

3   Q.  But you weren't going to leave that trailer without a

4   statement, were you?

08:32  5   A.  That is not correct.

6   Q.  And that's because you knew that the State Department was

7   taking over the investigation and you really weren't going to

8   get another chance.  Isn't that true?

9   A.  No, sir, it is not.

08:33  10   Q.  Jamie had not spoken with a lawyer at the time you took her

11   statement, true?

12   A.  That is correct.

13   Q.  The only people she had spoken with at that time were

14   people from KBR, true?

08:33  15   A.  She had spoken with her mother.

16   Q.  She made the statement at around 8:00 p.m. that evening?

17         MS. VORPAHL:  Your Honor, this is all covered --

18   A.  I don't remember the exact time.

19   BY MR. KELLY:

08:33  20   Q.  It was late in the evening, wasn't it?

21         THE COURT:  Yeah, I think this has been covered.

22   A.  Sir, I do not remember.

23   BY MR. KELLY:

24   Q.  It was made after the State Department had told KBR to

08:33  25   stand down, wasn't it?

08:33   1   A.  No, sir, it was not.

2   Q.  Are you saying that the story about a woman being raped,

3   killed, and buried in Iraq was something that Jamie Jones made

4   up?

08:34   5   A.  Sir, this is the first time tonight that I've heard that

6   story.

7   Q.  Were you present when Jamie was on the phone with her

8   mother and with her father?

9   A.  I walked in at one point when she was on the phone with her

08:34   10   mother, yes.

11   Q.  Do you know who Patty Chapman is?

12       MS. CATES:  Your Honor, I object.  This is

13   completely --

14   A.  No, sir, I do not.

08:34   15       THE COURT:  Let's wind it up.

16       MR. KELLY:  Well, your Honor, Patty Chapman is the

17   witness from Ted Poe's office --

18       MS. CATES:  Your Honor, may we approach if he's going

19   to stand here and testify about this?

08:34   20       THE COURT:  Yeah, I know who she is; and I don't think

21   this is the right person to ask about that.  She doesn't even

22   know the woman.

23       MR. KELLY:  Okay.

24   BY MR. KELLY:

08:35   25   Q.  You told us in your deposition, Ms. Armstrong, that if

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:35   1    sexual harassment occurred in the Green Zone, you would

2    definitely know about it, true?

3    A.   Yes, sir.

4    Q.   You didn't know about --

08:35   5    A.   Just like human resources.

6    Q.   You didn't know about Craig King?

7    A.   What?

8    Q.   You didn't know about Craig King's sexual harassment, did

9    you?

08:35   10              MS. CATES:  Your Honor, this completely exceeds the

11    scope of what we're --

12    A.   No, sir, I don't know that name.

13    BY MR. KELLY:

14    Q.   You don't know about Jo Frederiksen or her roommate, do

08:35   15    you?

16              MS. CATES:  Your Honor, seriously, this is irrelevant.

17              THE COURT:  Okay.  I think we've had enough.  It's way

18    far afield from what we wanted to ask her about.

19                   Thank you very much -- oh.

08:35   20              Thank you very much for making yourself available

21    to us, and thank you for your patience.  We all appreciate it,

22    both sides and the jury.  Thank you.

23              THE WITNESS:  Thank you.

24              MR. KELLY:  Your Honor, may we approach?

08:36   25         (At sidebar with all counsel)

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:36   1          MR. KELLY:  Your Honor, it's hard to try a case with
        2   my wings clipped.  And every time that I have objected to
        3   things going outside the scope of anything, the Court's
        4   response to me has been:  It goes to impeach the credibility.
08:36   5          And that is all that I was trying to do.
        6          THE COURT:  Reflecting back, I should never have let
        7   Ms. Jones' statement in, her recovered memory statement.  For
        8   her to come up with something like that, that lurid, that
        9   sensational without any prior warning to adverse counsel was
08:37  10   really a mistake on my part.  We did do this to give them a
       11   chance to level the playing field.
       12          You had a chance to ask her about the statement.
       13   She disavowed the statement.  There was no reason to go into
       14   picayune details about food or fly bird or whatever to try to
08:37  15   show this woman was lying.  That was never within my
       16   contemplation when I suggested we talk to her.
       17          MR. KELLY:  I would like to bring Patty Chapman, your
       18   Honor, to show that just because the implication is that
       19   Ms. Jones has made up this story, that it's a story of a recent
08:37  20   fabrication and therefore -- and that witness clearly --
       21          THE COURT:  It is one of recent fabrication.
       22          MR. KELLY:  It's not fabrication at all.  It's a
       23   recently resurrected memory, your Honor; and it was recently
       24   resurrected because Ms. Chapman recently made contact with
08:37  25   Ms. Jones and reminded her.  And because of that, we should be

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

08:37  1    allowed to bring in Ms. Chapman to show this jury Ms. Jones

2    didn't make this story up at all.  It was --

3              THE COURT:  We'll discuss that later.

4              MS. VORPAHL:  Your Honor, may I say one thing?

08:38  5    Mr. Kelly said that the mother and father both remembered this

6    recovered memory, too.  The mother was on the stand.  She had

7    the opportunity to say it, and she didn't.  They didn't even

8    ask her about it.

9              THE COURT:  I know.

08:38  10             MS. VORPAHL:  Patty Chapman is somebody they've had

11   contact with since the beginning.  Her name is identified in

12   documents that they've had access to, and there is no reason

13   for her to come here.

14             MR. KELLY:  Exactly when did I contact her since

08:38  15   you're making the representation that she --

16             MS. VORPAHL:  Your client testified to it.

17             MR. KELLY:  That I had contact with her?  I don't

18   think so.

19      (In open court)

08:38  20             MR. ESTEFAN:  Your Honor, we're recovering Mr. Daigle.

21             THE COURT:  Okay.

22                  Okay.  You know the program, if you would resume

23   your seat.

24                  You're still under oath, of course.

08:39  25   ///

**CROSS-EXAMINATION**

BY MR. McKINNEY:

Q.  Good morning.

A.  Morning.

Q.  We left yesterday --

    MR. McKINNEY:  Is the mike on?

    THE COURT:  Who did that, left the microphone off?

BY MR. McKINNEY:

Q.  When we stopped at the end of the day, we were discussing what happened in San Diego.  Do you recall that?

A.  Yes.

Q.  And I don't want to go over all of that in great detail this morning, unless you would like to.  If you feel there's something that needs to be clarified or expanded on or explained, I'm happy to hear that.

A.  I feel you're asking me to make a lot of assumptions and just because I can assume something doesn't mean that's necessarily how I feel it happened.

Q.  Understood.  Understood.  And I am going to ask you to make one or two more assumptions just to sort of round this out and then we will talk about one or two other things and then we'll be done.

A.  Okay.

    THE COURT:  I guess the jury is having a little trouble hearing you.  So, please speak directly into the mike;

08:40    1    and try to keep your voice at a elevated volume if you could.

2    THE WITNESS:  Okay.  Can you-all hear me now?

3    BY MR. McKINNEY:

4    Q.  Recalling that what you described as having happened that

08:41    5    evening as being -- and if I miss -- if I unfairly or

6    inaccurately characterize what you've described -- it's one of

7    those unfortunate but not entirely unheard of altercations that

8    young people, possibly aggravated by alcohol, have from time to

9    time.

08:41   10    Is that a fair general characterization of what

11    happened between you and your wife as you recall it there in

12    the parking lot?

13    A.  Yeah, I do believe alcohol did have a factor in it.

14    Q.  Yes, sir.  Now, if we look at how others, healthcare

08:41   15    professionals in specific, recorded how your wife described

16    that unfortunate event, we have in the first instance you and

17    your wife sitting at a bar and suddenly, and for no good

18    reason, you struck her in the face.  Do you recall that from

19    yesterday?

08:42   20    A.  I do recall that.  I mean, technically we were at the bar

21    when I hit her; but it wasn't inside the bar.

22    Q.  Understood.  And then you also recalled that

23    Commander Gilford wrote down that your wife said that she had

24    informed you that you were -- that she was pregnant and you

08:42   25    began kicking her in the stomach and hitting her in the face.

08:42  1   Do you recall that from yesterday?

2   A.  Yes, I recall that that was written down.

3   Q.  And then Commander Gilford reported that Ms. Jones --

4   Ms. Daigle had changed her description and stated that you

08:43  5   had -- you were losing at bowling and became angry and began

6   hitting her in the face and kicking her in the stomach.  Do you

7   recall going over that -- that version as recorded by

8   Commander Gilford?

9   A.  Right, and I do recall that.  A lot of those make sense but

08:43  10  not in the order that they were written down.  I mean, we did

11  have a lot of those arguments that night.  It wasn't just like

12  one argument that I was -- all of a sudden just snapped.  It

13  was a compilation of a bunch of arguments.  And it seems like

14  each one of those are bits and pieces and parts of them are

08:43  15  somewhat accurate and parts of them aren't.  And it just seems

16  like if I can see what Jamie's statement was that she wrote,

17  then maybe it could fit together a little better for me.

18  Q.  Well, a couple of points in view of what you just stated.

19          First of all, do you recall that we reviewed

08:44  20  verbatim the statements that your wife was reported as having

21  made?  We reviewed those verbatim in your testimony last

22  night -- or in the afternoon?

23  A.  I reviewed what other people had recorded, but I don't

24  think I saw what my wife had written down.

08:44  25  Q.  Right.  Well, you probably had a chance to visit with your

08:44  1   wife in the evening last night about her memory of those
       2   events?
       3   A.  Actually, I kind of avoided the subject.  I don't -- I
       4   didn't really discuss a lot with her.  I mean, we did talk
08:44  5   about how hard it is to be up on the stand and everything.
       6   Q.  Well, I know it's not easy being a witness.
       7   A.  Right.
       8   Q.  But do you recall telling our jury previously, when I
       9   described and read to you verbatim from the various reports,
08:44 10   that none of those statements were true?
      11   A.  Right, none of them were 100 percent accurate.  Like I
      12   said, parts of them were somewhat --
      13   Q.  Actually --
      14   A.  I mean, nothing all together at once was perfectly
08:45 15   accurate, so --
      16   Q.  I believe you told us yesterday that you would not, in a
      17   million years, kick your wife in the stomach, for example, for
      18   informing you that she was pregnant?
      19   A.  Right.
08:45 20   Q.  And you would not, in a million years, kick your wife in
      21   the stomach and hit her in the face because you were losing at
      22   bowling?
      23   A.  Right.
      24   Q.  And so, to sort of wrap this up, if we can --
08:45 25   A.  That's fine.

08:45   1   Q.  -- if we look at the way your wife is reported to have
        2   described the event that you've described in the parking lot,
        3   for example, she tells you that she's pregnant and your
        4   reaction is to strike her in the face and strike her in the
08:46   5   stomach, if we just take those words as having actually been
        6   spoken by your wife -- I know you think they're probably taken
        7   out of context or misunderstood -- but if we take the words as
        8   they're written down in these actual records that were made at
        9   the time, wouldn't it be fair to say that your wife's
08:46  10   description of this unfortunate event casts you -- that is,
       11   presents you -- in the worst possible light and casts your wife
       12   as the blameless victim?  Wouldn't that be a fair description
       13   of the way it has been written down by others?
       14   A.  I don't think it would be very fair because -- I mean, we
08:46  15   were both arguing and a lot of those things that people wrote
       16   down were parts of our argument that we had during the day.
       17   And, I mean, it -- I don't know if I can just solely put the
       18   blame on either of us.
       19         I mean, as far as the pregnancy thing, I don't
08:47  20   believe that she told me she was pregnant and we had been
       21   arguing about -- because we had been trying to get pregnant for
       22   several months, and I don't know the exact time frame that we
       23   had been trying.  And it was one of our arguments that we did
       24   have that night.
08:47  25         THE COURT:  I think the question is not whether the

08:47　1　description is fair.  The question is whether you would agree

2　that the description as written down portrays you very

3　negatively and your wife very positively.

4　　　　THE WITNESS:  Right.  And I was the one that committed

08:47　5　the offense.  So, I could very easily -- I mean, it was a very

6　negative thing that I did.

7　BY MR. McKINNEY:

8　Q.  Understood.  So, let's now look at Bortz Exhibit 83 again;

9　and then we're going to be through with this subject.

08:48　10　A.  Okay.

11　　　　MR. McKINNEY:  Sorry, I don't know why I said --

12　please go to Page 000974.

13　BY MR. McKINNEY:

14　Q.  And I asked you about this previously, and we're going to

08:48　15　pick up and move on pretty quickly.

16　A.  Yes, sir.

17　Q.  In the middle, fourth line down in the highlighted

18　paragraph --

19　　　　MR. McKINNEY:  If we could bring that up, the complete

08:48　20　sentence there beginning with "He stated."

21　　　　May I approach the witness?

22　　　　THE COURT:  You may.

23　BY MR. McKINNEY:

24　Q.  I would like to call your particular attention to the line

08:49　25　beginning "He stated."

08:49  1    A.   Okay.

2    Q.   Would you mind reading that to yourself?

3    A.   Would you like me to read it out loud or to myself?

4    Q.   Why don't you read it out loud?

08:49  5    A.   Okay.   "He stated that he never hit her and that she would

6    say the same thing."

7                    Would you like me to read all the lines you have

8    highlighted?

9    Q.   Sure, read the next sentence.

08:49  10   A.   "Sailor Daigle stated that they had been drinking and his

11   wife was on medication for stress and she knew she should not

12   have been drinking, but she was.   Sailor Daigle stated that his

13   wife was involved in" --

14   Q.   All right.   Now, the sum and substance of what is written

08:49  15   down there as having been statements that you made, did you

16   tell us previously that those, in fact, are statements that you

17   made?

18   A.   Yes, I did.   If you look at one line before, it also states

19   that, you know, I knew that she needed my support, that I knew

08:50  20   that I was her support system there, and I knew she wouldn't be

21   able to function without me.   And so, I was -- easily assume

22   that she would need me there to take care of her.

23   Q.   I understand.   Focusing on the part there where it states

24   that you denied striking your wife and you reported to

08:50  25   Chief Diaz-Pelot that your wife would back your story --

08:50  1    A.  Right.

2    Q.  -- and agree that you did not strike her --

3    A.  Right.

4    Q.  -- that statement was made at a time when you and your wife

08:50  5    were not in communication, correct?

6    A.  Correct.

7    Q.  Yet, you were confident that your wife would tell the

8    authorities that you had not struck her, correct?

9    A.  Correct.

08:51  10   Q.  And, in fact, if we turn the page --

11        MR. McKINNEY:  And let's bring up these -- no, these

12   statements right here, please.

13   BY MR. McKINNEY:

14   Q.  Either that day or the next day, if you read this report in

08:51  15   detail, we will see statements that your wife made to

16   Chief Diaz-Pelot.  Do you see those there?

17   A.  Yes.

18   Q.  Have you seen these before?

19   A.  I don't think I've seen this document before.  But I --

08:51  20   I've heard the statements before because, obviously, I was

21   involved in the incident.

22   Q.  All right.  As you can see, Chief Diaz-Pelot wrote down, in

23   quotation marks, that your wife said, "Please remove the MPO.

24   I really need my husband at home."

08:52  25        Do you believe she made that statement?

08:52   1   A.  I wasn't there.  So, assuming this is a correct document,

2   then she -- I assume she did.

3   Q.  Yes, sir.  And I'm asking you actually whether you believe

4   in your heart and in your mind that your wife made that

08:52   5   statement?

6   A.  I really believe in my heart and mind -- I knew she needed

7   me there, and I believe she did need me at home.

8   Q.  Okay.  Let's look at the next statement, quote, "He never

9   hit me," close quote.

08:52   10          Do you believe, as you sit here today, that your

11   wife made that statement to Chief Diaz-Pelot?

12   A.  Yes, I believe that she did make all those statements there

13   to help me get out of trouble.

14   Q.  So, did you know -- I'm just trying to set -- trying to get

08:52   15   my arms around this.  Please help me.

16          After you had sobered up, after Ms. Jones had had

17   a night to sleep, it was your sober and conscious belief

18   that -- even though both of you knew something had happened of

19   a physical nature, it was your sober and conscious belief that

08:53   20   your wife would deny that it happened and, even though the

21   truth was that it had happened, that was your belief the next

22   day, correct?

23   A.  Yes.  I believe she would deny that it happened because I

24   knew how much she needed me for her day-to-day function.  I

08:53   25   mean, she couldn't even be able to get food for herself at a

08:53   1   grocery store or anything.  So, I knew she would need me there

2   to take care of her.

3          And after the fact, she had even phoned her mom

4   to help her survive for the week until I was able to meet back

08:53   5   up with her.

6   Q.  If you look at the very last line, according to your wife's

7   last statement, she states, quote, "I have the ER report which

8   will show that I had no injuries at all," period, close quote.

9          Do you see that?

08:54  10   A.  Yes, I see that.

11   Q.  And, in fact, the ER report shows exactly that, your wife

12   had no injuries whatsoever?

13   A.  But according to the police report, it said that she had

14   a -- that I saw in my depo, I believe, that she had a mark on

08:54  15   her left cheek from where I had struck her and blood in her

16   eyes, if I'm correct.

17   Q.  Yes.  Did you read the rest of the report which shows that

18   upon further examination, there was no mark and that your

19   wife's eyes were actually simply bloodshot as a result of the

08:54  20   alcohol and the crying?

21   A.  I did not read that far into the report.

22   Q.  All right.

23   A.  I just know that the report said that.

24   Q.  And who's -- by the way, who's been furnishing you with

08:54  25   these reports to assist you in your testimony?

08:55    1    A.  Like I said, I think I saw that report in my depo; and

2    these other reports, these are the first time I've seen them.

3    Q.  All right.  Now, changing --

4    A.  Yesterday was also the first time I had seen those reports

08:55    5    that you showed me.

6    Q.  All right.  Changing subjects entirely and completely --

7    A.  Okay.

8    Q.  And this will certainly come as being totally off topic.

9           When you and your wife got married, you went on a

08:55    10    honeymoon?

11    A.  I think we did the honeymoon right before we were married

12    because of the time frame I had to ship out to boot camp.

13    Q.  All right.  And that was a happy time for you and

14    Ms. Jones?

08:55    15    A.  Yes.

16    Q.  You had a great trip?

17    A.  Yes, overall it was great.

18    Q.  There were no incidents, no problems, a good time was had

19    by the two of you?

08:55    20    A.  Yes.

21    Q.  A great way to start a marriage?

22    A.  Yes.

23    Q.  The particular honeymoon that you and your wife took was a

24    one-week Carnival cruise.  Is that right?

08:56    25    A.  Correct.

08:56   1   Q.  And, of course, cruise ships are large and carry a lot of

        2   people?

        3   A.  Yes.

        4   Q.  And you and your wife didn't know any of those folks?

08:56   5   A.  No, we didn't.

        6   Q.  It's not particularly fun to stay in the little stateroom

        7   that you live in, you sleep in at night.  You would get out and

        8   about?

        9   A.  Yes.

08:56  10   Q.  And mingle with the crowds?

       11   A.  I think we pretty much stuck together, and we didn't really

       12   mingle with too many people.  There's a lot of stuff to do on

       13   the cruise boat, like you can gamble and play cards, go

       14   dancing, swimming at the pool.  I mean, we did everything

08:56  15   together, so --

       16   Q.  Understood.  I'm just wondering -- well, we've heard that

       17   your wife basically can't do anything without you, correct, or

       18   someone?

       19   A.  Or someone.

08:56  20   Q.  Someone she knows and trusts?

       21   A.  Right.

       22   Q.  And that she becomes very upset and agitated, for example,

       23   at the Wal-Mart.  We've heard that several times?

       24   A.  I'm not sure what you're referencing to as far as the

08:57  25   Wal-Mart.

08:57  1    Q.  Yes.  Well, does -- has your wife, in fact, had episodes in

2    the past where, in your presence, she would experience anxiety

3    while at a grocery store or out shopping or out in public?

4    A.  Yes.

08:57  5    Q.  And so, for those folks who may not have had a chance to go

6    on a cruise yet, first of all, when you get on a cruise ship,

7    it's quite crowded because literally hundreds of people are

8    walking up the gangplank, shoulder to shoulder at the same

9    time, correct?

08:57  10   A.  Correct.

11   Q.  And then shortly after you are in your stateroom, as

12   required by the law of the sea, there is an all-passenger

13   abandon ship drill, is there not?

14   A.  I don't recall exactly.

08:58  15   Q.  Where everyone puts on their life jackets and crowds out on

16   the deck next to the lifeboat and learns what it would be like

17   to have to abandon ship.  That's one of the safety precautions

18   that are taken on these cruise lines, is it not?

19   A.  I really don't remember doing that; and if they did, I

08:58  20   don't remember it at all.

21   Q.  And the reason I'm asking this is, having heard your wife's

22   description and her mother's description of the difficulties

23   that your wife has around strangers, I was just wondering if --

24   and hopefully you can tell us -- if your wife experienced any

08:58  25   particular problems dealing with the large crowds and close

quarters of a cruise ship roughly a year after returning from Iraq.

A.   I wasn't in my wife's head, but I could assume that she very easily could have.  And even if she didn't, didn't tell me that -- she might have been just wanting me to have a good time and not be dealing with her difficulties, maybe putting herself first.

          And also, I'd have extensive water survival training and egress training from working offshore on oil rigs and I could have said, "You know, we don't even need to go to that.  We can skip it," because I know how to run one of those lifeboats by myself.

          So, I could find that a very plausible circumstance, where we just totally skipped the practice egress.

Q.   I think -- if I'm wrong, tell me -- but somewhere in your answer was -- were you telling us that throughout the cruise, if your wife did have an anxiety issue because of the crowds or the strangers or the close quarters, she did not bring that up in conversation that you recall here today?

A.   Oh, yes, throughout the entire cruise I do remember she did have issues with certain places that I wanted to go and she necessarily didn't want to.  And she didn't always tell me the reason behind it, and I could assume that was because there was a crowd there or for whatever reason she had.

09:00  1          So, yes, we were prevented from doing certain

2    things and I was prevented from doing -- you know, I wanted to

3    go fishing by myself.  And that would cause her to be on the

4    cruise ship by herself, and she really didn't want me to do

09:00  5    that.  And fishing is my favorite thing to do; so, it was a big

6    sacrifice for me.

7    Q.  Let's change gears one more time and talk about your wife's

8    job as an adjunct professor at -- is it the University of

9    Houston?

09:01  10   A.  Yes.

11   Q.  And I believe you told us in your deposition that your wife

12   leaves home on -- or in this past semester, in the spring

13   semester, that your wife would leave home at 5:00 or 6:00 in

14   the morning and return around noon.  Is that correct?

09:01  15   A.  That's about right.  I'm not really good with time and

16   stuff; but that sounds -- you know, give or take on hour or so,

17   it sounds about right.

18   Q.  Well, we can get your deposition out if that would help

19   refresh your memory.  But at the time, do you remember telling

09:01  20   us actually, without any qualification, that your wife left at

21   5:00 to 6:00 in the morning and would return around noon to

22   12:30?

23   A.  That sounds about right to me.

24   Q.  All right.  Now, of course, when she would leave, she would

09:01  25   be by herself?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:01   1    A.   Yes.

2    Q.   And do you know what time her first class was?

3    A.   No.  I wasn't really familiar with her schedule.

4    Q.   All right.  But presumably she wasn't teaching a class at

09:02   5    7:00 in the morning or 6:30 or anything like that?

6    A.   No.  The route she had to go to get there was kind of --

7    there was no, like, highway track to there.  So, it was kind of

8    back country roads.  So, the traffic was very brutal coming

9    there and going back any time of the day.  It was 1488 heading

09:02   10   toward Tomball and cutting across on 2978, I believe, or -- I

11   don't remember the road exactly.

12   Q.   In any event, your wife would spend somewhere between four

13   and five hours every morning on a college campus with male and

14   female students, male and female instructors, administrative

09:02   15   people, people taking care of the grounds, just a whole variety

16   of folks, and would come home every day and be ready to go to

17   work again the next day, would she not?

18   A.   She was able to be in her classroom.  And as a teacher,

19   she's the only one that had access to that classroom and was

09:03   20   able to allow access.  Now, I do not doubt she came across

21   people going to and from class; but it's not like she was

22   spending the whole day with all these multiple people all at

23   once.

24   Q.   Is it your impression that your wife was teaching class

09:03   25   from roughly 7:00 or 7:30 in the morning until roughly 11:00 or

09:03  1    11:30 and, therefore, was not out and about intermingling with

2    strangers and otherwise acting as most folks do, getting along

3    fairly well with the world?  Is that your impression?

4    A.  I'm pretty sure she stuck to her classroom and didn't get

09:03  5    out for anything.  But I don't know her work schedule either.

6    I don't know the exact hours she was there, so --

7    Q.  Did you attend your wife's classes?

8    A.  I didn't actually attend a class.  I sat out in the parking

9    lot in the car.  The first time that I went up there with her

09:04  10   was a tour of the school and she wasn't -- didn't have a class.

11   So, we did that together, but I didn't -- that time wasn't

12   actual attending the class or anything like that.

13   Q.  Who would watch the babies while you were sitting in the

14   car?

09:04  15   A.  At the time we had only one child and she would either come

16   with me and -- I had a little portable DV player she would

17   watch that kept her pretty well entertained.  I'd do numerous

18   things to keep her entertained.  I'm a stay-at-home dad.  So, I

19   know her ins and outs pretty well.

09:04  20   Q.  This past semester you've had two children.  Is that

21   correct?

22   A.  Correct.  Our newest daughter is four months old now.

23   Q.  Have you been attending school with your two -- have you

24   been attending school with your wife and the two children?

09:04  25   A.  No.  By the time she had the second child, it was over

09:05   1   midway through the semester.  So, I believe she was pretty

2   comfortable by then and didn't need me to go to school with

3   her.  And the way my schedule was, I was doing night classes;

4   and I think one night a week my mother-in-law was the one that

09:05   5   babysat the children.  And it was only for a couple of hours,

6   just while I was in class; and I would pick them up on the way

7   home.

8   Q.  Thank you.  I believe that's all I have.

9   A.  Okay.

09:05   10              MR. ESTEFAN:  I'll be very brief, your Honor.

11   **JOSEPH KALLAN DAIGLE, PREVIOUSLY SWORN, CONTINUED TO TESTIFY:**

12                    **REDIRECT EXAMINATION**

13   BY MR. ESTEFAN:

14   Q.  Hi, Kallan.

09:05   15   A.  Hi.

16   Q.  You told us all about leaving the safe house here in

17   Houston and going back to San Diego, I believe it was, after a

18   week?

19   A.  Correct.

09:05   20   Q.  Why did you feel it was okay to go back then?

21   A.  Well, we felt the danger was compiled with the fact that we

22   were just about to go public with Jamie's story, and to get the

23   threat at that time kind of compiled our fears of there might

24   be something that could happen to us.  And during the week we

09:06   25   were gone, it publicly came out; and due to the public

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:06  1   knowledge, we felt we were safer because of everyone knowing

2   that -- what happened to Jamie.

3   Q.  Thank you.  I want to do away with assumptions about what

4   happened at the bowling alley; and I want to talk about facts.

09:06  5                   Was Jamie, in fact, pregnant?

6   A.  No.  She was not pregnant at the bowling alley.

7   Q.  Did you, in fact, kick her?

8   A.  No, I did not kick her.

9   Q.  Had both of you been drinking?

09:06  10   A.  Yes, we had both been drinking.

11   Q.  Do you accept responsibility for what you did on that

12   night?

13   A.  Yes, I do.

14   Q.  That's all the questions.

09:06  15   A.  And --

16   Q.  I'm sorry.  Go ahead.

17                   THE COURT:  Thank you, Counselor.

18                   MR. ESTEFAN:  Unless he wanted to finish his answer,

19   your Honor, I'm sorry.

09:06  20   A.  I was just going to reiterate how much I regret that it

21   happened, and I'm really appreciative that my wife was able to

22   forgive me.  That's it.

23                   MR. ESTEFAN:  Thank you, Kallan.

24                      Pass the witnesses, your Honor.

09:07  25                   MS. CATES:  I don't have any additional questions.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:07  1          MR. McKINNEY:  I have nothing, your Honor.

2          THE COURT:  Okay.  You may step down.  You're free to

3    go.  Thank you very much.

4          THE WITNESS:  To my knowledge, I was allowed to stay

09:07  5    in court after I testified?

6          MR. ESTEFAN:  Yes, I think we have that agreement.

7          THE COURT:  Okay.  Yes, you may.

8          MR. ESTEFAN:  Your Honor, plaintiffs call Thomas King

9    to the stand.

09:07  10          THE COURT:  Very well.

11          *(Witness being summoned to the stand)*

12          THE COURT:  Make your way up here.  This will be your

13    seat.  Mrs. Loewe will administer the oath before you take your

14    seat.

09:08  15          MS. LOEWE:  Do you solemnly swear the testimony you're

16    about to give in the matter now before the Court will be the

17    truth, the whole truth, and nothing but the truth?

18          THE WITNESS:  I do.

19          THE COURT:  Yes, sir.  If you would try to adjust the

09:08  20    mic so you can speak directly into it.

21          You may proceed.

22          MR. ESTEFAN:  Thank you, your Honor.

23          **THOMAS KING, DULY SWORN, TESTIFIED:**

24          **DIRECT EXAMINATION**

09:08  25    BY MR. ESTEFAN:

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:08  1   Q.  And you may need to pull that microphone a little closer,

2   Mr. King, please.

3   A.  How about that?

4   Q.  I don't think the jury can hear you.

09:08  5   A.  How about that?

6   Q.  A little better.

7   A.  Is that better?

8        THE COURT:  That's better.  I think we can do it.

9   BY MR. ESTEFAN:

09:08  10  Q.  Please keep your voice up.  Thank you, sir.

11  A.  Yes, sir.

12  Q.  Please state your name.

13  A.  Thomas William King.

14  Q.  Mr. King, what is your background, please?

09:08  15  A.  I'm a Board certified vocational rehabilitation counselor.

16  Q.  What does that mean, first of all, to be Board certified?

17  A.  To be Board certified, you have to take a rehabilitation

18  test and have educational experience in vocational

19  rehabilitation.  It's through the Certified Rehabilitation

09:09  20  Counselors Society in Chicago, Illinois.

21  Q.  And I think you alluded to it just now in your answer, but

22  is a vocational rehabilitation counselor someone who helps

23  people try to find work that's suitable for their limitations?

24  A.  Yes, sir, that is basically what we do.  We work with

09:09  25  people that are physically or mentally impaired, assess their

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:09   1   limitations to employment and then address what they need as

2   far as skills or training or other services in order to help

3   them go back to work.

4   Q.  Mr. King, can you tell us about your education, please,

09:09   5   probably starting with college?

6   A.  Yes, sir.  I obtained my Bachelor's of Science from

7   Mississippi State University in 1974.  I also received my

8   Master's of education in vocational rehabilitation counseling

9   from Mississippi State University in 1976.

09:10   10              Upon graduation, I moved to Texas and went to

11   work for the Texas Rehabilitation Commission in La Marque,

12   Texas.

13   Q.  Is most of the work that you have done in your work life as

14   a vocational rehabilitation counselor, I believe?

09:10   15   A.  It has, yes, sir.  I've worked for the -- as I just

16   testified to, for the Texas Rehabilitation Commission.  I've

17   worked for insurance companies as a vocational rehabilitation

18   counselor and case manager.  I've worked for -- I've been

19   self-employed since 1995, providing rehabilitation services to

09:10   20   different individuals, insurance companies.

21   Q.  Will you give any opinions that you give today to a

22   reasonable degree of probability?

23   A.  Yes.

24   Q.  Why are you involved in this case for Jamie Leigh Jones?

09:11   25   A.  I was contacted to meet with Ms. Jones to provide a

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:11   1   vocational assessment of her -- in their office.

2   Q.  When you say "they," you mean us, Jamie's lawyers?

3   A.  Yes.

4   Q.  And you're being paid for the time spent doing the work

09:11   5   you're doing, right?

6   A.  I am, yes, sir.

7   Q.  How much are you being paid?

8   A.  My fee for these services are $250 an hour.

9   Q.  How many hours have you spent on this case?

09:11   10   A.  I think my billing to this point has been around $5,000.

11   Q.  Thank you.  So, what are you here to tell us about Jamie

12   Leigh Jones?

13   A.  Today I would -- I can go over what my assessment was and

14   after I completed around about a two and a half -- about a

09:11   15   two-hour and ten-minute interview with her to do the vocational

16   assessment back in 2011.

17   Q.  Okay.  And then to form your conclusions, there are factors

18   that you take into account to get to that conclusion or

19   conclusions.  Is that a fair statement?

09:12   20   A.  Yes, sir, that is.

21   Q.  What factors are those, Mr. King?

22   A.  That is based on -- a vocational rehabilitation counselor

23   would meet with the individual, do an assessment, as far as an

24   interview with them to get background information, what type of

09:12   25   injury they had, how that injury occurred, what type of

09:12   1   treatment, what current treatment they're under, what
        2   limitations they feel like, what their doctors feel like they
        3   have as far as going back to work, and then making --
        4   addressing what a vocational rehabilitation counselor could do
09:12   5   for that individual to help them go back to work after that
        6   incident.
        7   Q.  You also factor in their employment history?
        8   A.  We do a complete employment history, starting with their
        9   first, what we call "substantial," gainful employment of a
09:12  10   person at a young age up to their current employment status or
       11   wherever -- the last job that they worked, up until their
       12   injury.
       13   Q.  Okay.  And so, you said that you had a two-hour and
       14   ten-minute meeting with Ms. Jones during which you did your
09:13  15   assessment?
       16   A.  I did, yes, sir.
       17   Q.  And you've looked at some other documents and records to
       18   arrive at your conclusions?
       19   A.  I did.
09:13  20   Q.  And what conclusions have you made as far as Jamie's
       21   employ -- I guess -- is "employability" the right word?  Or
       22   maybe "capacity for work"?
       23   A.  Yes.  I would say we arrived -- I arrived at that based
       24   on -- due to the -- her situation and the 2005 accident that
09:13  25   she had, it was a long period of time until a vocational

09:13  1    rehabilitation counselor did an assessment on her.  So, in her

2    situation, after the situation in Iraq, she decided -- she went

3    back to school, obtained her college degree, obtained her

4    Master's degree, and then went to work as a teacher.  So, she

09:14  5    provided herself with a lot of rehabilitation type services

6    without actually contacting a rehabilitation professional.

7              So, in this situation the -- myself, I got

8    involved with the case after all that had been done.  And she

9    had really found an appropriate field to go back to work in

09:14  10   based on her limitations to work, from her incident in Iraq,

11   and was pursuing that at this point.  So, in my report I stated

12   what she was doing, the type of income she was making currently

13   as a college instructor, and what she could make in the future.

14             And based on my expertise and opinion, it's a

09:14  15   very appropriate job.  I would -- a counselor would say that

16   she is in an occupation that is very appropriate for her

17   limitation to employment, and she seems to be doing as well as

18   expected at this point in her work.

19   Q.  Are the methods that you use to arrive at your conclusions

09:15  20   standard methods for professionals in your field?

21   A.  Yes.  Any vocational counselor would -- how I arrived at my

22   assessment, conclusions, and recommendations, any -- any

23   certified vocational rehabilitation counselor would use the

24   same methods.

09:15  25   Q.  Are these methods that you used also used outside the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

context of litigation?

A.   Yes.   I work with people through insurance companies,

private individuals, any type of assessment you would -- you

would do this -- basically an initial vocational assessment

would be done with any individual in any capacity, you know,

from any referral source would be done the same way.

Q.   During your interview with Jamie, did she have trouble

remembering dates and time frames and which company she worked

for?

A.   That was -- I would say that was her primary issue at

times, remembering specific dates, how long she worked for

different employers, specific salaries, et cetera.   That was

probably a general issue through the entire assessment of that

area.

Q.   So, how did you get the accurate information about her past

employment?

A.   Basically, I took the information from the tax returns in

the record, employment records that were supplied, to match up

what income she was making from her previous past employment.

Q.   Do you know what her immediate past job was prior to the

assault?

A.   That would have been work with the Kingwood Christian

School.

Q.   No.   I'm sorry.   The one -- her employment prior to the

assault in Iraq?

09:17  1   A.  Oh, excuse me.  That would have been with KBR.  She was

2   going to be an information technologist there in Iraq.

3   Q.  Could Jamie work full-time today in her previous career as

4   an information technology technician?

09:17  5   A.  I would say no, I don't believe.  Based on her symptoms and

6   her work limitations and reviewing the records that I reviewed

7   for my assessment, I don't believe she could have returned to

8   that type of work.

9   Q.  What is it that is causing Jamie the limitations that

09:17  10  you're describing?

11  A.  I think it's -- from her description in our assessment, she

12  had some problems with being around crowds of people.  Just

13  being in an information technology type job, she would be

14  having flashbacks if she went back to that type of work.

09:18  15         She made a decision after the incident to not

16  return to that type of work and pursue college; and she was not

17  going to go back and do that type of work.  So, she pursued,

18  you know, an alternative shortly thereafter.

19  Q.  Well, an information technology person, I suppose, could

09:18  20  work remotely from home or somewhere on the phone.  Is that

21  possible?

22  A.  Yes, a person could work from their home, could be hooked

23  up working, you know, by telephone or -- of that nature.

24  Q.  Is that reasonable to expect her to limit her career

09:18  25  opportunities to having to work from a phone at home?

09:18   1    A.  Yes, I would think that would limit her substantially

       2    because typically a homebound --

       3           THE COURT:  I don't think that was quite the question.

       4    Maybe you could pose the question again.

09:19   5    BY MR. ESTEFAN:

       6    Q.  The question is, is it reasonable for her to be limited

       7    such -- in her career field, to having to be at home, using a

       8    phone to do her job?

       9    A.  No.

09:19  10    Q.  In fact, did KBR, pre-assault, find Jamie qualified to earn

      11    the 110,000-plus-dollar salary that they were paying her?

      12    A.  That is correct, yes, sir.  She was started out in -- as an

      13    administrative clerk and then was promoted to an information

      14    technologist.

09:19  15    Q.  During your assessment, when you were visiting with Jamie,

      16    were there any attorneys present in that meeting with you and

      17    Jamie?

      18    A.  There was not.

      19    Q.  Why not?

09:19  20    A.  I didn't -- there was not a need for anyone to sit in.  She

      21    didn't -- she felt okay, comfortable with sitting in with me

      22    doing the assessment after explanation.

      23    Q.  And you -- currently you know that Jamie works part time as

      24    a college professor?

09:20  25    A.  Yes, sir.

09:20 1   Q.  And is that a reasonable position for her to hold, given

2   her limitations?

3   A.  Yes, sir.

4       MR. ESTEFAN:  Pass the witness, your Honor.

09:20 5       THE COURT:  All right.

6                     **CROSS-EXAMINATION**

7   BY MR. McKINNEY:

8   Q.  Good morning.

9   A.  Morning.

09:20 10  Q.  I'm Andrew McKinney.  I represent Charles Bortz.  I've been

11  practicing law 31 years.  I don't think you and I have ever

12  met.

13  A.  No, sir.

14  Q.  Let's go back a little bit.  When were you first contacted

09:20 15  by the attorneys for Ms. Jones to act as a vocational rehab

16  expert in this case?

17  A.  I believe I would have -- I did the interview April 5th,

18  and it was probably a couple of weeks prior to that.  I don't

19  know the exact date.

09:20 20  Q.  Do you have an office?

21  A.  I have -- I work out of my home.

22  Q.  All right.  And so, when you interviewed Ms. Jones, where

23  did you interview her?

24  A.  I interviewed Ms. Jones in a conference room at the Kelly

09:21 25  Law Firm office.

09:21    1    Q.  And is that customarily -- and I say -- that was a poorly

2    phrased question.

3           When you interview or evaluate or assess a client

4    such as Ms. Jones, do you typically do that in the offices of

09:21    5    the attorney that has retained you?

6    A.  Yes, sir, you could.  I mean, it -- it can be done there,

7    it can be done at their residence.  And I would like to correct

8    myself.  I do have an executive suite.  I can interview people

9    in an executive suite if I need to.

09:21    10    Q.  All right.  And just in case it matters to anyone, how much

11    of your work is directly for lawyers or companies that are

12    either suing or being sued?

13    A.  I would say probably about 1 percent.

14    Q.  All right.  So, you don't do this very often?

09:22    15    A.  No.

16    Q.  All right.  When you met with Ms. Jones, did you bring with

17    you any industry recognized skills or competency or

18    intelligence type tests that you administered to Ms. Jones to

19    determine what her skill level was, what her competency was in

09:22    20    a given field?

21    A.  No, sir.  I -- because I -- I could have; but based on the

22    information that I had received, she had obtained a college

23    degree and was currently working.  So, at that point I did not

24    feel like -- a need to provide any type of testing under that

09:23    25    situation.

*Cheryll K. Barron, CSR, CM, FCRR*           *713.250.5585*

09:23  1    Q.  All right.  Now, are you familiar with the fact that many,

       2    many companies hire many, many people with college degrees?

       3    A.  Yes, sir.

       4    Q.  And that many, many of those companies, before hiring

09:23  5    someone with a college degree, administer competency, skill,

       6    intelligence, and other tests to assess whether the person is a

       7    good fit for a particular position?

       8    A.  Yes, sir, of course.

       9    Q.  That's widely done in the private sector, is it not?

09:23 10    A.  I don't know the statistics of that.  I would say that some

      11    do, yes, sir.

      12    Q.  All right.  And so that our jury understands who you are

      13    and what you do, you're not a medical doctor?

      14    A.  That is correct.

09:23 15    Q.  And you're not a psychiatrist or psychologist?

      16    A.  That is correct.

      17    Q.  And so, you don't have any more ability to read and

      18    interpret medical records and psychiatric and psychological

      19    testing, diagnostic studies run by physicians than, say, the

09:24 20    lawyers in this room.  Would that be fair?

      21    A.  Well, I would say that -- I mean, I have experience in my

      22    field, of reviewing records.  I cannot make diagnosis; but I

      23    can look at that and say, you know, "Here's limitations from

      24    anxiety or concentration problems," that a person might have

09:24 25    from an employment standpoint.

09:24    1              That's how I would review those.

2    Q.  All right.  All right.  Now, in your report -- and I

3    believe your report has been used by the next expert that the

4    jury will hear from as a basis for calculating Ms. Jones'

09:24    5    economic damages.  In your report, you compare Ms. Jones' wage

6    loss to other college instructors?

7    A.  Yes, sir.

8    Q.  And you went online somewhere and found an average salary

9    for all college instructors in the State of Texas?

09:25   10    A.  Yes, sir.  That -- those documents and that wage

11    information was for the State of Texas.

12    Q.  All right.  Now, was there a distinction made in the

13    database that you accessed for Ms. Jones -- for the wage data

14    that you used for comparative purposes, was there a distinction

09:25   15    made in the database between college instructors or -- and

16    college professors?

17    A.  That would be based on a college instructor, not a tenured

18    professor.

19    Q.  Not a tenured professor?

09:25   20    A.  Right.

21    Q.  All right.  Did you happen to bring with you today the

22    database explanation of what college instructors were

23    determined to be for purposes of establishing the average wage?

24    A.  I do not have that specific data with me, but it can be

09:26   25    obtained.

09:26  1    Q.  Well, for example, was the figure that you used in your
2    report, was that based on all college instructors, those from
3    entry level through 40 years experience?
4    A.  It would be based on -- from entry level to, say, a
09:26  5    professor that has been there for a long period of time.
6    Q.  And does it include professors?
7    A.  It includes college instructors, professors.  It's kind of
8    a broad area.
9    Q.  I'm trying to -- yes.  And I'm trying to find out how broad
09:26  10   it is.  Does it include engineering professors at
11   Rice University, for example?  Is that part of the database?
12   A.  To briefly explain that, I mean, how that was -- how the
13   wage information was arrived, the -- to just give a little
14   background about that, the Bureau of Labor Statistics provides
09:27  15   information from a government standpoint on occupations and
16   wages.  Then the Texas Workforce Commission then takes that
17   information and looks at what occupation and wages are in the
18   State of Texas for those jobs.  And that's how I arrived at
19   those employment numbers.
09:27  20          So, it's the -- there's not a specific breakdown
21   of how many would be at Rice University or how many would be at
22   UT.  It's more of taking all the professors and college
23   instructors at all the major universities, junior colleges,
24   et cetera, in the State of Texas.
09:27  25   Q.  I understand.  And what you're telling us and telling our

09:27   1   jury is that, if you take all of the engineering professors at

        2   Rice University and all of the biology professors at the

        3   University of Texas and those that have been teaching for

        4   40 years and have written many, many books and if you take all

09:28   5   of their annual salaries and benefits and you average them in

        6   with folks like Ms. Jones, who is at an entry level and does

        7   not have a PhD, the average number from bottom to top,

        8   sideways, throughout the state is approximately $82,000 or

        9   somewhere in that area?

09:28   10  A.  Somewhere in that area, yes, sir.

        11  Q.  And you have taken this average figure of $82,000, which

        12  encompasses people with many, many years experience teaching

        13  who have -- are well published and well recognized in the

        14  field, you've taken that average figure of $82,000, you have

09:29   15  subtracted Ms. Jones' annual pay of 25 or $27,000, correct?

        16  A.  Yes, sir, that is correct, yes, sir.

        17  Q.  And you have opined in your report that if you subtract her

        18  entry-level salary from the average salary of all of these

        19  other folks, that produces a wage loss, correct?

09:29   20  A.  Yes, sir.

        21  Q.  But, in fact, Ms. Jones is at an entry level, correct?

        22  A.  She's -- I'm not sure I would say she's at an entry -- she

        23  is just beginning her teaching as a college instructor

        24  certainly.

09:29   25  Q.  She's a brand-new instructor?

09:29  1    A.  Right.

2    Q.  At a satellite campus?

3    A.  That's right, yes, sir.

4    Q.  To your knowledge she has not published in her field, which

09:30  5    is expected of college instructors, is it not?

6    A.  Yes, sir, typically if they stay.

7    Q.  She has not presented papers to any professional societies

8    or any academic societies, which, again, is something that

9    college professors and college instructors are expected to do

09:30  10   in order to advance in their careers?

11   A.  Yes, sir.

12   Q.  She has not achieved a PhD, nor does she appear to be

13   working toward a PhD, has she?

14   A.  At this point, no.

09:30  15   Q.  There are a substantial number of qualitative differences

16   between Ms. Jones, at her current stage in her academic career,

17   at her current stage in life, and the statistical average that

18   produces the 82,000-dollar number.  Isn't that so?

19   A.  Yes, sir.

09:30  20   Q.  And so, really and truly, taking Ms. Jones, as an

21   entry-level person or a beginning instructor, and comparing her

22   to the average of all college professors throughout the State

23   of Texas and saying that her wage loss is their average wage

24   minus her average wage really is comparing apples to oranges,

09:31  25   isn't it?

09:31 1    A.  Well, I would say that those numbers that I gave in my

2    report, I mean, they take into account, I mean, like your

3    example of Rice professors, tenured professors that are

4    writing, all of this, to entry-level college professors.  So,

09:31 5    you would have some that would be making a couple of hundred

6    thousand a year to 20 -- you know, part-time instructors.  So,

7    I think they -- the Texas Workforce Commission takes all that

8    information in to come up with that median wage of that 89,000

9    that I put in the report.

09:31 10   Q.  Yes, sir.  But the point is that you don't have a number

11   for other part-time instructors in your report, under the same

12   or similar circumstances as Ms. Jones, for us -- for our jury

13   to use for comparative purposes?

14   A.  Not -- no, not today but that information could be

09:32 15   obtained, I would feel sure, through the Texas Workforce

16   Commission.

17   Q.  Right.  And if you had wanted to, for example, you could

18   have gone out and found the precise wage data for someone in

19   Ms. Jones' statistical cohort and compared that precise wage

09:32 20   data to Ms. Jones' wage data and come up with a more comparable

21   number, could you not?

22   A.  You could have looked more specifically at part-time

23   workers, yes, sir.

24   Q.  Yes, sir.  Now, when it comes to someone's decision to work

09:33 25   part time or full time, that can be for any number of reasons,

09:33  1   can it not?

2   A.  Yes, sir.

3   Q.  It can be a lifestyle choice, correct?

4   A.  Yes, sir, it could be.

09:33  5   Q.  It can be the fact that, like Ms. Jones or my law partner,

6   Kim Cooper, kids at the house, cut back on your hours.  A lot

7   of women make that decision, do they not, with small children

8   at home?

9   A.  They do.

09:33  10   Q.  Some folks are doing part-time work because in their chosen

11   or preferred field, there's no full-time work available.

12   A.  That would be correct also.

13   Q.  Career advancement depends -- is not a statistical issue,

14   it depends on the individual, correct?

09:33  15   A.  Yes, that is correct.

16   Q.  Every person brings to a job his own particular unique

17   skills, abilities, intelligence, application, ambition,

18   et cetera, correct?

19   A.  Yes, sir.

09:34  20   Q.  And statistics cannot tell us how far in life Ms. Jones

21   will go, can they?

22   A.  No, sir.

23   Q.  Ms. Jones herself is the captain of her fate in that

24   regard, correct?

09:34  25   A.  Yes, sir.

09:34  1          MR. McKINNEY:  Pass the witness.

2          THE COURT:  Okay.  Mr. Hedges.

3                 How long do you plan to be?

4          MR. HEDGES:  Five minutes.

09:34  5          THE COURT:  Okay.

6                        **CROSS-EXAMINATION**

7    BY MR. HEDGES:

8    Q.  Mr. King, I think you testified that Ms. Jones was making

9    somewhere in the vicinity of $110,000 with KBR at the time she

09:34  10   left them?

11   A.  Yes, sir, that was -- I think that was her contract that

12   she was going to be paid.

13   Q.  And that's a one-year contract, correct?

14   A.  Yes, sir, I think from the records that was a one-year

09:34  15   contract.

16   Q.  And it includes working 84 hours a week?

17   A.  I don't know the exact number.  I think that was -- it was

18   close to that, yes, sir.

19   Q.  And it involves hazard pay for being in a war zone?

09:35  20   A.  Yes, that would be correct, yes, sir.

21   Q.  So, the jury should not take that 110,000-dollar figure and

22   run it out for any period of time more than just that one year.

23   Is that fair?

24   A.  For a one-year contract, that would be fair, yes, sir.

09:35  25   Q.  Plaintiffs' counsel asked you a question about limiting --

09:35  1   would it be fair to limit Ms. Jones to working from home.  I'm

2   pretty confident that you counsel an awful lot of people who

3   do, in fact, work out of their homes.  Is that fair?

4   A.  I would not say a lot; but yes, I do.  Some people, based

09:35  5   on their limitations from their injuries, are only capable of

6   working out of their home.

7   Q.  And don't you work out of your home?

8   A.  I do work out of my home.

9   Q.  Does that limit you?

09:35  10  A.  No, it doesn't.

11  Q.  And isn't IT work, particularly working with computers,

12  particularly compatible with working at home?

13  A.  I think I would say overall that some -- some IT people do

14  work out of their homes.  I don't know the exact percentage,

09:36  15  but there are homebound --

16  Q.  Don't some IT people who work for Fortune 500 companies out

17  of their homes make a very good living?

18  A.  I would think so, yes, sir.

19  Q.  And one last area.  Did I understand you to say that

09:36  20  Ms. Jones was concerned that if she went back to doing IT work,

21  she would have flashbacks?

22  A.  She had mentioned that in our assessment of, you know --

23  Q.  Had she done any IT work since returning from Iraq?

24  A.  I don't believe so.

09:36  25  Q.  So, it wasn't like she had tried to do some IT work and it

09:36  1    caused a flashback.  She was just concerned that if she did IT

2    work, she might have a flashback?

3    A.  I would -- yes, I would agree with that, yes, sir.

4    Q.  Did she really tell you that working around computers might

09:37  5    cause her to have a flashback to a rape?

6    A.  No, we did not specifically discuss that notion.

7                MR. HEDGES:  Pass the witness, your Honor.

8                THE COURT:  Let's take our morning break, please.

9                     Would all rise?

10   *(Recess was taken from 9:37 a.m. to 9:52 a.m.)*

11   *(Jury not present)*

12               THE COURT:  We need voir dire?

13               MR. KELLY:  Before that, I have one issue.

14               THE COURT:  Yes, sir.

09:52  15               MR. KELLY:  I guess it's a little bit delicate for me;

16   but at -- the last time we were having a bench conference, the

17   Court made the comment, "It is one of recent fabrication," and

18   it was overheard by the jury.  I am told by people at my

19   counsel table that the jury definitely took notice.

09:53  20               THE COURT:  Well, your table has repeatedly said

21   things that the jury has overheard, just repeatedly, including

22   Ms. Jones herself.

23               MR. KELLY:  Your Honor, this prejudices my client with

24   that coming from the Court.  What we would like to do -- and I

09:53  25   actually -- we're looking for an e-mail right now so maybe I

09:53   1   can convince the Court that it is not one of recent

2   fabrication.  I've made the representation --

3           THE COURT:  Definitely recent, right?

4           MR. KELLY:  It's recent, but it's not a recent

09:53   5   fabrication.

6           THE COURT:  If there's any truth to it, why did you

7   not ask her husband about it, or her mother about it?

8           MR. KELLY:  Well, first of all, her husband wasn't

9   around during that time frame, your Honor.  She didn't even

09:53   10  meet him until well after that fact.

11          THE COURT:  In all these years together, she never

12  went into that?

13          MR. KELLY:  Her husband has tried to stay away from

14  the facts of the case for reasons that he's testified to.

09:54   15          But the other thing is, your Honor, as an officer

16  of the court -- and I'll urge it again -- I was present when

17  Patty Chapman reminded Jamie.  I watched Jamie light up and go,

18  "Oh, my, God, yes, I remember."

19          This is not one of recent fabrication.  This is

09:54   20  one of recent recollection, but not recent fabrication.  And

21  the jury heard -- and actually, we're looking for an e-mail

22  that I hopefully can use to at least convince the Court that,

23  in fact, this is true.  But I understand we haven't convinced

24  the Court of our position.  However --

09:54   25          THE COURT:  Well, the Court doesn't have a position on

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:54  1    whether -- who's right and who's wrong.  But that

2    unquestionably is very recent and the -- why was her mother not

3    asked about it?  She's somebody who allegedly heard this.

4         MR. KELLY:  Well, I didn't present her mother.  So,

09:54  5    I'll defer to --

6         THE COURT:  But anyway, repeatedly the jury has heard

7    things.  That just has happened.

8         MR. KELLY:  Your Honor, the jury has heard now the

9    Court use the word "fabrication" in response to Ms. Jones -- or

09:54  10   in reference to Ms. Jones.

11        THE COURT:  What do you want me to do?

12        MR. KELLY:  I want you to allow me to bring

13   Ms. Chapman in here to prove that it was not a fabrication,

14   your Honor.  Because I can prove it.  The jury has heard the

09:55  15   Court say that my client fabricates --

16        THE COURT:  I'm not going to accept that until we hear

17   from the jury but --

18             Yes, sir.

19        MR. HEDGES:  I was just going to say, aside from

09:55  20   whether it's a recent fabrication or not, it is the grossest

21   form of hearsay.  It's a self-serving statement made by the

22   plaintiff, supposedly, to somebody with Congressman Poe's

23   office.  She herself has said it from the stand.

24             So, it's out there to then bring in someone else

09:55  25   who says, "well, six years ago, she said it to me.  I have no

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:55  1    idea whether it's true or not, but she said it to me," which is

    2    remarkable hearsay.

    3            MS. VORPAHL:  Especially given the fact that they've

    4    known about this witness for a long time.  Ms. Jones herself

09:55  5    said that she had met with or talked to Patty Chapman in times

    6    past, recently reconnected with her a week ago Sunday or

    7    something like that.  Her name is all over the Poe records.

    8    They could have designated her if they thought she was that

    9    important.

09:56  10           MR. KELLY:  As is typical, when Ms. Vorpahl represents

    11   what's happened on the plaintiffs' side, your Honor, she makes

    12   assumptions that are not true.

    13           MR. McKINNEY:  Excuse me.

    14           THE COURT:  You did try to depose her?

09:56  15           MR. KELLY:  No.  But this idea that we've had these

    16   ongoing conversations in the past with Ms. Chapman and that

    17   there was -- no.  Ms. Chapman was contacted as "the lady at Ted

    18   Poe's office."  While her name may be in the records, her

    19   import was not known to me until Sunday a week -- a week ago

09:56  20   from this past Sunday, when she contacted us after hearing news

    21   of this trial beginning.

    22           MS. VORPAHL:  I didn't say that her import was known

    23   to you for a long time, Mr. Kelly.  I said that I believe that

    24   your client testified that she had prior contact with Patty

09:56  25   Chapman and then it was after the trial began that she had

09:57   1    contact with her again.

2                    I believe allowing Patty Chapman to come here and

3    testify, given that she was not designated and she was well

4    known to the plaintiffs or should have been well known to the

09:57   5    plaintiffs for a long time, would be improper.

6              MR. KELLY:  The record about what you said about me

7    will speak for itself, Ms. Vorpahl.

8              THE COURT:  Why is it admissible?

9              MR. KELLY:  Why what, your Honor?

09:57   10             THE COURT:  Why is anything she said admissible?

11             MR. KELLY:  Well, it certainly goes to show -- with

12   respect to Ms. Jones' comment, it is her present sense

13   impression because it certainly goes to her fear at the time

14   that she's in the trailer.  As to --

09:57   15             THE COURT:  What we're worried about is the statement

16   made a week ago or whatever --

17             MR. KELLY:  Right.

18             THE COURT:  -- by Ms. Chapman.  What is --

19             MR. KELLY:  As to Ms. Chapman, it goes to rebut a

09:57   20   presumption of a recent fabrication, your Honor.

21             THE COURT:  I need a hearsay exception, though.

22             MR. KELLY:  That is it.  It's -- it's not being

23   admitted for the truth of the matter asserted, your Honor.

24   It's being admitted to rebut the presumption of a recent

09:58   25   fabrication.  And that is classically non-hearsay.

09:58   1          MS. HOLCOMBE:  The only way that would rebut a recent

2       fabrication is to very much say that the statement was, in

3       fact, true --

4                  MR. KELLY:  No.

09:58   5          MS. HOLCOMBE:  -- which goes to the very heart of it.

6               Furthermore, your Honor, I would just add that

7       even if -- assuming it is correct that Ms. Jones had a

8       recovered memory six years later, her father and her mother

9       have not had recovered memories, they're not suffering from the

09:58   10      same post-traumatic stress syndrome she's claiming.  There has

11      been media.  They've gone over the story over and over.

12      There's been a book where they've gone over and over and over

13      these stories, where her mother even helped her write the book,

14      where she --

09:58   15         THE COURT:  And her husband.

16         MS. HOLCOMBE:  And her husband.  And yet, even the

17      three of them -- or just the two of them, mother and father,

18      have never brought it back to Ms. Jones' attention until just

19      recently.  And yet they weren't even asked -- or Ms. Jones --

09:58   20      Ms. Breanna Morgan was not asked about that on the stand, where

21      we could have avoided the very hearsay concern that this --

22      what is enveloping this Court now with Ms. Chapman's testimony.

23      And that was something they chose not to --

24              Sorry, Mr. McKinney.  You have not gotten a

09:59   25      chance to speak.

09:59    1          MR. McKINNEY:  If I may, the -- to bring us back to

         2    how this subject came up, we had a bench conference and the

         3    Court --

         4          THE COURT:  It was an unnecessary bench conference; I

09:59    5    will point that out, too.

         6          MR. McKINNEY:  Yes, it was an unnecessary bench

         7    conference.

         8          And it was, I believe, at the urging of Mr. Kelly

         9    that the subject of Ms. Chapman came up at the bench

09:59   10    conference, off topic.  And I believe the Court did say

        11    something about a recent fabrication.  However, I believe the

        12    Court -- and the record will speak for this -- immediately

        13    modified the Court's take on that.  I don't know that the jury

        14    has heard it.  I don't know that the jury is unduly influenced

10:00   15    by it.

        16          THE COURT:  I don't know if the jury -- recent

        17    fabrication of what?  I mean, what?  Ms. Chapman?  We don't

        18    know.

        19          The jury has heard about our bench conferences.

10:00   20    That's one of the frailties with the technology in here.

        21    Without knowing whether I was referring to Ms. Chapman or

        22    Ms. Jones or somebody else different, I'm not terribly worried

        23    about it.

        24          MS. HOLCOMBE:  Or even counsel.  It could have been a

10:00   25    recent fabrication of one of us, too.  There's no way to know.

10:00   1          MR. KELLY:  Your Honor, with all due respect, taken in

2      context, based upon the timing of the bench conference, based

3      upon the testimony that had just been done, based upon the fact

4      that I was being prevented from cross-examining the witness the

10:00   5      way I wanted to do so, which I could have --

6          THE COURT:  You should have done it in the deposition.

7          MR. KELLY:  Your Honor, things are learned as the

8      discovery goes on; and some of the things that I knew about her

9      dishonesty were learned after her deposition.  And she was

10:01  10      brought here; and I was not permitted to impeach her, your

11      Honor.  And that was the reason for the bench conference.  And

12      I informed the Court -- I think the term that I used was, "It's

13      hard to try a case when my wings are clipped."

14          THE COURT:  Well, your questions got farther and

10:01  15      farther off the subject.  And we have, in the form jury

16      instructions' at the closing of the case, the statement that

17      the mistakes about immaterial facts should not be treated as

18      worthy of impeaching a witness.

19              Whether she ate a kiwi or an apple, whether she

10:01  20      was strapped or unstrapped in the aircraft, none of that went

21      to impeach her for the one reason, the single reason we had her

22      connected inter-continentally to ask her about this case.  That

23      was simply did she ever say anything like that.

24              She said no.

10:02  25              It was asked about by several of us, including

10:02   1   me.

2          MR. KELLY:  In which case, your Honor, if that's -- if

3   that's the case, then we are certainly entitled to bring a

4   rebuttal witness.  And it doesn't matter how long we've known

10:02   5   or whether we ever put on --

6          THE COURT:  I couldn't let the evidence in anyway.

7   It's hearsay.

8          MR. KELLY:  Your Honor, it's not hearsay.  We -- it is

9   not being offered to prove the matters -- the matter asserted.

10:02   10   We're not trying to prove that a woman was raped, killed, and

11   buried in Iraq.  That's not our intent.

12          Our intent is to prove that Ms. Jones believed it

13   and that she communicated it back on July the 28th of 2005.

14   That's what we're offering it to prove, not that rape, murder,

10:02   15   and burial occurred.

16          THE COURT:  It would have been much more effective if

17   you had just asked her mother about that.  Why didn't you do

18   that?

19          MR. KELLY:  Well, your Honor, again, I didn't have her

10:02   20   mother on the stand.  But is -- with all due respect, your

21   Honor, that's the Court telling me how I should try my case.

22          THE COURT:  No.

23          MR. KELLY:  The hearsay -- or the comment here is not

24   hearsay.  The rules make that very clear.  And I'm frustrated

10:03   25   again, I know, your Honor; and I apologize for that.  But I'm

10:03  1   frustrated because there's no doubt in my mind this is not

2   hearsay, your Honor.  It's not being offered for the truth of

3   the matter asserted.

4           THE COURT:  If somebody were to come in and testify

10:03  5   she didn't eat kiwi, she ate an apricot, that would be

6   something that went not to the truth of the matter asserted but

7   whether it was said.  The quote you're wanting to get in from

8   Ms. Chapman is of no relevance to the case whatsoever unless

9   there's some truth to it.  If there's not truth to it, then it

10:03  10  just -- it's not a statement we need to hear about.

11          MR. KELLY:  That's not true, your Honor.

12          MR. McKINNEY:  Judge, excuse me.  Excuse me.  Pardon

13  me.

14          Ms. Chapman's statement, most charitably viewed,

10:03  15  is an out-of-court statement offered to prove a spontaneous

16  memory -- a memory that was spontaneously refreshed.  And it's

17  being offered for the truth -- the truth that the statement

18  was, in fact, made to refresh the witness' recollection of a

19  statement the witness now claims to have heard.  That is all

10:04  20  out-of-court hearsay.

21          And moreover, the indicia -- or the opposite of

22  the indicia of reliability, at a lawyer's office, in a lawyer's

23  presence, during trial, six years after the fact.  Nothing

24  about the Chapman, Jones, Kelly dialogue that day lends itself

10:04  25  to any exception to the hearsay rule.  The Court's ruling is

10:04  1    correct.

2               We need to move on because we have -- I have an
3    expert witness motion I need to make before the jury comes back
4    in.

10:05  5               THE COURT:  And the -- it would be more tempting to me
6    to introduce another witness whom they've not had a chance to
7    depose and they perhaps haven't spoken with at all if you had
8    used what was available to you to confirm the statement as
9    having been said.  You had Ms. Jones -- you had Ms. Morgan on
10:05 10   the stand.  Nobody asked about it then.  And it doesn't matter
11   which lawyer -- your side did not choose to ask about it.

12              Her husband was on the side that collaborated on
13   the book.  You didn't ask him about it.  And now you want to
14   bring somebody way outside the bounds of this case and ask her
10:05 15   about it.  I just -- when you don't use the tools that are
16   available, your argument that we need another tool is really
17   substantially attenuated.

18              MR. KELLY:  Your Honor, I know I've lost this argument
19   with you.  But with all due respect, I disagree with the
10:05 20   Court's ruling.

21              THE COURT:  All right.

22              MR. McKINNEY:  Judge, on another matter, if I could
23   have a moment.

24              THE COURT:  I want to say -- have a word with Steph.
10:06 25              You, too.

10:07    1          *(Judge leaves courtroom briefly)*

         2                  THE COURT:  Okay.  Where is everybody?

         3                  MR. ESTEFAN:  We're hiding, Judge.

         4                  THE COURT:  Yeah.  I'm reminded that the -- at that

10:07    5          bench conference, I did see a hand waved to keep voices down.

         6          And it was a perception of at least one person that the voice

         7          that being heard was Mr. Kelly's.  Now, that may or may not

         8          be right.  But, really, we've seen continuing signaling from

         9          your table.

10:07   10                  I mean, Ms. Jones was laughing when her husband

        11          testified about her calling him a dick.  I mean, she's

        12          repeatedly done that.  I just -- I've had to caution you on the

        13          record a couple of times about that.  I do so again now.

        14                  But anyway, the closing instructions we give also

10:08   15          say that anything a judge says is not -- should not be of any

        16          influence on the jury.  And, so, they'll have to go first and

        17          decide what's a recent fabrication and who uttered it and then

        18          all the way to the proposition that because the Judge might

        19          have said it and it might have been about the recovered memory,

10:08   20          then perhaps we ought to be influenced by what the Judge said.

        21                  That's just so many logic leaps that I -- if you

        22          want me to give a corrective instruction about bench

        23          conferences are not to be viewed as evidence, I'm happy to do

        24          that.  But I think that draws more attention to whatever went

10:08   25          on there.  But, unquestionably, what's been said at bench

10:08    1    conferences has been heard by the jury a time or two,

2    unquestionably.  More than a time or two.

3                   Okay.  Let's get the voir dire back in here.

4              MR. McKINNEY:  Judge, I'm not sure that it's necessary

10:08    5    for me to voir dire the witness.  I think I can just report to

6    the Court what the situation is.

7                   The statistician economist who is calculating

8    future wage loss proceeds on four assumptions.  The first

9    assumption --

10:09   10              THE COURT:  Are we talking about the guy who just got

11    on the stand?

12              MR. McKINNEY:  No, Judge.  He's -- he will be the next

13    witness.  He will appear in about ten minutes.  And I thought

14    it would be best to deal with it now while the jury is out

10:09   15    rather than when the jury comes back in.

16              THE WITNESS:  Okay.

17              MR. McKINNEY:  He has four scenarios.  Each scenario

18    depends on a separate assumption.  And my objection to the --

19    to three out of the four scenarios is that there's no evidence

10:09   20    whatsoever in the record upon which to predicate the scenarios.

21                   Here's the situation.  Ms. Jones, of course, was

22    an IT technician, an IT person working for KBR; whatever

23    happens, happens; she comes back; she's now a college

24    professor.

10:09   25                   The statistician, the economist, projects wage

10:09   1   loss based on her being an IT technician or an IT person with

2   only a high school degree or diploma.  And that's his first

3   scenario, and that's valid.  I don't complain about that one.

4           He then has three additional scenarios, one based

10:10   5   upon her getting an Associate's degree in computer technology,

6   one getting a Bachelor's degree, and one getting a Master's

7   degree.  There's been no evidence in the record that Ms. Jones

8   ever intended to pursue higher education in the field of

9   computer science or computer technology and that, but for this

10:10   10   event, she has decided not to pursue that career avenue.

11          With each added degree level, the numbers become

12   quite larger.  And I'm simply saying --

13          THE COURT:  Did we hear about this in the motion in

14   limine stage?

10:10   15          MR. McKINNEY:  No, Judge, we didn't.  Probably should

16   have, but I think it will shorten the cross-examination and

17   shorten the direct --

18          THE COURT:  Okay.  Let me hear their response.

19          MR. ESTEFAN:  The response is, your Honor, that, in

10:10   20   fact, Ms. Jones is -- does have her Master's degree.  And it's

21   not whether she wanted to get an advanced degree in information

22   technology or whatever.  It is that she, in fact, does have an

23   advanced degree.  And we all know that people with advanced

24   degrees earn more income or have potential to earn more income

10:11   25   over their career.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:11  1          Beyond that, there was testimony, I believe, from

2     Ms. Jones and her résumé showed that she did, in fact, have

3     college hours prior to even beginning work at Halliburton.

4     Someone from their side elicited that testimony.  So, she had

10:11  5     made some -- some indication that she was going to college.

6          THE COURT:  Well, is this -- this person who's

7     qualified as an economist, does she teach or --

8          MR. McKINNEY:  It's a he.

9          MR. ESTEFAN:  It's a he, and he does.

10:11  10          MR. McKINNEY:  I'm not questioning the qualifications.

11     I'm simply questioning the opinion.

12          THE COURT:  Well, but a qualified economist would not

13     have done that, I wouldn't have thought.

14          MR. ESTEFAN:  He has four scenarios, Judge.

10:11  15          THE COURT:  I know.  And on that subject -- and I

16     haven't read the report.  This last expert, was he really

17     comparing Ms. Jones to people with, like, PhDs who are tenured

18     at Rice and UT?

19          MR. ESTEFAN:  Well, and we have an opinion -- I wasn't

10:12  20     finished.  You actually excused the jury without asking me

21     about redirect, your Honor.

22          THE COURT:  No.  We're coming back to redirect.

23          MR. ESTEFAN:  Okay.

24          THE COURT:  We're coming back to it.  I didn't say you

10:12  25     waived it.  We're coming back for it.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1    MR. ESTEFAN:  Okay.  He's comparing the average,

2  Judge.  And that's the point.

3    THE COURT:  Well, that is such bogus economics, such

4  bogus rehab.  I mean, really.  Anybody who's been to a college

5  knows the difference between somebody who's at the extension

6  school or the satellite campus or community college and is

7  teaching part time.  That's no comparison at all.  That's like

8  comparing somebody -- high school baseball players' to the

9  major league salaries.  I mean, it's just -- it's not remotely

10  close.

11    MR. McKINNEY:  In which case, I move to strike.

12    THE COURT:  Well, I'm going to let it go to the jury.

13      Was I wrong about that, though?  That's just --

14  that's a preposterous measure of damages.

15    MR. ESTEFAN:  Your Honor, I don't think that it's

16  preposterous.  Because in order for Ms. Jones or anybody to

17  have a chance to get to the 82,000 plus -- which is, by the

18  way, the average -- they got to start somewhere.  And, you

19  know, Mr. McKinney made a reference that he's a 31-year lawyer.

20  And I'd wager to say he makes more now than he did as a

21  first-year associate.  And that's just part of the progression

22  of a career.  And, so, in comparing one's average, you

23  necessarily have to look at --

24    THE COURT:  Well, it should have been -- okay.  Well,

25  that's already happened.  I'm not going to strike it.  I'm

10:13   1   going to let this economist testify, and we'll see what -- if

2   anything needs to be stricken, it will be.  But I'm going to

3   let it all come in.

4                Okay.  Let's get Mr. King back on the stand.

10:13   5           MR. ESTEFAN:  Your Honor, in thinking about it, I

6   don't have another question for Mr. King.  If the Court is

7   going to be -- if the Court is just going to let it be where it

8   is, then we're going to call Mr. Steward as our next witness.

9   We're going to call our next witness.

10:14   10          THE COURT:  We're going to excuse you.  Thank you,

11  Mr. King.

12          THE WITNESS:  Okay.  Thank you.

13      (Witness being summoned to the stand)

14          THE COURT:  Sir, make your way up here.  I'll

10:14   15  administer the oath before you take your seat.

16              In the matter now before the Court, do you swear

17  your testimony will be the truth, the whole truth, and nothing

18  but the truth?

19          THE WITNESS:  I do.

10:14   20          THE COURT:  Yes, sir.  Please be seated.

21              Everybody else may be seated, too.

22      (Jury present)

23          THE COURT:  Members of the jury, please be seated.

24              You have another witness.  Mr. King has been

10:15   25  excused.  This witness has already been sworn.

10:15  1    MR. ESTEFAN:  Your Honor, so I may introduce him, may

2 I proceed?

3    THE COURT:  You may.

4    **DWIGHT STEWARD, DULY SWORN, TESTIFIED:**

10:15  5      **DIRECT EXAMINATION**

6 BY MR. ESTEFAN:

7 Q.  Good morning.

8 A.  Good morning.

9 Q.  Would you state your name, please?

10:15  10 A.  Dwight Steward.

11 Q.  And you're Dr. Steward.  Is that correct?

12 A.  Yes, that's correct.

13 Q.  Okay.  And you might need to pull that microphone a little

14 closer to you, sir.

10:15  15    Can you give us your educational background,

16 please, starting with college?

17 A.  Sure.  I have an undergraduate degree in economics from the

18 University of Texas at Austin.  I'm also -- with a minor in

19 military science, as well.

10:15  20    After that, I took my undergraduate degree in

21 economics from UT.  I got a PhD in economics from the

22 University of Iowa.

23 Q.  Dr. Steward, can you tell us about your working experience,

24 please?

10:16  25 A.  Let's see.  In between undergraduate and graduate school, I

10:16   1    spent a little time on active duty as a field artillery

2    officer, just -- all state side.  And then, after graduate

3    school, I went to work at a consulting firm in College Station

4    for a couple of years and -- doing basically economics work.

10:16   5              Then after that -- let's see -- about six years

6    or so I spent at the University of Texas and also Sam Houston

7    State, teaching in the economics departments.  And for about

8    the last six, seven, eight years or so, I've been primarily

9    doing economic consulting.

10:16   10   Q.  Would you agree to state any opinions you give today in

11   terms of reasonable probability?

12   A.  Yes, sir.

13   Q.  Thank you.

14              What is your role in this case, Dr. Steward?

10:16   15   A.  Well, in this case I was just simply asked to look at the

16   damages that Ms. Jones incurred.

17   Q.  And to do that, you're looking at her work-related damages,

18   employment related?

19   A.  Yes, that's correct.

10:17   20   Q.  Okay.  What methods do you use to come to your conclusions?

21   A.  Well, generally there are some methodologies that we all

22   use and -- in economics in these types of cases.  But generally

23   what it involves is -- is really just comparing what you would

24   expected her to earn had the incident not occurred to what you

10:17   25   now expect her to earn.

10:17  1   Q.  Is that what you call a "but-for analysis"?

2   A.  Yes, that's correct.

3   Q.  But for the incident, there would have been a certain

4   stream of income; and now there's a different stream of income.

10:17  5   Is that a fair summary?

6   A.  Yes, that's fair.

7   Q.  What do you base your opinions on, Doctor?

8   A.  Well, in a case like this, the first part is I look at the

9   economics; but I also look at the documents in terms of whether

10:17  10   financial -- the statements were in terms of what she was

11   actually earning prior to the incident.  I also look at what --

12   what her capacity is now.  In this particular case, I relied on

13   Mr. King.

14   Q.  Are your conclusions broken down in segments from July 28

10:18  15   to April 15th and then from -- of 2011 -- July 28, 2005, and

16   then to April 15th, 2011, and then from April 15th, 2011,

17   forward into the future?

18   A.  Yes, that's correct.

19   Q.  And why is there that breaking point at April 15th, 2011?

10:18  20   A.  Well, basically the damages are evaluated in two buckets,

21   so to speak, or two time periods.  The first time period is the

22   past, and that would be from the date of the report -- the date

23   of the incident to the date of the report.  And then the second

24   part of the analysis involves looking at what would be

10:18  25   projected into the future, particularly over her work life

10:18  1    taken.

2              THE COURT:  Those have been numbers you've generated

3       by looking at a body of statistics that's available to you?

4              MR. ESTEFAN:  I was just about to ask that, your

10:18  5    Honor.

6              THE COURT:  Is that right?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  Did you do any individual testing or

9       appraisal of this particular person's capacity for advancement,

10:19  10   such as looking at undergraduate transcripts or high school

11      transcripts or graduate board scores or talking to any of her

12      former teachers?

13             THE WITNESS:  No, your Honor.

14      BY MR. ESTEFAN:

10:19  15   Q.  So, Dr. Steward, you based your opinions on Dr. --

16      Mr. King's report, the person that testified just before you,

17      on his assessment, right?

18      A.  Yes, that's correct.

19      Q.  And you also used the -- I believe, the Current Population

10:19  20   Survey labor market data from the US Bureau of Labor

21      Statistics?

22      A.  That's correct.

23      Q.  You also use the US Bureau of Labor Statistics' Employer

24      Costs for Employee Compensation data --

10:19  25   A.  Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:19  1    Q.  -- as part of your -- formulation of your opinions?

2    A.  Yes.

3    Q.  All right.  And I believe that you've come up with separate

4    scenarios based on level of education.  Is that accurate?

10:19  5    A.  Yes, that's accurate.

6            MR. ESTEFAN:  Let me provide this to counsel.  Excuse

7    me one second.

8            Your Honor, this is a little difficult with the

9    Elmo for me to question him from here.

10:20  10           THE COURT:  You can stand over there.

11           MR. ESTEFAN:  May I ask him to come to the Elmo?

12           THE COURT:  That's fine.

13   BY MR. ESTEFAN:

14   Q.  Dr. Steward, would you please come to the Elmo?

10:20  15           MR. ESTEFAN:  And if I could have the Elmo, please?

16   BY MR. ESTEFAN:

17   Q.  I've taken the middle -- the section -- the four tables

18   that you have here.  And there they are, starting with the

19   first one.  And if you can go to the Elmo, and feel free to

10:20  20   show our jury what tables you've constructed there.

21           And here's the zoom right here, sir, if you need

22   to zoom it.  And if you need to use my pen or any other pen or

23   highlighter -- here's a highlighter here, so you can use that.

24           You may need to zoom that a little bit.  It's a

10:21  25   little hard to read.

10:21  1      Okay.  So, what are we looking at, Doctor, right
       2  here?
       3      You may need to speak into this -- let me get you
       4  a different mic.
10:21  5  A.  Okay.  What this is, this is Table 2.  And, so, it's the
       6  scenario that's looking at had Ms. Jones, basically, when she
       7  got back from Iraq, had she just gone straight to work in the
       8  IT industry.  And, so, what it shows is it shows the earnings
       9  that she would have been projected to have had the incident not
10:21 10  occurred, and then it compares that to what she's now projected
      11  to earn.
      12      And, so, the first -- the first two columns -- or
      13  the first column just shows the time period that the analysis
      14  is -- it's broken down by year.  And, of course, it shows her
10:21 15  age at each of those years.
      16      But the relevant areas are here in terms of
      17  earnings.  Column 3 shows what her earnings would have been had
      18  the incident not occurred.  And it goes in the past, I mean,
      19  from the date of the accident -- incident to the date of the
10:22 20  report, which is April 15th.  And then, from there, it goes
      21  forward over her projected work life.
      22      And there's a second table, second part of the
      23  table, that shows -- that goes through age 57.  And that's
      24  basically her expected work life.  And it's not that she's
10:22 25  expected to retire at 57.  It's just -- it adds all the

10:22   1   fractions of the years up that she would have been in the

2   workforce.

3   Q.  Did you arrive at a total, Doctor -- this is -- you're

4   talking about the past right now?

10:22   5   A.  Yes.

6   Q.  Okay.  Is there a future component to your damage --

7   A.  Yes.

8   Q.  -- calculation?

9   A.  Sure.  And the future component would be shown starting at

10:22   10   March -- April 15th, 2011, and going forward.  And then -- so,

11   the post-incident earnings capacity would be Column 7; and that

12   shows what she's expected to earn now.  And that's based off

13   Mr. King's analysis, which puts it at about $25,200 per year.

14            And then the future bottom line number in this

10:23   15   particular scenario is $779,363.

16   Q.  And that is if Ms. Jones had stayed with only a high school

17   education?

18   A.  That's correct.

19   Q.  All right.  So, now you have a second table here, I

10:23   20   believe.  And what's the difference between the first table and

21   the second table, apart from the numbers, Doctor?

22   A.  The second table works in the same way, compares what she

23   would have earned had the incident not occurred to what she did

24   earn.  The only difference here, now the assumption is that she

10:23   25   gets an Associate's degree.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:23  1           And, so, now, under that scenario, the back

2      damages would be estimated to be $263,919 and the future would

3      be 843 -- $843,104.

4      Q.  That's with an Associate's degree?

10:24  5      A.  That's correct.

6      Q.  All right.  Thank you, Doctor.

7           And the next one is with -- what do we have here?

8      A Bachelor's degree?

9      A.  Yes, Scenario 3 is the Bachelor's degree.  And that works

10:24 10     the same way.  In the past the damages would be $210,096, and

11     the damages are a little different in the past because it would

12     have taken her a little bit longer to get the degree.  And the

13     future damages would be higher; and that would be $1,434,726.

14     Q.  And the last table is with a Master's degree, and that is

10:24 15     what Ms. Jones currently holds.  Is that accurate, Doctor?

16     A.  That's correct.  And, so, the last scenario is with a

17     Master's; and there the back damages would be $106,326.  And,

18     of course, they're less because she would have taken more time

19     to get the degree; but the future damages are higher because

10:25 20     she would earn more.  It would be $1,716,726.

21     Q.  Okay.  And I believe, Doctor, the very last thing I want

22     you to show us is this, I believe, it's a fair summary of the

23     four scenarios you've got there.  And if you could slide it to

24     the right a little bit so we can see the totals.  There you go.

10:25 25          Is that a fair summary of the four totals you put

up there?

A.   Yes, it is.   It breaks it down by past and future, but it's a summary of each of the scenarios.

Q.   All right.   And which one of those do you believe applies to Ms. Jones with her education level?

A.   Well, currently she has a Master's.   So, Scenario 4 would be the one that's appropriate, based off her actual education level.

THE COURT:   Do these numbers reflect any distinction between a Master's from one university versus a Master's from another?

THE WITNESS:   No, your Honor, it doesn't.

THE COURT:   Don't you think that's a huge variable?

THE WITNESS:   It's a factor.   And it could matter.   It could matter.

THE COURT:   It could matter profoundly, couldn't it?

THE WITNESS:   It really depends on the type of the degree.   But in something like -- I think in informational technology, where there tends to be a lot of jobs, I don't know if it would be as large as in something -- like a Master's and -- like, an MBA, for example, it's pretty big in an MBA.

BY MR. ESTEFAN:

Q.   Okay.   Doctor, thank you.   If you could take your seat back, please.

10:26   1   A.   (Witness complies.)

2   Q.   Are these numbers that you have come up with, do they

3   account for future inflation?

4   A.   Yes, they do.

10:26   5   Q.   And, so, did you apply a number to these salaries to get to

6   the numbers in your table?

7   A.   Yes.   There was a salary growth part as well as an

8   inflation factor that was included.

9   Q.   Yes.   And then after you did that, did you then reduce the

10:27   10   numbers to present value number?

11   A.   Yes, I did.

12   Q.   How did you do that?

13   A.   Well, the present value factor is just simply to account

14   for the fact that those damages would occur in the future.   So,

10:27   15   basically the idea is to figure out how much you would have to

16   put in the bank account today to be able to meet those

17   withdrawals, basically, or the amount that she would be paid

18   over time.

19               And, so, there I just used the T-bill rate to

10:27   20   figure out what that discount factor would be.

21   Q.   And how are these numbers -- these -- the figures that

22   you've come up with, I know they're based on calculations; but

23   where do these numbers come from?

24   A.   The numbers themselves, they come from the US Bureau of

10:27   25   Labor Statistics, in terms of the growth factors.   The

10:27  1   inflation numbers come from the Census and the Bureau of Labor

2   Statistics.  And the interest rate numbers come from the

3   Federal Reserve.

4   Q.  Are these numbers the average for the industry?

10:27  5   A.  Yes.

6          MR. ESTEFAN:  Pass the witness.

7                     **CROSS-EXAMINATION**

8   BY MR. McKINNEY:

9   Q.  I have a calculator.

10:28  10          Good morning.

11  A.  Good morning.

12  Q.  I'm Andrew McKinney.  I represent Charles Bortz.  I don't

13  believe you and I have ever met before.  Is that correct?

14  A.  Yes, that's correct.

10:28  15  Q.  All right.  Let me -- there's a few things I need to look

16  at here to ask you some questions.  Let me ask, first, when

17  were you first contacted to become involved in this case.

18  A.  I think it would have been early 2011, maybe February,

19  maybe January of 2011.

10:28  20  Q.  All right.  And when did you receive a copy of Mr. King's

21  report that you base your opinions on?

22  A.  I don't recall the exact date; but it was prior to drafting

23  my report, my April 15th report, 2011.

24  Q.  All right.

10:29  25          MR. McKINNEY:  May I approach the witness?

10:29    1            THE COURT:  You may.

2    BY MR. McKINNEY:

3    Q.  Do you recognize that document?

4    A.  Yes.

10:29    5    Q.  And what is that document?

6    A.  This document is Mr. King's initial rehabilitation

7    assessment.

8    Q.  All right.  And what else did you review in preparing your

9    opinion -- your opinions that you've expressed here in this

10:29   10    courtroom?

11    A.  I reviewed Ms. Jones' financial records, her tax returns.

12    I reviewed her -- some personnel record documents from KBR, the

13    contract.  There was some medical records that were included in

14    the file.

10:29   15    Q.  Any depositions?

16    A.  I don't recall any depositions.

17    Q.  All right.  And I believe you projected four different

18    scenarios that we'll -- and we'll talk about how you went about

19    doing your calculations in a minute.  But you projected four

10:30   20    different scenarios for Ms. Jones, all of which are in the IT

21    field.  Is that correct?

22    A.  Yes, sir.

23    Q.  Now, if you look at Mr. King's report, specifically at the

24    fifth and sixth pages, isn't it true that Mr. King does not

10:30   25    project any wage loss in the IT field but, rather, he projects

10:30   1   his wage loss based on Ms. Jones' current career as a college

        2   instructor?

        3   A.  I don't know about his wage loss calculation.  I focused on

        4   his earnings capacity analysis.  I didn't do anything with his

10:31   5   wage loss calculations.  I don't know.

        6   Q.  All right.  You've assumed, to get back to the four

        7   scenarios, that Ms. Jones would return to the IT field, first,

        8   with a high school diploma, correct?

        9   A.  Yes, sir.

10:31  10   Q.  Second, with an Associate's degree, correct?

       11   A.  Yes.

       12   Q.  Then with a Bachelor's degree, correct?

       13   A.  Yes.

       14   Q.  And then with a Master's degree correct?

10:31  15   A.  Yes, sir.

       16   Q.  Now, do you identify in your report the particular major or

       17   concentration or specialty that Ms. Jones would be acquiring

       18   her hypothetical Associate, Bachelor's and/or Master's degree

       19   in?

10:32  20   A.  No.  I don't identify the Master's degree.  I identify the

       21   occupation that she would be working in.  So, it would be a

       22   person with a Master's degree who's working in IT, which the

       23   majority of those are going to be Master's -- people with

       24   Master's degrees, but some would have other degrees.

10:32  25   Q.  Yes.  But -- well, I think you know and I know but our jury

10:32   1   may not know, for you to get your basic wage data for, let's

2   say, a person with a Master's degree in the IT field, you go to

3   some Bureau of Labor Statistics composite number and take that

4   number as your baseline number, correct?

10:32   5   A.   That's close.   What I actually do is I have the underlying

6   data that actually has the surveys that the people filled out.

7   So, I have data on about 50,000 people in each year.   And, so,

8   based off that data, I actually calculate what the average

9   salary would be for a person in the IT field with a Master's

10:32   10   degree.   So, it's close; but I actually use the raw data that

11   the BLS actually compiles.

12   Q.   Does your raw data include the major or the type of degree

13   that the person with the Master's has; that is, computer

14   science versus physical education, computer technology versus

10:33   15   anthropology?   Does your database draw any qualitative

16   distinction between the type of degree and someone's earning

17   capacity in the information technology field?

18   A.   The -- no.   The BLS data that -- the CPS BLS data does not.

19   It just records the highest level of education that the person

10:33   20   possesses.   So, it's a Master's degree and then you know what

21   field they're working in.   So, it would be IT.

22   Q.   All right.   So, you don't know from your data whether

23   someone with a Master's degree in physical education would make

24   the same -- would earn the same amount of money in the

10:34   25   information technology field as someone with a degree in

computer science?

A.   From the CPS data by the Bureau of Labor Statistics, which is the Current Population Survey, the answer would be, no, it does not record the major of the -- of the individual.  So, you wouldn't be able to determine any salary differences with that data.

Q.   But intuitively, as a matter of common sense, wouldn't you infer that someone with a Master's degree in computer science would make more money in the information technology field than someone with, say, a Master's degree in history or a professional degree in law?  Wouldn't you expect the computer science person to have an advantage?

A.   Well, that's when it's going to depend on the occupation. So, if it's a computer programming job, then I would expect the person with the Master's in computer programming to earn more than a person in, say -- who doesn't have a Master's in computer programming.  But if they're in the IT field and they're more -- say, like, more managerial, then that's not going to be as important.

           So, the answer is really it's going to depend on the type of job in which you are actually looking at in terms of how much of a premium you would expect.

Q.   Well, that brings me to my next question.  I thank you for that.

           Is your statistical cohort -- or does your

10:35   1   statistical cohort of 50,000 people in the information

2   technology field, does this include the broad array of

3   employees one might expect to find at, say, Compaq Computers,

4   where you have inside sales, outside sales, human resources,

10:35   5   admin, senior execs, programmers, technicians, et cetera,

6   et cetera?  Is that -- is that the statistical cohort we're

7   talking about?

8   A.  Well, you definitely could break it down that way.  But,

9   obviously, at some point you -- you have people that are going

10:36   10   to be classified as information technology type professionals

11   who are in occupations and then other people who maybe work for

12   Compaq, they would be classified as in an administrative role

13   if they were, as you described, more of an administrative

14   person.

10:36   15         So, it really would depend on the occupation that

16   you are talking about.  But most of that is going to be in --

17   the IT is going to be computer related jobs, either management

18   or otherwise.

19   Q.  Help me, if you can, please, then.  Explain to me what the

10:36   20   database is or who comprises the database, what is the job

21   skill set that we're talking about in the database that you're

22   referring to.  Before we get into your methodology, what's the

23   job base skill that makes up your database?

24   A.  The survey --

10:36   25   Q.  Is it programmers and -- and the technical people, or is it

1    everybody?

2    A.  The actual underlying data is everyone.  So -- but within

3    there, you can -- you can look at different cross sets of it.

4    But the actual data comprises -- it's a survey that comprises

5    all types of people in the IT field.

6    Q.  Did you harvest from your database a representative

7    statistical group that matches Ms. Jones' skill set and current

8    level of education?

9    A.  Okay.  The answer is no.  I just need to be clear, though.

10                   But my analysis was done under the -- is for the

11   non-incident.  So, the idea is that, had the incident not

12   occurred, what types of jobs would there have been for her in

13   the IT field.  So, I couldn't make that comparison with where

14   she is now.  The idea is, had it not occurred, what would it

15   look like.  So, I didn't make that comparison.

16   Q.  Well, when we're projecting someone's future earning

17   capacity -- in this case Jamie Leigh Jones -- we have to

18   compare -- do we not have to compare people with her -- not --

19   if not precise undergraduate and graduate degree, at least

20   people with graduate and undergraduate degrees in similar

21   related areas and track that statistical cohort over time and

22   learn what that statistical cohort is earning in order to have

23   a valid baseline number as our starting point?

24   A.  In certain situations, that's how it would be done.  But

25   this is -- this is a different situation in the sense that now

10:38    1    the idea is to figure out what she would have -- what her

       2    future would have looked like had the incident not occurred.

       3           So, that's -- that's not related to what she is

       4    doing now.  She's now an instructor, which is -- that's not in

10:38    5    the IT industry.

       6           So, the idea is, prior to the incident, what are

       7    the -- the outcomes that she could have.  And that's what I've

       8    laid out in the four different scenarios.

       9    Q.  Perhaps I'm not being very clear, and I apologize for that.

10:39    10           You are predicating Ms. Jones' future earning

      11    capacity based on the type of undergraduate and graduate degree

      12    she currently holds, correct?  Or are you assuming that

      13    Ms. Jones, instead of obtaining the undergraduate and graduate

      14    degrees that she has, would have instead obtained graduate and

10:39    15    undergraduate degrees in some information technology related

      16    field?

      17    A.  It's closer to the last.  The idea is that, had the

      18    incident not occurred, then she would have stayed in the IT

      19    field, where she was employed before.  She would have stayed in

10:39    20    the IT field and done one of four different things.  One, she

      21    would have stayed like she was at the time of the incident,

      22    she -- just stayed with -- got an Associate's in IT, she was in

      23    IT; or down the road she could have decided to go and get an

      24    additional education in IT because she was in IT, and that

10:40    25    would lead her either to an Associate's, Bachelor's, or

10:40    1    Master's.

         2               And then what I've done is I've looked at the

         3    different scenarios to show what the outcomes would be in terms

         4    of the economics.

10:40    5    Q.  I understand what you've done.  I'm just trying to find out

         6    where -- what the starting point is.

         7               And so that you and I are on the same page, your

         8    starting point is that Ms. Jones would have done something

         9    different than what she's actually done.  The starting point is

10:40   10    that Ms. Jones would have elected a course of education through

        11    a Master's degree in a field related to information technology.

        12    That's your starting point, correct?

        13    A.  Close.  But let me be completely clear.  My starting point

        14    is that she would have stayed in IT and gone one of four

10:40   15    routes.  She either would have gone as far as a Master's or got

        16    a Bachelor's or Associate's --

        17    Q.  I have that part.

        18    A.  -- or high school.

        19    Q.  I have that part.  The part that I'm trying to nail down

10:41   20    with you here is that your assumption is that -- I'm not trying

        21    to be sarcastic here.  But if someone wanted to stay in the

        22    information technology field and advance in the information

        23    technology field and wanted to do so by pursuing college and

        24    postgraduate studies, that person would have to decide what to

10:41   25    major in, correct?

10:41   1   A.  Yes, that's --

2   Q.  That's obvious?

3   A.  Yes, sir.

4   Q.  For instance, you majored in economics and got a PhD in

10:41   5   economics and that's what qualifies you to be here today,

6   correct?

7   A.  Yes, sir.

8   Q.  You could have elected to major in history.  Could have.

9   You didn't, but you could have, right?

10:41   10   A.  Yes.

11   Q.  But if you had majored in history, you wouldn't be

12   qualified to come in here and express economic opinions, would

13   you?

14   A.  Most likely not.

10:41   15   Q.  All right.  So, getting back to Ms. Jones, if Ms. Jones --

16   to fulfill your assumptions, if Ms. Jones was going to

17   pursue -- or sorry -- if Ms. Jones was going to remain in the

18   IT field and pursue undergraduate and graduate degrees, she

19   would have to make a decision whether to pursue something that

10:42   20   is actually related to information technology or whether to get

21   a history degree or an art degree or a music degree or an

22   accounting degree, correct?

23   A.  Yes, sir.

24   Q.  And what you're telling us is that your assumption is that

10:42   25   Ms. Jones, in making her decision about what to study, having

10:42  1   already decided to stay in the IT field, that you assume that
       2   Ms. Jones would study something relevant to her career
       3   advancement as opposed to something completely irrelevant to
       4   her career advancement, correct?
10:43  5   A.  I would say that's close.  But the reality is, with the
       6   data, as I said before, it just captures if they have a
       7   Master's.  And, so, what --
       8   Q.  I'm going to get to that.  Right now I'm trying to find out
       9   whether you assume that Ms. Jones would have gotten
10:43  10  undergraduate degrees in a relevant subject, relevant to
       11  information technology; or are you simply assuming that she
       12  would have gotten some kind of Master's degree, some kind of
       13  Bachelor's degree, whether it has to do with anything with
       14  information technology or not?
10:43  15  A.  That's what I am saying.  It's close.  The idea is that she
       16  would have gotten a degree -- let's say, for example, a
       17  Master's degree or Bachelor's degree.  If it's related or not,
       18  that's going to depend on the employer.  Some employers are
       19  going to value that specific skill that you learned in school.
10:43  20  Others will value the fact that you have that increased ability
       21  to learn, and that's going to add the additional value.
       22          So, at the point that we're looking at now where
       23  the incident has occurred, you know, the only thing I can do is
       24  to figure out what those scenarios would look like if she gets
10:44  25  those different levels of education.  But I don't have any

assumptions about what she would have majored in had the

incident not occurred.

Q.  Well, that actually wasn't my question.  But let me

approach it this way.

        Do you have any useful statistical data that you

can provide for us today that shows the difference in earning

capacity between -- total universe is people in the actual IT

technical field -- you follow me there, do you not?

A.  Yes, sir.

Q.  All right.  Now, within that universe, do you have a subset

of people who have -- actually have a relevant Master's degree,

relevant to IT and their earning capacity, compared to people

who have Master's degrees in art history or the liberal arts or

accounting, so that we can see whether people who have

irrelevant degrees do as well or not as well as people who have

the relevant degree?  Do you have any of that statistical

evidence here for us today?

A.  Well, first, the -- I don't have any of those numbers with

me.  But first of all, I would have a hard time because the

relevant part -- or the irrelevant part, is as I've described.

Because the different majors are going to depend on the

employer.  For example, as you just described with art history,

some of that stuff is relevant, depending upon the employer.

        In terms of technical writing, they hire a lot of

English majors to be tech writers.  And, so, you know, on the

10:45   1    surface you would say that's irrelevant; but it's not.  It's

2    relevant because computer science majors can't write as well as

3    English majors.  So, they hire them to do tech -- tech type

4    work.

10:46   5            So, I guess my major point is that I couldn't

6    distinguish between irrelevant and relevant because it depends

7    on the employer.  But as I sit here, I don't have my data with

8    me.

9            MR. McKINNEY:  All right.  Can we put up the first

10:46  10   earning scenario, please, on the screen?

11           And under the "Future" category, please, if you

12   would highlight the second line, beginning with "1/1/2012."

13           And, then, cut that out and blow it up.

14           If you could drop that down, because then I want

10:47  15   you to highlight these topics right up here and these column

16   numbers and blow that up.  Put that above.  Nice work.

17           I think we're just about there.  Good job.

18           And if you could highlight the different column

19   names for me, please.

10:47  20   BY MR. McKINNEY:

21   Q.  By the way, while the technician is doing that, economics

22   is often called the dismal science, is it not?

23   A.  Yes, sir, I've heard it called that before.

24   Q.  For those who are not economists, it can be pretty tedious,

10:48  25   can it not?

10:48  1    A.  I don't agree with that, but I suppose it could be.

2    Q.  And number crunching, which we're getting ready to do, is

3    fairly tedious, is it not?

4    A.  Again, I don't necessarily agree; but it can be for some.

10:48  5    Q.  Yes.

6            THE COURT:  Let me ask this.  What was your PhD

7    dissertation on?

8            THE WITNESS:  Actually, I did my work on bank mergers

9    and effective managerial efficiency on bank --

10:48  10            THE COURT:  Have you taught much?

11            THE WITNESS:  Yes, your Honor.  I've taught --

12    actually, I'm teaching now.  I'm back teaching at the

13    University of Texas and teaching the summer, as well.

14            THE COURT:  What are your -- what are the courses you

10:48  15    offer?

16            THE WITNESS:  My courses, I primarily teach

17    statistics.  I'm developing a labor course.  Let's see.  Micro,

18    which is, you know, theory of labor, the markets.  I've also

19    taught some business courses, as well.

10:49  20            THE COURT:  Thank you.

21    BY MR. McKINNEY:

22    Q.  Now, in order to project future earnings, you have to make

23    certain assumptions, do you not?

24    A.  Yes, you do.

10:49  25    Q.  All right.  And what you do, sort of conceptually, is you

10:49   1   calculate as your first baseline number a person's total

2   compensation, including benefits, less taxes, correct?

3   A.  The only part is you don't take the taxes from the

4   benefits.  It's earnings less taxes and then benefits.

10:49   5   Q.  Earnings less taxes plus benefits is -- that's your -- and

6   then that's your first number, correct?

7   A.  Yes, sir.

8   Q.  Then you subtract from your first number what the person is

9   actually earning, less taxes and benefits -- or less taxes plus

10:50   10   benefits, correct?

11   A.  That's correct.

12   Q.  And the difference between your assumed number and the

13   actual number is the number that you say is the person's net

14   loss, correct?

10:50   15   A.  Correct.  For that year, that's correct.

16   Q.  And then you apply a growth rate and a discount rate; and,

17   depending on which numbers you choose to apply, that person's

18   loss becomes bigger or smaller, correct?

19   A.  They're factors that we all apply.  The growth factor's

10:50   20   just inflation.  So -- and, then, discount is just whatever the

21   interest rates are.  So, whatever the interest rates are,

22   that's going to impact the present value.

23   Q.  All right.  Let's look then at this highlighted line we

24   have here.  This is for the year 2012, is it not?

10:50   25   A.  Yes, it is.

10:50   1    Q.  And you start off with an assumed salary for Ms. Jones.
        2    And this would be in Scenario 1; so, this would be her working
        3    with a high school diploma, correct?
        4    A.  Yes, that's correct.
10:51   5    Q.  You start off with a base salary; and you subtract from
        6    that her income taxes, correct?
        7    A.  Yes.
        8    Q.  Do you happen to know what the FICA tax rate is currently?
        9    A.  I think it's 6.7 percent.
10:51   10   Q.  All right.  Is FICA included in your tax calculation?
        11   A.  FICA would be -- that's income tax.  So, it would be --
        12   Column 4 is how much income tax she would pay at the end of the
        13   year.  So, that does not include FICA.  It's just the income
        14   tax that she would pay.
10:51   15   Q.  All right.  But, of course, she would pay FICA, correct?
        16   A.  Yes.  I mean, like I say, that's going to be her bottom
        17   line -- no, I take -- actually, it is.  It's going to be her
        18   bottom-line number on the IRS statement.  So, yes, FICA is
        19   going to be included as part of that rate.  Whatever the
10:52   20   bottom-line number is on her income tax, that's what that
        21   reflects.
        22   Q.  Well, let me try to be clear on this.  I think you told us
        23   that the $2,739 was the income tax that Ms. Jones would pay,
        24   correct?
10:52   25   A.  That's correct.

10:52   1    Q.   Not the FICA?

2    A.   Well, it is her income tax, that's correct.   It's not a

3    separate tax.   It's just whatever income tax is for that

4    particular year.

10:52   5    Q.   Does the 2,739-dollar figure include her FICA?

6    A.   I would have to look at her actual tax return.   She's going

7    to have her income that she brings in.   Then she's going to

8    have any deductions that she has.   I would have to look at her

9    tax return to see --

10:53   10   Q.   Are these numbers based on the actual tax liability that

11   Ms. Jones had per her income tax returns?

12   A.   The non-incident are based on the average tax liability for

13   that income level.

14   Q.   For example, we see that in 2008, which would be the fourth

10:53   15   column down -- no, never mind.   We'll approach it differently.

16            You understand that on a Form 1040, or the

17   Easy 1040 or whatever form is used by the taxpayer, that no

18   check is written by the taxpayer to cover FICA; that's withheld

19   from every paycheck.   You understand that?

10:54   20   A.   Yes.

21   Q.   All right.   You're basing your tax numbers here not based

22   on a FICA payment by Ms. Jones, because she doesn't make one;

23   you're basing your tax calculations based on her income tax

24   returns and her tax liability generated by her income tax

10:54   25   returns, correct?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:54   1   A.  I'm sorry.  You have to repeat that.  I don't understand

        2   the first part.

        3   Q.  Okay.

        4        MR. McKINNEY:  Can we pull up Ms. Jones' 2004 income

10:54   5   tax return?  Do we have that handy, 2004?

        6   BY MR. McKINNEY:

        7   Q.  Let's just do it a different way.  FICA comes out of

        8   people's earnings, correct?

        9   A.  That's correct.

10:54  10   Q.  And if your figure, right here in Column 4, of $2,738 does

       11   not include FICA, then you have overstated Ms. Jones' earnings

       12   in Column 3 by the amount of 6.7 percent.  Fair statement?

       13   A.  The way it would work is you've got the FICA part that

       14   comes out; that's going to be put on your tax return, however,

10:55  15   as money that you paid in.  And then, if she has taxes that are

       16   above and beyond that or if she has tax liability that's above

       17   and beyond that, then she would pay additional.

       18        So, I'm not -- I guess I still don't completely

       19   understand your question in terms -- it wouldn't be an

10:55  20   overpayment.  It's going to be whatever it is, based off her

       21   income situation and her income tax situation.

       22   Q.  Do you prepare income tax returns for a living?

       23   A.  No, sir.

       24   Q.  Are you knowledgeable, expert in income tax law and how

10:56  25   income tax -- how income is taxed and reported?

10:56   1    A.   Only as I need to.   I mean, I don't -- that's not something

        2    I do on a day-to-day basis other than to evaluate these type

        3    income losses in these type cases.   And, of course, my own.

        4                MR. McKINNEY:   Can we switch to the Elmo, please, for

10:56   5    a minute?

        6    BY MR. McKINNEY:

        7    Q.   As an example, this is Ms. Jones' W-2 form for 2004.   Do

        8    you see the upper two right-hand boxes right here?

        9    A.   Yes.   Are you referring to 2 and 4, Box 2 and 4?

10:56   10   Q.   Yes.

        11   A.   Yes.

        12   Q.   And you can see where there is -- on $23,000 in income,

        13   there is $2,957 withheld for income tax.   Do you see that?

        14   A.   Yes, I see it.

10:57   15   Q.   And you see that there is also withheld $1,434 as Social

        16   Security earnings.   That would be the FICA.   Do you see that?

        17   A.   I see that, yes.

        18   Q.   All right.   Now, as you can see in 2004, based on earnings

        19   of $23,000, the federal withholding was $2,957.   Do you see

10:57   20   that?

        21   A.   Yes, sir, I see it.

        22   Q.   $23,000 is $15,000 less than $38,000.   You would -- that's

        23   just simple arithmetic, right?

        24   A.   Yes.

10:57   25   Q.   Okay.

Cheryll K. Barron, CSR, CM, FCRR                        713.250.5585

10:58  1          MR. McKINNEY:  Apparently this doesn't have -- this

2      tax return doesn't have Ms. Jones' tax liability calculation.

3      Let's go back to the earnings scenario, please.

4              THE COURT:  What do we need?

10:58  5   BY MR. McKINNEY:

6      Q.  If you look at Column 4, for the year 2012, you'll see

7      right here that you have calculated a tax liability of $2,739

8      based on annual income of $38,000.  Do you see that?

9      A.  Yes, I see that.

10:59  10          MR. McKINNEY:  May I approach?

11             THE COURT:  You may.

12     BY MR. McKINNEY:

13     Q.  And as you can see from the W-2 form in 2004, based on

14     $23,000 in income, not 38,000 but 23,000 -- do you see that?

10:59  15   A.  Yes, I see it.

16     Q.  The tax withheld is $2,957.  Do you see that?

17     A.  Yes, I see it.

18     Q.  That is over and above the FICA of $1,434.  Do you see

19     that?

10:59  20   A.  Yes, I see it.

21     Q.  Doing the math in your head, you are almost at $4,500 in

22     total tax liability, FICA plus income tax, based on income of

23     $23,000.  Do you see that?

24     A.  Yes, I do.

10:59  25   Q.  All right.  Now, in your methodology up here, where we see

11:00  1  that $23,000 produces approximately $4,500 in tax liability,

2  according to your methodology, $38,000 produces $2,739 in tax

3  liability.  Do you see that?

4  A.  Yes.

11:00  5  Q.  That doesn't make any sense, does it, that if your income

6  goes up $15,000, your tax liability goes down by $1,700?  That

7  doesn't make any sense, does it?

8  A.  Yes, sir, it makes perfect sense, because what you've shown

9  me is simply -- you've shown me a W-2.  It shows how much they

11:00  10  took out.  It doesn't show how much she actually paid.

11  What I've actually looked at here in Column 4

12  shows the actual amount that people actually pay.  This is from

13  IRS returns that show, on average, a person that makes $38,000

14  a year will, on average, pay about -- I put here $2,739 in

11:01  15  taxes per year.  It's based off of actual IRS returns, in terms

16  of what she actually could be expected to pay.

17  Q.  Okay.  So, your Column 4 income tax is based on a

18  statistical average, correct?

19  A.  It's based on the average that the IRS -- in terms of what

11:01  20  people actually pay who earn $38,000, what, on average, do they

21  actually pay in terms of tax returns.  And that's the

22  calculation, yes, sir.

23  Q.  All right.  And do you know whether the number that you are

24  relying upon from the IRS statistics is income tax only or is

11:01  25  it income tax plus Social Security tax?

11:01  1  A.  It's the bottom-line income tax.  And, so, as I described

2  before, if it's the case that -- what you just showed me there,

3  whatever they withhold -- first of all, she's going to have her

4  FICA.  They take that out.  Then, obviously, depending on how

11:01  5  many deductions you have, that's going to be another component

6  that gets taken out.  Some people, they'll only claim a few

7  number of deductions because they want a large amount taken

8  out.

9              This number here shows the bottom-line number in

11:02  10  terms of taxes that that person -- their tax liability at the

11  end of the year.  This is how much they would owe in taxes,

12  accounting for, just as I described, the calculation.

13  Q.  Do you understand that there is a fundamental difference

14  between income tax and Social Security tax?

11:02  15  A.  Yes.

16  Q.  You understand that?

17  A.  Yes.

18  Q.  Everybody who makes $38,000 in the United States pays

19  exactly the same Social Security tax.  It's a stated percentage

11:02  20  of their income, which the employer matches.  You understand

21  that?

22  A.  Yes.

23  Q.  So, there's not an average, there's not a composite.

24  Everybody pays the same at 38,000; everybody pays the same at

11:02  25  39,000.  You understand that?

11:02  1   A.  It's the same percentage, the Social Security is the same
       2   percentage.
       3   Q.  Income taxes are different.  Some people are married, some
       4   people have children, some people take care of an elderly
11:03  5   person, some people are blind, some people have a home and have
       6   a mortgage interest deduction, some people give a lot of money
       7   to charity; and that causes a fluctuation in the amount of
       8   money that two people earning the same amount might pay in
       9   income tax.  You understand that?
11:03  10  A.  Yes.
       11  Q.  The number that appears in Column 4 -- Column 4 is the
       12  income tax number.  It's the average income tax number, not the
       13  FICA number.  Isn't that true?  Or do you know?
       14  A.  It's the average income tax number, just as I described.
11:03  15  It flows through the IRS tax return.  That's how much they will
       16  actually pay in income taxes to -- taking into account what you
       17  paid in and your deductions, that's how much your liability
       18  would be.
       19  Q.  So, it's true, then, that your baseline numbers do not
11:04  20  adjust downward for the FICA tax.  Isn't that true?
       21  A.  I don't believe that's true.  I mean, it flows all through
       22  the IRS tax return.  From my understanding, it flows all
       23  through the tax return.  So, that's going to be how much that
       24  they pay at the end of the year in income taxes on that income.
11:04  25          MR. McKINNEY:  Judge, I think we need to approach

11:04  1  because we have a fundamental disconnect here on what tax
       2  returns do and do not do.
       3          THE COURT:  Cher, I'm going to have to ask you to move
       4  over here.
11:04  5          THE REPORTER:  Yes, Judge.
       6      *(At sidebar with all counsel)*
       7          MR. McKINNEY:  I know this is like watching paint dry
       8  and I apologize.  Here's the problem.  This witness doesn't
       9  have a clue about the difference between FICA and income tax.
11:07 10  And he starts off with basic Number A and backs out taxes.  He
      11  doesn't back out FICA.  Okay?  If you don't back out FICA, you
      12  get a bigger number down here.
      13          But he doesn't even know what FICA is and when it
      14  comes out.  You don't pay FICA on your income tax returns.
11:07 15  It's W-2 reporting.  That doesn't show up anywhere on the tax
      16  return.  It's already paid in.  It's simply an income tax
      17  calculation based on taxable income.
      18          THE COURT:  As long as you make the maximum amount,
      19  yeah.
11:07 20          MR. McKINNEY:  Right.  He doesn't know that.  He
      21  doesn't have a clue on that, and you can't instruct him that's
      22  the case because you can't put knowledge in his --
      23          THE COURT:  What are you asking me to do, then?
      24          MR. McKINNEY:  The witness' fundamental technology and
11:08 25  his competence and his expertise and his premises simply make

11:08  1   it impossible to examine the man.

2           THE COURT:  I wish we had this on a motion in limine.

3   I know you had many things to limine out.

4                But I have a huge problem assuming she would have

11:08  5   ever have got a Master's degree.

6           MR. McKINNEY:  That's a big problem, too.  He doesn't

7   know what kind of Master's degree she would have gotten.  He

8   doesn't know what the earnings projections are for somebody who

9   has a degree in anthropology that likes to work at Compaq

11:08  10  Computers.

11          THE COURT:  The bigger problem is whether she has the

12  capacity to get a Master's.

13          MR. McKINNEY:  In an area that would matter.

14          THE COURT:  Yeah.  Well, I mean, did she distinguish

11:08  15  herself in high school?

16          MR. ESTEFAN:  She was taking college courses before

17  she even began working for Halliburton.  There's evidence of

18  that.

19          MR. McKINNEY:  That's another fundamental flaw --

11:09  20          MR. HEDGES:  Her degrees are online degrees.

21          THE COURT:  I know they are.

22          MR. HEDGES:  American military university.

23          THE COURT:  I know they are.  But he seems to think

24  that doesn't matter either.

11:09  25          MR. HEDGES:  I'm going to ask him that.  I think

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:09  1    you're right.

2          MR. McKINNEY:  Here's something -- this is -- you can

3    bounce him on methodology right here.  Although, he obviously

4    is going to use it for different purposes.  But I just can't

11:09  5    believe his ignorance on this one fundamental flaw.  So, I'm

6    stuck there.

7          But you see how every year her projected wages go

8    up?  He backs out the current earnings and assumes that her

9    earnings remain stable and never go up.  The only number that

11:09  10   doesn't go up for a lifetime in these projections are her

11   current earnings.  That's total fantasy, cannot happen, would

12   not happen.  It's just a ridiculous assumption.  But it causes

13   these numbers over here to grow and grow and grow.

14         And I think this witness needs to be stricken or

11:10  15   the jury needs to be instructed that this witness is not an

16   expert in calculating income tax and the jury should consider

17   the fact that he has not included FICA in his calculation which

18   would reduce the amount of --

19         THE CASE MANAGER:  The jury wants a break.

11:10  20         THE COURT:  Okay.  The jury wishes to have a break.

21   Would all please rise?

22         It may be a little bit longer than a momentary

23   break, but you -- all of you can step back now.

24         MR. McKINNEY:  Can I voir dire this witness now that

11:08  25   the jury is out?

11:08   1          THE COURT:  Yeah.

2          *(Jury not present)*

3          THE COURT:  You may be seated, Doctor.  You're clearly

4     a very intelligent, man; but I'm having trouble with your

11:08   5     methodology.

6               The plaintiff was a woman who graduated high

7     school early perhaps but didn't even pursue a college education

8     and got her further degrees from institutions of higher

9     learning that I've never heard of.  They're mail order, I

11:09  10     think -- or online, I mean.

11               Without having some grounding in her personal

12     abilities, her personal ambitions, it is really hard for me to

13     think of the kind of projections you're making as suitable for

14     this particular person.

11:09  15               I know statistics deal with masses, but I'm not

16     even sure she belongs in the larger universe you picked for

17     her.

18               Can you help me understand why it's appropriate

19     to assume that this woman would have gone to -- on to a

11:09  20     graduate degree?

21          THE WITNESS:  Sure.  But as I've stated in the report,

22     I mean, that's why I do four different scenarios.  At this

23     point when I looked at -- the only thing I've done is looked at

24     her actual, you know, what she has done.  And my understanding,

11:10  25     she did take some courses after -- in between high school and

11:10    1   her deployment -- or her contract with KBR.

         2            THE COURT:  Where were those courses?

         3            THE WITNESS:  When I asked her, she didn't know the

         4   courses -- she couldn't recall the courses at the time but --

11:10    5            THE COURT:  Where were they taught, though?

         6            THE WITNESS:  They were at Lone Star Community

         7   College.

         8            THE COURT:  I never even heard of that.

         9            THE WITNESS:  But I think at the time it was called

11:10   10   North Harris, Montgomery County Community College, is where she

        11   took those courses.  But as I said before, I've done four

        12   different scenarios to account for that.  I don't have any --

        13            THE COURT:  But shouldn't we apply some kind of

        14   percentile likelihood to that?  I mean, could you have done

11:10   15   something where you looked at all the high school graduates who

        16   started off at online universities and try to work from that

        17   database rather than -- I mean, yours don't account for some

        18   undergraduate who might have gone to MIT or whatever versus

        19   somebody that earned degrees online, right?

11:11   20            THE WITNESS:  It would include all types of Master's

        21   degrees.

        22            THE COURT:  Okay, Mr. McKinney.

        23            MR. McKINNEY:  Can we call back up the earnings

        24   scenario?

        25   ///

**VOIR DIRE EXAMINATION**

BY MR. McKINNEY:

Q.   Doctor, the jury is not in the room; and I apologize for my brusqueness with you.  We're all grownups.  We do this for a living.  You testify in courts for a living.  You're used to the rough and tumble.  So, it's getting ready to get rough and tumble.  Okay?

A.   No problem, sir.

Q.   Okay.  Do you have your calculator with you?

A.   No, I don't.

Q.   All right.

        THE COURT:  Do you want me to go get one?

        MR. McKINNEY:  I've got one.

BY MR. McKINNEY:

Q.   Take my word for it, 6.75 percent of $38,000 is $2,546.  Okay?  You with me?

A.   Yes.

Q.   All right.  So, that would be an automatic reduction in the base salary of $38,000 that you start with in the year 2012, would it not?

A.   I think -- you wouldn't do that because -- I see what you're -- the question -- that FICA is a benefit.  She pays into the system and she's going to get retirement for that and she's also eligible for Social Security.  So, you don't deduct that from the -- this first part.  You don't make that

11:12  1    calculation.

2    Q.  Do you agree with me that FICA is not included in the

3    2,739-dollar figure that you have for income tax?

4    A.  I do understand your question now.  That is -- like I said

11:12  5    before, it is the amount that is paid on income tax.

6            The FICA part is actually -- if you look at the

7    Column 5, that's the benefit that the employer -- that's the

8    benefit -- the benefit that she gets from FICA.  And then she

9    pays into it and then she gets those down the road.  So, the

11:12  10   income is just -- is the only thing shown in 4, the actual

11   income tax.

12   Q.  You know, I've been asking you that question for about

13   15 minutes.  Have you not understood it?

14   A.  Not until now, sir, I didn't.

11:13  15   Q.  All right.  Well, let's roll down to Column 7.  And before

16   we talk about Column 7, you have projected future growth in

17   every column that -- regarding Ms. Jones' future earnings

18   capacity, correct?

19           You projected that her salary will go up every

11:13  20   year; and you've applied a growth factor that further increases

21   that number, correct?

22   A.  Under the non -- had the incident not occurred, there is a

23   growth factor in terms of what her salary would be.  The growth

24   factor shown in Column 7 is just inflation.  So, that's the

11:13  25   factor that would account for inflation.

11:14   1    Q.  All right.  Now, if you look at Column 7, you use a
     2    baseline of Ms. Jones' current earnings, 25,000 a year and you
     3    project that out over the life of your analysis, through the
     4    age of 55, with not a single penny in increase on the Column 7
11:14   5    earnings, correct?
     6    A.  Well, there's the -- if you look at Column 12, the growth
     7    factor is applied to the earnings in that.  It's assumed to
     8    grow by inflation.
     9    Q.  You don't have any raises in salary for Ms. Jones, do
11:14   10   you --
     11   A.  No, I don't.
     12   Q.  -- in Column 7?
     13           Now, something else that you do is, in Column 3,
     14   you predict a raise every year for Ms. Jones if she had stayed
11:14   15   in the IT field, correct?
     16   A.  That's correct.
     17   Q.  Then, in Column 12, you increase the raise by the rate of
     18   inflation, correct?
     19   A.  The amount is increased by inflation to put it all in the
11:15   20   same dollars.  It's just -- the first component is the increase
     21   and the actual salary.  The other part is just simply to
     22   account for inflation so that the dollars stay in the same
     23   terms, 2011 dollars.
     24   Q.  So, you actually grow her salary in two ways on the plus
11:15   25   side.  You give her a raise every year and then every year you

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:15  1  have an inflation factor that goes up that further increases

2  her salary, correct?

3  A.  That's the mathematical component.  It ends up that -- the

4  person's salary had the one part --

11:15  5  Q.  The answer to my question, Doctor --

6  A.  -- and then also the inflation part.  And, so, they go in

7  jointly.

8  Q.  Doctor, the answer to the question is, yes, you start off

9  giving her a raise every year and then you increase that raise

11:15  10  by a projected rate of inflation.  Is that correct?

11          MR. ESTEFAN:  I'd ask that he let the witness answer

12  the question rather than asking his question and then answering

13  it himself, your Honor.

14          THE COURT:  Well, I worry less about leading questions

11:16  15  and prompts during a hearing outside the presence of the jury

16  but --

17          MR. ESTEFAN:  I understand.

18          THE COURT:  But I think they have been, for several

19  minutes, not just -- not on the same bandwidth.  So, I'm going

11:16  20  to allow some latitude to Mr. McKinney on this.

21          But do give him a chance to answer the question.

22  BY MR. McKINNEY:

23  Q.  The punch line here is you project a raise every year for

24  Ms. Jones and then you take that raise and you increase it

11:16  25  again by an assumed inflation factor, correct?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:16   1   A.   That's the mathematics of it, yes.

2   Q.   All right.   However, in each year where you do that, you

3   also assume that Ms. Jones, if she remained in her present

4   position, would not make any more money in ten years than she's

11:17   5   making today, other than an inflation adjustment, correct?

6   A.   Well, just to be clear, that assumption is based off of the

7   rehabilitation assessment.   I don't have the independent

8   assessment of her future earnings.   It's based off of my

9   understanding of Mr. King's analysis that says this is her

11:17   10   earnings capacity and it hasn't changed.   So --

11        THE COURT:   The Judge needs to take a short break.

12   I'll be back.   You-all may take a break, too.

13        *(Recess was taken from 11:17 a.m. to 11:22 a.m.)*

14        *(Jury not present)*

11:22   15        THE COURT:   Okay.   Mr. McKinney, do you have other

16   questions?

17        MR. McKINNEY:   One or two, Judge.

18   BY MR. McKINNEY:

19   Q.   In Column 7, Column 8, and Column 9, you project the same

11:23   20   earnings as your deduction factor for calculating economic

21   loss.   You project the same number, the same earnings, a level

22   $25,200 for every year of Ms. Jones' work life, do you not?

23   A.   As I stated, that's based off Mr. -- I don't have a

24   separate opinion there, as I put in my report.   That's the

11:23   25   number that's based off of Mr. King's report.   It assumes

11:23   1   that -- it goes forward.  And, as I stated in the report, if it
        2   were to change, then the damage would end earlier.  I don't
        3   have any separate --
        4   Q.  It's not a difficult question.  It really isn't.  It's not
11:23   5   a difficult question.  I am asking you if you do not project --
        6   okay.
        7            In every other instance in your report, what you
        8   do is you assume that every year Ms. Jones would get a raise
        9   and every year of that raise would be further enhanced by
11:24  10   inflation.  You do that, do you not?
       11   A.  I assume, had the incident not occurred, that she would
       12   have continued down the path in IT and would have gotten raises
       13   on a regular basis.
       14            MR. McKINNEY:  Judge, I cannot effectively examine
11:24  15   this witness, either before the Court or in front of the jury,
       16   if he is not instructed to answer a straightforward question
       17   "yes" or "no."
       18            It is plain as the nose on his face and mine what
       19   he has done here.  And we have one column, the good column,
11:24  20   where he gets his damages up, where he assumes a raise every
       21   year and he further inflates it by an inflation factor.
       22            THE COURT:  All right.
       23            MR. McKINNEY:  He won't just say that's what he
       24   does --
11:24  25            THE COURT:  Is there any disagreement about that

11:24  1  point, Doctor?

2  THE WITNESS:  No, your Honor, there isn't.

3  MR. McKINNEY:  Now, the next thing he does -- and this

4  is why his methodology is fundamentally flawed -- he does not

11:24  5  apply the same standard to Ms. Jones' current earnings.

6  If you look at Columns 7, 8, and 9, you will see

7  that they remain the same, she gets no raises, there's no

8  inflation factor.  It remains the same for a 55-year life

9  history.

11:25  10  So, he uses one process to the get damages up.

11  Then he artificially and, contrary to all reality and all

12  reason, he holds the negative number down, producing --

13  THE COURT:  A large cap.

14  MR. McKINNEY:  -- a false inflation of a number.  The

11:25  15  methodology is inherently suspect.  It's not used anywhere

16  outside the courtroom.  It's not peer reviewed.  It's not in

17  accordance with general accounting principles.  It's not in

18  accordance with anything other than getting the number up in

19  the courtroom for the jury.

11:25  20  THE COURT:  Let me get his response to that.

21  Why shall we not also increase the projection

22  from Ms. Jones' current work?

23  THE WITNESS:  Sure, Judge.  Simply, it's based off of

24  the analysis that's done by Mr. King that says at the present

11:25  25  time that this is her best and highest use in terms of her

11:26    1   capacity.

         2            THE COURT:  She wouldn't even get cost of living

         3   raises?

         4            THE WITNESS:  Based off his analysis, he says that

11:26    5   this is -- well, I do give her cost of living raises.  I don't

         6   give her any promotions because -- or I don't assume she can

         7   teach any additional classes because that's not what's stated

         8   in Mr. King's report.  But I do give her cost of living

         9   increases.

11:26   10   BY MR. McKINNEY

        11   Q.  Can you show me the cost of living increases, please, in

        12   Column 7?

        13   A.  No, sir.  It wouldn't be in 7.  7 is the earnings.

        14            But the cost of living increases are going to

11:26   15   come from 12 when you get the growth factor.  That was the cost

        16   of living increases that I was describing earlier.

        17   Q.  No, sir.  With all due respect, you are calculating -- in

        18   Column 10, you are calculating a 26,932-dollar annual loss

        19   consecutive for 30-some-odd years.  You are subtracting it from

11:27   20   Column 6.  You're getting the answer that appears in Column 11,

        21   and then you are applying your growth factor to the answer that

        22   you get in Column 11.  That's what you're doing.  I can show

        23   you mathematically.

        24            So, you never ever in this table apply your

11:27   25   growth factor or your discount factor to the baseline figure of

11:27  1   $25,200.  Sir, you simply do not do it.  Isn't that true?

2   A.  No, sir, that's completely incorrect.  As I describe here

3   in the table, what you described are the columns -- that part

4   is correct, but the actual mathematics that goes on is that I

11:27  5   apply the cost of living at the end.

6            There's no reason to add the cost of living

7   column to both, because I do cost of living increases to both

8   the non-incident and the post-incident side.  So, I just do the

9   cost of living increase at the end of Column 12.

11:27  10            So, that's completely incorrect.  I do give her

11   cost of living increases.  But Mr. King did not provide -- he

12   did not suggest that her earnings capacity was going to

13   increase in the future.  So, I didn't make any separate

14   analysis.

11:28  15   Q.  All right.  Let's do the math.

16            Let's start with -- let's pick age 30.  You start

17   with the baseline number of 41692, correct?

18   A.  Yes, that's right.

19   Q.  And you subtract -- you work that up to -- you start with a

11:28  20   gross adjusted number or a total in Column 6 of 44 -- of

21   48,141, correct?

22   A.  That is --

23   Q.  That's earnings less taxes plus benefits, 48141?

24   A.  That's correct.

11:28  25   Q.  All right.  You subtract that from -- from that you

11:28   1   subtract $26,932, correct?

2   A.   That's correct.

3   Q.   Producing 21,209, correct?

4   A.   In Column 11.

11:29   5   Q.   Yes.  And, then, this $26,932 remains constant throughout

6   every calculation you do for every year, correct?

7   A.   In Column 10, that's correct.

8   Q.   Now, you apply your growth number to this net here, do you

9   not?

11:29  10   A.   Yes, I do.

11   Q.   And then you apply your discount number to this -- to

12   21,209 times the growth factor and then discount it, correct?

13   A.   That's correct.

14        MR. McKINNEY:  It is obvious from this testimony and

11:29  15   from this chart that the growth factor is never applied to

16   Column 7, the growth factor is applied to column -- or sorry --

17   to Column 10.  The growth factor is applied to the ever

18   increasing Column 6, minus the constant of Column 10, and then

19   inflated by the growth factor.  So, this witness is not

11:30  20   increasing, in any way, shape, or form, his net damage

21   calculation by future earnings --

22        THE COURT:  If she stayed doing what she was doing?

23        MR. McKINNEY:  Right, if she stayed doing what she was

24   doing.

11:30  25            This methodology, Judge, is -- with all due

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

| | |
|---|---|
| 11:30 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:30 | 5 |

respect to the doctor, it is quack economics.  It is junk
economics and this witness should be stricken and the jury
instructed to disregard because the only thing we have to work
with here to cross-examine this witness is fundamentally
flawed.

6           If you were to go out and do new charts, it would

7  be too late.  It would be like a late designated witness.

8       THE COURT:  Let me get Mr. Estefan's response.

9       MR. ESTEFAN:  My response, Judge, is I think the

10  witness was explaining exactly how he arrived at his

11  methodology.  Right now, the -- the previous witness, Mr. King,

12  showed for one or two or however many years in his report that

13  that's what Ms. Jones made.  And for Dr. Steward to start

14  making assumptions that she can -- that she can make different

15  incomes without a basis for that is --

16       THE COURT:  But why is that without a basis whereas

17  her regular raises and cost of living adjustments on the other

18  end are fair to assume?

19       MR. ESTEFAN:  We have a history, Judge, of her -- what

20  she earned in the prior years.  So, that gives us something to

21  use.  She's -- according to Mr. King, she's maxed out at as

22  much as she can make right now with her limitations.  He is

23  staying faithful to the methodology by saying, "I can't assume

24  next year she'll make 30" -- or 50 or a hundred or however much

25  down the road.

*Cheryll K. Barron, CSR, CM, FCRR*         *713.250.5585*

11:32  1            He can't do that or, otherwise, he would be

2  challenged for that.  They would come in here and say, "How do

3  you know she's making that?  How can you predict" -- if we had

4  somebody come in and say, "You should give Ms. Jones $5 million

11:32  5  because she could have made this much earnings over the years,

6  "but there's no track for the record that, they would be

7  attacking that.

8        THE COURT:  Well, I mean, I just -- I just find it

9  hard to assume that -- hard to believe that an assumption as to

11:32  10  one set of numbers is acceptable but not another set of

11  numbers.

12            Dr. -- I mean, Mr. King, whatever he says, this

13  is more Dr. Steward's field than Mr. King's.  I don't know why

14  he should be bound by Mr. King's thinking she's not going to do

11:32  15  better.

16        MR. ESTEFAN:  He has to factor that into his

17  calculation, Judge.  He can't independently decide what her

18  earning potential is.  That's why you have a vocational

19  rehabilitation person.

11:32  20            Dr. Steward has testified time and time again in

21  court.  His CV is long enough to warrant his credentials and

22  qualifications in this case.  He's --

23        THE COURT:  He's clearly a very, very smart man.  I

24  don't deny that.  But I just -- I just have a hard time with

11:33  25  this assumption.

11:33  1       MR. McKINNEY:  Judge, it's worse than that.  First, we

2  assume -- he assumes education levels, he assumes salaries, he

3  assumes raises, he assumes a growth factor in all of those,

4  assumption piled on assumption piled on assumption piled on

11:33  5  assumption.

6       Then he takes an arbitrary number that is -- that

7  actually bears some relationship to reality and refuses to make

8  any of the same assumptions he applies to his assumed numbers

9  and projects a level rate of earnings in -- over a 35 or

11:33  10  36-year period.  That's quackery.  That's not economics.  It's

11  quackery.

12       And we have your role as the gatekeeper.  In 31

13  years of doing this stuff, I'm fine with fact witnesses.  This

14  kind of expert testimony, Judge, is precisely why we have

11:34  15  Daubert and its progeny, because faulty -- faulty calculations

16  like this, fundamentally, cannot form the basis of the jury's

17  opinion.  That's the holding in Daubert.

18       THE COURT:  Well, why wasn't this brought before me

19  earlier?  This is awfully hard for me to do on the fly.

11:34  20       MR. McKINNEY:  Well, Judge, A, there was an awful lot

21  to do.

22       THE COURT:  I know there was.

23       MR. McKINNEY:  It came in very late in the case.  And,

24  given all of the other witnesses I've had to examine, quite

11:34  25  frankly, I did not sit down and flyspeck this until just this

11:34   1   weekend, getting ready for these upcoming witnesses.  And I
        2   knew he was on the list.  I knew he would be here.
        3          THE COURT:  Yeah.  Dr. Steward, if a given employee
        4   has the kind of skill set that would advance her in one line of
11:35   5   work, wouldn't the same employee be able to bring that skill
        6   set to work and advance in another field?  Is that not a fair
        7   assumption?
        8          THE WITNESS:  Well, your Honor, I think the biggest
        9   issue is that we're talking about what would have happened had
11:35  10   the incident not occurred versus what has happened now.  And
       11   the reason that I don't think it's appropriate to make that
       12   assumption is that she's now become basically injured; and I
       13   relied on the vocational expert to tell me what that capacity
       14   is.  I don't think it's correct to --
11:35  15          THE COURT:  Okay.  So, one number is assuming she is
       16   injured and the other number is assuming she's not?
       17          THE WITNESS:  That is correct.
       18          MR. ESTEFAN:  That's his whole point, Judge.  You
       19   have -- you have an earnings line that would have happened if
11:35  20   she had not been injured and a separate earnings line now
       21   because of the injury.  That's the differential.  That's all
       22   he's testifying to.
       23          THE COURT:  Well, I understand what he's doing.  I
       24   just -- this is one instance that I find it very hard to accept
11:36  25   assumptions because I -- I don't see anything about Ms. Jones'

11:36  1  life that would justify the higher set of numbers.  I know

2  we're dealing with statistics and all that, but --

3       MR. McKINNEY:  And it's the methodology, Judge.

4  There's just no defensible, articulable, intellectually

11:36  5  supportable process that would allow only growth assumptions on

6  the assumption side --

7       THE COURT:  Well, he's taken Mr. King -- and maybe

8  even farther than Mr. King took his own reasoning.  He's saying

9  that this is a damaged employee who will ever make only 25,000

11:36  10  a year or whatever.

11       MR. McKINNEY:  And that's no part of Mr. King's

12  testimony.  That is not anywhere in the record.  And that is

13  not in Mr. King's report either.

14            Furthermore, even if Mr. King were to come in and

11:37  15  testify that, based upon his view of the future, Ms. Jones

16  would never make a penny more than she is making today, you

17  would have to strike that opinion because it's totally contrary

18  to common sense and everything we know about the economic

19  history of the United States.

11:37  20            And no one can predict with respect to a specific

21  individual that they will make $25,000 a year in the year 2047.

22  No one can make that prediction and have that be a valid,

23  receivable expert opinion in federal court.

24            And that's essentially the logical extension of

11:37  25  what this witness says that Mr. King said, which Mr. King did

11:37   1    not say.  I examined King on his methodology and whatnot.
        2    It's, I think, suspect.  But this witness is not tying his
        3    testimony to Mr. King.  Read Mr. King's report.  You won't find
        4    what this witness says is in there.
11:38   5              But still, you can't come into federal court
        6    wearing the cloak of an expert and perform mathematical
        7    problems in the way that this witness has and pass Daubert
        8    muster.  It can't be done.  It's not an acceptable process for
        9    arriving at these numbers.  It's intentionally skewed.
11:38  10              THE COURT:  Mr. Hedges, you want to add anything?
       11              MR. HEDGES:  No, your Honor.
       12              THE COURT:  Okay.  Mr. Estefan?
       13              MR. ESTEFAN:  Yes, Judge.  I think what Mr. McKinney
       14    is going toward here is the weight of his testimony, not its
11:38  15    admissibility.  If he thinks that his methodology is flawed,
       16    point it out to the jury, let them come up with -- he has four
       17    different scenarios there.  One is if she had stayed with a
       18    high school diploma.  That's the first one.  The one -- we
       19    don't have to go all the way up to a Master's if Mr. McKinney
11:38  20    is arguing that.
       21              But the fact is his methods are sound.  He's
       22    testified as to why.  He's defended his position and his
       23    methodology.  He's -- his testimony should be allowed to go to
       24    the jury.
11:39  25              MR. McKINNEY:  I move to strike this witness on the

11:39   1   grounds of unsupportable process and methodology pursuant to
        2   Daubert.  He has admitted that he only applies his growth
        3   factor to the net of an increased number minus a stable number
        4   times a growth factor.  He has admitted that.  That is not a
11:39   5   methodology that is recognized as sound in any peer reviewed or
        6   generally accepted accounting or economic principle.  It's
        7   simply fundamentally flawed.  I move to strike.
        8        THE COURT:  I mean, Dr. Steward has all the right
        9   credentials; and he's made a study of this field, which I have
11:40  10   not done.
       11        I am most concerned about the extrapolation made
       12   from Mr. King.  Why don't you say another word about that, sir?
       13        THE WITNESS:  Sure.  As far as Mr. King, like I said,
       14   I looked at his report.  And he goes in and he assesses what
11:40  15   she's capable because -- her best use is as we sit now.  And he
       16   says that basically she can work the two -- two courses that
       17   she's doing.  And that's what he projects her earnings capacity
       18   is.
       19        And, so, what I have done is tied off of that and
11:40  20   estimated basically post-injury as --
       21        THE COURT REPORTER:  I'm sorry?
       22        THE COURT:  I'm sorry.  We've got to be careful of the
       23   paper rustling.
       24        But I don't under -- I mean, I can assume that if
11:40  25   she's really injured she might not get merit-based increases.

11:40   1   But wouldn't she at least get cost of living increases?

2            THE WITNESS:  Yes.  And I -- and I'm going --

3   Mr. McKinney is just incorrect, sir.  The growth factor that I

4   apply to the difference is the same as applying it to it

11:41   5   individually -- I mean, to each of the individual -- I apply it

6   at the end because it makes the calculation simpler.  But I do

7   give her -- in fact, give her cost of living increases in both

8   scenarios.

9            MR. McKINNEY:  Absolutely not true.  That's the

11:41   10  fundamental problem here.  We have done the math.  We have

11  taken the assumed inflated Column 6 number, we have subtracted

12  the constant Column 9 number; and then, and only then, do we

13  apply a growth factor.  No growth factor is applied to the

14  Column 10 number -- or Column 9 number.  It's not done.

11:41   15           MR. KELLY:  The problem here, your Honor, is that

16  Mr. McKinney is not an economist and he's arguing with an

17  economist as if he is on equal footing and his testimony should

18  be believed over the economist's.

19           We understand Mr. McKinney doesn't agree; but

11:42   20  unless he's going to take the stand as an economist, I don't

21  think he's allowed to sit there and say that his methodologies

22  are flawed.  He has no evidence of that.  That's just his

23  opinion.

24           THE COURT:  Well, was this gone into at Dr. Steward's

11:42   25  deposition?

1     11:42     MR. ESTEFAN:  No, it was not.

2     MR. KELLY:  They canceled his deposition.

3     MR. ESTEFAN:  No, they did take it later.

4     MR. KELLY:  Did they take it?

5     11:42     MR. ESTEFAN:  It was taken, and it was not gone into.

6     His deposition was recent, too, your Honor.

7     MS. CULLEN:  And that's entirely my fault because I

8     simply do not have Mr. McKinney's grasp of economics.

9     THE COURT:  Okay.  Well, I'm not interested in placing

10    11:42     blame.

11    I do think Dr. Steward has the right credentials;

12    and I do think that, to the extent that the method could be

13    challenged, opposing counsel can do that in the courtroom.  I'm

14    not going to strike his testimony.  I'm not going to strike him

15    11:42     as a witness.

16    Now, is the lunch -- I bought them lunch again

17    today.  I thought -- they may deserve that much.

18    Not here yet?

19    Does it make sense to get them back in for just a

20    11:43     few minutes or not?

21    *(Discussion off the record)*

22    *(Jury present)*

23    THE COURT:  Members of the jury, please be seated.

24    **CROSS-EXAMINATION**

25    11:45     BY MR. McKINNEY:

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:45  1    Q.  I think when we broke I was asking you if your reduction in
       2    Column 4 includes FICA, and I believe we determined that it
       3    does not.  Is that correct?
       4    A.  Yes.
11:45  5    Q.  Column 5 is your benefit assumption, correct?
       6    A.  That's correct.
       7    Q.  And what is the basis for these benefits of $9,265 that we
       8    see here that you are assuming for the year 2012?
       9    A.  The $9,265, that represents the value of the -- the dollar
11:45  10   value of her health benefits, retirement contributions, her --
       11   the employers' contributions to FICA.  Those are the three --
       12   life insurance.
       13   Q.  All right.  And do you know whether Ms. Jones actually has
       14   ever received all of those benefits?
11:46  15   A.  My understanding is that when -- with her employment with
       16   KBR that she did have those benefits.
       17   Q.  Which benefits did she have with KBR?
       18   A.  I believe she had retirement benefits, some type of health
       19   benefits.  I'm not sure of the FICA or how that works with
11:46  20   overseas deployments, but I'm not sure of --
       21   Q.  Let me ask you this.  Can you tell us as you sit here today
       22   what the actual value of Ms. Jones' employer benefit package
       23   was while working with KBR?
       24   A.  No.
11:46  25   Q.  So, you -- can you tell us approximately what that number

11:46   1   is?

2   A.   Oh, I'm sorry.   For -- not for -- to be clear, in 2012, I

3   mean, there's no assumption that she's actually working for

4   KBR.   There's actually only one year in which I look at the

11:47   5   actual KBR benefits, and that would be the 2006.   And I have a

6   value of $16,563 for that year.

7   Q.   Yes, I see where you came up with that number.   But she

8   didn't work for KBR in 2006.   Were you aware of that?

9   A.   Yes, I'm aware of that.

11:47   10   Q.   All right.   So, you have a number here of $16,563 for her

11   2006 benefits.   If she wasn't working for KBR in 2006, how do

12   you know what that number was?

13   A.   Okay.   As I've stated when I went through the report that

14   this is a non-incident scenario.   So, that's the scenario or

11:47   15   the part of the analysis that looks at had she -- had the

16   incident not occurred, the assumption is that she would have

17   continued to work at KBR.   And that number is based off of the

18   contract that I reviewed.   The number of this $16,563 is the

19   benefits based off of the contract that I reviewed.

11:48   20   Q.   So, you're saying you reviewed the contract and actually

21   did a mathematical calculation?

22   A.   I did review the contract, and I did do a mathematical

23   calculation to get the benefits.

24   Q.   All right.   Did you bring that calculation here with you

11:48   25   today?

11:48   1    A.   It's just the benefit multiplier.   I don't have the number

2    with me, no.

3    Q.   All right.   Continuing down on Column 6, Column 6 is the

4    total assumed earnings that you assume that Ms. Jones would

11:48   5    have, benefits and income minus taxes but not minus FICA,

6    correct?

7    A.   Income minus taxes plus the benefits, which -- and there's

8    no deduction for her contribution to FICA in this particular --

9    in each of the years, no.

11:49   10   Q.   Yes.   So, you don't back out her FICA and you consider the

11   employer's matching FICA to be a benefit and that goes in the

12   number that we see in Column 6, correct?

13   A.   That's -- the 6 -- 5 has the FICA that the employer pays

14   in, and 6 is the total of the earnings minus taxes plus the

11:49   15   benefits.

16   Q.   I think that's what I said.   You consider -- you consider

17   the employer's matching FICA to be a part of the employee's

18   benefit program, correct?

19   A.   Yes.

11:49   20   Q.   And, so, you have this -- as we see in 2012, you have a

21   total assumed earning for Ms. Jones of $44,528, correct?

22   A.   Yes, sir.

23   Q.   Then, in the next column, you have her current earnings as

24   an adjunct professor at $25,200, correct?

11:50   25   A.   Yes.

11:50   1   Q.  You subtract her taxes but not her FICA, correct?

2   A.  That is correct.

3   Q.  And then you have a benefit package of $3,408.  Do you see

4   that?

11:50   5   A.  Yes.

6   Q.  All right.  Now -- for a total compensation package of

7   $26,932, correct?

8   A.  Yes.

9   Q.  You subtract -- and that's Column 10, is the total earning

11:50   10   package that you say -- that you assume Ms. Jones has, correct?

11   A.  Yes, Column 10 is the total package that she currently had

12   that year, that's correct.

13   Q.  And to calculate her loss of earnings, you subtract

14   Column 10 from Column 6, do you not?

11:51   15   A.  Yes, I do.

16   Q.  And that produces, based upon the various assumptions

17   you've made, a loss to Ms. Jones of $17,596, correct?

18   A.  Yes, sir.

19   Q.  And then you apply a growth factor to that number of

11:51   20   $17,596, correct?

21   A.  Yes.  There's a growth factor applied to the number in

22   Column 11, that's correct.

23   Q.  All right.  And what that growth factor does, without doing

24   a bunch of arithmetic, is it makes the damage figure that

11:51   25   you've calculated of $17,596, it makes that damage figure go

11:51  1   up, correct?

2   A.  Well, I mean, from a mathematical standpoint, that's the

3   factor; but that's not -- that's not what the factor is for.

4   It is to account for inflation.

11:52  5   Q.  I understand -- I understand you -- it's an inflation

6   factor that you assume.  But the effect of applying your growth

7   factor is to cause the number of $17,596, to cause that number

8   to increase, correct?

9   A.  The impact of that is an increase, too, as a result of

11:52  10   inflation.  I'm not trying to cause anything, but it's -- the

11   impact of that is to account for inflation and --

12   Q.  I got that.

13   A.  -- inflation causes things -- prices to increase.  And

14   that's what that accounts for.

11:52  15   Q.  This is to help the jury understand your methodology and

16   the effect of these different numbers.  We're going to talk

17   about the fact, in just a minute, that the discount factor then

18   reduces the number.

19           So, first let's talk about the growth factor and

11:53  20   get it clear on the record that what you essentially do with

21   this growth factor number is you multiply 1.0376 times $17,596;

22   and that produces a new number to which you -- which is a

23   larger number, correct?

24   A.  It is a larger number than $17,596, yes.

11:53  25   Q.  Right.  And then you discount the number by a discount

11:53  1   rate, correct?

2   A.  Yes, that's correct.

3   Q.  And the discount rate reduces the number that had

4   previously been increased by the growth rate, correct?

11:53  5   A.  Yes, that's correct.

6   Q.  And that produces the net economic value, or net loss, that

7   we see in Column 14, correct?

8   A.  That's correct.

9   Q.  And Column 15 represents the -- the cumulative total of the

11:54  10  prior losses that you've calculated, correct?

11  A.  Yes.

12  Q.  And, so, that's how you do the annual calculation and you

13  add it up to what you calculated in the past and that's how we

14  can look at each one of these horizontal columns to figure out

11:54  15  what you've done.  Is that right?

16  A.  That's correct.

17  Q.  All right.  Now, if we look vertically at column -- let's

18  look at Column 6.

19        MR. McKINNEY:  And if we can highlight Column 6 from

11:54  20  top to bottom and also highlight Column 10 from top to bottom

21  and pull those two out side by side, please.

22        Sometimes these things take a minute, and I

23  apologize.

24        Can we blow those up, please?

11:55  25        Is that as good as it gets?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:55  1                    Okay.  Good enough.

    2  BY MR. McKINNEY:

    3  Q.  This is kind of a snapshot, if you will, of where you see

    4  the assumptions you make in Column 6 increasing every year,

11:56  5  correct?

    6  A.  Column 6 --

    7  Q.  And let's review what Column 6 is.  Column 6 is the

    8  arithmetic result of, first, your assumption as to what

    9  Ms. Jones' starting salary would be -- or what her salary would

11:56 10  be in the year 2012, then increased every year by your

    11  projected or assumed rates of her getting raises, correct?

    12  A.  Close.  What Column 6 is -- just to be completely clear,

    13  Column 6 is the -- what she would have earned had she got a

    14  high school -- I believe -- I think this is a high school

11:57 15  education.

    16              And, so, this shows what she would have been

    17  expected to earn in each of the years.  The age is not shown

    18  there.  But each of the years, this is how much she would have

    19  been expected to earn.  And it takes into account the expect --

11:57 20  the average increases that a person with a high school

    21  education gets from year to year.  That's what Column 6 is.

    22  Q.  Right.  But so we're all clear on what you're doing here,

    23  you assume that she will get a raise every year of her life

    24  from age 28 through age 55, correct?

11:57 25  A.  Like I say, that's not an assumption.  It's a projection

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:57   1   based off the data.  The data shows this is what people with a

2   high school education earn at different parts of their career.

3   And it reflects that as people progress along their career they

4   do get increases, but they -- if you look at the actual growth

11:57   5   there, you'll see that they increase but they increase at a

6   decreasing rate.  So, there are raises; but that's what's

7   typical of most people's careers.

8   Q.  Okay.  Well, sorry.  You're assuming that the projection,

9   the average statistical projection that appears in Column 6

11:58   10   right here applies to Ms. Jones?

11   A.  My assumption is that had she not -- had the incident not

12   occurred, that -- and she would have stayed -- she would have

13   gotten a high school degree and would have stayed in the

14   IT field, Column 6 represents the earnings that she could have

11:58   15   expected to receive over her remaining work life.

16   Q.  Okay.  Now, Column 6 goes up every year, does it not?

17   A.  Yes, sir, Column 6 increases each year.

18   Q.  But Column 10 does not go up every year, does it?

19   A.  No, sir, it doesn't.

11:58   20   Q.  You assume, or you project, in calculating Ms. Jones'

21   economic loss a number of things.  First you assume that she

22   will stay in exactly the same position she is in right now.

23   That's one assumption you make, correct?

24   A.  No.

11:59   25   Q.  You don't make that assumption?

11:59  1   A.  No, sir.

2            MR. McKINNEY:  Well, let's throw up Column 7.

3   BY MR. McKINNEY:

4   Q.  And even without highlighting, I believe we can see that in

11:59  5   every year -- comparing 6 and 7, every year in Column 6 your

6   numbers go up and every year in Column 7 the numbers stay the

7   same.  Do you see that?

8   A.  Yes, I see that.

9   Q.  All right.  Now, in order for the numbers to stay the same,

11:59  10  Ms. Jones would have to remain in her current position -- or

11  are you assuming she might find some other job somewhere else

12  paying exactly $25,200 a year?

13  A.  Well, what my assumption is, is that now that she has

14  become injured that -- I've looked at the rehabilitation

12:00  15  assessment of Mr. King; and he assesses her best use as what

16  her earnings are right now, which is $25,200.

17           And, so, what this represents is what she could

18  be expected to earn if her injuries don't improve.  So, that's

19  the assumption that's made for Column 7.

12:00  20  Q.  You assume -- apparently based on something you read

21  Mr. King wrote, you assume that, for whatever reason, when

22  Ms. Jones is 46 years old, which is the last line right down

23  here, you assume that at age 46 Ms. Jones would be able to make

24  only $25,200, the same $25,000 you have her making at age 28.

12:01  25  Is that correct?

12:01  1    A.  No, sir.  As I stated before, the assumption is that, based

2    off Mr. King's assessment -- he's determined what her current

3    earnings capacity is as we sit.  And he stated at this point

4    there's no -- there have been no improvement in those injuries.

12:01  5              So, based off of that, that's the only projection

6    that I do.  I base it off of his earnings capacity analysis.

7    And until her injuries improve, this is what you would expect

8    her to be able to earn.

9    Q.  Do you have Mr. King's report in front of you?

12:01  10   A.  Yes, I do.

11   Q.  Can you find the part where he says that she will never

12   make more than $25,200 a year for as long as she lives?

13   Because I would like to see that.

14   A.  I don't think he uses those exact words.

12:02  15   Q.  Well, can you find something that comes close, that would

16   justify the projection that you've made?

17   A.  Sure.  Let me review it.

18              I'm ready.

19         MR. McKINNEY:  May I stand next to the witness,

12:02  20   please?

21         THE COURT:  All right.  You may.

22   A.  He states that --

23   BY MR. McKINNEY:

24   Q.  Show it to me.

12:02  25   A.  Okay.  Well, I'll read it from my report first.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:02  1          He states that, "Ms. Jones is working at the

2      highest level she can function in work setting at this time."

3      And that -- that is the earnings capacity that she's at now.

4      Q.  Based on Mr. King's assessment in his report, that she is

12:03  5      currently doing as much as she can do at this time, you take

6      those words to mean that for the rest of her life she will

7      never make more than $25,200?

8      A.  No, sir.  As I said before, I take that to mean that at the

9      current time, until -- when and if her injuries improve, her

12:03  10     income may go up.  But I state that -- in my report, that if

11     her injuries do -- I don't know how long the damages will go

12     forward.  If they do improve to the point where she can work

13     more, then those numbers would go up.

14          But I do take that to mean that, as we sit here,

12:03  15     until those injuries improve, this is her earnings capacity.

16          And I'm not a vocational rehabilitation expert.

17     So, I rely on him to tell me what her capacity is; and that's

18     what he states.

19     Q.  Well, just applying common sense, does it make any sense to

12:04  20     you whatsoever that Ms. Jones would work for a company, for the

21     rest of her life, that never gave her a raise even once in 35

22     or 40 years?  I mean, who -- who would ever do that?

23     A.  Okay.  Well, as I said before, it makes perfect sense.

24     It's not like she would work for one employer.  The idea is

12:04  25     that this is all she can do.  She can't work any more hours.

12:04  1    She can work -- right now she's doing two courses; and that's

2    the extent, given the preps and everything else that she has to

3    do.  And, so, it's not unreasonable to think that that's what's

4    going to happen in the future.

12:04  5              If things improve, then I would expect those

6    numbers could change and she may be able to add more courses.

7    But as we sit here now, my understanding is this is her

8    capacity.

9    Q.  Let's talk about how reasonable the assumption is that she

12:04  10   can't do any more than she's currently doing.

11             Did you review her employment history?

12   A.  Yes, sir.

13   Q.  Did you happen to note that, before taking the position

14   with the University of Houston, Ms. Jones was actually employed

12:05  15   full time?

16   A.  I know she was employed as a teacher, yes.

17   Q.  Full time?

18   A.  I saw the salary.  I think it was full time.  I don't know

19   exactly how many hours she was working on a given week; but it

12:05  20   was what would be classified as a full-time teaching position,

21   I believe.

22   Q.  Yes.  If Ms. Jones was employed full time and is now

23   working part time, wouldn't that imply that, A, she was capable

24   of working full time and, B, for whatever reason, perhaps that

12:05  25   she has small children at the home, she has decided to work

12:05  1    part time?

2              That is a personal choice, not a situation forced

3    by what happened or what did not happen in Iraq.  Does that not

4    seem reasonable to you?

12:05  5    A.  Well, of course, I'm not a vocational rehab expert; but

6    just based on that, no, I don't think there's any reason to

7    believe that because she was teaching full time at an

8    elementary school versus teaching part time at a college, I

9    don't think that that suggests that she could still work full

12:06  10   time.  Because now the preps -- the two preps she has now for

11   those two classes could be quite -- could be equal to what she

12   was doing before.  No, I don't think that that's enough to say

13   that she can work full time.

14   Q.  All right.  Okay.  Now, if we go out to Column 12, we have

12:06  15   a growth factor, do we not?

16             MR. McKINNEY:  Blow up Column 12.

17   A.  Yes.  That's growth factor, yes.

18   BY MR. McKINNEY:

19   Q.  And that's your predicted rate of inflation and how that

12:06  20   might impact earnings, correct?

21   A.  Yes.

22   Q.  And you take your predicted inflation rate and you apply

23   that to a salary that you have already predicted will produce a

24   raise, correct?

12:06  25   A.  No.  The growth factor -- growth factor is actually applied

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:07  1    to both sides of the equation.  It's applied to the earnings

2    that I would expect her to have had she not become injured, and

3    it's also applied to the side where it's based off of

4    Mr. King's assessment of her current earnings capacity.  So,

12:07  5    it's applied to both sides, not just the side -- the

6    pre-incident side.

7         THE COURT:  The food is here for the jury.  So, why

8    don't we take a break now?

9         I know you-all -- and we appreciate the fact you

12:07  10   want to work as many hours as you can today.  Do you want

11   45 minutes?  Is that enough?

12        Okay.  All right.  Be back here, then, at five

13   minutes to 1:00.

14     *(Jury not present)*

12:08  15        MR. KELLY:  Just to be fair, your Honor, I don't know

16   how much cross-examination we have.  I'm not sure how much

17   cross-examination they have of this witness or of Ms. Nelson;

18   but depending how much cross-examination they have, we may not

19   have enough witnesses to fill the day.  So, I don't know if you

12:08  20   want to give the jury a longer lunch in light of that or how

21   you want to handle it.

22        MR. McKINNEY:  We're stopping at 3:00.

23        MR. KELLY:  I'd forgotten that.  Never mind.

24     *(Recess was taken from 12:08 p.m. to 12:57 p.m.)*

12:57  25     *(Jury present)*

12:57   1        THE COURT:  Members of the jury, please be seated.

       2             Ladies and gentlemen, we haven't discussed it;

       3   but I rather think we've all been assuming that we will work

       4   next Friday since it would otherwise be a three-day work week

12:57   5   for us.  So, if you have a reason you can't, let us know.  But

       6   that's my proposal.

       7             Okay.  You may resume, Mr. McKinney.

       8        MR. McKINNEY:  Please the Court.

       9   BY MR. McKINNEY:

12:57  10   Q.  Is my calculator up there with you, by any chance?

      11   A.  Yes, it is.

      12   Q.  All right.  Thanks very much.

      13             Before our lunch break, you and I were discussing

      14   these calculations that you've run, and you told our jury that

12:57  15   you apply your growth rate to both sides of the calculation,

      16   both the Column 6 and the Column 10 side of the calculation.

      17   Is that correct?

      18   A.  Yes.

      19        MR. McKINNEY:  May I use the chart, please, your

12:58  20   Honor?

      21        THE COURT:  You may.

      22   BY MR. McKINNEY:

      23   Q.  You've got the calculator there handy.  At age 28, you have

      24   a Column 6 figure of $44,528, correct?

12:58  25   A.  That is a Column 6 figure, that's correct.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:58    1    Q.  And what's your Column 10 figure?

         2    A.  It is $26,932.

         3    Q.  And you subtract Column 6 from Column 10, correct?

         4    A.  Yes, that's correct.

12:59    5    Q.  And that produces Column 11, does it not?

         6    A.  Yes, it does.

         7    Q.  Column 11 is 17,596, correct?

         8    A.  Yes.

         9    Q.  And then your growth factor, which is Column 12, is 1.0376,

12:59   10    correct?

        11    A.  Yes, that's right.

        12    Q.  And you multiply 1.0376 times $17,569 and then discount

        13    that to present value, correct?

        14    A.  Yes.

12:59   15    Q.  All right.  Now, we drop down to, say, age 46, what do

        16    you -- and this is for age 27 -- 28, correct?

        17    A.  I actually cannot see it very clearly.  It looks to be 28.

        18    Q.  All right.  If we drop down to age 46 -- which is I believe

        19    18 years in the future, correct?

01:00   20    A.  Yes.

        21    Q.  What is your Column 6 number at age 46?

        22    A.  It is $68,461.

        23    Q.  And what's your Column 10 number?

        24    A.  $26,932.

01:00   25    Q.  Now, it looks like you have the same number at age 46 for

01:00    1   Ms. Jones that you have for her at age 28, when it comes to

         2   reducing her economic loss.  Is that correct?

         3   A.  No.  It's the same number in Column 10.  But when I do the

         4   reduction for the present value, the growth factor is applied;

01:01    5   and, so, I can -- by applying the growth factor, it applies to

         6   both sides, both the pre-incident and the post-incident side.

         7   Q.  I understand what you're saying, but that was not the

         8   question.

         9           The Column 10 number, Ms. Jones' earnings at

01:01   10   age 46, is the same number that you have her making at age 28,

        11   correct?

        12   A.  The column number -- the number in Column 10 is the same at

        13   age 26 -- at age 28 and age 46.

        14   Q.  All right.  And what is the Column 11 number at age 46?

01:01   15   A.  $41,529.

        16   Q.  Now, if Ms. Jones -- and you calculate this as -- this is

        17   the beginning number on calculating her economic loss, correct,

        18   and coming up with those million-dollar figures, right?

        19   A.  Well, it's -- what it is, it's just simply the difference

01:02   20   between her earnings after taxes plus benefits in both the

        21   non-incident and the pre-incident side.  So, it's that number.

        22   Q.  Follow the question, please.

        23           Conceptually, the Column 11 number is the

        24   beginning number in calculating a particular year's economic

01:02   25   loss for Ms. Jones.  Isn't that correct?

01:02   1   A.  No, sir.  As I've described before, the beginning number

    2   has to do with the non-incident earnings; and I take it all the

    3   way through.  That's simply -- the 11 column is simply the

    4   difference between those two earning screens.  It's a part of

01:02   5   the calculation.

    6   Q.  What's the growth factor that you have at age 46?

    7   A.  It is 2.0161.

    8   Q.  And, so, you multiply 2.0161 times $41,529; and that

    9   produces her economic loss in -- at the age of 46 times the

01:03  10   growth rate but yet to be discounted by present value, correct?

   11   A.  Yes.

   12   Q.  Now, Column 10 remains constant every year, does it not?

   13   A.  Column 10 remains constant, that's correct.

   14   Q.  You're familiar with how algebra works, correct?

01:03  15   A.  Yes.

   16   Q.  And just to illustrate the point, to work with easy

   17   numbers, we have $10 and then we have $15 and then we have $20

   18   and every year we subtract $5, we get 5, 10, and 15.  Do you

   19   see that?

01:04  20   A.  Yes.

   21   Q.  Now, if you multiply the 5, the 10, and the 15 by your

   22   growth factors, you're not multiplying the constant.  You're

   23   only multiplying the difference between the constant and the

   24   ever increasing number.  Do you see what I am saying?

01:04  25   A.  I see what you're saying, but it's incorrect.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:04  1    Q.  You don't agree with that?

2    A.  It's incorrect.

3    Q.  You take this number right here and you subtract this

4    number and you get this number, correct?

01:04  5    A.  That's correct.

6    Q.  Then 18 years later, you take a much larger number.  Do you

7    see that?

8    A.  Yes, I see that.

9    Q.  You subtract the same number that you subtracted 18 years

01:04  10   ago?

11   A.  Yes.

12   Q.  All right.  And you get this number right here?

13   A.  Yes, that's correct.

14   Q.  Which has gotten a lot bigger, as you can see.  The -- we

01:05  15   have a 46,000 -- is that 41 or 46?  41,000.  We've gone from

16   17,000 to 41,000.  That's one year's baseline loss on the

17   economic side, correct?

18   A.  That's just simply the difference between the two in that

19   particular year.  It's $41,000 and -- 41,529 at age 46.  The

01:05  20   loss at 28 is $17,596.

21   Q.  Okay.  The number that you're applying your growth factor

22   to whether, it's in your 28, 46, 55, or what have you, is the

23   delta, or the difference, between the ever increasing Column 6

24   and the ever constant Column 10.  Isn't that true?

01:05  25   A.  (No response).

01:05  1  Q.  We can go through it line by line and do the math; but it

2  works out that way every time, doesn't it?

3  A.  Sir, that's not what the growth factor is.  I described

4  what the growth factor is.

01:06  5  Q.  I'm not talking about the growth factor.

6  A.  Well, the answer to your question is, no; it's incorrect.

7  Q.  Look at Column 6.  It's up on the board.

8         Now, every year, doesn't the number in Column 6

9  get bigger?

01:06  10  A.  Yes, sir, it does.

11  Q.  And every year doesn't the number in Column 10 stay the

12  same?

13  A.  Yes.

14  Q.  All right.  And, so, if every year you're subtracting the

01:06  15  same number from an ever increasing number, then every year

16  you're going to get a bigger Column 11 number, which is then

17  applied to the growth factor, correct?

18  A.  That's exactly what the table shows.

19  Q.  All right.  And then we have the discount.  And the

01:06  20  discount then -- when you apply the growth factor, this number

21  right here gets bigger, correct?  It goes up by 2-point

22  whatever percent, correct?

23  A.  Well, it actually goes up by -- it's times --

24  Q.  You multiplied by 2.

01:07  25  A.  Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:07   1   Q.  So, you double it.  And this 41,000 becomes -- well, you

2   multiply -- you double it and then you add a discount factor,

3   correct?

4   A.  No.

01:07   5   Q.  You back out a discount factor?

6   A.  No.

7   Q.  Sorry.  You apply the growth rate and then you back out the

8   discount factor?

9   A.  Again, no.

01:07   10   Q.  What do you do?

11   A.  I multiply it by the discount factor.

12   Q.  Back it out, multiply.  Okay.  So, let's do the math.

13   You multiply 41,529 by essentially 2, correct?

14   A.  Right, by the 2.64161.

01:07   15   Q.  And then you apply a discount factor of -- and this is a

16   discount factor, which is Column 13, is 39 point -- 39 --

17   .39 -- 3961.

18   And how is that number derived?

19   A.  That is just simply 1 over 1 plus the interest rate to the

01:08   20   whatever power.  So, if it's 25 years in the future, it's

21   1 over 1 plus -- because the interest rate is 5 percent.  So,

22   it's 1 plus .05 to the 15th power.

23   Q.  In layperson's terms, the purpose of discounting to present

24   value is you project a dollar 20 years into the future and you

01:08   25   ask yourself how much would you have to invest today to have a

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:08  1  dollar 18 years in the future.  Is that correct?

2  A.  Yes.

3  Q.  Now, how much money are you saying that you would have to

4  invest today to have a dollar in 18 years?

01:09  5  A.  Well, the numbers that I have on the table, I would have

6  to -- you're asking for age 46.  I can't see it from this table

7  here but --

8  Q.  Let me give you a complete copy of your worksheet.

9  A.  Okay.  So, at age 46 the total loss would be $41,529.

01:09  10  Q.  All right.

11  A.  Then the economic value of that, or the amount you would

12  have to put into an account today, would be $33,166.  That

13  would give you the $41,000 of loss in the future.

14  Q.  What is your anticipated rate of return on the $33,000 to

01:10  15  produce $41,000 in 18 years?

16  A.  Sure.  That would be from whatever the T-bill rate was and

17  that -- when I did the report.  So, I would have to look at

18  what those numbers are.  But those numbers are going to vary

19  between one percent and probably about 5 percent.  It's based

01:10  20  off the year of maturity, but -- and it's also based on the

21  year of the date of the report.

22  Q.  Well, 5 percent of $33,000 is how much?

23  A.  Let's see.  33,000 --

24  Q.  About 1650?

01:10  25  A.  It is 1650.

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

01:10 1   Q.  All right.  What's 1650 times 18?

2   A.  $29,700.

3   Q.  So, at 5 percent, if you invested $33,000 today, you would

4   have 29,000 in interest plus 33,000 bucks, your principal; and

01:11 5   you would come up with $62,000, correct?

6   A.  I'm sorry, sir.  I don't follow that calculation at all.

7   Q.  Well, you're talking about investing a sum today, discount

8   to present value, correct?  To produce a given number 18 years

9   in the future.

01:11 10   A.  Correct.

11   Q.  All right.  And you're saying -- and you're saying that you

12   would take 33 -- sorry -- yeah, $33,000.

13        If you invested $33,000 today, according to your

14   work papers, you would produce $41,529 in the future, 18 years

01:11 15   from now.  Is that not what you told us?

16   A.  What I said was that, if you needed to have $41,529 at

17   age 46, which is 2030, then investment today -- it's equivalent

18   to an investment today of 33,000 -- $32,166 at the interest

19   rates that were present -- that were current at the date of the

01:12 20   report.

21   Q.  And I'm asking you what those interest rates were, and I

22   believe you told me they are between 1 and 5 percent.  So, I'm

23   checking your math.

24        If they were 5 percent, your $33,000 would

01:12 25   produce $29,000 in income, would it not, over an 18-year

01:12  1   period?

2              We just did the math.  We multiplied $33,000

3   times 5 percent.  We came up with $1,650.  We then -- that

4   would be for one year's worth of interest, correct?  A

01:12  5   5 percent annualized rate of return produces 1650.  Multiply

6   that times 18 years.  That's 29,000 bucks.

7              So, if you were getting a 5 percent rate of

8   return and you wanted to have 41,000 in the future, you would

9   need a lot less than 33,000, wouldn't you?

01:13  10   A.  Well, by your calculation of 5 percent.  But, again, the

11   part that you're missing is you get the interest on the

12   interest.

13   Q.  Sure.  The number goes up even higher?

14   A.  Well, again --

01:13  15   Q.  And your principal drops?

16   A.  Well, I'm saying -- let me finish the answer.

17              Like I said, the range is going to be between one

18   and 5 percent.  I've listed out what the rates were on that

19   day, but they vary.  I don't know what the actual rate was.

01:13  20   But $31,166 is what you would need to have the income to meet

21   the $41,529.

22   Q.  Well, given that you're a PhD in economics and that you

23   have a calculator there in front of you, why don't you tell us

24   what rate of return -- on an annualized rate of interest,

01:14  25   steady rate of interest, if you invest $33,166 today and you

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

01:14  1   leave it invested at the same rate of interest for 18 years and

2   you wind up with $41,529, per your work papers, what's our

3   effective rate of interest?  Can you do the calculation and

4   tell us?

01:14  5   A.  No, I couldn't do it with this calculator as we sit here.

6   Q.  So, you don't know what the effective rate of return is on

7   the numbers you're telling our jury are a valid calculation of

8   future economic loss?

9   A.  No.  What I am saying is I can't sit here and calculate

01:14  10  those numbers, because those aren't numbers that are calculated

11  in these types of calculations.  I mean, what I do is I ask,

12  "What do you need today to replace that income in the future?"

13          I look at the interest rates and what they were

14  and that's -- that's what it is.  I mean, there's nothing else

01:15  15  I can do.  I don't have the Excel spreadsheet and the computer

16  program that I use to perform those here in the stand.

17  Q.  Well, you don't know what rate of return you need over a

18  constant 18-year period to invest $33,000 today and produce

19  41,000 eighteen years from now?

01:15  20  A.  No, sir.  Those are the kind of questions I give to my

21  students, and I let them go home and do them at home and come

22  back to me with homework.  I can't do that as we sit here.

23  Q.  Well, but you prepared an expert report.

24          MR. McKINNEY:  Let's throw Line 46, age 46, up on the

01:15  25  board.

01:15  1          MR. ESTEFAN:  From which table are you working?

2          MR. McKINNEY:  Scenario 1.

3          MR. ESTEFAN:  All right.  Just wanted to be sure.

4          MR. McKINNEY:  Page 1, Line 46.  Yeah, I need the

01:16  5  whole thing up.  It's horizontal.

6              Is that as big as it gets?

7              Actually, I need the -- can you get me the

8  Columns 11 through 14 and, then, on Line 46 -- age 46.

9              Sorry about this, folks.

01:17  10             There we go.

11  BY MR. McKINNEY:

12  Q.  You see the 33,000-dollar figure?

13  A.  Yes, I see it.

14  Q.  And you're telling our jury that, if that number, that

01:17  15  amount of money, was put in an investment vehicle today, it

16  would produce the 41,000-dollar figure we see to the left,

17  correct?

18  A.  Yes.  The $33,000 -- $33,166 represents the present value,

19  taking into account the growth factor and the interest rates

01:18  20  that were current as of the date of the report.  That's what

21  you would -- that's the present day value of that $41,529.

22  Q.  But what you can't tell our jury, apparently, is what rate

23  of interest the $33,000 is being invested at to produce the

24  $41,000 in 18 years, correct?

01:18  25  A.  Exactly.  I can't tell you the exact number as I sit here,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:18    1    because I do all this on a spreadsheet.

    2                But as I mentioned in the report, the data that's

    3    used is the T-bill rates for that date.  So, those rates vary.

    4    And, so, based off of those rates, you get whatever the

01:18    5    interest rate is for that day.  But I can't figure that out as

    6    I sit here.

    7    Q.  Well, you said you don't know the exact rate of interest.

    8    Do you know the approximate rate of interest?

    9    A.  Yes, sir.  As I said, on that date I believe the interest

01:18   10    rates were between 1 and pretty close to 5 percent, I believe.

   11    Q.  Well, that's an interest swing, isn't it?

   12    A.  Not really, sir.  That just represents the yield curve.

   13    And the -- in the earlier time periods, you have -- they pay

   14    less.  And then, in the later time periods, they pay more.  And

01:19   15    then in the intermediate periods, they tend to pay less.  So,

   16    it's what you see with most yield curves.

   17    Q.  Well, one percent interest, what's one percent of $33,000?

   18                It's 330, correct?

   19    A.  Yes.

01:19   20    Q.  And what's $330 times 18 years?

   21    A.  It is $5,940.

   22    Q.  Okay.  And what is -- add that number to 33,186 -- or 66,

   23    whatever that number is.  I have -- oh, I got it right here --

   24    166.

01:19   25    A.  $39,106.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:19  1    Q.   Okay.   So, just kind of eyeballing our situation, it looks

2    like your annualized rate of return on the $33,000 is at about

3    1.2 or 1.3 percent over the 18-year period, correct?

4    A.   Eyeballing it based off of that, I mean, you would --

01:20  5    actually, you have to add the inflation to that, right?   So, if

6    you --

7    Q.   Well --

8    A.   Sorry, I have to finish the answer.

9              That would not be the correct answer, because

01:20  10   what that is, that's a real rate that you just -- that we just

11   discounted by.   That 1.6 is after inflation.   So, you would --

12   you'd add the 3 percent.   That means that the real rate of

13   return on that investment would be 4.6 percent.   And, so, those

14   two things go hand in hand, which is why I can't sit here on

01:20  15   the fly and produce these numbers.

16   Q.   Well, you've factored in inflation by adding the growth

17   factor of 2.01, correct?

18   A.   Well, sir, that's how inflation is captured in the earnings

19   projections.   But --

01:21  20   Q.   I understand.

21   A.   But in the interest rate calculation, that's a separate

22   calculation.   So, if we're talking real dollars, then you have

23   to subtract inflation from those -- from the rates.   If you're

24   talking nominal dollars, then you leave the inflation in.   And,

01:21  25   so, that's a separate issue completely.

01:21  1    Q.  Well, if you've told us we need 33,000 today to get 41,000

2    in 18 years, those are 33,000 real dollars today, correct?

3    A.  And -- right, those are 33 real dollars, after inflation

4    dollars, that's right.  Those are real dollars.

01:21  5    Q.  All right.  And you're going to produce 41,000 in real

6    dollars 18 years from now, correct?

7    A.  In 18 years from now, I'm going to have $41,000 that are --

8    $41,000.  And then I have to take that and account for

9    inflation; and that's done in Column 12, the growth factor.

01:22  10   So, that accounts for that inflation.

11   Q.  Well, what number are we trying to produce -- well, maybe I

12   can figure it out.

13        If it turns out that what you're saying to our

14   jury is that the rate of return you are anticipating on the

01:23  15   present value of dollars is somewhere in the 1.2 or 1.3 percent

16   rate over an 18-year period, wouldn't you agree that that is a

17   very low rate of return, an unreasonably low rate of return

18   over an 18-year period?

19   A.  Absolutely not.  If that represents a real return, then

01:23  20   that's about what you would expect on average.  The average

21   rate of real return is around 2 percent.  That is, when you

22   account for inflation, you add inflation onto it, which those

23   are the rates you actually see in the banks.  That may be

24   around 4 or 5 percent.

01:23  25        I mean, all you have to do is look at the yield

01:23   1   curve as we sit here.  And interest rates are really, really

     2   low.  In fact, in some of the earlier periods, it was basically

     3   zero.  I mean, there was no discounting at all.  Interest rates

     4   are still at a very, very low point.

01:24   5   Q.  Are there not other investment vehicles available to people

     6   with competent financial managers, where they can markedly

     7   improve on the short-term T-bill rate of return?

     8   A.  There are, sir; but none of those are relative to this type

     9   of calculation.  In this type of calculation, you want to look

01:24  10   at a risk-free rate of return.  I don't want to make the

    11   assumption that Ms. Jones would have to go out -- or be able to

    12   become an investor in the stock market and be able to time the

    13   market.

    14            So, the idea is, with a risk-free investment in

01:24  15   T-bills -- and that's basically the only thing that's out there

    16   that's completely risk free -- what would be the rate of

    17   return.  And that's -- in real terms, it would be around that 1

    18   or 2 percent level.

    19   Q.  Your view of the future is that Treasury bills,

01:24  20   particularly long-term Treasury bills, the United States debt,

    21   is risk free?

    22   A.  I'm sorry.  That's just a conventional view in economics,

    23   that the risk free -- the least risky vehicle out there is US

    24   Government debt.  I mean, there's nothing else out there that's

01:25  25   safer.

01:25   1    Q.  Most investors use money managers and invest prudently with

         2   a balanced portfolio and achieve substantially greater than 1

         3   or 2 rate of return.

         4          THE COURT:  I really don't think we need to argue

01:25   5    about this.  He's talking about what the conventional view is

         6   in the field of economics.  It's risk free.  That's what you

         7   get.

         8          MR. McKINNEY:  Judge, I'll pass the witness.  I would

         9   offer, for the purposes of my record only, B256 in connection

01:25  10   with the proceedings outside the jury.

        11          THE COURT:  Okay.

        12             Mr. Hedges.

        13                    **CROSS-EXAMINATION**

        14   BY MR. HEDGES:

01:25  15   Q.  For better or worse, Dr. Steward, I don't do math.  So, I'm

        16   just going to ask you a couple of questions.

        17             I understand Mr. King did certain work and you

        18   did different work than what he did, some of your work is based

        19   on his work.  Is that an accurate description?

01:26  20   A.  Yes, sir, that's fine.

        21   Q.  And, so, you don't have an opinion, sitting here today, one

        22   way or the other, as to whether Ms. Jones is, in fact, capable

        23   of going back to do full-time IT work?

        24   A.  That's correct.  I don't have a separate opinion

01:26  25   regarding --

01:26 1  Q.  That was Mr. King?

2  A.  Yes, sir.

3  Q.  I want to follow up on a question that the judge asked you

4  and see if I -- I probably understood you incorrectly.  So, I

01:26 5  want to ask this.

6        You're looking at the future earnings streams and

7  projected earnings streams in the IT field for people with

8  Master's degrees.  Is that correct?

9  A.  That is partially correct that -- I actually look at it

01:26 10  under several different scenarios.  I look at people in the IT

11  field with high school, Associate, Bachelor's, and Master's.  I

12  do all four.

13  Q.  Okay.  I just want to focus for right now on the Master's.

14  One of your charts is for people for the next X years with

01:26 15  Master's degrees in the IT field.  Is that correct?

16  A.  Yes, sir.

17  Q.  And what I think I must have heard wrong was -- I believe

18  the judge asked you if it made any difference, A, where they

19  got their degrees and, B, what the degrees were in.  And I

01:27 20  thought you said, for the purposes of this chart and this

21  calculation, it didn't make any difference.

22  A.  No.  I would like to think I said that it's really going to

23  depend.  I mean, in here, I think, in IT, where there's a

24  demand, a pretty strong demand, it's probably going to be a

01:27 25  smaller premium than in other fields.  I mean, and again, it's

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:27   1   going to depend on the job.  If you're looking at a computer

2   programmer, then it may not hurt to have a computer programming

3   background.  But if you're looking at a person who's a tech

4   writer, who's going to write the books, the manuals, then

01:27   5   they're going to potentially look at someone with an English

6   degree over someone who was a computer degree.

7   Q.  I remember that testimony.  Let me ask you this.  Sort of

8   across the IT field, does your chart treat the same a person

9   with a Bachelor's degree in computer science from Rice, a

01:28   10   Master's degree in computer science from Rice, with another

11   person who has a Bachelor's degree in criminal justice from an

12   online program of the American Military University and a

13   Master's degree in business administration from an online

14   course at American Military University?

01:28   15   A.  I don't know the answer to that.  I mean, I would have to

16   look at the raw data.  Because, again, like I said before, it

17   does not have where they got their degree from.  And,

18   obviously, online courses are a lot more popular now.

19   But in that data, they don't differentiate in

01:28   20   terms of if they got it online or not.  But -- so, I guess the

21   answer to that is I don't know as we sit here if I can

22   distinguish -- I know I can't distinguish it with the data that

23   I've got.

24   Q.  Let me ask you your own personal opinion.  Would you value

01:28   25   someone in the IT field's future earning capacity the same if

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:29  1   that person had a Bachelor's and a Master's from Rice in

2   computer science versus somebody with a Bachelor's in criminal

3   justice and a Master's in business administration from American

4   Military University online?

01:29  5   A.  I would definitely look at each of the cases.  I'm not -- I

6   wouldn't say that I would get to different points, but I would

7   definitely look at what they majored in at Rice.  I would look

8   at what they majored in at American University.  I'm familiar

9   with it through ROTC.  I know people have gone through it.

01:29  10          So, I mean, I would look at it.  I would look at

11  it, but I don't know at what point I would get to, if I would

12  value it differently or not.  I don't know.

13  Q.  I just told you what the degrees were in.  The one from

14  Rice is in computer science.  The degrees from the American

01:29  15  Military University online are criminal justice and business

16  administration.

17  A.  Yes, but my answer is still the same.  I need to know more

18  about -- I mean, just because you go to Rice and you take the

19  courses there, I mean, how well did you do in the courses, were

01:30  20  there applied courses, were they more in line to go to graduate

21  school.  And that's one of the things that comes out a lot in

22  these programs, is that you'll have some that are more

23  theoretically focused and that's of interest to employers.

24          And you'll have other schools that are more

01:30  25  focused on the technical aspect of it, and they can go to work

01:30   1   the next day.  And, so, it's not as simple as simply looking at

2   the degree and where they got it from.

3         MR. HEDGES:  Pass the witness, your Honor.

4         THE COURT:  Any redirect?

01:30   5         MR. ESTEFAN:  Your Honor, all the plaintiff would

6   offer is the tables that Dr. Steward testified from.

7         THE COURT:  Very well.

8         MR. ESTEFAN:  I provided copies.

9         THE COURT:  What number are they going to be?

01:30   10        MR. ESTEFAN:  Our next number.  I lost track.

11        THE COURT:  Okay.  You may step down.  You're free to

12   go.  Thank you very much, Doctor.

13        MR. ESTEFAN:  It will be 84, your Honor.

14        THE COURT:  Okay.

01:30   15        MR. KELLY:  Dawn Nelson, your Honor.

16            Are those admitted?

17        THE COURT:  Those are admitted without objection, yes,

18   they are.

19        *(Witness being summoned to the stand)*

01:31   20            Ms. Nelson, good afternoon.  We're going to have

21   you up here.  Perhaps could we remove the one report that's up

22   here?

23            We're going to have you up here in the seat

24   nearest me.  If you could, please -- before you take your seat,

01:31   25   Mrs. Loewe will administer the oath.  Raise your right hand,

please.

THE CASE MANAGER:  Do you solemnly swear the testimony you're about to give in the matter now before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  Try to make yourself as comfortable as you can.  It's not a great perch, but we need to ask you to speak directly into the mic.  We've had a little trouble at this trial.  Thank you very much.

You may inquire.

MR. KELLY:  Thank you, your Honor.

**DAWN NELSON, DULY SWORN, TESTIFIED:**

**DIRECT EXAMINATION**

BY MR. KELLY:

Q.  Please introduce yourself to the ladies and gentlemen of the jury.

A.  My name is Dawn Nelson.  I'm a licensed clinical social worker, and I'm Jamie's therapist.

Q.  Can you tell me a little bit about your education and training, Ms. Nelson?

A.  Yes, sir.  I have a Master's of social work from the University of Houston, and I'm a clinical practitioner.

Q.  How long have you been a clinical practitioner?

A.  You can sit for the exam three years after being in practice and being supervised.  So, that has been for

| | | |
|---|---|---|
| 01:32 | 1 | approximately 12 years. |
| | 2 | Q.   And what does it mean to be a clinical practitioner? |
| | 3 | A.   It means that you can make a diagnosis, you can treat, you |
| | 4 | can assess clients and build a treatment plan and work with |
| 01:32 | 5 | them individually. |
| | 6 | Q.   And have you, in fact, done all of those things with |
| | 7 | respect to your treatment of Jamie Leigh Jones? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   Where have you treated Jamie, physically? |
| 01:32 | 10 | A.   In my office. |
| | 11 | Q.   Okay.  And where is your office? |
| | 12 | A.   Well, I have moved a couple of times during the course of |
| | 13 | treatment. |
| | 14 | Q.   All right.  And currently you're located where? |
| 01:33 | 15 | A.   701 North Post Oak Road in Houston. |
| | 16 | Q.   And prior to that? |
| | 17 | A.   730 North Post Oak Road in Houston. |
| | 18 | Q.   Where was the office you were located in when Jamie |
| | 19 | returned from San Diego? |
| 01:33 | 20 | A.   730 North Post Oak Road. |
| | 21 | Q.   Can you describe that building for us? |
| | 22 | A.   It is a steel and concrete building, about four stories |
| | 23 | high, small building. |
| | 24 | Q.   Where was your office in that building? |
| 01:33 | 25 | A.   In Suite 350. |

01:33  1   Q.  How many practitioners were in there with you?

2   A.  Three together, all of us, three.

3   Q.  I want to ask you a little bit about post-traumatic stress

4   disorder.  First of all, what is it?

01:33  5   A.  Do you want me to give you the clinical criteria?

6   Q.  Actually, I would.  And I know we -- we had an opportunity

7   to speak about this, did we not?

8   A.  Yes.

9   Q.  And would it help to diagram it out and show us what the

01:34  10   clinical criteria are?

11   A.  I'll be happy to do it.  It will take some time.

12           MR. KELLY:  May I approach, your Honor?

13           THE COURT:  You may approach.

14   BY MR. KELLY:

01:34  15   Q.  There used to be a marker up here, I promise.

16           THE COURT:  We can find you one.

17           MR. McKINNEY:  I'm sorry.

18   BY MR. KELLY:

19   Q.  You're already started.  So, thank you.  I was going to say

01:34  20   if you could tell us a little bit about --

21   A.  First of all, the person --

22           THE WITNESS:  I don't know.  Can you hear me?

23           THE COURT:  It's going to be a little bit of a

24   problem.

01:34  25           Yeah, why don't you just disconnect that.  Tap on

01:34  1    it.  Yeah, it's working.

2    A.   A person has to meet certain criteria to be diagnosed with

3    the disorder.  They have to be exposed to a traumatic event.

4    The traumatic event has to involve either real or threatened

01:35  5    death, serious injury or -- what word am I looking for -- a

6    threat to the physical -- to your physical integrity, of

7    yourself or someone else, and that exposure has to involve a

8    response of fear, helplessness, or horror.  So, both of those

9    criteria have to be met.

01:35  10           Other criteria that has to be met is that a

11   person has to reexperience the trauma or aspects of the trauma.

12   Reexperiencing them through recurrent, intrusive, distressing

13   thoughts of it, recurrent through nightmares, reoccurring

14   through -- or reexperiencing through flashbacks, having an

01:36  15   intense psychological and physiological response to being

16   exposed to a cue that is reminiscent or represents the trauma.

17   So, that has to be present, the reexperiencing piece.

18           So, a person has to have both of these criteria.

19   They have to have one of those things that I just mentioned in

01:36  20   terms of reoccurring distressing thoughts, nightmares,

21   flashbacks, the intense physiological response or the intense

22   psychological response to being exposed to cues.

23           They also have to have avoidant or numbing

24   behaviors; and that includes -- that includes efforts to avoid

01:37  25   conversations, thoughts, feelings that are associated with the

01:37   1    trauma; efforts to avoid people, places, and situations that

2    represent the trauma; an inability to recall an important

3    aspect of the trauma; a markedly diminished interest in

4    activities; a sense of being detached or estranged from other

01:38   5    people, like, "I'm different now than other people."

6            A restricted range of affect, which means

7    noticeable mood that you could tell from looking at someone's

8    face or their appearance.  A sense of a foreshortened future,

9    meaning that there's a sense of, "I'm not going to have the

01:38   10   same life I would have had," something along those lines.

11           Also, symptoms of what's called hyperarousal.

12   Hyperarousal symptoms would be difficulty falling or staying

13   asleep, irritability, difficulty concentrating, hypervigilance,

14   which is kind of always looking around, waiting for the other

01:39   15   shoe to drop, waiting for something bad to happen.  And an

16   exaggerated startle response, meaning if you round the corner

17   and somebody comes around the corner at the same time you do,

18   you might just go like that.  Someone with this disorder might

19   scream, might become very frightened.

01:39   20           So, those things -- you have to have some of

21   those symptoms.  In this case you have to have two of

22   hyperarousal.  You also have to have the symptoms present for

23   four weeks or longer.

24           And the last criteria is that it has to cause

01:40   25   significant impairment in your functioning, either social,

01:40   1   occupational functioning, or some other area of important

2   functioning.  So, those are the clinical criteria for

3   post-traumatic stress disorder.

4   Q.  Thank you, Ms. Nelson.

01:40   5              How long have you treated Jamie Leigh Jones?

6          THE WITNESS:  I can use this one now?

7          THE COURT:  Yes, you may.

8          MR. KELLY:  Yes, you can.  Here, I'll come get it.

9   A.  Since August 22nd of 2005 until approximately February,

01:40   10   March of '07, when she went to San Diego.  And then when she

11   returned back to Houston again, which would have been fall of

12   '09, until now.

13   BY MR. KELLY:

14   Q.  I want to ask you about the exposure.  And can you tell me,

01:41   15   with respect to exposure, what you found with Ms. Jones?

16   A.  Yes.  She had been exposed to a traumatic event.

17   Q.  And there's -- can you be exposed to a traumatic event

18   while you are unconscious?

19   A.  Yes.

01:41   20   Q.  Okay.  Can you explain how that is?

21   A.  Can I explain how that is in this case?

22   Q.  Yes, specifically in this case.

23   A.  There was exposure that happened -- there were events that

24   led up to this event that she has reported to me and events

01:41   25   that happened after this event and there was fear,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:41  1   helplessness, and horror that was a response to learning about
       2   what had happened when she was drugged.
       3   Q.  So, the fear, helplessness, and horror, you said she needed
       4   two of those?
01:42  5   A.  She needs to have had exposure and have had either fear,
       6   helplessness, or horror as a response.
       7   Q.  Okay.  How many of those did she have?
       8   A.  All three.
       9   Q.  So, she had all three when she needed two?
01:42  10  A.  No.  You're getting those --
       11  Q.  I'm sorry.  I'm sorry.  So, she needed all three of these?
       12  A.  A person has to have exposure and the response out of
       13  either fear, helplessness, or horror; and they can have one or
       14  two or three of those.
01:42  15  Q.  I see.  Have I totally messed up your chart now?
       16  A.  Not really.
       17  Q.  Okay.
       18  A.  Exposure and that response, fear, helplessness, or horror,
       19  has to be met.  Those two criteria were met.
01:42  20  Q.  I see.  So, she had to have both of these?
       21  A.  Yes.
       22  Q.  And she had them?
       23  A.  Yes.
       24  Q.  Okay.  You're going to have to help me along a lot here.
01:42  25  I'm sorry, Dawn.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:42   1                    What did you mean when you said "experience"?

        2    A.   Reexperiencing the trauma through a number of different

        3    ways.  She had the intrusive distressing thoughts of the

        4    trauma, meaning that thoughts come into your mind when you

01:43   5    would like to be thinking about something else and you start

        6    getting them when you -- excuse me -- don't want them.

        7    Sometimes you're preoccupied with them.  Particularly right

        8    after a trauma, it's not uncommon for people to be kind of

        9    hyper-focused and get a lot of distressing thoughts.

01:43   10   Q.   Okay.  She had that one?

        11   A.   Yes.

        12   Q.   What else?

        13   A.   Nightmares.  She had flashbacks, which are images or

        14   perceptions of the trauma happening.

01:43   15   Q.   Anything else?

        16   A.   She had the intense psychological and physiological

        17   response to cues.

        18   Q.   So, she had four findings there?

        19   A.   I think it was five.

01:43   20   Q.   Okay.  Was there another one I didn't ask you about?

        21   A.   Actually, the last two, I put together.  They're actually

        22   separate, physiological and psychological.

        23   Q.   I see.  So, she had five findings under the reexperiencing?

        24   A.   Yes.

01:44   25   Q.   And what about the avoidance or numbing behaviors, did you

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

01:44   1   find any of those?

2   A.   Yes.

3   Q.   What do you find there?

4   A.   Inability to fall and stay asleep has been an ongoing

01:44   5   problem since the beginning.

6          Excuse me.   I think I've got that confused with

7   hyperarousal.   Oh, no.

8          The avoidant piece, efforts to avoid thoughts,

9   feelings, and conversations about the trauma, that certainly

01:44   10   was present.   Efforts to avoid people, places, and situations

11   that remind you of the trauma, yes, that's present.

12   Q.   Okay.   So, she had -- I'm sorry.

13          Please, I don't mean to cut you off.

14   A.   The inability to recall important aspect of the trauma, I

01:44   15   attributed that more to being drugged, not being able to

16   remember particular aspects of it.

17   Q.   Okay.

18   A.   Markedly diminished interest in activities, she had that in

19   the beginning.   A sense of detachment or estrangement from

01:45   20   other people, yes, she had that.

21          Restricted range of affect, she had that.   And a

22   foreshortened sense of the future, that -- I would say for a

23   small period of time.   That got resolved.

24   Q.   That one was resolved?

01:45   25   A.   That resolved.

01:45   1   Q.  So, as we're sitting here today, if I counted right, that

        2   was seven of the avoidant/numbing symptoms?

        3   A.  I didn't count them, but I think there's seven.

        4   Q.  Okay.  And, so, she's -- one of them is self corrected.

01:45   5   And, so, now she has six.  Is that --

        6   A.  I'm saying at the time of the diagnosis she had --

        7   Q.  She had seven?

        8   A.  She had the ones I just named off.

        9   Q.  Okay.  What about the hyperarousal?

01:46   10  A.  Hyperarousal, she had and continues to have difficulty

        11  falling and staying asleep.  Certainly had irritability in the

        12  beginning.  Difficulty concentrating, I think that was present

        13  in the beginning; but I think she's done well with that.

        14          Hypervigilance is still a problem.  It was a

01:46   15  problem from the beginning, and it's still a problem.

        16          Exaggerated startle response she still has.

        17  Q.  Okay.  I counted four that you just told me.  Is that

        18  right?

        19  A.  I didn't count them.

01:46   20  Q.  Okay.  Fair to say that she had at least the two that she

        21  would need for -- under hyperarousal?

        22  A.  Yes.

        23  Q.  Okay.  I'll say two plus, just so that we're not being

        24  misleading at all.

01:47   25          Has she had these symptoms in excess of four

01:47   1   weeks?

2   A.   Yes.

3   Q.   And has it affected her functioning?

4   A.   Yes.

01:47   5   Q.   Where do these criteria come from, Ms. Nelson?

6   A.   They come from the DSM, which is the Diagnostic and

7   Statistical Manual that all mental health professionals use.

8   Q.   And I think you said it is normal in your practice to make

9   the diagnosis of your patients.   Is that right?

01:47   10   A.   My clients, yes.

11   Q.   Your clients.   I'm sorry.

12          And have you, in fact, made the diagnosis of

13   post-traumatic stress disorder in Jamie Leigh Jones?

14   A.   Yes, sir.

01:47   15   Q.   Is it important when assessing a patient to have a

16   perspective of that -- I think you said "client."   I used the

17   word "patient."   I apologize.

18          Is it important when assessing a client to have a

19   perspective of that client over time?

01:48   20   A.   Important to what?

21          THE COURT:   To the treatment program, is that what you

22   are talking about?

23          MR. KELLY:   Yes, your Honor.   I didn't ask it very

24   well.   I'll see if I can phrase it a better way.

01:48   25          THE COURT:   Okay.

BY MR. KELLY:

Q.  Ms. Nelson, there will be likely another expert that will be called in this case to come in and say that Jamie does not suffer from post-traumatic stress disorder.  Does the length of time that you've treated Jamie have any bearing upon the strength that we should give your opinion?

A.  Yes.

Q.  Can you explain that, please?

A.  Yes.  I've seen her and treated her over the course of six years, with the two years that I mentioned that she was not living in Houston, I did not see her during that time.

Q.  And why is the length of time over which you treat somebody an important factor in making an accurate assessment of them?

A.  Well, you see what's happening with them throughout the picture, throughout time.  Often we don't see people for that length of time.  So, I've had the opportunity to see her over the course of many weeks and months, during times that, you know, other things in life have come up and seen her reactions and how she's dealing with things.

Q.  How often does Jamie treat with you currently?

A.  About twice a month.

Q.  And has that been consistent over the years or has that changed?

A.  It's changed.  In the beginning it was at least once a week and sometimes twice a week in the beginning.

01:49  1   Q.  Can you explain the concept of "resilience" versus

2   "recovery"?

3   A.  Yes.  Clinically, when you look at these criteria that

4   we're discussing, we're looking for treatment to produce a

01:50  5   reduction of symptoms.  And some -- some clients, some people

6   who have post-traumatic stress disorder never fully recover

7   from it.  Some do with -- they go into remission and have

8   isolated times that it pops back up again in life.  Some people

9   don't recover at all from it.

01:50  10        Resilience is about something different.

11   Resilience is about in spite of having a clinical disorder that

12   causes significant impairment, what do people do with their

13   lives.  Resilience is about doing the best that you can do

14   given the fact that you're still experiencing these symptoms.

01:51  15   Q.  With respect to your treatment -- and in particular of

16   Jamie Leigh Jones -- have you done anything to try to assist

17   her with the various factors that you've listed on the chart

18   there as far as the criteria for post-traumatic stress

19   disorder?

01:51  20   A.  Yes.

21   Q.  And can you tell me what your treatment entails and what it

22   is that you're trying to accomplish by that treatment?

23   A.  Okay.

24   Q.  And we can -- I know we -- we'll break it down as we go,

01:51  25   but if you can just start us.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:51   1   A.  Oh, okay.  It's kind of two pronged.  It's addressing

2   symptoms of post-traumatic stress and looking to reduce those

3   symptoms and dealing with life that's happening right now,

4   stressors that are coming up, real-life situations that are

01:51   5   coming up while you're addressing these other things and

6   dealing with them.

7   Q.  What sort -- I'm sorry.  I cut you off.

8   A.  Specifically I was going to go back and talk about the

9   reduction of symptoms.  There are a number of different

01:52   10   techniques that we used in treatment that are called "cognitive

11   behavioral therapy."  It's an evidence-based practice, and it

12   is the treatment of choice for post-traumatic stress.  It's

13   shown to be the most effective through research.

14   Q.  Can a person look calm and passive and still have problems

01:52   15   with post-traumatic stress disorder?

16   A.  Yes.

17   Q.  Why is that so?

18   A.  Well, any of us can have a feeling on the inside and not

19   being able to be read from the outside readily from others.

01:52   20   Post-traumatic stress involves -- maybe you should rephrase

21   that.

22   Q.  Well, let me just ask you.  We've all heard of a specific

23   event that occurred on August the 15th of 2005, less than three

24   weeks after Jamie's assault, where she's noted as being calm or

01:53   25   passive in her physician's office.  And I think you've told us

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:53  1   that she was hypervigilant?

2   A.   Yes.

3   Q.   How do those things -- how is that possible to be both?

4   A.   Well, hypervigilant is different than being --

01:53  5   hypervigilant would only be read probably -- or known by people

6   very close to you over a period of time.  And it would have

7   more to do with the individual's experience than it would be of

8   anything that you could readily assess or notice from looking

9   at the person.

01:53  10   Q.   Does Jamie, in fact, suffer hypervigilance even today?

11   A.   Yes.

12   Q.   Okay.  Does someone with post-traumatic stress disorder

13   exhibit extreme emotional responses to various stimuli?

14   A.   They can, yes.

01:54  15   Q.   Does Jamie?

16   A.   I'm thinking what -- what I recall and what I've witnessed.

17   I guess it depends on what we're talking about.

18   Q.   Okay.  Do you recall any specific instances yourself?

19   A.   Not any off of the top of my head, but are you talking

01:54  20   about heightened emotionality?

21   Q.   Yes.

22   A.   Yes, that would be consistent.

23   Q.   Okay.  Tell me about some of the techniques that you have

24   suggested to Jamie to cope with the post-traumatic stress

01:54  25   disorder.

01:54  1  A.  Well, there are a number of different pieces of the

2  treatment plan that we've used.  One is called desensitization

3  exposure therapy where it's not something we can do right up

4  front sometimes.  And everybody is different.  So, the course

01:55  5  of treatment is different with every individual with

6  post-traumatic stress.  We have to start where our clients are.

7  So, depending on their sense of safety and how

8  they can tolerate talking about the event, it may take a very

9  long time in treatment to cover all of that.  In fact, at first

01:55  10  when she first came to see me, the -- my biggest job, once we

11  got to treatment, was to build rapport and trust with her.  And

12  that took a very long period of time in comparison to working

13  with people with other diagnoses.  So, that took a long period

14  of time.

01:55  15  Then we began using desensitization and exposure

16  therapy, where we'd start talking about the trauma in small,

17  little pieces, as much as she could tolerate each time we met.

18  That's one prong of treatment.

19  Q.  So, does that mean when you first met with Jamie, she

01:56  20  couldn't even talk about the event?  Is that what I am hearing

21  you say?

22  A.  She could talk about it; but it was very, very difficult

23  and there would be times where she would get to a certain point

24  she wouldn't want to talk about it anymore because she was both

01:56  25  visibly shaken and upset.  And that was certainly, I would say,

01:56  1   about the first several months of treatment.

2   Q.  Are there coping techniques that you recommend to your

3   clients to deal with the initial aftermath, things such as

4   journaling and those sorts of things?

01:56  5   A.  Yes.  Can I go back to my answer for the previous question?

6   Q.  Any time you want to.

7   A.  Because I didn't really complete that.

8   Q.  I'm sorry.

9   A.  You asked me about treatment.

01:56  10   Q.  Thank you.

11   A.  Another piece of that treatment was cognitive behavioral

12   processing, "processing" meaning talking about the event,

13   looking at feelings, thoughts, different ways that things can

14   be thought of so they're not so traumatizing.  Weighing

01:57  15   information to say is it happening right here, right now, that

16   kind of thing.  Because a lot of times in post-traumatic

17   stress, people will relive the event as if it's happening right

18   now.  So, we have to call attention to the fact that was this

19   date how many weeks ago, how many months ago, what's happening

01:57  20   right here, right now.

21       We did use some hypnotherapy in her treatment.  I

22   used assertiveness training, stress inoculation, relaxation

23   training, problem solving.  Those are more of the pieces that

24   had to deal with dealing with the trauma.  And then the problem

01:58  25   solving and -- mostly the problem solving had to deal with

what's going on right here, right now, how are we going to deal
with the things that are happening to you today, struggles that
come up.

Q.  Tell us what stress inoculation training is.

A.  It is about decreasing stress and having a game plan for
stress, recognizing how stress happens, what you can do about
it.

Q.  And what is assertiveness training?

A.  Assertiveness training is about your choice about how to
respond to any given situation.  And it's about standing up for
your rights -- standing up for your rights, asking to have your
needs met while respecting the rights of other people.

Q.  And you trained her with the assertiveness training?

A.  Yes.

Q.  So I guess we actually owe you a debt of gratitude for
teaching Jamie to push us all to the point where we're sitting
in front of this jury, don't we?

                    What about hypnotherapy?

A.  The hypnotherapy that we did was to reduce symptoms and
reduce the intensity of the emotion and the trauma.  I'm not --
I'm trained as a clinical hypnotherapist.  I'm not trained as a
forensic hypnotherapist.  The only people in Texas who are
trained like that are police officers, law enforcement people.
So, for -- we did this with the purpose of reducing symptoms,
not to gather information.

01:59   1   Q.  And have you been successful with being able to reduce
        2   Jamie's symptoms?
        3   A.  Yes, to a certain extent.  With some others -- there are
        4   some that are present, maybe not as intense as they once were;
02:00   5   however, they're still present.
        6   Q.  Is part of the treatment in the initial phase, Ms. Nelson,
        7   to allow them to emote --
        8   A.  Yes.
        9   Q.  To allow them to get this -- how do they do that?
02:00  10   A.  Well, through processing, certainly through the
       11   hypnotherapy process that we did.  It was also a very emotional
       12   process.
       13   Q.  Do some of your clients journal?
       14   A.  Some of them do.
02:00  15   Q.  Okay.  Did Jamie discover, as part of the emoting that she
       16   had, a particular talent that she didn't know about before this
       17   attack?
       18   A.  She did.
       19   Q.  What is that?
02:00  20   A.  She discovered that she was actually a quite gifted artist.
       21   Q.  And what his her method or her --
       22            THE COURT:  Métier?
       23            MR. KELLY:  That word is above me, your Honor.  I'm
       24   looking for a word that's escaping me, but I'll go with that.
02:01  25            THE COURT:  All right.

BY MR. KELLY:

Q.  What is her mechanism?  What is her format?

A.  Painting.

Q.  Painting.  Okay.

        THE COURT:  Abstract or representation?

        THE WITNESS:  Representation.  I don't know if she
does abstract or not.  I've seen -- she's shown me pictures
that she's done of real life and of people.

BY MR. KELLY:

Q.  Are there other things that are used in treatment to
distract your clients from the situation that they are
suffering from?  Have I asked a really bad question?

A.  Well, my answer is:  Yes, but I don't know what you're
asking beyond that.

Q.  Okay.  Is it important that your patients become distracted
by concentrating on other things?

A.  Was it important in this case?

Q.  Yes.

A.  Yes.

Q.  Okay.  And, first of all, why was it important?

A.  Well, when someone has intense, distressing, intrusive
thoughts, if you allow yourself to stay focused on those, they
can kind of take on a life of their own.  So, there are times
you have to practice getting away from it.

        And it's a practice.  It -- you know, it doesn't

02:02    1    come naturally for most people.  They have to learn how to do

         2    it.  They have to learn how to stop those thoughts and take

         3    concentration and move it someplace else, often through reading

         4    with comprehension.  So, when you read something, you know what

02:02    5    you're reading, you can shut the page after, you know, reading

         6    one page and give me the gist of what was on that page.

         7                 There are a number of other techniques to bring

         8    yourself back into the here and now instead of get, what we

         9    call, "in your head."

02:03   10    Q.  And in Jamie's case, was her painting a part of that

        11    distraction by concentration?

        12    A.  Yes.

        13    Q.  Did she have any other distractions by concentration that

        14    you're aware of?

02:03   15    A.  Yes.

        16    Q.  What did she have?

        17    A.  Well, she earned an undergraduate and an MBA during this

        18    time period; and that required studying and concentration.

        19    Q.  Now, there's been some testimony about the fact that she

02:03   20    earned those degrees online.  Do you know why she earned her

        21    degrees online?

        22    A.  Yes.

        23    Q.  Why?

        24    A.  Well, one of the things that she avoids is going to places

02:03   25    with unknown or unfamiliar males.  So, a college campus would

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:03  1    represent having unknown males.

       2    Q.  And are there any other distractions of her concentration

       3    in your life -- in her life that you're aware of?

       4    A.  Well, certainly studying for the two degrees and artwork.

02:04  5    She also -- from her -- from my understanding in her report is

       6    that she enjoyed physical exercise before this trauma.  And I

       7    encouraged her to start that again when her doctor gave her

       8    permission to do that.

       9    Q.  Would her two daughters be a concentration on something

02:04  10   other than --

       11   A.  Definitely.

       12   Q.  Tell me about the functioning aspect of what -- of the

       13   post-traumatic stress disorder, how does that play in,

       14   especially with -- with respect -- my tongue's not working very

02:04  15   well today -- especially with respect to the post-traumatic

       16   stress disorder in Jamie Leigh Jones?

       17   A.  Would you restate that?

       18   Q.  I certainly will.  Can you tell me how the lack of

       19   functioning, I think is the way that you phrased it, or the

02:05  20   effect on the ability for someone to function, how does that

       21   relate to the case of Jamie Leigh Jones?

       22   A.  Okay.  She had impaired functioning in social and

       23   occupational functioning.  Socially it means that her world is

       24   very small.  It's limited to a number of people.  It's limited

02:05  25   to going places in the company of her husband or her mother or

Cheryll K. Barron, CSR, CM, FCRR                        713.250.5585

02:05   1    some other trusted person.

2         There's a small number of places she goes

3    independently.  When she does go to those places, it's a very

4    challenging event for her.  So, it's limited her world in terms

02:05   5    of its scope and certainly the occupational functioning,

6    because not wanting to go places that remind her of the trauma

7    or in her mind are places that make her vulnerable to

8    experiencing that type of a crime again, would mean that it

9    greatly impairs her ability to be gainfully employed.  So, she

02:06   10   is probably underemployed for her educational background.

11   Q.  Does it have -- does the diagnosis of post-traumatic stress

12   disorder have any impact on a person's memory?

13   A.  Does it have any impact on their memory?

14   Q.  Or their forgetfulness?

02:06   15        THE COURT:  Does it reduce short-term memory or

16   long-term memory or make them forget things like where they put

17   their car keys anything like that?

18        THE WITNESS:  (No response.)

19        THE COURT:  If no, that's fine.

02:06   20        THE WITNESS:  Yeah, I don't know that I have any

21   clinical research on that.  Can I answer further?

22        THE COURT:  Yes.

23        MR. KELLY:  Absolutely.  I don't mean to cut you off.

24        THE WITNESS:  She has become very forgetful.  She said

02:07   25   that she had times before where she might have been a little

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:07  1   bit forgetful, but nothing like she's experienced in the last

2   six years.

3   BY MR. KELLY:

4   Q.   What is that related to, in your opinion, the

02:07  5   forgetfulness?

6          THE COURT:   Well, I think the question originally was

7   whether PTSD might cause memory loss.   Do you think it could be

8   attributed to that or could be attributed to something else,

9   the fact that her memory seems to be in decline?

02:07  10          THE WITNESS:   I don't really have any information

11   about memory.

12          MR. KELLY:   Okay.

13          THE WITNESS:   I would think that post-traumatic stress

14   would more effect somebody in terms of their functioning, in

02:07  15   terms of having -- reexperiencing things, certainly when

16   there's prolonged exposure to having to talk about the trauma,

17   think about it, experience the feelings, go back over details,

18   which in this -- in her particular case have been part of it

19   because of having a court case.   There are times when you have

02:08  20   to go back over those things.

21   BY MR. KELLY:

22   Q.   And how does that impact on Jamie when she has to go back

23   over those things?

24   A.   Well, it's like stepping back into it.   So, it kind of

02:08  25   brings it back -- brings you back to that time and point.

02:08   1   Q.  And I'm struggling a little bit here, Ms. Nelson, as far as
        2   how to ask this question.  So, I guess I'll just throw it out
        3   there.
        4           Is part of the reason for the treatment to help
02:08   5   to make it so the person doesn't continue to think about it and
        6   remember what happened to them?
        7   A.  Yes.
        8   Q.  Okay.  If Jamie hypothetically were to suffer from some
        9   other psychiatric disorder, does that preclude her from having,
02:09  10   in addition to that other psychiatric disorder, post-traumatic
       11   stress disorder?
       12   A.  Let me see if I can restate your question.
       13   Q.  Please do.
       14   A.  Are you asking me can a person have post-traumatic stress
02:09  15   disorder and another mental illness disorder?
       16   Q.  Yes.
       17   A.  Yes.
       18   Q.  In your evaluation of Jamie, does she suffer from another
       19   psychiatric disorder?
02:09  20   A.  No.
       21   Q.  Okay.  You mentioned earlier that you believe that Jamie is
       22   underemployed for her education level.  What did you mean by
       23   that?
       24   A.  Well, she has an MBA and MBA's typically earn more money
02:09  25   than she has earned in the last few years.  And they also

02:09  1    generally are in careers that have greater earning potential,
       2    have -- you know, are more commensurate with her education.
       3    Q.  And do you have a sense from your treatment of Jamie why
       4    she doesn't have a position that's more commensurate with her
02:10  5    education?
       6    A.  Yes.
       7    Q.  And what is that?
       8    A.  It's because of the limitation of not wanting to go places
       9    that remind her of the trauma, in terms of being exposed to
02:10  10   unfamiliar males.
       11   Q.  In terms of what Jamie can expect in the future, what
       12   prognosis do you have for her?
       13   A.  I wish I had a real clear-cut answer for you.  I don't.
       14   Q.  What are the potential prognoses for Jamie?
02:10  15   A.  The potential prognosis is that she will hopefully have
       16   some remission and maybe have some periods in time where this
       17   comes back into her life for short periods of time and then it
       18   goes away again as the symptoms go away or die down.  Or she
       19   may struggle with it for the rest of her life.
02:11  20   Q.  If the symptoms do die down, as you put it, does that mean
       21   that the condition is cured, not to come back?
       22   A.  No.
       23   Q.  How does that play out typically?
       24   A.  I don't know what you're asking.
02:11  25            THE COURT:  Does it have long periods of remission, or

02:11  1    does it have regular recurrences?

2            THE WITNESS:  I don't think I can give you an answer

3    that fits across the board.  Every person is different and

4    their response is different.

02:11  5    BY MR. KELLY:

6    Q.  Fair enough.  You recall an event in your office that you

7    described to us, in July of 2010?

8    A.  Yes.

9    Q.  Tell us about that event.

02:12  10   A.  In July of 2010, my office was broken into over a weekend.

11   There is a tape of the person who broke into the building.

12   They had to break into the building, which was alarmed, which I

13   did not know; but it was.  We're talking about a cement

14   building with thick glass.

02:12  15           They broke the glass, came into the building,

16   went directly to -- we have a tape of this, went directly to

17   the elevator, took the elevator up to the third floor, got off

18   at the third floor, went to our office, had some sort of tool

19   with him to break into our office, which had a cherrywood door

02:12  20   about this thick (indicating), hacked up our door, hacked up

21   the door to my file room and my associates' file room with our

22   records in it, hacked into both of our office, hacked into our

23   file cabinet, which looks like it was opened with a crowbar.

24   Q.  Were any files taken?

02:13  25   A.  Not that I can find.

02:13   1   Q.   Where was Jamie Leigh Jones' file at the time?

        2   A.   Her file was not in the office.

        3            MR. KELLY:   Nothing further.

        4            THE COURT:   Okay.   Any cross-examination?

02:13   5                      **CROSS-EXAMINATION**

        6   BY MS. CULLEN:

        7   Q.   Good afternoon, Ms. Nelson.   My name is Sharon Cullen.   I

        8   represent Charles Bortz.   I would like to ask you a few

        9   follow-up questions on some of the same issues that Mr. Kelly

02:13  10   addressed with you first.

       11            You mentioned that in the case of Ms. Jones,

       12   there had been -- although there was unconscious exposure, so

       13   to speak, she knew about events that led up to and events after

       14   and experienced fear and horror when learning what happened

02:14  15   afterwards.   And I want to address the three parts of that

       16   observation.

       17   A.   Uh-huh.

       18   Q.   First, what have you been told are the events that led up

       19   to -- and I'm not sure that you gave a name to what it led up

02:14  20   to.   You said events that led up to, events that occurred

       21   afterward.   Do you think of it in terms of her assault, I would

       22   assume?

       23   A.   Rape and physical assault.

       24   Q.   That's what you've been told?

02:14  25   A.   Yes.

02:15   1   Q.  So, tell me what are the events that led up to the alleged

    2   assault, that you know about.

    3   A.  Okay.  She told me that she had been in Iraq for

    4   approximately four days and was socializing with some coworkers

02:15   5   after work, in a place that was set up for people to socialize,

    6   and alcohol was served and she was asked if she wanted a drink.

    7   Someone offered to get her a drink.  She got that drink, began

    8   drinking it and started noticing that, you know, her senses

    9   were becoming numbed and was -- had no -- what word am I

02:15  10   looking for?

   11           THE COURT:  Perception, no sensory perception?

   12           THE WITNESS:  Yes.

   13   A.  Had no -- lost consciousness basically.

   14   BY MS. CULLEN:

02:15  15   Q.  Let me be sure I'm understanding you correctly.  Ms. Jones

   16   told you that after drinking some of her drink -- did she tell

   17   you how much of it she had drunk or how long it had been that

   18   she had been sipping before she began to notice her senses

   19   becoming numb?

02:16  20   A.  I think it was about half of the drink.

   21   Q.  So, she had been sipping about half of the drink.  Do you

   22   know over what period of time?

   23   A.  I do not.

   24   Q.  All right.  And then she told you that she began to notice

02:16  25   her senses becoming numb?

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

02:16    1    A.  I'm describing this and maybe not very well.  And that all

         2    of a sudden, thing -- you know, sight, sound -- sight was

         3    blurring, sound was becoming muffled, all of the things that

         4    happen to people when they become unconscious.

02:16    5    Q.  And that's what Ms. Jones described to you?

         6    A.  Yes, ma'am.

         7    Q.  All right.  So, are those all of the events that you can

         8    recall for us right now that you've been told led up to the

         9    alleged assault?

02:17   10    A.  Yes, ma'am.

        11    Q.  All right.  Can you describe for us, please, what you know

        12    about events following the alleged assault?

        13    A.  Yes.  What she reported to me was that she woke up the

        14    following morning and was a little incoherent, but kind of

02:17   15    noticing, first of all, that someone was next to her naked and

        16    that she was naked and that she had pain in her body and that

        17    she had no recollection of what had taken place and asked the

        18    person, the man next to her:  Did we have unprotected sex?

        19              And he said:  Yeah, we did.

02:17   20    Q.  Okay.  Someone was next to her, you mean there was someone

        21    lying in bed next to her?

        22    A.  Yes.

        23    Q.  That was the recollection that she described to you?

        24    A.  Yes.

02:18   25    Q.  And both of them were naked?

02:18   1   A.  Yes.

2   Q.  All right.  And was it while she was lying in bed with him

3   that she described:  Did we have unprotected sex?

4   A.  You know, I don't recall.  It was -- it was either then or

02:18   5   shortly thereafter.  I don't recall specifically if it was

6   right --

7   Q.  Did you get any other description about -- that you

8   consider relevant to the diagnosis about what happened after

9   the alleged assault?

02:18   10   A.  In what way relevant?

11   Q.  Well, I don't know.  I mean, you're -- the exposure portion

12   of the criteria for PTSD, I understand, is met, in your

13   opinion, because of events that led up to and events that

14   followed the alleged assault.  So, what I would like to be sure

02:18   15   I have from you in full is what's your understanding of those

16   events that you feel support your diagnosis.

17   A.  Okay.  She was horrified.  She started asking other

18   questions and he explained to her what had taken place and she

19   was horrified.

02:19   20   Q.  And I assume this horrified response came after she asked

21   the man in bed with her whether they had had unprotected sex

22   and he said yes?

23   A.  Yes.

24   Q.  And then she felt horrified?

02:19   25   A.  Well, she asked more questions.

02:19  1    Q.  Okay.  What else is your understanding about what else she

       2    asked?

       3    A.  Well, I don't know that she asked more questions.  I'll

       4    take that back.  She got more information.

02:19  5    Q.  Okay.

       6    A.  And the information that she got is that there had been

       7    five men involved and that she had had sex with five men.  So,

       8    that she had been assaulted by five men, not one.

       9    Q.  All right.  So, the information that she learned that led

02:19  10   to her horror response was, first, she had unprotected sex with

       11   the man in her bed?

       12   A.  Uh-huh.

       13   Q.  That five men total had also had sex with her, and what

       14   else?

02:20  15   A.  Well, when she got up, she noticed that she was very sore,

       16   had pain in her breasts, had soreness in her vaginal area, had

       17   soreness in her anal area and went to the bathroom and scraped

       18   together some clothing.  She told me this, but I don't remember

       19   exactly where she got the clothing from.  And basically got

02:20  20   more understanding of what had taken place.

       21   Q.  Can you tell us the form of understanding that you're

       22   referring to about what had taken place?

       23   A.  Form of understanding?

       24   Q.  Well, you said she got more understanding about what had

02:20  25   taken place; and I'm not really following you.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:21   1          What exactly are you referring to?  What
        2   understanding did she get, and how did she get it?
        3   A.  Well, the information that had been provided her and the
        4   fact that she was bruised, the fact that she had tears in her
02:21   5   vaginal area and her anal area.  Her breast tissue was torn.
        6   Q.  All right.
        7   A.  She had been physically assaulted.
        8   Q.  Bruised, tears in vaginal and anal area and torn breast
        9   tissue, is that what you said?
02:21   10  A.  Uh-huh.
        11  Q.  Okay.  And how did Ms. Jones tell you she acquired that
        12  information?
        13  A.  How did she tell me she acquired that information?
        14  Q.  Yes, ma'am.  I would assume she could see the bruise?
02:21   15  A.  I would, too.
        16  Q.  How did she know that she had vaginal and anal tears?
        17  A.  I think that this was information that became apparent when
        18  she had a rape kit performed.
        19  Q.  Is it your understanding from Ms. Jones that the physician
02:22   20  who examined her in Baghdad told her that she had vaginal and
        21  anal tears?
        22  A.  Yes.
        23  Q.  And what about the torn breast tissue, did she tell you
        24  anything about how she came to conclude that she had torn
02:22   25  breast tissue?

02:22   1   A.   Well, she had an examination when she came back here as

2   well; but the MD who did the rape kit also mentioned that she

3   had torn tissue --

4   Q.   Ms. Jones had told you that the military physician in

02:22   5   Baghdad told her she had torn breast tissue?

6   A.   Yes.

7   Q.   Do you have a clear recollection of that conversation with

8   Ms. Jones?

9   A.   Clear in what way?

02:22  10   Q.   You're sure?

11   A.   That she told me this?

12   Q.   Yes, ma'am.

13   A.   Yes.

14   Q.   All right.  We've gone through events leading up, events

02:23  15   following, learning what happened afterward.  And by learning

16   what happened afterward, are you including the conversation

17   with the man in her bed?

18   A.   Uh-huh.

19   Q.   What she was told by Dr. Schulz -- that's the name of the

02:23  20   military physician who examined her in Baghdad.

21   A.   (Nodding head.)

22   Q.   So, we're talking about comments by the man in her bed,

23   what she was told by Dr. Schulz.  Is there anything else about

24   the learning process that contributed to the horror reaction?

02:23  25   A.   Looking at her own body and feeling that, you know, that

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:23   1   she had been assaulted.

2   Q.   Okay.   Anything else?

3   A.   (Shaking head.)

4   Q.   I'm just -- it's something attorneys do.   I mean, you're

02:23   5   looking at me rather puzzled as if I'm expecting you to have

6   something else.   I just want to be sure that I've given you an

7   opportunity to tell us about every aspect of the basis for your

8   opinion.

9   A.   If there's something specific, if you would ask that, I

02:24   10   could answer "yes" or "no."

11   Q.   I will certainly do that.

12   A.   Okay.

13   Q.   I will certainly do that.

14        This information gathering process, if we may

02:24   15   refer to it as that, beginning with the conversation with the

16   man in her bed, continuing with her observations of her own

17   body in the bathroom, and then ending with her conversation

18   with the physician at the military hospital, that is a course

19   of events that spanned a couple of hours.   I mean, does that

02:24   20   comport with your understanding, that she woke up, she went to

21   the bathroom, she went to a clinic, she went to the hospital,

22   they did the whole rape kit?   I mean, this wasn't something

23   that happened instantaneously.   You understand that?

24   A.   Yes.

02:25   25   Q.   Is it typical that you see cases of PTSD that are the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:25   1   result of horror inspired by a two or three-hour course of
        2   learning about events?
        3   A.   I have, yes.
        4   Q.   Let's talk about -- you mentioned when discussing
02:25   5   reexperiencing the events -- which is, of course, one of the
        6   requirements for the DSM-IV, you mentioned intense
        7   physiological response to cues?
        8   A.   Uh-huh.
        9   Q.   Could you tell us, please, specifically which physiological
02:25   10  responses you have observed in Ms. Jones?
        11  A.   Observed or reported?
        12  Q.   Well, an excellent distinction.  Tell me about the ones
        13  that have been reported to you by Ms. Jones.
        14  A.   Okay.  Physiological responses that happen when exposed to
02:26   15  cues would be racing a heart, a lump in the throat, distress in
        16  your stomach, feeling like you've, you know, got something --
        17  been kicked in the stomach, something along those lines,
        18  feeling it in your stomach, in other words.
        19  Q.   All right.
02:26   20  A.   So, having a physical response to being exposed to a cue.
        21  Q.   And which of those responses have been reported to you by
        22  Ms. Jones?
        23  A.   The three I just named.
        24  Q.   The three you mentioned?
02:26   25  A.   Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:26  1   Q.  I'm sorry.  I thought you were speaking in general.

       2   A.  No.

       3   Q.  So, racing heart, lump in the throat, and what did you

       4   mention about the stomach?

02:26  5   A.  Distress in the stomach, feeling kind of like you've been

       6   kicked in the stomach or a pit in the stomach, to use her own

       7   words, felt like she had a pit in her stomach.

       8   Q.  All of these are subjective reports, correct?

       9   A.  All of these are reports by -- my client?

02:27 10   Q.  By your client.

      11   A.  Yes.

      12   Q.  Yeah.  All right.  Is there any objective evidence,

      13   anything that you have observed objectively that would

      14   contribute to physiological responses to cues?

02:27 15   A.  Well, I can't see a racing heart.

      16   Q.  Right.

      17   A.  I can't see a pit in the stomach.  I can't see a lump in

      18   the throat.  I can see if somebody is visibly shaken, upset,

      19   traumatized, crying, has distress in their voice, I could

02:27 20   observe those.

      21   Q.  So, in terms of physiological responses to cues, there

      22   really aren't any of those that we can have an objective

      23   finding related to?

      24   A.  Certainly we could if we had somebody -- you know, a

02:28 25   medical doctor assessing those at the time they were happening,

02:28  1  in terms of the racing heart.

2  Q.  Right.  Right.  But that's not something that you can or

3  have done with Ms. Jones?

4  A.  No, ma'am.

02:28  5  Q.  You mentioned under the avoidance and numbing criteria that

6  Ms. Jones avoids people and places that remind her of the

7  events.  What people and places does she avoid?

8  A.  She avoids going places where there are unfamiliar males,

9  any men that she doesn't know.  She avoids lots of places.  It

02:28  10  has been a big focus of therapy to encourage her and get her to

11  go to more public places, to increase the scope of her

12  mobility.

13  Q.  Does it have to be a place that is in some way -- I don't

14  know -- reminiscent of Iraq or a place where there are lots of

02:28  15  young people drinking?  I mean, does it have to bear some

16  similarity to the events immediately preceding the alleged

17  assault?

18  A.  Does it have to or is it?

19  Q.  For her -- in order to be a problem for her, does it need

02:29  20  to have some similarity, or is it just any place that's public

21  is difficult for her?

22  A.  It's basically a place where there are unfamiliar males.

23  Q.  Do you know that she is now -- instead of teaching

24  elementary school, she is now teaching college courses in

02:29  25  business?

02:29  1   A.  I do.

2   Q.  Are there people -- I mean, other than just men she doesn't

3   know, are there specific people she avoids because they remind

4   her of events?

02:29  5   A.  Specific people other than unfamiliar males?

6   Q.  Yeah.

7   A.  Not that I can think of.

8   Q.  You went through a list of items that you would group under

9   the finding of hyperarousal.

02:30  10  A.  Uh-huh.

11  Q.  Can you distinguish between hyperarousal and generalized

12  anxiety?

13  A.  People with PTSD often have features of other things going

14  on, particularly mood disorders.  PTSD is an anxiety disorder.

02:30  15  Q.  Yes.

16  A.  So, are you going to see anxiety with it, yeah.  So, to

17  distinguish between those two disorders, I don't think you can

18  exactly distinguish between them because the post-traumatic

19  stress has anxiety that goes with it.  It's kind of built into

02:30  20  the criteria, and hyperarousal is certainly a big piece of

21  that.

22  Q.  Would it be particularly difficult to diagnose PTSD in

23  someone who had long-standing anxiety problems?

24  A.  No, I don't think so.

02:31  25  Q.  How would you tell the difference between the anxiety

02:31    1    problems that had been going on for years and new anxiety

        2    problems that are now PTSD?

        3    A.  I don't know that you could exactly determine it; however,

        4    you would have to have the exposure.  You would have to have

02:31    5    that response.

        6    Q.  So, it is the alleged assault event, the exposure that

        7    transforms or could transform generalized long-term anxiety to

        8    PTSD?

        9    A.  The word you're using, "transforms," I wouldn't agree with.

02:31    10    Q.  Okay.

       11    A.  Could you have both disorders --

       12    Q.  Simultaneously?

       13    A.  Yeah, you could.

       14    Q.  You have been seeing Ms. Jones for six years, I believe you

02:32    15    said?

       16    A.  Four.

       17    Q.  Oh, it's a six-year span.  For two of them she was in

       18    San Diego?

       19    A.  (Nodding head.)

02:32    20    Q.  Very good.  And it is somewhat unusual for you to see a

       21    particular client for such a long time?

       22    A.  Is it unusual?

       23    Q.  Yes.

       24    A.  It's more rare.  It's more rare.  Although I have had

02:32    25    clients and do have clients I've seen for a long period of

02:32    1    time, depending on the diagnoses.

         2    Q.   PTSD?

         3    A.   I have had clients with PTSD I treated for longer periods

         4    of time.

02:32    5    Q.   Longer than six years?

         6    A.   No.

         7    Q.   Were you aware that at one point Ms. Jones was evaluated by

         8    a psychiatrist, I believe, at Tulane, Dr. Manguno-Mire?

         9    A.   She's told me at different times she's been evaluated by

02:33   10    psychiatrists.  I don't recall Manguno-Mire per se.

        11    Q.   I want to read you an observation of Dr. Manguno-Mire, and

        12    I would like to know if you share this view.

        13              "Research demonstrates that the median time to

        14    remission of PTSD is 36 months for those in treatment and

02:33   15    64 months for those who have not sought treatment."

        16              Does that correlate with your general

        17    understanding about PTSD?

        18    A.   Research and what happens in real life are two different

        19    things.  We use research a lot as -- well, we use it as

02:34   20    informational.  We use it as -- you know, just the very nature

        21    of research is that it's not specific to individual human

        22    beings.  It's groups of people who are studied.  Do I -- what

        23    was the question?  Do I agree with --

        24    Q.   Well, I wondered if you agree.  I mean, would it have been

02:34   25    your observation as well that -- from the research that you're

02:34  1   familiar with and your own education and training, would you

2   agree that typically with treatment, PTSD resolves in the

3   neighborhood of 36 months, without treatment it will resolve on

4   its own in 64?

02:34  5   A.   Because I'm working with people individually and not in

6   academia and not in research, I can't really use the word

7   "typical."   Because every client is individual, and

8   particularly in the case of PTSD.

9   Q.   Well, tell me this, would you agree that just logically it

02:34  10  would seem the more extreme the exposure, the more traumatic

11  the exposure, the longer it's likely to take for the client to

12  see real progress and heal?

13  A.   Yes.

14  Q.   So, when you're looking at PTSD in particular, you're going

02:35  15  to see folks who have been in horrible car wrecks, seen their

16  children die in front of their faces, men in combat who've seen

17  a limb blown off in front of them, all manner of really, really

18  horrible and dreadful experiences.

19          Would you anticipate that that sort of trauma

02:35  20  would be at the farther end of the spectrum in terms of your

21  anticipation of when therapy might be successful or complete?

22  It's going to take longer?

23  A.   Would I anticipate that the situations that you've talked

24  about would take longer to resolve?

02:36  25  Q.   Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:36    1    A.   Not necessarily, no.

         2    Q.   So, what -- are there any factors that you have found that

         3    are in any way predictive for you in treating patients in terms

         4    of how long you would anticipate it to take before the patient

02:36    5    is no longer in need of therapy?

         6    A.   Yes.

         7    Q.   All right.   What are those factors?

         8    A.   One of those factors is the nature of the trauma.   So, you

         9    will find that in post-traumatic stress, in the literature --

02:36   10    the professional research would speak to this -- is that the

        11    nature of the trauma has a lot to do with resolving it in

        12    therapy in terms of how successful it might be and how long it

        13    might take.   The nature of the trauma -- someone who

        14    experiences an earthquake is going to have a different reaction

02:36   15    than somebody who is physically assaulted, raped, and

        16    sodomized.   It's an interpersonal nature of the trauma and the

        17    crime, a crime of violence.   It's not like being in a car

        18    accident.

        19    Q.   So, interpersonal kind of assaults --

02:37   20    A.   Yes.

        21    Q.   -- you find require the most lengthy recovery time?

        22    A.   Yes, ma'am.

        23    Q.   Did you say you've had other patients who had no -- who

        24    were unconscious at the time of whatever the traumatic event

02:37   25    was that triggered PTSD?

02:37   1    A.  Am I here to speak about other patients?

2            THE COURT:  Well, we don't want you to violate any

3    confidentiality; but I think Ms. Cullen is just asking whether

4    there have been patients within your practice who have had that

02:37   5    experience, as Ms. Jones says she has.

6            THE WITNESS:  Of being drugged, ma'am?

7            THE COURT:  No, being unconscious in any way, whether

8    from drugs or from violence to the head or anything else.

9    A.  Not to my knowledge.

02:38   10   BY MS. CULLEN:

11   Q.  I want to go through a number of items that you have

12   mentioned in your initial consultation.  And first let me ask

13   you:  Does your initial consultation reflect the kinds of

14   information that you think it's important for you to have in

02:38   15   order to begin treating a client?

16   A.  Yes.

17   Q.  That's why you discuss those particular kinds of

18   information, is it not?

19   A.  Yes.

02:38   20   Q.  And some of the information that you discussed with

21   Ms. Jones involves what you might call social or personal

22   history?

23   A.  Yes.

24   Q.  You asked about a history of either -- of problems with

02:39   25   either alcohol or drugs?

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

02:39   1   A.  Yes.

        2   Q.  And I see from your initial consultation --

        3         MS. CULLEN:  And why don't we pull that up?  That's

        4   Bortz 195.  And if you could please enlarge the third

02:39   5   paragraph.  There we are.

        6   BY MS. CULLEN:

        7   Q.  Client denied any history of alcohol or drug problems?

        8   A.  Uh-huh.

        9         MS. CULLEN:  If you could please put up now Bortz

02:39  10   B182?  Can you lose the highlighting that you have there and

       11   instead highlight just after it, where it says, "Patient

       12   reports possible" --

       13         See right in the middle of the paragraph -- no.

       14   Right in the middle of the paragraph.  Let me find it for you.

02:40  15         THE COURT:  It's on the fifth line down.

       16         MS. CULLEN:  Perhaps this will help.

       17         MR. HEDGES:  She's got it.

       18   BY MS. CULLEN:

       19   Q.  "Patient reports possible sexual intercourse with new

02:40  20   partner after having several drinks and passed out."

       21         Would you describe that as a problem with

       22   alcohol, at least once?

       23   A.  When I look for problems with alcohol, I'm looking for a

       24   pattern, a pattern of alcohol abuse or drug abuse.

02:41  25   Q.  Did she report to you having had any problems with passing

02:41   1   out in the past and not remembering things?  I mean, the date

2   on here, if you will notice, is 5-19-05, just two months before

3   she went to Iraq.

4                So, is it -- in your opinion, that would have

02:41   5   been irrelevant to you even though it's only two months before

6   this event, the fact that she had a history of drinking,

7   passing out, and not remembering if she had sex?  Is that not

8   relevant to you?

9   A.  It's relevant.  It's not a pattern.

02:41   10   Q.  Okay.  Fair enough.

11          MS. CULLEN:  Let's go back to B195.  Please enlarge

12   the same highlighted paragraph.

13   BY MS. CULLEN:

14   Q.  The next phrase is:  "Denies any prior treatment with the

02:42   15   exception of one initial visit recently with another

16   therapist."

17   A.  Uh-huh.

18   Q.  Would you agree that treatment includes the use of

19   prescription psychotropic drugs?

02:42   20   A.  Actually, the treatment I'm speaking to there was therapy.

21   Q.  Therapy?

22   A.  The prior treatment by a psychotherapist.

23   Q.  So, if, in fact, she had been prescribed Xanax, Effexor,

24   Lamictal for years, that would not have been information that

02:42   25   you would have been trying to elicit?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:42   1   A.  No.  That would have been treatment as well.

2   Q.  All right.  And are you aware that beginning as early as

3   2001, she was routinely taking Zoloft, Ativan --

4   A.  Routinely?

02:43   5   Q.  Tell you what.  Let's bring up -- let's be specific.

6           MS. CULLEN:  Please bring up Bortz 247.

7   BY MS. CULLEN:

8   Q.  This is a summary of some rather voluminous pharmacy

9   records.  And if you'll notice she was prescribed Xanax

02:43   10   November of 2001.  In October of 2002, we see Zoloft; and

11   that's refilled twice in that month.  And then in December and

12   January following, more Zoloft.  And we know that the family

13   used three pharmacies.  We were only able to obtain records

14   from one of the three.

02:44   15           Then in July of '03, we see Effexor twice.  And

16   then in August, again Effexor.  Lamictal in September.  Zoloft

17   in September.  Lamictal again in October.  Zoloft again in

18   October of '03.  You see it's fairly regular over a span of

19   years.

02:44   20           Was this information that would have been

21   responsive to your interview questions and relevant to your

22   treatment of her?

23   A.  It would have been responsive to the question.  It would

24   have been information good to document in the chart and know

02:44   25   about.  I don't know that it would have changed my treatment.

02:45   1   Q.  Fair enough.  Would knowledge of preexisting problems of
        2   anxiety and depression have influenced your diagnosis?
        3   A.  Good question.  In this case, I don't know because it
        4   didn't happen.  I had some knowledge of, I would say, episodes
02:45   5   of depression and anxiety.  That did not change.
        6   Q.  Let's go back to your report.
        7           MS. CULLEN:  Same paragraph, if we can enlarge that
        8   again.
        9   BY MS. CULLEN:
02:45   10  Q.  And the next phrase is deny -- well, actually, the next
        11  phrase is:  "Denies any history of suicidal ideation."
        12          So far as I know, we have no relevant information
        13  on that point.
        14          "Denies any history of domestic violence."
02:46   15          Did she share with you that when she was -- the
        16  dates are not entirely clear -- that 16 or 17, possibly as old
        17  as 18, she was living with her mother, who had a physically
        18  abusive boyfriend, and that, indeed, she reported herself to
        19  Children's Protective Services?
02:46   20  A.  She did, ma'am.
        21  Q.  Did she?
        22  A.  She did.
        23  Q.  You didn't consider that a history of domestic violence?
        24  A.  No, I do not.
02:46   25  Q.  The next sentence:  "Additionally, client denies any

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:46   1    emotional, physical, or sexual abuse."

2                Were you aware that she reported to physicians

3    that she had been sexually assaulted by her manager at work in

4    2005?

02:47   5    A.  I was not aware that she had reported to physicians that

6    she was sexually assaulted by someone at work.

7    Q.  I would like to get a little information from you, a little

8    insight about your treatment modalities, if that's the proper

9    phrase.

02:47   10               THE COURT:  Excuse me.  I'm getting a little bit

11   concerned about the time.  Who's going to handle the

12   questioning?  Mr. Hedges, how much do you anticipate?

13               MR. HEDGES:  I think ten minutes, five to ten minutes.

14               THE COURT:  How much more do you think you have,

02:47   15   Ms. Cullen?

16               MS. CULLEN:  Actually, I think I have about three more

17   questions.

18               THE COURT:  All right.  Let's carry on.

19               MS. CULLEN:  I'll hurry.

02:47   20               THE COURT:  Let's carry on.

21   BY MS. CULLEN:

22   Q.  If you could, please, Ms. Nelson, tell us, if you would,

23   what is desensitization exposure therapy?

24   A.  It is talking to the client about the event in what I'm

02:48   25   going to call "snippets," or as much as they can tolerate at

02:48   1    one time, building up over time to talking about the most

        2    uncomfortable parts of it.  So, it starts out with small things

        3    and doing that in a safe exchange between myself and the

        4    client.

02:48   5    Q.  And have you done that with Ms. Jones?

        6    A.  Yes.

        7    Q.  And what -- are these snippets about what she remembered

        8    before taking -- before losing consciousness when she was at

        9    the social gathering, or are these snippets about when she woke

02:48  10    up afterward?

       11    A.  Yes.

       12    Q.  Both?

       13    A.  Afterwards, yes.

       14    Q.  Okay.  What sorts of things has she told you that she can

02:49  15    now recall about afterward?

       16    A.  Now --

       17    Q.  Anything other than what you've already told me?

       18    A.  Are you talking about in desensitization and exposure

       19    therapy?

02:49  20    Q.  Yeah.  What snippets does she think about and talk about in

       21    that aspect?

       22    A.  Okay.  These are things that are thoughts, feelings, images

       23    that come up during the time period that we were talking about

       24    this.  You're wanting to know exact thoughts, exact feelings?

02:49  25    Q.  Not thoughts and feelings so much as what is it that she

02:49   1    recalls factually that causes her the greatest discomfort.

        2    What memories is she describing to you?

        3    A.  Well, one is being drugged; and the second one is waking up

        4    battered, bruised, next to someone who she doesn't know and,

02:50   5    you know, learning that she's been assaulted by five people.

        6    Q.  Hypnotherapy, you mentioned that you use it to reduce

        7    symptom intensity, that the point of hypnotherapy with you is

        8    not to remember things that happened?

        9    A.  Right.

02:50  10    Q.  However, notwithstanding that it isn't the goal, has

       11    Ms. Jones experienced any recovered memories as a result of

       12    hypnotherapy with you?

       13    A.  It wasn't about recovered memories; and, no, there was no

       14    recovered memories from that session.  It was more emoting.

02:50  15    Q.  Stress inoculation, can you tell me what that is?

       16    A.  Stress inoculation is learning ways to look at things, to

       17    do things that are less stressful to you.  Sometimes -- I would

       18    say mostly it's behavior.  Sometimes it's how we think about

       19    something, but that's going to be more covered in the cognitive

02:51  20    behavioral processing/restructuring.  So, looking at a thought

       21    differently.

       22    Q.  Interesting.  Thank you.

       23            THE COURT:  Thank you.

       24            MS. CULLEN:  Pass the witness.

02:51  25            THE COURT:  Mr. Hedges.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:51   1                          **CROSS-EXAMINATION**

2    BY MR. HEDGES:

3    Q.  Ms. Nelson, my name is Dan Hedges; and I represent KBR.

4                    Who told Ms. Jones that five men had raped her?

02:51   5    A.  I believe the man that was laying in bed next to her told

6    her that.

7    Q.  That was the morning when she got up and he said, "It

8    wasn't just me, there were five other guys who raped you," and

9    that was part of why she was so horrified?

02:51   10   A.  Yes.

11   Q.  I think that you said that Dr. Schulz -- excuse me --

12   Ms. Jones told you that Dr. Schulz told her that she had torn

13   breast tissue.  Did I get that correct?

14   A.  From having a physical examination, her breasts were

02:52   15   hurting, and she was told that there was something going on

16   with the breasts.  I don't know if that actually was Dr. Schulz

17   or if that was the doctor when she got back here.  But she knew

18   she had something wrong with her breasts, she could feel it,

19   see it.

02:52   20   Q.  What did she tell you -- what do you remember that

21   Ms. Jones told you that Dr. Schulz told her?

22   A.  Nothing except that -- the conversation that I remember

23   that she had with Dr. Schulz did not occur at the time that

24   you're asking about it.  It occurred much later.

02:52   25   Q.  She had a much later conversation with Dr. Schulz?

02:52   1    A.   Yes.

        2    Q.   When was that?

        3    A.   It was at some time -- I can't give you a date.  I don't

        4    know a date.  It was --

02:52   5    Q.   Was it while she was still in Iraq?

        6    A.   No.

        7    Q.   When did she meet Dr. Schulz other than when she was in

        8    Iraq?

        9    A.   She didn't meet her.  She talked to her on the telephone.

02:53  10    Q.   Okay.  Let me ask you something about how she described

       11    herself the morning of the 28th.  Did she tell you -- you just

       12    said she said she was bruised and battered?

       13    A.   Yes.

       14    Q.   Did she have severe bruising?

02:53  15    A.   She said she had bruising on the inside of her thighs and

       16    around her buttocks.

       17    Q.   Did she tell you it was severe bruising?

       18    A.   No, she didn't tell me it was severe.

       19    Q.   Did she tell you she was bleeding profusely?

02:53  20    A.   No.

       21    Q.   You've told us that the man in bed with her told her:

       22    Yeah, I believe -- I think you said this.  I've heard it from

       23    other people, so I may be confusing it -- that he told her that

       24    they had had unprotected sex?

02:53  25    A.   Yes.

02:53   1    Q.   And he told her there actually were five people who had sex

        2    with her that night?

        3    A.   Yes.

        4    Q.   So, if she told several other people the next day that five

02:53   5    people had had sex with her, she was relying on what the man in

        6    bed with her had told her.   Is that fair?

        7    A.   Yes.

        8    Q.   What else did he tell her?

        9    A.   You know, that was a long time ago; and I don't recall

02:54   10   anything else that he told her.

        11   Q.   Without recalling the details of it, do you recall that he

        12   did, in fact, tell her some other things; you just don't

        13   remember them sitting here today?

        14   A.   I don't recall.

02:54   15   Q.   A couple of questions, then I'll be through, about avoidant

        16   behavior.   She goes out of her way to avoid being around adult

        17   males that she does not know.   Is that correct?

        18   A.   Yes.

        19   Q.   Did she know the members of the Congressional committee

02:54   20   that she testified before?

        21   A.   I don't believe so.   That's different than going with

        22   somebody.   She goes with someone, and she feels less

        23   vulnerable.

        24   Q.   Who was she with during the television interviews?

02:54   25   A.   I don't know, sir.

02:54   1        MR. HEDGES:  I pass the witness, your Honor.

        2        THE COURT:  Okay.  We did promise the jury we would

        3   get out of here by 3:00, so --

        4        MR. KELLY:  I'll be real quick, your Honor.

02:55   5        THE COURT:  Okay.  Very well.

        6                     **REDIRECT EXAMINATION**

        7   BY MR. KELLY:

        8   Q.  Did you happen to see me sitting next to her in the

        9   television interviews?

02:55  10   A.  I didn't see the television interviews.

       11   Q.  I notice, Ms. Nelson, you weren't looking at your records

       12   while you're answering these questions.  Is it straining your

       13   memory to go back some six years?

       14   A.  A little bit.

02:55  15   Q.  Okay.  Is it fair to say that some of it is just doing the

       16   best you can?

       17   A.  In some areas.

       18   Q.  Okay.  You mentioned that she didn't say anything about her

       19   breast injury until sometime after she had gotten back into the

02:55  20   country, back in the United States?

       21   A.  (No response.)

       22   Q.  Did I understand you right in --

       23   A.  I'm not understanding.

       24   Q.  Okay.  She didn't tell you she learned about her breast

02:55  25   injury immediately on the rape examination, if I

02:55    1    understood you --

         2    A.  She knew something was wrong with her breasts.  I don't

         3    know if it was -- and I did state that I thought the doctor had

         4    told her that.

02:56    5    Q.  Could it have been a different doctor that told her that?

         6    A.  It could have been, yes.

         7    Q.  Okay.  And --

         8    A.  She knew something was wrong with her breasts.  Did she

         9    have a diagnosis then from the doctor, I don't know.

02:56   10    Q.  Sure.  You mentioned that you knew she had episodes of

        11    anxiety and depression prior to your diagnosis of

        12    post-traumatic stress disorder.  Why is that different than the

        13    diagnosis of anxiety and depression?

        14    A.  Well, a diagnosis, you have to meet specific criteria; and

02:56   15    there are certain time frames that you have to meet.  And a lot

        16    of us have episodes of feeling down or anxious.  And

        17    particularly when you have certain, what I would call,

        18    psychosocial stressors or certain stressors in your life, if

        19    you have something happen in your life, your reaction may be to

02:56   20    it that you feel depressed or anxious.  It doesn't mean you

        21    have a diagnosis of depression or anxiety.

        22    Q.  And you were asked about entries in medical records of

        23    diagnosis -- or excuse me -- episodes of anxiety and depression

        24    in 2001.  Do you know how old Jamie was in 2001?

02:57   25    A.  I can do the math.  I know she's 26 right now.

02:57   1   Q.  So, she would have been 15 --

       2              THE COURT:   16.

       3   BY MR. KELLY:

       4   Q.  -- or so?

02:57   5   A.  (Positive nod.)

       6   Q.  Have you treated Jamie through the course of this

       7   litigation?

       8   A.  Yes, all but the two years she was in California.

       9   Q.  By the way, you were treating Jamie before she ever met me,

02:57  10   weren't you?

      11   A.  I don't know when she met you; but I believe so, yes.

      12   Q.  And has going through this litigation process been

      13   difficult for her from the psychiatric standpoint?

      14   A.  Yes, it's been very stressful.

02:58  15   Q.  You were asked about whether or not Jamie could suffer from

      16   a post-traumatic stress disorder without having -- I'm sorry,

      17   whether she could suffer from that permanently.  I think there

      18   was some reading from Dr. Manguno-Mire about when it normally

      19   subsides.  Do you recall that?

02:58  20              In fact, do you know who Dr. Manguno-Mire is?

      21   A.  I do not.

      22   Q.  Okay.  Do you know what Dr. Manguno-Mire's findings were?

      23   A.  I do not.

      24   Q.  Okay.  Is it true that there are military veterans going

02:58  25   back as far as World War II who even today still suffer from

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:58  1  post-traumatic stress disorder?

2  A.   Yes.

3  Q.   So, if Dr. Manguno-Mire said it ended in 36 months, that's

4  not always true, is it?

02:58  5  A.   No.   I made the distinction that, you know, what research

6  says and what actually happens in real life are two different

7  things.

8           MR. KELLY:   Pass the witness, your Honor.

9           THE COURT:   Okay.   Ms. Nelson, you're free to go.

02:59  10  Thank you very much.

11           Ladies and gentlemen, we promised you an early

12  departure.   I don't want to let you leave, though, without

13  saying this.   We celebrate our 235th birthday this year, and we

14  must give thanks for our country despite all its blemishes.   I

02:59  15  particularly give thanks that we live in a country in which we

16  have a system of justice in which I get to work with men and

17  women like you.   It's nothing short of inspirational to come

18  into the courtroom and confront an uninvited task of vital

19  importance without any prior warning.   You've done it

02:59  20  heroically, and all of us stand very much in your debt.   Thank

21  you.

22           Would all please rise for the jury.

23      (Jury not present)

24           THE COURT:   Okay.   Anything we need to take up in the

03:00  25  postgame period?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:00   1          MR. ESTEFAN:  I think Mr. Hedges was asking if we are

2      confirmed with Dr. Scarano at 8:30 on Tuesday?

3          THE COURT:  8:30 on Tuesday, Dr. Scarano.

4          MR. ESTEFAN:  Thank you, your Honor.

5      (Proceedings recessed for evening)

6                        * * * * *

7                COURT REPORTER'S CERTIFICATION

8          I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled cause.

9

10     Date:  June 30, 2011

11

12                        /s/   Cheryll K. Barron

13                        Cheryll K. Barron, CSR, CMR, FCRR
                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

**$**
**$1,434 [2]** 105/15 106/18
**$1,434,726 [1]** 84/13
**$1,650 [1]** 157/3
**$1,700 [1]** 107/6
**$1,716,726 [1]** 84/20
**$10 [1]** 151/17
**$106,326 [1]** 84/17
**$110,000 [1]** 58/9
**$15 [1]** 151/17
**$15,000 [2]** 105/22 107/6
**$16,563 [3]** 135/6 135/10 135/18
**$17,569 [1]** 149/12
**$17,596 [7]** 137/17 137/20 137/25 138/7 138/21 138/24 152/20
**$2,546 [1]** 115/15
**$2,738 [1]** 104/10
**$2,739 [4]** 102/23 106/7 107/2 107/14
**$2,957 [3]** 105/13 105/19 106/16
**$20 [1]** 151/17
**$210,096 [1]** 84/10
**$23,000 [6]** 105/12 105/19 105/22 106/14 106/23 107/1
**$25,000 [2]** 129/21 142/24
**$25,200 [9]** 83/13 119/22 123/1 136/24 142/12 142/16 142/24 143/12 144/7
**$250 [1]** 43/8
**$26,932 [5]** 124/1 124/5 137/7 149/2 149/24
**$263,919 [1]** 84/2
**$27,000 [1]** 54/15
**$29,000 [1]** 156/25
**$29,700 [1]** 156/2
**$3,408 [1]** 137/3
**$31,166 [1]** 157/20
**$32,166 [1]** 156/18
**$33,000 [12]** 155/14 155/22 156/3 156/12 156/13 156/24 157/2 158/18 159/18 159/23 160/17 161/2
**$33,166 [3]** 155/12 157/25 159/18
**$330 [1]** 160/20
**$38,000 [8]** 105/22 106/8 107/2 107/13 107/20 108/18 115/15 115/19
**$39,106 [1]** 160/25
**$4,500 [2]** 106/21 107/1
**$41,000 [6]** 152/19 155/13 155/15 159/24 162/7 162/8
**$41,529 [8]** 150/15 151/8 155/9 156/14 156/16 157/21 158/2 159/21
**$44,528 [2]** 136/21 148/24
**$5 [2]** 126/4 151/18
**$5 million [1]** 126/4
**$5,000 [1]** 43/10
**$5,940 [1]** 160/21
**$62,000 [1]** 156/5
**$68,461 [1]** 149/22
**$779,363 [1]** 83/15
**$82,000 [3]** 54/8 54/11 54/14
**$843,104 [1]** 84/3
**$9,265 [2]** 134/7 134/9

**'**
**'03 [2]** 215/15 215/18

**'07 [1]** 163/10
**'09 [1]** 174/12

**-**

**-- I [1]** 131/24

**.**

**.05 [1]** 154/22
**.39 [1]** 154/17

**/**

**/s [1]** 227/12

**0**

**000974 [1]** 26/12
**05 [1]** 214/2

**1**

**1 over [1]** 154/21
**1 percent [1]** 50/13
**1.0376 [3]** 138/21 149/9 149/12
**1.2 [2]** 161/3 162/15
**1.3 percent [2]** 161/3 162/15
**1.6 [1]** 161/11
**1/1/2012 [1]** 99/12
**10 [23]** 122/18 124/7 124/17 124/18 132/14 137/9 137/11 137/14 139/20 141/18 148/16 149/1 149/3 149/23 150/3 150/9 150/12 151/12 151/13 151/18 151/21 152/24 153/11
**100 percent [1]** 24/11
**1000 [1]** 2/6
**1040 [2]** 103/16 103/17
**11 [11]** 122/20 122/22 124/4 137/22 149/5 149/7 150/14 150/23 151/3 153/16 159/8
**110,000-dollar [1]** 58/21
**110,000-plus-dollar [1]** 48/11
**1150 [2]** 1/16 1/19
**11:00 or [1]** 36/25
**11:17 [1]** 119/13
**11:22 [1]** 119/13
**11:30 and [1]** 37/1
**12 [9]** 117/6 117/17 122/15 123/9 146/14 146/16 149/9 162/9 170/1
**12:08 [1]** 147/24
**12:30 [1]** 35/22
**12:57 [1]** 147/24
**13 [1]** 154/16
**14 [2]** 139/7 159/8
**1488 [1]** 36/9
**15 [4]** 139/9 151/18 151/21 225/1
**15 minutes [1]** 116/13
**15th [9]** 79/15 79/16 79/16 79/19 82/20 83/10 87/23 154/22 182/23
**16 [2]** 216/16 225/2
**1650 [4]** 155/24 155/25 156/1 157/5
**166 [1]** 160/24
**17 [1]** 216/16
**17,000 [1]** 152/16
**17,596 [1]** 149/7
**18 [17]** 149/19 152/6 152/9 155/1 155/4 155/15 156/1 156/8 156/14 157/6 158/1 159/24 160/20 162/2 162/6 162/7 216/17

**'**
**'09 [1]** 174/12
161/3 162/16 162/18
**19382 [1]** 1/22
**195 [1]** 213/4
**1974 [1]** 42/7
**1976 [1]** 42/9
**1995 [1]** 42/19
**1:00 [1]** 147/13

**2**

**2 percent [2]** 162/21 163/18
**2,739-dollar [2]** 103/5 116/3
**2-point [1]** 153/21
**2.01 [1]** 161/17
**2.0161 [2]** 151/7 151/8
**2.64161 [1]** 154/14
**20 [1]** 154/24
**20 -- you [1]** 56/6
**2001 [4]** 215/3 215/10 224/24 224/24
**2002 [1]** 215/10
**2004 [5]** 104/4 104/5 105/7 105/18 106/13
**2005 [8]** 5/10 5/11 44/24 68/13 79/15 174/9 182/23 217/4
**2006 [4]** 135/5 135/8 135/11 135/11
**2008 [1]** 103/14
**2010 [2]** 195/7 195/10
**2011 [12]** 1/5 43/16 79/15 79/16 79/16 79/19 83/10 87/18 87/19 87/23 117/23 227/10
**2012 [8]** 99/12 101/24 106/6 115/19 134/8 135/2 136/20 140/10
**2030 [1]** 156/17
**2047 [1]** 129/21
**21,209 [2]** 124/3 124/12
**22nd [1]** 174/9
**23,000 [1]** 106/14
**235th [1]** 226/13
**247 [1]** 215/6
**25 [2]** 54/15 154/20
**25,000 [2]** 117/2 129/9
**26 [2]** 150/13 224/25
**26,932-dollar [1]** 122/18
**27 [2]** 1/22 149/16
**2719 [1]** 1/4
**28 [13]** 5/11 79/14 79/15 140/24 142/24 148/23 149/16 149/17 150/1 150/10 150/13 150/20 152/22
**28th [2]** 68/13 221/11
**29,000 [2]** 156/4 157/6
**2978 [1]** 36/10

**3**

**3 by [1]** 104/12
**3 percent [1]** 161/12
**30 [4]** 1/5 123/16 125/24 227/10
**30-some-odd [1]** 122/19
**31 [2]** 49/11 127/12
**31-year [1]** 75/19
**32 [2]** 156/12 162/3
**33,000 [6]** 155/23 156/4 156/18 157/9 162/1 162/2
**33,000-dollar [1]** 159/12
**33,186 [1]** 160/22
**330 [1]** 160/18

**3**

**35 [2]**  127/9 144/21
**350 [1]**  170/25
**36 [3]**  209/14 210/3 226/3
**36-year [1]**  127/10
**36th [1]**  2/6
**38,000 [2]**  106/14 108/24
**39 [2]**  154/16 154/16
**39,000 [1]**  108/25
**3961 [1]**  154/17
**3:00 [2]**  147/22 223/3

**4**

**4.6 percent [1]**  161/13
**40 [2]**  53/3 144/22
**40 years [1]**  54/4
**41 [1]**  152/15
**41,000 [7]**  152/15 152/16
154/1 157/8 158/19 162/1
162/5
**41,000-dollar [1]**  159/16
**41,529 [2]**  152/19 154/13
**41692 [1]**  123/17
**44 [1]**  123/20
**45 minutes [1]**  147/11
**46 [22]**  142/22 142/23 149/15
149/18 149/21 149/25 150/10
150/13 150/14 151/6 151/9
152/15 152/19 152/22 155/6
155/9 156/17 158/24 158/24
159/4 159/8 159/8
**46,000 [1]**  152/15
**48,141 [1]**  123/21
**48141 [1]**  123/23

**5**

**5 percent [11]**  154/21 155/22
156/3 156/22 156/24 157/3
157/5 157/7 157/10 160/10
162/24
**5-19-05 [1]**  214/2
**50 [1]**  125/24
**50,000 [2]**  90/7 92/1
**500 [2]**  2/11 59/16
**515 [1]**  2/15
**55 [3]**  117/4 140/24 152/22
**55-year [1]**  121/8
**57 [2]**  82/23 82/25
**5:00 or [1]**  35/13
**5:00 to [1]**  35/21
**5th [1]**  49/17

**6**

**6.7 percent [2]**  102/9 104/12
**6.75 percent [1]**  115/15
**64 [1]**  210/4
**64 months [1]**  209/15
**66 [1]**  160/22
**6:00 in [2]**  35/13 35/21
**6:30 or [1]**  36/5

**7**

**701 [1]**  170/15
**730 [2]**  170/17 170/20
**77002 [2]**  2/7 2/15
**77056 [3]**  1/17 1/20 2/12
**7:00 in [1]**  36/5
**7:00 or [1]**  36/25
**7:30 [1]**  36/25

**8**

**82,000 [1]**  75/17

**82,000-dollar [1]**  75/17
**83 [1]**  26/8
**84 [2]**  58/16 168/13
**843 [1]**  84/3
**89,000 [1]**  56/8
**8:00 p.m [1]**  16/16
**8:15 [1]**  1/5
**8:30 [2]**  227/2 227/3

**9**

**9:37 [1]**  60/10
**9:52 [1]**  60/10

**A**

**a.m [5]**  1/5 60/10 60/10
119/13 119/13
**abandon [2]**  33/13 33/17
**abilities [2]**  57/17 113/12
**ability [4]**  51/17 97/20
190/20 191/9
**able [18]**  27/21 29/25 30/4
36/18 36/20 39/21 86/16 91/5
128/5 142/23 143/8 145/6
163/11 163/12 177/15 182/19
187/1 215/13
**about [207]**  4/20 6/13 10/6
13/6 17/2 17/19 17/21 18/2
18/4 18/6 18/8 18/14 18/18
19/12 19/14 20/8 21/21 24/1
24/5 25/21 26/14 32/8 35/7
35/15 35/17 35/23 37/1 38/16
38/22 39/3 39/4 40/16 41/3
41/5 42/4 43/11 43/14 43/14
46/15 50/13 53/14 58/25 61/7
61/7 62/3 63/4 64/6 64/6
64/15 65/20 66/11 66/19
66/23 67/8 67/17 67/22 67/25
68/17 69/10 69/24 70/10
70/11 70/13 70/15 71/1
71/13 71/19 71/22 72/10
72/13 73/3 73/13 74/21 75/13
76/5 77/23 78/5 78/7 80/4
83/4 83/13 88/18 88/18 89/3
90/7 92/7 92/16 92/21 96/25
98/1 99/17 107/14 110/9
116/12 116/16 118/14 120/25
128/9 128/25 129/18 131/11
131/12 138/17 138/19 145/9
153/5 155/19 155/24 156/7
159/9 161/2 162/20 164/5
164/5 167/18 169/3 169/19
170/22 171/3 171/7 171/20
174/14 175/1 176/5 176/20
176/25 177/9 178/9 179/22
180/21 181/10 181/11 181/13
182/8 183/17 183/20 183/23
184/8 184/16 184/20 184/22
184/24 185/1 185/9 185/12
186/5 186/6 186/9 186/9
186/10 186/18 187/16 189/19
190/12 192/11 192/16 192/17
193/5 195/9 195/13 195/20
196/13 197/2 197/20 197/21
198/12 199/7 199/8 200/1
200/22 200/24 201/23 201/24
202/22 202/23 203/7 204/2
204/4 204/12 205/4 209/17
210/24 212/1 212/24 215/25
217/8 217/11 217/16 217/24
218/1 218/7 218/9 218/15
218/18 218/20 218/20 218/23
219/13 219/18 220/24 221/10

225/15 225/18
**above [6]**  99/16 104/16 104/16
106/18 187/23 227/8
**above-entitled [1]**  227/8
**absentia [1]**  4/12
**Absolutely [3]**  132/9 162/19
191/23
**abstract [2]**  188/5 188/7
**abuse [3]**  213/24 213/24 217/1
**abusive [1]**  216/18
**academia [1]**  210/6
**academic [2]**  55/8 55/16
**accept [3]**  39/11 62/16 128/24
**acceptable [2]**  126/10 130/8
**accepted [1]**  131/6
**access [3]**  20/12 36/19 36/20
**accessed [1]**  52/13
**accident [3]**  44/24 82/19
211/18
**accomplish [1]**  181/22
**accordance [2]**  121/17 121/18
**according [5]**  30/6 30/13
107/2 125/21 156/13
**account [17]**  43/18 56/2 86/3
86/13 86/16 109/16 114/12
114/17 116/25 117/22 138/4
138/11 140/19 155/12 159/19
162/8 162/22
**accounting [5]**  96/22 98/14
108/12 121/17 131/6
**accounts [2]**  138/14 162/10
**accurate [9]**  23/15 24/11
24/15 46/15 81/4 81/5 84/15
164/19 180/13
**achieve [1]**  164/2
**achieved [1]**  55/12
**acquired [2]**  201/11 201/13
**acquiring [1]**  89/17
**across [4]**  36/10 36/20 166/8
195/3
**act [1]**  49/15
**acting [1]**  37/2
**active [1]**  78/1
**activities [2]**  173/4 177/18
**actual [19]**  25/8 37/12 85/7
93/2 93/4 98/7 101/13 103/6
103/10 107/12 107/15 113/24
116/10 117/21 123/4 134/22
135/5 141/4 157/19
**actually [62]**  7/6 10/25 13/12
24/3 24/13 25/5 29/3 30/19
35/20 37/8 45/6 60/25 61/21
74/20 79/11 90/5 90/6 90/8
90/10 90/11 91/21 95/9 96/20
98/3 98/11 100/8 100/12
101/9 102/17 107/10 107/11
107/12 107/16 107/20 107/21
109/16 116/6 117/24 127/7
134/13 135/3 135/4 135/20
145/14 146/25 149/17 153/23
159/7 161/5 162/23 165/9
171/6 176/21 176/21 186/15
187/20 214/20 216/10 217/16
220/16 222/1 226/6
**add [11]**  65/6 97/21 123/6
130/10 139/13 145/6 154/2
160/22 161/5 161/12 162/22
**added [1]**  73/11
**adding [1]**  161/16
**addition [1]**  193/10
**additional [6]**  39/25 73/4

**additional... [4]** 94/24 97/21
 104/17 122/7
**Additionally [1]** 216/25
**address [2]** 42/1 196/15
**addressed [1]** 196/10
**addressing [4]** 14/11 44/4
 182/1 182/5
**adds [1]** 82/25
**adjunct [2]** 35/8 136/24
**adjust [2]** 40/19 109/20
**adjusted [1]** 123/20
**adjustment [1]** 119/5
**adjustments [1]** 125/17
**admin [1]** 92/5
**administer [4]** 40/13 51/5
 76/15 168/25
**administered [1]** 50/18
**administration [3]** 166/13
 167/3 167/16
**administrative [4]** 36/14
 48/13 92/12 92/13
**admissibility [1]** 130/15
**admissible [2]** 64/8 64/10
**admit [1]** 7/4
**admitted [6]** 64/23 64/24
 131/2 131/4 168/16 168/17
**adult [1]** 222/16
**advance [4]** 55/10 95/22 128/4
 128/6
**advanced [3]** 73/21 73/23
 73/23
**advancement [4]** 57/13 80/9
 97/3 97/4
**advantage [1]** 91/12
**adverse [1]** 19/9
**affect [2]** 175/6 177/21
**affected [1]** 179/3
**afield [1]** 18/18
**after [41]** 11/17 16/24 29/16
 29/16 30/3 33/11 34/1 38/17
 40/5 43/14 44/5 45/2 45/8
 47/15 48/22 61/10 63/20
 63/25 67/9 69/23 77/20 78/2
 78/5 86/9 113/25 150/20
 161/11 163/2 169/24 174/25
 176/8 182/24 189/5 196/13
 197/5 197/16 199/8 199/20
 213/11 213/20 223/19
**aftermath [1]** 185/3
**afternoon [3]** 23/22 168/20
 196/7
**afterward [5]** 196/21 202/15
 202/16 218/10 218/15
**afterwards [2]** 196/15 218/13
**again [27]** 26/8 36/17 48/4
 55/8 61/16 64/1 68/19 68/25
 71/13 100/4 118/25 126/20
 133/16 154/9 157/10 157/14
 165/25 166/16 174/11 181/8
 190/7 191/8 194/18 215/16
 215/17 215/17 216/8
**age [31]** 44/10 82/15 82/23
 117/4 123/16 140/17 140/24
 140/24 142/23 142/24 148/23
 149/15 149/16 149/18 149/21
 149/25 150/1 150/10 150/10
 150/13 150/13 150/13 150/14
 151/6 151/9 152/19 155/6
 155/9 156/17 158/24 159/8
**age 46 [2]** 150/10 156/17

**agitated [1]** 32/22
**ago [8]** 62/25 63/6 63/19
 64/16 152/10 185/19 185/19
 222/9
**agree [17]** 13/23 26/1 28/2
 60/3 78/10 100/1 100/4 116/2
 132/19 152/1 162/16 208/9
 209/23 209/24 210/2 210/9
 214/18
**agreed [2]** 4/4 8/22
**agreement [1]** 40/6
**ahead [1]** 39/16
**aided [1]** 1/24
**aircraft [5]** 12/14 12/20
 12/21 12/23 67/20
**alarmed [1]** 195/12
**alcohol [9]** 22/8 22/13 30/20
 197/6 212/25 213/7 213/22
 213/23 213/24
**algebra [1]** 151/14
**all [207]** 7/4 7/11 8/25 9/12
 11/9 14/4 14/13 16/17 18/21
 18/25 19/5 19/22 20/2 21/12
 22/2 23/12 23/19 24/14 27/7
 27/14 28/22 29/12 30/8 30/22
 31/3 31/6 31/13 33/6 33/12
 33/20 35/24 36/4 36/22 36/22
 38/8 38/16 39/14 41/16 45/8
 49/5 49/22 50/10 50/14 50/16
 51/1 51/12 52/2 52/2 52/9
 52/12 52/21 53/2 53/22 53/23
 54/1 54/2 54/4 54/18 55/22
 56/4 56/7 60/9 61/8 61/11
 63/7 67/1 68/20 69/19 70/7
 70/19 70/21 71/18 73/23 75/7
 76/3 78/2 78/21 81/3 82/25
 83/19 84/6 85/4 87/15 87/20
 87/24 88/8 88/17 88/20 89/6
 90/22 93/5 96/15 98/10 98/19
 99/9 100/25 101/19 101/23
 102/10 102/15 103/21 105/18
 106/25 107/23 108/3 109/21
 109/22 110/6 112/21 112/23
 114/15 114/20 115/4 115/11
 115/18 116/15 117/1 117/19
 119/2 119/12 120/22 121/11
 121/11 122/17 123/15 123/25
 124/25 127/3 127/24 128/21
 129/2 130/19 131/8 134/13
 134/14 135/10 135/24 136/3
 137/6 137/23 139/17 140/22
 142/9 143/21 144/25 146/14
 147/9 147/12 148/3 148/12
 149/15 149/18 150/14 151/2
 152/12 153/14 153/19 155/10
 156/1 156/6 156/11 159/3
 160/1 162/5 162/25 163/3
 165/12 168/5 170/6 170/14
 171/2 171/4 171/21 175/8
 175/9 175/11 178/24 179/7
 181/9 182/22 184/9 186/16
 187/25 188/20 197/24 198/1
 198/3 198/7 198/7 198/11
 198/15 199/2 200/9 201/6
 202/14 204/19 205/8 205/9
 205/12 210/17 211/7 215/2
 217/18 225/8 226/14 226/20
 226/22
**all-passenger [1]** 33/12
**alleged [7]** 197/1 198/9
 198/12 199/9 199/14 206/16

**allegedly [1]** 62/3
**alleging [1]** 5/14
**alley [2]** 39/4 39/6
**allow [7]** 36/20 62/12 118/20
 129/5 187/7 187/9 188/22
**allowed [4]** 20/1 40/4 130/23
 132/21
**allowing [1]** 64/2
**alluded [1]** 41/21
**almost [1]** 106/21
**along [5]** 37/2 141/3 173/10
 175/24 204/17
**already [10]** 4/13 8/24 14/9
 75/25 76/25 97/1 110/16
 146/23 171/19 218/17
**also [32]** 22/22 27/18 31/4
 34/8 42/7 44/7 44/25 57/12
 71/14 77/18 78/6 79/9 79/11
 80/19 80/23 100/18 105/15
 115/24 118/6 119/3 121/21
 139/20 147/3 155/20 172/23
 173/11 173/22 187/11 190/5
 193/25 200/13 202/2
**altercations [1]** 22/7
**alternative [1]** 47/18
**although [3]** 112/3 196/12
 208/24
**always [3]** 34/23 173/14 226/4
**am [13]** 15/14 21/19 43/6
 60/18 97/15 120/5 131/11
 151/24 158/9 172/5 184/20
 197/9 212/1
**ambition [1]** 57/17
**ambitions [1]** 113/12
**American [6]** 111/22 166/12
 166/14 167/3 167/8 167/14
**amount [13]** 86/17 90/24
 104/12 107/12 108/7 109/7
 109/8 110/18 112/18 116/5
 117/19 155/11 159/15
**ample [1]** 13/24
**anal [5]** 200/17 201/5 201/8
 201/16 201/21
**analysis [13]** 79/1 79/24
 82/13 83/13 89/4 93/10 117/3
 119/9 121/24 122/4 123/14
 135/15 143/6
**and UT [1]** 74/18
**and/or [1]** 89/18
**Andrew [3]** 2/9 49/10 87/12
**angry [1]** 23/5
**annual [5]** 54/5 54/15 106/8
 122/18 139/12
**annualized [3]** 157/5 157/24
 161/2
**another [23]** 4/12 6/6 13/8
 14/9 16/8 70/6 70/16 70/22
 76/6 76/24 85/11 108/5
 111/19 126/10 128/6 131/12
 166/10 176/20 180/2 185/11
 193/15 193/18 214/15
**answer [27]** 11/7 34/17 39/18
 41/21 91/3 91/20 93/9 118/5
 118/8 118/11 118/21 120/16
 122/20 122/21 153/6 157/16
 161/8 161/9 166/15 166/21
 167/17 185/5 188/13 191/21
 194/13 195/2 203/10
**answered [1]** 14/9
**answering [2]** 118/12 223/12
**anthropology [2]** 90/15 111/9

**anticipate [4]** 210/19 210/23 211/4 217/12
**anticipated [1]** 155/14
**anticipating [1]** 162/14
**anticipation [1]** 210/21
**anxiety [17]** 33/2 34/18 51/24 207/12 207/14 207/16 207/19 207/23 207/25 208/1 208/7 216/2 216/5 224/11 224/13 224/21 224/23
**anxious [2]** 224/16 224/20
**any [102]** 5/23 6/10 6/17 6/20 9/19 11/2 11/5 19/9 32/4 33/24 35/20 36/9 36/12 39/25 42/21 45/21 45/22 45/22 46/3 46/5 46/5 46/6 48/16 50/17 50/24 51/17 55/7 55/8 56/25 58/22 59/23 61/6 69/25 71/15 78/10 80/8 80/11 81/22 85/9 88/15 88/16 88/25 90/15 91/5 97/25 98/5 98/16 98/18 103/8 107/5 107/7 114/12 117/9 119/4 120/3 120/25 122/6 122/7 123/13 124/20 127/8 131/5 144/19 144/25 145/10 146/6 148/10 165/18 165/21 168/4 177/1 180/5 182/18 183/18 183/19 185/6 186/10 189/13 190/2 191/12 191/13 191/20 192/10 195/24 196/4 199/7 205/12 205/22 206/9 206/20 211/2 211/3 212/2 212/7 213/7 213/25 214/14 216/11 216/14 216/25 219/11 226/19
**anybody [3]** 11/7 75/4 75/16
**anymore [1]** 184/24
**anyone [6]** 6/13 6/19 9/17 9/22 48/20 50/10
**anything [31]** 6/13 9/16 19/3 30/1 32/17 36/5 37/5 37/12 64/10 67/23 71/15 76/2 89/4 97/13 121/18 128/25 130/10 138/10 176/15 181/16 183/8 191/17 201/24 202/23 203/2 205/13 212/8 218/17 222/10 223/18 226/24
**anyway [4]** 14/16 62/6 68/6 71/14
**anywhere [4]** 10/5 110/15 121/15 129/12
**apart [1]** 83/21
**apologize [6]** 68/25 94/9 110/8 115/3 139/23 179/17
**apparent [1]** 201/17
**apparently [3]** 106/1 142/20 159/22
**appear [2]** 55/12 72/13
**appearance [1]** 173/8
**appears [3]** 109/11 122/20 141/9
**apple [1]** 67/19
**apples [1]** 55/24
**application [1]** 57/17
**applied [14]** 116/20 117/7 124/15 124/16 124/17 132/13 137/21 146/25 147/1 147/3 147/5 150/4 153/17 167/20
**applies [5]** 85/4 127/8 131/2 141/10 150/5

101/19 114/13 121/5 122/24 123/5 124/8 124/11 132/4 132/5 132/13 137/19 146/22 148/15 153/20 154/7 154/15
**applying [6]** 122/21 132/4 138/6 144/19 150/5 152/21
**appraisal [1]** 80/9
**appreciate [2]** 18/21 147/9
**appreciative [1]** 39/21
**approach [10]** 17/18 18/24 26/21 87/25 98/4 103/15 106/10 109/25 171/12 171/13
**appropriate [6]** 45/9 45/15 45/16 85/7 113/18 128/11
**approximate [1]** 160/8
**approximately [6]** 54/8 107/1 134/25 170/1 174/9 197/4
**apricot [1]** 69/5
**April [8]** 49/17 79/15 79/16 79/16 79/19 82/20 83/10 87/23
**April 15th [7]** 79/15 79/16 79/16 79/19 82/20 83/10 87/23
**arbitrary [1]** 127/6
**are [195]** 4/6 11/12 12/23 12/23 15/11 17/2 23/14 23/14 27/16 31/2 32/1 33/7 33/11 33/18 41/25 42/24 43/7 43/8 43/11 43/17 43/21 45/19 45/25 50/11 51/1 51/12 53/17 54/13 55/9 55/15 56/3 57/10 59/5 59/15 63/12 67/7 67/13 68/3 70/15 71/23 72/10 74/17 78/21 79/14 79/20 81/18 82/1 82/16 84/11 84/19 86/2 86/21 87/4 88/20 89/23 91/21 92/9 92/11 92/16 94/6 94/10 94/12 95/7 97/11 97/18 98/21 99/24 100/14 100/14 101/21 101/21 103/10 103/12 104/15 104/24 105/9 106/21 107/23 109/3 109/3 109/5 110/23 111/8 111/20 111/21 111/23 112/10 122/14 122/17 122/18 122/19 122/21 123/3 125/18 130/21 132/22 134/8 134/11 141/6 142/11 142/16 155/3 155/18 155/18 156/22 158/7 158/10 158/20 159/1 162/2 162/3 162/4 162/7 162/11 162/14 162/23 163/1 163/4 163/5 163/8 163/8 166/18 167/15 167/22 167/24 168/9 168/16 168/17 168/18 171/10 172/25 174/21 174/18 176/13 179/22 182/4 182/4 182/9 182/10 183/19 184/1 184/6 185/2 185/23 186/1 186/2 186/22 186/23 187/3 187/4 188/10 188/10 188/11 188/23 189/7 190/2 191/7 192/19 193/14 194/1 194/2 194/14 196/18 197/1 198/7 201/1 202/16 203/25 205/8 205/9 206/8 206/14 206/22 207/2 207/3 207/16 208/2 209/18 209/22 211/2 211/3 211/7 213/5 215/2 216/16 218/7 218/9 218/18 218/22 218/22 219/17 224/15 225/24 226/6 227/1

54/10 59/19 111/13 174/1 200/16 200/17 201/5 201/5 201/8
**areas [3]** 82/16 93/21 223/17
**aren't [4]** 12/24 23/15 158/10 205/22
**argue [1]** 164/4
**arguing [4]** 25/15 25/21 130/20 132/16
**argument [4]** 23/12 25/16 70/16 70/18
**arguments [3]** 23/11 23/13 25/23
**arithmetic [3]** 105/23 137/24 140/8
**arms [1]** 29/15
**Armstrong [12]** 4/5 4/13 4/13 5/1 5/4 6/1 6/16 6/22 7/6 8/21 11/7 17/25
**around [17]** 16/16 29/15 33/23 35/14 35/21 43/10 43/14 47/12 60/4 61/9 162/21 162/24 163/17 173/14 173/17 221/16 222/16
**arranged [1]** 13/4
**array [1]** 92/2
**arrive [3]** 44/18 45/19 83/3
**arrived [6]** 44/23 44/23 45/21 53/13 53/18 125/10
**arriving [1]** 130/9
**art [3]** 96/21 98/13 98/22
**articulable [1]** 129/4
**artificially [1]** 121/11
**artillery [1]** 78/1
**artist [1]** 187/20
**arts [1]** 98/13
**artwork [1]** 190/4
**as [211]** 7/14 8/13 11/14 22/4 22/5 22/11 23/7 23/20 25/5 25/7 25/12 25/19 25/19 26/2 27/15 28/22 29/10 30/19 31/8 32/24 32/24 33/11 35/8 36/18 37/2 42/1 42/2 42/13 42/15 42/17 43/23 43/23 44/3 44/3 44/20 44/20 45/4 45/13 45/17 45/17 47/3 48/12 48/23 49/15 50/4 52/4 54/23 55/20 56/12 61/15 63/10 63/17 64/14 64/19 67/7 67/17 70/8 71/23 74/7 75/20 76/8 77/19 78/1 80/10 81/1 85/20 85/20 86/7 86/7 89/1 90/4 90/25 91/7 91/19 92/10 92/12 92/13 93/23 95/15 95/15 97/3 97/6 98/15 98/15 98/15 98/20 98/22 99/2 99/2 99/7 100/13 100/19 101/1 102/19 104/15 105/1 105/7 105/15 105/18 106/13 108/1 108/12 109/14 110/18 110/18 113/13 113/21 114/11 119/20 119/23 119/24 120/1 120/18 123/2 125/21 125/22 126/9 127/12 130/22 131/5 131/13 131/13 131/15 131/20 132/4 132/17 132/20 133/15 134/21 135/13 136/20 136/23 138/9 139/25 139/25 140/8 141/3 142/15 143/1 143/3 143/12 143/12 144/5 144/5 144/8 144/14 144/23 145/7 145/16 145/20 147/10

**A**

**as... [60]**  147/10 150/16 151/1 152/14 158/5 158/22 159/6 159/6 159/20 159/25 160/2 160/5 160/9 163/1 164/22 166/21 168/1 168/1 169/6 169/6 175/6 178/1 181/18 181/18 181/24 182/24 184/17 184/17 185/3 185/17 186/21 186/21 187/4 187/4 187/15 193/1 193/1 194/18 194/20 202/1 203/5 203/15 209/19 209/19 209/20 209/25 212/5 213/21 215/1 215/2 215/2 216/12 216/16 216/17 217/25 217/25 218/25 219/11 225/25 225/25

**aside [2]**  14/6 62/19

**ask [39]**  9/5 10/1 14/14 17/21 18/18 19/12 20/8 21/19 61/7 67/22 70/11 70/13 70/14 80/4 81/11 87/16 87/16 100/6 110/3 111/25 118/11 134/21 154/25 158/11 164/16 165/5 166/7 166/24 169/7 171/3 174/14 176/20 179/23 182/22 193/2 196/8 203/9 212/12 221/10

**asked [30]**  11/5 13/6 14/8 14/9 14/18 14/22 15/13 26/14 58/25 62/3 65/19 65/20 67/25 68/17 70/10 78/15 114/3 165/3 165/18 185/9 188/12 197/6 198/17 199/20 199/25 200/2 200/3 212/24 224/22 225/15

**asking [21]**  12/6 14/7 21/16 29/3 33/21 74/20 110/23 116/12 118/12 120/5 134/1 155/6 156/21 186/11 188/14 193/14 194/24 199/17 212/3 220/24 227/1

**asleep [3]**  173/13 177/4 178/11

**aspect [6]**  167/25 173/3 177/14 190/12 203/7 218/21

**aspects [2]**  172/11 177/16

**assault [13]**  46/21 46/25 48/10 182/24 196/21 196/23 197/2 198/9 198/12 199/9 199/14 206/17 208/6

**assaulted [7]**  200/8 201/7 203/1 211/15 217/3 217/6 219/5

**assaults [1]**  211/19

**asserted [4]**  64/23 68/9 69/3 69/6

**assertiveness [4]**  185/22 186/8 186/9 186/13

**assess [5]**  41/25 50/3 51/6 170/4 183/8

**assesses [2]**  131/14 142/15

**assessing [3]**  179/15 179/18 205/25

**assessment [24]**  43/1 43/13 43/16 43/23 44/15 45/1 45/22 46/3 46/4 46/13 47/7 47/11 48/15 48/22 59/22 80/17 88/7 119/7 119/8 142/15 143/2 144/4 147/4 180/13

**assist [2]**  30/25 181/16

**associate [1]**  165/11

**Associate's [7]**  73/5 83/25 84/4 89/10 94/22 94/25 95/16

**associated [1]**  172/25

**associates' [1]**  195/21

**assume [29]**  21/17 27/21 29/2 34/3 34/24 97/1 97/9 113/19 119/3 120/8 120/11 122/6 125/18 125/23 126/9 127/2 131/24 136/4 137/10 138/6 140/23 141/20 141/21 142/20 142/21 142/23 196/22 199/20 201/14

**assumed [10]**  89/6 101/12 102/1 117/7 118/25 127/8 132/11 136/4 136/21 140/11

**assumes [7]**  112/8 119/25 120/20 127/2 127/2 127/3 127/3

**assuming [11]**  29/1 65/7 94/12 97/11 111/4 128/15 128/16 134/8 141/8 142/11 148/3

**assumption [29]**  72/9 72/18 83/24 95/20 96/24 112/12 119/6 126/9 126/25 127/4 127/4 127/4 127/5 128/7 128/12 129/6 134/5 135/3 135/16 140/8 140/25 141/11 141/23 141/25 142/13 142/19 143/1 145/9 163/11

**assumptions [14]**  21/16 21/20 39/3 63/12 72/8 96/16 98/1 100/23 125/14 127/8 128/25 129/5 137/16 140/4

**at [283]**

**ate [2]**  67/19 69/5

**Ativan [1]**  215/3

**attack [1]**  187/17

**attacking [1]**  126/7

**attend [2]**  37/7 37/8

**attending [3]**  37/12 37/23 37/24

**attention [4]**  26/24 65/18 71/24 185/18

**attenuated [1]**  70/17

**attorney [1]**  1/18 50/5

**attorneys [3]**  48/16 49/15 203/4

**attributed [3]**  177/15 192/8 192/8

**August [3]**  174/9 182/23 215/16

**August 22nd [1]**  174/9

**Austin [1]**  77/18

**authorities [1]**  28/8

**automatic [1]**  115/18

**availability [1]**  9/15

**available [6]**  18/20 57/11 70/8 70/16 80/3 163/5

**avenue [1]**  73/10

**average [29]**  52/8 52/23 54/5 54/7 54/11 54/14 54/18 55/17 55/22 55/23 55/24 75/1 75/18 75/22 87/4 90/8 103/12 107/13 107/14 107/18 107/19 107/20 108/23 109/12 109/14 140/20 141/9 162/20 162/20

**avoid [6]**  172/24 173/1 177/8 177/10 206/7 222/16

**avoidance [2]**  176/25 206/5

**avoidant [4]**  172/23 177/8

**avoidant/numbing [1]**  178/2

**avoided [2]**  24/3 65/21

**avoids [5]**  189/24 206/6 206/8 206/9 207/3

**aware [11]**  8/18 9/21 15/11 135/8 135/9 189/14 190/3 209/7 215/2 217/2 217/5

**away [5]**  39/3 61/13 188/24 194/18 194/18

**awful [2]**  59/2 127/20

**awfully [1]**  127/19

**B**

**B182 [1]**  213/10

**B195 [1]**  214/11

**B256 [1]**  164/9

**babies [1]**  37/13

**babysat [1]**  38/5

**Bachelor's [15]**  42/6 73/6 84/8 84/9 89/12 89/18 94/25 95/16 97/13 97/17 165/11 166/9 166/11 167/1 167/2

**back [75]**  5/10 7/17 11/1 19/6 27/25 30/4 36/8 36/9 38/17 38/20 42/3 43/16 44/3 44/5 45/3 45/9 47/14 47/17 49/14 57/6 59/20 65/18 66/1 68/13 70/3 72/3 72/15 72/23 74/22 74/24 74/25 76/4 82/7 84/1 84/17 85/25 89/6 96/15 100/12 106/3 110/11 110/11 112/23 114/23 119/12 133/19 136/10 147/12 154/5 154/7 154/12 158/22 164/23 174/11 181/8 182/8 185/5 189/8 192/17 192/20 192/22 192/24 192/25 192/25 194/17 194/21 200/4 202/1 214/11 216/6 220/17 223/13 223/19 223/20 225/25

**background [6]**  41/14 43/24 53/14 77/15 166/3 191/10

**backs [2]**  110/10 112/8

**bad [2]**  173/15 188/12

**Baghdad [3]**  201/20 202/5 202/20

**balanced [1]**  164/2

**bandwidth [1]**  118/19

**bank [3]**  86/16 100/8 100/9

**banks [1]**  162/23

**bar [3]**  22/17 22/20 22/21

**Barron [3]**  2/14 227/12 227/13

**base [6]**  79/7 87/21 92/23 102/5 115/19 143/6

**baseball [1]**  75/8

**based [60]**  43/22 44/23 45/10 45/14 47/5 50/21 52/17 53/2 53/4 59/4 67/2 67/2 67/3 73/1 73/4 80/15 81/4 83/12 85/7 86/22 89/1 90/8 94/11 103/10 103/12 103/21 103/23 104/20 105/18 106/8 106/13 106/22 107/15 107/17 107/19 110/17 119/6 119/8 119/23 119/25 121/23 122/4 129/15 131/25 135/17 135/19 137/16 141/1 142/20 143/1 143/5 144/4 146/6 147/3 155/19 155/20 160/4 161/4 164/18 182/11

**baseline [8]**  90/4 93/23 101/1

**baseline... [5]** 109/19 117/2
122/25 123/17 152/16
**basic [2]** 90/1 110/10
**basically [18]** 32/17 41/24
46/4 46/17 78/4 79/20 82/6
82/24 86/15 86/17 128/12
131/16 131/20 163/2 163/15
197/13 200/19 206/22
**basing [2]** 103/21 103/23
**basis [9]** 8/24 52/4 105/2
120/13 125/15 125/16 127/16
134/7 203/7
**bathroom [3]** 200/17 203/17
203/21
**battered [2]** 219/4 221/12
**be [244]**
**bear [1]** 206/15
**be careful [1]** 131/22
**bearing [1]** 180/5
**bears [1]** 127/7
**became [2]** 23/5 201/17
**because [80]** 6/6 8/19 10/13
13/4 15/22 16/1 16/2 16/6
19/18 19/24 19/25 21/17
24/21 25/14 25/21 28/20
29/23 31/12 33/7 34/11 34/18
34/24 39/1 48/2 50/21 57/10
62/14 64/13 69/1 70/2 71/18
75/16 84/11 84/18 84/19
94/24 98/19 98/21 99/2 99/6
99/14 103/22 107/8 108/7
110/1 110/22 115/21 122/6
122/7 123/7 125/3 126/5
127/15 128/21 128/25 129/17
131/15 132/6 133/7 143/13
146/7 146/10 154/21 158/10
160/1 161/9 166/16 167/18
184/24 185/7 185/16 191/6
192/19 194/8 199/13 207/3
207/18 210/5 210/7 216/3
**because -- I [1]** 25/14
**become [10]** 73/11 87/17
128/12 142/14 147/2 163/12
173/19 188/15 191/24 198/4
**becomes [3]** 32/22 101/18
154/1
**becoming [4]** 197/9 197/19
197/25 198/3
**bed [11]** 13/7 198/21 199/2
199/21 200/11 202/17 202/22
203/16 220/5 221/21 222/6
**been [111]** 5/15 9/12 9/18
12/5 13/24 14/9 16/21 19/4
25/5 25/13 25/20 25/21 25/23
27/10 27/12 27/15 30/24 34/5
37/23 37/24 39/9 39/10 42/18
43/10 45/8 46/22 47/1 49/10
52/3 53/5 54/3 64/4 65/11
65/12 66/24 67/3 68/16 70/9
71/19 71/25 72/1 73/7 75/4
75/24 76/24 76/25 78/8 79/3
80/2 82/9 82/17 83/1 87/18
93/12 116/12 118/18 128/20
139/4 140/16 140/19 143/4
148/3 169/23 169/25 174/11
174/16 177/4 180/22 187/1
189/19 191/25 192/18 196/12
196/18 196/24 197/3 197/17
197/18 197/21 198/8 200/6
200/8 201/3 201/7 203/1

206/10 208/1 208/14 209/9
209/24 210/15 212/4 214/5
214/23 214/24 214/25 215/1
215/20 215/23 215/24 217/3
219/5 224/5 224/6 225/1
225/12 225/14
**before [51]** 1/10 4/11 4/20
7/4 12/13 27/18 28/18 28/19
28/20 31/11 40/13 40/16 51/4
60/13 70/3 76/15 76/16 80/16
87/13 92/22 94/19 97/6 99/23
108/2 111/16 114/11 116/5
116/15 120/15 127/18 143/1
144/8 144/23 145/13 146/12
148/13 151/1 166/16 168/24
169/3 187/16 190/6 191/25
197/18 211/4 214/2 214/5
218/8 218/8 222/20 225/9
**began [8]** 22/25 23/5 63/25
111/17 184/15 197/7 197/18
197/24
**begin [1]** 212/15
**beginning [20]** 20/11 26/20
26/25 54/23 55/21 63/21 74/3
99/12 150/17 150/24 151/1
177/5 177/19 178/12 178/13
178/15 180/24 180/25 203/15
215/2
**behavior [2]** 219/18 222/16
**behavioral [3]** 182/11 185/11
219/20
**behaviors [2]** 172/24 176/25
**behind [1]** 34/24
**being [45]** 4/14 12/18 13/6
17/2 22/5 24/6 31/8 40/11
43/4 43/7 47/12 47/13 50/12
58/19 64/2 64/24 67/4 68/9
69/2 69/17 71/7 73/1 76/13
94/9 159/23 168/19 169/24
169/25 172/15 172/22 173/4
177/15 177/15 178/23 182/19
182/24 183/4 187/1 194/9
204/20 211/17 212/6 212/7
219/3 222/16
**beings [1]** 209/22
**belay [1]** 12/17
**belief [3]** 29/17 29/19 29/21
**believe [58]** 9/17 22/13 24/16
25/20 28/25 29/3 29/6 29/7
29/10 29/12 29/23 30/14
35/11 36/10 38/1 38/18 38/17
42/14 47/5 47/7 49/17 52/3
59/24 63/23 64/2 66/8 66/10
66/11 74/1 80/19 81/3 83/20
84/21 84/22 85/4 87/13 88/17
109/21 112/5 126/9 134/2
134/18 140/14 142/4 145/21
146/7 149/18 156/22 160/9
160/10 165/17 193/21 208/14
209/8 220/5 221/22 222/21
225/11
**believed [2]** 68/12 132/18
**belongs [1]** 113/16
**bench [10]** 60/16 66/2 66/4
66/6 66/9 66/19 67/2 67/11
71/5 71/22 71/25
**benefit [10]** 115/22 116/7
116/8 116/8 134/5 134/22
136/1 136/11 136/18 137/3
**benefits [23]** 54/5 101/2
101/4 101/4 101/5 101/9

134/14 134/16 134/17 134/18
134/19 135/5 135/11 135/19
135/23 136/5 136/7 136/15
150/20
**best [6]** 72/14 121/25 131/15
142/15 181/13 223/16
**better [8]** 6/6 23/17 41/6
41/7 41/8 126/15 164/15
179/24
**between [29]** 22/11 36/12
52/15 55/16 75/5 77/25 83/20
85/10 90/16 98/7 99/6 101/12
108/14 110/9 113/25 150/20
151/4 151/23 152/18 152/23
155/19 156/22 157/17 160/10
207/11 207/17 207/18 207/25
218/3
**beyond [5]** 10/7 74/1 104/16
104/17 188/14
**big [6]** 35/5 85/21 111/6
159/6 206/10 207/20
**bigger [7]** 101/18 110/12
111/11 152/14 153/9 153/16
153/21
**biggest [2]** 128/8 184/10
**bill [4]** 86/19 155/16 160/3
163/7
**billing [1]** 43/10
**bills [3]** 163/15 163/19
163/20
**biology [1]** 54/2
**bird [7]** 12/12 12/13 12/14
12/16 12/18 13/5 19/14
**Birds [2]** 13/1 13/3
**birthday [1]** 226/13
**bit [14]** 49/14 60/15 81/24
84/12 84/24 112/22 169/19
171/3 171/20 171/23 192/1
193/1 217/10 223/14
**bits [1]** 23/14
**Blake [1]** 2/4
**blame [2]** 25/18 133/10
**blameless [1]** 25/12
**bleeding [1]** 221/19
**blemishes [1]** 226/14
**blind [1]** 109/5
**blood [1]** 30/15
**bloodshot [1]** 30/19
**blow [4]** 99/13 99/16 139/24
146/16
**blown [1]** 210/17
**BLS [3]** 90/11 90/18 90/18
**blurring [1]** 198/3
**board [7]** 41/15 41/16 41/17
80/11 153/7 158/25 195/3
**boat [1]** 32/13
**body [4]** 80/3 198/16 202/25
203/17
**bogus [2]** 75/3 75/4
**book [3]** 65/12 65/13 70/13
**books [2]** 54/4 166/4
**boot [1]** 31/12
**BORTZ [11]** 2/8 13/6 13/11
13/12 26/8 49/10 87/12 196/8
213/4 213/9 215/6
**both [25]** 18/22 20/5 25/15
29/18 39/9 39/10 123/7 123/7
132/7 147/1 147/5 148/15
148/16 150/6 150/6 150/20
172/8 172/18 175/20 183/3
184/24 195/22 198/25 208/11

134/10
134/14 134/16 134/17 134/18
134/19 135/5 135/11 135/19
135/23 136/5 136/7 136/15
150/20

**both... [1]** 218/12
**bottled [1]** 8/2
**bottom [9]** 54/7 83/14 102/16 102/18 102/20 108/1 108/9 139/20 139/20
**bottom-line [4]** 102/18 102/20 108/1 108/9
**bought [1]** 133/16
**bounce [1]** 112/3
**bound [1]** 126/14
**bounds [1]** 70/14
**bowling [4]** 23/5 24/22 39/4 39/6
**Box [1]** 105/9
**boxed [1]** 8/2
**boxes [1]** 105/8
**boyfriend [1]** 216/18
**bra [2]** 12/2 12/7
**brand [1]** 54/25
**brand-new [1]** 54/25
**Brandon [1]** 2/10
**break [12]** 60/8 92/8 112/19 112/20 112/23 119/11 119/12 147/8 148/13 181/24 195/12 195/19
**breakdown [1]** 53/20
**breaking [1]** 79/19
**breaks [3]** 8/19 10/13 85/2
**Breanna [1]** 65/20
**breast [8]** 201/5 201/8 201/23 201/25 202/5 220/13 223/19 223/24
**breasts [6]** 200/16 220/14 220/16 220/18 224/2 224/8
**brief [1]** 38/10
**briefly [2]** 53/12 71/1
**bring [20]** 7/25 12/2 14/13 19/17 20/1 26/19 28/11 34/19 50/16 52/21 62/12 62/24 66/1 68/3 70/14 128/5 135/24 189/7 215/5 215/6
**bringing [1]** 8/6
**brings [5]** 57/16 91/23 103/7 192/25 192/25
**broad [3]** 53/8 53/9 92/2
**broke [3]** 134/1 195/11 195/15
**broken [3]** 79/14 82/14 195/10
**brought [6]** 7/22 8/5 12/3 65/18 67/10 127/18
**BROWN [2]** 1/6 1/7
**bruise [1]** 201/14
**bruised [4]** 201/4 201/8 219/4 221/12
**bruising [3]** 221/14 221/15 221/17
**brusqueness [1]** 115/4
**brutal [1]** 36/8
**buckets [1]** 79/20
**bucks [2]** 156/4 157/6
**build [2]** 170/4 184/11
**building [9]** 170/21 170/22 170/23 170/24 195/11 195/12 195/14 195/15 218/1
**built [1]** 207/19
**bunch [2]** 23/13 137/24
**Bureau [7]** 53/14 80/20 80/23 86/24 87/1 90/3 91/2
**burial [1]** 68/15
**buried [5]** 6/7 6/11 15/12 17/3 68/11

**business [5]** 100/19 166/13 167/3 167/15 206/25
**but [202]** 4/21 8/18 8/22 9/7 9/25 10/4 10/5 10/12 11/13 11/16 12/18 13/16 14/15 14/22 16/3 22/7 22/21 23/9 23/23 24/8 25/7 27/12 28/19 30/13 34/3 34/16 35/16 35/19 36/4 36/21 37/5 37/11 40/17 41/21 50/21 51/22 52/24 54/21 56/10 56/14 59/4 59/15 60/16 61/4 61/15 61/20 61/23 62/1 62/6 62/17 63/1 63/15 68/20 68/25 69/6 70/19 71/8 71/14 71/24 71/25 73/9 73/16 74/12 76/2 76/18 78/22 79/1 79/3 79/9 82/16 84/19 85/2 85/18 86/22 87/22 88/19 88/25 89/24 89/25 89/25 90/10 91/7 91/17 92/8 92/16 93/2 93/4 93/10 93/24 95/13 95/21 96/9 96/11 97/5 97/25 98/3 98/19 99/1 99/7 100/1 100/4 102/15 106/14 110/13 111/4 111/23 112/4 112/7 112/12 112/23 113/4 113/7 113/15 113/21 114/4 114/9 114/11 114/13 118/16 118/18 118/21 122/8 122/14 123/4 123/11 125/16 126/6 126/10 126/24 129/2 130/2 130/5 130/21 131/24 132/1 132/6 132/19 134/20 135/7 136/5 137/1 138/3 138/6 138/10 140/18 140/22 141/4 141/5 141/6 141/18 144/10 144/14 145/7 145/19 146/5 147/18 148/3 148/5 150/3 150/7 151/10 151/25 153/1 155/7 155/18 155/20 157/10 157/19 157/20 158/23 159/22 160/2 160/5 161/19 161/21 163/8 166/3 166/19 166/20 167/6 167/11 167/17 169/4 169/7 178/3 178/13 181/25 183/19 184/22 187/24 188/13 192/1 195/13 198/14 200/18 202/2 206/2 212/3 219/19 220/17 225/8 225/11
**but-for [1]** 79/1
**buttocks [1]** 221/16

**C**

**cabinet [1]** 195/23
**calculate [5]** 90/8 101/1 137/13 150/16 158/9
**calculated [5]** 106/7 137/25 139/10 139/13 158/10
**calculating [9]** 52/4 72/7 112/16 119/20 122/17 122/18 141/20 150/17 150/24
**calculation [29]** 83/8 89/3 102/10 106/2 107/22 108/12 110/17 112/17 116/1 124/6 124/21 126/17 132/6 135/21 135/23 135/24 139/12 148/15 148/16 151/5 156/6 157/10 158/3 158/7 161/21 161/22 163/9 163/9 165/21
**calculations [7]** 86/22 88/19 89/5 103/23 127/15 148/14

**calculator [6]** 87/9 115/9 148/10 148/23 157/23 158/5
**California [1]** 225/8
**call [12]** 26/24 40/8 44/9 76/6 76/9 79/1 114/23 185/18 189/9 212/21 217/25 224/17
**called [8]** 14/10 99/22 99/23 114/9 173/11 180/3 182/10 184/2
**calling [1]** 71/11
**calm [2]** 182/14 182/24
**came [12]** 36/20 38/25 66/2 66/9 127/23 135/7 157/3 184/10 195/15 199/20 201/24 202/1
**camp [2]** 9/22 31/12
**campus [4]** 36/13 55/2 75/6 189/25
**can [161]** 4/3 9/5 9/7 9/9 9/12 9/14 9/16 10/1 10/4 10/5 11/11 12/20 14/14 21/17 22/2 23/16 24/24 25/17 28/22 32/13 33/24 34/11 35/18 40/20 41/4 41/8 42/4 43/13 50/6 50/7 50/8 51/23 52/24 56/25 57/1 57/3 57/5 57/21 61/1 61/22 62/14 72/5 77/15 77/23 81/10 81/19 81/23 84/24 92/19 93/3 93/3 97/23 98/6 98/14 99/9 99/24 99/25 100/4 104/4 105/4 105/12 105/18 106/13 112/2 112/23 112/24 113/18 114/23 122/6 122/11 122/22 125/14 125/14 125/22 126/3 129/20 129/22 131/16 131/24 133/13 134/21 134/25 139/14 139/19 139/24 142/4 143/11 143/15 144/2 144/5 144/12 144/25 145/1 146/13 147/10 150/5 152/14 153/1 158/3 158/15 159/7 162/12 163/6 166/21 167/25 169/7 169/19 169/24 170/3 170/3 170/4 170/21 171/16 171/22 174/6 174/8 174/14 174/17 174/20 174/21 175/13 179/24 180/8 181/1 181/13 181/21 181/24 181/25 182/14 182/18 183/14 184/3 184/8 185/5 185/13 186/6 188/23 189/5 190/18 191/21 193/12 193/14 194/11 195/2 195/25 197/7 198/11 200/21 205/18 205/22 206/2 207/7 207/11 207/17 213/10 216/7 217/25 218/14 219/15 223/16 224/25
**can't [27]** 9/7 32/17 99/2 110/21 110/22 112/4 125/23 126/1 126/17 130/5 130/8 144/25 145/10 148/5 155/6 158/9 158/22 159/22 159/25 160/5 161/14 166/22 205/15 205/17 205/17 210/6 221/3
**canceled [1]** 133/2
**cannot [6]** 51/22 57/20 112/11 120/14 127/16 149/17
**cap [1]** 121/13
**capable [4]** 59/5 131/15 145/23 164/22
**capacity [28]** 14/23 15/1 44/22 46/5 79/12 80/9 83/11

**capacity... [21]** 89/4 90/17
93/17 94/11 98/7 98/12
111/12 116/18 119/10 122/1
123/12 128/13 131/17 143/3
143/6 144/3 144/15 144/17
145/8 147/4 166/25
**captain [1]** 57/23
**captured [1]** 161/18
**captures [1]** 97/6
**car [5]** 37/9 37/14 191/17
210/15 211/17
**cards [1]** 32/13
**care [5]** 7/11 27/22 30/2
36/15 109/4
**career [13]** 47/3 47/24 48/7
55/16 57/13 73/10 73/25
75/22 89/1 97/2 97/4 141/2
141/3
**careers [3]** 55/10 141/7 194/1
**careful [2]** 6/6 131/22
**Carnival [1]** 31/24
**carry [3]** 32/1 217/18 217/20
**case [41]** 4/14 11/10 19/1
42/18 42/24 43/9 45/8 49/16
50/10 61/14 67/13 67/16
67/22 68/2 68/3 68/21 69/8
70/14 75/11 78/14 78/15 79/8
79/12 87/17 93/17 108/2
110/22 126/22 127/23 173/21
174/21 174/22 180/3 188/17
189/10 190/21 192/18 192/19
196/11 210/8 216/3
**cases [4]** 78/22 105/3 167/5
203/25
**casts [2]** 25/10 25/11
**category [1]** 99/11
**Cates [2]** 2/3 5/4
**cause [8]** 35/3 60/5 138/7
138/7 138/10 173/24 192/7
227/8
**caused [2]** 9/17 60/1
**causes [5]** 109/7 112/12
138/13 181/12 219/1
**causing [1]** 47/9
**caution [1]** 71/12
**celebrate [1]** 226/13
**cement [1]** 195/13
**Census [1]** 87/1
**certain [12]** 34/22 35/1 79/3
93/24 100/23 164/17 172/2
184/23 187/3 224/15 224/17
224/18
**certainly [17]** 31/8 54/24
64/11 64/13 68/3 177/9
178/11 184/25 187/10 190/4
190/18 191/5 192/15 203/11
203/13 205/24 207/20
**Certification [1]** 227/7
**certified [5]** 41/15 41/16
41/17 41/19 45/23
**certify [1]** 227/8
**cetera [5]** 46/12 53/24 57/18
92/5 92/6
**challenged [2]** 126/2 133/13
**challenging [1]** 191/4
**chance [10]** 16/8 19/11 19/12
23/25 33/5 65/25 70/6 75/17
118/21 148/10
**chances [1]** 8/1
**change [4]** 35/7 120/2 145/6

**changed [5]** 23/4 119/10
180/23 180/24 215/25
**changing [2]** 31/3 31/6
**Chapman [20]** 17/11 17/16
19/17 19/24 20/1 20/10 61/17
62/13 63/5 63/16 63/17 63/25
64/2 64/18 64/19 66/9 66/17
66/21 69/8 69/24
**Chapman's [2]** 65/22 69/14
**characterization [1]** 22/10
**characterize [1]** 22/6
**charitably [1]** 69/14
**charity [1]** 109/7
**CHARLES [6]** 2/8 13/11 13/12
49/10 87/12 196/8
**chart [7]** 124/15 148/19
165/20 166/8 175/15 181/17
215/24
**charts [2]** 125/6 165/14
**check [1]** 103/18
**checking [1]** 156/23
**cheek [1]** 30/15
**Cher [1]** 110/3
**cherrywood [1]** 195/19
**Cheryll [3]** 2/14 227/12
227/13
**Chester [1]** 1/22
**Chicago [1]** 41/20
**Chief [4]** 27/25 28/16 28/22
29/11
**Chief Diaz-Pelot [4]** 27/25
28/16 28/22 29/11
**child [2]** 37/15 37/25
**children [7]** 37/20 37/24 38/5
57/7 109/4 145/25 210/16
**Children's [1]** 216/19
**choice [4]** 57/3 146/2 182/12
186/9
**choose [2]** 70/11 101/17
**chose [1]** 65/23
**chosen [1]** 57/10
**Christian [1]** 46/22
**circumstance [1]** 34/14
**circumstances [1]** 56/12
**claim [1]** 108/6
**claimed [3]** 7/22 9/18 9/22
**claiming [1]** 65/10
**claims [1]** 69/19
**clarified [1]** 21/14
**class [8]** 36/2 36/4 36/21
36/24 37/8 37/10 37/12 38/6
**classes [4]** 37/7 38/3 122/7
146/11
**classically [1]** 64/25
**classified [3]** 92/10 92/12
145/20
**classroom [3]** 36/18 36/19
37/4
**clear [14]** 68/24 93/9 94/9
95/13 102/22 119/6 135/2
138/20 140/12 140/22 194/13
202/7 202/9 216/16
**clear-cut [1]** 194/13
**clearly [4]** 19/20 113/3
126/23 149/17
**clerk [1]** 48/13
**client [18]** 20/16 50/3 60/23
62/15 63/24 179/16 179/18
179/19 205/9 205/10 208/21
210/7 210/11 212/15 213/7
216/25 217/24 218/4

179/11 181/5 184/6 185/3
187/13 188/11 208/25 208/25
209/3
**clinic [1]** 203/21
**clinical [10]** 169/17 169/22
169/23 170/2 171/5 171/10
174/2 181/11 186/21 191/21
**Clinically [1]** 181/3
**clipped [2]** 19/2 67/13
**cloak [1]** 130/6
**close [16]** 10/6 29/9 30/8
33/25 34/19 58/18 75/10 90/5
90/10 95/13 97/5 97/15
140/12 143/15 160/10 183/6
**closer [3]** 41/1 77/14 94/17
**closing [2]** 67/16 71/14
**clothes [1]** 12/3
**clothing [3]** 10/16 200/18
200/19
**clue [2]** 110/9 110/21
**CM [1]** 2/14
**CMR [1]** 227/13
**cognitive [3]** 182/10 185/11
219/19
**cohort [6]** 56/19 91/25 92/1
92/6 93/21 93/22
**collaborated [1]** 70/12
**college [40]** 36/13 42/5 45/3
45/13 47/16 48/24 50/22 51/2
51/5 52/6 52/9 52/15 52/16
52/17 52/22 53/2 53/7 53/22
54/23 55/5 55/9 55/9 55/22
56/4 72/23 74/3 74/5 75/4
75/6 77/16 78/3 89/1 95/23
111/16 113/7 114/7 114/10
146/8 189/25 206/24
**colleges [1]** 53/23
**column [113]** 82/13 82/17
83/11 99/15 99/18 102/12
103/15 104/10 104/12 106/6
107/11 107/17 109/11 109/11
116/7 116/15 116/16 116/17
116/24 117/1 117/4 117/6
117/12 117/13 117/17 119/19
119/19 119/19 120/19 120/19
122/12 122/18 122/20 122/20
122/22 123/7 123/9 123/20
124/4 124/7 124/16 124/16
124/17 124/18 124/18 132/11
132/12 132/14 132/14 134/2
134/5 136/3 136/3 136/12
136/23 137/9 137/11 137/14
137/14 137/22 139/7 139/9
139/17 139/18 139/19 139/20
140/4 140/6 140/7 140/7
140/12 140/13 140/21 141/9
141/14 141/16 141/17 141/18
142/2 142/5 142/6 142/19
146/14 146/16 148/16 148/16
148/24 148/25 149/1 149/3
149/3 149/5 149/7 149/9
149/21 149/23 150/3 150/9
150/12 150/12 150/14 150/23
151/3 151/12 151/13 152/23
152/24 153/7 153/8 153/11
153/16 154/16 162/9
**Column 10 [16]** 137/9 137/11
137/14 139/20 141/18 148/16
149/1 149/3 149/23 150/3
150/9 150/12 151/12 151/13
152/24 153/11

**C**
**Column 11 [6]** 137/22 149/5
  149/7 150/14 150/23 153/16
**Column 12 [2]** 149/9 162/9
**Column 13 [1]** 154/16
**Column 14 [1]** 139/7
**Column 15 [1]** 139/9
**Column 3 [2]** 82/17 117/13
**Column 4 [5]** 102/12 107/11
  107/17 109/11 134/2
**Column 6 [26]** 136/3 136/3
  136/12 137/14 139/18 139/19
  140/4 140/6 140/7 140/7
  140/12 140/13 140/21 141/9
  141/14 141/16 141/17 142/5
  148/16 148/24 148/25 149/3
  149/21 152/23 153/7 153/8
**Column 7 [13]** 83/11 116/15
  116/16 116/24 117/1 117/4
  117/12 119/19 122/12 124/16
  142/2 142/6 142/19
**Column 8 [1]** 119/19
**Column 9 [3]** 119/19 132/12
  132/14
**columns [5]** 82/12 121/6 123/3
  139/14 159/8
**combat [1]** 210/16
**come [43]** 7/3 7/14 8/23 19/8
  20/13 31/8 36/16 37/15 56/8
  56/20 64/2 69/4 76/3 78/20
  81/3 81/11 81/14 86/2 86/22
  86/23 86/24 87/1 87/2 96/12
  122/15 126/2 126/4 129/14
  130/5 130/16 156/5 158/21
  174/8 176/4 179/5 179/6
  180/3 180/18 186/3 189/1
  194/21 218/23 226/17
**comes [12]** 56/24 70/3 72/15
  72/23 104/7 104/14 110/14
  143/15 150/1 167/21 173/17
  194/17
**comfortable [3]** 38/2 48/21
  169/6
**coming [8]** 36/8 60/24 74/22
  74/24 74/25 150/18 182/4
  182/5
**Commander [3]** 22/23 23/3 23/8
**Commander Gilford [3]** 22/23
  23/3 23/8
**commensurate [2]** 194/2 194/4
**comment [3]** 60/17 64/12 68/23
**comments [1]** 202/22
**Commission [5]** 42/11 42/16
  53/16 56/7 56/16
**committed [1]** 26/4
**committee [1]** 222/19
**common [3]** 91/7 129/18 144/19
**communicated [1]** 68/13
**communication [2]** 5/19 28/5
**community [3]** 75/6 114/6
  114/10
**companies [7]** 42/17 42/20
  46/2 50/11 51/2 51/4 59/16
**company [4]** 1/6 46/8 144/20
  190/25
**Compaq [3]** 92/3 92/12 111/9
**comparable [1]** 56/20
**comparative [2]** 52/14 56/13
**compare [3]** 52/5 93/18 93/18
**compared [2]** 56/19 98/12
**compares [2]** 82/10 83/22

**comparing [1]** 83/1
  74/17 75/1 75/8 75/22 78/23
  142/5
**comparison [4]** 75/7 93/13
  93/15 184/12
**compatible [1]** 59/12
**compensation [3]** 80/24 101/2
  137/6
**competence [1]** 110/25
**competency [2]** 50/17 50/19
  51/5
**competent [1]** 163/6
**compilation [1]** 23/13
**compiled [2]** 38/21 38/23
**compiles [1]** 90/11
**complain [1]** 73/3
**complete [5]** 26/19 44/8 155/8
  185/7 210/21
**completed [1]** 43/14
**completely [5]** 17/13 18/10
  31/6 95/13 97/3 104/18 123/2
  123/10 140/12 161/25 163/16
**complies [1]** 86/1
**component [5]** 83/6 83/9 108/5
  117/20 118/3
**comport [2]** 14/1 203/20
**composite [2]** 90/3 108/23
**comprehension [1]** 189/4
**comprises [3]** 92/20 93/4 93/4
**computer [22]** 1/24 73/5 73/9
  73/9 90/13 90/14 91/1 91/8
  91/11 91/14 91/15 91/17
  92/17 99/2 158/15 166/1
  166/2 166/6 166/9 166/10
  167/2 167/14
**computer-aided [1]** 1/24
**computers [4]** 59/11 60/4 92/3
  111/10
**concentrating [3]** 173/13
  178/12 188/16
**concentration [8]** 51/24 89/17
  189/3 189/11 189/13 189/18
  190/2 190/9
**concept [1]** 181/1
**conceptually [2]** 100/25
  150/23
**concern [1]** 65/21
**concerned [4]** 59/20 60/1
  131/11 217/11
**conclude [1]** 201/24
**conclusion [1]** 43/18
**conclusions [8]** 43/17 43/19
  44/18 44/20 45/19 45/22
  78/20 79/14
**concrete [1]** 170/22
**condition [1]** 194/21
**conference [9]** 49/24 60/16
  66/2 66/4 66/7 66/10 67/2
  67/11 71/5
**conferences [3]** 66/19 71/23
  72/1
**confident [2]** 28/7 59/2
**confidentiality [1]** 212/3
**confirm [1]** 70/8
**confirmed [1]** 227/2
**conflicting [2]** 11/12 13/14
**confront [1]** 226/18
**confused [1]** 177/6
**confusing [1]** 221/23
**Congressional [1]** 222/19
**Congressman [1]** 62/22
**connected [1]** 67/22

**conscious [2]** 29/17 29/19
**consciousness [2]** 197/13
  218/8
**consecutive [1]** 122/19
**consider [6]** 112/16 136/10
  136/16 136/16 199/8 216/23
**consistent [2]** 180/22 183/22
**constant [9]** 124/5 124/18
  132/12 151/12 151/13 151/22
  151/23 152/24 158/18
**constructed [1]** 81/20
**consultation [3]** 212/12
  212/13 213/2
**consulting [2]** 78/3 78/9
**contact [6]** 19/24 20/11 20/14
  20/17 63/24 64/1
**contacted [5]** 42/25 49/14
  63/17 63/20 87/17
**contacting [1]** 45/6
**contacts [1]** 12/4
**container [1]** 8/13
**containerized [2]** 5/11 5/24
**contemplation [1]** 19/16
**context [3]** 25/7 46/1 67/2
**continentally [1]** 67/22
**continue [1]** 193/5
**continued [4]** 2/1 38/11
  120/12 135/17
**continues [1]** 178/10
**continuing [3]** 71/8 136/3
  203/16
**contract [10]** 58/11 58/13
  58/15 58/24 88/13 114/1
  135/18 135/19 135/20 135/22
**contrary [2]** 121/11 129/17
**contribute [1]** 205/14
**contributed [1]** 202/24
**contribution [1]** 136/8
**contributions [2]** 134/10
  134/11
**conventional [2]** 163/22 164/5
**conversation [7]** 34/20 202/7
  202/16 203/15 203/17 220/22
  220/25
**conversations [3]** 63/16
  172/25 177/9
**convince [2]** 61/1 61/22
**convinced [1]** 61/23
**Cooper [2]** 2/10 57/6
**cope [1]** 183/24
**copies [1]** 168/8
**coping [1]** 185/2
**copy [2]** 87/20 155/8
**corner [2]** 173/16 173/17
**correct [192]** 5/9 5/12 5/13
  5/13 7/5 7/9 7/13 10/18 15/7
  15/10 16/5 16/12 28/5 28/6
  28/8 28/9 29/1 29/22 30/16
  31/25 32/17 33/9 33/10 35/14
  37/21 37/22 38/19 48/12 50/7
  51/14 51/16 54/15 54/16
  54/19 54/21 57/3 57/12 57/14
  57/15 57/18 57/24 58/13
  58/20 65/7 70/1 77/11 77/12
  78/19 79/2 79/18 80/18 80/22
  83/18 84/5 84/16 87/13 87/14
  88/21 89/8 89/10 89/12 89/14
  90/4 94/12 95/12 95/25 96/6
  96/22 97/4 101/2 101/6
  101/10 101/11 101/14 101/15
  101/15 101/18 102/3 102/4

## C

correct... [113] 102/6 102/15
102/24 102/25 103/2 103/25
104/8 104/9 107/18 116/18
116/21 117/5 117/15 117/16
117/18 118/2 118/10 118/25
119/5 123/4 123/17 123/21
123/24 124/1 124/2 124/3
124/6 124/7 124/12 124/13
128/14 128/17 134/3 134/5
134/6 136/6 136/12 136/18
136/21 136/24 137/1 137/2
137/7 137/10 137/12 137/17
137/20 137/22 138/1 138/8
138/23 139/1 139/2 139/4
139/5 139/7 139/8 139/10
139/16 140/5 140/11 140/24
141/23 142/25 146/20 146/24
148/17 148/24 148/25 149/3
149/4 149/7 149/10 149/13
149/16 149/19 150/2 150/11
150/17 150/25 151/10 151/13
151/14 152/4 152/5 152/13
152/17 153/17 153/21 153/22
154/3 154/13 155/1 156/5
156/8 156/10 157/4 159/17
159/24 160/18 161/3 161/9
161/17 162/2 162/6 164/24
165/8 165/9 165/15 205/8
220/13 222/17 227/8
corrected [1] 178/4
corrective [1] 71/22
correctly [1] 197/15
correlate [1] 209/16
cost [14] 122/2 122/5 122/8
122/11 122/14 122/15 123/5
123/6 123/7 123/9 123/11
125/17 132/1 132/7
Costs [1] 80/24
could [85] 8/17 10/24 11/6
11/15 22/1 23/17 26/5 26/19
34/3 34/4 34/10 34/13 34/24
38/24 44/4 45/13 47/3 47/7
47/19 47/22 47/22 48/4 50/6
50/21 56/14 56/17 56/21
56/22 57/4 63/8 65/21 66/24
67/5 70/22 81/15 84/23 85/14
85/15 85/16 85/24 92/8 94/7
94/23 96/8 96/8 96/9 99/14
99/18 100/1 107/16 114/14
126/5 133/12 141/14 142/17
145/6 146/9 146/11 146/11
168/21 168/24 171/20 173/7
183/8 184/17 184/22 192/7
192/8 201/14 203/10 204/9
205/19 205/24 208/3 208/7
208/11 208/13 213/4 213/9
217/22 220/18 224/5 224/6
225/15 225/17
couldn't [9] 15/23 29/25 68/6
85/16 93/13 99/5 114/4 158/5
184/20
counsel [9] 18/25 19/9 58/25
59/2 60/19 66/24 81/6 110/6
133/13
counseling [1] 42/8
counselor [11] 39/17 41/15
41/22 42/14 42/18 43/22 44/4
45/1 45/15 45/21 45/23
Counselors [1] 41/20
count [2] 178/3 178/19

course [21] 20/24 32/1 35/24
country [4] 36/8 223/20
226/14 226/15
County [1] 114/10
couple [10] 23/18 38/5 49/18
56/5 71/13 78/4 164/16
170/12 203/19 222/15
course [21] 20/24 32/1 35/24
51/8 72/21 82/14 84/18 95/10
100/17 102/15 105/3 146/5
166/14 170/12 180/9 180/17
184/4 203/18 204/1 204/5
225/6
courses [17] 100/14 100/16
100/19 111/16 113/25 114/2
114/4 114/4 114/11 131/16
145/1 145/6 166/18 167/19
167/19 167/20 206/24
court [39] 1/1 2/13 2/14 4/20
7/4 8/23 20/19 40/5 40/16
60/17 60/24 61/1 61/16 61/22
61/24 61/25 62/9 62/15 65/22
66/3 66/10 66/12 67/12 68/21
69/15 69/20 72/6 76/6 76/7
76/16 120/15 126/21 129/23
130/5 148/8 169/3 192/19
227/7 227/13
Court's [4] 19/3 66/13 69/25
70/20
courtroom [6] 71/1 88/10
121/16 121/19 133/13 226/18
courts [1] 115/5
cover [2] 103/18 184/9
covered [3] 16/17 16/21
219/19
coworkers [1] 197/4
CPS [2] 90/18 91/2
Craig [2] 18/6 18/8
credentials [3] 126/21 131/9
133/11
credibility [2] 9/1 19/4
crime [5] 10/24 11/14 191/8
211/17 211/17
criminal [3] 166/11 167/2
167/15
criteria [16] 171/5 171/10
172/2 172/9 172/10 172/18
173/24 174/2 175/19 179/5
181/3 181/18 199/12 206/5
207/20 224/14
cross [17] 7/1 21/1 49/6 58/6
67/4 73/16 87/7 93/3 125/4
133/24 147/16 147/17 147/18
164/13 196/4 196/5 220/1
cross-examination [14] 7/1
21/1 49/6 58/6 73/16 87/7
133/24 147/16 147/17 147/18
164/13 196/4 196/5 220/1
cross-examine [1] 125/4
cross-examining [1] 67/4
crowbar [1] 195/23
crowd [1] 34/25
crowded [1] 33/7
crowds [5] 32/10 33/15 33/25
34/18 47/12
cruise [10] 31/24 32/1 32/13
33/6 33/6 33/18 34/1 34/17
34/21 35/4
crunching [1] 100/2
crying [2] 30/20 205/19
CSR [2] 2/14 227/13
cue [2] 172/16 204/20

204/15 205/14 205/21
Cullen [4] 2/9 196/7 212/3
217/15
cumulative [1] 139/9
cured [1] 194/21
current [20] 44/1 44/10 55/16
55/17 80/19 89/1 91/3 93/7
112/8 112/11 117/2 121/5
121/22 136/23 142/10 143/2
144/9 147/4 156/19 159/20
currently [12] 45/12 48/23
50/23 84/15 85/6 94/12 102/8
137/11 144/5 145/10 170/14
180/20
curve [2] 160/12 163/1
curves [1] 160/16
customarily [1] 50/1
cut [6] 57/6 99/13 177/13
182/7 191/23 194/13
cutting [1] 36/10
CV [2] 1/4 126/21

## D

D/B/A [1] 1/6
dad [1] 37/18
Daigle [5] 20/20 23/4 27/10
27/12 38/11
Daigle's [1] 4/11
damage [5] 83/6 120/2 124/20
137/24 137/25
damaged [1] 129/9
damages [15] 52/5 75/14 78/16
78/17 79/20 84/2 84/10 84/11
84/13 84/17 84/19 86/14
120/20 121/10 144/11
Dan [1] 220/3
dancing [1] 32/14
danger [1] 38/21
Daniel [1] 2/5
Darington [1] 1/22
data [29] 52/13 52/24 56/18
56/20 56/20 80/20 80/24 90/1
90/6 90/7 90/8 90/10 90/12
90/18 90/18 90/22 91/2 91/6
93/2 93/4 97/6 98/5 99/7
141/1 141/1 160/2 166/16
166/19 166/22
database [11] 52/13 52/15
52/22 53/11 90/15 92/20
92/20 92/21 92/23 93/6
114/17
date [17] 49/19 79/22 79/22
79/23 82/19 82/19 87/22
155/21 156/19 159/20 160/3
160/9 185/19 214/1 221/3
221/4 227/10
dates [3] 46/8 46/11 216/16
Daubert [4] 127/15 127/15
130/7 131/2
daughter [1] 37/22
daughters [1] 190/9
Dawn [4] 168/15 169/12 169/17
175/25
day [24] 6/20 6/20 8/15 21/9
25/16 28/14 28/14 29/22
29/24 29/24 36/9 36/16 36/17
36/22 69/24 105/2 105/2
147/19 148/4 157/19 159/21
160/5 168/1 222/4
day-to-day [2] 29/24 105/2
days [1] 197/4

**deal [6]** 72/14 113/15 185/3
 185/24 185/25 186/1
**dealing [8]** 5/20 33/25 34/6
 129/2 180/19 182/3 182/6
 185/24
**death [1]** 172/5
**debt [4]** 163/20 163/24 186/15
 226/20
**December [1]** 215/11
**decent [1]** 5/20
**decide [3]** 71/17 95/24 126/17
**decided [5]** 45/2 73/10 94/23
 97/1 145/25
**decision [5]** 47/15 56/24 57/7
 96/19 96/25
**deck [1]** 33/16
**decline [1]** 192/9
**decreasing [2]** 141/6 186/5
**deduct [1]** 115/24
**deduction [3]** 109/6 119/20
 136/8
**deductions [4]** 103/8 108/5
 108/7 109/17
**DEFENDANT [2]** 2/2 2/8
**DEFENDANTS [1]** 1/8
**defended [1]** 130/22
**defense [1]** 13/24
**defensible [1]** 129/4
**defer [1]** 62/5
**definitely [7]** 18/2 60/19
 61/3 92/8 167/5 167/7 190/11
**degree [66]** 42/22 45/3 45/4
 50/23 51/5 73/2 73/5 73/6
 73/7 73/11 73/20 73/21 73/23
 77/17 77/20 83/25 84/4 84/8
 84/9 84/12 84/14 84/19 85/18
 89/10 89/12 89/14 89/18
 89/20 89/22 90/2 90/10 90/12
 90/16 90/20 90/23 90/25 91/8
 91/10 91/11 93/19 94/11
 95/11 96/21 96/21 96/21
 96/22 97/12 97/13 97/16
 97/17 97/17 98/11 98/16
 111/5 111/7 111/9 113/20
 141/13 166/6 166/6 166/9
 166/10 166/11 166/13 166/17
 168/2
**degrees [25]** 51/2 73/24 89/24
 89/24 93/20 94/14 94/15
 96/18 97/10 98/13 98/15
 111/20 111/20 113/8 114/19
 114/21 165/8 165/15 165/19
 165/19 167/13 167/14 189/20
 189/21 190/4
**delicate [1]** 60/15
**delta [1]** 152/23
**demand [2]** 165/24 165/24
**demonstrates [1]** 209/13
**denied [3]** 15/21 27/24 213/7
**denies [4]** 214/14 216/11
 216/14 216/25
**deny [4]** 29/21 29/23 126/24
 216/10
**Department [3]** 8/10 16/6
 16/24
**departments [1]** 78/7
**departure [1]** 226/12
**depend [7]** 91/13 91/20 92/15
 97/18 98/21 165/23 166/1
**depending [6]** 98/23 101/17

**depends [6]** 57/13 57/14 72/18
 85/17 99/6 183/17
**deployment [1]** 114/1
**deployments [1]** 134/20
**depo [2]** 30/14 31/1
**depose [2]** 63/14 70/7
**deposition [16]** 4/14 7/10
 8/24 9/4 10/2 11/10 13/9
 14/8 17/25 35/11 35/18 67/6
 67/9 132/25 133/2 133/6
**depositions [2]** 88/15 88/16
**depressed [1]** 224/20
**depression [6]** 216/2 216/5
 224/11 224/13 224/21 224/23
**derived [1]** 154/18
**describe [4]** 123/2 170/21
 198/11 213/21
**described [20]** 22/4 22/6
 22/15 24/9 25/2 25/2 92/13
 98/20 98/22 108/1 108/12
 109/14 123/3 151/1 153/3
 195/7 198/5 198/23 199/3
 221/10
**describing [4]** 47/10 122/16
 198/1 219/2
**description [10]** 23/4 25/10
 25/12 26/1 26/2 33/22 33/22
 47/11 164/19 199/7
**desensitization [4]** 184/2
 184/15 217/23 218/18
**deserve [1]** 133/17
**designated [3]** 63/8 64/3
 125/7
**despite [1]** 226/14
**detached [1]** 173/4
**detachment [1]** 177/19
**detail [2]** 21/12 28/15
**details [4]** 13/19 19/14
 192/17 222/11
**determine [3]** 50/19 91/5
 208/3
**determined [3]** 52/23 134/2
 143/2
**developing [1]** 100/17
**DFAC [1]** 8/10
**diagnose [1]** 207/22
**diagnosed [1]** 172/2
**diagnoses [2]** 184/13 209/11
**diagnosis [15]** 51/22 170/3
 178/6 179/9 179/12 191/11
 199/8 199/16 216/2 224/9
 224/11 224/13 224/14 224/21
 224/23
**diagnostic [2]** 51/19 179/6
**diagram [1]** 171/9
**dialogue [1]** 69/24
**Diaz [4]** 27/25 28/16 28/22
 29/11
**dick [1]** 71/11
**did [166]** 5/14 5/17 5/23 5/25
 6/8 6/9 6/10 6/12 6/13 6/15
 6/16 6/18 6/19 6/21 7/20
 7/21 7/25 8/11 8/18 9/21
 10/11 10/13 10/14 12/2 18/8
 19/10 20/14 21/7 22/13 23/10
 24/4 25/23 26/6 27/15 27/18
 28/2 29/2 29/7 29/12 29/14
 30/17 30/21 31/11 32/14
 33/19 34/18 34/19 34/21 37/7
 37/11 38/20 39/7 39/8 39/11
 44/14 44/16 44/19 45/1 46/7

50/16 50/23 52/21 59/19 60/1
 60/4 60/6 61/6 63/14 66/10
 67/23 70/11 71/5 73/13 74/2
 75/20 80/8 83/3 83/23 86/5
 86/9 86/9 86/11 86/12 87/20
 88/8 93/6 100/8 111/14
 113/25 123/11 123/12 127/25
 129/25 133/3 133/4 134/16
 134/17 135/21 135/22 135/22
 135/24 145/11 145/13 146/3
 155/17 157/2 164/17 164/18
 164/18 167/19 171/7 175/7
 176/1 176/25 180/11 185/21
 186/19 186/24 187/11 187/15
 187/18 189/13 189/16 193/22
 195/13 197/16 198/18 198/19
 199/3 199/7 201/2 201/2
 201/11 201/13 201/16 201/23
 202/2 203/22 205/3 211/23
 213/25 216/5 216/15 216/20
 216/21 216/22 220/13 220/20
 220/23 221/7 221/11 221/14
 221/17 221/19 222/8 222/12
 222/19 223/2 223/8 223/22
 224/3 224/8
**didn't [62]** 7/7 7/20 7/23
 10/9 10/12 11/25 15/6 15/19
 15/20 18/4 18/6 18/8 20/2
 20/7 20/7 24/4 32/4 32/5
 32/11 34/4 34/4 34/23 34/23
 35/4 37/4 37/8 37/10 37/11
 38/2 48/20 48/21 61/9 62/4
 63/22 68/17 68/19 69/5 70/13
 73/15 74/24 89/4 93/15 96/9
 113/7 114/3 116/14 123/13
 135/8 165/21 176/20 178/3
 178/19 179/23 185/7 187/16
 216/4 216/23 221/9 221/18
 223/10 223/18 223/24
**die [3]** 194/18 194/20 210/16
**Diego [5]** 21/10 38/17 170/19
 174/10 208/18
**difference [16]** 75/5 83/20
 83/24 98/6 101/12 108/13
 110/9 132/4 150/19 151/4
 151/23 152/18 152/23 165/18
 165/21 207/25
**differences [2]** 55/15 91/5
**different [48]** 12/20 42/20
 46/12 66/22 79/4 82/4 84/11
 88/17 88/20 93/3 93/25 94/8
 94/20 95/3 95/9 97/25 98/21
 99/18 104/7 109/3 112/4
 113/22 114/12 125/14 130/17
 138/16 141/2 164/18 165/10
 167/6 173/5 176/2 181/10
 182/9 183/4 184/1 184/4
 184/5 185/13 195/3 195/4
 209/9 209/18 211/14 222/21
 224/5 224/12 226/6
**differential [1]** 128/21
**differentiate [1]** 166/19
**differently [3]** 103/15 167/12
 219/21
**differing [2]** 11/17 13/21
**difficult [7]** 81/8 120/4
 120/5 184/22 206/21 207/22
 225/13
**difficulties [2]** 33/22 34/6
**difficulty [4]** 173/12 173/13
 178/10 178/12

**diminished [2]**  173/3 177/18
**dining [2]**  8/1 8/12
**diploma [4]**  73/2 89/8 102/3
130/18
**dire [5]**  60/12 72/3 72/5
112/24 115/1
**direct [5]**  5/2 40/24 73/17
77/5 169/13
**directly [6]**  21/25 40/20
50/11 169/16 195/16 195/16
**disagree [1]**  70/19
**disagreement [1]**  120/25
**disavowed [1]**  19/13
**discomfort [1]**  219/1
**disconnect [2]**  110/1 171/25
**discount [20]**  86/20 101/16
101/20 122/25 124/11 124/12
138/17 138/25 138/25 139/3
149/12 153/19 153/20 154/2
154/5 154/8 154/11 154/15
154/16 156/7
**discounted [2]**  151/10 161/11
**discounting [2]**  154/23 163/3
**discover [1]**  187/15
**discovered [1]**  187/20
**discovery [1]**  67/8
**discuss [4]**  20/3 24/4 60/6
212/17
**discussed [2]**  148/2 212/20
**discussing [4]**  21/9 148/13
181/4 204/4
**Discussion [1]**  133/21
**dishonesty [1]**  67/9
**dismal [1]**  99/22
**disorder [25]**  171/4 172/3
173/18 174/3 179/13 180/4
181/6 181/11 181/19 182/15
183/12 183/25 190/13 190/16
191/12 193/9 193/10 193/11
193/15 193/15 193/19 207/14
224/12 225/16 226/1
**disorders [3]**  207/14 207/17
208/11
**dispute [1]**  10/1
**disregard [1]**  125/3
**dissertation [1]**  100/7
**distinction [6]**  52/12 52/14
85/9 90/16 204/12 226/5
**distinguish [7]**  99/6 111/14
166/22 166/22 207/11 207/17
207/18
**distract [1]**  188/11
**distracted [1]**  188/15
**distraction [1]**  189/11
**distractions [2]**  189/13 190/2
**distraught [3]**  15/17 15/23
16/1
**distress [3]**  204/15 205/5
205/19
**distressing [5]**  172/12 172/20
176/3 176/9 188/21
**DISTRICT [4]**  1/1 1/1 1/11
2/14
**DIVISION [1]**  1/2
**do [279]**
**doctor [22]**  51/13 79/7 82/1
83/3 83/21 84/6 84/15 84/21
85/24 113/3 115/3 118/5
118/8 121/1 125/1 168/12
190/7 205/25 220/17 224/3

**doctors [1]**  44/2
**document [6]**  28/19 29/1 88/3
88/5 88/6 215/24
**documents [5]**  20/12 44/17
52/10 79/9 88/12
**does [75]**  8/20 13/1 33/1
41/16 53/6 53/10 54/6 55/12
59/9 73/20 73/22 74/7 74/9
88/24 90/12 90/15 90/18 91/4
91/25 92/2 102/13 103/5
104/10 107/5 107/7 120/24
121/3 121/4 133/19 134/3
137/23 141/16 141/18 141/18
144/19 146/3 149/5 149/6
151/12 153/10 166/8 166/17
170/2 180/3 180/4 180/20
183/10 183/12 183/15 184/19
188/7 190/13 190/20 191/3
191/11 191/11 191/13 191/15
192/22 193/9 193/18 194/20
194/23 194/25 195/1 203/19
206/7 206/13 206/15 206/18
206/19 209/16 212/13 218/20
222/17
**doesn't [41]**  8/10 8/16 10/12
13/23 14/1 17/21 21/17 59/10
61/25 68/4 70/10 85/12 91/16
103/22 106/1 106/2 107/5
107/7 107/10 110/8 110/11
110/13 110/15 110/20 110/21
111/6 111/8 111/24 112/10
132/19 141/19 153/2 153/8
153/11 188/25 193/5 194/4
206/9 207/2 219/4 224/20
**doing [36]**  10/6 33/19 35/1
35/2 38/3 43/4 43/5 45/12
45/17 48/22 57/10 59/20 78/4
78/9 88/19 94/4 99/21 106/21
122/22 124/22 124/22 124/23
124/24 127/13 128/23 131/17
137/23 140/22 144/5 145/1
145/10 146/12 181/13 218/3
223/15
**dollar [13]**  48/11 55/18 58/21
103/5 116/3 122/18 134/9
150/18 154/24 155/1 155/4
159/12 159/16
**dollars [11]**  117/20 117/22
117/23 161/22 161/24 162/2
162/3 162/4 162/4 162/6
162/15
**domestic [2]**  216/14 216/23
**don't [174]**  8/4 8/11 9/3 10/1
10/3 10/5 10/6 11/8 11/11
12/4 12/8 12/18 12/25 14/3
14/20 16/18 17/20 18/12
18/14 20/17 21/12 23/23 24/3
25/14 25/17 25/19 25/22
26/11 27/4 28/19 33/14 33/19
33/20 34/10 36/11 37/5 37/6
39/25 41/4 47/5 47/7 48/3
49/11 49/18 50/14 51/10
51/17 56/10 58/17 59/7 59/14
59/16 59/24 66/13 66/14
66/16 66/17 70/15 73/3 75/15
76/6 85/13 85/19 87/12 87/22
88/16 89/3 89/5 89/20 90/22
97/25 98/18 99/7 100/1 100/4
101/3 100/1 104/18 105/1
109/21 110/11 110/14 114/12
114/17 115/10 115/24 115/25

120/2 122/5 122/6 126/13
126/24 128/11 128/14 128/25
130/19 131/12 131/24 132/20
136/1 136/10 141/25 142/18
143/14 144/11 145/18 146/6
146/9 146/12 147/8 147/15
147/19 152/1 156/6 157/19
157/23 158/6 158/15 158/17
160/7 163/10 164/4 164/15
164/21 164/24 166/15 166/19
166/21 167/11 167/12 171/22
171/25 176/6 177/13 180/15
181/9 186/17 188/6 188/13
191/20 191/23 192/10 194/13
194/24 195/2 199/4 199/5
199/11 200/3 200/18 206/13
207/17 207/24 208/3 209/10
212/2 213/3 215/25 216/3
220/16 221/3 222/9 222/12
222/14 222/21 222/25 224/2
224/9 225/11 226/12
**don't under [1]**  131/24
**done [40]**  21/22 42/13 45/8
46/5 46/6 50/6 50/7 51/9
59/23 67/3 67/6 71/12 74/13
93/10 93/24 94/20 95/2 95/5
95/8 95/9 113/23 113/24
114/11 114/14 120/19 121/24
130/8 131/10 131/19 132/10
132/14 139/15 162/9 170/6
178/13 181/16 188/8 206/3
218/5 226/19
**door [3]**  195/19 195/20 195/21
**double [2]**  154/1 154/2
**doubt [2]**  36/20 69/1
**down [44]**  10/24 11/14 14/14
14/15 16/25 22/23 23/2 23/10
23/24 25/8 25/13 25/16 26/2
26/17 27/15 28/22 40/2 71/5
79/14 82/14 85/2 92/8 94/23
95/19 99/14 103/15 107/6
110/12 116/9 116/15 120/12
121/12 125/25 127/25 136/3
142/22 149/15 149/18 168/11
181/24 194/18 194/20 213/15
224/16
**downward [1]**  109/20
**Dr [16]**  77/11 77/23 78/14
80/15 80/15 81/14 125/13
126/13 126/20 128/3 131/8
132/24 133/11 164/15 168/6
202/23
**Dr. [17]**  126/12 202/19 209/8
209/11 220/11 220/12 220/16
220/21 220/23 220/25 221/7
225/18 225/20 225/22 226/3
227/2 227/3
**Dr. -- I [1]**  126/12
**Dr. Manguno-Mire [5]**  209/8
209/11 225/18 225/20 226/3
**Dr. Manguno-Mire's [1]**  225/22
**Dr. Scarano [2]**  227/2 227/3
**Dr. Schulz [8]**  202/19 220/11
220/12 220/16 220/21 220/23
220/25 221/7
**drafting [1]**  87/22
**draw [1]**  90/15
**draws [1]**  71/24
**dreadful [1]**  210/18
**drill [1]**  33/13
**drink [6]**  197/6 197/7 197/7

**D**

drink... **[3]** 197/16 197/20 197/21
drinking **[8]** 27/10 27/12 39/9 39/10 197/8 197/16 206/15 214/6
drinks **[2]** 8/13 213/20
drop **[4]** 99/14 149/15 149/18 173/15
drops **[1]** 157/15
drug **[2]** 213/7 213/24
drugged **[5]** 13/25 175/2 177/15 212/6 219/3
drugs **[3]** 212/8 212/25 214/19
drunk **[1]** 197/17
dry **[1]** 110/7
DSM **[2]** 179/6 204/6
DSM-IV **[1]** 204/6
due **[7]** 38/25 44/24 67/1 68/20 70/19 122/17 124/25
DULY **[4]** 5/1 40/23 77/4 169/12
during **[15]** 6/3 25/16 38/24 44/14 46/7 48/15 61/9 69/23 118/15 170/12 180/11 180/17 189/17 218/23 222/24
duty **[1]** 78/1
DV **[1]** 37/16
Dwight **[2]** 77/4 77/10

**E**

e-mail **[2]** 60/25 61/21
each **[15]** 23/14 72/17 73/11 82/15 85/3 90/7 119/2 132/5 136/9 139/14 140/17 140/18 141/17 167/5 184/17
earlier **[6]** 120/2 122/16 127/19 160/13 163/2 193/21
early **[4]** 87/18 113/7 215/2 226/11
earn **[18]** 48/10 73/24 73/24 78/24 78/25 82/11 83/12 83/24 84/20 90/24 91/15 107/20 140/17 140/19 141/2 142/18 143/8 193/24
earned **[8]** 83/23 114/19 125/20 140/13 189/17 189/20 189/20 193/25
earning **[16]** 79/11 90/16 93/16 93/22 94/10 98/6 98/12 99/10 101/9 109/8 126/18 136/21 137/9 151/4 166/25 194/1
earnings **[55]** 82/8 82/17 82/17 83/11 89/4 100/22 101/4 101/5 104/8 104/11 105/16 105/18 106/3 111/8 112/8 112/9 112/11 114/23 116/17 117/2 117/5 117/7 119/8 119/10 119/20 119/21 121/5 122/13 123/12 123/23 124/21 126/5 127/9 128/19 128/20 131/17 136/4 136/14 136/23 137/13 141/14 142/16 143/3 143/6 144/3 144/15 146/20 147/1 147/4 150/9 150/20 151/2 161/18 165/6 165/7
earthquake **[1]** 211/14
easier **[1]** 15/25
easily **[3]** 26/5 27/21 34/4

easy **[3]** 24/6 103/17 151/16
Easy 1040 **[1]** 103/17
eat **[1]** 69/5
economic **[15]** 52/5 78/9 96/12 119/20 129/18 131/6 139/6 141/21 150/2 150/17 150/24 151/9 152/17 155/11 158/8
economics **[19]** 75/3 77/17 77/21 77/21 78/4 78/7 78/22 79/9 95/4 96/4 96/5 99/21 125/1 125/2 127/10 133/8 157/22 163/22 164/6
economist **[8]** 72/7 72/25 74/7 74/12 76/1 132/16 132/17 132/20
economist's **[1]** 132/18
economists **[1]** 99/24
education **[24]** 42/4 42/8 73/8 81/4 83/17 85/5 85/7 90/14 90/19 90/23 93/8 94/24 95/10 97/25 113/7 127/2 140/15 140/21 141/2 169/19 193/22 194/2 194/5 210/1
educational **[3]** 41/18 77/15 191/10
effect **[4]** 138/6 138/16 190/20 192/14
effective **[5]** 68/16 100/9 158/3 158/6 182/13
effectively **[1]** 120/14
Effexor **[3]** 214/23 215/15 215/16
efficiency **[1]** 100/9
efforts **[4]** 172/24 173/1 177/8 177/10
egress **[2]** 34/9 34/15
eight **[1]** 78/8
eighteen **[1]** 158/19
either **[18]** 25/18 28/14 37/5 37/15 50/12 92/17 94/25 95/15 111/24 120/15 129/13 172/4 173/25 175/5 175/13 199/4 212/24 212/25
elderly **[1]** 109/4
elected **[2]** 95/10 96/8
elementary **[2]** 146/8 206/24
elevated **[1]** 22/1
elevator **[2]** 195/17 195/17
elicit **[1]** 214/25
elicited **[1]** 74/4
eligible **[1]** 115/24
ELLISON **[2]** 1/10 9/11
Elmo **[6]** 81/9 81/11 81/14 81/15 81/19 105/4
else **[29]** 6/19 8/15 9/19 9/22 11/12 62/24 66/22 76/21 88/8 117/13 142/11 145/2 158/14 163/24 172/7 176/5 176/12 176/15 189/3 192/8 200/1 200/1 200/14 202/23 203/2 203/6 212/8 222/8 222/10
emote **[1]** 187/7
emoting **[2]** 187/15 219/14
emotion **[1]** 186/20
emotional **[3]** 183/13 187/11 217/1
emotionality **[1]** 183/20
employ **[1]** 44/21
employability **[1]** 44/21
employed **[6]** 42/19 94/19 145/14 145/16 145/22 191/9

employer **[4]** 80/4 94/8 128/5 129/9
employee's **[1]** 136/17
employees **[1]** 92/3
employer **[11]** 9/19 80/23 97/18 98/22 98/23 99/7 108/20 116/7 134/22 136/13 144/24
employer's **[2]** 136/11 136/17
employers **[3]** 46/12 97/18 167/23
employers' **[1]** 134/11
employment **[15]** 42/1 44/7 44/8 44/9 44/10 45/17 46/16 46/18 46/19 46/24 51/25 53/19 78/18 134/15 145/11
encompasses **[1]** 54/12
encourage **[1]** 206/10
encouraged **[1]** 190/7
end **[11]** 14/13 21/9 102/12 108/11 109/24 120/2 123/5 123/9 125/18 132/6 210/20
ended **[1]** 226/3
ending **[1]** 203/17
ends **[1]** 118/3
enforcement **[1]** 186/23
engineering **[2]** 53/10 54/1
English **[3]** 98/25 99/3 166/5
enhanced **[1]** 120/9
enjoyed **[1]** 190/6
enlarge **[3]** 213/4 214/11 216/7
enough **[9]** 18/17 126/21 140/1 146/12 147/11 147/19 195/6 214/10 216/1
entails **[1]** 181/21
entertained **[2]** 37/17 37/18
entire **[3]** 9/3 34/21 46/13
entirely **[4]** 22/7 31/6 133/7 216/16
entitled **[3]** 13/17 68/3 227/8
entries **[1]** 224/22
entry **[8]** 53/3 53/4 54/6 54/18 54/21 54/22 55/21 56/4
entry-level **[3]** 54/18 55/21 56/4
enveloping **[1]** 65/22
episodes **[5]** 33/1 216/4 224/10 224/16 224/23
equal **[2]** 132/12 146/11
equation **[1]** 147/1
equivalent **[1]** 156/17
ER **[2]** 30/7 30/11
escaping **[1]** 187/24
especially **[3]** 63/3 190/14 190/15
essentially **[3]** 129/24 138/20 154/13
establishing **[1]** 52/23
Estefan **[2]** 1/18 130/12
Estefan's **[1]** 125/8
estimated **[2]** 84/2 131/20
estranged **[1]** 173/4
estrangement **[1]** 177/19
et **[5]** 46/12 53/24 57/18 92/5 92/6
et cetera **[5]** 46/12 53/24 57/18 92/5 92/6
evaluate **[2]** 50/3 105/2
evaluated **[3]** 79/20 209/7 209/9
evaluation **[1]** 193/18

**E [33]**  7/20 11/10 14/6
17/21 20/7 29/18 29/20 29/25
30/3 34/4 34/10 61/9 65/7
65/13 65/16 65/19 66/24 74/3
110/13 111/17 113/7 113/16
114/8 122/2 129/8 129/14
142/4 144/21 157/13 183/10
184/20 214/5 225/25

**evening [5]**  16/16 16/20 22/5
24/1 227/5

**event [24]**  8/16 22/16 25/2
25/10 36/12 73/10 172/3
172/4 174/16 174/17 174/24
174/25 182/23 184/8 184/20
185/12 185/17 191/4 195/6
195/9 208/6 211/24 214/6
217/24

**events [22]**  24/2 174/23
174/24 196/13 196/13 196/18
196/20 196/20 197/1 198/7
198/12 199/13 199/13 199/16
202/14 202/14 203/19 204/2
204/5 206/7 206/16 207/4

**ever [16]**  49/11 67/23 68/5
73/8 87/13 111/5 122/24
124/17 129/9 134/14 144/22
151/24 152/23 152/24 153/15
225/9

**every [39]**  19/2 36/13 36/16
57/16 103/19 112/7 116/17
116/19 117/14 117/25 117/25
118/9 118/23 119/22 120/7
120/8 120/9 120/20 124/6
124/6 140/4 140/10 140/23
141/16 141/18 142/5 142/5
142/6 151/12 151/18 153/2
153/8 153/11 153/14 153/15
184/5 195/3 203/7 210/7

**everybody [7]**  71/2 76/21 93/1
108/18 108/24 108/24 184/4

**everyone [3]**  33/15 39/1 93/2

**everyone's [1]**  13/21

**everything [5]**  8/15 24/5
32/14 129/18 145/2

**evidence [12]**  11/23 11/25
14/7 68/6 71/23 72/19 73/7
98/17 111/17 132/22 182/11
205/12

**evidence-based [1]**  182/11

**exact [13]**  8/6 16/18 25/22
37/6 49/19 58/17 59/14 87/22
143/14 159/25 160/7 218/24
218/24

**exactly [16]**  14/1 20/14 30/11
33/14 36/11 108/19 125/10
141/22 142/12 145/19 153/18
159/25 200/19 201/1 207/18
208/3

**exaggerated [2]**  173/16 178/16

**exam [1]**  169/24

**examination [25]**  5/2 7/1 21/1
30/18 38/12 40/24 49/6 58/6
73/16 77/5 87/7 115/1 133/24
147/16 147/17 147/18 164/13
169/13 196/4 196/5 202/1
220/1 220/14 223/6 223/25

**examine [4]**  111/1 120/14
125/4 127/24

**examined [3]**  130/1 201/20
202/20

**example [12]**  24/17 25/3 32/22
53/1 53/11 56/3 56/17 85/21
97/16 98/22 103/14 105/7

**exceeding [1]**  11/20

**exceeds [2]**  11/9 18/10

**Excel [1]**  158/15

**excellent [1]**  204/12

**except [1]**  220/22

**exception [3]**  64/21 69/25
214/15

**excess [1]**  178/25

**exchange [1]**  218/3

**excuse [11]**  47/1 63/13 69/12
69/12 76/10 81/6 176/6 177/6
217/10 220/11 224/23

**excused [2]**  74/20 76/25

**execs [1]**  92/5

**executive [2]**  50/8 50/9

**exercise [1]**  190/6

**exhibit [2]**  26/8 183/13

**Exhibit 83 [1]**  26/8

**expanded [1]**  21/14

**expect [13]**  5/20 47/24 78/25
91/11 91/14 91/22 92/3
140/19 143/7 145/5 147/2
162/20 194/11

**expected [12]**  45/18 55/5 55/9
78/24 82/24 82/25 83/12
107/16 140/17 140/19 141/15
142/18

**expecting [1]**  203/5

**experience [10]**  33/2 41/18
51/21 53/3 54/12 77/23 176/1
183/7 192/17 212/5

**experienced [4]**  33/24 192/1
196/14 219/11

**experiences [2]**  210/18 211/14

**experiencing [2]**  181/14 191/8

**expert [14]**  49/16 52/3 70/3
74/16 104/24 112/16 127/14
128/13 129/23 130/6 144/16
146/5 158/23 180/2

**expertise [2]**  45/14 110/25

**explain [6]**  53/12 92/19
174/20 174/21 180/8 181/1

**explained [2]**  21/15 199/18

**explaining [1]**  125/10

**explanation [4]**  48/22 52/22

**exposed [8]**  172/3 172/16
172/22 174/16 174/17 194/9
204/14 204/20

**exposure [18]**  172/7 174/14
174/15 174/23 175/5 175/12
175/18 184/3 184/15 192/16
196/12 199/11 208/4 208/6
210/10 210/11 217/23 218/18

**express [1]**  96/12

**expressed [1]**  88/9

**extension [2]**  75/5 129/24

**extensive [1]**  34/8

**extent [3]**  133/12 145/2 187/3

**extrapolation [1]**  131/11

**extreme [2]**  183/13 210/10

**eyeballing [2]**  161/1 161/4

**eyes [2]**  30/16 30/19

**F**

**fabricates [1]**  62/15

**fabrication [18]**  19/20 19/21
19/22 60/17 61/2 61/5 61/19
61/20 62/9 62/13 62/20 64/20

**face [7]**  22/18 22/25 23/6
24/21 25/4 120/18 173/8

**faces [1]**  210/16

**facilities [1]**  8/1

**facility [1]**  8/12

**fact [52]**  8/8 8/14 14/6 15/5
15/22 27/16 28/10 30/3 30/11
33/1 38/21 39/5 39/7 48/10
51/1 54/21 57/5 59/3 61/10
61/23 63/3 65/3 67/3 69/18
69/23 73/20 73/22 74/2 86/14
97/20 112/17 127/13 130/21
132/7 138/17 147/9 163/2
164/22 170/6 179/12 181/14
183/10 184/9 185/18 189/19
192/9 201/4 201/4 214/6
214/23 222/12 225/20

**factor [66]**  22/13 44/7 85/14
86/8 86/13 86/20 116/20
116/23 116/24 116/25 117/7
118/1 118/25 119/20 120/21
121/8 122/15 122/21 122/25
122/25 124/12 124/15 124/16
124/17 124/19 126/16 127/3
131/3 131/4 132/3 132/13
132/13 137/19 137/21 137/23
138/3 138/3 138/6 138/7
138/17 138/19 138/21 146/15
146/17 146/25 146/25 149/9
150/4 150/5 151/6 152/21
153/3 153/4 153/5 153/17
153/20 154/2 154/5 154/8
154/11 154/15 154/16 159/19
161/17 162/9 180/13

**factor's [1]**  101/19

**factored [1]**  161/16

**factors [9]**  43/17 43/21 86/25
101/19 151/22 181/17 211/2
211/7 211/8

**facts [3]**  39/4 61/14 67/17

**factually [1]**  219/1

**fair [25]**  22/10 25/9 25/12
25/14 26/1 43/19 51/20 58/23
58/24 59/1 59/3 79/5 79/6
84/22 84/25 104/12 125/18
128/6 147/15 178/20 195/6
214/10 216/1 222/6 223/15

**fairly [3]**  37/3 100/3 215/18

**faithful [1]**  125/23

**fall [2]**  174/11 177/4

**falling [2]**  173/12 178/11

**false [1]**  121/14

**familiar [5]**  36/3 51/1 151/14
167/8 210/1

**family [1]**  215/12

**fantasy [1]**  112/11

**far [15]**  18/18 25/19 30/21
32/24 42/2 43/23 44/3 44/20
57/20 95/15 131/13 181/18
193/1 216/12 225/25

**farther [4]**  67/14 67/15 129/8
210/20

**fate [1]**  57/23

**father [4]**  17/8 20/5 65/8
65/17

**fault [1]**  133/7

**faulty [2]**  127/15 127/15

**favorite [1]**  35/5

**FCRR [2]**  2/14 227/13

**fear [8]**  64/13 172/8 174/25

**F**

**fear... [5]** 175/3 175/5 175/13 175/18 196/14
**fears [1]** 38/23
**features [1]** 207/13
**February [2]** 87/18 174/9
**federal [4]** 87/3 105/19 129/23 130/5
**fee [1]** 43/8
**feel [12]** 21/13 21/16 21/18 38/20 44/2 44/2 50/24 56/15 81/19 199/16 220/18 224/20
**feeling [6]** 182/18 202/25 204/16 204/18 205/5 224/16
**feelings [7]** 172/25 177/9 185/13 192/17 218/22 218/24 218/25
**feels [1]** 222/22
**felt [5]** 38/21 39/1 48/21 199/24 205/7
**female [2]** 36/14 36/14
**few [6]** 14/15 87/15 108/6 133/20 193/25 196/8
**FICA [39]** 102/8 102/10 102/11 102/13 102/15 102/18 103/1 103/5 103/18 103/22 104/7 104/11 104/13 105/16 106/18 106/22 108/4 109/13 109/20 110/9 110/11 110/11 110/13 110/14 112/17 115/22 116/2 116/6 116/8 134/2 134/11 134/19 136/5 136/8 136/10 136/11 136/13 136/17 137/1
**field [43]** 19/11 45/9 45/20 48/7 50/20 51/22 54/14 55/4 57/11 73/8 78/1 88/21 88/25 89/7 90/2 90/9 90/17 90/21 90/25 91/9 91/17 92/2 93/5 93/13 94/16 94/19 94/20 95/11 95/22 95/23 96/18 97/1 98/8 117/15 126/13 128/6 131/9 141/14 164/6 165/7 165/11 165/15 166/8
**field's [1]** 166/25
**fields [1]** 165/25
**fifth [2]** 88/24 213/15
**figure [22]** 53/1 54/11 54/14 58/21 86/15 86/20 94/1 97/24 103/5 104/10 116/3 122/25 137/24 137/25 139/14 148/24 148/25 149/1 159/12 159/16 160/5 162/12
**figures [2]** 86/21 150/18
**file [6]** 88/14 195/21 195/21 195/23 196/1 196/2
**files [1]** 195/24
**fill [1]** 147/19
**filled [1]** 90/6
**financial [3]** 79/10 88/11 163/6
**find [20]** 34/13 41/23 48/10 53/9 92/3 95/5 97/8 126/8 128/24 130/3 142/11 143/11 143/15 171/16 177/1 177/3 195/25 211/9 211/21 213/14
**finding [2]** 205/23 207/9
**findings [3]** 176/18 176/23 225/22
**fine [6]** 24/25 81/12 127/13 164/20 191/19
**finish [4]** 9/24 39/18 157/16

**finished [1]** 74/20
**firm [3]** 1/15 49/25 78/3
**first [57]** 4/6 8/9 17/5 22/16 23/19 31/2 31/4 33/6 34/7 36/2 37/9 41/16 44/9 49/14 61/8 71/16 72/8 73/2 75/21 79/8 79/21 81/19 82/12 82/12 82/13 83/20 87/16 87/17 89/7 98/18 98/19 99/9 101/1 101/6 101/8 104/2 108/3 115/25 117/20 127/1 130/18 138/19 140/8 141/21 143/25 171/4 171/21 184/9 184/10 184/19 185/1 188/20 196/10 196/18 198/15 200/10 212/12
**first-year [1]** 75/21
**fishing [2]** 35/3 35/5
**fit [2]** 23/17 51/7
**fits [1]** 195/3
**five [15]** 36/13 58/4 147/12 176/19 176/23 200/7 200/7 200/8 200/13 217/13 219/5 220/4 220/8 222/1 222/4
**flashback [3]** 60/1 60/2 60/5
**flashbacks [5]** 47/14 59/21 172/14 172/21 176/13
**flaw [2]** 111/19 112/5
**flawed [5]** 121/4 125/5 130/15 131/7 132/22
**flies [1]** 13/3
**floor [3]** 2/6 195/17 195/18
**flown [1]** 12/11
**flows [3]** 109/15 109/21 109/22
**fluctuation [1]** 109/7
**fly [5]** 12/20 13/1 19/14 127/19 161/15
**flyspeck [1]** 127/25
**focus [2]** 165/13 206/10
**focused [5]** 89/3 167/23 167/25 176/9 188/22
**Focusing [1]** 27/23
**folks [9]** 32/4 33/5 36/16 37/2 54/6 54/19 57/10 159/9 210/15
**follow [5]** 98/8 150/22 156/6 165/3 196/9
**follow-up [1]** 196/9
**followed [1]** 199/14
**following [5]** 198/12 198/14 200/25 202/15 215/12
**food [13]** 7/22 7/25 8/1 8/5 8/6 8/7 8/9 8/13 10/6 10/7 19/14 29/25 147/7
**footing [1]** 132/17
**forced [1]** 146/2
**foregoing [1]** 227/8
**forensic [1]** 186/22
**foreshortened [2]** 173/8 177/22
**forget [1]** 191/16
**forgetful [2]** 191/24 192/1
**forgetfulness [2]** 191/14 192/5
**forgive [1]** 39/22
**forgotten [1]** 147/23
**form [11]** 43/17 62/21 67/15 103/16 103/17 105/7 106/13 124/20 127/16 200/21 200/23
**format [1]** 188/2
**former [1]** 80/12

**Fortune [1]** 59/16
**forward [5]** 79/17 82/21 83/10 120/1 144/12
**found [5]** 45/9 52/8 56/18 174/15 211/2
**four [26]** 36/12 37/22 72/8 72/17 72/19 74/14 81/17 84/23 84/25 88/17 88/19 89/6 94/8 94/20 95/14 113/22 114/11 130/16 165/12 170/22 173/23 176/18 178/17 178/25 197/4 208/16
**fourth [2]** 26/17 103/14
**fractions [1]** 83/1
**frailties [1]** 66/20
**frame [3]** 25/22 31/12 61/9
**frames [2]** 46/8 224/15
**frankly [1]** 127/25
**Frederiksen [1]** 18/14
**free [12]** 7/14 7/17 40/2 81/19 163/10 163/14 163/16 163/21 163/23 164/6 168/11 226/9
**Friday [1]** 148/4
**frightened [1]** 173/19
**front [7]** 120/15 143/9 157/23 184/4 186/17 210/16 210/17
**fruit [1]** 8/2
**frustrated [2]** 68/24 69/1
**fulfill [1]** 96/16
**full [14]** 47/3 56/25 57/11 145/15 145/17 145/18 145/20 145/22 145/24 146/7 146/9 146/13 164/23 199/15
**full-time [4]** 47/3 57/11 145/20 164/23
**fully [1]** 181/6
**fun [1]** 32/6
**function [4]** 27/21 29/24 144/2 190/20
**functioning [10]** 173/25 174/1 174/2 179/3 190/12 190/19 190/22 190/23 191/5 192/14
**fundamental [6]** 108/13 110/1 110/24 111/19 112/5 132/10
**fundamentally [4]** 121/4 125/4 127/16 131/7
**furnishing [1]** 30/24
**further [8]** 30/18 113/8 116/20 118/1 120/9 120/21 191/21 196/3
**Furthermore [2]** 65/6 129/14
**future [41]** 45/13 72/8 79/17 79/25 83/6 83/9 83/14 84/2 84/13 84/19 85/2 86/3 86/14 93/16 94/2 94/10 99/11 100/22 116/16 116/17 119/8 123/13 124/21 129/15 145/4 149/19 154/20 154/24 155/1 155/13 156/9 156/14 157/8 158/8 158/12 163/19 165/6 166/25 173/8 177/22 194/11

**G**

**gainful [1]** 44/9
**gainfully [1]** 191/9
**gamble [1]** 32/13
**game [1]** 186/25
**gangplank [1]** 33/8
**gatekeeper [1]** 127/12
**gather [1]** 186/25

**G**

**gathering [2]** 203/14 218/9
**gave [4]** 56/1 144/21 190/7
196/19
**gears [1]** 35/7
**general [5]** 22/10 46/13
121/17 205/1 209/16
**generalized [2]** 207/11 208/7
**generally [4]** 78/21 78/22
131/6 194/1
**generated [2]** 80/2 103/24
**gentlemen [3]** 148/2 169/15
226/11
**get [77]** 10/15 10/24 12/16
16/8 25/21 29/13 29/14 29/25
32/7 33/6 35/18 36/6 37/4
38/22 43/18 43/24 46/15 69/7
72/3 73/21 75/17 76/4 82/3
84/12 84/19 86/5 89/6 90/1
92/22 94/23 96/20 97/8
110/12 111/12 115/6 115/12
115/23 120/8 121/10 121/20
122/2 122/15 122/22 125/8
131/25 132/1 133/19 135/23
138/20 140/23 141/4 151/18
152/4 152/12 153/9 153/16
157/11 159/7 160/4 162/1
164/7 167/6 167/11 174/8
176/9 184/23 187/9 189/8
197/7 199/7 201/2 201/2
206/10 217/7 220/13 223/3
226/16
**gets [11]** 83/25 97/24 108/6
116/8 116/9 120/20 121/7
139/25 140/21 153/21 159/6
**getting [18]** 8/13 8/13 37/2
73/5 73/6 73/6 96/15 100/2
115/6 121/18 122/20 128/1
140/11 157/7 175/10 176/6
188/24 217/10
**getting those [1]** 175/10
**gifted [1]** 187/20
**Gilford [3]** 22/23 23/3 23/8
**girl [2]** 6/6 12/7
**gist [1]** 189/6
**give [36]** 4/20 6/5 15/19
15/21 19/10 35/16 40/16
42/21 42/21 53/13 71/14
71/22 77/15 78/10 109/6
117/25 118/21 122/5 122/6
122/8 123/10 126/4 132/7
132/7 147/20 155/8 155/13
158/20 169/3 171/5 180/6
189/6 195/2 221/3 226/14
226/15
**given [13]** 49/1 50/20 63/3
64/3 127/24 128/3 145/2
145/19 156/8 157/22 181/14
186/10 203/6
**gives [1]** 125/20
**giving [1]** 118/9
**glass [2]** 195/14 195/15
**go [79]** 5/10 7/14 7/17 8/7
8/13 19/13 21/12 26/12 32/13
33/5 34/10 34/22 35/3 36/6
36/16 38/2 38/20 38/22 39/16
40/3 42/3 43/13 44/5 45/9
47/17 49/14 57/21 61/17
71/16 75/12 81/19 84/24 90/2
94/23 106/3 112/7 112/9
112/10 115/12 116/19 118/6

141/18 142/6 144/10 144/11
144/13 146/14 153/1 158/21
159/10 161/14 163/11 167/18
167/20 167/25 168/12 173/18
181/7 181/24 182/8 185/5
187/24 191/3 191/6 192/17
192/20 192/22 194/8 194/18
206/11 212/11 214/11 216/6
223/13 226/9
**goal [1]** 219/10
**God [1]** 61/18
**goes [26]** 9/1 19/4 64/11
64/13 64/19 65/5 67/8 82/18
82/20 82/23 107/6 107/6
118/1 120/1 123/4 131/14
136/11 141/16 153/21 153/23
157/13 191/2 194/18 207/19
222/16 222/22
**going [110]** 4/6 4/12 8/12
16/3 16/7 17/18 19/3 21/19
23/7 26/9 26/14 36/9 36/21
38/17 39/20 44/3 47/2 47/17
58/12 62/16 62/19 74/5 75/12
75/25 76/1 76/2 76/7 76/7
76/8 76/9 76/10 83/10 89/23
91/13 91/19 91/20 92/9 92/16
92/17 96/16 96/17 97/8 97/18
97/19 97/21 98/21 101/22
102/16 102/17 102/19 103/6
103/7 104/14 104/20 108/3
108/5 109/23 110/3 111/25
112/4 115/23 118/19 122/14
123/12 126/14 130/14 132/2
132/20 133/14 133/14 138/16
145/4 153/16 155/18 157/17
162/5 162/7 164/16 164/23
165/22 165/24 166/1 166/4
166/5 168/9 168/20 168/23
171/19 171/23 173/9 175/24
182/8 186/1 186/1 189/24
190/25 206/8 207/13 207/16
208/1 210/14 210/22 211/14
217/11 217/25 219/19 220/15
222/21 225/12 225/24
**going to [1]** 76/7
**gone [15]** 8/24 38/25 56/18
65/11 65/12 82/7 95/14 95/15
113/19 114/18 132/24 133/5
152/15 167/9 202/14
**good [21]** 21/3 22/17 31/18
34/5 35/15 49/8 51/7 59/17
77/7 77/8 87/10 87/11 99/17
120/19 139/25 140/1 168/20
196/7 208/20 215/24 216/3
**Goodgine [8]** 10/20 10/23
10/25 11/2 11/6 11/9 11/17
14/18
**got [41]** 12/6 31/9 45/7 67/14
72/10 75/18 77/21 82/7 84/23
94/22 95/15 96/4 104/13
111/5 113/8 115/13 131/22
138/12 140/13 148/23 160/23
165/19 166/17 166/20 166/23
168/2 177/6 177/23 184/11
195/17 197/7 200/4 200/6
200/15 200/19 200/20 200/24
204/16 213/17 220/7 220/17
**gotten [11]** 11/6 11/15 65/24
97/9 97/12 97/16 111/7
120/12 141/13 152/14 223/19
**government [2]** 53/15 163/24

80/11 93/19 93/20 94/11
94/13 94/14 96/18 113/20
167/20
**graduated [1]** 113/6
**graduates [1]** 114/5
**graduation [1]** 42/10
**grasp [1]** 133/8
**gratitude [1]** 186/15
**great [5]** 21/12 31/16 31/17
31/21 169/7
**greater [2]** 164/2 194/1
**greatest [1]** 219/1
**greatly [1]** 191/9
**Green [1]** 18/1
**grocery [2]** 30/1 33/3
**gross [1]** 123/20
**grossest [1]** 62/20
**grounding [1]** 113/11
**grounds [2]** 36/15 131/1
**group [2]** 93/7 207/8
**groups [1]** 209/22
**grow [5]** 112/13 112/13 112/13
117/8 117/24
**grownups [1]** 115/4
**growth [54]** 86/7 86/25 101/16
101/19 116/16 116/20 116/23
116/23 117/6 122/15 122/21
122/25 124/8 124/12 124/15
124/16 124/17 124/19 127/3
129/5 131/2 131/4 132/3
132/13 132/13 137/19 137/21
137/23 138/6 138/19 138/21
139/4 141/4 146/15 146/17
146/25 146/25 148/15 149/9
150/4 150/5 151/6 151/10
151/22 152/21 153/3 153/4
153/5 153/17 153/20 154/7
159/19 161/16 162/9
**guess [10]** 13/4 21/24 44/21
60/15 99/5 104/18 166/20
183/17 186/15 193/2
**guy [1]** 72/10
**guys [1]** 220/8

**H**

**H-07-CV-2719 [1]** 1/4
**hacked [4]** 195/20 195/20
195/22 195/22
**had [232]**
**hair [3]** 8/19 10/9 10/13
**half [3]** 43/14 197/20 197/21
**HALLIBURTON [3]** 1/6 74/3
111/17
**hand [5]** 71/5 105/8 161/14
161/14 168/25
**handle [2]** 147/21 217/11
**handy [2]** 104/5 148/23
**happen [14]** 38/24 52/21 102/8
112/11 112/12 145/4 145/13
146/3 173/15 198/4 204/14
216/4 223/8 224/19
**happened [29]** 8/15 21/10
21/18 22/4 22/11 29/18 29/20
29/21 29/23 39/2 39/4 39/21
62/7 63/11 75/25 128/9
128/10 128/19 146/3 174/23
174/25 175/2 193/6 196/14
199/8 202/15 202/16 203/23
219/8
**happening [8]** 176/14 180/14
182/3 185/15 185/17 185/19

**happening... [2]** 186/2 205/25
**happens [6]** 11/17 72/23 72/23 186/6 209/18 226/6
**happy [5]** 8/21 21/15 31/13 71/23 171/11
**harassment [2]** 18/1 18/8
**hard [11]** 19/1 24/5 67/13 81/25 98/19 113/12 126/9 126/9 126/24 127/19 128/24
**harmed [1]** 9/19
**harmonized [1]** 13/22
**Harris [1]** 114/10
**harvest [1]** 93/6
**has [105]** 6/2 10/23 13/16 14/18 16/21 19/4 19/19 25/13 33/1 33/23 42/15 43/10 50/5 52/3 53/5 55/4 55/7 55/12 55/13 60/20 60/21 61/13 62/6 62/7 62/8 62/14 62/23 65/10 66/14 66/19 72/1 72/17 73/4 73/10 74/14 76/24 76/25 85/6 90/6 90/13 94/14 97/13 97/23 103/8 104/15 104/16 111/9 111/11 112/17 113/24 120/19 126/16 126/20 128/4 128/10 130/7 130/16 131/2 131/4 131/8 132/22 133/11 134/13 136/13 137/10 142/13 145/2 145/25 145/25 146/10 151/2 152/14 166/11 169/25 172/2 172/4 172/7 172/10 172/11 172/17 172/18 173/24 174/24 175/12 175/19 177/4 178/5 178/16 178/25 179/3 180/22 180/22 188/21 191/24 192/22 193/24 193/25 205/19 206/10 207/19 211/11 212/5 218/14 219/10 225/12
**hasn't [1]** 119/10
**have [455]**
**have -- you [1]** 194/2
**haven't [4]** 61/23 70/7 74/16 148/2
**having [27]** 21/24 22/4 23/20 25/5 27/15 33/21 47/14 47/25 48/7 60/16 70/9 96/25 113/4 113/11 172/14 181/11 186/5 190/1 192/15 192/16 192/19 193/9 204/20 213/20 213/25 220/14 225/16
**hazard [1]** 58/19
**he [93]** 10/20 11/20 14/18 14/21 14/21 26/20 26/25 27/5 27/5 29/8 39/18 72/12 72/13 72/17 73/4 74/8 74/9 74/9 74/14 74/16 75/20 75/20 88/25 110/10 110/10 110/13 110/20 110/20 111/6 111/7 111/23 112/3 112/8 112/17 118/11 120/16 120/19 120/20 120/20 120/21 120/23 120/23 121/3 121/4 121/10 121/11 121/12 122/4 123/11 125/10 125/22 126/1 126/1 126/12 126/14 126/16 126/17 127/2 127/2 127/2 127/3 127/6 127/8 128/2 128/2 130/15 130/16 131/2 131/2 131/4 131/14 131/14 131/15 131/17 132/17 132/22 142/15 143/3

144/18 164/18 198/19 199/18 199/22 220/7 221/23 222/1 222/8 222/10 222/11
**he's [20]** 17/18 61/14 72/12 75/1 75/19 126/22 126/23 128/22 128/23 129/7 129/8 130/21 130/22 130/23 131/9 132/16 132/20 132/21 143/2 164/5
**head [8]** 34/3 106/21 183/19 189/9 202/21 203/3 208/19 212/8
**heading [1]** 36/9
**heal [1]** 210/12
**health [3]** 134/10 134/18 179/7
**healthcare [1]** 22/14
**hear [13]** 6/19 9/6 9/7 9/12 21/15 22/2 41/4 52/4 62/16 69/10 73/13 73/18 171/22
**heard [25]** 4/13 7/10 10/20 14/5 17/5 28/20 32/16 32/23 33/21 61/21 62/3 62/6 62/8 62/14 66/14 66/19 69/19 71/7 72/1 99/23 113/9 114/8 165/17 182/22 221/22
**hearing [4]** 21/25 63/20 118/15 184/20
**hearsay [12]** 62/21 63/2 64/21 64/25 65/21 68/7 68/8 68/23 68/24 69/2 69/20 69/25
**heart [7]** 29/4 29/6 65/5 204/15 205/3 205/15 206/1
**Hedges [9]** 2/5 2/5 58/2 130/10 164/12 217/12 219/25 220/3 227/1
**Heidi [2]** 1/15 8/9
**heightened [1]** 183/20
**Hello [1]** 9/11
**help [13]** 29/13 29/15 30/4 35/18 42/2 44/5 92/19 113/18 138/15 171/9 175/24 193/4 213/16
**helped [1]** 65/13
**helplessness [6]** 172/8 175/1 175/3 175/6 175/13 175/18
**helps [1]** 41/22
**her [410]**
**here [105]** 6/7 8/23 17/19 20/13 28/12 29/10 34/20 38/16 40/12 43/11 62/13 64/2 66/20 67/10 68/23 72/3 76/14 81/9 81/18 81/21 81/23 82/2 82/16 83/19 83/24 84/7 87/16 88/9 95/20 95/21 96/5 96/12 98/17 99/7 99/15 101/24 103/21 104/10 105/8 106/7 106/25 107/11 107/14 108/9 110/1 110/4 110/12 112/3 112/13 118/23 120/19 123/2 124/8 125/4 126/2 128/2 130/14 132/10 132/15 133/18 134/8 134/21 135/10 135/24 140/22 141/10 142/23 144/14 145/7 147/7 147/12 152/3 152/12 153/21 155/7 158/5 158/9 158/16 158/22 159/25 160/6 160/23 161/14 163/1 164/21 165/23 166/21 168/21 168/22 168/23 171/15 174/8 175/24 178/1 185/15 185/20

212/1 214/2 220/17 222/13 223/3
**here's [6]** 51/23 72/21 81/21 81/23 110/8 112/2
**heroically [1]** 226/20
**herself [14]** 7/18 15/23 29/25 34/6 35/4 35/25 45/5 57/23 60/22 62/23 63/4 111/15 216/18 221/11
**Hi [3]** 5/4 38/14 38/15
**hiding [1]** 71/3
**high [19]** 73/2 75/8 80/10 83/16 89/8 95/18 102/3 111/15 113/6 113/25 114/15 130/18 140/14 140/14 140/20 141/2 141/13 165/11 170/23
**higher [6]** 73/8 84/13 84/19 113/8 129/1 157/13
**highest [3]** 90/19 121/25 144/2
**highlight [6]** 99/12 99/15 99/18 139/19 139/20 213/11
**highlighted [4]** 26/17 27/8 101/23 214/12
**highlighter [2]** 81/23 81/23
**highlighting [2]** 142/4 213/10
**highway [1]** 36/7
**him [14]** 61/10 70/13 71/11 77/1 81/9 81/11 110/21 111/25 112/3 118/21 133/14 144/17 195/19 199/2
**himself [1]** 118/13
**hire [3]** 51/2 98/24 99/3
**hiring [1]** 51/4
**his [53]** 11/7 27/10 27/12 39/18 57/16 73/2 80/17 89/1 89/3 89/4 89/4 110/22 110/25 110/25 110/25 112/5 112/17 118/12 120/18 120/20 121/4 121/20 122/4 124/20 125/10 125/12 126/16 126/21 126/21 127/8 128/18 129/8 129/15 130/1 130/2 130/14 130/15 130/21 130/22 130/22 130/23 131/2 131/14 132/17 132/21 132/22 133/2 133/6 133/14 143/6 144/4 164/19 187/21
**history [19]** 44/7 44/8 91/10 96/8 96/11 96/21 98/13 98/22 121/9 125/19 129/19 145/11 212/22 214/24 213/7 214/6 216/11 216/14 216/23
**hit [4]** 22/21 24/21 27/5 29/9
**hitting [2]** 22/25 23/6
**Holcombe [1]** 2/4
**hold [1]** 49/1
**holding [2]** 12/19 127/17
**holds [3]** 84/15 94/12 121/12
**home [22]** 28/24 29/7 35/12 35/13 36/16 37/18 38/7 47/20 47/22 47/25 48/7 49/21 57/8 59/1 59/6 59/7 59/8 59/12 109/5 145/25 158/21 158/21
**homebound [2]** 48/2 59/15
**homes [3]** 59/3 59/14 59/17
**homework [1]** 158/22
**honeymoon [3]** 31/10 31/11 31/23
**Honor [85]** 4/3 4/24 6/24 8/21 10/3 10/7 11/8 11/13 12/9

**H**

**Honor... [76]** 13/16 13/23
14/16 14/20 16/17 17/12
17/16 17/18 18/10 18/16
18/24 19/1 19/18 19/23 20/4
20/20 38/10 39/19 39/24 40/1
40/8 40/22 49/4 60/7 60/23
61/9 61/15 62/8 62/14 63/11
64/9 64/20 64/23 65/6 67/1
67/7 67/11 68/2 68/8 68/19
68/21 68/25 69/2 69/11 70/18
73/19 74/21 75/15 76/5 77/1
80/5 80/7 80/13 81/8 85/12
100/11 118/13 121/2 128/8
130/11 132/15 133/6 147/15
148/20 168/3 168/5 168/13
168/15 169/11 171/12 179/23
187/23 223/1 223/4 226/8
227/4
**HONORABLE [1]** 1/10
**hooked [1]** 47/22
**hopefully [3]** 33/24 61/22
194/15
**horizontal [2]** 139/14 159/5
**horrible [2]** 210/15 210/18
**horrified [5]** 199/17 199/19
199/20 199/24 220/9
**horror [10]** 172/8 175/1 175/3
175/6 175/13 175/18 196/14
200/10 202/24 204/1
**hospital [2]** 203/18 203/21
**hour [5]** 35/16 43/8 43/15
44/13 204/1
**hours [11]** 36/13 37/6 38/5
43/9 57/6 58/16 74/3 144/25
145/19 147/10 203/19
**house [2]** 38/16 57/6
**housing [2]** 5/11 5/24
**HOUSTON [14]** 1/2 1/4 2/7 2/12
2/15 35/9 38/17 78/6 145/14
169/22 170/15 170/17 174/11
180/11
**how [110]** 7/7 21/18 22/14
22/15 24/5 29/24 34/11 39/20
41/3 41/5 43/7 43/9 43/25
45/21 46/11 46/15 50/10 52/1
53/9 53/12 53/12 53/18 53/21
53/21 57/20 58/3 66/2 68/4
68/21 86/12 86/15 86/21
88/18 91/22 93/24 102/12
104/24 104/25 107/9 107/10
108/4 108/11 109/15 109/17
109/23 112/7 125/10 126/2
126/3 134/19 135/11 139/12
139/13 140/18 144/11 145/9
145/19 146/19 147/16 147/16
147/18 147/20 151/14 154/18
154/25 155/3 155/22 161/18
167/19 169/23 171/1 174/5
174/20 174/21 175/7 180/19
180/20 183/3 183/3 184/7
185/19 185/19 186/1 186/6
186/9 187/9 189/1 189/2
190/13 190/18 190/20 192/22
193/2 194/23 197/17 197/17
201/2 201/11 201/13 201/16
201/24 207/25 211/4 211/12
211/12 217/12 217/14 219/18
221/10 224/24
**however [10]** 13/23 61/24
66/11 104/14 119/2 125/12

**huge [2]** 85/13 111/4
**huh [8]** 196/17 200/12 201/10
202/18 204/8 207/10 213/8
214/17
**human [5]** 14/22 15/1 18/5
92/4 209/21
**hundred [2]** 56/5 125/24
**hundreds [1]** 33/7
**hurry [1]** 217/19
**hurt [1]** 166/2
**hurting [1]** 220/15
**husband [9]** 28/24 61/7 61/8
61/13 65/15 65/16 70/12
71/10 190/25
**hyper [1]** 176/9
**hyper-focused [1]** 176/9
**hyperarousal [10]** 173/11
173/12 173/22 177/7 178/9
178/10 178/21 207/9 207/11
207/20
**hypervigilance [3]** 173/13
178/14 183/10
**hypervigilant [3]** 183/1 183/4
183/5
**hypnotherapist [2]** 186/21
186/22
**hypnotherapy [7]** 185/21
186/18 186/19 187/11 219/6
219/7 219/12
**hypothetical [1]** 89/18
**hypothetically [1]** 193/8

**I**

**I'd [5]** 34/8 37/17 75/20
118/11 147/23
**I'll [17]** 38/10 61/16 62/5
76/14 119/12 143/25 164/8
171/11 174/8 178/23 179/24
187/24 193/2 200/3 217/19
222/15 223/4
**I'm [120]** 8/21 10/7 11/24
12/25 13/17 14/16 21/15 29/3
29/14 30/16 32/16 32/24
33/21 34/16 35/15 37/4 37/18
39/16 39/19 39/21 41/15
46/24 49/10 53/9 53/9 54/22
59/1 62/16 66/22 68/24 68/25
71/4 71/23 72/4 73/12 74/10
74/11 75/12 75/25 75/25 76/2
77/18 87/12 94/9 95/5 95/19
95/20 97/8 97/8 100/12
100/12 100/17 104/1 104/18
110/3 111/25 112/5 113/4
113/15 118/19 127/13 131/21
131/22 132/2 133/9 133/13
133/14 134/19 134/20 135/2
135/9 138/10 143/18 144/16
146/5 147/16 153/5 156/6
156/21 156/22 157/16 162/7
163/22 164/15 167/5 167/8
169/17 169/18 169/22 171/17
173/5 173/9 175/11 175/11
175/25 177/12 178/6 179/11
182/7 183/16 185/8 186/20
186/21 186/21 187/23 193/1
196/19 197/15 198/1 200/25
203/4 203/5 205/1 210/5
213/23 214/20 217/10 217/24
223/23 225/16
**I've [44]** 9/11 13/20 17/5
28/19 28/20 31/2 42/15 42/16

70/2 70/17
71/12 78/8 81/17 94/7 95/2
95/2 98/20 99/23 100/11
100/18 107/11 113/9 113/21
113/23 114/11 115/13 116/12
127/24 135/13 142/14 151/1
157/18 166/23 177/6 180/9
180/16 183/16 188/7 203/6
208/25 221/22
**idea [11]** 63/1 63/15 86/15
93/11 93/14 94/1 94/6 94/17
97/15 144/24 163/14
**ideation [1]** 216/11
**identified [1]** 20/11
**identify [3]** 89/16 89/20
89/20
**if [199]** 4/5 7/3 7/18 9/9
11/6 11/13 12/6 13/16 13/21
14/5 14/21 17/18 17/25 20/22
21/13 22/1 22/5 22/5 22/14
23/16 24/24 25/1 25/5 25/7
25/17 26/19 27/18 28/10
28/14 30/6 30/16 33/19 33/23
33/24 34/4 34/16 34/18 35/18
40/19 47/14 50/9 54/1 54/4
54/17 55/6 56/17 59/20 60/1
61/6 63/8 65/7 66/1 66/16
68/2 68/2 68/16 69/4 69/9
70/7 70/22 71/21 76/1 76/6
76/7 81/15 81/19 81/21 81/22
83/16 84/23 85/20 85/24
88/23 91/14 91/17 92/13
92/19 93/19 95/21 96/11
96/15 96/16 96/17 97/6 97/17
97/24 99/11 99/14 99/18
104/10 104/15 104/16 106/6
107/5 108/2 110/11 116/6
117/1 117/6 117/14 119/3
120/1 120/5 120/16 121/6
124/22 124/23 125/6 126/3
128/3 128/19 129/14 130/15
130/17 130/19 131/24 132/17
134/1 135/11 139/17 139/19
140/3 141/4 142/18 144/9
144/10 144/12 145/5 145/22
146/14 147/19 148/5 149/18
150/16 151/21 153/14 154/20
156/3 156/13 156/16 156/24
157/7 157/25 159/14 161/5
161/22 161/23 162/1 162/13
162/19 165/4 165/18 166/1
166/3 166/20 166/21 166/25
167/11 168/24 171/20 173/16
178/1 179/24 181/25 185/17
188/6 188/22 191/19 193/8
193/12 194/20 197/6 199/5
203/5 203/9 203/9 203/14
205/18 205/24 209/12 209/24
213/4 213/9 214/2 214/7
214/23 215/9 216/7 217/8
217/22 217/22 220/16 220/17
222/4 223/25 224/3 224/18
226/3 227/1
**if it [1]** 224/3
**ignorance [1]** 112/5
**II [1]** 225/25
**Illinois [1]** 41/20
**illness [1]** 193/15
**illustrate [1]** 151/16
**images [2]** 176/13 218/22
**immaterial [1]** 67/17
**immediate [1]** 46/20

**immediately [3]** 66/12 206/16
223/25
**impact [7]** 101/22 138/9
138/11 146/20 191/12 191/13
192/22
**impaired [2]** 41/25 190/22
**impairment [2]** 173/25 181/12
**impairs [1]** 191/9
**impeach [5]** 10/4 11/11 19/4
67/10 67/21
**impeaching [1]** 67/18
**impeachment [1]** 14/6
**implication [4]** 13/24 14/2
14/3 19/18
**imply [1]** 145/23
**import [2]** 63/19 63/22
**importance [1]** 226/19
**important [15]** 15/5 15/8 63/9
91/19 173/2 174/1 177/14
179/15 179/18 179/20 180/13
188/15 188/17 188/20 212/14
**impossible [1]** 111/1
**impression [3]** 36/24 37/3
64/13
**improper [1]** 64/5
**improve [7]** 142/18 143/7
144/9 144/12 144/15 145/5
163/7
**improvement [1]** 143/4
**inability [3]** 173/2 177/4
177/14
**inaccurately [1]** 22/6
**INC [1]** 1/7
**incident [36]** 28/21 44/6
45/10 47/15 78/24 79/3 79/11
79/23 82/9 82/18 82/19 83/11
83/23 93/11 93/11 94/2 94/6
94/18 94/21 97/23 98/2
103/12 116/22 120/11 123/8
123/8 128/10 135/14 135/16
141/11 147/6 150/6 150/6
150/21 150/21 151/2
**incidents [1]** 31/18
**include [8]** 53/6 53/10 90/12
92/2 102/13 103/5 104/11
114/20
**included [7]** 12/5 86/8 88/13
102/10 102/19 112/17 116/2
**includes [6]** 53/7 58/16 134/2
172/24 172/24 214/18
**including [4]** 60/21 67/25
101/2 202/16
**incoherent [1]** 198/14
**income [63]** 45/12 46/19 73/24
73/24 79/4 79/4 102/6 102/11
102/12 102/13 102/20 102/23
103/2 103/3 103/7 103/11
103/13 103/23 103/24 104/4
104/21 104/21 104/22 104/24
104/25 104/25 105/3 105/12
105/13 106/8 106/14 106/22
106/22 107/5 107/17 107/24
107/25 108/1 108/14 108/20
109/3 109/9 109/12 109/12
109/14 109/16 109/24 109/24
110/9 110/14 110/16 110/17
112/16 116/3 116/5 116/10
116/11 136/5 136/7 144/10
156/25 157/20 158/12
**incomes [1]** 125/15

**incorrect [1]** 132/3 151/25 152/2 153/6
**incorrectly [1]** 165/4
**increase [14]** 117/4 117/17
117/20 118/9 118/24 121/21
123/9 123/13 138/8 138/9
138/13 141/5 141/5 206/11
**increased [5]** 97/20 117/19
131/3 139/4 140/10
**increases [14]** 116/20 118/1
122/9 122/11 122/14 122/16
123/7 123/11 131/25 132/1
132/7 140/20 141/4 141/17
**increasing [6]** 124/18 124/20
140/4 151/24 152/23 153/15
**incurred [1]** 78/16
**indeed [1]** 216/18
**independent [1]** 119/7
**independently [2]** 126/17
191/3
**INDEX [1]** 3/1
**indicating [1]** 195/20
**indication [1]** 74/5
**indicia [2]** 69/21 69/22
**individual [11]** 43/23 44/5
46/5 57/14 80/8 91/4 129/21
132/5 184/5 209/21 210/7
**individual's [1]** 183/7
**individually [3]** 132/5 170/5
210/5
**individuals [2]** 42/20 46/3
**industry [4]** 50/17 82/8 87/4
94/5
**infer [1]** 91/8
**inflated [2]** 124/19 132/11
**inflates [1]** 120/21
**inflation [37]** 86/3 86/8 87/1
101/20 116/24 116/25 117/8
117/18 117/19 117/22 118/1
118/6 118/10 118/25 119/5
120/10 120/21 121/8 121/14
138/4 138/5 138/10 138/11
138/13 146/19 146/22 161/5
161/11 161/16 161/18 161/23
161/24 162/3 162/9 162/10
162/22 162/22
**influence [1]** 71/16
**influenced [3]** 66/14 71/20
216/2
**information [47]** 43/24 46/15
46/17 47/2 47/4 47/13 47/19
48/13 50/22 52/11 53/13
53/15 53/17 56/8 56/14 73/21
90/17 90/25 91/9 92/1 92/10
94/15 95/11 95/22 95/22
96/20 97/11 97/14 185/15
186/25 192/10 200/4 200/6
200/9 201/3 201/12 201/13
201/17 203/14 212/14 212/18
212/20 214/24 215/20 215/24
216/12 217/7
**informational [2]** 85/18
209/20
**informed [2]** 22/24 67/12
**informing [1]** 24/18
**inherently [1]** 121/15
**initial [8]** 46/4 88/6 185/3
187/6 212/12 212/13 213/2
214/15
**injured [6]** 128/12 128/16
128/20 131/25 142/14 147/2
**injuries [9]** 30/8 30/12 59/5

**injuring [2]** 130/11 146/22
144/11 144/15
**injury [8]** 43/25 43/25 44/12
128/21 131/20 172/5 223/19
223/25
**inoculation [4]** 185/22 186/4
219/15 219/16
**inquire [2]** 4/23 169/10
**ins [1]** 37/19
**inside [4]** 22/21 92/4 182/18
221/15
**insight [1]** 217/8
**inspirational [1]** 226/17
**inspired [1]** 204/1
**instance [5]** 7/17 22/16 96/4
120/7 128/24
**instances [1]** 183/18
**instantaneously [1]** 203/23
**instead [5]** 94/13 94/14 189/8
206/23 213/11
**institutions [1]** 113/8
**instruct [1]** 110/21
**instructed [3]** 112/15 120/16
125/3
**instruction [1]** 71/22
**instructions [1]** 71/14
**instructions' [1]** 67/16
**instructor [7]** 45/13 52/17
54/23 54/25 55/21 89/2 94/4
**instructors [12]** 36/14 52/6
52/9 52/15 52/22 53/2 53/7
53/23 55/5 55/9 56/6 56/11
**insurance [4]** 42/17 42/20
46/2 134/12
**integrity [1]** 172/6
**intellectually [1]** 129/4
**intelligence [3]** 50/18 51/6
57/17
**intelligent [1]** 113/4
**intend [1]** 10/3
**intended [1]** 73/8
**intense [7]** 172/15 172/21
172/21 176/16 187/4 188/21
204/6
**intensity [2]** 186/20 219/7
**intent [2]** 68/11 68/12
**intentionally [1]** 130/9
**inter [1]** 67/22
**inter-continentally [1]** 67/22
**intercourse [1]** 213/19
**interest [31]** 87/2 101/21
101/21 109/6 154/19 154/21
156/4 156/18 156/21 157/4
157/11 157/12 157/24 157/25
158/1 158/3 158/13 159/19
159/23 160/5 160/7 160/8
160/9 160/11 160/17 161/21
163/1 163/3 167/23 173/3
177/18
**interested [1]** 133/9
**Interesting [1]** 219/22
**intermediate [1]** 160/15
**intermingling [1]** 37/1
**interpersonal [2]** 211/16
211/19
**interpret [1]** 51/18
**interview [8]** 43/15 43/24
46/7 49/17 49/23 50/3 50/8
215/21
**interviewed [2]** 49/22 49/24
**interviews [3]** 222/24 223/9
223/10

**I** 118/7

**intimidate [1]** 5/23
**intimidating [1]** 6/5
**into [42]** 11/6 11/15 12/16
12/18 19/13 21/25 30/21
40/20 43/18 56/2 61/12 79/17
79/25 82/3 92/22 109/16
115/23 116/9 126/16 130/5
132/24 133/5 140/19 154/24
155/12 159/19 169/8 176/4
181/7 189/8 192/24 194/17
195/10 195/11 195/12 195/15
195/19 195/22 195/22 207/19
223/19 226/18
**introduce [3]** 70/6 77/1
169/15
**introductory [1]** 4/4
**intrusive [3]** 172/12 176/3
188/21
**intuitively [1]** 91/7
**invest [5]** 154/25 155/4
157/25 158/18 164/1
**invested [4]** 156/3 156/13
158/1 159/23
**investigation [1]** 16/7
**investigator [1]** 14/22
**investing [1]** 156/7
**investment [6]** 156/17 156/18
159/15 161/13 163/5 163/14
**investor [1]** 163/12
**investors [1]** 164/1
**involve [2]** 172/4 172/7
**involved [6]** 27/13 28/21
42/24 45/8 87/17 200/7
**involves [5]** 58/19 78/23
79/24 182/20 212/21
**Iowa [1]** 77/22
**Iraq [17]** 6/11 15/12 17/3
34/2 45/2 45/10 46/25 47/2
59/23 68/11 82/7 146/3 197/3
206/14 214/3 221/5 221/8
**irrelevant [7]** 18/16 97/3
98/15 98/20 99/1 99/6 214/5
**irritability [2]** 173/13
178/11
**IRS [7]** 102/18 107/13 107/15
107/19 107/24 109/15 109/22
**is [650]**
**is deny [1]** 216/10
**isn't [18]** 7/7 13/13 15/3
15/23 16/8 55/18 55/25 59/11
88/24 109/13 109/20 120/4
121/2 123/1 150/25 152/24
160/11 219/10
**isolated [1]** 181/8
**issue [7]** 34/18 46/10 46/13
57/13 60/13 128/9 161/25
**issues [2]** 34/22 196/9
**it [585]**
**It -- you [1]** 188/25
**IT field [1]** 141/14
**IT industry [1]** 82/8
**it's [186]** 9/2 13/19 13/20
14/7 14/9 14/13 18/17 19/1
19/19 19/22 19/22 22/6 24/6
32/6 33/7 36/21 41/19 45/14
47/11 53/7 53/20 53/22 60/15
61/4 61/4 62/20 62/21 62/24
63/1 64/22 64/22 64/24 67/12
68/7 68/8 69/2 69/10 69/16
72/4 73/20 74/8 74/9 75/9

82/24 82/25 84/22 85/2 85/14
85/21 90/10 90/20 91/13
91/14 91/20 93/4 94/17 97/15
97/17 99/1 99/1 101/4 102/9
102/13 102/17 103/2 103/3
104/20 107/15 107/19 108/1
108/2 108/19 109/1 109/12
109/14 109/19 110/15 110/16
110/16 112/12 113/18 115/6
117/7 117/20 119/8 120/4
120/4 121/15 121/16 121/16
121/17 121/23 127/1 127/10
128/11 128/14 129/3 129/17
130/2 130/8 130/9 131/6
132/14 136/1 138/5 138/10
140/25 144/24 145/3 147/1
147/3 147/3 147/5 150/3
150/19 150/19 150/21 151/4
151/25 152/2 152/19 152/22
153/6 153/7 153/23 154/20
154/20 154/22 155/19 155/20
156/17 159/5 160/16 160/18
164/6 165/22 165/24 165/25
168/1 169/7 171/23 172/1
176/8 178/15 180/24 182/1
182/1 182/11 182/12 184/3
185/17 186/10 188/25 190/24
190/24 191/3 191/4 192/24
194/8 203/4 206/22 207/19
208/17 208/24 208/24 209/21
209/22 210/11 210/22 211/16
211/17 212/14 213/15 214/5
214/9 214/9 215/18 219/18
219/18 225/14 226/17
**items [3]** 11/1 207/8 212/11
**its [5]** 127/15 130/14 191/5
210/4 226/14
**itself [2]** 64/7 69/24
**IV [2]** 2/9 204/6

**J**

**jackets [1]** 33/15
**JAMIE [74]** 1/3 4/5 4/12 4/13
5/1 5/7 6/1 6/4 6/8 6/10
6/13 6/16 6/19 8/8 8/14 8/19
10/12 11/7 12/2 12/11 12/13
13/6 13/8 13/10 14/19 14/25
15/2 15/16 16/10 17/3 17/7
39/2 39/5 42/24 43/11 46/7
47/3 47/9 48/10 48/15 48/17
48/23 61/17 61/17 93/17
170/7 170/9 170/18 174/5
179/13 180/3 180/5 180/20
181/16 183/10 183/15 183/24
184/19 186/16 187/15 190/16
190/21 192/22 193/8 193/18
193/21 194/3 194/11 194/14
196/1 224/24 225/6 225/9
225/15
**Jamie's [15]** 7/11 10/9 10/15
10/23 11/6 11/15 11/25 23/16
38/22 43/2 44/20 169/18
182/24 187/2 189/10
**January [2]** 87/19 215/12
**Jo [1]** 18/14
**Joanne [1]** 2/3
**job [15]** 35/8 44/11 45/15
46/20 47/13 48/8 57/16 91/14
91/21 92/20 92/23 99/17
142/11 166/1 184/10
**jobs [4]** 53/18 85/19 92/17

**jointly [1]** 118/7
**JONES [137]** 1/3 5/8 5/11 5/23
6/2 6/4 6/8 6/10 6/13 7/3
7/6 9/17 14/12 15/16 17/3
19/19 19/25 20/1 23/3 29/16
31/14 42/24 42/25 43/12
44/14 49/15 49/22 49/24 50/4
50/16 50/18 52/13 54/6 54/21
55/16 55/20 56/12 57/5 57/20
57/23 58/8 59/1 59/20 60/22
62/9 62/10 63/4 65/7 65/19
66/22 68/12 69/24 70/9 71/10
72/21 73/7 73/20 74/2 74/17
75/16 78/16 82/6 83/16 84/15
85/5 88/20 89/7 89/17 93/17
94/13 95/8 95/10 96/15 96/15
96/16 96/17 96/25 97/2 97/9
102/1 102/23 103/11 103/22
117/9 117/14 118/24 119/3
120/8 125/13 126/4 129/15
134/13 136/4 136/21 137/10
137/17 141/10 142/10 142/22
142/23 144/1 144/20 145/14
145/22 150/1 150/16 150/25
163/11 164/22 170/7 174/5
174/15 179/13 181/16 190/16
190/21 196/11 197/15 198/5
201/1 201/19 202/4 202/8
204/10 204/13 204/22 206/3
206/6 208/14 209/7 212/5
212/21 218/5 219/11 220/4
220/12 220/21
**Jones' [33]** 6/16 6/19 13/25
13/25 14/11 15/2 19/7 52/4
52/5 54/15 56/19 56/20 64/12
65/18 88/11 89/1 93/7 94/10
104/4 104/11 105/7 106/2
116/17 117/2 119/22 121/5
121/22 128/25 134/22 140/9
141/20 150/9 196/1
**Joseph [1]** 38/11
**journal [1]** 187/13
**journaling [1]** 185/4
**judge [35]** 1/11 9/9 9/12 14/5
69/12 70/22 71/1 71/3 71/15
71/18 71/20 72/4 72/12 73/15
74/14 75/2 109/25 110/5
119/11 119/17 120/14 121/23
124/25 125/9 125/19 126/17
127/1 127/14 127/20 128/18
129/3 130/13 164/8 165/3
165/18
**juice [1]** 8/2
**July [8]** 5/10 5/11 68/13
79/14 79/15 195/7 195/10
215/15
**July 28 [3]** 5/11 79/14 79/15
**JUNE [2]** 1/5 227/10
**junior [1]** 53/23
**junk [1]** 125/1
**jury [73]** 1/10 4/2 4/9 13/17
14/8 18/22 20/1 21/24 24/8
41/4 51/12 52/4 54/1 56/12
58/21 60/11 60/18 60/19
60/21 61/21 62/6 62/8 62/14
62/17 66/13 66/14 66/16
66/19 67/15 70/3 71/16 72/1
72/14 72/15 74/20 75/12
76/22 76/23 81/20 89/25
112/15 112/16 112/19 112/20
112/25 113/2 115/3 118/15

jury... [25] 119/14 120/15 121/19 125/2 130/16 130/24 133/22 133/23 138/15 147/7 147/14 147/20 147/25 148/1 148/14 158/7 159/14 159/22 162/14 164/10 169/16 186/17 223/2 226/22 226/23

jury's [1] 127/16

just [144] 6/1 8/12 9/3 10/17 11/19 11/20 14/13 18/5 19/18 21/17 21/20 23/11 23/12 23/15 23/18 25/5 25/17 29/14 30/23 32/16 33/23 34/5 34/14 36/15 38/6 38/22 39/20 41/21 42/15 47/12 50/10 53/13 54/23 58/22 60/1 60/21 62/7 62/19 65/6 65/17 65/18 67/3 68/17 69/10 70/15 71/12 71/21 72/5 72/10 75/9 75/13 75/21 76/7 78/2 78/15 78/23 80/4 80/16 82/7 82/13 82/25 86/13 86/19 90/19 93/9 94/22 95/5 97/6 98/22 99/17 101/20 101/20 102/13 103/3 104/7 105/23 108/2 108/12 109/14 112/4 112/12 116/10 116/24 117/20 117/21 118/19 119/6 120/23 123/8 126/8 126/8 126/24 126/24 127/25 128/24 129/4 132/3 132/22 133/19 136/1 138/17 140/12 144/19 146/6 147/5 147/15 150/19 151/16 152/18 154/19 157/2 159/3 160/12 161/1 161/10 161/10 163/22 164/16 165/13 167/13 167/18 171/25 172/19 173/18 178/8 178/17 178/23 181/25 182/22 193/2 203/4 203/6 204/23 206/20 207/2 209/20 210/9 212/3 213/11 214/2 220/8 221/11 222/12 223/15

justice [4] 166/11 167/3 167/15 226/16

justify [2] 129/1 143/16

**K**

Kallan [3] 38/11 38/14 39/23

KBR [25] 1/6 1/7 2/2 5/5 5/8 12/23 13/1 15/8 16/14 16/24 47/1 48/10 58/9 72/22 88/12 114/1 134/16 134/17 134/23 135/4 135/5 135/8 135/11 135/17 220/3

keep [4] 22/1 37/18 41/10 71/5

KEITH [2] 1/10 9/11

KELLOGG [2] 1/6 1/7

Kelly [11] 1/14 1/15 6/25 9/24 14/7 20/5 49/24 63/23 66/8 69/24 196/9

Kelly's [1] 71/7

kept [1] 37/17

keys [1] 191/17

kick [4] 24/17 24/20 39/7 39/8

kicked [2] 204/17 205/6

kicking [2] 22/25 23/6

kids [1] 57/6

killed [3] 15/11 17/3 68/10

kind [26] 8/11 24/3 36/6 36/7 38/23 53/7 97/12 97/12 111/7 113/13 114/13 127/14 128/4 140/3 158/20 161/1 173/14 176/8 182/1 185/16 188/23 192/24 198/14 205/5 207/19 211/19

kinds [2] 212/13 212/17

King [33] 18/6 40/8 40/23 41/2 41/13 41/14 42/4 43/21 58/8 76/4 76/6 76/11 76/24 79/13 88/24 121/24 123/11 125/11 125/21 126/12 129/7 129/8 129/14 129/25 129/25 130/1 130/3 131/12 131/13 142/15 142/21 164/17 165/1

King's [18] 18/8 80/16 83/13 87/20 88/6 88/23 119/9 119/25 122/8 126/13 126/14 129/11 129/13 130/3 143/2 143/9 144/4 147/4

Kingwood [1] 46/22

kit [3] 201/18 202/2 203/22

kiwi [4] 8/9 8/14 67/19 69/5

knew [20] 15/16 15/18 15/19 16/6 27/11 27/19 27/19 27/20 29/6 29/18 29/24 30/1 67/8 128/2 128/2 196/13 220/17 224/2 224/8 224/10

know [169] 7/7 8/18 8/18 9/3 10/12 10/20 10/20 12/1 12/3 12/22 17/11 17/20 17/22 18/2 18/4 18/6 18/8 18/12 18/14 20/9 20/22 24/6 25/6 25/17 25/22 26/11 27/19 29/14 30/23 32/4 34/10 34/11 35/2 35/16 36/2 37/5 37/6 37/19 46/5 46/20 47/18 47/23 48/23 49/19 51/10 51/23 56/6 58/17 59/14 59/22 66/13 66/14 66/16 66/18 66/25 68/25 70/18 73/23 74/15 75/19 85/19 86/22 89/3 89/5 89/25 89/25 90/1 90/20 90/22 97/23 98/25 100/18 102/8 107/23 109/13 110/7 110/13 110/20 111/3 111/7 111/8 111/21 111/23 113/15 113/24 114/3 116/12 126/3 126/13 127/22 129/1 129/18 134/13 135/12 144/11 145/16 145/18 147/9 147/15 147/19 148/5 157/19 158/6 158/17 160/7 160/8 166/15 166/21 166/22 167/9 167/11 167/12 167/17 171/6 171/22 180/18 181/24 187/16 188/6 188/13 188/25 189/4 189/5 189/20 191/20 194/2 194/24 195/13 197/2 197/8 197/22 198/2 198/11 199/4 199/11 200/3 201/16 202/25 204/16 205/24 206/9 206/14 206/23 207/3 208/3 209/12 209/20 215/12 215/24 215/25 216/3 216/12 218/24 219/4 219/5 220/16 221/4 222/9 222/17 222/19 222/25 224/3 224/9 224/24 224/25 225/11 225/20 225/22 226/5

knowing [2] 39/1 66/21

knowledge [7] 39/1 40/4 55/4

**J**

jury... [25] 119/14 120/15 121/19 125/2 130/16 130/24 133/22 133/23 138/15 147/7 147/14 147/20 147/25 148/1 148/14 158/7 159/14 159/22 162/14 164/10 169/16 186/17 223/2 226/22 226/23
jury's [1] 127/16
just [144] 6/1 8/12 9/3 10/17 11/19 11/20 14/13 18/5 19/18 21/17 21/20 23/11 23/12 23/15 23/18 25/5 25/17 29/14 30/23 32/16 33/23 34/5 34/14 36/15 38/6 38/22 39/20 41/21 42/15 47/12 50/10 53/13 54/23 58/22 60/1 60/21 62/7 62/19 65/6 65/17 65/18 67/3 68/17 69/10 70/15 71/12 71/21 72/5 72/10 75/9 75/13 75/21 76/7 78/2 78/15 78/23 80/4 80/16 82/7 82/13 82/25 86/13 86/19 90/19 93/9 94/22 95/5 97/6 98/22 99/17 101/20 101/20 102/13 103/3 104/7 105/23 108/2 108/12 109/14 112/4 112/12 116/10 116/24 117/20 117/21 118/19 119/6 120/23 123/8 126/8 126/24 126/24 127/25 128/24 129/4 132/3 132/22 133/19 136/1 138/17 140/12 144/19 146/6 147/5 147/15 150/19 151/16 152/18 154/19 157/2 159/3 160/12 161/1 161/10 163/22 164/16 165/13 167/13 167/18 171/25 172/19 173/18 178/8 178/17 178/23 181/25 182/22 193/2 203/4 203/6 204/23 206/20 207/2 209/20 210/9 212/3 213/11 214/2 220/8 221/11 222/12 223/15
justice [4] 166/11 167/3 167/15 226/16
justify [2] 129/1 143/16

**K**

Kallan [3] 38/11 38/14 39/23
KBR [25] 1/6 1/7 2/2 5/5 5/8 12/23 13/1 15/8 16/14 16/24 47/1 48/10 58/9 72/22 88/12 114/1 134/16 134/17 134/23 135/4 135/5 135/8 135/11 135/17 220/3
keep [4] 22/1 37/18 41/10 71/5
KEITH [2] 1/10 9/11
KELLOGG [2] 1/6 1/7
Kelly [11] 1/14 1/15 6/25 9/24 14/7 20/5 49/24 63/23 66/8 69/24 196/9
Kelly's [1] 71/7
kept [1] 37/17
keys [1] 191/17
kick [4] 24/17 24/20 39/7 39/8
kicked [2] 204/17 205/6
kicking [2] 22/25 23/6
kids [1] 57/6
killed [3] 15/11 17/3 68/10

kind [26] 8/11 24/3 36/6 36/7 38/23 53/7 97/12 97/12 111/7 113/13 114/13 127/14 128/4 140/3 158/20 161/1 173/14 176/8 182/1 185/16 188/23 192/24 198/14 205/5 207/19 211/19
kinds [2] 212/13 212/17
King [33] 18/6 40/8 40/23 41/2 41/13 41/14 42/4 43/21 58/8 76/4 76/6 76/11 76/24 79/13 88/24 121/24 123/11 125/11 125/21 126/12 129/7 129/8 129/14 129/25 130/1 130/3 131/12 131/13 142/15 142/21 164/17 165/1
King's [18] 18/8 80/16 83/13 87/20 88/6 88/23 119/9 119/25 122/8 126/13 126/14 129/11 129/13 130/3 143/2 143/9 144/4 147/4
Kingwood [1] 46/22
kit [3] 201/18 202/2 203/22
kiwi [4] 8/9 8/14 67/19 69/5
knew [20] 15/16 15/18 15/19 16/6 27/11 27/19 27/19 27/20 29/6 29/18 29/24 30/1 67/8 128/2 128/2 196/13 220/17 224/2 224/8 224/10
know [169] 7/7 8/18 8/18 9/3 10/12 10/20 10/20 12/1 12/3 12/22 17/11 17/20 17/22 18/2 18/4 18/6 18/8 18/12 18/14 20/9 20/22 24/6 25/6 25/17 25/22 26/11 27/19 29/14 30/23 32/4 34/10 34/11 35/2 35/16 36/2 37/5 37/6 37/19 46/5 46/20 47/18 47/23 48/23 49/19 51/10 51/23 56/6 58/17 59/14 59/22 66/13 66/14 66/16 66/18 66/25 68/25 70/18 73/23 74/15 75/19 85/19 86/22 89/3 89/5 89/25 89/25 90/1 90/20 90/22 97/23 98/25 100/18 102/8 107/23 109/13 110/7 110/13 110/20 111/3 111/7 111/8 111/21 111/23 113/15 113/24 114/3 116/12 126/3 126/13 127/22 129/1 129/18 134/13 135/12 144/11 145/16 145/18 147/9 147/15 147/19 148/5 157/19 158/6 158/17 160/7 160/8 166/15 166/21 166/22 167/9 167/11 167/12 167/17 171/6 171/22 180/18 181/24 187/16 188/6 188/13 188/25 189/4 189/5 189/20 191/20 194/2 194/24 195/13 197/2 197/8 197/22 198/2 198/11 199/4 199/11 200/3 201/16 202/25 204/16 205/24 206/9 206/14 206/23 207/3 208/3 209/12 209/20 215/12 215/24 215/25 216/3 216/12 218/24 219/4 219/5 220/16 221/4 222/9 222/17 222/19 222/25 224/3 224/9 224/24 224/25 225/11 225/20 225/22 226/5
knowing [2] 39/1 66/21
knowledge [7] 39/1 40/4 55/4

knowledgeable [1] 104/24
known [7] 63/4 63/19 63/22 64/4 64/4 68/4 183/5
knows [3] 11/20 32/20 75/5
Kristen [1] 12/6

**L**

La [1] 42/11
labor [10] 53/14 80/20 80/20 80/23 86/25 87/1 90/3 91/2 100/17 100/18
lack [1] 190/18
ladies [3] 148/2 169/15 226/11
lady [1] 63/17
laid [1] 94/8
Lamictal [3] 214/24 215/16 215/17
Lannie [1] 1/14
large [5] 32/1 33/25 85/20 108/7 121/13
larger [5] 73/12 113/16 138/23 138/24 152/6
last [18] 23/21 24/1 30/6 30/7 44/11 59/19 60/16 74/16 78/8 84/14 84/16 84/21 94/17 142/22 173/24 176/21 192/1 193/25
late [5] 9/2 16/20 125/7 125/7 127/23
later [7] 20/3 65/8 133/3 152/6 160/14 220/24 220/25
latitude [1] 118/20
laughing [1] 71/10
law [11] 1/15 1/18 1/21 33/12 38/4 49/11 49/25 57/5 91/11 104/24 186/23
lawyer [3] 16/10 70/11 75/19
lawyer's [2] 69/22 69/22
lawyers [3] 43/2 50/11 51/20
laying [1] 220/5
layperson's [1] 154/23
lead [1] 94/25
leading [2] 118/14 202/14
league [1] 75/9
leaps [1] 71/21
learn [4] 93/22 97/21 189/1 189/2
learned [5] 67/7 67/9 97/19 200/9 223/24
learning [9] 113/9 175/1 196/14 202/15 202/15 202/24 204/2 219/5 219/16
learns [1] 33/16
least [8] 61/22 71/6 93/19 132/1 163/23 178/20 180/24 213/22
leave [6] 16/3 35/13 35/24 158/1 161/24 226/12
leaves [2] 35/12 71/1
leaving [1] 38/16
led [9] 174/24 196/13 196/18 196/19 196/20 197/1 198/8 199/13 200/9
left [6] 21/5 21/7 30/15 35/20 58/10 159/16
LEIGH [19] 1/3 5/8 6/1 6/4 6/8 6/10 6/13 6/16 6/19 42/24 43/12 93/17 170/7 174/5 179/13 181/16 190/16 190/21 196/1

**lends [1]** 69/24

**length [3]** 180/4 180/12 180/16

**lengthy [3]** 10/2 10/3 211/21

**less [15]** 84/18 101/2 101/4 101/5 101/9 101/9 105/22 118/14 123/23 157/9 160/14 160/15 182/23 219/17 222/22

**let [38]** 8/21 9/5 9/24 11/20 19/6 68/6 73/18 75/12 76/1 76/3 76/7 81/6 82/3 87/15 87/16 95/13 98/3 100/6 102/22 118/11 121/20 125/8 130/16 134/21 143/17 148/5 155/8 157/16 158/21 166/7 166/24 182/22 193/12 197/15 212/12 213/14 221/10 226/12

**let's [39]** 9/24 14/14 14/15 17/15 26/8 28/11 29/8 35/7 49/14 60/8 72/3 76/4 77/25 78/5 90/1 97/16 100/17 101/23 104/7 106/3 116/15 123/15 123/16 123/16 138/19 139/17 140/7 142/2 145/9 154/12 155/23 158/24 204/4 214/11 215/5 215/5 216/6 217/18 217/20

**level [21]** 19/11 50/19 53/3 53/4 54/6 54/18 54/21 55/21 56/4 73/11 81/4 85/5 85/8 90/19 93/8 103/13 119/21 127/9 144/2 163/18 193/22

**levels [2]** 97/25 127/2

**liability [12]** 103/10 103/12 103/24 104/16 106/2 106/7 106/22 107/1 107/3 107/6 108/10 109/17

**liberal [1]** 98/13

**licensed [1]** 169/17

**life [33]** 6/16 6/19 33/15 42/13 55/17 57/20 79/25 82/21 82/24 117/3 119/22 121/8 129/1 134/12 140/23 141/15 144/6 144/21 173/10 180/18 181/8 182/3 182/4 188/8 188/23 190/3 190/3 194/17 194/19 209/18 224/18 224/19 226/6

**lifeboat [1]** 33/16

**lifeboats [1]** 34/12

**lifestyle [1]** 57/3

**lifetime [1]** 112/10

**light [4]** 8/15 25/11 61/17 147/20

**like [73]** 10/24 18/5 19/8 19/17 21/13 23/11 23/13 23/16 24/11 26/24 27/3 27/7 31/1 32/13 33/16 36/5 36/7 36/21 37/12 44/2 44/2 50/7 50/24 54/6 56/2 57/5 59/25 60/24 63/7 67/23 74/17 75/7 79/8 85/18 85/20 85/21 91/18 93/15 94/2 94/21 97/24 102/16 110/7 116/4 125/7 127/16 131/13 140/25 143/13 144/24 149/25 157/17 161/2 165/22 166/16 173/5 173/18 176/5 186/23 191/16 191/17 192/1 192/24 195/23 196/8 199/14 204/16 205/5 205/7

**likelihood [1]** 114/14

**likely [3]** 96/14 180/2 210/11

**likes [1]** 111/9

**limb [1]** 210/17

**limine [3]** 73/14 111/2 111/3

**limit [5]** 9/25 47/24 48/1 59/1 59/9

**limitation [2]** 45/17 194/8

**limitations [10]** 41/23 42/1 44/2 45/10 47/6 47/9 49/2 51/23 59/5 125/22

**limited [7]** 4/15 8/23 14/10 48/6 190/24 190/24 191/4

**limiting [1]** 58/25

**line [24]** 26/17 26/24 27/18 30/6 83/14 99/12 101/23 102/17 102/18 102/20 108/1 108/9 118/23 128/4 128/19 128/20 142/22 153/1 153/1 158/24 159/4 159/8 167/20 213/15

**Line 46 [1]** 158/24

**lines [4]** 27/7 33/18 173/10 204/17

**list [2]** 128/2 207/8

**listed [2]** 157/18 181/17

**literally [1]** 33/7

**literature [1]** 211/9

**litigation [3]** 46/1 225/7 225/12

**little [38]** 12/11 12/14 12/16 12/18 13/1 13/3 13/5 21/24 23/17 32/6 37/16 41/1 41/6 49/14 53/13 60/15 77/13 78/1 81/8 81/24 81/25 84/11 84/12 84/24 112/22 169/8 169/19 171/3 171/20 171/23 184/17 191/25 193/1 198/14 217/7 217/7 217/10 223/14

**live [2]** 32/7 226/15

**lives [2]** 143/12 181/13

**living [20]** 59/17 104/22 115/5 115/5 122/2 122/5 122/8 122/11 122/14 122/16 123/5 123/6 123/7 123/9 123/11 125/17 132/1 132/7 180/11 216/17

**LLP [1]** 2/10

**located [2]** 170/14 170/18

**locked [2]** 10/24 11/14

**Loewe [3]** 4/17 40/13 168/25

**logic [1]** 71/21

**logical [1]** 129/24

**logically [1]** 210/9

**Lone [1]** 114/6

**long [28]** 44/25 46/11 53/5 58/3 63/4 63/23 64/5 68/4 110/18 126/21 143/12 144/11 163/20 169/23 174/5 184/9 184/12 184/13 191/16 194/25 197/17 207/23 208/7 208/21 208/25 211/4 211/12 222/9

**long-standing [1]** 207/23

**long-term [3]** 163/20 191/16 208/7

**longer [10]** 84/12 112/22 147/20 173/23 209/3 209/5 210/11 210/22 210/24 211/5

**look [48]** 22/14 25/1 26/8 27/18 29/8 30/6 51/23 75/23 78/15 79/8 79/9 79/11 87/15

101/23 103/6 103/8 106/6 116/6 117/1 117/6 121/6 135/4 139/14 139/17 139/18 141/4 153/7 155/17 158/13 162/25 163/9 165/9 165/10 166/5 166/16 167/5 167/7 167/7 167/10 167/10 181/3 182/14 213/23 219/16

**looked [10]** 44/17 56/22 94/2 95/2 107/11 113/23 113/23 114/15 131/14 142/14

**looking [29]** 60/25 61/21 78/17 79/24 80/3 80/10 82/1 82/6 91/21 97/22 165/6 166/1 166/3 168/1 172/5 173/7 173/14 181/4 182/2 183/8 185/13 187/24 197/10 202/25 203/5 210/14 213/23 219/20 223/11

**looks [6]** 53/17 135/15 149/17 149/25 161/1 195/23

**lose [1]** 213/10

**losing [3]** 23/5 24/21 218/8

**loss [27]** 52/6 54/19 55/23 72/8 73/1 88/25 89/1 89/3 89/5 101/14 101/18 119/21 122/18 137/13 137/17 139/6 141/21 150/2 150/17 150/25 151/9 152/16 152/20 155/9 153/15 158/8 192/7

**losses [2]** 105/3 139/10

**lost [3]** 70/18 168/10 197/13

**lot [28]** 21/16 22/12 23/9 23/11 24/4 25/2 25/15 32/1 32/12 37/9 45/5 57/6 59/2 59/4 85/19 98/24 109/6 127/20 152/14 157/9 166/18 167/21 175/24 176/9 185/16 209/19 211/11 224/15

**lots [2]** 206/9 206/14

**loud [2]** 27/3 27/4

**low [4]** 162/17 162/17 163/2 163/4

**lump [3]** 204/15 205/3 205/17

**lunch [4]** 133/16 133/16 147/20 148/13

**lurid [1]** 19/8

**lying [4]** 14/2 19/15 198/21 199/2

**M**

**ma'am [12]** 6/9 6/12 9/5 9/5 198/6 198/10 201/14 202/12 206/4 211/22 212/6 216/20

**made [36]** 14/12 16/16 16/24 17/3 19/19 19/24 23/21 25/8 27/15 27/17 28/4 28/15 28/25 29/4 29/11 44/20 47/15 52/12 52/15 60/17 61/2 62/21 64/16 69/18 74/5 75/19 125/13 126/5 131/9 131/11 137/17 142/19 143/16 165/18 179/12 226/5

**mail [3]** 60/25 61/21 113/9

**Main [1]** 2/6

**major [8]** 53/23 75/9 89/16 90/12 91/4 95/25 96/8 99/5

**majored [5]** 96/4 96/11 98/1 167/7 167/8

**majority [1]** 89/23

**majors [4]** 98/21 98/25 99/2

majors... [1]  99/3
make [56]  6/8 15/2 15/5 15/24
20/2 21/16 21/19 23/9 29/12
40/12 45/13 51/22 57/7 59/17
68/24 70/3 76/14 90/23 91/9
93/13 93/15 96/19 100/22
103/22 107/5 107/7 110/18
110/25 115/25 119/4 123/13
125/14 125/22 125/24 127/7
128/11 129/9 129/16 129/21
129/22 133/19 140/4 141/23
141/25 142/23 143/12 144/7
144/19 163/10 165/21 169/6
170/3 179/8 191/7 191/16
193/5
makes [11]  8/16 63/11 75/20
92/23 107/8 107/13 108/18
132/6 137/24 137/25 144/23
making [16]  18/20 20/15 44/3
45/12 46/19 56/5 58/8 96/25
113/13 119/5 125/14 126/3
129/16 142/24 150/10 180/13
male [2]  36/13 36/14
males [7]  189/25 190/1 194/10
206/8 206/22 207/5 222/17
man [12]  111/1 113/4 126/23
198/18 199/21 200/11 202/17
202/22 203/16 220/5 221/21
222/5
management [3]  12/24 13/1
92/17
manager [2]  42/18 217/3
managerial [2]  91/18 100/9
managers [2]  163/6 164/1
Manguno [7]  209/8 209/10
209/11 225/18 225/20 225/22
226/3
Manguno-Mire [1]  209/10
manner [1]  210/17
Manual [1]  179/7
manuals [1]  166/4
many [26]  7/7 32/12 43/9 51/1
51/2 51/2 51/2 51/4 51/4
53/21 53/21 54/4 54/4 54/12
54/12 71/21 108/5 111/3
125/12 145/19 147/10 171/1
175/7 180/17 185/19 185/19
March [2]  83/10 174/10
Marie [1]  1/21
mark [2]  30/14 30/18
markedly [3]  163/6 173/3
177/18
marker [1]  171/15
market [3]  80/20 163/12
163/13
markets [1]  100/18
marks [1]  28/23
Marque [1]  42/11
marriage [1]  31/21
married [3]  31/9 31/11 109/3
Mart [2]  32/23 32/25
masses [1]  113/15
Master's [47]  42/8 45/4 73/6
73/20 84/14 84/17 85/6 85/10
85/10 85/21 89/14 89/18
89/20 89/22 89/23 89/24 90/2
90/9 90/13 90/20 90/23 91/8
91/10 91/15 91/16 95/1 95/11
95/15 97/7 97/12 97/17 98/11
98/13 111/5 111/7 111/12

165/13 165/15 166/10 166/13
167/1 167/3 169/21
Master's and [1]  85/21
match [1]  46/18
matches [2]  93/7 108/20
matching [2]  136/11 136/17
math [9]  106/21 123/15 132/10
153/1 154/12 156/23 157/2
164/15 224/25
mathematical [5]  118/3 130/6
135/21 135/22 138/2
mathematically [1]  122/23
mathematics [2]  119/1 123/4
matter [17]  4/20 40/16 64/23
68/4 68/9 69/3 69/6 70/10
70/22 76/16 85/14 85/15
85/16 91/7 111/13 111/24
169/3
matters [2]  50/10 68/9
maturity [1]  155/20
maxed [1]  125/21
maximum [1]  110/18
may [54]  4/23 8/18 14/5 14/21
17/18 18/24 20/4 26/21 26/22
33/5 40/2 40/7 40/21 41/1
63/18 66/1 71/7 71/7 76/21
77/1 77/1 77/3 81/11 81/24
82/3 87/25 88/1 90/1 106/10
106/11 112/22 113/3 119/12
133/17 143/19 143/21 144/10
145/6 147/18 148/7 148/19
148/21 162/23 166/2 168/11
169/10 171/12 171/13 174/7
184/8 194/19 203/14 221/23
224/19
maybe [15]  8/3 23/17 34/6
44/22 48/4 60/25 87/18 87/19
92/11 129/7 162/11 182/20
187/4 194/16 198/1
MBA [4]  85/21 85/22 189/17
193/24
MBA's [1]  193/24
McKinney [15]  2/9 2/10 49/10
65/24 75/19 87/12 114/22
118/20 119/15 130/13 130/19
132/3 132/16 132/19 148/7
McKinney's [1]  133/8
McMichael [1]  8/9
MD [1]  202/2
me [141]  9/5 9/6 9/12 19/4
21/16 22/2 23/17 25/20 27/3
27/7 27/21 27/22 29/7 29/7
29/9 29/13 29/15 29/24 30/1
31/5 34/4 34/5 34/16 34/23
35/4 35/6 35/23 37/16 38/2
39/22 47/1 48/21 52/24 60/15
62/11 62/12 62/25 63/1 63/13
63/19 64/6 68/1 68/21 69/12
69/12 69/13 70/5 71/22 72/5
73/18 74/20 81/6 81/7 81/9
82/3 87/15 87/16 91/23 92/19
92/19 95/13 98/3 98/8 98/19
99/8 99/19 100/6 102/22
107/9 107/9 108/2 110/23
113/12 113/18 115/12 115/16
116/2 121/20 122/11 125/8
127/18 127/19 128/13 134/21
136/2 143/17 143/24 144/17
155/8 156/22 157/16 158/22
159/7 166/7 166/24 168/24
169/19 171/5 171/22 174/14

178/17 181/21 182/22 183/23
184/10 185/9 187/23 187/24
188/7 189/6 190/12 190/18
193/12 193/14 197/1 197/3
197/15 198/13 200/18 201/13
202/11 203/5 204/12 209/9
210/9 212/12 213/14 217/10
218/17 219/15 220/8 220/11
221/10 221/18 223/8 224/23
225/9
mean [75]  11/20 13/14 21/17
22/20 23/10 24/4 24/14 25/14
25/17 25/19 26/5 29/25 32/14
41/16 43/2 50/6 51/21 53/12
56/2 56/2 66/17 71/10 71/11
75/4 75/9 82/18 102/16 105/1
109/21 111/14 113/10 113/22
114/14 114/17 126/8 126/12
131/8 131/24 132/5 135/3
138/2 144/6 144/8 144/14
144/22 158/11 158/14 161/4
162/25 163/3 163/24 165/23
165/25 166/15 167/10 167/18
167/19 170/2 176/1 177/13
184/19 191/8 191/23 193/22
194/20 198/20 199/11 203/4
203/19 203/22 206/15 207/2
209/24 214/1 224/20
meaning [4]  173/9 173/16
176/4 185/12
means [5]  5/19 161/12 170/3
173/6 190/23
measure [1]  75/14
mechanical [1]  1/24
mechanism [1]  188/2
media [1]  65/11
median [2]  56/8 209/13
medical [5]  51/13 51/18 88/13
205/25 224/22
medication [1]  27/11
meet [11]  30/4 42/25 43/23
61/10 86/16 157/20 172/2
221/7 221/9 224/14 224/15
meeting [2]  44/14 48/16
members [4]  76/23 133/23
148/1 222/19
memories [8]  11/12 11/17
13/21 65/9 219/2 219/11
219/13 219/14
memory [20]  13/25 14/1 14/11
19/7 19/23 20/6 24/1 35/19
65/8 69/16 69/16 71/19
191/12 191/13 191/15 191/16
192/7 192/9 192/11 223/13
men [9]  200/7 200/7 200/8
200/13 206/9 207/2 210/16
220/4 226/16
mental [2]  179/7 193/15
mentally [1]  41/25
mention [2]  9/21 205/4
mentioned [15]  59/22 160/2
172/19 180/10 193/21 196/11
202/2 204/4 204/6 204/24
206/5 212/12 219/6 223/18
224/10
mergers [1]  100/8
merit [1]  131/25
merit-based [1]  131/25
messed [1]  175/15
met [15]  15/16 49/12 50/16
63/5 87/13 172/9 172/10

**met...** **[8]** 175/19 175/19
184/17 184/19 186/12 199/12
225/9 225/11
**method** **[2]** 133/12 187/21
**methodologies** **[2]** 78/21
132/21
**methodology** **[17]** 92/22 106/25
107/2 112/3 113/5 121/4
121/15 124/25 125/11 125/23
129/3 130/1 130/15 130/23
131/1 131/5 138/15
**methods** **[6]** 45/19 45/20 45/24
45/25 78/20 130/21
**mic** **[3]** 40/20 82/4 169/8
**Micro** **[1]** 100/17
**microphone** **[3]** 21/7 41/1
77/13
**middle** **[4]** 26/17 81/17 213/13
213/14
**midway** **[1]** 38/1
**might** **[25]** 4/4 9/17 34/5
38/23 51/24 60/2 60/4 71/18
71/19 77/13 92/3 109/8
114/18 131/25 142/11 146/20
173/18 173/18 173/19 191/25
192/7 210/21 211/12 211/13
212/21
**mike** **[3]** 9/10 21/6 21/25
**military** **[13]** 12/14 12/20
12/21 77/19 111/22 166/12
166/14 167/4 167/15 202/4
202/20 203/18 225/24
**million** **[4]** 24/17 24/20 126/4
150/18
**million-dollar** **[1]** 150/18
**mind** **[10]** 11/2 11/5 27/2 29/4
29/6 69/1 103/15 147/23
176/4 191/7
**mine** **[1]** 120/18
**mingle** **[2]** 32/10 32/12
**minor** **[1]** 77/18
**minus** **[7]** 55/24 124/18 131/3
136/5 136/5 136/7 136/14
**minute** **[6]** 43/15 44/14 88/19
105/5 138/17 139/22
**minutes** **[9]** 58/4 72/13 116/13
118/19 133/20 147/11 147/13
217/13 217/13
**Mire** **[6]** 209/8 209/10 209/11
225/18 225/20 226/3
**Mire's** **[1]** 225/22
**misleading** **[1]** 178/24
**miss** **[1]** 22/5
**missing** **[1]** 157/11
**Mississippi** **[2]** 42/7 42/9
**mistake** **[1]** 19/10
**mistakes** **[1]** 67/17
**mistreated** **[1]** 9/18
**misunderstood** **[1]** 25/7
**MIT** **[1]** 114/18
**mobility** **[1]** 206/12
**modalities** **[1]** 217/8
**modified** **[1]** 66/13
**mom** **[1]** 30/3
**moment** **[1]** 70/23
**momentary** **[1]** 112/22
**money** **[10]** 90/24 91/9 104/15
109/6 109/8 119/4 155/3
159/15 164/1 193/24
**Montgomery** **[1]** 114/10

**month** **[2]** 180/25 180/25
**months** **[11]** 25/22 37/22
180/17 185/1 185/19 209/14
209/15 210/3 214/2 214/5
226/3
**mood** **[2]** 173/7 207/14
**more** **[60]** 13/21 14/15 21/20
35/7 51/17 53/22 56/20 56/22
58/22 68/16 70/5 71/24 72/2
73/24 73/24 75/20 84/18
84/20 91/9 91/15 91/18 91/18
92/13 119/4 126/13 129/16
143/12 144/7 144/13 144/25
145/6 145/10 160/14 166/18
167/17 167/20 167/22 167/24
177/15 183/7 185/23 192/14
193/24 194/2 194/4 199/25
200/3 200/4 200/20 200/24
206/11 208/24 208/24 210/10
210/10 215/12 217/14 217/16
219/14 219/19
**moreover** **[1]** 69/21
**Morgan** **[2]** 65/20 70/9
**Morgan on** **[1]** 70/9
**morning** **[19]** 4/15 21/3 21/4
21/13 35/14 35/21 36/5 36/13
36/25 49/8 49/9 60/8 77/7
77/8 87/10 87/11 198/14
220/7 221/11
**Morris** **[2]** 1/21 1/21
**mortgage** **[1]** 109/6
**most** **[13]** 37/2 42/13 69/14
92/16 96/14 131/11 141/7
160/16 164/1 182/13 189/1
211/21 218/1
**mostly** **[2]** 185/25 219/18
**mother** **[16]** 16/15 17/8 17/10
20/5 20/6 38/4 61/7 62/2
62/4 65/8 65/13 65/17 68/17
68/20 190/25 216/17
**mother's** **[1]** 33/22
**mother-in-law** **[1]** 38/4
**motion** **[3]** 70/3 73/13 111/2
**move** **[7]** 26/15 70/2 75/11
110/3 130/25 131/7 189/3
**moved** **[2]** 42/10 170/12
**MPO** **[1]** 28/23
**Mr** **[2]** 119/23 125/8
**Mr.** **[77]** 4/11 6/25 9/24 11/17
14/7 14/18 20/5 20/20 41/2
41/14 42/4 43/21 58/2 58/8
63/23 65/24 66/8 71/7 75/19
76/4 76/6 76/8 76/11 76/24
79/13 80/16 83/13 87/20 88/6
88/23 88/24 114/22 118/20
119/9 119/15 119/25 121/24
122/8 123/11 125/11 125/21
126/12 126/13 126/14 129/7
129/8 129/11 129/13 129/14
129/25 129/25 130/3 130/3
130/10 130/12 130/13 130/19
131/12 131/13 132/3 132/16
132/19 133/8 142/15 142/21
143/2 143/9 144/4 147/4
148/7 164/12 164/17 165/1
196/9 217/12 219/25 227/1
**Mr. Daigle** **[1]** 20/20
**Mr. Daigle's** **[1]** 4/11
**Mr. Estefan** **[1]** 130/12
**Mr. Goodgine** **[2]** 11/17 14/18
**Mr. Hedges** **[6]** 58/2 130/10
164/12 217/12 219/25 227/1

**Mr. Kelly** **[1]** 67/24 14/7
20/5 63/23 66/8 196/9
**Mr. Kelly's** **[1]** 71/7
**Mr. King** **[28]** 41/2 41/14 42/4
43/21 58/8 76/4 76/6 76/11
76/24 79/13 88/24 121/24
123/11 125/11 125/21 126/12
129/7 129/8 129/14 129/25
129/25 130/3 131/12 131/13
142/15 142/21 164/17 165/1
**Mr. King's** **[17]** 80/16 83/13
87/20 88/6 88/23 119/9
119/25 122/8 126/13 126/14
129/11 129/13 130/3 143/2
143/9 144/4 147/4
**Mr. McKinney** **[11]** 65/24 75/19
114/22 118/20 119/15 130/13
130/19 132/3 132/16 132/19
148/7
**Mr. McKinney's** **[1]** 133/8
**Mr. Steward** **[1]** 76/8
**Mrs.** **[2]** 40/13 168/25
**Mrs. Loewe** **[2]** 40/13 168/25
**Ms** **[19]** 13/25 65/20 65/22
69/14 70/9 117/2 168/20
169/20 174/4 179/5 180/2
187/6 193/1 196/7 202/4
217/22 220/3 223/11 226/9
**Ms.** **[171]** 4/12 4/13 4/17 5/4
5/11 5/23 6/1 6/16 6/22 7/3
7/6 7/6 8/21 9/17 13/25
14/11 14/12 17/25 19/7 19/19
19/24 19/25 20/1 20/1 23/3
23/4 29/16 31/14 42/25 44/14
49/15 49/22 49/24 50/4 50/16
50/18 52/4 52/5 52/13 54/6
54/15 54/21 55/16 55/20
56/12 56/19 56/20 57/5 57/20
57/23 58/8 59/1 59/20 60/22
62/9 62/10 62/13 63/4 63/10
63/16 63/17 64/7 64/12 64/18
64/19 65/7 65/18 65/19 66/9
66/17 66/21 66/22 68/12 69/8
70/9 71/10 72/21 73/7 73/20
74/2 74/17 75/16 78/16 82/6
83/16 84/15 85/5 88/11 88/20
89/1 89/7 89/17 93/7 94/10
94/13 95/8 95/10 96/15 96/15
96/16 96/17 96/25 97/2 97/9
102/1 102/23 103/11 103/22
104/4 104/11 105/7 106/2
116/17 117/9 117/14 118/24
119/3 119/22 120/8 121/5
121/22 125/13 126/4 128/25
129/15 134/13 134/22 136/4
136/21 137/10 137/17 140/9
141/10 141/20 142/10 142/22
142/23 144/1 144/20 145/14
145/22 147/17 150/1 150/9
150/16 150/25 163/11 164/22
174/15 196/11 197/15 198/5
201/11 201/19 202/8 204/10
204/13 204/22 206/3 206/6
208/14 209/7 212/3 212/5
212/21 217/15 218/5 219/11
220/4 220/12 220/21
**Ms. Armstrong** **[7]** 5/4 6/1
6/16 6/22 7/6 8/21 17/25
**Ms. Chapman** **[11]** 19/24 20/1
62/13 63/16 63/17 64/18
64/19 66/9 66/17 66/21 69/8
**Ms. Cullen** **[2]** 212/3 217/15

**M**

**Ms. Daigle [1]**  23/4
**Ms. Jamie [2]**  4/12 4/13
**Ms. Jones [117]**  5/11 5/23 7/3
  7/6 9/17 14/12 19/19 19/25
  20/1 23/3 29/16 31/14 42/25
  44/14 49/15 49/22 49/24 50/4
  50/16 50/18 52/13 54/6 54/21
  55/16 55/20 56/12 57/5 57/20
  57/23 58/8 59/1 59/20 60/22
  62/9 62/10 63/4 65/7 65/19
  66/22 68/12 70/9 71/10 72/21
  73/7 73/20 74/2 74/17 75/16
  78/16 82/6 83/16 84/15 85/5
  88/20 89/7 89/17 94/13 95/8
  95/10 96/15 96/15 96/16
  96/17 96/25 97/2 97/9 102/1
  102/23 103/11 103/22 117/9
  117/14 118/24 119/3 120/8
  125/13 126/4 129/15 134/13
  136/4 136/21 137/10 137/17
  141/10 142/10 142/22 142/23
  144/1 144/20 145/14 145/22
  150/1 150/16 150/25 163/11
  164/22 174/15 196/11 197/15
  198/5 201/11 201/19 202/8
  204/10 204/13 204/22 206/3
  206/6 208/14 209/7 212/5
  212/21 218/5 219/11 220/4
  220/12 220/21
**Ms. Jones' [27]**  13/25 14/11
  19/7 52/4 52/5 54/15 56/19
  56/20 64/12 65/18 88/11 89/1
  93/7 94/10 104/4 104/11
  105/7 106/2 116/17 119/22
  121/5 121/22 128/25 134/22
  140/9 141/20 150/9
**Ms. Loewe [1]**  4/17
**Ms. Nelson [1]**  147/17
**Ms. Vorpahl [2]**  63/10 64/7
**much [48]**  9/15 14/16 18/19
  18/20 29/24 32/11 39/20 40/3
  43/7 50/10 65/2 68/16 86/15
  91/22 100/10 102/12 107/9
  107/10 108/11 109/15 109/17
  109/23 125/22 125/24 126/5
  133/17 140/18 144/5 147/16
  147/16 147/18 148/12 152/6
  154/25 155/3 155/22 168/12
  169/9 184/17 197/17 217/12
  217/14 217/25 218/25 220/24
  220/25 226/10 226/20
**muffled [1]**  198/3
**Mullen [1]**  2/10
**multiple [1]**  36/22
**multiplied [2]**  153/24 157/2
**multiplier [1]**  136/1
**multiply [9]**  138/21 149/12
  151/8 151/21 154/2 154/11
  154/12 154/13 157/5
**multiplying [2]**  151/22 151/23
**murder [1]**  68/14
**murdering [1]**  6/14
**music [1]**  96/21
**must [2]**  165/17 226/14
**muster [1]**  130/8
**my [90]**  5/4 9/11 19/2 19/10
  19/15 23/24 27/19 28/24 29/6
  29/15 30/14 31/1 34/3 35/5
  38/3 38/4 39/21 40/4 42/6
  42/7 43/8 43/10 43/13 45/11

56/1 57/5 59/8 60/18 60/23
61/18 62/15 67/13 68/21 69/1
72/18 77/20 81/22 87/23
87/23 91/23 93/10 95/13 98/3
99/5 99/7 100/8 100/16 105/3
109/22 113/24 115/3 115/15
118/5 119/8 119/24 125/9
133/7 134/15 141/11 142/13
143/25 144/10 145/7 148/6
148/10 158/20 164/9 167/17
169/17 170/10 179/10 183/19
184/10 185/5 188/13 190/5
190/14 195/10 195/21 195/21
196/7 205/9 212/9 215/25
220/3
**myself [6]**  27/3 34/12 35/3
  45/7 50/8 218/3
**Métier [1]**  187/22

**N**

**nail [1]**  95/19
**naked [3]**  198/15 198/16
  198/25
**name [13]**  5/4 9/11 18/12
  20/11 41/12 63/7 63/18 77/9
  169/17 196/7 196/19 202/19
  220/3
**named [2]**  178/8 204/23
**names [1]**  99/19
**naturally [2]**  7/3 189/1
**nature [7]**  29/19 47/23 209/20
  211/8 211/11 211/13 211/16
**nearest [1]**  168/24
**necessarily [5]**  21/18 34/23
  75/23 100/4 211/1
**necessary [1]**  72/4
**need [44]**  4/16 7/20 9/3 27/22
  28/24 29/7 30/1 34/10 38/2
  41/1 42/1 48/20 50/9 50/24
  60/12 64/21 69/10 70/2 70/3
  70/16 77/13 81/21 81/22
  81/24 82/3 87/15 93/9 105/1
  106/4 109/25 157/9 157/20
  158/12 158/17 159/4 159/7
  162/1 164/4 167/17 169/7
  178/21 206/19 211/5 226/24
**needed [7]**  27/19 29/6 29/24
  156/16 175/3 175/9 175/11
**needs [8]**  7/11 21/14 76/2
  112/14 112/15 119/11 175/5
  186/12
**negative [2]**  26/6 121/12
**negatively [1]**  26/3
**neighborhood [1]**  210/3
**Nelson [16]**  147/17 168/15
  168/20 169/12 169/17 169/20
  174/4 179/5 180/2 187/6
  193/1 196/7 217/22 220/3
  223/11 226/9
**net [6]**  101/13 124/8 124/20
  131/3 139/6 139/6
**never [22]**  5/5 8/19 15/21
  15/21 19/6 19/15 27/5 29/8
  61/11 65/18 103/15 112/9
  113/9 114/8 122/24 124/15
  129/16 143/11 144/7 144/21
  147/23 181/6
**new [5]**  54/25 125/6 138/22
  208/1 213/19
**newest [1]**  37/22
**news [1]**  63/20

28/14
29/8 29/21 33/16 36/17 52/3
72/12 76/8 76/9 84/7 91/23
121/3 125/24 136/23 143/19
148/4 165/14 168/1 168/10
198/15 198/18 198/20 198/21
214/14 216/10 216/10 216/25
219/4 220/5 222/4 223/8
**Nice [1]**  99/16
**night [11]**  9/2 23/11 23/22
  24/1 25/24 29/17 32/7 38/3
  38/4 39/12 222/2
**nightmares [3]**  172/13 172/20
  176/13
**no [157]**  5/6 5/25 6/9 6/12
  6/15 6/18 6/21 6/24 7/21 8/6
  8/12 9/5 9/20 9/23 10/14
  10/24 11/4 11/14 12/8 12/15
  13/2 15/14 16/9 17/1 17/14
  18/12 19/13 20/12 22/17
  28/11 30/8 30/12 30/18 31/18
  31/18 32/5 36/3 36/6 36/7
  37/25 39/6 39/8 46/24 47/5
  48/9 49/13 50/15 50/21 55/14
  56/14 57/11 57/22 59/10 60/6
  62/25 63/15 63/17 65/4 66/25
  67/24 68/22 69/1 69/8 72/12
  72/19 73/7 73/15 74/22 75/7
  80/13 85/12 89/20 90/18 91/3
  93/9 102/17 103/15 103/17
  104/23 115/8 115/10 117/11
  120/17 121/2 121/7 121/7
  122/13 122/17 123/2 123/6
  126/6 129/4 129/11 129/20
  129/22 130/11 132/13 132/22
  133/1 133/3 134/24 135/3
  136/2 136/8 136/9 141/19
  141/24 142/1 143/1 143/4
  143/4 144/8 146/6 146/12
  146/25 150/3 151/1 152/25
  153/6 154/4 154/6 154/9
  158/5 158/9 158/20 163/3
  165/22 175/10 177/7 191/18
  191/19 193/20 194/22 197/9
  197/11 197/13 198/17 203/10
  205/2 206/4 207/24 209/6
  211/1 211/5 211/23 212/7
  213/13 215/1 216/12 216/24
  219/13 219/13 221/6 221/18
  221/20 223/21 226/5
**Nobody [1]**  70/10
**nod [1]**  225/5
**Nodding [2]**  202/21 208/19
**nominal [1]**  161/24
**non [9]**  12/20 64/25 93/11
  103/12 116/22 123/8 135/14
  150/21 151/2
**non-hearsay [1]**  64/25
**non-incident [6]**  93/11 103/12
  123/8 135/14 150/21 151/2
**non-military [1]**  12/20
**none [4]**  24/10 24/11 67/20
  163/8
**noon [2]**  35/14 35/21
**nor [1]**  55/12
**normal [1]**  179/8
**normally [2]**  13/3 225/18
**North [4]**  114/10 170/15
  170/17 170/20
**nose [1]**  120/18
**not [350]**
**note [1]**  145/13

**N**

noted [1]   182/24
nothing [14]   4/21 9/20 24/14
40/1 40/17 69/23 76/17
158/14 163/24 169/4 192/1
196/3 220/22 226/17
notice [8]   8/4 60/19 183/8
197/18 197/24 214/2 215/9
223/11
noticeable [1]   173/7
noticed [1]   200/15
noticing [2]   197/8 198/15
notion [1]   60/6
notwithstanding [1]   219/10
November [1]   215/10
now [114]   4/20 7/22 10/15
22/2 22/14 26/8 27/14 31/3
35/24 36/20 37/22 40/16
41/21 51/1 52/2 52/12 56/24
60/25 62/8 65/22 69/19 70/13
71/7 71/13 72/14 72/23 75/20
76/16 78/25 79/4 79/12 82/10
83/4 83/12 83/19 83/24 84/1
88/23 89/16 93/14 93/25 94/4
94/4 97/8 97/22 98/10 100/12
100/22 105/18 106/25 112/23
112/24 116/4 116/14 117/1
117/13 121/3 124/8 125/11
125/22 128/10 128/12 128/20
131/15 133/16 137/6 139/17
141/16 141/22 142/9 142/13
142/16 144/3 145/1 145/7
145/22 146/10 146/10 146/14
147/8 149/15 149/25 150/16
151/12 151/21 153/8 155/3
156/15 158/19 162/6 162/7
165/13 166/18 169/3 173/5
174/6 174/12 175/15 178/5
182/3 185/15 185/18 185/20
186/1 189/8 189/19 198/8
206/23 206/24 208/2 213/9
218/15 218/16 224/25
numb [2]   197/19 197/25
numbed [1]   197/9
number [119]   54/7 55/15 55/18
56/10 56/21 56/25 58/17
83/14 86/5 86/10 90/3 90/4
90/4 93/23 100/2 101/1 101/6
101/8 101/12 101/13 101/13
102/18 102/20 107/23 108/7
108/9 108/9 109/11 109/12
109/12 109/13 109/14 110/10
110/12 112/9 116/21 119/21
119/25 121/12 121/14 121/18
123/17 123/20 124/8 124/11
127/6 128/15 128/16 131/3
131/3 132/11 132/12 132/14
132/14 134/25 135/7 135/10
135/12 135/17 135/18 136/1
136/12 137/19 137/21 138/7
138/7 138/18 138/21 138/22
138/23 138/24 138/25 139/3
141/21 149/21 149/23 149/25
150/3 150/9 150/10 150/12
150/12 150/14 150/17 150/21
150/23 150/24 151/1 151/24
152/3 152/4 152/4 152/6
152/9 152/12 152/21 153/8
153/11 153/15 153/15 153/16
153/20 154/18 156/8 157/13
159/14 159/25 160/22 160/23
182/9 184/1 189/7 190/24
191/2 212/11
number 18 [1]   156/8
numbers [41]   53/19 56/1 73/11
80/2 83/21 85/9 86/2 86/6
86/10 86/21 86/23 86/24 87/1
87/2 87/4 98/18 99/16 101/17
103/10 103/21 109/19 112/13
126/10 126/11 127/8 129/1
130/9 138/16 142/6 142/6
142/9 144/13 145/6 151/17
155/5 155/18 155/18 158/7
158/10 158/10 161/15
numbing [4]   172/23 176/25
178/2 206/5
numerous [2]   5/15 37/17

**O**

Oak [3]   170/15 170/17 170/20
oath [6]   6/3 6/3 20/24 40/13
76/15 168/25
object [3]   11/8 14/20 17/12
objected [1]   19/2
objection [3]   10/17 72/18
168/17
objective [2]   205/12 205/22
objectively [1]   205/13
observation [3]   196/16 209/11
209/25
observations [1]   203/16
observe [1]   205/20
observed [3]   204/10 204/11
205/13
obtain [1]   215/13
obtained [7]   42/6 45/3 45/3
50/22 52/25 56/15 94/14
obtaining [1]   94/13
obvious [2]   96/2 124/14
obviously [5]   28/20 92/9
108/4 112/3 166/18
occupation [5]   45/16 53/17
89/21 91/13 92/15
occupational [3]   174/1 190/23
191/5
occupations [2]   53/15 92/11
occur [2]   86/14 220/23
occurred [21]   18/1 43/25
68/15 78/24 82/10 82/18
83/23 93/12 93/14 94/2 94/18
97/23 98/2 116/22 120/11
128/10 135/16 141/12 182/23
196/20 220/24
October [3]   215/10 215/17
215/18
odd [1]   122/19
off [39]   21/7 31/8 66/10
67/15 83/12 85/7 90/8 102/1
102/5 104/20 107/15 110/10
114/16 118/8 119/6 119/8
119/23 119/25 121/23 122/4
131/19 133/21 135/17 135/19
141/1 143/2 143/5 143/6
147/3 155/20 160/4 161/4
177/13 178/8 182/7 183/19
191/23 195/17 210/17
offense [1]   26/5
offer [3]   100/15 164/9 168/6
offered [6]   15/24 68/9 69/2
69/15 69/17 197/7
offering [1]   68/14
office [19]   1/21 17/17 43/1
182/9 184/1 189/7 190/24
191/2 212/11
number 18 [1]   156/8
69/22 170/10 170/11 170/18
170/24 182/25 195/6 195/10
195/18 195/19 195/22 196/2
officer [2]   61/15 78/2
officers [1]   186/23
offices [1]   50/4
OFFICIAL [2]   2/13 227/13
offshore [1]   34/9
often [6]   50/14 99/22 180/15
180/20 189/3 207/13
oh [9]   18/19 34/21 47/1
61/18 135/2 160/23 177/7
182/1 208/17
oil [1]   34/9
okay [130]   4/5 4/15 6/25 8/8
9/24 13/3 13/6 14/14 17/23
18/17 20/21 20/22 21/23 22/2
26/10 27/1 27/5 29/8 31/7
38/9 38/20 40/2 40/7 43/17
44/13 48/21 58/2 58/5 71/2
72/3 72/16 73/18 74/23 75/1
75/24 76/4 76/12 77/13 78/20
82/1 82/5 83/6 84/21 85/24
93/9 104/3 105/25 107/17
110/11 112/20 114/22 115/7
115/9 115/16 119/15 120/6
128/15 130/12 133/9 135/13
140/1 141/8 141/16 143/25
144/23 146/14 147/12 148/7
152/21 154/12 155/9 160/22
161/1 164/11 165/13 168/11
168/14 170/11 174/20 175/7
175/17 175/24 176/10 176/20
177/12 177/17 178/4 178/9
178/17 178/20 178/23 179/25
181/23 182/1 183/12 183/18
183/23 187/15 188/4 188/15
188/20 190/22 192/12 193/8
193/21 196/4 197/3 198/20
199/17 200/1 200/5 201/11
203/2 203/12 204/14 208/10
214/10 218/14 218/22 221/10
223/2 223/5 223/15 223/18
223/24 224/7 225/22 225/24
226/9 226/24
old [4]   37/22 142/22 216/16
224/24
Olsen [1]   1/15
on [222]   4/4 4/8 4/15 5/11
8/23 12/11 12/19 12/19 13/1
13/3 13/15 13/19 14/5 14/10
17/7 17/9 19/10 20/6 21/6
21/14 24/5 25/18 26/15 27/11
27/23 30/14 31/9 32/12 33/6
33/6 33/15 33/15 33/18 34/9
35/3 35/12 35/16 36/10 36/13
38/6 39/11 43/9 43/22 44/24
45/1 45/10 45/14 47/5 47/20
50/21 52/17 53/2 53/4 53/15
57/6 57/14 59/5 61/25 63/11
65/20 66/13 67/8 68/5 68/13
68/20 70/2 70/9 70/12 70/12
70/22 71/12 71/16 71/25 72/8
72/11 72/18 73/1 74/15 76/4
78/1 79/7 79/12 80/15 80/17
81/4 85/17 86/22 87/21 89/1
89/3 90/7 91/13 91/20 92/15
94/11 95/7 97/18 98/21 98/25
99/7 99/10 100/7 100/8 100/9
101/17 102/18 102/20 102/22
103/10 103/12 103/16 103/22

**on... [110]** 103/23 104/14
105/2 105/12 105/18 106/8
106/13 106/22 107/13 107/14
107/17 107/19 107/20 108/4
109/24 110/1 110/14 110/15
110/17 110/21 111/2 112/3
112/5 113/19 116/5 117/4
117/24 118/19 118/20 120/13
120/18 123/4 125/17 127/4
127/4 127/4 127/19 128/2
128/13 129/5 130/1 130/25
132/17 136/3 138/20 140/22
142/20 144/4 144/17 145/19
146/6 150/17 152/16 153/7
155/5 155/14 155/20 157/11
157/18 157/24 158/6 158/24
159/8 160/1 160/9 161/2
161/13 161/14 162/14 162/20
163/7 164/19 165/3 165/13
166/1 167/25 171/25 181/17
182/18 182/23 183/17 184/7
186/1 188/16 188/22 188/23
189/6 190/9 190/20 191/12
191/13 191/21 192/22 196/9
207/14 208/1 209/1 210/3
213/15 214/2 216/13 217/18
217/20 220/15 221/9 221/15
222/5 223/25 227/2 227/3
**once [8]** 14/9 24/14 36/23
144/21 180/24 184/10 187/4
213/22
**one [108]** 1/16 1/19 4/3 10/24
13/7 13/10 17/9 19/21 20/4
21/20 21/21 22/6 23/12 23/14
25/23 26/4 27/18 31/24 33/17
34/11 35/7 36/19 37/15 38/4
38/4 46/24 58/13 58/14 58/22
58/24 59/19 60/13 60/17 61/1
61/19 61/20 66/20 66/25
67/21 71/6 73/3 73/4 73/6
73/6 81/7 81/19 84/7 85/4
85/7 85/10 92/3 94/20 94/20
95/14 103/22 112/5 115/12
115/13 118/4 119/17 120/19
121/10 125/12 126/10 128/4
128/15 128/24 129/20 129/22
130/17 130/18 130/18 135/4
139/14 141/23 144/24 152/16
155/19 157/4 157/17 160/17
160/17 164/21 165/14 167/13
167/21 168/21 171/16 172/19
174/6 175/13 176/10 176/20
177/24 178/4 184/2 184/18
189/6 189/24 200/8 204/5
209/7 211/8 214/15 215/14
218/1 219/3 219/3
**one percent [3]** 155/19 160/17
160/17
**one's [1]** 75/22
**one-week [1]** 31/24
**one-year [3]** 58/13 58/14
58/24
**ones [2]** 178/8 204/12
**ongoing [2]** 63/16 177/4
**online [13]** 52/8 111/20
113/10 114/16 114/19 166/12
166/13 166/18 166/20 167/4
167/15 189/20 189/21
**only [33]** 9/9 16/13 36/19
37/15 38/5 59/5 65/1 73/2

105/1 107/24 108/6 112/9
113/23 116/10 125/3 129/5
129/9 131/2 132/12 135/4
142/24 143/5 151/23 163/15
164/9 183/5 186/22 214/5
215/13
**onto [1]** 162/22
**open [1]** 20/19
**opened [1]** 195/23
**opined [1]** 54/17
**opinion [17]** 45/14 74/11
74/19 88/9 119/24 127/17
129/17 129/23 132/23 164/21
164/24 166/24 180/6 192/4
199/13 203/8 214/4
**opinions [8]** 42/21 78/10 79/7
80/15 81/1 87/21 88/9 96/12
**opportunities [1]** 47/25
**opportunity [4]** 20/7 171/6
180/16 203/7
**opposed [1]** 97/3
**opposing [1]** 133/13
**opposite [1]** 69/21
**or [259]**
**oranges [1]** 55/24
**order [10]** 23/10 42/2 55/10
75/16 93/22 100/22 113/9
142/9 206/19 212/15
**ordered [1]** 8/23
**originally [1]** 192/6
**other [61]** 6/20 21/21 23/23
31/2 42/2 44/17 51/6 52/6
54/19 56/11 61/15 81/22
89/24 92/11 105/2 117/21
119/5 119/15 120/7 121/18
125/17 127/24 128/16 142/11
163/5 164/22 165/25 167/24
172/10 173/4 173/5 173/14
174/1 177/20 180/18 182/5
184/13 186/12 188/10 188/16
189/7 189/13 190/2 190/10
191/1 193/9 193/10 199/7
199/17 204/18 207/2 207/5
207/13 211/23 212/1 218/17
220/8 221/7 221/23 222/4
222/12
**others [5]** 22/14 25/13 97/20
182/19 187/3
**otherwise [4]** 37/2 92/18
126/1 148/4
**ought [2]** 9/25 71/20
**our [39]** 8/1 24/8 25/16 25/23
37/22 38/23 47/11 51/12
53/25 56/12 59/22 60/8 61/24
66/19 68/11 68/12 76/8 76/9
81/20 89/25 93/23 148/13
148/14 158/2 158/7 159/14
159/22 161/1 162/13 168/10
184/6 195/18 195/19 195/20
195/21 195/22 195/22 226/13
226/14
**ourselves [1]** 9/25
**out [86]** 12/11 21/20 25/7
27/3 27/4 29/13 31/12 32/7
33/3 33/3 33/15 35/18 37/1
37/5 37/8 38/25 48/12 49/21
53/9 56/18 58/22 59/3 59/6
59/7 59/8 59/14 59/16 62/24
66/5 69/15 69/20 72/14 72/19
86/15 86/20 90/6 94/1 94/8
95/5 97/8 97/24 99/13 104/7

108/8 110/10 110/11 110/11
110/14 111/3 112/8 112/25
117/3 125/6 125/21 130/16
136/10 139/14 139/21 146/14
153/2 154/5 154/7 154/12
157/18 160/5 162/12 162/13
163/11 163/15 163/23 163/24
167/21 171/9 175/12 193/2
194/23 213/20 214/1 214/7
218/2 222/16 223/3
**out-of-court [2]** 69/15 69/20
**outcomes [2]** 94/7 95/3
**outs [1]** 37/19
**outside [8]** 19/3 45/25 70/14
92/4 118/15 121/16 164/10
182/19
**over [49]** 6/7 8/24 16/7 21/12
23/7 37/25 43/13 63/7 65/11
65/11 65/11 65/12 65/12
65/12 73/25 79/25 81/10
82/21 86/18 93/21 106/18
110/4 112/13 117/3 126/5
127/9 132/18 141/15 154/19
154/21 156/25 158/17 161/3
162/16 162/18 166/6 179/19
180/9 180/12 180/16 180/22
183/6 192/17 192/20 192/23
195/10 197/22 215/18 218/1
**overall [2]** 31/17 59/13
**overheard [2]** 60/18 60/21
**overpayment [1]** 104/20
**overseas [2]** 9/2 134/20
**overstated [1]** 104/11
**owe [2]** 108/11 186/15
**own [11]** 7/17 57/16 105/3
129/8 166/24 188/23 202/25
203/16 205/6 210/1 210/4

# P

**p.m [3]** 16/16 147/24 147/24
**package [5]** 134/22 137/3
137/6 137/10 137/11
**page [8]** 3/2 26/12 28/10 95/7
159/4 189/5 189/6 189/6
**Page 000974 [1]** 26/12
**Page 1 [1]** 159/4
**pages [1]** 88/24
**paid [9]** 43/4 43/7 58/12
86/17 104/15 107/10 109/7
110/16 116/5
**pain [2]** 198/16 200/16
**paint [1]** 110/7
**painting [3]** 188/3 188/4
189/10
**paper [1]** 131/23
**papers [3]** 55/7 156/14 158/2
**paragraph [6]** 26/18 213/5
213/13 213/14 214/12 216/7
**Pardon [1]** 69/12
**parking [3]** 22/12 25/2 37/8
**part [49]** 13/7 13/8 15/22
19/10 27/23 48/23 53/11 56/6
56/11 56/22 56/25 57/10 75/7
75/21 79/8 79/24 81/1 82/22
86/7 95/17 95/19 95/19 98/20
98/20 101/3 102/19 104/2
104/13 115/25 116/6 117/21
118/4 118/6 123/3 129/11
135/15 136/17 143/11 145/23
146/1 146/8 151/4 157/11
187/6 187/15 189/10 192/18

**P**

**part... [2]**  193/4 220/9
**part-time [4]**  56/6 56/11
56/22 57/10
**partially [1]**  165/9
**particular [21]**  26/24 31/23
33/25 51/7 57/16 79/12 80/9
83/15 89/16 103/4 113/14
136/8 150/24 152/19 177/16
181/15 187/16 192/18 208/21
210/14 212/17
**particularly [11]**  32/6 59/11
59/12 79/25 163/20 176/7
207/14 207/22 210/8 224/17
226/15
**parties [2]**  4/4 8/22
**partner [2]**  57/5 213/20
**parts [7]**  23/14 23/15 24/12
25/16 141/2 196/15 218/2
**pass [11]**  39/24 49/4 58/1
60/7 87/6 130/7 164/8 168/3
219/24 223/1 226/8
**passed [1]**  213/20
**passenger [1]**  33/12
**passing [2]**  213/25 214/7
**passive [2]**  182/14 182/25
**past [17]**  33/2 35/12 37/20
46/15 46/19 46/20 63/6 63/16
63/20 79/22 82/18 83/4 84/10
84/11 85/2 139/13 214/1
**path [1]**  120/12
**patience [1]**  18/21
**patient [5]**  179/15 179/17
211/4 213/11 213/19
**patients [6]**  179/9 188/15
211/3 211/23 212/1 212/4
**pattern [3]**  213/24 213/24
214/9
**Patty [5]**  17/11 17/16 19/17
20/10 61/17 63/5 63/24 64/2
**pay [19]**  54/15 58/19 102/12
102/14 102/15 102/23 104/17
107/12 107/14 107/16 107/20
107/21 109/8 109/16 109/24
110/14 160/13 160/14 160/15
**paycheck [1]**  103/19
**paying [2]**  48/11 142/12
**payment [1]**  103/22
**pays [6]**  108/18 108/24 108/24
115/22 116/9 136/13
**PC [1]**  1/15
**peer [2]**  121/16 131/5
**Pelot [4]**  27/25 28/16 28/22
29/11
**pen [2]**  81/22 81/22
**Pennsylvania [1]**  1/22
**penny [2]**  117/4 129/16
**people [95]**  5/15 7/7 16/13
16/14 22/8 23/23 25/15 32/2
32/12 33/7 36/15 36/15 36/21
36/22 41/23 41/25 46/2 47/12
50/8 51/2 54/12 59/2 59/4
59/13 59/16 60/18 73/23
74/17 89/23 90/6 90/7 92/1
92/9 92/11 92/25 93/5 93/18
93/20 98/7 98/11 98/12 98/14
98/15 107/12 107/20 108/6
109/3 109/4 109/4 109/5
109/5 109/6 109/8 141/1
141/3 163/5 165/7 165/10
165/14 167/9 173/1 173/5

**people -- I [1]**  207/2
**people's [2]**  104/8 141/7
**per [5]**  83/13 103/11 107/15
158/2 209/10
**percent [28]**  24/11 50/13
102/9 104/12 115/15 153/22
154/21 155/19 155/19 155/22
156/3 156/22 156/24 157/3
157/5 157/7 157/10 157/18
160/10 160/17 160/17 161/3
161/12 161/13 162/15 162/21
162/24 163/18
**percentage [4]**  59/14 108/19
109/1 109/2
**percentile [1]**  114/14
**perception [3]**  71/6 197/11
197/11
**perceptions [1]**  176/14
**perch [1]**  169/7
**perfect [2]**  107/8 144/23
**perfectly [2]**  13/22 24/14
**perform [2]**  130/6 158/16
**performed [1]**  201/18
**perhaps [7]**  70/7 71/20 94/9
113/7 145/24 168/21 213/16
**period [21]**  30/8 44/25 53/5
58/22 79/21 82/13 127/10
157/1 158/18 161/3 162/16
162/18 177/23 183/6 184/12
184/13 189/18 197/22 208/25
218/23 226/25
**periods [9]**  79/21 160/13
160/14 160/15 163/2 194/16
194/17 194/25 209/3
**permanently [1]**  225/17
**permission [1]**  190/8
**permitted [1]**  67/10
**person [48]**  5/20 17/21 44/10
47/19 47/22 51/6 51/24 55/21
57/16 71/6 72/22 73/1 74/6
80/16 89/22 90/2 90/9 90/13
90/19 91/12 91/15 91/16
92/14 95/24 101/8 107/13
108/10 109/5 113/14 126/19
140/20 166/3 166/8 166/11
167/1 171/21 172/2 172/11
172/18 175/12 182/14 183/9
191/1 193/5 193/14 195/3
195/11 198/18
**person's [6]**  80/9 101/1
101/13 101/17 118/4 191/12
**personal [5]**  113/11 113/12
146/2 166/24 212/21
**personnel [1]**  88/12
**perspective [2]**  179/16 179/19
**pharmacies [1]**  215/13
**pharmacy [1]**  215/8
**phase [1]**  187/6
**PhD [7]**  54/7 55/12 55/13
77/21 96/4 100/6 157/22
**PhDs [1]**  74/17
**phone [5]**  17/7 17/9 47/20
47/25 48/8

**phrase [5]**  179/24 214/14
216/10 216/11 217/9
**phrased [2]**  50/2 190/19
**physical [10]**  29/19 90/14
90/23 172/6 172/6 190/6
196/23 204/20 217/1 220/14
**physically [5]**  41/25 170/9
201/7 211/15 216/17
**physician [4]**  201/19 202/4
202/20 203/18
**physician's [1]**  182/25
**physicians [3]**  51/19 217/2
217/5
**physiological [9]**  172/15
172/21 176/16 176/22 204/7
204/9 204/14 205/14 205/21
**picayune [1]**  19/14
**pick [4]**  10/25 26/15 38/6
123/16
**picked [1]**  113/16
**picture [1]**  180/15
**pictures [1]**  188/7
**piece [4]**  172/17 177/8 185/11
207/20
**pieces [4]**  23/14 184/1 184/17
185/23
**piled [3]**  127/4 127/4 127/4
**pit [3]**  205/6 205/7 205/17
**place [10]**  197/5 198/17
199/18 200/20 200/22 200/25
206/13 206/14 206/20 206/22
**places [15]**  34/22 173/1
177/10 189/24 190/25 191/2
191/3 191/6 191/7 194/8
206/6 206/7 206/8 206/9
206/11
**placing [1]**  133/9
**plain [1]**  120/18
**plaintiff [4]**  1/3 62/22 113/6
168/5
**plaintiffs [4]**  1/13 40/8 64/4
64/5
**plaintiffs' [2]**  58/25 63/11
**plan [4]**  58/3 170/4 184/2
186/5
**plausible [1]**  34/13
**play [3]**  32/13 190/13 194/23
**played [2]**  8/24 11/10
**player [1]**  37/16
**players' [1]**  75/8
**playing [1]**  19/11
**please [50]**  4/10 21/25 26/12
28/12 28/23 29/15 41/2 41/10
41/12 41/14 42/4 60/8 76/20
76/23 77/9 77/16 77/24 81/14
81/15 85/25 92/19 99/10
99/11 99/19 105/4 106/3
112/21 122/11 133/23 139/21
139/24 143/20 148/1 148/8
148/19 150/22 168/24 169/1
169/15 177/13 180/8 193/13
198/11 204/9 213/4 213/9
214/11 215/6 217/22 226/22
**pleased [1]**  7/15
**PLLC [1]**  1/21
**plus [16]**  48/11 75/17 101/5
101/19 106/22 107/25 117/24
123/23 136/7 136/14 150/20
154/19 154/21 154/22 156/4
178/23
**Poe [1]**  63/7

**Poe's [3]** 17/17 62/22 63/18
**point [38]** 9/25 13/10 17/9
43/10 45/11 45/18 50/23
55/14 56/10 66/5 75/2 79/19
92/9 93/23 95/6 95/8 95/9
95/12 95/13 97/22 99/5
113/23 121/1 128/18 130/16
143/3 144/12 151/16 153/21
154/16 163/4 167/11 184/23
186/16 192/25 209/7 216/13
219/7
**points [2]** 23/18 167/6
**police [2]** 30/13 186/23
**pool [1]** 32/14
**poor [1]** 12/7
**poorly [1]** 50/1
**pops [1]** 181/8
**popular [1]** 166/18
**Population [2]** 80/19 91/3
**portable [1]** 37/16
**Porter [1]** 2/5
**portfolio [1]** 164/2
**portion [1]** 199/11
**portrays [1]** 26/2
**pose [1]** 48/4
**position [11]** 49/1 51/7 61/24
61/25 119/4 130/22 141/22
142/10 145/13 145/20 194/4
**Positive [1]** 225/5
**positively [1]** 26/3
**possesses [1]** 90/20
**possible [5]** 25/11 47/21
183/3 213/12 213/19
**possibly [3]** 5/21 22/8 216/16
**post [33]** 65/10 83/11 123/8
131/20 150/6 170/15 170/17
170/20 171/3 174/3 179/13
180/4 181/6 181/18 182/2
182/12 182/15 182/20 183/12
183/24 184/6 185/16 190/13
190/15 191/11 192/13 193/10
193/14 207/18 211/9 224/12
225/16 226/1
**post-incident [3]** 83/11 123/8
150/6
**post-injury [1]** 131/20
**post-traumatic [26]** 65/10
171/3 174/3 179/13 180/4
181/6 181/18 182/2 182/12
182/15 182/20 183/12 183/24
184/6 185/16 190/13 190/15
191/11 192/13 193/10 193/14
207/18 211/9 224/12 225/16
226/1
**postgame [1]** 226/25
**postgraduate [1]** 95/24
**potential [5]** 73/24 126/18
194/1 194/14 194/15
**potentially [1]** 166/5
**power [2]** 154/20 154/22
**practice [7]** 34/14 169/25
179/8 182/11 188/24 188/25
212/4
**practicing [1]** 49/11
**practitioner [3]** 169/22
169/23 170/2
**practitioners [1]** 171/1
**pre [4]** 48/10 147/6 150/6
150/21
**pre-assault [1]** 48/10

**pre-incident [3]** 147/6
150/21
**precautions [1]** 33/17
**preceding [1]** 206/16
**precise [3]** 56/18 56/19 93/19
**precisely [1]** 127/14
**preclude [1]** 193/9
**predicate [1]** 72/20
**predicating [1]** 94/10
**predict [3]** 117/14 126/3
129/20
**predicted [3]** 146/19 146/22
146/23
**prediction [1]** 129/22
**predictive [1]** 211/3
**preexisting [1]** 216/1
**preferred [1]** 57/11
**pregnancy [1]** 25/19
**pregnant [7]** 22/24 24/18 25/3
25/20 25/21 39/5 39/6
**prejudices [1]** 60/23
**premises [1]** 110/25
**premium [2]** 91/22 165/25
**preoccupied [1]** 176/7
**prepare [1]** 104/22
**prepared [1]** 158/23
**preparing [1]** 88/8
**preposterous [2]** 75/14 75/16
**preps [3]** 145/2 146/10 146/10
**prescribed [2]** 214/23 215/9
**prescription [1]** 214/19
**presence [3]** 33/2 69/21
118/15
**present [37]** 4/2 4/9 12/11
17/7 48/16 60/11 61/16 62/4
64/12 76/22 86/10 86/13
101/22 113/2 119/3 119/14
121/24 133/22 147/14 147/25
149/13 150/4 151/10 154/23
156/8 156/19 159/18 159/21
162/15 172/17 173/22 177/10
177/11 178/12 187/4 187/5
226/23
**presented [3]** 4/14 14/8 55/7
**presents [1]** 25/11
**presiding [1]** 9/12
**presumably [1]** 36/4
**presumption [2]** 64/20 64/24
**pretty [12]** 14/16 26/15 32/11
37/4 37/17 37/19 38/1 59/2
85/21 99/24 160/10 165/24
**prevented [2]** 35/1 35/2 67/4
**previous [4]** 46/19 47/3
125/11 185/5
**previously [5]** 24/8 26/14
27/16 38/11 139/4
**prices [1]** 138/13
**primarily [2]** 78/8 100/16
**primary [1]** 46/10
**principal [2]** 156/4 157/15
**principle [1]** 131/6
**principles [1]** 121/17
**prior [17]** 15/11 19/9 46/20
46/24 49/18 63/24 74/3 79/11
87/22 94/6 125/20 139/10
170/16 214/14 214/22 224/11
226/19
**private [2]** 46/3 51/9
**probability [2]** 42/22 78/11
**probably [14]** 8/2 8/4 23/25
25/6 42/5 46/13 49/18 50/13
73/15 155/19 165/4 165/24

**problem [17]** 110/8 111/4
111/6 111/11 115/8 132/10
132/15 171/24 177/5 178/14
178/15 178/15 185/23 185/24
185/25 206/19 213/21
**problems [14]** 31/18 33/25
47/12 51/24 130/7 182/14
207/23 208/1 208/2 212/24
213/7 213/23 213/25 216/1
**proceed [2]** 40/21 77/2
**proceedings [4]** 1/24 164/10
227/5 227/8
**proceeds [1]** 72/8
**process [9]** 121/10 129/5
130/8 131/1 187/11 187/12
202/24 203/14 225/12
**processing [4]** 185/12 185/12
187/10 219/20
**processing/restructuring [1]**
219/20
**produce [12]** 146/23 155/15
156/8 156/14 156/25 158/18
159/16 159/23 161/15 162/5
162/11 181/4
**produced [1]** 1/24
**produces [10]** 54/19 55/18
107/1 107/2 137/16 138/22
139/6 149/5 151/9 157/5
**producing [2]** 121/12 124/3
**professional [4]** 45/6 55/7
91/11 211/10
**professionals [4]** 22/15 45/20
92/10 179/7
**professor [7]** 35/8 48/24
52/18 52/19 53/5 72/24
136/24
**professors [12]** 52/16 53/6
53/7 53/10 53/22 54/1 54/2
55/9 55/22 56/3 56/3 56/4
**profoundly [1]** 85/16
**profusely [1]** 221/19
**progeny [1]** 127/15
**prognoses [1]** 194/14
**prognosis [2]** 194/12 194/15
**program [5]** 20/22 136/18
158/16 166/12 179/21
**programmer [1]** 166/2
**programmers [2]** 92/5 92/25
**programming [4]** 91/14 91/15
91/17 166/2
**programs [1]** 167/22
**progress [2]** 141/3 210/12
**progression [1]** 75/21
**project [9]** 88/25 100/22
117/3 118/23 119/19 119/21
120/5 141/20 154/24
**projected [12]** 79/25 82/9
82/10 82/21 88/17 88/19
112/7 116/16 116/19 118/10
140/11 165/7
**projecting [1]** 93/16
**projection [6]** 121/21 140/25
141/8 141/9 143/5 143/16
**projections [4]** 111/8 112/10
113/13 161/19
**projects [4]** 72/25 88/25
127/9 131/17
**prolonged [1]** 192/16
**promise [2]** 171/15 223/2
**promised [1]** 226/11
**promoted [1]** 48/13

**P**

promotions [1]  122/6
prompts [1]  118/15
prong [1]  184/18
pronged [1]  182/1
proper [1]  217/8
properly [1]  10/1
proposal [1]  148/6
proposition [1]  71/18
Protective [1]  216/19
prove [7]  62/13 62/14 68/9
  68/10 68/12 68/14 69/15
provide [5]  42/25 50/24 81/6
  98/6 123/11
provided [3]  45/5 168/8 201/3
provides [1]  53/14
providing [1]  42/19
prudently [1]  164/1
psychiatric [5]  51/18 193/9
  193/10 193/19 225/13
psychiatrist [2]  51/15 209/8
psychiatrists [1]  209/10
psychological [5]  51/18
  172/15 172/22 176/16 176/22
psychologist [1]  51/15
psychosocial [1]  224/18
psychotherapist [1]  214/22
psychotropic [1]  214/19
PTSD [16]  192/7 199/12 203/25
  207/13 207/14 207/22 208/2
  208/8 209/2 209/3 209/14
  209/17 210/2 210/8 210/14
  211/25
public [5]  33/3 38/22 38/25
  206/11 206/20
publicly [1]  38/25
published [2]  54/13 55/4
pull [5]  41/1 77/13 104/4
  139/21 213/3
punch [1]  118/23
purpose [4]  7/20 14/11 154/23
  186/24
purposes [6]  52/14 52/23
  56/13 112/4 164/9 165/20
pursuant [1]  131/1
pursue [7]  47/16 73/8 73/10
  96/17 96/18 96/19 113/7
pursued [1]  47/17
pursuing [2]  45/11 95/23
push [1]  186/16
put [19]  10/12 25/17 56/9
  68/5 84/25 86/16 99/9 99/16
  104/14 107/14 110/22 117/19
  119/24 155/12 159/15 176/21
  191/16 194/20 213/9
puts [3]  8/19 33/15 83/13
putting [1]  34/6
puzzled [1]  203/5

**Q**

quack [1]  125/1
quackery [2]  127/10 127/11
qualification [1]  35/20
qualifications [2]  74/10
  126/22
qualified [4]  48/10 74/7
  74/12 96/12
qualifies [1]  96/5
qualitative [2]  55/15 90/15
quarters [2]  34/1 34/19
question [41]  12/8 12/25

  26/1 48/3 48/4 48/6 50/2
  58/25 76/6 81/9 91/23 98/3
  104/19 115/22 116/4 116/12
  118/5 118/8 118/12 118/12
  118/21 120/4 120/5 120/16
  150/8 150/22 153/6 165/3
  185/5 188/12 192/6 193/2
  193/12 209/23 215/23 216/3
questioning [3]  74/10 74/11
  217/12
questions [19]  6/24 8/25
  14/15 39/14 39/25 67/14
  87/16 118/14 119/16 158/20
  164/16 196/9 199/18 199/25
  200/3 215/21 217/17 222/15
  223/12
quick [1]  223/4
quickly [1]  26/15
quite [6]  33/7 48/3 73/12
  127/24 146/11 187/20
quotation [1]  28/23
quote [6]  6/5 29/8 29/9 30/7
  30/8 69/7

**R**

racing [4]  204/15 205/3
  205/15 206/1
raise [14]  117/14 117/17
  117/25 118/9 118/9 118/23
  118/24 120/8 120/9 120/20
  140/23 144/21 146/24 168/25
raises [9]  117/9 120/12 121/7
  122/3 122/5 125/17 127/3
  140/11 141/6
range [3]  157/17 173/6 177/21
rape [13]  5/21 6/11 6/14 9/18
  9/22 15/11 60/5 68/14 196/23
  201/18 202/2 203/22 223/25
raped [8]  5/15 6/6 7/7 17/2
  68/10 211/15 220/4 220/8
rapport [1]  184/11
rare [2]  208/24 208/24
rate [49]  86/19 87/2 101/16
  101/16 102/8 102/19 117/17
  118/10 127/9 139/1 139/3
  139/4 141/6 146/19 146/22
  148/15 151/10 154/7 154/19
  154/21 155/14 155/16 157/5
  157/7 157/19 157/24 157/24
  157/25 158/1 158/3 158/6
  158/17 159/22 160/5 160/7
  160/8 161/2 161/10 161/12
  161/21 162/14 162/16 162/17
  162/17 162/21 163/7 163/10
  163/16 164/3
rates [16]  101/21 101/21
  140/11 156/19 156/21 157/18
  158/13 159/19 160/3 160/3
  160/4 160/10 161/23 162/23
  163/1 163/3
rather [7]  72/15 88/25 114/17
  118/12 148/3 203/5 215/8
raw [3]  90/10 90/12 166/16
reaction [4]  25/4 202/24
  211/14 224/19
reactions [1]  180/18
read [18]  24/9 27/3 27/4 27/7
  27/9 28/14 30/17 30/21 51/17
  74/16 81/25 130/3 142/20
  143/25 182/19 183/5 189/4
  209/11

reading [5]  27/2 189/3 189/5
  189/5 225/18
ready [5]  36/16 100/2 115/6
  128/1 143/18
real [18]  161/10 161/12
  161/22 162/2 162/3 162/4
  162/5 162/19 162/21 163/17
  172/4 182/4 188/8 194/13
  209/18 210/12 223/4 226/6
real-life [1]  182/4
reality [3]  97/5 121/11 127/7
really [43]  7/20 8/5 10/6
  16/7 19/10 24/4 28/24 29/6
  32/11 33/19 35/4 35/15 36/3
  39/21 45/9 55/20 55/24 60/4
  70/16 71/8 74/16 75/4 78/23
  85/17 91/20 92/15 113/12
  120/4 131/25 160/12 163/1
  163/1 164/4 165/22 175/16
  185/7 188/12 192/10 200/25
  205/22 210/6 210/17 210/17
reason [19]  11/2 11/5 19/13
  20/12 22/18 33/21 34/24
  34/25 67/11 67/21 67/21
  121/12 123/6 128/11 142/21
  145/24 146/6 148/5 159/4
reasonable [7]  42/22 47/24
  48/6 49/1 78/11 145/9 146/4
reasoning [1]  129/8
reasons [2]  56/25 61/14
reassert [1]  10/17
rebut [3]  64/19 64/24 65/1
rebuttal [1]  68/4
recall [33]  8/11 13/6 13/8
  13/10 21/10 22/11 22/18
  22/20 23/1 23/2 23/7 23/9
  23/19 24/8 33/14 34/20 87/22
  88/16 114/4 173/2 177/14
  183/16 183/18 195/6 198/8
  199/4 199/5 209/10 218/15
  222/9 222/11 222/14 225/19
recalled [1]  22/22
recalling [2]  22/4 222/11
recalls [1]  219/1
receivable [1]  129/23
receive [2]  87/20 141/15
received [3]  42/7 50/22
  134/14
recent [20]  19/19 19/21 60/17
  61/1 61/3 61/4 61/4 61/19
  61/20 61/20 62/2 62/20 64/20
  64/24 65/1 66/11 66/16 66/25
  71/17 133/6
recently [7]  14/11 19/23
  19/23 19/24 63/6 65/19
  214/15
Recess [3]  60/10 119/13
  147/24
recessed [1]  227/5
recognize [1]  88/3
recognized [3]  50/17 54/13
  131/5
recognizing [1]  186/6
recollection [5]  61/20 69/18
  198/17 198/23 202/7
recommend [1]  185/2
recommendations [1]  45/22
reconnected [1]  63/6
record [14]  46/18 64/6 66/12
  71/13 72/20 73/7 88/12 91/4
  126/6 129/12 133/21 138/20

**record...** [2]  164/9 227/8
**recorded** [4]  1/24 22/15 23/7
23/23
**records** [17]  25/8 44/17 46/18
47/6 51/18 51/22 58/14 63/7
63/18 88/11 88/13 90/19
195/22 215/9 215/13 223/11
224/22
**recover** [2]  181/6 181/9
**recovered** [9]  14/11 19/7 20/6
65/8 65/9 71/19 219/11
219/13 219/14
**recovering** [1]  20/20
**recovery** [2]  181/2 211/21
**recurrences** [1]  195/1
**recurrent** [2]  172/12 172/13
**redirect** [5]  38/12 74/21
74/22 168/4 223/6
**reduce** [8]  86/9 112/18 182/2
186/19 186/20 187/1 191/15
219/6
**reduces** [2]  138/18 139/3
**reducing** [2]  150/2 186/24
**reduction** [5]  115/18 134/1
150/4 181/5 182/9
**reexperience** [1]  172/11
**reexperiencing** [7]  172/12
172/14 172/17 176/2 176/23
192/15 204/5
**refer** [1]  203/15
**reference** [2]  62/10 75/19
**referencing** [1]  32/24
**referral** [1]  46/6
**referring** [5]  66/21 92/22
105/9 200/22 201/1
**refilled** [1]  215/11
**reflect** [2]  85/9 212/13
**Reflecting** [1]  19/6
**reflects** [2]  102/21 141/3
**refresh** [2]  35/19 69/18
**refreshed** [1]  69/16
**refuses** [1]  127/7
**regard** [1]  57/24
**regarding** [3]  14/12 116/17
164/25
**regret** [1]  39/20
**regular** [4]  120/13 125/17
195/1 215/18
**rehab** [3]  49/15 75/4 146/5
**rehabilitation** [22]  41/15
41/17 41/19 41/19 41/22 42/8
42/11 42/14 42/16 42/17
42/19 43/22 44/4 45/1 45/5
45/6 45/23 88/6 119/7 126/19
142/14 144/16
**rehash** [1]  9/3
**reiterate** [1]  39/24
**relate** [1]  190/21
**related** [11]  78/17 78/18
92/17 93/21 94/3 94/15 95/11
96/20 97/17 192/4 205/23
**relationship** [1]  127/7
**relative** [1]  163/8
**relaxation** [1]  185/22
**relevance** [1]  69/8
**relevant** [17]  82/16 97/2
97/9 97/10 98/11 98/12
98/16 98/20 98/23 99/2 99/6
199/8 199/10 214/8 214/9
215/21 216/12

**relied** [2]  79/12 128/13
**relive** [1]  185/17
**rely** [1]  144/17
**relying** [2]  107/24 222/5
**remain** [4]  96/17 112/9 121/7
142/10
**remained** [1]  119/3
**remaining** [1]  141/15
**remains** [4]  121/8 124/5
151/12 151/13
**remarkable** [1]  63/2
**remember** [23]  8/5 8/6 8/12
12/4 12/6 12/8 12/18 16/18
16/22 33/19 33/20 34/21
35/19 36/11 61/18 166/7
177/16 193/6 200/18 219/8
220/20 220/22 222/13
**remembered** [2]  20/5 218/7
**remembering** [4]  46/8 46/11
214/1 214/7
**remembers** [2]  8/8 8/14
**remind** [5]  177/11 191/6 194/9
206/6 207/3
**reminded** [3]  19/25 61/17 71/4
**reminiscent** [2]  172/16 206/14
**remission** [4]  181/7 194/16
194/25 209/14
**remotely** [3]  14/6 47/20 75/9
**remove** [2]  28/23 168/21
**reoccurring** [2]  172/13 172/20
**repeat** [1]  104/1
**repeatedly** [4]  60/20 60/21
62/6 71/12
**rephrase** [1]  182/20
**replace** [1]  158/12
**report** [53]  28/14 30/7 30/11
30/13 30/17 30/21 30/23 31/1
45/11 52/2 52/3 52/5 53/2
54/17 56/2 56/9 56/11 72/5
74/16 79/22 79/23 80/16
82/20 87/21 87/23 87/23
88/23 89/16 113/21 119/24
119/25 120/1 120/7 122/8
125/12 129/13 130/3 131/14
135/13 143/9 143/25 144/4
144/10 155/17 155/21 156/20
158/23 159/20 160/2 168/21
190/5 213/25 216/6
**reported** [13]  23/3 23/20 25/1
27/24 104/25 174/24 198/13
204/11 204/13 204/21 216/18
217/2 217/5
**REPORTER** [2]  2/13 227/13
**Reporter's** [1]  227/7
**reporting** [1]  110/15
**reports** [8]  24/9 30/25 31/2
31/4 205/8 205/9 213/12
213/19
**represent** [7]  5/4 49/10 87/12
173/2 190/1 196/8 220/3
**representation** [4]  20/15 61/2
188/5 188/6
**representative** [1]  93/6
**represents** [9]  63/10 134/9
139/9 141/14 142/17 159/18
160/12 162/19 172/16
**request** [1]  15/2
**require** [1]  211/21
**required** [2]  33/12 189/18
**requirements** [1]  204/6
**research** [10]  182/13 191/21

209/25 210/6 211/10 226/5
**Reserve** [1]  87/3
**residence** [1]  50/7
**resilience** [4]  181/1 181/10
181/11 181/13
**resolve** [2]  210/3 210/24
**resolved** [3]  177/23 177/24
177/25
**resolves** [1]  210/2
**resolving** [1]  211/11
**resources** [4]  14/22 15/1 18/5
92/4
**respect** [12]  64/12 67/1 68/20
70/19 122/17 125/1 129/20
170/7 174/15 181/15 190/14
190/15
**respecting** [1]  186/12
**respond** [1]  186/10
**response** [27]  19/4 62/9 73/18
73/19 121/20 125/8 125/9
152/25 172/8 172/15 172/21
172/22 173/16 175/1 175/6
175/12 175/18 176/17 178/16
191/18 195/4 199/20 200/10
204/7 204/20 208/5 223/21
**responses** [6]  183/13 204/10
204/14 204/21 205/14 205/21
**responsibility** [1]  39/11
**responsive** [2]  215/21 215/23
**rest** [4]  30/17 144/6 144/21
194/19
**restate** [2]  190/17 193/12
**restricted** [2]  173/6 177/21
**restructuring** [1]  219/20
**result** [5]  30/19 138/9 140/8
204/1 219/11
**resume** [3]  4/11 20/22 148/7
**resurrected** [2]  19/23 19/24
**retained** [1]  50/5
**retire** [1]  82/25
**retirement** [3]  115/23 134/10
134/18
**return** [30]  35/14 35/21 47/16
89/7 103/6 103/9 104/5
104/14 106/2 109/15 109/22
109/23 110/16 155/14 157/5
157/8 157/24 158/6 158/17
161/2 161/13 162/14 162/17
162/17 162/19 162/21 163/7
163/10 163/17 164/3
**returned** [3]  47/7 170/19
174/11
**returning** [2]  34/1 59/23
**returns** [11]  46/17 88/11
103/11 103/24 103/25 104/22
107/13 107/15 107/21 110/2
110/14
**review** [6]  52/1 88/8 135/22
140/7 143/17 145/11
**reviewed** [11]  23/19 23/21
23/23 47/6 88/11 88/12
121/16 131/5 135/18 135/19
135/20
**reviewing** [2]  47/6 51/22
**Rice** [11]  53/11 53/21 54/2
56/3 74/18 166/9 166/10
167/1 167/7 167/14 167/18
**Rice University** [1]  53/11
**Richmond** [2]  1/17 1/20
**ridiculous** [1]  112/12
**right** [192]  7/12 9/13 10/16

**R**

right... **[189]** 10/21 11/16
11/23 12/17 13/13 15/9 16/1
17/21 23/9 23/25 24/7 24/11
24/19 24/23 26/4 27/14 28/1
28/3 28/12 28/22 30/22 31/3
31/6 31/11 31/13 31/24 32/21
35/15 35/17 35/23 35/24 36/4
43/5 44/21 49/5 49/22 50/10
50/14 50/16 51/1 51/12 52/2
52/2 52/12 52/20 52/21 55/1
55/3 56/17 60/25 61/3 62/1
64/17 70/21 71/8 80/6 80/17
81/3 81/21 82/1 83/4 83/19
84/6 84/24 85/4 87/15 87/20
87/24 88/8 88/17 89/6 90/22
96/9 96/15 97/8 98/10 99/9
99/15 100/25 101/23 102/10
102/15 103/21 104/10 105/8
105/8 105/18 105/23 106/7
106/25 107/23 110/20 112/1
112/3 114/19 115/11 115/18
116/15 117/1 119/2 120/22
123/15 123/18 123/25 124/23
125/11 125/22 131/8 133/11
134/13 135/10 135/24 136/3
137/6 137/23 138/25 139/15
139/17 140/22 141/10 141/22
142/9 142/16 142/22 143/21
145/1 146/14 147/12 148/12
149/11 149/15 149/18 150/14
150/18 152/3 152/12 152/12
153/14 153/19 153/21 154/14
155/10 156/1 156/11 159/3
160/23 161/5 162/3 162/4
162/5 165/13 168/25 170/14
176/7 178/1 178/18 179/9
182/3 184/3 185/15 185/15
185/17 185/20 185/20 186/1
186/1 187/25 197/24 198/7
198/8 198/11 199/2 199/6
200/9 201/6 202/14 204/19
205/12 205/16 206/2 206/2
211/7 213/13 213/14 215/2
217/18 219/9 223/22 224/25
**right-hand [1]** 105/8
**rights [3]** 186/11 186/11
186/12
**rigs [1]** 34/9
**rise [3]** 60/9 112/21 226/22
**risk [6]** 163/10 163/14 163/16
163/21 163/23 164/6
**risk-free [2]** 163/10 163/14
**risky [1]** 163/23
**Riverway [3]** 1/16 1/19 2/11
**road [7]** 36/11 94/23 116/9
125/25 170/15 170/17 170/20
**roads [1]** 36/8
**role [3]** 78/14 92/12 127/12
**roll [1]** 116/15
**Ron [1]** 1/18
**room [13]** 7/17 10/15 10/23
11/6 11/15 11/23 11/25 13/12
49/24 51/20 115/3 195/21
195/21
**roommate [1]** 18/14
**ROOT [2]** 1/6 1/7
**ROTC [1]** 167/9
**rough [2]** 115/6 115/6
**roughly [3]** 34/1 36/25 36/25
**round [2]** 21/20 173/16

routes [1] 95/15
**routinely [2]** 215/3 215/4
**rule [1]** 69/25
**rules [2]** 12/20 68/24
**ruling [2]** 69/25 70/20
**Rumba [1]** 12/6
**run [4]** 34/11 51/19 58/22
148/14
**Runions [1]** 2/4
**Rusk [1]** 2/15
**rustling [1]** 131/23
**résumé [1]** 74/2

**S**

**sacrifice [1]** 35/6
**safe [2]** 38/16 218/3
**safer [2]** 39/1 163/25
**safety [2]** 33/17 184/7
**said [67]** 6/5 9/16 9/17 9/20
10/15 11/12 11/19 13/10
13/12 14/1 20/5 22/23 24/12
26/11 28/23 30/13 30/23 31/1
34/10 44/13 60/20 62/23
62/25 63/1 63/5 63/23 64/6
64/10 67/24 69/7 70/9 71/19
71/20 71/25 97/6 114/11
116/4 129/25 131/13 136/16
144/8 144/23 156/16 157/17
160/7 160/9 165/20 165/22
166/16 175/3 176/1 179/8
179/16 191/24 196/20 198/19
199/22 200/24 201/9 208/15
220/7 220/11 221/12 221/12
221/15 221/22 226/3
**Sailor [2]** 27/10 27/12
**salaries [5]** 46/12 54/5 75/9
86/5 127/2
**salary [21]** 48/11 52/8 54/18
54/18 86/7 90/9 91/5 102/1
102/5 115/19 116/19 116/23
117/9 117/21 117/24 118/2
118/4 140/9 140/9 145/18
146/23
**sales [2]** 92/4 92/4
**Sam [1]** 78/6
**same [52]** 8/22 10/17 14/7
27/6 33/8 45/24 46/6 56/11
65/10 83/22 84/10 90/24
90/24 95/7 108/19 108/24
108/24 109/1 109/1 109/8
117/20 117/22 118/19 119/19
119/21 119/21 121/5 121/7
121/8 127/8 128/5 132/4
141/22 142/7 142/9 142/24
149/25 150/3 150/10 150/12
152/9 153/12 153/15 158/1
166/8 166/25 167/17 173/10
173/17 196/9 214/12 216/7
**San [5]** 21/10 38/17 170/19
174/10 208/18
**San Diego [1]** 208/18
**sandwich [1]** 8/2
**sarcastic [1]** 95/21
**sat [1]** 37/8
**satellite [2]** 55/2 75/6
**saw [5]** 10/9 23/24 30/14
31/1 145/18
**say [68]** 4/3 4/5 6/13 20/4
20/7 25/9 27/6 43/2 44/23
45/15 46/10 47/5 50/1 50/13
51/10 51/19 51/21 51/23 53/4

59/19
62/15 62/19 63/22 65/2 66/10
67/23 70/24 71/15 74/24
75/20 90/2 91/10 91/16 91/18
92/3 97/5 97/16 99/1 101/13
102/16 120/23 126/2 126/4
130/1 131/12 132/21 137/10
140/25 146/12 149/15 167/6
171/19 177/22 178/20 178/23
180/3 184/21 184/25 185/15
211/23 216/4 219/18 223/15
223/18
**saying [19]** 6/10 17/2 55/23
73/12 97/15 125/23 129/8
135/20 150/7 151/24 151/25
155/3 156/11 156/11 157/16
158/9 162/13 178/6 226/13
**says [13]** 62/25 71/15 119/9
121/24 122/4 126/12 129/25
130/4 131/16 143/11 212/5
213/11 226/6
**Scarano [2]** 227/2 227/3
**scenario [15]** 72/17 73/3 82/6
83/15 84/1 84/9 84/16 85/6
99/10 102/2 106/3 114/24
135/14 135/14 159/2
**Scenario 1 [1]** 102/2
**Scenario 4 [1]** 85/6
**scenarios [19]** 72/17 72/19
72/20 73/4 74/14 81/4 84/23
85/3 88/18 88/20 89/7 94/8
95/3 97/24 113/22 114/12
130/17 132/8 165/10
**scene [2]** 10/24 11/14
**schedule [3]** 36/3 37/5 38/3
**school [31]** 37/10 37/23 37/24
38/2 45/3 46/23 73/2 75/6
75/8 77/25 78/3 80/10 83/16
89/8 95/18 97/19 102/3
111/15 113/7 113/25 114/15
130/18 140/14 140/14 140/20
141/2 141/13 146/8 165/11
167/21 206/24
**schools [1]** 167/24
**Schulz [9]** 202/19 202/23
220/11 220/12 220/16 220/21
220/23 220/25 221/7
**science [13]** 42/6 73/9 77/19
90/14 91/1 91/8 91/12 99/2
99/22 166/9 166/10 167/2
167/14
**scope [7]** 4/15 11/10 11/21
18/11 19/3 191/5 206/11
**scores [1]** 80/11
**scraped [1]** 200/17
**scream [1]** 173/19
**screen [2]** 4/8 99/10
**screens [1]** 151/4
**se [1]** 209/10
**sea [1]** 33/12
**sealed [2]** 11/23 11/25
**seat [7]** 20/23 40/13 40/14
76/15 85/24 168/23 168/24
**seated [7]** 4/10 76/20 76/21
76/23 113/3 133/23 148/1
**second [11]** 37/25 79/23 81/7
82/22 82/22 83/19 83/21
83/22 89/10 99/12 219/3
**section [1]** 81/17
**sector [1]** 51/9
**security [8]** 13/4 14/21
105/16 107/25 108/14 108/19

**security... [2]** 109/1 115/24
**see [99]** 9/8 9/9 23/16 28/15
 28/16 28/22 30/9 30/10 71/5
 76/1 77/25 78/5 84/24 98/14
 100/17 103/9 103/14 105/8
 105/12 105/13 105/14 105/15
 105/16 105/17 105/18 105/19
 105/21 106/6 106/8 106/9
 106/13 106/14 106/15 106/16
 106/17 106/18 106/20 106/23
 106/25 107/3 112/7 115/21
 121/6 128/25 134/8 135/7
 136/12 136/20 137/3 139/7
 140/3 141/5 142/4 142/7
 142/8 143/13 149/17 151/19
 151/24 151/25 152/7 152/8
 152/14 155/6 155/23 159/12
 159/13 159/16 160/16 162/23
 165/4 175/15 175/20 176/23
 179/24 180/11 180/14 180/15
 180/16 184/10 193/12 201/14
 203/25 205/15 205/17 205/17
 205/18 207/16 208/20 210/12
 210/15 213/2 213/13 215/10
 215/15 215/18 220/19 223/8
 223/10
**seeing [4]** 13/6 13/7 13/8
 208/14
**seem [2]** 146/4 210/10
**seems [5]** 23/13 23/15 45/17
 111/23 192/9
**seen [12]** 13/20 28/18 28/19
 31/2 31/4 71/8 180/9 180/18
 188/7 208/25 210/15 210/16
**segments [1]** 79/14
**self [3]** 42/19 62/21 178/4
**self-employed [1]** 42/19
**self-serving [1]** 62/21
**semester [4]** 35/12 35/13
 37/20 38/1
**senior [1]** 92/5
**sensational [1]** 19/9
**sense [7]** 23/9 64/12 91/7
 93/25 107/5 107/7 107/8
 129/18 133/19 144/19 144/19
 144/23 173/4 173/8 173/9
 177/19 177/22 184/7 194/3
**senses [3]** 197/8 197/18
 197/25
**sensitive [1]** 5/17
**sensory [1]** 197/11
**sentence [4]** 4/4 26/20 27/9
 216/25
**separate [11]** 72/18 81/3
 103/3 119/24 120/3 123/13
 128/20 161/21 161/25 164/24
 176/22
**September [2]** 215/16 215/17
**serious [1]** 172/5
**seriously [1]** 18/16
**served [1]** 197/6
**services [6]** 1/7 42/2 42/19
 43/8 45/5 216/19
**serving [1]** 62/21
**session [1]** 219/14
**set [9]** 29/14 92/21 93/7
 126/10 126/10 128/4 128/6
 129/1 197/5
**sets [1]** 93/3
**setting [1]** 144/2

178/7
**several [8]** 25/22 32/23 67/25
 118/18 165/10 185/1 213/20
 222/4
**severe [3]** 221/14 221/17
 221/18
**sex [10]** 198/18 199/3 199/21
 200/7 200/10 200/13 214/7
 221/24 222/1 222/5
**sexual [4]** 18/1 18/8 213/19
 217/1
**sexually [2]** 217/3 217/6
**shaken [2]** 184/25 205/18
**Shaking [1]** 203/3
**shall [1]** 121/21
**shampoo [1]** 12/3
**shape [1]** 124/20
**share [2]** 209/12 216/15
**Sharon [2]** 2/9 196/7
**she [530]**
**she'll [1]** 125/24
**she's [49]** 4/8 9/2 14/2 25/3
 36/19 54/22 54/22 54/25 62/3
 64/14 65/10 71/11 72/23
 82/10 82/24 83/12 94/4 95/9
 103/6 103/7 108/3 115/23
 115/24 119/4 125/21 125/21
 126/3 126/14 128/12 128/16
 131/15 131/17 131/25 135/3
 144/3 145/1 145/10 178/4
 178/13 180/19 182/24 188/7
 188/8 192/1 209/9 209/9
 213/17 219/5 224/25
**ship [6]** 31/12 33/6 33/13
 33/17 34/1 35/4
**ships [1]** 32/1
**shoe [1]** 173/15
**shopping [1]** 33/3
**short [5]** 119/11 163/7 191/15
 194/17 226/17
**short-term [2]** 163/7 191/15
**shorten [2]** 73/16 73/17
**shortly [3]** 33/11 47/18 199/5
**should [19]** 19/6 19/25 27/11
 58/21 64/4 67/6 67/17 68/21
 71/15 73/15 75/24 112/16
 125/2 126/4 126/14 130/23
 132/17 180/6 182/20
**shoulder [2]** 33/8 33/8
**shouldn't [1]** 114/13
**show [16]** 13/17 19/15 19/18
 20/1 30/8 64/11 81/20 84/22
 95/3 107/10 107/13 110/15
 122/11 122/22 143/24 171/9
**showed [4]** 31/5 74/2 108/2
 125/12
**shown [8]** 83/9 107/8 107/9
 116/10 116/24 140/17 182/13
 188/7
**shows [16]** 30/11 30/17 82/8
 82/8 82/13 82/14 82/17 82/23
 83/12 98/6 107/9 107/12
 108/9 140/16 141/1 153/18
**shut [1]** 189/5
**side [18]** 12/19 63/11 70/11
 70/12 74/4 78/2 117/25 123/8
 129/6 139/21 139/21 147/3
 147/5 147/6 148/16 150/6
 150/21 152/17
**sidebar [2]** 18/25 110/6
**sides [5]** 18/22 147/1 147/5

**sideways [1]** 54/8
**sight [2]** 198/2 198/2
**signaling [1]** 71/8
**significant [3]** 8/16 173/25
 181/12
**similar [3]** 14/21 56/12 93/20
**similarity [2]** 206/16 206/20
**simple [2]** 105/23 168/1
**simpler [1]** 132/6
**simply [22]** 14/7 30/19 67/23
 73/12 74/11 78/15 86/13
 97/11 107/9 110/16 110/25
 117/21 121/23 123/1 131/7
 133/8 150/19 151/3 151/3
 152/18 154/19 168/1
**Simultaneously [1]** 208/12
**since [7]** 20/11 20/14 42/19
 59/23 148/4 174/9 177/5
**single [2]** 67/21 117/4
**sipping [2]** 197/18 197/21
**sir [114]** 7/24 8/12 9/20
 10/14 11/4 12/15 13/2 15/14
 15/24 16/9 16/22 17/1 17/5
 17/14 18/3 18/12 22/14 26/16
 29/3 40/19 41/10 41/11 41/24
 42/6 42/15 43/6 43/20 44/16
 48/12 48/25 49/3 49/13 50/6
 50/21 51/3 51/8 51/11 52/7
 52/10 54/10 54/16 54/16
 54/20 55/3 55/6 55/11 55/19
 56/10 56/23 56/24 57/2 57/4
 57/19 57/22 57/25 58/11
 58/14 58/18 58/20 58/24
 59/18 60/3 60/14 62/18 76/14
 76/20 77/14 78/12 81/21
 88/22 89/9 89/15 96/3 96/7
 96/23 98/9 99/23 101/7
 104/23 105/21 107/8 107/22
 115/8 116/14 122/13 122/17
 123/1 123/2 131/12 132/3
 136/22 137/18 141/17 141/19
 142/1 143/1 144/8 145/12
 151/1 153/3 153/10 156/6
 158/20 160/9 160/12 161/18
 163/8 164/20 165/2 165/16
 169/21 170/8 179/14 222/25
**sit [19]** 29/10 48/20 99/7
 127/25 131/15 132/21 134/21
 143/3 144/14 145/7 158/5
 158/9 158/22 159/25 160/6
 161/14 163/1 166/21 169/24
**sitting [8]** 22/17 37/13 48/21
 164/21 178/1 186/16 222/13
 223/8
**situation [16]** 5/17 15/24
 44/24 45/2 45/2 45/7 50/25
 72/6 72/21 93/25 104/21
 104/21 146/2 161/1 186/10
 188/11
**situations [5]** 93/24 173/1
 177/10 182/4 210/23
**six [13]** 11/17 62/25 65/8
 69/23 78/5 78/8 178/5 180/9
 192/2 208/14 208/17 209/5
 223/13
**six-year [1]** 208/17
**sixth [1]** 88/24
**skewed [1]** 130/9
**skill [8]** 50/19 51/5 92/21
 92/23 93/7 97/19 128/4 128/5
**skills [3]** 42/2 50/17 57/17

34

**skip [1]**  34/11
**skipped [1]**  34/14
**sleep [2]**  29/17 32/7
**slide [1]**  84/23
**small [8]**  57/7 145/25 170/23
177/23 184/16 190/24 191/2
218/2
**smaller [2]**  101/18 165/25
**smart [1]**  126/23
**snapped [1]**  23/12
**snapshot [1]**  140/3
**snippets [4]**  217/25 218/7
218/9 218/20
**so [258]**
**so, [1]**  97/7
**so, what [1]**  97/7
**sober [2]**  29/17 29/19
**sobered [1]**  29/16
**social [12]**  105/15 107/25
108/14 108/19 109/1 115/24
169/17 169/21 173/25 190/22
212/21 218/9
**socialize [1]**  197/5
**socializing [1]**  197/4
**Socially [1]**  190/23
**societies [2]**  55/7 55/8
**Society [1]**  41/20
**sodomized [1]**  211/16
**solely [1]**  25/17
**solemnly [3]**  4/19 40/15 169/2
**solving [3]**  185/23 185/25
185/25
**some [85]**  8/2 11/1 44/17
47/12 51/10 56/5 57/10 59/4
59/13 59/13 59/16 59/25 67/8
69/9 74/5 74/5 78/21 87/16
88/12 88/13 89/24 90/3 92/9
94/15 97/12 97/12 97/18
98/23 100/4 100/19 108/6
109/3 109/3 109/4 109/5
109/5 109/6 113/11 113/25
114/13 114/17 118/20 122/19
127/7 134/18 142/11 163/2
164/18 167/22 171/11 173/20
174/1 181/5 181/5 181/5
181/7 181/8 183/23 185/21
187/3 187/4 187/13 187/14
189/19 191/1 193/8 194/16
194/16 195/18 196/9 197/4
197/16 200/18 206/13 206/15
206/20 212/20 215/8 216/4
221/3 222/12 223/13 223/15
223/17 225/18
**somebody [22]**  5/21 11/12 14/1
20/10 62/3 62/22 66/22 69/4
70/14 75/5 75/8 111/8 114/19
126/4 167/2 173/17 180/12
192/14 205/18 205/24 211/15
222/22
**someone [30]**  32/18 32/19
32/20 41/22 51/5 56/18 62/24
74/4 90/23 90/25 91/8 91/10
95/21 166/5 166/6 166/25
172/7 173/18 183/12 188/21
190/20 197/7 198/15 198/20
198/20 207/23 211/13 217/6
219/4 222/22
**someone's [4]**  56/24 90/16
93/16 173/7
**someplace [1]**  189/3

**something [48]**  4/13 10/8 11/24
17/3 19/8 21/14 21/17 29/18
38/24 55/8 63/7 65/23 66/11
69/6 85/18 85/20 95/8 96/19
97/2 97/3 105/1 112/2 114/15
117/13 125/20 142/20 143/15
173/10 173/15 176/5 181/10
184/3 189/4 190/9 192/8
203/4 203/6 203/9 203/22
204/16 204/17 206/2 219/19
220/15 220/18 221/10 224/2
224/8 224/19
**sometime [1]**  223/19
**sometimes [6]**  139/22 176/7
180/25 184/4 219/17 219/18
**somewhat [3]**  23/15 24/12
208/20
**somewhere [10]**  34/16 36/12
47/20 52/8 54/9 54/10 58/9
75/18 142/11 162/15
**sore [1]**  200/15
**soreness [2]**  200/16 200/17
**sorry [30]**  11/24 12/25 26/11
39/16 39/19 46/24 65/24
96/17 104/1 124/16 131/21
131/22 135/2 141/8 154/7
156/6 156/12 159/9 161/8
163/22 171/17 175/11 175/11
175/25 177/12 179/11 182/7
185/8 205/1 225/16
**sort [9]**  4/4 8/15 21/20 24/24
100/25 166/7 182/7 195/18
210/19
**sorts [2]**  185/4 218/14
**sought [1]**  209/15
**sound [4]**  130/21 131/5 198/2
198/3
**sounds [3]**  35/16 35/17 35/23
**source [1]**  46/6
**SOUTHERN [1]**  1/1
**span [2]**  208/17 215/18
**spanned [1]**  203/19
**speak [12]**  21/25 40/20 64/7
65/25 66/12 79/21 82/3 169/7
171/7 196/13 211/10 212/1
**speaking [2]**  205/1 214/20
**specialty [1]**  89/17
**specific [17]**  9/25 12/8 22/15
46/11 46/12 52/24 53/20
97/19 129/20 182/22 183/18
203/9 207/3 207/5 209/21
215/5 224/14
**specifically [11]**  8/8 8/14
11/5 12/4 56/22 60/6 88/23
174/22 182/8 199/5 204/9
**spectrum [1]**  210/20
**spend [1]**  36/12
**spending [1]**  36/22
**spent [4]**  43/4 43/9 78/1 78/6
**spite [1]**  181/11
**spoken [6]**  5/5 16/10 16/13
16/15 25/6 70/7
**spontaneous [1]**  69/15
**spontaneously [1]**  69/16
**spreadsheet [2]**  158/15 160/1
**spring [1]**  35/12
**stable [2]**  112/9 131/3
**stage [3]**  55/16 55/17 73/14
**stand [21]**  6/2 14/10 16/25
17/19 20/6 24/5 40/9 40/11
62/23 65/20 68/20 70/10
72/11 76/4 76/13 81/10

**stable [1]**  168/19
226/20
**standard [2]**  45/20 121/5
**standing [3]**  186/10 186/11
207/23
**standpoint [4]**  51/25 53/15
138/2 225/13
**Star [1]**  114/6
**start [15]**  31/21 75/18 102/1
102/5 115/19 118/8 123/16
123/16 123/19 125/13 176/5
181/25 184/6 184/16 190/7
**started [5]**  48/12 114/16
171/19 197/8 199/17
**starting [12]**  42/5 44/8 77/16
81/18 83/9 93/23 95/6 95/8
95/9 95/12 95/13 140/9
**startle [2]**  173/16 178/16
**starts [2]**  110/10 218/2
**state [18]**  8/10 16/6 16/24
41/12 42/7 42/9 52/9 52/11
53/18 53/24 54/8 55/22 77/9
78/2 78/7 78/10 144/10 224/3
**stated [16]**  23/4 23/18 26/20
26/25 27/5 27/10 27/12 45/11
108/19 113/21 119/23 120/1
122/7 135/13 143/1 143/3
**statement [43]**  6/5 6/8 13/7
13/8 14/12 14/18 14/21 14/22
14/25 15/3 15/6 15/9 15/19
15/21 15/22 15/24 16/4 16/11
16/16 19/7 19/7 19/12 19/13
23/16 28/4 28/25 29/5 29/8
29/11 30/7 43/19 62/21 64/15
65/2 67/16 69/10 69/14 69/15
69/17 69/19 70/8 102/18
104/12
**statements [9]**  23/20 24/10
27/15 27/16 28/12 28/15
28/20 29/12 79/10
**stateroom [2]**  32/6 33/11
**states [12]**  1/1 1/11 27/18
27/23 30/7 108/18 129/19
143/22 144/1 144/18 163/20
223/20
**Station [1]**  78/3
**statistical [14]**  55/17 56/19
57/13 91/25 92/1 92/6 93/7
93/21 93/22 98/5 98/16
107/18 141/9 179/7
**statistician [2]**  72/7 72/25
**statistics [13]**  51/10 53/14
57/20 80/3 80/21 86/25 87/2
90/3 91/2 100/17 107/24
113/15 129/2
**Statistics' [1]**  80/23
**status [1]**  44/10
**stay [15]**  10/1 32/6 37/18
40/4 55/6 61/13 95/21 97/1
117/22 141/22 142/6 142/9
153/11 177/4 188/22
**stay-at-home [1]**  37/18
**stayed [12]**  83/16 94/18 94/19
94/21 94/22 95/14 117/14
124/22 124/23 130/17 141/12
141/13
**staying [3]**  125/23 173/12
178/11
**steady [1]**  157/25
**steel [1]**  170/22
**stenography [1]**  1/24
**step [3]**  40/2 112/23 168/11

**S**

Steph [1]  70/24
Stephanie [3]  1/21 1/21 2/4
stepping [1]  192/24
Steward [15]  76/8 77/4 77/10
 77/11 77/23 78/14 80/15
 81/14 125/13 126/20 128/3
 131/8 133/11 164/15 168/6
Steward's [2]  126/13 132/24
still [14]  20/24 104/18 130/5
 146/9 163/4 167/17 178/14
 178/15 178/16 181/14 182/14
 187/5 221/5 225/25
stimuli [1]  183/13
stock [1]  163/12
stomach [14]  22/25 23/6 24/17
 24/21 25/5 204/16 204/17
 204/18 205/4 205/5 205/6
 205/6 205/7 205/17
stop [1]  189/2
stopped [1]  21/9
stopping [1]  147/22
store [2]  30/1 33/3
stories [3]  13/15 65/13
 170/22
story [8]  17/2 17/6 19/19
 19/19 20/2 27/25 38/22 65/11
straight [1]  82/7
straightforward [1]  120/16
straining [1]  223/12
strangers [3]  33/23 34/19
 37/2
strapped [3]  12/16 12/18
 67/20
stream [2]  79/4 79/4
streams [2]  165/6 165/7
Street [3]  1/22 2/6 2/15
strength [1]  180/6
stress [34]  27/11 65/10 171/3
 174/3 179/13 180/4 181/6
 181/18 182/2 182/12 182/15
 182/20 183/12 183/24 184/6
 185/17 185/22 186/4 186/5
 186/6 186/6 190/13 190/16
 191/11 192/13 193/11 193/14
 207/19 211/9 219/15 219/16
 224/12 225/16 226/1
stressful [2]  219/17 225/14
stressors [3]  182/4 224/18
 224/18
stricken [3]  76/2 112/14
 125/2
strike [10]  25/4 25/4 28/2
 75/11 75/25 129/17 130/25
 131/7 133/14 133/14
striking [1]  27/24
strong [1]  165/24
struck [3]  22/18 28/8 30/15
struggle [1]  194/19
struggles [1]  186/2
struggling [1]  193/1
stuck [3]  32/11 37/4 112/6
students [2]  36/14 158/21
studied [1]  209/22
studies [2]  51/19 95/24
study [3]  96/25 97/2 131/9
studying [2]  189/18 190/4
stuff [4]  32/12 35/16 98/23
 127/13
subject [7]  24/3 26/9 66/2
 66/9 67/15 74/15 97/10

subjects [1]  31/6
subset [1]  98/10
subsides [1]  225/19
substance [1]  27/14
substantial [2]  44/9 55/15
substantially [3]  48/1 70/17
 164/2
subtract [14]  54/17 101/8
 102/5 123/19 123/25 124/1
 137/1 137/9 137/13 149/3
 151/18 152/3 152/9 161/23
subtracted [3]  54/15 132/11
 152/9
subtracting [2]  122/19 153/14
successful [3]  187/1 210/21
 211/12
such [7]  48/7 50/4 75/3 75/3
 80/10 185/3 208/21
sudden [2]  23/12 198/2
suddenly [1]  22/17
sued [1]  50/12
suffer [7]  180/4 183/10 193/8
 193/18 225/15 225/17 225/25
suffering [2]  65/9 188/12
suggest [1]  123/12
suggested [2]  19/16 183/24
suggests [1]  146/9
suicidal [1]  216/11
suing [1]  50/12
suitable [2]  41/23 113/13
suite [6]  1/16 1/19 2/11 50/8
 50/9 170/25
sum [2]  27/14 156/7
summary [5]  79/5 84/22 84/25
 85/3 215/8
summer [1]  100/13
summoned [3]  40/11 76/13
 168/19
Sunday [3]  63/6 63/19 63/20
Sunday a [1]  63/19
supervised [1]  169/25
supplied [1]  46/18
supplies [1]  10/16
support [3]  27/19 27/20
 199/16
supportable [1]  129/5
suppose [2]  47/19 100/1
supposedly [1]  62/22
sure [25]  27/9 32/24 37/4
 54/22 56/15 72/4 77/17 83/9
 113/16 113/21 121/23 131/13
 134/19 134/20 143/17 147/16
 155/16 157/13 159/3 196/19
 197/15 199/14 202/10 203/6
 224/10
surface [1]  99/1
survey [4]  80/20 91/3 92/24
 93/4
surveys [1]  90/6
survival [1]  34/8
survive [1]  30/4
Susan [2]  2/3 5/4
suspect [2]  121/15 130/2
swear [6]  4/16 4/17 4/19
 40/15 76/16 169/2
swimming [1]  32/14
swing [1]  160/11
switch [1]  105/4
swore [1]  6/2
sworn [6]  5/1 38/11 40/23
 76/25 77/4 169/12

symptoms [17]  47/5 173/11
 173/12 173/21 173/22 178/2
 178/25 181/5 181/14 182/2
 182/3 182/9 186/19 186/24
 187/2 194/18 194/20
syndrome [1]  65/10
system [3]  27/20 115/23
 226/16

**T**

T-bill [4]  86/19 155/16 160/3
 163/7
T-bills [1]  163/15
table [18]  60/19 60/20 71/9
 82/5 82/22 82/23 83/19 83/20
 83/21 83/22 84/14 86/6
 122/24 123/3 153/18 155/5
 155/6 159/1
Table 2 [1]  82/5
tables [3]  81/17 81/20 168/6
take [54]  11/1 25/5 25/7
 27/22 30/2 35/16 40/13 41/17
 43/18 54/1 54/4 56/2 58/21
 60/8 66/13 76/15 85/24 90/3
 101/3 102/17 108/4 109/4
 113/25 115/15 118/24 119/11
 119/12 132/20 133/3 133/4
 139/22 144/5 144/8 144/14
 146/22 147/8 151/2 152/3
 152/6 156/12 162/8 167/18
 168/24 171/11 184/8 188/23
 189/2 200/4 210/11 210/22
 210/24 211/4 211/13 226/24
taken [24]  6/2 25/6 33/18
 54/11 54/14 60/10 67/1 80/1
 81/17 84/12 84/18 108/6
 108/7 119/13 129/7 132/11
 133/5 147/24 195/24 198/17
 199/18 200/20 200/22 200/25
takes [4]  53/16 56/7 127/6
 140/19
taking [10]  16/7 36/15 53/22
 55/20 109/16 111/16 145/13
 159/19 215/3 218/8
talent [1]  187/16
talk [17]  19/16 21/21 24/4
 35/7 39/4 88/18 116/16
 138/16 138/19 145/9 182/8
 184/20 184/22 184/24 192/16
 204/4 218/20
talked [3]  63/5 210/23 221/9
talking [25]  10/6 72/10 80/11
 83/4 92/7 92/16 92/21 128/9
 153/5 156/7 161/22 161/24
 164/5 179/22 183/17 183/19
 184/8 184/16 185/12 195/13
 202/22 217/24 218/1 218/18
 218/23
Tap [1]  171/25
tape [2]  195/11 195/16
task [1]  226/18
taught [4]  100/10 100/11
 100/19 114/5
tax [66]  46/17 88/11 102/8
 102/10 102/11 102/12 102/14
 102/20 102/23 103/2 103/3
 103/3 103/6 103/9 103/10
 103/11 103/12 103/21 103/23
 103/23 103/24 103/24 104/5
 104/14 104/16 104/21 104/22
 104/24 104/25 105/13 106/2

**tax... [35]**  106/2 106/7
106/16 106/22 106/22 107/1
107/2 107/6 107/17 107/21
107/24 107/25 107/25 108/1
108/10 108/14 108/14 108/19
109/9 109/12 109/12 109/14
109/15 109/20 109/22 109/23
110/1 110/9 110/14 110/15
110/16 112/16 116/3 116/5
116/11
**taxable [1]**  110/17
**taxed [1]**  104/25
**taxes [21]**  101/2 101/3 101/4
101/5 101/9 101/9 102/6
104/15 107/15 108/10 108/11
109/3 109/16 109/24 110/10
123/23 136/5 136/7 136/14
137/1 150/20
**taxpayer [2]**  103/17 103/18
**teach [3]**  74/7 100/16 122/7
**teacher [3]**  36/18 45/4 145/16
**teachers [1]**  80/12
**teaching [16]**  36/4 36/24 54/3
54/12 54/23 75/7 78/7 100/12
100/12 100/13 145/20 146/7
146/8 186/16 206/23 206/24
**tears [4]**  201/4 201/8 201/16
201/21
**tech [4]**  98/25 99/3 99/3
166/3
**technical [4]**  92/25 98/8
98/24 167/25
**technically [1]**  22/20
**technician [4]**  47/4 72/22
73/1 99/21
**technicians [1]**  92/5
**techniques [4]**  182/10 183/23
185/2 189/7
**technologist [2]**  47/2 48/14
**technology [22]**  47/4 47/13
47/19 66/20 73/5 73/9 73/22
85/19 90/14 90/17 90/25 91/9
92/2 92/10 94/15 95/11 95/22
95/23 96/20 97/11 97/14
110/24
**Ted [2]**  17/17 63/17
**tedious [2]**  99/24 100/3
**telephone [2]**  47/23 221/9
**television [3]**  222/24 223/9
223/10
**tell [52]**  6/3 27/16 28/7
33/24 34/4 34/16 34/23 42/4
43/11 57/20 60/4 77/23
128/13 134/21 134/25 144/17
157/23 158/4 159/22 159/25
169/19 171/20 173/7 174/14
181/21 183/23 186/4 190/12
190/18 195/9 197/1 197/16
200/21 201/11 201/13 201/23
203/7 204/9 204/12 207/25
210/9 215/5 217/22 219/15
220/20 221/11 221/17 221/18
221/19 222/8 222/12 223/24
**telling [9]**  24/8 34/17 35/19
53/25 53/25 68/21 96/24
158/7 159/14
**tells [1]**  25/3
**tempting [1]**  70/5
**ten [6]**  43/14 44/14 72/13
119/4 217/13 217/13

**ten-minute [1]**  132/8
**tend [1]**  160/15
**tends [1]**  85/19
**tenor [1]**  5/19
**tenured [4]**  52/17 52/19 56/3
74/17
**term [6]**  67/12 163/7 163/20
191/15 191/16 208/7
**terms [31]**  78/11 79/9 79/10
82/16 86/25 91/21 95/3 98/24
104/19 107/15 107/19 107/21
108/10 116/23 117/23 121/25
154/23 163/17 166/20 172/20
191/4 192/14 192/15 194/9
194/11 196/21 205/21 206/1
210/20 211/3 211/12
**terribly [1]**  66/22
**test [1]**  41/18
**testified [22]**  5/1 6/4 10/9
10/23 11/9 13/17 14/18 20/16
40/5 40/23 42/16 58/8 61/14
63/24 71/11 77/4 80/16
126/20 130/22 168/6 169/12
222/20
**testify [10]**  4/12 4/13 8/22
17/19 38/11 64/3 69/4 76/1
115/5 129/15
**testifying [1]**  128/22
**testimony [23]**  4/11 4/19 6/3
13/22 23/21 30/25 40/15
65/22 67/3 74/1 74/4 76/17
124/14 127/14 129/12 130/3
130/14 130/23 132/17 133/14
166/7 169/2 189/19
**testing [3]**  50/24 51/19 80/8
**tests [2]**  50/18 51/6
**TEXAS [24]**  1/1 1/4 1/17 1/20
2/7 2/12 2/15 42/10 42/11
42/12 42/16 52/9 52/11 53/16
53/18 53/24 54/3 55/23 56/7
56/15 77/18 78/6 100/13
186/22
**than [43]**  12/21 51/19 58/22
72/2 72/15 75/20 91/9 91/16
95/9 105/2 105/22 112/22
114/17 118/12 119/4 119/5
121/18 126/13 127/1 129/8
129/16 138/24 143/12 144/7
145/10 157/9 164/2 164/18
165/25 173/5 182/23 183/4
183/7 190/10 193/25 207/2
207/5 209/5 211/15 218/17
221/7 222/21 224/12
**than -- I [1]**  114/17
**thank [35]**  4/10 4/24 6/22
9/15 18/19 18/20 18/21 18/22
18/23 38/8 39/3 39/17 39/23
40/3 40/22 41/10 43/11 76/10
76/12 78/13 84/6 85/24 91/23
100/20 168/12 169/9 169/11
171/19 174/4 185/10 219/22
219/23 226/10 226/20 227/4
**thanks [3]**  148/12 226/14
226/15
**that [1445]**
**that the [1]**  71/4
**that's [224]**  4/5 5/9 11/16
13/4 14/3 16/6 21/17 24/25
33/17 35/15 38/8 39/14 39/22
41/8 41/23 51/9 52/1 53/18
55/3 58/13 66/20 68/2 68/3
68/11 68/14 68/21 69/11

75/5 75/7
75/7 75/13 75/14 75/21 75/25
77/12 78/19 79/2 79/6 79/18
80/3 80/18 80/22 81/5 81/12
82/6 82/23 83/12 83/18 84/4
84/5 84/16 85/7 85/13 87/14
90/5 91/13 91/18 93/24 94/3
94/3 94/4 94/7 95/12 96/1
96/2 96/5 97/5 97/15 97/18
97/21 99/1 101/5 101/6
101/11 101/15 101/22 102/4
102/11 102/16 102/20 102/25
103/2 103/18 104/9 104/14
104/16 105/1 105/22 107/21
108/5 109/15 109/17 109/21
109/23 110/21 111/6 111/19
112/11 113/22 116/7 116/7
116/24 117/16 118/3 119/1
119/23 119/24 119/25 120/23
121/24 122/7 122/22 123/2
123/10 123/18 123/23 123/24
124/2 124/7 124/13 125/13
126/18 127/10 127/10 127/17
128/18 128/21 128/21 129/11
129/24 130/18 131/17 132/9
132/22 133/7 134/6 135/14
136/13 136/16 137/9 137/12
137/22 138/2 138/3 138/3
138/14 139/2 139/5 139/8
139/12 139/13 139/16 140/21
140/25 141/6 141/23 142/18
142/19 143/5 144/17 145/1
145/3 146/12 146/17 146/19
148/6 148/25 149/4 149/11
151/3 151/13 152/5 152/13
152/16 152/18 153/3 153/18
157/6 158/14 158/14 159/20
159/21 160/2 160/11 161/10
161/18 161/21 161/25 162/4
162/9 162/20 163/15 163/15
163/16 163/17 163/22 163/24
164/6 164/20 164/24 167/21
167/23 168/21 177/11 182/3
184/18 187/24 191/19 194/4
196/24 198/5 202/19 206/2
206/20 212/17 213/3 215/11
217/8 219/19 222/21 226/3
**the representation [1]**  20/15
**their [43]**  33/15 41/23 41/25
43/1 44/2 44/7 44/8 44/10
44/11 47/22 50/7 54/5 55/10
55/23 57/10 59/3 59/5 59/5
59/6 59/14 59/17 73/18 73/25
74/4 98/12 108/10 108/20
141/2 141/3 165/19 166/17
173/8 181/12 184/7 188/23
191/13 191/14 191/17 192/14
195/4 205/19 210/15 210/16
**them [42]**  19/10 23/14 23/15
24/11 24/12 31/2 38/6 42/3
43/24 44/5 54/5 58/10 65/17
65/17 99/3 130/16 133/16
133/19 158/21 158/21 170/5
172/12 175/22 176/6 176/6
176/7 178/3 178/4 178/19
180/13 180/14 182/6 187/7
187/9 187/14 191/16 193/6
198/25 207/18 208/17 210/17
222/13
**them to [1]**  187/9
**themselves [1]**  86/24
**then [128]**  11/14 13/7 21/21

**then... [125]**   21/21 22/22
23/3 23/17 26/9 29/2 33/11
38/2 38/20 42/1 43/17 44/3
45/4 48/13 53/16 53/16 62/24
63/25 68/3 69/9 70/10 71/17
71/20 73/4 76/8 78/2 78/5
79/15 79/16 79/16 79/23
82/10 82/20 83/10 83/14 86/9
86/9 89/12 89/14 90/20 91/14
91/18 92/11 92/19 94/18 95/2
99/13 99/14 101/4 101/6
101/8 101/16 101/20 101/23
103/7 104/11 104/15 104/17
108/4 109/19 110/23 116/8
116/9 117/17 117/25 118/6
118/9 118/12 118/24 120/2
121/11 122/21 124/5 124/11
124/12 124/18 127/6 132/12
132/12 136/23 137/3 137/19
138/17 138/25 140/10 144/13
145/5 147/12 149/9 149/12
151/17 151/17 152/6 153/15
153/16 153/19 153/20 154/2
154/7 154/15 155/11 156/17
157/3 159/8 160/14 160/15
161/22 161/24 162/8 162/19
166/2 166/4 174/10 184/15
185/24 194/17 197/24 199/4
199/24 203/17 215/11 215/15
215/16 222/15 224/9
**theoretically [1]**   167/23
**theory [1]**   100/18
**therapist [2]**   169/18 214/16
**therapy [11]**   182/11 184/3
184/16 206/10 210/21 211/5
211/12 214/20 214/21 217/23
218/19
**there [141]**   11/12 14/16 19/13
20/12 22/11 26/20 27/15
27/20 27/22 27/23 28/16 29/1
29/7 29/12 30/1 30/18 31/18
33/12 33/13 34/24 34/25 36/6
36/7 36/7 36/9 37/6 37/9
38/23 43/17 47/2 48/16 48/18
48/20 50/6 52/12 52/14 53/5
55/15 59/15 62/24 63/17
65/10 71/25 74/1 78/21 79/3
79/19 81/10 81/18 81/20
82/20 83/6 84/17 84/23 84/24
85/1 85/19 86/7 86/19 88/13
93/3 93/12 98/8 99/17 105/12
105/13 105/15 108/2 108/13
112/6 116/22 119/24 120/25
121/2 127/20 127/22 130/4
130/17 132/21 140/18 141/5
141/6 143/4 148/10 148/23
157/23 159/10 163/3 163/5
163/8 163/15 163/23 163/24
167/19 167/20 171/1 171/15
174/23 174/23 174/25 176/18
176/20 177/3 180/2 181/18
182/9 184/1 184/23 185/2
187/3 188/10 188/23 189/7
190/2 192/19 193/3 195/11
196/12 196/12 198/20 200/6
202/23 205/12 205/21 206/8
206/14 206/22 207/2 207/3
211/2 212/4 213/5 213/10
214/20 219/13 220/8 220/15
222/1 224/15 225/17 225/24

**there's [42]**   20/16 21/10
21/13 32/12 53/20 57/11 61/6
65/12 66/25 69/1 69/9 69/9
72/19 73/7 79/4 82/22 87/15
108/23 108/23 111/17 117/6
121/7 123/6 126/6 129/4
135/3 135/4 136/7 137/21
143/4 146/6 158/14 163/24
165/23 173/9 174/17 178/3
189/19 191/2 192/16 203/9
**thereafter [2]**   47/18 199/5
**therefore [2]**   19/20 37/1
**these [57]**   8/25 12/23 13/19
25/8 28/11 28/11 28/18 30/25
31/2 31/2 33/18 36/22 43/8
45/25 54/18 61/11 63/15
65/13 78/22 85/9 86/2 86/5
86/21 86/21 86/23 87/4 99/15
99/15 103/10 105/2 105/3
112/10 112/13 128/1 130/9
134/7 138/16 139/14 139/22
148/14 158/11 161/15 167/22
172/18 175/11 175/20 178/25
179/5 181/3 181/14 182/5
205/8 205/9 218/7 218/9
218/22 223/12
**they [113]**   9/7 9/7 11/19
11/23 11/25 11/25 12/5 12/24
20/7 23/10 27/10 33/19 42/1
43/2 43/25 44/2 44/2 44/11
48/11 55/6 56/2 56/7 57/7
57/9 57/21 63/8 63/8 65/19
65/23 70/7 75/18 81/18 86/2
86/4 86/24 92/12 92/13 97/6
98/24 99/3 107/9 107/20
108/3 108/4 108/7 108/11
109/15 109/24 111/21 111/23
114/5 114/6 118/6 118/18
121/7 126/2 126/6 129/21
133/2 133/3 133/4 133/17
141/3 141/4 141/5 141/5
144/12 147/17 147/18 156/22
156/24 157/19 158/13 160/13
160/14 160/15 163/6 165/18
166/17 166/19 166/20 167/7
167/8 167/20 167/25 168/2
168/9 168/18 172/3 172/19
172/23 175/13 179/6 181/7
183/14 184/8 187/4 187/9
188/11 188/22 189/1 189/2
191/16 193/25 195/12 195/15
198/4 199/21 203/22 205/25
207/3 217/25 221/24
**they'll [2]**   71/16 108/6
**they're [15]**   25/6 25/8 44/1
65/9 84/18 86/22 90/21 91/17
91/18 101/19 113/9 166/5
176/21 185/14 187/5
**they've [6]**   20/10 20/12 63/3
65/11 65/12 70/6
**thick [2]**   195/14 195/20
**thighs [1]**   221/15
**thing [17]**   4/3 20/4 25/19
26/6 27/6 35/5 61/15 84/21
97/23 113/23 116/10 121/3
125/3 159/5 163/15 185/16
198/2
**thing -- you [1]**   198/2
**things [49]**   12/3 19/3 21/21
25/15 35/2 37/18 60/21 62/7
67/7 67/8 87/15 94/20 111/3
138/13 139/22 141/21 145/5

173/20 180/18 180/19 182/5
183/3 185/3 185/4 185/13
186/2 188/10 188/16 189/24
191/16 192/15 192/20 192/23
198/3 207/13 209/19 214/1
218/2 218/14 218/22 219/8
219/16 219/17 222/12 226/7
**think [123]**   8/23 9/16 9/25
10/1 10/5 11/8 11/11 11/16
11/20 12/5 13/17 13/19 13/24
14/3 14/13 14/20 15/13 16/21
17/20 18/17 20/18 23/24 25/6
25/14 25/25 28/19 31/1 31/11
32/11 34/16 38/4 40/6 41/4
41/8 41/21 43/10 47/11 48/1
48/3 49/11 56/7 58/8 58/11
58/14 58/17 59/13 59/18
67/12 71/24 72/5 73/16 75/15
85/13 85/18 87/18 89/25
99/17 102/9 102/22 109/25
111/23 111/25 112/14 113/10
113/13 114/9 115/21 118/18
125/9 128/8 128/11 128/14
130/2 130/13 132/21 133/11
133/12 134/1 136/16 140/14
143/14 145/3 145/18 146/6
146/9 146/12 148/3 164/4
165/17 165/22 165/23 176/19
177/6 178/3 178/12 178/13
179/8 179/16 182/25 190/19
192/6 192/7 192/13 192/17
193/5 195/2 196/21 197/20
201/17 207/7 207/17 207/24
212/3 212/14 217/13 217/14
217/16 218/20 219/18 220/11
221/22 225/17 227/1
**thinking [4]**   76/5 126/14
176/5 183/16
**thinks [1]**   130/15
**third [3]**   195/17 195/18 213/4
**this [254]**
**Thomas [3]**   40/8 40/23 41/13
23/14 23/21 24/1 24/10 25/5
25/15 27/16 28/16 29/12 31/4
32/4 33/5 34/11 43/21 51/4
52/1 52/10 53/2 53/18 53/19
54/3 56/1 80/2 82/15 85/4
86/14 86/16 89/23 97/24
97/25 98/18 99/24 114/2
114/11 116/9 127/3 134/11
134/14 134/16 139/21 139/24
143/4 143/14 144/6 144/13
144/15 145/5 146/11 150/18
151/4 155/18 155/18 156/21
158/10 158/10 158/16 158/20
160/3 160/4 161/13 161/23
162/2 162/3 162/4 162/22
163/8 168/16 168/17 170/6
172/8 172/19 173/10 173/20
173/21 174/2 175/4 175/7
175/10 175/14 175/19 177/1
182/2 183/3 185/4 185/23
188/22 189/2 189/20 191/3
192/20 192/23 198/7 199/15
204/17 204/21 205/20 205/22
205/25 207/17 209/14 209/15
211/7 211/8 212/17
**though [8]**   29/18 29/20 64/21
75/13 93/9 114/5 214/5
226/12

**thought [9]**  63/8 72/13 74/13 133/17 165/20 185/14 205/1 219/20 224/3

**thoughts [13]**  172/13 172/20 172/25 176/3 176/4 176/9 177/8 185/13 188/22 189/2 218/22 218/24 218/25

**thousand [1]**  56/6

**threat [2]**  38/23 172/6

**threaten [4]**  5/23 6/10 6/16 6/19

**threatened [2]**  7/3 172/4

**three [21]**  2/11 65/17 72/19 73/4 134/11 148/4 169/24 171/2 171/2 175/8 175/9 175/11 175/14 182/23 196/15 204/1 204/23 204/24 215/13 215/14 217/16

**three-day [1]**  148/4

**three-hour [1]**  204/1

**throat [3]**  204/15 205/3 205/18

**through [35]**  26/9 38/1 41/19 46/2 46/13 53/3 56/15 82/23 95/10 109/15 109/21 109/23 117/3 135/13 140/24 151/3 153/1 159/8 167/9 167/9 172/12 172/13 172/14 172/14 176/2 182/13 187/10 187/10 189/3 202/14 207/8 212/11 222/15 225/6 225/12

**throughout [7]**  34/17 34/21 54/8 55/22 124/5 180/14 180/15

**throw [3]**  142/2 158/24 193/2

**tied [1]**  131/19

**tight [2]**  10/24 11/14

**time [129]**  5/14 8/22 10/12 14/13 15/16 15/20 16/10 16/13 16/18 17/5 19/2 22/8 22/9 25/9 25/22 28/4 31/2 31/4 31/12 31/13 31/18 33/9 34/5 35/7 35/15 35/19 36/2 36/9 37/9 37/11 37/15 37/25 38/23 43/4 44/25 46/8 47/3 48/23 53/5 56/6 56/11 56/22 56/25 56/25 57/10 57/11 58/9 58/22 60/16 61/9 63/4 63/23 64/5 64/13 72/1 72/2 75/7 78/1 79/21 79/21 82/13 84/18 86/18 93/21 94/21 98/19 114/4 114/9 121/25 126/20 126/20 126/24 144/2 144/5 144/9 145/15 145/17 145/18 145/20 145/22 145/23 145/24 146/1 146/7 146/8 146/10 146/13 153/2 160/13 160/14 163/12 164/23 171/11 173/17 177/23 178/6 179/19 180/5 180/11 180/12 180/15 180/16 183/6 184/9 184/12 184/14 184/17 185/6 189/18 192/25 194/16 194/17 196/1 197/22 205/25 208/21 209/1 209/4 209/13 211/21 211/24 217/11 218/1 218/1 218/23 220/23 221/3 222/9 224/15

**times [24]**  32/23 46/11 63/5 71/13 124/12 131/4 138/21 149/12 151/8 151/9 153/23

170/12 180/17 181/8 184/23 185/16 188/23 191/25 192/19 209/9

**timing [1]**  67/2

**tired [1]**  16/2

**tissue [7]**  201/5 201/9 201/23 201/25 202/3 202/5 220/13

**to do [1]**  67/5

**to-go [1]**  8/13

**today [40]**  5/7 29/10 34/20 42/21 43/13 47/3 52/21 56/14 78/10 86/16 96/5 98/6 98/17 119/5 129/16 133/17 134/21 135/25 147/10 154/25 155/4 155/12 156/3 156/7 156/13 156/17 156/18 157/25 158/12 158/18 159/15 162/1 162/2 164/21 178/1 183/10 186/2 190/15 222/13 225/25

**Todd [1]**  1/14

**together [11]**  10/25 11/19 23/17 24/14 32/11 32/15 37/11 61/11 171/2 176/21 200/18

**told [53]**  7/6 7/10 7/14 11/3 15/5 15/8 16/24 17/25 24/16 25/20 35/11 38/16 60/18 102/22 148/14 156/15 156/22 162/1 167/13 178/17 182/25 196/18 196/24 197/3 197/16 197/24 198/8 200/18 201/20 202/4 202/5 202/11 202/19 202/23 209/9 218/14 218/17 220/4 220/5 220/12 220/12 220/15 220/21 220/21 221/21 221/21 221/23 222/1 222/4 222/6 222/10 224/4 224/5

**tolerate [3]**  184/8 184/17 217/25

**Tomball [1]**  36/10

**tone [1]**  5/19

**tongue's [1]**  190/14

**tonight [1]**  17/5

**too [12]**  6/26 32/12 66/5 66/25 70/25 76/21 111/6 119/12 125/7 133/6 138/9 201/15

**took [13]**  7/11 8/10 16/10 31/23 46/17 60/19 77/20 107/10 114/11 129/8 184/12 184/13 195/17

**tool [2]**  70/16 195/18

**tools [1]**  70/15

**top [4]**  54/7 139/20 139/20 183/19

**topic [2]**  31/8 66/10

**topics [1]**  99/15

**torn [7]**  201/5 201/8 201/23 201/24 202/3 202/5 220/12

**total [15]**  83/3 98/7 101/1 106/22 112/11 123/20 136/4 136/14 136/21 137/6 137/9 137/11 139/9 155/9 200/13

**totally [4]**  31/8 34/14 129/17 175/15

**totals [2]**  84/24 84/25

**tour [1]**  37/10

**toward [3]**  36/10 55/13 130/14

**towel [3]**  8/19 10/9 10/13

**track [4]**  36/7 93/21 126/6 168/10

**trailer [4]**  7/12 7/22 16/3 64/14

**trained [4]**  186/13 186/21 186/21 186/23

**training [11]**  34/9 34/9 42/2 169/20 185/22 185/23 186/4 186/8 186/9 186/13 210/1

**transcript [3]**  1/10 1/24 227/8

**transcription [1]**  1/24

**transcripts [2]**  80/10 80/11

**transform [1]**  208/7

**transforms [2]**  208/7 208/9

**trauma [25]**  172/11 172/11 172/16 173/1 173/2 173/3 176/2 176/4 176/8 176/14 177/9 177/11 177/14 184/16 185/24 186/20 190/6 191/6 192/16 194/9 210/19 211/8 211/11 211/13 211/16

**traumatic [32]**  65/10 171/3 172/3 172/4 174/3 174/16 174/17 179/13 180/4 181/6 181/18 182/2 182/12 182/15 182/20 183/12 183/24 184/6 185/16 190/13 190/15 191/11 192/13 193/10 193/14 207/18 210/10 211/9 211/24 224/12 225/16 226/1

**traumatized [1]**  205/19

**traumatizing [1]**  185/14

**Treasury [2]**  163/19 163/20

**treat [4]**  166/8 170/3 180/12 180/20

**treated [7]**  67/17 170/9 174/5 180/5 180/9 209/3 225/6

**treating [3]**  211/3 212/15 225/9

**treatment [37]**  44/1 44/1 170/4 170/7 170/13 179/21 181/4 181/15 181/21 181/22 182/10 182/12 184/2 184/5 184/9 184/11 184/18 185/1 185/9 185/11 185/21 187/6 188/10 193/4 194/3 209/14 209/15 210/2 210/3 214/14 214/18 214/20 214/22 215/1 215/22 215/25 217/8

**trial [9]**  1/10 5/7 6/2 6/4 9/12 63/21 63/25 69/23 169/9

**tried [2]**  59/25 61/13

**triggered [1]**  211/25

**trip [1]**  31/16

**trouble [5]**  21/25 29/13 46/7 113/4 169/8

**true [31]**  7/8 7/15 7/16 7/18 7/19 12/21 14/19 15/3 15/4 15/17 15/23 16/8 16/11 16/14 18/2 24/10 61/23 63/1 63/12 65/3 69/11 88/24 109/13 109/19 109/20 109/21 123/1 132/9 152/24 225/24 226/4

**truly [1]**  55/20

**trust [1]**  184/11

**trusted [1]**  191/1

**trusts [1]**  32/20

**truth [22]**  4/21 4/21 4/21 6/3 29/21 40/17 40/17 40/17 61/6 64/23 69/2 69/6 69/9 69/9 69/17 69/17 76/17 76/17 76/18 169/4 169/4 169/4

**T**

**try [12]**   19/1 19/14 22/1
40/19 41/23 63/14 67/13
68/21 102/22 114/16 169/6
181/16
**trying [16]**   19/5 25/21 25/23
29/14 29/14 53/9 53/9 68/10
95/5 95/19 95/20 97/8 138/10
162/11 181/22 214/25
**Tuesday [2]**   227/2 227/3
**Tulane [1]**   209/8
**tumble [2]**   115/6 115/7
**turn [1]**   28/10
**turns [1]**   162/13
**twice [4]**   180/21 180/25
215/11 215/15
**two [49]**   21/20 21/21 31/19
37/20 37/23 37/24 43/14
43/15 44/13 65/17 72/1 72/2
79/20 79/21 82/12 105/8
109/8 117/24 119/17 125/12
131/16 131/16 139/21 145/1
146/10 146/11 151/4 152/18
161/14 173/21 175/4 175/9
175/14 175/19 176/21 178/20
178/23 180/10 182/1 190/4
190/9 204/1 207/17 208/17
209/18 214/2 214/5 225/8
226/6
**two degrees [1]**   190/4
**two-hour [2]**   43/15 44/13
**tying [1]**   130/2
**type [26]**   5/20 43/24 43/25
45/5 45/12 46/3 47/8 47/13
47/14 47/16 47/17 50/18
50/24 85/17 90/12 90/16
91/21 92/10 94/11 99/3 105/2
105/3 134/18 163/8 163/9
191/8
**types [6]**   8/6 78/22 93/5
93/12 114/20 158/11
**typical [4]**   63/10 141/7
203/25 210/7
**typically [7]**   12/23 48/2 50/4
55/6 193/24 194/23 210/2

**U**

**U.S [1]**   2/14
**Uh [8]**   196/17 200/12 201/10
202/18 204/8 207/10 213/8
214/17
**Uh-huh [8]**   196/17 200/12
201/10 202/18 204/8 207/10
213/8 214/17
**uncomfortable [1]**   218/2
**uncommon [1]**   176/8
**unconscious [5]**   174/18 196/12
198/4 211/24 212/7
**under [17]**   6/2 6/3 12/20
20/24 44/1 50/24 56/11 84/1
93/10 99/11 116/22 131/24
165/10 176/23 178/21 206/5
207/8
**underemployed [2]**   191/10
193/22
**undergarments [1]**   12/4
**undergraduate [13]**   77/17
77/20 77/25 80/10 93/19
93/20 94/11 94/13 94/15
96/18 97/10 114/18 189/17
**underlying [2]**   90/5 93/2

**understand [36]**   5/25 6/1
6/1 11/13 12/25 14/25 15/2
27/23 53/25 59/19 61/23 95/5
103/16 103/19 104/1 104/19
108/13 108/16 108/20 108/25
109/9 113/18 116/4 118/17
128/23 132/19 138/5 138/5
138/15 150/7 161/20 164/17
199/12 203/23 223/22
**understanding [18]**   109/22
113/24 119/9 134/15 145/7
190/5 197/15 199/15 200/1
200/20 200/21 200/23 200/24
201/2 201/19 203/20 209/17
223/23
**understands [1]**   51/12
**understood [8]**   21/19 21/19
22/22 26/8 32/16 116/13
165/4 224/1
**understood you [1]**   224/1
**underwear [1]**   12/2
**unduly [1]**   66/14
**unfairly [1]**   22/5
**unfamiliar [5]**   189/25 194/10
206/8 206/22 207/5
**unfortunate [3]**   22/7 22/16
25/10
**unheard [1]**   22/7
**uninvited [1]**   226/18
**unique [1]**   57/16
**unit [2]**   5/11 5/24
**UNITED [6]**   1/1 1/11 108/18
129/19 163/20 223/20
**universe [3]**   98/7 98/10
113/16
**universities [2]**   53/23 114/16
**university [20]**   35/8 42/7
42/9 53/11 53/21 54/2 54/3
77/18 77/22 78/6 85/10
100/13 111/22 145/14 166/12
166/14 167/4 167/8 167/15
169/22
**unknown [2]**   189/25 190/1
**unless [4]**   21/13 39/18 69/8
132/20
**unnecessary [2]**   66/4 66/6
**unprotected [5]**   198/18 199/3
199/21 200/10 221/24
**unquestionably [3]**   62/2 71/25
72/2
**unreasonable [1]**   145/3
**unreasonably [1]**   162/17
**unstrapped [1]**   67/20
**unsupportable [1]**   131/1
**until [16]**   30/4 36/25 44/11
44/25 61/10 62/16 63/19
65/18 116/14 127/25 143/7
144/9 144/15 174/9 174/12
223/19
**untruthfully [1]**   13/17
**untruthfulness [1]**   13/20
**unusual [3]**   14/12 208/20
208/22
**up [120]**   10/25 13/10 17/4
17/15 19/8 19/19 20/2 24/5
24/24 26/15 26/19 28/11
29/16 30/5 33/8 34/19 37/9
38/6 40/12 41/10 44/10 44/11
46/18 47/23 56/8 56/20 61/17
66/2 66/9 76/14 81/3 83/1
85/1 86/2 86/22 92/23 99/9
99/13 99/15 99/16 104/4

112/9 112/10 114/23 116/19
118/1 118/3 120/20 121/10
121/18 123/19 130/16 130/19
135/7 138/1 139/13 139/24
141/16 141/18 142/2 142/6
144/10 144/13 146/16 148/10
150/18 153/7 153/21 153/23
156/5 157/3 157/13 158/2
158/24 159/5 165/3 168/21
168/21 168/23 171/15 174/24
175/15 180/18 181/8 182/4
182/5 184/3 186/3 186/10
186/11 195/17 195/20 195/20
196/9 196/13 196/18 196/19
196/20 197/1 197/5 198/8
198/13 199/13 200/15 202/14
203/20 213/3 213/9 215/5
215/6 218/1 218/10 218/23
219/3 220/7 226/24
**up with [1]**   130/16
**upcoming [1]**   128/1
**upon [12]**   30/18 42/10 67/2
67/3 67/3 72/20 73/5 98/23
107/24 129/15 137/16 180/5
**upper [1]**   105/8
**upset [4]**   15/18 32/22 184/25
205/18
**urge [1]**   61/16
**urging [1]**   66/8
**us [65]**   7/4 7/10 7/14 11/3
17/25 18/21 24/16 25/18
27/16 33/24 34/17 35/11
35/20 38/16 38/24 42/4 43/2
43/11 53/25 56/12 57/20
63/20 66/1 66/25 67/25 77/15
77/23 80/20 80/23 84/22
86/24 96/24 98/6 98/17
102/22 125/20 134/21 134/25
148/5 148/5 156/15 157/23
158/4 162/1 163/23 170/21
171/2 171/9 171/20 181/25
182/18 182/25 186/4 186/16
195/7 195/9 198/8 198/11
200/21 203/7 204/9 217/22
221/21 224/16 226/20
**use [31]**   45/19 45/23 56/13
61/22 62/9 70/15 78/20 78/22
80/23 81/22 81/23 90/10
112/4 117/1 121/25 125/21
131/15 142/15 148/19 158/16
164/1 174/6 179/7 185/21
205/6 209/19 209/19 209/20
210/6 214/18 219/6
**used [22]**   8/4 12/23 45/25
45/25 52/3 52/14 53/1 67/12
70/8 80/19 86/19 103/17
115/5 121/15 160/3 171/15
179/16 182/10 184/2 185/22
188/10 215/13
**useful [1]**   98/5
**uses [2]**   121/10 143/14
**using [3]**   48/7 184/15 208/9
**usually [1]**   13/1
**UT [3]**   53/22 74/18 77/21
**uttered [1]**   71/17

**V**

**vaginal [5]**   200/16 201/5
201/8 201/16 201/20
**valid [4]**   73/3 93/23 129/22
158/7

**value [22]** 86/10 86/13 97/19
97/20 97/21 101/22 134/9
134/10 134/22 135/6 139/6
149/13 150/4 151/10 154/24
155/11 156/8 159/18 159/21
162/15 166/24 167/12
**variable [1]** 85/13
**variety [1]** 36/15
**various [4]** 24/9 137/16
181/17 183/13
**vary [3]** 155/18 157/19 160/3
**vehicle [2]** 159/15 163/23
**vehicles [1]** 163/5
**verbatim [3]** 23/20 23/21 24/9
**version [1]** 23/7
**versus [9]** 5/8 85/10 90/14
90/14 114/18 128/10 146/8
167/2 181/1
**vertically [1]** 139/17
**very [61]** 4/15 9/15 18/19
18/20 25/14 26/2 26/3 26/5
26/5 30/6 32/22 34/4 34/13
36/8 38/10 40/3 40/10 45/15
45/16 50/14 59/17 62/2 65/2
65/5 65/21 68/24 84/21 94/9
113/4 126/23 126/23 127/23
128/24 148/12 149/17 162/17
163/4 163/4 168/7 168/12
169/9 173/19 179/23 183/6
184/8 184/12 184/22 184/22
187/11 190/14 190/24 191/3
191/24 198/1 200/15 208/20
209/20 223/5 225/14 226/10
226/20
**veterans [1]** 225/24
**vicinity [1]** 58/9
**Vicknair [1]** 1/15
**victim [6]** 5/21 6/11 6/14
9/18 15/11 25/12
**video [1]** 4/14
**view [6]** 23/18 129/15 163/19
163/22 164/5 209/12
**viewed [2]** 69/14 71/23
**violate [1]** 212/2
**violence [4]** 211/17 212/8
216/14 216/23
**visibly [2]** 184/25 205/18
**visit [2]** 23/25 214/15
**visiting [1]** 48/15
**vital [1]** 226/18
**vocational [19]** 41/15 41/18
41/22 42/8 42/14 42/17 43/1
43/15 43/22 44/4 44/25 45/21
45/23 46/4 49/15 126/18
128/13 144/16 146/5
**voice [4]** 22/1 41/10 71/6
205/19
**voices [1]** 71/5
**voir [5]** 60/12 72/3 72/5
112/24 115/1
**volume [1]** 22/1
**voluminous [1]** 215/8
**Vorpahl [3]** 2/3 63/10 64/7
**vulnerable [2]** 191/7 222/23

**W**

**W-2 [4]** 105/7 106/13 107/9
110/15
**wage [20]** 52/5 52/10 52/13
52/23 53/13 54/19 55/23

56/20 72/8 72/25 88/25 89/1
89/3 89/5 90/1
**wager [1]** 75/20
**wages [3]** 53/16 53/17 112/7
**waiting [2]** 173/14 173/15
**waived [1]** 74/25
**waking [1]** 219/3
**Wal [2]** 32/23 32/25
**Wal-Mart [2]** 32/23 32/25
**walked [1]** 17/9
**walking [1]** 33/8
**want [37]** 15/19 21/12 34/23
35/4 39/3 39/4 62/11 62/12
70/13 70/24 71/22 84/21
99/14 108/7 115/12 130/10
147/10 147/10 147/20 147/21
163/9 163/10 165/3 165/5
165/13 171/3 171/5 174/14
176/6 184/24 185/6 196/15
203/6 209/11 212/2 212/11
226/12
**wanted [14]** 7/18 14/25 18/18
34/22 35/2 39/18 56/17 67/5
73/21 95/21 95/23 157/8
159/3 197/6
**wanting [6]** 15/21 34/5 69/7
191/6 194/8 218/24
**wants [1]** 112/19
**war [2]** 58/19 225/25
**warning [2]** 19/9 226/19
**warrant [1]** 126/21
**was [366]**
**wasn't [20]** 15/2 16/20 16/25
22/21 23/11 29/1 34/3 36/3
36/4 37/10 37/11 59/25 61/8
74/19 98/3 127/18 135/11
203/22 219/13 220/8
**watch [2]** 37/13 37/17
**watched [1]** 61/17
**watching [1]** 110/7
**water [2]** 8/2 34/8
**waved [1]** 71/5
**way [44]** 5/23 6/10 6/17 9/19
11/14 12/16 18/17 25/1 25/13
30/24 31/21 38/3 38/6 40/12
46/6 65/1 66/25 67/5 70/14
71/18 75/18 76/14 83/22
84/10 92/8 98/4 99/21 104/7
104/13 124/20 130/7 130/19
151/3 153/2 164/22 179/24
190/19 199/10 202/9 206/13
211/3 212/7 222/16 225/9
**ways [4]** 117/24 176/3 185/13
219/16
**we [237]**
**we'd [1]** 184/16
**we'll [7]** 20/3 21/21 76/1
88/18 88/18 103/15 181/24
**we're [41]** 4/11 5/7 18/11
20/20 26/9 26/14 60/25 61/21
64/15 68/10 68/14 71/3 74/22
74/24 74/25 76/8 76/9 76/10
92/6 92/21 93/16 97/22 99/17
100/2 115/4 128/9 129/2
138/16 140/22 147/22 161/22
168/20 168/23 178/1 178/23
181/4 181/4 183/17 186/16
195/13 202/22
**we've [19]** 5/5 7/10 8/24 8/24
13/14 13/14 18/17 32/16
32/23 63/15 68/4 71/8 131/22

**wearing [1]** 130/6
**week [14]** 30/4 31/24 38/4
38/18 38/24 58/16 63/6 63/19
63/19 64/16 145/19 148/4
180/24 180/25
**weekend [2]** 128/1 195/10
**weeks [6]** 49/18 173/23 179/1
180/17 182/24 185/19
**Weighing [1]** 185/14
**weight [1]** 130/14
**welcome [1]** 6/23
**well [147]** 8/13 11/19 17/16
23/18 23/25 24/6 32/16 33/1
35/18 37/3 37/17 37/19 38/21
40/10 45/17 47/19 51/21 53/1
54/13 54/13 56/1 60/20 61/8
61/10 61/25 62/4 62/25 64/3
64/4 64/11 67/14 68/19 74/6
74/12 74/19 75/3 75/12 75/24
75/24 77/19 78/15 78/21 79/8
79/20 85/6 86/7 86/13 89/25
91/13 91/23 92/8 93/16 98/3
98/15 98/15 98/18 99/2
100/13 100/19 102/22 103/2
111/14 116/15 117/6 118/14
119/6 122/5 126/8 127/18
127/20 128/8 128/23 129/7
132/24 133/9 138/2 141/8
142/2 142/13 143/15 143/25
144/19 144/23 146/5 150/19
153/6 153/23 154/1 155/5
155/22 156/7 157/10 157/14
157/16 157/22 158/17 158/23
160/7 160/11 160/17 161/7
161/16 161/18 162/1 162/11
162/11 167/19 168/7 170/12
178/13 179/24 180/14 182/18
182/22 183/4 184/1 187/10
188/13 188/21 189/17 189/24
190/4 190/15 192/6 192/24
193/24 198/1 199/11 199/25
200/3 200/15 200/24 201/3
202/1 202/2 204/12 205/15
209/19 209/24 209/25 210/9
212/2 215/1 216/10 219/3
223/5 224/14
**went [28]** 10/15 10/25 11/19
31/9 37/9 42/10 45/2 45/4
47/14 52/8 59/20 61/12 67/20
69/6 71/24 78/3 88/18 135/13
174/10 195/16 195/16 195/18
200/17 203/20 203/21 203/21
207/8 214/3
**were [87]** 5/10 8/1 9/21 12/11
16/4 16/13 17/7 21/9 22/20
22/24 23/5 23/10 24/10 24/11
24/12 24/21 25/8 25/15 25/16
28/5 28/7 30/19 31/11 31/18
34/17 35/1 37/13 38/22 38/25
39/1 46/18 48/11 48/15 48/16
49/14 52/22 60/16 67/9 69/4
79/10 87/17 88/13 92/13
114/2 114/5 116/4 120/2
125/6 129/14 135/8 148/13
156/19 156/19 156/21 156/24
157/7 157/18 158/13 159/20
160/10 165/19 167/13 167/19
167/20 170/18 171/1 174/23
175/19 187/4 193/8 195/24
197/9 198/25 205/1 205/25

**were... [12]**  209/7 211/24
215/13 217/2 218/23 220/8
220/14 222/1 224/22 225/9
225/15 225/22
**were present [1]**  156/19
**weren't [5]**  16/3 16/7 65/19
223/11 225/10
**West [1]**  1/22
**what [338]**
**what's [20]**  63/11 71/17 71/25
83/20 92/22 122/7 141/6
145/3 149/1 149/23 151/6
156/1 158/2 160/17 160/20
173/11 180/14 185/19 186/1
199/15
**whatever [24]**  19/14 34/25
64/16 71/24 72/22 73/22
101/20 101/21 102/19 103/3
103/17 104/20 108/3 114/18
126/12 129/10 142/21 145/24
153/22 154/20 155/16 160/4
160/23 211/24
**whatnot [1]**  130/1
**whatsoever [4]**  30/12 69/8
72/20 144/20
**when [91]**  5/10 8/9 8/20 11/5
12/11 13/25 17/7 17/9 19/16
20/14 21/9 22/21 24/8 28/4
31/9 33/6 35/24 43/2 48/15
49/14 49/22 50/3 50/16 56/24
61/16 63/10 63/20 67/13
70/15 71/10 72/15 82/6 87/16
87/20 91/13 93/16 110/13
113/23 114/3 122/15 134/1
134/15 135/13 142/21 144/9
150/1 150/3 153/20 155/17
162/21 170/18 174/10 174/10
175/2 175/9 176/1 176/4
176/6 179/15 179/18 181/3
184/10 184/19 188/21 189/4
190/7 191/3 192/15 192/19
192/22 196/14 198/4 200/15
201/17 202/1 204/4 204/14
210/14 210/21 213/23 216/15
218/8 218/9 220/7 220/17
221/2 221/7 221/7 224/17
225/11 225/18
**where [60]**  9/2 27/23 30/15
33/2 33/15 34/14 49/22 65/12
65/13 65/14 65/20 71/2 76/7
85/19 86/23 92/4 93/13 94/19
95/6 97/22 105/12 106/25
114/2 114/5 114/10 114/15
119/2 120/20 120/20 135/7
140/3 143/11 144/12 147/3
163/6 165/18 165/23 166/17
168/2 170/9 170/11 170/14
170/18 170/24 179/5 182/24
184/3 184/6 184/16 184/23
186/16 191/16 191/25 194/16
196/1 200/19 206/8 206/14
206/22 213/11
**whereas [1]**  125/16
**wherever [1]**  44/11
**whether [31]**  25/25 26/1 29/3
51/6 62/1 62/20 63/1 66/21
67/19 67/19 68/5 69/7 73/21
79/9 90/22 96/19 96/20 97/9
97/13 98/14 107/23 111/11
134/13 152/22 164/22 192/7

225/17
**which [63]**  30/7 30/17 44/14
46/8 54/11 55/4 55/8 63/1
65/5 67/5 68/2 70/11 72/20
75/11 75/17 82/20 83/13 85/4
88/20 89/22 91/2 91/21 94/4
100/2 100/18 101/17 103/14
108/20 112/17 129/25 131/9
134/17 135/4 136/7 138/22
138/22 142/16 142/22 149/9
149/18 152/14 153/16 154/16
156/17 159/1 161/14 162/22
173/6 173/14 174/11 176/13
179/6 180/12 192/18 195/12
195/12 195/19 195/23 204/5
204/9 204/21 226/15 226/16
**while [14]**  7/11 33/3 37/13
38/6 63/18 72/14 99/21
134/23 174/18 182/5 186/12
199/2 221/5 223/12
**who [69]**  5/21 9/18 9/22 10/20
11/20 13/3 13/4 13/25 15/11
17/11 17/20 21/7 33/5 37/13
41/22 51/12 54/6 54/13 59/2
59/16 62/3 62/25 71/17 72/7
72/10 74/17 91/16 92/11
92/11 92/20 98/11 98/13
98/14 98/15 99/24 107/20
108/18 111/8 113/6 114/15
114/18 129/9 144/22 144/22
166/6 166/11 181/6 186/22
195/11 201/20 202/2 202/20
207/23 209/15 209/22 210/15
211/13 211/15 211/23 211/23
212/4 216/17 219/4 220/4
220/8 222/1 222/24 225/20
225/25
**who's [11]**  30/24 30/24 62/1
62/1 74/6 75/4 75/5 89/22
166/3 166/4 217/11
**who've [1]**  210/16
**whole [9]**  4/21 36/15 36/22
40/17 76/17 128/18 159/5
169/4 203/22
**whom [1]**  70/6
**why [39]**  11/2 11/5 26/11 27/4
38/20 42/24 48/19 61/6 62/2
64/8 64/9 64/10 68/17 79/19
113/18 113/22 121/4 121/21
125/16 126/13 126/18 127/14
127/18 130/22 131/12 147/7
157/23 161/14 171/25 180/12
182/17 188/20 189/20 189/23
194/3 212/17 213/3 220/9
224/12
**widely [1]**  51/9
**wife [40]**  22/11 22/15 22/17
22/23 23/20 23/24 24/1 24/17
24/20 25/1 25/6 25/11 26/3
27/11 27/13 27/24 27/25 28/4
28/7 28/15 28/23 29/4 29/11
29/20 30/11 31/9 31/23 32/4
32/17 33/1 33/23 33/24 34/18
35/11 35/13 35/20 36/12
36/24 37/24 39/21
**wife's [7]**  25/9 30/6 30/19
33/21 34/3 35/7 37/7
**will [50]**  4/17 4/20 21/21
28/15 30/8 31/8 40/12 40/13
40/16 42/21 52/4 57/21 64/7
66/5 66/12 72/12 72/13 73/16

109/15 116/19 121/6 129/9
129/21 140/3 140/23 141/22
143/11 144/6 144/11 146/23
148/3 168/13 168/25 169/3
171/11 180/2 180/2 185/17
190/18 194/15 203/11 203/13
210/3 211/9 213/16 214/2
**William [7]**  10/20 10/23 10/25
11/2 11/6 11/9 41/13
**wind [4]**  14/14 14/15 17/15
158/2
**wings [2]**  19/2 67/13
**wish [2]**  111/2 194/13
**wishes [1]**  112/20
**withdrawals [1]**  86/17
**withheld [4]**  103/18 105/13
105/15 106/16
**withhold [1]**  108/3
**withholding [1]**  105/19
**within [4]**  19/15 93/2 98/10
212/4
**without [19]**  16/3 19/9 27/21
32/17 35/20 45/6 66/21 74/20
113/11 125/15 125/16 137/23
142/4 168/17 210/3 222/11
225/16 226/12 226/19
**witness [60]**  4/12 4/16 4/18
10/4 11/15 13/16 14/8 14/10
14/10 17/17 19/20 24/6 26/21
40/11 49/4 58/1 60/7 63/4
67/4 67/18 68/4 69/19 70/3
70/6 72/5 72/13 76/8 76/9
76/13 76/24 76/25 86/1 87/6
87/25 110/8 112/14 112/15
112/24 118/11 120/15 124/19
125/2 125/4 125/7 125/10
125/11 129/25 130/2 130/4
130/7 130/25 133/15 143/19
147/17 164/8 168/3 168/19
219/24 223/1 226/8
**witness' [2]**  69/18 110/24
**witnessed [1]**  183/16
**witnesses [6]**  3/3 39/24
127/13 127/24 128/1 147/19
**woke [3]**  198/13 203/20 218/9
**woken [1]**  13/10
**woman [6]**  17/2 17/22 19/15
68/10 113/6 113/19
**women [2]**  57/7 226/17
**won't [2]**  120/23 130/3
**wondered [1]**  209/24
**wondering [2]**  32/16 33/23
**word [13]**  8/4 44/21 62/9
70/24 115/15 131/12 172/5
179/17 187/23 187/24 197/9
208/9 210/6
**words [6]**  25/5 25/7 143/14
144/6 204/18 205/7
**work [94]**  36/17 37/5 41/23
41/24 42/3 42/11 42/13 42/13
43/4 44/3 44/5 44/22 45/4
45/9 45/10 45/18 46/2 46/22
47/3 47/6 47/8 47/14 47/16
47/17 47/20 47/22 47/25
49/21 50/11 56/24 57/10
57/11 59/3 59/7 59/8 59/11
59/14 59/16 59/20 59/23
59/25 60/2 74/3 78/3 78/4
78/17 79/25 82/7 82/21 82/24
92/11 99/4 99/16 100/8
104/13 111/9 114/16 119/22

## W

**work... [36]**  121/22 123/19
 125/3 128/5 128/6 131/16
 135/8 135/17 141/15 144/2
 144/12 144/20 144/24 144/25
 145/1 145/25 146/19 146/13
 147/10 148/3 148/4 151/16
 156/14 158/2 164/17 164/18
 164/18 164/19 164/23 167/25
 169/21 170/4 197/5 217/3
 217/6 226/16
**work-related [1]**  78/17
**worked [6]**  42/15 42/17 42/18
 44/11 46/8 46/11
**worker [1]**  169/18
**workers [1]**  56/23
**workforce [4]**  53/16 56/7
 56/15 83/2
**working [29]**  34/9 47/23 50/23
 55/13 58/16 59/1 59/6 59/11
 59/12 60/4 72/22 77/23 89/21
 89/22 90/21 102/2 111/17
 134/23 135/3 135/11 144/1
 145/19 145/23 145/24 159/1
 172/1 184/12 190/14 210/5
**works [6]**  48/23 83/22 84/9
 134/19 151/14 153/2
**worksheet [1]**  155/8
**world [4]**  37/3 190/23 191/4
 225/25
**worried [3]**  13/21 64/15 66/22
**worry [1]**  118/14
**worse [2]**  127/1 164/15
**worst [1]**  25/11
**worth [1]**  157/4
**worthy [1]**  67/18
**would [346]**
**wouldn't [22]**  7/4 11/2 25/9
 25/12 27/20 74/13 91/5 91/7
 91/11 96/11 104/19 115/21
 122/2 122/13 128/5 132/1
 145/23 157/9 162/16 167/6
 184/24 208/9
**wrap [1]**  24/24
**wrecks [1]**  210/15
**write [5]**  15/22 15/24 65/13
 99/2 166/4
**writer [1]**  166/4
**writers [1]**  98/25
**writing [2]**  56/4 98/24
**written [9]**  23/2 23/10 23/24
 25/8 25/13 26/2 27/14 54/4
 103/18
**wrong [7]**  34/16 62/1 75/13
 165/17 220/18 224/2 224/8
**wrote [5]**  22/23 23/16 25/15
 28/22 142/21

## X

**Xanax [2]**  214/23 215/9

## Y

**yeah [21]**  9/24 16/21 17/20
 22/13 71/4 110/19 111/14
 113/1 128/3 156/12 159/4
 171/25 172/1 191/20 198/19
 205/12 207/6 207/16 208/13
 218/20 221/22
**year [75]**  34/1 56/6 58/13
 58/14 58/22 58/24 75/19
 75/21 82/14 83/13 90/7

 106/6 107/14 107/15 108/11
 109/24 112/7 115/19 116/20
 117/2 117/14 117/25 117/25
 118/9 118/23 119/2 119/22
 120/8 120/9 120/21 121/8
 124/6 125/24 127/10 129/10
 129/21 129/21 134/8 135/4
 135/6 137/12 140/4 140/10
 140/10 140/21 140/21 140/23
 141/16 141/17 141/18 142/5
 142/5 142/6 142/12 143/12
 151/12 151/18 152/19 153/8
 153/11 153/14 153/15 155/20
 155/21 156/25 158/18 161/3
 162/16 162/18 208/17 226/13
**year's [3]**  150/24 152/16
 157/4
**years [60]**  11/18 24/17 24/20
 49/11 53/3 54/4 54/12 61/11
 62/25 65/8 69/23 78/4 78/5
 78/8 82/15 83/1 119/4 122/19
 125/12 125/20 126/5 127/13
 136/9 140/17 140/18 142/22
 144/22 149/19 152/6 152/9
 154/20 154/24 155/1 155/4
 155/15 156/8 156/14 157/6
 158/1 158/19 159/24 160/20
 162/2 162/6 162/7 165/14
 169/24 170/1 180/10 180/10
 180/22 192/2 193/25 208/1
 208/14 209/5 214/24 215/19
 223/13 225/8
**yes [319]**
**yesterday [5]**  21/5 22/19 23/1
 24/16 31/4
**yet [6]**  28/7 33/6 65/16
 65/19 133/18 151/10
**yield [3]**  160/12 160/16
 162/25
**you [1114]**
**you'd [1]**  161/12
**you'll [5]**  106/6 141/5 167/22
 167/24 215/9
**you're [83]**  4/20 6/23 9/9
 10/5 20/15 20/24 21/16 32/24
 40/2 40/15 43/4 43/5 47/10
 51/13 51/15 53/25 69/7 77/11
 78/17 83/3 92/21 96/24
 103/21 103/23 112/1 113/3
 113/13 115/5 115/22 122/20
 122/22 135/20 140/22 141/8
 150/7 151/14 151/22 151/22
 151/25 152/21 153/14 153/16
 155/6 156/7 156/11 156/11
 157/11 157/22 158/7 159/14
 161/23 162/5 162/13 165/6
 166/1 166/3 168/11 169/3
 170/14 171/19 175/10 175/24
 176/7 181/14 181/22 182/5
 188/13 189/5 189/14 190/3
 194/24 199/11 200/21 202/10
 203/4 208/9 209/25 210/14
 210/14 218/24 220/24 223/12
 226/9
**you've [40]**  4/13 9/16 22/6
 25/2 37/20 44/17 54/14 80/2
 81/3 81/20 84/23 86/22 88/9
 89/6 95/5 104/13 107/8 107/9
 116/20 137/17 137/25 139/10
 139/15 143/16 148/14 148/23
 161/16 162/1 180/5 181/17

 205/5 210/23 211/23 218/17
 221/21 226/19
**you-all [3]**  22/2 119/12 147/9
**young [3]**  22/8 44/10 206/15
**your [357]**
**yours [1]**  114/17
**yourself [9]**  18/20 27/2
 154/25 169/6 169/15 172/7
 183/18 188/22 189/8

## Z

**zero [1]**  163/3
**Zoloft [5]**  215/3 215/10
 215/12 215/16 215/17
**zone [2]**  18/1 58/19
**zoom [3]**  81/21 81/22 81/24