1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF TEXAS
2                HOUSTON DIVISION

3   JAMIE LEIGH JONES,            .
    PLAINTIFF,                    .
4                                 . H-07-CV-2719
            v.                    . HOUSTON, TEXAS
5                                 . JULY 6 2011
                                  . 8:05 A.M.
6   HALLIBURTON COMPANY D/B/A     .
    KBR KELLOGG BROWN & ROOT      .
7   (KBR); KELLOGG BROWN & ROOT   .
    SERVICES, INC.;               .
8   DEFENDANTS.                   .
    . . . . . . . . . . . . . .   .
9

10              TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE KEITH P. ELLISON
11           UNITED STATES DISTRICT JUDGE

12

    A P P E A R A N C E S:
13

    FOR THE PLAINTIFFS:
14

         Lannie Todd Kelly
15       The Kelly Law Firm PC
         One Riverway
16       Suite 1150
         Richmond, Texas 77056
17
         Ron Estefan
18       Attorney at Law
         One Riverway
19       Suite 1150
         Richmond, Texas 77056
20
         Stephanie Marie Morris
21       The Law Office of Stephanie M. Morris, PLLC
         27 S. Darington Street
22       West Chester, Pennsylvania 19382

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                           - - - - -


         *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

```
1    A P P E A R A N C E S:   (Continued)

2    FOR DEFENDANT KBR:

3          Joanne Vorpahl
           Susan Cates
4          Blake Runions
           Stephanie Holcombe
5          Daniel K. Hedges
           Porter & Hedges
6          1000 Main Street
           36th Floor
7          Houston, Texas 77002

8    FOR DEFENDANT CHARLES BORTZ:

9          Andrew T. McKinney, IV
           Sharon Cullen
10         McKinney Cooper LLP
           Three Riverway
11         Suite 500
           Houston, Texas 77056
12
     OFFICIAL COURT REPORTER:
13
           Cheryll K. Barron, CSR, CM, FCRR
14         U.S. District Court
           515 Rusk Street
15         Houston, Texas  77002

16                               - - - - -

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2                                                    PAGE

3    WITNESSES

4    James Paskowitz

5        Direct Examination by Mr. McKinney          24

6        Cross-Examination by Mr. Kelly              80

7    Kristen Rumba, by Video

8        Excerpts Presented by Defendants            92

9        Excerpts Presented by Plaintiffs            92

10   Sara Simco Tumbarella, by Video

11       Excerpts Presented by Defendants            92

12       Excerpts Presented by Plaintiffs            92

13   Pete Arroyo, by Video

14       Excerpts Presented by Defendants            93

15       Excerpts Presented by Plaintiffs            93

16   William Goodgine, by Video

17       Excerpts Presented by Defendants            93

18       Excerpts Presented by Plaintiffs            94

19   Anthony Adams, by Video

20       Excerpts Presented by Defendants            94

21   Tyler Schmidt, by Video

22       Excerpts Presented by Defendants            94

23       Excerpts Presented by Plaintiffs            95

24                      - - - - -

25
```

Cheryll K. Barron, CSR, CM, FCRR              713.250.5585

INDEX

(Continued)

PAGE

WITNESSES

Tom Jones, by Video

   Excerpts Presented by Plaintiffs          128

   Excerpts Presented by Plaintiffs          159

- - - - -

1                     P R O C E E D I N G S

2      *(Jury not present)*

3              THE COURT:  Okay.  Good morning and welcome.

4              Okay.  On the motion for directed verdicts.  As I

5      said yesterday, I'm not going to be able to grant Mr. Bortz'.

6      That is officially denied.  On KBR's motion for directed

7      verdict on the sexual harassment and hostile -- you can cover

8      for everybody?

9              MS. MORRIS:  No, your Honor.  Bill is going to grab

10     Todd and Ron.

11     *(Mr. Kelly and Mr. Estefan entering courtroom)*

12             THE COURT:  Okay.  Are we ready now?

13             MS. MORRIS:  Yes.

14             THE COURT:  Okay.  On the issue of -- I've already

15     said Mr. Bortz' motion for directed verdict is denied.

16             KBR's motion for directed verdict on the sexual

17     harassment, hostile work environment, I think the plaintiff has

18     introduced enough evidence that we're going to have to give

19     that to the jury.

20             On the issue of fraudulent inducement through

21     affirmative misrepresentation, I guess I need for plaintiff

22     sometime today to highlight the places in the record where

23     plaintiff put on evidence that there were affirmative

24     misrepresentations made by KBR on -- I don't think -- I don't

25     think I can find evidence that KBR had a sexual harassment

08:07  1  policy in place which it failed -- which it did not disclose --

       2  excuse me -- which it did not enforce.

       3          Maybe the fact that Ms. Jones claimed she was

       4  told that she would be placed in a hooch, maybe that's enough,

08:08  5  that KBR had certain safety measures in place, I don't remember

       6  any testimony that -- from Jones or anyone else that this was

       7  an affirmative misrepresentation.  Maybe somebody can point me

       8  somewhere in the record where there is evidence that KBR told

       9  Ms. Jones that the barracks would not be predominantly male,

08:08  10  but I don't -- I can't remember anything.

       11         On fraudulent inducement through non-disclosure,

       12  I think I have to dismiss that.  I just didn't see any evidence

       13  of that.  And I think I'm going to have to also dismiss the

       14  claim that KBR was vicariously liable for -- or liable through

08:09  15  a theory of respondeat superior for the rape and the assault

       16  and battery.

       17         On this one, there's -- we have to be somewhat

       18  consistent.  As you will recall, I did deny KBR's motion to

       19  enforce arbitration on the ground that I did not think rape was

08:09  20  in the course of employment; so, I didn't think the arbitration

       21  agreement reached that far.  Given that, it's very difficult

       22  for me to now come back and say KBR is vicariously liable

       23  because the rape was in the course of employment.  So --

       24         MR. KELLY:  Actually, your Honor, it's a ratification

08:09  25  theory, as well.

            *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:09   1                    Did the Court receive our responsive brief this

        2    morning?

        3                    THE COURT:  No, I didn't.  I'll tell them to look at

        4    it.

08:10   5                    MR. KELLY:  What time was it filed?

        6                    THE COURT:  Was it filed?

        7                    MR. ESTEFAN:  It was filed this morning.

        8                    MS. VORPAHL:  It was filed.  I have a copy of it.

        9    Would you like me to give you a copy of it?

08:10  10                    THE COURT:  Okay.  You can tell me orally why KBR did

       11    anything to ratify.

       12                    MS. CATES:  Well, I believe, your Honor, just to

       13    start, I don't think ratification has been pled in the live

       14    pleading.

08:10  15                    MS. VORPAHL:  It was not pled.

       16                    MR. KELLY:  Ratification itself does not have to be

       17    pled.  It's a theory of liability for respondeat superior.

       18                    THE COURT:  What did they do to ratify?

       19                    MR. KELLY:  Well, they consistently -- and there's

08:10  20    evidence since back in 1998 they have consistently punished

       21    people for reporting and protected the wrongdoers.  They

       22    rehired wrongdoers under -- or they fired them under the wrong

       23    firing code, if you will, and rehired them and brought them

       24    back.

08:10  25                    They have consistently provided their security

08:10    1    representation at interviews.  They have consistently punished

         2    women who have come forward and complained about these things.

         3    All of that amounts to a ratification.

         4                  They did the same thing with respect to

08:11    5    Ms. Jones.  She was just one of a series of victims of this

         6    company.  And this company continues to then ratify the conduct

         7    of its wrongdoers, again, predominantly by punishing those who

         8    have the audacity to complain about it.  They've done that

         9    from -- at least in this trial, we've heard evidence from 1998

08:11   10    to 2006.

        11         THE COURT:  But isn't the pattern here in this case

        12    that once they were informed of the alleged rape they made sure

        13    that Ms. Jones was safe, they contacted other parties, the

        14    State Department and the DOJ did an investigation?  And I think

08:11   15    the finding was -- we didn't let it in, but I think the finding

        16    was it wasn't a rape.  So, I don't know why that constitutes

        17    ratification.

        18         MR. KELLY:  Well, first of all, your Honor, that is

        19    one side of the evidence.  That is certainly not what we

08:12   20    believe the evidence shows.  We believe the evidence shows that

        21    Ms. Jones was imprisoned.  We believe the evidence shows there

        22    certainly is at least a prima facie case that she was

        23    imprisoned, that she was threatened and that Mr. Bortz was

        24    protected and, even knowing that Mr. Bortz had violated the

08:12   25    company's rules, was not fired, was not reprimanded any way

08:12  1    whatsoever.  And that was part of the pattern.  They don't fire

2    or reprimand the wrongdoer; they punish the victim.

3            And while I understand that the Court has just

4    announced for defense' case -- defense' position on the fact.

08:12  5    That's not at all what our position is and not at all what our

6    evidence has shown.  Our evidence has shown that, in fact, she

7    was in imprisoned and that she was threatened.  I think it's

8    for the jury to decide whether or not they believe the

9    plaintiffs' version of those facts or the defendants' version.

08:12  10           THE COURT:  KBR wish to respond?

11           MS. VORPAHL:  Well, your Honor, briefly.  Again,

12   ratification hasn't been pled; and it's required to be pled.

13   But furthermore, what Mr. Kelly posits is, you know, Amy Katz

14   and Julie LaFranca and -- and that's not the issue in this

08:13  15   case.  And Mr. Kelly's wishful thinking about the evidence

16   doesn't make it so.

17           I think that the evidence has demonstrated

18   nothing other than that KBR took steps to protect Ms. Jones and

19   in no way ratified any bad act, again, assuming that

08:13  20   ratification had been pled.

21           MR. RUNIONS:  If I can add, I think that there's at

22   least some evidence that KBR complied with or went along with

23   the State Department investigation, as you mentioned, and was

24   awaiting the results of the State Department investigation to

08:13  25   see what their actions would be down the road with regard to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:13  1    the incident.

       2             THE COURT:  I don't think the evidence shows that in

       3    all cases KBR fired people who cohabited.  I think --

       4             MR. KELLY:  That's the point, your Honor, they didn't.

08:14  5             THE COURT:  Well, I know; but I don't think that

       6    proves that she -- that Mr. Bortz is a wrongdoer.

       7             I've been in law firms where there were policies

       8    against cohabitation and they weren't enforced.  I don't think

       9    that proves that they're siding with the wrongdoer.

08:14  10            MR. KELLY:  It's more than just that, your Honor.

       11   It's the fact that they did punish Ms. Jones; it's the fact

       12   that they didn't punish Mr. Bortz; it's the fact that they

       13   hadn't punished -- they created the environment where they

       14   hadn't punished for years.  And there's ample evidence in this

08:14  15   transcript to show that they had a consistent pattern of not

       16   punishing wrongdoers.

       17            You know, we heard from Ms. Westcott yesterday

       18   about how the five victims of one rapist, when four of them

       19   backed off, they kept their jobs but when she pushed forward

08:15  20   she was fired.  We've heard the -- all of the victims that have

       21   come forward, that talk about how they were -- they knew of the

       22   environment over in Iraq, that if they complained of sexual

       23   harassment or if they complained of sexual assault that they

       24   would lose their jobs.

08:15  25            This is a corporate culture.  And it actually

08:15  1   also does go to the fraud, your Honor.  It's a fraud by failing

2   to communicate that corporate culture, when they had a superior

3   knowledge, because this is happening overseas in Baghdad, where

4   Ms. Jones could not have had the same knowledge.  So, both as

08:15  5   to the fraud and as to the ratification of the wrongdoers'

6   actions, I think there's been ample evidence for this jury to

7   find against KBR.

8        THE COURT:  I'll take another look at the pleading.  I

9   don't think ratification was pled, though.

08:15  10       MR. KELLY:  Your Honor, I don't think ratification

11  itself has to be specifically pled.  It is a way to find

12  vicarious liability and does not require that ratification be

13  specifically pled.

14       MR. ESTEFAN:  And actually, your Honor, I got that out

08:15  15  of the pattern jury charge, the ratification language.  It's to

16  hold a corporation liable for the acts of an employee.

17       THE COURT:  I know what ratification is.  But if --

18       MR. ESTEFAN:  It's part of an instruction.  It's not

19  part of a specific separate cause of action or theory of

08:16  20  recovery.

21       THE COURT:  If KBR should be held vicariously liable

22  for Bortz' actions, then I think we made the wrong decision on

23  arbitration.  I mean, if it really is that this was part of

24  the -- part of KBR's obligation to police, not just on-the-job

08:16  25  conduct but after-hours conduct involving sex, then I should

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:16   1   have just sent the whole thing to arbitration, I think.

2          MR. KELLY:  Well, your Honor, even if that were true,

3   at this point I don't think that KBR would have tried to

4   enforce the arbitration based upon the Franken Amendment.  So,

08:16   5   even if that were true, that issue would now be moot based upon

6   the fact that the laws have changed.  And unless KBR wants to

7   risk it's billion-dollar contracts with the government, I don't

8   think they're going to try to enforce the arbitration provision

9   at this juncture.

08:17  10          MS. MORRIS:  But, your Honor, I think the biggest

11   distinction in your analysis on the arbitration issue was

12   whether or not it was within Ms. Jones' course and scope of

13   employment, as opposed to Mr. Bortz'.

14          MR. KELLY:  Exactly.

08:17  15          MS. MORRIS:  So, when you were looking at whether or

16   not the arbitration provision applied to Ms. Jones, you looked

17   within her course and scope of employment.  Now, whether or not

18   they should be held liable for his acts, we're looking at

19   his -- whether he was acting within the course and scope of

08:17  20   employment.

21          MR. KELLY:  If they --

22          THE COURT:  He clearly wasn't.

23          MR. ESTEFAN:  He doesn't have to be, though.

24          MS. VORPAHL:  You can't possibly argue that, that if

08:17  25   you believe there was a rape that he was acting within the

08:17   1    course and scope of his employment --

2            MR. KELLY:  He doesn't have to be in the course and

3    scope of his employment for KBR to be vicariously liable, your

4    Honor, under the theories of ratification and the fact that

08:17   5    they created this environment.  And, actually, they kind of go

6    hand in glove.  But the fact that they created this environment

7    that allowed Mr. Bortz to believe he could get away with this

8    and, in fact, to get away with this, the -- and the fact that

9    they had had a history of allowing wrongdoers to get away with

08:18   10   their actions, you don't -- he doesn't have to be in the course

11   and scope when they ratify the way that they did.

12           MR. ESTEFAN:  It's like leaving any other dangerous

13   condition in place, Judge.  If they had left a live grenade,

14   with the pin pulled out, lying around there, it's the same

08:18   15   thing.  I mean, it doesn't have to be a course and scope issue

16   for Mr. Bortz.  They allowed this environment to perpetuate

17   because of their lack of enforcement of their own rules.

18           MS. VORPAHL:  That's the negligence claim that you

19   previously dismissed.

08:18   20           THE COURT:  Yeah.  I don't think I'm going to be able

21   to allow KBR's vicarious liability to go to the jury.  I will

22   allow the hostile work environment, the sexual harassment to

23   go.

24           I need some more evidence from the plaintiff as

08:18   25   to fraudulent inducements through affirmative

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:18  1    misrepresentation.

2              On fraudulent inducement through non-disclosure,

3    the --

4              MR. KELLY:  Your Honor, there's been ample -- I mean,

08:19  5    there's been a lot of evidence on the fact that KBR was in a

6    superior position to know about what was happening over in Iraq

7    and failed to disclose it to Ms. Jones.

8              She testified from the stand that she was told

9    she was more likely to get hit by a truck or be in a car wreck

08:19  10   in the United States than for anything to happen over there.

11   She's testified that the only threats that they told her about

12   were spiders and heat stroke and insurgency, never told her

13   anything about the sexually hostile work environment that we've

14   heard so much evidence about in this trial.

08:19  15             So, clearly, they -- clearly, they were in a

16   better position to know and failed to disclose.

17             MS. VORPAHL:  And, your Honor, the threshold issue

18   there is whether or not there was a duty to disclose

19   information.

08:19  20             THE COURT:  I know that.

21             MS. VORPAHL:  Okay.

22             MR. KELLY:  And if you look at -- your Honor, we've

23   provided -- both in our jury charge and in our recently filed

24   response, we've provided other definitions of "fraud," which

08:19  25   were not included in the defense' definition, right out of the

08:20   1   pattern jury charges.  And we think that the definition of
        2   "fraud" proffered by the defense is obviously the most
        3   restricted.
        4        THE COURT:  So, your theory is that the non-disclosure
08:20   5   was that KBR should have represented that Iraq was not safe for
        6   women?
        7        MR. KELLY:  They should have -- they should have
        8   informed Ms. Jones, and other similarly situated women, of the
        9   problems that they were having, based upon the fact that it was
08:20  10   as rampant as it was and based upon the fact that they knew
       11   that it was as rampant as it was and did nothing.
       12        They didn't just -- they didn't just fail to
       13   tell, your Honor; they actively concealed.  They kept these
       14   documents in an HR file in an office.  They didn't even go into
08:20  15   the personnel files of these women [sic].  And we've heard from
       16   Kara Hall, who testified that when these reports would come in
       17   they would simply sit in a manila folder in his office
       18   somewhere in Baghdad.  They never made it into the personnel
       19   files.  And, you know, and oftentimes these reports never even
08:21  20   made it that far because the managers knew that as long as they
       21   kept that secret they wouldn't get in trouble for it.
       22        We've heard that when women would complain to the
       23   hotline that that information would actually get back to the
       24   managers so as to quell the complaints.  This was active
08:21  25   concealment, your Honor.

08:21   1              THE COURT:  I'm going to leave in the affirmative --
        2    well, I think I'm going to leave in the affirmative
        3    misrepresentation of fraudulent inducement, but I need -- I
        4    need plaintiff to point out some more evidence in the record.
08:21   5              But on fraudulent concealment, what we would be
        6    creating is a -- in Texas is an obligation on the part of an
        7    employer to disclose everything potentially hazardous,
        8    negative, uncomfortable about a job; and I just don't think
        9    that's the law.  But I'll read your papers, which I haven't
08:21  10    read yet.
       11              MR. KELLY:  Thank you, your Honor.
       12              THE COURT:  And I'll wait for more citations from the
       13    record as to the affirmative misrepresentation.
       14              Let's talk about line and page now.
08:22  15              MR. RUNIONS:  Thank you, your Honor.
       16              MS. HOLCOMBE:  Your Honor, we would like to start with
       17    Anthony Adams.
       18              I have a copy, Stephanie.
       19              Plaintiff did not have any objections to our page
08:22  20    and line designation.  However, we have objections to their
       21    cross -- sorry -- cross-examination.
       22              As an overall theme, kind of, throughout
       23    plaintiffs' cross-examinations of our direct examinations, if I
       24    had to guess, about 80 percent are dealing with the same
08:22  25    problem, specifically that the cuts are cumulative,

                 *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:22  1   duplicative, and unfairly prejudicial under 403 because those

2   exact same page and lines, as referenced in our written

3   objections, were already played in plaintiffs' case in chief.

4           The deposition, they've had on file forever

08:23  5   and -- or as long as we have.  And in order to allow them to

6   play these additional cuts again before the jury would

7   improperly bolster their testimony -- or the deponent's

8   testimony, in favor of their case, to hear it twice.

9           MS. CATES:  And I would just add that, if that is,

08:23  10  80 percent, additionally, it's sort of outside the scope of the

11  direct examination that we proposed.

12          THE COURT:  Okay.  Let me get the response.

13          MS. MORRIS:  Your Honor, there are three cuts from

14  Adams, which encompasses 55 seconds of tape, one of which --

08:23  15  one objection that the defendant has made is outside the scope,

16  they allege is outside the scope of their direct.

17          These cuts were played in plaintiffs' direct, for

18  substantive reasons.  They're being played in cross to attack

19  his credibility and the weight of the evidence being presented.

08:24  20          And I would like to add that the defendants have

21  done the same in several other depositions, where they have

22  cited to cuts that they're going to use in their direct that

23  were also played in their cross in our case.

24          THE COURT:  Yes, ma'am?

08:24  25          MS. HOLCOMBE:  Respectfully, the only time that we

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:24  1   have ever used a cut that was already played -- and I have our

2   page and line cuts here and we can look at them -- is if it was

3   a two -- two-sentence thing, to put whatever the cross -- or

4   the direct point was going to be in context -- where they were

08:24  5   located when this section is played, what time of day it was,

6   or who the name is -- when you say the word "she," are we

7   referring to Ms. Jones or are we referring to Ms. Armstrong or

8   who.  That's the only time that we've used a repetitive cut at

9   all, because we would not want to improperly bolster the

08:24  10  testimony for the jury to hear it twice.

11      THE COURT:  I tell you what.  I think you're probably

12  right on what you're saying; but at this late date, I would

13  rather just put the -- are we going to have time to go through

14  these and make a different sets of cuts now?

08:24  15      MS. MORRIS:  Your Honor, our cuts are -- I think the

16  longest one we have is about two minutes -- or I'm sorry.  One

17  is three minutes and 11 seconds.  And the majority of the

18  defendants' objections are that they were played in our direct,

19  what they're alleging here.

08:25  20          And I disagree with Ms. Holcombe's assertion that

21  her cuts that are replayed are just to correct the record.

22  There's about three pages in Mr. Goodgine's, another page in

23  Mr. Goodgine's.  That's a lot of information that was played in

24  their direct -- I mean, their cross.

08:25  25      MS. CATES:  Your Honor, if I could just use as an

08:25   1   example, for example, Rumba, like, this is our direct.  It is

        2   her saying, "If sexual assault came to Camp Hope during this

        3   time period, a sexual assault complaint, would it have come

        4   through you, as the physician's assistant?"

08:25   5               And she says, "Yes, it would have."

        6               They've designated a couple of things that are

        7   appropriate cross.  And then they go back through the whole,

        8   "What did Dr. Schulz say, that you were penetrated vaginally

        9   and anally?"  That's not cross of that direct, and they played

08:25  10   it in their direct.  You don't just get to bolster your

       11   arguments by putting in a snippet here and there just to say,

       12   "Let me take the best thing from my direct and put it in your

       13   cross," when it has nothing to do with the direct.

       14               MS. HOLCOMBE:  And if I could add just one more thing

08:26  15   real quickly.  Just for the efficiency purpose, your Honor, two

       16   things.  One, we've had ours on file since June 19th, our cross

       17   and our direct.  And we didn't receive their cross to object to

       18   until this weekend.

       19               Secondly, your Honor, as far as making these

08:26  20   cuts, if your Honor agrees that in order to play the same cuts

       21   again would be unfairly prejudicial and duplicative under 403,

       22   then we have a witness this morning that we could take up that

       23   time.  We can step outside with Ms. Morris.  We can cut them

       24   out.  Our own person told us it doesn't take very long to

08:26  25   remove cuts from a deposition and they can be ready to play if

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:26   1    that's a general ruling across the board, which would cover a

        2    bulk of the issues that we have with the page and lines.

        3            MS. CATES:  Although, to be fair, not all of them.  We

        4    still have other objections we would need to raise with the

08:26   5    Court.

        6            MS. HOLCOMBE:  Yes.

        7            MS. CATES:  It's why we tried to do it yesterday.  I'm

        8    sorry, your Honor.

        9            THE COURT:  I know.  We had a critical person

08:27  10    unavailable yesterday.

       11            And how many depositions are involved?

       12            MS. HOLCOMBE:  Six, your Honor, or seven if we include

       13    Mr. Jones.

       14            MS. CATES:  Seven with Mr. Jones.

08:27  15            THE COURT:  We're going to start with the doctor this

       16    morning.  How long is that likely to take?

       17            MR. McKINNEY:  Couple of hours.  That's plenty of

       18    time.  There will be plenty of time to edit the depositions.

       19            THE COURT:  But I have to go through each one right

08:27  20    now and decide what should be edited and what should not.

       21            MR. McKINNEY:  Well, to follow up on what Ms. Holcombe

       22    and Ms. Cates said, the only designations that are being

       23    offered on the defense side this morning are designations that

       24    the plaintiffs have had notice of --

08:28  25            THE COURT:  I'm troubled by that.  I'm troubled by

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

08:28   1    that.

    2               MR. McKINNEY:  And what we received this weekend is

    3    notice from the plaintiffs that they intend to replay portions

    4    of the depositions they previously played.  So, not only is it

08:28   5    untimely notice, it's untimely notice of their intent to be

    6    repetitive.  And there's just no good reason why the Court

    7    should allow that, for either reason, one, untimely notice, B,

    8    it's repetitive.  We have the right in our case to show

    9    additional evidence, and that does not give the plaintiffs the

08:28  10    right to reshow their evidence.

   11               THE COURT:  I understand the point.  I do.

   12               MS. CATES:  If I may just make one more point?

   13               We had offered to do all our page and lines in

   14    the plaintiffs' case in chief.  They're the ones that refused

08:28  15    and said, "You have to limit your cross to our direct," which

   16    forced us to do direct.  But their cross has to be limited just

   17    like ours was in their case.

   18               THE COURT:  Is it the case that these suggested

   19    excerpts were not disclosed to the other side until this

08:29  20    weekend?

   21               MS. MORRIS:  I believe --

   22       (Sotto voce discussion among plaintiffs' counsel)

   23               MS. MORRIS:  Yes.

   24               MR. KELLY:  Your Honor, if lack of notice is really

08:29  25    the reason, I mean, I -- I have to be -- we have a witness

08:29    1    about to take the stand who was never put on a witness list and

         2    we have -- and we've been denied the opportunity to bring a

         3    witness, who can controvert Jamie Armstrong, when we put --

         4    when we gave the defense notice the day after I learned of her.

08:29    5    If that's really the reason that this is being rejected, this

         6    is a hand being dealt one way, Judge.

         7            THE COURT:  No, it's not.  We went through the reasons

         8    yesterday as to whether -- as to why the doctor should be

         9    called.  And we have been through the -- several times the

08:30   10    reason that the Congressional aide should not be called.

        11            One was on the witness list, one was not.  One

        12    presumably you were -- you would be ready to cross, the doctor;

        13    one was that the other side did not have any reason to expect

        14    to have to cross.  There are a number of distinctions.

08:30   15            I'm going to -- this is my rule.  Let me see if

        16    you can work with this.  I'm not going to allow any quotes that

        17    have already been played for the Court except in those

        18    instances where a pronoun is ambiguous or a time is ambiguous

        19    or something else is required to make defendants' excerpts

08:30   20    complete and cognizable; that is, to make the grammar work, to

        21    make the references work.  The rest of it that's already been

        22    played does not come in.

        23            MS. CATES:  Your Honor, would it be okay if the three

        24    of us stepped outside during the testimony of the doctor to

08:31   25    work on this?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:31     1              THE COURT:  Sure.  I don't care about that.

          2              MS. CATES:  Thank you, your Honor.

          3              THE COURT:  Okay.

          4              MS. CULLEN:  Your Honor, Mr. McKinney already stepped

08:31     5    out.  I'm not --

          6              THE COURT:  Okay.  Let's all take a few minutes to

          7    step out or see what we need.  No more than two minutes.

          8         (Jury present)

          9              THE COURT:  All right.  Defendants have another

08:35    10    witness.  Why don't we proceed with him?

         11              MR. McKINNEY:  Charles Bortz calls Dr. Paskowitz to

         12    the stand.

         13              THE COURT:  Okay.  Dr. Paskowitz.

         14              MR. McKINNEY:  I believe he's outside.

08:36    15              THE COURT:  You may summon him.

         16         (Witness being summoned to the stand)

         17              THE COURT:  Yes, sir.  Doctor, before you take your

         18    seat, Mrs. Loewe will administer the oath.  If you could raise

         19    your right hand, please.

08:36    20              THE CASE MANAGER:  Do you solemnly swear the testimony

         21    you're about to give in the matter now before the Court will be

         22    the truth, the whole truth, and nothing but the truth?

         23              THE WITNESS:  Yes.

         24              THE COURT:  Okay.  Please have a seat and try to speak

08:36    25    directly into that mic.  It might be hard for a tall guy like

08:36   1    you, but try to adjust it.

2              Okay.  You may inquire.

3              MR. McKINNEY:  Please the Court.

4              **JAMES PASKOWITZ, DULY SWORN, TESTIFIED:**

08:36   5                   **DIRECT EXAMINATION**

6    BY MR. McKINNEY:

7    Q.  Dr. Paskowitz, good morning.  I'm Andrew McKinney.  I

8    represent Charles Bortz, and my apologies for being the man who

9    has brought you down here today.

08:37  10              If we could start, please, sir, by you stating

11   your full name for the record.

12   A.  James Paskowitz.

13   Q.  All right, sir.  And because the court reporter is taking

14   down what you say and because our jury needs to hear what you

08:37  15   have to say, if you could pitch your voice a little bit louder

16   and speak into the microphone so that everyone can hear you,

17   that would be much appreciated.  All right?

18   A.  All right.

19              James Paskowitz.  Is that better?

08:37  20   Q.  That's perfect.  Thank you.

21              Tell us what you do for a living, please, sir.

22   A.  I'm a psychiatrist in private practice in Houston.

23   Q.  All right, sir.  Tell us about your education.  When did

24   you go to medical school and where?

08:37  25   A.  I went to medical school from 2002 to 2006 at the Medical

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:37  1   College of Virginia in Richmond, Virginia, and did my residency

2   training -- I'm sorry -- 1998 to 2002 was the medical school.

3   And then, from 2002, 2006 was residency at Baylor College of

4   Medicine here in Houston.

08:38  5   Q.  And did you specialize in psychiatry during your residency?

6   A.  Yes, sir.

7   Q.  And have you taken the examination for Board certification

8   in psychiatry?

9   A.  Yes, sir.

08:38  10   Q.  And when did you complete your Board certification?

11   A.  I don't remember the exact date.  I think it was sometime

12   in 2008, somewhere around that.  It's too far to remember when

13   the -- I passed both parts the first time, but I don't remember

14   the exact dates.

08:38  15   Q.  All right.  You've been subpoenaed to be here today,

16   because my understanding is that you are the treating

17   psychiatrist for Jamie Leigh Jones.  Is that correct?

18   A.  Correct.

19   Q.  Can you tell us how Ms. Jones came to see you?  Was it by

08:38  20   referral?

21   A.  My best recollection was that she had previously seen a

22   psychiatrist named Elizabeth Weinberg, who had been a mentor of

23   mine when I was in residency.  And Dr. Weinberg was going on

24   maternity leave around that time -- or she may have been

08:39  25   already been on maternity leave.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:39    1              And Jamie called her from the standpoint of

         2     trying to follow up, I think, several months after the initial

         3     appointment.  And Dr. Weinberg wasn't able to see her, and so

         4     she referred Jamie to me.

08:39    5     Q.  All right, sir.  And just by way of background, have you

         6     ever met me before or anyone from my office, to your knowledge?

         7     A.  Not that I'm aware of.

         8     Q.  All right, sir.

         9     A.  I spoke to, I guess, Rhonda on the phone; but I don't think

08:39   10     I've met anybody.

        11     Q.  Right.  Rhonda was making arrangements for you to be here?

        12     A.  Right.

        13     Q.  And have you spoken with any of the attorneys involved in

        14     this case?

08:39   15     A.  I have, yes.

        16     Q.  Who have you spoken with?

        17     A.  I spoke with one or two of the defense attorneys -- I think

        18     two -- on the phone at one point.

        19     Q.  Attorneys for who, please, sir?

08:40   20     A.  Sorry.  For the plaintiff.

        21     Q.  For Ms. Jones?

        22     A.  Right.

        23     Q.  And do you recall when that conversation was?

        24     A.  I think it was somewhere around a week ago.

08:40   25     Q.  All right.  And were they discussing the possibility of you

08:40   1   coming here to testify?

2   A.   Yes.

3   Q.   I notice you did not bring your chart with you.

4   A.   Correct.

08:40   5   Q.   Did you take the time yesterday to review your chart

6   regarding Ms. Jones before coming down here?

7   A.   I mean, I did briefly.  I figured you guys have the chart

8   and probably knew it better than I do at this point.

9   Q.   Well, the first part is probably true.  I don't know about

08:40   10  the second, but we'll find out.

11                 Do you recall when Ms. Jones had her last visit?

12  A.   I don't remember when her last visit was.  I talked to her

13  on the phone, I believe, sometime in May.  And I think it was

14  after she had gotten a copy of one of the reports and was

08:40   15  reading through it and was quite distressed about it.  And we

16  talked about it on the phone and ended up raising her dose of

17  Paxil.  And I advised her to stop reading the reports because

18  it was clearly distressing to her.

19  Q.   Would that be the report from Dr. Victor Scarano?

08:41   20  A.   I'm not for sure.  I'm assuming it is, having gotten a copy

21  of that.  But I think she's gotten multiple reports.  I'm

22  pretty sure that was the one that was disturbing to her.

23  Q.   And did you read the report, Dr. Scarano's report?

24  A.   I didn't read it fully.  I've read pieces of it, yes.

08:41   25  Q.   All right.  Did you see things in that report that were new

08:41   1   to you?

2   A.  Yes.

3   Q.  We'll be talking about some of those things over the course

4   of the morning, I'm sure.

08:41   5       I have your last -- I have Ms. Jones' last visit

6   with you, according to the records that I have, as being

7   August 17th of 2010.  Does that sound about right?

8   A.  I don't think so.  I think that I might have seen her in

9   person some time in 2011.  Again, I'm not positive about that.

08:42   10  Q.  All right.  If you did see her in person in 2011, by my

11  count, you've seen Ms. Jones ten times over the last six years

12  or so?

13  A.  I think that's probably about right, yes.

14      MR. McKINNEY:  Let's put Bortz 217 up on the screen,

08:42   15  please, if we can.

16  BY MR. McKINNEY:

17  Q.  And this is the initial visit, your notes from the initial

18  visit with Ms. Jones.

19      MR. McKINNEY:  And if we could highlight -- do we have

08:42   20  a pointer handy -- the history right up here, down to the

21  words -- not that far down -- about 12 lines down, to right

22  here.

23  BY MR. McKINNEY:

24  Q.  Now, again, a little bit of background, Doctor.  When you

08:43   25  take a history from a patient, confirm for the jury that it's a

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:43   1   part of your standard training through medical school and your

2   residency to write down as accurately as you can what the

3   patient tells you about their condition and, as much as you

4   can, in the patient's own words?

08:43   5   A.   Right.   I mean, when I take a history, I generally will jot

6   down brief notes on a piece of paper and then write my report

7   at the end.   I try to focus as much attention on the patient as

8   I can during the interview as possible.   So -- but I do my best

9   to, you know, have my records be as accurately as I can

08:44   10   remember from the interview and try to write the report, you

11   know, that day if not the next day.

12   Q.   And that's pretty much a universal practice of healthcare

13   providers in the United States, is it not?

14   A.   I would think so.

08:44   15   Q.   What we see here --

16       MR. McKINNEY:   If we could highlight that a little

17   bit.

18   BY MR. McKINNEY:

19   Q.   And you have it there on the screen in front of you,

08:44   20   "Patient is a 21-year-old white female who presents for initial

21   evaluation with her husband."

22       Was her husband present in the room throughout?

23   A.   Actually, I'm not sure if it was -- because -- I'm not sure

24   if it was her husband or if it was actually her mother for the

08:44   25   initial evaluation, now that I think about it.   But it might

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

08:44  1    have been her husband.  I knew that she came with a family
       2    member for the first several times that I saw her.  I actually
       3    don't -- but again, you know, if that's what's in my record, I
       4    guess that's the best that I can recall.
08:45  5    Q.  The next line states, "Patient reports being the victim of
       6    a violent rape in July of 2005 when working as an IT tech in
       7    Baghdad for Halliburton."
       8                 And that would all be information that you would
       9    have gotten directly from Ms. Jones, correct?
08:45 10    A.  Correct.
      11    Q.  And she reports to you having been raped by multiple
      12    attackers, both vaginally and anally, and having sustained
      13    severe physical damage vaginally and to her chest, where she
      14    has had to have multiple reconstructive surgeries and may have
08:45 15    to have another surgery on her chest."
      16                 Again, all of that information is information
      17    that could only come from Ms. Jones, correct?
      18    A.  I believe so, unless it came from the family member who was
      19    with her.
08:46 20    Q.  Is it customary for you to do an initial psychiatric
      21    consultation with a patient, with a family member present?
      22    A.  It depends on the patient.  You know, especially in a
      23    situation where, you know, a patient has been -- you know, in
      24    this case having been raped and me being male, the patient
08:46 25    being female, you know, one of my initial questions is, "Do you

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:46   1   feel comfortable with me being your treater," first of all, and
        2   then, you know, "Would you rather have a family member present
        3   in the -- during the interview."
        4   Q.   That makes sense.   Was she comfortable having this initial
08:46   5   interview with you?
        6   A.   It seemed like it.   You know, I think that -- again, you
        7   know, whoever was with her, I think she was more comfortable
        8   with that person being in the room.   But, you know, she seemed
        9   relatively comfortable, you know.   I mean, on the hypervigilant
08:47  10   side.   But I think part of it was that she had told her story
       11   enough times that, you know, she was probably more comfortable
       12   than, you know, somebody who would be coming in the very first
       13   time giving her history.
       14   Q.   Understood.   Now, I would like to focus for a moment on the
08:47  15   multiple attackers angle.   First of all, it would be unusual
       16   for you to have a patient come in and report having been
       17   sexually assaulted by multiple assailants.   That's not
       18   something that you see normally.   Fair statement?
       19   A.   I mean, it certainly can happen.   I mean, I don't know the
08:47  20   percentage of patients who have been raped where it's multiple
       21   attackers but --
       22   Q.   No.   I'm asking in your practice.
       23   A.   In my practice, you know, I don't have an especially large
       24   practice.   I think I've had other patients who have had, you
08:48  25   know, multiple attackers; but I can't tell you the percentage

08:48    1    of people that have been raped that have multiple attackers.

2    Q.  The point I'm making here -- I'll try to be a little bit

3    more clear.  When a young woman comes in and tells you that she

4    was sexually assaulted by multiple assailants, that's not like

08:48    5    someone coming in and saying, "I lost my job and I'm depressed"

6    or "I'm having trouble with my wife" or something of that

7    nature.  That statement alone -- and if I'm wrong on this, feel

8    free to tell me.  But that statement alone would almost

9    instantly heighten your awareness, heighten your senses as to

08:48   10    the gravity of the patient's problem, would it not?

11    A.  I mean, potentially.  You know, but if it had been one

12    person versus multiple people, I'm not sure if that would

13    necessarily, you know, affect it.

14         Maybe I would see it as being more severe; but I

08:49   15    don't know how much that would actually affect treatment or

16    diagnosis or, you know, my level of -- I don't know if interest

17    in the case is something that you're asking about.

18    Q.  You don't know whether, based on how you perceive yourself

19    as functioning as a psychiatrist, whether a patient coming in

08:49   20    alleging --

21    A.  I mean, I would probably see it as worse than one, you

22    know; but, you know, I certainly wouldn't discount if it was

23    one.

24    Q.  Oh, understood.  And I'm not implying that you would.

08:49   25         I'm just saying that that's the kind of

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:49    1   circumstance that's reasonably calculated to get a
         2   psychiatrist's attention, is it not?
         3   A.   I mean, I guess it would; but again, one attacker would
         4   also, I think, get my attention very well, as well.
08:50    5   Q.   All right.  But, in any event, the information that there
         6   were multiple attackers came to you directly from Ms. Jones?
         7   A.   I believe so, yes.
         8   Q.   And the date of your initial visit --
         9            MR. McKINNEY:  If we were to highlight that?
08:50   10   A.   November 6 of 2006.
        11   BY MR. McKINNEY:
        12   Q.   Pardon me?
        13   A.   November 6 of 2006.
        14   Q.   Right.  Late 2006, roughly 16 months post-Iraq?
08:50   15   A.   Right.
        16   Q.   Okay.  And, again, Ms. Jones told you that she sustained
        17   severe physical damage vaginally and to her chest at the time
        18   of the assault?
        19   A.   I believe so, yes.
08:50   20   Q.   Wouldn't have written it down that way, otherwise, if she
        21   hadn't?
        22   A.   I mean, I'm assuming what I wrote in my chart is, you know,
        23   the best recollection of what she told me.
        24   Q.   Do you actually remember the initial visit that you had
08:50   25   with Ms. Jones?

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

08:50  1    A.  Vaguely.  I mean, it was five years ago.  So, my memory for
       2    it is certainly not what it would have been back then.  But, I
       3    mean, I -- so --
       4    Q.  Of course, you would remember more then than you do today.
08:51  5    But I'm just asking you if you happen to recall this initial
       6    visit.
       7    A.  I mean, I recall it.  I certainly don't have any
       8    photographic memory for it.
       9    Q.  Not asking you if you do.
08:51  10               She also reported to you that she had had
       11   multiple surgeries of a reconstructive nature?
       12   A.  That's what I recall her saying.
       13   Q.  And, again, "multiple" means many, not one or two but some
       14   number?
08:51  15   A.  It might have actually been two.  But I don't remember.
       16   Because looking back on it, it might have been two at the time;
       17   but I don't think I remembered the number that she had said or
       18   even if I had asked.
       19               You know, I guess one other thing to note is that
08:52  20   when I am seeing somebody who's been in a situation that's
       21   traumatic I don't try to delve too deeply and re-traumatize the
       22   patient.  So -- but, you know, I think "multiple" was more than
       23   one.
       24   Q.  But by definition, "multiple" would be more than one?
08:52  25   A.  Right.


*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

08:52  1   Q.  Then you chart that Ms. Jones lost consciousness for some

       2   of the attack?

       3   A.  Correct.

       4   Q.  And she reported that to you?

08:52  5   A.  I believe so, yes.

       6   Q.  Did she report to you any specific memory of any part of

       7   the attack?

       8   A.  I believe that she did.  I don't actually remember the

       9   details that she told me, other than having been raped.  But,

08:52  10  you know, I do remember her saying that, you know, she had lost

       11  memory for at least part of the event.  But, you know, I don't

       12  know how much my memory is skewed by other things that I've

       13  read recently.  Because I don't remember exactly what she told

       14  me in the initial evaluation.

08:53  15          And again, I told her during the initial

       16  evaluation to just let me know what she was comfortable telling

       17  me, because I didn't want to re-traumatize her.

       18  Q.  Sure.  But if we look at just what's written down in the

       19  record, the reasonable inference to draw would be that the

08:53  20  history related to you by Ms. Jones, in sum and substance, is

       21  that she had some level of awareness of the number of

       22  assailants and she had some level of awareness of actually

       23  experiencing some part of the assault.  Is that a fair

       24  statement?

08:54  25  A.  I believe so, yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:54    1    Q.  And then she reported to you that, since that time, she's

         2    had nightmares and flashbacks and has been very hypervigilant,

         3    particularly around unknown men?

         4    A.  Correct.

08:54    5    Q.  Did Ms. Jones indicate to you -- and I've looked for it in

         6    your chart, and I haven't seen it; so, I'm wondering if you

         7    have an independent memory of Ms. Jones saying this to you and

         8    not being something -- not being something that you remember

         9    having read from another source.

08:54   10                Did Ms. Jones ever indicate to you that she had

        11    been given some kind of a drug?

        12    A.  I believe that she did, at least that she thought that she

        13    had.

        14    Q.  And is that in your chart anywhere, that you're aware of?

08:55   15    A.  I don't know if it is or not.  I mean, if you didn't see it

        16    in the chart, then I'm assuming it's not there.

        17    Q.  Well, I didn't.  And I'm wondering if, when you looked at

        18    your chart yesterday, you saw any reference to it.

        19    A.  I don't think so.  But I do remember her saying that she

08:55   20    believed that she had been drugged.

        21    Q.  And you think that was at the initial visit or in a

        22    subsequent visit?

        23    A.  I think it was in the initial visit; but, again, I'm not

        24    sure.

08:55   25    Q.  Normally that would be the kind of thing you would write

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:55  1  down in the initial visit if it had been passed along to you?

2  A.  I mean, again, my job is from the standpoint of a treating

3  psychiatrist.  So, you know, from the standpoint of would that

4  necessarily have an impact on how I treat her, you know, again,

08:55  5  it's not a perfect 100 percent, you know, recollection of what

6  she said.  Otherwise, the report would probably be about five

7  pages long or ten pages long.

8  Q.  I understand.  Do you record your sessions with your

9  patients?

08:56  10  A.  I do not.

11  Q.  So, if in the initial session, to round out the picture,

12  the impression that you got from Ms. Jones is -- if I'm putting

13  words into your memory, you tell me.  Okay?  Because I don't

14  want to get it wrong.

08:56  15          She told you that she thought that she might have

16  been given some kind of a drug but you don't remember any other

17  detail about that and you didn't chart that particular fact,

18  correct?

19  A.  I believe so, yes.

08:56  20  Q.  But that -- whether drugged or not, Ms. Jones gave you the

21  impression that she was consciously aware of the fact that

22  there were multiple assailants and she was consciously aware of

23  some aspects of the actual assault itself?

24  A.  I don't remember if she had said she was consciously aware

08:57  25  of it or that she believed that it was multiple attackers.

*Cheryll K. Barron, CSR, CM, FCRR*                           *713.250.5585*

08:57 1   Q.  Well, you're -- again, not to quibble too much; but your
2   chart says that she reported to you losing conscious [sic]
3   during some of the attack?
4   A.  Correct.
08:57 5   Q.  Which would imply that she was conscious for the remainder
6   of the attack.
7   A.  Right.  And I don't remember how much of the attack she was
8   actually conscious for.
9   Q.  All right.  Did you make a diagnosis in Ms. Jones of
08:57 10  post-traumatic stress disorder?
11  A.  Yes, sir.
12  Q.  Do you agree that the DSM-IV criteria for post-traumatic
13  stress disorder requires that the patient actually
14  experience -- that is, have awareness of -- some kind of life
08:58 15  threatening event or witness some other person be killed or
16  maimed or in some form or fashion sustain a grievous injury?
17  A.  It might say that in the DSM-IV.  I don't have the criteria
18  memorized, by any means.
19          To me, the DSM-IV is more of a -- you know, kind
08:58 20  of a guidelines to go by.  But I don't think it's meant to be a
21  100 percent accurate assessment.
22  Q.  Does that appear to be the diagnostic criteria for
23  post-traumatic stress disorder per the DSM?
24  A.  It certainly looks like the DSM, yes.
08:58 25  Q.  And it requires, does it not, as sort of the threshold

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:59   1   inquiry, that the patient experience -- that is, have actual

        2   awareness of -- some sort of life threatening event as the

        3   initial diagnostic criteria.  Fair statement?

        4   A.  Well, I mean, it says that it could be experienced or was

08:59   5   confronted with it, not necessarily it has to be witnessed.

        6   Q.  Well, how else --

        7   A.  I think that's what you are asking.

        8   Q.  Well, the word "experience" means "have awareness of," does

        9   it not?

08:59  10   A.  Right.  But, I mean, it -- from the standpoint of what

       11   "witness" would mean, you know, I mean, if you had been hit

       12   over the head with a -- you know, like a two-by-four and then

       13   woke up and, you know, had been assaulted, you know, the

       14   assumption that you would have had to have actually witnessed

08:59  15   what actually happened versus the aftereffects, I would take

       16   issue with that, saying that you would have experienced it even

       17   if you hadn't specifically witnessed it.

       18   Q.  That wouldn't happen to be something that you discussed

       19   with Ms. Jones' attorneys about a week ago, in anticipation of

09:00  20   your testimony, would it?

       21   A.  It was not.  It was actually something that I've thought

       22   about.

       23   Q.  All right.  Going back now to your record --

       24         MR. McKINNEY:  If we drop down to the initial -- the

09:00  25   HPI.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:00   1   BY MR. McKINNEY:

2   Q.   That's history -- what's "HPI" stand for, history --

3   A.   "History of present illness."

4   Q.   All right.   If we drop down to the fourth line from the

09:00   5   bottom of the history of the present illness, "The patient

6   reports that she did not have any problems with anxiety or

7   depression before the attack."

8               Do you see that?

9   A.   Yes.

09:01   10   Q.   Now, that's a normal question that you would ask an

11   incoming patient with Ms. Jones' presenting profile, is it not?

12   A.   Correct.

13   Q.   And you have good reasons for asking that question, do you

14   not?

09:01   15   A.   Yes.

16   Q.   It's not an irrelevant question; you're not killing time

17   during the interview; that's something you need to know?

18   A.   Yes.

19   Q.   And in the case of someone like Ms. Jones, why do you need

09:01   20   to know that?

21   A.   Both from the standpoint of how she had been treated and

22   what she might have responded to in the past but also, you

23   know, to know this is something that's been a struggle for her

24   from the standpoint of trying to treat her in the best way that

09:01   25   I possibly could.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:02   1    Q.  Exactly.  When a patient comes to you, complaining of a

2    specific event in their life, that they think is the cause of

3    their problems, a part of your psychiatric training is that

4    that may be one of the causes of their problems; but many

09:02   5    people have a lifetime of events --

6    A.  Sure.  And it's more likely for somebody who's had

7    depression or anxiety in the past to have it in the present or

8    the future.

9    Q.  Correct.  And your whole treatment program, immediate, near

09:02   10   term, mid term and long term, is based on what you know of the

11   patient's history; and the more psychologically or

12   psychiatrically complex the patient's history is, the more

13   detailed, the more thorough, the more intense your treatment

14   modalities well might be.  Fair statement?

09:03   15   A.  Potentially, especially if I'm the therapist.

16   Q.  Which you are in this case?

17   A.  No.  I'm the treating psychiatrist.  I'm not the therapist.

18   Dawn Nelson is her therapist.

19   Q.  All right.  However, as a treating psychiatrist, if you had

09:03   20   a history of a number of psychiatrically significant events in

21   a patient's life, whether functioning as a treating

22   psychiatrist or a therapist, you would adjust your treatment

23   modalities and perhaps confer with the therapist based on

24   information you received --

09:03   25   A.  Yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:03  1   Q.  -- if it suggested a more psychiatrically complex patient

2   profile?

3   A.  Yes.

4   Q.  Let's turn to the next page --

09:04  5        MR. KELLY:  Actually, we need to redact part of that

6   page, your Honor.

7        Before you put that up -- (indicating)

8   *(Sotto voce discussion between Mr. McKinney and Mr. Kelly)*

9        MR. McKINNEY:  Okay.  Next page, under "Social and

09:05  10  Development History," three lines down, beginning with the word

11  "Abuse."

12       Yes, let's highlight that sentence right there

13  and enlarge it.

14       If we can bring that up?

09:05  15  BY MR. McKINNEY:

16  Q.  This is also an important history that you take from a

17  patient, is it not?

18  A.  Yes.

19  Q.  Particularly with the profile that Ms. Jones presented

09:05  20  with?

21  A.  Correct.

22  Q.  And although your note here is somewhat cryptic, can we

23  reasonably infer that at this point in your consultation with

24  Ms. -- if that's the wrong word, your visit with Ms. Jones,

09:06  25  what you asked her about here is whether in her past she had

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:06   1   ever been sexually or physically abused?

2   A.   Or emotionally abused.

3   Q.   Or emotionally abused?

4   A.   Correct.

09:06   5   Q.   All right.  Now -- and, again, you wouldn't just ask

6   Ms. Jones that question; you would probably ask any patient who

7   came to see you that question?

8   A.   Correct.

9   Q.   It's a fairly standard question for a psychiatrist or a

09:06   10   psychologist to ask?

11   A.   Yes.

12   Q.   But particularly in the case of someone who is reporting a

13   violent assault by multiple assailants, you would be very

14   interested to know, as a treating psychiatrist, whether there

09:06   15   had been past incidents of sexual, physical, or emotional

16   abuse?

17   A.   It would certainly be, you know, from the standpoint of

18   does this add on to previous trauma in the past, yes.

19   Q.   Well, if, hypothetically, there was a prior instance or

09:07   20   even a serial instance of sexual oppression or sexual abuse,

21   that would add on.  There's no question about it.

22   A.   Right.

23   Q.   I mean, it would flat be relevant to your treatment.  And

24   if you knew about it and you didn't think the therapist knew

09:07   25   about it, you would pick up the phone and you would call the

09:07   1   therapist and tell him or her, would you not?

2   A.  I believe that I would, yes.

3           MR. McKINNEY:  Let's go, please, to Bortz 242, please.

4   BY MR. McKINNEY:

09:08   5   Q.  And as you can see, this is a psychosocial history dated

6   October the 19th of 2009.  This comes from Dawn Nelson's chart.

7   And I'll represent to you that the handwriting we see on

8   Bortz 242 is the handwriting of Jamie Leigh Jones.  Will you

9   take that as an assumed fact?

09:08  10   A.  Okay.

11   Q.  If we turn the page, we'll see --

12           MR. McKINNEY:  Highlight 5 and 6, please.

13               Actually, 5, 6, and then Family History Question

14   1.

09:09  15   BY MR. McKINNEY:

16   Q.  Question Number 5 is, "Give details of previous

17   relationships and marriages."  And she notes, "Not applicable."

18   Do you see that?

19   A.  (Nodding head.)

09:09  20   Q.  If you don't mind saying "yes" or "no," because --

21   A.  Oh.

22   Q.  -- the court reporter really doesn't know how to spell the

23   "uh-huh" part.

24               And, then, Item 6 inquires about, "Any history of

09:09  25   abuse," parenthesis, "emotional, physical, sexual, in current

09:09    1    or previous relationships."  And again we see, "Not

         2    applicable"?

         3    A.  Correct.

         4    Q.  Under Family History we see, "Describe your childhood and

09:09    5    adolescence, include home atmosphere, relationship with

         6    parents."

         7          And Ms. Jones reports a good relationship,

         8    stay-at-home mom, working father.

         9          And then we turn the page, top item, Number 2, we

09:10    10    see the question of, "Any history of significant life events,

       11    such as death, abuse," again, "physical, emotional, sexual,

       12    divorce, separation, other?"

       13          And Ms. Jones writes that she was, "Brutally

       14    sexually assaulted in Baghdad, Iraq.  Halliburton/KBR held me

09:10    15    captive by armed guard in container/trailer."

       16          Do you see that?

       17    A.  Yes.

       18    Q.  And finally, the next page, under Drug and Alcohol Abuse,

       19    we see Item Number 2, "Any personal history of drug/alcohol

09:10    20    usage?  List and describe."

       21          And Ms. Jones says, "No."  Do you see that?

       22    A.  Yes.

       23    Q.  And in -- this history that we've just looked at from

       24    October of 2009 pretty much dovetails with the history that

09:11    25    Ms. Jones gave you back in November of 2006, does it not?

09:11   1    A.   Yes.

        2    Q.   So, would you say that Ms. Jones, when she presented to you

        3    in October of 2006, that but for the assault that she related

        4    to you, in Iraq, that her life was a pretty typical,

09:11   5    uneventful, normal, healthy, well-adjusted suburban upbringing,

        6    high school, some work, some college, not an uncommon profile

        7    at all?

        8    A.   More or less.  I wouldn't say that I went into great detail

        9    about it.  But, you know, that seems to be more or less what

09:12   10   the message was, yes.

        11   Q.   All right, sir.  Now, let's chat about some things that

        12   have come up in this case that you may have learned when you

        13   read Dr. Scarano's report, or you may not have learned.

        14            MR. McKINNEY:  If we could put up Bortz 242, please.

09:12   15            And turn the page, please.

        16            Is that -- that's not 242, I don't believe.

        17            Sorry.  Bortz 247.  That is 242.  I've got my

        18   numbers wrong.

        19   BY MR. McKINNEY:

09:13   20   Q.   Doctor, what you see before you is a summary of the

        21   Walgreen's records reflecting the prescriptions that Ms. Jones

        22   filled at one of the three pharmacies that she solicited as a

        23   teenager.  And I think you can see, beginning in the year 2000

        24   and continuing through 2001 and 2002, a variety of medications

09:13   25   that are specific to anxiety and depression, can you not?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:13    1    A.  Yes.

         2              MR. McKINNEY:  Let's turn the page.

         3    BY MR. McKINNEY:

         4    Q.  And, again, continuing from 2003 to 2004, we continue to

09:13    5    see a fairly consistent pattern and history of filling

         6    prescriptions for medications that are specific to anxiety and

         7    depression?

         8    A.  At least the Zoloft, yes.

         9    Q.  What about -- get close enough to read.

09:14   10    A.  Lamictal and Topamax can certainly be used for headaches or

        11    migraines if she has that, or for seizures, which I'm not aware

        12    of her having those.  But those would certainly be

        13    possibilities for those use.

        14              From the Zoloft standpoint, that's actually

09:14   15    potentially a headache medication, as well.  But it's usually

        16    much more likely to be for anxiety or depression.

        17    Q.  All right, sir.  And let's look now at Bortz 182.

        18              Before we talk about Bortz 182, having seen the

        19    records from one of the three pharmacies that Ms. Jones traded

09:15   20    at, implying, if not expressing, a prior and fairly consistent

        21    history of anxiety and depression, do you now have additional

        22    information about Ms. Jones that you did not have from her

        23    because -- based on the history that she gave?

        24    A.  I believe that would add to the history that she gave me

09:15   25    during the initial interview, yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:15   1   Q.  All right.  Now, highlighted in front of you is some
2   language that our jury has seen on a number of occasions.
3   And that is a history taken by Dr. Terri Scott, Ms. Jones'
4   treating OB-GYN back in the 2004 to 2005 time frame.  Do you
09:16   5   see that?
6   A.  Yes.
7   Q.  And in sum and substance, does the history taken there by
8   Dr. Scott indicate that -- and the date is unclear.  It's
9   either May the 17th or May the 19th of 2005 -- other evidence
09:16  10   points us in that direction.  Do you see there, where Ms. Jones
11   reported being with a new partner, having several drinks,
12   passing out and not knowing whether she had had intercourse?
13   A.  Yes.
14   Q.  Again, I'm going to be showing you some items that our jury
09:16  15   has seen.  This is a 2007 incident that took place in
16   San Diego.  Are you familiar at all with that incident?
17   A.  I believe so.  This is the one in the bowling alley?
18   Q.  Yes.  And how did you become familiar with that incident?
19   A.  I at least read through it briefly in Dr. Scarano's report.
09:17  20   Q.  All right.  Then perhaps we can expedite this.
21       Did you pick up from Dr. Scarano's report that
22   Ms. Jones gave at least three different histories of an
23   altercation with her husband; one that she was sitting at the
24   bar and, for no good reason, her husband hit her in the cheek;
09:17  25   and then, subsequently, the ER physician noted that her initial

09:17  1   story was that she had informed her husband that she was

2   pregnant and her husband became angry and began hitting her and

3   kicking her in the stomach; and, then, the third history that

4   Ms. Jones gave was that she was beating her husband at bowling

09:18  5   and he became angry and began hitting her and kicking her in

6   the stomach?

7   A.   That sounds vaguely familiar.   I don't know the exact

8   details but --

9   Q.   All right, sir.   And do you also recall, from Dr. Scarano's

09:18  10   report and his documenting of that incident, that Ms. Jones

11   subsequently recanted and told the naval investigators that her

12   husband had not hit her, that she had been intoxicated, and she

13   had made it up and she wanted her husband to come home,

14   et cetera, et cetera?

09:18  15   A.   I believe so, yes.

16   Q.   Would you agree that those two incidents, the San Diego

17   incident and what you just looked at there from Dr. Scott's

18   notes, would be noteworthy historical events in assessing

19   Ms. Jones' relationship with alcohol and how she deals with it?

09:19  20   A.   Yes.

21   Q.   Now, back to Ms. Jones' denial of any prior history of

22   sexual abuse.

23        MR. McKINNEY:   If we could put up, please, first,

24   Bortz -- see if my exhibit number is right here -- Bortz 170.

09:20  25   BY MR. McKINNEY:

09:20    1    Q.  And if you look at the highlighted portion there -- and
         2    note the date, please, Doctor, November 22nd of 2004.  Do you
         3    see that?
         4    A.  Yes.
09:20    5    Q.  Ms. Jones alleges that she was raped in Iraq on July 28th,
         6    2005.  So, this report that you're looking at is almost seven
         7    months to the date prior to the allegations in Iraq.  All
         8    right, sir?
         9    A.  Yes.
09:20   10    Q.  And as you can see, Ms. Jones is reporting that she was
        11    sexually assaulted by a manager, that occurred at work, she was
        12    claiming an investigation in progress, she made a claim,
        13    et cetera, et cetera, and the patient did not go to the
        14    emergency room.
09:20   15    A.  Yes.
        16    Q.  And just to kind of round out that point --
        17          MR. McKINNEY:  If we could go to Bortz 170 -- sorry --
        18    177.
        19          And highlight the text here, the handwritten text
09:21   20    right there, please.
        21    BY MR. McKINNEY:
        22    Q.  Other evidence in this case shows that this is a note by
        23    clerical staff at Dr. Scott's office.  And as you can see --
        24    A.  Dr. Scott was the one from the previous --
09:21   25    Q.  The OB-GYN, yes.

09:21  1  A.  No.  It was from the previous report?

2  Q.  Yes.  This was is Ms. Jones apparently calling, needing a

3  letter stating she had herpes as a result of rape, needs it

4  sent to the Air Force.

09:21  5            And I guess my question to you would be, A, would

6  you expect your office staff and any properly trained office

7  staff taking a phone message of this type, from a patient, to

8  as closely follow the patient's words as possible in reporting

9  what the patient had to say?

09:22  10  A.  Yes.

11  Q.  And does it appear to you that the person to whom Ms. Jones

12  was speaking concluded that Ms. Jones believed that she had

13  been raped?

14  A.  Yes.

09:22  15            MR. McKINNEY:  Let's go now, please, to Bortz 185.

16            If we could blow that highlighted portion up.

17  BY MR. McKINNEY:

18  Q.  This is a June 6, 2005, note from one of Ms. Jones'

19  treaters.  And I don't know the man's name or the woman's name

09:23  20  off the top of my head.

21            You see here, where Ms. Jones gave a history of

22  being raped five to six months ago?

23  A.  Yes.

24  Q.  If we just look at the records that you have seen right

09:23  25  now, the initial report on December the 22nd of 2004, the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:23  1    February request for a letter to the airport [sic], and the
       2    doctor's history here dated June the 6th, does it not appear
       3    that Ms. Jones is -- A, reported rape and, B, on at least two
       4    separate occasions referred to herself as being a rape victim
09:23  5    approximately seven months prior to her allegations in Iraq?
       6    A.   Yes.
       7    Q.   When you asked Ms. Jones in your initial visit with her
       8    about her prior history of sexual and physical and emotional
       9    abuse, was your question sufficiently clear and well phrased
09:24 10    such that you would have expected her to have revealed that to
      11    you at that time?
      12    A.   I would assume so.  I don't remember exactly what I said;
      13    but I believe that it would have encompassed that, yes.
      14    Q.   Right.  And, again, by way of background, when a patient --
09:24 15    not necessarily Ms. Jones, but let's just take your typical
      16    composite patient -- comes to you, first of all, they're not
      17    coming to you because life is good for them, are they?
      18    A.   Not usually, no.
      19    Q.   They're coming to you because they have a problem -- let's
09:24 20    back up for a second.  For a lot of people it would be a stigma
      21    to go see a psychologist or a psychiatrist?
      22    A.   Correct.
      23    Q.   And a lot of people, in order to go see a psychologist or a
      24    psychiatrist, initially have to overcome that stigma?
09:25 25    A.   A lot of people, yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:25   1    Q.  Ms. Jones, unlike a lot of people, had seen several

2    therapists and a psychiatrist before coming to you?

3    A.  She had.  But she also, at least with Dr. Weinberg, had

4    seen her, had filled the prescriptions and, you know, had told

09:25   5    me that she hadn't taken the antidepressive medication

6    prescribed.

7    Q.  And I appreciate that answer.  I'm actually headed in a

8    slightly different direction.

9    A.  Okay.

09:25  10    Q.  When a patient comes to see you and they want to get well,

11   the typical patient, the average patient will tell you what's

12   wrong with them, because they are looking to be treated,

13   correct?

14   A.  Are you asking if they're going to tell the full story

09:26  15   completely and leave nothing out?

16   Q.  I'm not saying that.  I'm saying that if you ask a patient

17   who wants to get well a question, an important question, isn't

18   it your experience that if the patient wants to get well, the

19   patient will answer your question in a reasonably honest

09:26  20   fashion?

21   A.  Not necessarily.

22   Q.  And why is that?

23   A.  Because a lot of patients have unconscious reasons or even

24   conscious reasons for, you know, the history that they give.

09:26  25   And you could see in a situation like this that, you know,

09:26  1    something like this might be omitted just because it seems so

2    irrelevant compared to what happened in Iraq, also from the

3    standpoint of not trying to be seen as somebody who, you know,

4    had had this happen before.

09:27  5    Q.  All right.  Well, let's add to this particular event.

6    Let's add to it some assumptions I would like you to make about

7    other evidence that we have in the trial regarding Ms. Jones.

8    Okay?

9              Let's assume -- or let me ask you to assume that

09:27  10   beginning in the September, October time frame of 2004, less

11   than a year before Ms. Jones went to Iraq, and continuing

12   through the end of March of 2005, three months before Ms. Jones

13   went to Iraq, that Ms. Jones was the victim of a sexually

14   oppressive --

09:28  15            THE COURT:  "Relationship"?

16   BY MR. McKINNEY:

17   Q.  -- man, a man who was her boss, who required her to pretend

18   to the entire world, including her mother and her father, that

19   she was this man's boyfriend; he would require her to travel to

09:28  20   his home in Liberty, Texas, and spend nights with him; she

21   would -- he would require her to have --

22            THE COURT:  Mr. McKinney, we need to ask a question.

23            MR. McKINNEY:  I need to paint the picture, your

24   Honor, of the relationship to ask about its psychological and

09:28  25   psychiatric --

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

09:28  1           THE COURT:  But that's not your job.  I'm sorry.  You

2    need to ask a question, and the jury will have its own memory

3    of what was testified to about a prior relationship.

4    BY MR. McKINNEY:

09:29  5    Q.  If Ms. Jones was in a prior relationship where she was

6    required to, against her will, submit to repeated sexual

7    encounters with a man 20 years older than her, non consensually

8    for a period of months and months and months on end, would that

9    not be a psychologically or psychiatrically significant event

09:29  10   in someone's life?

11   A.  Yes.

12   Q.  And would that not be the kind of psychiatric or

13   psychological event that, if it was disclosed to you, would

14   materially alter, given Ms. Jones' history as she gave it to

09:30  15   you regarding the events in Iraq, if you were to know of a

16   prior long-term oppressive relationship in addition to the

17   events in Iraq and being relatively close in time, all within

18   the same year, wouldn't all of that, if you knew about it,

19   materially alter your treatment regimen, near term and long

09:30  20   term, and wouldn't that most likely produce a consult with

21   Ms. Jones' therapist to prepare a more detailed and thorough

22   and perhaps different long-term treatment plan?

23   A.  I think it would effect the call to the therapist, or the

24   discussion with the therapist.

09:30  25           Would it impact the way that I treated her?  I do

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:30    1    not believe so.

2    Q.  All right.  Let me put on our Elmo, if I can, please --

3    this is from the DSM-IV.  Do you recognize the criteria for

4    malingering?

09:31    5    A.  I mean, it's familiar to me.  I certainly don't know it by

6    heart.

7    Q.  Well, malingering essential -- the essential feature of

8    malingering is the intentional production of false or grossly

9    exaggerated physical or psychological symptoms motivated by

09:32   10    external incentives.

11    A.  Yes.

12    Q.  And then we drop down and we find that, "Malingering should

13    be strongly suspected if any combination of the following is

14    noted: Medicolegal context of presentation, for example, the

09:32   15    person is referred by an attorney to the clinician for

16    examination."

17              And, 2, "A marked discrepancy between the

18    person's claimed stress or disability and the objective

19    findings."

09:33   20              Another way of approaching the issue of

21    malingering is by looking to see how the patient manages

22    information the patient chooses to impart to the treater,

23    correct?

24    A.  Yes.

09:33   25    Q.  And you learn about this in medical school because there

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:33   1    are some people who go to the doctor and pretend to have, for

2    example, hurt their back at work --

3    A.   Sure.

4            MR. KELLY:   Your Honor, Mr. McKinney continues to lead

09:33   5    this witness.   It's his witness --

6            THE COURT:   Let's ask a question.   Let's ask a

7    question.

8            MR. McKINNEY:   It's not my witness, actually.   I've

9    called him adversely.

09:33   10           THE COURT:   Well, my concern is a little bit different

11   from Mr. Kelly's.   I'm worried about putting too many facts in

12   your questions.   That's -- you're testifying.   We don't want

13   that.

14           MR. McKINNEY:   Sorry.

09:34   15   BY MR. McKINNEY:

16   Q.   Is one of the things that you learn in medical school is

17   that people will come in and complain of an injury for reasons

18   other than the fact that they actually have the injury?

19   A.   Yes.

09:34   20   Q.   And is another thing that you learn in medical school is

21   that people will come in and attribute their problems to one

22   event and will withhold information regarding other events if

23   they think withholding that information makes their case

24   stronger?

09:34   25   A.   Potentially, yes.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:35   1           MR. McKINNEY:  Your Honor, I'm going to approach the

        2      witness and show him some documents which I would like him to

        3      read briefly, if that's permissible with the Court.

        4           THE COURT:  It is.

09:35   5           (Sotto voce discussion between Mr. McKinney and Mr. Kelly)

        6           MR. KELLY:  We need to approach.  Judge, I think we

        7      need to approach.

        8           THE COURT:  Let's go this way.

        9      (At sidebar with all counsel)

09:35  10           MR. McKINNEY:  I was going to lay the predicate, but

       11      obviously we're going to have to go outside the presence of the

       12      jury.  He doesn't know about the prior assaults.  And if he

       13      knew about them, it certainly would alter the treatment

       14      modality.

09:36  15           THE COURT:  A little bit louder.

       16           MR. McKINNEY:  It would affect the treatment modality.

       17      I wish to make a record on the 412 issue because I think the

       18      prior assaults -- allegations of assaults are relevant to this

       19      woman's history and they're also relevant to the fact that she

09:36  20      was practicing information management, withholding information

       21      from all of her post-Iraq treaters.  That is, by this witness'

       22      testimony, already a factor clearly relevant to her treatment

       23      and this is the kind of information that over time you would

       24      expect a patient to impart.  And --

09:36  25           THE COURT:  What good are we going to do if we talk to

09:36   1    him off the record -- or outside the presence of the jury?

2              MR. McKINNEY:  I'm going to lay the foundation so that

3    I can get this into the presence of the jury.  I have a right

4    to do that.

09:37   5              MR. KELLY:  This violates Rule 412, your Honor.  It's

6    a repeated attempt -- and Mr. McKinney has done this throughout

7    the trial.  When he doesn't like the Court's ruling, he just

8    keeps coming back.

9                   This is a violation of Rule 412.  It's a

09:37   10   violation of this Court's ruling on Rule 412.

11             MR. McKINNEY:  This Court's ruling on 412 was

12   specifically stated to be a preliminary ruling, subject to --

13             THE COURT:  Okay.  Let me get rid of the jury.  Let me

14   excuse the jury.

09:37   15     *(In open court)*

16             THE COURT:  We're going to take our morning break now,

17   ladies and gentlemen.

18                  Would all please rise for the jury?

19     *(Jury not present)*

09:38   20             THE COURT:  Please be seated.

21                  You may step down, Doctor.  Thank you very much.

22   Don't go away.  We'll need you again.

23             MR. McKINNEY:  Judge, may I ask the doctor some

24   questions?

09:38   25             THE COURT:  Well, we'll talk about that.


*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:38    1                      Have a seat, sir.  We'll put you back up there in
         2     a minute.  If you want to stay there, that's fine.
         3                 THE WITNESS:  Can I use the restroom?
         4                 THE COURT:  You may.
09:38    5                      Yes, sir, tell me the issue now.
         6                 MR. McKINNEY:  Judge, the issue is -- based on the
         7     record evidence now before the Court and the jury, is that a
         8     history of prior sexual abuse, if true, would be highly
         9     relevant from both a therapy as well as a treatment -- the
09:39   10     treatment aspect of Ms. Jones' condition.
        11                 THE COURT:  Okay.  I'm with you thus far.
        12                      Why do we need to tell this doctor about all of
        13     this?  I mean, can't we just make a proffer?  Can't we just
        14     make a proffer?
09:39   15                 MR. McKINNEY:  Well, because I want -- Judge, I need
        16     to make a record on this; and it should go to the jury because
        17     the alternative -- you have one of two things here.  Either
        18     Ms. Jones has forgotten the fact of three, if not four prior
        19     assaults and has neglected to mention them to multiple
09:39   20     treaters, as testified to by Dr. Scarano yesterday, or --
        21                 THE COURT:  I understand that.
        22                 MR. McKINNEY:  -- or she is intentionally practicing
        23     information management and is not disclosing these.
        24                      Or the third alternative is that none of the
09:40   25     prior assaults actually happened and she's telling the truth

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:40   1   when she tells her post-Iraq treaters that, in fact, she has no

2   history of prior assault.

3                    Rule 412 -- and I looked at it again last

4   night -- says that prior sexual conduct or predisposition is

09:40   5   admissible unless there is undue harm to a victim.  And we're

6   not -- that's not an issue -- or unless the probative value is

7   outweighed by unfair -- operative word, "unfair" -- prejudice.

8                    Now, what we're talking about here is not even

9   prior sexual conduct, to begin with.  An allegation of sexual

09:40   10   assault is not an allegation of sexual conduct.  It is an

11   allegation of being the victim of a crime.

12                    Furthermore, the prejudice would not be unfair --

13             THE COURT:  But -- I understand everything you're

14   saying, Mr. McKinney; but we do not have to go through this

09:41   15   exercise with other treatment professionals.  We didn't do this

16   with Ms. Nelson.  We didn't do it with anybody else.

17                    Tell me -- I know what the record is.  I know

18   what her history is represented to be.  Why does -- well, we

19   can't convey it to the jury for reasons we've already

09:41   20   discussed.

21             MR. McKINNEY:  Well --

22             THE COURT:  Just a second.

23                    Do you want to inform the doctor of this history

24   and ask the doctor about it once the jury has come back in?

09:41   25             MR. McKINNEY:  Judge, I want to do two things.  First,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:41   1   I want to revisit what the Court said about us not being able

2   to tell the jury about these prior assaults.  With all due

3   respect, my client, being accused of rape, the fifth time in

4   this lady's life that she has accused someone of rape by the

09:42   5   age of 20 and a half years old, is entitled to show this jury

6   the history that this young woman has.  And there is nothing in

7   Rule 412 that forbids my client from making that proof.

8         The Court's initial ruling -- the Court's initial

9   ruling on 412 was not a blanket prohibition that, regardless of

09:42   10   what the evidence is, the 412 evidence would not come in.

11   THE COURT:  No.  But my concern about several of the

12   prior incidents was that they happened when she was so young

13   and under such confused circumstances that I thought the

14   probative value was slight.  We were talking about things that

09:43   15   happened when she was 15 years old.  I think the probative

16   value there is slight.  I think the unfair prejudice is great.

17         I did allow the testimony to come in as to the

18   relationship with Mr. Iler, and that has been put before the

19   jury in all its tawdry fullness.  But I don't think my

09:43   20   reasoning has been changed by this trial as to the nature of

21   the conduct alleged when she was still very much a child.

22   MR. McKINNEY:  Judge, if you would let me ask this

23   witness some questions, I can make a more detailed argument.

24   THE COURT:  Okay.

09:43   25   MR. McKINNEY:  And would like the opportunity to do

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1  so.

2              THE COURT:  Do you want to say anything, Mr. Kelly?

3              MR. KELLY:  I do, your Honor, actually.  It's very

4  telling.  At least now I know why Mr. McKinney was in such a

5  push to call this witness.  This was an attempt to ambush.  And

6  I think it's despicable; and I think the Court has ruled, in

7  fact, as you just stated, your Honor, that 412 keeps this

8  evidence out.

9              I think this attempt by Mr. McKinney is way below

10 the belt.  The fact of the matter is, your Honor, that if, in

11 fact, Mr. McKinney's argument is that these were not sexual

12 assaults, then they're not relevant, then they're not relevant

13 with this witness at all.  If his argument is they were just --

14             THE COURT:  No.  His argument is that this woman is --

15 has a pattern of alleging things that did not happen.

16             MR. KELLY:  I understand.  And if that's the case,

17 then they're not relevant to this witness' testimony.  They're

18 just not.  Because they would have no impact upon her -- her

19 psychological state.

20             If, on the other hand, his argument is that they

21 did happen and, therefore, they're relevant to her

22 psychological state, then the Court has ruled under Rule 412

23 that they don't come in.  So, this doesn't come in either way,

24 Judge.  I don't think even questioning this witness does us any

25 good.

09:45  1          THE COURT:  I think --

       2          MR. McKINNEY:  Let me make a couple of more points

       3   here.  I could have, with Dr. Scarano, tried to shoehorn this

       4   into evidence yesterday.  The objection we would have caught,

09:45  5   because we've caught it before on non-treating physicians, is

       6   that Scarano is not a treater, not the right person to ask the

       7   question.

       8          I could have hired my own psychiatrist to come in

       9   and absolutely assert that this is all highly relevant and

09:45  10  should have been disclosed and the fact that it wasn't -- I

       11  could have made my record with a paid witness.  That would have

       12  been despicable.

       13         But what I have chosen to do is to make my record

       14  with someone I'm not paying any money to, someone who is

09:45  15  aligned with Ms. Jones.  And if the record develops from a

       16  witness with those credentials, then this is fairly an issue,

       17  because it is not a concocted, it is not a programmed, it is

       18  not a choreographed effort to get this into evidence.

       19         THE COURT:  I can see that giving him more background

09:46  20  than he apparently has received from the patient might impinge

       21  on his diagnosis, might impinge on his recommendation to

       22  Ms. Nelson for treatment.  What I don't think his testimony can

       23  provide is a reason to go into this very --

       24         MR. McKINNEY:  We don't --

09:46  25         THE COURT:  Just let me finish.

       *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:46   1          MR. McKINNEY:  Sorry, Judge.

2          THE COURT:  -- this very confused, very prejudicial

3    history that Ms. Jones has.  That I don't think has changed

4    since I made my initial ruling.  412 has struck the balance --

09:46   5    and I don't think I can strike it differently -- that there is

6    even relevant sexual history that cannot come in for fear of

7    prejudice to the witness and for fear of deterring future rape

8    victims.  I don't think that has changed.

9          MR. McKINNEY:  May I ask the witness my questions,

09:47  10    Judge?

11          THE COURT:  Yes -- well, but I'm not signaling that

12    I'm going to let this in.

13          MR. McKINNEY:  I understand, Judge.

14          *(At this time there was further examination of Dr.*

09:49  15    *Paskowitz by Mr. McKinney outside the presence of the jury and*

16    *is sealed under order of the Court.*

17          *(Recess was taken from 10:03 a.m. to 10:09 a.m.)*

18          *(Jury not present)*

19          THE COURT:  We're going to do the deposition cuts.

10:09  20    We're down to five disagreements.  Is that right?

21          MS. CATES:  I know on the ones I'm responsible for, we

22    are down to three.  I'm not sure about Stephanie Holcombe.

23    She's probably on her way back in.

24          MS. MORRIS:  There are about three objections that we

10:09  25    have where the defendant wants to bring in testimony regarding

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

| | | |
|---|---|---|
| 10:09 | 1 | Beneta, which is -- |
| | 2 | THE COURT:  Regarding? |
| | 3 | MS. MORRIS:  Her name is Beneta, Mr. Bortz' girlfriend |
| | 4 | at the time. |
| 10:09 | 5 | They asked whether or not there were any |
| | 6 | complaints about her about -- |
| | 7 | MS. CATES:  We're going to need Ms. Holcombe.  I'm |
| | 8 | sorry.  That's part of her -- |
| | 9 | THE COURT:  She's here. |
| 10:09 | 10 | MS. HOLCOMBE:  I ran to the restroom.  Sorry. |
| | 11 | THE COURT:  Okay.  Beneta. |
| | 12 | MS. MORRIS:  They want to bring out testimony where |
| | 13 | some of the witnesses are saying that there were no complaints |
| | 14 | from her about how Charles -- |
| 10:10 | 15 | MS. HOLCOMBE:  Okay.  We took those out.  Those are |
| | 16 | the two that we just agreed upon. |
| | 17 | MS. MORRIS:  All right. |
| | 18 | MS. CATES:  I have one Beneta reference. |
| | 19 | MS. CULLEN:  We'll withdraw our designation of Arroyo |
| 10:10 | 20 | on that issue. |
| | 21 | MS. HOLCOMBE:  Perfect.  Then we have no more on |
| | 22 | Arroyo.  We'll withdraw Arroyo. |
| | 23 | MS. CATES:  The only Beneta reference that I have is |
| | 24 | in Schmidt and it's the bottom section, 31-2 to 31-8, and it's |
| 10:10 | 25 | Schmidt, who was Charles Bortz' roommate.  Just -- the question |

```
10:10    1   was:

         2              "Charles had a girlfriend, too?"

         3              And he says, "Yes," and basically that Charles

         4   told him that morning that he was going to break up with her.

10:10    5   I think -- and that's before the rape allegations are made, and

         6   that's what he was thinking about the event and what he told

         7   Schmidt.  I think it's relevant.

         8              THE COURT:  Okay.  Your response?

         9              MS. CATES:  Here's a copy, Stephanie, if you want.

10:11   10              THE COURT:  It's relevant to prove that he thought of

        11   Ms. Jones possibly as his new girlfriend?

        12              MS. CATES:  That that was his intention to break --

        13   yeah, his intent -- his thought process that morning.

        14              THE COURT:  So, his mindset was not that of a rapist?

10:11   15              MS. CATES:  Exactly, yes, sir.  Thank you.

        16              THE COURT:  Okay.  I understand.

        17              MS. MORRIS:  Your Honor, and that would be hearsay.

        18              MS. CATES:  He's a party.

        19              MS. MORRIS:  It's not being used against him.  It's

10:11   20   being used --

        21              THE COURT:  Well, it is being used against him.  Who

        22   wants to introduce that?  You do?

        23              MS. CATES:  I do.

        24              THE COURT:  Yeah, right.  Okay.  But the statement --

10:11   25              MS. CATES:  We think it just goes to his state of mind
```

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1   that morning.

2           THE COURT:  Okay.  So, I guess we have to get into the

3   relationship between your client and Mr. McKinney's client.  It

4   seems to me you're aligned on the same side of the case, aren't

5   you?

6           Okay.  Never mind.  Never mind.  It comes in

7   under (d)(1), consistent with the declarant's testimony offered

8   to rebut.  So, it does come in, yeah.

9           MS. CATES:  Stephanie, should we address the other

10  Schmidt -- your other objection?

11          MS. MORRIS:  Yes.

12          Your Honor, you've already ruled, I believe, on

13  this issue.  There was testimony offered in cross, in our case

14  in chief, by the defense, where they were trying to discuss how

15  dangerous it was because there was a war going on, sort of

16  prejudicing the testimony and showing that it was more

17  dangerous than, say, here.  And I believe your Honor had

18  already ruled that that was not admissible, and they are trying

19  to present the same testimony again in Tyler Schmidt's --

20          MS. CATES:  I don't believe I've sponsored this

21  testimony before, just to make that clear.

22          But all that it says is that -- it's talking

23  about his firefighting skills, Charles Bortz', and the job of

24  the firemen.  It's just to sort of place the firefighters'

25  responsibilities.  It's in front of you at 10-6 to 10-18.  And,

1   again, I think it's relevant.

2           THE COURT:  I think we've already heard testimony to

3   that effect.

4           MR. McKINNEY:  We haven't, Judge; but I thought you

5   ruled earlier that it did come into evidence.

6           MS. MORRIS:  It was my understanding that it didn't.

7           MS. CATES:  This section has not been played.

8           THE COURT:  Well, we had testimony about he was

9   competent at his job but didn't like the guy, right?

10          MR. McKINNEY:  No.  It was part he didn't like the

11  guy.  This has not been heard by the jury.

12          THE COURT:  And why is it relevant whether he was

13  competent or not?

14          MR. McKINNEY:  Well, Judge, we've heard tons of

15  evidence about Ms. Jones and her accomplishments in life --

16          THE COURT:  So, it's just --

17          MR. McKINNEY:  Round out the picture.

18          THE COURT:  I see.  I'll allow it.

19          MS. MORRIS:  Your Honor, if I could just address that,

20  it's not about his competency.  It's about the danger of the

21  Green Zone.

22          MS. CATES:  I don't think it says anything about the

23  dangerousness of the Green Zone -- I stand corrected.  It says,

24  "Everybody came home alive," which would, I guess, imply that

25  it was -- it could have been dangerous.

10:13   1          THE COURT:  That's always true of firefighters,
        2   there's a risk of --
        3          MS. CATES:  Yeah.
        4          THE COURT:  I'll allow it.  I'll allow it.
10:14   5          MS. HOLCOMBE:  This is for Sara Simco.  Your Honor,
        6   I've marked the three places that remain objections from
        7   plaintiffs to our cuts.  These are our cuts.
        8          THE COURT:  When you say "cuts," you mean "excerpts"?
        9          MS. HOLCOMBE:  Yes, your Honor.
10:14  10          THE COURT:  "Cuts" could also mean what you want out
       11   of it.
       12          MS. HOLCOMBE:  No, your Honor.  I apologize.
       13          MS. MORRIS:  These are our objections, right?
       14          MS. HOLCOMBE:  Uh-huh.
10:14  15          MS. MORRIS:  Okay.
       16          THE COURT:  Okay.  Let's talk about her breast
       17   implants.
       18          MS. MORRIS:  Yeah.  And this is another.  I think this
       19   was raised before.  And I think your Honor --
10:14  20          THE COURT:  Yeah, I don't think we need any more on
       21   her breast implants.  I really don't.
       22          MS. MORRIS:  The remaining one was the --
       23          MS. HOLCOMBE:  At 13-18, this one about -- it's right
       24   there.
10:14  25          MS. MORRIS:  The remaining objection is the defense

10:15    1    wants to bring out testimony as to whether or not anyone had
         2    complained --
         3              MS. HOLCOMBE:  There actually are two remaining
         4    objections, your Honor.  Starting at Page 39-8 to 39-13.
10:15    5              THE COURT:  Okay.  I see that.
         6              MS. HOLCOMBE:  And plaintiffs have objected to
         7    hearsay.  And first of all, your Honor, there is no statement
         8    at all being offered for the truth of the matter asserted.  And
         9    furthermore, it goes to notice.
10:15   10              The question is, "Have you -- or do you know of
        11    anyone who was in Iraq at the same time who would have anything
        12    to say that would support the allegations?"
        13              She says, "No."
        14              There's no statement, she doesn't talk about the
10:15   15    contents or the truth of the matter of any statement.
        16              And furthermore, the question was, "Do you even
        17    know of anyone," which would go to notice.
        18              That would be our only response to their only
        19    objection, which was hearsay.
10:15   20              THE COURT:  So, we have the absence of a statement?
        21    Is that the point?
        22              MS. MORRIS:  Yes, your Honor.
        23         (Sotto voce discussion between Mr. McKinney and Ms.
        24    Holcombe)
10:16   25              MR. McKINNEY:  We'll drop it.  I'll drop it.

                 *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:16   1          THE COURT:  Okay.

2          MS. HOLCOMBE:  Okay.

3          THE COURT:  Okay.  What else?

4          MS. HOLCOMBE:  The last one is 82-9, the objection

10:16   5   starts at 82, Line 17.  It should be on Page 12 of the thing I

6   handed you.  82-17 through 23, they also object to hearsay.

7   And we again would say that it goes to her notice, her

8   knowledge about what people think.  It doesn't go to specific

9   contents or direct statements, and we think it's highly

10:16  10   relevant to the issues in this case.

11          MR. McKINNEY:  Furthermore, the plaintiffs' case is

12   90 percent hearsay evidence for the opposite proposition.  So,

13   this is simply rebuttal evidence of the same kind, character,

14   and quality as the plaintiffs' case.

10:16  15          THE COURT:  Who is the deponent?

16          MS. HOLCOMBE:  Your Honor, the deponent is Sara Simco.

17          THE COURT:  Okay.  What's plaintiffs' response?

18          MS. MORRIS:  Your Honor, it's the same as the last

19   objection.  It's relying upon statements, hearsay statements,

10:17  20   or the lack thereof.

21          MS. HOLCOMBE:  Your Honor, it goes to notice and it

22   goes -- it's -- there's actually no specific statement being

23   offered for the truth of any matter.  No one is saying,

24   "What -- what have you heard?  What has been said that's great

10:17  25   about it?  Tell us the contents of it."

10:17  1          THE COURT:  So, this goes to KBR's notice?

       2          MS. HOLCOMBE:  Yes, your Honor.

       3          THE COURT:  I'm going to allow it.

       4               Is that it, I hope?

10:17  5          MS. CATES:  I have one more.

       6          MR. KELLY:  She's a low-level employee.  Sara Simco is

       7  a low-level employee, your Honor, at KBR.  She's not a -- it's

       8  not like she's a high-ranking employee.

       9          MS. HOLCOMBE:  Respectfully, you-all have had employee

10:17  10  statements under party opponent admissions from the lowest of

      11  them to constitute authorization on behalf --

      12          THE COURT:  It's not hearsay.  There's no statement.

      13  It can't possibly be hearsay.

      14          MS. CATES:  I have just one more.  It's very limited.

10:18  15               Kristen Rumba, I think I mentioned it this

      16  morning.  This is the limit of her direct.

      17               It just says, "If there were other sexual

      18  assaults, they would have come through your office?"

      19               In response to that --

10:18  20          THE COURT:  We've already had that one, too.

      21          MS. CATES:  No.  I just mentioned it this morning.

      22  That hasn't come in, not from Kristen Rumba.

      23               And they're not objecting to that.  They're

      24  agreeing to that.

10:18  25          THE COURT:  Okay.  All right.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:18   1          MS. CATES:  But what they want put on in cross is

        2    a question, "Was there anything in her behavior to indicate to

        3    you that was anything abnormal for a victim of assault?"

        4          THE COURT:  Slowly.  Slowly.

10:18   5          MS. CATES:  Sorry.

        6              And the answer is, "No, I had no prior

        7    experience.  I don't know what normal would be."

        8              I mean, that section, that was everything about

        9    what was in their direct.  In response to other victims of

10:18  10    sexual assaults, it's not --

       11          THE COURT:  Okay.  What's your response?

       12          MS. CATES:  -- directly on point.

       13              I just think it's outside the scope of cross.

       14          MS. MORRIS:  Your Honor, it's not outside the scope.

10:19  15    Ms. Rumba's testimony is about her observations of Ms. Jones

       16    after she was raped.  And it's --

       17          MS. CATES:  No, it's not.

       18          THE COURT:  Just a second.  Let her speak.

       19          MS. CATES:  Sorry.

10:19  20          MS. MORRIS:  And the statement that they want to --

       21    they are objecting to is her statement that she had no

       22    experience with victims.  So, it's to discredit her testimony.

       23          THE COURT:  No.  That comes in.  That comes in.

       24          MS. CATES:  That's all I have, your Honor.  Thank you.

10:19  25          THE COURT:  I hope we're all done.

                  *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:19   1          MR. KELLY:  I'm sorry, your Honor, we didn't hear the

        2   ruling.

        3          THE COURT:  I ruled it comes in.  It comes in.

        4          MR. McKINNEY:  Judge, so that I don't step any further

10:19   5   into the Court's disfavor, may I ask this witness if, based on

        6   what he's reviewed, it appears to him that Ms. Jones has been

        7   selective in what she reports to her treating physicians?

        8          MR. KELLY:  I only heard the last part.

        9          THE COURT:  Whether he can ask this witness that

10:20   10  Ms. Jones apparently has been incomplete in her communications

        11  to treating physicians about what had happened to her.

        12         MR. KELLY:  I think he can only base that upon the

        13  testimony that he's already elicited in front of the jury, your

        14  Honor.  As long as he does that, I don't think I have --

10:20   15         THE COURT:  I agree that's the line we need to draw.

        16             Let's bring the jury in, please.

        17             But you can ask, yes.

        18      (Jury present)

        19         THE COURT:  Members of the jury, please be seated.

10:20   20             You may resume your inquiry.

        21  BY MR. McKINNEY:

        22  Q.  Doctor, does it appear to you that Ms. Jones has been

        23  incomplete in reporting material aspects of her prior --

        24  pre-Iraq history?

10:21   25  A.  Yes.


                Cheryll K. Barron, CSR, CM, FCRR                713.250.5585

10:21    1    Q.  I asked you in the early part of your examination this

2    morning about Ms. Jones giving you a history of having some

3    recall of actually experiencing or knowing about a number of

4    assailants and some recall of the -- of some part of the

10:21    5    assault.  You recall that?

6    A.  Yes.

7    Q.  And that's what appears in your notes?

8    A.  Yes, I believe so.

9    Q.  Now, I would like you to assume that here in this courtroom

10:22    10    it is Ms. Jones' sworn testimony that she has no recollection

11    of the attack whatsoever, that, in fact, she took two sips of a

12    drink at a social gathering and doesn't remember anything until

13    she woke up the next morning.

14    A.  Right.

10:22    15    Q.  That would be inconsistent with the history she gave you,

16    would it not?

17    A.  Not necessarily.  I mean, if she's referring to the

18    "assault" as the entire sequence of events, then it wouldn't

19    necessarily be inconsistent.

10:22    20         MR. McKINNEY:  Well, let's go back to -- I believe

21    it's -- get the right number here -- Bortz 217, please.

22         And we can highlight the -- enlarge the portion

23    where it states -- highlight that.  Can you bring that up?

24         Right here.

10:23    25    BY MR. McKINNEY:

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

10:23   1   Q.  "Patient reports having lost consciousness for some of the
        2   attack," you see that?
        3   A.  Yes.
        4   Q.  And I went into some detail with this -- with you about
10:23   5   this.  And for the express purpose, I think, of showing our
        6   jury that at the time she visited with you she was reporting
        7   and you were writing down that she was unconscious for some
        8   portion of the attack, necessarily implying that she was
        9   conscious for other portions of the attack?
10:24  10   A.  Except from the standpoint of her reporting that she
       11   remembered events afterwards and beforehand, which if you want
       12   to look at it from, again, the grand scheme of things, it could
       13   be considered part of the attack.
       14   Q.  On the other hand, you could look at it exactly the way
10:24  15   it's written down; and it would imply that Ms. Jones was
       16   reporting to you and that you wrote down that she was actually
       17   conscious during portions of the attack.  Fair statement?
       18   A.  Right.  That could be either way, yes.
       19   Q.  All right.  And it would be inconsistent for her to have
10:24  20   told you that she was conscious for portions of the attack and
       21   then to tell our jury that she has no memory whatsoever of the
       22   attack?
       23   A.  That would be inconsistent, yes.
       24   Q.  And on the subject of post-traumatic stress disorder -- you
10:25  25   have the DMV there in front of you, I believe -- the DSM -- are

10:25   1    you aware of any reported cases, validated, verified cases in
        2    the medical literature, where someone wakes up with no memory
        3    of an event and imagines that they have been subjected to a
        4    life-threatening event and develops post-traumatic stress
10:25   5    disorder based upon their belief as to what could have happened
        6    during a time in which they have no memory?
        7    A.   I have not seen anything in the literature one way or the
        8    other.
        9    Q.   Isn't it true that the literature on post-traumatic stress
10:26  10    disorder uniformly, if not universally, reports victims as
       11    having actually perceived a life-threatening event?
       12    A.   It's in the criteria from the DSM-IV, which is a
       13    generalized --
       14    Q.   And I'm now talking about the literature regarding reported
10:26  15    instances of post-traumatic stress disorder.
       16    A.   That, I do not know.
       17    Q.   You don't know whether the literature uniformly deals with
       18    patients who have actually perceived the event that produces
       19    post-traumatic stress disorder?
10:26  20    A.   That is correct.
       21    Q.   All right.  You understand -- or do you understand that
       22    amnesia produced by drugs prevents the brain from ever
       23    acquiring a memory?
       24    A.   I don't believe that's actually true.
10:26  25    Q.   All right.  Is it your belief that amnesia -- sorry.

10:27   1           Is it your belief that amnesia induced by a drug,

        2   the period of time during which the patient has amnesia, the

        3   patient can actually remember not remembering?

        4   A.   Say that again.

10:27   5   Q.   Well, what is "amnesia"?

        6   A.   "Amnesia" is a lack of memory.

        7   Q.   Correct.  And by definition, if someone has a lack of

        8   memory, they can't remember, correct?

        9   A.   Sure.  But that can also -- you know, it's just like can

10:27  10   you remember your dreams from last night.  You generally have

       11   amnesia for it; but if asked to recall it, you might remember

       12   it now or some other event might trigger remembering some of

       13   it.  So, amnesia doesn't have to be a 100 percent yes or no.

       14   Q.   Well, but amnesia -- isn't it true that amnesia induced by

10:28  15   a drug, an anesthetic or a Versed or something of that nature,

       16   is a different kind of amnesia than simply not remembering or

       17   being asleep; it's a different kind of amnesia entirely?

       18   A.   Not necessarily.  I mean, if you take a drug that produces

       19   amnesia, it doesn't necessarily mean that the memories are

10:28  20   completely wiped out.  You might have a harder time accessing

       21   them.  So, again, it's not a 100 percent.

       22           Now, if you're completely unconscious, then I

       23   don't believe you would be able to have a memory for the event

       24   or to recall the event later; but if it's something that alters

10:28  25   consciousness, I do believe you can have at least bits and

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:28   1   pieces.

2   Q.  If someone had experienced the type of life-threatening

3   event calculated to produce post-traumatic stress disorder

4   let's say at 6:30 in the morning, would you expect that person,

10:29   5   by 7:00 o'clock in the morning, 30 minutes later, to appear to

6   all outward appearances made up, dressed appropriately,

7   communicating in a normal, even-toned fashion, engaging in

8   prolonged e-mail banter, acting as if nothing had happened?

9   Would you reasonably expect that to happen?

10:30   10   A.  I don't know.

11          MR. McKINNEY:  I have no further questions, your

12   Honor.

13          MR. HEDGES:  KBR has no questions, your Honor.

14          THE COURT:  All right.

10:30   15          Mr. Kelly?

16                     **CROSS-EXAMINATION**

17   BY MR. KELLY:

18   Q.  Doctor, good morning.

19   A.  Good morning.

10:30   20   Q.  You and I spoke on the phone last week, and we met for the

21   first time today.  Is that right?

22   A.  Correct.

23   Q.  I haven't paid you to be here?

24   A.  Correct.

10:30   25   Q.  Nobody from Ms. Jones has paid you to be here, correct?

10:30    1   A.   Correct.

         2   Q.   Thank you for coming.

         3           I think you indicated that your initial intake

         4   notes -- I wrote down -- were not a perfect record of what she

10:30    5   said.  Is that right?

         6   A.   Yeah.

         7   Q.   What did you mean by that, Doctor?

         8   A.   You know, it's not like I have what she said recorded on

         9   tape, where I can just transcribe them back.  They're, you

10:31   10   know, to the best of my recollection from the standpoint of,

        11   you know, what little notes that I do jot down, as well as my

        12   recollection of what was said.

        13   Q.   And I just want to ask you a little bit about how that

        14   happens.  The patient is sitting there and you're meeting with

10:31   15   the patient, and you're making some handwritten notes, right?

        16   A.   Correct.

        17   Q.   And then, later on, you go back and transcribe those

        18   handwritten notes into a typewritten form?

        19   A.   I mean, the amount of notes that I take are probably

10:31   20   somewhere between, you know, two and ten lines.  So, it's not a

        21   transcription by any means.  It's a, you know, elaboration from

        22   my memory plus whatever I've written down.

        23   Q.   You said that much better than I did.  I used the word

        24   "transcription" as though we're talking about a court reporter

10:31   25   here, and that's not what I meant at all.  Thank you for

         *Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

10:31  1    correcting me.

2                    That's pretty normal in the medical field, isn't

3    it?

4    A.   Some people will take notes during the -- you know, while

10:31  5    they're seeing somebody.  I have the style of actually, you

6    know, doing my best to maintain eye contact and not just

7    sitting there and writing the note while I'm talking to the

8    patient.

9    Q.   Well, just by way of example, Doctor, is it possible -- is

10:32  10   it feasible, based upon the way your notes were written that

11   Jamie may have said, you know, "I need multiple surgeries based

12   on what happened," instead of "I had multiple surgeries"?

13   A.   Yes.

14   Q.   There's been a lot of questions about this level of

10:32  15   consciousness, this drug -- and I want to talk to you about

16   that.

17                    First of all, let me ask you this.  What's a

18   "flashback," Doctor?

19   A.   A "flashback" would be, while you're awake, to actually

10:32  20   reexperience what happened at some previous time, I mean,

21   generally associated with a traumatic event; but it could be a

22   flashback to anything.  I mean, it could be a positive or a

23   negative.

24   Q.   Now, there has been testimony in this trial that Ms. Jones

10:32  25   has had flashbacks to this trauma.  And, in fact, I think one

10:32  1    of the flashbacks she testified to was Mr. Bortz on top of her

       2    and the man who handed her the drink being in the room with

       3    her.

       4              In order to have such a flashback, is there a

10:33  5    memory?

       6    A.  I would say yes.

       7    Q.  And how does that work?  Can you explain to us how you can

       8    say, "I don't have a memory" and then, yet, have a flashback?

       9    A.  I mean, you can have memories for bits and pieces of

10:33  10   events.  I guess probably a good example would be if someone

       11   had surgery and they were under, you know, some sort of

       12   sedative hypnotic, that, you know, they'll probably have bits

       13   and pieces of memories from the rest of that day but that the

       14   drug will impair their memory-forming ability.

10:33  15   Q.  And, in fact, with respect to the drugs that impair the

       16   memory-forming ability, is that -- are you familiar with date

       17   rape drugs?

       18   A.  I mean, not -- I'm certainly not an expert on them by any

       19   means.

10:33  20   Q.  Fair enough.  Are you aware of whether or not that's their

       21   function, or one of their functions?

       22   A.  I mean, as far as I know, their function is to basically

       23   disinhibit somebody and to also make it where they don't

       24   remember the events of that night.

10:34  25   Q.  Your diagnosis of post-traumatic stress disorder, I think

10:34   1   Mr. McKinney had some questions for you about that and how you

2   could actually come up with that.  Are you familiar with people

3   who had friends and family lost in the attacks of 9-11 having

4   post-traumatic stress disorder and not even been there to see?

10:34   5   A.  I mean, I've certainly seen patients like that, yes.

6   Q.  And they didn't have a conscious present sense view of the

7   attack itself, did they?

8   A.  No.

9   Q.  And, yet, their diagnosis was post-traumatic stress

10:34   10   disorder?

11   A.  Right.  I mean, I would imagine it would be as if -- you

12   know, if -- I don't know if you have a wife or kids; but if

13   your house burned to the ground right now and you lost them in

14   that event, that you would probably still experience symptoms

10:35   15   of PTSD, you know, some people to a different extent, even if

16   you weren't actually there.

17   Q.  Even though I wasn't there.  And is that what you meant

18   when you responded to Mr. McKinney about experiencing this

19   threshold gateway function of PTSD, that experiencing the event

10:35   20   can be when you are confronted with it?

21   A.  I believe it would be along the same lines, yes.

22   Q.  For instance, if you walked into a room, saw a man in your

23   bed and said, "Did we have sex" and he answered "Yes," and then

24   you said, "Was it protected" and he said "Yes," would that be

10:35   25   being confronted with your rape?

10:35    1    A.  You mean, if he said no?

2    Q.  If he said -- I'm sorry.  Thank you.

3                 "Did we have sex?"

4                 "Yes."

10:35    5                 "Was it protected?"

6                 "No."

7    A.  I mean, depending on your belief of what happened.  I mean,

8    that doesn't necessarily define rape, by any means.  You can

9    have consent -- consensual unprotected sex but --

10:36   10    Q.  Sure.  If you knew that you had not consented and you

11    received those answers, might that -- might those answers, in

12    and of themselves, cause post-traumatic stress disorder?

13    A.  I could see where it would.  I mean, I can't certainly say

14    with a definitive yes or no to that.

10:36   15    Q.  How about being held captive in a foreign country?

16    A.  I mean, I would certainly think that that would be -- you

17    know, fall under the category of being afraid for your life.

18    Q.  You were asked very briefly some questions about the

19    incident in San Diego, in the bowling alley.  Does it make any

10:36   20    difference to you at all that Mr. Daigle took that stand and

21    admitted and actually apologized to his wife for what he had

22    done?

23    A.  I mean, from the standpoint of treatment, I think the only

24    thing that the effect -- from that event that would affect my

10:36   25    treatment -- I mean, again, this is coming from the standpoint

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

10:37  1   of a treating physician --

2   Q.  Yes, sir.

3   A.  -- would be, again, warning from the use of Xanax or Ambien

4   along with using alcohol.

10:37  5   Q.  You were asked -- I'm sorry.

6   A.  I was just going to say I don't think that that event would

7   affect my diagnosis, if that's what you're asking.

8   Q.  It is a part, yes, sir.

9              You were asked some questions about some sexual

10:37  10  advances by Ms. Jones' boss.  Do you recall that line of

11  questioning?

12  A.  Yes.

13  Q.  Okay.  And let me just ask you this set of questions,

14  Doctor.  If, in fact, the series of sexual advances or

10:37  15  coercion, however you choose to phrase that, from her boss here

16  in Houston was followed by the rape in Iraq, how does that

17  impact your diagnosis?

18  A.  It doesn't.

19  Q.  I think there was at least some implication, Doctor, that

10:38  20  perhaps Jamie was making up or imagining what had happened in

21  Iraq.  Did you gather that?

22  A.  Yes.

23  Q.  Can you imagine fissures in your vaginal area?

24  A.  It's hard for me to do.

10:38  25  Q.  Can you imagine bruises -- I'm saying "you," but can a

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:38    1    person imagine fissures -- let me reask that based on the way

         2    that you -- thank you.

         3                 Can a person, can a woman imagine fissures in her

         4    vaginal area?

10:38    5    A.   I've never asked a woman if they could.

         6                 THE COURT:   Okay.   I think the question is confusing.

         7    I mean, she surely could imagine them.   Is the question that,

         8    is it conceivable that Ms. Jones imagined them without a

         9    assault?   Is that the question?

10:38   10                 MR. KELLY:   Let me try it again, your Honor.   You're

        11    right, I'm not asking it very well.

        12    BY MR. KELLY:

        13    Q.   Can your imagination cause fissures in your vaginal area?

        14    A.   Ones that are actually real and you can see?

10:39   15    Q.   Yes.

        16    A.   No.

        17    Q.   Can your imagination cause bruises to your inner thighs?

        18    A.   I wouldn't see how it could.

        19    Q.   Can your imagination cause a man to be present in your room

10:39   20    the next morning?

        21                 THE COURT:   Okay.   All right.   We get the point.

        22    Let's move on.

        23    BY MR. KELLY:

        24    Q.   You were asked some questions about malingering, Doctor.

10:39   25    You've been treating Jamie Jones since 2006?

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:39  1    A.  Yes.

2    Q.  Is she malingering?

3    A.  Not that I'm aware of.

4    Q.  Your diagnosis is post-traumatic stress disorder?

10:39  5    A.  Correct.

6    Q.  You've been presented with some information today by

7    Mr. Bortz' attorney.  Has it changed your diagnosis?

8    A.  No, sir.

9    Q.  As Jamie Jones' treater since 2006, is it your testimony,

10:40  10   to a reasonable medical probability, that Jamie Leigh Jones

11   suffers post-traumatic stress disorder from what happened to

12   her in Iraq?

13   A.  Yes.

14        MR. KELLY:  I pass the witness.

10:40  15        THE COURT:  Okay.  Any further questions from anyone?

16        MR. McKINNEY:  I have nothing further.

17        MR. HEDGES:  Nothing further.

18        THE COURT:  You may step down, Doctor.  Thank you for

19   joining us this morning.  You're free to go.  Yes, sir.

10:40  20        Okay.  Do we have further witnesses?

21        MR. McKINNEY:  Judge, I don't have any more witnesses.

22   I would like to read into evidence from the -- from Bortz 98

23   the findings of the State Department in the -- their final

24   report.  The Court's ruled that the findings come into

10:40  25   evidence; and I would like to read that into evidence as a part

10:40  1    of my case in chief, move for the admission of a couple of

       2    exhibits and then rest.

       3             MR. KELLY:  May I take a look at exactly what he

       4    intends to read, your Honor?  Because based on things that

10:41  5    happened --

       6             MR. McKINNEY:  I'll be happy to show it to you.

       7                  Right there, there, that and these.

       8                  It's a long report.  I have no objection to you

       9    offering --

10:42  10            MR. KELLY:  Yeah.

       11                 I don't have any objection as long as we can,

       12   under the rule of completeness, offer a rebuttal piece, your

       13   Honor, which may take me awhile.

       14            MR. McKINNEY:  No problem with that.

10:42  15            THE COURT:  All right.

       16            MR. McKINNEY:  Reading from the -- some of the

       17   findings from the final report of the United States Department

       18   of State, Diplomatic Security Service Report of Investigation

       19   dated May the 14th of -- signed and dated May the 14th of 2009.

10:42  20                 "On June 15th, 2008, RA" -- that is reporting

       21   agent -- "provided the final FBI lab report which indicated the

       22   subject's DNA is present on the previously submitted samples

       23   from the rape kit and evidence seized from DNA's room -- from

       24   the victim's room.  There is no/no scientific findings that can

10:43  25   support the theory that more than one person was involved in

10:43   1    the incident.

     2              "Pertinent issues:  Victim stated that she was

     3    raped by subject, and subject stated that it was consensual

     4    sex.  Victim has stated in different settings that she was gang

10:43   5    raped by five firefighters.  None of the witnesses at the party

     6    on the evening in question made any statements that either

     7    victim or subject was intoxicated to the point of inebriation.

     8              "When asked, witnesses stated that victim was

     9    flirtatious towards subject.

10:44  10              "Rape kit chain of custody was established on

    11    July 28th, 2005, and it has never been broken or compromised."

    12              That's the end of the offer from the State

    13    Department report.

    14              THE COURT:  Thank you.

10:44  15              MR. McKINNEY:  I move Bortz 242 and 185 into evidence.

    16    They were discussed with the witness.

    17              MR. KELLY:  No objection to those, your Honor.  And

    18    again, we do have a counter proffer.  It would just take --

    19              THE COURT:  Do you want to do it now or later?

10:44  20              MR. KELLY:  If I can have a few minutes to look at

    21    it -- we can do it later or --

    22              THE COURT:  Okay.  We'll do it later.

    23              In other words, it's one more example of a time

    24    when one side has offered a segment of a document, the other

10:44  25    side wants to admit and read to you another segment.  You

10:44   1   understand?

2   Okay.  We'll do that later.  All right.

3   MR. McKINNEY:  Your Honor, there will be some short

4   offers from some deps that will be done in KBR's case.  Subject

10:44   5   to those offers, Charles Bortz rests.

6   THE COURT:  All right.  Thank you very much.

7   All right.  We going to offer deposition excerpts

8   now?

9   MS. CATES:  Yes, your Honor.  I just want to make sure

10:45   10   with Stephanie Morris that their cuts are ready for their

11   crosses of our directs.

12   THE COURT:  Is Ms. Morris available?

13   MS. CATES:  I guess we can go ahead and start with our

14   direct.

10:45   15   THE COURT:  Okay.

16   MS. CATES:  We're going to start with Kristen Rumba.

17   May I just remind the jury who she is?

18   She's the KBR physician assistant who saw Jamie

19   Leigh Jones the next morning.

10:45   20   MR. ESTEFAN:  Your Honor, someone has come to pick up

21   Ms. Morris' child; and she's downstairs.

22   THE COURT:  All right.  We'll proceed with what we

23   have; and if we need to have an intermission later, we can do

24   that.

10:46   25   MR. ESTEFAN:  I believe Mr. Schmidt is working on that

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:46  1    as quickly as they can.

2              THE COURT:  Okay.  But KBR is ready.  So, let's

3    proceed with that.

4         *(Videotaped of testimony of Kristen Rumba playing)*

10:46  5              THE COURT:  Is that it?

6              MS. CATES:  That concludes our direct, your Honor.

7              THE COURT:  Okay.  Well, do you have something you're

8    ready to offer on the --

9              MR. ESTEFAN:  He's going to try, Judge.

02:16  10        *(Videotaped of testimony of Kristen Rumba playing)*

11             MR. ESTEFAN:  That was our very long offer.

12             THE COURT:  Okay.

13             MS. HOLCOMBE:  Your Honor, at this time we would like

14   to play a deposition excerpt from Ms. Sara Simco Tumbarella.

10:47  15   Again, she was one of the employees that worked alongside of

16   Jamie Leigh Jones.

17             THE COURT:  Very well.

18        *(Videotaped of testimony of Sara Simco Tumbarella playing)*

19             MS. HOLCOMBE:  That concludes the KBR offer of

10:57  20   defendant on Ms. Simco.

21             THE COURT:  All right.  Do you have any offer?

22             MR. ESTEFAN:  We do.  We're going to try, your Honor.

23        *(Videotaped of testimony of Sara Simco Tumbarella playing)*

24             MR. ESTEFAN:  And that is, again, our long offer,

10:58  25   Judge.

10:58    1              THE COURT:  All right.

         2              MS. HOLCOMBE:  Your Honor, at this time KBR defendants

         3    would call -- or like to show Mr. Arroyo, Pete Arroyo's direct

         4    examination deposition excerpt.

10:58    5              THE COURT:  All right.

         6              MS. HOLCOMBE:  And just as a reminder, Mr. Arroyo is

         7    the person that picked Ms. Jones up the morning of the

         8    incident.

         9              THE COURT:  Very well.

10:58   10        (Videotaped of testimony of Pete Arroyo playing)

        11              MS. HOLCOMBE:  That concludes our offer of Pete

        12    Arroyo.

        13              THE COURT:  Okay.  Do we have an offer from the

        14    plaintiff?

11:03   15              MR. ESTEFAN:  We do, your Honor.

        16        (Videotaped of testimony of Pete Arroyo playing)

        17              MR. ESTEFAN:  That concludes ours, your Honor.

        18              THE COURT:  All right.  Thank you.

        19              MS. CATES:  Your Honor, we would now like to call Will

11:05   20    Goodgine, who was the head of security at Camp Hope in 2005.

        21              THE COURT:  Thank you.

        22        (Videotaped of testimony of William Goodgine playing)

        23              MS. CATES:  That concludes our direct.  I just want to

        24    note that the picture at the end is because I think it lost

11:25   25    reception.


            *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:25  1            THE COURT:  Thank you.

2                     Anything from plaintiff on this witness?

3            MS. MORRIS:  Yes, your Honor.  We have cross of

4       Mr. Goodgine.

11:25  5            THE COURT:  Okay.

6          *(Videotaped of testimony of William Goodgine playing)*

7            MS. MORRIS:  That concludes plaintiffs' cross, your

8       Honor.

9            THE COURT:  All right.  Defendant again?

11:31  10           MS. HOLCOMBE:  Yes, your Honor.  The KBR defendants

11      would call Anthony Adams by deposition.

12           THE COURT:  All right.  Thank you.

13           MS. HOLCOMBE:  And, again, Anthony Adams was someone

14      that worked with Ms. Jones at Camp Hope.

11:31  15          *(Videotaped of testimony of Anthony Adams playing)*

16           MS. HOLCOMBE:  Your Honor, that concludes KBR's cross

17      of Anthony Adams for direct.

18           MS. MORRIS:  And plaintiff has nothing to present.

19           THE COURT:  All right.  Back to defendants.

11:32  20           MS. CATES:  Our next offer is Tyler Schmidt by

21      deposition.  He was Charles Bortz' roommate.

22           THE COURT:  Okay.

23          *(Videotaped of testimony of Tyler Schmidt playing)*

24           MS. CATES:  That concludes our direct.

11:33  25           THE COURT:  All right.  Plaintiff.

11:33  1           MS. MORRIS:  Yes, your Honor, a short cross from

       2    plaintiff.

       3        *(Videotaped of testimony of Tyler Schmidt playing)*

       4           MS. MORRIS:  That concludes our cross, your Honor.

11:34  5           THE COURT:  Okay.

       6           MS. CATES:  We have no more video depositions at this

       7    time.  It might be a good time to break until 1:00 o'clock.

       8           MR. KELLY:  Your Honor, before we do that, I actually

       9    do have my cross designations from the State Department report.

11:35 10           THE COURT:  Okay.  Let's get the lights back on.

      11           You remember this.  That's the -- this is the

      12    response to what Mr. McKinney read into the record.

      13           MR. McKINNEY:  Do you mind if I take a look at it?

      14           MR. KELLY:  No, not at all.

11:35 15           MR. McKINNEY:  Well, the point is --

      16           THE COURT:  Is that all we have to argue about?

      17           MR. McKINNEY:  That is.

      18           THE COURT:  We need till 1:00 o'clock for the next

      19    witness?

11:35 20           Okay.  Ladies and gentlemen, this will be our

      21    break until 1:00 o'clock.

      22           Would all please rise for the jury?

      23        *(Jury not present)*

      24           THE COURT:  Please be seated.

11:36 25           Okay.  What's the issue here?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:36   1          MR. McKINNEY:  The issue is I read the findings from

2       the report.  Already in evidence are various portions of the

3       report.

4               THE COURT:  Yeah, I know that.

11:36   5          MR. McKINNEY:  And it's Mr. Kelly's proposal to read

6       from that portion of the report, that is in evidence, that

7       constitutes the interview of Charles Bortz.  He plans to read

8       portions of that under the rule of optional completeness.  And

9       I think that it's -- one, it's not optional completeness,

11:37   10      because it has nothing to do with the findings.

11              It's simply a portion of the report he wants to

12      read into evidence, which he should have done in his case if he

13      intended to.

14              So, it's not optional completeness, to begin

11:37   15      with; and, secondly, it's already in evidence and it doesn't

16      need to be read yet again.

17              THE COURT:  If you hand me the passage, I'll look at

18      it over lunch.

19              Who's the next witness?

11:37   20          MS. VORPAHL:  Your Honor, we're, I think, still

21      waiting -- and you guys can address this better than I can --

22      on Tom Jones' responsive cuts.  And, so, we need to get that

23      done.  And then we have one more live witness.

24              MS. CATES:  And there is an issue with the Tom Jones.

11:37   25      In fairness, we just gave them to them this morning.

11:37   1           Until yesterday, we thought Tom Jones was coming

2   live.  We found out yesterday.  It took a few hours to get the

3   page and lines done, but we do need to call him next.  But I

4   also understand that they just got it.  So, I'm not entirely

11:38   5   sure of what to do about it.

6        MS. HOLCOMBE:  And they just got ours, but I

7   believe --

8        MS. CULLEN:  Actually, our offer for Tom Jones, we're

9   the only ones who initially designated testimony from Mr.

11:38   10   Jones.  And that was done pretrial, and no objections to our

11   offer were interposed.

12        I will say that there were three, I believe,

13   segments that would clearly violate the Court's order on 412.

14   Those have been removed.  And as far as I know, the remainder

11:38   15   of our designation is not subject of any objections.

16        But if the parties would like to play all of them

17   together, at one time, that makes perfect sense to me; and

18   we're certainly willing to wait until KBR plaintiffs work out

19   their disagreements.

11:38   20        MS. VORPAHL:  It does make sense to play them all at

21   one time.  Otherwise, there are -- there are necessary

22   redundancies.  And there's just -- I think there's just one

23   relatively large section but one additional section that may

24   not have been in the prior designations.  I just am saying I

11:39   25   would not rule out trying to get this done over the lunch hour.

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

11:39   1          MR. KELLY:  I'm not ruling anything out.  All I want
        2    to do is respond to Ms. Cullen's representation and --
        3          THE COURT:  Yeah, go ahead.
        4          MR. KELLY:  There was absolutely no intention to make
11:39   5    objections because, up until very recently, it had been our
        6    intention to bring Tom Jones.
        7          MR. McKINNEY:  We understand that.
        8          THE COURT:  Is he now out of subpoena range?
        9          MS. VORPAHL:  He is.  He is outside of subpoena range.
11:39  10          THE COURT:  Okay.  Well, work with industry and
       11    application; and I hope we get this done.
       12               Then one other witness beyond that?
       13          MS. VORPAHL:  That's correct, your Honor.  And then
       14    it's our intention, I believe, to rest.
11:39  15          THE COURT:  Okay.  Have you talked about jury
       16    instructions yet?
       17          MS. VORPAHL:  No.
       18          THE COURT:  Okay.  Thank you very much.
       19      (Recess was taken from 11:39 a.m. to 1:29 p.m.)
01:22  20      (Jury not present)
       21          THE COURT:  All right.  As to old business, I don't
       22    think the excerpts from Mr. Bortz' statement to the State
       23    Department are responsive to what Mr. McKinney read.  However,
       24    you're welcome to put it on as part of your rebuttal case.
01:30  25          MR. KELLY:  I understand, your Honor.  That's

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:30   1   certainly fine.  The Court has my only copy, if I could
        2   retrieve it.
        3           THE COURT:  Okay.  I know you have another set of
        4   disagreements.  Which one do you want to take up first?
01:30   5           MS. MORRIS:  Your Honor, I think it may be best to do
        6   the objections to the page and line of Mr. Jones.
        7           THE COURT:  Okay.
        8           MS. MORRIS:  Then we can get cutting them.
        9           THE COURT:  Okay.
01:30  10           MS. MORRIS:  And plaintiff has several objections to
       11   both Bortz' and KBR's page and lines.
       12               This deposition was taken and, basically, a lot
       13   of leading questions were made and presented to Mr. Jones, who
       14   had a very bad memory.  So, a lot of the cuts are leading
01:30  15   questions where he responds, "I don't know," and then it's
       16   followed up by another question.  And it's completely
       17   inflammatory throughout.
       18           THE COURT:  "I don't know" is?
       19           MS. MORRIS:  He says, "I don't know."  Like the
01:31  20   question is -- As an example is, "Do you recall Ms. Jones, when
       21   she was released from the hospital, prescribed an
       22   antidepressant and birth control pills?"
       23               He says, "I don't know.  I don't recall."
       24               And then they follow it up with another question
01:31  25   about that.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:31    1          THE COURT:  The questions are inflammatory?

         2          MS. MORRIS:  Yeah.  I'm sorry.  The question is.

         3              And so -- and he doesn't remember.  So, they want

         4     to present their testimony in his deposition.  And we would

01:31    5     object to that because he clearly doesn't recall these things.

         6     And throughout this trial we've heard about her prescriptions

         7     from other witnesses.  I think it's a waste of time, also.

         8              There's questions to Mr. Jones about alleged

         9     alcohol and drug abuse, where he doesn't answer the question,

01:31   10     he denies it.  And they want to present that, also.  Again, the

        11     question is inflammatory.

        12          THE COURT:  Okay.  So, that's one set of your

        13     objections.  Let's get the response.

        14          MS. CULLEN:  If I could respond, yes, your Honor.  On

01:32   15     the issues of Ms. Jones' history, from about the age of 16, of

        16     being on psychotropic drugs, it's clearly relevant.  Her mother

        17     testified that she was unaware of it.  She wasn't the one going

        18     to Walgreen's and buying the drugs for her daughter, had no

        19     idea her daughter had any sort of problem.

01:32   20              She was a minor.  She was living with either

        21     father or mother at all times.  It's clearly relevant to talk

        22     to the father about it.  The fact that he also denies knowing

        23     anything about it says a lot about her home life and her

        24     general emotional health.

01:32   25              I don't think it is irrelevant.  And I don't

01:32  1    think asking the father, "Were you aware that your daughter was

2    requiring antidepressants and antianxiety medications," I don't

3    see how that's inflammatory.

4          THE COURT:  How is she getting these drugs if neither

01:32  5    the father nor the mother was getting them for her?

6          MS. CULLEN:  Well, I think it's pretty clear that one

7    or the other of them is not testifying truthfully or simply has

8    no recollection, because one of them had to get the drugs for

9    her.  We've got the Walgreen's records showing they were

01:33  10    purchased.

11          THE COURT:  They don't ever give them to a minor, do

12    they, prescription medicines?  I'm not a pharmacist.  I think

13    that's the policy, isn't it?

14          MR. McKINNEY:  A minor can't go down and get

01:33  15    prescription meds and -- you know, when Ms. Jones was putting

16    on her case, Judge, she waxed eloquent on her -- the closeness

17    of her relationship to her mom and her dad and how in touch

18    they were on all these issues.  And that's part of the whole

19    person of Jamie Leigh Jones --

01:33  20          THE COURT:  Okay.  Well, I understand your point.  I

21    don't think you actually talked about this particular point.

22    Or is this one of the "I don't knows" you're worried about?

23          MS. MORRIS:  Yes, your Honor.  Ms. Jones has testified

24    that she took those drugs.  So, it's not about whether or not

01:33  25    it's true.  It's just whether or not he knew about it; and he

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:34  1    testifies he doesn't know, they don't remember, they don't

2    recall these things.

3              We're talking about, what?  Nine, ten years ago,

4    during a time where he was going through a divorce with Jamie's

01:34  5    mother.  And he talks about how she was having trouble during

6    that time, where she went to talk to Dr. Burnett.  And I

7    believe it was about problems with her relationship with her

8    parents as they were going through the divorce.  So, it's not

9    whether or not -- it's true that she was taking them, because

01:34  10   she's testified to that.  It's just --

11         MR. McKINNEY:  Another issue in this case, Judge, is

12   that perhaps one or more jurors may have noted that there is an

13   interesting congruence between how Mrs. Morgan's testimony and

14   Ms. Jones' testimony seems to fit on favorable issues and there

01:34  15   seems to be a joint lack of memory on unfavorable issues.

16             And we believe that the testimony from Mr. Jones,

17   the father, will be consistent with the inability to remember

18   things that are viewed as unfavorable to the Jones' side of the

19   case contrasted to the remarkable memory that the witnesses on

01:35  20   the Jones' side of the case seem to have when the issue is

21   favorable.  So, it is relevant.

22         THE COURT:  Okay.  Let's -- before I make my rulings,

23   let's go through all these.  First one is on prescription

24   drugs.

01:35  25             Okay.  What's the next one?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:35    1          MS. MORRIS:  Whether she was depressed.  He says, "I

         2   don't know."

         3               Whether Breanna ever tried to hurt her, the

         4   answer is "I don't know."

01:35    5          MS. CATES:  Do you want us to wait to respond?

         6          THE COURT:  Well, no.  Let's go through -- let's start

         7   with depression.

         8          MS. CULLEN:  The same issues apply to her parents and

         9   their association with her while she was suffering from

01:35   10   depression -- and I think maybe anxiety comes up, as well -- as

        11   applied to the need for drugs.  I mean, she was getting the

        12   drugs for those conditions.  And it all goes to what the family

        13   situation was and to what her situation was for the years

        14   immediately preceding going to Iraq.

01:36   15          MS. CATES:  It all goes to her damages that she's

        16   seeking in this lawsuit.  Her history of depression and anxiety

        17   are directly relevant to the damages we're here for today.

        18          MS. MORRIS:  But he adds nothing to it.  He does not

        19   remember.  She's already testified to it, and we've heard other

01:36   20   people testify -- other doctors testify to it.  It's in.  But

        21   he doesn't remember.  And it's just trying -- they're just

        22   trying to repeat the testimony over and over again.

        23          THE COURT:  Your objection is it's cumulative?

        24          MS. MORRIS:  Yes.

01:36   25          MR. KELLY:  Counsel is testifying, is the point here,

01:36  1    your Honor.

2              MS. MORRIS:  Yeah, they're testifying throughout.

3              MR. KELLY:  Counsel is testifying.

4              MS. MORRIS:  The other question they ask that he

01:36  5    doesn't remember is did Jamie have any abusive boyfriend.

6                   He says, "I don't know.  I don't remember."

7              MS. HOLCOMBE:  I was going to say, your Honor, a

8    couple of other things as to the damages.  Yes, those types of

9    anxiety are before the jury; but the effect her own father,

01:36  10   whether he was a part of her life or not a part of her life or

11   helpful during that time period, that's directly related to a

12   teenager and all the way through, emotional state, mental

13   state, which is directly at issue as to what truly was causing

14   her the psychological problems she's claiming of now.

01:37  15            Furthermore, Ms. Jones took the stand and built

16   up both her dad, calling him the "protector" several times, as

17   well as her mother and the type of relationship they had.  On

18   direct examination, Mr. Kelly asked all sorts of questions

19   regarding that relationship.

01:37  20            The fact that her father, when asked about

21   specific moments of her life that would be very memorable to

22   her, doesn't recall and doesn't really have any emotion one way

23   or the other is directly credible to his credibility as a

24   witness, as well as Ms. Jones' credibility when she talks about

01:37  25   how close their relationship was.


*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:37   1          These are the exact same type of questions that

2    we asked Ms. Morgan on the stand when she was taking the stand.

3    We had no objections from that.  And they're the same questions

4    we would ask him if he had come live, which he's not.  So,

01:38   5    unfortunately, all we have is his deposition testimony where he

6    chose not to explain his answer but to limit it to, "I don't

7    recall."

8          MS. CATES:  And additionally, Dr. Scarano has brought

9    up the relationship between the father and Jamie.  I mean, it's

01:38  10    at issue.  We need to be able to ask him, through his depo, the

11    important questions.

12          MS. MORRIS:  And I think that's where they're going.

13    I think they want to present Jamie's father as a father who

14    just didn't care, when the reality is he has a bad memory, he

01:38  15    just doesn't remember.

16          THE COURT:  I don't know what reality is.  I mean, I

17    don't know.

18          MS. MORRIS:  Well, his answers are, "I don't know."

19    He's not trying to cover anything up.  He doesn't --

01:38  20          THE COURT:  Well, see, but "I don't know" answers are

21    subject to an infinity of different interpretations.  I mean,

22    it may mean he has a bad memory; it may mean he's an absentee

23    father; it may mean he doesn't want to come forward with

24    negative information.  That's just for the jury, isn't it?

01:38  25          MR. KELLY:  I don't think it's probative of anything,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:38  1    your Honor.  The fact that his answer is "I don't know" is not

       2    probative of anything.  The only thing that they're wanting to

       3    do is inflame the jury with the verbiage in their questions.

       4            MR. McKINNEY:  Excuse me.

01:39  5            THE COURT:  For the reasons I just stated, "I don't

       6    know" answers might be interpreted by the jury as very

       7    probative.  I don't know.  That's their province.

       8            MR. McKINNEY:  To follow up on what the Court is

       9    saying, there are some things a father should know and there

01:39 10    are some things a father probably wouldn't know.  And the kinds

      11    of questions that were asked of Mr. Jones are within the ambit

      12    of what a father should know about his daughter.

      13            Likewise, the questions that were asked to

      14    Ms. Morgan when she was on the witness stand are questions that

01:39 15    a mother should know the answer to.

      16            These aren't hypothetical, philosophical

      17    questions that would require him to be at a particular place at

      18    a particular time to have witnessed a particular event.  They

      19    are, in fact, general questions about his daughter as she grew

01:39 20    up and afflictions that are documented in the records.

      21            MR. KELLY:  I missed the part of this trial when

      22    Mr. McKinney was qualified as an expert in parenting.  How can

      23    he stand there and say that, your Honor?  There's no way that

      24    he can say with a straight face what a parent should or should

01:40 25    not know, as if he were an expert.

                 *Cheryll K. Barron, CSR, CM, FCRR*              *713.250.5585*

01:40   1          THE COURT:  I know.  That's why I think it's a jury

        2     question.  But let's go on.  We have --

        3          MS. MORRIS:  Just to be clear, his answers are

        4     sometimes "I don't know" and then sometimes -- most of the time

01:40   5     "I don't remember."  So, it's not just "I don't know".  It's "I

        6     don't remember."

        7          MS. HOLCOMBE:  Which go to weight and not

        8     admissibility.

        9          MS. MORRIS:  We are, in addition, arguing that it is

01:40   10    cumulative.  It's a waste of time.  He doesn't remember.  We've

        11    already heard it all.

        12         MR. McKINNEY:  It's going to take us --

        13         THE COURT:  Okay.  I have prescription drugs; I have

        14    depression; and, thirdly, I have whether Jamie's mother tried

01:40   15    to hurt Jamie.

        16             What are the other issues?

        17         MS. MORRIS:  The other "I don't remember" is whether

        18    she had abusive boyfriends.

        19         MS. CATES:  Do you have a page and line?

01:40   20         MS. MORRIS:  I can get that for you.

        21         MS. CULLEN:  There is testimony that Mr. Jones was

        22    aware of Jamie's relationship with Eric Iler, and the fact that

        23    he's not aware of her having had any abusive boyfriends is

        24    certainly relevant.

01:41   25         THE COURT:  Okay.  Is that it?


                 *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:41  1          MR. KELLY:  That's Rule 412.

       2          MS. MORRIS:  I'm sorry, your Honor, if we could add to

       3    the abusive boyfriends issue, that is a 412 issue, also.

       4          MS. HOLCOMBE:  It's not sexual, though.

01:41  5          MS. MORRIS:  Her boyfriend?

       6          MS. HOLCOMBE:  Having an abusive boyfriend is not

       7    sexual, and she's already talked about the person that we know

       8    to be abusive is the person she admitted on the stand she lived

       9    with.  She's already talked about that she lived with this guy.

01:41  10   No one is talking about their sexual encounters with each

       11   other; but if he physically hit her in any way, shape, or

       12   form -- which does not talk about her sexual predisposition or

       13   behavior.

       14         THE COURT:  Let me have a moment with my colleagues.

01:42  15   Just a second.

       16      (Judge leaves bench briefly)

       17         THE COURT:  These issues, especially involving a young

       18   woman who's clearly been through a lot, are always very

       19   difficult.  But at the heart of this case, at the very heart of

01:44  20   the case is the huge credibility issue.  And I do believe that

       21   all four of this set of contested passages do go to

       22   credibility.  I really do.  So, I'm going to have to allow it.

       23   I'm going to have to allow it.  I'm sorry.

       24         What's next?

01:44  25         MS. MORRIS:  Mr. Jones was presented with a string of

01:44    1    e-mails from KBR employees that he is not on.  And I believe
         2    Ms. --
         3              THE COURT:  Who was presented with them?
         4              MS. MORRIS:  Mr. Jones is presented with them.
01:44    5              MS. CULLEN:  Can you tell us where?
         6              MS. MORRIS:  164 --
         7              THE COURT:  What was the nature of the questions?
         8    "Have you seen this before?"
         9              MS. MORRIS:  No.  Actually, it's an e-mail from Ron
01:45   10    Boutwell, where he's writing to another KBR employee and he
        11    says he spoke to Tom Jones and told him this.
        12              So, they presented it to him during his
        13    deposition and said, "Do you remember that phone conversation?"
        14              And he didn't.  He wasn't able to -- there is one
01:45   15    where he is on the e-mail.
        16              MS. CATES:  With respect to the e-mails that he is not
        17    on -- I believe Stephanie has those page and lines -- but that
        18    he was presented them and he said, "This is about a
        19    conversation with you.  Do you remember having that
01:45   20    conversation?"  Not "Can you prove up this e-mail," but, "Do
        21    you remember having a conversation that sounds like that?"
        22              And he would say, "Yes," or, "I know I had a
        23    conversation.  I don't know if it was at that exact time."
        24              But it was more to refresh his memory as to the
01:45   25    conversations that he had with Ron Boutwell.

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

01:45   1              THE COURT:  What useful came of this?  What useful

        2   came of these questions, then?

        3              MS. CATES:  That KBR in Iraq, when his daughter was in

        4   Iraq, was updating him on the travel plans of Jamie Jones; she

01:45   5   was not locked in a trailer.  They were working with Tom Jones

        6   here in Houston to make sure that he knew where he could meet

        7   his daughter and that he knew that they were making

        8   arrangements to get her safely home.  That's clearly relevant.

        9              MS. HOLCOMBE:  And he does testify that he -- in

01:46  10   looking at these e-mail, he testifies, "You think you had this

       11   conversation?"

       12              In response, he says, "Yes."

       13              THE COURT:  No, no, no.  Way too fast.

       14              MS. HOLCOMBE:  I'm sorry.

01:46  15              THE COURT:  "You think" -- go ahead.

       16              MS. HOLCOMBE:  "You think you had' -- this is at 165,

       17   Line 8 -- I'm sorry, Line 10.  "So, you think you had this

       18   conversation?"

       19              Mr. Jones responds, "Yes."

01:46  20              "QUESTION:  And you think this is accurately

       21   reported?"

       22              Mr. Jones responds, "Yes."

       23              So, even in looking at this e-mail that he may

       24   not have been the recipient, the reference, for purposes of

01:46  25   recollecting his memory is -- refreshing his memory, is he's --

              *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:46   1   he stated is correct, that he does, indeed, remember it --

        2                THE COURT:  This is the immediate post-rape period?

        3                MS. MORRIS:  And, your Honor, we --

        4                MS. CATES:  The week after.

01:46   5                MS. MORRIS:  We object to the presentation of the

        6   e-mail to the jury.  If it is used to refresh his memory,

        7   that's all it can be used for and not admitted to the jury.

        8                MS. HOLCOMBE:  I believe the e-mails are already in

        9   evidence, but I can confirm.

01:47  10                MS. CATES:  I think it's a joint exhibit.

       11                THE COURT:  Hold on a second.  To the extent we're

       12   talking about the period immediately after the rape or close

       13   thereto, I guess it goes to the issue of whether she was being

       14   locked up or whatever.  Is that right?

01:47  15                MS. CATES:  Yes, your Honor.  And they're

       16   communications with him just to show that they were working on

       17   bringing her home and that he knew that.

       18                THE COURT:  Tell me again what the time period is of

       19   these e-mails.  When are they dated?

01:47  20                MS. CATES:  I believe they're dated the 30th and the

       21   31st, and she made the allegation on the 28th.  And maybe even

       22   the 29th.  I'm not positive.  I'll check.

       23                MS. HOLCOMBE:  They are July 30th and --

       24                MS. MORRIS:  There's several e-mails.

01:47  25                MS. HOLCOMBE:  And I will just say that these e-mails,

                    *Cheryll K. Barron, CSR, CM, FCRR*              *713.250.5585*

01:47   1   looking at our joint exhibit list, are exhibits Joint 70 and

        2   Joint 71 that were agreed to by all parties before the trial

        3   started.

        4           MS. CATES:  They're already in evidence.

01:48   5           MR. KELLY:  Actually, your Honor, there's a number of

        6   joint exhibits that need to be addressed by this Court.

        7           THE COURT:  I've heard that.  How did that happen,

        8   that we had agreement on all the exhibits and now there are

        9   disagreements?

01:48  10           MR. KELLY:  There were witnesses anticipated to come,

       11   specifically those from Ted Poe's office, your honor, Ted Poe

       12   himself and then the witness from Ted Poe's office.  And then,

       13   once Ted Poe wasn't coming, those are specifically -- and they

       14   need to be addressed here in a moment, as well, because they're

01:48  15   relevant to this deposition, also.

       16           But there were a number of exhibits that had been

       17   anticipated to be properly authenticated --

       18           THE COURT:  No, no, no.  When a joint exhibit is

       19   submitted, what that means is both sides have agreed to admit

01:48  20   the exhibit.  In other words, they've waived any objection as

       21   to accuracy or authentication.

       22           MS. MORRIS:  There were several -- I mean, motions in

       23   limine were still outstanding and a lot of the documents that

       24   were in the proposed joint exhibits had then to be redacted

01:48  25   after the Court made decisions on things like the grand jury

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:49    1    and 412 issues.

         2            THE COURT:  Well, I can understand that -- they

         3    shouldn't have been in the joint exhibits ever, then, if there

         4    were still issues about them.

01:49    5            MR. KELLY:  I agree, your Honor.  But the issue is,

         6    though, that based on the way that the evidence has come into

         7    this case or has not come in, some of these exhibits really --

         8    let me just address what I am talking about, for instance.

         9            There are two exhibits in the joint exhibits.

01:49   10    One of them is a ledger, for lack of a better term, that could

        11    be explained only by the person who made it.  That person has

        12    been excluded by this Court based upon the defendants'

        13    objections on a number of occasions.  It's referenced in this

        14    deposition.  That's a ledger that was created by Patti Chapman

01:49   15    at Ted Poe's office.  It needs to be explained if it's going to

        16    be introduced to this jury.  Because if it's just introduced to

        17    this jury, it's misleading.  Ms. Chapman --

        18            MS. CATES:  Your Honor, you know Patti Chapman wasn't

        19    going to be a witness.

01:50   20            MR. KELLY:  No, but I --

        21            MS. CATES:  You knew it back then.

        22            MR. KELLY:  No, but we were certainly still trying to

        23    get Ted Poe here and believed we could.

        24            And there is -- to allow that exhibit to go

01:50   25    forward without some explanation from Ted Poe's office, your

01:50   1   Honor, which we've tried --

2        THE COURT:  Okay.  Well, we'll take these up after

3   we've excused the jury for the day.

4        But I do want to make clear, a joint exhibit--

01:50   5   are we talking --

6        MR. KELLY:  This is in this deposition, your Honor.

7        MS. CATES:  Because it was used to ask Mr. Jones about

8   the -- it's a log of his calls to Ted Poe's office.  And, so,

9   it was --

01:50   10       MS. VORPAHL:  And what he said.

11       MS. CATES:  And what he said.  So, it was used to say,

12  "Is this what you said to Ted Poe's office?"

13       And, you know, when they -- when we agreed on

14  this joint exhibit list, they didn't know if they would be able

01:50   15  to subpoena Ted Poe.

16       They claim they had no contact with Patti Chapman

17  and that she contacted them after this trial had started.  So,

18  I don't know -- if they agreed to it then, I'm not sure how

19  they thought they were going to --

01:51   20       THE COURT:  A joint exhibit -- just in case we ever

21  try a case together again, a joint exhibit means, "Whatever

22  reservations, qualifications, or objections we could have

23  asserted as to this exhibit, we waive, we agree it comes in."

24  So, on that basis, I'm going to allow it.

01:51   25       MS. MORRIS:  I'm sorry, your Honor.  You're going to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:51  1   allow the --

2          THE COURT:  The log and the e-mail excerpts.

3          MR. KELLY:  Your Honor, we've allowed a witness that

4   wasn't properly notified or put on a list by the defendants.

01:51  5   We're allowing evidence that can be explained by a witness if

6   the Court would allow us to call that witness.  And we're not

7   allowing us to call the witness to explain it.  I don't

8   understand the --

9          THE COURT:  Your two reasons are contradictory.

01:51  10  First, the reason Ms. Chapman was not allowed is she was on

11  nobody's witness list.  And the reason the joint exhibit is

12  allowed is that it was agreed to by the parties and the other

13  party has a right to have relied on that.

14         MR. KELLY:  I understand, your Honor; but this morning

01:52  15  we put Dr. Paskowitz on, who was never put on one of their

16  witness lists.  The rules are not being applied equally here,

17  Judge.  They're just not.

18         THE COURT:  No.  You're absolutely wrong about that.

19              Paskowitz was on your witness list and

01:52  20  uncontradicted evidence from the defendants was that you

21  repeatedly reassured them that you would call him.  Only at the

22  last minute did you decide not to call him.  And I'm sorry, but

23  lawyers' words ought to be worth more than just that.  You give

24  somebody your word, I'm going to enforce it.

01:52  25              What else?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:52   1          MS. MORRIS:  Your Honor, if I could just ask if we are
        2   permitted to call Ms. Chapman on rebuttal since this is going
        3   to be brought in?
        4          MS. HOLCOMBE:  Can I just add --
01:52   5          MS. MORRIS:  A very brief testimony?
        6          MS. HOLCOMBE:  I would add that they don't need
        7   Ms. Chapman, because the document speaks for itself.  There's a
        8   business affidavit to fully authenticate it, covers the
        9   business record hearsay rules.  The documents speaks for
01:53  10   itself.
       11          And Mr. Jones, who is referenced in the document,
       12   has already testified to that.
       13          And furthermore, while her name is on there,
       14   again, if they felt she was necessary to explain it, if it
01:53  15   needed explaining, they've known that, since they've had
       16   Mr. Poe's documents in their possession for months now, because
       17   it says "P. Chapman."  So, if they felt she was necessary, she
       18   would have been on their witness list.  They don't need her.
       19          MS. MORRIS:  This is a rebuttal witness, your Honor.
01:53  20   She would not need to be on the witness list.  It's to protect
       21   us from surprise, which is what is happening here, you know.
       22   They're going to --
       23          THE COURT:  What's the surprise?  That I'm allowing in
       24   a joint exhibit?
01:53  25          MS. MORRIS:  Well, we initially thought that

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:53  1    Congressman Poe was going to be here to testify to that

2    document and that --

3          THE COURT:  That is a breathtaking assumption, that we

4    could get a sitting Congressman to testify in court.  I mean,

01:53  5    have you ever done that before?

6          MS. MORRIS:  No.  No, your Honor.  But, I mean,

7    Mr. Poe was -- or Congressman Poe was working with Ms. Jones

8    throughout this ordeal, for the last few years, and making

9    appearances on her behalf.  So, we thought that, you know, he

01:54  10   was going to be here.  He had to vote on the week that the --

11         MR. KELLY:  There were a lot of unusual things that

12   happened in this case in getting it to this point, your Honor.

13   Congressman Poe coming would have been not that unusual in

14   light of everything else that happened.  We expected him to be

01:54  15   here.

16         THE COURT:  Was he deposed?

17         MR. KELLY:  No, sir.

18         THE COURT:  Okay.  The issue is, on rebuttal, can

19   Ms. Chapman come in.  And she is responsive to what?  I mean,

01:54  20   we already let in perhaps more than I should have when we

21   allowed the testimony that somebody was killed after having

22   alleged rape.  That is huge.  I mean, to the plaintiffs' point

23   that they have not been treated right, that was an enormous act

24   of leniency on my part to let that in.

01:54  25              Anyway, on the issue of rebuttal testimony.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:54   1          MR. McKINNEY:  Yes, Judge.  I'm unaware of any case or

2    any rule on rebuttal evidence that allows a rebuttal witness to

3    address an agreed-upon exhibit that's marked and entered into

4    evidence prior to trial.  Rebuttal witnesses come to address

01:55   5    issues that hadn't -- that couldn't reasonably be anticipated

6    during the trial, and they are allowed to testify on those

7    matters only.

8          They want to bring a rebuttal witness to contest

9    or explain or whatever a joint exhibit.  It's a contradiction

01:55  10    in terms.  It's not rebuttal.  It's case in chief evidence.

11          MS. MORRIS:  What was not anticipated is that

12    Congressman Poe would not be here to testify to the document

13    and the other conversations that went on within the office,

14    that are outside of that document.  I mean, they --

01:55  15          THE COURT:  What would Ms. Chapman testify about,

16    then?

17          MS. MORRIS:  That she received a call from Jamie's

18    father and Jamie's father contacted -- or when he contact --

19    actually, these guys spoke to her.

01:55  20          MR. KELLY:  While Jamie was still in the trailer, she

21    received a phone call from Tom Jones.

22          THE COURT:  Okay.

23          MR. KELLY:  And while Jamie was still locked in that

24    trailer, she called Jenny Foo of the State Department and Jenny

01:56  25    Foo dispatched two State Department agents to retrieve Jamie

01:56    1    from that trailer, which is directly, directly rebutting

         2    everything that they've said about, "We did it," "We took care

         3    of her," "We protected her."

         4                   They imprisoned her; and that witness can prove

01:56    5    it, Judge.

         6              THE COURT:  But that issue has been on the table the

         7    whole time, right?

         8              MR. KELLY:  The issue has been; but this particular

         9    witness, despite whatever they say, despite the fact that

01:56   10    P. Chapman may be listed on an e-mail somewhere, this witness

        11    was not known to me until the Sunday after this trial started.

        12                   We did expect Congressman Poe to come in and

        13    testify.  Obviously, the Court understands how that went down;

        14    and it didn't happen.

01:56   15                   But to now allow the documents which are

        16    documents that are dated the following day, without allowing

        17    Ms. Chapman to come and explain why she did it that way, is

        18    misleading this jury.

        19              THE COURT:  Why, if you did not have Ms. Chapman on

01:57   20    your witness list, did you ever think she would be needed to

        21    authenticate an exhibit that was agreed to jointly?

        22              MR. KELLY:  Because we believed that Congressman Poe

        23    would be able to explain that document, your Honor.

        24              MR. McKINNEY:  And if I may say -- sorry.

01:57   25                   What Todd just said, Judge, is that Ms. Chapman

01:57   1   would testify to a conversation she had with Ms. Foo at the

        2   State Department in which Ms. Foo informed Ms. Chapman that

        3   Ms. Foo sent agents over to the trailer and that is all

        4   hearsay.

01:57   5           MR. KELLY:  No, it's a verbal act.  She was --

        6           MR. McKINNEY:  Please.

        7           MR. KELLY:  -- by her words directing that somebody go

        8   and get Jamie out.  That is a verbal act.

        9           MS. VORPAHL:  Your Honor, may I say this?

01:57  10           If Patti Chapman came and testified in the manner

       11   in which Mr. Kelly said that she would, she would be directly

       12   controverting her own writing.  Her own writing says,

       13   "7-29-2005, Father, Thomas Jones, called to say that his

       14   daughter was brutally raped in Baghdad, Iraq, by civilians with

01:58  15   Halliburton.  Jamie Leigh Jones," date of birth, Social

       16   Security number -- I'm leaving those out.

       17           "Jamie was in Iraq, working for KBR as an

       18   IT technician contracted with Halliburton.  Federal

       19   investigator Matt McCormack," phone number, "or Heidi

01:58  20   McMichael," phone number, "are supposed to be working on case,

       21   according to father.

       22           "I got in touch with Jenny Foo from Overseas

       23   Citizens Service with DOS," phone number, main phone number,

       24   after hours phone number.

01:58  25           That is an entry dated 7-29-2005.  It doesn't

01:58    1   require any explanation by anybody.  And as I said, if

         2   Mr. Kelly is correct about what Ms. Chapman is going to say, it

         3   is contrary to her own written record which is an agreed

         4   exhibit in this trial.  We don't need Patti Chapman to come

01:59    5   here and testify about anything.

         6          MR. KELLY:  The fact that it contradicts is exactly

         7   why we need Ms. Chapman here, your Honor, because that document

         8   is misleading.

         9          MS. VORPAHL:  Well, then, why did you agree that it

01:59   10   was an admitted exhibit at this trial?

        11          MR. KELLY:  As I've said a number of times,

        12   Ms. Vorpahl, because I believed that Congressman Poe would be

        13   here to explain it.

        14          THE COURT:  That's never a safe assumption on any

01:59   15   witness, certainly not a sitting Congressman.

        16          MR. KELLY:  I understand, your Honor.  But that -- I

        17   mean, I've been asked the question; that's the answer.  Ms. --

        18   like I said, Ms. Chapman contacted us a week into this trial

        19   and made it very clear to me that that document should have

01:59   20   reflected the 28th, and she can explain to this jury why that

        21   is.

        22          MS. VORPAHL:  The testimony -- and I'll be happy to go

        23   and find it from Ms. Jones' own mouth -- is that, while she had

        24   not been in touch with Patti Chapman for awhile, she had been

02:00   25   in touch with her previously.  This is a witness they knew full

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

02:00    1    well about, that they could have listed on their very lengthy

         2    witness list and chose not to.

         3           MS. HOLCOMBE:  And I would only add that for rebuttal

         4    under Fifth Circuit it has to be unfair surprise that they

02:00    5    couldn't have reasonably anticipated during their own

         6    discovery.

         7           If this entry is so contrary to plaintiffs'

         8    position throughout this entire case as to when the Department

         9    of State was contacted, they would have looked into that during

02:00   10    their discovery and they would have seen P. Chapman's name by

        11    it and asked her about it at that time if that's what they had

        12    issues with.  But they chose not to.  And, therefore, there's

        13    no surprise.  There's no surprise at all.

        14           MS. MORRIS:  The testimony Ms. Chapman would give is

02:00   15    about July 28th, the conversation she had prior to those

        16    documented conversations.

        17           THE COURT:  What would she say?

        18           MS. MORRIS:  That Mr. Jones contacted her and told her

        19    that Jamie was in a trailer and that she was in fear of her

02:01   20    life, felt intimidated and needed someone to help her get out.

        21    And then Ms. Chapman acts, and then she goes back -- goes back

        22    and talks to Tom again and puts in that the State Department is

        23    involved.

        24           MR. KELLY:  Ms. Chapman has a very vivid recollection

02:01   25    of this, your Honor.  She -- she got up when she got the phone

02:01  1    call.  She was very upset.  She shut her door; she shut her
       2    blinds; she took no other business that day except for her
       3    phone conversations with Jenny Foo, to confirm that Ms. Jones
       4    was retrieved from that trailer.  She is very clear and very
02:01  5    specific.
       6            MR. McKINNEY:  That doesn't rebut anything in this
       7    case --
       8            MR. KELLY:  It absolutely does.
       9            MS. MORRIS:  Your Honor --
02:01  10           MR. McKINNEY:  Excuse me.  Excuse me.
       11           And it takes the defense totally by surprise at
       12   the end of the lawsuit, when there's absolutely no way we can
       13   go out and conduct additional discovery and respond to those
       14   incendiary allegations.
02:01  15           The document was agreed -- you know, I've seen
       16   stuff on the joint list that, if I had it to do over again, I
       17   wouldn't have agreed to it; but that's life.  You make a deal,
       18   you got to stand hitched to it.
       19           And Ms. Chapman, her name did not come up as a
02:02  20   potential witness in this case until we had the recovered thing
       21   about --
       22           MS. CATES:  Buried victim.
       23           MR. McKINNEY:  -- buried and dead -- a rape victim was
       24   buried and dead or whatever, that popped out without warning
02:02  25   when Ms. Jones answered one of Mr. Kelly's questions.  We

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:02  1    haven't been able to respond very effectively to that, other

       2    than getting Ms. Armstrong, fortunately, by phone in Kabul.

       3              Judge, it's not rebuttal.  It just isn't.

       4         MR. KELLY:  Your Honor, there are a lot of issues in

02:02  5    this case.  And I understand that the Court finds that that

       6    allegation that Ms. Armstrong made the comment to Ms. Jones in

       7    order to get a statement, that the Court finds it egregious.

       8    So do we.

       9         THE COURT:  Wait.  What?

02:03  10        MR. KELLY:  The comment about -- the comment about a

      11    woman having been --

      12        THE COURT:  Killed.

      13        MR. KELLY:  -- killed after she reported her rape, we

      14    agree, it is egregious.  That's why we're here, Judge, because

02:03  15   we believe that KBR's conduct is repeatedly egregious.

      16              And the whole point -- the whole point is to then

      17    allow them to put in a document which the witness who authored

      18    it can come in and tell you why it is inaccurate and can tell

      19    this jury the same thing, to allow that without allowing the

02:03  20   explanation is grossly unfair to the plaintiff.

      21        THE COURT:  Well, do we know the name of this woman

      22    who was murdered?

      23        MS. MORRIS:  I don't think that's necessarily true.

      24        MR. KELLY:  I don't even think a woman was murdered.

02:03  25   I think that Ms. Armstrong told Ms. Jones that for the sole

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:03  1    purpose of coercing the statement.  We never offered it for the

      2    truth of the matter asserted.  We offered it to show that it

      3    had an effect on Ms. Jones, which was to -- to force her to

      4    make the statement.

02:03  5              And there's been testimony that Ms. Jones was

      6    reluctant to make a statement.  Mr. Goodgine ordered it;

      7    Ms. Armstrong was filling the order.  And to do so, she told

      8    her about this -- this -- probably phantom.  I don't have any

      9    evidence that any woman was actually killed after reporting a

02:04  10   rape, but I do have evidence that Ms. Jones was told that.

      11             MS. VORPAHL:  Your Honor, if I might, I didn't know

      12   this issue was going to come up again.  But, in fact, I believe

      13   that there is a document in Ted Poe's file where Patti Chapman

      14   says something, but it is that Charles -- that Jamie Jones had

02:04  15   said that Charles Bortz made the comment that they're

      16   attributing to Jamie Jones.

      17             MR. McKINNEY:  Jamie Armstrong.

      18             MS. VORPAHL:  Jamie Armstrong.  Excuse me.

      19             You know, these folks, they can't keep their

02:04  20   story straight.  And I think that's relevant to what we're

      21   talking about here.

      22             It is time to put an end to all of this -- this

      23   testimony that's coming out at the last minute, their claim of

      24   unfair surprise, when they've had these documents every bit as

02:04  25   long as we have, and probably longer.  And it's time that we

02:05   1    get on with this.

2                      Mr. Jones says in his deposition he thinks it was

3    the 28th.  That's -- that's some evidence, you know.  He can

4    say when he thought it was.  The record says it's the 29th.

02:05   5    We're entitled to ask him about that.  That's what we're here

6    to talk about.

7                      And it seems to me that it's pretty clear that

8    the Court ought to allow that and doesn't need to find that

9    Ms. Jones' counsel is somehow surprised by that, given that

02:05   10   this deposition was taken back in March.

11             THE COURT:  I'm sorry.  Joint exhibit lists need to be

12   treated as if it were joint, and I don't think there's any

13   reason for Ms. Chapman to testify.  That is my ruling.  I've

14   made a similar ruling previously.  Thank you.

02:05   15                  Anything else on the tapes?

16             MS. CATES:  The only thing we would -- we proposed

17   perhaps putting both tape -- sorry -- both groups' cuts

18   together so that they would run consecutively.  We thought it

19   would save the jury time.

02:05   20             THE COURT:  I don't care about that.  I really --

21   we've now had the jury out two and a half hours.  Let's get

22   going.

23             MS. CATES:  Okay.  Thank you, your Honor.

24             MS. HOLCOMBE:  Thank you.

02:06   25             MS. VORPAHL:  Your Honor, we should probably say that,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:06   1    with this last testimony -- which is how long now?

2                    MS. CATES:  Ours will be 45 minutes, our cut.

3                    MS. VORPAHL:  Are we not playing it --

4                    MS. CATES:  No.  He just said --

02:06   5                    MS. VORPAHL:  All right.  I'm sorry.  So, it's not

6    going to be combined.  So, it's 45 and how much?

7                         I just want to tell the Court we have decided

8    against calling our last witness; and, so, we're going to rest.

9                    MS. HOLCOMBE:  One thing that we have to do before we

02:06   10   rest is enter some housekeeping matters before we officially

11   rest on the record.

12                   THE COURT:  Can you do the housekeeping without the

13   jury here?

14                   MS. HOLCOMBE:  Yes.

02:06   15                   MS. VORPAHL:  Yes, we absolutely can.

16                   MS. HOLCOMBE:  We just don't want to officially rest

17   without getting those done.

18                   THE COURT:  Two-minute break and then we'll have the

19   jury in.

02:10   20      (Jury present)

21                   THE COURT:  Ladies and gentlemen, Mrs. Loewe and I are

22   both grateful for your thank you card.  Thank you.  That's very

23   thoughtful of you, but the pleasure has been ours.  The

24   pleasure has been entirely ours.

02:10   25                        All right.  Let's proceed.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:10    1          MS. CATES:  We would like to present Thomas Jones,

         2    Jamie Leigh Jones' father, by deposition.  This is the last

         3    one.

         4          THE COURT:  All right.

02:10    5       *(Videotaped testimony of Tom Jones playing)*

         6          MS. CATES:  Sorry, your Honor, small technical

         7    difficulty.

         8          THE COURT:  Okay.

         9       *(Videotaped testimony of Tom Jones playing)*

02:39   10          MS. CATES:  That concludes our testimony from

        11    Mr. Jones.

        12          THE COURT:  Okay.

        13          MR. KELLY:  We have a situation, your Honor.  The good

        14    news is that we're going to shorten our counter proffer by a

02:57   15    lot.  The bad news is it's going to take us a minute to do

        16    that.

        17          THE COURT:  Okay.  Would all rise for the jury?

        18       *(Jury not present)*

        19          THE COURT:  Be seated.

02:58   20          Looks like we're going to finish today at a

        21    comfortable hour, and then I'll turn my colleagues to the jury

        22    instructions.  I really don't want to delay the trial any more.

        23          I will -- I propose to have, by the time you get

        24    here tomorrow, a finished draft, which I'm going to issue.  We

02:58   25    should have had these a long time ago, of course.

02:58   1                    I have yours.

        2            MR. McKINNEY:  Yes, Judge.

        3                I do -- are we going to have any colloquy and

        4    discussion --

02:58   5            THE COURT:  I don't think so.  I think you waived

        6    that.  I think both sides have waived that.

        7            MR. McKINNEY:  On the jury charge?

        8            THE COURT:  Yes.  It should have been submitted, you

        9    know, days ago.

02:59  10            MR. McKINNEY:  I did submit mine days ago.

       11            THE COURT:  What's the issue, then?  I have yours.

       12            MR. McKINNEY:  Well, which issue -- or how are you

       13    going to submit the case against Charles Bortz?

       14                We have submitted it in a form of, as its pled

02:59  15    and it's been argued to the jury, as a rape case.  The

       16    plaintiffs' submission is a common law assault and battery

       17    submission, which does not conform to the pleadings or the

       18    proof.  And I think there's a huge difference between a battery

       19    and the case that's been alleged against my client.

02:59  20                And I have a real problem with a submission to

       21    the jury that substantially dilutes the plaintiffs' burden of

       22    proof as they have pled their case against my client.  And I

       23    would like an opportunity to be heard on that --

       24            THE COURT:  I'll hear you right now.

02:59  25            MR. McKINNEY:  I think it's essential that this

                        _Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

02:59   1   Court hold --

2   THE COURT:  Stand by the microphone, if you would,

3   please.  Stand by the microphone.

4   MR. McKINNEY:  I think it's essential that this Court

03:00   5   hold Ms. Jones and her attorneys to their pleadings, to the

6   statements they've made about my client throughout this case,

7   and that Ms. Jones not be permitted -- and her -- her attorneys

8   not be permitted to reduce their burden of proof and reduce the

9   nature of the charges against my client to an unwanted

03:00   10  touching, which is essentially what a battery is.

11  And I have a real problem with the submission

12  proposed by Ms. Jones' attorneys, because it's not what they

13  pled and it's not how we've defended this case.

14  THE COURT:  Do you have jury instructions from the

03:00   15  plaintiff?

16  MR. McKINNEY:  I do.

17  MR. KELLY:  Your Honor, my simple response is, yes, it

18  is.  If you take a look at the fourth amended complaint, which

19  is the live pleadings in this case, assault and battery is what

03:00   20  was pled.  So, I beg to differ with Mr. McKinney.

21  MR. McKINNEY:  I happen to have it right here.

22  MR. KELLY:  Good.

23  MR. McKINNEY:  The caption says -- the caption says,

24  "Assault and battery," dash, "Charles Bortz and Several John

03:01   25  Doe Plaintiffs."  Operatively --

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:01   1          THE COURT:  "Defendants," right?  "Charles Bortz and
        2   other defendants"?
        3          MR. McKINNEY:  Actually, "Several John Doe rapists" is
        4   how it's captioned.
03:01   5          THE COURT:  Oh, "rapists."  I thought you said
        6   "plaintiffs."
        7              Go ahead.
        8          MR. McKINNEY:  "Charles Bortz and Several John Doe
        9   rapists conspired to drug Jamie with the intent of raping her
03:01  10   once she became unconscious.  Charles Bortz and several John
       11   Doe rapists raped Jamie while she was unconscious and incapable
       12   of consenting to said forcible acts of sexual intercourse,
       13   sodomy, and brutality."
       14              So, regardless of how the paragraph was captioned
03:01  15   at the top, if the Court wants to see it, the specific factual
       16   allegations in the complaint are specifically those of rape.
       17              And there is no need, I don't believe, under
       18   federal pleading practice for me to file for a more definite
       19   statement when I have a very specific statement that the
03:02  20   plaintiffs have put themselves on their proof of and to which
       21   we would have responded with our own evidence.
       22          THE COURT:  Okay.  Your response?
       23          MR. KELLY:  Well, my response, your Honor, is that
       24   he's trying to raise the -- raise our burden beyond what's
03:02  25   required.  We've pled an assault and battery.  It happens to be

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:02  1    that the assault and battery is in the form of a sexual assault
       2    and is in the form of a rape.
       3              But the truth of the matter is, if the jury were
       4    to find that there was an unwanted sexual touching of some
03:02  5    lesser nature, we should not be precluded from getting a
       6    finding on that.
       7              What we've proposed is the -- is the appropriate
       8    standard in a civil case for a civil assault and battery is
       9    what we've pled.  It's what the proof is -- has certainly been
03:02 10    put before this jury, and it's what we're asking the Court to
      11    instruct the jury on.
      12         THE COURT:  Okay.  I have your arguments, and I'll
      13    make a decision.
      14         MR. KELLY:  Your Honor, there is an issue -- I think
03:03 15    we still have the issue of the directed verdict before the
      16    Court.  I don't know if you want to take that up now.
      17         THE COURT:  That's fine.  We can talk about that.
      18         MR. KELLY:  There's a number of issues --
      19         MS. VORPAHL:  Can I say one thing about my charge
03:03 20    before?  Because I --
      21         MR. KELLY:  It's unrelated.
      22         MS. VORPAHL:  -- made an error --
      23              No, I don't think this is.
      24              Someone in my office made on error in our
03:03 25    Instruction Number 8.  I have sent a revised Instruction

                  *Cheryll K. Barron, CSR, CM, FCRR*                *713.250.5585*

03:03   1   Number 8, and I want to make sure that the Court gets it.

2   Because I wasn't aware of this until I compared my -- my

3   charge -- or my Instruction Number 8 against the Fifth Circuit

4   PJC over lunch and realized there were some added words.  So,

03:03   5   if you will simply take the new Instruction Number 8 and make

6   sure it gets in there.

7        THE COURT:  Okay.  Right now I'm missing -- I go

8   from -- let's see -- Instruction Number 6, Instruction

9   Number 7, and then I have Question 1.

03:04  10        MS. VORPAHL:  I'm happy to get you --

11   *(Sotto voce discussion at bench with court staff)*

12        THE COURT:  We just got the new one.  Apparently, I do

13   have the new one.

14        MS. VORPAHL:  All right.  That's fine.  That was just

03:04  15   a housekeeping matter that I wanted to make sure that we had

16   gotten the mistake out of my charge.

17        THE COURT:  Okay.

18        MS. VORPAHL:  I'm happy to address the motion for

19   judgment as a matter of law.

03:04  20        THE COURT:  Okay.  I'll let Mr. Kelly go first.

21        MR. KELLY:  Your Honor, there's a number of issues.  I

22   know this morning we talked about it.  And even as we sit here

23   today, we don't have page and line numbers from the transcript

24   of the trial proceedings to refer to.  However, we would like

03:04  25   to readdress the issue of ratification just briefly.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:04   1          There has certainly been at least some

2   prima facie evidence of the defendant tampering with e-mails in

3   the -- what we would argue is an attempt to cover up what's

4   happened here, that -- and there's also an e-mail that was a

03:04   5   joint exhibit -- it's 55 -- that Will Goodgine himself says

6   that Jamie Jones is sitting in a trailer in fear of retaliation

7   and retribution, which certainly goes to the ratification of

8   the acts here.

9          Ms. Jones has testified that Ms. Armstrong came

03:05   10   in and made a threat to get her to make a statement, whereas no

11   statement was taken by KBR from Charles Bortz.  Additionally,

12   the evidence that's in this case, in joint exhibits, is that

13   KBR, although told to stand down at 5:30 in the afternoon, went

14   in and got the statement from Ms. Jones at 8:00 o'clock in the

03:05   15   evening, after having been told to stand down by KBR.

16          Those are all acts of ratification of this

17   particular act.  That doesn't even begin to talk about the acts

18   of ratification that preceded Ms. Jones' attack and allowed

19   Mr. Bortz to believe he could get away with it.

03:05   20          And I think Mr. Estefan has something to add to

21   that as well.

22          MR. ESTEFAN:  To which I would like to add, your

23   Honor, I know the argument has been brought forth about

24   ratification not having been pled.  Ratification occurs when

03:05   25   the employer or its vice principal confirms, adopts, or fails

03:06   1   to repudiate the acts of its employee.

2               There are four cases that the Court can look at,

3   and some of which -- one of which is a Southern District of

4   Texas opinion; another is a Fifth Circuit opinion; and one is a

03:06   5   Texas Supreme Court case.

6               And I'm going to give the Court the cites on all

7   these, although I don't have it briefed.

8               One is the slip copy --

9       THE COURT:  I'm not sure what these are proving.  That

03:06   10   it doesn't need to be pled or it has been pled?

11       MR. ESTEFAN:  That it doesn't need to be pled and that

12   there are -- that a ratification instruction is appropriate for

13   the jury under these circumstances.

14               The seminal case, probably, for this Court is

03:06   15   *Prunty versus Arkansas Freightways, Inc.*  It's 16 F.3d 649,

16   particularly at Page 653.  It's a Fifth Circuit opinion from

17   1994.

18               Additionally your Honor, the *Willey* -- the

19   *Prunty* case has cited the *Willey versus SouthernCross*

03:06   20   *Ambulance, Inc.* opinion, which is out of the Southern District

21   of Texas, 2007.  The Westlaw slip opinion for that, your Honor,

22   is 1467427.

23               Additionally, the Texas Supreme Court case of

24   *Porter versus Nemir, Jr.*, at 900 S.W.2d, 376 at Page 385, which

03:07   25   is a Texas Supreme Court case, 1995, no writ, speaks to actions

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:07  1    that are outside the course of employment committed by the

2    employee yet still the employer was found to be liable for

3    punitive damages in those facts.

4          The last case I'll cite the Court to is the

03:07  5    *Skidmore versus Precision Printing and Package, Inc.* case,

6    which is also a Fifth Circuit opinion.  It's 188 F.3d at

7    Page 615, Fifth Circuit, 1999 opinion.  And the proposition

8    there, your Honor, is, "The employer may ratify its employee's

9    conduct through its own acts, conduct, or affirmative

03:08  10   acquiescence."

11         And there's been lots of evidence, both as to

12   Mr. Bortz and prior to the assault on Jamie, that there was

13   acquiescence and other actions by KBR.

14         THE COURT:  Okay.  I've written all those down.

03:08  15        MR. ESTEFAN:  Thank you, your Honor.

16         MR. KELLY:  On the -- I'm sorry.  I'll let you

17   respond.

18         THE COURT:  Yes.

19         MR. RUNIONS:  Just to respond to that quickly, two

03:08  20   things.  First off, I think that -- we put this in our judgment

21   as a matter of law.  The law on vicarious liability for an

22   employee's intentional tort is done under respondeat superior,

23   and it has to be within the scope of employment.  We discussed

24   that earlier this morning.

03:08  25         On the issue of ratification, although it's not

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:08  1    pled, in one of our briefs on the me-too witnesses, your Honor,

2    we briefed the fact that ratification -- you have to have --

3    the company has to accepted the benefit of the conduct.  So --

4          THE COURT:  Well, do you think it has to be pled or it

03:08  5    doesn't have to be pled?

6          MR. RUNIONS:  Your Honor, I think it has to be pled.

7    I mean, they're asserting it as an affirmative claim.  They

8    didn't even have it in their compliant.

9          THE COURT:  No.  I know.  That troubles me.  I just

03:09  10   wanted to know your position on it.

11         MR. RUNIONS:  Our position is it should have been

12   pled.

13         THE COURT:  But the fact that it wasn't pled, is that

14   dispositive?

03:09  15         MR. RUNIONS:  I think that's absolutely dispositive.

16   I mean, it's not a claim they have.  They have a claim for

17   vicarious liability to respondeat superior and, you know --

18         THE COURT:  Anyway, they have to benefit from the act?

19         MR. RUNIONS:  Right.  What I am saying is, if

03:09  20   ratification is considered -- I don't think it should be

21   considered.  If it is considered --

22         THE COURT:  Slow down.

23         MR. RUNIONS:  Sorry.  If it is considered, the company

24   must have accepted a benefit of the conduct.

03:09  25         THE COURT:  I understand the concept.

03:09   1          MR. RUNIONS:  Okay.

        2          MS. VORPAHL:  Can I say just a couple of words?

        3          THE COURT:  Yes.

        4          MS. VORPAHL:  Your Honor, no party can defend against

03:09   5  unpled theories of liability.  And I think that's what we've

        6  got here.  I just -- I want to make sure that the Court

        7  understands the Will Goodgine e-mail that was referred to

        8  earlier, where it was represented that Will Goodgine was

        9  concerned -- or indicated that Ms. Jones was concerned about

03:10  10  retribution and retaliation.

       11          What Mr. Goodgine's e-mail says -- and Mr. Kelly

       12  is right that it's a joint exhibit.  But what it says is, "The

       13  case has been turned over to Diplomatic Security Service

       14  agents.  They have just arrived to the security department and

03:10  15  are being briefed at this time.  Ms. Jones is currently alone,

       16  resting in a trailer on administrative leave, until we can

       17  resolve the case.  She has not given any names of the alleged

       18  assaulters at this time for fear of retribution and

       19  retaliation," further demonstrating why it was that it was

03:10  20  entirely reasonable that we would have placed her in a secure

       21  living condition.  So, I feel like you need to understand the

       22  entire e-mail.

       23          I don't believe that there -- even if there were

       24  a ratification pleading here, I don't feel like there's any

03:11  25  evidence that's been adduced to support the theory that KBR did

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:11   1   anything to ratify wrongful conduct, criminal conduct by

2   Charles Bortz.

3                    And, so, I urge you to grant our motion for

4   judgment as a matter of law on that issue.

03:11   5                    THE COURT:  Okay.  Thank you.

6                    MS. VORPAHL:  And I'm happy to talk about the other

7   issues, too, but --

8                    THE COURT:  Okay.  Mr. McKinney's views.

9                    MR. McKINNEY:  Judge, this is actually on a different

03:11   10   subject and -- but it ties into the motion for instructed

11   verdict.

12                    THE COURT:  Okay.  Well, let me get their response on

13   the ratification.

14                    MR. ESTEFAN:  Your Honor, a criminal act will always

03:11   15   be argued by an employer to be outside of its interests.  It's

16   never going to say, "We benefited somehow from these criminal

17   acts."

18                    If that's the case, then the statute -- Texas

19   Civil Practice & Remedies Code, Section 41.005, is meaningless.

03:12   20   The statute where an employer [sic] can be held liable for the

21   acts of its employer [sic] is meaningless if they say, "It's

22   criminal.  Therefore, King's X.  We get out of jail free on

23   that one."  That renders the statute meaningless.

24                    So, the -- even if an employee's action is

03:12   25   outside the scope of an employment, an employer still may be

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

03:12    1    liable for the torts of its employee under the theory of

         2    ratification.  Ratification is not a separate cause of action.

         3    It's not a --

         4              THE COURT:  No.  It's an affirmative defense, isn't

03:12    5    it?

         6              MR. ESTEFAN:  It's not even an affirmative defense.

         7    It's part of -- when you look at the pleadings and the

         8    evidence, you say, "Did the employer, under the evidence,

         9    ratify the conduct of the employee through its actions?"

03:12   10              You don't have to say -- I've looked through all

        11    the O'Connors causes of action and everything else.  I can't

        12    find a cause of action for ratification, Judge.  Because there

        13    isn't one.  Because it's strictly something that you determine

        14    based on the evidence.  And so --

03:13   15              MR. KELLY:  It's a way to get vicarious liability,

        16    your Honor.

        17              MR. ESTEFAN:  That's right.

        18              MR. KELLY:  And to say that they didn't benefit, your

        19    Honor, there's been ample evidence adduced in this case -- or

03:13   20    evidence that's come forward in this case about the cost-plus

        21    contract and how keeping the problems of KBR quiet would

        22    increase the benefit of that cost-plus contract.

        23              So, to say that they didn't benefit, they clearly

        24    benefited by ratifying these actions and keeping the

03:13   25    complaining victims quiet.  And they continue to do so today.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:13   1          MS. VORPAHL:  May I respond briefly?

       2          THE COURT:  Yes.

       3          MS. VORPAHL:  You know, respectfully, I think the

       4   plaintiffs are just wrong about this.  There is a claim for

03:13   5   ratification, the requisite elements of which are, one, that

       6   the plaintiff was injured by an agent or non-agent of the

       7   defendant; two, the agent or non-agent committed the act on

       8   behalf of the defendant; three, the defendant approved the act

       9   by word, act, or conduct after acquiring full knowledge of the

03:14  10   act; and, four, the defendant's approval was given with the

      11   intention of giving validity to the agent or non-agent's act.

      12          That's a Texas Supreme Court case from 2002,

      13   cited in our -- cited actually in our me-too brief.  The case

      14   is *St. Joseph's Hospital versus Wolff*, 94 S.W.3d, 513 at 536

03:14  15   and 37, Texas 2002.

      16          I think ratification does have to be pled, and

      17   now they're telling you that there's a cause of action under

      18   the Texas Practice & Remedies Code, Section 41.005.  I do

      19   recall looking at that.  I don't have the Texas Practice &

03:14  20   Remedies Code in here with me right now; but, your Honor, I'm

      21   confident that that's a cause of action that would have to be

      22   pled, as well.

      23          I think that it is a claim for when someone can

      24   be held vicariously liable for the criminal acts of another;

03:15  25   but I'm quite confident that you can't come up, you know, after

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:15  1    all the evidence is in and say, "Well, I meant to assert this

2    cause of action," either.

3            MR. McKINNEY:  Could I say one thing?

4            THE COURT:  Mr. McKinney, do you have anything on this

03:15  5    point?  On this point.

6            MR. McKINNEY:  Well, I just really don't have a dog in

7    the fight; but vicarious liability, with all due respect to

8    Ms. Vorpahl and Mr. Kelly, is not created by the affirmative

9    act of ratification.  I litigate in this area all the time.

03:15  10   Vicarious liability is simply the liability that enures to the

11   master or the employer under traditional -- the traditional law

12   of --

13           THE COURT:  Master and servant, yes.

14           MR. McKINNEY:  Master and servant.  Thank you.

03:15  15           THE COURT:  Why do you say -- you're saying nothing

16   can be ratified?

17           MR. McKINNEY:  No.  A ratification is an affirmative

18   act after the fact by the principal, or the master, with full

19   knowledge of the agent's conduct that is otherwise outside of

03:16  20   the course and scope of the agency or the employment.

21           THE COURT:  I think that's what Ms. Vorpahl said.

22           MR. McKINNEY:  Well, except it's not vicarious

23   liability.  Vicarious liability exists because of the position

24   of the parties, master/servant.  Anything the servant does in

03:16  25   the course and scope of the master's interests is vicariously

03:16   1   imputed to -- automatically imputed to the master.  You don't

2   even have to sue the servant to get a judgment against the

3   master for the servant's acts.  It's a point of law.

4                A ratification is a separate and distinct theory

03:16   5   of liability against a master that requires specific pleading

6   and specific proof that the master ratified the specific

7   tortuous or criminal act of the servant.  And ratification has

8   a series of elements.  It's set forth in the Texas Pattern Jury

9   Charge.

03:17   10               You run into this in a defamation case where an

11   employee defames somebody, that's normally outside the course

12   and scope of their employment.  So, it's a tort concept.  I'm a

13   tort lawyer.  I'm just -- kind of clear the air on that point

14   of law.

03:17   15          MR. KELLY:  I think the response, quite simply, your

16   Honor --

17          MS. VORPAHL:  Go ahead.

18          MR. KELLY:  The response, quite simply, your Honor, is

19   that the cases cited by Mr. Estefan will tell you that

03:17   20   Mr. McKinney's representations, tort lawyer or not, are wrong.

21          THE COURT:  Let me ask this.  Let's assume that you

22   pled ratification.  Let's assume we analyze KBR as perhaps

23   having ratified.  What is the evidence that the ratification

24   took place after KBR acquired full knowledge?

03:17   25          MR. KELLY:  One, by imprisoning Jamie; two, by forcing

03:18  1    Jamie to give a statement when they did not do so with
       2    Mr. Bortz; three -- I guess it's three -- tampering with
       3    e-mails --
       4              THE COURT:  This is after they acquired full
03:18  5    knowledge, though.  After they acquired full knowledge of what
       6    happened, what did they do to ratify?
       7              MR. ESTEFAN:  They didn't fire Charles Bortz for
       8    months, your Honor.  In fact, he left voluntarily; and there's
       9    evidence of that.  He quit months after the fact, on his own
03:18  10   terms, without -- even though he violated the company's zero
       11   tolerance policy of sexual assault.  And that sends, as we've
       12   said all throughout this case, a clear and direct message to
       13   all employees --
       14             THE COURT:  I thought we were having a trial that it's
03:18  15   not clear that he committed a sexual assault.
       16             MR. KELLY:  Well, but the point is, your Honor, that
       17   KBR was certainly, certainly aware that he had violated some of
       18   their policies.  They did nothing but protect him.
       19             In addition, the ratification goes not only to
03:18  20   the acts that occurred subsequent to this assault; but the
       21   ratifications of the prior acts, the prior assaults, all those
       22   things that we've brought in front of this Court, those
       23   ratification -- the ratification of those bad acts created the
       24   scenario which caused this rape.
03:19  25             THE COURT:  Well, that wouldn't -- I don't think she

        *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:19  1    can sue for ratification of assaults against other people,

2    though.

3             MS. VORPAHL:  Well, and you can't have -- you can't

4    ratify an act before it happens.  I mean, let's get in a big

03:19  5    circle here.

6             THE COURT:  No.  I understand.

7             MR. McKINNEY:  And the full knowledge issue, with all

8    due respect, they might have -- at worst, there would be an

9    issue that KBR had ratified two people spending the night

03:19  10   together or had waived the right to fire them --

11            THE COURT:  Yes.

12            MR. McKINNEY:  -- but there was -- there has never

13   been shown a point in time where Ms. Jones' allegations against

14   my client were proved to anyone's satisfaction.  Just the

03:20  15   opposite.  The State Department arrived at no conclusion.  The

16   grand jury did not return a true bill.

17            I mean, if anything, the thrust of the evidence

18   in this case would prevent anyone from concluding, A, that my

19   client raped Jamie Leigh Jones; and B, in the absence of that

03:20  20   proof, there's nothing -- nothing to ratify.

21            MR. RUNIONS:  Your Honor, and some of this evidence

22   has not been allowed into the case; but there's clear evidence

23   that KBR participated or at least kept up with the State

24   Department investigation and was inquiring with the State

03:20  25   Department, "Should we fire him or should we not," and was

03:20    1    waiting on the State Department determination of what their

         2    investigation produced.

         3         MS. HOLCOMBE:  Which did come in through Mr. Goodgine

         4    today, your Honor, as well as Ms. Armstrong's testimony.  Both

03:20    5    of those are in evidence that we were, indeed, waiting for

         6    their result.

         7         MR. KELLY:  That is ludicrous to think that you have

         8    to depend upon the State Department to tell you whether to fire

         9    one of your employees.

03:20    10         That has nothing to do with this case or whether

       11    this company acted appropriately, your Honor.

       12         THE COURT:  Well, I thought at the heart of this case

       13    was whether or not Mr. Bortz had consensual or non consensual

       14    sex.  I thought that's why we were here.

03:21    15         MR. ESTEFAN:  And there's ample evidence that it was

       16    non consensual.

       17         THE COURT:  Well, there is.  But you want me to say

       18    that KBR should have assumed it was non consensual and fired

       19    Mr. Bortz?

03:21    20         MR. ESTEFAN:  They did a rape kit.  They must have

       21    thought it was non consensual.

       22         MR. McKINNEY:  It was an army doctor that did the rape

       23    kit.

       24         THE COURT:  Rape kits are used all the time.

03:21    25         MS. VORPAHL:  She had alleged that she had been raped.

*Cheryll K. Barron, CSR, CM, FCRR*                  *713.250.5585*

03:21   1   That was exactly the right protocol.

2           MS. MORRIS:  Your Honor, there have been a couple of

3   records today about the grand jury not indicting.  They were

4   never asked to indict.  And that was up to the Department of

03:21   5   Justice to ask the grand jury whether or not there was probable

6   cause to arrest him for the rape.  They themselves decided not

7   to.  They didn't ask the grand jury and the grand jury said,

8   "No, there's not probable cause."  So --

9           THE COURT:  No.  But I think that argument cuts

03:21  10   against you, though.  I think the fact that they weren't even

11  asked suggests that the DOJ thought it was a pretty weak case.

12          MR. KELLY:  There was no jurisdiction, Judge.

13          MS. MORRIS:  Because there was no jurisdiction.

14          MR. KELLY:  There was no jurisdiction here.  And

03:21  15  it's --

16          MS. MORRIS:  Not that there was a lack of evidence.

17          MR. KELLY:  The evidence hasn't come into this court

18  about that, your Honor.  But I can tell you as an officer of

19  the court, I've read the e-mails.  There was no jurisdiction.

03:22  20  They knew they had no jurisdiction or at least strongly

21  suspected they had no jurisdiction and --

22          MS. VORPAHL:  We haven't seen those e-mails.

23          MR. KELLY:  Well, they're not in the case.  But it was

24  very clear.

03:22  25          MS. VORPAHL:  We certainly requested those documents.

03:22  1          MR. KELLY:  You have everything I've got.  If you
       2     haven't seen them, then you need to look for them.
       3          THE COURT:  Well, I'm just unwilling to believe that
       4     no one of the 94 judicial districts in this country had
03:22  5     jurisdiction over a rape if it occurred in Iraq on Halliburton
       6     premises.  That makes no sense.  It may have been in the wrong
       7     district in Florida but it --
       8          MR. KELLY:  The law was changed after and as a result
       9     of this case, your Honor, to establish jurisdiction under the
03:22 10     MEJA.  MEJA was expanded because of Ms. Jones.  And prior to
      11     that, there was no jurisdiction.
      12          MS. MORRIS:  And they had the e-mails.  The e-mails
      13     are between Lynn Falanga, who was the investigating agent, and
      14     the Department of Justice prosecutor; and they are talking
03:23 15     about whether or not they have jurisdiction.
      16              You guys have the e-mails.
      17          MS. CULLEN:  And they concluded that they did.
      18          MS. MORRIS:  They -- there's never an e-mail that they
      19     concluded they did.
03:23 20          MR. KELLY:  No.
      21          MR. HEDGES:  Your Honor, I really don't think the
      22     Justice Department would have spent what had to amount to 75 to
      23     a hundred thousand dollars to fly eight or nine people back
      24     from Iraq --
03:23 25          MS. MORRIS:  I disagree.

03:23   1        MR. HEDGES:  -- house them in Pensacola, have them

2    testify before the grand jury if they knew they didn't have

3    jurisdiction in the case.  That wouldn't make sense at all.

4        MR. KELLY:  It was a dog and pony show, Judge.  They

03:23   5    were being chastised on the floor of the Congress.  That's

6    wrong.

7        MR. McKINNEY:  It's all a big conspiracy.  That's the

8    plaintiffs' case.  Every time somebody in a position of

9    authority looks into this and doesn't take the action that

03:23  10    Ms. Jones and her attorneys would have them take, they all

11    become part of the conspiracy.

12        And the beauty of the conspiracy is it doesn't

13    require any evidence.  The evidence is the lack of action on

14    behalf of Ms. Jones.

03:24  15        But the fact of the matter is, as Mr. Hedges just

16    said, eight or nine people were flown in from around the

17    country, there were --

18        MR. HEDGES:  World.

19        MR. McKINNEY:  -- the world, 25 witnesses --

03:24  20        MR. HEDGES:  Something like that.

21        MR. McKINNEY:  A ton of witnesses were called.  My

22    client went in there, waived the Fifth Amendment, testified

23    freely.  Ms. Jones testified to the grand jury.  Anybody on

24    that grand jury who wanted to ask Ms. Jones or my client

03:24  25    questions was free to do so.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:24  1              THE COURT:  I'm just stuck on the proposition that

       2   we --

       3              MR. McKINNEY:  It's silly.

       4              THE COURT:  -- that KBR was supposed to have known

03:24  5   that a rape did occur and, therefore, fired Bortz when we're

       6   here now, in our fourth week of this trial, trying to determine

       7   that very question.  And maybe after this week we'll have an

       8   answer as to whether or not he did.

       9              But I don't think KBR can be said -- they

03:24 10   could -- KBR would have faced legal action if they had fired

      11   him for something he hadn't done.

      12              MR. KELLY:  If that's the case, your Honor, once

      13   again, it renders the whole concept of ratification moot

      14   because then you would always have to have a trial of the bad

03:25 15   actor before you could ever say the company was responsible for

      16   ratifying their conduct.  You would need the trial every time.

      17   That's --

      18              THE COURT:  No.

      19              MR. KELLY:  That renders the whole concept moot.

03:25 20              MR. McKINNEY:  No.  A typical ratification goes like

      21   this.  Somebody, in the course and scope of his employment or

      22   driving a company vehicle gets intoxicated, runs a red light,

      23   kills somebody, and the company keeps that person on the

      24   payroll after having been informed reliably of the underlying

03:25 25   facts and gives the person a car and puts him out on the road

            *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:25   1   again.  That's a ratification of a prior act.

2   MR. KELLY:  Well, not if he says -- not if he says the

3   light was green.

4   MR. ESTEFAN:  And not without a trial.

03:25   5   MR. KELLY:  Not if he says the light was green.

6   THE COURT:  No, no.  There are all sorts of differing

7   concepts of proof; but the one thing that's clear in this case,

8   it's not proved that Mr. Bortz raped Ms. Jones.  There are

9   other issues, but that one issue is why we're having this

03:25   10   trial.

11   Now, there are many other examples.  Insider

12   trading is another classic one, where it can be documented

13   without talking to anybody that insider trading was going on

14   and the company benefited from this rogue employee.

03:26   15   Ratification can occur very easily in that circumstance.  We

16   have a very different circumstance here, a very different

17   circumstance.

18   MR. KELLY:  Judge, can we simply ask that you read the

19   cases that have been referred?

03:26   20   THE COURT:  I'll read them, yeah.

21   And your position is that this was -- this act

22   was committed on behalf of KBR just in order to keep everybody

23   quiet?  Is that the idea?

24   MR. KELLY:  Because being quiet increases their public

03:26   25   perception, which increases their profits.  That testimony has

Cheryll K. Barron, CSR, CM, FCRR                 713.250.5585

03:26   1   been adduced, your Honor.

2          MR. ESTEFAN:  There's ample evidence of that.

3          THE COURT:  Okay.  Let's move on.

4          What's the next point?

03:26   5          MS. VORPAHL:  Your Honor, the next thing that I think

6   we need to talk about, I understand that you've granted our

7   motion for judgment as a matter of law as to the non-disclosure

8   fraud as to both the employment contract and the arbitration --

9          THE COURT:  I was ready to.  Plaintiff wants to argue

03:26   10   about it.

11          MR. KELLY:  I do, your Honor.  First of all, the

12   failure's to inform, the act of concealment here, it kind of

13   goes back to some of the things we've just been talking about.

14   Act of concealment included things -- and we've heard testimony

03:27   15   from the witness stand here -- about imprisoning complainants.

16   We've heard testimony about the high volume of sexual

17   harassment and assault complaints that were filed that were

18   ignored, that were simply shoved in a drawer somewhere.

19          We've heard the allegations of women being fired

03:27   20   and knowing that they would be fired if they reported and,

21   therefore, keeping that -- the reporting down and, again, for

22   the same reasons, because keeping it quiet increased the

23   profits.

24          So, in addition to that, there was active

03:27   25   concealment by using the confidentiality clause of the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:27  1    arbitration provision, keeping these things quiet, making sure

2    that these -- even the victims that did finally come forward on

3    some version of a claim -- kept it quiet so that the world

4    didn't know.  That was an active concealment of the problem

03:27  5    that KBR knew was happening in Iraq.

6          THE COURT:  What's the best authority for the

7    proposition that an employer owes that kind of information to

8    an employee?

9          MR. KELLY:  It's -- the issue is, your Honor, it's --

03:28  10   when you actively conceal it, when you actively conceal -- it's

11   in the definition of "fraud."  If you have superior knowledge

12   and you actively conceal that knowledge, that's fraud,

13   especially when it's material to the issue.  It's in the

14   pattern jury charge.  It's the act of concealment of that -- of

03:28  15   those facts that are relevant here.

16         MS. VORPAHL:  Of course, as your Honor just pointed

17   out, there must be a duty that arises before the fact of

18   concealment becomes actionable; and there is no duty here.  And

19   there are no cases that suggest that there is a duty.

03:28  20         And there -- the cases that we've cited in our

21   motion for judgment as a matter of law suggest to the -- or,

22   well, hold to the contrary.  "There is no duty of good faith

23   and fair dealing and no special relationship in the employment

24   context that would create an obligation for employers to inform

03:29  25   potential employees about all potentially negative issues."

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:29    1   That's a Texas Supreme Court case from 2000.

         2              This -- the Eastern District of Texas has

         3   specifically addressed this issue and stated that, "Courts are

         4   reluctant to find the existence of special duties in the

03:29    5   employer/employee relationship."

         6              And the Northern District of Texas has held that,

         7   "No special relationship exists in the employment relationship

         8   that would give rise to a duty to disclose."

         9              And most recent -- well, no, least recently,

03:29   10   again, the Northern District of Texas found that there would be

        11   no such duty.

        12              In 2005, the Northern District of Texas did a

        13   thorough examination of this issue and said that, "Texas law

        14   would never recognize the failure to disclose in the employment

03:30   15   context as fraudulent concealment," explaining that if it did

        16   it would open floodgates to all sorts of causes of action and

        17   claims of non-disclosure.  I mean, you -- it doesn't make any

        18   sense.

        19        MR. KELLY:  There's a difference in a simple

03:30   20   non-disclosure, your Honor, and an active concealment.  And

        21   they actively concealed these problems, with superior

        22   knowledge.

        23              What's more, they actually went in and they had a

        24   week-long presentation where they would tell these -- these

03:30   25   people, that were going overseas, about certain issues.  They

03:30   1   would undertake to tell them about certain things and actively

2   conceal this one.  This is a problem --

3   THE COURT:  I didn't see any evidence of that.  I

4   really didn't.  Who testified about their concealment at the

03:30   5   orientation session?

6   MR. KELLY:  Well, no, no, no.  They would actively

7   conceal this fact by not bringing it forward, Judge.  They

8   would actively conceal it by imprisoning the complainants and

9   firing the complainants and forcing them into arbitration and

03:30   10  all those things that we've adduced.  They didn't bring this

11  evidence forward.  They didn't let these women know what was

12  happening overseas when they were telling them about camel

13  spiders and heat stroke.

14          You know, it's different than simply --

03:31   15  THE COURT:  I just did not hear any evidence on what

16  was told them in the orientation about sexual assault.  I'll go

17  back and look at the transcript.

18  MR. KELLY:  Well, that's the point, your Honor, is

19  they didn't tell them.  That's the whole point, they didn't

03:31   20  tell them about --

21  THE COURT:  I didn't even hear evidence of that.  I

22  didn't hear evidence of what they said.  Maybe I'm just not

23  remembering, because I didn't hear that about the orientation

24  session.

03:31   25  MS. VORPAHL:  Your Honor, the evidence is that there

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:31  1   was a presentation on sexual harassment --

2                THE COURT:  Yeah, I remember that.

3                MS. VORPAHL:  -- at the orientation session.

4                    If we could move on to fraudulent

03:31  5   misrepresentation and -- and, again, I would ask the Court to

6   take another look at their -- at the plaintiffs' pleadings,

7   which is something that I've done last night and this morning.

8   You know, they've got these two fraudulent inducement claims.

9   Part of them are by this concealment or non-disclosure, and

03:32  10  we've talked about the duty that would have to arise.

11                   Then there's a few of their specific allegations

12  that talk about affirmative fraudulent misrepresentations, and

13  I don't believe that there is any evidence whatsoever that

14  there have been any misrepresentations made.  And, so, I'm

03:32  15  asking the Court to direct a verdict on that if you haven't

16  already done so.

17               THE COURT:  Okay.  Let me ask.  Are we ready to go on

18  these -- the rest of the depo?

19               MR. SCHMIDT:  Yes.

03:32  20               THE COURT:  Okay.  We'll take a two-minute break and

21  then we'll come back.

22           *(Recess was taken from 3:32 p.m. to 3:43 p.m.)*

23           *(Jury not present)*

24               THE COURT:  Okay.  Just a couple of things about --

03:43  25  that may be outstanding before this -- we play the tape.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:43     1                    Anthony Adams' statement to the State Department

          2     investigators --

          3                    THE CASE MANAGER:  We're missing the plaintiffs.

          4                    MR. HEDGES:  There's no lawyers at this table.

03:43     5               (Plaintiffs attorneys enter the courtroom)

          6                    THE COURT:  Okay.  Maybe I don't fully understand this

          7     issue about portions of Anthony Adams' statement to the State

          8     Department.  What's the issue on that?

          9                    MS. HOLCOMBE:  Your Honor, the outstanding issue was

03:43    10     that, during Anthony Adams' testimony in plaintiffs' case in

         11     chief, plaintiff specifically asked Anthony Adams about

         12     specific statements within his portion of the Department of

         13     Statement interview.  And, therefore, at the close of his

         14     testimony, we moved that under -- there's waiver as well as

03:44    15     consistent statements of recent fabrication.  We thought that

         16     as part of -- I think it's Bortz -- or the full Department of

         17     State report that we are continually throwing things in and

         18     redacting -- I have to grab the exhibit number.

         19                    THE COURT:  Do you want to read something from that?

03:44    20                    MR. McKINNEY:  Bortz 98.

         21                    MS. HOLCOMBE:  Yes, your Honor, we would like to read

         22     it into evidence as it being just this portion as -- being

         23     unredacted and being allowed to come in as evidence, is what we

         24     argued before the, Judge.  Your Honor reserved his ruling.

03:44    25                    MR. KELLY:  It's hearsay within hearsay, your Honor.


                     *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:44   1    The time for cross-examination of that witness on his own

        2    statement was at his deposition.  They failed to do it.  To do

        3    it now prejudices us.  We cannot cross-examine him on it at

        4    this point in time.

03:44   5            MS. MORRIS:  And I believe it's not an actual

        6    statement, something that he wrote or signed.  Correct?  I

        7    think it's just the investigator's notes of something that he

        8    said.

        9            THE COURT:  Give me the exact passage, and I'll look

03:45  10    at it.

       11            Okay.  Let's get the jury in.

       12            MS. VORPAHL:  Your Honor, there is one other

       13    housekeeping matter.

       14            THE COURT:  Okay.  Wait a minute.

03:45  15            MS. VORPAHL:  It will take 30 seconds.

       16            We do have all of the deposition transcripts we

       17    would want to put into evidence before we rest.

       18            THE COURT:  We can do that outside the presence of the

       19    jury.

03:45  20            MS. VORPAHL:  I just wanted you to be aware of that.

       21            THE COURT:  Okay.  Now Mr. Bagwell.

       22       *(Jury present)*

       23            THE COURT:  Ladies and gentlemen, please be seated.

       24            We now have the plaintiffs' excerpts from

03:46  25    Mr. Jones' deposition.

                    *Cheryll K. Barron, CSR, CM, FCRR*            *713.250.5585*

03:46  1          MR. KELLY:  This is actually an excerpt, your Honor,

2    from his statement -- oh, I'm sorry.  I'm sorry.  We're

3    doing -- my mistake.

4          THE COURT:  Okay.

03:46  5      *(Videotaped testimony of Tom Jones playing)*

6          MR. KELLY:  That's plaintiffs' proffer, your Honor.

7          THE COURT:  That's it?

8          Okay.  I thought it was going to be a lot longer.

9          MR. KELLY:  I promised to shorten it, Judge.

03:47  10         THE COURT:  Okay.  All right.

11         All right.  We have -- I know we have lawyer work

12   to do.  Do we have anything else for the jury?

13         MS. CATES:  No, your Honor.  Given all the testimony

14   to date, we have no more witnesses we need to call.

03:48  15         MR. KELLY:  One item in rebuttal, your Honor.

16         THE COURT:  Okay.

17         MR. KELLY:  This is the item that the Court ruled on

18   earlier.

19         THE COURT:  Okay.  Ladies and gentlemen, you'll

03:48  20   remember that an excerpt was read from the State Department.

21   And we now have an offer of another portion of the testimony --

22   another portion of the State Department report that plaintiff

23   wishes to submit.

24         MR. KELLY:  This is from the interview of Charles

03:48  25   Bortz.

03:48   1           "Subject is identified as a US citizen named
        2   Charles David" -- I'm sorry -- "Charles David Jacob Bortz,"
        3   date of birth, which I will leave redacted, Social Security
        4   number, which I will leave redacted.
03:48   5           "Subject is contract employee of KBR at the
        6   offices of KBR US Mission Iraq Security.  Subject identified
        7   himself by presenting a KBR-issued photographic identification
        8   card" --
        9       THE COURT:  You're going too fast, though.  You really
03:49  10   are.
       11       MR. KELLY:  -- "with number" -- and I'll redact that.
       12           "During the course of an investigation into the
       13   alleged sexual assault of a female KBR employee on July 27th,
       14   2005, subject had been identified as the individual who had
03:49  15   been in the victim's room when she awoke the morning after the
       16   alleged assault.  Subject was interviewed in order to determine
       17   his role in the alleged sexual assault.  Prior to commencement
       18   of the interview, subject requested that a representative of
       19   KBR be permitted to observe the interview on his behalf.
03:49  20           "According to subject, he saw the victim walking
       21   the hallway of Barracks Number 2, obviously on her way to the
       22   restroom again.  Subject stated that he advised victim not to
       23   walk through the barracks wearing a bathrobe as, quote, 'guys
       24   are weird here,' end quote.
03:49  25           "In response to direct questioning on this,

subject stated that victim was not wearing a bathrobe at the time that he made these comments in jest.  Subject continued that he did not see victim again until approximately 2100 hours on the evening of July 27th, 2005.  Bortz stated that at that time he observed victim talking on a cellular telephone outside of Barracks Number 2 with an empty Corona bottle sitting on the ground next to her.

"Subject recalled that he asked victim if she was drinking -- i.e., consuming alcohol -- by herself and proceeded to invite her to join him and a group of his friends who were gathered nearby.  Subject stated that he had spent the afternoon, from approximately 1730 or 1800 hours, visiting with Matthew Ryan, a coworker who was shortly to depart for annual leave.

"Subject recalled that he, Ryan, and Ryan's roommate, Mike McCall, sat in Ryan's room, conversing and consuming beer.  Subject further recalled that at some point prior to meeting victim that night, he, Ryan, and McCall moved to a patio outside Barracks Number 1, KBR, Camp Hope.  Subject admitted that prior to moving outside, he had consumed five or six 12-ounce bottles of Corona beer.

"Subject continued to narrate the events of the evening of July 27th, 2008, stating that McCall departed from the outdoor patio shortly after they had arrived.  Subject further stated that after McCall departed, he had the

interaction with victim previously described above.  Subject
recalled that approximately 20 minutes after his conversation
with victim, Simco and Eraka, LNU" -- which is believed to be
"last name unknown" -- "arrived at the patio and joined the
gathering.

"Subject explained that he informed Simco that
victim was sitting by herself outside Barracks Number 2 and
physically pointed out her location to Simco.  According to
subject, Simco then approached victim and began to engage her
in conversation, at which time subject rejoined his other
friends on the patio outside Barracks Number 1.

"Subject stated that he recalled that shortly
after Simco and victim left the party Simco returned to the
patio outside Barracks Number 1 and informed subject that
victim would be returning shortly and that she had gone to her
room to obtain an alcoholic beverage before rejoining them.
Subject could not recall how much time had elapsed prior to
victim arriving at the site of the gathering and stated that,
in the interim, Jaime Castillo, another coworker, had arrived
and joined the group.

"Subject stated that victim returned to the party
and was in possession of an alcoholic beverage contained in a
plastic cup.  Subject noted that, by its smell and due to the
fact that he tasted it later in the evening, he knew that it
was Baileys Irish Cream.  Subject stated that when victim

03:52  1   arrived she was wearing the same clothing she had on when he

2   saw her earlier outside Barracks Number 2; namely, loose sweat

3   pants, a T-shirt, and a pair of flip-flops.

4       "Subject stated that after victim arrived Matt

03:53  5   Ryan offered to mix an alcoholic beverage for her and that she

6   accepted the offer.  Subject further stated that Ryan left the

7   gathering and returned to his room in order to mix the

8   beverage.

9       "When asked about subject's alcohol consumption

03:53 10   while on the patio, he responded that Castillo had brought with

11  him several beers at the request of Ryan and that subject had

12  consumed one of these beers.  Subject did not recall if victim

13  consumed any of these beers.

14      "In response to a direct question, subject

03:53 15   characterized his level of intoxication as 'buzzed but not

16  completely intoxicated.'  Subject stated that Ryan's obvious

17  intoxication led subject to make a joke regarding the placing

18  of a ruffie in Ryan's drink.  Subject reiterated that his

19  statement regarding a ruffie was made in jest and directed

03:53 20   solely at Ryan and was not motivated by anything specific.

21      "In response to a direct question, subject stated

22  that victim did not exhibit behaviors which would indicate a

23  loss of her faculties, was impaired in her ability to walk, or

24  slurring her speech.  However, subject admitted that it was

03:54 25   entirely possible that victim was intoxicated at the time.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:54  1          "Subject stated that the lower bunk of the set

2    immediately to the right of the door was made and appeared to

3    be where the victim slept.  Subject explained that at

4    approximately 0215 hours on July 28, 2005, he and victim ceased

03:54  5    having sexual intercourse and fell asleep together on victim's

6    bed.  Subject claimed that at no point during their sexual

7    activity did he achieve orgasm or ejaculate.  Subject could not

8    state whether victim achieved orgasm and denied having

9    attempted or engaged in anal intercourse.

03:54  10         "Subject stated that he awoke to a cellular

11   telephone alarm at approximately 0500 hours on July 28, 2005,

12   and that victim was still asleep when he awoke.  Subject

13   continued that at this time he attempted to wake victim but

14   that she did not wake up.  As a result, according to subject,

03:55  15   he returned to sleep briefly, woke again, and once more

16   attempted to wake up the victim.  When the victim did not

17   arise, subject left her room and went to the restroom.  Subject

18   recalled that this occurred at approximately 0550 hours.

19         "In response to a direct question from

03:55  20   Special Agent McCormack, regarding his conversation with the

21   victim, when they woke up on the morning of July 28, 2008,

22   subject responded that he recalled victim asking him if they

23   had engaged in sexual activity.  Subject continued that he

24   asked victim if she was serious, at which point she indicated

03:55  25   that she was asking in jest.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:55  1            "Subject admitted that he recalled she also

2      inquired as to whether a condom had been used.  When pushed,

3      subject was unable to explain why, if she had been in

4      possession of her faculties, victim would be unaware that a

03:56  5      condom had not been used.

6            "Subject continued that Simco and victim had

7      worked together for one day when victim arrived and then victim

8      was transferred to another office.  Subject said he questioned

9      Simco as to why the victim had been transferred and was told

03:56  10     that they, no further information, had transferred victim

11     because she had a reputation as a troublemaker from her time

12     working with KBR in Houston, Texas.

13           "Subject provided substantially the same

14     description as detailed above.  Subject confirmed his claim

03:56  15     that he did not ejaculate during the sexual activity.  Subject

16     did not attempt to engage in anal intercourse to the best of

17     his recollection."

18           That ends our proffer, your Honor.

19           THE COURT:  Thank you.

03:56  20           Okay.  Any reason I cannot now excuse the jury

21     for the day?

22           MS. VORPAHL:  No, your Honor.

23           MR. ESTEFAN:  No reason.

24           MR. KELLY:  No, your Honor.

03:57  25           THE COURT:  Okay.  Ladies and gentlemen, I'm going to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:57  1    ask you -- I know this isn't the ideal starting time for you,

2    but I'm going to ask you be back here at 9:30 in the morning.

3    We think we'll have the case to you by lunchtime.

4                Would all please rise for the jury?

03:57  5        *(Jury not present)*

6            THE COURT:  All right.  Let's see.  I guess we need to

7    finish arguing the motion for judgment on pleadings.

8            MR. McKINNEY:  I'm not sure where we are in the

9    argument, Judge.  There is an additional argument that I'm

03:58  10   afraid I have to raise at this time.

11           THE COURT:  About what?

12           MR. McKINNEY:  Statute of limitations.

13           THE COURT:  Okay.

14           MR. McKINNEY:  The statute is five years.  The suit

03:58  15   was filed timely.  But, as best I can tell, there were no

16   efforts to serve my client until after the statute had run

17   three years after my client was named in the pleadings.  And

18   Texas law requires, when someone pleads the statute of

19   limitations, that, if there is a substantial gap between filing

03:59  20   and service and service falls outside of the limitations

21   period, then it becomes incumbent on the plaintiff to show due

22   diligence.

23           THE COURT:  Why are we hearing this issue just now?

24           MR. McKINNEY:  Well, Judge, quite frankly, you're

03:59  25   hearing it now because if you don't hear it now, I waive the

03:59   1    defense.

        2            THE COURT:  No.  I don't mean -- I meant why didn't we

        3    hear it right at the beginning of the case?

        4            MR. McKINNEY:  That's, on its face --

03:59   5            THE COURT:  That's a prior -- prior law firm.  I know.

        6            MR. McKINNEY:  Well, it's a good point, Judge.  I'm

        7    not a regular practitioner in federal court.

        8            THE COURT:  I understand.

        9            MR. McKINNEY:  And the way I would do this in state

03:59  10    court is I would take the verdict and defend my client on the

       11    merits and, if necessary, raise the statute on a motion for

       12    judgment notwithstanding the verdict, in the highly unlikely

       13    event the case goes the wrong way.

       14            But out of an abundance of caution, I -- it has

04:00  15    been suggested to me, by others who understand federal practice

       16    better than me, that if I don't raise it now I waive it.  And

       17    in the highly unlikely event the case goes the wrong way, I

       18    think my client would be upset with me if I waived a

       19    meritorious matter of law defense.

04:00  20            Now, it may well be that the Court thinks that

       21    evidence should be taken on the issue of due diligence in

       22    obtaining service against my client, and it may be that the

       23    Court might wish to bifurcate --

       24            THE COURT:  Let me just ask this, to begin with.  You

04:00  25    reference federal law, and you cite Texas law.  Wouldn't the

        *Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

04:00   1    issue of service be a federal question under *Erie*, rather than

        2    a state question?

        3              MR. McKINNEY:  No, Judge.  Because the statute of

        4    limitations is a state law defense.  And under state law, a

04:01   5    lawsuit is not considered timely filed unless it is filed in

        6    the limitations period and is served within the limitations

        7    period; or, if service is outside the limitations period, due

        8    diligence has to be shown, on the part of the party seeking

        9    service, that efforts were made to get service out in a

04:01  10    timely and reasonable -- in a reasonable fashion.

       11              And here what the record will show is that three

       12    years or more went by between the time suit was filed against

       13    Charles Bortz and he was finally served in August of 2010.

       14    Now, I'm not here to say that I can conclusively negate due

04:01  15    diligence.  And again, due diligence isn't my burden.

       16              What I am proposing to the Court is that I made

       17    my motion for instructed verdict based on the statute of

       18    limitations.  The Court may wish to take evidence on whether or

       19    not due diligence was exercised in obtaining service.  And I am

04:02  20    amenable to bifurcating that issue, putting the case to the

       21    jury on the merits, which could obviate the need for a

       22    limitations hearing on due diligence.

       23              THE COURT:  Okay.

       24              MR. McKINNEY:  And we could handle it in that fashion.

04:02  25              But I just don't want to waive any error.  So, I

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

04:02  1   don't want to put Mr. Kelly behind the eight ball.  If due

2   diligence was used, then it was used and there you go.

3           MR. KELLY:  Two things, your Honor.  I think

4   Mr. Bortz' own words were, in the e-mail, something to the

04:02  5   effect of, "They don't know where I am, and I ain't saying."

6           They clearly knew that we wanted him, we didn't

7   know where they were, we were looking for them.

8           Furthermore, if we're using Texas law, Texas law

9   would require that, for the running of the statute to count,

04:03  10  the defendant would have to be within the borders of the state.

11  He was not.  So, the five years hasn't run; and, therefore, I

12  don't think we need to bifurcate anything.  I think that, as a

13  matter of law, Mr. McKinney is simply wrong and we need to move

14  forward.

04:03  15          MS. VORPAHL:  May I say very briefly that the renewed

16  motion for judgment as a matter of law that we filed today,

17  that is the added claim for judgment as a matter of law that

18  the KBR defendants have added, and that is that, if there is a

19  vicarious liability or a respondeat superior claim based on

04:03  20  Bortz -- Mr. Bortz' bad acts and there is a limitations defense

21  found, KBR is entitled to take advantage of that defense.

22          Mr. Bortz has pled the limitations.  We wouldn't

23  even have to.  In point of fact, we have also pled limitations.

24  So --

04:03  25          MR. KELLY:  Actually, that's absolutely not true, your

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:03  1   Honor.  I would have never had to serve Mr. Bortz in order to

2   hold KBR, if the Court agrees with our vicarious liability

3   theories and if the jury does.  I would never had to serve

4   Mr. Bortz at all for KBR to be found liable under vicarious

04:04  5   liability.  So, that's absolutely a ludicrous position to take.

6        Furthermore -- I failed to bring this one up and

7   I'm not sure on this point but I'm going to make it just

8   because I'm not.  When you file a counterclaim, I think you may

9   have waived your statute of limitations by -- simply by virtue

04:04  10  of filing a counterclaim.  So, you know, I --

11       THE COURT:  Okay.  Those are all issues I haven't

12  thought about at all.  So, I'll have to think about them some.

13       MR. KELLY:  And, honestly, I hadn't either, your

14  Honor.  I hadn't expected to see this --

04:04  15       MR. McKINNEY:  Do you wish to hear any more on --

16       THE COURT:  Yeah.  Go ahead.

17       MR. McKINNEY:  All right.  It is true that there is a

18  tolling statute, under Texas law, for Texas residents who are

19  absent from the jurisdiction during the period of limitations.

04:04  20  But -- and that's -- I think that's what Todd was alluding to.

21       THE COURT:  Yes.

22       MR. McKINNEY:  However, the reason for that tolling

23  provision is that, for example, if I were a defendant and I

24  wasn't at my home, I was in London, England, then for the time

04:05  25  period that I was in London, England --

*Cheryll K. Barron, CSR, CM, FCRR*                *713.250.5585*

04:05  1          THE COURT:  I understand.

2          MR. McKINNEY:  -- they wouldn't be able to serve me at

3  my home.

4              It's different when you're talking about a

04:05  5  non-resident of the state.  The statute of limitations runs

6  whether the defendant is a resident or a non-resident, and it

7  becomes incumbent on the plaintiff to locate the defendant and

8  serve them with papers.

9              And the fact that my client put in an e-mail that

04:05  10  he wasn't going to advertise his location to a party who was

11  seeking to sue him is no evidence that my client was evading

12  service.  Evidence of evading service would be in the form of a

13  process server who was hired during the limitations period to

14  try to serve Mr. Bortz at a known address and evidence that

04:05  15  Mr. Bortz would not answer the door or denied being who he was

16  or something of that nature.  There's nothing in the record to

17  that effect.  And I'm quite confident there will be no evidence

18  to that effect.

19          THE COURT:  Okay.  So, you're saying state law and

04:06  20  Rule 4(m) doesn't apply.

21              It says, "If the defendant is not served within

22  120 days after the complaint is filed, the Court, on motion or

23  on its own after notice to the plaintiff, must dismiss the

24  action without prejudice."

04:06  25              You're not relying on that?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:06   1          MR. McKINNEY:  Like I said, I don't spend a lot of

2      time in federal court.  I need to read the rule real quick.

3          THE COURT:  All right.  Let's defer this issue.  If

4      you want to submit something later, you have raised it.  I'm

04:06   5      not going to rule as to whether it was timely raised.  I'm not

6      going to rule as to whether or not there was a stay of the

7      statute of limitation.  I'm not going to rule on any of that.

8      We'll take it up later.

9          MR. KELLY:  Your Honor, there are two issues left on

04:07  10      the motion for the directed verdict.

11          THE COURT:  Okay.

12          MR. KELLY:  And, again, I -- and I apologize because I

13      know the Court has heard this issue.  And I stepped out of the

14      room this morning when it was being heard.

04:07  15              But on the issue of the claim regarding fraud in

16      the inducement to arbitrate, I think the Court took the

17      position that to allow that claim to go forward would be

18      inconsistent with the Court's ruling, is my understanding.  I

19      was out of the room at the time.

04:07  20          THE COURT:  Yeah.  I'm not sure that was my reasoning,

21      but I think that is a consideration.

22          MR. KELLY:  Well, and if that was the Court's

23      reasoning -- and I'm not sure what the Court's reasoning was.

24      Again, I was out of the room.  But my -- I would like to offer

04:08  25      this.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:08  1              THE COURT:  Yeah.  Okay.

2              MR. KELLY:  The whole point is that, while we contend

3    that the Court ruled absolutely appropriately with respect to

4    its ruling on the motion to -- or not to compel arbitration on

04:08  5    all of the claims, the fact remains that KBR continued to try

6    to compel arbitration based upon that contract which they, we

7    believe, coerced and enticed Jamie to sign.  And they continued

8    to try to compel that arbitration; and it cost four years of

9    time, additional attorneys' fees, which she has testified to,

04:08 10    and expense.  And, so, there are certainly --

11             THE COURT:  How did they continue after I ruled on

12    that?  You mean other parts of this case?

13             MR. KELLY:  They appealed it.  They actually had an

14    appeal pending at the United States Supreme Court, which was

04:08 15    withdrawn only after Ms. Jones went to Congress and the law was

16    changed.

17             So, even after the Court ruled appropriately, KBR

18    didn't drop that.  It continued, and it cost her money and

19    time.  It cost us four years of time to get this case before

04:09 20    the Court, of just battling for that issue.

21             So, if that, in fact, was the rationale for the

22    Court, that it would be inconsistent, I would argue that it's

23    not inconsistent at all.  In fact, it's directly consistent

24    because they were arguing on appeal an issue that should never

04:09 25    have been brought up in the first place.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:09   1          THE COURT:  That wasn't my argument.  My argument was

        2   that I found that the alleged rape was not within the course of

        3   Ms. Jones' employment and, therefore, it would be a little odd

        4   now for me to come back and say that, for other purposes, it

04:09   5   was within the scope of either Ms. Jones' or Mr. Bortz'

        6   employment.

        7          MR. KELLY:  I understand.  And we're not asking you to

        8   do that, your Honor.  What we're asking you to do is to say

        9   that because it was not in the scope of Ms. Jones' employment

04:09  10   that the pursuit of these claims through -- the pursuit to push

       11   these claims into arbitration for four years was damages

       12   directly related to the fraud in the inducement to sign the

       13   arbitration provision.  It has nothing to do with -- the

       14   damages are different in that allegation than the rape damages.

04:10  15          Am I making sense?  I'm not trying to --

       16          THE COURT:  I understand what you're saying.  I

       17   understand what you're saying.

       18          Ms. Vorpahl?

       19          MS. VORPAHL:  Your Honor, at the risk of -- I'm not

04:10  20   sure I understand what Mr. Kelly is saying, but I will say

       21   this.  Mr. Kelly himself has said that KBR pursued appellate

       22   rights, appellate rights presumably that Mr. Kelly would agree

       23   KBR was within its right to pursue.  And Mr. Kelly has also

       24   said that the law changed and when the law changed KBR

04:10  25   abandoned those claims.

04:10  1          But if you take a look at what the claims are in

2    the lawsuit -- and this is true of both fraud in the inducement

3    claims.  But as to the fraud in the inducement to agree to

4    arbitration, there are Subparagraphs A through G.  All but one

04:10  5    of them, which is Subparagraph F, are fraud -- fraudulent

6    inducement by concealment, by non-disclosure.  Paragraph F is

7    the only paragraph that is an affirmative misrepresentation.

8          But there are no affirmative misrepresentations.

9    Here's what the allegation is.

04:11  10          "Jamie Jones relied on the misrepresentations of

11    fact regarding the safety measures for women in Iraq, at least

12    as they pertained to her fellow countrymen in general and her

13    coworkers in particular, when she agreed to the mandatory

14    arbitration provision on July 21, 2005."

04:11  15          There aren't any "misrepresentations of fact

16    regarding the safety measures for women in Iraq, at least as

17    they pertain to her fellow countrymen in general and her

18    coworkers in particular."  And I believe the Court has already

19    concluded that, as to the other subparts of this fraud in the

04:11  20    inducement claim, there's no duty.

21          And, so, I submit to your Honor that there is

22    nothing to send to the jury as to either this fraud in the

23    inducement to agree to arbitration or as to the fraud in the

24    inducement to enter into the employment agreement, for

04:12  25    precisely the same reason.  And I'm happy to go through which

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

04:12   1   of those are fraud by non-disclosure.

2       THE COURT:  As far as I know, there is -- there just

3   is not an obligation for an employer to come forward and make

4   every possible disclosure.  I'm willing to listen to contrary

04:12   5   authority on that, but I don't believe that that duty exists.

6           Now, through affirmative misrepresentation -- I

7   mean, I think there's been a lot of testimony -- you know, I

8   don't -- that's not saying I would find it persuasive but --

9       MR. KELLY:  Your Honor, there's been more than just

04:12   10  testimony.  Ms. Vorpahl has stood up here a number of times and

11  held up the Code of Business Conduct, which is supposed to give

12  these women some sense of security that its policies and

13  procedures would be enforced.  And we've heard numerous times

14  from that stand that a policy and procedure that is not

04:13   15  enforced is more dangerous than not having one at all.

16          But what they did is they had one, they told

17  these women it was there and it would be enforced, and then

18  they didn't enforce it.  And they concealed the fact that they

19  didn't enforce it for reasons that we've already talked about.

04:13   20          They didn't enforce their open door policy.  In

21  fact, we've heard testimony -- and I just read a passage that

22  referred to it again -- that the open door policy was not

23  confidential at all, although it was represented to be.  And,

24  in fact, it created an even more hostile work environment,

04:13   25  because these women, including Ms. Jones, would use the open

04:13  1   door policy, they would complain of sexual harassment, and then
       2   their harassers and others would learn about it.
       3           THE COURT:  But what evidence do we have that
       4   Ms. Jones acted in reliance on the representation by signing
04:13  5   the agreement?
       6           MR. KELLY:  Her testimony, your Honor.  She testified
       7   from that stand that she would not have gone to Iraq, she would
       8   not have done it if she had known that these policies would not
       9   be enforced.
04:14  10          MS. VORPAHL:  Your Honor, there has to be a
      11   misrepresentation of fact.  I'm not making this up.  I'm
      12   reading it out of Mr. Kelly's pleading.  And there has been
      13   absolutely no evidence of a misrepresentation of fact regarding
      14   "the safety measures for women in Iraq," paren, "at least as
04:14  15   they pertained to her fellow countrymen in general and her
      16   coworkers in particular."  That's what they pled was the
      17   misrepresentation, and there's just not any evidence of that.
      18          Now, if they want to plead some other
      19   misrepresentations, the time to do that is past.
04:14  20          MR. KELLY:  Your Honor, there was representations
      21   about living conditions, there were representations about being
      22   more likely to be killed in a car wreck in the States than have
      23   something happen to you in Iraq.  All of these representations
      24   were made.  They were active misrepresentations, they were
04:14  25   affirmative misrepresentations.

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

04:14    1              KBR knew it.  They were concealing what was

    2    happening to women over there and they kept it from Ms. Jones

    3    and they keep it from women and they continue to keep it from

    4    women today.  And if -- you know, if a company can do this --

04:15    5    if really a company can do this and get away with it, there is

    6    no justice.

    7              THE COURT:  Okay.  You had something you wanted to

    8    say?

    9              MR. RUNIONS:  Your Honor, I just want to say each one

04:15   10    of the representations he just went through were not

   11    misrepresentations, they were representations.  There's been no

   12    evidence that any of those were in any way false, the fact that

   13    it was more likely to be in a car crash rather than be hurt by

   14    an IED or something like that.

04:15   15              In addition, I just -- Ms. Vorpahl mentioned this

   16    earlier.  The *Kaddouri case versus Merrill Lynch*, which is one

   17    of the cases that Ms. Vorpahl mentioned earlier -- which is

   18    2005, Westlaw 283582, the Court there was Northern District of

   19    Texas, specifically talked about the non-disclosure in the

04:15   20    employment context and they said that, "This would require

   21    employers to confess all the faults of its employees before

   22    hiring a new employee" --

   23              THE COURT:  Slowly, slowly.  "All the faults" --

   24              MR. RUNIONS:  I'm sorry.

04:16   25              "To require this type of disclosure would require

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:16   1   employers to confess all the faults of its employees, before
        2   hiring a new employee, in order to escape liability for
        3   fraudulent concealment."  And it absolutely rejected that sort
        4   of a standard.
04:16   5           THE COURT:  Well, that's my concern.  That's my
        6   concern.
        7           MR. KELLY:  Your Honor, this isn't just a failure to
        8   disclose.
        9           THE COURT:  No.  I'm dividing the two, I think.
04:16  10   Fraudulent inducement through affirmative misrepresentation may
       11   be something we need to get the jury's verdict on.
       12           But fraudulent inducement through non-disclosure,
       13   I just don't think Texas law supports that.  That KBR had a
       14   sexual harassment policy in place which it enforced, I don't
04:17  15   think we've heard any evidence that KBR made this
       16   representation knowing it was not enforcing sexual harassment
       17   policies.
       18           The living accommodation may be the closest call,
       19   because Jones says that KBR said it would place her in a hooch.
04:17  20   She says she was told that during one of the training sessions
       21   in Houston.  And KBR says that's not right, it didn't say that.
       22   That seems to me a question for the jury.
       23           MS. VORPAHL:  Actually, Ms. Jones didn't testify that
       24   was said to her during a training session.  She said that it
04:17  25   was said to her in the open area outside the training sessions.

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

04:17  1    I would be happy to locate that testimony.

2                    THE COURT:  Okay.  Well --

3                    MS. VORPAHL:  By somebody who looked like they were a

4    manager.  That was her testimony.  And I --

04:17  5                    THE COURT:  We have the same issue, though, whether

6    she would be placed in an all-female environment.  She says she

7    was told that.  KBR says, "Nonsense."  I mean, aren't these

8    jury questions?

9                    MS. VORPAHL:  Your Honor, I don't think they are

04:18  10   but --

11                   THE COURT:  But why not?  If we have --

12                   MS. VORPAHL:  Because she was placed in an all-female

13   living situation.  She had a private room.

14                       I mean, what she was told is that men and women

04:18  15   would not live in the same house together, would not live in

16   the same room together.  And I don't think that her testimony

17   has been clear to the contrary.

18                       I mean, Judge, you've also got to determine

19   whether those are material misrepresentations and whether they

04:18  20   proximately caused a rape.

21                   THE COURT:  Well, common sense kicks in here

22   somewhere.  I wouldn't want to go to someplace where I had to

23   live with people of the opposite sex and share bathrooms and

24   all that.  That strikes me as fairly material.  I mean,

04:19  25   that's --

04:19  1          MS. VORPAHL:  Again, I would be happy to get
       2     Ms. Jones' testimony on that point.  Why don't I do that
       3     overnight?
       4               Because I don't believe that it's clear -- I
04:19  5     mean, I think that she testified that she understood that
       6     living conditions would be extremely austere.  I don't think
       7     that it's clear that -- I don't think her testimony is clear --
       8     though I will certainly go back and look at it -- on this topic
       9     at all, not clear enough, I don't believe, to create a fact
04:19 10     issue.  But, you know, I'll be the first to admit that I don't
      11     remember everything --
      12          THE COURT:  Well, I don't know.  Nobody has perfect
      13     recall of -- what?  This is day 16 or so?  I don't think
      14     anybody has perfect recall.
04:20 15               I don't think these are the guts of the case.  I
      16     really don't.  I think the guts of the case are what happened
      17     in that room.
      18               But I don't see the fraudulent concealment issue
      19     at all.  I really don't.  I just -- I'm just not going to be
04:20 20     able to allow that.
      21          MS. VORPAHL:  If I could just say one more time -- and
      22     I apologize for repeating myself.  The plaintiff ought to be
      23     held to their pleadings.  And their pleadings, again, say that
      24     Jamie Jones relied upon "the misrepresentations of fact
04:20 25     regarding the safety measures for women in Iraq, at least as

04:20   1    they pertained to her fellow countrymen in general and her

2    coworkers in particular."  I just don't think there's any

3    evidence of that.  And I will be happy to look overnight.

4              THE COURT:  You want to respond?

04:21   5              MR. KELLY:  Well, your Honor, there is evidence of

6    that.  There's evidence that Ms. Jones was told she would be

7    housed with all women, which is certainly a safety measure.

8              We've heard ample testimony about the treatment

9    of women when they complained of these issues and the fact that

04:21  10    they were punished, which is certainly a safety issue.

11    Because, if the victims of sexual harassment and sexual assault

12    are punished for reporting it, then there is no cleaning up of

13    the problem and the problem gets worse.

14              They were not -- she was not told that.  She was

04:21  15    not told she would be punished for reporting her sexual

16    harassment or assault or that women had been being punished

17    that way for so long.  Clearly, those issues have been

18    testified to.  There's ample evidence before this jury, you

19    know, to find -- the fact issues for this jury to find that, in

04:21  20    fact, KBR actively misrepresented.

21              THE COURT:  Well, that's the part I'm -- I think does

22    need to go to the jury.

23              MS. VORPAHL:  Well, your Honor, for the plaintiffs to

24    say that KBR misrepresented that things had happened to other

04:22  25    women is ludicrous.  KBR that -- we're back to the concealment

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

04:22  1   issue that you've already said is not going to go to the jury.

2   Again, "Jamie Jones relied upon the

3   misrepresentations of fact," she would have to say that she was

4   told that there were no dangers for women in Iraq and that she

04:22  5   relied on that.

6   MR. KELLY:  She was told that the Code of Business

7   Conduct would be enforced against all employees, your Honor.

8   She was told about terminable offenses.  She was told about the

9   things we've heard in this courtroom and that KBR sold itself

04:22  10  as somebody who would enforce those policies when, in fact, KBR

11  knew that it was not enforcing those policies, particularly as

12  it related to sexual harassment and sexual assault.

13  THE COURT:  Well, what is missing maybe and the really

14  hard question here is whether whoever it was who made these

04:23  15  statements on the part of KBR, whether in writing or orally,

16  knew they were false at the time they made them.  And I just

17  don't see a basis of taking that away from the jury.  I really

18  don't.

19  That's certainly something you can argue to them,

04:23  20  that we have -- all we have is some anonymous person saying --

21  according to Ms. Jones -- saying that she would be placed in an

22  all-female living situation or KBR had certain safety measures

23  in place.

24  MS. VORPAHL:  I think the testimony was actually that

04:23  25  she would be in a hooch, in a containerized housing unit, by

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:23  1    herself, that some unidentified person told her that when they
       2    were milling around out --
       3          THE COURT:  Well, I thought it both, that she would be
       4    placed in a hooch and she would be in an all-female living
04:24  5    situation.
       6          MS. VORPAHL:  Your Honor, you may be right again.
       7          THE COURT:  And I may be wrong.  I don't recall.  I'm
       8    not claiming perfect recall.
       9          MS. VORPAHL:  No.  And I'm not either.
04:24  10         MR. KELLY:  We recall it the same way, Judge.
       11         MS. VORPAHL:  Well, I think I've probably said all I
       12   need to say.
       13         MR. McKINNEY:  On a different subject --
       14         THE COURT:  Yes, sir.
04:24  15         MR. McKINNEY:  I'll be getting ready -- I'm sure all
       16   the lawyers will tonight -- for their closing arguments
       17   tomorrow.  I think the law on workplace harassment, et cetera,
       18   et cetera, is probably fairly well settled.  I'm sure there's
       19   some minor differences in the charge in that area.
04:24  20         But as respects my client, a very big issue and
       21   big for me in getting ready to argue the case is how the Court
       22   plans to submit the one question regarding my client.  And,
       23   obviously, if you're not ready to rule at this time, then
       24   you're not ready to rule and I have to --
04:25  25         THE COURT:  Well, I'm debating whether --

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

04:25   1          MR. McKINNEY:  -- prepare two arguments.

        2          THE COURT:  I'm debating whether we, in chambers, need

        3     to pull an all-nighter and get the jury instructions ready and

        4     have you guys come in, in the morning, for arguments.  I'm

04:25   5     really not happy that we're in this position.  I wish we had

        6     had the proposed jury instructions a lot earlier.

        7                  And you have submitted yours.

        8          MR. McKINNEY:  And I would go so far as to say -- not

        9     to be argumentative, but I have submitted exactly in line with

04:25  10     the case as factually pled by Ms. Jones in this case and as

       11     Ms. Jones has tried to prove the case.

       12                  And it would be very difficult for my client to

       13     be put to trial on a much lower standard of proof on Ms. Jones'

       14     part.  The ambiguity that would arise from such a verdict, the

04:26  15     benefit that would inure to Ms. Jones and her attorneys with

       16     the reduced burden of proof --

       17          THE COURT:  I know.  I want to talk to my colleagues,

       18     and then I'll be back.  You-all have time to go to the bathroom

       19     if that's what you need to do.

       20          (Recess was taken from 4:26 p.m. to 4:35 p.m.)

       21          THE COURT:  Well, I do have some limited good news.

       22     It appears to be raining very hard outside.

       23                  Okay.  We need to move on.  I'm going to have you

       24     come here at 8:00 o'clock.  I may or may not want to see you

04:35  25     then, but I don't want to be trying to -- I'll be here by then.

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:35   1    I don't want to be trying to get hold of you guys on your cell

2    phones to tell you to come here.  So, we'll all be here at

3    8:00.

4              Now, on the motion for directed verdict, I'm

04:36   5    going to deny the motion as to the sexual harassment and

6    hostile work environment.  KBR doesn't seem to want to admit

7    it; but, even without anything more, a rape can be sexual

8    harassment, hostile work environment.

9              I am going to allow plaintiff to argue that there

04:36  10    was fraudulent inducement through affirmative

11    misrepresentation, but I'm not going to allow argument that it

12    was through non-disclosure.  And I know the distinction is not

13    crystal clear, but it's going to have to be observed tomorrow

14    in closing argument.

04:36  15              I've reviewed at least some of the cases cited by

16    plaintiff on the respondeat superior and vicarious liability.

17    My rulings are:  Ratification does need to be pled.  It wasn't

18    pled.  And the cases, particularly the *Skidmore* case that was

19    cited -- that's the Fifth Circuit case -- actually cuts against

04:36  20    plaintiff.  So, I'm not going to allow that either.  So, two of

21    the claims that we argued about are in, two of them are out.

22              On the jury instructions, one thing I need some

23    help on is this.

24              This is primarily for you, Mr. McKinney.

04:37  25              MR. McKINNEY:  Yes, sir.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:37   1          THE COURT:  When you're finished with your cell phone.

       2          MR. McKINNEY:  I'm sorry.  I'm multitasking.  I

       3   apologize.

       4          THE COURT:  I see that.

04:37   5                 Is it your view that we just send rape, and

       6   nothing else, to the jury?  Is that your point?

       7          MR. McKINNEY:  No.  I have an instruction on rape

       8   right out of the Texas Penal Code.

       9          THE COURT:  I've read that.  But, I mean, is that

04:37  10   because there's only evidence of rape or nothing?  Is there any

      11   evidence of assault without rape?

      12          MR. McKINNEY:  No.

      13          THE COURT:  Okay.  I need some help on that.  Is that

      14   plaintiffs' view?

04:37  15          MR. ESTEFAN:  Judge --

      16          THE COURT:  I don't know why I should submit a lesser

      17   included instruction if something -- something besides rape

      18   happened, because we have the testimony from Mr. Bortz that sex

      19   happened and we have really no testimony from Ms. Jones because

04:37  20   she can't remember.  But it looks like it's the act of sex or

      21   nothing else -- the act -- excuse me -- the act of

      22   non-consensual sex or nothing.  Because we don't have any

      23   evidence, I don't think, of non-consensual something that was

      24   less than rape.

04:38  25          MR. KELLY:  Well, the drugging alone, your Honor,

04:38  1   would have been an assault.

2           MR. ESTEFAN:  And in addition --

3           MR. KELLY:  Drugging by itself.

4           MR. ESTEFAN:  I mean, it depends on how fine you want

04:38  5   to cut it, Judge.  She's got evidence of physical injury apart

6   from the rape.  She's got bruising on the insides of her

7   thighs.  There's testimony and evidence of that.

8           THE COURT:  What evidence was there that anything

9   happened other than sex, consensual or non consensual?

04:38  10          MR. ESTEFAN:  Whatever led up to perhaps.  I mean, we

11  don't -- she -- we don't -- she doesn't know and we don't.  But

12  she has other evidence of physical injuries separate and apart

13  from the private parts of her body that were damaged.  And that

14  is an assault and it's a battery.

04:38  15          MR. KELLY:  The damage to her breasts, your Honor,

16  while there's conflicting testimony, there's certainly

17  testimony that it was caused by a trauma.  And the only trauma

18  that makes any sense occurred during the time when Ms. Jones

19  was unconscious with Mr. Bortz.

04:39  20          MR. McKINNEY:  There are a bunch of reasons why that

21  is wrong.

22          MR. KELLY:  I said there's conflicting evidence; but

23  there's certainly evidence that could be the case,

24  Mr. McKinney.

04:39  25          MR. McKINNEY:  The evidence of bruising -- first of

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:39   1   all, there's not a single bruise on her inner thigh; and her
        2   OB-GYN, who she saw the day she arrived back in the United
        3   States, confirmed that and Dr. Schulz confirmed that.  The
        4   bruising is perfectly ordinary, very small bruising on a lower
04:39   5   leg, a wrist, just above the knee.  It's not anything that's
        6   indicative of anything other than the normal bumps and scrapes
        7   that we all get as we go through life.
        8         But the problem that I have with submitting
        9   anything other than rape is because that's what these folks
04:39   10  have been saying about my client for six years.
        11        THE COURT:  I understand that.
        12        MR. McKINNEY:  And that's how they pled their case.
        13  That's how they tried it to the jury.  Ms. Jones' testimony was
        14  she woke up, she went to the bathroom, she saw all these
04:40   15  things, she knew she had been raped, she wanted to make sure
        16  she had been raped before she said something about my client
        17  having raped her.  Those are all her words.
        18        So, there's nothing wrong with my client saying,
        19  "Fine, those are the allegations you've made.  You wanted your
04:40   20  day in court.  You battled through the arbitration process.
        21  You're in court.  Now you're going to be held to your" --
        22        THE COURT:  What if the jury decides the sex was
        23  consensual but Ms. Jones didn't consent to the roughness of it
        24  all?  She didn't want the bruises, she didn't want the damage
04:40   25  to her breasts?  What do we do with that?

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

04:40  1          MR. McKINNEY:  There's no evidence to support any of

2      that.  It's either all non consensual or it's consensual.

3      Because the evidence from Ms. Jones is she doesn't know what

4      happened.  She has a description of her body post-event, that

04:41  5      is not documented in any of the records.

6          THE COURT:  I understand that.  But it seems to me it

7      would not be out of the realm of possibility for the jury to

8      conclude that she consented, even invited sex but didn't want

9      the damage to her breasts.

04:41  10          MR. McKINNEY:  Well, I wish that case had been pled so

11      I could have defended it.  And I wish that theory had been

12      articulated at some point during discovery so I could have

13      responded to it in discovery.  It's a little late in the day

14      for me to have to defend that case now.

04:41  15          I have defended the case pled.  I have defended

16      the case that has been developed in the evidence or not, as the

17      case may be.  But I haven't defended any other case, nor should

18      I have to defend a case that has not been pled, has not been

19      filed, and has not been developed in discovery.

04:41  20          THE COURT:  Your response?

21          MR. ESTEFAN:  I don't even know how to respond, Judge.

22      If he's trying to raise the standard of proof to something

23      beyond preponderance of the evidence -- because by trying to

24      get in the jury's mind that it's a rape, therefore, you have to

04:41  25      have beyond a reasonable doubt standard, that's not what this

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:42    1    case is --

2            THE COURT:  No, I don't think he's arguing that.

3            MR. McKINNEY:  No.  I'm arguing they have to prove the

4    elements of rape by a preponderance of the evidence in order to

04:42    5    prevail against my client, not some generic assault, not some

6    generic unwanted touching, not some generic rough sex that

7    produced a drop-down on the left breast, because that's not

8    what the complaint says, that's not how this case has been

9    prosecuted.

04:42    10          MR. ESTEFAN:  I think you meant "bottoming out," but

11    I --

12          MR. McKINNEY:  I've been calling it "drop-down" all

13    along, and I don't know why.

14          MR. ESTEFAN:  But, in any event, Judge, Mr. McKinney

04:42    15    conveniently disregards evidence he doesn't like.  For example,

16    the -- Dr. Schulz documents the bruising.  He says there's no

17    documentation of it.  Dr. Schulz documents it.  She took

18    photographs of it.  All that is in evidence.  So, there is

19    plenty of evidence of battery apart from sexual battery.

04:42    20          THE COURT:  But there's no evidence that he caused it.

21          MR. ESTEFAN:  Well, only that she said those weren't

22    there before and that it occurred -- all that was documented

23    after.

24          MR. McKINNEY:  The only reason why my client is in

04:43    25    this case is because he spent the night with Ms. Jones.  If you

04:43  1    take her at her word that she has no memory of the night

2    before, if my client had had the good judgment to finish his

3    business and go home, I wouldn't be here and neither would he.

4         Rapists don't stick around overnight.  Rapists

04:43  5    don't walk their victim to work.  That's not what rapists do.

6    Nonetheless, that's what he's been accused of from day one; and

7    it's been hell on him.  And they ought to have to prove the

8    case they've pled, by a preponderance of the evidence.  There's

9    nothing unfair about that.

04:43  10        MR. ESTEFAN:  So much hell that he dropped his

11    counterclaim, Judge, I noticed.  It's really been rough on

12    Mr. Bortz, you know.  I mean, I have no sympathy.

13        THE COURT:  This isn't something for the jury.  But I

14    think it's unquestionably true that a lot of lives have been

04:44  15    damaged, probably irreparably damaged by this case.  That

16    happens in litigation.  I'm not at all insensitive to that

17    fact.  It's a very, very sad case for lots of people.

18        Okay.  I'll see what I can do on this.  I mean,

19    anybody else want to make any preemptive arguments on jury

04:44  20    instructions?

21        MS. VORPAHL:  Your Honor, I just -- I want to really

22    more confirm that we have a consensus of opinion.  I thought --

23    I thought that Mr. Estefan and I had agreed yesterday that the

24    Title VII claim that would be submitted, "Was plaintiff

04:44  25    sexually harassed by one or more of her coworkers at Camp Hope

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:44   1    in Iraq in late July, 2005?"

2                    The question that they propose to submit is, "Was

3    Jamie Leigh Jones sexually harassed?"

4                    That is completely confusing to the jury and

04:44   5    allows the jury to make findings that are contrary to this

6    Court's rulings as a matter of law --

7                THE COURT:  That would pick up Eric Iler.

8                MS. VORPAHL:  Absolutely it would, and the

9    administrative remedies were not exhausted on that.  This Court

04:45   10   has already reviewed that and granted summary judgment, and I

11   think we just need to get straight.

12                   I mean, I had seen one ideation of your charge

13   that said, "Was plaintiff sexually harassed by Charles Bortz at

14   Camp Hope in Iraq in late July 2005," or words to that effect.

04:45   15               MR. ESTEFAN:  I know.  You're looking at the fourth or

16   fifth version at this point.

17               MS. VORPAHL:  Which is fine.  I mean, I --

18               MR. ESTEFAN:  It's a work in progress, Judge.

19               MS. VORPAHL:  I'm okay with either Charles Bortz or

04:45   20   one or more of her coworkers.  I thought they were still

21   claiming that there were maybe more than one person.

22               THE COURT:  But your concern is the time period is not

23   limited?

24               MS. VORPAHL:  The time period and the place.

04:45   25               THE COURT:  Yeah.  Well, that's similar, yeah.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:45   1         MS. VORPAHL:  And that it needs to be clear that it's

  2   coworker and not supervisor harassment.

  3           I mean, all of those things are captured in my

  4   proposal, and I just wanted -- I mean, if there was a way that

04:46   5   you and I can reach agreement right now as to how this is going

  6   to be submitted, we would -- seems to me we would want to give

  7   the benefit -- the Judge the benefit of our thinking.

  8         MR. ESTEFAN:  Let's go have a drink and talk it over.

  9         MS. VORPAHL:  I don't think the Judge wants to wait

04:46 10   for us to --

11         MR. KELLY:  There's evidence of supervisor harassment

12   as well, your Honor.

13         THE COURT:  Who's the supervisor?

14         MR. KELLY:  Willie Tompkins was aware and obviously

04:46 15   made Sara Simco aware of Jamie's exercise of the open door

16   policy.  That -- she exercised the open door policy while still

17   in Houston; but the informing of her coworkers that she had

18   done so occurred in Iraq.

19         MS. VORPAHL:  That is ridiculous.  I mean, that is

04:46 20   preposterous.

21         MR. KELLY:  There's evidence to that.  Sara Simco

22   testified to it, your Honor.

23         MS. VORPAHL:  And that wasn't in the EEOC charge

24   either.  I mean, what we're talking about is what they've pled;

04:46 25   and what they've pled is Charles Bortz and other John Doe

04:46    1    rapists raped Jamie Leigh Jones, KBR is responsible for that

         2    because it's sexual harassment.  And that's what the jury needs

         3    to be charged on, because this Court has granted summary

         4    judgment on all the other claims.  And it would be ridiculous

04:47    5    to submit the charge that the plaintiffs have proposed.

         6            THE COURT:  Yeah, I know there was some evidence of

         7    unwelcome comments and all that.  Under the Fifth Circuit

         8    standard for what sexual harassment is, though, the testimony

         9    does not meet that standard.  It's just not pervasive enough.

04:47   10    And I'm not saying I would agree with the Fifth Circuit on

        11    this.  I'm not saying that.

        12              But, you know, if you do get a verdict, you're

        13    not going -- it's not going to do you any good if it gets taken

        14    away by the Fifth Circuit.  You just do not meet the Fifth

04:47   15    Circuit standard on harassment other than the rape, if that's

        16    what it was.  So, okay.

        17            MS. VORPAHL:  That's all I have.

        18            THE COURT:  Ms. Holcombe, I've learned that look.

        19    You're about to --

04:47   20            MR. ESTEFAN:  When she grabs a stack of papers that

        21    thick, Judge --

        22            THE COURT:  And clutches them to her breast, that's

        23    what --

        24            MS. HOLCOMBE:  I would like to start from the

04:47   25    beginning.  No, I'm just kidding.

              _Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

04:48    1                We, before we officially rest, would like to

         2     offer into the record the actual transcripts of our deposition

         3     cuts that were played for the jury, since Ms. Barron did say

         4     that she would not be typing or transcribing as they were

04:48    5     played.  So that it is clear for the record what was said, we

         6     have our cuts here.

         7                We can show them to opposing counsel, but they

         8     were the exact same ones that we played.  I represent that to

         9     the Court as an officer of the court.

04:48   10          MR. KELLY:  As long as they're not going back to the

        11     jury, we don't have an objection, your Honor.  But I think --

        12          THE COURT:  I think they are going back to the jury.

        13          MR. KELLY:  If they go back to the jury, your Honor,

        14     that's bolstering; and I don't think that's appropriate.

        15     Transcripts of depositions --

        16          THE COURT:  Were you offering them as exhibits?  Is

        17     that what you are offering?  No?

        18                Okay.  Maybe I misunderstood.

        19          MS. VORPAHL:  Your Honor, really we're not.

04:48   20          THE COURT:  You're just making a record --

        21          MS. VORPAHL:  We just want to make the record clear

        22     for appeal.

        23          THE COURT:  Okay.  That's fine.

        24          MR. ESTEFAN:  They're not going to be going back?

04:48   25          MS. VORPAHL:  No.  No, we're not trying to send them

                   *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:48   1   back, just like -- I mean, we don't -- if somebody -- if the

         2   jury wants testimony read back and the Court decides to read it

         3   back, they could read from the transcripts the same as they

         4   could from the record.

04:49   5               MR. KELLY:  Fair enough.

         6               MS. VORPAHL:  We're not asking these to go back.

         7               MR. ESTEFAN:  Understood.

         8               MR. KELLY:  We're good, then.

         9               MS. CULLEN:  And for the record, these are combined

04:49  10   defendants' cuts.  They do include testimony offered by Charles

        11   Bortz.

        12               THE COURT:  Okay.  What else?

        13               MR. ESTEFAN:  She's out of documents, Judge.

        14               THE COURT:  Yeah.

04:49  15               MR. KELLY:  I've got some paper over here, Judge.

        16               THE COURT:  Yeah, right.

        17               MR. McKINNEY:  Judge, is it your plan that we'll argue

        18   the case tomorrow morning and give it to the jury by about

        19   noon?

04:49  20               THE COURT:  Well, the first thing I'm going to do is

        21   read my instructions, which I hope will not take more than

        22   20 minutes.

        23         (Sotto voce discussion at bench with court staff)

        24               THE COURT:  And then an hour for each side.  So, I

04:49  25   would -- 9:30 plus two hours plus 20 minutes.  Yeah, I think

04:50   1   so.

2             MR. ESTEFAN:  Judge --

3             THE COURT:  We do have the issue remaining as to what

4   I am going to say about your client's defamation claim.

04:50   5             MR. McKINNEY:  I don't know why you need to say

6   anything at all.  You've got a good charge.  Hopefully we'll

7   have a good charge.  We argue the case, and we go.

8             Why would that -- are we going to argue the

9   non-suit to the jury?  It's not evidence.

04:50  10             THE COURT:  Well, I'm raising the issue.  I don't want

11  to particularly tell them that I've ruled against the

12  plaintiffs on two of the four claims.  I don't want to say

13  anything about these if I can avoid it, but I don't want this

14  to be issue on appeal either.  So --

04:50  15             MR. McKINNEY:  I don't see how it could be an issue on

16  appeal if, in the exercise of your discretion, you don't

17  comment on a motion that was filed and granted outside the

18  jury's presence.  All of this, I think, is limited in limine,

19  that you not comment, you know, on motions you ruled on --

04:50  20             THE COURT:  Stand near the mic.

21             Okay.  Does anybody -- anybody have a problem if

22  I don't say anything about the -- about the directed verdict

23  I've entered or the voluntary dismissal of the defamation

24  claim?

04:51  25             MR. ESTEFAN:  Judge, they're two different things.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:51  1  The Court's ruling on dismissing claims is totally and
       2  traditionally not something people mention in closing argument,
       3  ever, period.  That's usually just appropriate.
       4         We had heard from Mr. McKinney in voir dire, in
04:51  5  opening statement, from the witness stand a bunch of things
       6  about defamations and counterclaims and everything else.  And
       7  then all of the sudden, it's just gone.
       8         THE COURT:  Well, I know.  And the jury can draw
       9  whatever inference from that the jury wishes.
04:51  10        MR. ESTEFAN:  Yeah.  But see, they -- he gets to lob
       11  the defamation claim against Jamie and then run out the door
       12  without any -- without the jury being fully informed of why
       13  they're not hearing about it anymore.
       14        THE COURT:  I don't know why they're not hearing about
04:51  15  it.  He just chose to dismiss it.
       16        MR. ESTEFAN:  I understand.  And I think that ought to
       17  be pointed out to the jury, that he chose to dismiss it, which
       18  is a separate animal than the Court has ruled that it doesn't
       19  get to them as a matter of law.
04:51  20        MR. McKINNEY:  That makes me a witness in the case,
       21  having to explain a strategic decision I made based on what I
       22  perceived to be a change in the Court's ruling on the simple
       23  assault arrests.  And there's no point in -- it's just not
       24  right to put me in that position, of having to explain to the
04:52  25  jury why I made a strategic move and how court rules change and

04:52  1    how objections are ruled upon.

2                   It puts me in the position of arguing essentially

3    with the Court about a ruling that I still don't agree with.

4    But I'm stuck with it.  That's life.  Excuse me.

04:52  5                   And let me also point out that I did mention at

6    the very end of my opening statement that we had a counterclaim

7    for defamation on file.  That's all that's been said.  I did

8    not mention the counterclaim in voir dire.  And I non-suited

9    during the plaintiffs' case; and the only people who offered

04:52  10   evidence relevant to my defamation claim was the plaintiff,

11   when they offered the video cuts that we had taken from the

12   media.  That was offered by the plaintiffs, not by us.

13                  We put on no evidence in support of a

14   counterclaim.  We did not discuss the counterclaim with any

04:53  15   witness at any time before this jury.  With the exception of

16   the one brief statement I made, there has been no reference to

17   the counterclaim.

18                  And it would be like me getting up and talking in

19   closing argument about the fact that the plaintiffs tried to

04:53  20   amend their complaint and change the facts that they had

21   alleged and tried to do that twice and twice the Court told

22   them, "No, you can't change your story this late in the trial."

23                  And that would invite argument from opposing

24   counsel, "Well, we had good reasons for doing that."

04:53  25                  None of that is arguing the evidence in the case.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:53   1    It's arguing the procedure outside the jury's presence.

        2    It's -- you know, for a million different reasons, it's --

        3            THE COURT:  Okay.  I'll make a call on that.

        4            Anything else?

04:53   5            MS. VORPAHL:  Well, I would just add one sentence.

        6    Certainly to the extent that the Court is going to say

        7    something about claims voluntarily dismissed, it seems to me

        8    that the Court would also -- I mean, that they would go hand in

        9    glove, that the Court would also feel like it had to say

04:54  10    something about claims that had been dismissed as a matter of

       11    law.  I happen to believe the Court should say nothing about

       12    either, but they seem to be two sides of the same coin.

       13            THE COURT:  Anything else?

       14            MS. MORRIS:  Yes, your Honor.  The plaintiffs played

04:54  15    the videotapes because we -- their claims for defamation were

       16    still in, and we played them in anticipation of them playing

       17    them.  We wanted to play them first.  We wouldn't have played

       18    them.

       19            And I believe when they withdrew the claim the

04:54  20    Court said that you would instruct the jury, just not right

       21    then, and we would discuss what exactly you would say later.

       22            THE COURT:  I thought Mr. McKinney was very upset with

       23    me then, and I thought he would want me to say something by way

       24    of attenuation of that.  But he doesn't.  So, I don't know that

04:54  25    I committed to say it over his objection.  I'll just have to

                *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:54      1   think about that.  Okay.

           2              MR. ESTEFAN:  8:00 o'clock tomorrow, your Honor?

           3              THE COURT:  8:00 o'clock tomorrow.  Thank you very

           4   much.

           5      *(Recess was taken from 4:55 p.m. to 7:17 p.m.)*

           6      (At this time Mr. McKinney, Ms. Cates, Mr. Hedges, and Ms.

           7   Morris are not present and Ms. Vorpahl and Ms. Cullen are

           8   appearing by phone)

           9              THE COURT:  Okay.  We all ready?

07:17     10              Okay.  We're on the record.  We've just -- for

          11   those of you on the phone, we just handed out a -- not final,

          12   but very nearly final set of jury instructions.  And I just

          13   proposed to go through them one by one till we get our

          14   differences, if not resolved, at least fully aired on the

07:17     15   record, for appellate purposes.

          16              Now, the first several instructions are, I think,

          17   fully agreed: general instructions, publicity during trial,

          18   duty to deliberate, bias, consider damages only if necessary,

          19   impeachment by inconsistent statements, deposition testimony.

07:18     20              Then Jury Question Number 1, which is, "Did

          21   Charles Bortz rape Jamie Leigh Jones on or around July 27

          22   and/or July 28, 2005," followed by a two-sentence description

          23   of what "rape" is.  And we ask the jury to answer "yes" or "no"

          24   and leave a space for their answer.

07:18     25              My view on giving an instruction about assault, I

                    *Cheryll K. Barron, CSR, CM, FCRR*              *713.250.5585*

```
07:18   1   don't think we really have a theory of assault short of sexual
        2   penetration.  I don't think we have a theory of that, and I
        3   think it -- if I were the plaintiff, I wouldn't want that.  I
        4   think it would dilute the main case and give plaintiff an
07:18   5   option -- give the jury an option to decide for plaintiff but
        6   not give very much money.
        7           MR. ESTEFAN:  Your Honor, plaintiff will agree to the
        8   proposed instruction at -- the first part as -- and, so, we can
        9   cross out our --
07:19  10           MR. KELLY:  We would also recommend, though, Judge,
       11   just to avoid jury confusion, that we strike all the
       12   referential language at the bottom.
       13           THE COURT:  We are.  We are.  This is just for us
       14   right now.
07:19  15           MR. ESTEFAN:  So, as it appears at the top of --
       16   that's the instruction the Court will submit --
       17           THE COURT:  That's what we'll go with.
       18           MR. ESTEFAN:  And that's the question the Court will
       19   submit.  Okay.
07:19  20           MS. CULLEN:  Your Honor, this is Sharon Cullen.
       21               Is this the question with the embedded
       22   definitions that we requested?
       23           THE COURT:  Yes.
       24           MS. CULLEN:  All right.  Very good.  Thank you, your
07:19  25   Honor.
```

07:19   1          THE COURT:   Jury Question Number 2 is assault and

2      damages therefore.

3          MS. CULLEN:   Question Number 2 is the assault damages?

4          THE COURT:   Yes, ma'am.

07:19   5          MS. CULLEN:   Okay.

6          MR. ESTEFAN:   Your Honor, this was our submission for

7      plaintiff; and I believe there's ample evidence of both

8      physical impairment and disfigurement in the past and future.

9      And, also, there's certainly evidence by experts from the stand

07:20  10      about lost earnings and loss of earning capacity.   We heard

11      from -- there's plenty of evidence of all of that.

12              So, those are what is being -- that's what's not

13      been submitted and wants -- there's a note here that plaintiff

14      wants to add that.   So --

07:20  15          THE COURT:   Anybody want to respond as to why that

16      shouldn't be added?

17          MS. HOLCOMBE:   I don't want to interrupt anyone.

18          THE COURT:   The plaintiff wants -- we have physical

19      pain -- A is physical pain already sustained; B is physical

07:20  20      pain in the future; C, medical care expenses incurred in the

21      past; D, medical care expenses in the future.

22              And plaintiff wants to add, E, physical

23      impairment and disfigurement in the past; F, such impairment

24      and disfigurement in the future; G, loss of earnings in the

07:21  25      past; H, loss of future earnings.


*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

07:21   1          MS. CULLEN:  Your Honor, to the extent that they

2   offered, you know, some evidence through some of their experts

3   on those issues, I can't, in good conscience, really fight it.

4   Obviously, I think that the evidence is nowhere near adequate

07:21   5   for that finding; but I can't say that they haven't at least

6   made an attempt to put some evidence on the record.

7          THE COURT:  Does KBR want to be heard on this?

8          MR. RUNIONS:  No, your Honor.

9          MS. VORPAHL:  Your Honor, it's damages as to --

07:21   10          THE COURT:  You're right.  You're right.  Sorry,

11   sorry, sorry.

12          Okay.  Well, if Bortz doesn't object to it, then

13   we'll add it.

14          Okay.  Instruction 8 is Title VII, sexual

07:21   15   harassment and hostile work environment.  And what we do is we

16   go through and we define what that is and define "prompt

17   remedial action."

18          And then the -- Jury Question Number 3 is damages

19   for if she suffered sexual harassment and hostile work

07:22   20   environment.

21          MS. VORPAHL:  Wouldn't there be first a predicate

22   question, "Was plaintiff sexually harassed by one or more of

23   her coworkers at Camp Hope?"

24          MR. ESTEFAN:  That is Question 3, Jo.

07:22   25          MS. VORPAHL:  I'm sorry.  I thought he said it was a

07:22   1   damage question.  Maybe I misunderstood.

        2           MR. KELLY:  And it's the one you submitted, Jo.

        3           MR. ESTEFAN:  No.  Question 3 reads, "Was Jamie Leigh

        4   Jones sexually harassed by one or more of her coworkers at Camp

07:22   5   Hope in Iraq in late July 2005?"  Just as you submitted it.

        6           MS. VORPAHL:  Okay.  Great.

        7           THE COURT:  Okay.  Jury Question Number 4, "Did

        8   KBR" -- it's the one about did KBR know.

        9           MS. VORPAHL:  Yes.  And we had agreed on that.  So,

07:22  10   I'm sure it's fine.  And that one, of course, will be

       11   predicated on an affirmative finding to Number 3.

       12           MR. RUNIONS:  Yes.

       13           MR. ESTEFAN:  Yes, it is.

       14           MS. HOLCOMBE:  Yes.

07:23  15           THE COURT:  Okay.  Number 5 is, "Did KBR fail to take

       16   prompt remedial action?"

       17           MS. VORPAHL:  About the sexual harassment.  Again,

       18   this is predicated upon an affirmative finding to 4?

       19           MR. RUNIONS:  Yes.

07:23  20           THE COURT:  Well, it's not specifically predicated.  I

       21   mean, I think it follows; but it's --

       22           MR. ESTEFAN:  It is, your Honor.  At the top it

       23   says --

       24           MR. RUNIONS:  At the top, it is.

07:23  25           MS. VORPAHL:  Yeah, those have to be -- 3 -- 4 has to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

07:23  1  be predicated --

2          THE COURT:  Oh, I see.  I just missed the legend at

3  the top.  I'm sorry.

4          MR. ESTEFAN:  It is predicated.

07:23  5          MS. VORPAHL:  Okay.

6          MR. ESTEFAN:  And that's as we agreed to submit it,

7  Jo.  So --

8          THE COURT:  Okay.  Okay.  Very good.

9          MS. VORPAHL:  All right.

07:23  10          THE COURT:  Instruction 9 is Title VII damages, which

11  is asking, if KBR violated Title VII, what the compensatory

12  damages ought to be.

13          MR. ESTEFAN:  Right.

14          MS. VORPAHL:  Right.

07:23  15          MR. ESTEFAN:  That comes out of the PJC, I believe,

16  your Honor.  So --

17          THE COURT:  Well, I don't hear anybody arguing about

18  it.  That's fine.

19          Jury Question 7 is fraud in the inducement to

07:23  20  enter the employment contract.  And we do have a disagreement

21  here, I think.

22          MR. RUNIONS:  Yes, your Honor.

23          THE COURT:  What I would propose is we say a

24  "misrepresentation" means "a false statement of fact."

07:24  25          MS. VORPAHL:  That's what I --

07:24   1          THE COURT:  What plaintiffs wants is, in addition to

        2   that, a statement of opinion based on a false statement of

        3   fact, a statement of opinion that the maker knows to be false,

        4   or an expression of opinion that is false made by one claiming

07:24   5   or implying to have special knowledge."

        6          MS. VORPAHL:  I don't believe any of those apply, and

        7   the one I'm comfortable with is the very first one.

        8          THE COURT:  You don't believe they apply because you

        9   don't think there's any proof?

07:24  10          MS. VORPAHL:  That's exactly right, your Honor.

       11          THE COURT:  Give me an example, if you can, of any of

       12   these other three, "a statement of opinion based on a false

       13   statement of fact."

       14          MR. KELLY:  "You're more likely to be injured in a car

07:24  15   accident in the United States than anything happen to you in

       16   Iraq."

       17          THE COURT:  Well, we never had any evidence that's

       18   false.  I mean, she had a very, very bad thing happen; but we

       19   don't have any evidence that somebody who said that knew they

07:25  20   were making a false statement.

       21          MS. VORPAHL:  Yes.  Nor is it a statement of opinion.

       22   It is a statement of fact.

       23          MR. KELLY:  It's a statement of opinion.  More

       24   likely -- come on.  More likely to be injured in a car wreck?

07:25  25               But if you're agreeing that that's a statement of

07:25   1   fact and we can use that as an example, then --
        2               THE COURT:  Yeah, I think you can use that.
        3               MR. KELLY:  All right.  Fine.  We're good then.
        4               MR. ESTEFAN:  So, then we also take out "special
07:25   5   knowledge" because that was a definition --
        6               THE COURT:  Yeah, I think we do, we take out "special
        7   knowledge," too.
        8               MR. ESTEFAN:  It was supplied by -- or supplied
        9   because of Number 4.  So, if 2, 3, and 4 are out, then that's
07:25  10   out, too, right?
       11               THE COURT:  Right.
       12               MR. ESTEFAN:  All right.  So, we're on to Question 8.
       13               THE COURT:  Then, 8 is the damages for fraud in the
       14   inducement to enter the employment contract.
07:25  15               MS. VORPAHL:  Is there an instruction with regard to
       16   the fraud damages?
       17               THE COURT:  Yeah.
       18               MR. RUNIONS:  I believe that's what we're on now,
       19   Number 8.
07:26  20               MS. VORPAHL:  Oh, and -- I'm sorry.
       21               THE COURT:  And there's a predicate, too.
       22               MS. VORPAHL:  There's a predicate instruction?
       23               THE COURT:  Yes.
       24               MS. VORPAHL:  Okay.  Thank you.
07:26  25               MR. ESTEFAN:  Plaintiff would ask, again, Judge --

07:26   1         THE COURT:  Well, we have to add this if we add it the

2    other place, I guess.

3         MR. ESTEFAN:  That's right.

4         MS. HOLCOMBE:  Just so Jo knows what we're adding,

07:26   5    what they want to add is E, F, G, and H to damages.  Physical

6    impairment in the past, physical impairment in the future, loss

7    of earnings in the past, loss of earnings in the future are

8    what are proposed by plaintiff at this point for damages for

9    fraud.

07:26  10         MS. VORPAHL:  Right.

11         MR. RUNIONS:  Jo, do you have any --

12         MS. VORPAHL:  Yeah.  I'm thinking.

13         MR. RUNIONS:  Okay.  I mean, I question -- there would

14    have to be some proximate cause between the agreement and the

07:26  15    injury.  And I don't think there's been any evidence of that.

16         MS. VORPAHL:  I think built into the fraud finding --

17    fraud occurs when there are --

18         MR. ESTEFAN:  You still there, Jo?

19         MS. VORPAHL:  Yes, I am.  I'm sorry.  I'm trying to

07:27  20    find -- my problem is I don't have exactly what you-all are

21    looking at.  And I apologize that I'm holding people up.

22         I'm looking for -- maybe I've got the PJC here.

23    I'm looking for the definition of "fraud by misrepresentation"

24    as opposed to the "fraud by failure to disclose," which is no

07:27  25    longer in the case.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

07:27  1        MR. RUNIONS:  Right.  Do you need me to read you what
2  Question 7 is, Jo?

3        MS. VORPAHL:  If you would, please, that's probably
4  the easiest thing.

07:28  5        MR. RUNIONS:  It says, "Fraud occurs when, A, a party
6  makes a material representation and the misrepresentation is
7  made with knowledge of its falsity or made recklessly without
8  any knowledge of the truth and as a positive assertion --

9        THE COURT:  Slowly, slowly.

07:28  10        MR. RUNIONS:  -- and the misrepresentation is made
11  with the intention that it should be acted on by the other
12  party and, D, the other party relies on the misrepresentation
13  and thereby suffers injury.

14        MS. VORPAHL:  So, Blake, I think to speak to your
07:28  15  issue, I think that reliance is embedded into the definition of
16  "fraud."

17            I mean, Judge, I don't know that -- I don't
18  believe that there's any evidence of medical care and expenses
19  in the past.

07:28  20        THE COURT:  Well, I think the testimony from the
21  doctors who did the breast surgery, I think that speaks to
22  medical -- I mean, I'm not sure -- Ms. Cullen didn't object to
23  it when we had the Bortz instruction.

24            I'm not sure I see a clear delineation between
07:29  25  physical impairment and disfigurement and medical care

07:29  1    expenses, but maybe there is one.

2              MS. VORPAHL:  I don't think that -- I mean,

3    respectfully, I don't think that there is.  And I certainly

4    could be wrong.

07:29  5              We've talked about how long this trial has been,

6    but I don't believe that there is any evidence of medical care

7    and expenses in the past or medical care -- well --

8              MS. CULLEN:  Well, wasn't there some testimony about

9    the cost of Dr. Ciaravino's surgery?  I mean, maybe I'm just

07:29  10   wrong.  I thought he testified as to what he had charged for

11   that.

12             THE COURT:  Yeah, I thought he did, too.

13             MS. CULLEN:  Maybe I'm wrong.

14             MS. VORPAHL:  No, I don't think that he did.  But --

07:29  15   so, I object to medical care and expenses in the past and

16   reasonable and necessary medical care and expenses in the

17   future.

18             THE COURT:  Okay.  We thought that was agreed.  So --

19   okay.

07:30  20             MS. VORPAHL:  I apologize.  I didn't object before

21   because it was Bortz' issue.  And maybe I should have objected.

22             THE COURT:  No, I didn't mean that.  You're certainly

23   entitled to object to something that only applies to KBR.  My

24   notes just reflected this was an agreed -- this was agreed, the

07:30  25   first four elements; and I thought we were arguing about the

07:30   1   next four elements, which is the physical impairment --

2           MS. VORPAHL:  No.  Well, what I had said as to the

3   elements of damages is that Ron and I could not agree and we

4   were willing to leave it to the Court.

07:30   5           Maybe that was a cheap way for me to get out of

6   it but --

7           MR. ESTEFAN:  No, that's an accurate representation.

8           THE COURT:  Okay.  Well, I'll make the decision.

9   That's fine.

07:30  10           Okay.  Exemplary damages as to Charles Bortz, I

11  think this is pretty standard.  It defines "malice" and

12  requires the jury to answer "yes" or "no."

13          MS. CULLEN:  I don't have the petition in front of me.

14  I didn't recall that they pled for exemplary damages against

07:31  15  Bortz.  And I don't have the petition in front of me, but I

16  didn't anticipate that.

17          THE COURT:  Okay.  We'll check.

18          Okay.  Let me see.

19          MS. VORPAHL:  I have it right here, and I might be

07:31  20  able to check it.

21          THE COURT:  No.  It's Paragraph 89, "If the trier of

22  fact finds the requisite degree of culpability required by

23  Texas law for an assessment of punitive or exemplary damages,

24  plaintiffs seek such an award as is just and right."

07:31  25           So, I think they do.

07:31  1            MS. CULLEN:  Okay.

2            MR. ESTEFAN:  But who thought to look in Paragraph 89,

3     Sharon, really?

4            THE COURT:  Okay.  All right.  So, I think that's

07:31  5     fine.  I'm going to leave it.

6            Then Jury Question 10 is, "What amount of money

7     should be assessed against Bortz as exemplary damages?"

8            And 11 is the same instruction on exemplary

9     damages as to KBR, and 12 is the same question as to KBR and

07:32  10    the amount of -- and then the last page is --

11           MR. ESTEFAN:  Signature.

12           THE COURT:  -- is signature.

13           MS. VORPAHL:  The only punitive damage or exemplary

14    damage claim that is being submitted against KBR is related to

07:32  15    the fraud.  Is that correct?

16           MR. ESTEFAN:  Are you worried about it being as part

17    of the Title VII, Jo?

18           MS. VORPAHL:  I'm worried about that, yes.  And I'm --

19    I don't think that that's there, because you and I agreed that

07:32  20    that's not --

21           MR. RUNIONS:  Jo, it -- the punitive damage question,

22    Question Number 11, exemplary damages as to KBR, is predicated

23    on Question 7.  Question 7 is the fraud in the inducement

24    question.

07:33  25           MS. VORPAHL:  Okay.  Thank you.

07:33   1          MR. ESTEFAN:  Yeah, it's all predicated.  So, is

         2   that --

         3          MS. VORPAHL:  Your Honor, subject to my ability to

         4   eyeball this, it sounds like it's what we agreed to earlier.

07:33   5          THE COURT:  Okay.  Well, this is last chance.  I want

         6   to make that clear.  This is last chance.

         7          MS. VORPAHL:  Well, you -- you're not saying that we

         8   might not -- that we can't have a formal charge conference in

         9   the morning?

07:33  10          THE COURT:  Yeah, that's what I am saying.  Yes,

        11   that's what I'm saying.  This is the formal charge conference.

        12          MS. VORPAHL:  Well, okay.  Then I better make my

        13   record.

        14          MR. RUNIONS:  Jo, my understanding is that they've

07:33  15   e-mailed this to you.  So, you may have Sherry try to print it

        16   right quick.

        17          MS. VORPAHL:  Okay.  That's great.

        18          MR. RUNIONS:  If I can just point out on Question

        19   Number 12, I think the lettering probably needs to be changed

07:33  20   to A, B, C, D.

        21          MS. VORPAHL:  Well, I need to object to the failure to

        22   predicate.

        23          THE COURT:  What?  Failure to predicate what?

        24          MS. VORPAHL:  The failure to predicate the issues with

07:34  25   regard to the affirmative defenses on sexual harassment on an

---

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

07:34    1    affirmative finding as to sexual harassment; that is, I believe

2    your Jury Question Number 3 -- is the rape question going

3    first?

4            MR. ESTEFAN:  Yes.

07:34    5            MR. RUNIONS:  The rape question goes first.

6            MS. VORPAHL:  Okay.  And, so, I believe it's Jury

7    Question Number 3, "Was plaintiff sexually harassed by one or

8    more of her coworkers at Camp Hope in Iraq in late July of

9    2005?"

07:34   10          And then you only -- if your answer -- is it --

11   Jury Question Number 4 is, "If you answered 'yes' to Question

12   Number 3, then answer Question Number 4.  Otherwise, do not

13   answer Question Number 4."

14           MR. RUNIONS:  That's correct.

07:34  15          MS. HOLCOMBE:  And it's written in that way.

16         MS. VORPAHL:  All right.  And then Jury Question

17   Number 5 is predicated, "If you answered 'yes' to Questions 3

18   and 4, then answer Question Number 5.  Otherwise, do not answer

19   Question Number 5."

07:35  20         THE COURT:  That's in there, too.

21         MS. VORPAHL:  Okay.  I just wanted to be sure that

22   what you-all were looking at -- may I -- the only thing that I

23   couldn't square as you-all talked -- and again, someone is

24   trying to go and get me a copy of what apparently has been

07:35  25    e-mailed -- is that the numbering of the instructions didn't

07:35   1    appear to incorporate all of the instructions that I had asked
        2    for.
        3                    May I say the instructions that I asked for?
        4             THE COURT:  Okay.
07:35   5             MS. VORPAHL:  Number 1, do we have a page of
        6    definitions?
        7             MR. RUNIONS:  Yes.
        8             MR. ESTEFAN:  Yes.
        9             MS. VORPAHL:  Okay.  Then we have the Court's general
07:35  10    Instruction Number 1.
       11             THE COURT:  Right.
       12             MS. VORPAHL:  General instruction.
       13             MR. ESTEFAN:  Yes.
       14             MS. VORPAHL:  Then we have an instruction on publicity
07:35  15    during trial.
       16             MR. ESTEFAN:  Correct.
       17             THE COURT:  Yeah, we have that.
       18             MS. VORPAHL:  Duty to deliberate.
       19             THE COURT:  Yes.
07:36  20             MS. VORPAHL:  Bias, corporate party involved.
       21             THE COURT:  Yes.
       22             MS. VORPAHL:  Consider damages only if necessary.
       23             THE COURT:  Yes.
       24             MS. VORPAHL:  Impeachment by witness' inconsistent
07:36  25    statement.

07:36  1                THE COURT:  Yes, yes.

2                MS. VORPAHL:  Deposition testimony.

3                THE COURT:  Yep.

4                MS. VORPAHL:  And then we go to Jury Question

07:36  5    Number 1, which is the rape question.

6                THE COURT:  Correct.

7                MS. VORPAHL:  Okay.  Okay.

8                MR. ESTEFAN:  And, then, Instruction 8 comes later,

9    Jo, the one about Title VII sexual harassment and hostile work

07:36  10   environment.

11               MS. VORPAHL:  Yes.  Yes.  I think that actually was

12   how I had hoped that it would be, was right before the

13   question.

14               MR. ESTEFAN:  That's where the Court put it.

07:36  15               MS. VORPAHL:  And, so, that certainly is fine for me.

16               THE COURT:  Okay.

17               MR. RUNIONS:  Your Honor, if I could just --

18               MS. VORPAHL:  The only -- then the only thing I want

19   to do to preserve error for appeal is to say that I do not

07:36  20   agree that -- as to the fraud, that medical care and expenses

21   in the past should be included.  "Reasonable and necessary

22   medical care and expenses which will, in all reasonable

23   probability, be incurred in the future," I do not agree that

24   that should be included.

07:37  25                I do not agree that "physical impairment and

07:37   1   disfigurement in the past" or "physical impairment and

2   disfigurement in the future" should be included.

3            THE COURT:  Okay.

4            MS. VORPAHL:  Nor do I agree that "loss of earnings

07:37   5   the past" should be included.  And that's the -- I think that's

6   the only record I wish to make.

7            THE COURT:  Okay.  It's noted.  It's preserved for

8   appeal.

9            MS. VORPAHL:  Thank you, your Honor.

07:37   10           THE COURT:  Blake has one other thing he wants to say.

11           MR. RUNIONS:  Yeah.  Jo, I just want to point out on

12   Jury Question Number 5, you had -- just a moment ago you said

13   you wanted it predicated on Number 3 and Number 4?

14                Currently it's only predicated on Number 4.

07:37   15   Effectively that's the same thing, I believe, because Number 4

16   is predicated on 3.

17           MS. VORPAHL:  Yeah, I think it is, too, because 3

18   is --

19           MR. RUNIONS:  Right.

07:37   20           MS. VORPAHL:  -- 4 is predicated on an affirmative

21   finding of 3.

22           MR. RUNIONS:  That's correct.

23           MS. VORPAHL:  So, I'm fine with that.

24           MR. RUNIONS:  I just wanted to clear it up.

07:37   25           MS. VORPAHL:  Thank you, Blake, for noting that.

```
07:37    1              THE COURT:  Okay.  Thank you all very much.  You can
         2    go home.
         3              MR. RUNIONS:  Thank you, your Honor.
         4              MS. VORPAHL:  Thank you, your Honor.
07:38    5              MR. ESTEFAN:  Judge, are we going to get a ruling --
         6    are we going to get all the elements of damage, or are we going
         7    to get a final charge tonight before we get --
         8              THE COURT:  No, you're not going to get it tonight,
         9    no.
07:38   10              MR. ESTEFAN:  Okay.
        11              MS. HOLCOMBE:  Your Honor, are we still on the record?
        12              THE COURT:  We're still on the record.
        13              MS. HOLCOMBE:  The only thing I wanted to add, just
        14    because Ms. Vorpahl did not have the luxury of having the
07:38   15    exhibits in front of her, is just to say that, based on my
        16    records, none of the billing records themselves for any of
        17    Ms. Jones' past doctors have been admitted into evidence either
        18    and -- and going along with Ms. Vorpahl's objection to past
        19    medical expenses.
07:38   20              THE COURT:  Okay.
        21              MS. VORPAHL:  And I'm still actually on this call or
        22    eavesdropping, depending on how you view it.  And thank you, I
        23    agree with what Stephanie said.
        24              THE COURT:  I think I'm going to put all the different
07:38   25    elements of damage in, and we'll see.  I really don't think
```

07:38    1    it's going to be a large number on some of these things where
         2    the proof was pretty impressionistic.  But I think the better
         3    side of discretion is to let the plaintiffs have what they want
         4    on that.
07:39    5         MS. VORPAHL:  That's fine, your Honor.  And I
         6    appreciate you allowing us to preserve that.
         7         THE COURT:  Yeah.  All objections are preserved.
         8    Thank you very much.
         9         MS. VORPAHL:  Thank you.  Good night.
07:39   10      (Discussion off the record)
        11         THE COURT:  One more thing.  I'm sorry.  We had a last
        12    page for juror signatures and jurors' names.  And it's been
        13    pointed out to me that this may end up on ECF and I don't want
        14    the jurors' name on ECF.  So, I'm dropping that.
07:39   15         MR. ESTEFAN:  And it should be because it's got to be
        16    unanimous anyway.
        17         THE COURT:  We're definitely dropping that one.  I
        18    don't know how that got in there.
        19      (Proceedings recessed for evening)
        20                         * * * * *
        21
        22
        23
        24
        25

1                    COURT REPORTER'S CERTIFICATION

2          I certify that the foregoing is a correct transcript from
           the record of proceedings in the above-entitled cause.
3

4    Date:  July 6 2011

5

6                              /s/   Cheryll K. Barron

7                         Cheryll K. Barron, CSR, CMR, FCRR
                          Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'buzzed [1]**  163/15
**'guys [1]**  160/23
**'yes' [2]**  216/11 216/17

/

**/s [1]**  222/6

0

**0215 [1]**  164/4
**0500 [1]**  164/11
**0550 [1]**  164/18

1

**10 [2]**  110/17 214/6
**10-18 [1]**  68/25
**10-6 [1]**  68/25
**100 percent [4]**  37/5 38/21
 79/13 79/21
**1000 [1]**  2/6
**10:03 [1]**  65/17
**10:09 [1]**  65/17
**11 [4]**  18/17 84/3 214/8
 214/22
**1150 [2]**  1/16 1/19
**11:39 [1]**  98/19
**12 [4]**  28/21 72/5 214/9
 215/19
**12-ounce [1]**  161/21
**120 [1]**  171/22
**13 [1]**  71/4
**13-18 [1]**  70/23
**1467427 [1]**  135/22
**14th [2]**  89/19 89/19
**15 [1]**  62/15
**15th [1]**  89/20
**16 [4]**  33/14 100/15 135/15
 181/13
**164 [1]**  109/6
**165 [1]**  110/16
**17 [2]**  72/5 72/6
**170 [2]**  49/24 50/17
**1730 [1]**  161/12
**177 [1]**  50/18
**17th [2]**  28/7 48/9
**18 [2]**  68/25 70/23
**1800 [1]**  161/12
**182 [2]**  47/17 47/18
**185 [2]**  51/15 90/15
**188 [1]**  136/6
**19382 [1]**  1/22
**1994 [1]**  135/17
**1995 [1]**  135/25
**1998 [3]**  7/20 8/9 25/2
**1999 [1]**  136/7
**19th [3]**  19/16 44/6 48/9
**1:00 [2]**  95/7 95/18
**1:00 o'clock [1]**  95/21
**1:29 [1]**  98/19

2

**20 [4]**  55/7 62/5 162/2
 197/25
**20 minutes [1]**  197/22
**2000 [2]**  46/23 154/1
**2001 [1]**  46/24
**2002 [6]**  24/25 25/2 25/3
 46/24 141/12 141/15
**2003 [1]**  47/4
**2004 [5]**  47/4 48/4 50/2 51/25
 54/10

**2005 [3]**  51/18 90/11 115/19
 51/18 54/12 90/11 93/20
 120/13 120/25 154/12 160/14
 161/4 164/4 164/11 175/14
 178/18 193/1 193/14 202/22
 206/5 216/9
**2006 [10]**  8/10 24/25 25/3
 33/10 33/13 33/14 45/25 46/3
 87/25 88/9
**2007 [2]**  48/15 135/21
**2008 [4]**  25/12 89/20 161/23
 164/21
**2009 [3]**  44/6 45/24 89/19
**2010 [2]**  28/7 168/13
**2011 [4]**  1/5 28/9 28/10 222/4
**21 [1]**  175/14
**21-year-old [1]**  29/20
**2100 [1]**  161/3
**217 [2]**  28/14 76/21
**22nd [2]**  50/2 51/25
**23 [1]**  72/6
**242 [6]**  44/3 44/8 46/14
 46/16 46/17 90/15
**247 [1]**  46/17
**25 [1]**  149/19
**27 [2]**  1/21 202/21
**2719 [1]**  1/4
**27th [3]**  160/13 161/4 161/23
**28 [4]**  164/4 164/11 164/21
 202/22
**283582 [1]**  178/18
**28th [6]**  50/5 90/11 111/21
 121/20 122/15 126/3
**29th [2]**  111/22 126/4

3

**30 [2]**  80/5 158/15
**30th [2]**  111/20 111/23
**31-2 [1]**  66/24
**31-8 [1]**  66/24
**31st [1]**  111/21
**36th [1]**  2/6
**37 [1]**  141/15
**376 [1]**  135/24
**385 [1]**  135/24
**39-13 [1]**  71/4
**3:32 [1]**  156/22
**3:43 [1]**  156/22

4

**403 [2]**  17/1 19/21
**41.005 [2]**  139/19 141/18
**412 [16]**  58/17 59/5 59/9
 59/10 59/11 61/3 62/7 62/9
 62/10 63/7 63/22 65/4 97/13
 108/1 108/3 113/1
**45 [2]**  127/2 127/6
**4:26 [1]**  185/20
**4:35 [1]**  185/20
**4:55 [1]**  202/5

5

**500 [1]**  2/11
**513 [1]**  141/14
**515 [1]**  2/14
**536 [1]**  141/14
**55 [2]**  17/14 134/5
**5:30 [1]**  134/13

6

**615 [1]**  136/7
**649 [1]**  135/15

**6:30 in [1]**  80/4
**6th [1]**  52/2

7

**7-29-2005 [2]**  120/13 120/25
**70 [1]**  112/1
**71 [1]**  112/2
**75 [1]**  148/22
**77002 [2]**  2/7 2/15
**77056 [3]**  1/16 1/19 2/11
**7:00 o'clock [1]**  80/5
**7:17 [1]**  202/5

8

**80 percent [2]**  16/24 17/10
**82 [1]**  72/5
**82-17 [1]**  72/6
**82-9 [1]**  72/4
**89 [2]**  213/21 214/2
**8:00 [1]**  186/3
**8:00 o'clock [4]**  134/14
 185/24 202/2 202/3
**8:05 [1]**  1/5

9

**9-11 [1]**  84/3
**90 percent [1]**  72/12
**900 [1]**  135/24
**94 [2]**  141/14 148/4
**98 [2]**  88/22 157/20
**9:30 [2]**  166/2 197/25

A

**a question [1]**  74/2
**a.m [4]**  1/5 65/17 65/17
 98/19
**abandoned [1]**  174/25
**ability [4]**  83/14 83/16
 163/23 215/3
**able [13]**  5/5 13/20 26/3 62/1
 79/23 105/10 109/14 114/14
 119/23 124/1 171/2 181/20
 213/20
**abnormal [1]**  74/3
**about [215]**  8/2 8/8 9/15
 10/18 10/21 14/6 14/11 14/13
 14/14 16/8 16/14 16/24 18/16
 18/22 22/1 23/1 23/21 23/23
 27/9 27/15 27/16 28/3 28/7
 28/9 28/13 28/21 29/3 29/25
 32/17 37/6 37/17 39/19 39/22
 42/25 43/21 43/24 43/25
 44/24 46/9 46/11 47/9 47/18
 47/22 52/8 54/6 54/24 55/3
 55/18 56/25 57/11 58/12
 58/13 59/25 60/12 61/8 61/24
 62/1 62/2 62/11 62/14 65/22
 65/24 66/6 66/6 66/14 67/6
 68/23 69/8 69/15 69/20 69/20
 69/22 70/16 70/23 71/14 72/8
 72/25 74/8 74/15 75/11 76/2
 76/3 77/4 78/14 81/13 81/24
 82/14 82/15 84/1 84/18 85/15
 85/18 86/9 87/24 95/16 97/5
 98/15 99/25 100/6 100/8
 100/15 100/22 100/23 100/23
 101/21 101/22 101/24 101/25
 102/3 102/5 102/7 104/20
 104/24 106/12 106/19 108/7
 108/9 108/10 108/12 109/18
 111/12 113/4 113/8 114/7

**A**

**about... [91]** 115/18 118/15
119/2 121/2 121/5 122/1
122/11 122/15 123/21 124/10
124/10 125/8 125/21 126/5
126/6 126/20 130/6 132/17
132/19 133/22 134/17 134/23
138/9 139/6 140/20 141/4
147/3 147/18 148/15 152/6
152/10 152/13 152/15 152/16
153/25 154/25 155/1 155/4
155/12 155/16 155/20 155/23
156/10 156/12 156/24 157/7
157/11 163/9 166/11 170/12
170/12 171/4 176/19 177/2
177/21 177/21 178/19 182/8
183/8 183/8 186/21 189/10
189/16 192/9 194/24 195/19
197/18 198/4 198/13 198/22
198/22 199/6 199/13 199/14
200/3 200/19 201/7 201/10
201/11 202/1 202/25 204/10
206/8 206/17 207/17 212/5
212/8 212/25 214/16 214/18
218/9

**above [4]** 162/1 165/14 189/5
222/2

**above-entitled [1]** 222/2

**absence [2]** 71/20 145/19

**absent [1]** 170/19

**absentee [1]** 105/22

**absolutely [13]** 64/9 98/4
115/18 123/8 123/12 127/15
137/15 169/25 170/5 173/3
177/13 179/3 193/8

**abundance [1]** 167/14

**abuse [10]** 42/11 43/16 43/20
44/25 45/11 45/18 49/22 52/9
60/8 100/9

**abused [3]** 43/1 43/2 43/3

**abusive [6]** 104/5 107/18
107/23 108/3 108/6 108/8

**accepted [3]** 137/3 137/24
163/6

**accessing [1]** 79/20

**accident [1]** 208/15

**accommodation [1]** 179/18

**accomplishments [1]** 69/15

**according [6]** 28/6 120/21
160/20 162/8 164/14 183/21

**accuracy [1]** 112/21

**accurate [2]** 38/21 213/7

**accurately [3]** 29/2 29/9
110/20

**accused [3]** 62/3 62/4 192/6

**achieve [1]** 164/7

**achieved [1]** 164/8

**acquiescence [2]** 136/10
136/13

**acquired [3]** 143/24 144/4
144/5

**acquiring [2]** 78/23 141/9

**across [1]** 20/1

**act [24]** 9/19 117/23 120/5
120/8 134/17 137/18 139/14
141/7 141/8 141/9 141/10
141/11 142/9 142/18 143/7
145/4 151/1 151/21 152/12
152/14 153/14 187/20 187/21
187/22

**acted [3]** 146/11 177/4 211/11

**action [15]** 11/19 139/24
140/2 140/11 140/12 141/17
141/21 142/2 149/9 149/13
150/10 154/16 171/24 205/17
206/16

**actionable [1]** 153/18

**actions [8]** 9/25 11/6 11/22
13/10 135/25 136/13 140/9
140/24

**active [5]** 15/24 152/24 153/4
154/20 177/24

**actively [9]** 15/13 153/10
153/10 153/12 154/21 155/1
155/6 155/8 182/20

**activity [3]** 164/7 164/23
165/15

**actor [1]** 150/15

**acts [17]** 11/16 12/18 122/21
131/12 134/8 134/16 134/17
135/1 136/9 139/17 139/21
141/24 143/3 144/20 144/21
144/23 169/20

**actual [4]** 37/23 39/1 158/5
196/2

**actually [59]** 6/24 10/25
11/14 13/5 15/23 29/23 29/24
30/2 32/15 33/24 34/15 35/8
35/22 38/8 38/13 39/14 39/15
39/21 42/5 44/13 47/14 53/7
57/8 57/18 60/25 63/3 71/3
72/22 76/3 77/16 78/11 78/18
78/24 79/3 82/5 82/19 84/2
84/16 85/21 87/14 95/8 97/8
101/21 109/9 112/5 118/19
125/9 131/3 139/9 141/13
154/23 159/1 169/25 173/13
179/23 183/24 186/19 218/11
220/21

**Adams [7]** 16/17 17/14 94/11
94/13 94/15 94/17 157/11

**Adams' [3]** 157/1 157/7 157/10

**add [23]** 9/21 17/9 17/20
19/14 43/18 43/21 47/24 54/5
54/6 108/2 116/4 116/6 122/3
134/20 134/22 201/5 204/14
204/22 205/13 210/1 210/1
210/5 220/13

**added [4]** 133/4 169/17 169/18
204/16

**adding [1]** 210/4

**addition [7]** 55/16 107/9
144/19 152/24 178/15 188/2
208/1

**additional [7]** 17/6 21/9
47/21 97/23 123/13 166/9
173/9

**additionally [5]** 17/10 105/8
134/11 135/18 135/23

**address [8]** 68/9 69/19 96/21
113/8 118/3 118/4 133/18
171/14

**addressed [3]** 112/6 112/14
154/3

**adds [1]** 103/18

**adduced [4]** 138/25 140/19
152/1 155/10

**adequate [1]** 205/4

**adjust [2]** 24/1 41/22

**adjusted [1]** 46/5

**administer [1]** 23/18

**administrative [2]** 138/16

**admissibility [1]** 107/8

**admissible [2]** 61/5 68/18

**admission [1]** 89/1

**admissions [1]** 73/10

**admit [4]** 90/25 112/19 181/10
186/6

**admitted [8]** 85/21 108/8
111/7 112/10 161/20 163/24
165/1 220/17

**adolescence [1]** 45/5

**adopts [1]** 134/25

**advances [2]** 86/10 86/14

**advantage [1]** 169/21

**adversely [1]** 57/9

**advertise [1]** 171/10

**advised [2]** 27/17 160/22

**affect [5]** 32/13 32/15 58/16
85/24 86/7

**affidavit [1]** 116/8

**affirmative [25]** 5/21 5/23
6/7 13/25 16/1 16/2 16/13
136/9 137/7 140/4 140/6
142/8 142/17 156/12 175/7
175/8 176/6 177/25 179/10
186/10 206/11 206/18 215/25
216/1 219/20

**afflictions [1]** 106/20

**afraid [2]** 85/17 166/10

**after [40]** 11/25 22/4 26/2
27/14 74/16 111/4 111/12
112/25 114/2 114/17 117/21
119/11 120/24 124/13 125/9
134/15 141/9 141/25 142/18
143/24 144/4 144/5 144/9
148/8 150/7 150/24 160/15
161/24 161/25 162/2 162/13
163/4 166/16 166/17 171/22
171/23 173/11 173/15 173/17
191/23

**after-hours [1]** 11/25

**aftereffects [1]** 39/15

**afternoon [2]** 134/13 161/12

**afterwards [1]** 77/11

**again [68]** 8/7 9/11 9/19 17/6
19/21 28/9 28/24 30/3 30/16
31/6 33/3 33/16 34/13 35/15
36/23 37/2 37/4 38/1 43/5
45/1 45/11 47/4 48/14 52/14
59/22 61/3 68/19 69/1 72/7
77/12 79/4 79/21 85/25 86/3
87/10 90/18 92/15 92/24 94/9
94/13 96/16 100/10 103/22
111/18 114/21 116/14 122/22
123/16 125/12 150/13 151/1
152/21 154/10 156/5 160/22
161/3 164/15 168/15 172/12
172/24 176/22 181/1 181/23
183/2 184/6 206/17 209/25
216/23

**against [27]** 10/8 11/7 55/6
67/19 67/21 127/8 129/13
129/19 129/22 130/9 133/3
138/4 143/2 143/5 145/1
145/13 147/10 167/22 168/12
183/7 186/19 191/5 198/11
199/11 213/14 214/7 214/14

**age [2]** 62/5 100/15

**agency [1]** 142/20

**agent [8]** 89/21 141/6 141/6
141/7 141/7 141/11 148/13
164/20

**agent's [2]** 141/11 142/19
**agents [3]** 118/25 120/3
138/14
**ago [9]** 26/24 34/1 39/19
51/22 102/3 128/25 129/9
129/10 219/12
**agree [19]** 38/12 49/16 75/15
113/5 114/23 121/9 124/14
174/22 175/3 175/23 195/10
200/3 203/7 213/3 218/20
218/23 218/25 219/4 220/23
**agreed [21]** 66/16 112/2
112/19 114/13 114/18 115/12
118/3 119/21 121/3 123/15
123/17 175/13 192/23 202/17
206/9 207/6 212/18 212/24
212/24 214/19 215/4
**agreed-upon [1]** 118/3
**agreeing [2]** 73/24 208/25
**agreement [6]** 6/21 112/8
175/24 177/5 194/5 210/14
**agrees [2]** 19/20 170/2
**ahead [6]** 91/13 98/3 110/15
131/7 143/17 170/16
**aide [1]** 22/10
**aided [1]** 1/24
**ain't [1]** 169/5
**air [2]** 51/4 143/13
**Air Force [1]** 51/4
**aired [1]** 202/14
**airport [1]** 52/1
**alarm [1]** 164/11
**alcohol [7]** 45/18 45/19 49/19
86/4 100/9 161/9 163/9
**alcoholic [3]** 162/16 162/22
163/5
**aligned [2]** 64/15 68/4
**alive [1]** 69/24
**all [202]** 8/3 8/18 9/5 9/5
10/3 10/20 18/9 20/3 21/13
23/6 23/9 24/13 24/17 24/18
24/23 25/15 26/5 26/8 26/25
27/25 28/10 30/8 30/16 31/1
31/15 33/5 38/9 39/23 40/4
41/19 43/5 46/7 46/11 47/17
48/1 48/16 48/20 49/9 50/7
52/16 54/5 55/17 55/18 56/2
58/9 58/21 59/18 60/12 62/2
62/19 63/13 64/9 66/17 68/22
71/7 71/8 73/9 73/25 74/24
74/25 77/19 78/21 78/25 80/6
80/14 81/25 82/17 85/20
87/21 89/15 91/2 91/6 91/7
91/22 92/21 93/1 93/5 93/18
94/9 94/12 94/19 94/25 95/14
95/16 95/22 97/16 97/20 98/1
98/21 100/21 101/18 102/23
103/12 103/15 104/12 104/18
105/5 107/11 108/21 111/7
112/2 112/8 120/3 122/13
125/22 127/5 127/25 128/4
128/17 133/14 134/16 135/6
136/14 140/10 142/1 142/7
142/9 144/12 144/13 144/21
145/7 146/24 149/3 149/7
149/10 151/6 152/11 153/25
154/16 155/10 158/16 159/10
159/11 159/13 166/4 166/6
170/4 170/11 170/12 170/17
172/3 173/5 173/23 175/4

178/23 179/1 180/6 180/12
180/24 181/9 181/19 182/7
183/7 183/20 183/22 184/4
184/11 184/15 185/3 185/18
186/2 189/1 189/7 189/14
189/17 189/24 190/2 191/12
191/18 191/22 192/16 194/3
195/4 195/7 195/17 198/6
198/18 199/7 200/7 202/9
203/11 203/24 204/11 207/9
209/3 209/12 210/20 214/4
215/1 216/16 216/22 216/23
217/1 218/22 220/1 220/6
220/24 221/7
**all-female [4]** 180/6 180/12
183/22 184/4
**all-nighter [1]** 185/3
**allegation [7]** 61/9 61/10
61/11 111/21 124/6 174/14
175/9
**allegations [11]** 50/7 52/5
58/18 67/5 71/12 123/14
131/16 145/13 152/19 156/11
189/19
**allege [1]** 17/16
**alleged [12]** 8/12 62/21 100/8
117/22 129/19 138/17 146/25
160/13 160/16 160/17 174/2
200/21
**alleges [1]** 50/5
**alleging [3]** 18/19 32/20
63/15
**alley [1]** 48/17 85/19
**allow [25]** 13/21 13/22 17/5
21/7 22/16 62/17 69/18 70/4
70/4 73/3 108/22 108/23
113/24 114/24 115/1 115/6
119/15 124/17 124/19 126/8
172/17 181/20 186/9 186/11
186/20
**allowed [10]** 13/7 13/16 115/3
115/10 115/12 117/21 118/6
134/18 145/22 157/23
**allowing [7]** 13/9 115/5 115/7
116/23 119/16 124/19 221/6
**allows [2]** 118/2 193/5
**alluding [1]** 170/20
**almost [2]** 32/8 50/6
**alone [4]** 32/7 32/8 138/15
187/25
**along [6]** 9/22 37/1 84/21
86/4 191/13 220/18
**alongside [1]** 92/15
**already [30]** 5/14 17/3 18/1
22/17 22/21 23/4 25/25 58/22
61/19 68/12 68/18 69/2 73/20
75/13 96/2 96/15 103/19
107/11 108/7 108/9 111/8
112/4 116/12 117/20 156/16
175/18 176/19 183/1 193/10
204/19
**also [33]** 6/13 11/1 17/23
33/4 34/10 40/22 42/16 49/9
53/3 54/2 58/19 70/10 72/6
79/9 83/23 97/4 100/7 100/10
100/22 108/3 112/15 134/4
136/6 165/1 169/23 174/23
180/18 200/5 201/8 201/9
203/10 204/9 209/4
**also -- I [1]** 201/8
**also -- you [1]** 79/9

altercation [1] 48/23
58/13
**alternative [2]** 60/17 60/24
**alters [1]** 79/24
**although [6]** 20/3 42/22
134/13 135/7 136/25 176/23
**always [4]** 70/1 108/18 139/14
150/14
**am [12]** 34/20 97/24 113/8
137/19 168/16 168/19 169/5
174/15 186/9 198/4 210/19
215/10
**Ambien [1]** 86/3
**ambiguity [1]** 185/14
**ambiguous [2]** 22/18 22/18
**ambit [1]** 106/11
**Ambulance [1]** 135/20
**ambush [1]** 63/5
**amenable [1]** 168/20
**amend [1]** 200/20
**amended [1]** 130/18
**Amendment [2]** 12/4 149/22
**amnesia [13]** 78/22 78/25 79/1
79/2 79/5 79/6 79/11 79/13
79/14 79/14 79/16 79/17
79/19
**among [1]** 21/22
**amount [4]** 81/19 148/22 214/6
214/10
**amounts [1]** 8/3
**ample [9]** 10/14 11/6 14/4
140/19 146/15 152/2 182/8
182/18 204/7
**Amy [1]** 9/13
**anal [2]** 164/9 165/16
**anally [2]** 19/9 30/12
**analysis [1]** 12/11
**analyze [1]** 143/22
**And that [1]** 48/3
**and/or [1]** 202/22
**Andrew [2]** 2/9 24/7
**anesthetic [1]** 79/15
**angle [1]** 31/15
**angry [2]** 49/2 49/5
**animal [1]** 199/18
**announced [1]** 9/4
**annual [1]** 161/13
**anonymous [1]** 183/20
**another [22]** 11/8 18/22 23/9
30/15 36/9 56/20 57/20 70/18
90/25 99/3 99/16 99/24
102/11 109/10 135/4 141/24
151/12 156/6 159/21 159/22
162/19 165/8
**answer [19]** 53/7 53/19 74/6
100/9 103/4 105/6 106/1
106/15 121/17 150/8 171/15
202/23 202/24 213/12 216/10
216/12 216/13 216/18 216/18
**answered [4]** 84/23 123/25
216/11 216/17
**answers [6]** 85/11 85/11
105/18 105/20 106/6 107/3
**Anthony [9]** 16/17 94/11 94/13
94/15 94/17 157/1 157/7
157/10 157/11
**antianxiety [1]** 101/2
**anticipate [1]** 213/16
**anticipated [5]** 112/10 112/17
118/5 118/11 122/5
**anticipation [2]** 39/19 201/16
**antidepressant [1]** 99/22

4

**antidepressants [1]** 101/2
**antidepressive [1]** 53/5
**anxiety [9]** 40/6 41/7 46/25
47/6 47/16 47/21 103/10
103/16 104/9
**any [99]** 6/6 6/12 8/25 9/19
13/12 16/19 22/13 22/16
26/13 33/5 34/7 35/6 35/6
36/18 37/16 38/18 40/6 43/6
44/24 45/10 45/19 49/21 51/6
56/13 63/24 64/14 66/5 70/20
71/15 72/23 75/4 78/1 81/21
83/18 85/8 85/19 88/15 88/21
89/11 90/6 92/21 97/15
100/19 104/5 104/22 107/23
108/11 112/20 118/1 118/2
121/1 121/14 125/8 125/9
126/12 128/22 129/3 138/17
138/24 149/13 154/17 155/3
155/15 156/13 156/14 163/13
165/20 168/25 170/15 172/7
175/15 177/17 178/12 178/12
179/15 182/2 187/10 187/22
188/18 190/1 190/5 190/17
191/14 192/19 195/13 199/12
200/14 200/15 208/6 208/9
208/11 208/17 208/19 210/11
210/15 211/8 211/18 212/6
220/16
**anybody [11]** 26/10 61/16
121/1 149/23 151/13 181/14
192/19 198/21 198/21 204/15
207/17
**anymore [1]** 199/13
**anyone [8]** 6/6 26/6 71/1
71/11 71/17 88/15 145/18
204/17
**anyone's [1]** 145/14
**anything [39]** 6/10 7/11 14/10
14/13 63/2 69/22 71/11 74/2
74/3 76/12 78/7 82/22 94/2
98/1 100/23 105/19 105/25
106/2 121/5 123/6 126/15
139/1 142/4 142/24 145/17
159/12 163/20 169/12 186/7
188/8 189/5 189/6 189/9
198/6 198/13 198/22 201/4
201/13 208/15
**anyway [3]** 117/25 137/18
221/16
**anywhere [1]** 36/14
**apart [3]** 188/5 188/12 191/19
**apologies [1]** 24/8
**apologize [6]** 70/12 172/12
181/22 187/3 210/21 212/20
**apologized [1]** 85/21
**apparently [5]** 51/2 64/20
75/10 133/12 216/24
**appeal [7]** 173/14 173/24
196/22 198/14 198/16 218/19
219/8
**appealed [1]** 173/13
**appear [6]** 38/22 51/11 52/2
75/22 80/5 217/1
**appearances [2]** 80/6 117/9
**appeared [1]** 164/2
**appearing [1]** 202/8
**appears [4]** 75/6 76/7 185/22
203/15
**appellate [3]** 174/21 174/22

**applicable [2]** 44/17 45/2
**application [1]** 98/11
**applied [3]** 12/16 103/11
115/16
**applies [1]** 212/23
**apply [4]** 103/8 171/20 208/6
208/8
**appointment [1]** 26/3
**appreciate [2]** 53/7 221/6
**appreciated [1]** 24/17
**approach [3]** 58/1 58/6 58/7
**approached [1]** 162/9
**approaching [1]** 56/20
**appropriate [5]** 19/7 132/7
135/12 196/14 199/3
**appropriately [4]** 80/6 146/11
173/3 173/17
**approval [1]** 141/10
**approved [1]** 141/8
**approximately [7]** 52/5 161/3
161/12 162/2 164/4 164/11
164/18
**arbitrate [1]** 172/16
**arbitration [20]** 6/19 6/20
11/23 12/1 12/4 12/8 12/11
12/16 152/8 153/1 155/9
173/4 173/6 173/8 174/11
174/13 175/4 175/14 175/23
189/20
**are [162]** 5/12 16/24 16/25
17/13 18/6 18/7 18/13 18/15
18/18 18/21 18/21 19/6 20/11
20/22 20/23 22/14 25/16 39/7
41/16 46/25 47/6 48/16 52/17
53/12 53/14 57/1 58/18 58/25
65/22 65/24 66/13 66/15 67/5
68/18 70/7 70/13 71/3 74/21
77/25 79/19 81/19 83/16
83/20 84/2 84/20 87/14 91/10
96/2 97/21 97/21 98/23 99/14
100/1 102/18 103/17 104/9
105/1 105/18 105/20 106/9
106/10 106/11 106/14 106/19
106/20 107/3 107/9 107/16
108/18 111/8 111/19 111/23
112/1 112/8 112/13 113/9
114/5 115/9 115/16 116/1
118/6 118/14 119/15 119/16
120/20 124/4 127/3 127/21
129/3 129/12 131/16 134/16
135/2 135/9 135/12 136/1
138/15 141/4 141/5 143/20
146/5 146/24 148/13 148/14
151/6 151/8 151/11 153/15
153/19 154/3 156/9 156/17
157/17 160/10 160/24 166/8
166/23 170/11 170/18 172/9
173/10 174/14 175/1 175/4
175/5 175/8 176/1 180/9
180/19 181/15 181/16 182/12
186/17 186/21 186/21 188/20
189/17 189/19 193/5 194/3
196/12 196/17 197/9 198/8
200/1 202/7 202/7 202/16
203/13 203/13 204/12 209/9
210/7 210/8 210/17 210/20
214/16 220/5 220/6 220/6
220/11 221/7
**are July 30th [1]** 111/23
**area [6]** 86/23 87/4 87/13
142/9 179/25 184/19

**argue [11]** 12/24 95/16 134/3
152/9 173/22 183/19 184/21
186/9 197/17 198/7 198/8
**argued [4]** 129/15 139/15
157/24 186/21
**arguing [10]** 107/9 166/7
173/24 191/2 191/3 200/2
200/25 201/1 207/17 212/25
**argument [16]** 62/23 63/11
63/13 63/14 63/20 134/23
147/9 166/9 166/9 174/1
174/1 186/11 186/14 199/2
200/19 200/23
**argumentative [1]** 185/9
**arguments [6]** 19/11 132/12
184/16 185/1 185/4 192/19
**arise [3]** 156/10 164/17
185/14
**arises [1]** 153/17
**Arkansas [1]** 135/15
**armed [1]** 45/15
**Armstrong [9]** 18/7 22/3 124/2
124/6 124/25 125/7 125/17
125/18 134/9
**Armstrong's [1]** 146/4
**army [1]** 146/22
**around [9]** 13/14 25/12 25/24
26/24 36/3 149/16 184/2
192/4 202/21
**arrangements [2]** 26/11 110/8
**arrest [1]** 147/6
**arrests [1]** 199/23
**arrived [9]** 138/14 145/15
161/24 162/4 162/19 163/1
163/4 165/7 189/2
**arriving [1]** 162/18
**Arroyo [8]** 66/19 66/22 66/22
93/3 93/6 93/10 93/12 93/16
**Arroyo's [1]** 93/3
**articulated [1]** 190/12
**as [222]** 5/4 6/18 6/25 9/23
11/4 11/5 12/13 13/24 15/10
15/10 15/11 15/11 15/20
15/20 15/24 16/13 16/22 17/2
17/5 17/5 18/25 19/4 19/19
19/19 22/8 22/8 28/6 29/2
29/2 29/3 29/3 29/7 29/7
29/8 29/9 29/9 30/6 32/9
32/14 32/19 32/19 32/21 33/4
38/25 39/2 41/19 41/21 43/14
44/5 44/9 45/1 46/22 47/15
50/10 50/23 51/3 51/8 51/8
52/4 54/3 55/14 60/9 60/9
60/20 62/17 62/20 63/7 67/11
71/1 72/14 72/18 75/14 75/14
76/18 78/5 78/10 80/8 81/11
81/11 81/24 83/22 83/22
84/11 88/9 88/25 89/11 89/11
92/1 92/1 93/6 97/14 97/14
98/21 98/24 99/20 102/8
102/18 103/10 103/10 104/8
104/13 104/16 104/17 104/23
104/24 104/24 105/13 106/6
106/19 106/22 106/25 109/24
112/14 112/20 114/23 120/17
121/1 121/11 122/8 123/19
125/24 125/25 126/12 129/14
129/15 129/22 133/19 133/22
134/21 136/11 136/21 137/7
139/4 141/22 143/22 144/11

**A**

**as...** **[86]**   146/4  146/4  147/18
148/8  149/15  150/8  152/7
152/7  152/8  153/16  153/21
154/15  157/14  157/14  157/16
157/22  157/22  157/23  160/1
160/14  160/23  163/15  164/14
165/2  165/9  165/11  165/14
166/15  169/12  169/16  169/17
172/5  172/6  175/3  175/12
175/16  175/19  175/22  175/23
176/2  176/2  177/14  180/24
181/25  183/10  183/11  184/20
185/8  185/10  185/10  186/5
189/7  190/16  193/6  194/5
194/12  196/4  196/9  196/10
196/10  196/16  197/3  198/3
199/19  201/10  203/8  203/15
204/15  205/9  206/5  207/6
209/1  210/24  211/8  212/10
213/2  213/10  213/24  214/7
214/9  214/9  214/16  214/22
216/1  216/23  218/20

**ask** **[40]**   40/10  43/5  43/6
43/10  53/16  54/9  54/22  54/24
55/2  57/6  57/6  59/23  61/24
62/22  64/6  65/9  75/5  75/9
75/17  81/13  82/17  86/13
104/4  105/4  105/10  114/7
116/1  126/5  143/21  147/5
147/7  149/24  151/18  156/5
156/17  166/1  166/2  167/24
202/23  209/25

**asked** **[27]**   34/18  42/25  52/7
66/5  76/1  79/11  85/18  86/5
86/9  87/5  87/24  90/8  104/18
104/20  105/2  106/11  106/13
121/17  122/11  147/4  147/11
157/11  161/8  163/9  164/24
217/1  217/3

**asking** **[18]**   31/22  32/17  34/5
34/9  39/7  40/13  53/14  86/7
87/11  101/1  132/10  156/15
164/22  164/25  174/7  174/8
197/6  207/11

**asleep** **[3]**   79/17  164/5  164/12

**aspect** **[1]**   60/10

**aspects** **[2]**   37/23  75/23

**assailants** **[6]**   31/17  32/4
35/22  37/22  43/13  76/4

**assault** **[43]**   6/15  10/23  19/2
19/3  33/18  35/23  37/23  43/13
46/3  61/2  61/10  74/3  76/5
76/18  87/9  129/16  130/19
130/24  131/25  132/1  132/1
132/8  136/12  144/11  144/15
144/20  152/17  155/16  160/13
160/16  160/17  182/11  182/16
183/12  187/11  188/1  188/14
191/5  199/23  202/25  203/1
204/1  204/3

**assaulted** **[5]**   31/17  32/4
39/13  45/14  50/11

**assaulters** **[1]**   138/18

**assaults** **[11]**   58/12  58/18
58/18  60/19  60/25  62/2  63/12
73/18  74/10  144/21  145/1

**assert** **[2]**   64/9  142/1

**asserted** **[3]**   71/8  114/23
125/2

**asserting** **[1]**   137/7

**assessed** **[1]**   214/7

**assessing** **[1]**   49/18

**assessment** **[2]**   38/21  213/23

**assistant** **[2]**   19/4  91/18

**associated** **[1]**   82/21

**association** **[1]**   103/9

**assume** **[6]**   52/12  54/9  54/9
76/9  143/21  143/22

**assumed** **[2]**   44/9  146/18

**assuming** **[4]**   9/19  27/20  33/22
36/16

**assumption** **[3]**   39/14  117/3
121/14

**assumptions** **[1]**   54/6

**at** **[212]**   1/18  7/3  8/1  8/9
8/22  9/5  9/5  9/21  11/8  12/3
12/9  12/15  12/18  14/22  18/2
18/8  18/12  24/25  25/3  26/18
27/8  29/7  33/17  34/16  35/11
35/18  36/12  36/17  36/21
42/23  45/8  45/23  46/7  46/22
47/8  47/17  47/20  48/16  48/19
48/22  48/23  49/4  49/17  50/1
50/6  50/11  50/23  51/24  52/3
52/11  53/3  57/2  58/9  61/3
63/4  63/13  65/14  66/4  68/25
69/9  70/23  71/4  71/8  71/11
72/5  73/7  76/12  77/6  77/12
77/14  79/25  80/4  81/25  82/20
85/20  86/19  89/3  90/5  90/20
92/13  93/2  93/20  93/24  94/14
95/6  95/13  95/14  96/17  97/17
97/20  100/21  104/13  105/10
106/17  106/17  108/19  108/19
109/23  110/10  110/16  110/23
112/1  113/15  115/21  120/1
121/10  122/11  122/13  123/11
125/23  128/20  130/18  131/15
133/11  134/1  134/13  134/14
135/2  135/16  135/24  135/24
136/6  138/15  138/18  140/7
141/14  141/19  145/8  145/15
145/23  146/12  147/20  149/3
155/4  155/17  156/3  156/6
156/6  157/4  157/13  158/2
158/3  158/10  160/5  161/1
161/4  161/17  162/4  162/10
162/18  163/11  163/20  163/25
164/3  164/6  164/11  164/13
164/18  164/24  166/2  166/10
167/3  170/4  170/12  170/24
171/2  171/14  172/19  173/14
173/23  174/19  175/1  175/11
175/16  176/15  176/23  177/14
181/8  181/9  181/19  181/25
183/16  184/23  185/24  186/2
186/15  190/12  192/1  192/16
192/25  193/13  193/15  193/16
197/23  198/6  200/5  200/15
202/6  202/14  203/8  203/12
203/15  205/5  205/23  206/4
206/22  206/24  207/2  210/8
210/21  216/8  216/22

**atmosphere** **[1]**   45/5

**attack** **[17]**   17/18  35/2  35/7
38/3  38/6  38/7  40/7  76/11
77/2  77/8  77/9  77/13  77/17
77/20  77/22  84/7  134/18

**attacker** **[1]**   33/3

**attackers** **[7]**   30/12  31/15
31/21  31/25  32/1  33/6  37/25

**attempt** **[8]**   59/6  63/5  63/9
134/3  165/16  205/6

**attempted** **[3]**   164/9  164/13
164/16

**attention** **[3]**   29/7  33/2  33/4

**attenuation** **[1]**   201/24

**attorney** **[3]**   1/18  56/15  88/7

**attorneys** **[10]**   26/13  26/17
26/19  39/19  130/5  130/7
130/12  149/10  157/5  185/15

**attorneys'** **[1]**   173/9

**attribute** **[1]**   57/21

**attributing** **[1]**   125/16

**audacity** **[1]**   8/8

**August** **[2]**   28/7  168/13

**August 17th** **[1]**   28/7

**austere** **[1]**   181/6

**authenticate** **[2]**   116/8  119/21

**authenticated** **[1]**   112/17

**authentication** **[1]**   112/21

**authored** **[1]**   124/17

**authority** **[3]**   149/9  153/6
176/5

**authorization** **[1]**   73/11

**automatically** **[1]**   143/1

**available** **[1]**   91/12

**average** **[1]**   53/11

**avoid** **[2]**   198/13  203/11

**awaiting** **[1]**   9/24

**awake** **[1]**   82/19

**award** **[1]**   213/24

**aware** **[17]**   26/7  36/14  37/21
37/22  37/24  47/11  78/1  83/20
88/3  101/1  107/22  107/23
133/2  144/17  158/20  194/14
194/15

**awareness** **[6]**   32/9  35/21
35/22  38/14  39/2  39/8

**away** **[8]**   13/7  13/8  13/9  59/22
134/19  178/5  183/17  195/14

**awhile** **[2]**   89/13  121/24

**awoke** **[3]**   160/15  164/10
164/12

**B**

**back** **[44]**   6/22  7/20  7/24
15/23  19/7  34/2  34/16  39/23
45/25  48/4  49/21  52/20  57/2
59/8  60/1  61/24  65/23  76/20
81/9  81/17  94/19  95/10
113/21  122/21  122/21  126/10
148/23  152/13  155/17  156/21
166/2  174/4  181/8  182/25
185/18  189/2  196/10  196/12
196/13  196/24  197/1  197/2
197/3  197/6

**backed** **[1]**   10/19

**background** **[4]**   26/5  28/24
52/14  64/19

**bad** **[9]**   9/19  99/14  105/14
105/22  128/15  144/23  150/14
169/20  208/18

**Baghdad** **[5]**   11/3  15/18  30/7
45/14  120/14

**Bagwell** **[1]**   158/21

**Baileys** **[1]**   162/25

**balance** **[1]**   65/4

**ball** **[1]**   169/1

**banter** **[1]**   80/8

**bar** **[1]**   48/24

**barracks** **[9]**   6/9  160/21

**barracks... [7]**  160/23 161/6
161/19 162/7 162/11 162/14
163/2
**Barron [4]**  2/13 196/3 222/6
222/7
**base [1]**  75/12
**based [25]**  12/4 12/5 15/9
15/10 32/18 41/10 41/23
47/23 60/6 75/5 78/5 82/10
82/11 87/1 89/4 113/6 113/12
140/14 168/17 169/19 173/6
199/21 208/2 208/12 220/15
**basically [3]**  67/3 83/22
99/12
**basis [2]**  114/24 183/17
**bathrobe [2]**  160/23 161/1
**bathroom [2]**  185/18 189/14
**bathrooms [1]**  180/23
**battery [12]**  6/16 129/16
129/18 130/10 130/19 130/24
131/25 132/1 132/8 188/14
191/19 191/19
**battled [1]**  189/20
**battling [1]**  173/20
**Baylor [1]**  25/3
**be [288]**
**beating [1]**  49/4
**beauty [1]**  149/12
**became [3]**  49/2 49/5 131/10
**because [91]**  6/23 11/3 13/17
15/20 17/1 18/9 24/13 24/14
25/16 27/17 29/23 34/16
35/13 35/17 37/13 44/20
47/23 52/17 52/19 53/12
53/23 54/1 56/25 58/17 60/15
60/16 63/18 64/5 64/17 68/15
89/4 93/24 96/10 98/5 100/5
101/8 102/9 112/14 113/16
114/7 116/7 116/16 119/22
121/7 121/12 124/14 130/12
132/20 133/2 140/12 140/13
142/23 147/13 148/10 150/14
151/24 152/22 155/23 165/11
166/25 168/3 170/8 172/12
173/24 174/9 176/25 179/19
180/12 181/4 182/11 187/10
187/18 187/19 187/22 189/9
190/3 190/23 191/7 191/25
195/2 195/3 201/15 208/8
209/5 209/9 212/21 214/19
219/15 219/17 220/14 221/15
**become [2]**  48/18 149/11
**becomes [3]**  153/18 166/21
171/7
**bed [2]**  84/23 164/6
**been [144]**  7/13 9/12 9/20
10/7 11/6 14/4 14/5 22/2
22/9 22/17 22/21 25/15 25/22
25/24 25/25 30/1 30/11 30/23
30/24 31/16 31/20 32/1 32/11
34/2 34/15 34/16 34/20 35/9
36/2 36/11 36/20 37/1 37/16
39/11 39/13 40/21 40/23 43/1
43/15 49/12 51/13 62/18
62/20 64/10 64/12 69/7 69/11
69/25 72/24 75/6 75/10 75/22
78/3 82/14 82/24 84/4 87/25
88/6 90/11 97/14 97/24 98/5
108/18 110/24 112/16 113/3
113/12 116/18 117/13 117/23

121/24 124/1 124/11 125/5
127/23 127/24 129/8 129/15
129/19 132/9 134/1 134/15
134/23 134/24 135/10 136/11
137/11 138/13 138/25 140/19
145/13 145/22 146/25 147/2
148/6 150/24 151/19 152/1
152/13 156/14 160/14 160/15
165/2 165/3 165/5 165/9
167/15 173/25 176/7 176/9
177/12 178/11 180/17 182/16
182/17 188/1 189/10 189/15
189/16 190/10 190/11 190/16
190/18 190/18 190/19 191/8
191/12 192/6 192/7 192/11
192/14 200/7 200/16 201/10
204/13 210/15 212/5 216/24
220/17 221/12
**beer [2]**  161/17 161/21
**beers [3]**  163/11 163/12
163/13
**before [51]**  1/10 17/6 23/17
23/21 26/6 27/6 40/7 42/7
46/20 47/18 53/2 54/4 54/11
54/12 60/7 62/18 64/5 67/5
68/21 70/19 95/8 102/22
104/9 109/8 112/2 117/5
127/9 127/10 132/10 132/15
132/20 145/4 149/2 150/15
153/17 156/25 157/24 158/17
162/16 173/19 178/21 179/1
182/18 189/16 191/22 192/2
196/1 200/15 212/20 218/12
220/7
**beforehand [1]**  77/11
**beg [1]**  130/20
**began [3]**  49/2 49/5 162/9
**begin [4]**  61/9 96/14 134/17
167/24
**beginning [5]**  42/10 46/23
54/10 167/3 195/25
**behalf [6]**  73/11 117/9 141/8
149/14 151/22 160/19
**behavior [2]**  74/2 108/13
**behaviors [1]**  163/22
**behind [1]**  169/1
**being [51]**  17/18 17/19 20/22
22/5 22/6 23/16 24/8 28/6
30/5 30/24 30/25 31/1 31/8
32/14 36/8 36/8 48/11 51/22
52/4 55/17 61/11 62/1 62/3
67/19 67/20 67/21 71/8 72/22
79/17 83/2 84/25 85/15 85/17
100/16 111/13 115/16 138/15
149/5 151/24 152/19 157/22
157/22 157/23 171/15 172/14
177/21 182/16 199/12 204/12
214/14 214/16
**belief [4]**  78/5 78/25 79/1
85/7
**believe [71]**  7/12 8/20 8/20
8/21 9/8 12/25 13/7 21/21
23/14 27/13 30/18 33/7 33/19
35/5 35/8 35/25 36/12 37/19
44/2 46/16 47/24 48/17 49/15
52/13 56/1 68/12 68/17 68/20
76/8 76/20 77/25 78/24 79/23
79/25 84/21 91/25 97/7 97/12
98/14 102/7 102/16 108/20
109/1 109/17 111/8 111/20
124/15 125/12 131/17 134/19

173/7 175/18 176/5 181/4
181/9 201/11 201/19 204/7
207/15 208/6 208/8 209/18
211/18 212/6 216/1 216/6
219/15
**believed [7]**  36/20 37/25
51/12 113/23 119/22 121/12
162/3
**below [1]**  63/9
**belt [1]**  63/10
**bench [3]**  108/16 133/11
197/23
**benefit [9]**  137/3 137/18
137/24 140/18 140/22 140/23
185/15 194/7 194/7
**benefited [3]**  139/16 140/24
151/14
**Beneta [5]**  66/1 66/3 66/11
66/18 66/23
**besides [1]**  187/17
**best [12]**  19/12 25/21 29/8
30/4 33/23 40/24 81/10 82/6
99/5 153/6 165/16 166/15
**better [9]**  14/16 24/19 27/8
81/23 96/21 113/10 167/16
215/12 221/2
**between [14]**  42/8 56/17 58/5
68/3 71/23 81/20 102/13
105/9 129/18 148/13 166/19
168/12 210/14 211/24
**beverage [4]**  162/16 162/22
163/5 163/8
**beyond [4]**  98/12 131/24
190/23 190/25
**bias [2]**  218/20 217/20
**bifurcate [2]**  167/23 169/12
**bifurcating [1]**  168/20
**big [4]**  145/4 149/7 184/20
184/21
**biggest [1]**  12/10
**bill [2]**  5/9 145/16
**billing [1]**  220/16
**billion [1]**  12/7
**billion-dollar [1]**  12/7
**birth [3]**  99/22 120/15 160/3
**bit [8]**  24/15 28/24 29/17
32/2 57/10 58/15 81/13
125/24
**bits [3]**  79/25 83/9 83/12
**Blake [4]**  2/4 211/14 219/10
219/25
**blanket [1]**  62/9
**blinds [1]**  123/2
**blow [1]**  51/16
**board [3]**  20/1 25/7 25/10
**body [2]**  188/13 190/4
**bolster [3]**  17/7 18/9 19/10
**bolstering [1]**  196/14
**borders [1]**  169/10
**BORTZ [67]**  2/8 8/23 8/24 10/6
10/12 13/7 13/16 23/11 24/8
28/14 44/3 44/8 46/14 46/17
47/17 47/18 49/24 49/24
50/17 51/15 76/21 83/1 88/22
90/15 91/5 96/7 125/15
129/13 130/24 131/1 131/8
131/10 134/11 134/19 136/12
139/2 144/2 144/7 146/13
146/19 150/5 151/8 157/16
157/20 159/25 160/2 161/4
168/13 169/20 169/22 170/1

**B**

**BORTZ... [16]** 170/4 171/14
171/15 187/18 188/19 192/12
193/13 193/19 194/25 197/11
202/21 205/12 211/23 213/10
213/15 214/7
**Bortz 242 [1]** 44/8
**Bortz' [15]** 5/5 5/15 11/22
12/13 66/3 66/25 68/23 88/7
94/21 98/22 99/11 169/4
169/20 174/5 212/21
**boss [3]** 54/17 86/10 86/15
**both [19]** 11/4 14/23 25/13
30/12 40/21 60/9 99/11
104/16 112/19 126/17 126/17
127/22 129/6 136/11 146/4
152/8 175/2 184/3 204/7
**bottle [1]** 161/6
**bottles [1]** 161/21
**bottom [3]** 40/5 66/24 203/12
**bottoming [1]** 191/10
**Boutwell [2]** 109/10 109/25
**bowling [3]** 48/17 49/4 85/19
**boyfriend [4]** 54/19 104/5
108/5 108/6
**boyfriends [3]** 107/18 107/23
108/3
**brain [1]** 78/22
**break [7]** 59/16 67/4 67/12
95/7 95/21 127/18 156/20
**Breanna [1]** 103/3
**breast [5]** 70/16 70/21 191/7
195/22 211/21
**breasts [3]** 188/15 189/25
190/9
**breathtaking [1]** 117/3
**brief [5]** 7/1 29/6 116/5
141/13 200/16
**briefed [3]** 135/7 137/2
138/15
**briefly [10]** 9/11 27/7 48/19
58/3 85/18 108/16 133/25
141/1 164/15 169/15
**briefs [1]** 137/1
**bring [12]** 22/2 27/3 42/14
65/25 66/12 71/1 75/16 76/23
98/6 118/8 155/10 170/6
**bringing [2]** 111/17 155/7
**broken [1]** 90/11
**brought [8]** 7/23 24/9 105/8
116/3 134/23 144/22 163/10
173/25
**BROWN [2]** 1/6 1/7
**bruise [1]** 189/1
**bruises [3]** 86/25 87/17
189/24
**bruising [5]** 188/6 188/25
189/4 189/4 191/16
**brutality [1]** 131/13
**brutally [2]** 45/13 120/14
**built [2]** 104/15 210/16
**bulk [1]** 20/2
**bumps [1]** 189/6
**bunch [2]** 188/20 199/5
**bunk [1]** 164/1
**burden [5]** 129/21 130/8
131/24 168/15 185/16
**buried [3]** 123/22 123/23
123/24
**burned [1]** 84/13
**Burnett [1]** 102/6

business [7] 8/20 22/21 89/8
116/9 123/2 176/11 183/6
192/3
**but [211]** 6/10 8/11 8/15 9/13
10/5 10/19 11/17 11/25 12/10
13/6 16/3 16/5 16/9 18/12
20/19 21/16 23/22 24/1 25/13
26/9 27/10 27/21 29/8 29/25
30/3 31/8 31/10 31/21 31/25
32/8 32/11 32/14 32/22 33/3
33/5 34/2 34/5 34/13 34/15
34/17 34/22 34/24 35/9 35/11
35/18 36/19 36/23 37/16
37/20 38/11 38/20 39/10 40/22
41/4 43/12 46/3 46/9 47/12
47/15 49/8 52/13 52/15 53/3
55/1 58/10 61/13 61/14 62/11
62/19 64/13 65/11 67/24
68/22 69/4 69/9 74/1 75/17
79/9 79/11 79/14 79/24 82/21
83/13 84/12 85/9 86/25 92/2
97/3 97/3 97/6 97/16 97/23
103/18 103/20 104/9 105/6
105/20 107/2 108/11 108/19
109/17 109/20 109/24 111/9
112/16 113/5 113/20 113/22
114/4 115/14 115/22 117/6
119/6 119/8 119/15 121/16
122/12 123/17 125/10 125/12
125/14 127/23 132/3 137/13
138/12 139/7 139/10 141/20
141/25 142/7 144/16 144/18
144/20 145/12 145/22 146/17
147/9 147/18 147/23 148/7
149/15 150/9 151/7 151/9
163/15 164/13 166/2 166/15
167/14 168/25 170/7 170/20
172/15 172/21 172/24 174/20
175/1 175/3 175/4 175/8
176/5 176/8 176/16 177/3
179/12 180/10 180/11 181/10
181/18 184/20 185/9 185/25
186/7 186/11 186/13 187/9
187/20 188/11 188/22 189/8
189/23 190/6 190/8 190/17
191/10 191/14 191/20 192/13
193/22 194/17 195/12 196/7
196/11 198/13 199/10 200/4
201/12 201/24 202/12 203/5
205/5 206/21 208/18 208/25
212/1 212/6 212/14 213/6
213/15 214/2 221/2
**but it [1]** 148/7
**buying [1]** 100/18

**C**

**calculated [2]** 33/1 80/3
**call [19]** 43/25 55/23 63/5
93/3 93/19 94/11 97/3 115/6
115/7 115/21 115/22 116/2
118/17 118/21 123/1 159/14
179/18 201/3 220/21
**called [7]** 22/9 22/10 26/1
57/9 118/24 120/13 149/21
**calling [4]** 51/2 104/16 127/8
191/12
**calls [2]** 23/11 114/8
**came [11]** 19/2 25/19 30/1
30/18 33/6 43/7 69/24 110/1
110/2 120/10 134/9
**camel [1]** 155/12
**Camp [9]** 19/2 93/20 94/14

business [7] 205/23
206/4 216/8
**can [122]** 5/7 5/25 6/7 7/10
9/21 18/2 19/23 19/23 19/25
22/3 22/16 24/16 25/19 28/15
29/2 29/4 29/8 29/9 30/4
31/19 42/14 42/22 44/5 46/23
46/25 47/10 48/20 50/10
50/23 56/2 59/3 60/3 62/23
64/19 64/22 65/5 75/9 75/12
75/17 76/22 76/23 79/3 79/9
79/9 79/25 81/9 83/7 83/7
83/9 84/20 85/8 86/23 86/25
86/25 87/3 87/3 87/13 87/14
87/17 87/19 89/11 89/24
90/20 90/21 91/13 91/23 92/1
96/21 96/21 99/8 106/22
106/24 107/20 109/5 109/20
111/7 111/9 113/2 115/5
116/4 117/18 119/4 121/20
123/12 124/18 124/18 126/3
127/12 127/15 132/17 132/19
135/2 138/2 138/4 138/16
139/20 141/23 142/16 145/1
147/18 150/9 151/12 151/15
151/18 158/18 166/15 168/14
178/4 178/5 183/19 186/7
192/18 194/5 196/7 198/13
199/8 203/8 208/11 209/1
209/22 215/18 220/1
**can't [20]** 6/10 12/24 31/25
60/13 60/13 61/19 73/13 79/8
85/13 101/14 125/19 140/11
141/25 145/3 145/3 187/20
200/22 205/3 205/5 215/8
**cannot [3]** 65/6 158/3 165/20
**capacity [1]** 204/10
**caption [2]** 130/23 130/23
**captioned [2]** 131/4 131/14
**captive [2]** 45/15 85/15
**captured [1]** 194/3
**car [6]** 14/9 150/25 177/22
178/13 208/14 208/24
**card [2]** 127/22 160/8
**care [14]** 23/1 105/14 119/2
126/20 204/20 204/21 211/18
211/25 212/6 212/7 212/15
212/16 218/20 218/22
**case [123]** 8/11 8/22 9/4 9/15
17/3 17/8 17/23 21/8 21/14
21/17 21/18 26/14 30/24
32/17 40/19 41/16 43/12
46/12 50/22 57/23 63/16 68/4
68/13 72/10 72/11 72/14 89/1
91/4 96/12 98/24 101/16
102/11 102/19 102/20 108/19
108/20 113/7 114/20 114/21
117/12 118/1 118/10 120/20
122/8 123/7 123/20 124/5
129/13 129/15 129/19 129/22
130/6 130/13 130/19 132/8
134/12 135/5 135/14 135/19
135/23 135/25 136/4 136/5
138/13 138/17 139/18 140/19
140/20 141/12 141/13 143/10
144/12 145/18 145/22 146/10
146/12 147/11 147/23 148/9
149/3 149/8 150/12 151/7
154/1 157/10 166/3 167/3
167/13 167/17 168/20 173/12
173/19 178/16 181/15 181/16
184/21 185/10 185/10 185/11

**case... [24]**  186/18 186/19
188/23 189/12 190/10 190/14
190/15 190/16 190/17 190/17
190/18 191/1 191/8 191/25
192/8 192/15 192/17 197/18
198/7 199/20 200/9 200/25
203/4 210/25
**cases [11]**  10/3 78/1 78/1
135/2 143/19 151/19 153/19
153/20 178/17 186/15 186/18
**Castillo [2]**  162/19 163/10
**category [1]**  85/17
**Cates [3]**  2/3 20/22 202/6
**caught [2]**  64/4 64/5
**cause [15]**  11/19 41/2 85/12
87/13 87/17 87/19 140/2
140/12 141/17 141/21 142/2
147/6 147/8 210/14 222/2
**caused [4]**  144/24 180/20
188/17 191/20
**causes [3]**  41/4 140/11 154/16
**causing [1]**  104/13
**caution [1]**  167/14
**ceased [1]**  164/4
**cell [2]**  186/1 187/1
**cellular [2]**  161/5 164/10
**certain [4]**  6/5 154/25 155/1
183/22
**certainly [39]**  8/19 8/22
31/19 32/22 34/2 34/7 38/24
43/17 47/10 47/12 56/5 58/13
83/18 84/5 85/13 85/16 97/18
99/1 107/24 113/22 121/15
132/9 134/1 134/7 144/17
144/17 147/25 173/10 181/8
182/7 182/10 183/19 188/16
188/23 201/6 204/9 212/3
212/22 218/15
**certification [3]**  25/7 25/10
222/1
**certify [1]**  222/2
**cetera [6]**  49/14 49/14 50/13
50/13 184/17 184/18
**chain [1]**  90/10
**chambers [1]**  185/2
**chance [2]**  215/5 215/6
**change [4]**  199/22 199/25
200/20 200/22
**changed [10]**  12/6 62/20 65/3
65/8 88/7 148/8 173/16
174/24 174/24 215/19
**Chapman [27]**  113/14 113/17
113/18 114/16 115/10 116/2
116/7 116/17 117/19 118/15
119/10 119/17 119/19 119/25
120/2 120/10 121/2 121/4
121/7 121/18 121/24 122/14
122/21 122/24 123/19 125/13
126/13
**Chapman's [1]**  122/10
**character [1]**  72/13
**characterized [1]**  163/15
**charge [17]**  11/15 14/23 129/7
132/19 133/3 135/16 143/9
153/14 184/19 193/12 194/23
195/5 198/6 198/7 215/8
215/11 220/7
**charged [2]**  195/3 212/10
**charges [2]**  15/1 130/9
**CHARLES [31]**  2/8 23/11 24/8

91/5 94/21 96/7 125/14
125/15 129/13 130/24 131/1
131/8 131/10 134/11 139/2
144/7 159/24 160/2 160/2
168/13 193/13 193/19 194/25
197/10 202/21 213/10
**chart [12]**  27/3 27/5 27/7
33/22 35/1 36/6 36/14 36/16
36/18 37/17 38/2 44/6
**chastised [1]**  149/5
**chat [1]**  46/11
**cheap [1]**  213/5
**check [3]**  111/22 213/17
213/20
**cheek [1]**  48/24
**Cheryll [3]**  2/13 222/6 222/7
**chest [3]**  30/13 30/15 33/17
**Chester [1]**  1/22
**chief [6]**  17/3 21/14 68/14
89/1 118/10 157/11
**child [2]**  62/21 91/21
**childhood [1]**  45/4
**choose [1]**  86/15
**chooses [1]**  56/22
**choreographed [1]**  64/18
**chose [5]**  105/6 122/2 122/12
199/15 199/17
**chosen [1]**  64/13
**Ciaravino's [1]**  212/9
**circle [1]**  145/5
**Circuit [11]**  122/4 133/3
135/4 135/16 136/6 136/7
186/19 195/7 195/10 195/14
195/15
**circumstance [4]**  33/1 151/15
151/16 151/17
**circumstances [2]**  62/13
135/13
**citations [1]**  16/12
**cite [2]**  136/4 167/25
**cited [8]**  17/22 135/19 141/13
141/13 143/19 153/20 186/15
186/19
**cites [1]**  135/6
**citizen [1]**  160/1
**Citizens [1]**  120/23
**civil [3]**  132/8 132/8 139/19
**civilians [1]**  120/14
**claim [24]**  6/14 13/18 50/12
114/16 125/23 137/7 137/16
137/16 141/4 141/23 153/3
165/14 169/17 169/19 172/15
172/17 175/20 192/24 198/4
198/24 199/11 200/10 201/19
214/14
**claimed [3]**  6/3 56/18 164/6
**claiming [5]**  50/12 104/14
184/8 193/21 208/4
**claims [15]**  154/17 156/8
173/5 174/10 174/11 174/25
175/1 175/3 186/21 195/4
198/12 199/1 201/7 201/10
201/15
**classic [1]**  151/12
**clause [1]**  152/25
**cleaning [1]**  182/12
**clear [27]**  32/3 52/9 68/21
101/6 107/3 114/4 121/19
123/4 126/7 143/13 144/12
144/15 145/22 147/24 151/7
180/17 181/4 181/7 181/7

196/21 211/24 215/6 219/24
**clear -- I [1]**  181/4
**clearly [14]**  12/22 14/15
14/15 27/18 58/22 97/13
100/5 100/16 100/21 108/18
110/8 140/23 169/6 182/17
**clerical [1]**  50/23
**client [28]**  62/3 62/7 68/3
68/3 129/19 129/22 130/6
130/9 145/14 145/19 149/22
149/24 166/16 166/17 167/10
167/18 167/22 171/9 171/11
184/20 184/22 185/12 189/10
189/16 189/18 191/5 191/24
192/2
**client's [1]**  198/4
**clinician [1]**  56/15
**close [5]**  47/9 55/17 104/25
111/12 157/13
**closely [1]**  51/8
**closeness [1]**  101/16
**closest [1]**  179/18
**closing [4]**  184/16 186/14
199/2 200/19
**clothing [1]**  163/1
**clutches [1]**  195/22
**CM [1]**  2/13
**CMR [1]**  222/7
**code [7]**  7/23 139/19 141/18
141/20 176/11 183/6 187/8
**coerced [1]**  173/7
**coercing [1]**  125/1
**coercion [1]**  86/15
**cognizable [1]**  22/20
**cohabitation [1]**  10/8
**cohabited [1]**  10/3
**coin [1]**  201/12
**colleagues [3]**  108/14 128/21
185/17
**college [3]**  25/1 25/3 46/6
**colloquy [1]**  129/3
**combination [1]**  56/13
**combined [2]**  127/6 197/9
**come [52]**  6/22 8/2 10/21
15/16 19/3 22/22 30/17 31/16
46/12 49/13 57/17 57/21
61/24 62/10 62/17 63/23
63/23 64/8 65/6 68/8 69/5
73/18 73/22 84/2 88/24 91/20
105/4 105/23 112/10 113/6
113/7 117/19 118/4 119/12
119/17 121/4 123/19 124/18
125/12 140/20 141/25 146/3
147/17 153/2 156/21 157/23
174/4 176/3 185/4 185/24
186/2 208/24
**comes [14]**  32/3 41/1 44/6
52/16 53/10 68/6 74/23 74/23
75/3 75/3 103/10 114/23
207/15 218/8
**comfortable [8]**  31/1 31/4
31/7 31/9 31/11 35/16 128/21
208/7
**coming [15]**  27/1 27/6 31/12
32/5 32/19 52/17 52/19 53/2
59/8 81/2 85/25 97/1 112/13
117/13 125/23
**commencement [1]**  160/17
**comment [6]**  124/6 124/10
124/10 125/15 198/17 198/19
**comments [2]**  161/2 195/7

**committed [5]** 136/1 141/7
144/15 151/22 201/25
**common [2]** 129/16 180/21
**communicate [1]** 11/2
**communicating [1]** 80/7
**communications [2]** 75/10
111/16
**company [12]** 1/6 8/6 8/6
137/3 137/23 146/11 150/15
150/22 150/23 151/14 178/4
178/5
**company's [2]** 8/25 144/10
**compared [2]** 54/2 133/2
**compel [3]** 173/4 173/6 173/8
**compensatory [1]** 207/11
**competency [1]** 69/20
**competent [2]** 69/9 69/13
**complain [4]** 8/8 15/22 57/17
177/1
**complainants [3]** 152/15 155/8
155/9
**complained [5]** 8/2 10/22
10/23 71/2 182/9
**complaining [2]** 41/1 140/25
**complaint [6]** 19/3 130/18
131/16 171/22 191/8 200/20
**complaints [4]** 15/24 66/6
66/13 152/17
**complete [2]** 22/20 25/10
**completely [6]** 53/15 79/20
79/22 99/16 163/16 193/4
**completeness [4]** 89/12 96/8
96/9 96/14
**complex [2]** 41/12 42/1
**compliant [1]** 137/8
**complied [1]** 9/22
**composite [1]** 52/16
**compromised [1]** 90/11
**computer [1]** 1/24
**computer-aided [1]** 1/24
**conceal [6]** 153/10 153/10
153/12 155/2 155/7 155/8
**concealed [3]** 15/13 154/21
176/18
**concealing [1]** 178/1
**concealment [16]** 15/25 16/5
152/12 152/14 152/25 153/4
153/14 153/18 154/15 154/20
155/4 156/9 175/6 179/3
181/18 182/25
**conceivable [1]** 87/8
**concept [4]** 137/25 143/12
150/13 150/19
**concepts [1]** 151/7
**concern [5]** 57/10 62/11 179/5
179/6 193/22
**concerned [2]** 138/9 138/9
**conclude [1]** 190/8
**concluded [4]** 51/12 148/17
148/19 175/19
**concludes [10]** 92/6 92/19
93/11 93/17 93/23 94/7 94/16
94/24 95/4 128/10
**concluding [1]** 145/18
**conclusion [1]** 145/15
**conclusively [1]** 168/14
**concocted [1]** 64/17
**condition [4]** 13/13 29/3
60/10 138/21
**conditions [3]** 103/12 177/21

**condom [2]** 165/2 165/5
**conduct [21]** 8/6 11/25 11/25
61/4 61/9 61/10 62/21 123/13
124/15 136/9 136/9 137/3
137/24 139/1 139/1 140/9
141/9 142/19 150/16 176/11
183/7
**confer [1]** 41/23
**conference [2]** 215/8 215/11
**confess [2]** 178/21 179/1
**confident [3]** 141/21 141/25
171/17
**confidential [1]** 176/23
**confidentiality [1]** 152/25
**confirm [4]** 28/25 111/9 123/3
192/22
**confirmed [3]** 165/14 189/3
189/3
**confirms [1]** 134/25
**conflicting [2]** 188/16 188/22
**conform [1]** 129/17
**confronted [3]** 39/5 84/20
84/25
**confused [2]** 62/13 65/2
**confusing [2]** 87/6 193/4
**confusion [1]** 203/11
**Congress [2]** 149/5 173/15
**Congressional [1]** 22/10
**Congressman [9]** 117/1 117/4
117/7 117/13 118/12 119/12
119/22 121/12 121/15
**congruence [1]** 102/13
**conscience [1]** 205/3
**conscious [8]** 38/2 38/5 38/8
53/24 77/9 77/17 77/20 84/6
**consciously [3]** 37/21 37/22
37/24
**consciousness [4]** 35/1 77/1
79/25 82/15
**consecutively [1]** 126/18
**consensual [14]** 85/9 90/3
146/13 146/13 146/16 146/18
146/21 187/22 187/23 188/9
188/9 189/23 190/2 190/2
**consensually [1]** 55/7
**consensus [1]** 192/22
**consent [2]** 85/9 189/23
**consented [2]** 85/10 190/8
**consenting [1]** 131/12
**consider [2]** 202/18 217/22
**consideration [1]** 172/21
**considered [6]** 77/13 137/20
137/21 137/21 137/23 168/5
**consistent [8]** 6/18 10/15
47/5 47/20 68/7 102/17
157/15 173/23
**consistently [4]** 7/19 7/20
7/25 8/1
**conspiracy [3]** 149/7 149/11
149/12
**conspired [1]** 131/9
**constitute [1]** 73/11
**constitutes [2]** 8/16 96/7
**consult [1]** 55/20
**consultation [3]** 30/21 42/23
**consumed [3]** 161/20 163/12
163/13
**consuming [2]** 161/9 161/17
**consumption [1]** 163/9
**contact [3]** 82/6 114/16
118/18

118/18 121/18 122/9 122/18
**contained [1]** 162/22
**container [1]** 45/15
**container/trailer [1]** 45/15
**containerized [1]** 183/25
**contend [1]** 173/2
**contents [3]** 71/15 72/9 72/25
**contest [1]** 118/8
**contested [1]** 108/21
**context [5]** 18/4 56/14 153/24
154/15 178/20
**continually [1]** 157/17
**continue [4]** 47/4 140/25
173/11 178/3
**continued [10]** 2/1 4/2 161/2
161/22 164/13 164/23 165/6
173/5 173/7 173/18
**continues [2]** 8/6 57/4
**continuing [3]** 46/24 47/4
54/11
**contract [7]** 140/21 140/22
152/8 160/5 173/6 207/20
209/14
**contracted [1]** 120/18
**contracts [1]** 12/7
**contradiction [1]** 118/9
**contradictory [1]** 115/9
**contradicts [1]** 121/6
**contrary [6]** 121/3 122/7
153/22 176/4 180/17 193/5
**contrasted [1]** 102/19
**control [1]** 99/2
**controvert [1]** 22/3
**controverting [1]** 120/12
**conveniently [1]** 191/15
**conversation [13]** 26/23
109/13 109/19 109/20 109/21
109/23 110/11 110/18 120/1
122/15 162/2 162/10 164/20
**conversations [4]** 109/25
118/13 122/16 123/3
**conversing [1]** 161/16
**convey [1]** 61/19
**Cooper [2]** 2/10
**copy [9]** 7/8 7/9 16/18 27/14
27/20 67/9 99/1 135/8 216/24
**Corona [2]** 161/6 161/21
**corporate [3]** 10/25 11/2
217/20
**corporation [1]** 11/16
**correct [39]** 18/21 25/17
25/18 27/4 30/9 30/10 30/17
35/3 36/4 37/18 38/4 40/12
41/9 42/21 43/4 43/8 45/3
52/22 53/13 56/23 78/20 79/7
79/8 80/22 80/24 80/25 81/1
81/16 88/5 98/13 111/1 121/2
158/6 214/15 216/14 217/16
218/6 219/22 222/2
**corrected [1]** 69/23
**correcting [1]** 82/1
**cost [6]** 140/20 140/22 173/8
173/18 173/19 212/9
**cost-plus [2]** 140/20 140/22
**could [64]** 11/4 13/7 18/25
19/14 19/22 23/18 24/10
24/15 28/19 29/16 30/17 39/4
40/25 46/14 49/23 50/17
51/16 53/25 64/3 64/8 64/11
69/19 69/25 70/10 77/12
77/14 77/18 78/5 82/21 82/22

**C**

**could... [34]**   84/2 85/13 87/5 87/7 87/18 99/1 100/14 108/2 110/6 113/10 113/23 114/22 116/1 117/4 122/1 134/19 142/3 150/10 150/15 156/4 162/17 164/7 168/21 168/24 181/21 188/23 190/11 190/12 197/3 197/4 198/15 212/4 213/3 218/17

**couldn't [3]**   118/5 122/5 216/23

**counsel [7]**   21/22 58/9 103/25 104/3 126/9 196/7 200/24

**count [2]**   28/11 169/9

**counter [2]**   90/18 128/14

**counterclaim [8]**   170/8 170/10 192/11 200/6 200/8 200/14 200/14 200/17

**counterclaims [1]**   199/6

**country [3]**   85/15 148/4 149/17

**countrymen [4]**   175/12 175/17 177/15 182/1

**couple [8]**   19/6 20/17 64/2 89/1 104/8 138/2 147/2 156/24

**course [21]**   6/20 6/23 12/12 12/17 12/19 13/1 13/2 13/10 13/15 28/3 34/4 128/25 136/1 142/20 142/25 143/11 150/21 153/16 160/12 174/2 206/10

**court [97]**   1/1 2/12 2/14 7/1 9/3 20/5 21/6 22/17 23/21 24/3 24/13 44/22 58/3 59/15 60/7 62/1 63/6 63/22 65/16 81/24 99/1 106/8 112/6 112/25 113/12 115/6 117/4 119/13 124/5 124/7 126/8 127/7 130/1 130/4 131/15 132/10 132/16 133/1 133/11 135/2 135/5 135/6 135/14 135/23 135/25 136/4 138/6 141/12 144/22 147/17 147/19 154/1 156/5 156/15 159/17 167/7 167/10 167/20 167/23 168/16 168/18 170/2 171/22 172/2 172/13 172/16 173/3 173/14 173/17 173/20 173/22 175/18 178/18 184/21 189/20 189/21 193/9 195/3 196/9 196/9 197/2 197/23 199/18 199/25 200/3 200/21 201/6 201/8 201/9 201/11 201/20 203/16 203/18 213/4 218/14 222/1 222/7

**Court hold [1]**   130/1

**Court's [15]**   59/7 59/10 59/11 62/8 62/8 75/5 88/24 97/13 172/18 172/22 172/23 193/6 199/1 199/22 217/9

**courtroom [4]**   5/11 76/9 157/5 183/9

**Courts [1]**   154/3

**cover [4]**   5/7 20/1 105/19 134/3

**covers [1]**   116/8

**coworker [3]**   161/13 162/19 194/2

**coworkers [10]**   175/13 175/18 177/16 182/2 192/25 193/20

**crash [1]**   178/13

**Cream [1]**   162/25

**create [2]**   153/24 181/9

**created [7]**   10/13 13/5 13/6 113/14 142/8 144/23 176/24

**creating [1]**   16/6

**credentials [1]**   64/16

**credibility [5]**   17/19 104/23 104/24 108/20 108/22

**credible [1]**   104/23

**crime [1]**   61/11

**criminal [6]**   139/1 139/14 139/16 139/22 141/24 143/7

**criteria [6]**   38/12 38/17 38/22 39/3 56/3 78/12

**critical [1]**   20/9

**cross [29]**   16/21 16/21 16/23 17/18 17/23 18/3 18/24 19/7 19/9 19/13 19/16 19/17 21/15 21/16 22/12 22/14 68/13 74/1 74/13 80/16 94/3 94/7 94/16 95/1 95/4 95/9 158/1 158/3 203/9

**cross-examination [3]**   16/21 80/16 158/1

**cross-examinations [1]**   16/23

**cross-examine [1]**   158/3

**crosses [1]**   91/11

**cryptic [1]**   42/22

**crystal [1]**   186/13

**CSR [2]**   2/13 222/7

**Cullen [4]**   2/9 202/7 203/20 211/22

**Cullen's [1]**   98/2

**culpability [1]**   213/22

**culture [2]**   10/25 11/2

**cumulative [3]**   16/25 103/23 107/10

**cup [1]**   162/23

**current [1]**   44/25

**currently [2]**   138/15 219/14

**custody [1]**   90/10

**customary [1]**   30/20

**cut [5]**   18/1 18/8 19/23 127/2 188/5

**cuts [27]**   16/25 17/6 17/13 17/17 17/22 18/2 18/14 18/15 18/21 19/20 19/20 19/25 65/19 70/7 70/7 70/8 70/10 91/10 96/22 99/14 126/17 147/9 186/19 196/3 196/6 197/10 200/11

**cutting [1]**   99/8

**CV [1]**   1/4

**D**

**D/B/A [1]**   1/6

**dad [2]**   101/17 104/16

**Daigle [1]**   85/20

**damage [11]**   30/13 33/17 188/15 189/24 190/9 206/1 214/13 214/14 214/21 220/6 220/25

**damaged [3]**   188/13 192/15 192/15

**damages [26]**   103/15 103/17 104/8 136/3 174/11 174/14 174/14 202/18 204/2 204/3 205/9 205/18 207/10 207/12 209/13 209/16 210/5 210/8 213/3 213/10 213/14 213/23

**danger [1]**   69/20

**dangerous [5]**   13/12 68/15 68/17 69/25 176/15

**dangerousness [1]**   69/23

**dangers [1]**   183/4

**Daniel [1]**   2/5

**Darington [1]**   1/21

**dash [1]**   130/24

**date [11]**   18/12 25/11 33/8 48/8 50/2 50/7 83/16 120/15 159/14 160/3 222/4

**dated [8]**   44/5 52/2 89/19 89/19 111/19 111/20 119/16 120/25

**dates [1]**   25/14

**daughter [8]**   100/18 100/19 101/1 106/12 106/19 110/3 110/7 120/14

**David [2]**   160/2 162/17

**Dawn [2]**   41/18 44/6

**day [15]**   18/5 22/4 29/11 29/11 83/13 114/3 119/16 123/2 165/7 165/21 181/13 189/2 189/20 190/13 192/6

**days [3]**   129/9 129/10 171/22

**dead [2]**   123/23 123/24

**deal [1]**   123/17

**dealing [2]**   16/24 153/23

**deals [2]**   49/19 78/17

**dealt [1]**   22/6

**death [1]**   45/11

**debating [2]**   184/25 185/2

**debating whether [1]**   184/25

**December [1]**   51/25

**decide [4]**   9/8 20/20 115/22 203/5

**decided [2]**   127/7 147/6

**decides [2]**   189/22 197/2

**decision [4]**   11/22 132/13 199/21 213/8

**decisions [1]**   112/25

**declarant's [1]**   68/7

**deeply [1]**   34/21

**defamation [7]**   143/10 198/4 198/23 199/1 200/7 200/10 201/15

**defamations [1]**   199/6

**defames [1]**   143/11

**defend [4]**   138/4 167/10 190/14 190/18

**defendant [15]**   2/2 2/8 17/15 65/25 92/20 94/9 134/2 141/7 141/8 141/8 169/10 170/23 171/6 171/7 171/21

**defendant's [1]**   141/10

**defendants [11]**   1/8 17/20 23/9 93/2 94/10 94/19 115/4 115/20 131/1 131/2 169/18

**defendants' [5]**   9/9 18/18 22/19 113/12 197/10

**defended [5]**   130/13 190/11 190/15 190/15 190/17 190/17

**defense [14]**   15/2 20/23 22/4 26/17 68/14 70/25 123/11 140/4 140/6 167/1 167/19 168/4 169/20 169/21

**defense' [3]**   9/4 9/4 14/25

**defenses [1]**   215/25

**defer [1]**   172/3

**define [3]**   85/12 205/16 205/16

**defines [1]**   213/11

**definite [1]**  131/18
**definitely [1]**  221/17
**definition [8]**  14/25 15/1
  34/24 79/7 153/11 209/5
  210/23 211/15
**definitions [3]**  14/24 203/22
  217/6
**definitive [1]**  85/14
**degree [1]**  213/22
**delay [1]**  128/22
**deliberate [2]**  202/18 217/18
**delineation [1]**  211/24
**delve [1]**  34/21
**demonstrated [1]**  9/17
**demonstrating [1]**  138/19
**denial [1]**  49/21
**denied [5]**  5/6 5/15 22/2
  164/8 171/15
**denies [2]**  100/10 100/22
**deny [2]**  6/18 186/5
**depart [1]**  161/13
**departed [2]**  161/23 161/25
**department [28]**  8/14 9/23
  9/24 88/23 89/17 90/13 95/9
  98/23 118/24 118/25 120/2
  122/8 122/22 138/14 145/15
  145/24 145/25 146/1 146/8
  147/4 148/14 148/22 157/1
  157/8 157/12 157/16 159/20
  159/22
**depend [1]**  146/8
**depending [1]**  85/7 220/22
**depends [2]**  30/22 188/4
**depo [2]**  105/10 156/18
**deponent [2]**  72/15 72/16
**deponent's [1]**  17/7
**deposed [1]**  117/16
**deposition [24]**  17/4 19/25
  65/19 91/7 92/14 93/4 94/11
  94/21 99/12 100/4 105/5
  109/13 112/15 113/14 114/6
  126/2 126/10 128/2 158/2
  158/16 158/25 196/2 202/19
  218/2
**depositions [6]**  17/21 20/11
  20/18 21/4 95/6 196/15
**depressed [2]**  32/5 103/1
**depression [10]**  40/7 41/7
  46/25 47/7 47/16 47/21 103/7
  103/10 103/16 107/14
**deps [1]**  91/4
**describe [2]**  45/4 45/20
**described [1]**  162/1
**description [3]**  165/14 190/4
  202/22
**designated [2]**  19/6 97/9
**designation [3]**  16/20 66/19
  97/15
**designations [4]**  20/22 20/23
  95/9 97/24
**despicable [2]**  63/6 64/12
**despite [2]**  119/9 119/9
**detail [3]**  37/17 46/8 77/4
**detailed [4]**  41/13 55/21
  62/23 165/14
**details [3]**  35/9 44/16 49/8
**determination [1]**  146/1
**determine [4]**  140/13 150/6
  160/16 180/18
**deterring [1]**  65/7

**developed [1]**  137/1
**Development [1]**  42/10
**develops [2]**  64/15 78/4
**diagnosis [9]**  32/16 38/9
  64/21 83/25 84/9 86/7 86/17
  88/4 88/7
**diagnostic [2]**  38/22 39/3
**did [96]**  6/1 6/2 6/18 6/19
  7/1 7/10 7/18 8/4 8/14 10/11
  13/11 15/11 16/19 19/8 22/13
  24/23 25/1 25/5 25/10 27/3
  27/5 27/7 27/23 27/25 28/10
  35/6 35/8 36/5 36/10 36/12
  38/9 40/6 47/22 48/18 48/21
  50/13 62/17 63/15 63/21 69/5
  81/7 81/23 84/7 84/23 85/3
  86/21 104/5 112/7 115/22
  119/2 119/12 119/17 119/19
  119/20 121/9 123/19 129/10
  138/25 140/8 144/1 144/6
  144/18 145/16 146/3 146/20
  146/22 148/17 148/19 150/5
  150/8 153/2 154/12 154/15
  155/15 161/3 163/12 163/22
  164/7 164/14 164/16 165/15
  165/16 173/11 176/16 196/3
  200/5 200/7 200/14 202/20
  206/7 206/8 206/15 211/21
  212/12 212/14 220/14
**didn't [62]**  6/12 6/20 7/3
  8/15 10/4 10/12 15/12 15/12
  15/14 19/17 27/24 35/17
  36/15 36/17 37/17 43/24
  61/15 61/16 69/6 69/9 69/10
  75/1 84/6 105/14 109/14
  114/14 119/14 125/11 137/8
  140/18 140/23 144/7 147/7
  149/2 153/4 155/3 155/4
  155/10 155/11 155/19 155/19
  155/21 155/22 155/23 167/2
  169/6 173/18 176/18 176/19
  176/20 179/21 179/23 189/23
  189/24 189/24 190/8 211/22
  212/20 212/22 213/14 213/16
  216/25
**Diego [3]**  48/16 49/16 85/19
**differ [1]**  130/20
**difference [3]**  85/20 129/18
  154/19
**differences [2]**  184/19 202/14
**different [20]**  18/14 48/22
  53/8 55/22 57/10 79/16 79/17
  84/15 90/4 105/21 139/9
  151/16 151/16 155/14 171/4
  174/14 184/13 198/25 201/2
  220/24
**differently [1]**  65/5
**differing [1]**  151/6
**difficult [3]**  6/21 108/19
  185/12
**difficulty [1]**  128/7
**diligence [8]**  166/22 167/21
  168/8 168/15 168/15 168/19
  168/22 169/2
**dilute [1]**  203/4
**dilutes [1]**  129/21
**Diplomatic [2]**  89/18 138/13
**dire [2]**  199/4 200/8
**direct [33]**  16/23 17/11 17/16
  17/17 17/22 18/4 18/18 18/24
  19/1 19/9 19/10 19/12 19/13
  19/17 21/15 21/16 24/5 72/9

  73/6 79/8 79/15 92/6 93/3
  93/23 94/17 94/24 104/18
  144/12 156/15 160/25 163/14
  163/21 164/19
**directed [9]**  5/4 5/6 5/15
  5/16 132/15 163/19 172/10
  186/4 198/22
**directing [1]**  120/7
**direction [2]**  48/10 53/8
**directly [13]**  23/25 30/9 33/6
  74/12 103/17 104/11 104/13
  104/23 119/1 119/1 120/11
  173/23 174/12
**directs [1]**  91/11
**disability [1]**  56/18
**disagree [2]**  18/20 148/25
**disagreement [1]**  207/20
**disagreements [4]**  65/20 97/19
  99/4 112/9
**disclose [9]**  6/1 14/7 14/16
  14/18 16/7 154/8 154/14
  179/8 210/24
**disclosed [3]**  21/19 55/13
  64/10
**disclosing [1]**  60/23
**disclosure [14]**  6/11 14/2
  15/4 152/7 154/17 154/20
  156/9 175/6 176/1 176/4
  178/19 178/25 179/12 186/12
**discount [1]**  32/22
**discovery [6]**  122/6 122/10
  123/13 190/12 190/13 190/19
**discredit [1]**  74/22
**discrepancy [1]**  56/17
**discretion [2]**  198/16 221/3
**discuss [3]**  68/14 200/14
  201/21
**discussed [4]**  39/18 61/20
  90/16 136/23
**discussing [1]**  26/25
**discussion [9]**  21/22 42/8
  55/24 58/5 71/23 129/4
  133/11 197/23 221/10
**disfavor [1]**  75/5
**disfigurement [6]**  204/8
  204/23 204/24 211/25 219/1
  219/2
**disinhibit [1]**  83/23
**dismiss [5]**  6/12 6/13 171/23
  199/15 199/17
**dismissal [1]**  198/23
**dismissed [3]**  13/19 201/7
  201/10
**dismissing [1]**  199/1
**disorder [15]**  38/10 38/13
  38/23 77/24 78/5 78/10 78/15
  78/19 80/3 83/25 84/4 84/10
  85/12 88/4 88/11
**dispatched [1]**  118/25
**dispositive [2]**  137/14 137/15
**disregards [1]**  191/5
**distinct [1]**  143/4
**distinction [2]**  12/11 186/12
**distinctions [1]**  22/14
**distressed [1]**  27/15
**distressing [1]**  27/18
**district [12]**  1/1 1/1 1/11
  2/14 135/3 135/20 148/7
  154/2 154/6 154/10 154/12
  178/18
**districts [1]**  148/4
**disturbing [1]**  27/22

12

**dividing [1]**  179/9

**DIVISION [1]**  1/2

**divorce [3]**  45/12 102/4 102/8

**DMV [1]**  77/25

**DNA [1]**  89/22

**DNA's [1]**  89/23

**do [159]**  7/18 19/13 20/7
21/11 21/13 21/16 23/20
24/21 26/23 27/8 27/11 28/19
29/8 30/20 30/25 33/24 34/4
34/9 35/10 36/19 37/8 37/10
38/12 40/8 40/13 40/19 44/18
45/16 45/21 47/21 48/4 48/10
49/9 50/2 55/25 56/3 58/25
59/4 60/12 61/14 61/15 61/16
61/23 61/25 62/25 63/2 63/3
64/13 65/19 67/22 67/23
71/10 71/16 78/16 78/21
79/25 81/11 86/10 86/24
88/20 90/18 90/19 90/19
90/21 90/22 91/2 91/23 92/7
92/21 92/22 93/13 93/15 95/8
95/9 95/13 96/10 97/3 97/5
98/2 99/4 99/5 99/20 101/11
103/5 106/3 107/19 108/20
108/21 108/22 109/13 109/19
109/20 114/4 123/16 124/8
124/21 125/7 125/10 127/9
127/12 128/15 129/3 130/14
130/16 133/12 137/4 140/25
141/18 142/4 142/15 144/1
144/6 146/10 149/25 152/11
157/19 158/2 158/2 158/16
158/18 159/12 159/12 167/9
170/15 174/8 174/8 174/13
177/3 177/19 178/4 178/5
181/2 185/19 185/21 189/25
189/25 192/5 192/18 195/12
195/13 195/14 197/10 197/20
198/3 200/21 205/15 207/20
209/6 210/11 211/1 213/25
216/12 216/18 217/5 218/19
218/19 218/23 218/25 219/4

**doctor [24]**  20/15 22/8 22/12
22/24 23/17 28/24 46/20 50/2
57/1 59/21 59/23 60/12 61/23
61/24 75/22 80/18 81/7 82/9
82/18 86/14 86/19 87/24
88/18 146/22

**doctor's [1]**  52/2

**doctors [3]**  103/20 211/21
220/17

**document [12]**  90/24 116/7
116/11 117/2 118/12 118/14
119/23 121/7 121/19 123/15
124/17 125/13

**documentation [1]**  191/17

**documented [5]**  106/20 122/16
151/12 190/5 191/22

**documenting [1]**  49/10

**documents [12]**  15/14 58/2
112/23 116/9 116/16 119/15
119/16 125/24 147/25 191/16
191/17 197/13

**Doe [5]**  130/25 131/3 131/8
131/11 194/25

**does [37]**  7/16 11/1 11/12
21/9 22/22 28/7 38/22 38/25
39/8 43/18 45/25 48/7 51/11
52/2 61/18 63/24 68/8 75/14

103/18 108/12 110/9 111/1
123/8 129/17 141/16 142/24
170/3 182/21 186/17 195/9
198/21 205/7

**doesn't [48]**  9/16 12/23 13/2
13/10 13/15 19/24 44/22
58/12 59/7 63/23 71/14 72/8
76/12 79/13 79/19 85/8 86/18
96/15 100/3 100/5 100/9
102/1 103/21 104/5 104/22
104/22 105/15 105/19 105/23
107/10 120/25 123/6 126/8
134/17 135/10 135/11 137/5
149/9 149/12 154/17 171/20
186/6 188/11 190/3 191/15
199/18 201/24 205/12

**dog [2]**  142/6 149/4

**doing [3]**  82/6 159/3 200/24

**DOJ [2]**  8/14 147/11

**dollar [1]**  12/7

**dollars [1]**  148/23

**don't [222]**  5/24 5/24 6/5
6/10 7/13 8/16 9/1 10/2 10/5
10/8 11/9 11/10 12/3 12/7
13/10 13/20 16/8 19/10 23/1
23/10 25/11 25/13 26/9 27/9
27/12 28/8 30/3 31/19 31/23
32/15 32/16 32/18 34/7 34/15
34/17 34/21 35/8 35/11 35/13
36/15 36/19 37/13 37/16
37/24 38/7 38/17 38/20 44/20
46/16 49/7 51/19 52/12 56/5
57/12 59/22 62/19 63/23
63/24 64/22 64/24 65/3 65/5
65/8 68/20 69/22 70/20 70/21
74/7 75/4 75/14 78/17 78/24
79/23 80/10 83/8 83/23 84/12
86/6 88/21 89/11 98/21 99/15
99/18 99/19 99/23 99/23
100/25 100/25 101/2 101/11
101/21 101/22 102/1 102/1
103/2 103/4 104/6 104/6
105/6 105/16 105/17 105/18
105/20 105/25 106/1 106/5
106/7 107/4 107/5 107/5
107/6 107/17 109/23 114/18
115/7 116/6 116/18 121/4
124/23 124/24 125/8 126/12
126/20 127/16 128/22 129/5
131/17 132/16 132/23 133/23
135/7 137/20 138/23 138/24
140/10 141/19 142/6 143/1
144/25 148/21 150/9 156/13
157/6 166/25 167/2 167/16
168/25 169/1 169/5 169/12
172/1 176/5 176/8 179/13
179/14 180/9 180/16 181/2
181/4 181/6 181/7 181/9
181/10 181/12 181/13 181/15
181/16 181/18 181/19 182/2
183/17 183/18 184/7 185/25
186/1 187/16 187/22 187/23
188/11 188/11 188/11 190/21
191/2 191/13 192/4 192/5
194/9 196/11 196/14 197/1
198/5 198/10 198/12 198/13
198/15 198/16 198/22 199/14
200/3 201/24 203/1 203/2
204/17 207/17 208/6 208/8
208/9 208/19 210/15 210/20
211/17 211/17 212/2 212/3

214/19 220/25 221/13 221/18

**done [20]**  8/8 17/21 59/6
74/25 85/22 91/4 96/12 96/23
97/3 97/10 97/25 98/11 117/5
127/17 136/22 150/11 156/7
156/16 177/8 194/18

**door [9]**  123/1 164/2 171/15
176/20 176/22 177/1 194/15
194/16 199/11

**DOS [1]**  120/23

**dose [1]**  27/16

**doubt [1]**  190/25

**dovetails [1]**  45/24

**down [35]**  9/25 24/9 24/14
27/6 28/20 28/21 28/21 29/2
29/6 33/20 35/18 37/1 39/24
40/4 42/10 56/12 59/21 65/20
65/22 77/7 77/15 77/16 81/4
81/11 81/22 88/18 101/14
119/13 134/13 134/15 136/14
137/22 152/21 191/7 191/12

**downstairs [1]**  91/21

**Dr [1]**  65/14

**Dr. [27]**  19/8 23/11 23/13
24/7 25/23 26/3 27/19 27/23
46/13 48/3 48/8 48/19 48/21
49/9 49/17 50/23 50/24 53/3
60/20 64/3 102/6 105/8
115/15 189/3 191/16 191/17
212/9

**Dr. Burnett [1]**  102/6

**Dr. Ciaravino's [1]**  212/9

**Dr. Paskowitz [4]**  23/11 23/13
24/7 115/15

**Dr. Scarano [3]**  60/20 64/3
105/8

**Dr. Scarano's [5]**  27/23 46/13
48/19 48/21 49/9

**Dr. Schulz [4]**  19/8 189/3
191/16 191/17

**Dr. Scott [2]**  48/8 50/24

**Dr. Scott's [2]**  49/17 50/23

**Dr. Terri [1]**  48/3

**Dr. Victor [1]**  27/19

**Dr. Weinberg [3]**  25/23 26/3
53/3

**draft [1]**  128/24

**draw [3]**  35/19 75/15 199/8

**drawer [1]**  152/18

**dreams [1]**  79/10

**dressed [1]**  80/6

**drink [4]**  76/12 83/2 163/18
194/8

**drinking [1]**  161/9

**drinks [1]**  48/11

**driving [1]**  150/22

**drop [8]**  39/24 40/4 56/12
71/25 71/25 173/18 191/7
191/12

**drop-down [2]**  191/7 191/12

**dropped [1]**  192/10

**dropping [2]**  221/14 221/17

**drug [11]**  36/11 37/16 45/18
45/19 79/1 79/15 79/18 82/15
83/14 100/9 131/9

**drug/alcohol [1]**  45/19

**drugged [2]**  36/20 37/20

**drugging [2]**  187/25 188/3

**drugs [12]**  78/22 83/15 83/17
100/16 100/18 101/4 101/8
101/24 102/24 103/11 103/12

**D**

**drugs... [1]** 107/13
**DSM [8]** 38/12 38/17 38/19 38/23 38/24 56/3 77/25 78/12
**DSM-IV [5]** 38/12 38/17 38/19 56/3 78/12
**due [12]** 62/2 142/7 145/8 162/23 166/21 167/21 168/7 168/14 168/15 168/19 168/22 169/1
**DULY [1]** 24/4
**duplicative [2]** 17/1 19/21
**during [33]** 19/2 22/24 25/5 29/8 31/3 35/15 38/3 40/17 47/25 77/17 78/6 79/2 82/4 102/4 102/5 104/11 109/12 118/6 122/5 122/9 157/10 160/12 164/6 165/15 170/19 171/13 179/20 179/24 188/18 190/12 200/9 202/17 217/15
**duties [1]** 154/4
**duty [12]** 14/18 153/17 153/18 153/19 153/22 154/8 154/11 156/10 175/20 176/5 202/18 217/18

**E**

**e-mail [16]** 80/8 109/9 109/15 109/20 110/10 110/23 111/6 115/2 119/10 134/4 138/7 138/11 138/22 148/18 169/4 171/9
**e-mailed [2]** 215/15 216/25
**e-mails [13]** 109/1 109/16 111/8 111/19 111/24 111/25 134/2 144/3 147/19 147/22 148/12 148/12 148/16
**each [4]** 20/19 108/10 178/9 197/24
**earlier [9]** 69/5 136/24 138/8 159/18 163/2 178/16 178/17 185/6 215/4
**early [1]** 76/1
**earning [1]** 204/10
**earnings [6]** 204/10 204/24 204/25 210/7 210/7 219/4
**easiest [1]** 211/4
**easily [1]** 151/15
**Eastern [1]** 154/2
**eavesdropping [1]** 220/22
**ECF [2]** 221/13 221/14
**edit [1]** 20/18
**edited [1]** 20/20
**education [1]** 24/23
**EEOC [1]** 194/23
**effect [9]** 55/23 69/3 85/24 104/9 125/3 169/5 171/17 171/18 193/14
**effectively [2]** 124/1 219/15
**efficiency [1]** 19/15
**effort [1]** 64/18
**efforts [2]** 166/16 168/9
**egregious [3]** 124/7 124/14 124/15
**eight [3]** 148/23 149/16 169/1
**either [19]** 21/7 48/9 60/17 63/23 77/18 90/6 100/20 142/2 170/13 174/5 175/22 184/9 186/20 190/2 193/19 194/24 198/14 201/12 220/17
**ejaculate [2]** 164/7 165/15

**elapsed [1]** 162/17
**elements [8]** 141/5 143/8 191/4 212/25 213/1 213/3 220/6 220/25
**elicited [1]** 75/13
**Elizabeth [1]** 25/22
**ELLISON [1]** 1/10
**Elmo [1]** 56/2
**eloquent [1]** 101/16
**else [17]** 6/6 22/19 39/6 61/16 72/3 115/25 117/14 126/15 140/11 159/12 187/6 187/21 192/19 197/12 199/6 201/4 201/13
**embedded [2]** 203/21 211/15
**emergency [1]** 50/14
**emotion [1]** 104/22
**emotional [6]** 43/15 44/25 45/11 52/8 100/24 104/12
**emotionally [2]** 43/2 43/3
**employee [18]** 11/16 73/6 73/7 73/8 73/9 109/10 135/1 136/2 140/1 140/9 143/11 151/14 153/8 154/5 160/5 160/13 178/22 179/2
**employee's [3]** 136/8 136/22 139/24
**employees [8]** 92/15 109/1 144/13 146/9 153/25 178/21 179/1 183/7
**employer [13]** 16/7 134/25 136/2 136/8 139/15 139/20 139/21 139/25 140/8 142/11 153/7 154/5 176/3
**employer/employee [1]** 154/5
**employers [3]** 153/24 178/21 179/1
**employment [24]** 6/20 6/23 12/13 12/17 12/20 13/1 13/3 136/1 136/23 139/25 142/20 143/12 150/21 152/8 153/23 154/7 154/14 174/3 174/6 174/9 175/24 178/20 207/20 209/14
**empty [1]** 161/6
**encompassed [1]** 52/13
**encompasses [1]** 17/14
**encounters [2]** 55/7 108/10
**end [10]** 29/7 54/12 55/8 90/12 93/24 123/12 125/22 160/24 200/6 221/13
**ended [1]** 27/16
**ends [1]** 165/18
**enforce [9]** 6/2 6/19 12/4 12/8 115/24 176/18 176/19 176/20 183/10
**enforced [7]** 10/8 176/13 176/15 176/17 177/9 179/14 183/7
**enforcement [1]** 13/17
**enforcing [2]** 179/16 183/11
**engage [2]** 162/9 165/16
**engaged [2]** 164/9 164/23
**engaging [1]** 80/7
**England [2]** 170/24 170/25
**enlarge [2]** 42/13 76/22
**enormous [1]** 117/23
**enough [8]** 5/18 6/4 31/11 47/9 83/20 181/9 199/5 197/5
**enter [5]** 127/10 157/5 175/24 207/20 209/14

**entering [1]** 5/11
**enticed [1]** 173/7
**entire [4]** 54/18 76/18 122/8 138/22
**entirely [5]** 79/17 97/4 127/24 138/20 163/25
**entitled [5]** 62/5 126/5 169/21 212/23 222/2
**entry [2]** 120/25 122/7
**enures [1]** 142/10
**environment [15]** 5/17 10/13 10/22 13/5 13/6 13/16 13/22 14/13 176/24 180/6 186/6 186/8 205/15 205/20 218/10
**equally [1]** 115/16
**ER [1]** 48/25
**Eraka [1]** 162/3
**Eric [2]** 107/22 193/7
**Erie [1]** 168/1
**error [4]** 132/22 132/24 168/25 218/19
**escape [1]** 179/2
**especially [5]** 30/22 31/23 41/15 108/17 153/13
**essential [4]** 56/7 56/7 129/25 130/4
**essentially [2]** 130/10 200/2
**establish [1]** 148/9
**established [1]** 90/10
**Estefan [5]** 1/17 5/11 134/20 143/19 192/23
**et [6]** 49/14 49/14 50/13 50/13 184/17 184/18
**et cetera [6]** 49/14 49/14 50/13 50/13 184/17 184/18
**evading [2]** 171/11 171/12
**evaluation [4]** 29/21 29/25 35/14 35/16
**even [37]** 8/24 12/2 12/5 15/14 15/19 34/18 39/16 43/20 53/23 61/8 63/24 65/6 71/16 80/7 84/4 84/15 84/17 110/23 111/21 124/24 133/22 134/17 137/8 138/23 139/24 140/6 143/2 144/10 147/10 153/2 155/21 169/23 173/17 176/24 186/7 190/8 190/21
**even-toned [1]** 80/7
**evening [6]** 90/6 134/15 161/4 161/23 162/24 221/19
**event [28]** 33/5 35/11 38/15 39/2 41/2 54/5 55/9 55/13 57/22 67/6 78/3 78/4 78/11 78/18 79/12 79/23 79/24 80/3 82/21 84/14 84/19 85/24 86/6 106/18 167/13 167/17 190/4 191/14
**events [12]** 41/5 41/20 45/10 49/18 55/15 55/17 57/22 76/18 77/11 83/10 83/24 161/22
**ever [13]** 18/1 26/6 36/10 43/1 78/22 101/11 103/3 113/3 114/20 117/5 119/20 150/15 199/3
**every [4]** 125/24 149/8 150/16 176/4
**everybody [3]** 5/8 69/24 151/22
**everyone [1]** 24/16
**everything [9]** 16/7 61/13

**everything... [7]**   74/8 117/14 119/2 140/11 148/1 181/11 199/6

**evidence [146]**   5/18 5/23 5/25 6/8 6/12 7/20 8/9 8/19 8/20 8/20 8/21 9/6 9/6 9/15 9/17 9/22 10/2 10/14 11/6 13/24 14/5 14/14 16/4 17/19 21/9 21/10 48/9 50/22 54/7 60/7 62/10 62/10 63/8 64/4 64/18 69/5 69/15 72/12 72/13 88/22 88/25 88/25 89/23 90/15 96/2 96/6 96/12 96/15 111/9 112/4 113/6 115/5 115/20 118/2 118/4 118/10 125/9 125/10 126/3 131/21 134/2 134/12 136/11 138/25 140/8 140/8 140/14 140/19 140/20 142/1 143/23 144/9 145/17 145/21 145/22 146/5 146/15 147/16 147/17 149/13 149/13 152/2 155/3 155/11 155/15 155/21 155/22 155/25 156/13 157/22 157/23 158/17 167/21 168/18 171/11 171/12 171/14 171/17 177/3 177/13 177/17 178/12 179/15 182/3 182/5 182/6 182/18 187/10 187/11 187/23 188/5 188/7 188/8 188/12 188/22 188/23 188/25 190/1 190/3 190/16 190/23 191/4 191/15 191/18 191/19 191/20 192/8 194/11 194/21 195/6 198/9 200/10 200/13 200/25 204/7 204/9 204/11 205/2 205/4 205/6 208/17 208/19 210/15 211/18 212/6 220/17

**exact [8]**   17/2 25/11 25/14 49/7 105/1 109/23 158/9 196/8

**exactly [13]**   12/14 35/13 41/1 52/12 67/15 77/14 89/3 121/6 147/1 185/9 201/21 208/10 210/20

**exaggerated [1]**   56/9

**examination [12]**   16/21 17/11 24/5 25/7 56/16 65/14 76/1 80/16 93/4 104/18 154/13 158/1

**examinations [2]**   16/23 16/23

**examine [1]**   158/3

**example [12]**   19/1 19/1 56/14 57/2 82/9 83/10 90/23 99/20 170/23 191/15 208/11 209/1

**examples [1]**   151/11

**except [4]**   22/17 77/10 123/2 142/22

**exception [1]**   200/15

**excerpt [4]**   92/14 93/4 159/1 159/20

**excerpts [7]**   21/19 22/19 70/8 91/7 98/22 115/2 158/24

**excluded [1]**   113/12

**excuse [9]**   6/2 59/14 106/4 123/10 123/10 125/18 165/20 187/21 200/4

**excused [1]**   114/3

**exemplary [7]**   213/10 213/14 213/23 214/7 214/8 214/13 214/22

**exercise [3]**   168/13 194/8 198/16

**exercised [2]**   168/19 194/16

**exhausted [1]**   193/9

**exhibit [23]**   49/24 111/10 112/1 112/18 112/20 113/24 114/4 114/14 114/20 114/21 114/23 115/11 116/24 118/3 118/9 119/21 121/4 121/10 126/11 134/5 138/12 157/18 163/22

**exhibit is [2]**   112/18 115/11

**exhibit list [2]**   112/1 114/14

**exhibit lists [1]**   126/11

**exhibit means [1]**   114/21

**exhibits [13]**   89/2 112/1 112/6 112/8 112/16 112/24 113/3 113/7 113/9 113/9 134/12 196/16 220/15

**existence [1]**   154/4

**exists [3]**   142/23 154/7 176/5

**expanded [1]**   148/10

**expect [6]**   22/13 51/6 58/24 80/4 80/9 119/12

**expected [3]**   52/10 117/14 170/14

**expedite [1]**   48/20

**expense [1]**   173/10

**expenses [10]**   204/20 204/21 211/18 212/1 212/7 212/15 212/16 218/20 218/22 220/19

**experience [7]**   38/14 39/1 39/8 53/18 74/7 74/22 84/14

**experienced [3]**   39/4 39/16 80/2

**experiencing [4]**   35/23 76/3 84/18 84/19

**expert [3]**   83/18 106/22 106/25

**experts [2]**   204/9 205/2

**explain [12]**   83/7 105/6 115/7 116/14 118/9 119/17 119/23 121/13 121/20 165/3 199/21 199/24

**explained [5]**   113/11 113/15 115/5 162/6 164/13

**explaining [2]**   116/15 154/15

**explanation [3]**   113/25 121/1 124/20

**express [1]**   77/5

**expressing [1]**   47/20

**expression [1]**   208/4

**extent [4]**   84/15 111/11 201/6 205/1

**external [1]**   56/10

**extremely [1]**   181/6

**eye [1]**   82/6

**eyeball [1]**   215/4

**F**

**F.3d [2]**   135/15 136/6

**fabrication [1]**   157/15

**face [2]**   106/24 167/4

**faced [1]**   150/10

**facie [2]**   8/22 134/2

**fact [75]**   6/3 9/4 9/6 10/11 10/11 10/12 12/6 13/4 13/6 13/8 13/4 14/5 15/9 15/10 37/17 37/21 44/9 57/18 58/19 60/18 61/1 63/17 63/11 64/10 76/11 82/25 83/15 86/14 100/22 104/20 106/1

**...** 117/25 118/11 119/25 121/6 125/12 137/2 137/13 142/18 144/8 144/9 147/10 149/15 153/17 155/7 162/24 169/23 171/9 173/5 173/21 173/23 175/11 175/15 176/18 176/21 176/24 177/11 177/13 178/12 181/9 181/24 182/9 182/19 182/20 183/3 183/10 192/17 200/19 207/24 208/3 208/13 208/22 209/1 213/22

**factor [1]**   58/22

**facts [6]**   9/9 57/11 136/3 150/25 153/15 200/20

**factual [1]**   131/15

**factually [1]**   185/10

**faculties [2]**   163/23 165/4

**fail [2]**   15/12 206/15

**failed [5]**   6/1 14/7 14/16 158/2 170/6

**failing [1]**   11/1

**fails [1]**   134/25

**failure [6]**   154/14 179/7 210/24 215/21 215/23 215/24

**failure's [1]**   152/12

**fair [9]**   20/3 31/18 35/23 39/3 41/14 77/17 83/20 153/23 197/5

**fairly [6]**   43/9 47/5 47/20 64/16 180/24 184/18

**fairness [1]**   96/25

**faith [1]**   153/22

**Falanga [1]**   148/13

**fall [1]**   85/17

**falls [1]**   166/20

**false [10]**   56/8 178/12 183/16 207/24 208/2 208/3 208/4 208/12 208/18 208/20

**falsity [1]**   211/7

**familiar [8]**   48/16 48/18 49/7 56/5 83/16 84/2

**family [8]**   30/1 30/18 30/21 31/2 44/13 45/4 84/3 103/12

**far [10]**   6/21 15/20 19/19 25/12 28/21 60/11 83/22 97/14 176/2 185/8

**fashion [5]**   38/16 53/20 80/7 168/10 168/24

**fast [2]**   110/13 160/9

**father [21]**   45/8 54/18 100/21 100/22 101/1 101/5 102/17 104/9 104/20 105/9 105/13 105/13 105/23 106/9 106/10 106/12 118/18 118/18 120/13 120/21 128/2

**faults [3]**   178/21 178/23 179/1

**favor [1]**   17/8

**favorable [2]**   102/14 102/21

**FBI [1]**   89/21

**FCRR [2]**   2/13 222/7

**fear [5]**   65/6 65/7 122/19 134/6 138/18

**feasible [1]**   82/10

**feature [1]**   56/7

**February [1]**   52/1

**federal [7]**   120/18 131/18 167/7 167/15 167/25 168/1 172/2

**feel [5]**   31/1 32/7 138/21 138/24 201/9

**fees [1]**   173/9

**F**

**fell [1]**   164/5
**fellow [4]**   175/12 175/17
177/15 182/1
**felt [3]**   116/14 116/17 122/20
**female [7]**   29/20 30/25 160/13
180/6 180/12 183/22 184/4
**few [5]**   23/6 90/20 97/2
117/8 156/11
**field [1]**   82/2
**fifth [14]**   62/3 122/4 133/3
135/4 135/16 136/6 136/7
149/22 186/19 193/16 195/7
195/10 195/14 195/14
**fight [2]**   142/7 205/3
**figured [1]**   27/7
**file [7]**   15/14 17/4 19/16
125/13 131/18 170/8 200/7
**filed [14]**   7/5 7/6 7/7 7/8
14/23 152/17 166/15 168/5
168/5 168/12 169/16 171/22
190/19 198/17
**files [2]**   15/15 15/19
**filing [2]**   166/19 170/10
**filled [2]**   46/22 53/4
**filling [2]**   47/5 125/7
**final [6]**   88/23 89/17 89/21
202/11 202/12 220/7
**finally [3]**   45/18 153/2
168/13
**find [14]**   5/25 11/7 11/11
27/10 56/12 121/23 126/8
132/4 140/12 154/4 176/8
182/19 182/19 210/20
**finding [9]**   8/15 8/15 132/6
205/5 206/11 206/18 210/16
216/1 219/21
**findings [8]**   56/19 88/23
88/24 89/17 89/24 96/1 96/10
193/5
**finds [3]**   124/5 124/7 213/22
**fine [16]**   60/2 99/1 132/17
133/14 188/4 189/19 193/17
196/23 206/10 207/18 209/3
213/9 214/5 218/15 219/23
221/5
**finish [4]**   64/25 128/20 166/7
192/2
**finished [2]**   128/24 187/1
**fire [5]**   9/1 144/7 145/10
145/25 146/8
**fired [9]**   7/22 8/25 10/3
10/20 146/18 150/5 150/10
152/19 152/20
**firefighters [2]**   70/1 90/5
**firefighters' [1]**   68/24
**firefighting [1]**   68/23
**firemen [1]**   68/24
**firing [2]**   7/23 155/9
**firm [2]**   1/15 167/5
**firms [1]**   10/7
**first [31]**   8/18 25/13 27/9
30/2 31/1 31/12 31/15 49/23
52/16 61/25 71/7 80/21 82/17
99/4 102/23 115/10 133/20
136/20 152/11 173/25 181/10
188/25 197/20 201/17 202/16
203/8 205/21 208/7 212/25
216/3 216/5
**fissures [4]**   86/23 87/1 87/3
87/13

**five [9]**   10/18 34/1 37/6
51/22 65/20 90/5 161/20
166/14 169/11
**flashback [5]**   82/18 82/19
82/22 83/4 83/8
**flashbacks [3]**   36/2 82/25
83/1
**flat [1]**   43/23
**flip [1]**   163/3
**flip-flops [1]**   163/3
**flirtatious [1]**   90/9
**floodgates [1]**   154/16
**floor [2]**   2/6 149/5
**flops [1]**   163/3
**Florida [1]**   148/7
**flown [1]**   149/16
**fly [1]**   148/23
**focus [2]**   29/7 31/14
**folder [2]**   15/17
**folks [2]**   125/19 189/9
**follow [5]**   20/21 26/2 51/8
99/24 106/8
**followed [3]**   86/16 99/16
202/22
**following [2]**   56/13 119/16
**follows [1]**   206/21
**Foo [7]**   118/24 118/25 120/1
120/2 120/3 120/22 123/3
**forbids [1]**   62/7
**force [2]**   51/4 125/3
**forced [1]**   21/16
**forcible [1]**   131/12
**forcing [2]**   143/25 155/9
**foregoing [1]**   222/2
**foreign [1]**   85/15
**forever [1]**   17/4
**forgotten [1]**   60/18
**form [7]**   38/16 81/18 108/12
129/14 132/1 132/2 171/12
**formal [2]**   215/8 215/11
**forming [2]**   83/14 83/16
**forth [2]**   134/23 143/8
**fortunately [1]**   124/2
**forward [12]**   8/2 10/19 10/21
105/23 113/25 140/20 153/2
155/7 155/11 169/14 172/17
176/3
**found [6]**   97/2 136/2 154/10
169/21 170/4 174/2
**foundation [1]**   59/2
**four [12]**   10/18 39/12 60/18
108/21 135/2 141/10 173/8
173/19 174/11 198/12 212/25
213/1
**fourth [4]**   40/4 130/18 150/6
193/15
**frame [2]**   48/4 54/10
**Franken [1]**   12/4
**frankly [1]**   166/24
**fraud [30]**   11/1 11/1 11/5
14/24 15/2 152/8 153/11
153/12 172/15 174/12 175/2
175/3 175/5 175/19 175/22
175/23 176/1 207/19 209/13
209/16 210/9 210/16 210/17
210/23 210/24 211/5 211/16
214/15 214/23 218/20
**fraudulent [16]**   5/20 6/11
13/25 14/2 16/3 16/5 154/15
156/4 156/8 156/12 175/5
179/3 179/10 179/12 181/18

**free [4]**   32/8 88/19 139/22
149/25
**freely [1]**   149/23
**Freightways [1]**   135/15
**friends [3]**   84/3 161/10
162/11
**front [9]**   29/19 48/1 68/25
75/13 77/25 144/22 213/13
213/15 220/15
**full [10]**   24/11 53/14 121/25
141/9 142/18 143/24 144/4
144/5 145/7 157/16
**fullness [1]**   62/19
**fully [6]**   27/24 116/8 157/6
199/12 202/14 202/17
**function [3]**   83/21 83/22
84/19
**functioning [2]**   32/19 41/21
**functions [1]**   83/21
**further [12]**   65/14 75/4 80/11
88/15 88/16 88/17 88/20
138/19 161/17 161/25 163/6
165/10
**furthermore [9]**   9/13 61/12
71/9 71/16 72/11 104/15
116/13 169/8 170/6
**future [12]**   41/8 65/7 204/8
204/20 204/21 204/24 204/25
210/6 210/7 212/17 218/23
219/2

**G**

**gang [1]**   90/4
**gap [1]**   166/19
**gateway [1]**   84/19
**gather [1]**   86/21
**gathered [1]**   161/11
**gathering [4]**   76/12 162/5
162/18 163/7
**gave [11]**   22/4 37/20 45/25
47/23 47/24 48/22 49/4 51/21
55/14 76/15 96/25
**general [10]**   20/1 100/24
106/19 175/12 175/17 177/15
182/1 202/17 217/9 217/12
**generalized [1]**   78/13
**generally [3]**   29/5 79/10
82/21
**generic [3]**   191/5 191/6 191/6
**gentlemen [6]**   59/17 95/20
127/21 158/23 159/19 165/25
**get [69]**   13/7 13/8 13/9 14/9
15/21 15/23 17/12 19/10 33/1
33/4 37/14 47/9 53/10 53/17
53/18 59/3 59/13 64/18 68/2
76/21 87/21 95/10 96/22 97/2
97/25 98/11 99/8 100/13
101/8 101/14 107/20 110/8
113/23 117/4 120/8 122/20
124/7 126/1 126/21 128/23
133/10 134/10 134/19 139/12
139/22 140/15 143/2 145/4
158/11 168/9 173/19 178/5
179/11 181/1 185/3 186/1
189/7 190/24 193/11 195/12
199/19 202/13 213/5 216/24
220/5 220/6 220/7 220/7
220/8
**gets [6]**   133/1 133/6 150/22
182/13 195/13 199/10
**getting [10]**   101/4 101/5

## G

getting... **[8]**  103/11 117/12
124/2 127/17 132/5 184/15
184/21 200/18
girlfriend **[3]**  66/3 67/2
67/11
give **[20]**  5/18 7/9 21/9 23/21
44/16 53/24 101/11 115/23
122/14 135/6 144/1 154/8
158/9 176/11 194/6 197/18
203/4 203/5 203/6 208/11
given **[8]**  6/21 36/11 37/16
55/14 126/9 138/17 141/10
159/13
gives **[1]**  150/25
giving **[5]**  31/13 64/19 76/2
141/11 202/25
glove **[2]**  13/6 201/9
go **[70]**  11/1 13/5 13/21
13/23 15/14 18/13 19/7 20/19
24/24 38/20 44/3 50/13 50/17
51/15 52/21 52/23 57/1 58/8
58/11 59/22 60/16 61/14
64/23 71/17 72/8 76/20 81/17
88/19 91/13 98/3 101/14
102/23 103/6 107/2 107/7
108/21 110/15 113/24 120/7
121/22 123/13 131/7 133/7
133/20 143/17 155/16 156/17
169/2 170/16 172/17 175/25
180/22 181/8 182/22 183/1
185/8 185/18 189/7 192/3
194/8 196/13 197/6 198/7
201/8 202/13 203/17 205/16
216/24 218/4 220/2
goes **[18]**  67/25 71/9 72/7
72/21 72/22 73/1 103/12
103/15 111/13 122/21 122/21
134/7 144/19 150/20 152/13
167/13 167/17 216/5
going **[107]**  5/5 5/9 5/18 6/13
12/8 13/20 16/1 16/2 17/22
18/4 18/13 20/15 22/15 22/16
25/23 39/23 48/14 53/14 58/1
58/10 58/11 58/25 59/2 59/16
65/12 65/19 66/7 67/4 68/15
73/3 86/6 91/7 91/16 92/9
92/22 100/17 102/4 102/8
103/14 104/7 105/12 107/12
108/22 108/23 113/15 113/19
114/19 114/24 115/24 115/24
116/2 116/22 117/1 117/10
121/2 125/12 126/22 127/6
127/8 128/14 128/15 128/20
128/24 129/3 129/13 135/6
139/16 151/13 154/25 159/8
160/9 165/25 166/2 170/7
171/10 172/5 172/6 172/7
181/19 183/1 185/23 186/5
186/9 186/11 186/13 186/20
189/21 194/5 195/13 195/13
196/10 196/12 196/24 196/24
197/20 198/4 198/8 201/6
214/5 216/2 220/5 220/6
220/6 220/8 220/18 220/24
221/1
gone **[3]**  162/15 177/7 199/7
good **[29]**  5/3 21/6 24/7 40/13
45/7 48/24 52/17 58/25 63/25
80/18 80/19 83/10 95/7
128/13 130/22 153/22 167/6

198/6 198/7 200/24 203/24
205/3 207/8 209/3 221/9
Goodgine **[9]**  93/20 93/22 94/4
94/6 125/6 134/5 138/7 138/8
146/3
Goodgine's **[3]**  18/22 18/23
138/11
got **[23]**  11/14 37/12 46/17
97/4 97/6 101/9 120/22
122/25 122/25 123/18 133/12
134/14 138/6 148/1 156/8
180/18 188/5 188/6 197/15
198/6 210/22 221/15 221/18
gotten **[5]**  27/14 27/20 27/21
30/9 133/16
government **[1]**  12/7
grab **[2]**  5/9 157/18
grabs **[1]**  195/20
grammar **[1]**  22/20
grand **[10]**  77/12 112/25
145/16 147/3 147/5 147/7
147/7 149/2 149/23 149/24
grant **[2]**  5/5 139/3
granted **[4]**  152/6 193/10
195/3 198/17
grateful **[1]**  127/22
gravity **[1]**  32/10
great **[5]**  46/8 62/16 72/24
206/6 215/17
green **[4]**  69/21 69/23 151/3
151/5
grenade **[1]**  13/13
grew **[1]**  106/19
grievous **[1]**  38/16
grossly **[2]**  56/8 124/20
ground **[3]**  6/19 84/13 161/7
group **[2]**  161/10 162/20
groups' **[1]**  126/17
guard **[1]**  45/15
guess **[15]**  5/21 16/24 26/9
30/4 33/3 34/19 51/5 68/2
69/24 83/10 91/13 111/13
144/2 166/6 210/2
guidelines **[1]**  38/20
guts **[2]**  181/15 181/16
guy **[4]**  23/25 69/9 69/11
108/9
guys **[6]**  27/7 96/21 118/19
148/16 185/4 186/1
GYN **[3]**  48/4 50/25 189/2

## H

H-07-CV-2719 **[1]**  1/4
had **[190]**  5/25 6/5 8/24 9/20
10/15 11/2 11/4 13/9 13/9
13/13 16/24 17/4 19/16 20/9
20/24 21/13 25/21 25/22
27/11 27/14 30/14 31/10
31/24 31/24 32/11 33/24
34/10 34/10 34/17 34/18
35/10 35/21 35/22 36/2 36/10
36/13 36/20 37/1 37/24 39/11
39/13 39/14 40/21 41/6 41/19
42/25 43/15 48/12 48/12 49/1
49/12 49/12 49/13 51/3 51/9
51/12 53/1 53/3 53/3 53/4
53/4 54/4 54/4 67/2 68/17
69/8 71/1 73/9 73/20 74/6
74/21 75/11 80/2 80/8 82/12
82/25 83/11 84/1 84/3 85/10
85/21 86/20 98/5 99/14

105/3 105/4 107/18 107/23
109/22 109/25 110/10 110/17
112/8 112/16 112/24 114/16
114/17 116/15 117/10 120/1
121/23 121/24 122/11 122/15
123/16 123/20 125/3 125/14
125/24 126/21 128/25 133/15
144/17 145/9 145/10 146/13
146/25 146/25 147/20 147/21
148/4 148/12 148/22 150/10
154/23 160/14 160/14 161/11
161/20 161/24 161/25 162/15
162/17 162/19 163/1 163/10
163/11 164/23 165/2 165/3
165/5 165/6 165/9 165/10
165/11 166/16 170/1 170/3
173/13 176/16 177/8 178/7
179/13 180/13 180/22 182/16
182/24 183/22 185/5 185/6
189/15 189/16 190/10 190/11
192/2 192/2 192/23 193/12
194/17 199/4 200/6 200/11
200/20 200/24 201/9 201/10
206/9 208/17 208/18 211/23
212/10 213/2 217/1 218/12
219/12 221/11
had' **[1]**  110/16
hadn't **[9]**  10/13 10/14 33/21
39/17 53/5 118/5 150/11
170/13 170/14
half **[2]**  62/5 126/21
Hall **[1]**  15/16
HALLIBURTON **[6]**  1/6 30/7
45/14 120/15 120/18 148/5
Halliburton/KBR **[1]**  45/14
hallway **[1]**  160/21
hand **[7]**  13/6 22/6 23/19
63/20 77/14 96/7 201/8
handed **[3]**  72/6 83/2 202/11
handle **[1]**  168/24
handwriting **[2]**  44/7 44/8
handwritten **[3]**  50/19 81/15
81/18
handy **[1]**  28/20
happen **[15]**  14/10 31/19 34/5
39/18 54/4 63/15 63/21 80/9
112/7 119/14 130/21 177/23
201/11 208/15 208/18
happened **[24]**  39/15 54/2
60/25 62/12 62/15 75/11 78/5
80/8 82/12 82/20 85/7 86/20
88/11 89/5 117/12 117/14
134/4 144/6 181/16 182/24
187/18 187/19 188/9 190/4
happening **[6]**  11/3 14/6
116/21 153/5 155/12 178/2
happens **[4]**  81/14 131/25
145/4 192/16
happy **[10]**  89/6 121/22 133/10
133/18 139/6 175/25 180/1
181/1 182/3 185/5
harassed **[6]**  192/25 193/3
193/13 205/22 206/4 216/7
harassers **[1]**  177/2
harassment **[27]**  5/7 5/17 5/25
10/23 13/22 152/17 156/1
177/1 179/14 179/16 182/11
182/16 183/12 184/17 186/5
186/8 194/2 194/11 195/2
195/8 195/15 205/15 205/19
206/17 215/25 216/1 218/9

**H**

**hard [4]**   23/25 86/24 183/14
185/22
**harder [1]**   79/20
**harm [1]**   61/5
**has [127]**   5/17 7/13 9/3 9/6
9/6 9/17 11/11 17/15 19/13
21/16 24/9 30/14 30/23 36/2
39/5 47/11 48/2 48/15 59/6
60/18 60/19 61/1 61/24 62/4
62/6 62/18 62/20 63/6 63/15
63/22 64/20 65/3 65/3 65/4
65/8 69/7 69/11 72/24 75/6
75/10 75/22 76/10 77/21 79/2
79/7 80/13 80/25 82/24 82/25
88/7 90/4 90/11 90/24 91/20
94/18 96/10 99/1 99/10 101/7
101/23 105/8 105/14 105/22
109/17 113/6 113/7 113/11
115/13 116/12 119/6 119/8
122/4 122/24 127/23 127/24
132/9 134/1 134/9 134/20
134/23 135/10 135/19 136/23
137/3 137/4 137/6 138/13
138/17 143/7 145/12 145/22
146/10 151/25 154/2 154/6
167/14 168/8 169/22 172/13
173/9 174/13 174/21 174/23
175/18 176/10 177/10 177/12
180/17 181/12 181/14 185/11
188/12 190/4 190/16 190/18
190/18 190/19 191/8 192/1
193/10 195/3 199/18 200/16
206/25 212/5 216/24 219/10
**hasn't [4]**   9/12 73/22 147/17
169/11
**have [388]**
**haven't [11]**   16/9 36/6 69/4
80/23 124/1 147/22 148/2
156/15 170/11 190/17 205/5
**having [37]**   15/9 27/20 30/11
30/12 30/24 31/4 31/16 32/6
35/9 36/9 47/12 47/18 48/11
76/2 77/1 78/11 84/3 102/5
107/23 108/6 109/19 109/21
117/21 124/11 134/15 134/24
143/23 144/14 150/24 151/9
164/5 164/8 176/15 189/17
199/21 199/24 220/14
**hazardous [1]**   16/7
**he [167]**   12/19 12/22 12/23
12/25 13/2 13/7 13/10 49/5
54/19 54/21 58/12 58/12 59/7
59/7 64/20 67/3 67/4 67/6
67/6 67/10 69/8 69/10 69/12
75/9 75/12 75/14 84/23 84/24
85/1 85/2 85/21 89/3 94/21
96/7 96/11 96/12 96/12 98/8
98/9 98/9 99/15 99/19 99/23
100/3 100/5 100/9 100/10
100/22 101/25 101/25 102/1
102/4 102/5 103/1 103/18
103/18 103/21 104/4 104/6
104/10 105/4 105/5 105/14
105/14 105/19 105/22 105/23
106/23 106/24 106/25 107/10
108/11 109/1 109/10 109/11
109/14 109/14 109/15 109/16
109/18 109/18 109/22 109/25
110/6 110/6 110/7 110/9
110/9 110/10 110/12 110/23

114/11 117/9 117/10 117/16
118/18 126/2 126/3 126/4
127/4 134/19 144/8 144/9
144/10 144/15 144/17 150/8
150/11 151/2 151/2 151/5
158/6 158/7 160/20 160/22
161/2 161/3 161/5 161/8
161/11 161/15 161/18 161/20
161/25 162/6 162/12 162/24
162/24 163/1 163/10 164/4
164/7 164/10 164/12 164/13
164/15 164/22 164/23 165/1
165/8 165/15 168/13 169/11
171/10 171/15 178/10 191/15
191/16 191/20 191/25 192/3
192/10 199/10 199/15 199/17
201/23 201/24 205/25 212/10
212/10 212/12 212/14 219/10
**He doesn't [1]**   105/19
**he's [15]**   23/14 67/18 75/6
75/13 92/9 105/4 105/19
105/22 107/23 109/10 110/25
131/24 190/22 191/2 192/6
**head [4]**   39/12 44/19 51/20
93/20
**headache [1]**   47/15
**headaches [1]**   47/10
**headed [1]**   53/7
**health [1]**   100/24
**healthcare [1]**   29/12
**healthy [1]**   46/5
**hear [14]**   17/8 18/10 24/14
24/16 75/1 129/24 155/15
155/21 155/22 155/23 166/25
167/3 170/15 207/17
**heard [29]**   8/9 10/17 10/20
14/14 15/15 15/22 69/2 69/11
69/14 72/24 75/8 100/6
103/19 107/11 112/7 129/23
152/14 152/16 152/19 172/13
172/14 176/13 176/21 179/15
182/8 183/9 199/4 204/10
205/7
**hearing [5]**   166/23 166/25
168/22 199/13 199/14
**hearsay [12]**   67/17 71/7 71/19
72/6 72/12 72/19 73/12 73/13
116/9 120/4 157/25 157/25
**heart [4]**   56/6 108/19 108/19
146/12
**heat [2]**   14/12 155/13
**Hedges [4]**   2/5 2/5 149/15
202/6
**Heidi [1]**   120/19
**heighten [2]**   32/9 32/9
**held [10]**   11/21 12/18 45/14
85/15 139/20 141/24 154/6
176/11 181/23 189/21
**hell [2]**   192/7 192/10
**help [3]**   122/20 186/23 187/13
**helpful [1]**   104/11
**her [229]**
**her about [1]**   66/6
**here [85]**   8/11 18/2 18/19
19/11 24/9 25/4 25/15 26/11
27/1 27/6 28/20 28/22 29/15
32/2 42/22 42/25 49/24 50/19
51/21 52/2 60/17 61/8 64/3
66/9 68/17 76/7 76/21 76/24
80/23 80/25 81/25 86/15
95/25 103/17 103/25 110/6

117/1 117/10 117/15 118/12
121/5 121/7 121/13 124/14
125/21 126/5 127/13 128/24
130/21 133/22 134/4 134/8
138/6 138/24 141/20 145/5
146/14 147/14 150/6 151/16
152/12 152/15 153/15 153/18
166/2 168/11 168/14 176/10
180/21 183/14 185/24 185/25
186/2 186/2 192/3 196/6
197/15 204/13 207/21 210/22
213/19
**Here's [2]**   67/9 175/9
**here,' [1]**   160/24
**herpes [1]**   51/3
**herself [4]**   52/4 161/9 162/7
184/1
**high [3]**   46/6 73/8 152/16
**high-ranking [1]**   73/8
**highlight [9]**   5/22 28/19
29/16 33/9 42/12 44/12 50/19
76/22 76/23
**highlighted [3]**   48/1 50/1
51/16
**highly [5]**   60/8 64/9 72/9
167/12 167/17
**him [38]**   23/10 23/15 44/1
54/20 57/9 58/2 58/2 59/1
64/19 67/4 67/19 67/21 75/6
97/3 104/16 105/4 105/10
106/17 109/11 109/12 110/4
111/16 115/21 115/22 117/14
126/5 144/18 145/25 147/6
150/11 150/25 158/3 161/10
163/11 164/22 169/6 171/11
192/7
**himself [4]**   112/12 134/5
160/7 174/21
**hired [2]**   64/8 171/13
**hiring [2]**   178/22 179/2
**his [69]**   12/18 12/19 13/1
13/3 15/17 17/19 49/10 54/20
57/5 63/13 63/14 63/20 64/21
64/21 64/22 67/11 67/12
67/13 67/13 67/14 67/25
68/23 69/9 69/20 85/21 96/12
100/4 104/23 105/5 105/6
105/10 105/18 106/1 106/12
106/19 107/3 109/12 109/24
110/3 110/7 110/25 110/25
111/6 114/8 120/13 126/2
144/9 150/21 157/12 157/13
157/24 158/1 158/2 159/2
160/17 160/19 161/10 162/2
162/10 163/7 163/15 163/18
164/20 165/14 165/17 171/10
192/2 192/10 201/25
**historical [1]**   49/18
**histories [1]**   48/22
**history [49]**   13/9 28/20 28/25
29/5 31/13 35/20 40/2 40/2
40/3 40/5 41/11 41/12 41/20
42/10 42/16 44/5 44/13 44/24
45/4 45/10 45/19 45/23 45/24
47/5 47/21 47/23 47/24 48/3
48/7 49/3 49/21 51/21 52/2
52/8 53/24 55/14 58/19 60/8
61/2 61/18 61/23 62/6 65/3
65/6 75/24 76/2 76/15 100/15
103/16
**hit [5]**   14/9 39/11 48/24

**H**

**hit... [2]**   49/12 108/11
**hitched [1]**   123/18
**hitting [2]**   49/2 49/5
**Holcombe [6]**   2/4 20/21 65/22
 66/7 71/24 195/18
**Holcombe's [1]**   18/20
**hold [7]**   11/16 111/11 130/1
 130/5 153/22 170/2 186/1
**holding [1]**   210/21
**home [12]**   45/5 45/8 49/13
 54/20 69/24 100/23 110/8
 111/17 170/24 171/3 192/3
 220/2
**honest [1]**   53/19
**honestly [1]**   170/13
**honor [216]**   5/9 6/24 7/12
 8/18 9/11 10/4 10/10 11/1
 11/10 11/14 12/2 12/10 13/4
 14/4 14/17 14/22 15/13 15/25
 16/11 16/15 16/16 17/13
 18/15 18/25 19/15 19/19
 19/20 20/8 20/12 21/24 22/23
 23/2 23/4 42/6 54/24 57/4
 58/1 59/5 63/3 63/7 63/10
 67/17 68/12 68/17 69/19 70/5
 70/9 70/12 70/19 71/4 71/7
 71/22 72/16 72/18 72/21 73/2
 73/7 74/14 74/24 75/1 75/14
 80/12 80/13 87/10 89/4 89/13
 90/17 91/3 91/9 91/20 92/6
 92/13 92/22 93/2 93/15 93/17
 93/19 94/3 94/8 94/10 94/16
 95/1 95/4 95/8 96/20 98/13
 98/25 99/5 100/14 101/23
 104/1 104/7 106/1 106/23
 108/2 111/3 111/15 112/5
 112/11 113/5 113/18 114/1
 114/6 114/25 115/3 115/14
 116/1 116/19 117/6 117/12
 119/23 120/9 121/7 121/16
 122/25 123/9 124/4 125/11
 126/23 126/25 128/6 128/13
 130/17 131/23 132/14 133/21
 134/23 135/18 135/21 136/8
 136/15 137/1 137/6 138/4
 139/14 140/16 140/19 141/20
 143/16 143/18 144/8 144/16
 145/21 146/4 146/11 147/2
 147/18 148/9 148/21 150/12
 152/1 152/5 152/11 153/9
 153/16 154/20 155/18 155/25
 157/9 157/21 157/24 157/25
 158/12 159/1 159/6 159/13
 159/15 165/18 165/22 165/24
 169/3 170/1 170/14 172/9
 174/8 174/19 175/21 176/9
 177/6 177/10 177/20 178/9
 179/7 180/9 182/5 182/23
 183/7 184/6 187/25 188/15
 192/21 194/12 194/22 196/11
 196/13 196/19 201/14 202/2
 203/7 203/20 203/25 204/6
 205/1 205/8 205/9 206/22
 207/16 207/22 208/10 215/3
 218/17 219/9 220/3 220/4
 220/11 221/5
**HONORABLE [1]**   1/10
**hooch [4]**   6/4 179/19 183/25
 184/4
**hope [13]**   19/2 73/4 74/25

192/25 193/14 197/21 205/23
 206/5 216/8
**hoped [1]**   218/12
**Hopefully [1]**   198/6
**hospital [2]**   99/21 141/14
**hostile [10]**   5/7 5/17 13/22
 14/13 176/24 186/6 186/8
 205/15 205/19 218/9
**hotline [1]**   15/23
**hour [3]**   97/25 128/21 197/24
**hours [11]**   11/25 20/17 97/2
 120/24 126/21 161/3 161/12
 164/4 164/11 164/18 197/25
**house [3]**   84/13 149/1 180/15
**housed [1]**   182/7
**housekeeping [4]**   127/10
 127/12 133/15 158/13
**housing [1]**   183/25
**HOUSTON [12]**   1/2 1/4 2/7 2/11
 2/15 24/22 25/4 86/16 110/6
 165/12 179/21 194/17
**how [58]**   10/18 10/21 20/11
 20/16 25/19 32/15 32/18
 35/12 37/4 38/7 39/6 40/21
 44/22 48/18 49/19 56/21
 66/14 68/14 81/13 83/7 83/7
 84/1 85/15 86/16 87/18 101/3
 101/4 101/17 102/5 102/13
 104/25 106/22 112/7 114/18
 119/13 127/1 127/6 129/12
 130/13 131/4 131/14 140/21
 162/17 173/11 184/21 188/4
 189/12 189/13 190/21 191/8
 194/5 198/15 199/25 200/1
 212/5 218/12 220/22 221/18
**however [7]**   16/20 41/19 86/15
 98/23 133/24 163/24 170/22
**HPI [2]**   39/25 40/2
**HR [1]**   15/14
**huge [3]**   108/20 117/22 129/18
**huh [2]**   44/23 70/14
**hundred [1]**   148/23
**hurt [4]**   57/2 103/3 107/15
 178/13
**husband [11]**   29/21 29/22
 29/24 30/1 48/23 48/24 49/1
 49/2 49/4 49/12 49/13
**hypervigilant [2]**   31/9 36/2
**hypnotic [1]**   83/12
**hypothetical [1]**   106/16
**hypothetically [1]**   43/19

**I**

**I'll [33]**   7/3 11/8 16/9 16/12
 32/2 44/7 69/18 70/4 70/4
 71/25 89/6 96/17 111/22
 121/22 128/21 129/24 132/12
 133/20 136/4 136/16 151/20
 155/16 158/9 160/11 170/12
 181/10 184/15 185/18 185/25
 192/18 201/3 201/25 213/8
**I'm [178]**   5/5 6/13 13/20 16/1
 16/2 18/16 20/7 20/25 20/25
 22/15 22/16 23/5 24/7 24/22
 25/2 26/7 27/20 27/20 27/21
 28/4 28/9 29/23 29/23 31/22
 32/2 32/5 32/6 32/7 32/12
 32/24 32/25 33/22 34/5 36/6
 36/16 36/17 36/23 37/12
 41/15 41/17 41/17 47/11
 48/14 53/7 53/16 53/16 55/1

65/11 65/12 65/21 65/22 66/7
 73/3 75/1 78/14 82/7 83/18
 85/2 86/5 86/25 87/11 88/3
 97/4 98/1 100/2 101/12 108/2
 108/22 108/23 108/23 110/14
 110/17 111/22 114/18 114/24
 114/25 115/22 115/24 116/23
 118/1 120/16 126/11 127/5
 128/24 133/7 133/10 133/18
 135/6 135/9 136/16 139/6
 141/20 141/25 143/12 143/13
 148/3 150/1 155/22 156/14
 159/2 159/2 160/2 165/25
 166/2 166/8 166/9 167/6
 168/14 170/7 170/7 170/8
 171/17 172/4 172/5 172/7
 172/20 172/23 174/15 174/19
 175/25 176/4 177/11 177/11
 178/24 179/9 181/19 182/21
 184/7 184/9 184/15 184/18
 184/25 185/2 185/4 185/23
 186/4 186/11 186/20 187/2
 187/2 191/3 192/16 193/19
 195/10 195/11 195/25 197/20
 198/10 200/4 205/25 206/10
 207/3 208/7 209/20 210/12
 210/19 210/19 210/21 210/22
 210/23 211/22 211/24 212/9
 212/13 214/5 214/18 214/18
 215/11 219/23 220/21 220/24
 221/11 221/14
**I've [34]**   5/14 10/7 26/10
 27/24 31/24 35/12 36/5 39/21
 46/17 57/8 68/20 70/6 81/22
 84/5 87/5 112/7 121/11
 121/17 123/15 126/13 136/14
 140/10 147/19 148/1 156/7
 184/11 186/15 187/9 191/12
 195/18 197/15 198/11 198/23
 210/22
**i.e [1]**   161/9
**idea [2]**   100/19 151/23
**ideal [1]**   166/1
**ideation [1]**   193/12
**identification [1]**   160/7
**identified [3]**   160/1 160/6
 160/14
**IED [1]**   178/14
**if [256]**
**if it [1]**   29/23
**ignored [1]**   152/18
**Iler [3]**   62/18 107/22 193/7
**illness [2]**   40/3 40/5
**imagination [3]**   87/13 87/17
 87/19
**imagine [6]**   84/11 86/23 86/25
 87/1 87/3 87/7
**imagined [1]**   87/8
**imagines [1]**   78/3
**imagining [1]**   86/20
**immediate [2]**   41/9 111/2
**immediately [3]**   103/14 111/12
 164/2
**impact [4]**   37/4 55/25 63/18
 86/17
**impair [2]**   83/14 83/15
**impaired [1]**   163/23
**impairment [9]**   204/8 204/23
 204/23 210/6 210/6 211/25
 213/1 218/25 219/1
**impart [2]**   56/22 58/24

impeachment [2]  202/19 217/24
impinge [2]  64/20 64/21
implants [2]  70/17 70/21
implication [1]  86/19
imply [3]  38/5 69/24 77/15
implying [4]  32/24 47/20 77/8
208/5
important [3]  42/16 53/17
105/11
impression [2]  37/12 37/21
impressionistic [1]  221/2
imprisoned [4]  8/21 8/23 9/7
119/4
imprisoning [3]  143/25 152/15
155/8
improperly [2]  17/7 18/9
imputed [2]  143/1 143/1
inability [1]  102/17
inaccurate [1]  124/18
INC [4]  1/7 135/15 135/20
136/5
incapable [1]  131/11
incendiary [1]  123/14
incentives [1]  56/10
incident [9]  10/1 48/15 48/16
48/18 49/10 49/17 85/19 90/1
93/8
incidents [3]  43/15 49/16
62/12
include [3]  20/12 45/5 197/10
included [7]  14/25 152/14
187/17 218/21 218/24 219/2
219/5
including [2]  54/18 176/25
incoming [1]  40/11
incomplete [2]  75/10 75/23
inconsistent [9]  76/15 76/19
77/19 77/23 172/18 173/22
173/23 202/19 217/24
incorporate [1]  217/1
increase [1]  140/22
increased [1]  152/22
increases [2]  151/24 151/25
incumbent [2]  166/21 171/7
incurred [2]  204/20 218/23
indeed [2]  111/1 146/5
independent [1]  36/7
INDEX [2]  3/1 4/1
indicate [5]  36/5 36/10 48/8
74/2 163/22
indicated [4]  81/3 89/21
138/9 164/24
indicating [1]  42/7
indicative [1]  189/6
indict [1]  147/4
indicting [1]  147/3
individual [1]  160/14
induced [2]  79/1 79/14
inducement [7]  5/20 6/11
14/2 16/3 156/8 172/16
174/12 175/2 175/3 175/6
175/20 175/23 175/24 179/10
179/12 186/10 207/19 209/14
214/23
inducements [1]  13/25
industry [1]  98/10
inebriation [1]  90/7
infer [1]  42/23
inference [2]  35/19 199/9
infinity [1]  105/21

inflicts [1]  163/6
inflammatory [4]  99/17 100/1
100/11 101/3
inform [3]  61/23 152/12
153/24
information [20]  14/19 15/23
18/23 30/8 30/16 30/16 33/5
41/24 47/22 56/22 57/22
57/23 58/20 58/20 58/23
60/23 88/6 105/24 153/7
165/10
informed [8]  8/12 15/8 49/1
120/2 150/24 162/6 162/14
199/12
informing [1]  194/17
initial [27]  26/2 28/17 28/17
29/20 29/25 30/20 30/25 31/4
33/8 33/24 34/5 35/14 35/15
36/21 36/23 37/1 37/11 39/3
39/24 47/25 48/25 51/25 52/7
62/8 62/8 65/4 81/3
initially [3]  52/24 97/9
116/25
injured [3]  141/6 208/14
208/24
injuries [1]  188/12
injury [6]  38/16 57/17 57/18
188/5 210/15 211/13
inner [2]  87/17 189/1
inquire [1]  24/2
inquired [1]  165/2
inquires [1]  44/24
inquiring [1]  145/24
inquiry [2]  39/1 75/20
insensitive [1]  192/16
insider [2]  151/11 151/13
insides [1]  188/6
instance [4]  43/19 43/20
84/22 113/8
instances [2]  22/18 78/15
instantly [1]  32/9
instead [1]  82/12
instruct [1]  132/11 201/20
instructed [2]  139/10 168/17
instruction [23]  11/18 132/25
132/25 133/3 133/5 133/8
133/8 135/12 187/7 187/17
202/25 203/8 203/16 205/14
207/10 209/15 209/22 211/23
214/8 217/10 217/12 217/14
218/8
instructions [14]  98/16
128/22 130/14 185/3 185/6
186/22 192/20 197/21 202/12
202/16 202/17 216/25 217/1
217/3
insurgency [1]  14/12
intake [1]  81/3
intend [1]  21/3
intended [1]  96/13
intends [1]  89/4
intense [1]  41/13
intent [3]  21/5 67/13 131/9
intention [6]  67/12 98/4 98/6
98/14 141/11 211/11
intentional [2]  56/8 136/22
intentionally [1]  60/22
interaction [1]  162/1
intercourse [5]  48/12 131/12
164/5 164/9 165/16
interest [1]  32/16
interested [1]  43/14

interesting [1]  142/25
interests [2]  139/15 142/25
interim [1]  162/19
intermission [1]  91/23
interposed [1]  97/11
interpretations [1]  105/21
interpreted [1]  106/6
interrupt [1]  204/17
interview [11]  29/8 29/10
31/3 31/5 40/17 47/25 96/7
157/13 159/24 160/18 160/19
interviewed [1]  160/16
interviews [1]  8/1
intimidated [1]  122/20
into [41]  15/14 15/18 23/25
24/16 37/13 46/8 59/3 64/4
64/18 64/23 68/2 69/5 75/5
77/4 81/18 84/22 88/22 88/24
88/25 90/15 95/12 96/12
113/6 118/3 121/18 122/9
139/10 143/10 145/22 147/17
149/9 155/9 157/22 158/17
160/12 174/11 175/24 196/2
210/16 211/15 220/17
intoxicated [4]  49/12 90/7
150/22 163/25
intoxicated.' [1]  163/16
intoxication [2]  163/15
163/17
introduce [1]  67/22
introduced [3]  5/18 113/16
113/16
inure [1]  185/15
investigating [1]  148/13
investigation [8]  8/14 9/23
9/24 50/12 89/18 145/24
146/2 160/12
investigator [1]  120/19
investigator's [1]  158/7
investigators [2]  49/11 157/2
invite [2]  161/10 200/23
invited [1]  190/8
involved [5]  20/11 26/13
89/25 122/23 217/20
involving [1]  11/25 108/17
Iraq [43]  10/22 14/6 15/5
33/14 45/14 46/4 50/5 50/7
52/5 54/2 54/11 54/13 55/15
55/17 58/21 61/1 71/11 75/24
86/16 86/21 88/12 103/14
110/3 110/4 120/14 120/17
148/5 148/24 153/5 160/6
175/11 175/16 177/7 177/14
177/23 181/25 183/4 193/1
193/14 194/18 206/5 208/16
216/8
Irish [1]  162/25
irrelevant [3]  40/16 54/2
100/25
irreparably [1]  192/15
is [605]
isn't [14]  8/11 53/17 78/9
79/14 82/2 101/13 105/24
124/3 140/4 140/13 166/1
168/15 179/7 192/13
issue [72]  5/14 5/20 9/14
12/5 12/11 13/15 14/17 39/16
56/20 58/17 60/5 60/6 61/6
64/16 66/20 68/13 95/25 96/1
96/24 102/11 102/20 104/13
105/10 108/3 108/3 108/20
111/13 113/5 117/18 117/25

**issue... [42]** 119/6 119/8
125/12 128/24 129/11 129/12
132/14 132/15 133/25 136/25
139/4 145/7 145/9 151/9
153/9 153/13 154/3 154/13
157/7 157/8 157/9 166/23
167/21 168/1 168/20 172/3
172/13 172/15 173/20 173/24
180/5 181/10 181/18 182/10
183/1 184/20 198/3 198/10
198/14 198/15 211/15 212/21
**issued [1]** 160/7
**issues [28]** 20/2 72/10 90/2
100/15 101/18 102/14 102/15
103/8 107/16 108/17 113/1
113/4 118/5 122/12 124/4
132/18 133/21 139/7 151/9
153/25 154/25 170/11 172/9
182/9 182/17 182/19 205/3
215/24
**it [569]**
**IT technician [1]** 120/18
**it's [220]** 6/21 6/24 7/17 9/7
9/12 10/10 10/11 10/11 10/12
11/1 11/15 11/18 11/18 12/7
13/12 13/14 17/10 20/7 21/5
21/8 22/7 25/12 28/25 31/20
36/16 37/5 38/20 40/16 41/6
43/9 47/15 48/8 56/5 57/5
57/8 59/5 59/9 63/3 63/6
66/24 66/24 67/7 67/10 67/19
67/19 68/22 68/24 68/25 69/1
69/16 69/20 69/20 70/23 72/9
72/18 72/19 72/22 73/7 73/12
73/14 74/10 74/13 74/14
74/16 74/17 74/22 76/21
77/15 78/12 79/9 79/17 79/21
79/24 81/8 81/20 81/21 86/24
89/8 90/23 96/5 96/9 96/9
96/11 96/14 96/15 98/14
99/15 99/16 100/7 100/16
100/21 101/6 101/24 101/25
101/25 102/8 102/9 102/10
103/20 103/21 103/23 105/9
105/25 107/1 107/5 107/5
107/10 107/12 108/4 109/9
111/10 113/13 113/15 113/16
113/17 114/8 116/20 118/9
118/10 118/10 120/5 124/3
125/25 126/4 126/7 127/5
127/6 128/15 129/15 129/25
130/4 130/12 130/13 131/4
132/9 132/10 132/21 134/5
135/15 135/16 136/6 136/25
137/16 138/12 139/15 139/21
140/3 140/4 140/6 140/7
140/13 140/15 142/22 143/3
143/8 143/12 144/2 144/14
147/15 149/7 150/3 151/8
153/9 153/9 153/10 153/13
153/13 153/14 155/14 157/16
157/25 158/5 158/7 167/6
171/4 173/22 173/23 181/4
181/7 186/13 187/20 188/14
189/5 190/2 190/2 190/13
190/24 192/7 192/11 192/14
192/17 193/18 194/1 195/2
195/9 195/13 198/9 199/7
199/23 201/1 201/2 201/2
205/9 206/2 206/8 206/10

215/1 215/4 216/6 216/15
219/7 219/7 219/14 221/1
221/12 221/15
**item [5]** 44/24 45/9 45/19
159/15 159/17
**Item 6 inquires [1]** 44/24
**items [1]** 48/14
**its [22]** 8/7 54/24 55/2 62/19
129/14 134/25 135/1 136/8
136/9 139/15 139/21 140/1
140/9 162/23 167/4 171/23
173/4 174/23 176/12 178/21
179/1 211/7
**itself [8]** 7/16 11/11 37/23
84/7 116/7 116/10 183/9
188/3
**IV [6]** 2/9 38/12 38/17 38/19
56/3 78/12

**J**

**Jacob [1]** 160/2
**jail [1]** 139/22
**Jaime [1]** 162/19
**James [3]** 24/4 24/12 24/19
**JAMIE [46]** 1/3 22/3 25/17
26/1 26/4 44/8 82/11 86/20
87/25 88/9 88/10 91/18 92/16
101/19 104/5 105/9 107/15
110/4 118/20 118/23 118/25
120/8 120/15 120/17 122/19
125/14 125/16 125/17 125/18
128/2 131/9 131/11 134/6
136/12 143/25 144/1 145/19
173/7 175/10 181/24 183/2
193/3 195/1 199/11 202/21
206/3
**Jamie's [7]** 102/4 105/13
107/14 107/22 118/17 118/18
194/15
**Jenny [4]** 118/24 118/24
120/22 123/3
**jest [3]** 161/2 163/19 164/25
**Jo [12]** 205/24 206/2 207/7
210/4 210/11 210/18 211/2
214/17 214/21 215/14 218/9
219/11
**Joanne [1]** 2/3
**job [7]** 11/24 16/8 32/5 37/2
55/1 68/23 69/9
**jobs [2]** 10/19 10/24
**John [5]** 130/24 131/3 131/8
131/10 194/25
**join [1]** 161/10
**joined [2]** 162/4 162/20
**joining [1]** 88/19
**joint [23]** 102/15 111/10
112/1 112/1 112/2 112/6
112/18 112/24 113/3 113/9
114/4 114/14 114/20 114/21
115/11 116/24 118/9 123/16
126/11 126/12 134/5 134/12
137/16
**jointly [1]** 119/21
**joke [1]** 163/17
**JONES [170]** 1/3 6/3 6/6 6/9
8/5 8/13 8/21 9/18 10/11
11/4 12/16 14/7 15/8 18/7
20/13 20/14 25/17 25/19
26/21 27/6 27/11 28/11 28/18
30/9 30/17 33/6 33/16 33/25
35/1 35/20 36/5 36/7 36/10

40/23 43/6 44/8 45/7 45/13
45/21 45/25 46/2 46/21 47/19
47/22 48/10 48/22 49/4 49/10
50/5 50/10 51/2 51/11 51/12
51/21 52/3 52/7 52/15 53/1
54/7 54/11 54/12 54/13 55/5
60/18 64/15 65/3 67/11 69/15
74/15 75/6 75/10 75/22 76/2
77/15 80/25 82/24 87/8 87/25
88/10 91/19 92/16 93/7 94/14
96/24 97/1 97/8 97/10 98/6
99/6 99/13 99/20 100/8
101/15 101/19 101/23 102/16
104/15 106/11 107/21 108/25
109/4 109/11 110/4 110/5
110/19 110/22 114/7 116/11
117/7 118/21 120/13 120/15
122/18 123/3 123/25 124/6
124/25 125/3 125/5 125/10
125/14 125/16 126/2 128/1
128/5 128/9 128/11 130/5
130/7 134/6 134/9 134/14
138/9 138/15 145/19 148/10
149/10 149/14 149/23 149/24
151/8 159/5 173/15 175/10
176/25 177/4 178/2 179/19
179/23 181/24 182/6 183/2
183/21 185/10 185/11 185/15
187/19 188/18 189/23 190/3
191/25 193/3 195/1 202/21
206/4
**Jones' [34]** 12/12 28/5 39/19
40/11 48/3 49/19 49/21 51/18
55/14 55/21 60/10 76/10
86/10 88/9 96/22 100/15
102/14 102/18 102/20 104/24
121/23 126/9 128/2 130/12
134/18 145/13 158/25 174/3
174/5 174/9 181/2 185/13
189/13 220/17
**Joseph's [1]** 141/14
**jot [2]** 29/5 81/11
**Jr [1]** 135/24
**JUDGE [61]** 1/11 13/13 22/6
58/6 59/23 60/6 60/15 61/25
62/22 63/24 65/1 65/10 65/13
69/4 69/14 75/4 88/21 92/9
92/25 101/16 102/11 108/16
115/17 118/1 119/5 119/25
124/3 124/14 129/2 139/9
140/12 147/12 149/4 151/18
155/7 157/24 159/9 166/9
166/24 167/6 168/3 180/18
184/10 187/15 188/5 190/21
191/14 192/11 193/18 194/7
194/9 195/21 197/13 197/15
197/17 198/2 198/25 203/10
209/25 211/17 220/5
**judgment [13]** 133/19 136/20
139/4 143/2 152/7 153/21
166/7 167/12 169/16 169/17
192/2 193/10 195/4
**judicial [1]** 148/4
**Julie [1]** 9/14
**JULY [20]** 1/5 30/6 50/5 90/11
111/23 122/15 160/13 161/4
161/23 164/4 164/11 164/2
175/14 193/1 193/14 202/21
202/22 206/5 216/8 222/4
**July 2005 [2]** 193/14 206/5
**July 21 [1]** 175/14

**July 27 [1]** 202/21
**July 27th [3]** 160/13 161/4
161/23
**July 28 [4]** 164/4 164/11
164/21 202/22
**July 28th [3]** 50/5 90/11
122/15
**juncture [1]** 12/9
**June [4]** 19/16 51/18 52/2
89/20
**June 15th [1]** 89/20
**June 6 [1]** 51/18
**jurisdiction [12]** 147/12
147/13 147/14 147/19 147/20
147/21 148/5 148/9 148/11
148/15 149/3 170/19
**juror [1]** 221/12
**jurors [1]** 102/12
**jurors' [2]** 221/12 221/14
**jury [146]** 1/10 5/2 5/19 9/8
11/6 11/15 13/21 14/23 15/1
17/6 18/10 23/8 24/14 28/25
48/2 48/14 55/2 58/12 59/1
59/3 59/13 59/14 59/18 59/19
60/7 60/16 61/19 61/24 62/2
62/5 62/19 65/15 65/18 69/11
75/13 75/16 75/18 75/19 77/6
77/21 91/17 95/22 95/23
98/15 98/20 104/9 105/24
106/3 106/6 107/1 111/6
111/7 112/25 113/16 113/17
114/3 119/18 121/20 124/19
126/19 126/21 127/13 127/19
127/20 128/17 128/18 128/21
129/7 129/15 129/21 130/14
132/3 132/10 132/11 135/13
143/8 145/16 147/3 147/5
147/7 147/7 149/2 149/23
149/24 153/14 156/23 158/11
158/19 158/22 159/12 165/20
166/4 166/5 168/21 170/3
175/22 179/22 180/8 182/18
182/19 182/22 183/1 183/17
185/3 185/6 186/22 187/6
189/13 189/22 190/7 192/13
192/19 193/4 193/5 195/2
196/3 196/11 196/12 196/13
197/2 197/18 198/9 199/8
199/9 199/12 199/17 199/25
200/15 201/20 202/12 202/20
202/23 203/5 203/11 204/1
205/18 206/7 207/19 213/12
214/6 216/2 216/6 216/11
216/16 218/4 219/12
**jury's [4]** 179/11 190/24
198/18 201/1
**just [176]** 6/12 7/12 8/5 9/3
10/10 11/24 12/1 15/12 15/12
16/8 17/9 18/13 18/21 18/25
19/10 19/11 19/14 19/15 21/6
21/12 21/16 26/5 32/25 34/5
35/16 35/18 43/5 45/23 49/17
50/16 51/24 52/15 54/1 59/7
60/13 60/13 61/22 63/7 63/13
63/18 64/25 66/16 66/25
67/25 68/21 68/24 69/16
69/19 73/14 73/17 73/21
74/13 74/18 79/9 81/9 81/13
82/6 82/9 86/6 86/13 90/18
91/9 91/17 93/6 93/23 96/25

101/25 102/10 103/21 103/21
105/14 105/15 105/24 106/5
107/3 107/5 108/15 111/16
111/25 113/8 113/16 114/20
115/17 115/23 116/1 116/4
119/25 124/3 127/4 127/7
127/16 133/12 133/14 133/25
136/19 137/9 138/2 138/6
138/14 141/4 142/6 143/13
145/14 148/3 149/15 150/1
151/22 152/13 153/16 155/15
155/22 156/24 157/22 158/7
158/20 166/23 167/24 168/25
170/7 173/20 176/2 176/9
176/21 177/17 178/9 178/10
178/15 179/7 179/13 181/19
181/19 181/21 182/2 183/16
187/5 189/5 192/21 193/11
194/4 195/9 195/14 195/25
196/20 196/21 197/1 199/3
199/7 199/15 199/23 201/5
201/20 201/25 202/10 202/11
202/12 203/11 203/13 206/5
207/2 210/4 212/9 212/24
213/24 215/18 216/21 218/17
219/11 219/12 219/24 220/13
220/15
**justice [4]** 147/5 148/14
148/22 178/6

**K**

**Kabul [1]** 124/2
**Kaddouri [1]** 178/16
**Kara [1]** 15/16
**Katz [1]** 9/13
**KBR [92]** 1/6 1/7 2/2 5/24
5/25 6/5 6/8 6/14 6/22 7/10
9/10 9/18 9/22 10/3 11/7
11/21 12/3 12/6 13/3 14/5
15/5 45/14 73/7 80/13 91/18
92/2 92/19 93/2 94/10 97/18
109/1 109/10 110/3 120/17
134/11 134/13 134/15 136/13
138/25 140/21 143/22 143/24
144/17 145/9 145/23 146/18
150/4 150/9 150/10 151/22
153/5 160/5 160/6 160/7
160/13 160/19 161/19 165/12
169/18 169/21 170/2 170/4
173/5 173/17 174/21 174/23
174/24 178/1 179/13 179/15
179/19 179/21 180/7 182/20
182/24 182/25 183/9 183/10
183/15 183/22 186/6 195/1
205/7 206/8 206/8 206/15
207/11 212/23 214/9 214/9
214/14 214/22
**KBR's [10]** 5/6 5/16 6/18
11/24 13/21 73/1 91/4 94/16
99/11 124/15
**KBR-issued [1]** 160/7
**keep [4]** 125/19 151/22 178/3
178/3
**keeping [5]** 140/21 140/24
152/21 152/22 153/1
**keeps [3]** 59/8 63/7 150/23
**KEITH [1]** 1/10
**KELLOGG [2]** 1/6 1/7
**Kelly [19]** 1/14 1/15 5/11
9/13 42/8 58/5 63/2 80/15
104/18 120/11 121/2 133/20

**Kelly's [5]** 9/15 57/11 96/5
123/25 177/12
**kept [6]** 10/19 15/13 15/21
145/23 153/3 178/2
**kicking [2]** 49/3 49/5
**kicks [1]** 180/21
**kidding [1]** 195/25
**kids [1]** 84/12
**killed [6]** 38/15 117/21
124/12 124/13 125/9 177/22
**killing [1]** 40/16
**kills [1]** 150/23
**kind [17]** 13/5 16/22 32/25
36/11 36/25 37/16 38/14
38/19 50/16 55/12 58/23
72/13 79/16 79/17 143/13
152/12 153/7
**kinds [1]** 106/10
**King's [1]** 139/22
**kit [4]** 89/23 90/10 146/20
146/23
**kits [1]** 146/24
**knee [1]** 189/5
**knew [26]** 10/21 15/10 15/20
27/8 30/1 43/24 43/24 55/18
58/13 85/10 101/25 110/6
110/7 111/17 113/21 121/25
147/20 149/2 153/5 162/24
169/6 178/1 183/11 183/16
189/15 208/19
**know [185]** 8/16 9/13 10/5
10/17 11/17 14/6 14/16 14/20
15/19 20/9 27/9 29/9 29/11
30/3 30/22 30/23 30/23 30/25
31/2 31/6 31/7 31/8 31/9
31/11 31/12 31/19 31/23
31/25 32/11 32/13 32/15
32/16 32/16 32/18 32/22
32/22 33/22 34/19 34/22
35/10 35/10 35/11 35/12
35/16 36/15 37/3 37/4 37/5
38/19 39/11 39/12 39/13
39/13 40/17 40/20 40/23
40/23 41/10 43/14 43/17
44/22 46/9 49/7 51/19 53/4
53/24 53/25 54/3 55/15 56/5
58/12 61/17 61/17 63/4 65/21
71/10 71/17 74/7 78/16 78/17
79/9 80/10 81/8 81/10 81/11
81/20 81/21 82/4 82/6 82/11
83/11 83/12 83/22 84/12
84/12 84/15 85/17 96/4 97/14
99/3 99/15 99/18 99/19 99/23
101/15 102/1 103/2 103/4
104/6 105/16 105/17 105/18
105/20 106/1 106/6 106/7
106/9 106/10 106/12 106/15
106/25 107/1 107/4 107/5
108/7 109/22 109/23 113/18
114/13 114/14 114/18 116/21
117/9 123/15 124/21 125/11
125/19 126/3 129/9 132/16
133/22 134/23 137/9 137/10
137/17 141/3 141/25 153/4
155/11 155/14 156/8 159/11
166/1 167/5 169/5 169/7
170/10 172/13 176/2 176/7
178/4 181/10 181/12 182/19
185/17 186/12 187/16 188/11
190/3 190/21 191/13 192/12

**K**

**know...  [13]**  193/15 195/6
195/12 198/5 198/19 199/8
199/14 201/2 201/24 205/2
206/8 211/17 221/18
**knowing [6]**  8/24 48/12 76/3
100/22 152/20 179/16
**knowledge [18]**  11/3 11/4 26/6
72/8 141/9 142/19 143/24
144/5 144/5 145/7 153/11
153/12 154/22 208/5 209/5
209/7 211/7 211/8
**known [5]**  116/15 119/11 150/4
171/14 177/8
**knows [3]**  101/22 208/3 210/4
**Kristen [5]**  73/15 73/22 91/16
92/4 92/10

**L**

**lab [1]**  89/21
**lack [9]**  13/17 21/24 72/20
79/6 79/7 102/15 113/10
147/16 149/13
**ladies [6]**  59/17 95/20 127/21
158/23 159/19 165/25
**lady's [1]**  62/4
**LaFranca [1]**  9/14
**Lamictal [1]**  47/10
**language [3]**  11/15 48/2
203/12
**Lannie [1]**  1/14
**large [3]**  31/23 97/23 221/1
**last [24]**  27/11 27/12 28/5
28/5 28/11 61/3 72/4 72/18
75/8 79/10 80/20 115/22
117/8 125/23 127/1 127/8
128/2 136/4 156/7 162/4
214/10 215/5 215/6 221/11
**late [8]**  18/12 33/14 190/13
193/1 193/14 200/22 206/5
216/8
**later [13]**  79/24 80/5 81/17
90/19 90/21 90/22 91/2 91/23
162/24 172/4 172/8 201/21
218/8
**later or [1]**  90/21
**law [40]**  1/15 1/18 1/21 10/7
16/9 129/16 133/19 136/21
136/21 139/4 142/11 143/3
143/14 148/8 152/7 153/21
154/13 166/18 167/5 167/19
167/25 167/25 168/4 168/4
169/8 169/8 169/13 169/16
169/17 170/18 171/19 173/15
174/24 174/24 179/13 184/17
193/6 199/19 201/11 213/23
**laws [1]**  12/6
**lawsuit [4]**  103/16 123/12
168/5 175/2
**lawyer [3]**  143/13 143/20
159/11
**lawyers [2]**  157/4 184/16
**lawyers' [1]**  115/23
**lay [2]**  58/10 59/2
**lead [1]**  57/4
**leading [2]**  99/13 99/14
**learn [4]**  56/25 57/16 57/20
177/2
**learned [4]**  22/4 46/12 46/13
195/18
**least [24]**  8/9 8/22 9/22

52/3 53/3 63/4 79/25 86/19
134/1 145/23 147/20 154/9
175/11 175/16 177/14 181/25
186/15 202/14 205/5
**leave [12]**  16/1 16/2 25/24
25/25 53/15 138/16 160/3
160/4 161/14 202/24 213/4
214/5
**leaves [1]**  108/16
**leaving [2]**  13/12 120/16
**led [2]**  163/17 188/10
**ledger [2]**  113/10 113/14
**left [7]**  13/13 144/8 162/13
163/6 164/17 172/9 191/7
**leg [1]**  189/5
**legal [1]**  150/10
**legend [1]**  207/2
**LEIGH [14]**  1/3 25/17 44/8
88/10 91/19 92/16 101/19
120/15 128/2 145/19 193/3
195/1 202/21 206/3
**lengthy [1]**  122/1
**leniency [1]**  117/24
**less [4]**  46/8 46/9 54/10
187/24
**lesser [2]**  132/5 187/16
**let [32]**  8/15 17/12 19/12
22/15 35/16 54/9 56/2 59/13
59/13 62/22 64/2 64/25 65/12
74/18 82/17 86/13 87/1 87/10
108/14 113/8 117/20 117/24
133/20 136/16 139/12 143/21
155/11 156/17 167/24 200/5
213/18 221/3
**let's [42]**  16/14 23/6 28/14
42/4 42/12 44/3 46/11 47/2
47/17 51/15 52/15 52/19 54/5
54/6 54/9 57/6 57/6 58/8
70/16 75/16 76/20 80/4 87/22
92/2 95/10 100/13 102/22
102/23 103/6 103/6 107/2
126/21 127/25 133/8 143/21
143/22 145/4 152/3 158/11
166/6 172/3 194/8
**letter [2]**  51/3 52/1
**lettering [1]**  215/19
**level [7]**  32/16 35/21 35/22
73/6 73/7 82/14 163/15
**liability [18]**  7/17 11/12
13/21 136/21 137/17 138/5
140/15 142/7 142/10 142/10
142/23 142/23 143/5 169/19
170/2 170/5 179/2 186/16
**liable [12]**  6/14 6/14 6/22
11/16 11/21 12/18 13/3 136/2
139/20 140/1 141/24 170/4
**Liberty [1]**  54/20
**life [22]**  38/14 39/2 41/2
41/21 45/10 46/4 52/17 55/10
62/4 69/15 78/4 78/11 80/2
85/17 100/23 104/10 104/10
104/21 122/20 123/17 189/7
200/4
**life-threatening [3]**  78/4
78/11 80/2
**lifetime [1]**  41/5
**light [4]**  117/14 150/22 151/3
151/5
**lights [1]**  95/10
**like [58]**  7/9 13/12 16/16
17/20 19/1 21/17 23/25 31/6

53/25 54/1 54/6 58/2 59/7
62/25 69/9 69/10 73/8 76/9
79/9 81/8 84/5 88/22 88/25
92/13 93/3 93/19 97/16 99/19
109/21 112/25 121/18 128/1
128/20 129/23 133/24 134/22
138/21 138/24 149/20 150/20
157/21 172/1 172/24 178/14
180/3 187/20 191/15 195/24
196/1 197/1 200/18 201/9
215/4
**likely [10]**  14/9 20/16 41/6
47/16 55/20 177/22 178/13
208/14 208/24 208/24
**Likewise [1]**  106/13
**limine [2]**  112/23 198/18
**limit [3]**  21/15 73/16 105/6
**limitation [1]**  172/7
**limitations [16]**  166/12
166/19 166/20 168/4 168/6
168/6 168/7 168/18 168/22
169/20 169/22 169/23 170/9
170/19 171/5 171/13
**limited [5]**  21/16 73/14
185/21 193/23 198/18
**line [14]**  16/14 16/20 18/2
30/5 40/4 72/5 75/15 86/10
99/6 107/19 110/17 110/17
133/23 185/9
**lines [10]**  17/2 20/2 21/13
28/21 42/10 81/20 84/21 97/3
99/11 109/17
**list [13]**  22/1 22/11 45/20
112/1 114/14 115/4 115/11
115/19 116/18 116/20 119/20
122/2 123/16
**listed [2]**  119/10 122/1
**listen [1]**  176/4
**lists [2]**  115/16 126/11
**literature [5]**  78/2 78/7 78/9
78/14 78/17
**litigate [1]**  142/9
**litigation [1]**  192/16
**little [10]**  24/15 28/24 29/16
32/2 57/10 58/15 81/11 81/13
174/3 190/13
**live [9]**  7/13 13/13 96/23
97/2 105/4 130/19 180/15
180/15 180/23
**lived [2]**  108/8 108/9
**lives [1]**  192/14
**living [9]**  24/21 100/20
138/21 177/21 179/18 180/13
181/6 183/22 184/4
**LLP [1]**  2/10
**LNU [1]**  162/3
**lob [1]**  199/10
**locate [2]**  171/7 180/1
**located [1]**  18/5
**location [2]**  162/8 171/10
**locked [3]**  110/5 111/14
118/23
**Loewe [2]**  23/18 127/21
**log [2]**  114/8 115/2
**London [2]**  170/24 170/25
**long [22]**  15/20 17/5 19/24
20/16 37/7 37/7 41/10 55/16
55/19 55/22 75/14 89/8 89/11
92/11 92/24 125/25 127/1
128/25 154/24 182/17 196/10
212/5

**long-term [2]** 55/16 55/22
**longer [3]** 125/25 159/8 210/25
**longest [1]** 18/16
**look [26]** 7/3 11/8 14/22 18/2 35/18 47/17 50/1 51/24 77/12 77/14 89/3 90/20 95/13 96/17 130/18 135/2 140/7 148/2 155/17 156/6 158/9 175/1 181/8 182/3 195/18 214/2
**looked [9]** 12/16 36/5 36/17 45/23 49/17 61/3 122/9 140/10 180/3
**looking [16]** 12/15 12/18 34/16 50/6 53/12 56/21 110/10 110/23 112/1 141/19 169/7 193/15 210/21 210/22 210/23 216/22
**looks [4]** 38/24 128/20 149/9 187/20
**loose [1]** 163/2
**lose [1]** 10/24
**losing [1]** 38/2
**loss [7]** 163/23 204/10 204/24 204/25 210/6 210/7 219/4
**lost [8]** 32/5 35/1 35/10 77/1 84/3 84/13 93/24 204/10
**lot [21]** 14/5 18/23 52/20 52/23 52/25 53/1 53/23 82/14 99/12 99/14 100/23 108/18 112/23 117/11 124/4 128/15 159/8 172/1 176/7 185/6 192/14
**lots [2]** 136/11 192/17
**louder [2]** 24/15 58/15
**low [2]** 73/6 73/7
**low-level [2]** 73/6 73/7
**lower [3]** 164/1 185/13 189/4
**lowest [1]** 73/10
**ludicrous [3]** 146/7 170/5 182/25
**lunch [3]** 96/18 97/25 133/4
**lunchtime [1]** 166/3
**luxury [1]** 220/14
**lying [1]** 13/14
**Lynch [1]** 178/16
**Lynn [1]** 148/13

## M

**ma'am [2]** 17/24 204/4
**made [45]** 5/24 8/12 11/22 15/18 15/20 17/15 49/13 50/12 64/11 65/4 67/5 80/6 90/6 99/13 111/21 112/25 113/11 121/19 124/6 125/15 126/14 130/6 132/22 132/24 134/10 156/14 161/2 163/19 164/2 168/9 168/16 177/24 179/15 183/14 183/16 189/19 194/15 199/21 199/25 200/16 205/6 208/4 211/7 211/7 211/10
**mail [16]** 80/8 109/9 109/15 109/20 110/10 110/23 111/6 115/2 119/10 134/4 138/7 138/11 138/22 148/18 169/4 171/9
**mailed [2]** 215/15 216/25
**mails [13]** 109/1 109/16 111/8 111/19 111/24 111/25 134/2

148/12 148/16
**maimed [1]** 38/16
**main [3]** 2/6 120/23 203/4
**maintain [1]** 82/6
**majority [1]** 18/17
**make [47]** 9/16 18/14 21/12 22/19 22/20 22/21 38/9 54/6 58/17 60/13 60/14 60/16 62/23 64/2 64/13 68/21 83/23 85/19 91/9 97/20 98/4 102/22 110/6 114/4 123/17 125/4 125/6 132/13 133/1 133/5 133/15 134/10 138/6 149/3 154/17 163/17 170/7 176/3 189/15 192/19 193/5 196/21 201/3 213/8 215/6 215/12 219/6
**maker [1]** 208/3
**makes [7]** 31/4 57/23 97/17 148/6 188/18 199/20 211/6
**making [13]** 19/19 26/11 32/2 62/7 81/15 86/20 110/7 117/8 153/1 174/15 177/11 196/20 208/20
**male [2]** 6/9 30/24
**malice [1]** 213/11
**malingering [7]** 56/4 56/7 56/8 56/12 56/21 87/24 88/2
**man [7]** 24/8 54/17 54/17 55/7 83/2 84/22 87/19
**man's [2]** 51/19 54/19
**management [2]** 58/20 60/23
**manager [2]** 50/11 180/4
**managers [2]** 15/20 15/24
**manages [1]** 56/21
**mandatory [1]** 175/13
**manila [1]** 15/17
**manner [1]** 120/10
**many [5]** 20/11 34/13 41/4 57/11 151/11
**March [2]** 54/12 126/10
**Marie [1]** 1/20
**marked [3]** 56/17 70/6 118/3
**marriages [1]** 44/17
**master [9]** 142/11 142/13 142/14 142/18 142/24 143/1 143/3 143/5 143/6
**master's [1]** 142/25
**master/servant [1]** 142/24
**material [5]** 75/23 153/13 180/19 180/24 211/6
**materially [2]** 55/14 55/19
**maternity [2]** 25/24 25/25
**Matt [2]** 120/19 163/4
**matter [22]** 23/21 63/10 71/8 71/15 72/23 125/2 132/3 133/15 133/19 136/21 139/4 149/15 152/7 153/21 158/13 167/19 169/13 169/16 169/17 193/6 199/19 201/10
**matters [2]** 118/7 127/10
**Matthew [1]** 161/13
**may [55]** 21/12 23/15 24/2 25/24 27/13 30/14 41/4 46/12 46/13 48/9 48/9 59/21 59/23 60/4 65/9 75/5 75/20 82/11 88/18 89/3 89/13 89/19 89/19 91/17 97/23 99/5 102/12 105/22 105/22 105/23 110/23 119/10 119/24 120/9 136/8 139/25 141/1 148/6 156/25

170/8 179/10 179/18 184/6 184/7 185/24 185/24 190/17 215/15 216/22 217/3 221/13
**maybe [19]** 6/3 6/4 6/7 32/14 103/10 111/21 150/7 155/22 157/6 183/13 193/21 196/18 206/1 210/22 212/1 212/9 212/13 212/21 213/5
**McCall [4]** 161/16 161/18 161/23 161/25
**McCormack [2]** 120/19 164/20
**McKinney [28]** 2/9 2/10 23/4 24/7 42/8 54/22 57/4 58/5 59/6 61/14 63/4 63/9 65/15 71/23 84/1 84/18 95/12 98/23 106/22 130/20 142/4 169/13 186/24 188/24 191/14 199/4 201/22 202/6
**McKinney's [4]** 63/11 68/3 139/8 143/20
**McMichael [1]** 120/20
**me [95]** 6/2 6/7 6/22 7/9 7/10 17/12 19/12 22/15 26/4 26/6 30/24 31/1 32/8 33/12 33/23 35/9 35/14 35/16 35/17 37/13 38/19 45/14 47/24 53/5 54/9 56/2 56/5 59/13 59/13 60/5 61/17 62/22 64/2 64/25 68/4 82/1 82/17 86/13 86/24 87/1 87/10 89/13 96/17 97/17 106/4 108/14 111/18 113/8 119/11 121/19 123/10 123/10 125/18 126/7 131/18 137/1 137/9 139/12 141/13 141/20 143/21 146/17 156/17 158/9 167/15 167/16 167/18 167/24 171/2 174/4 179/22 180/24 184/21 187/21 190/6 190/14 194/6 199/20 199/24 200/2 200/4 200/5 200/18 201/7 201/23 201/23 208/11 211/1 213/5 213/13 213/15 213/18 216/24 218/15 221/13
**me-too [2]** 137/1 141/13
**mean [97]** 11/23 13/15 14/4 18/24 21/25 27/7 29/5 31/9 31/19 31/19 32/11 32/21 33/3 33/22 34/1 34/3 34/7 36/15 37/2 39/4 39/10 39/11 39/11 43/23 56/5 60/13 70/8 70/10 74/8 76/17 79/18 79/19 81/7 81/19 82/20 82/22 83/9 83/18 83/22 84/5 84/11 85/1 85/7 85/7 85/13 85/16 85/23 85/25 87/7 103/11 105/9 105/16 105/21 105/22 105/22 105/23 112/22 117/4 117/6 117/19 117/22 118/14 121/17 137/7 137/16 145/4 145/17 154/17 167/2 173/12 176/7 180/7 180/14 180/18 180/24 181/5 187/9 188/4 188/10 192/12 192/18 193/12 193/17 194/3 194/4 194/19 194/24 197/1 201/8 206/21 208/18 210/13 211/17 211/22 212/2 212/9 212/22
**meaningless [3]** 139/19 139/21 139/23
**means [9]** 34/13 38/18 39/8 81/21 83/19 85/8 112/19

**means... [2]** 114/21 207/24
**meant [6]** 38/20 81/25 84/17
142/1 167/2 191/10
**measure [1]** 182/7
**measures [6]** 6/5 175/11
175/16 177/14 181/25 183/22
**mechanical [1]** 1/24
**media [1]** 200/12
**medical [23]** 24/24 24/25
24/25 25/2 29/1 56/25 57/16
57/20 78/2 82/2 88/10 204/20
204/21 211/18 211/22 211/25
212/6 212/7 212/15 212/16
218/20 218/22 220/19
**medical -- I [1]** 211/22
**medication [2]** 47/15 53/5
**medications [3]** 46/24 47/6
101/2
**Medicine [1]** 25/4
**medicines [1]** 101/12
**Medicolegal [1]** 56/14
**meds [1]** 101/15
**meet [3]** 110/6 195/9 195/14
**meeting [2]** 81/14 161/18
**MEJA [2]** 148/10 148/10
**member [4]** 30/2 30/18 30/21
31/2
**Members [1]** 75/19
**memorable [1]** 104/21
**memories [3]** 79/19 83/9 83/13
**memorized [1]** 38/18
**memory [30]** 34/1 34/8 35/6
35/11 35/12 36/7 37/13 55/2
77/21 78/2 78/6 78/23 79/6
79/8 79/23 81/22 83/5 83/8
83/14 83/16 99/14 102/15
102/19 105/14 105/22 109/24
110/25 110/25 111/6 192/1
**memory-forming [2]** 83/14
83/16
**men [2]** 36/3 180/14
**mental [1]** 104/12
**mention [4]** 60/19 199/2 200/5
200/8
**mentioned [5]** 9/23 73/15
73/21 178/15 178/17
**mentor [1]** 25/22
**meritorious [1]** 167/19
**merits [2]** 167/11 168/21
**Merrill [1]** 178/16
**message [3]** 46/10 51/7 144/12
**met [3]** 26/6 26/10 80/20
**mic [2]** 23/25 198/20
**microphone [3]** 24/16 130/2
130/3
**mid [1]** 41/10
**might [24]** 23/25 28/8 29/25
34/15 34/16 37/15 38/17
40/22 41/14 54/1 64/20 64/21
79/11 79/12 79/20 85/11
85/11 95/7 106/6 125/11
145/8 167/23 213/19 215/8
**migraines [1]** 47/11
**Mike [1]** 161/16
**milling [1]** 184/2
**million [1]** 201/2
**mind [6]** 44/20 67/25 68/6
68/6 95/13 190/24
**mindset [1]** 67/14
**mine [2]** 25/23 129/10

**minc [1]** 33/14
101/14 184/19
**minute [7]** 60/2 115/22 125/23
127/18 128/15 156/20 158/14
**minutes [10]** 18/16 18/17 23/6
23/7 80/5 90/20 127/2 162/2
197/22 197/25
**misleading [3]** 113/17 119/18
121/8
**misrepresentation [18]** 5/21
6/7 14/1 16/3 16/13 156/5
175/7 176/6 177/11 177/13
177/17 179/10 186/11 207/24
210/23 211/6 211/10 211/12
**misrepresentations [13]** 5/24
156/12 156/14 175/8 175/10
175/15 177/19 177/24 177/25
178/11 180/19 181/24 183/3
**misrepresented [2]** 182/20
182/24
**missed [2]** 106/21 207/2
**missing [3]** 133/7 157/3
183/13
**Mission [1]** 160/6
**mistake [2]** 133/16 159/3
**misunderstood [2]** 196/18
206/1
**mix [2]** 163/5 163/7
**modalities [2]** 41/14 41/23
**modality [2]** 58/14 58/16
**mom [2]** 45/8 101/17
**moment [4]** 31/14 108/14
112/14 219/12
**moments [1]** 104/21
**money [4]** 64/14 173/18 203/6
214/6
**months [12]** 26/2 33/14 50/7
51/22 52/5 54/12 55/8 55/8
55/8 116/16 144/8 144/9
**moot [3]** 12/5 150/13 150/19
**more [69]** 10/10 13/24 14/9
16/4 16/12 19/14 21/12 23/7
31/7 31/11 32/3 32/14 34/4
34/22 34/24 38/19 41/6 41/11
41/12 41/13 41/13 42/1 46/8
46/9 47/16 55/21 62/23 64/2
64/19 66/21 68/16 70/20 73/5
73/14 88/21 89/25 90/23 95/6
96/23 102/12 109/24 115/23
117/20 128/22 131/18 154/23
159/14 164/15 168/12 170/15
176/9 176/15 176/24 177/22
178/13 181/21 186/7 192/22
192/25 193/20 193/21 197/21
205/22 206/4 208/14 208/23
208/24 216/8 221/11
**Morgan [2]** 105/2 106/14
**Morgan's [1]** 102/13
**morning [36]** 5/3 7/2 7/7
19/22 20/16 20/23 24/7 28/4
59/16 67/4 67/13 68/1 73/16
73/21 76/2 76/13 80/4 80/5
80/18 80/19 87/20 88/19
91/19 93/7 96/25 115/14
133/22 136/24 156/7 160/15
164/21 166/2 172/14 185/4
197/18 215/9
**Morris [6]** 1/20 1/21 19/23
91/10 91/12 202/7
**Morris' [1]** 91/21
**most [4]** 15/2 55/20 107/4
154/9

**mother [2]** 26/20 53/8 100/16
100/21 101/5 102/5 104/17
106/15 107/14
**motion [20]** 5/4 5/6 5/15 5/16
6/18 133/18 139/3 139/10
152/7 153/21 166/7 167/11
168/17 169/16 171/22 172/10
173/4 186/4 186/5 198/17
**motions [2]** 112/22 198/19
**motivated [2]** 56/9 163/20
**mouth [1]** 121/23
**move [8]** 87/22 89/1 90/15
152/3 156/4 169/13 185/23
199/25
**moved [2]** 157/14 161/18
**moving [1]** 161/20
**Mr [13]** 5/11 5/11 23/4 42/8
42/8 58/5 58/5 65/15 71/23
97/9 123/25 202/6 202/6
**Mr. [107]** 5/5 5/15 8/23 8/24
9/13 9/15 10/6 10/12 12/13
13/7 13/16 18/22 18/23 20/13
20/14 54/22 57/4 57/11 59/6
61/14 62/18 63/2 63/4 63/9
63/11 66/3 68/3 80/15 83/1
84/1 84/18 85/20 88/7 91/25
93/3 93/6 94/4 95/12 96/5
98/22 98/23 99/6 99/13 100/8
102/16 104/18 106/11 106/22
107/21 108/25 109/4 110/19
110/22 114/7 116/11 116/16
117/7 120/11 121/2 122/18
125/6 126/2 128/11 130/20
133/20 134/19 134/20 136/12
138/11 138/11 139/8 142/4
142/8 143/19 143/20 144/2
146/3 146/13 146/19 149/15
151/8 158/21 158/25 169/1
169/4 169/13 169/20 169/22
170/1 170/4 171/14 171/15
174/5 174/20 174/21 174/22
174/23 177/12 186/24 187/18
188/19 188/24 191/14 192/12
192/23 199/4 201/22
**Mr. Arroyo [2]** 93/3 93/6
**Mr. Bagwell [1]** 158/21
**Mr. Bortz [21]** 8/23 8/24 10/6
10/12 13/7 13/16 83/1 134/19
136/12 144/2 146/13 146/19
151/8 169/22 170/1 170/4
171/14 171/15 187/18 188/19
192/12
**Mr. Bortz' [9]** 5/5 5/15 12/13
66/3 88/7 98/22 169/4 169/20
174/5
**Mr. Daigle [1]** 85/20
**Mr. Estefan [3]** 134/20 143/19
192/23
**Mr. Goodgine [3]** 94/4 125/6
146/3
**Mr. Goodgine's [3]** 18/22
18/23 138/11
**Mr. Hedges [1]** 149/15
**Mr. Iler [1]** 62/18
**Mr. Jones [17]** 20/13 20/14
99/6 99/13 100/8 102/16
106/11 107/21 108/25 109/4
110/19 110/22 114/7 116/11
122/18 126/2 128/11
**Mr. Jones' [1]** 158/25
**Mr. Kelly [14]** 9/13 63/2
80/15 104/18 120/11 121/2

# M

**Mr. Kelly... [8]** 133/20 138/11 142/8 169/1 174/20 174/21 174/22 174/23
**Mr. Kelly's [4]** 9/15 57/11 96/5 177/12
**Mr. McKinney [19]** 54/22 57/4 59/6 61/14 63/4 63/9 84/1 84/18 95/12 98/23 106/22 130/20 142/4 169/13 186/24 188/24 191/14 199/4 201/22
**Mr. McKinney's [4]** 63/11 68/3 139/8 143/20
**Mr. Poe [1]** 117/7
**Mr. Poe's [1]** 116/16
**Mr. Schmidt [1]** 91/25
**Mrs. [3]** 23/18 102/13 127/21
**Mrs. Loewe [2]** 23/18 127/21
**Mrs. Morgan's [1]** 102/13
**Ms [17]** 18/20 42/24 61/16 71/23 98/2 105/2 109/2 113/17 119/19 120/1 120/2 121/17 174/5 202/6 202/6 202/7 202/7
**Ms. [192]** 6/3 6/9 8/5 8/13 8/21 9/18 10/11 10/17 11/4 12/12 12/16 14/7 15/8 18/7 18/7 19/23 20/21 20/22 25/19 26/21 27/6 27/11 28/5 28/11 28/18 30/9 30/17 33/6 33/16 33/25 35/1 35/20 36/5 36/7 36/10 37/12 37/20 38/9 39/19 40/11 40/19 42/19 42/24 43/6 45/7 45/13 45/21 45/25 46/2 46/21 47/19 47/22 48/10 48/22 49/4 49/10 49/19 49/21 50/5 50/10 51/2 51/11 51/12 51/18 51/21 52/3 52/7 52/15 53/1 54/7 54/11 54/12 54/13 55/5 55/21 55/5 55/14 55/21 60/10 60/18 64/15 64/22 65/3 66/7 67/11 69/15 74/15 74/15 75/6 75/10 75/22 76/2 77/15 80/25 82/24 87/8 93/7 94/14 99/20 101/15 101/23 104/15 117/7 123/3 123/25 124/6 124/25 125/3 125/5 125/10 130/5 130/7 134/9 134/14 138/9 138/15 148/10 149/10 149/14 149/23 149/24 151/8 173/15 176/25 177/4 178/2 179/23 182/6 183/21 185/10 185/11 185/15 187/19 188/18 189/23 190/3 191/25
**Ms. Armstrong [6]** 18/7 124/2 124/6 124/25 125/7 134/9
**Ms. Armstrong's [1]** 146/4
**Ms. Barron [1]** 196/3

**Ms. Chapman [16]** 115/10 116/2 116/7 117/19 118/15 119/17 119/25 120/2 121/2 121/7 121/18 122/14 122/21 122/24 123/19 126/13
**Ms. Cullen [1]** 211/22
**Ms. Foo [1]** 120/3
**Ms. Holcombe [3]** 20/21 66/7 195/18
**Ms. Jones [117]** 6/3 6/9 8/5 8/13 8/21 9/18 10/11 11/4 12/16 14/7 15/8 18/7 25/19 26/21 27/6 27/11 28/11 28/18 30/9 30/17 33/6 33/16 33/25 35/1 35/20 36/5 36/7 36/10 37/12 37/20 38/9 40/19 42/19 42/24 43/6 45/7 45/13 45/21 45/25 46/2 46/21 47/19 47/22 48/10 50/10 51/2 51/11 51/12 51/21 52/3 52/7 52/15 53/1 54/7 54/11 54/12 54/13 55/5 60/10 64/15 65/3 67/11 69/15 74/15 75/6 75/10 75/22 76/2 77/15 80/25 82/24 87/8 93/7 94/14 99/20 101/15 101/23 104/15 117/7 123/3 123/25 124/6 124/25 125/3 125/5 125/10 130/5 130/7 134/9 134/14 138/9 138/15 148/10 149/10 149/24 151/8 173/15 176/25 177/4 178/2 179/23 182/6 183/21 185/10 185/11 185/15 187/19 188/18 189/13 189/23 220/17
**Ms. Jones' [27]** 12/12 28/5 39/19 40/11 48/3 49/19 49/21 51/18 55/14 55/21 60/10 76/10 86/10 100/15 102/14 104/24 121/23 126/9 130/12 134/18 145/13 174/3 174/9 181/2 185/13 189/13 220/17
**Ms. Morgan [1]** 106/14
**Ms. Morris [2]** 19/23 91/12
**Ms. Morris' [1]** 91/21
**Ms. Nelson [1]** 64/22
**Ms. Rumba's [1]** 74/15
**Ms. Sara [1]** 92/14
**Ms. Simco [1]** 92/20
**Ms. Vorpahl [8]** 121/12 142/8 142/21 174/18 176/10 178/15 178/17 220/14
**Ms. Vorpahl's [1]** 220/18
**Ms. Westcott [1]** 10/17
**much [24]** 14/14 24/17 29/3 29/7 29/12 32/15 35/12 38/1 38/7 45/24 47/16 59/21 62/21 81/23 91/6 98/18 127/6 162/17 185/13 192/10 202/4 203/6 220/1 221/8
**multiple [21]** 27/21 30/11 30/14 31/15 31/17 31/20 31/25 32/1 32/4 32/12 33/6 34/11 34/13 34/22 34/24 37/22 37/25 43/13 60/19 82/11 82/12
**multitasking [1]** 187/2
**murdered [2]** 124/22 124/24
**must [4]** 137/24 146/20 153/17 171/23
**my [109]** 19/12 22/15 24/8

28/6 28/10 29/6 29/8 29/9 30/3 30/25 31/23 32/5 32/6 32/16 33/4 33/22 34/1 35/12 37/2 46/17 49/24 51/5 51/20 57/8 57/10 62/3 62/7 62/11 62/19 64/8 64/11 64/13 65/4 65/9 69/6 81/10 81/11 81/22 82/6 85/24 86/7 89/1 95/9 99/1 102/22 108/14 117/24 126/13 128/21 129/19 129/22 130/6 130/9 130/17 131/23 132/19 132/24 133/2 133/2 133/3 133/16 145/14 145/18 149/21 149/24 159/3 166/16 166/17 167/10 167/18 167/22 168/15 168/17 170/24 171/3 171/9 171/11 172/18 172/20 172/24 174/1 174/1 179/5 179/5 184/20 184/22 185/12 185/17 186/17 189/10 189/16 189/18 191/5 191/24 192/2 194/3 197/21 200/6 200/10 202/25 210/20 212/23 215/3 215/12 215/14 220/15
**myself [1]** 181/22

# N

**name [11]** 18/6 24/11 51/19 51/19 66/3 116/13 122/10 123/19 124/21 162/4 221/14
**named [3]** 25/22 160/1 166/17
**namely [1]** 163/2
**names [2]** 138/17 221/12
**narrate [1]** 161/22
**nature [8]** 32/7 34/11 62/20 79/15 109/7 130/9 132/5 171/16
**naval [1]** 49/11
**near [4]** 41/9 55/19 198/20 205/4
**nearby [1]** 161/11
**nearly [1]** 202/12
**necessarily [12]** 32/13 37/4 39/5 52/15 53/21 76/17 76/19 77/8 79/18 79/19 85/8 124/23
**necessary [8]** 97/21 116/14 116/17 167/11 202/18 212/16 217/22 218/21
**need [63]** 5/21 13/24 16/3 16/4 20/4 23/7 40/17 40/19 42/5 54/22 54/23 55/2 58/6 58/7 59/22 60/12 60/15 66/7 70/20 75/15 82/8 91/23 95/18 96/16 96/22 97/3 103/11 105/10 112/6 112/14 116/6 116/18 116/20 121/4 121/7 126/8 126/11 131/17 135/10 135/11 138/21 148/2 150/16 152/6 159/14 166/6 168/21 169/12 169/13 172/2 179/11 182/22 184/12 185/2 185/19 185/23 186/17 186/22 187/13 193/11 198/5 211/1 215/21
**needed [3]** 116/15 119/20 122/20
**needing [1]** 51/2
**needs [6]** 24/14 51/3 113/15 194/1 195/2 215/19
**negate [1]** 168/14
**negative [4]** 16/8 82/23

negative... **[2]** 105/24 153/25
neglected **[1]** 60/19
negligence **[1]** 13/18
neither **[2]** 101/4 192/3
Nelson **[3]** 41/18 61/16 64/22
Nelson's **[1]** 44/6
Nemir **[1]** 135/24
never **[20]** 14/12 15/18 15/19
22/1 68/6 68/6 87/5 90/11
115/15 121/14 125/1 139/16
145/12 147/4 148/18 154/14
170/1 170/3 173/24 208/17
new **[8]** 27/25 48/11 67/11
133/5 133/12 133/13 178/22
179/2
news **[3]** 128/14 128/15 185/21
next **[18]** 29/11 30/5 42/4
42/9 45/18 76/13 87/20 91/19
94/20 95/18 96/19 97/3
102/25 108/24 152/4 152/5
161/7 213/1
night **[9]** 61/4 79/10 83/24
145/9 156/7 161/18 191/25
192/1 221/9
nighter **[1]** 185/3
nightmares **[1]** 36/2
nights **[1]** 54/20
nine **[3]** 102/3 148/23 149/16
no **[171]** 5/9 7/3 9/19 21/6
22/7 23/7 31/22 41/17 43/21
44/20 45/21 48/24 51/1 52/18
61/1 62/11 63/14 63/18 66/13
66/21 69/10 70/12 71/7 71/13
71/14 72/22 72/23 73/12
73/21 74/6 74/6 74/17 74/21
74/23 76/10 77/21 78/2 78/6
79/13 80/11 80/13 84/8 85/1
85/6 85/14 87/16 88/8 89/8
89/14 89/24 89/24 90/17 95/6
95/14 97/10 98/4 98/17
100/18 101/8 103/6 105/3
106/23 108/10 109/9 110/13
110/13 110/13 112/18 112/18
112/18 113/20 113/22 114/16
115/18 117/6 117/6 117/17
120/5 122/13 122/13 123/2
123/12 127/4 131/17 132/23
134/10 135/25 137/9 138/4
140/4 142/17 145/6 145/15
147/8 147/9 147/12 147/13
147/14 147/19 147/20 147/21
148/4 148/6 148/11 148/20
150/18 150/20 151/6 151/6
153/18 153/19 153/22 153/23
154/7 154/9 154/11 155/6
155/6 155/6 157/4 159/13
159/14 164/6 165/10 165/22
165/23 165/24 166/15 167/2
168/3 171/11 171/17 175/8
175/20 177/13 178/6 178/11
179/9 182/12 183/4 184/9
187/7 187/12 187/19 190/1
191/2 191/3 191/16 191/20
192/1 192/12 195/25 196/17
196/25 196/25 199/23 200/13
200/16 200/22 202/23 205/8
206/3 210/24 212/14 212/22
213/2 213/7 213/12 213/21
220/8 220/9
no/no **[1]** 89/24

nobody's **[1]** 115/11
Nodding **[1]** 44/19
non **[29]** 6/11 14/2 15/4 55/7
64/5 141/6 141/7 141/11
146/13 146/16 146/18 146/21
152/7 154/17 154/20 156/9
171/5 171/6 175/6 176/1
178/19 179/12 186/12 187/22
187/23 188/9 190/2 198/9
200/8
non consensual **[1]** 146/16
non-agent **[2]** 141/6 141/7
non-agent's **[1]** 141/11
non-consensual **[2]** 187/22
187/23
non-disclosure **[12]** 6/11 14/2
15/4 152/7 154/17 154/20
156/9 175/6 176/1 178/19
179/12 186/12
non-resident **[2]** 171/5 171/6
non-suit **[1]** 198/9
non-suited **[1]** 200/8
non-treating **[1]** 64/5
none **[4]** 60/24 90/5 200/25
220/16
Nonetheless **[1]** 192/6
Nonsense **[1]** 180/7
noon **[1]** 197/19
nor **[4]** 101/5 190/17 208/21
219/4
normal **[6]** 40/10 46/5 74/7
80/7 82/2 189/6
normally **[3]** 31/18 36/25
143/11
Northern **[4]** 154/6 154/10
154/12 178/18
not **[408]**
not a **[1]** 140/3
note **[8]** 34/19 42/22 50/2
50/22 51/18 82/7 93/24
204/13
noted **[5]** 48/25 56/14 102/12
162/23 219/7
notes **[14]** 28/17 29/6 44/17
49/18 76/7 81/4 81/11 81/15
81/18 81/19 82/4 82/10 158/7
212/24
noteworthy **[1]** 49/18
nothing **[27]** 9/18 15/11 19/13
23/22 53/15 62/6 80/8 88/16
88/17 94/18 96/10 103/18
142/15 144/18 145/20 145/20
146/10 171/16 174/13 175/22
187/6 187/10 187/21 187/22
189/18 192/9 201/11
notice **[14]** 20/24 21/3 21/5
21/5 21/7 21/24 22/4 27/3
71/9 71/17 72/7 72/21 73/1
171/23
noticed **[1]** 192/11
notified **[1]** 115/4
noting **[1]** 219/25
notwithstanding **[1]** 167/12
November **[4]** 33/10 33/13
45/25 50/2
November 22nd **[1]** 50/2
November 6 **[2]** 33/10 33/13
now **[70]** 5/12 6/22 12/5 12/17
16/14 18/14 20/20 23/21
28/24 29/25 31/14 39/23
40/10 43/5 46/11 47/17 47/21

58/25 59/16
60/5 60/7 61/8 63/4 76/9
78/14 79/12 79/22 82/24
84/13 90/19 91/8 93/19 98/8
104/14 112/8 116/16 119/15
126/21 127/1 129/24 132/16
133/7 141/17 141/20 150/6
151/11 158/3 158/21 158/24
159/21 165/20 166/23 166/25
166/25 167/16 167/20 168/14
174/4 176/6 177/18 186/4
189/21 190/14 194/5 202/16
203/14 209/18
nowhere **[1]** 205/4
number **[70]** 22/14 34/14 34/17
35/21 41/20 44/16 45/9 45/19
48/2 49/24 76/3 76/21 112/5
112/16 113/13 120/16 120/19
120/20 120/23 120/23 120/24
121/11 132/18 132/25 133/1
133/3 133/5 133/8 133/9
133/21 157/18 160/4 160/11
160/21 161/6 161/19 162/7
162/11 162/14 163/2 176/10
202/20 204/1 204/3 205/18
206/7 206/11 206/15 209/9
209/19 214/22 215/19 216/2
216/7 216/11 216/12 216/12
216/13 216/17 216/18 216/19
217/5 217/10 218/5 219/12
219/13 219/13 219/14 219/15
221/1
Number 1 **[7]** 161/19 162/11
162/14 202/20 217/5 217/10
218/5
Number 11 **[1]** 214/22
Number 12 **[1]** 215/19
Number 2 **[8]** 45/9 45/19
160/21 161/6 162/7 163/2
204/1 204/3
Number 3 **[6]** 205/18 206/11
216/2 216/7 216/12 219/13
Number 4 **[8]** 206/7 209/9
216/11 216/12 216/13 219/13
219/14 219/15
Number 5 **[6]** 44/16 206/15
216/17 216/18 216/19 219/12
Number 7 **[1]** 133/9
Number 8 **[5]** 132/25 133/1
133/3 133/5 209/19
numbering **[1]** 216/25
numbers **[2]** 46/18 133/23
numerous **[1]** 176/13

**O**

o'clock **[8]** 80/5 95/7 95/18
95/21 134/14 185/24 202/2
202/3
O'Connors **[1]** 140/11
oath **[1]** 23/18
OB **[3]** 48/4 50/25 189/2
OB-GYN **[3]** 48/4 50/25 189/2
object **[10]** 19/17 72/6 100/5
111/5 205/12 211/22 212/15
212/20 212/23 215/21
objected **[2]** 71/6 212/21
objecting **[2]** 73/23 74/21
objection **[15]** 17/15 64/4
68/10 70/25 71/19 72/4 72/19
89/8 89/11 90/17 103/23
112/20 196/11 201/25 220/18
objections **[20]** 16/19 16/20

objections... [18]  17/3 18/18
  20/4 65/24 70/6 70/13 71/4
  97/10 97/15 98/5 99/6 99/10
  100/13 105/3 113/13 114/22
  200/1 221/7
objective [1]  56/18
obligation [4]  11/24 16/6
  153/24 176/3
observations [1]  74/15
observe [1]  160/19
observed [2]  161/5 186/13
obtain [1]  162/16
obtaining [2]  167/22 168/19
obviate [1]  168/21
obvious [1]  163/16
obviously [7]  15/2 58/11
  119/13 160/21 184/23 194/14
  205/4
occasions [3]  48/2 52/4
  113/13
occur [2]  150/5 151/15
occurred [7]  50/11 144/20
  148/5 164/18 188/18 191/22
  194/18
occurs [3]  134/24 210/17
  211/5
October [4]  44/6 45/24 46/3
  54/10
odd [1]  174/3
off [5]  10/19 51/20 59/1
  136/20 221/10
offenses [1]  183/8
offer [17]  89/12 90/12 91/7
  92/8 92/11 92/19 92/21 92/24
  93/11 93/13 94/20 97/8 97/11
  159/21 163/6 172/24 196/2
offered [15]  20/23 21/13 68/7
  68/13 71/8 72/23 90/24 125/1
  125/2 163/5 197/10 200/9
  200/11 200/12 205/2
offering [3]  89/9 196/16
  196/17
offers [2]  91/4 91/5
office [17]  1/21 15/14 15/17
  26/6 50/23 51/6 51/6 73/18
  112/11 112/12 113/15 113/25
  114/8 114/12 118/13 132/24
  165/8
officer [2]  147/18 196/9
offices [1]  160/6
OFFICIAL [2]  2/12 222/7
officially [4]  5/6 127/10
  127/16 196/1
oftentimes [1]  15/19
oh [6]  32/24 44/21 131/5
  159/2 207/2 209/20
okay [157]  5/3 5/4 5/12 5/14
  7/10 14/21 17/12 22/23 23/3
  23/6 23/13 23/24 24/2 33/16
  37/13 42/9 44/10 53/9 54/8
  59/13 60/11 62/24 66/11
  66/15 67/8 67/16 67/24 68/2
  68/6 70/15 70/16 71/5 72/1
  72/2 72/3 72/17 73/25 74/11
  86/13 87/6 87/21 88/15 88/20
  90/22 91/2 91/15 92/2 92/7
  92/12 93/13 94/5 94/22 95/5
  95/10 95/20 95/25 98/10
  98/15 98/18 99/3 99/7 99/9
  100/12 101/20 102/22 102/25
  118/2 126/23 128/8 128/12
  128/17 131/22 132/12 133/7
  133/17 133/20 136/14 138/1
  139/5 139/8 139/12 152/3
  156/17 156/20 156/24 157/6
  158/11 158/14 158/21 159/4
  159/8 159/10 159/16 159/19
  165/20 165/25 166/13 168/23
  170/11 171/19 172/11 173/1
  178/7 180/2 185/23 187/13
  192/18 193/19 195/16 196/18
  196/23 197/12 198/21 201/3
  202/1 202/9 202/10 203/19
  204/5 205/12 205/14 206/6
  206/7 206/15 207/5 207/8
  207/8 209/24 210/13 212/18
  212/19 213/8 213/10 213/17
  213/18 214/1 214/4 214/25
  215/5 215/12 215/17 216/6
  216/21 217/4 217/9 218/7
  218/7 218/16 219/3 219/7
  220/1 220/10 220/20
old [4]  29/20 62/5 62/15
  98/21
older [1]  55/7
omitted [1]  54/1
on [330]
on-the-job [1]  11/24
once [6]  8/12 61/24 112/13
  131/10 150/12 164/15
one [137]  1/15 1/18 6/17 8/5
  8/19 10/18 17/14 17/15 18/16
  18/16 19/14 19/16 20/19 21/7
  21/12 22/6 22/11 22/11 22/11
  22/13 26/17 26/18 27/14
  27/22 30/25 32/11 32/21
  32/23 33/3 34/13 34/19 34/23
  34/24 41/4 46/22 47/19 48/17
  48/23 50/24 51/18 57/16
  57/21 60/17 66/18 70/22
  70/23 72/4 72/23 73/5 73/14
  73/20 78/7 82/25 83/21 89/25
  90/23 90/24 92/15 96/9 96/23
  97/17 97/21 97/22 97/23
  98/12 99/4 100/12 100/17
  101/6 101/8 101/22 102/12
  102/23 102/25 104/22 108/10
  109/14 113/10 115/15 123/25
  127/9 128/3 132/19 133/12
  133/13 135/3 135/4 135/8
  137/1 139/23 140/13 141/5
  142/3 143/25 146/9 148/4
  151/7 151/9 151/12 155/2
  158/12 159/15 163/12 165/7
  170/6 175/4 176/15 176/16
  178/9 178/16 179/20 181/21
  184/22 186/22 192/6 192/25
  193/12 193/20 193/21 200/16
  201/5 202/13 202/13 205/22
  206/2 206/4 206/8 206/10
  208/4 208/7 208/7 212/1
  216/7 218/9 219/10 221/11
  221/17
ones [5]  21/14 65/21 87/14
  97/9 196/8
only [39]  14/11 17/25 18/8
  20/22 21/4 30/17 66/23 71/18
  71/18 75/8 75/12 85/23 97/9
  99/1 106/2 113/11 115/21
  118/7 122/3 126/16 144/19
  173/15 175/7 187/10 188/17
  212/23 214/13 216/10 216/22
  217/22 218/18 218/18 219/6
  219/14 220/13
open [8]  59/15 154/16 176/20
  176/22 176/25 179/25 194/15
  194/16
opening [2]  199/5 200/6
operative [1]  61/7
Operatively [1]  130/25
opinion [14]  135/4 135/4
  135/16 135/20 135/21 136/6
  136/7 192/22 208/2 208/3
  208/4 208/12 208/21 208/23
opponent [1]  73/10
opportunity [3]  22/2 62/25
  129/23
opposed [2]  12/13 210/24
opposing [2]  196/7 200/23
opposite [3]  72/12 145/15
  180/23
oppression [1]  43/20
oppressive [2]  54/14 55/16
option [2]  203/5 203/5
optional [3]  96/8 96/9 96/14
or [233]
orally [2]  7/10 183/15
ordeal [1]  117/8
order [14]  17/5 19/20 52/23
  65/12 83/4 97/13 124/7 125/7
  151/22 160/16 163/7 170/1
  179/2 191/4
ordered [1]  125/6
ordinary [1]  189/4
orgasm [2]  164/7 164/8
orientation [4]  155/5 155/16
  155/23 156/3
other [75]  8/13 9/18 13/12
  14/24 15/8 17/21 20/4 21/19
  22/13 31/24 34/19 35/9 35/12
  37/16 38/15 45/12 48/9 50/22
  54/7 57/18 57/22 61/15 63/20
  68/9 68/10 73/17 74/9 77/9
  77/14 78/8 79/12 90/23 90/24
  98/12 100/7 101/7 103/19
  103/20 104/4 104/8 104/23
  107/16 107/17 108/11 112/20
  115/12 118/13 123/2 124/1
  131/2 136/13 139/6 145/1
  151/9 151/11 158/12 162/10
  173/12 174/4 175/19 177/18
  182/24 188/9 188/12 189/6
  189/9 190/17 194/25 195/4
  195/15 208/12 210/2 211/11
  211/12 219/10
others [2]  167/15 177/2
otherwise [6]  33/20 37/6
  97/21 142/19 216/12 216/18
ought [6]  115/23 126/8 181/22
  192/7 199/16 207/12
ounce [1]  161/21
our [74]  7/1 9/5 9/5 9/6
  14/23 14/23 16/19 16/23 17/2
  17/23 18/1 18/15 18/18 19/1
  19/16 19/17 19/24 21/8 21/13
  21/15 24/14 48/2 48/14 56/2
  59/16 66/19 68/13 70/7 70/7
  70/13 71/18 77/5 77/21 91/11
  91/13 92/6 92/11 92/24 93/11
  93/23 94/20 94/24 95/4 95/20
  97/8 97/10 97/15 98/5 98/14
  112/1 127/2 127/8 128/10

**our... [21]**  128/14 131/21 131/24 132/24 136/20 137/1 137/11 139/3 141/13 141/13 150/6 152/6 153/20 165/18 170/2 194/7 196/2 196/6 202/13 203/9 204/6
**ours [7]**  19/16 21/17 93/17 97/6 127/2 127/23 127/24
**out [63]**  11/14 13/14 14/25 16/4 19/24 23/5 23/7 27/10 37/11 48/12 50/16 53/15 63/8 66/12 66/15 69/17 70/10 71/1 79/20 97/2 97/18 97/25 98/1 98/8 120/8 120/16 122/20 123/13 123/24 125/23 126/21 133/16 135/20 139/22 150/25 153/17 162/8 167/14 168/9 172/13 172/19 172/24 177/12 184/2 186/21 187/8 190/7 191/10 197/13 199/11 199/17 200/5 202/11 203/9 207/15 209/4 209/6 209/9 209/10 213/5 215/18 219/11 221/13
**outdoor [1]**  161/24
**outside [32]**  17/10 17/15 17/16 19/23 22/24 23/14 58/11 59/1 65/15 74/13 74/14 98/9 118/14 136/1 139/15 139/25 142/19 143/11 158/18 161/5 161/19 161/20 162/7 162/11 162/14 163/2 166/20 168/7 179/25 185/22 198/17 201/1
**outstanding [3]**  112/23 156/25 157/9
**outward [1]**  80/6
**outweighed [1]**  61/7
**over [20]**  10/22 14/6 14/10 28/3 28/11 39/12 58/23 96/18 97/25 103/22 103/22 120/3 123/16 133/4 138/13 148/5 178/2 194/8 197/15 201/25
**overall [1]**  16/22
**overcome [1]**  52/24
**overnight [3]**  181/3 182/3 192/4
**overseas [4]**  11/3 120/22 154/25 155/12
**owes [1]**  153/7
**own [17]**  13/17 19/24 29/4 55/2 64/8 104/9 120/12 120/12 121/3 121/23 122/5 131/21 136/9 144/9 158/1 169/4 171/23

**P**

**P. [2]**  119/10 122/10
**P. Chapman [1]**  119/10
**P. Chapman's [1]**  122/10
**p.m [7]**  98/19 156/22 156/22 185/20 185/20 202/5 202/5
**Package [1]**  136/5
**page [31]**  3/2 4/3 16/14 16/19 17/2 18/2 18/22 20/2 21/13 42/4 42/6 42/9 44/11 45/9 45/18 46/15 47/2 71/4 72/5 97/3 99/6 99/11 107/19 109/17 133/23 135/16 135/24 136/7 214/10 217/5 221/12
**Page 12 [1]**  72/5

**Page 39-8 [1]**  71/4
**Page 615 [1]**  136/7
**Page 653 [1]**  135/16
**pages [3]**  18/22 37/7 37/7
**paid [3]**  64/11 80/23 80/25
**pain [3]**  204/19 204/19 204/20
**paint [1]**  54/23
**pair [1]**  163/3
**pants [1]**  163/3
**paper [2]**  29/6 197/15
**papers [3]**  16/9 171/8 195/20
**paragraph [5]**  131/14 175/6 175/7 213/21 214/2
**Pardon [1]**  33/12
**paren [1]**  177/14
**parent [1]**  106/24
**parenthesis [1]**  44/25
**parenting [1]**  106/22
**parents [3]**  45/6 102/8 103/8
**part [39]**  9/1 11/18 11/19 11/23 11/24 16/6 27/9 29/1 31/10 35/6 35/11 35/23 41/3 42/5 44/23 66/8 69/10 75/8 76/1 76/4 77/13 86/8 88/25 98/24 101/18 104/10 104/10 106/21 117/24 140/7 149/11 156/9 157/16 168/8 182/21 183/15 185/14 203/8 214/16
**participated [1]**  145/23
**particular [12]**  37/17 54/5 101/21 106/17 106/18 106/18 119/8 134/17 175/13 175/18 177/16 182/2
**particularly [7]**  36/3 42/19 43/12 135/16 183/11 186/18 198/11
**parties [5]**  8/13 97/16 112/2 115/12 142/24
**partner [1]**  48/11
**parts [3]**  25/13 173/12 188/13
**party [13]**  67/18 73/10 90/5 115/13 138/4 162/13 162/21 168/8 171/10 211/5 211/12 211/12 217/20
**Paskowitz [9]**  23/11 23/13 24/4 24/7 24/12 24/19 65/15 115/15 115/19
**pass [1]**  88/14
**passage [3]**  96/17 158/9 176/21
**passages [1]**  108/21
**passed [2]**  25/13 37/1
**passing [1]**  48/12
**past [20]**  40/22 41/7 42/25 43/15 43/18 177/19 204/8 204/21 204/23 204/25 210/6 210/7 211/19 212/7 212/15 218/21 219/1 219/5 220/17 220/18
**patient [41]**  28/25 29/3 29/7 29/20 30/5 30/21 30/22 30/23 30/24 31/16 32/19 34/22 38/13 39/1 40/5 40/11 41/1 42/1 42/17 43/6 50/13 51/7 51/9 52/14 52/16 53/10 53/11 53/11 53/16 53/18 53/19 56/21 56/22 58/24 64/20 77/1 79/2 79/3 81/14 81/15 82/8
**patient's [6]**  29/4 32/10 41/11 41/12 41/21 51/8
**patients [6]**  31/20 31/24 37/9

**patio [6]**  9 161/19 161/24 162/4 162/11 162/14 163/10
**pattern [9]**  8/11 9/1 10/15 11/15 15/1 47/5 63/15 143/8 153/14
**Patti [7]**  113/14 113/18 114/16 120/10 121/4 121/24 125/13
**Paxil [1]**  27/17
**paying [1]**  64/14
**payroll [1]**  150/24
**PC [1]**  1/15
**Penal [1]**  187/8
**pending [1]**  173/14
**penetrated [1]**  19/8
**penetration [1]**  203/2
**Pennsylvania [1]**  1/22
**Pensacola [1]**  149/1
**people [27]**  7/21 10/3 32/1 32/12 41/5 52/20 52/23 52/25 53/1 57/1 57/17 57/21 72/8 82/4 84/2 84/15 103/20 145/1 145/9 148/23 149/16 154/25 180/23 192/17 199/2 200/9 210/21
**per [2]**  38/23
**perceive [1]**  32/18
**perceived [3]**  78/11 78/18 199/22
**percent [7]**  16/24 17/10 37/5 38/21 72/12 79/13 79/21
**percentage [2]**  31/20 31/25
**perception [1]**  151/25
**perfect [8]**  24/20 37/5 66/21 81/4 97/17 181/12 181/14 184/8
**perfectly [1]**  189/4
**perhaps [9]**  41/23 48/20 55/22 86/20 102/12 117/20 126/17 143/22 188/10
**period [17]**  19/3 55/8 79/2 104/11 111/2 111/12 111/18 166/21 168/6 168/7 168/7 170/19 170/25 171/13 193/22 193/24 199/3
**permissible [1]**  58/3
**permitted [4]**  116/2 130/7 130/8 160/19
**perpetuate [1]**  13/16
**person [25]**  19/24 20/9 28/9 28/10 31/8 32/12 38/15 51/11 56/15 64/6 80/4 87/1 87/3 89/25 93/7 101/19 108/7 108/8 113/11 113/11 150/23 150/25 183/20 184/1 193/21
**person's [1]**  56/18
**personal [1]**  45/19
**personnel [2]**  15/15 15/18
**persuasive [1]**  176/8
**pertain [1]**  175/17
**pertained [3]**  175/12 177/15 182/1
**Pertinent [1]**  90/2
**pervasive [1]**  195/9
**Pete [4]**  93/3 93/10 93/11 93/16
**petition [2]**  213/13 213/15
**phantom [1]**  125/8
**pharmacies [2]**  46/22 47/19
**pharmacist [1]**  101/12
**philosophical [1]**  106/16

**phone [20]** 26/9 26/18 27/13 27/16 43/25 51/7 80/20 109/13 118/21 120/19 120/20 120/23 120/23 120/24 122/25 123/3 124/2 187/1 202/8 202/11
**phones [1]** 186/2
**photographic [2]** 34/8 160/7
**photographs [1]** 191/18
**phrase [1]** 86/15
**phrased [1]** 52/9
**physical [20]** 30/13 33/17 43/15 44/25 45/11 52/8 56/9 188/5 188/12 204/8 204/18 204/19 204/19 204/22 210/5 210/6 211/25 213/1 218/25 219/1
**physically [3]** 43/1 108/11 162/8
**physician [3]** 48/25 86/1 91/18
**physician's [1]** 19/4
**physicians [3]** 64/5 75/7 75/11
**pick [4]** 43/25 48/21 91/20 193/7
**picked [1]** 93/7
**picture [4]** 37/11 54/23 69/17 93/24
**piece [2]** 29/6 89/12
**pieces [4]** 27/24 80/1 83/9 83/13
**pills [1]** 99/22
**pin [1]** 13/14
**pitch [1]** 24/15
**PJC [3]** 133/4 207/15 210/22
**place [13]** 6/1 6/5 13/13 48/15 68/24 106/17 143/24 173/25 179/14 179/19 183/23 193/24 210/2
**placed [6]** 6/4 138/20 180/6 180/12 183/21 184/4
**places [2]** 5/22 70/6
**placing [1]** 163/17
**plaintiff [42]** 1/3 5/17 5/21 5/23 13/24 16/4 16/19 26/20 93/14 94/2 94/18 94/25 95/2 99/10 124/20 130/15 141/6 152/9 157/11 159/22 166/21 171/7 171/23 181/22 186/9 186/16 186/20 192/24 193/13 200/10 203/3 203/4 203/5 203/7 204/7 204/13 204/18 204/22 205/22 209/25 210/8 216/7
**plaintiffs [22]** 1/13 20/24 21/3 21/9 70/7 71/6 97/18 130/25 131/6 131/20 141/4 157/3 157/5 182/23 195/5 198/12 200/12 200/19 201/14 208/1 213/24 221/3
**plaintiffs' [21]** 9/9 16/23 17/3 17/17 21/14 21/22 72/11 72/14 72/17 94/7 117/22 122/7 129/16 129/21 149/8 156/6 157/10 158/24 159/6 187/14 200/9
**plan [2]** 55/22 197/17
**plans [3]** 96/7 110/4 184/22
**plastic [1]** 162/23

**say** 92/14 97/16 97/20 156/25 201/17
**played [19]** 17/3 17/17 17/18 17/23 18/1 18/5 18/18 18/23 19/9 21/4 22/17 22/22 69/7 196/3 196/5 196/8 201/14 201/16 201/17
**playing [16]** 92/4 92/10 92/18 92/23 93/10 93/16 93/22 94/6 94/15 94/23 95/3 127/3 128/5 128/9 159/5 201/16
**plead [1]** 177/18
**pleading [6]** 7/14 11/8 131/18 138/24 143/5 177/12
**pleadings [9]** 129/17 130/5 130/19 140/7 156/6 166/7 166/17 181/23 181/23
**pleads [1]** 166/18
**please [29]** 23/19 23/24 24/3 24/10 24/21 26/19 28/15 44/3 44/3 44/12 46/14 46/15 49/23 50/2 50/20 51/15 56/2 59/18 59/20 75/16 75/19 76/21 95/22 95/24 120/6 130/3 158/23 166/4 211/3
**pleasure [2]** 127/23 127/24
**pled [42]** 7/13 7/15 7/17 9/12 9/12 9/20 11/9 11/11 11/13 129/14 129/22 130/13 130/20 131/25 132/9 134/24 135/10 135/10 135/11 137/1 137/4 137/5 137/6 137/12 137/13 141/16 141/22 143/22 169/22 169/23 177/16 185/10 186/17 186/18 189/12 190/10 190/15 190/18 192/8 194/24 194/25 213/14
**plenty [4]** 20/17 20/18 191/19 204/11
**PLLC [1]** 1/21
**plus [5]** 81/22 140/20 140/22 197/25 197/25
**Poe [12]** 112/11 112/13 113/23 114/15 117/1 117/7 117/7 117/13 118/12 119/12 119/22 121/12
**Poe's [8]** 112/11 112/12 113/15 113/25 114/8 114/12 116/16 125/13
**point [50]** 6/7 10/4 12/3 16/4 18/4 21/11 21/12 26/18 27/8 32/2 42/23 50/16 71/21 74/12 87/21 90/7 95/15 101/20 101/21 103/25 117/12 117/22 124/16 124/16 142/5 142/5 143/3 143/13 144/16 145/13 152/4 155/18 155/19 158/4 161/17 164/6 164/24 167/6 169/23 170/7 173/2 181/2 187/6 190/12 193/16 199/23 200/5 210/8 215/18 219/11
**pointed [4]** 153/16 162/8 199/17 221/13
**pointer [1]** 28/20
**points [2]** 48/10 64/2
**police [1]** 11/24
**policies [7]** 10/7 144/18 176/12 177/8 179/17 183/10 183/11
**policy [10]** 6/1 101/13 144/11 176/14 176/20 176/22 177/1

**pony [1]** 149/4
**popped [1]** 123/24
**Porter [2]** 2/5 135/24
**portion [10]** 50/1 51/16 76/22 77/8 96/6 96/11 157/12 157/22 159/21 159/22
**portions [7]** 21/3 77/9 77/17 77/20 96/2 96/8 157/7
**position [15]** 9/4 9/5 14/6 14/16 122/8 137/10 137/11 142/23 149/8 151/21 170/5 172/17 185/5 199/24 200/2
**positive [4]** 28/9 82/22 111/22 211/8
**posits [1]** 9/13
**possession [3]** 116/16 162/22 165/4
**possibilities [1]** 47/13
**possibility [2]** 26/25 190/7
**possible [5]** 29/8 51/8 82/9 163/25 176/4
**possibly [4]** 12/24 40/25 67/11 73/13
**post [20]** 33/14 38/10 38/12 38/23 58/21 61/1 77/24 78/4 78/9 78/15 78/19 80/3 83/25 84/4 84/9 85/12 88/4 88/11 111/2 190/4
**post-event [1]** 190/4
**post-Iraq [3]** 33/14 58/21 61/1
**post-rape [1]** 111/2
**post-traumatic [15]** 38/10 38/12 38/23 77/24 78/4 78/9 78/15 78/19 80/3 83/25 84/4 84/9 85/12 88/4 88/11
**potential [2]** 123/20 153/25
**potentially [6]** 16/7 32/11 41/15 47/15 57/25 153/25
**practice [10]** 24/22 29/12 31/22 31/23 31/24 131/18 139/19 141/18 141/19 167/15
**practicing [2]** 58/20 60/22
**practitioner [1]** 167/7
**pre [1]** 75/24
**pre-Iraq [1]** 75/24
**preceded [1]** 134/18
**preceding [1]** 103/14
**precisely [1]** 175/25
**Precision [1]** 136/5
**precluded [1]** 132/5
**predicate [7]** 58/10 205/21 209/21 209/22 215/22 215/23 215/24
**predicated [12]** 206/11 206/18 206/20 207/1 207/4 214/22 215/1 216/17 219/13 219/14 219/16 219/20
**predisposition [2]** 61/4 108/12
**predominantly [2]** 6/9 8/7
**preemptive [1]** 192/19
**pregnant [1]** 49/2
**prejudice [5]** 61/7 61/12 62/16 65/7 171/24
**prejudices [1]** 158/3
**prejudicial [3]** 17/1 19/21 65/2
**prejudicing [1]** 68/16
**preliminary [1]** 59/12
**premises [1]** 148/6

**P**

**prepare [2]** 55/21 185/1
**preponderance [3]** 190/23
191/4 192/8
**preposterous [1]** 194/20
**prescribed [2]** 53/6 99/21
**prescription [4]** 101/12
101/15 102/23 107/13
**prescriptions [4]** 46/21 47/6
53/4 100/6
**presence [7]** 58/11 59/1 59/3
65/15 158/18 198/18 201/1
**present [28]** 5/2 23/8 29/22
30/21 31/2 40/3 40/5 41/7
59/19 65/18 68/19 75/18 84/6
87/19 89/22 94/18 95/23
98/20 100/4 100/10 105/13
127/20 128/1 128/18 156/23
158/22 166/5 202/7
**presentation [4]** 56/14 111/5
154/24 156/1
**presented [10]** 17/19 42/19
46/2 88/6 99/13 108/25 109/3
109/4 109/12 109/18
**presenting [2]** 40/11 160/7
**presents [1]** 29/20
**preserve [2]** 218/19 221/6
**preserved [2]** 219/7 221/7
**presumably [2]** 22/12 174/22
**pretend [2]** 54/17 57/1
**pretrial [1]** 97/10
**pretty [10]** 27/22 29/12 45/24
46/4 82/2 101/6 126/7 147/11
213/11 221/2
**prevail [1]** 191/5
**prevent [1]** 145/18
**prevents [1]** 78/22
**previous [6]** 43/18 44/16 45/1
50/24 51/1 82/20
**previously [7]** 13/19 21/4
25/21 89/22 121/25 126/14
162/1
**prima [2]** 8/22 134/2
**prima facie [1]** 134/2
**primarily [1]** 186/24
**principal [2]** 134/25 142/18
**print [1]** 215/15
**Printing [1]** 136/5
**prior [35]** 43/19 47/20 49/21
50/7 52/5 52/8 55/3 55/5
55/16 58/12 58/18 60/8 60/18
60/25 61/2 61/4 61/9 62/2
62/12 74/6 75/23 97/24 118/4
122/15 136/12 144/21 144/21
148/10 151/1 160/17 161/18
161/20 162/17 167/5 167/5
**private [3]** 24/22 180/13
188/13
**probability [2]** 88/10 218/23
**probable [2]** 147/5 147/8
**probably [23]** 18/11 27/8 27/9
28/13 31/11 32/21 37/6 43/6
65/23 81/19 83/10 83/12
84/14 106/10 125/8 125/25
126/25 135/14 184/11 184/18
192/15 211/3 215/19
**probative [6]** 61/6 62/14
62/15 105/25 106/2 106/7
**problem [14]** 16/25 32/10
52/19 89/14 100/19 129/20
130/11 153/4 155/2 182/13

**problems [9]** 15/9 40/6 41/3
41/4 57/21 102/7 104/14
140/21 154/21
**procedure [2]** 176/14 201/1
**procedures [1]** 176/13
**proceed [4]** 23/10 91/22 92/3
127/25
**proceeded [1]** 161/9
**proceedings [4]** 1/24 133/24
221/19 222/2
**process [3]** 67/13 171/13
189/20
**produce [2]** 55/20 80/3
**produced [4]** 1/24 78/22 146/2
191/7
**produces [2]** 78/18 79/18
**production [1]** 56/8
**professionals [1]** 61/15
**proffer [6]** 60/13 60/14 90/18
128/14 159/6 165/18
**proffered [1]** 15/2
**profile [4]** 40/11 42/2 42/19
46/6
**profits [2]** 151/25 152/23
**program [1]** 41/9
**programmed [1]** 64/17
**progress [2]** 50/12 193/18
**prohibition [1]** 62/9
**prolonged [1]** 80/8
**promised [1]** 159/9
**prompt [2]** 205/16 206/16
**pronoun [1]** 22/18
**proof [14]** 62/7 129/18 129/22
130/8 131/20 132/9 143/6
145/20 151/7 185/13 185/16
190/22 208/9 221/2
**properly [3]** 51/6 112/17
115/4
**proposal [2]** 96/5 194/4
**propose [3]** 128/23 193/2
207/23
**proposed [10]** 17/11 112/24
126/16 130/12 132/7 185/6
195/5 202/13 203/8 210/8
**proposing [1]** 168/16
**proposition [4]** 72/12 136/7
150/1 153/7
**proposition that [1]** 150/1
**prosecuted [1]** 191/9
**prosecutor [1]** 148/14
**protect [3]** 9/18 116/20
144/18
**protected [5]** 7/21 8/24 84/24
85/5 119/3
**protector [1]** 104/16
**protocol [1]** 147/1
**prove [6]** 67/10 109/20 119/4
185/11 191/3 192/7
**proved [2]** 145/14 151/8
**proves [2]** 10/6 10/9
**provide [1]** 64/23
**provided [5]** 7/25 14/23 14/24
89/21 165/13
**providers [1]** 29/13
**province [1]** 106/7
**proving [1]** 135/9
**provision [6]** 12/8 12/16
153/1 170/23 174/13 175/14
**proximate [1]** 210/14
**proximately [1]** 180/20
**Prunty [2]** 135/15 135/19

**PSD type [1]** 30/20
**psychiatric [4]** 30/19 41/3
54/25 55/12
**psychiatrically [4]** 41/12
41/20 42/1 55/9
**psychiatrist [14]** 24/22 25/17
25/22 32/19 37/3 41/17 41/19
41/22 43/9 43/14 52/21 52/24
53/2 64/8
**psychiatrist's [1]** 33/2
**psychiatry [2]** 25/5 25/8
**psychological [6]** 54/24 55/13
56/9 63/19 63/22 104/14
**psychologically [2]** 41/11
55/9
**psychologist [3]** 43/10 52/21
52/23
**psychosocial [1]** 44/5
**psychotropic [1]** 100/16
**PTSD [2]** 84/15 84/19
**public [1]** 151/24
**publicity [2]** 202/17 217/14
**pull [1]** 185/3
**pulled [1]** 13/14
**punish [3]** 9/2 10/11 10/12
**punished [8]** 7/20 8/1 10/13
10/14 182/10 182/12 182/15
182/16
**punishing [2]** 8/7 10/16
**punitive [4]** 136/3 213/23
214/13 214/21
**purchased [1]** 101/10
**purpose [3]** 19/15 77/5 125/1
**purposes [3]** 110/24 174/4
202/15
**pursue [1]** 174/23
**pursued [1]** 174/21
**pursuit [2]** 174/10 174/10
**push [2]** 63/5 174/10
**pushed [2]** 10/19 165/2
**put [32]** 5/23 18/3 18/13
19/12 22/1 22/3 28/14 42/7
46/14 49/23 56/2 60/1 62/18
74/1 98/24 115/4 115/15
115/15 124/17 125/22 131/20
132/10 136/20 158/17 169/1
171/9 185/13 199/24 200/13
205/6 218/14 220/24
**put the [1]** 18/13
**puts [3]** 122/22 150/25 200/2
**putting [6]** 19/11 37/12 57/11
101/15 126/17 168/20

**Q**

**qualifications [1]** 114/22
**qualified [1]** 106/22
**quality [1]** 72/14
**quell [1]** 15/24
**question [87]** 40/10 40/13
40/16 43/6 43/7 43/9 43/21
44/13 44/16 45/10 51/5 52/9
53/17 53/17 53/19 54/22 55/2
57/6 57/7 64/7 66/25 71/10
71/16 74/2 87/6 87/7 87/9
90/6 99/16 99/20 99/24 100/2
100/9 100/11 104/4 107/2
110/20 121/17 133/9 150/7
163/14 163/21 164/19 168/1
168/2 179/22 183/14 184/22
193/2 202/20 203/18 203/21
204/1 204/3 205/18 205/22
205/24 206/1 206/3 206/7

# Q

**question... [27]**  207/19
209/12 210/13 211/2 214/6
214/9 214/21 214/22 214/23
214/23 214/24 215/18 216/2
216/2 216/5 216/7 216/11
216/11 216/12 216/13 216/16
216/18 216/19 218/4 218/5
218/13 219/12
**Question 1 [1]**  133/9
**questioned [1]**  165/8
**questioning [3]**  63/24 86/11
160/25
**questions [34]**  30/25 57/12
59/24 62/23 65/9 80/11 80/13
82/14 84/1 85/18 86/9 86/13
87/24 88/15 99/13 99/15
100/1 100/8 104/18 105/1
105/3 105/11 106/3 106/11
106/13 106/14 106/17 106/19
109/7 110/2 123/25 149/25
180/8 216/17
**quibble [1]**  38/1
**quick [2]**  172/2 215/16
**quickly [3]**  19/15 92/1 136/19
**quiet [7]**  140/21 140/25
151/23 151/24 152/22 153/1
153/3
**quit [1]**  144/9
**quite [6]**  27/15 141/25 143/15
143/18 166/24 171/17
**quote [2]**  160/23 160/24
**quotes [1]**  22/16

# R

**RA [1]**  89/20
**raining [1]**  185/22
**raise [8]**  20/4 23/18 131/24
131/24 166/10 167/11 167/16
190/22
**raised [3]**  70/19 172/4 172/5
**raising [2]**  27/16 198/10
**rampant [2]**  15/10 15/11
**ran [1]**  66/10
**range [2]**  98/8 98/9
**ranking [1]**  73/8
**rape [56]**  6/15 6/19 6/23 8/12
8/16 12/25 30/6 51/3 52/3
52/4 62/3 62/4 65/7 67/5
83/17 84/25 85/8 86/16 89/23
90/10 111/2 111/12 117/22
123/23 124/13 125/10 129/15
131/16 132/2 144/24 146/20
146/22 146/24 147/6 148/5
150/5 174/2 174/14 180/20
186/7 187/5 187/7 187/10
187/11 187/17 187/24 188/6
189/9 190/24 191/4 195/15
202/21 202/23 216/2 216/5
218/5
**raped [20]**  30/11 30/24 31/20
32/1 35/9 50/5 51/13 51/22
74/16 90/3 90/5 120/14
131/11 145/19 146/25 151/8
189/15 189/16 189/17 195/1
**raping [1]**  131/9
**rapist [2]**  10/18 67/14
**rapists [8]**  131/3 131/5 131/9
131/11 192/4 192/4 192/5
195/1
**rather [4]**  18/13 31/2 168/1

**ratification [46]**  6/24 7/13
7/16 8/3 8/17 9/12 9/20 11/5
11/9 11/10 11/12 11/15 11/17
13/4 133/25 134/7 134/16
134/18 134/24 134/24 135/12
136/25 137/2 137/20 138/24
139/13 140/2 140/2 140/12
141/5 141/16 142/9 142/17
143/4 143/7 143/22 143/23
144/19 144/23 144/23 145/1
150/13 150/20 151/1 151/15
186/17
**ratifications [1]**  144/21
**ratified [5]**  9/19 142/16
143/6 143/23 145/9
**ratify [10]**  7/11 7/18 8/6
13/11 136/8 139/1 140/9
144/6 145/4 145/20
**ratifying [2]**  140/24 150/16
**rationale [1]**  173/21
**re [2]**  34/21 35/17
**re-traumatize [2]**  34/21 35/17
**reach [1]**  194/5
**reached [1]**  6/21
**read [36]**  16/9 16/10 27/23
27/24 27/24 35/13 36/9 46/13
47/9 48/19 58/3 88/22 88/25
89/4 90/25 95/12 96/1 96/5
96/7 96/12 96/16 98/23
147/19 151/18 151/20 157/19
157/21 159/20 172/2 176/21
187/9 197/2 197/2 197/3
197/21 211/1
**readdress [1]**  133/25
**reading [4]**  27/15 27/17 89/16
177/12
**reads [1]**  206/3
**ready [14]**  5/12 19/25 22/12
91/10 92/2 92/8 152/9 156/17
184/15 184/21 184/23 184/24
185/3 202/9
**real [5]**  19/15 87/14 129/20
130/11 172/2
**reality [2]**  105/14 105/16
**realized [1]**  133/4
**really [28]**  11/23 21/24 22/5
44/22 70/21 104/22 108/22
113/7 126/20 128/22 142/6
148/21 155/4 160/9 178/5
181/16 181/19 183/13 183/17
185/5 187/19 192/11 192/21
196/19 203/1 205/3 214/3
220/25
**realm [1]**  190/7
**reask [1]**  87/1
**reason [16]**  21/6 21/7 21/25
22/5 22/10 22/13 48/24 64/23
115/10 115/11 126/13 165/20
165/23 170/22 175/25 191/24
**reasonable [9]**  35/19 88/10
138/20 168/10 168/10 190/25
212/16 218/21 218/22
**reasonably [6]**  33/1 42/23
53/19 80/9 118/5 122/5
**reasoning [4]**  62/20 172/20
172/23 172/23
**reasons [14]**  17/18 22/7 40/13
53/23 53/24 57/17 61/19
106/5 115/9 152/22 176/19
188/20 200/24 201/2
**reassured [1]**  115/21

**rebuttal [15]**  72/13 89/12
98/24 116/2 116/19 117/18
117/25 118/2 118/2 118/4
118/8 118/10 122/3 124/3
159/15
**rebutting [1]**  119/1
**recall [29]**  6/18 26/23 27/11
30/4 34/5 34/7 34/12 49/9
76/3 76/4 76/5 79/11 79/24
86/10 99/20 99/23 100/5
102/2 104/22 105/7 141/19
162/17 163/12 181/13 181/14
184/7 184/8 184/10 213/14
**recalled [8]**  161/8 161/15
161/17 162/2 162/12 164/18
164/22 165/1
**recanted [1]**  49/11
**receive [2]**  7/1 19/17
**received [6]**  21/2 41/24 64/20
85/11 118/17 118/21
**recent [2]**  154/9 157/15
**recently [4]**  14/23 35/13 98/5
154/9
**reception [1]**  93/25
**Recess [5]**  65/17 98/19 156/22
185/20 202/5
**recessed [1]**  221/19
**recipient [1]**  110/24
**recklessly [1]**  211/7
**recognize [2]**  56/3 154/14
**recollecting [1]**  110/25
**recollection [9]**  25/21 33/23
37/5 76/10 81/10 81/12 101/8
122/24 165/17
**recommend [1]**  203/10
**recommendation [1]**  64/21
**reconstructive [2]**  30/14
34/11
**record [41]**  5/22 6/8 16/4
16/13 18/21 24/11 30/3 35/19
37/8 39/23 58/17 59/1 60/7
60/16 61/17 64/11 64/13
64/15 81/4 95/12 116/9 121/3
126/4 127/11 168/11 171/16
196/2 196/5 196/20 196/21
197/4 197/9 202/10 202/15
205/6 215/13 219/6 220/11
220/12 221/10 222/2
**recorded [2]**  1/24 81/8
**records [11]**  28/6 29/9 46/21
47/19 51/24 101/9 106/20
147/3 190/5 220/16 220/16
**recovered [1]**  123/20
**recovery [1]**  11/20
**red [1]**  150/22
**redact [2]**  42/5 160/11
**redacted [3]**  112/24 160/3
160/4
**redacting [1]**  157/18
**reduce [2]**  130/8 130/8
**reduced [1]**  185/16
**redundancies [1]**  97/22
**reexperience [1]**  82/20
**refer [1]**  133/24
**reference [6]**  36/18 66/18
66/23 110/24 167/25 200/16
**referenced [3]**  17/2 113/13
116/11
**references [1]**  22/21
**referential [1]**  203/12
**referral [1]**  25/20

**referred [6]** 26/4 52/4 56/15
 138/7 151/19 176/22
**referring [3]** 18/7 18/7 76/17
**reflected [2]** 121/20 212/24
**reflecting [1]** 46/21
**refresh [2]** 109/24 111/6
**refreshing [1]** 110/25
**refused [1]** 21/14
**regard [3]** 9/25 209/15 215/25
**regarding [17]** 27/6 54/7
 55/15 57/22 65/25 66/2 78/14
 104/19 163/17 163/19 164/20
 172/15 175/11 175/16 177/13
 181/25 184/22
**regardless [2]** 62/9 131/14
**regimen [1]** 55/19
**regular [1]** 167/7
**rehired [2]** 7/22 7/23
**reiterated [1]** 163/18
**rejected [2]** 22/5 179/3
**rejoined [1]** 162/10
**rejoining [1]** 162/16
**related [6]** 35/20 46/3 104/11
 174/12 183/12 214/14
**relationship [21]** 45/5 45/7
 49/19 54/15 54/24 55/3 55/5
 55/16 62/18 68/3 101/17
 102/7 104/17 104/19 104/25
 105/9 107/22 153/23 154/5
 154/7 154/7
**relationships [2]** 44/17 45/1
**relatively [3]** 31/9 55/17
 97/23
**released [1]** 99/21
**relevant [26]** 43/23 58/18
 58/19 58/22 60/9 63/12 63/12
 63/17 63/21 64/9 65/6 67/7
 67/10 69/1 69/12 72/10
 100/16 100/21 102/21 103/17
 107/24 110/8 112/15 125/20
 153/15 200/10
**reliably [1]** 150/24
**reliance [2]** 177/4 211/15
**relied [5]** 115/13 175/10
 181/24 183/2 183/5
**relies [1]** 211/12
**reluctant [2]** 125/6 154/4
**relying [2]** 72/19 171/25
**remain [1]** 70/6
**remainder [2]** 38/5 97/14
**remaining [4]** 70/22 70/25
 71/3 198/3
**remains [1]** 173/5
**remarkable [1]** 102/19
**remedial [2]** 205/17 206/16
**remedies [4]** 139/19 141/18
 141/20 193/9
**remember [46]** 6/5 6/10 25/11
 25/12 25/13 27/12 29/10
 33/24 34/4 34/15 35/8 35/10
 35/13 36/8 36/19 37/16 37/24
 38/7 52/12 76/12 79/3 79/8
 79/10 79/11 83/24 95/11
 100/3 102/1 102/17 103/19
 103/21 104/5 104/6 105/15
 107/5 107/6 107/10 107/17
 109/13 109/19 109/21 111/1
 156/2 159/20 181/11 187/20
**remembered [2]** 34/17 77/11
**remembering [4]** 79/3 79/12

**remind [1]** 91/17
**reminder [1]** 93/6
**remove [1]** 19/25
**removed [1]** 97/14
**renders [3]** 139/23 150/13
 150/19
**renewed [1]** 169/15
**repeat [1]** 103/22
**repeated [2]** 55/6 59/6
**repeatedly [2]** 115/21 124/15
**repeating [1]** 181/22
**repetitive [3]** 18/8 21/6 21/8
**replay [1]** 21/3
**replayed [1]** 18/21
**report [29]** 27/19 27/23 27/23
 27/25 29/6 29/10 31/16 35/6
 37/6 46/13 48/19 48/21 49/10
 50/6 51/1 51/25 88/24 89/8
 89/17 89/18 89/21 90/13 95/9
 96/2 96/3 96/6 96/11 157/17
 159/22
**reported [11]** 34/10 35/4 36/1
 38/2 48/11 52/3 78/1 78/14
 110/21 124/13 152/20
**reporter [5]** 2/12 24/13 44/22
 81/24 222/7
**Reporter's [1]** 222/1
**reporting [13]** 7/21 43/12
 50/10 51/8 75/23 77/6 77/10
 77/16 89/20 125/9 152/21
 182/12 182/15
**reports [12]** 15/16 15/19
 27/14 27/17 27/21 30/5 30/11
 40/6 45/7 75/7 77/1 78/10
**represent [3]** 24/8 44/7 196/8
**representation [6]** 8/1 98/2
 177/4 179/16 211/6 213/7
**representation and [1]** 98/2
**representations [6]** 143/20
 177/20 177/21 177/23 178/10
 178/11
**representative [1]** 160/18
**represented [4]** 15/5 61/18
 138/8 176/23
**reprimand [1]** 9/2
**reprimanded [1]** 8/25
**repudiate [1]** 135/1
**reputation [1]** 165/11
**request [2]** 52/1 163/11
**requested [3]** 147/25 160/18
 203/22
**require [10]** 11/12 54/19
 54/21 106/17 121/1 149/13
 169/9 178/20 178/25 178/25
**required [6]** 9/12 22/19 54/17
 55/6 131/25 213/22
**requires [5]** 38/13 38/25
 143/5 166/18 213/12
**requiring [1]** 101/2
**requisite [2]** 141/5 213/22
**reservations [1]** 114/22
**reserved [1]** 157/24
**reshow [1]** 21/10
**residency [5]** 25/1 25/3 25/5
 25/23 29/2
**resident [3]** 171/5 171/6
 171/6
**residents [1]** 170/18
**resolve [1]** 138/17
**resolved [1]** 202/14
**respect [7]** 8/4 62/3 83/15

**respectfully [4]** 17/25 73/9
 141/3 212/3
**respects [1]** 184/20
**respond [12]** 9/10 98/2 100/14
 103/5 123/13 124/1 136/17
 136/19 141/1 182/4 190/21
 204/15
**respondeat [6]** 6/15 7/17
 136/22 137/17 169/19 186/16
**responded [6]** 40/22 84/18
 131/21 163/10 164/22 190/13
**responds [3]** 99/15 110/19
 110/22
**response [22]** 14/24 17/12
 67/8 71/18 72/17 73/19 74/9
 74/11 95/12 100/13 110/12
 130/17 131/22 131/23 139/12
 143/15 143/18 160/25 163/14
 163/21 164/19 190/20
**responsibilities [1]** 68/25
**responsible [3]** 65/21 150/15
 195/1
**responsive [4]** 7/1 96/22
 98/23 117/19
**rest [11]** 22/21 83/13 89/2
 98/14 127/8 127/10 127/11
 127/16 156/18 158/17 196/1
**resting [1]** 138/16
**restricted [1]** 15/3
**restroom [4]** 60/3 66/10
 160/22 164/17
**rests [1]** 91/5
**result [4]** 51/3 146/6 148/8
 164/14
**results [1]** 9/24
**resume [1]** 75/20
**retaliation [3]** 134/6 138/10
 138/19
**retribution [3]** 134/7 138/10
 138/18
**retrieve [2]** 99/2 118/25
**retrieved [1]** 123/4
**return [1]** 145/16
**returned [4]** 162/13 162/21
 163/7 164/15
**returning [1]** 162/15
**revealed [1]** 52/10
**review [1]** 27/5
**reviewed [3]** 75/6 186/15
 193/10
**revised [1]** 132/25
**revisit [1]** 62/1
**Rhonda [2]** 26/9 26/11
**Richmond [3]** 1/16 1/19 25/1
**rid [1]** 59/13
**ridiculous [2]** 194/19 195/4
**right [145]** 14/25 18/12 20/19
 21/8 21/10 23/9 23/19 24/13
 24/17 24/18 24/23 25/15 26/5
 26/8 26/11 26/12 26/22 26/25
 27/25 28/7 28/10 28/13 28/20
 28/21 29/5 33/5 33/14 33/15
 34/25 38/7 38/9 39/10 39/23
 40/4 41/19 42/12 43/5 43/22
 46/11 47/17 48/1 48/20 49/9
 49/24 50/8 50/20 51/24 52/14
 54/5 56/2 59/3 64/6 65/20
 66/17 67/24 69/9 70/13 70/23
 73/25 76/14 76/21 76/24
 77/18 77/19 78/21 78/25
 80/14 80/21 81/5 81/15 84/11

**R**

right... **[74]** 84/13 87/11
87/21 89/7 89/15 91/2 91/6
91/7 91/22 92/21 93/1 93/5
93/18 94/9 94/12 94/19 94/25
98/21 111/14 115/13 117/23
119/7 127/5 127/25 128/4
129/24 130/21 131/1 133/7
133/14 137/19 138/12 140/17
141/20 145/10 147/1 159/10
159/11 164/2 166/6 167/3
170/17 172/3 174/23 179/21
184/6 187/8 194/5 197/16
199/24 201/20 203/14 203/24
205/10 205/10 207/9 207/13
207/14 208/10 209/3 209/10
209/11 209/12 210/3 210/10
211/1 213/19 213/24 214/4
215/16 216/16 217/11 218/12
219/19
rights **[2]** 174/22 174/22
rise **[5]** 59/18 95/22 128/17
154/8 166/4
risk **[3]** 12/7 70/2 174/19
Riverway **[3]** 1/15 1/18 2/10
road **[2]** 9/25 150/25
rogue **[1]** 151/14
role **[1]** 160/17
Ron **[5]** 1/17 5/10 109/9
109/25 213/3
room **[19]** 29/22 31/8 50/14
83/2 84/22 87/19 89/23 89/24
160/15 161/16 162/16 163/7
164/17 172/14 172/19 172/24
180/13 180/16 181/17
roommate **[3]** 66/25 94/21
161/16
ROOT **[2]** 1/6 1/7
rough **[2]** 191/6 192/11
roughly **[1]** 33/14
roughness **[1]** 189/23
round **[5]** 37/11 50/16 69/17
ruffie **[2]** 163/18 163/19
rule **[19]** 22/15 59/5 59/9
59/10 61/3 62/7 63/22 89/12
96/8 97/25 108/1 118/2
171/20 172/2 172/5 172/6
172/7 184/23 184/24
Rule 412 **[4]** 59/10 61/3 62/7
108/1
ruled **[15]** 63/6 63/22 68/12
68/18 69/5 75/3 88/24 159/17
173/3 173/11 173/17 198/11
198/19 199/18 200/1
rules **[5]** 8/25 13/17 115/16
116/9 199/25
ruling **[19]** 20/1 59/7 59/10
59/11 59/12 62/8 62/9 65/4
75/2 98/1 126/13 126/14
157/24 172/18 173/4 199/1
199/22 200/3 220/5
rulings **[3]** 102/22 186/17
193/6
Rumba **[6]** 19/1 73/15 73/22
91/16 92/4 92/10
Rumba's **[1]** 74/15
run **[5]** 126/18 143/10 166/16
169/11 199/11
Runions **[1]** 2/4
running **[1]** 169/9
runs **[2]** 150/22 171/5

**S**

S.W.2d **[1]** 135/24
S.W.3d **[1]** 141/14
sad **[1]** 192/17
safe **[3]** 8/13 15/5 121/14
safely **[1]** 110/8
safety **[8]** 6/5 175/11 175/16
177/14 181/25 182/7 182/10
183/22
said **[66]** 5/5 5/15 20/22
21/15 34/17 37/6 37/24 52/12
62/1 72/24 81/5 81/8 81/12
81/23 82/11 84/23 84/24
84/24 85/1 85/2 109/13
109/18 114/10 114/11 114/12
119/2 119/25 120/11 121/1
121/11 121/18 125/15 127/4
131/5 131/12 142/21 144/12
147/7 149/16 150/9 154/13
155/22 158/8 165/8 172/1
174/21 174/24 178/20 179/19
179/24 179/24 179/25 183/1
184/11 188/22 189/16 191/21
193/13 196/5 200/7 201/20
205/25 208/19 213/2 219/12
220/23
same **[32]** 8/4 11/4 13/14
16/24 17/2 17/21 19/20 55/18
68/4 68/19 71/11 72/13 72/18
84/21 103/8 105/1 105/3
124/19 152/22 163/1 165/13
175/25 180/5 180/15 180/16
184/10 196/8 197/3 201/12
214/8 214/9 219/15
samples **[1]** 89/22
San **[3]** 48/16 49/16 85/19
San Diego **[1]** 48/16
Sara **[8]** 70/5 72/16 73/6
92/14 92/18 92/23 194/15
194/21
sat **[1]** 161/16
satisfaction **[1]** 145/14
save **[1]** 126/19
saw **[8]** 30/2 36/18 84/22
91/18 160/20 163/2 189/2
189/14
say **[80]** 6/22 18/6 19/8 19/11
24/14 24/15 38/17 46/2 46/8
51/9 63/2 68/17 70/8 71/12
72/7 79/4 80/4 83/6 83/8
85/13 86/6 97/12 104/7
106/23 106/24 109/22 111/25
114/11 119/9 119/24 120/9
120/13 121/2 122/17 126/4
126/25 132/19 138/2 139/16
139/21 140/8 140/10 140/18
140/23 142/1 142/3 142/15
146/17 150/15 168/14 169/15
174/4 174/8 174/20 178/8
178/9 179/21 181/21 181/23
182/24 183/3 184/12 185/8
196/3 198/4 198/5 198/12
198/22 201/6 201/9 201/11
201/21 201/23 201/25 205/5
207/23 217/3 218/19 219/10
220/15

**S** (continued column)
32/5 32/7 32/22 32/5
32/25 34/12 35/10 36/7 36/19
39/16 44/20 53/16 53/16
61/14 66/13 72/23 86/25
97/24 106/9 137/19 142/15
169/5 171/19 174/16 174/17
174/20 176/8 183/20 183/21
189/10 189/18 195/10 195/11
215/7 215/10 215/11
says **[41]** 19/5 38/2 39/4
45/21 61/4 67/3 68/22 69/22
69/23 71/13 73/17 99/19
99/23 100/23 103/1 104/6
109/11 110/12 116/17 120/12
125/14 126/2 126/4 130/23
130/23 134/5 138/11 138/12
151/2 151/2 151/5 171/21
179/19 179/20 179/21 180/6
180/7 191/8 191/16 206/23
211/5
Scarano **[5]** 27/19 60/20 64/3
64/6 105/8
Scarano's **[5]** 27/23 46/13
48/19 48/21 49/9
scenario **[1]** 144/24
scheme **[1]** 77/12
Schmidt **[8]** 66/24 66/25 67/7
68/10 91/25 94/20 94/23 95/3
Schmidt's **[1]** 68/19
school **[8]** 24/24 24/25 25/2
29/1 46/6 56/25 57/16 57/20
Schulz **[4]** 19/8 189/3 191/16
191/17
scientific **[1]** 89/24
scope **[20]** 12/12 12/17 12/19
13/1 13/3 13/11 13/15 17/10
17/15 17/16 74/13 74/14
136/23 139/25 142/20 142/25
143/12 150/21 174/5 174/9
Scott **[3]** 48/3 48/8 50/24
Scott's **[2]** 49/17 50/23
scrapes **[1]** 189/6
screen **[2]** 28/14 29/19
sealed **[1]** 65/16
seat **[3]** 23/18 23/24 60/1
seated **[5]** 59/20 75/19 95/24
128/19 158/23
second **[6]** 27/10 52/20 61/22
74/18 108/15 111/11
secondly **[2]** 19/19 96/15
seconds **[3]** 17/14 18/17
158/15
secret **[1]** 15/21
section **[8]** 18/5 66/24 69/7
74/8 97/23 97/23 139/19
141/18
secure **[1]** 138/20
security **[9]** 7/25 89/18 93/20
120/16 138/13 138/14 160/3
160/6 176/12
sedative **[1]** 83/12
see **[67]** 6/12 9/25 22/15 23/7
25/19 26/3 27/25 28/10 29/15
31/18 32/14 32/21 36/15 40/8
43/7 44/5 44/7 44/11 44/18
45/1 45/4 45/10 45/16 45/19
45/21 46/20 46/23 47/5 48/5
48/10 49/24 50/3 50/10 50/23
53/25 56/21 64/19 69/18 71/5
77/2 84/4 85/13 87/14 87/18
101/3 105/20 131/15 133/8

**see... [15]** 155/3 161/3 166/6 170/14 181/18 183/17 185/24 187/4 192/18 198/15 199/10 207/2 211/24 213/18 220/25
**seeing [2]** 34/20 82/5
**seek [1]** 213/24
**seeking [3]** 103/16 168/8 171/11
**seem [3]** 102/20 186/6 201/12
**seemed [2]** 31/6 31/8
**seems [10]** 46/9 54/1 68/4 102/14 102/15 126/7 179/22 190/6 194/6 201/7
**seen [19]** 25/21 28/8 28/11 36/6 47/18 48/2 48/15 51/24 53/1 53/4 54/3 78/7 84/5 109/8 122/10 123/15 147/22 148/2 193/12
**segment [2]** 90/24 90/25
**segments [1]** 97/13
**seized [1]** 89/23
**seizures [1]** 47/11
**selective [1]** 75/7
**seminal [1]** 135/14
**send [3]** 175/22 187/5 196/25
**sends [1]** 144/11
**sense [11]** 31/4 84/6 97/17 97/20 148/6 149/3 154/18 174/15 176/12 180/21 188/18
**senses [1]** 32/9
**sent [4]** 12/1 51/4 120/3 132/25
**sentence [4]** 18/3 42/12 201/5 202/22
**separate [6]** 11/19 52/4 140/2 143/4 188/12 199/18
**separation [1]** 45/12
**September [1]** 54/10
**sequence [1]** 76/18
**serial [1]** 43/20
**series [3]** 8/5 86/14 143/8
**serious [1]** 164/24
**servant [6]** 142/13 142/14 142/24 142/24 143/2 143/7
**servant's [1]** 143/3
**serve [6]** 166/16 170/1 170/3 171/2 171/8 171/14
**served [3]** 168/6 168/13 171/21
**server [1]** 171/13
**service [13]** 89/18 120/23 138/13 166/20 166/20 167/22 168/1 168/7 168/9 168/9 168/19 171/12 171/12
**SERVICES [1]** 1/7
**session [5]** 37/11 155/5 155/24 156/3 179/24
**sessions [3]** 37/8 179/20 179/25
**set [7]** 86/13 99/3 100/12 108/21 143/8 164/1 202/12
**sets [1]** 18/14
**settings [1]** 90/4
**settled [1]** 184/18
**seven [4]** 20/12 20/14 50/6 52/5
**several [17]** 17/21 22/9 26/2 30/2 48/11 53/1 62/11 99/10 104/16 111/24 112/22 130/24 131/3 131/8 131/10 163/11

**several -- I [1]** 112/22
**severe [3]** 30/13 32/14 33/17
**sex [14]** 11/25 84/23 85/3 85/9 90/4 146/14 180/23 187/18 187/20 187/22 188/9 189/22 190/8 191/6
**sexual [65]** 5/7 5/16 5/25 10/22 10/23 13/22 19/2 19/3 43/15 43/20 43/20 44/25 45/11 49/22 52/8 55/6 60/8 61/4 61/9 61/9 61/10 63/11 65/6 73/17 74/10 86/9 86/14 108/4 108/7 108/10 108/12 131/12 132/1 132/4 144/11 144/15 152/16 155/16 156/1 160/13 160/17 164/5 164/6 164/23 165/15 177/1 179/14 179/16 182/11 182/11 182/15 183/12 183/12 186/5 186/7 191/19 195/2 195/8 203/1 205/14 205/19 206/17 215/25 216/1 218/9
**sexually [13]** 14/13 31/17 32/4 43/1 45/14 50/11 54/13 192/25 193/3 193/13 205/22 206/4 216/7
**shape [1]** 108/11
**share [1]** 180/23
**Sharon [3]** 2/9 203/20 214/3
**she [266]**
**she's [21]** 14/11 27/21 36/1 60/25 65/23 66/9 73/6 73/7 73/8 76/17 91/18 91/21 102/10 103/15 103/19 104/14 108/7 108/9 188/5 188/6 197/13
**Sherry [1]** 215/15
**shirt [1]** 163/3
**shoehorn [1]** 64/3
**short [3]** 91/3 95/1 203/1
**shorten [2]** 128/14 159/9
**shortly [4]** 161/13 161/24 162/12 162/15
**should [46]** 11/21 11/25 12/18 15/5 15/7 15/7 20/20 20/20 21/7 22/8 22/10 56/12 60/16 64/10 68/9 72/5 96/12 106/9 106/12 106/15 106/24 106/24 117/20 121/19 126/25 128/25 129/8 132/5 137/11 137/20 145/25 145/25 146/18 167/21 173/24 187/16 190/17 201/11 211/11 212/21 214/7 218/21 218/24 219/2 219/5 221/15
**shouldn't [2]** 113/3 204/16
**shoved [1]** 152/18
**show [12]** 10/15 21/8 58/2 62/5 89/6 93/3 111/16 125/2 149/4 166/21 168/11 196/7
**showing [4]** 48/14 68/16 77/5 101/9
**shown [4]** 9/6 9/6 145/13 168/8
**shows [5]** 8/20 8/20 8/21 10/2 50/22
**shut [2]** 123/1 123/1
**sic [5]** 15/15 38/2 52/1 139/20 139/21
**side [12]** 8/19 20/23 21/19 22/13 31/10 68/4 90/24 90/25 102/18 102/20 197/24 221/3

**sides [3]** 112/19 129/6 201/12
**siding [1]** 10/9
**sign [2]** 173/7 174/12
**signaling [1]** 65/11
**signature [2]** 214/11 214/12
**signatures [1]** 221/12
**signed [2]** 89/13 158/6
**significant [3]** 41/20 45/10 55/9
**signing [1]** 177/4
**silly [1]** 150/3
**Simco [17]** 70/5 72/16 73/6 92/14 92/18 92/20 92/23 162/3 162/6 162/8 162/9 162/13 162/13 165/6 165/9 194/15 194/21
**similar [2]** 126/14 193/25
**similarly [1]** 15/8
**simple [3]** 130/17 154/19 199/22
**simply [14]** 15/17 72/13 79/16 96/11 101/7 133/5 142/10 143/15 143/18 151/18 152/18 155/14 169/13 170/9
**since [9]** 7/20 19/16 36/1 65/4 87/25 88/9 116/2 116/15 196/3
**single [1]** 189/1
**sips [1]** 76/11
**sir [25]** 23/17 24/10 24/13 24/21 24/23 25/6 25/9 26/5 26/8 26/19 38/11 46/11 47/17 49/9 50/8 60/1 60/5 67/15 86/2 86/8 88/8 88/9 117/17 184/14 186/25
**sit [2]** 15/17 133/22
**site [1]** 162/18
**sitting [8]** 48/23 81/14 82/7 117/4 121/15 134/6 161/6 162/7
**situated [1]** 15/8
**situation [9]** 30/23 34/20 53/25 103/13 103/13 128/13 180/13 183/22 184/5
**six [5]** 20/12 28/11 51/22 161/21 189/10
**skewed [1]** 35/12
**Skidmore [2]** 136/5 186/18
**skills [1]** 68/23
**sleep [1]** 164/15
**slept [1]** 164/3
**slight [2]** 62/14 62/16
**slightly [1]** 53/8
**slip [2]** 135/8 135/21
**Slow [1]** 137/22
**slowly [6]** 74/4 74/4 178/23 178/23 211/9 211/9
**slurring [1]** 163/24
**small [2]** 128/6 189/4
**smell [1]** 162/23
**snippet [1]** 19/11
**so [155]** 6/20 6/23 8/16 9/16 11/4 12/4 12/15 14/14 14/15 15/4 15/24 21/4 24/16 26/3 28/8 28/12 29/8 29/14 30/18 33/7 33/19 34/1 34/3 34/22 35/5 35/25 36/6 36/19 37/3 37/11 37/19 46/2 48/17 49/15 50/6 52/12 54/1 56/1 59/2 62/12 63/1 63/23 67/14 68/2 68/8 69/16 71/20 72/12 73/1

**so... [106]** 74/22 75/4 76/8
79/13 79/21 81/20 92/2 96/14
96/22 97/4 99/14 100/3 100/3
100/12 101/24 102/8 102/21
105/4 107/5 108/22 109/12
110/17 110/23 114/8 114/11
114/17 114/24 116/17 117/9
122/7 124/8 125/7 126/18
127/5 127/6 127/8 129/5
130/20 131/14 133/4 137/3
138/21 139/3 139/24 140/14
140/23 140/25 143/12 144/1
147/8 149/25 152/24 153/3
156/14 156/16 168/25 169/11
169/24 170/5 170/10 170/12
171/19 173/10 173/17 173/21
175/21 181/13 182/17 185/8
186/2 186/20 186/20 189/18
190/10 190/12 191/18 192/10
194/18 195/16 196/5 197/24
198/1 198/14 201/24 203/8
203/15 204/12 204/14 206/9
207/7 207/16 209/4 209/9
209/12 210/4 211/14 212/15
212/18 213/25 214/4 215/1
215/15 216/6 218/15 219/23
221/14
**social [4]** 42/9 76/12 120/15
160/3
**sodomy [1]** 131/13
**sold [1]** 183/9
**sole [1]** 124/25
**solely [1]** 163/20
**solemnly [1]** 23/20
**solicited [1]** 46/22
**some [89]** 9/22 13/24 16/4
28/3 28/9 34/13 35/1 35/21
35/22 35/23 36/11 37/16
37/23 38/3 38/14 38/15 38/16
39/2 46/6 46/6 46/11 48/1
48/14 54/6 57/1 58/2 59/23
62/3 66/13 76/2 76/4 76/4
77/1 77/4 77/7 79/12 79/12
81/15 82/4 82/20 83/11 84/1
84/15 85/18 86/9 86/9 86/19
87/24 88/6 89/16 91/3 91/4
106/9 106/10 113/7 113/25
126/3 127/10 132/4 133/4
134/1 135/3 144/17 145/21
152/13 153/3 161/17 170/12
176/12 177/18 183/20 184/1
184/19 185/21 186/15 186/22
187/13 190/12 191/5 191/5
191/6 195/6 197/15 205/2
205/2 205/6 210/14 212/8
221/1
**somebody [18]** 6/7 31/12 34/20
41/6 54/3 82/5 83/23 115/24
117/21 120/7 143/11 149/8
150/21 150/23 180/3 183/10
197/1 208/19
**somehow [2]** 126/9 139/16
**someone [17]** 32/5 40/19 43/12
62/4 64/14 64/14 78/2 79/7
80/2 83/10 91/20 94/13
122/20 132/24 141/23 166/18
216/23
**someone's [1]** 55/10
**someplace [1]** 180/22
**something [42]** 22/19 31/18

39/21 40/17 40/23 54/1 79/15
79/24 92/7 125/14 134/20
140/13 149/20 150/11 156/7
157/19 158/6 158/7 169/4
171/16 172/4 177/23 178/7
178/14 179/11 183/19 187/17
187/17 187/23 189/16 190/22
192/13 199/2 201/7 201/10
201/23 212/23
**sometime [3]** 5/22 25/11 27/13
**sometimes [2]** 107/4 107/4
**somewhat [2]** 6/17 42/22
**somewhere [8]** 6/8 15/18 25/12
26/24 81/20 119/10 152/18
180/22
**sorry [45]** 16/21 18/16 20/8
25/2 26/20 46/17 50/17 55/1
57/14 65/1 66/8 66/10 74/5
74/19 75/1 78/25 85/2 86/5
100/2 108/2 108/23 110/14
110/17 114/25 115/22 119/24
126/11 126/17 127/5 128/6
136/16 137/23 159/2 159/2
160/2 178/24 187/2 205/10
205/11 205/11 205/25 207/3
209/20 210/19 221/11
**sort [8]** 17/10 38/25 39/2
68/15 68/24 83/11 100/19
179/3
**sorts [3]** 104/18 151/6 154/16
**Sotto [6]** 21/22 42/8 58/5
71/23 133/11 197/23
**sound [1]** 28/7
**sounds [3]** 49/7 109/21 215/4
**source [1]** 36/9
**SOUTHERN [3]** 1/1 135/3 135/20
**SouthernCross [1]** 135/19
**space [1]** 202/24
**speak [4]** 23/24 24/16 74/18
211/14
**speaking [1]** 51/12
**speaks [4]** 116/7 116/9 135/25
211/21
**special [7]** 153/23 154/4
154/7 164/20 208/5 209/4
209/6
**Special Agent [1]** 164/20
**specialize [1]** 25/5
**specific [17]** 11/19 35/6 41/2
46/25 47/6 72/8 72/22 104/21
123/5 131/15 131/19 143/5
143/6 143/6 156/11 157/12
163/20
**specifically [12]** 11/11 11/13
16/25 39/17 59/12 112/11
112/13 131/16 154/3 157/11
178/19 206/20
**speech [1]** 163/24
**spell [1]** 44/22
**spend [2]** 54/20 172/1
**spending [1]** 145/9
**spent [3]** 148/22 161/11
191/25
**spiders [2]** 14/12 155/13
**spoke [5]** 26/9 26/17 80/20
109/11 118/19
**spoken [2]** 26/13 26/16
**sponsored [1]** 68/20
**square [1]** 216/23
**St. [1]** 141/14
**St. Joseph's [1]** 141/14

**staff [5]** 50/23 51/6 51/7
133/11 197/23
**stand [24]** 14/8 22/1 23/12
23/16 40/2 69/23 85/20
104/15 105/2 105/2 106/14
106/23 108/8 123/18 130/2
130/3 134/13 134/15 152/15
176/14 177/7 198/20 199/5
204/9
**standard [11]** 29/1 43/9 132/8
179/4 185/13 190/22 190/25
195/8 195/9 195/15 213/11
**standpoint [13]** 26/1 37/2
37/3 39/10 40/21 40/24 43/17
47/14 54/3 77/10 81/10 85/23
85/25
**start [8]** 7/13 16/16 20/15
24/10 91/13 91/16 103/6
195/24
**started [3]** 112/3 114/17
119/11
**starting [2]** 71/4 166/1
**starts [1]** 72/5
**state [36]** 8/14 9/23 9/24
63/19 63/22 67/25 88/23
89/18 90/12 95/9 98/22
104/12 104/13 118/24 118/25
120/2 122/9 122/22 145/15
145/23 145/24 146/1 146/8
157/1 157/7 157/17 159/20
159/22 164/8 167/9 168/2
168/4 168/4 169/10 171/5
171/19
**stated [24]** 59/12 63/7 90/2
90/3 90/4 90/8 106/5 111/1
154/3 160/22 161/1 161/4
161/11 161/25 162/12 162/18
162/21 162/25 163/4 163/6
163/16 163/21 164/1 164/10
**statement [49]** 31/18 32/7
32/8 35/24 39/3 41/14 67/24
71/7 71/14 71/15 71/20 72/22
73/12 74/20 74/21 77/17
98/22 124/7 125/1 125/4
125/6 131/19 131/19 134/10
134/11 134/14 144/1 157/1
157/7 157/13 158/2 158/6
159/2 163/19 199/5 200/6
200/16 207/24 208/2 208/2
208/3 208/12 208/13 208/20
208/21 208/22 208/23 208/25
217/25
**statements [10]** 72/9 72/19
72/19 73/10 90/6 130/6
157/12 157/15 183/15 202/19
**states [11]** 1/1 1/11 14/10
29/13 30/5 76/23 89/17
173/14 177/22 189/3 208/15
**stating [3]** 24/10 51/3 161/23
**statute [15]** 139/18 139/20
139/23 166/12 166/14 166/16
166/18 167/11 168/3 168/17
169/9 170/9 170/18 171/5
172/7
**stay [3]** 45/8 60/2 172/6
**stay-at-home [1]** 45/8
**stenography [1]** 1/24
**step [5]** 19/23 23/7 59/21
75/4 88/18
**Stephanie [10]** 1/20 1/21 2/4
16/18 65/22 67/9 68/9 91/10

**S**

Stephanie... **[2]** 109/17
220/23
stepped **[3]** 22/24 23/4 172/13
steps **[1]** 9/18
stick **[1]** 192/4
stigma **[2]** 52/20 52/24
still **[21]** 20/4 62/21 84/14
96/20 112/23 113/4 113/22
118/20 118/23 132/15 136/2
139/25 164/12 193/20 194/16
200/3 201/16 210/18 220/11
220/12 220/21
stomach **[2]** 49/3 49/6
stood **[1]** 176/10
stop **[1]** 27/17
story **[5]** 31/10 49/1 53/14
125/20 200/22
straight **[3]** 106/24 125/20
193/11
strategic **[2]** 199/21 199/25
Street **[3]** 1/21 2/6 2/14
stress **[16]** 38/10 38/13 38/23
56/18 77/24 78/4 78/9 78/15
78/19 80/3 83/25 84/4 84/9
85/12 88/4 88/11
strictly **[1]** 140/13
strike **[2]** 65/5 203/11
strikes **[1]** 180/24
string **[1]** 108/25
stroke **[2]** 14/12 155/13
stronger **[1]** 57/24
strongly **[2]** 56/13 147/20
struck **[1]** 65/4
struggle **[1]** 40/23
stuck **[2]** 150/1 200/4
stuff **[1]** 123/16
style **[1]** 82/5
subject **[67]** 59/12 77/24 90/3
90/3 90/7 90/9 91/4 97/15
105/21 139/10 160/1 160/5
160/6 160/14 160/16 160/18
160/20 160/22 161/1 161/2
161/8 161/11 161/15 161/17
161/19 161/22 161/24 162/1
162/6 162/9 162/10 162/12
162/14 162/17 162/21 162/23
162/25 163/4 163/6 163/11
163/12 163/14 163/16 163/17
163/18 163/21 163/24 164/1
164/3 164/6 164/7 164/10
164/12 164/14 164/17 164/17
164/22 164/23 165/1 165/3
165/6 165/8 165/13 165/14
165/15 184/13 215/3
subject's **[2]** 89/22 163/9
subjected **[1]** 78/3
submission **[5]** 129/16 129/17
129/20 130/11 204/6
submit **[13]** 55/6 129/10
129/13 159/23 172/4 175/21
184/22 187/16 193/2 195/5
203/16 203/19 207/6
submitted **[12]** 89/22 112/19
129/8 129/14 185/7 185/9
192/24 194/6 204/13 206/2
206/5 214/14
submitting **[1]** 189/8
Subparagraph **[1]** 175/5
Subparagraphs **[1]** 175/4
subparts **[1]** 175/19

subpoenaed **[1]** 25/15
subsequent **[2]** 36/22 144/20
subsequently **[2]** 48/25 49/11
substance **[2]** 35/20 48/7
substantial **[1]** 166/19
substantially **[2]** 129/21
165/13
substantive **[1]** 17/18
suburban **[1]** 46/5
such **[9]** 45/11 52/10 62/13
63/4 83/4 154/11 185/14
204/23 213/24
sudden **[1]** 199/7
sue **[3]** 143/2 145/1 171/11
suffered **[1]** 205/19
suffering **[1]** 103/9
suffers **[2]** 88/11 211/13
sufficiently **[1]** 52/9
suggest **[2]** 153/19 153/21
suggested **[3]** 21/18 42/1
167/15
suggests **[1]** 147/11
suit **[3]** 166/14 168/12 198/9
Suite **[3]** 1/16 1/19 2/11
suited **[1]** 200/8
sum **[2]** 35/20 48/7
summary **[3]** 46/20 193/10
195/3
summon **[1]** 23/15
summoned **[1]** 23/16
Sunday **[1]** 119/11
superior **[10]** 6/15 7/17 11/2
14/6 136/22 137/17 153/11
154/21 169/19 186/16
supervisor **[3]** 194/2 194/11
194/13
supplied **[2]** 209/8 209/8
support **[5]** 71/12 89/25
138/25 190/1 200/13
supports **[1]** 179/13
supposed **[3]** 120/20 150/4
176/11
Supreme **[6]** 135/5 135/23
135/25 141/12 154/1 173/14
sure **[37]** 8/12 23/1 27/20
27/22 28/4 29/23 29/23 32/12
35/18 36/24 41/6 57/3 65/22
79/9 85/10 91/9 97/5 110/6
114/18 133/1 133/6 133/15
135/9 138/6 153/1 166/8
170/7 172/20 172/23 174/20
184/15 184/18 189/15 206/10
211/22 211/24 216/21
surely **[1]** 87/7
surgeries **[4]** 30/14 34/11
82/11 82/12
surgery **[4]** 30/15 83/11
211/21 212/9
surprise **[7]** 116/21 116/23
122/4 122/13 122/13 123/11
125/24
surprised **[1]** 126/9
Susan **[1]** 2/3
suspected **[2]** 56/13 147/21
sustain **[1]** 38/16
sustained **[3]** 30/12 33/16
204/19
swear **[1]** 23/20
sweat **[1]** 163/2
sworn **[2]** 24/4 76/10
sympathy **[1]** 192/12

symptoms **[2]** 156/3 205/14

**T**

T-shirt **[1]** 163/3
table **[2]** 119/6 157/4
take **[46]** 11/8 19/12 19/22
19/24 20/16 22/1 23/6 23/17
27/5 28/25 29/5 39/15 42/16
44/9 52/15 59/16 79/18 81/19
82/4 89/3 89/13 90/18 95/13
99/4 107/12 114/2 128/15
130/18 132/16 133/5 149/9
149/10 156/6 156/20 158/15
167/10 168/18 169/21 170/5
172/8 175/1 192/1 197/21
206/15 209/4 209/6
taken **[15]** 25/7 48/3 48/7
53/5 65/17 98/19 99/12
126/10 134/11 156/22 167/21
185/20 195/13 200/11 202/5
takes **[1]** 123/11
taking **[5]** 24/13 51/7 102/9
105/2 183/17
talk **[19]** 10/21 16/14 47/18
58/25 59/25 70/16 71/14
82/15 100/21 102/6 108/12
126/6 132/17 134/17 139/6
152/6 156/12 185/17 194/8
talked **[12]** 27/12 27/16 98/15
101/21 108/7 108/9 133/22
156/10 176/19 178/19 212/5
216/23
talking **[20]** 28/3 61/8 62/14
68/22 78/14 81/24 82/7 102/3
108/10 111/12 113/8 114/5
125/21 148/14 151/13 152/13
161/5 171/4 194/24 200/18
talks **[3]** 102/5 104/24 122/22
tall **[1]** 23/25
tampering **[2]** 134/2 144/2
tape **[4]** 17/14 81/9 126/17
156/25
tapes **[1]** 126/15
tasted **[1]** 162/24
tawdry **[1]** 62/19
tech **[1]** 30/6
technical **[1]** 128/6
technician **[1]** 120/18
Ted **[11]** 112/11 112/11 112/12
112/13 113/15 113/23 113/25
114/8 114/12 114/15 125/13
teenager **[2]** 46/23 104/12
telephone **[2]** 161/5 164/11
tell **[34]** 7/3 7/10 15/13
18/11 24/21 24/23 25/19
31/25 32/8 37/13 44/1 53/11
53/14 60/5 60/12 61/17 62/2
72/25 77/21 109/5 111/18
124/18 124/18 127/7 143/19
146/8 147/18 154/24 155/1
155/19 155/20 166/15 186/2
198/11
telling **[5]** 35/16 60/25 63/4
141/17 155/12
tells **[3]** 29/3 32/3 61/1
ten **[4]** 28/11 37/7 81/20
102/3
term **[8]** 41/10 41/10 41/10
55/16 55/19 55/20 55/22
113/10
terminable **[1]** 183/8
terms **[2]** 118/10 144/10

Terri [1]  48/3
testified [23]  14/8 14/11
15/16 24/4 55/3 60/20 83/1
100/17 101/23 102/10 103/19
116/12 120/10 134/9 149/22
149/23 155/4 173/9 177/6
181/5 182/18 194/22 212/10
testifies [2]  102/1 110/10
testify [15]  27/1 103/20
103/20 110/9 117/1 117/4
118/6 118/12 118/15 119/13
120/1 121/5 126/13 149/2
179/23
testifying [5]  57/12 101/7
103/25 104/2 104/3
testimony [90]  6/6 17/7 17/8
18/10 22/24 23/20 39/20
58/22 62/17 63/17 64/22
65/25 66/12 68/7 68/13 68/16
68/19 68/21 69/2 69/8 71/1
74/15 74/22 75/13 76/10
82/24 88/9 92/4 92/10 92/18
92/23 93/10 93/16 93/22 94/6
94/15 94/23 95/3 97/9 100/4
102/13 102/14 102/16 103/22
105/5 107/21 116/5 117/21
117/25 121/22 122/14 125/5
125/23 127/1 128/5 128/9
128/10 146/4 151/25 152/14
152/16 157/10 157/14 159/5
159/13 159/21 176/7 176/10
176/21 177/6 180/1 180/4
180/16 181/2 181/7 182/8
183/24 187/18 187/19 188/7
188/16 188/17 189/13 195/8
197/2 197/10 202/19 211/20
212/8 218/2
testimony -- you [1]  176/7
TEXAS [37]  1/1 1/4 1/16 1/19
2/7 2/11 2/15 16/6 54/20
135/4 135/5 135/21 135/23
135/25 139/18 141/12 141/15
141/18 141/19 143/8 154/1
154/2 154/6 154/10 154/12
154/13 165/12 166/18 167/25
169/8 169/8 170/18 170/18
178/19 179/13 187/8 213/23
text [2]  50/19 50/19
than [40]  9/18 10/10 14/10
23/7 27/8 31/12 32/21 34/4
34/22 34/24 35/9 54/11 55/7
57/18 64/20 68/17 79/16
81/23 89/25 96/21 115/23
117/20 124/2 155/14 167/16
168/1 174/14 176/9 176/15
177/22 178/13 187/24 188/9
189/6 189/9 193/21 195/15
197/21 199/18 208/15
than the [1]  199/18
thank [40]  16/11 16/15 23/2
24/20 59/21 67/15 74/24 81/2
81/25 85/2 87/2 88/18 90/14
91/6 93/18 93/21 94/1 94/12
98/18 126/14 126/23 126/24
127/22 127/22 136/15 139/5
142/14 165/19 202/3 203/24
209/24 214/25 219/9 219/25
220/1 220/3 220/4 220/22
221/8 221/9
that [1371]

that's [175]  6/4 9/5 9/14
10/4 13/18 16/9 18/8 18/23
19/9 20/1 20/17 22/5 22/21
24/20 28/13 29/12 30/3 30/4
31/17 32/4 32/25 33/1 34/12
34/20 39/7 40/2 40/10 40/17
40/23 42/24 46/16 47/14 55/1
57/12 58/3 60/2 61/6 63/16
66/8 67/5 67/6 70/1 72/24
74/24 75/15 76/7 78/24 81/25
82/2 83/20 86/7 90/12 95/11
98/13 98/25 100/12 101/3
101/13 101/18 104/11 105/12
105/24 106/7 107/1 108/1
110/8 111/7 113/14 118/3
121/14 121/17 122/11 123/17
124/14 124/23 125/20 125/23
126/3 126/3 126/5 127/22
129/19 132/17 133/14 134/12
137/15 138/5 138/25 139/18
140/17 140/20 141/12 141/21
142/21 143/11 146/14 149/5
149/7 150/12 150/17 151/1
151/7 153/12 154/1 155/18
155/19 159/6 159/7 167/4
167/5 169/25 170/5 170/20
170/20 176/8 177/16 179/5
179/5 179/21 180/25 182/21
183/19 185/19 186/19 189/5
189/9 189/12 189/13 190/25
191/7 191/8 192/5 192/6
193/25 195/2 195/15 195/17
195/22 196/14 196/14 196/23
199/3 200/4 200/7 200/7
203/16 203/17 203/18 204/12
207/6 207/18 207/25 208/10
208/17 208/25 209/9 209/18
210/3 211/3 213/7 213/9
214/4 214/19 214/20 215/10
215/11 215/17 216/14 216/20
218/14 219/5 219/5 219/15
219/22 221/5
the -- you [1]  82/4
the company [1]  137/3
their [82]  7/25 9/25 10/19
10/24 13/10 13/17 13/17
16/20 17/7 17/8 17/16 17/22
17/23 18/24 18/24 19/10
19/17 21/5 21/10 21/16 21/17
29/3 41/2 41/3 41/4 57/2
57/21 57/23 71/18 74/9 78/5
83/14 83/20 83/21 83/22 84/9
88/23 91/10 91/10 97/19
100/4 103/9 104/25 106/3
106/7 108/10 115/15 116/16
116/18 122/1 122/5 122/10
125/19 125/23 129/22 130/5
130/8 131/20 137/8 139/12
143/12 144/18 146/1 146/6
150/16 151/24 151/25 155/4
156/6 156/11 164/6 176/20
177/2 181/23 181/23 184/16
189/12 192/5 200/20 201/15
202/24 205/2
them [73]  7/3 7/22 7/23 7/23
10/18 17/5 18/2 19/23 20/3
52/17 53/12 58/13 60/19
73/11 79/21 81/9 83/18 84/13
87/7 87/8 96/25 96/25 97/16
97/20 99/8 101/5 101/7 101/8
101/11 102/9 109/3 109/4

that [114/17
115/21 124/17 145/10 148/2
148/2 149/1 149/1 149/10
151/20 155/1 155/9 155/12
155/16 155/19 155/20 156/9
162/16 169/7 170/12 171/8
175/5 183/16 183/19 186/21
195/22 196/7 196/16 196/25
198/11 199/19 200/22 201/16
201/16 201/17 201/17 201/18
202/13
theme [1]  16/22
themselves [4]  85/12 131/20
147/6 220/16
then [100]  8/6 11/22 11/25
19/7 19/22 25/3 29/6 31/2
34/2 34/4 35/1 36/1 36/16
39/12 44/13 44/24 45/9 48/20
48/25 49/3 56/12 63/12 63/12
63/17 63/22 64/16 66/21
76/18 77/21 79/22 81/17 83/8
84/23 89/2 96/23 98/12 98/13
99/8 99/15 99/24 107/4 110/2
112/12 112/12 112/24 113/3
113/21 114/18 118/16 121/9
122/21 122/21 124/16 127/18
128/21 129/11 133/9 139/18
148/2 150/14 156/11 156/21
162/9 165/7 166/21 169/2
170/24 176/17 177/1 182/12
184/23 185/18 185/25 185/25
197/8 197/24 199/7 199/11
201/21 201/23 202/20 205/12
205/18 209/1 209/3 209/4
209/9 209/13 214/6 214/10
215/12 216/10 216/12 216/16
216/18 217/9 217/14 218/4
218/8 218/18
theories [3]  13/4 138/5 170/3
theory [12]  6/15 6/25 7/17
11/19 15/4 89/25 138/25
140/1 143/4 190/11 203/1
203/2
therapist [10]  41/15 41/17
41/18 41/22 41/23 43/24 44/1
55/21 55/23 55/24
therapists [1]  53/2
therapy [1]  60/9
there [172]  5/23 6/8 8/21
10/7 12/25 13/14 14/10 14/18
14/18 17/13 19/11 20/18
22/14 29/19 33/5 36/16 37/22
42/12 43/14 43/19 48/7 48/10
49/17 50/1 50/20 56/25 60/1
60/2 61/5 62/6 62/16 65/5
65/14 65/24 66/5 66/13 68/13
68/15 70/24 71/3 71/7 73/17
74/2 77/25 81/14 82/7 82/24
83/4 84/4 84/16 84/17 86/19
89/7 89/7 89/24 91/3 96/24
97/12 97/21 97/21 98/4
102/12 102/14 106/9 106/9
106/23 107/21 109/14 112/8
112/10 112/16 112/22 113/3
113/9 113/24 116/13 117/11
124/4 125/13 131/17 132/4
132/14 133/4 133/6 134/1
135/2 135/12 136/8 136/12
138/23 138/23 140/12 141/4
145/8 145/12 145/12 146/17
147/2 147/5 147/12 147/13
147/14 147/16 147/19 148/11

**there... [67]** 149/17 149/22
151/6 151/8 151/11 152/24
153/17 153/18 153/19 153/19
153/20 153/22 154/10 155/25
156/13 156/14 158/12 166/9
166/15 166/19 169/2 169/18
169/20 170/17 171/17 172/6
172/9 173/10 175/4 175/8
175/15 175/21 176/2 176/2
176/17 177/10 177/12 177/20
177/21 178/2 178/5 178/18
182/5 182/12 183/4 186/9
187/10 188/8 188/20 191/18
191/22 193/21 194/4 195/6
200/16 205/21 209/15 210/13
210/17 210/18 212/1 212/3
212/6 212/8 214/19 216/20
221/18

**there's [80]** 6/17 7/19 9/21
10/14 11/6 14/4 14/5 18/22
21/6 43/21 70/2 71/14 72/22
73/12 82/14 97/22 97/22
100/8 106/23 111/24 112/5
116/7 122/12 122/13 123/12
125/5 126/12 129/18 132/18
133/21 134/4 136/11 138/24
140/19 141/17 144/8 145/20
145/22 146/15 147/8 148/18
152/2 154/19 156/11 157/4
157/14 171/16 175/20 176/7
176/9 177/17 178/11 182/2
182/6 182/18 184/18 187/10
188/7 188/16 188/16 188/22
188/23 189/1 189/18 190/1
191/16 191/20 192/8 194/11
194/21 199/23 204/7 204/9
204/11 204/13 208/9 209/21
209/22 210/15 211/18

**thereby [1]** 211/13
**therefore [10]** 63/21 122/12
139/22 150/5 152/21 157/13
169/11 174/3 190/24 204/2
**thereof [1]** 72/20
**thereto [1]** 111/13
**these [68]** 8/2 15/13 15/15
15/16 15/19 17/6 17/17 18/14
19/19 21/18 60/23 62/2 63/11
70/7 70/13 89/7 100/5 101/4
101/18 102/2 102/23 105/1
106/16 108/17 110/2 110/10
111/19 111/25 113/7 114/2
118/19 125/19 125/24 128/25
135/7 135/9 135/13 139/16
140/24 153/1 153/2 154/21
154/24 154/24 155/11 156/8
156/18 161/2 163/12 163/13
174/10 174/11 176/12 176/17
176/25 177/8 177/23 180/7
181/15 182/9 183/14 189/9
189/14 197/6 197/9 198/13
208/12 221/1
**they [278]**
**they'll [1]** 83/12
**they're [39]** 10/9 12/8 17/18
17/22 18/19 21/14 52/16
52/19 53/14 58/19 63/12
63/12 63/17 63/17 63/21
73/23 73/23 81/9 82/5 103/21
104/2 105/3 105/12 106/2
111/15 111/20 112/4 112/14

141/17 147/23 196/10 196/24
198/25 199/13 199/14
**they've [14]** 8/8 17/4 19/6
112/20 116/15 116/15 119/2
125/24 130/6 156/8 192/8
194/24 194/25 215/14
**thick [1]** 195/21
**thigh [1]** 189/1
**thighs [2]** 87/17 188/7
**thing [30]** 8/4 12/1 13/15
18/3 19/12 19/14 34/19 36/25
57/20 72/5 85/24 106/2
123/20 124/19 126/16 127/9
132/19 142/3 151/7 152/5
186/22 197/20 208/18 211/4
216/22 218/18 219/10 219/15
220/13 221/11
**things [39]** 8/2 19/6 19/16
27/25 28/3 35/12 46/11 57/16
60/17 61/25 62/14 63/15
77/12 89/4 100/5 102/2
102/18 104/8 106/9 106/10
112/25 117/11 136/20 144/22
152/13 152/14 153/1 155/1
155/10 156/24 157/17 169/3
182/24 183/9 189/15 194/3
198/25 199/5 221/1
**think [227]**
**thinking [4]** 9/15 67/6 194/7
210/12
**thinks [2]** 126/2 167/20
**third [2]** 49/3 60/24
**thirdly [1]** 107/14
**this [357]**
**Thomas [2]** 120/13 128/1
**thorough [3]** 41/13 55/21
154/13
**those [58]** 8/7 9/9 17/1 22/17
28/3 47/12 47/12 47/13 49/16
64/16 66/15 66/15 81/17
85/11 85/11 90/17 91/5 97/14
101/24 103/12 104/8 109/17
112/11 112/13 118/6 120/16
122/15 123/13 127/17 131/16
134/16 136/3 136/14 144/21
144/22 144/23 146/5 147/22
147/25 153/15 155/10 170/11
174/25 176/1 178/12 180/19
182/17 183/10 183/11 189/17
189/19 191/21 194/3 202/11
204/12 205/3 206/25 208/6
**though [15]** 11/9 12/23 81/24
84/17 108/4 113/6 144/5
144/10 145/2 147/10 160/9
180/5 181/8 195/8 203/10
**thought [34]** 36/12 37/15
39/21 62/13 67/10 67/13 69/4
97/1 114/19 116/25 117/9
126/4 126/18 131/5 144/14
146/12 146/14 146/21 147/11
157/15 159/8 170/12 184/3
192/22 192/23 193/20 201/22
201/23 205/25 212/10 212/12
212/18 212/25 214/2
**thoughtful [1]** 127/23
**thousand [1]** 148/23
**threat [1]** 134/10
**threatened [2]** 8/23 9/7
**threatening [5]** 38/15 39/2
78/4 78/11 80/2
**threats [1]** 14/11

18/17
18/22 22/23 42/10 46/22
47/19 48/22 54/12 60/18
65/22 65/24 70/6 97/12 141/8
144/2 144/2 166/17 168/11
208/12
**threshold [3]** 14/17 38/25
84/19
**through [45]** 5/20 6/11 6/14
13/25 14/2 18/13 19/4 19/7
20/19 22/7 22/9 27/15 29/1
46/24 48/19 54/12 61/14 72/6
73/18 102/4 102/8 102/23
103/6 104/12 105/10 108/18
136/9 140/9 140/10 146/3
160/23 174/10 175/4 175/25
176/6 178/10 179/10 179/12
186/10 186/12 189/7 189/20
202/13 205/2 205/16
**throughout [10]** 16/22 29/22
59/6 99/17 100/6 104/2 117/8
122/8 130/6 144/12
**throwing [1]** 157/17
**thrust [1]** 145/17
**thus [1]** 60/11
**ties [1]** 139/10
**till [2]** 95/18 202/13
**time [92]** 7/5 17/25 18/5 18/8
18/13 19/3 19/23 20/18 20/18
22/18 25/13 25/24 27/5 28/9
31/13 33/17 34/16 36/1 40/16
48/4 52/11 54/10 55/17 58/23
62/3 65/14 66/4 71/11 77/6
78/6 79/2 79/20 80/21 82/20
90/23 92/13 93/2 95/7 95/7
97/17 97/21 100/7 102/4
102/6 104/11 106/18 107/4
107/10 109/23 111/18 119/7
122/11 125/22 125/25 126/19
128/23 128/25 138/15 138/18
142/9 145/13 146/24 149/8
150/16 158/1 158/4 161/2
161/5 162/10 162/17 163/25
164/13 165/11 166/1 166/10
168/12 170/24 172/2 172/19
173/9 173/19 173/19 177/19
181/21 183/16 184/23 185/18
188/18 193/22 193/24 200/15
202/6
**timely [4]** 166/15 168/5
168/10 172/5
**timely and [1]** 168/10
**times [9]** 22/9 28/11 30/2
31/11 100/21 104/16 121/11
176/10 176/13
**Title [6]** 192/24 205/14
207/10 207/11 214/17 218/9
**Title VII [6]** 192/24 205/14
207/10 207/11 214/17 218/9
**to constitute [1]** 73/11
**today [14]** 5/22 24/9 25/15
34/4 80/21 88/6 103/17
128/20 133/23 140/25 146/4
147/3 169/16 178/4
**Todd [4]** 1/14 5/10 119/25
170/20
**together [8]** 97/17 114/21
126/18 145/10 164/5 165/7
180/15 180/16
**told [40]** 6/4 6/8 14/8 14/11
14/12 19/24 31/10 33/16
33/23 35/9 35/13 35/15 37/15

**T**

**told...** **[27]** 49/11 53/4 67/4
  67/6 77/20 109/11 122/18
  124/25 125/7 125/10 134/13
  134/15 155/16 165/9 176/16
  179/20 180/7 180/14 182/6
  182/14 182/15 183/4 183/6
  183/8 183/8 184/1 200/21
**tolerance** **[1]** 144/11
**tolling** **[2]** 170/18 170/22
**Tom** **[12]** 96/22 96/24 97/1
  97/8 98/6 109/11 110/5
  118/21 122/22 128/5 128/9
  159/5
**tomorrow** **[6]** 128/24 184/17
  186/13 197/18 202/2 202/3
**Tompkins** **[1]** 194/14
**ton** **[1]** 149/21
**toned** **[1]** 80/7
**tonight** **[3]** 184/16 220/7
  220/8
**tons** **[1]** 69/14
**too** **[17]** 25/12 34/21 38/1
  57/11 67/2 73/20 110/13
  137/1 139/7 141/13 160/9
  209/7 209/10 209/21 212/12
  216/20 219/17
**took** **[13]** 9/18 48/15 66/15
  76/11 85/20 97/2 101/24
  104/15 119/2 123/2 143/24
  172/16 191/17
**top** **[8]** 45/9 51/20 83/1
  131/15 203/15 206/22 206/24
  207/3
**Topamax** **[1]** 47/10
**topic** **[1]** 181/8
**tort** **[4]** 136/22 143/12 143/13
  143/20
**torts** **[1]** 140/1
**tortuous** **[1]** 143/7
**totally** **[2]** 123/11 199/1
**touch** **[4]** 101/17 120/22
  121/24 121/25
**touching** **[3]** 130/10 132/4
  191/6
**towards** **[1]** 90/9
**traded** **[1]** 47/19
**trading** **[2]** 151/12 151/13
**traditional** **[2]** 142/11 142/11
**traditionally** **[1]** 199/2
**trailer** **[10]** 45/15 110/5
  118/20 118/24 119/1 120/3
  122/19 123/4 134/6 138/16
**trained** **[1]** 51/6
**training** **[6]** 25/2 29/1 41/3
  179/20 179/24 179/25
**transcribe** **[2]** 81/9 81/17
**transcribing** **[1]** 196/4
**transcript** **[6]** 1/10 1/24
  10/15 133/23 155/17 222/2
**transcription** **[3]** 1/24 81/21
  81/24
**transcripts** **[4]** 158/16 196/2
  196/15 197/3
**transferred** **[3]** 165/8 165/9
  165/10
**trauma** **[4]** 43/18 82/25 188/17
  188/17
**traumatic** **[17]** 34/21 38/10
  38/12 38/23 77/24 78/4 78/9
  78/15 78/19 80/3 82/21 83/25

**traumatize** **[2]** 34/21 35/17
**travel** **[2]** 54/19 110/4
**treat** **[2]** 37/4 40/24
**treated** **[5]** 40/21 53/12 55/25
  117/23 126/12
**treater** **[4]** 31/1 56/22 64/6
  88/9
**treaters** **[4]** 51/19 58/21
  60/20 61/1
**treating** **[12]** 25/16 37/2
  41/17 41/19 41/21 43/14 48/4
  64/5 75/7 75/11 86/1 87/25
**treatment** **[17]** 32/15 41/9
  41/13 41/22 43/23 55/19
  55/22 58/13 58/16 58/22 60/9
  60/10 61/15 64/22 85/23
  85/25 182/8
**treatment -- I** **[1]** 85/25
**trial** **[30]** 1/10 8/9 14/14
  54/7 59/7 62/20 82/24 100/6
  106/21 112/2 114/17 118/4
  118/6 119/11 121/4 121/10
  121/18 128/22 133/24 144/14
  150/6 150/14 150/16 151/4
  151/10 185/13 200/22 202/17
  212/5 217/15
**tried** **[10]** 12/3 20/7 64/3
  103/3 107/14 114/1 185/11
  189/13 200/19 200/21
**trier** **[1]** 213/21
**trigger** **[1]** 79/12
**trouble** **[3]** 15/21 32/6 102/5
**troubled** **[2]** 20/25 20/25
**troublemaker** **[1]** 165/11
**troubles** **[1]** 137/9
**truck** **[1]** 14/9
**true** **[16]** 12/2 12/5 27/9 60/8
  70/1 78/9 78/24 79/14 101/25
  102/9 124/23 145/16 169/25
  170/17 175/2 192/14
**truly** **[1]** 104/13
**truth** **[10]** 23/22 23/22 23/22
  60/25 71/8 71/15 72/23 125/2
  132/3 211/8
**truthfully** **[1]** 101/7
**try** **[15]** 12/8 23/24 24/1 29/7
  29/10 32/2 34/21 87/10 92/9
  92/22 114/21 171/14 173/5
  173/8 215/15
**trying** **[20]** 26/2 40/24 54/3
  68/14 68/18 97/25 103/21
  103/22 105/19 113/22 131/24
  150/6 174/15 185/25 186/1
  190/22 190/23 196/25 210/19
  216/24
**Tumbarella** **[3]** 92/14 92/18
  92/23
**turn** **[6]** 42/4 44/11 45/9
  46/15 47/2 128/21
**turned** **[1]** 138/13
**twice** **[4]** 17/8 18/10 200/21
  200/24
**two** **[41]** 18/3 18/3 18/16
  19/15 23/7 26/17 26/18 34/13
  34/15 34/16 39/12 49/16 52/3
  60/17 61/25 66/16 71/3 76/11
  81/20 113/9 115/9 118/25
  126/21 127/18 136/19 141/7
  143/25 145/9 156/8 156/20
  169/3 172/9 179/9 185/1
  186/20 186/21 197/25 198/12

**two-by-four** **[1]** 39/12
**two-minute** **[2]** 127/18 156/20
**two-sentence** **[1]** 18/3 202/22
**Tyler** **[4]** 68/19 94/20 94/23
  95/3
**type** **[5]** 51/7 80/2 104/17
  105/1 178/25
**types** **[1]** 104/8
**typewritten** **[1]** 81/18
**typical** **[4]** 46/4 52/15 53/11
  150/20
**typing** **[1]** 196/4

**U**

**U.S** **[1]** 2/14
**uh** **[2]** 44/23 70/14
**uh-huh** **[2]** 44/23 70/14
**unable** **[1]** 165/3
**unanimous** **[1]** 221/16
**unavailable** **[1]** 20/10
**unaware** **[3]** 100/17 118/1
  165/4
**unclear** **[1]** 48/8
**uncomfortable** **[1]** 16/8
**uncommon** **[1]** 46/6
**unconscious** **[6]** 53/23 77/7
  79/22 131/10 131/11 188/19
**uncontradicted** **[1]** 115/20
**under** **[32]** 7/22 7/22 13/4
  17/1 19/21 42/9 45/4 45/18
  62/13 63/22 65/16 68/7 73/10
  83/11 85/17 89/12 96/8 122/4
  131/17 135/13 136/22 140/1
  140/8 141/17 142/11 148/9
  157/14 168/1 168/4 170/4
  170/18 195/7
**underlying** **[1]** 150/24
**understand** **[35]** 9/3 21/11
  37/8 60/21 61/13 63/16 65/13
  67/16 78/21 78/21 91/1 97/4
  98/7 98/25 101/20 113/2
  115/8 115/14 121/16 124/5
  137/25 138/21 145/6 152/6
  157/6 167/8 167/15 171/1
  174/7 174/16 174/17 174/20
  189/11 190/6 199/16
**understand the** **[1]** 115/8
**understanding** **[4]** 25/16 69/6
  172/18 215/14
**understands** **[2]** 119/13 138/7
**understood** **[4]** 31/14 32/24
  181/5 197/7
**undertake** **[1]** 155/1
**undue** **[1]** 61/5
**uneventful** **[1]** 46/5
**unfair** **[8]** 61/7 61/7 61/12
  62/16 122/4 124/20 125/24
  192/9
**unfairly** **[2]** 17/1 19/21
**unfavorable** **[2]** 102/15 102/18
**unfortunately** **[1]** 105/5
**unidentified** **[1]** 184/1
**uniformly** **[2]** 78/10 78/17
**unit** **[1]** 183/25
**UNITED** **[8]** 1/1 1/11 14/10
  29/13 89/17 173/14 189/2
  208/15
**universal** **[1]** 29/12
**universally** **[1]** 78/10
**unknown** **[2]** 36/3 162/4
**unless** **[5]** 12/6 30/18 61/5

40

## U

unless... [2]  61/6 168/5
unlike [1]  53/1
unlikely [2]  167/12 167/17
unpled [1]  138/5
unprotected [1]  85/9
unquestionably [1]  192/14
unredacted [1]  157/23
unrelated [1]  132/21
until [14]  19/18 21/19 76/12
  95/7 95/21 97/1 97/18 98/5
  119/11 123/20 133/2 138/16
  161/3 166/16
untimely [3]  21/5 21/5 21/7
unusual [3]  31/15 117/11
  117/13
unwanted [1]  130/9 132/4
  191/6
unwelcome [1]  195/7
unwilling [1]  148/3
up [65]  19/22 20/21 26/2
  27/16 28/14 28/20 39/13 42/7
  42/14 43/25 46/12 46/14
  48/21 49/13 49/23 51/16
  52/20 60/1 67/4 76/13 76/23
  78/2 80/6 84/2 86/20 91/20
  93/7 98/5 99/4 99/16 99/24
  103/10 104/16 105/9 105/19
  106/8 106/20 109/20 111/14
  114/2 122/25 123/19 125/12
  132/16 134/3 141/25 145/23
  147/4 164/14 164/16 164/21
  170/6 172/8 173/25 176/10
  176/11 177/11 182/12 188/10
  189/14 193/7 200/18 210/21
  219/24 221/13
upbringing [1]  46/5
updating [1]  110/4
upon [18]  12/4 12/5 15/9
  15/10 63/18 66/16 72/19
  75/12 78/5 82/10 113/12
  118/3 146/8 173/6 181/24
  183/2 200/1 206/18
upset [3]  123/1 167/18 201/22
urge [1]  139/3
us [28]  19/24 21/16 22/24
  24/21 24/23 25/19 48/10 62/1
  63/24 72/25 83/7 88/19 103/5
  107/12 109/5 115/6 115/7
  116/21 121/18 128/15 158/3
  160/1 160/6 173/19 194/10
  200/12 203/13 221/6
us to [1]  194/10
usage [1]  45/20
use [8]  17/22 18/25 47/13
  60/3 86/3 176/25 209/1 209/2
used [16]  18/1 18/8 47/10
  67/19 67/20 67/21 81/23
  111/6 111/7 114/7 114/11
  146/24 165/2 165/5 169/2
  169/2
useful [2]  110/1 110/1
using [3]  86/4 152/25 169/8
usually [3]  47/15 52/18 199/3

## V

vaginal [3]  86/23 87/4 87/13
vaginally [4]  19/8 30/12
  30/13 33/17
vaguely [2]  34/1 49/7
validated [1]  78/1

value [3]  61/6 62/14 62/16
variety [1]  46/24
various [1]  96/2
vehicle [1]  150/22
verbal [2]  120/5 120/8
verbiage [1]  106/3
verdict [15]  5/7 5/15 5/16
  132/15 139/11 156/15 167/10
  167/12 168/17 172/10 179/11
  185/14 186/4 195/12 198/22
verdicts [1]  5/4
verified [1]  78/1
Versed [1]  79/15
version [4]  9/9 9/9 153/3
  193/16
versus [8]  32/12 39/15 135/15
  135/19 135/24 136/5 141/14
  178/16
very [60]  6/21 19/24 31/12
  33/4 36/2 43/13 59/21 62/21
  63/3 64/23 65/2 65/2 73/14
  85/18 87/11 91/6 92/11 92/17
  93/9 98/5 98/18 99/14 104/21
  106/6 108/18 108/19 116/5
  121/19 122/1 122/24 123/1
  123/4 123/4 124/1 127/22
  131/19 147/24 150/7 151/15
  151/16 151/16 169/15 184/20
  185/12 185/22 189/4 192/17
  192/17 200/6 201/22 202/3
  202/12 203/6 203/24 207/8
  208/7 208/18 208/18 220/1
  221/8
vicarious [13]  11/12 13/21
  136/21 137/17 140/15 142/7
  142/10 142/22 142/23 169/19
  170/2 170/4 186/16
vicariously [6]  6/14 6/22
  11/21 13/3 141/24 142/25
vice [1]  134/25
victim [50]  9/2 30/5 52/4
  54/13 61/5 61/11 74/3 90/2
  90/4 90/7 90/8 123/22 123/23
  160/20 160/22 161/1 161/3
  161/5 161/8 161/18 162/1
  162/3 162/7 162/9 162/13
  162/15 162/18 162/21 162/25
  163/4 163/12 163/22 163/25
  163/4 164/4 164/8 164/12
  164/13 164/16 164/16 164/21
  164/22 164/24 165/4 165/6
  165/7 165/7 165/9 165/10
  192/5
victim's [3]  89/24 160/15
  164/5
victims [10]  8/5 10/18 10/20
  65/8 74/9 74/22 78/10 140/25
  153/2 182/11
Victor [1]  27/19
video [2]  95/6 200/11
Videotaped [14]  92/4 92/10
  92/18 92/23 93/10 93/16
  93/22 94/6 94/15 94/23 95/3
  128/5 128/9 159/5
videotapes [1]  201/15
view [5]  84/6 187/5 187/14
  202/25 220/22
viewed [1]  102/18
views [1]  139/8
VII [6]  192/24 205/14 207/10
  207/11 214/17 218/9

violated [4]  8/24 144/10
  144/17 207/11
violates [1]  59/5
violation [2]  59/9 59/10
violent [2]  30/6 43/13
Virginia [2]  25/1 25/1
virtue [1]  170/9
visit [14]  27/11 27/12 28/5
  28/17 28/18 33/8 33/24 34/6
  36/21 36/22 36/23 37/1 42/24
  52/7
visited [1]  77/6
visiting [1]  161/12
vivid [1]  122/24
voce [6]  21/22 42/8 58/5
  71/23 133/11 197/23
voice [1]  24/15
voir [2]  199/4 200/8
volume [1]  152/16
voluntarily [2]  144/8 201/7
voluntary [1]  198/23
Vorpahl [10]  2/3 121/12 142/8
  142/21 174/18 176/10 178/15
  178/17 202/7 220/14
Vorpahl's [1]  220/18
vote [1]  117/10

## W

wait [6]  16/12 97/18 103/5
  124/9 158/14 194/9
waiting [3]  96/21 146/1 146/5
waive [4]  114/23 166/25
  167/16 168/25
waived [7]  112/20 129/5 129/6
  145/10 149/22 167/18 170/9
waiver [1]  157/14
wake [3]  164/13 164/14 164/16
wakes [1]  78/2
Walgreen's [3]  46/21 100/18
  101/9
walk [3]  160/23 163/23 192/5
walked [1]  84/22
walking [1]  160/20
want [74]  18/9 35/17 37/14
  53/10 57/12 60/2 60/15 61/23
  61/25 62/1 63/2 66/12 67/9
  70/10 74/1 74/20 77/11 81/13
  82/15 90/19 91/9 93/23 98/1
  99/4 100/3 100/10 103/5
  105/13 105/23 114/4 118/8
  127/7 127/16 128/22 132/16
  133/1 138/6 146/17 157/19
  158/17 168/25 169/1 172/4
  177/18 178/9 180/22 182/4
  185/17 185/24 185/25 186/1
  186/6 188/4 189/24 189/24
  190/8 192/19 192/21 194/6
  196/21 198/10 198/12 198/13
  201/23 203/3 204/15 204/17
  205/7 210/5 215/5 218/18
  219/11 221/3 221/13
wanted [15]  49/13 133/15
  137/10 149/24 158/20 169/6
  178/7 189/15 189/19 194/4
  201/17 216/21 219/13 219/24
  220/13
wanted -- I [1]  194/4
wanting [1]  106/2
wants [18]  12/6 53/17 53/18
  65/25 67/22 71/1 90/25 96/11
  131/15 152/9 194/9 197/2

**wants... [6]**  204/13 204/14
204/18 204/22 208/1 219/10
**war [1]**  68/15
**warning [2]**  86/3 123/24
**was [450]**
**wasn't [18]**  8/16 12/22 26/3
64/10 84/17 100/17 109/14
112/13 113/18 115/4 133/2
137/13 170/24 171/10 174/1
186/17 194/23 212/8
**waste [2]**  100/7 107/10
**waxed [1]**  101/16
**way [41]**  8/25 9/19 11/11
13/11 22/6 26/5 33/20 40/24
52/14 55/25 56/20 58/8 63/9
63/23 65/23 77/14 77/18 78/7
82/9 82/10 87/1 104/12
104/22 106/23 108/11 110/13
113/6 119/17 123/12 140/15
160/21 167/9 167/13 167/17
178/12 182/17 184/10 194/4
201/23 213/5 216/15
**we [365]**
**we get [1]**  220/7
**we'll [26]**  27/10 28/3 44/11
59/22 59/25 60/1 66/19 66/22
71/25 90/22 91/2 91/22 114/2
127/18 150/7 156/20 156/21
166/3 172/8 186/2 197/17
198/6 203/17 205/13 213/17
220/25
**we're [51]**  5/18 12/18 20/15
58/11 59/16 61/5 61/8 65/19
65/20 66/7 74/25 81/24 91/16
92/22 96/20 97/8 97/18 102/3
103/17 111/11 115/5 115/6
124/14 125/20 126/5 126/5
127/8 128/14 128/20 132/10
150/5 151/9 157/3 159/2
169/8 174/7 174/8 182/25
185/5 194/24 196/19 196/25
197/6 197/8 202/10 209/3
209/12 209/18 210/4 220/12
221/17
**we've [46]**  8/9 10/20 14/13
14/22 14/24 15/15 15/22 18/8
19/16 22/2 45/23 61/19 64/5
69/2 69/14 73/20 100/6 101/9
103/19 107/10 114/1 114/3
115/3 126/21 130/13 131/25
132/7 132/9 138/5 144/11
144/22 152/13 152/14 152/16
152/19 153/20 155/10 156/10
176/13 176/19 176/21 179/15
182/8 183/9 202/10 212/5
**weak [1]**  147/11
**wearing [3]**  160/23 161/1
163/1
**week [9]**  26/24 39/19 80/20
111/4 117/10 121/18 150/6
150/7 154/24
**week-long [1]**  154/24
**weekend [3]**  19/18 21/2 21/20
**weight [2]**  17/19 107/7
**Weinberg [4]**  25/22 25/23 26/3
53/3
**weird [1]**  160/24
**welcome [2]**  5/3 98/24
**well [127]**  6/25 7/12 7/19
8/18 9/11 10/5 12/2 16/2

38/1 39/4 59/6 39/8 41/14
43/19 46/5 47/15 52/9 53/10
53/17 53/18 54/5 56/7 57/10
59/25 60/9 60/15 61/18 61/21
65/11 67/21 69/8 69/14 76/20
79/5 79/14 81/11 82/9 87/11
92/7 92/17 93/9 95/15 98/10
101/6 101/20 103/6 103/10
104/17 104/24 105/18 105/20
112/14 113/2 114/2 116/25
121/9 122/1 124/21 129/12
131/23 134/21 137/4 139/12
141/22 142/1 142/6 142/22
144/16 144/25 145/3 146/4
146/12 146/17 147/23 148/3
151/2 153/22 154/9 155/6
155/18 157/14 166/24 167/6
167/20 172/22 179/5 180/2
180/21 181/12 182/5 182/21
182/23 183/13 184/3 184/11
184/18 184/25 185/21 187/25
190/10 191/21 193/25 194/12
197/20 198/10 199/8 200/24
201/5 205/12 206/20 207/17
208/17 210/1 211/20 212/7
212/8 213/2 213/8 215/5
215/7 215/12 215/21
**well-adjusted [1]**  46/5
**went [18]**  9/22 22/7 24/25
46/8 54/11 54/13 77/4 102/6
118/13 119/13 134/13 149/22
154/23 164/17 168/12 173/15
178/10 189/14
**were [118]**  5/23 8/12 10/7
10/21 12/2 12/5 12/15 14/12
14/15 14/25 15/9 17/3 17/17
17/23 18/4 18/18 19/8 21/19
22/12 26/25 27/25 33/6 33/9
37/22 55/15 62/14 63/11
63/13 66/5 66/13 68/14 73/17
77/7 81/4 82/10 83/11 85/18
86/5 86/9 87/24 90/16 97/11
97/12 99/13 101/1 101/9
101/18 102/8 106/11 106/13
106/25 110/5 110/7 111/16
112/2 112/10 112/16 112/22
112/23 112/24 113/4 113/22
114/19 117/11 126/12 132/3
133/4 138/23 144/14 145/14
146/5 146/14 147/3 149/5
149/16 149/17 149/21 152/17
152/17 152/18 154/25 155/12
161/10 166/15 168/9 169/4
169/7 169/7 170/23 173/24
177/21 177/24 177/24 177/24
178/1 178/10 178/11 178/12
180/3 182/10 182/14 183/4
183/16 184/2 188/13 193/9
193/20 193/21 196/3 196/4
196/8 196/16 201/15 203/3
208/20 212/25 213/4 216/22
**were going [1]**  114/19
**weren't [4]**  10/8 84/16 147/10
117/11
**West [1]**  1/22
**Westcott [1]**  10/17
**Westlaw [2]**  135/21 178/18
**what [213]**  7/5 7/18 8/19 9/5
9/5 9/13 9/25 11/17 14/6
16/5 18/5 18/11 18/12 18/19
19/8 20/20 20/20 20/21 21/2

29/15 33/22 33/23 34/2 34/12
35/13 35/16 37/5 39/7 39/10
39/15 40/22 41/10 42/25 46/9
46/20 47/9 49/17 51/9 52/12
54/2 55/3 58/25 61/8 61/17
61/18 62/1 62/10 64/13 64/22
67/6 67/6 70/10 72/3 72/8
72/24 72/24 72/24 74/1 74/7
74/9 75/6 75/7 75/11 76/7
78/5 79/5 81/4 81/7 81/8
81/11 81/12 81/25 82/12
82/20 84/17 85/7 85/21 86/7
86/20 88/11 89/3 91/22 95/12
97/5 98/23 102/3 103/12
103/13 104/13 105/16 106/8
106/12 106/24 107/16 109/7
110/1 110/1 111/18 112/19
113/8 114/10 114/11 114/12
115/25 116/21 117/19 118/11
118/15 119/25 121/2 122/11
122/17 124/9 125/20 126/5
130/10 130/12 130/19 132/7
132/9 132/9 132/10 134/3
135/9 137/19 138/5 138/11
138/12 142/21 143/23 144/5
144/6 146/1 148/22 155/11
155/15 155/22 157/23 166/11
168/11 168/16 170/20 172/23
174/8 174/16 174/17 174/20
175/1 175/9 176/16 177/3
177/16 178/1 180/14 181/13
181/16 183/13 185/19 188/8
189/9 189/22 189/25 190/3
190/25 191/8 192/5 192/6
192/18 194/24 194/24 194/25
195/2 195/8 195/16 195/23
196/5 196/17 197/12 198/3
199/21 201/21 202/23 203/17
204/12 205/15 205/16 207/11
207/23 207/25 208/1 209/18
210/4 210/5 210/8 210/20
211/1 212/10 213/2 214/6
215/4 215/10 215/11 215/23
215/23 216/22 216/24 220/23
221/3
**what's [19]**  30/3 35/18 40/2
53/11 72/17 74/11 82/17
95/25 102/25 108/24 116/23
129/11 131/24 134/3 152/4
153/6 154/23 157/8 204/12
**whatever [9]**  18/3 81/22
111/14 114/21 118/9 119/9
123/24 188/10 199/9
**whatsoever [4]**  9/1 76/11
77/21 156/13
**when [99]**  10/18 10/19 11/2
12/15 13/11 15/16 15/22 18/5
18/6 19/13 22/3 22/4 24/23
25/10 25/12 25/23 26/23
27/11 27/12 28/24 29/5 30/6
32/3 34/20 36/17 41/1 46/2
46/12 52/7 52/14 53/10 59/7
61/1 62/12 62/15 62/21 70/8
84/18 84/20 90/8 90/24 99/20
101/15 102/20 104/20 104/24
105/2 105/14 106/14 106/21
110/3 111/19 112/18 114/13
114/13 117/20 118/18 122/8
122/25 123/12 123/25 126/5
126/4 131/19 134/24 140/7
141/23 144/1 150/5 153/10

**when... [29]** 153/10 153/13 155/12 160/15 162/25 163/1 163/9 164/12 164/16 164/21 165/2 165/7 166/18 170/8 171/4 172/14 174/24 175/13 182/9 183/10 184/1 187/1 188/18 195/20 200/11 201/19 210/17 211/5 211/23

**where [47]** 5/22 6/8 10/7 10/13 11/3 17/21 18/4 22/18 24/24 30/13 30/23 31/20 48/10 51/21 55/5 65/25 66/12 68/14 76/23 78/2 81/9 83/23 85/13 99/15 100/9 102/4 102/6 105/5 105/12 109/5 109/10 109/15 110/6 125/13 138/8 139/20 143/10 145/13 151/12 154/24 164/3 166/8 169/5 169/7 180/22 218/14 221/1

**whereas [1]** 134/10

**whether [48]** 9/8 12/12 12/15 12/17 12/19 14/18 22/8 32/18 32/19 37/20 41/21 42/25 43/14 48/12 66/5 69/12 71/1 75/9 78/17 83/20 101/24 101/25 102/9 103/1 103/3 104/10 107/14 107/17 111/13 146/8 146/10 146/13 147/5 148/15 150/8 164/8 165/2 168/18 171/6 172/5 172/6 180/5 180/19 180/19 183/14 183/15 184/25 185/2

**which [84]** 6/1 6/1 6/2 14/24 16/9 17/14 17/14 20/1 21/15 38/5 41/16 47/11 58/2 66/1 69/24 71/17 71/19 77/11 78/6 78/12 79/2 89/13 89/21 96/12 99/4 104/13 105/4 107/7 108/12 114/1 116/21 119/1 119/15 120/2 120/11 121/3 124/17 125/3 127/1 128/24 129/12 129/17 130/10 130/18 131/20 134/7 134/22 135/3 135/3 135/20 135/24 136/6 141/5 144/24 146/3 151/25 156/7 160/3 160/4 162/3 162/10 163/22 164/24 168/21 173/6 173/9 173/14 175/5 175/25 176/11 178/16 178/17 179/14 182/7 182/10 193/17 197/21 199/17 202/20 207/10 210/24 213/1 218/5 218/22

**while [14]** 9/3 82/4 82/7 82/19 103/9 116/13 118/20 118/23 121/23 131/11 163/10 173/2 188/16 194/16

**white [1]** 29/20

**who [64]** 8/2 8/7 10/3 15/16 18/6 18/8 22/1 22/3 24/8 25/22 26/16 26/19 29/20 30/18 31/12 31/20 31/24 43/6 43/12 53/17 54/3 54/17 54/17 57/1 64/14 66/25 67/21 71/11 71/11 72/15 78/18 83/2 84/3 91/17 91/18 93/20 97/9 99/13 105/13 109/3 113/11 115/15 116/11 124/17 124/22 148/13 149/24 155/4 160/14 161/10 161/13 167/15 170/18 171/10

183/14 189/2 200/9 208/19 211/21 214/2

**who's [5]** 34/20 41/6 96/19 108/18 194/13

**whoever [2]** 31/7 183/14

**whole [12]** 12/1 19/7 23/22 41/9 101/18 119/7 124/16 124/16 150/13 150/19 155/19 173/2

**whom [1]** 51/11

**why [40]** 7/10 8/16 20/7 21/6 22/8 23/10 40/19 53/22 60/12 61/18 63/4 69/12 107/1 119/17 119/19 121/7 121/9 121/20 124/14 124/18 138/19 142/15 146/14 151/9 165/3 165/9 166/23 167/2 180/11 181/2 187/16 188/20 191/13 191/24 198/5 198/8 199/12 199/14 199/25 204/15

**wife [3]** 32/6 84/12 85/21

**will [47]** 6/18 7/23 13/21 20/18 23/18 23/21 29/5 44/8 53/11 53/19 55/2 55/6 57/17 57/21 57/22 82/4 83/14 91/3 91/4 93/19 95/20 97/12 102/17 111/25 127/2 128/23 133/5 134/5 138/7 138/8 139/14 143/19 158/15 160/3 160/4 168/11 171/17 174/20 181/8 182/3 184/16 197/21 203/7 203/16 203/18 206/10 218/22

**Willey [2]** 135/18 135/19

**William [2]** 93/22 94/6

**Willie [1]** 194/14

**willing [3]** 97/18 176/4 213/4

**wiped [1]** 79/20

**wish [9]** 9/10 58/17 167/23 168/18 170/15 185/5 190/10 190/11 219/6

**wishes [2]** 159/23 199/9

**wishful [1]** 9/15

**withdraw [2]** 66/19 66/22

**withdrawn [1]** 173/15

**withdrew [1]** 201/19

**withhold [1]** 57/22

**withholding [2]** 57/23 58/20

**within [16]** 12/12 12/17 12/19 12/25 55/17 106/11 118/13 136/23 157/12 157/25 168/6 169/10 171/21 174/2 174/5 174/23

**without [16]** 87/8 113/25 119/16 123/24 124/19 127/12 127/17 144/10 151/4 151/13 171/24 186/7 187/11 199/12 199/12 211/7

**witness [61]** 19/22 21/25 22/1 22/3 22/11 23/10 23/16 38/15 39/11 57/5 57/5 57/8 58/2 62/23 63/5 63/13 63/24 64/11 64/16 65/7 65/9 75/5 75/9 88/14 90/16 94/2 95/19 96/19 96/23 98/12 104/24 106/14 112/12 113/19 115/3 115/5 115/6 115/7 115/11 115/16 115/19 116/18 116/19 116/20 118/2 118/8 119/4 119/9 119/10 119/20 121/15 121/25 122/2 123/20 124/17 127/8

**witness' [3]** 58/21 63/17 217/24

**witnessed [4]** 39/5 39/14 39/17 106/18

**witnesses [15]** 3/3 4/4 66/13 88/20 88/21 90/5 90/8 100/7 102/19 112/10 118/4 137/1 149/19 149/21 159/14

**woke [5]** 39/13 76/13 164/15 164/21 189/14

**Wolff [1]** 141/14

**woman [10]** 32/3 62/6 63/14 87/3 87/5 108/18 124/11 124/21 124/24 125/9

**woman's [2]** 51/19 58/19

**women [23]** 8/2 15/6 15/8 15/15 15/22 152/19 155/11 175/11 175/16 176/12 176/17 176/25 177/14 178/2 178/3 178/4 180/14 181/25 182/7 182/9 182/16 182/25 183/4

**wondering [2]** 36/6 36/17

**word [9]** 18/6 39/8 42/10 42/24 61/7 81/23 115/24 141/9 192/1

**words [13]** 28/21 29/4 37/13 51/8 90/23 112/20 115/23 120/7 133/4 138/2 169/4 189/17 193/14

**work [22]** 5/17 13/22 14/13 22/16 22/20 22/21 22/25 46/6 50/11 57/2 83/7 97/18 98/10 159/11 176/24 186/6 186/8 192/5 193/18 205/15 205/19 218/9

**worked [3]** 92/15 94/14 165/7

**working [9]** 30/6 45/8 91/25 110/5 111/16 117/7 120/17 120/20 165/12

**workplace [1]** 184/17

**world [4]** 54/18 149/18 149/19 153/3

**worried [4]** 57/11 101/22 214/16 214/18

**worse [2]** 32/21 182/13

**worst [1]** 145/8

**worth [1]** 115/23

**would [286]**

**wouldn't [22]** 15/21 32/22 33/20 39/18 43/5 46/8 55/18 55/20 76/18 87/18 106/10 123/17 144/25 149/3 167/25 169/22 171/2 180/22 192/3 201/17 203/3 205/21

**wreck [3]** 14/9 177/22 208/24

**wrist [1]** 189/5

**writ [1]** 135/25

**write [4]** 29/2 29/6 29/10 36/25

**writes [1]** 45/13

**writing [6]** 77/7 82/7 109/10 120/12 120/12 183/15

**written [9]** 17/2 33/20 35/18 77/15 81/22 82/10 121/3 136/14 216/15

**wrong [21]** 7/22 11/22 32/7 37/14 42/24 46/18 53/12 115/18 141/4 143/20 148/6 149/6 167/13 167/17 169/13 184/7 188/21 189/18 212/4

99/20
200/15

**W**

**wrong... [2]** 212/10 212/13
**wrongdoer [3]** 9/2 10/6 10/9
**wrongdoers [5]** 7/21 7/22 8/7
 10/16 13/9
**wrongdoers' [1]** 11/5
**wrongful [1]** 139/1
**wrote [4]** 33/22 77/16 81/4
 158/6

**X**

**Xanax [1]** 86/3

**Y**

**yeah [37]** 13/20 67/13 67/24
 68/8 70/3 70/18 70/20 81/6
 89/10 96/4 98/3 100/2 104/2
 151/20 156/2 170/16 172/20
 173/1 193/25 193/25 195/6
 197/14 197/16 197/25 199/10
 206/25 209/2 209/6 209/17
 210/12 212/12 215/1 215/10
 217/17 219/11 219/17 221/7
**year [4]** 29/20 46/23 54/11
 55/18
**years [17]** 10/14 28/11 34/1
 55/7 62/5 62/15 102/3 103/13
 117/8 166/14 166/17 168/12
 169/11 173/8 173/19 174/11
 189/10
**Yep [1]** 218/3
**yes [148]** 5/13 17/24 19/5
 20/6 21/23 23/17 23/23 25/6
 25/9 26/15 27/2 27/24 28/2
 28/13 33/7 33/19 35/5 35/25
 37/19 38/11 38/24 40/9 40/15
 40/18 41/25 42/3 42/12 42/18
 43/11 43/18 44/2 44/20 45/17
 45/22 46/1 46/10 47/1 47/8
 47/25 48/6 48/13 48/18 49/15
 49/20 50/4 50/9 50/15 50/25
 51/2 51/10 51/14 51/23 52/6
 52/13 52/25 55/11 56/11
 56/24 57/19 57/25 60/5 65/11
 67/3 67/15 68/11 70/9 71/22
 73/2 75/17 75/25 76/6 76/8
 77/3 77/18 77/23 79/13 82/13
 83/6 84/5 84/21 84/23 84/24
 85/4 85/14 86/2 86/8 86/12
 86/22 87/15 88/1 88/13 88/19
 91/9 94/3 94/10 95/1 100/14
 101/23 103/24 104/8 109/22
 110/12 110/19 110/22 111/15
 118/1 127/14 127/15 129/2
 129/8 130/17 136/18 138/3
 141/2 142/13 145/11 156/19
 157/21 170/21 184/14 186/25
 201/14 202/23 203/23 204/4
 206/9 206/12 206/13 206/14
 206/19 207/22 208/21 209/23
 210/19 213/12 214/18 215/10
 216/4 217/7 217/8 217/13
 217/19 217/21 217/23 218/1
 218/1 218/11 218/11
**yesterday [12]** 5/5 10/17 20/7
 20/10 22/8 27/5 36/18 60/20
 64/4 97/1 97/2 192/23
**yet [6]** 16/10 83/8 84/9
 96/16 98/16 136/2
**you [620]**
**you don't [1]** 13/10

**you'... [3]** 18/8 19/9
**you're [47]** 18/11 18/12 23/21
 32/17 36/14 38/1 40/16 50/6
 57/12 61/13 68/4 79/22 81/14
 81/15 82/19 86/7 87/10 88/19
 92/7 98/24 101/22 114/25
 115/18 142/15 160/9 166/24
 171/4 171/19 171/25 174/16
 174/17 184/23 184/24 187/1
 189/21 189/21 193/15 195/12
 195/19 196/20 205/10 205/10
 208/14 208/25 212/22 215/7
 220/8
**you've [10]** 25/15 28/11 68/12
 87/25 88/6 152/6 180/18
 183/1 189/19 198/6
**you-all [5]** 73/9 185/18
 210/20 216/22 216/23
**young [4]** 32/3 62/6 62/12
 108/17
**your [330]**
**your answer [1]** 216/10
**yours [3]** 129/1 129/11 185/7
**yourself [1]** 32/18

**Z**

**zero [1]** 144/10
**Zoloft [2]** 47/8 47/14
**Zone [2]** 69/21 69/23