1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION

3   JAMIE LEIGH JONES,              .
    PLAINTIFF,                      .
4                                   . H-07-CV-2719
            v.                      . HOUSTON, TEXAS
5                                   . JULY 7, 2011
                                    . 8:27 A.M.
6   HALLIBURTON COMPANY D/B/A       .
    KBR KELLOGG BROWN & ROOT        .
7   (KBR); KELLOGG BROWN & ROOT .
    SERVICES, INC.;                 .
8   DEFENDANTS.                     .
    . . . . . . . . . . . . . .

9

10                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE KEITH P. ELLISON
11              UNITED STATES DISTRICT JUDGE

12

    A P P E A R A N C E S:
13

    FOR THE PLAINTIFFS:
14

          Lannie Todd Kelly
15        Heidi Olsen Vicknair
          The Kelly Law Firm PC
16        One Riverway
          Suite 1150
17        Richmond, Texas 77056

18        Ron Estefan
          Attorney at Law
19        One Riverway
          Suite 1150
20        Richmond, Texas 77056

21        Stephanie Marie Morris
          The Law Office of Stephanie M. Morris, PLLC
22        27 S. Darington Street
          West Chester, Pennsylvania 19382

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                          - - - - -

        *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1    A P P E A R A N C E S:   (Continued)

2    FOR DEFENDANT KBR:

3         Joanne Vorpahl
          Susan Cates
4         Blake Runions
          Stephanie Holcombe
5         Daniel K. Hedges
          Porter & Hedges
6         1000 Main Street
          36th Floor
7         Houston, Texas 77002

8    FOR DEFENDANT CHARLES BORTZ:

9         Andrew T. McKinney, IV
          Sharon Cullen
10        McKinney Cooper LLP
          Three Riverway
11        Suite 500
          Houston, Texas 77056
12
     OFFICIAL COURT REPORTER:
13
          Cheryll K. Barron, CSR, CM, FCRR
14        U.S. District Court
          515 Rusk Street
15        Houston, Texas  77002

16                              - - - - -

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2      *(Jury not present)*

3          THE COURT:  All right.  On the Anthony Adams issue,

4   there's one paragraph which I think does represent a consistent

08:27   5   statement about his conversation with Ms. Jones, and I'm going

6   to allow that one paragraph.  The rest of it, I'm not.

7              I don't know -- who's got my copy of that?  It's

8   on Page 31.

9          MS. HOLCOMBE:  Oh, Page 31?  Okay.  Let me look.

08:28   10   Here's page --

11          THE COURT:  It's the paragraph beginning, "Adams

12   complained that the previous day," second to last paragraph on

13   the page.

14          MS. HOLCOMBE:  And it's that paragraph right there?

08:28   15          THE COURT:  Yes.

16          MR. ESTEFAN:  Just the one paragraph is coming in --

17          MS. CULLEN:  Your Honor, if I might note, when going

18   through Bortz exhibits that had been shown as admitted last

19   night, to be sure everything was properly redacted, I found

08:28   20   that the second page, Page 977, Bates label 977, is on the

21   admitted exhibit list.

22          THE COURT:  The second page is?

23          MS. CULLEN:  Yes, your Honor.

24          MR. ESTEFAN:  It would be Page 32 of the statement,

08:28   25   your Honor, if you look in the lower right-hand corner.

08:29  1           THE COURT:  I have that, too.

       2           MS. CULLEN:  I can't remember when it was admitted,

       3    but it's there.

       4               What's the Bortz exhibit number on that?

08:29  5           MS. HOLCOMBE:  98.

       6           MS. CULLEN:  98.  98, Page 977 only was the way it was

       7    listed.

       8           MR. ESTEFAN:  Your Honor, I think if we -- if -- early

       9    on I seem to recall something about if all parties agree, even

08:29  10   if it's a joint exhibit, to withdraw something that --

       11          THE COURT:  If you agree, I'll withdraw something.

       12          MR. ESTEFAN:  If it's something that shouldn't be

       13   in --

       14          MS. MORRIS:  It's the State Department exhibit.

08:29  15          MR. McKINNEY:  I have a recollection of that.

       16   Page 977 is, I'm pretty sure, where you'll find the entry that

       17   there is no scientific evidence that would support the notion

       18   that more than one person was involved.

       19              Am I right about that?

08:29  20          MS. HOLCOMBE:  977?  No.

       21          THE COURT:  It's all talking about Mr. Adams.

       22          MS. HOLCOMBE:  This is the stuff when he talks

       23   about -- remember, he testifies in his deposition about how he

       24   saw Charles Bortz the next morning?

08:29  25              It kind of starts here, goes there.

08:30   1          MS. MORRIS:  I think 98 is the State Department

2    report.

3          THE COURT:  Yeah, it is.

4          MS. MORRIS:  And pages were taken out as the witnesses

08:30   5    were testifying.  So, I think the whole thing may have been

6    construed as admitted at one point; but only certain pages

7    were.  And I don't know that that that --

8          MR. McKINNEY:  Well, what I was going to say is that I

9    thought -- so I'm not confusing people, I thought that the

08:30   10   matter in issue was the portion that I had read into evidence

11   expressly, subject to redaction.  And I'm not walking away from

12   that.

13          But, apparently, the matter in issue is a

14   separate exhibit that I must have offered at some point during

08:30   15   my cross-examination of Ms. Jones and -- you know, if I got it

16   in, I like it; so, I'm inclined to leave it in.

17          MS. MORRIS:  Aren't the Bortz exhibits --

18          *(Sotto voce discussion at bench with court staff)*

19          THE COURT:  Yeah.  Ms. Talla reports that it was

08:31   20   admitted on June 22nd.

21          MS. HOLCOMBE:  Page 977?

22          *(Sotto voce discussions among all counsel)*

23          THE COURT:  Let's have one person talking at a time if

24   you want it on the record.  Maybe you-all are just talking to

08:31   25   yourselves.

08:31  1          *(Sotto voce discussions among all counsel)*

      2          THE COURT:  Okay.  We have another factoid from

      3  Ms. Talla.  What was admitted was the last paragraph on

      4  Page 32.  It said, "On June 15th, 2008, RA provided AUSA

08:32  5  Eggers" -- E-G-G-E-R-S -- "with a final FBI lab report which

      6  indicated that the subject's DNA was present on the previously

      7  submitted samples from the rape kit and evidence seized from

      8  victim's room."

      9          You're right, Mr. McKinney, there's no scientific

08:32 10  findings that can --

     11          MS. CULLEN:  Perfect.

     12          MR. McKINNEY:  That's what I read into evidence.

     13          THE COURT:  So, that's in.  That's in, that one

     14  paragraph.

08:32 15          MR. McKINNEY:  Actually, there's a portion on the next

     16  two -- couple of pages later that's also read into evidence.

     17          But I read it.  I didn't offer it as an exhibit.

     18  It's simply part of the transcript record.

     19          THE COURT:  Okay.  We can leave it that way, then.

08:32 20          MR. McKINNEY:  I think that's the proper way to do it,

     21  then.  I never marked it and stuck it in.

     22          THE COURT:  All right.

     23          MS. MORRIS:  So, it's going to be admitted and

     24  redacted?  Is that --

08:32 25          THE COURT:  Well, what he just finished saying was

08:32   1   what he read will remain in the transcript but not in the
        2   exhibits.
        3              MS. MORRIS:  Okay.  That's fine.
        4              MR. ESTEFAN:  That's that last paragraph?
08:33   5              THE COURT:  Of Page 32.
        6              MR. ESTEFAN:  All right.  But the prior is coming in
        7   as an exhibit, just that one paragraph that you told us about?
        8              THE COURT:  Yes.
        9              MR. ESTEFAN:  Okay.  Thank you, Judge.
08:33  10              MS. HOLCOMBE:  Okay.  I'm going to go get that
       11   redacted right now.
       12              THE COURT:  Okay.  Before we break on the -- I have
       13   your concern on the predicates as to punitive damages, and
       14   we'll fix that.
08:33  15                   We've already made the copies.  Logistically what
       16   would be easier?  Would anybody mind if we just wrote it in?
       17              MR. ESTEFAN:  No, no objection from plaintiffs.  I
       18   think that's easy.
       19                   You're going to give them the official charge,
08:33  20   anyway?
       21              THE COURT:  I'm going to read the official charge.
       22              MR. ESTEFAN:  Do we need to make the changes on their
       23   handwritten --
       24              THE COURT:  No.  That's what I am saying.  On theirs,
08:33  25   yes, that's exactly where the changes need to be made, right.

08:33   1            MR. ESTEFAN:  Right.

        2            MR. HEDGES:  A procedural question, your Honor?

        3            THE COURT:  Sure.

        4            MR. HEDGES:  What are your policies on the lawyers or

08:33   5     consultants visiting with the jurors after the verdict?

        6            THE COURT:  I tell you what.  I used to encourage

        7     that, and I don't prevent it.  But I had a couple of cases,

        8     high-profile cases, where lawyers talked to the jurors, I'm

        9     sure in good faith; but one or more of them said something that

08:34   10    led to a motion for new trial.

        11           And I just have found a good lawyer can always

        12    get a juror to say something that will confuse or even

        13    contradict the jury's verdict.  So, I don't encourage it.

        14           And I'm sorry about that because I thought they

08:34   15    provided very useful debriefing for the attorneys.

        16           MR. HEDGES:  They really do.

        17           THE COURT:  They pointed out some things to attorneys

        18    that needed to be pointed out.  But it's just -- I don't want

        19    to have this trial over again.  I really don't.

08:34   20           MR. HEDGES:  No way, Judge.

        21           THE COURT:  So, I'm not going to encourage it.  If you

        22    get somebody to talk, I'm not going to sanction you.  But my

        23    preference will be expressed to them, when I go back there to

        24    shake hands, that they not talk.

08:34   25           Okay.  Anything else?  I'm going to go back and

08:34   1   make these changes.

2                Mr. Bagwell, you'll let us know when all of them

3   are here.  We can start a little bit early if we can.

4        *(Recess was taken from 8:35 a.m to 9:16 a.m.)*

09:14   5        *(Jury not present)*

6        THE COURT:  Okay.  I'm told we have need of another

7   evidentiary ruling on Joint Exhibit 255.

8                Is that right?

9        MS. CULLEN:  Bortz exhibit.

09:16   10       THE COURT:  Bortz Exhibit 255?

11       MR. ESTEFAN:  Correct, your Honor.

12       MR. McKINNEY:  That's correct, Judge.  Bortz

13   Exhibit 255 is the CD that had the media clips.  We stopped

14   playing the media clips --

09:16   15       THE COURT:  Because there was some impingement on the

16   proscribed evidence, right?

17       MR. McKINNEY:  Correct.  We have since deleted that

18   portion and redacted any reference to the grand jury or any

19   other materials that the Court has ruled should not come into

09:16   20   evidence.  The jury has seen, however, a substantial portion of

21   the media activity.

22       THE COURT:  Right.

23       MR. McKINNEY:  And, you know, I don't think there's

24   any disagreement on this.  I think for the integrity of the

09:17   25   record, because the jury did see that, we should have the

09:17  1  redacted --

2  THE COURT:  No argument from me.

3  MR. ESTEFAN:  I take Mr. McKinney at his word, Judge.

4  If they've redacted it and -- in compliance with the Court's

09:17  5  order, we have no objection -- plaintiff has no objection to

6  admission of Bortz 255.

7  THE COURT:  Very well.  It is hereby admitted by

8  agreement.

9  Okay.  Just one more rule of the road here.  I

09:17  10  am -- I know it's a huge duplication of effort, but I will read

11  these instructions because I understand that to be required.

12  I'm assuming that the way the parties want these read is in the

13  order they're written, which would mean that I would also read

14  in sequence the questions.

09:18  15  Is that correct?

16  MR. ESTEFAN:  That's correct.

17  MR. HEDGES:  Yes.

18  THE COURT:  All right.

19  *(Recess was taken from 9:18 a.m. to 9:37 a.m.)*

09:36  20  THE COURT:  Would all please rise for the jury?

21  *(Jury present)*

22  THE COURT:  Thank you.  Please be seated.

23  All of us remain grateful for your punctuality.

24  I've never had a jury more scrupulous about meeting its

09:37  25  obligations for so very, very long.  Thank you.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:37  1            You should have in your seats a copy of the

2      instructions that are going to be guiding your deliberations.

3      I will also plan to read those.  And I know that is a

4      redundancy, but tradition requires the reading and I think your

09:37  5      convenience requires the hard copy.  It is an awful lot to ask

6      anyone to keep in mind without a script to refer to.

7            We begin with definitions.  For purposes of this

8      jury charge, "Bortz" shall mean defendant Charles Bortz.

9            "Defendants" shall mean all of the defendants

09:38  10     collectively in this case.

11           "KBR" shall mean collectively defendants

12     Halliburton Company doing business as KBR, Kellogg Brown &

13     Root, Kellogg Brown & Root Services, Inc., Kellogg Brown & Root

14     International, Inc., Kellogg Brown & Root, LLC, Kellogg Brown &

09:38  15     Root, Inc., Kellogg Brown & Root S de RL, KBR Technical

16     Services, Inc., and Overseas Administrative Services.

17           "Plaintiff" or "Jones" shall mean Plaintiff Jamie

18     Jones.

19           Members of the jury, you have heard the evidence

09:38  20     in this case.  I will now instruct you on the law that you must

21     apply.  It is your duty to follow the law as I give it to you.

22     On the other hand, you, the jury, are the judges of the facts.

23     Do not consider any statement that I have made in the course of

24     trial or make in these instructions as an indication that I

09:39  25     have any opinion about the facts of this case.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:39   1          You will soon hear the closing arguments of the

2   attorneys.  Statements and arguments of the attorneys are not

3   evidence and are not instructions on the law.  They are

4   intended only to assist the jury in understanding the evidence

09:39   5   and the parties' contentions.

6          Answer each question from the facts as you find

7   them.  Do not first decide who you think should win and then

8   answer the questions accordingly.  Your answers and your

9   verdict must be unanimous.

09:39   10          Except where otherwise indicated, you must answer

11   all questions from a preponderance of the evidence.  By this is

12   meant the greater weight and degree of credible evidence before

13   you.  In other words, a preponderance of the evidence just

14   means the amount of evidence that persuades you that a claim is

09:39   15   more likely true than not true.

16          In determining whether any fact has been proved

17   by a preponderance of the evidence in the case, you may, unless

18   otherwise instructed, consider the testimony of all witnesses,

19   regardless of who may have called them, and all exhibits

09:40   20   received in evidence, regardless of who may have produced them.

21          You will recall that during the course of the

22   trial I instructed you that certain testimony and certain

23   exhibits were admitted into evidence for a limited purpose.

24   You may consider such evidence only for the specific limited

09:40   25   purpose for which it was admitted.


*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:40  1          In determining the weight to be given to the

2    testimony of a witness, you should ask yourself whether there

3    was evidence tending to prove that the witness testified

4    falsely concerning some important fact or whether there was

09:40  5    some evidence that at some different time the witness said or

6    did something or failed to say or do something that was

7    different from the testimony the witness gave before you during

8    this trial.

9          You should keep in mind, of course, that a simple

09:40  10   mistake by a witness does not necessarily mean that the witness

11   was not telling the truth as he or she remembers it.  Because

12   people may forget some things or remember other things

13   inaccurately.  So, if a witness has made a misstatement, you

14   need to consider whether the misstatement was an intentional

09:41  15   falsehood or simply an innocent lapse of memory.  And the

16   significance of that may depend on whether it's to do with an

17   important fact or only an unimportant detail.

18         While you should consider only the evidence in

19   this case, you are permitted to draw such reasonable inferences

09:41  20   from the testimony and exhibits as you feel are justified in

21   the light of common experience.  In other words, you may make

22   deductions and reach conclusions that reason and common sense

23   lead you to draw from the facts that have been established by

24   the testimony and the evidence in the case.  The testimony of a

09:41  25   single witness may be sufficient to prove any fact, even if a

09:41  1    greater number of witnesses may have testified to the contrary,

2    if, after considering all the other evidence, you believe the

3    single witness.

4              There are two types of evidence that you may

09:41  5    consider in properly finding the truth as to the facts of this

6    case.  One is direct evidence, such as testimony of an

7    eyewitness.  The other is indirect or circumstantial evidence,

8    the proof of a chain of circumstances that indicates the

9    existence or non-existence of certain other facts.  As a

09:42  10   general rule, the law makes no distinction between direct and

11   circumstantial evidence but simply requires that you find the

12   facts from a preponderance of all the evidence, both direct and

13   circumstantial.

14             When knowledge of technical subject matter may be

09:42  15   helpful for the jury, a person who has special training or

16   experience in that technical field, called an "expert witness,"

17   is permitted to state his opinion on those technical terms.

18   However, you are not required to accept that opinion.  As with

19   any other witness, it is up to you to decide whether to rely

09:42  20   upon it.

21             In deciding whether to accept or rely on the

22   opinion of an expert witness, you may consider any bias of the

23   witness, including any bias you may infer from the evidence

24   that the expert witness has been or will be paid for reviewing

09:43  25   the case and testifying, or from evidence that he testifies

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:43  1    regularly as an expert witness and his income from such
       2    testimony represents a significant portion of his income.

       3              Any notes that you have taken during the trial
       4    are only aids to memory.  If your memory should differ from
09:43  5    your notes, then you should rely on your memory and not on the
       6    notes.  The notes are not evidence.

       7              A juror who has not taken notes should rely on
       8    his or her independent recollection of the evidence and should
       9    not be unduly influenced by the notes of other jurors.  Notes
09:43  10   are not entitled to any greater weight than the recollection or
       11   impression of each juror about the testimony.

       12             When you retire to deliberate on your verdict,
       13   you may take this charge with you, as well as exhibits which
       14   the Court has admitted into evidence.  Select your foreperson,
09:43  15   and conduct your deliberations.  If you recess during your
       16   deliberations, follow all the instructions the Court has given
       17   you about/on your conduct during the trial.

       18             If you have reached a unanimous verdict, your
       19   foreperson is to fill in on the form your answers to the
09:44  20   questions.  Do not reveal your answer until such time as you
       21   are discharged, unless otherwise directed by me.  You must
       22   never disclose to anyone, not even to me, your numerical
       23   division on any question.

       24             Let me pause here and just emphasize that.  I've
09:44  25   had to declare mistrials a couple of times because the jury

09:44   1   sent out a note saying, "We're eight to four for conviction" or
2   "We're seven to five for acquittal."  Don't ever, ever do that.
3   Everybody understand that?

4           Okay.  If you want to communicate with me at any
09:44   5   time, please give a written message or question to the bailiff,
6   who will bring it to me.  I will then respond as promptly as
7   possible, either in writing or by having you brought into the
8   courtroom so that I can address you orally.  I will always
9   first disclose to the attorneys your question and my response
09:44   10  before I answer your question.

11          After you have reached a verdict, you are not
12  required to talk with anyone about the case unless the Court
13  orders otherwise.

14          These instructions have been signed in Houston,
09:45   15  Texas on this 7th day of July, 2011, by me, Keith P. Ellison,
16  United States District Judge.

17          Those are what are called general instructions.
18  The rest of what I am going to read are more specific to this
19  case.  Both kinds of instructions govern your deliberations.

09:45   20          If there has been publicity about this trial, you
21  must ignore it.  You must decide this case only from the
22  evidence presented in the trial.  Do not consider anything you
23  may have read or heard in the media, including the newspaper,
24  Internet, television, or radio concerning this case.

09:45   25          It is your sworn duty as jurors to discuss the

case with one another in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong.  However, do not give up your honest beliefs solely because the others think differently or merely to finish the case.

Remember that in a very real sense you are the judges, judges of the facts.  Your only interest is to seek the truth from the evidence in this case.

Do not let bias, prejudice, or sympathy play any part in your deliberation.  A corporation and all other persons are equal before the law and must be treated as equals in the court of justice.

Let me say for anybody standing, there are seats on the first row and there are chairs out there you're welcome to bring in.

If the plaintiff has proven her claim against the defendants by a preponderance of the evidence, you must determine the damages to which the plaintiff is entitled.  You should not interpret the fact that I have given instructions about the plaintiff's damages as an indication in any way that I believe that the defendant should or should not win the case. It is your task first to decide whether the defendants are

liable.  I am instructing you on damages only so that you will have guidance in the event you decide that the defendants are liable and that the plaintiff is entitled to recover money from the defendants.

        In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact or whether there was evidence that at some other time the witness said or did something or failed to say or do something that was different from the testimony he or she gave at the trial.

        Certain testimony has been presented to you through depositions.  A deposition is the sworn recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness' testimony may be presented under oath in the form of a deposition.

        Some time before this trial, attorneys representing the parties in this case questioned some of the witnesses under oath.  A court reporter was present and recorded the testimony.  Some of these questions and answers were presented to you during trial.  The deposition testimony of these witnesses is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you, insofar as possible, in the same way as if

the witness had been present and had testified from the witness stand in this court.

This is Jury Question Number 1.  Did Charles Bortz rape Jamie Leigh Jones on or around July 27th, 2005, and/or July 28th, 2005?

A person commits a rape if he intentionally or knowingly causes the penetration of the anus, sexual organ, or mouth of another person by any means, without that person's consent.

A rape is without the consent of the other person if the other person has not consented and the actor knows the other person is unconscious or physically unable to resist.

Please answer "Yes" or "No."

If you answered "Yes" to Question 1, then answer Question Number 2.  Otherwise, do not answer Question 2.

Consider the elements of damages listed below and none other.  Consider each element separately.  Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.  Do not include interest on any amount of damages you find.

Jury Question 2 is:  What sum of money, if paid now in cash, would fairly and reasonably compensate plaintiff for her damages, if any, as a result of the conduct found in response to Question Number 1?

09:50   1          Answer in dollars and cents, if any.

2          A, Physical pain and mental anguish sustained in

3    the past;

4          B, Physical pain and mental anguish that, in

09:50   5    reasonable probability, plaintiff will sustain in the future;

6          C, Medical care expenses incurred in the past;

7          D, Medical care expenses that, in reasonable

8    probability, plaintiff will incur in the future;

9          E, Physical impairment and disfigurement in the

09:50  10    past;

11          F, Physical impairment and disfigurement which,

12    in all reasonable probability, will be suffered in the future;

13          Loss of earnings in the past is G;

14          H, Loss of earning capacity which will, in all

09:50  15    probability, be incurred in the future.

16          Okay.  Now, back to instructions.

17          It is unlawful for an employer to discriminate

18    against an employee because of the employee's gender.  This

19    includes sexual harassment.  Sexual harassment is unwelcome

09:50  20    conduct that is based on plaintiff's gender.  For KBR to be

21    liable for sexual harassment, the conduct must be sufficiently

22    severe or pervasive to alter the terms or conditions of

23    plaintiff's employment and create a hostile or abusive work

24    environment.

09:51  25          To determine whether the conduct in this case

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

rises to a level that alters the terms or conditions of plaintiff's employment, you should consider all the circumstances, including: the frequency of the conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with plaintiff's work performance.  There is no requirement that the conduct be psychologically injurious.

In determining whether a hostile work environment existed, you must consider the evidence from both plaintiff's perspective and from the perspective of a reasonable person. First, plaintiff must actually find the conduct offensive. Next, you must look at the evidence from the perspective of a reasonable person's reaction to a similar environment under similar circumstances.  You cannot view the evidence from the perspective of an overly sensitive person, nor can you view the evidence from the perspective of someone who is never offended. Rather, the alleged harassing behavior must be such that a reasonable person in the same or similar circumstances as plaintiff would find the conduct offensive.

Although sexual harassment must be based on sex, it need not be motivated by sexual desire.  Sexual harassment may include extremely insensitive conduct because of gender. Simple teasing, offhand comments, sporadic use of offensive language, occasional gender-related jokes, and isolated incidents, unless extremely serious, will generally not amount

09:52   1    to discriminatory changes in the terms and conditions of

        2    employment.  Discriminatory intimidation, ridicule, sexual

        3    advances, request for sexual favors, or other physical or

        4    verbal conduct of a sexual nature in the workplace may be

09:53   5    sufficiently extreme to alter the terms and conditions of

        6    employment.

        7           In determining whether KBR knew or should have

        8    known of the harassment, plaintiff must prove that, A, the

        9    harassment was known or communicated to a person who had the

09:53   10   authority to receive, address, or report the complaint, even if

        11   that person did not do so; or, B, the harassment was so open

        12   and obvious that KBR should have known of it.

        13          Prompt remedial action is conduct by KBR that is

        14   reasonably calculated to stop the harassment and remedy the

09:53   15   situation.  Whether KBR's actions were prompt and remedial

        16   depends upon the particular facts; and you may look at, among

        17   other things, the effectiveness of any actions taken.

        18          Okay.  Jury Question Number 3:  If you answered

        19   "Yes" to Question Number 1, then answer Question Number 3.

09:53   20   Otherwise, do not answer Question Number 3.

        21          Question:  Was Jamie Leigh Jones sexually

        22   harassed by one or more of her coworkers at Camp Hope in Iraq

        23   in late July of 2005?

        24          Answer "Yes" or "No."

09:54   25          If you answered "Yes" to Question Number 3, then

answer Question Number 4.  Otherwise, do not answer Question Number 4.

Question:  Did KBR know or, in the exercise of reasonable care, should KBR have known that Jamie Leigh Jones was being sexually harassed by one or more of her coworkers at Camp Hope in Iraq in late July, 2005?

Answer "Yes" or "No."

If you answered "Yes" to Question Number 4, then answer Question Number 5.  Otherwise, do not answer Question Number 5.

Question:  Did KBR fail to take prompt remedial action to stop the sexual harassment of Jamie Leigh Jones by one or more of her coworkers at Camp Hope in Iraq in late July of 2005?

Answer "Yes" or "No."

Back to the instructions.

If you found that KBR violated Title VII, then you must determine whether KBR has caused plaintiff's damages; and, if so, you must determine the amount, if any, of those damages.

Plaintiff must prove her damages by preponderance of the evidence.  Your award must be based on evidence and not speculation or guesswork.  On the other hand, plaintiff need not prove the amount of her losses with mathematical precision, but only with as much definitiveness and accuracy as the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:55  1    circumstances permit.

2                    You should consider the following elements of

3    damages and no others.  First, economic loss which includes

4    backpay and benefits; two, compensatory damages which include

09:55  5    emotional pain, suffering, inconvenience, mental anguish, loss

6    of enjoyment of life, and other non-pecuniary losses.

7                    Back pay and benefits include the amounts the

8    evidence shows plaintiff would have earned had she remained an

9    employee of KBR, and includes fringe benefits such as life and

09:56  10   health insurance, stock options, contributions to retirement,

11   et cetera, minus the amount of earnings and benefits, if any,

12   KBR proves by a preponderance of the evidence plaintiff

13   received in the interim.

14                   There is no exact standard for determining

09:56  15   compensatory damages.  You are to determine an amount that will

16   fairly compensate plaintiff for any injury she has sustained.

17   Do not include as compensatory damages back pay or interest on

18   back pay and/or benefits.

19                   If you answered "Yes" to Question Number 5, then

09:56  20   answer Question Number 6.  Otherwise, do not answer Question

21   Number 5 -- excuse me.

22                   Otherwise, do not answer Question Number 6.

23                   Question:  What sum of money, if paid now in

24   cash, would fairly and reasonably compensate plaintiff for the

09:56  25   damages, if any, you have found that KBR defendants caused

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:56  1    plaintiff as a result of the conduct found in response to

2    Question Number 3?

3                    Answer in dollars and cents for the following

4    items and none other.  First, back pay and benefits; secondly,

09:57  5    emotional pain and suffering, inconvenience, mental anguish,

6    and loss of enjoyment of life.

7                    We come to Question 7.  Did KBR commit fraud

8    against Jamie Leigh Jones by inducing her to enter into the

9    employment contract?

09:57  10                   Fraud occurs when a party makes a material

11   misrepresentation and the misrepresentation is made with

12   knowledge of its falsity or made recklessly without any

13   knowledge of the truth and is a positive assertion.  And, C,

14   the misrepresentation is made with the intention that it should

09:57  15   be acted on by the other party and the other party relies on

16   the misrepresentation and thereby suffers injury.

17                   A "misrepresentation" means a false statement of

18   fact.

19                   Answer "Yes" or "No."

09:57  20                   If you answered "Yes" to Question Number 7, then

21   answer Question Number 8.  Otherwise, do not answer question

22   Number 8.

23                   Question:  Consider the elements of damages below

24   and none other.  Consider each element separately.  Do not

09:58  25   award any sum of money on any element if you have otherwise,

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

09:58   1   under some other element, awarded a sum of money for the same

2   loss; that is, do not compensate twice for the same loss, if

3   any.  Do not include interest on any amount of damages you

4   find.

09:58   5           What sum of money, if paid now in cash, would

6   fairly and reasonably compensate plaintiff for her damages, if

7   any, as a result of the conduct found in response to Question

8   Number 7?

9           Okay.  We then have the same eight-part set of

09:58   10   factors you have to answer.  Since I've already read them once,

11   does anybody mind if I skip them further?

12           Okay.  I will skip them.  They're the same as

13   appear earlier.

14           Okay.  If you found any damages in Question 2,

09:58   15   then answer the following question.  Otherwise, do not answer

16   the following question.

17           Question:  Do you find by clear and convincing

18   evidence that the harm to Jamie Leigh Jones caused by Charles

19   Bortz resulted from malice?

09:59   20           "Clear and convincing evidence" means the measure

21   or degree of proof of that produces a firm belief or conviction

22   of the truth of the allegation sought to be established.

23           "Malice" means, A, a specific intent by Charles

24   Bortz to cause substantial injury to Jamie Leigh Jones; or, B,

09:59   25   an act or omission by Charles Bortz:

09:59  1              i, which, when viewed objectively from the

2      standpoint of Charles Bortz at the time of its occurrence,

3      involved an extreme degree of risk, considering the probability

4      and magnitude of the potential harm to others; and

09:59  5              ii, of which Charles Bortz had actual

6      subjective awareness of the risk involved but nevertheless

7      proceeded with conscious indifference to the rights, safety, or

8      welfare of others.

9                      Answer "Yes" or "No."

09:59  10             If your answer to Question 9 is "Yes," then

11     answer the following question.  Otherwise, do not answer the

12     following question.

13             What sum of money, if any, if paid now in cash,

14     should be assessed against Charles Bortz and awarded to Jamie

10:00  15   Leigh Jones as exemplary damages, if any, for the conduct found

16     in response to Question 1?

17             "Exemplary damages" means an amount that you may,

18     in your discretion, award as a penalty or by way of punishment.

19             Factors to consider in awarded -- that should be

10:00  20   "awarding" -- awarding exemplary damages, if any, are, A, the

21     nature of the wrong; B, the character of the conduct involved;

22     C, the degree of culpability of Charles Bortz; D, the situation

23     and sensibility of the parties concerned; E, the extent to

24     which such conduct offends a public sense of justice and

10:00  25   propriety; and, F, the net worth of Charles Bortz.


*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:00    1              Answer in dollars and cents, if any.

         2              If you found any damages to Question 8, then

         3     answer the following question.  Otherwise, do not answer the

         4     question.

10:01    5              Question:  Do you find, by clear and convincing

         6     evidence, that the harm to Jamie Leigh Jones caused by KBR

         7     resulted from malice?

         8              "Clear and convincing evidence" means the measure

         9     or degree of proof that produces a firm belief or conviction of

10:01   10     the truth of the allegation sought to be established.

        11              "Malice" means, A, a specific intent by KBR to

        12     cause substantial injury to Jamie Leigh Jones; or, B, an act or

        13     omission by KBR which, when viewed objectively from the

        14     standpoint of KBR at the time of its occurrence, involved an

10:01   15     extreme degree of risk, considering the probability and

        16     magnitude of the potential harm to others; and, 2, of which KBR

        17     had actual, subjective awareness of the risk involved but

        18     nevertheless proceeded with conscious indifference to the

        19     rights, safety, or welfare of others.

10:01   20              Answer "Yes" or "No."

        21              If your answer to Question 11 is "Yes," then

        22     answer the following question.  Otherwise, do not answer the

        23     following question.

        24              Question:  What sum of money, if any, if paid now

10:02   25     in cash, should be assessed against KBR and awarded to Jamie

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:02   1   Leigh Jones as exemplary damages, if any, for the conduct found
        2   in response to Question 7?

        3           "Exemplary damages" means an amount that you may
        4   in your discretion award as a penalty or by way of punishment.

10:02   5           Factors to consider in awarding exemplary damages
        6   are, A, the nature of the wrong; B, the character of the
        7   conduct involved; C, the degree of culpability of KBR; D, the
        8   situation and sensibilities of the parties concerned; E, the
        9   extent to which such conduct offends a public sense of justice
10:02  10   and propriety; and, F, the net worth of KBR.

       11           Answer in dollars and cents.

       12           The following page, Page 27, provides for you --
       13   your certification.  The presiding juror -- that is, the
       14   foreperson -- should sign that and write his or her name in
10:03  15   print form immediately below.  Thus ends the jury instructions.

       16           By custom and tradition, the first closing
       17   arguments are made by plaintiff.

       18           Are you ready to proceed?

       19       MR. ESTEFAN:  Plaintiff is ready to proceed, your
10:03  20   Honor.  Thank you.

       21           May it please the Court.

       22       THE COURT:  Yes, sir.

       23       MR. ESTEFAN:  One of you is taking notes.  That's all
       24   right.  I'm waiting for you.  Whenever you're ready.

10:03  25           Ready?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:03    1              Good morning.

2         THE JURORS:  (In unison)  Good morning.

3         MR. ESTEFAN:  On behalf of Jamie Leigh Jones, I want

4    to thank each and every one of you.  I have never hoped for or

10:04    5    expected a jury to work as hard as you have worked in this

6    case.  You've asked to come in early; you've asked to work

7    late; you've worked when you're sick.  You stuck it out.  I

8    know you know how important this case is, and we appreciate it.

9              The story starts back before any of us in this

10:04   10    room was born.  The company that would become KBR has its

11    offices now right down the street here, now downtown Houston.

12              And I can see a boardroom in that company, with a

13    big table, leather chairs.  And in that boardroom there are a

14    bunch of KBR executives.  And as the company grows, they say,

10:04   15    "You know what we need here?  We need some policies.  We need

16    some rules.

17              "Why do we need rules?  Well, we need rules

18    because someday somebody might get hurt and they may come sue

19    the company and we better have some policies that we can say,

10:05   20    'Look what we've got.  We've got these rules.'

21              "What about enforcing the rules?  What are we

22    going to do about that?

23              "Don't worry about enforcing the rules.  We have

24    the rules."

10:05   25              And the minute they made that decision, the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:05  1    minute they made that decision not to enforce the rules, the

2    die was cast.  And you heard early on in this trial KBR knew as

3    far back as -- we know as 1998.  You heard the word from Amy

4    Katz, the first witness who testified almost four weeks ago.

10:06  5            It wasn't foreseeable.  It was inevitable that

6    this was going to happen.  You remember Amy.  She was asked by

7    KBR -- she was hired by them and asked, "Fix our sexual

8    harassment and sexual assault problem that we're having.  Come,

9    Amy, and fix it."

10:06  10           And, so she tried.  She comes in to KBR, she

11   starts interviewing people.  She comes up with a plan, and she

12   presents it to KBR.  And they tell her, "We don't need that

13   headache."

14           That's what they told her, "We don't need that

10:06  15   headache."  And then they got rid of her.

16           So, KBR creates this environment and then goes to

17   all the trouble to have orientations for people who are going

18   to go overseas to their camps.  And they have them right here

19   in Greenspoint Mall.

10:07  20           And here at Greenspoint Mall they tell people all

21   this stuff designed to make you believe, "We're a safe company.

22   Here are all of our incentives and inducements.  We're going to

23   pay you three to four times what you could make here in the

24   United States, but we do need to warn you about some things

10:07  25   over there.  We need to warn you about heat, insurgency, camel

10:07   1    spiders.  We're going to warn you about that."

2                    Well, when they take the trouble to warn about

3    that but don't take the trouble to warn about the things they

4    should be warning about, that's a misrepresentation.  That's

10:07   5    fraud.  That's them in a superior position of information, not

6    telling the people --

7            MS. VORPAHL:  Your Honor, I'm sorry to object during

8    closing argument; but I believe this is exactly what we talked

9    about with regard to the charge -- may we approach?

10:08   10           MR. ESTEFAN:  This goes --

11           THE COURT:  Okay.  Let's approach.  Let's approach.

12       *(Bench conference)*

13           MS. VORPAHL:  He's talking about fraud by

14   non-disclosure, and you specifically told him he could not talk

10:10   15   about fraud by non-disclosure because it is not an issue.  He's

16   got to put specific --

17           THE COURT:  Okay.  Let me get your response.

18           MR. ESTEFAN:  Which I am doing.  They're

19   misrepresenting the safety of the environment and it's fraud

10:10   20   and it goes to punitive damages and that's part of the charge.

21           THE COURT:  But not that they failed to say something.

22           MR. ESTEFAN:  That's right.

23           THE COURT:  You can't say they failed to say

24   something.

10:10   25           MR. ESTEFAN:  I understand.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:10   1            MR. McKINNEY:  I thought you were starting down those

        2   elements --

        3            MR. ESTEFAN:  I didn't say it.

        4        (In open court)

10:09   5            MR. ESTEFAN:  May I proceed, your Honor?

        6            THE COURT:  You may proceed.

        7            MR. ESTEFAN:  When KBR knows one thing and represents

        8   that, what they're doing is they're telling all the people who

        9   like I -- we talked about in voir dire and jury selection, who

10:09  10   are going to buy Ford Pintos, they're telling them all about

       11   how safe the Pinto is and how nice the Pinto is and how

       12   everything else the Pinto is; but they're misrepresenting it as

       13   something it's not.  That's what they're doing.

       14            What else did they do?  They start stacking the

10:09  15   deck against the people who are going to work for them.  They

       16   have them fill out questionnaires that -- they have them tell

       17   them their life history and all this other stuff and they put

       18   those in their back pocket like little insurance markers.  One

       19   day -- it reminds me of a life insurance policy you can't ever

10:09  20   get through.  And when you do, when somebody eventually does

       21   die and you go to collect on it, they go looking for technical

       22   little errors all through it so they can say, "See, we don't

       23   have to pay you on that policy."

       24            You know, that's what KBR did.  We're well past

10:10  25   rape in this case.  Everybody in this room knows that Jamie was

10:10  1    raped.  KBR wanted to divert, distract, and deceive you by
       2    making her the object of their attack.
       3             And here's how it goes.  Jamie goes to report a
       4    rape in Iraq and they tell her, "Stay down, Jamie, stay down,"
10:10  5    and they put her in a trailer.  And they put her there by
       6    herself and they put a KBR person in there and they take her
       7    statement.
       8             And then she goes, gets out of the trailer and
       9    comes back to the United States and wants to file her lawsuit.
10:10 10    And KBR says, "Stay down, Jamie.  Your employment contract that
      11    you signed says you have to go to arbitration.  You can't get
      12    here to these folks, to this jury.  You can't have your day in
      13    court because you signed an arbitration agreement.  Stay down,
      14    Jamie."
10:11 15             And Jamie wouldn't stay down.  She went to the
      16    media.  She went everywhere she could go to get the word out
      17    because she knows, like you know, this case is bigger than
      18    Jamie Leigh Jones.  This case is about all the people that you
      19    have heard from and a whole bunch you haven't.
10:11 20             You heard all the people come early in the case
      21    and tell you about how they had been sexually harassed by KBR,
      22    how they had been locked up in trailers, how Lorenzo Santuro
      23    stood guard at a trailer himself and then was locked in one
      24    when he was being fired by KBR.  It's bigger than Jamie Leigh
10:11 25    Jones.

10:11  1          You heard about the -- all their rules, their

2     Code of Business Conduct, all these things that were supposed

3     to make Jamie comfortable going to work over there.  And while

4     she's busy looking out here for insurgency and mortar fire and

10:12  5     camel spiders, whatever else, where she's not looking is inside

6     the camp.  And she's not supposed to be, because that's what

7     KBR is supposed to be doing, making sure she's safe.

8          They have control over the premises.  They have

9     control over the people.  They have control over whether they

10:12  10    enforce their policies.  And we know they don't.  We know they

11    didn't.

12         Zero tolerance?  We heard all about Craig King

13    was harassing women, reported two different incidents and

14    Mr. Andino counsels him as to what "sexual harassment" is.

10:12  15    Now, that doesn't sound like zero tolerance.  That's not zero

16    tolerance.  And that happened before Jamie Leigh Jones got to

17    Iraq, three weeks before.  And that's not zero tolerance.

18         And then Jamie comes into this court.  She

19    finally gets here, to you, to you 11 people.  And they are

10:13  20    doing everything they can to keep the dam from cracking,

21    because she's the first.  Jamie is the first to ever get into a

22    courtroom and get to where she is today with you, in front of

23    you.  And they don't want her to break -- to crack -- to crack

24    the dam and break that dam, because they know what happens.

10:13  25         How do we know what happened that night?  It's

10:13    1    real easy.  We know what happened because we have all the

         2    information we need.  We know that a man walked up to Jamie

         3    after mixing a drink away from her and hands it to her and

         4    says, "Don't worry, there's no ruffies in it.  I've saved them

10:13    5    for Dubai."

         6                We know that.  Everyone admits that, even

         7    Mr. Bortz says that comment happened.  We know that Jamie takes

         8    two sips and remembers nothing until the next morning.  We know

         9    that when she gets out of bed, she's beaten up and wonders how

10:14   10    one man can do that to her and all she remembers is, from the

        11    night before, "I'm around four or five guys, and that's my last

        12    memory."

        13                And then she wakes up the next morning, and she's

        14    beaten up and naked in her bed.  And as she walks down the hall

10:14   15    and gets to the bathroom and looks down and sees the bruises

        16    and the blood and the scratch.  She starts -- it starts dawning

        17    on her that something horrible has happened to her; but she

        18    doesn't know for sure until she walks back into her bedroom and

        19    there he is, Charles Bortz, right there, in the bed.

10:14   20                Now, why would a man -- why would a man who raped

        21    a woman stay in the room?  You know, he didn't get Jamie's

        22    consent to do this.  He couldn't.  She couldn't give consent.

        23    The rape facilitation drug she was given made her incapable of

        24    giving consent to that.  But he got all the consent he needed

10:15   25    from KBR.  He got their consent when they were busy not

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

10:15   1   enforcing their policies; and he knew, he knew nothing was
         2   going to happen to him.  And that's why he stayed in the room.
         3          Do we have any doubt?  Are we past this?  Do we
         4   have any doubt what Dr. Schulz diagrammed?  The fissures, the
10:15   5   bruising, the scratch.  Do we have any doubt that Jamie was
         6   raped?  But they want make it a sideshow.  They want to make it
         7   all about Jamie.
         8          Okay?  So, I wish someone would answer that
         9   question.  And that stands for, "Do I matter to you?"
10:16  10          If someone would just give me the list -- if KBR
        11   would give me the list of the people who aren't worthy of
        12   bringing a lawsuit, I would stop representing those people.  If
        13   they'll just give me that list and say, "These people who have
        14   little things in their background that really have nothing to
10:16  15   do with the rape," if they'll give me the list of women and men
        16   who are not worthy, I won't represent them anymore.  But I've
        17   never seen that list.  Because everyone is worthy.
        18          And no one deserves to be told, "You don't have
        19   the right to decide what happens to your body."  No matter what
10:17  20   else happens, no one has the right to take that away from
        21   anyone else.  And that's what they did.
        22          So, if Jamie matters a little, then a little
        23   justice is what she'll get.  But if she matters a lot, then a
        24   lot of justice is what she'll get.
10:17  25          Jamie knew when she brought this lawsuit --

10:17   1              I'm sorry, Jamie.  I'm sorry.

2              She knew when she brought this lawsuit that she

3  was going to be literally burned at the stake.  She knew it,

4  and she's been through it for six years.  And KBR keeps piling

10:18   5  it on, and you saw it.  Two and a half, almost three days on

6  this witness stand, being cross-examined about things that

7  matter not to whether she was raped but only designed to make

8  her look bad.

9              And they didn't just stop with Jamie.  They did

10:18   10  it to every witness who took the stand on her behalf -- her

11  mother, her husband, her doctors -- because that's their way.

12  That's KBR acting through its lawyers the way KBR acts.

13  They're bullies.  And no one has gotten this far, and they

14  don't want her to get this far either.

10:18   15           "Stay down, Jamie."  That's what they want you to

16  help them do with her, "Stay down, Jamie.  Just mind your place

17  and stay down."  And Jamie is not going to stay down.

18           I can imagine in that boardroom the KBR

19  executives saying things like, "How dare that woman sue us.

10:19   20  Who does she think she is?  We'll show her.  We'll make her pay

21  for bringing that lawsuit.  We are holding" --

22           You know what?  It's not just about Jamie.

23  They're sending a message to anyone who might think about suing

24  KBR.  "You sue us, this is what you're going to get.  So, bring

10:19   25  it.  You better be ready."

*Cheryll K. Barron, CSR, CM, FCRR*                *713.250.5585*

39

10:19   1          And that's what they're doing, they're making an

2     example out of her.  If you look -- if this courtroom had

3     windows and you looked out the windows, what you would see is a

4     lot of corporations trying to look in right now.  And what

10:20   5     they're trying to find out by looking at this trial -- and I

6     think you know this case is bigger than all of us here.  In

7     fact, the door to that courtroom got broken there were so many

8     people coming in and out during this trial.

9          Big corporations are looking in here to find out

10:20  10     if they have to have rules, whether they have to enforce their

11     rules and, if they don't enforce their rules and someone gets

12     hurt, how they can defend the claim successfully.  And what

13     they really want to know is:  Is it just cheaper to deal with

14     it on the back end than to fix it on the front end?  That's

10:20  15     really what they want to know.

16          I need to go through this charge with you because

17     in your hands each of you holds a charge.  And I'm not going to

18     go back through the instructions.  But I want to start with

19     Question Number 1, which is on Page 11 of the charge.  And on

10:21  20     question -- that's -- I mean, we're a "Yes."  That's a "Yes."

21     I mean, that's an easy one.  How do we know?

22          I want to show you and remind you of one other

23     thing that I know you-all have seen in this trial.  And that is

24     Jamie's statement.  How do we know she was raped?  Because

10:21  25     before there were any lawyers involved, before there were

10:21  1  any -- anybody else trying to come up with a story, Jamie

2  writes out her statement.

3          And if you read that statement -- and I would

4  like you to -- when you go back into the jury room, I believe

10:22  5  you're going to find that is Exhibit -- Joint Exhibit 103.  So,

6  you can see that -- those boards don't go back with you, but

7  the statement itself is in one of those binders you're going to

8  have.  And in that statement you know all you need to know.

9  Because before anybody was concocting any stories, while Jamie

10:22  10  is sitting in a trailer, KBR says, "We need your statement."

11          And, so, she writes it out.  And that story has

12  never changed.  That is the truth.  That's what happened as

13  best Jamie could tell it while the fog is still lifting off of

14  what happened to her.  She wrote the truth, and she has never

10:22  15  changed that story from then till now.

16          So, let's go to Question 2, please.  The damages

17  for assault by Charles Bortz.  Remember in voir dire, back --

18  gosh, we met a month ago, it seems like, and it has been a

19  month -- we talked about two different kinds of damages.  There

10:23  20  were the kinds of damages that brought Jamie back to where she

21  was, and only money can do that.  And I wish money wasn't the

22  only remedy, but it is.  Because I tell you now, Jamie has told

23  me, "If I could have myself back the way I was, I would rather

24  have that than the money."  But we can't give her that.  And if

10:23  25  you could, she would take it in second.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:23  1                    Question 1, physical pain and mental anguish in

2      the past, $750,000 is my number.  I told you early on I

3      wouldn't ask you to do anything I am not willing to do myself.

4      So, these numbers are my numbers.  If I'm too low, you can

10:23  5      always give more.  But I had to come up with numbers because I

6      can't ask you to if I'm not willing to.

7                    B, physical pain and mental anguish in the

8      past -- I'm sorry, in the future, $6 million.  You heard

9      testimony from the stand about the medical expenses in the past

10:24  10      for the reconstructive surgery that Jamie had.  That was

11      $5,000.  I believe I heard that number from the doctors.

12                    And then she needs another surgery yet; and

13      that's 5,000 for future medical expenses, which is D.

14                    E is physical impairment and disfigurement in the

10:24  15      past.  My number is $500,000.

16                    Physical -- F is physical impairment and

17      disfigurement which, in all reasonable probability, will be in

18      the future.  $250,000 because hopefully, with surgery, her

19      disfigurement goes down.

10:24  20                    Now, we get to loss of earnings in the past.  You

21      remember Dr. Steward, who took this stand and gave you a table,

22      a chart.  That chart you can find at Plaintiffs' Exhibit 85.

23      And he gave us four scenarios.  So, when you get back to the

24      jury room, if you look at Dr. Steward's chart, he said what are

10:25  25      her loss of earnings if she has just a high school education,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:25   1   an Associate's degree, a Bachelor's, and a Master's.

2               Well, Jamie has a Master's.  So, we know which

3   chart to use.  The chart to use is the fourth one, which says

4   lost earnings in the past -- loss of earnings in the past is

10:25   5   $106,326.  And loss of earning capacity in the future,

6   Dr. Steward told us, is $1,716,000 -- I'm sorry, $716,726.

7   There's been no other evidence of anything other than that for

8   loss of earnings and lost wages.  So, that's the evidence.

9               Question 3, Was Jamie Leigh Jones sexually

10:25   10  harassed?  Sexual harassment includes sexual assault.

11  Unquestionably Jamie was sexually harassed when she was

12  sexually assaulted and raped on July 27th and 28th, 2005.

13  That's a "Yes."

14              Question 4, we're back to what KBR should have

10:26   15  known.  Did they know that Charles Bortz was sexually harassing

16  her?  No, probably not.  Did they know that there was a

17  sexually hostile work environment there?  Yeah, they knew it,

18  because they made it.  Of course, they knew it.  So, that's a

19  "Yes."

10:26   20              And the fact that Jamie was only there three days

21  before she was raped doesn't preclude the environment.  You

22  don't just -- we don't get to say, "Hey, she wasn't there long

23  enough, so she doesn't get to recover for a hostile work

24  environment."  She was there long enough, because if somebody

10:27   25  comes to work the first day and they're sexually harassed,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

they're not left without a remedy.  KBR knew of the environment they created, and they didn't -- and they can't back off of that now.

Did KBR fail to take prompt remedial action is the next question.  Well, I guess it depends on your point of view.  KBR remedied the action by putting Jamie in a trailer, but that's not stopping the sexual harassment.  What did they do to Charles Bortz?  Did we hear about that?  Nothing.  That's what they did to Charles Bortz, nothing.  Now, if that guy didn't violate the zero tolerance policy, I don't know how you can do it.

Charles Bortz was allowed to just go about his business.  And he left voluntarily from the company months after this happened.  He wasn't fired.  He wasn't counseled.  He wasn't written up.  What did they do to remedy it?  That's a "Yes" to that question.

Number 9 is an instruction, Instruction Number 9 on Page 18 is an instruction.  So, we go to Question Number 6.

If it's a sexually hostile work environment, then you have to consider the back pay and benefits on the top line there.  And Dr. Steward -- back to Dr. Steward, is $106,326.  He came up with that.

And on the second line, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, $7,500,000.  That's a lot of money, but it's a lot of

10:28  1  harm that was caused to her.  And maybe I'm too low with that

2  number.

3  Fraud in the inducement to enter the employment

4  contract.  We're on now Question 7.  What did they know and

10:29  5  when did they know it, what did they tell her?  What did they

6  know is what they knew back in that boardroom.  You know,

7  there's something missing from that boardroom.  We're going to

8  get to that in a minute.  But they knew they weren't enforcing

9  their own policies.

10:29  10  Every witness who came in here and said they were

11  sexually harassed, they tried to stop it, they tried to fix it,

12  everyone who's come before Jamie told you the same story:  They

13  represented it as safe; they represented it as something it was

14  not.  So, that's a "Yes" answer to that question.

10:30  15  And then, when you get to the damages for fraud

16  in the inducement to enter the contract, these numbers are

17  different.  And I'm going to tell you why my numbers are

18  different than they were for Mr. Bortz.  Yes, I fault Mr. Bortz

19  for what he did.  I do.  But he wouldn't have had the chance to

10:30  20  do it if it hadn't have been for KBR and what they did.  So, on

21  the damages, I hold KBR more liable than Mr. Bortz because they

22  created the environment.

23  Element A, physical pain and mental anguish in

24  the past, $2 million.

10:30  25  I think there's two C's on the charge I'm looking

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:30   1   at, Judge.  I may have a mistake there, but it should be a

2   letter B.

3                    Physical pain and mental anguish in the future,

4   $9 million.

10:31   5                    Medical care and expenses in the past, $5,000.

6                    And the same for the future, $5,000, because

7   that's what the evidence was.

8                    Physical impairment and disfigurement in the

9   past, $750,000.

10:31   10                    And physical impairment and disfigurement in the

11   future, $500,000.

12                    And then we're back to our earnings, past and

13   future.  Those numbers don't change because that's what

14   Dr. Steward told us about.

10:31   15                    And, so, then we go on to the exemplary damages,

16   which you also know as "punitive damages."  A different

17   standard of proof here, and I need to talk with you about that

18   a little bit.  All the other questions before that, it's just

19   more likely than not, more probably true than not true.  That's

10:32   20   the only standard you meet up to now.

21                    When you get to this question, you have a new

22   definition the judge has given you.  It's called "clear and

23   convincing evidence."  And, so, you have to have that degree of

24   proof that produces a firm belief or conviction of the truth of

10:32   25   the allegations sought to be established; and then you have to

10:32   1   find that the injuries resulted from malice, Charles Bortz'

2   malice.

3        So, did Charles Bortz have a specific intent to

4   cause substantial injury to Jamie Leigh Jones?  I believe he

10:32   5   did.  But even if you don't, even if he were to say he did not,

6   Part B applies, which is, when you look at it objectively from

7   the standpoint of Charles Bortz, did it involve an extreme

8   degree of risk, considering the probability and magnitude of

9   the potential harm to others and of which Charles Bortz had

10:33   10   actual subjective awareness but then went ahead with it anyway

11   with conscious indifference to the rights, safety, or welfare

12   of Jamie Leigh Jones.  Yeah, he did.  Answer "Yes" to that.

13        Question 10, this is the amount of money -- now,

14   we talked about this back in jury selection, too.  And back

10:33   15   then we talked about percentages, of how do you stop somebody

16   from bad conduct.  And I think we talked about 5 percent of

17   whatever somebody's net worth was.

18        We didn't talk to Mr. Bortz about his net worth

19   because there's so many of the other factors that are so

10:33   20   off-the-chart-bad that Mr. Bortz deserves to be punished so

21   that he won't do it again.  And my number there is $100,000 as

22   to Mr. Bortz.

23        Question 11, it's the same question as the one --

24   Question 9, predicated on finding damages in the earlier

10:34   25   question to -- as to KBR.  And, again, did KBR know at the time

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

of this occurrence that there was an extreme degree of risk?
Yeah, sure they did.  They had actual subjective awareness of
it and went ahead and just left that environment without rules.

And what have we said every -- witnesses, even
Mr. Andino said a rule that's not enforced is more dangerous
than no rule at all.  Why?  Because it's a green light.  It's a
go on ahead, pass that cop, he's not going to pull you over for
speeding anyway; so, just go on ahead.  And they knew it, and
they made everyone else act on it because they knew they
wouldn't get stopped.  So, if we go to question -- so, that's a
"Yes."

And, then, Question 12, you heard evidence of
KBR's net worth.  And if we're going to stop KBR, if you-all
are going to stop KBR from this, 5 percent of that net worth is
a very large number, a big number.  The numbers were, as of
December 31st, 2010, their net worth was 2,204,000,000.  Three
months later, March 31st, 2011, their net worth is
2,289,000,000.  So, in three months they made $85 million in
net worth.

And if we're going to award an amount or use an
amount to punish KBR and stop it from this conduct, is five --
we talked to each other about this in jury selection.  I said,
"What if it's a really, really big number, if it's 5 percent of
a really, really big number?  Is that going to be okay?"

And everybody said, "Oh, yeah, that's fine."

10:36   1            It's the percentage that matters.  Well,

2      5 percent of $2,289,000,000 is 114,500,000.  That's the number

3      I put there.  It's a huge number, but it's 5 percent of KBR's

4      current net worth.  They make almost that in three months.

10:36   5            Will it stop them?  I don't know.  If it's too --

6      if it's too little or not enough, that's up to you to decide.

7      These are my numbers.  I've given them to you because I can't,

8      in good conscience, ask you to give me numbers unless I've done

9      it myself.

10:37   10           The thing that was missing from the boardroom at

11     KBR all those years ago is you.  Because KBR didn't have a

12     conscience in that boardroom.  KBR was only concerned about

13     circling its own wagons, protecting its profits, and not having

14     to spend money on headaches.  But they didn't count on you.

10:37   15     They didn't count on this day ever getting here.  And you're

16     their conscience.  You're going to supply it to them by your

17     verdict.

18           And that form you hold in your hands, that jury

19     verdict, that jury charge, that is justice.  I don't know what

10:37   20     it is, but I know it's in your hands to deliver it to Jamie.

21     And we trust that you'll do that.

22           Thank you, each and every one of you.

23           THE COURT:  Thank you, Mr. Estefan.

24           Mr. Bortz' counsel wish to proceed?

10:38   25           MR. McKINNEY:  I do, your Honor.  Thank you.  If I can

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:38   1   get all this over there without making a mess.

2          Good morning.  The only thing that we agree on in

3   this case is how much we value your service as jurors under the

4   difficult circumstances of this case.

10:38   5          We took a lot of breaks.  We sent you out of the

6   room a lot.  You came in early, you stayed late.  And I was

7   watching a little bit.  I try not to stare at the jury.  I

8   think it makes them uncomfortable.  I was watching a little

9   bit.  You stayed focused.  That's what I asked you to do in

10:38  10  voir dire, and you've done that.  You've been marines, and we

11   thank you.

12          This case is different from pretty much any other

13   case that will be tried in this courtroom, possibly in this

14   courthouse, and possibly in this state in this or any other

10:39  15  year.  But the one thing that this case has in common with

16   every other case that's tried in this courtroom, this

17   courthouse, and throughout our country is it comes down to a

18   couple of simple things.  Who and what do you, as the jury,

19   believe to be true?  Who and what do you, the jury, believe not

10:39  20  to be true?  What makes sense?  What doesn't make sense?

21          I'm only going to address one question this

22   morning; and that's Question Number 1, the question as to

23   whether Charles Bortz raped Jamie Leigh Jones.

24          You were told that everybody knows that Jamie

10:40  25  Leigh Jones was raped in Iraq.  I did not get that memo.  I do

10:40  1    not agree with that statement.

2         We have a basic fact in this case.  I've never

3    tried to walk away from it, nor has my client ever tried to

4    walk away from it.  Charles Bortz spent the night in Jamie

10:40  5    Leigh Jones' room and had sex with her on July the 28th of

6    2005.  That happened.  He woke up with her the next morning, as

7    rapists often do.  They spend the night in their bed.  Does

8    anyone actually believe that is what rapists often do?

9         Ms. Jones wrote in this statement right here that

10:41  10   after she got ready for work, Mr. Bortz walked her to work.  Is

11   that what rapists often do?  Does anyone really believe that is

12   what a rapist would do?

13        And who believes, who believes that a woman would

14   walk into a trailer and have a conversation with another woman

10:41  15   who just said that she had been raped and begin that

16   conversation by telling this woman who says that she has been

17   raped that another woman over here was raped and buried so

18   you'd better give us a statement?  Who thinks that makes sense?

19   Who finds that credible?

10:41  20        What are the odds, really, when you think about

21   it, that one of the meanest women in the world would wind up in

22   that hooch at that particular point in time for the purpose of

23   taking Ms. Jones' statement and under those apparently horrific

24   circumstances?  Does that make any sense to you whatsoever?

10:42  25        You heard the deposition testimony of Pete

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:42  1    Arroyo.  He described picking Jamie Leigh Jones up for work

2    that morning at around 7:00 o'clock in the morning, about

3    30 minutes after Ms. Jones says that she woke up and realized

4    that she had been raped, in her mind, by multiple assailants.

10:42  5              And what did Ms. Jones tell Mr. Arroyo on the way

6    to work?  That Charles Bortz was thinking about breaking up

7    with his girlfriend or was going to break up with his

8    girlfriend so he could try to start dating Jamie Leigh Jones.

9              Is that what a victim of a multiple-assailant

10:43 10   rape says in a calm, ordinary, matter-of-fact tone of voice

11   30 minutes after realizing she has been raped?  Does that make

12   any sense to you whatsoever?  Is that the kind of evidence that

13   you feel would support a true verdict in a federal court in the

14   United States of America?

10:43 15             Pete Arroyo told you that at about 7:00 o'clock

16   in the morning Ms. Jones was nicely dressed, well made up, hair

17   in place, exhibiting no outward signs of pain or discomfort,

18   much less the shock and horror that one would expect to see

19   from someone who had just endured what Jamie Leigh Jones says

10:44 20   that she endured.

21             And let's keep in mind the time sequence here and

22   the testimony that you heard from Ms. Jones and the hard

23   documentary evidence that was put before you.  Ms. Jones told

24   you that waking up in a drug-induced fog, barely able to move

10:44 25   because the pain was so great, that she went to the bathroom

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:44  1    and observed in minute detail, which she can remember second by

2    second six years later, all of these horrible things that she

3    says that she saw and observed on her body.

4             And then Ms. Jones, under oath, looking you in

10:45  5    the eye, told you that she could not remember a nearly

6    one-and-a-half-hour e-mail conversation that she had with Pete

7    Arroyo.  Does that make any sense whatsoever to any of you?

8    Does that sound even remotely right?

9             And what was that e-mail conversation?  How did

10:45  10   it begin?  She's expressing concern that she is already a part

11   of the camp gossip.  She says, "The girls here all hate me."

12   She says, "Already it's day three, and I've made enemies."

13   Those are her words, in black and white, typed into her

14   computer and sent on her e-mail, supposedly barely an hour

10:46  15   after the worst kind of event any man or woman could imagine

16   happening to someone.  Now, does that make sense?  Does that

17   ring true?  Is that the kind of evidence that you think should

18   support a jury's verdict in our country?

19            I'm getting ready to lay out for you what I

10:46  20   believe the evidence shows the important sequence of events to

21   have been that morning.  I hope I do a good enough job to where

22   it comes through.

23            When Ms. Jones woke up that morning, it's highly

24   unlikely that she had any idea whatsoever how her day and her

10:47  25   life and now my client's life would unfold.  But here's what

10:47 1   she knew, and we know she knew it because she has said she knew
2   it.  She knew that she was the new kid in town.  Not a big
3   town, a small town, closed community, Camp Hope in the Green
4   Zone in Baghdad, Iraq.

10:47 5                   She knew the night before she had made a popular
6   young woman, Sara Simco, angry.  She knew that she had spent
7   the night with the boyfriend of her soon-to-be coworker Beneta
8   Brumatti.  She knew that that boyfriend was going to break up
9   with Beneta and try to start dating her.

10:48 10                  She knew that she spent the last six months
11  actively fighting two different sexually transmitted diseases.
12  She knew she had had unprotected sex with Charles Bortz.  And
13  she knew that she had signed a one-year contract with KBR to
14  stay in Iraq in that small closed community where all of this
10:48 15  was going to come out eventually.  That's what she knew when
16  she went to work that morning.  Those were the hard facts of
17  her life.

18                  What she didn't know is how she was going to deal
19  with those hard facts.  It's a lot to have on someone's plate.
10:48 20  It's a difficult position to be in.  We all understand it.

21                  But I don't think anybody, if we could go back in
22  time and look at Jamie Leigh Jones at, let's say, 8:30 in the
23  morning, would have ever predicted that events would unfold the
24  way they did.

10:49 25                  You'll have all of the e-mails back in the jury

10:49   1   room.  I'm not going to go through them line by line.  Please

        2   do so.  Please look at your notes regarding Pete Arroyo's

        3   testimony.  What you'll see is that she wanted someone to talk

        4   to, something had happened the night before.  "It kind of

10:49   5   sucks," I think is the way she put it.  And, "I don't need a

        6   ride, LOL."  You'll remember all of that.

        7            And, so, she gets together with Pete; and she

        8   begins telling Pete -- and this is where the story begins.

        9   There's going to be a point of departure as the story

10:50  10   progresses; but if you look at all the evidence, this is where

       11   the story begins.

       12            She tells Pete, "You know, four or five firemen

       13   came to my room last night and they gave me a drink."  She said

       14   to Pete, "Is it possible that they had sex with me?"  And then

10:50  15   she becomes hysterical.

       16            Fastforward to Kristen Rumba, the physician's

       17   assistant, army reserve, pretty matter-of-fact young lady.

       18   Take a hard look at Ms. Rumba's report.  She consistently

       19   states patient states this, she says this, she says this.

10:50  20            At this point in time, the die is cast, the path

       21   is chosen.  Ms. Jones, for the first time, says, "Four men came

       22   to my room.  They gave me a drink.  I don't remember what

       23   happened after that.  I think I was raped."

       24            Four anonymous men, no one to check the story out

10:51  25   with, it all happened with no witnesses, this is my ticket out

10:51   1   of town.

2   Then she goes and sees Dr. Schulz.  The number

3   goes from four to five; but the story remains the same.  That's

4   what the documentary evidence and the other witnesses show.

10:51   5   Ms. Jones and her attorneys deal with that by

6   saying, "No, no, it was all a big misunderstanding.  Pete

7   Arroyo misunderstood what Jamie Leigh Jones said to him, then

8   Pete Arroyo spoke to Ms. Rumba, and then Ms. Rumba spoke to

9   Dr. Schulz.  Jamie Leigh Jones never said any of that."

10:52   10   So, how do you break that tie?  How do you decide

11   which way to go on that?  Well, we'll put up some deposition

12   testimony that was read in yesterday from Jamie Leigh Jones'

13   father.

14   Can we get that up on the screen?

10:52   15   I have the testimony here in front of me.  I'm

16   going to read it.

17   If you drop down to Page 20, "Did she tell you

18   she had consumed alcohol the night of July 27th?"

19   Mr. Jones answered, Yeah, she told me that a

10:52   20   couple of men came out -- up to her dorm room door and offered

21   her a drink and that's about the last she remembers and she

22   woke up and was -- and realized she had been raped.

23   "QUESTION:  Okay.  So, she told you that a couple

24   of men came to her door -- came to her door or her barracks

10:53   25   room.  Is that right?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:53    1                    "ANSWER:  That's correct.

         2                    "And they offered her a drink.  Is that correct?

         3                    "ANSWER:  That's what she told me.

         4                    "All right.  Did she say whether they came in her

10:53    5    room?

         6                    "ANSWER:  No.

         7                    "All right.  And that they offered her a drink

         8    and that was the last thing she remembered?

         9                    "ANSWER:  That's correct.

10:53   10                    "Okay.  Did she tell you whether she had attended

        11    a party that evening?

        12                    "ANSWER:  She didn't tell me that.

        13                    "Did she tell you about a party that she -- she

        14    didn't tell you about a party that she had attended that

10:53   15    evening?

        16                    "ANSWER:  No."

        17                    If you recall from Tom Jones' testimony just

        18    yesterday, he got the call, the first call, from Ms. Jones at

        19    2:00 o'clock in the morning Houston time.  That's 11:00 o'clock

10:53   20    in the morning Baghdad time.  Now, I'm a little unclear whether

        21    there was one or more than one phone call; and perhaps your

        22    notes will straighten us out on that point.

        23                    Excuse me.

        24                    But if you go in there and you put all the

10:54   25    evidence together and you do a timeline, what you'll see is

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

1    that it was in the 11:00 o'clock, noon time frame that

2    Ms. Jones finished her exam by Dr. Schulz and was en route to

3    the hooch and it wasn't until somewhat later that Jamie

4    Armstrong came along.

5                This phone call, this discussion that Mr. Jones

6    had with his daughter preceded, came before, the interview with

7    Jamie Armstrong.  And what this phone call tells us is that it

8    was Ms. Jones' words, not Pete Arroyo's words, that showed up

9    in Kristen Rumba's report and in Dr. Schulz' report, because

10   she spoke the very words directly to her father.

11               Now, Ms. Jones was 20 and a half years old.

12   She's not sophisticated in the ways of the world at this point

13   in her life.  By the time she finished talking to her dad, it

14   was still unnamed, unknown, unidentified assailants, no

15   witnesses, no one to interview, no one to investigate a story.

16   That was contained.

17               But when Ms. Armstrong came in and it became

18   apparent that there was going to be an investigation and, of

19   course, Ms. Jones has now had more time to think about it,

20   Ms. Jones well knew that there were many, many witnesses who

21   saw her the night before, saw her with Charles Bortz, sitting

22   together, holding hands, flirting with him and this "four or

23   five men coming to the room, giving me a drink, that's all I

24   remember," that's not going to hold up.

25               And, so, that's when this statement here became

more or less a story.  And I say "more or less" because that's

not the end of the story.  It's sort of the core of the story,

but the story morphs over time.  And not a lot of time either.

On August the 2nd, the day after Ms. Jones got

back to the United States, she went to see Dr. Scott.

Dr. Scott testified -- you remember her, the nice lady, the

OB-GYN.  She told Dr. Scott that she thought she had been

drugged and that she had been raped by four men.

Twenty days later, she has her first visit with

Dawn Nelson.  You may remember Ms. Nelson.  Very nice lady,

interesting hair, as I recall, kind of.

Anyway, what did Ms. Jones tell Ms. Nelson?

Ms. Nelson was very clear.  That Ms. Jones woke up in bed with

Charles Bortz, a fact that Ms. Jones now vehemently denies, and

Mr. Bortz told her not only had they had unprotected sex but

that he and four or five of his friends had vaginally and

anally raped her the night before.  That's a different story.

But that's the one she told her therapist 21 days, three weeks

after coming back to the United States of America.

Now her story to you folks is simply that she had

two sips from the cup, doesn't remember anything else till she

woke up the next morning.  We've been through all of that.

Ms. Jones well knew who she had slept with.

When I had Ms. Jones on cross-examination, one of

the things that I showed you and showed her were her phone

records.  We also reviewed the State Department report.  And between those two documents, what we know is that starting at about 9:20 the night before, Ms. Jones made two calls to Charles Bortz that he didn't respond to.  Charles Bortz showed those missed calls to the Department of State; and they documented those calls in his statement, which I believe is Joint 167.

Her own phone records show a five-minute conversation with Mr. Bortz at about 10:20, 10:15, 10:30.  The document is in evidence.  And then the next morning, after she had gotten to work and after supposedly she had been raped by Mr. Bortz, another two-minute phone call.  So, Ms. Jones knew before she ever saw -- before she ever spoke to Pete Arroyo, before she ever talked to Kristen Rumba or Dr. Schulz or her father, she knew who she had spent the night with.  There's no mystery there.  She knew that.  She didn't tell anybody, but she knew it.

The beauty of having no memory is you don't have to explain what you did or why you did it.  The problem with getting your memory back is you have to keep your story straight.  And I hope you folks have seen from the evidence that that's a real problem that Ms. Jones has.

Ms. Jones claims that she was drugged on the night in question.  We disagree completely with that issue well -- as you well know.  Her behavior the next day doesn't

fit the picture whatsoever, all the people who saw her and spoke to her the next day.

More importantly, a urine screen was captured, the appropriate medium for testing for Rohypnol.  It was sent to the army folks in Germany and tested.  It came up negative.

Yes, I remember Dr. Tackett.  I will remember him for a long time.  But if you sort through his testimony and see what he actually said, Rohypnol is the only drug that, in a large enough dose, induces amnesia.  GHB?  No, not supported by the literature.  Ms. Jones was not given Rohypnol.  Ms. Jones was not drugged.

The problem with Charles Bortz in this case is that, after that party broke up and until Mr. Adams came by Ms. Jones' room the next morning, he and Ms. Jones were completely alone.  And while it's an unusual case of he said/she doesn't remember as opposed to he said/she said, still, as the deciders, you folks need to have some guide as to how to sort out what did or did not happen that evening. That's the problem with an unwitnessed event.

So, what we've done in this case is something we would not have done in any other circumstance, but for the fact that Ms. Jones is accusing my client, Charles Bortz, of raping her.  Under those circumstances you have to defend your client. And a young man like Mr. Bortz has to put up a defense.  You can't just say, "I didn't do it," and hope you folks accept

11:02  1    that.

2    So, what we have done, to try to show you what

3    kind of people are involved in this case, is we have looked for

4    other examples in Ms. Jones' life that might give you a look

11:03  5    into the window of the kind of person that she is.  And we've

6    shown you Ms. Jones at age 22 in San Diego; we've shown you

7    Ms. Jones at age 16 or 17 in a hospital; and we've shown you

8    Ms. Jones at age 20 talking to her doctor, Terri Scott, about

9    two months before going to Iraq.

11:03  10   And here's what we've shown.  We've shown that in

11   San Diego at age 22 Ms. Jones accused her husband, among other

12   things, of hitting her in the face and kicking her in the

13   stomach because her husband -- because she told her husband

14   that she was pregnant.  Now, who would make up a story like

11:04  15   that?  Where does that come from?  And as a husband, how do you

16   respond to that?

17   Age 16 or 17 in the hospital Ms. Jones is

18   observed by three different people -- a physical therapist, a

19   registered nurse, and a medical doctor -- of malingering,

11:04  20   faking signs of illness.  How does Ms. Jones respond to that?

21   She blames her parents.  "It's their fault the doctors didn't

22   see and understand just how sick I was."

23   Age 20, two months and ten days before Ms. Jones

24   says that my client raped her, she tells her doctor that she's

11:05  25   with a new partner, they've had a few drinks, she passed out,

11:05  1   doesn't remember anything, doesn't know whether she had sexual

2   intercourse, not upset about it.  Dr. Scott was on the witness

3   stand.  She remembered that visit.

4           Ms. Jones was in the courtroom and heard that

11:05  5   testimony.  Dr. Scott said, "She just didn't remember.  She

6   just didn't know."  And what does Ms. Jones tell you about

7   Dr. Scott's testimony and Dr. Scott's record?  That Dr. Scott

8   got it completely wrong, that she, in fact, was conscious, she

9   wanted -- she and her date wanted to have some fun so they had

11:06  10  a few drinks; she was concerned about her STDs so they kept

11  their underwear on and used their underwear as protection and

12  tried to have intercourse through their underwear.

13  Diametrically opposed to the actual record of what happened at

14  the time, but that is the kind of testimony that you've been

11:06  15  getting in this case.

16          THE COURT:  You're almost at halfway for defendants.

17          MR. McKINNEY:  Thirty minutes?

18          THE COURT:  Twenty-eight minutes right now.

19          MR. McKINNEY:  Time goes really fast when you're up

11:06  20  here.  Probably a lot slower when you're sitting over there.

21  I'm going to go very quickly now.  I need to wrap this up

22  because the folks from KBR have some things they want to say to

23  you.

24          Victor Scarano is an independent expert witness.

11:07  25  He's the only witness, the only doctor, the only professional

11:07   1   who has looked at every single piece of information in this

2   case, whether it's admissible into evidence or not.  He's not

3   an outlier.  He knows everything about Jamie Leigh Jones.  He

4   knows everything there is to know about Charles Bortz.  He does

11:07   5   not agree with anything that Jamie Leigh Jones said.

6          Every doctor that has seen Jamie Leigh Jones has

7   had the benefit only of what Jamie Leigh Jones chose to tell

8   them.  Charles Bortz has never once refused to answer any

9   question from any law enforcement authority, from the

11:07   10   Department of State, from anyone.  He has never once taken the

11   Fifth Amendment.  He has never once walked away from what he

12   did, and we don't walk away from what he did.

13          And no one, no one who has looked at this case,

14   both sides of this case, has come away concluding that Charles

11:08   15   Bortz raped Jamie Leigh Jones.  Ms. Jones -- and I'll only say

16   this on damages.  Bortz Exhibits 105 through 108 are some

17   pictures that Ms. Jones posted of herself on MySpace.  I didn't

18   show them to you during the case.  But if you look at those

19   pictures, you ask yourself:  Is this a rape victim who has been

11:08   20   horribly and permanently damaged by a rape?  Look at those

21   pictures, decide for yourself.

22          Final note, Ms. Jones' injuries the morning

23   after, Dr. Schulz didn't find any blood.  Jamie Leigh Jones

24   denied bleeding.  She had fissures, small splits or cracks in

11:09   25   the skin, so small they don't bleed.  Dr. Jones [sic] did not

11:09   1   know of the six months of medical activity and caustic creams

2   that Ms. Jones had experienced up to the time she went to Iraq.

3   That information was missing from Dr. Schulz' fund of

4   information.

11:09   5        The bruises are not on the inner thigh.  They are

6   the types of bruises we all have, that we all get from, let's

7   say, flying from Houston to Baghdad, fighting our way off and

8   on crowded airplanes, moving into a new dorm room, moving

9   things around.  We all have small bruises, small bumps, small

11:09   10   scrapes even as we sit here in this courtroom.

11        I'm going to yield the floor now.  There's really

12   a lot more I would like to say; and this is, unfortunately my,

13   last chance to speak to you.  No matter what Todd Kelly says

14   when he gets up, I can't -- I can't respond.  I would, but I

11:10   15   can't.

16        Your attention, again, throughout this entire

17   trial and to my, unfortunately, too brief time to speak to you

18   is extremely, extremely appreciated.  We will accept your

19   verdict whatever it is.  Thank you so much for your service.

11:10   20        THE COURT:  Thank you very much.

21        Ladies and gentlemen, KBR has 28 minutes,

22   plaintiff has 26 more minutes.  Would you like a break?

23        MS. VORPAHL:  Your Honor, I would like a break even if

24   they wouldn't, if you don't mind.

11:10   25        THE COURT:  Okay.  Let's try to keep it to ten

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:10   1    minutes.

2                    Would all please rise for the jury?

3                 *(Recess was taken from 11:10 a.m. to 11:26 a.m.)*

4                 *(Jury present)*

11:26   5              THE COURT:  Members of the jury, please be seated.

6                    All right.  Ms. Vorpahl, you're in -- your turn.

7              MS. VORPAHL:  Thank you, your Honor.  May it please

8    the Court.

9              THE COURT:  Counsel.

11:26   10             MS. VORPAHL:  Your Honor, ladies and gentlemen, I want

11   to join Judge Ellison and my colleagues in thanking you for

12   your very diligent service in this case.

13                   As Judge Ellison told you initially, you were not

14   summoned here to serve as jurors out of any sense of whim or

11:26   15   caprice.  Your work is and has been enormously important, both

16   to the three parties in this lawsuit and to our entire American

17   system of justice.

18                   I want to go back to where we started on June

19   13th, almost a month ago.  I stood here in front of you and I

11:26   20   told you KBR is not who Jamie Jones says it is and she is not

21   who she claims to be.

22                   I hope that you'll agree with me that the

23   evidence has demonstrated precisely that; we aren't who she

24   says we are.  To the contrary, KBR is an organization with a

11:27   25   long history of setting high standards, both professionally and

1   ethically, for itself as an entity and for all of its

2   employees.  You've heard former and current employees of KBR

3   testify that KBR's Code of Business Conduct is a central part

4   of who KBR is and what its core values are and represent.

5           Like any company, KBR has differences with

6   employees from time to time.  But what's important is the

7   manner in which KBR has chosen to address those differences.

8   You've heard evidence that KBR has a host of well publicized

9   ways that employees can report or attempt to resolve a problem;

10  through chain of command; through complaints made to human

11  resources or employee relations; through a variety of KBR

12  hotlines, help lines, and e-mail addresses; by way of phone

13  numbers, hotlines and help lines that are publicized and

14  contained in KBR's Code of Business Conduct; all the way from

15  KBR's general counsel to its vice-president of human resources

16  to various legal offices worldwide.

17          In the KBR Code of Business Conduct is even

18  information on how to contact KBR's board of directors by mail,

19  by e-mail, and by telephone.  I hope that you'll look at this

20  exhibit, which is Joint Exhibit 5, as well as Exhibit -- Joint

21  Exhibit 136, which is the dispute resolution program that KBR

22  has implemented and uses, and Joint Exhibit 139, which is the

23  specific LOGCAP III option for dispute resolution.  All of

24  these are provided to all employees and they detail the many

25  avenues available to KBR's employees for resolution of

11:29  1    disputes.

2                Even KBR's detractors -- and any large

3      organization is bound to have those kind of detractors -- have

4      to acknowledge that KBR's dispute resolution program works to

11:29  5    resolve the vast majority of disputes like this one.  Teresa

6      Westcott, who had nothing good to say about her work at

7      Camp Victory and elsewhere, acknowledged that she resolved her

8      dispute with KBR only one month after she filed a claim with

9      the EEOC.

11:30 10                I want to spend a few minutes going back through

11     the timeline that we discussed in opening.

12                Could we put the timeline up?

13                And I really want to focus on Thursday, July the

14     28th.  I will say to you, first of all, that every one of the

11:30 15    items contained on this timeline has been supported with

16     evidence that you-all have heard here in this courtroom.

17                But on Thursday, July the 28th, the evidence has

18     indicated that Jamie Leigh Jones awoke at some point; that

19     Anthony Adams saw Charles Bortz outside Jamie's room; that at

11:30 20    6:45 Jamie called Pete Arroyo for a ride to work.  She arrived

21     at work some time before 7:21.  She called Charles Bortz on her

22     phone at 7:21 that morning.

23                Between 7:21 and 9:50 on July the 28th, she and

24     Pete Arroyo exchanged approximately 20 e-mails with each other.

11:31 25    You'll have those e-mails as evidence.  And I encourage you to

look at them again, though I know we've been through them in
some great detail during the trial.

After exchanging these approximately 20 e-mails,
at 10:30 a.m. approximately, Jamie asked Pete Arroyo to come
over, tells him the beginning of her story; and Pete Arroyo
takes Jamie to the KBR clinic, where she meets Kristen Rumba
and tells Kristen Rumba a story.

About that same time, Will Goodgine, KBR's
director of security at Camp Hope, is notified of the
allegation that Jamie Leigh Jones has made that she's been
raped.  About that same time, Jamie -- or shortly thereafter,
Jamie, Pete Arroyo, and Kristen Rumba, the physician assistant,
travel to and arrive at the army hospital.  And a rape
examination and rape kit are commenced by Dr. Jodi Schulz, the
army physician.

At about that same time, Gabe Andino, the project
manager, is notified of the allegations and confirms that
security, safety, and medical have also been notified.

Some time before noon that Thursday, July the
28th, Tom Jones calls headquarters offices.  So, it's clear
that Jamie Leigh Jones has been able to contact her father.

At about 2:50 in the afternoon, Jamie is released
from the army hospital and is taken to a secure containerized
housing unit, a hooch, by Jamie Armstrong, a KBR human
resources employee.

11:33  1          Sometime mid afternoon Will Goodgine contacts the

2   Department of State.  At 5:30 p.m., according to the Department

3   of State's own records, it assumes the investigation.  And

4   later that evening Jamie writes her statement, which the State

11:33  5   Department takes, along with the rape kit, and instructs KBR,

6   at 9:30 p.m. that evening, to stand down.  As you know,

7   Ms. Jones is then moved to a similar containerized housing unit

8   on the Department of State grounds.

9          This timeline makes several things clear.  First,

11:33  10  despite what Jamie Jones has told numerous people, including

11  Kristen Rumba, Dr. Jodi Schulz, and her own father, firemen

12  didn't come to her room and randomly hand her a drink.  To the

13  contrary, Jamie poured Baileys Irish Cream into an 18-ounce cup

14  and voluntarily attended a get-together with coworkers.

11:34  15         She sat with Charles Bortz.  She flirted with

16  Charles Bortz.  She left the party.  She called Charles Bortz

17  at 10:13 p.m. that evening, July 27th.  She returned to the

18  party, and then she drank from the same drink that Charles

19  Bortz drank from.  She invited Charles Bortz to her room.

11:34  20         Second, Jamie Jones didn't wake up in the top

21  bunk of her bunk beds or lying nude next to some stranger, both

22  of which she's claimed in the past.  She knew exactly who was

23  in her room, in her bed.  She had his phone number in her

24  phone; and she called him, both the evening of July 27th and

11:35  25  the morning of July 28th.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:35   1           Third, she appeared normal to Pete Arroyo as they

2      traveled to work and to Anthony Adams once she arrived at work.

3      On the way to work, she told Pete Arroyo about her new

4      relationship with Charles Bortz.  Arroyo warned her that she

11:35   5      was making a mistake because Charles Bortz' girlfriend was due

6      back at camp and Jamie would be working in the same office with

7      her.

8                  We'll never know exactly when Jamie Jones began

9      to conceive the plan that led her to claim that Charles Bortz

11:35   10     raped her.

11                 Was it when she awoke and remembered that she had

12     had unprotected sex with Bortz, as the independent expert,

13     Dr. Scarano, posited?

14                 Was it when Pete Arroyo told her on the way to

11:36   15     work she was treading water and to be careful, "If Charles

16     breaks up with his girlfriend and you've got to work with her,

17     that's not going to look good"?

18                 Was it when she called Charles Bortz after she

19     arrived at work on the morning of July 28th, to tell him that

11:36   20     Anthony Adams was upset that Charles had slept with Jamie Jones

21     because Charles had a girlfriend, Beneta Brumatti?

22                 Was it when Jamie received Sara Simco's e-mail

23     asking whether Jamie had fun the night before and Jamie feared

24     the relationship was probably public knowledge?

11:36   25                 Or was it something in one of Pete Arroyo's many

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:36   1   e-mails later that morning, perhaps when Pete again warned

2   Jamie not to get caught up in camp gossip between Charles Bortz

3   and his girlfriend?

4         Now, Jamie Jones also claimed that she was

11:36   5   imprisoned in a shipping container and deprived of food and

6   water.  The evidence that you've heard and seen and will review

7   in greater detail as you deliberate today is, again, directly

8   at odds with Ms. Jones' claims.  You heard from Will Goodgine,

9   KBR's director of security at Camp Hope and a former member of

11:37   10   the army special forces, that Jamie Jones was taken to a VIP

11   hooch.  He described it to you, and he told you that Ms. Jones

12   was taken there for her own safety, because of her allegations

13   of gang rape by unknown assailants.

14         Dr. Scarano, the independent expert, not hired by

11:37   15   any party to this dispute, pointed out the numerous

16   inconsistencies and conflicting accounts that make up Jamie

17   Jones' story of rape.  Dr. Scarano went on to say that he

18   believes that Jamie Jones has fabricated many events, both

19   before and after the five days she spent in Iraq.

20         Finally, Dr. Scarano told you that people with

11:38   21   personality disorders like Ms. Jones has believe that they are

22   superior to the rest of us and blame others but never

23   themselves for things that happen.  You've seen plenty of

24   evidence of this blaming others in Ms. Jones' testimony in this

11:38   25   trial.

11:38  1              She blames Eric Iler for forcing her to have sex

2  with him and giving her sexually transmitted diseases, even

3  though there is no support for any of these allegations or her

4  claim that she reported anything to anyone at KBR.  She blames

11:38  5  Kristen Rumba and Dr. Jodi Schulz for recording incorrect

6  information in medical records.  She blames Jamie Armstrong for

7  depriving her of food and water and claims for the very first

8  time on this witness stand that Armstrong told her that there

9  was another rape victim buried outside.

11:38  10            She blames KBR for allowing her to have sex with

11  Charles Bortz.  She blames her prior attorney for suggesting

12  that she should contact KBR to ask whether she could return to

13  work less than two weeks after she was flown home, out of

14  Baghdad, in a dangerous mission by people who literally risked

11:39  15  their lives to see that Jamie Jones got home quickly.

16            She blamed the woman she claimed signed letters

17  for her for getting her story wrong when reporting it to

18  Senator Barbara Boxer and others.  She blamed her mother and

19  father when it was convenient, trying to explain away a

11:39  20  doctor's lengthy record of Ms. Jones pretending, malingering as

21  Dr. Scarano would call it, to have muscle weakness.

22            She blamed her own gynecologist, Dr. Scott, for

23  recording in her medical records that Jamie, quote, "reports

24  possible sexual intercourse with new partner after she had

11:39  25  several drinks and passed out, does not remember anything,"

only two months before she left for Iraq.  Jamie claims that she had only attempted to have sexual intercourse while she and her new boyfriend were both in their underwear.

And she even blamed her own husband for an incident in a bowling alley in San Diego, where she claimed he had hit her with a baseball bat, that he hit her in the face, that her husband became angry because she told him she might be pregnant and hit her in the stomach and face, and then that her husband hit her because she was winning at bowling.

Once you retire to deliberate, you will have two very critical jobs.  First, of course, you will answer the questions in the Judge's charge.  Second, and equally important, you will explain to one another why you hold the beliefs you hold about the evidence that you've seen and heard in this case.

So, what if someone asks, "What about these other people that testified about problems they had or claim to have at other KBR locations, at other times, and involving other people?"

You will recall that I told you in my opening statements that we expected Jamie Jones' lawyers to bring witnesses to tell you about other times, other places, other people, and other camps.  I told you, and I believe I was correct, that Jones' lawyers would do this because they had no other witnesses.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:41  1          If any of you are inclined to give this testimony

2     any weight in determining whether Jamie Jones was raped by

3     Charles Bortz or whether KBR sexually harassed Jamie Jones,

4     then I hope you will also consider Kimberly Nichols' testimony.

11:41  5     You will recall that until June, 2005, less than a month before

6     Jamie Jones arrived at Camp Hope, Kimberly Nichols lived in the

7     very same room in Barracks 2 at Camp Hope that Jamie Jones

8     later lived in.  When asked how she would rank Camp Hope in

9     relation to many other camps that she had worked in, Kimberly

11:42  10    said, "It was one of the best places I've ever worked."

11          Furthermore, these other people have a right to

12    make their own claims; and several of them have.  Teresa

13    Westcott testified that she resolved her dispute with KBR using

14    KBR's dispute resolution procedure.

11:42  15          The Judge has asked you to determine whether

16    Jamie Jones was raped by Charles Bortz and, only if you find

17    that she was, whether she was sexually harassed by one or more

18    of her coworkers in Iraq in late July of 2005.

19          Significantly, the question doesn't ask you about

11:42  20    anyone other than Jamie Jones, the person who brought this

21    lawsuit.  We believe that the evidence can lead you to only one

22    conclusion as to the answer to those questions, and that is

23    "No."

24          Another question that someone might ask is, "Do

11:43  25    we need to figure out what happened between Jamie Jones and her

supervisor in Houston?  What was that all about?"

Ladies and gentlemen, the evidence demonstrated that KBR absolutely tries to make sure that supervisors and subordinates don't have romantic relationships.  KBR's policy in this regard applied to both parties, the supervisor and the subordinate.  KBR wishes that both Eric Iler and Jamie Jones had followed its policy, but they didn't.

Once again, however, Ms. Jones tells a fantastic -- and I will call it "unbelievable" -- series of stories about having to pretend to be Eric Iler's girlfriend. But none of that matters in this case because the questions you are required to answer are whether Jamie Jones was raped by Charles Bortz and, depending on that answer, whether she was sexually harassed by one or more KBR employees at Camp Hope in late July of 2005.

Now, what if someone suggests that Jamie Jones was tricked into going to Iraq, that KBR misrepresented what it would be like?  Ladies and gentlemen, nothing could be further from the truth.  KBR put Ms. Jones through a week of intensive training.  Take a look at the LOGCAP III training materials, which are Joint Exhibit 125.  KBR described many of the adversities that she would face.  KBR provided specific training on employment issues.  Take a look at Joint Exhibits 131 and 132.

Jim Coin, a former KBR employee relations

employee, who worked both in Houston and in Iraq, testified that he himself taught the employment portion, including the sexual harassment portion, of the LOGCAP III training to both Jamie Jones and to Charles Bortz.  No one at KBR -- and I will say that again -- no one made any misrepresentations to Jamie Jones.

She herself admitted that she was told in training presentations at Greenspoint that she might live in a tent or in a barracks or in a containerized housing unit.  But Jamie claims that someone who she can't identify but who she says was in a, quote, higher position told her that she wouldn't have to follow the same rules everyone else had to follow regarding housing at Camp Hope.

Kimberly Nichols and Gabe Andino both told you exactly what those rules were and how they operated and were applied without exception.  So, to find that KBR misrepresented this to Jamie, you must believe Jamie that this unidentified person in a higher position actually promised Jamie something different, something better than everyone else and that she would not have signed her employment agreement or agreed to come to Iraq if it had not been for this chance meeting with this unidentified stranger.

You have the Court's charge to you.  You've sworn to follow the Court's charge, and that's what I want to spend my remaining few minutes talking with you about.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:46  1          THE COURT:  You have five minutes.

      2          MS. VORPAHL:  Thank you, your Honor.

      3              The Judge has made the decisions about the order

      4      of the questions that you will answer and about which questions

11:46  5      you will answer or skip, depending on your answers to other

      6      questions.  Mr. McKinney has covered the first question, which

      7      is the question regarding whether Charles Bortz raped Jamie

      8      Leigh Jones.  I submit to you that the answer to that is "No."

      9      If you answer the question "No," as I believe the evidence will

11:47 10      lead you to do, then you're going to skip to Page 20 of the

     11      charge.

     12              Should you answer the question regarding the rape

     13      in the affirmative, you will go to Instruction Number 8 that

     14      addresses the issue of sexual harassment and hostile work

11:47 15      environment.  There's a lengthy instruction that the Court has

     16      read to you once.

     17              Based on the evidence, I submit to you that Jamie

     18      Leigh Jones was not sexually harassed by anyone in the five

     19      days that she spent in Iraq.  And, so, even should you reach

11:47 20      Jury Question Number 3, the answer should certainly be "No."

     21              Moreover, KBR has a couple of additional issues

     22      that you will have to address should you find somehow that KBR

     23      is responsible for or its employees are responsible for having

     24      sexually harassed Ms. Jones.

11:48 25              I want to turn now to Page 20, to the Jury

11:48    1    Question Number 7, which is a fraud question against KBR.  And

2    I ask you to ask yourself as you consider this question what

3    evidence is there that KBR made any false statement to Jamie

4    Jones, knowing that it was false, or made it recklessly,

11:48    5    without knowing or caring whether it was true or false, with

6    the intention that Jamie Jones should take action and decide to

7    go to Iraq based upon that statement and that Jamie Jones

8    suffered injury as a result.

9              I submit to you that there is no evidence of any

11:48   10    of the elements of this cause of action, and I submit to you

11    that some of the evidence of that is that Jamie Jones herself

12    asked to return to Iraq.

13              Let me say this before I sit down.  I know it

14    might make a better manuscript or a book or a play or a movie

11:49   15    or screenplay to tell the story that Jamie Jones was gang raped

16    and locked in a shipping container.  But I'm asking you to

17    reject that fiction and do justice in this case.

18              I thank you again for your patience with us, for

19    your time, and for your attention.

11:49   20              THE COURT:  Thank you, Ms. Vorpahl.

21              Sir, you have 26 minutes.

22              MR. KELLY:  Thank you, your Honor.  May it please the

23    Court.

24              THE COURT:  Counsel.

11:49   25              MR. KELLY:  "I promise you we'll follow this.  I

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

promise you if anyone violates this Code of Business Conduct,
they'll be punished, they'll be dealt with.  I promise you we
have a record of following these rules.  Will you come with me?
Will you put your life in danger?  I'll protect you."

Yeah, they lied to her.  Because, as Amy Katz
told you, from back in 1998 those rules aren't followed.  They
never intended to follow them, and they've put Jamie and Amy
and Julie and Linda and Terry and too many others too afraid to
come before you in danger because they won't follow their rules
when they promise that they will.

"If you get raped, Jamie, and you report it,
we're going to lock you up.  And even though, even though the
State Department will tell us in Exhibit 87 on Page 2, even
though the State Department will tell us at 5:30 in the evening
to stand down, have no further contact with you, Jamie, I'm
going to send Jamie Armstrong in and she's going to get a
statement from you, damn it.  She's going to get your
statement, and she is going to tell you whatever she has to do
to get it.  Do you understand me?"

That's how KBR follows their policies.

Did Charles Bortz rape Jamie?  As Sara Simco told
you, "They don't know where I am, and I ain't saying."

You know why he ain't saying?  He ain't saying
because he doesn't want to be questioned about the fact that he
swears he watched Jamie get on a bus after he kissed her

11:52   1   lovingly after a long night of passionate, missionary position

2   sex.  How did he watch her get on that bus if Pete Arroyo was

3   picking her up?

4              Charles Bortz wasn't questioned for two days.

11:52   5   Jamie's forced to do this before the effects of the drug have

6   even worn off.  Was Jamie Jones raped by Charles Bortz?  Yeah.

7   Was she raped by others?  We'll never know.  That claim is not

8   before you because we agree we can't prove it.

9              Her flashbacks to Matthew Ryan watching as

11:53   10   Charles Bortz raped her, we agree that's not sufficient

11   evidence to hold Matthew Ryan accountable.  But does Jamie

12   believe it?  In every core of her fiber.  And is it true?

13   Probably.

14              You've been asked to listen to the testimony of

11:53   15   Kimberly Nichols, and I pray that you do.  The Judge asked her

16   a question, and she responded.  She turned to him and said,

17   "Judge, when it comes to American military contracting, it's

18   all about the bottom line."  That's why we're here, because

19   when it comes to American military contracting, it is all about

11:54   20   the bottom line.

21              "Stay down, Jamie.  Stay down.  Because you don't

22   matter.  You don't matter.  Your foundation doesn't matter."

23              Jamie knows this case is so much bigger than she

24   is.  That's why she took that stand and she told you when you

11:54   25   punish KBR, when you tell KBR to stop, she'll put it in her

11:54  1  foundation, every bit of it.  Punish them.  Make it count.

2          This case is bigger than anyone in this room.

3  Jamie Leigh Jones is exactly what she told you she was.  She's

4  the victim of a fraud, a lie, an affirmative misrepresentation

11:55  5  from KBR about who they were and what they would do.  She never

6  said she was perfect.  She said she was human and she was a

7  victim.  And she is.  That's all she's ever claimed to be.

8          KBR is exactly what Jamie Leigh Jones has told

9  you they were.  Jamie, who has sat here and listened as media

11:55  10  sat in the back and reported on her herpes and her Human

11  Papilloma Virus -- two strains remember, the second one

12  obtained on July 27th, 2005.  But she sat as her life was

13  exposed.  And if you think she hasn't known for five years that

14  was going to happen, you're wrong.  And she sat here and

11:56  15  watched her life ripped apart in front of you, as she's known

16  she would have to do.

17          And they can call it anything they want.  They

18  can hire an expert.  They can bring an expert in to say it's

19  something other than what it is.  Every treater, every treater

11:56  20  has said Jamie has injuries related to trauma.

21          Are these ruptured breast implants?  No, they're

22  not.

23          Jamie, I'm sorry.  I am truly sorry, because that

24  one is not on you.  That's on me.  I misunderstood.

11:57  25          Are those torn pectoral muscles?  No, they're

11:57  1    not.  They're torn capsules that hold the pectoral muscle.  But

2    every expert that's talked about that injury says it's the

3    worst case of bottoming out they've ever seen, that it was most

4    probably caused by trauma.  No one, no one, not even their

11:57  5    hired expert, can come in and say "not caused by trauma."  No

6    one.

7                Fissures, Dr. Scott testified that she was

8    completely healed five days before Charles Bortz raped Jamie

9    Jones.  Even if she were more prone to fissures, something had

11:58  10   to cause them.  "I didn't have anal sex with Jamie Jones."

11   Bull.

12                "I didn't ejaculate."  Then why was it found all

13   over the place: in her panties, in her vaginal swabs, on the

14   sheets?

11:58  15                Mr. McKinney stood up here and said that Charles

16   Bortz never walked away from this, never hid anything.  Let's

17   look at Joint Exhibit -- I believe it's 162.

18                Why won't he give a DNA sample?  What's he

19   worried about?  Because Charles Bortz had to get his story

11:59  20   straight first.  He had two days to do it with his buddies,

21   with Sara Simco, who wrote in her e-mails to him that she loved

22   him, she "hates that bitch, I swear I'm going to kill her."

23   Her words, not mine.

24                Sara Simco, who tells you that Jamie wrote her an

11:59  25   e-mail the next day about what a good time she had, let's do it

11:59   1   again, where is that e-mail?  Doesn't KBR have control of all

2   the e-mails?  Where is it?  Didn't it happen?

3   Jamie tried to use the open door policy when she

4   was in Houston.  She tried because it was private,

12:00   5   confidential.  How did Sara Simco know that Jamie had sexual

6   harassment problems in Houston on the very day of this rape,

7   when she called Charles Bortz to warn him?  How did Sara Simco

8   know that if it was so confidential?

9   KBR is exactly what Jamie Leigh Jones has told

12:00   10   you they were, exactly what Amy Katz took that stand and told

11   you they were, exactly what Lorenzo Santuro told you they were,

12   exactly what Linda Lindsey told you they were.

13   Jamie, looking square in the face of what she was

14   going to have to do in front of you, put it aside and came here

12:01   15   and did it.  Some people call it crazy.  I call it courage.

16   After five years I want you to know, Jamie, that

17   I've never been more proud to represent a client or never

18   watched a client go through more fire than I had to watch you

19   go through at the hands of KBR.  I couldn't be more proud than

12:01   20   to sit with you here.

21   There's a story of a young boy on the seashore.

22   As he looked across the seashore, he saw thousands and

23   thousands of starfish.  And an old man came over the sand dune

24   and saw the young boy.  And every once in while he would see

12:02   25   the young boy bend down and stand up and throw a starfish back

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:02  1   into the ocean.

2              And the old man approached the boy and he sort of

3   laughed at him and he said, "Young man, there are thousands of

4   starfish on this beach.  You can't possibly make a difference."

12:02  5              And the young boy, leaned down, and he picked up

6   a starfish and, with all of his might, he threw that starfish

7   as far as he could into the ocean.  And he turned to that man

8   and he said, "I made a difference to that one."

9              You can make a difference here today.  This is

12:03  10  bigger than us.  Make a difference.

11             Thank you, your Honor.

12             THE COURT:  Ladies and gentlemen, the case is now

13  yours.  Up until now I've had some control over the timing of

14  the case.  But henceforth, the question of schedule is entirely

12:03  15  yours.

16             I know you would do so anyway, but I feel better

17  if I say please be sensitive to one another's schedules.

18             Our schedules can be whatever you wish it to be.

19  We'll stay late at night with you.  We'll come in early in the

12:03  20  morning.  We'll do whatever you need.  And you will be -- we

21  will take care of all your meals and snacks for the duration.

22             As I told you on the first day, there are

23  probably 200 years of accumulated lawyer experience in the

24  room; but it is you who are going to make the difference,

12:04  25  because you're going to make the decision.  All of us -- I know

12:04  1    all of us wish you well in that endeavor.

2                        Would all please rise for the jury?

3          *(Jury retires to deliberate)*

4          *(Recess was taken from 12:04 p.m. to 3:37 p.m.)*

03:36  5              THE COURT:  Okay.  You have the note.  And, better

6    yet, I'm told you have the index.  Well done.  Okay.

7              MS. VORPAHL:  Yes, we do.

8              THE COURT:  All right.  Well, we will --

9              MS. VORPAHL:  They're taking a quick look at what we

03:37  10    have.

11             THE COURT:  -- provide it to them as soon as you

12    provide it to Stephanie.

13                       Anything else we need to talk about?

14             MR. KELLY:  We thought the answer ought to just go

03:37  15    back to the jury, "Yes," Judge.

16             THE COURT:  That would be one way to do it.

17                       I think you can always interpret jury notes in

18    many different ways.  It sounds like this one means they're

19    settling down for some long deliberations.

03:37  20             MR. HEDGES:  They're reading exhibits.  That's one

21    indication.

22             THE COURT:  I hate to have all you guys stay around

23    here.  I know how much lawyer time costs.  I mean, as long as

24    we have your cell phone numbers you can go back to your office

03:37  25    and we can call you.  But you do whatever you want.

03:37      1          MR. HEDGES:  Have the jury given any indication of how
           2     long they think they want to stay?
           3          THE COURT:  The only thing they told -- I haven't talk
           4     to them, but the only thing they told members of my staff is
03:37      5     they're going to adhere to their usual schedule.  So, 8:00,
           6     8:30 to 5:00, 5:30.
           7          *(Recess was taken from 3:37 p.m. to 5:02 p.m.)*
           8          THE COURT:  The first thing I need to say is the jury
           9     is leaving.  So, we can all leave, I think, after we get this
05:02     10     worked out.
          11          Okay.  I have your proposed answers.  I thank you
          12     for working cooperatively on that.
          13          The more we look at this question the more
          14     complicated we thought the answer needed to be.  Because what
05:03     15     we're saying, I think, in Question 7 is that the
          16     misrepresentations, if any, must have taken place in Houston
          17     because they had to be prior to the execution of the contract;
          18     but the injury, it seems to me, as I read plaintiff's prayer,
          19     could be Iraq or Houston or both because their allegation is
05:03     20     that she continues to this day to suffer injury.
          21          MS. VORPAHL:  Your Honor, I don't disagree with what
          22     you've said; but I understood the question differently.  I
          23     understood the question to mean, "Do we consider everything
          24     while Ms. Jones was employed by KBR in Houston or do we
05:04     25     consider -- or what is the reference to the employment

1   contract?"

2           And, so, I want to make sure that the jury

3   understands that the reference to the "employment contract" is

4   a reference to Joint Exhibit 38, or the overseas employment

5   agreement.

6           MR. KELLY:  Well, two things, your Honor.  First of

7   all, I don't think that Joint Exhibit 38 should be referenced

8   at all.  I think that's somewhat of a comment on the evidence

9   that shouldn't be made at all.

10          But the other thing is -- this is the only reason

11  we differ, although the Court has come up with something we

12  hadn't thought of out here, quite frankly.  The place where

13  Ms. Vorpahl and I differed earlier is basically on the word in

14  Jury Question Number 7, "inducing."

15          And, so, to us, this was about the events

16  surrounding the contract and not just the contract itself,

17  which is why there's a slight different in the proposed

18  responses from plaintiff versus the proposed responses from the

19  defense.

20          Quite honestly, I hadn't thought about it in as

21  much detail as the Court has.

22          THE COURT:  Don't give me any credit.  I'm just

23  surrounded by very smart people.

24          MS. VORPAHL:  And, of course, I object to the use of

25  the word "surrounding" because it's not a verb that is in the

05:05    1    charge.  The -- the verb is "induce."

2              And it seems to me that if they understand what

3    contract is referred to that we've answered their question.

4    But perhaps I'm --

05:05    5         THE COURT:  Well, it's a multipart question.  And we

6    thought at one time that A, B and C and the first half of D

7    must have happened only in Houston whereas the second half of

8    D, "thereby suffers injury," could be Houston or Iraq.  Or

9    both.

05:06   10         MS. VORPAHL:  But I think they're confused about what

11   employment agreement is referred to.  And, so, I'm going to

12   ask --

13        THE COURT:  We can do that, but I don't think that's

14   enough.  We can definitely say something like, "The question

05:06   15   refers to possible misrepresentations prior to Ms. Jones'

16   execution of the overseas employment agreement."  But I think,

17   since we're talking about injury as well as misrepresentation,

18   I think we need to say something more than that.

19        MS. VORPAHL:  And, so -- say it again -- I'm sorry --

05:06   20   what you propose.

21        THE COURT:  Well, I don't have language at the ready,

22   but I think we can certainly say -- make a reference to the

23   employment agreement signed on July 15th, but we need to tell

24   the jury to consider alleged injury that was suffered both in

05:07   25   Iraq and in Houston.

05:07   1          MS. VORPAHL:  Well, your Honor, I don't --

        2          THE COURT:  The reference is not --

        3          MS. VORPAHL:  In Houston after July 15, 2005.

        4          THE COURT:  Yes.

05:07   5          MS. VORPAHL:  I just want the jury to be clear that it

        6    is injury after she signed the contract.

        7          THE COURT:  We don't want to pick up Eric Iler or

        8    whatever that is.

        9          MS. VORPAHL:  Thank you, your Honor.  You understand

05:07  10    where I am coming from.

       11          But might I propose that we use the response I've

       12    offered and add to it, "If this does not fully answer your

       13    question, please send another question."

       14          THE COURT:  Well, I don't want to put it back on them,

05:07  15    though.  I really don't.

       16          MR. KELLY:  Well, and if I might your Honor, the

       17    response that the Court was proposing is actually not in line

       18    with the proposal that Ms. Vorpahl has made.  It's more in the

       19    line with the proposal that the plaintiffs made.  I propose

05:08  20    that we go with the Court's verbiage, which has been

       21    transcribed in the record, and simply add to it that the

       22    injuries include those injuries post July 15th of 2005 which

       23    occurred, whether they occurred in Iraq or in Houston.

       24          MS. VORPAHL:  There is no evidence of any injury in

05:08  25    Houston.

05:08   1          THE COURT:  No.  She -- well, I think there is.

2    Because the plaintiffs urge and have submitted evidence that

3    tends to show that Ms. Jones continues to suffer injury by

4    what's happened to her breasts, what's happened to her

05:08   5    psychologically, what's happened to her in terms of fear of

6    men, all that.  I don't want them to think that once she left

7    Iraq the injury was over.

8          MS. VORPAHL:  Okay.  I appreciate what the Court is

9    saying.

05:08  10          MR. McKINNEY:  I don't have a dog in this fight, but

11    one of the issues that I have, Judge, just kind of -- because I

12    can't keep my mouth shut, I guess -- is I really can't tell and

13    I'm not sure anybody can tell what the jury is asking here.

14          THE COURT:  That's a very common problem.  They're not

05:09  15    comfortable with the same language and the same concepts we

16    are.

17          MR. McKINNEY:  And my thought is that all of us may be

18    reading too much into this question.  And I would think that,

19    if all they're hung up on is which employment contract, the one

05:09  20    where she got hired originally in Houston or the one that sent

21    her to Iraq, if that's what the jury is hung up on, just

22    instruct them on which contract is at issue.  And if that's not

23    enough, they will send out another note because they need

24    further information.

05:09  25          MS. VORPAHL:  That's exactly my proposal.  I mean,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:09   1   I -- and that's exactly how I read this question.  I think we
        2   are reading too much into it.
        3           THE COURT:  Well, another alternative -- we can't do
        4   this today, but we could have them come into the courtroom and
05:09   5   I can instruct them again.
        6           MR. KELLY:  Your Honor, I think we're actually
        7   very -- I mean, I don't want to argue it at all, but I think
        8   we're very close in our responses.  And I think, really, if the
        9   Court looks at the language that you proposed, that's in the
05:10  10   transcript of this case, I think that language going back to
       11   the jury to explain what contract we're talking about is
       12   sufficient.  The problem is that the language --
       13           THE COURT:  The defendant is not happy with that.
       14           MR. KELLY:  I understand, your Honor.  But the problem
05:10  15   is the defendant's language doesn't talk about inducement.  And
       16   that's the problem.  Because the defendant's language limits
       17   its to the actually signing of the contract and there needs to
       18   be some explanation that this is about the inducement to sign
       19   the contract.  And the Court's language incorporated that.  And
05:10  20   that's all that we're asking, is that the language in answer to
       21   this question be aligned with the actual Question Number 7.
       22           MS. VORPAHL:  The verb doesn't need to be repeated.  I
       23   mean, if you want to say, "Consider the question to be the
       24   following:  Did KBR commit fraud against Jamie Leigh Jones by
05:10  25   inducing her to enter into the overseas employment contract

                *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:11   1   signed on July 15, 2005," then I'm fine with that.  But I don't

2   believe that it's proper for the Court to comment by

3   reinforcing language about which questions have not been posed.

4           THE COURT:  But, see, the note -- in the question, the

05:11   5   jury refers to the entire question.  It doesn't refer to just

6   the inducement part of the question.

7           MR. McKINNEY:  Well, we -- that's one interpretation

8   of the note, Judge.  My main interest is just to get a verdict.

9   And since we don't know what the jury is asking about,

05:11   10  answering a question that hasn't been asked is just going to

11  make things even more confusing.

12          And, you know, this jury knows how to send a note

13  out.  They've learned how to do that.  I would strongly

14  recommend, I think, in the interest of moving their

05:12   15  deliberations along, that -- the shorter, simpler answer the

16  first time around and see if it draws a second question is the

17  way to go, because the question itself from the jury is quite

18  ambiguous.

19          THE COURT:  The reason --

05:12   20          MS. VORPAHL:  And I think you're just going to confuse

21  things.

22          THE COURT:  Just a second.

23          The reason I think that is inadequate is it -- if

24  the jury were simply asking about a contract that was executed,

05:12   25  then it would not be puzzled that we're asking about Houston or

05:12   1   Iraq.  Clearly the contract was signed in Houston.

2          MR. McKINNEY:  But there are actually two employment

3   contracts.  There was the at-will contract that she entered

4   into on August the 15th of 2004 for her employment in

05:12   5   Houston --

6          THE COURT:  I understand that.

7          MR. McKINNEY:  -- and then there was her overseas

8   contract.  And my initial interpretation of the question was

9   they don't know which of the two contracts she was --

05:12   10          THE COURT:  Why would they possibly be asking about

11   Iraq?  If that was their question, that we're just choosing

12   between two contracts, both of which were signed in Houston,

13   why would they ever ask about Iraq?

14          MS. VORPAHL:  What they mean is the contract related

05:13   15   to her employment in Houston, the contract related to her

16   employment in Iraq, or both of those contracts.  That's -- I

17   mean, Judge that's how I read it.  And I do think we're

18   over-complicating it.

19          I mean, if you want to say, "The reference to

05:13   20   employment contract in Jury Question Number 7 is to Jones'

21   overseas employment contract signed on July 15, 2005," then --

22   and I think that's fine.  And if you want to say, "If this does

23   not fully answer your question, send another question."

24          MS. CATES:  If I could just add, I think just saying

05:13   25   something about an injury in response to a question this vague

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:13   1   just seems to suggest that they should be looking for an

2   injury, that there may be an injury.  And I don't think that

3   that way would be proper.

4        THE COURT:  Well, I always hate when you guys have

05:14   5   come close to an answer that I have done something to interject

6   disagreement.  If you-all were originally okay with the notion

7   that we go back with the overseas employment contract, then,

8   you know, it's not my prerogative to decline to do that.

9        MR. McKINNEY:  It's not like they're going to find for

05:14   10   one party or against the other if you give that instruction.

11   It's not going to push the jury in any direction, other than to

12   send out another question if they're confused.

13        THE COURT:  Well, they've been in deliberations now

14   for almost five hours.  And for them to ask a question at

05:14   15   all -- this is only the second one -- means something must ride

16   on this.

17        And, again, if all they were asking was what

18   contract, then I don't think they would have mentioned Iraq.

19   Because there was no -- that I know of, there was no contract

05:15   20   signed in Iraq.

21        MS. VORPAHL:  But there was a contract related to --

22   specifically related to employment in Iraq.  And that's what I

23   think they're referring to.

24        And, respectfully, I think that's what we all

05:15   25   thought out here, just for what that's worth.

*Cheryll K. Barron, CSR, CM, FCRR*        *713.250.5585*

05:15   1          THE COURT:  Well, no.  That's worth a lot.  I mean --

        2               I do like plaintiff's fuller description.  I

        3   mean, I think it's events surrounding, not just the contract

        4   itself.  I mean, because --

05:15   5          MS. VORPAHL:  But it's the inducement -- and I didn't

        6   mean to interrupt you.

        7          THE COURT:  Three and a half parts of the four-part

        8   question talk about misrepresentation and half talks about

        9   injury.  So, it's not just the contract.  It's the events

05:16  10   surrounding.  I'm okay with plaintiff's version if you-all are

       11   okay with it.

       12          MR. KELLY:  We certainly are, Judge.

       13          MS. VORPAHL:  Well, your Honor, I just -- I want to

       14   keep my objection, but I understand --

05:16  15          THE COURT:  What exactly is it?

       16               I mean, the question is -- we're talking about

       17   the misrepresentations.  And if we're talking about

       18   misrepresentations, do you mean to limit the misrepresentations

       19   to those that were in writing?

05:16  20          MS. VORPAHL:  To those that induced her to enter into

       21   the employment contract, which is what the question says.  And

       22   I don't think -- I mean, we -- I would have objected if it had

       23   said, "Did KBR commit fraud against Jamie Leigh Jones regarding

       24   events surrounding her entry into the employment contract?"

05:16  25   And, so, I don't think that I should have to live with that

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:16   1   instruction.  I think the action is already there, and the

2   action is inducement.

3           THE COURT:  So, what if we said, "The question refers

4   to the inducement" --

05:16   5           MS. VORPAHL:  "To enter into" -- yes, I think I could

6   live with that.

7                "The question refers to inducing her" -- and

8   let's just track the language.  "The question refers to

9   inducing Jamie Leigh Jones" -- or "the question refers to

05:17   10  inducing her to enter into the overseas employment contract

11  signed on July 15, 2005."

12               Yes.  And you're right.  The question -- I think

13  Mr. McKinney is right.

14               "The question refers to whether Jamie Leigh Jones

05:17   15  was induced to enter into the overseas employment contract

16  signed on July 15, 2005."

17               And if you guys don't want to refer to the

18  exhibit number that's fine, but it's Joint Exhibit 38.

19          THE COURT:  Okay.  So, the -- this is what I am going

05:18   20  to say.  "The question refers to inducing Ms. Jones to enter

21  into the overseas employment agreement signed on July 15th,

22  2005."

23          MS. VORPAHL:  I would rather have "weather Jones was

24  induced to enter into."

05:18   25          THE COURT:  Well, she surely was induced.  I mean,

05:18   1   there's no negative connotation to "induce."  I mean --

2           MR. McKINNEY:  I think there is.

3           MS. VORPAHL:  I do, too.  I think there absolutely is.

4   And the question is did KBR commit fraud by inducing her.  I

05:18   5   think it should say "whether Jones was induced to enter into

6   the overseas employment contract."

7              That is the question, "whether she was induced to

8   enter into" --

9           THE COURT:  Well, I mean, I was induced to sign a

05:18   10   contract for my job.  I mean, she signed it.  So, she was

11   induced.  Was induced by misrepresentation --

12           MR. McKINNEY:  Then you should modify "induced" with

13   the word "fraudulently."

14           MR. KELLY:  Well, see, here's the problem.  That's not

05:19   15   in the instruction either.

16             It's interesting, your Honor, each time the Court

17   has said, "This is what we would like to do.  This is what I

18   this I is appropriate," they just argue till they get their

19   way.  And that's -- it just -- this has been an ongoing theme.

05:19   20            The Court has offered two acceptable proposals

21   two correct proposals; and we're still arguing about this.

22           MS. VORPAHL:  Look, maybe there's a way -- your Honor,

23   I've got to represent my client the best way I can --

24           THE COURT:  I know.

05:19   25           MS. VORPAHL:  -- and I'm sorry Mr. Kelly --

05:19  1          THE COURT:  I know we all have our roles to play.  I

2    understand that.

3          MS. VORPAHL:  What if we say, "Consider the question

4    as follows:  Did KBR commit fraud against Jamie Leigh Jones by

05:19  5    inducing her to enter into the overseas employment contract

6    signed on July 15, 2005?"

7          MR. ESTEFAN:  That is the question as it is originally

8    worded with the modifier "contract of July 15th, 2005," is the

9    only thing Ms. Vorpahl is offering to the question as its

05:20  10   proposed?  Is that right?

11         MS. VORPAHL:  Yes, that's right.  Again, "Did KBR --

12   "Consider the question to read as follows:  Did KBR commit

13   fraud against Jamie Leigh Jones by inducing her to enter into

14   the overseas employment contract signed on July 15, 2005?"

05:20  15         MR. KELLY:  Only because it's not in the original

16   instruction, take out the word "overseas" and we're okay with

17   it.

18         MR. ESTEFAN:  "The employment contract on July 15th,

19   2005."

05:20  20         MR. KELLY:  Yeah.  I would say just add the date.

21         MS. VORPAHL:  "The employment contract signed on

22   July 15, 2005."

23         MR. ESTEFAN:  That's acceptable.

24         MS. VORPAHL:  That's acceptable.  I believe that's

05:20  25   acceptable to us.

05:21  1          THE COURT:  Would you write it down.

2          MS. VORPAHL:  I'll write it right now.

3          THE COURT:  Okay.  And give it to Mrs. Loewe, and I'll

4    send it back -- well, I guess we'll hold it for tomorrow.  Is

05:21  5    that what we'll do?

6          MR. ESTEFAN:  Yes.  I think the jury is gone.

7          THE COURT:  That's what I am saying.  We'll hold it

8    for tomorrow and give it to them.

9          MS. VORPAHL:  Your Honor, do you want me to, like,

05:21  10   actually try to write it on a form that you're going to give to

11   them?

12              Do we have a blank one?

13          THE COURT:  If Ms. Barron has it, we can get it off

14   that.  So, we can do that.

05:22  15              When you're done writing it out, show it to the

16   other side.  And if you're agreed, give it to Mrs. Loewe.

17          MS. VORPAHL:  Thank you, your Honor.

18       *(Proceedings recessed for evening)*

19                           *  *  *  *  *

20

21

22

23

24

25

1                COURT REPORTER'S CERTIFICATION

2        I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled cause.

3

4  Date:  July 7, 2011

5

6                      /s/  Cheryll K. Barron

7               Cheryll K. Barron, CSR, CMR, FCRR
               Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,716,000 [1]**  42/6
**$100,000 [1]**  46/21
**$106,326 [2]**  42/5 43/21
**$2 [1]**  44/24
**$2 million [1]**  44/24
**$2,289,000,000 [1]**  48/2
**$250,000 [1]**  41/18
**$5,000 [3]**  41/11 45/5 45/6
**$500,000 [2]**  41/15 45/11
**$6 [1]**  41/8
**$6 million [1]**  41/8
**$7,500,000 [1]**  43/25
**$716,726 [1]**  42/6
**$750,000 [2]**  41/2 45/9
**$85 [1]**  47/18
**$9 [1]**  45/4
**$9 million [1]**  45/4

**'**

**'Look [1]**  30/20

**-**

**-- so [1]**  47/10

**/**

**/s [1]**  100/6

**1**

**10 [1]**  46/13
**1000 [1]**  2/6
**103 [1]**  40/5
**105 [1]**  63/16
**108 [1]**  63/16
**10:13 p.m [1]**  69/17
**10:15 [1]**  59/9
**10:20 [1]**  59/9
**10:30 [2]**  59/9 68/4
**11 [4]**  28/21 35/19 39/19
 46/23
**114,500,000 [1]**  48/2
**1150 [2]**  1/16 1/19
**11:00 o'clock [2]**  56/19 57/1
**11:10 [1]**  65/3
**11:26 [1]**  65/3
**12 [1]**  47/12
**125 [1]**  75/21
**12:04 [1]**  85/4
**131 [1]**  75/24
**132 [1]**  75/24
**136 [1]**  66/21
**139 [1]**  66/22
**13th [1]**  65/19
**15 [8]**  89/3 92/1 93/21 96/11
 96/16 98/6 98/14 98/22
**15th [7]**  6/4 88/23 89/22 93/4
 96/21 98/8 98/18
**16 [2]**  61/7 61/17
**162 [1]**  82/17
**167 [1]**  59/7
**17 [2]**  61/7 61/17
**18 [1]**  43/18
**18-ounce [1]**  69/13
**19382 [1]**  1/22
**1998 [2]**  31/3 79/6

**2**

**2,204,000,000 [1]**  47/16
**2,289,000,000 [1]**  47/18
**20 [8]**  55/17 57/11 61/8
 61/23 67/24 68/3 77/10 77/25

**200 [3]**  8/23
**2004 [1]**  93/4
**2005 [23]**  19/4 19/5 22/23
 23/6 23/14 42/12 50/6 74/5
 74/18 75/15 81/12 89/3 89/22
 92/1 93/21 96/11 96/16 96/22
 98/6 98/8 98/14 98/19 98/22
**2008 [1]**  6/4
**2010 [1]**  47/16
**2011 [4]**  1/5 16/15 47/17
 100/4
**21 [1]**  58/18
**22 [2]**  61/6 61/11
**22nd [1]**  5/20
**255 [4]**  9/7 9/10 9/13 10/6
**26 [2]**  64/22 78/21
**27 [2]**  1/22 29/12
**2719 [1]**  1/4
**27th [6]**  19/4 42/12 55/18
 69/17 69/24 81/12
**28 [1]**  64/21
**28th [9]**  19/5 42/12 50/5
 67/14 67/17 67/23 68/20
 69/25 70/19
**2:00 o'clock [1]**  56/19
**2:50 [1]**  68/22
**2nd [1]**  58/4

**3**

**30 minutes [2]**  51/3 51/11
**31 [2]**  3/8 3/9
**31st [2]**  47/16 47/17
**32 [3]**  3/24 6/4 7/5
**36th [1]**  2/6
**38 [3]**  87/4 87/7 96/18
**3:37 [2]**  85/4 86/7

**5**

**5 percent [5]**  46/16 47/14
 47/23 48/2 48/3
**5,000 [1]**  41/13
**500 [1]**  2/11
**515 [1]**  2/14
**5:00 [1]**  86/6
**5:02 [1]**  86/7
**5:30 [1]**  86/6
**5:30 in [1]**  79/14
**5:30 p.m [1]**  69/2

**6**

**6:45 [1]**  67/20

**7**

**77002 [2]**  2/7 2/15
**77056 [3]**  1/17 1/20 2/11
**7:00 o'clock [2]**  51/2 51/15
**7:21 [1]**  67/21
**7:21 and [1]**  67/23
**7:21 that [1]**  67/22
**7th [1]**  16/15

**8**

**85 [1]**  41/22
**87 [1]**  79/13
**8:00 [1]**  86/5
**8:27 [1]**  1/5
**8:30 [1]**  86/6
**8:30 in [1]**  53/22
**8:35 [1]**  9/4

**9**

**977 [6]**  3/20 3/20 4/6 4/16

**98 [4]**  47/5 4/6 4/6 5/1
**9:16 [1]**  9/4
**9:18 [1]**  10/19
**9:20 the [1]**  59/3
**9:30 p.m [1]**  69/6
**9:37 [1]**  10/19
**9:50 on [1]**  67/23

**A**

**a.m [8]**  1/5 9/4 9/4 10/19
 10/19 65/3 65/3 68/4
**able [2]**  51/24 68/21
**about [109]**
**about/on [1]**  15/17
**above [1]**  100/2
**above-entitled [1]**  100/2
**absolutely [2]**  75/3 97/3
**abusive [1]**  20/23
**accept [4]**  14/18 14/21 60/25
 64/18
**acceptable [4]**  97/20 98/23
 98/24 98/25
**according [1]**  69/2
**accordingly [1]**  12/8
**accountable [1]**  80/11
**accounts [1]**  71/16
**accumulated [1]**  84/23
**accuracy [2]**  23/25
**accused [1]**  61/11
**accusing [1]**  60/22
**acknowledge [1]**  67/4
**acknowledged [1]**  67/7
**acquittal [1]**  16/2
**across [1]**  83/22
**act [3]**  26/25 28/12 47/9
**acted [1]**  25/15
**acting [1]**  38/12
**action [8]**  22/13 23/12 43/4
 43/6 78/6 78/10 96/1 96/2
**actions [2]**  22/15 22/17
**actively [1]**  53/11
**activity [2]**  9/21 64/1
**actor [1]**  19/11
**acts [1]**  38/12
**actual [6]**  27/5 28/17 46/10
 47/2 62/13 91/21
**actually [10]**  6/15 21/11 50/8
 60/8 76/18 89/17 91/6 91/17
 93/2 99/10
**Adams [7]**  3/3 3/11 4/21 60/13
 67/19 70/2 70/20
**add [4]**  89/12 89/21 93/24
 98/20
**additional [1]**  77/21
**address [5]**  16/8 22/10 49/21
 66/7 77/22
**addresses [2]**  66/12 77/14
**adhere [1]**  86/5
**Administrative [1]**  11/16
**admissible [1]**  63/2
**admission [1]**  10/6
**admits [1]**  36/6
**admitted [12]**  3/18 3/21 4/2
 5/6 5/20 6/3 6/23 10/7 12/23
 12/25 15/14 76/7
**advance [1]**  18/14
**advances [1]**  22/3
**adversities [1]**  75/22
**affirmative [2]**  77/13 81/4
**afraid [1]**  79/8
**after [29]**  8/5 14/2 16/11

**after... [26]** 17/3 36/3 43/14
50/10 51/3 51/11 52/15 54/23
58/4 58/19 59/10 59/11 60/13
63/23 67/8 68/3 70/18 71/19
72/13 72/24 79/25 80/1 83/16
86/9 89/3 89/6
**afternoon [2]** 68/22 69/1
**again [15]** 8/19 46/21 46/25
64/16 68/1 71/1 71/7 75/8
76/5 78/18 83/1 88/19 91/5
94/17 98/11
**against [12]** 17/19 20/18 25/8
27/14 28/25 33/15 78/1 91/24
94/10 95/23 98/4 98/13
**age [6]** 61/6 61/7 61/8 61/11
61/17 61/23
**ago [4]** 31/4 40/18 48/11
65/19
**agree [8]** 4/9 4/11 49/2 50/1
63/5 65/22 80/8 80/10
**agreed [2]** 76/20 99/16
**agreement [9]** 10/8 17/1 34/13
76/20 87/5 88/11 88/16 88/23
96/21
**ahead [4]** 46/10 47/3 47/7
47/8
**aided [1]** 1/24
**aids [1]** 15/4
**ain't [3]** 79/22 79/23 79/23
**airplanes [1]** 64/8
**alcohol [1]** 55/18
**aligned [1]** 91/21
**all [103]**
**allegation [4]** 26/22 28/10
68/10 86/19
**allegations [4]** 45/25 68/17
71/12 72/3
**alleged [2]** 21/17 88/24
**alley [1]** 73/5
**allow [1]** 3/6
**allowed [1]** 43/12
**allowing [1]** 72/10
**almost [6]** 31/4 38/5 48/4
62/16 65/19 94/14
**alone [1]** 60/15
**along [3]** 57/4 69/5 92/15
**already [5]** 7/15 26/10 52/10
52/12 96/1
**also [8]** 6/16 10/13 11/3
45/16 59/1 68/18 71/4 74/4
**alter [2]** 20/22 22/5
**alternative [1]** 91/3
**alters [1]** 21/1
**although [2]** 21/20 87/11
**always [5]** 8/11 16/8 41/5
85/17 94/4
**am [12]** 4/19 7/24 10/10
16/18 18/1 32/18 41/3 79/22
81/23 89/10 96/19 99/7
**ambiguous [1]** 92/18
**Amendment [1]** 63/11
**America [2]** 51/14 58/19
**American [3]** 65/16 80/17
80/19
**amnesia [1]** 60/9
**among [4]** 5/22 6/1 22/16
61/11
**amount [13]** 12/14 19/21 21/25
23/19 23/24 24/11 24/15 26/3
27/17 29/3 46/13 47/20 47/21

**amount... [1]** 24/24
**Amy [6]** 31/3 31/6 31/9 79/5
79/7 83/10
**anal [1]** 82/10
**anally [1]** 58/17
**and -- you [1]** 5/15
**and/or [2]** 19/5 24/18
**Andino [4]** 35/14 47/5 68/16
76/14
**Andrew [1]** 2/9
**angry [2]** 53/6 73/7
**anguish [9]** 20/2 20/4 24/5
25/5 41/1 41/7 43/24 44/23
45/3
**anonymous [1]** 54/24
**another [16]** 6/2 9/6 17/1
19/8 41/12 50/14 50/17 59/12
72/9 73/13 74/24 89/13 90/23
91/3 93/23 94/12
**another's [1]** 84/17
**answer [67]** 12/6 12/8 12/10
15/20 16/10 19/13 19/14
19/15 20/1 22/19 22/20 22/24
23/1 23/1 23/7 23/9 23/9
23/15 24/20 24/20 24/22 25/3
25/19 25/21 25/21 25/21 26/10
26/15 26/15 27/9 27/10 27/11
27/11 28/1 28/3 28/3 28/20
28/21 28/22 28/22 29/11 37/8
44/14 46/12 56/1 56/3 56/6
56/9 56/12 56/16 63/8 73/11
74/22 75/12 75/13 77/4 77/5
77/8 77/9 77/12 77/20 85/14
86/14 89/12 91/20 92/15
93/23 94/5
**answered [8]** 19/14 22/18
22/25 23/8 24/19 25/20 55/19
88/3
**answering [1]** 92/10
**answers [6]** 12/8 15/19 18/14
18/21 77/5 86/11
**Anthony [4]** 3/3 67/19 70/2
70/20
**anus [1]** 19/7
**any [77]** 9/18 9/18 9/24 11/23
11/25 12/16 13/25 14/19
14/22 14/23 15/3 15/10 15/23
16/4 17/12 17/23 19/8 19/18
19/18 19/20 19/21 19/24 20/1
22/17 23/19 24/11 24/16
24/25 25/12 25/25 25/25 26/3
26/3 26/7 26/14 27/13 27/15
27/20 28/1 28/2 28/24 29/1
30/9 37/3 37/4 37/5 39/25
40/1 40/9 49/12 49/14 50/24
51/12 52/7 52/7 52/15 52/24
55/9 60/21 63/8 63/9 63/23
65/14 66/5 67/2 71/15 72/3
74/1 74/2 76/5 78/3 78/9
86/1 86/16 87/22 89/24 94/11
**anybody [8]** 7/16 17/16 26/11
40/1 40/9 53/21 59/16 90/13
**anymore [1]** 37/16
**anyone [13]** 11/6 15/22 16/12
37/21 38/23 50/8 50/11 63/10
72/4 74/20 77/18 79/1 81/2
**anything [12]** 8/25 16/22 41/3
42/7 58/21 62/1 63/5 72/4
72/25 81/17 82/16 85/13
**anyway [5]** 7/20 46/10 47/8
58/12 84/16
**apart [1]** 81/15

**apparently [2]** 5/13 50/23
**appear [1]** 26/13
**appeared [1]** 70/1
**applied [2]** 75/5 76/16
**applies [1]** 46/6
**apply [1]** 11/21
**appreciate [2]** 30/8 90/8
**appreciated [1]** 64/18
**approach [3]** 32/9 32/11 32/11
**approached [1]** 84/2
**appropriate [2]** 60/4 97/18
**approximately [3]** 67/24 68/3
68/4
**arbitration [2]** 34/11 34/13
**are [78]** 5/24 8/4 9/3 11/2
11/22 12/2 12/3 12/3 13/19
13/20 14/4 14/18 15/4 15/6
15/10 15/21 16/11 16/17
16/17 16/18 17/4 17/6 17/9
17/14 17/16 17/17 17/25 18/2
24/15 27/20 29/6 29/17 29/18
30/13 30/21 31/17 31/22
33/10 33/15 35/19 37/3 37/16
38/21 39/9 41/4 41/24 44/16
44/17 46/19 47/14 48/7 50/20
52/13 61/3 63/16 64/5 64/5
65/24 66/4 66/13 66/24 68/14
71/21 74/1 75/12 75/12 75/21
77/23 81/21 81/25 84/3 84/22
84/24 90/16 91/2 93/2 95/10
95/12
**aren't [4]** 5/17 37/11 65/23
79/6
**argue [2]** 91/7 97/18
**arguing [1]** 97/21
**argument [2]** 10/2 32/8
**arguments [3]** 12/1 12/2 29/17
**Armstrong [7]** 57/4 57/7 57/17
68/24 72/6 72/8 79/16
**army [6]** 54/17 60/5 68/13
68/15 68/23 71/10
**around [6]** 19/4 36/11 51/2
64/9 85/22 92/16
**arrive [1]** 68/13
**arrived [4]** 67/20 70/2 70/19
74/6
**Arroyo [17]** 51/1 51/5 51/15
52/7 55/7 55/8 59/13 67/20
67/24 68/4 68/5 68/12 70/1
70/3 70/4 70/14 80/2
**Arroyo's [3]** 54/2 57/8 70/25
**as [109]**
**aside [1]** 83/14
**ask [15]** 11/5 13/2 18/6 41/3
41/6 48/8 63/19 72/12 74/19
74/24 78/2 78/2 88/12 93/13
94/14
**asked [13]** 18/14 30/6 30/6
31/6 31/7 49/9 68/4 74/8
74/15 78/12 80/14 80/15
92/10
**asking [9]** 70/23 78/16 90/13
91/20 92/9 92/24 92/25 93/10
94/17
**asks [1]** 73/16
**assailant [1]** 51/9
**assailants [3]** 51/4 57/14
71/13
**assault [3]** 31/8 40/17 42/10
**assaulted [1]** 42/12
**assertion [1]** 25/13

**A**

assessed [2]  27/14 28/25
assist [1]  12/4
assistant [2]  54/17 68/12
Associate's [1]  42/1
assumes [1]  69/3
assuming [1]  10/12
at [100]  1/18 5/6 5/14 5/18
 5/23 10/3 13/5 16/4 18/9
 18/11 21/12 22/16 22/22 23/5
 23/13 27/2 28/14 31/20 34/23
 38/3 39/5 41/22 41/24 45/1
 46/6 46/25 47/6 48/10 49/7
 50/22 51/2 51/15 53/22 53/22
 54/2 54/10 54/18 54/20 56/18
 57/12 59/2 59/9 61/6 61/7
 61/8 61/11 62/13 62/16 63/1
 63/13 63/18 63/20 66/19 67/6
 67/18 67/19 67/21 67/22 68/1
 68/4 68/9 68/13 68/16 68/22
 69/2 69/6 69/17 70/2 70/6
 70/19 71/8 71/9 72/4 73/9
 73/18 73/18 74/6 74/7 75/14
 75/20 75/23 76/4 76/8 76/13
 79/14 82/17 83/19 84/3 84/19
 85/9 86/13 87/8 87/9 88/6
 88/21 90/22 91/7 91/9 93/3
 94/14
at-will [1]  93/3
attack [1]  34/2
attempt [1]  66/9
attempted [1]  73/2
attended [3]  56/10 56/14
 69/14
attention [2]  64/16 78/19
attorney [2]  1/18 72/11
attorneys [7]  8/15 8/17 12/2
 12/2 16/9 18/18 55/5
August [2]  58/4 93/4
AUSA [1]  6/4
authority [2]  22/10 63/9
available [1]  66/25
avenues [1]  66/25
award [6]  19/17 23/22 25/25
 27/18 29/4 47/20
awarded [5]  19/19 26/1 27/14
 27/19 28/25
awarding [3]  27/20 27/20 29/5
awareness [4]  27/6 28/17
 46/10 47/2
away [10]  5/11 36/3 37/20
 50/3 50/4 63/11 63/12 63/14
 72/19 82/16
awful [1]  11/5
awoke [2]  67/18 70/11

**B**

Bachelor's [1]  42/1
back [46]  8/23 8/25 20/16
 23/16 24/7 24/17 24/18 25/4
 30/9 31/3 33/18 34/9 36/18
 39/14 39/18 40/4 40/6 40/17
 40/20 40/23 41/23 42/14 43/2
 43/20 43/21 44/6 45/12 46/14
 46/14 53/21 53/25 58/5 58/19
 59/20 65/18 67/10 70/6 79/6
 81/10 83/25 85/15 85/24
 89/14 91/10 94/7 99/4
background [1]  37/14
backpay [1]  24/4
bad [3]  38/8 46/16 46/20

bad/Job [1]  46/16
 72/14
Bagwell [1]  9/2
Baileys [1]  69/13
bailiff [1]  16/5
Barbara [1]  72/18
barely [2]  51/24 52/14
barracks [3]  55/24 74/7 76/9
Barron [4]  2/13 99/13 100/6
 100/7
baseball [1]  73/6
based [5]  20/20 21/20 23/22
 77/17 78/7
basic [1]  50/2
basically [1]  87/13
bat [1]  73/6
Bates [1]  3/20
bathroom [2]  36/15 51/25
be [91]  3/19 3/24 4/12 6/23
 7/16 7/25 8/18 8/23 10/11
 10/22 11/2 12/9 13/1 13/25
 14/14 14/24 15/9 17/14 18/15
 18/16 18/24 20/12 20/15
 20/20 20/21 21/7 21/17 21/20
 21/21 22/4 23/22 25/15 26/22
 27/14 27/19 28/10 28/25 32/4
 35/6 35/7 37/18 38/3 38/25
 41/17 45/1 45/25 46/20 47/24
 49/13 49/19 49/20 53/7 53/20
 54/9 57/18 65/5 65/21 70/6
 70/15 73/7 75/10 75/18 75/18
 77/20 79/2 79/2 79/24 81/7
 83/19 84/17 84/18 84/18
 84/20 85/16 86/14 86/17
 86/19 87/7 87/9 88/8 89/5
 90/17 91/18 91/21 91/22
 91/23 92/25 93/10 94/1 94/2
 94/3
beach [1]  84/4
beaten [2]  36/9 36/14
beauty [1]  59/18
became [3]  57/17 57/25 73/7
because [71]  8/14 9/15 9/25
 10/11 13/11 15/25 17/7 20/18
 21/22 30/18 32/15 34/13
 34/17 35/6 35/21 35/24 36/1
 37/17 38/11 39/16 39/24 40/9
 40/22 41/5 41/18 42/18 42/24
 44/21 45/6 45/13 46/19 47/6
 47/9 48/7 48/11 51/25 53/1
 57/9 58/1 61/13 61/13 62/22
 70/5 70/21 71/12 73/7 73/9
 73/24 75/11 79/5 79/9 79/24
 80/8 80/18 80/21 81/23 82/19
 83/4 84/25 86/14 86/17 86/19
 87/25 90/2 90/11 90/23 91/16
 92/17 94/19 95/4 98/15
become [2]  17/6 30/10
becomes [1]  54/15
bed [6]  36/9 36/14 36/19
 50/7 58/13 69/23
bedroom [1]  36/18
beds [1]  69/21
been [42]  3/18 5/5 12/16
 12/23 14/24 16/14 16/20
 18/12 19/1 34/21 34/22 38/4
 40/18 42/7 44/20 49/10 50/15
 50/16 51/4 51/11 52/21 55/22
 63/19 65/15 67/15 68/1 68/10
 68/18 68/21 76/21 80/14
 83/17 89/20 92/3 92/10 94/13

before [40]  1/10 7/12 12/12
 13/7 16/10 17/14 18/18 30/9
 35/16 35/17 36/11 39/25
 39/25 40/9 42/21 44/12 45/18
 51/23 53/5 54/4 57/6 57/21
 58/17 59/3 59/13 59/13 59/14
 61/9 61/23 67/21 68/19 70/23
 71/19 73/1 74/5 78/13 79/9
 80/5 80/8 82/8
began [1]  70/8
begin [3]  11/7 50/15 52/10
beginning [2]  3/11 68/5
begins [3]  54/8 54/8 54/11
behalf [2]  30/3 38/10
behavior [2]  21/17 59/25
being [3]  23/5 34/24 38/6
belief [3]  26/21 28/9 45/24
beliefs [2]  17/7 73/14
believe [22]  14/2 17/24 31/21
 32/8 40/4 41/11 46/4 49/19
 49/19 50/8 50/11 52/20 59/6
 71/21 73/23 74/21 76/17 77/9
 80/12 82/17 92/2 98/24
believes [3]  50/13 50/13
 71/18
below [1]  19/16 25/23 29/15
bench [2]  5/18 32/12
bend [1]  83/25
benefit [1]  63/7
benefits [7]  24/4 24/7 24/9
 24/11 24/18 25/4 43/20
Beneta [3]  53/7 53/9 70/21
best [3]  40/13 74/10 97/23
better [7]  30/19 38/25 50/18
 76/19 78/14 84/16 85/5
between [6]  14/10 59/2 67/23
 71/2 74/25 93/12
bias [3]  14/22 14/23 17/12
big [7]  30/13 39/9 47/15
 47/23 47/24 53/2 55/6
bigger [6]  34/17 34/24 39/6
 80/23 81/2 84/10
binders [1]  40/7
bit [5]  9/3 45/18 49/7 49/9
 81/1
bitch [1]  82/22
black [1]  52/13
Blake [1]  2/4
blame [1]  71/22
blamed [4]  72/16 72/18 72/22
 73/4
blames [6]  61/21 72/1 72/4
 72/6 72/10 72/11
blaming [1]  71/24
blank [1]  99/12
bleed [1]  63/25
bleeding [1]  63/24
blood [2]  36/16 63/23
board [1]  66/18
boardroom [7]  30/12 30/13
 38/18 44/6 44/7 48/10 48/12
boards [1]  40/6
body [2]  37/19 52/3
book [1]  78/14
born [1]  30/10
BORTZ [81]  2/8 3/18 4/4 4/24
 5/17 9/9 9/10 9/12 10/6 11/8
 11/8 19/4 26/19 26/24 26/25
 27/2 27/5 27/14 27/22 27/25
 36/7 36/19 40/17 42/15 43/8
 43/9 43/12 44/18 44/18 44/21

**B**

**BORTZ... [51]**   46/3 46/7 46/9
46/18 46/20 46/22 49/23 50/4
50/10 51/6 53/12 57/21 58/14
58/15 59/4 59/4 59/9 59/12
60/12 60/22 60/24 63/4 63/8
63/15 63/16 67/19 67/21
69/15 69/16 69/16 69/19
69/19 70/4 70/9 70/12 70/18
71/2 72/11 74/3 74/16 75/13
76/4 77/7 79/21 80/4 80/6
80/10 82/8 82/16 82/19 83/7
**Bortz' [3]**   46/1 48/24 70/5
**both [20]**   14/12 16/19 21/9
63/14 65/15 65/25 69/21
69/24 71/18 73/3 75/5 75/6
76/1 76/3 76/14 86/19 88/9
88/24 93/12 93/16
**bottom [2]**   80/18 80/20
**bottoming [1]**   82/3
**bound [1]**   67/3
**bowling [2]**   73/5 73/9
**Boxer [1]**   72/18
**boy [5]**   83/21 83/24 83/25
84/2 84/5
**boyfriend [3]**   53/7 53/8 73/3
**break [8]**   7/12 35/23 35/24
51/7 53/8 55/10 64/22 64/23
**breaking [1]**   51/6
**breaks [2]**   49/5 70/16
**breast [1]**   81/21
**breasts [1]**   90/4
**brief [1]**   64/17
**bring [5]**   16/6 17/18 38/24
73/21 81/18
**bringing [2]**   37/12 38/21
**broke [1]**   60/13
**broken [1]**   39/7
**brought [5]**   16/7 37/25 38/2
40/20 74/20
**BROWN [8]**   1/6 1/7 11/12 11/13
11/13 11/14 11/14 11/15
**bruises [4]**   36/15 64/5 64/6
64/9
**bruising [1]**   37/5
**Brumatti [2]**   53/8 70/21
**buddies [1]**   82/20
**Bull [1]**   82/11
**bullies [1]**   38/13
**bumps [1]**   64/9
**bunch [2]**   30/14 34/19
**bunk [2]**   69/21 69/21
**buried [2]**   50/17 72/9
**burned [1]**   38/3
**bus [2]**   79/25 80/2
**business [7]**   11/12 35/2 43/13
66/3 66/14 66/17 79/1
**busy [2]**   35/4 36/25
**but [96]**   4/3 5/6 5/13 6/17
7/1 7/6 8/7 8/9 8/18 8/22
10/10 11/4 14/11 17/2 23/25
27/6 28/17 31/24 32/3 32/8
32/21 33/12 36/17 36/24 37/6
37/16 37/23 38/7 39/18 40/6
40/22 40/24 41/5 43/7 43/25
44/8 44/19 45/1 46/5 46/10
48/3 48/14 48/20 49/15 52/25
53/21 54/10 55/3 56/24 57/17
58/3 58/15 58/18 59/16 60/7
60/21 62/14 63/18 64/14 66/6
67/17 71/22 75/7 75/11 76/9

84/14 84/16 84/24 85/25 86/4
86/18 86/22 87/10 88/4 88/10
88/13 88/16 88/22 88/23
89/11 90/10 91/4 91/7 91/14
92/1 92/4 93/2 94/21 95/5
95/14 96/18
**buy [1]**   33/10

**C**

**C's [1]**   44/25
**calculated [1]**   22/14
**call [12]**   56/18 56/18 56/21
57/5 57/7 59/12 72/21 75/9
81/17 83/15 83/15 85/25
**called [10]**   12/19 14/16 16/17
45/22 67/20 67/21 69/16
69/24 70/18 83/7
**calls [4]**   59/3 59/5 59/6
68/20
**calm [1]**   51/10
**came [16]**   43/22 44/10 49/6
54/13 54/21 55/20 55/24
55/24 56/4 57/4 57/6 57/17
60/5 60/13 83/14 83/23
**camel [2]**   31/25 35/5
**camp [16]**   22/22 23/6 23/13
35/6 52/11 53/3 67/7 68/9
70/6 71/2 71/9 74/6 74/7
74/8 75/14 76/13
**Camp Victory [1]**   67/7
**camps [3]**   31/18 73/23 74/9
**can [43]**   6/10 6/19 8/11 9/3
9/3 16/8 17/2 21/15 30/12
30/19 33/22 35/20 36/10
38/18 39/12 40/6 40/21 41/4
41/22 43/11 48/25 52/1 55/14
66/9 74/21 81/17 81/18 81/18
82/5 84/9 84/18 85/17 85/24
85/25 86/9 88/13 88/14 88/22
90/13 91/5 97/23 99/13 99/14
**can't [19]**   4/2 32/23 33/19
34/11 34/12 40/24 41/6 43/2
48/7 60/25 64/14 64/14 64/15
76/10 80/8 84/4 90/12 90/12
91/3
**cannot [2]**   18/15 21/14
**capacity [2]**   20/14 42/5
**caprice [1]**   65/15
**capsules [1]**   82/1
**captured [1]**   60/3
**care [5]**   20/6 20/7 23/4 45/5
84/21
**careful [1]**   70/15
**caring [1]**   78/5
**case [53]**   1/10 11/20 11/25
12/17 13/19 13/24 14/6 14/25
16/12 16/19 16/21 16/24 17/1
17/2 17/4 17/8 17/11 17/24
18/19 20/25 30/6 30/8 33/25
34/17 34/18 34/20 39/6 49/3
49/4 49/12 49/13 49/15 49/16
50/2 60/12 60/15 60/20 61/3
62/15 63/2 63/13 63/14 63/18
65/12 73/15 75/11 78/17
80/23 81/2 82/3 84/12 84/14
91/10
**cases [2]**   8/7 8/8
**cash [5]**   19/23 24/24 26/5
27/13 28/25
**cast [2]**   31/2 54/20
**Cates [1]**   2/3

**cause [6]**   26/24 28/12 46/4
78/10 82/10 100/2
**caused [7]**   23/18 24/25 26/18
28/6 44/1 82/4 82/5
**causes [1]**   19/7
**caustic [1]**   64/1
**CD [1]**   9/13
**cell [1]**   85/24
**central [1]**   66/3
**cents [4]**   20/1 25/3 28/1
29/11
**certain [5]**   5/6 12/22 12/22
14/9 18/12
**certainly [3]**   77/20 88/22
95/12
**certification [2]**   29/13 100/1
**certify [1]**   100/2
**cetera [1]**   24/11
**chain [2]**   14/8 66/10
**chairs [2]**   17/17 30/13
**chance [3]**   44/19 64/13 76/21
**change [2]**   17/5 45/13
**changed [2]**   40/12 40/15
**changes [4]**   7/22 7/25 9/1
22/1
**character [2]**   27/21 29/6
**charge [16]**   7/19 7/21 11/8
15/13 32/9 32/20 39/16 39/17
39/19 44/25 48/19 73/12
76/23 76/24 77/11 88/1
**CHARLES [64]**   2/8 4/24 11/8
19/3 26/18 26/23 26/25 27/2
27/5 27/14 27/22 27/25 36/19
40/17 42/15 43/8 43/9 43/12
46/1 46/3 46/7 46/9 49/23
50/4 51/6 53/12 57/21 58/14
59/4 59/4 60/12 60/22 63/4
63/8 63/14 67/19 67/21 69/15
69/16 69/16 69/18 69/19 70/4
70/5 70/9 70/15 70/18 70/20
70/21 71/2 72/11 74/3 74/16
75/13 76/4 77/7 79/21 80/4
80/6 80/10 82/8 82/15 82/19
83/7
**chart [6]**   41/22 41/22 41/24
42/3 42/3 46/20
**cheaper [1]**   39/13
**check [1]**   54/24
**Cheryll [3]**   2/13 100/6 100/7
**Chester [1]**   1/22
**choosing [1]**   93/11
**chose [1]**   63/7
**chosen [2]**   54/21 66/7
**circling [1]**   48/13
**circumstance [1]**   60/21
**circumstances [9]**   14/8 18/15
21/3 21/14 21/18 24/1 49/4
50/24 60/23
**circumstantial [3]**   14/7 14/11
14/13
**claim [8]**   12/14 17/19 39/12
67/8 70/9 72/4 73/17 80/7
**claimed [5]**   69/22 71/4 72/16
73/5 81/7
**claims [7]**   59/23 65/21 71/8
72/7 73/1 74/12 76/10
**clear [9]**   26/17 26/20 28/5
28/8 45/22 58/13 68/20 69/9
89/5
**Clearly [1]**   93/1
**client [7]**   50/3 60/22 60/23

**c**

**client... [4]** 61/24 83/17 83/18 97/23
**client's [1]** 52/25
**clinic [1]** 68/6
**clips [2]** 9/13 9/14
**close [2]** 91/8 94/5
**closed [2]** 53/3 53/14
**closing [3]** 12/1 29/16 32/8
**CM [1]** 2/13
**CMR [1]** 100/7
**Code [5]** 35/2 66/3 66/14 66/17 79/1
**Coin [1]** 75/25
**colleagues [1]** 65/11
**collect [1]** 33/21
**collectively [2]** 11/10 11/11
**come [22]** 9/19 25/7 30/6 30/18 31/8 34/20 40/1 41/5 44/12 53/15 61/15 63/14 68/4 69/12 76/21 79/3 79/9 82/5 84/19 87/11 91/4 94/5
**comes [9]** 31/10 31/11 34/9 35/18 42/25 49/17 52/22 80/17 80/19
**comfortable [2]** 35/3 90/15
**coming [6]** 3/16 7/6 39/8 57/23 58/19 89/10
**command [1]** 66/10
**commenced [1]** 68/14
**comment [3]** 36/7 87/8 92/2
**comments [1]** 21/23
**commit [6]** 25/7 91/24 95/23 97/4 98/4 98/12
**commits [1]** 19/6
**common [4]** 13/21 13/22 49/15 90/14
**communicate [1]** 16/4
**communicated [1]** 22/9
**community [2]** 53/3 53/14
**company [9]** 1/6 11/12 30/10 30/12 30/14 30/19 31/21 43/13 66/5
**compensate [6]** 19/20 19/23 24/16 24/24 26/2 26/6
**compensatory [3]** 24/4 24/15 24/17
**complained [1]** 3/12
**complaint [1]** 22/10
**complaints [1]** 66/10
**completely [4]** 59/24 60/15 62/8 82/8
**compliance [1]** 10/4
**complicated [1]** 86/14
**complicating [1]** 93/18
**computer [2]** 1/24 52/14
**computer-aided [1]** 1/24
**conceive [1]** 70/9
**concepts [1]** 90/15
**concern [2]** 7/13 52/10
**concerned [4]** 27/23 29/8 48/12 62/10
**concerning [2]** 13/4 16/24
**concluding [1]** 63/14
**conclusion [1]** 74/22
**conclusions [1]** 13/22
**concocting [1]** 40/9
**conditions [4]** 20/22 21/1 22/1 22/5
**conduct [28]** 15/15 15/17 19/24 20/20 20/21 20/25 21/3

22/13 25/1 26/7 27/15 27/21 27/24 29/1 29/7 29/9 35/2 46/16 47/21 66/3 66/14 66/17 79/1
**conference [1]** 32/12
**confidential [2]** 83/5 83/8
**confirms [1]** 68/17
**conflicting [1]** 71/16
**confuse [2]** 8/12 92/20
**confused [2]** 88/10 94/12
**confusing [2]** 5/9 92/11
**connotation [1]** 97/1
**conscience [3]** 48/8 48/12 48/16
**conscious [4]** 27/7 28/18 46/11 62/8
**consent [7]** 19/9 19/10 36/22 36/22 36/24 36/24 36/25
**consented [1]** 19/11
**consider [26]** 11/23 12/18 12/24 13/14 13/18 14/5 14/22 16/22 19/16 19/17 21/2 21/9 24/2 25/23 25/24 27/19 29/5 43/20 74/4 78/2 86/23 86/25 88/24 91/23 98/3 98/12
**consideration [2]** 17/3 18/23
**considered [1]** 18/25
**considering [4]** 14/2 27/3 28/15 46/8
**consistent [1]** 3/4
**consistently [1]** 54/18
**construed [1]** 5/6
**consultants [1]** 8/5
**consumed [1]** 55/18
**contact [4]** 66/18 68/21 72/12 79/15
**contacts [1]** 69/1
**contained [3]** 57/16 66/14 67/15
**container [2]** 71/5 78/16
**containerized [3]** 68/23 69/7 76/9
**contentions [1]** 12/5
**Continued [1]** 2/1
**continues [2]** 86/20 90/3
**contract [43]** 25/9 34/10 44/4 44/16 53/13 86/17 87/1 87/3 87/16 87/16 88/3 89/6 90/19 90/22 91/11 91/17 91/19 91/25 92/24 93/1 93/3 93/8 93/14 93/15 93/20 93/21 94/7 94/18 94/19 94/21 95/3 95/9 95/21 95/24 96/10 96/15 97/6 97/10 98/5 98/8 98/14 98/18 98/21
**contracting [2]** 80/17 80/19
**contracts [4]** 93/3 93/9 93/12 93/16
**contradict [1]** 8/13
**contrary [3]** 14/1 65/24 69/13
**contributions [1]** 24/10
**control [5]** 35/8 35/9 35/9 83/1 84/13
**convenience [1]** 11/5
**convenient [1]** 72/19
**conversation [6]** 3/5 50/14 50/16 52/6 52/9 59/9
**conviction [4]** 16/1 26/21 28/9 45/24
**convinced [1]** 17/6
**convincing [5]** 26/17 26/20

**Cooper [1]** 2/10
**cooperatively [1]** 86/12
**cop [1]** 47/7
**copies [1]** 7/15
**copy [3]** 3/7 11/1 11/5
**core [3]** 58/2 66/4 80/12
**corner [1]** 3/25
**corporation [1]** 17/13
**corporations [2]** 39/4 39/9
**correct [11]** 9/11 9/12 9/17 10/15 10/16 56/1 56/2 56/9 73/24 97/21 100/2
**costs [1]** 85/23
**could [19]** 31/23 32/14 34/16 40/13 40/23 40/25 51/8 52/5 52/15 53/21 67/12 72/12 75/18 84/7 86/19 88/8 91/4 93/24 96/5
**couldn't [3]** 36/22 36/22 83/19
**counsel [6]** 5/22 6/1 48/24 65/9 66/15 78/24
**counseled [1]** 43/14
**counsels [1]** 35/14
**count [3]** 48/14 48/15 81/1
**country [2]** 49/17 52/18
**couple [7]** 6/16 8/7 15/25 49/18 55/20 55/23 77/21
**courage [1]** 83/15
**course [7]** 11/23 12/21 13/9 42/18 57/19 73/11 87/24
**court [29]** 1/1 2/12 2/14 5/18 9/19 15/14 15/16 16/12 17/15 18/20 19/2 29/21 33/4 34/13 35/18 51/13 65/8 77/15 78/23 87/11 87/21 89/17 90/8 91/9 92/2 97/16 97/20 100/1 100/7
**Court's [5]** 10/4 76/23 76/24 89/20 91/19
**courthouse [2]** 49/14 49/17
**courtroom [10]** 16/8 35/22 39/2 39/7 49/13 49/16 62/4 64/10 67/16 91/4
**covered [1]** 77/6
**coworker [1]** 53/7
**coworkers [5]** 22/22 23/5 23/13 69/14 74/18
**crack [2]** 35/23 35/23
**cracking [1]** 35/20
**cracks [1]** 63/24
**Craig [1]** 35/12
**crazy [1]** 83/15
**Cream [1]** 69/13
**creams [1]** 64/1
**create [1]** 31/16
**created [2]** 43/2 44/22
**creates [1]** 31/16
**credibility [1]** 18/24
**credible [2]** 12/12 50/19
**credit [1]** 87/22
**critical [1]** 73/11
**cross [3]** 5/15 38/6 58/24
**cross-examination [2]** 5/15 58/24
**cross-examined [1]** 38/6
**crowded [1]** 64/8
**CSR [2]** 2/13 100/7
**Cullen [1]** 2/9
**culpability [2]** 27/22 29/7
**cup [2]** 58/21 69/13
**current [2]** 48/4 66/2

**C**

custom [1]   29/16
CV [1]   1/4

**D**

D/B/A [1]   1/6
dad [1]   57/13
dam [3]   35/20 35/24 35/24
damaged [1]   63/20
damages [36]   7/13 17/21 17/23
18/1 19/16 19/21 19/24 23/18
23/20 23/21 24/3 24/4 24/15
24/17 24/25 25/23 26/3 26/6
26/14 27/15 27/17 27/20 28/2
29/1 29/3 29/5 32/20 40/16
40/19 40/20 44/15 44/21
45/15 45/16 46/24 63/16
damn [1]   79/17
danger [2]   79/4 79/9
dangerous [2]   47/5 72/14
Daniel [1]   2/5
dare [1]   38/19
Darington [1]   1/22
date [3]   62/9 98/20 100/4
dating [2]   51/8 53/9
daughter [1]   57/6
Dawn [1]   58/10
dawning [1]   36/16
day [15]   3/12 16/15 33/19
34/12 42/25 48/15 52/12
52/24 58/4 59/25 60/2 82/25
83/6 84/22 86/20
days [10]   38/5 42/20 58/9
58/18 61/23 71/9 77/19 80/4
82/8 82/20
de [1]   11/15
deal [3]   39/13 53/18 55/5
dealt [1]   79/2
debriefing [1]   8/15
deceive [1]   34/1
December [1]   47/16
December 31st [1]   47/16
decide [11]   12/7 14/19 16/21
17/2 17/25 18/2 37/19 48/6
55/10 63/21 78/6
deciders [1]   60/17
deciding [1]   14/21
decision [3]   30/25 31/1 84/25
decisions [1]   77/3
deck [1]   33/15
declare [1]   15/25
decline [1]   94/8
deductions [1]   13/22
defend [2]   39/12 60/23
defendant [5]   2/2 2/8 11/8
17/24 91/13
defendant's [2]   91/15 91/16
defendants [10]   1/8 11/9 11/9
11/11 17/20 17/25 18/2 18/4
24/25 62/16
defense [2]   60/24 87/19
definitely [1]   88/14
definition [1]   45/22
definitions [1]   11/7
definitiveness [1]   23/25
degree [11]   12/12 26/21 27/3
27/22 28/9 28/15 29/7 42/1
45/23 46/8 47/1
deleted [1]   9/17
deliberate [4]   15/12 71/7
73/10 85/3

deliberating [1]   15/16
deliberations [7]   11/2 15/15
15/16 16/19 85/19 92/15
94/13
deliver [1]   48/20
demonstrated [2]   65/23 75/2
denied [1]   63/24
denies [1]   58/14
Department [11]   4/14 5/1 59/1
59/5 63/10 69/2 69/2 69/5
69/8 79/13 79/14
departure [1]   54/9
depend [1]   13/16
depending [2]   75/13 77/5
depends [2]   22/16 43/5
deposition [6]   4/23 18/13
18/17 18/22 50/25 55/11
depositions [1]   18/13
deprived [1]   71/5
depriving [1]   72/7
described [3]   51/1 71/11
75/21
description [1]   95/2
deserves [2]   37/18 46/20
designed [2]   31/21 38/7
desire [1]   21/21
despite [1]   69/10
detail [6]   13/17 52/1 66/24
68/2 71/7 87/21
determine [6]   17/21 20/25
23/18 23/19 24/15 74/15
determining [7]   12/16 13/1
18/5 21/8 22/7 24/14 74/2
detractors [2]   67/2 67/3
diagrammed [1]   37/4
Diametrically [1]   62/13
did [59]   9/25 13/6 18/9 19/3
22/11 23/3 23/11 25/7 33/14
33/24 37/21 38/9 42/15 42/16
43/4 43/7 43/8 43/9 43/15
44/4 44/5 44/5 44/5 44/19
44/20 46/3 46/5 46/5 46/7
46/12 46/25 47/2 49/25 51/5
52/9 53/24 55/17 56/4 56/10
56/13 58/12 59/19 59/19
60/18 60/18 63/12 63/12
63/25 79/21 80/2 83/5 83/7
83/15 91/24 95/23 97/4 98/4
98/11 98/12
didn't [29]   6/17 33/3 35/11
36/21 38/9 43/2 43/10 46/18
48/11 48/14 48/15 53/18
56/12 56/14 59/4 59/16 60/25
61/21 62/5 62/6 63/17 63/23
69/12 69/20 75/7 82/10 82/12
83/2 95/5
die [3]   31/2 33/21 54/20
Diego [1]   61/6 61/11 73/5
differ [2]   15/4 87/11
differed [1]   87/13
difference [5]   84/4 84/8 84/9
84/10 84/24
differences [2]   66/5 66/7
different [15]   13/5 13/7
18/10 35/13 40/19 44/17
44/18 45/16 49/12 53/11
58/17 61/18 76/19 85/18
87/17
differently [2]   17/8 86/22
difficult [2]   49/4 53/20
diligent [1]   65/12
dire [3]   33/9 40/17 49/10

directed [1] 14/12
directed [1]   15/21
direction [1]   94/11
directly [2]   57/10 71/7
director [2]   68/9 71/7
directors [1]   66/18
disagree [2]   59/24 86/21
disagreement [2]   9/24 94/6
discharged [1]   15/21
disclose [2]   15/22 16/9
disclosure [2]   32/14 32/15
discomfort [1]   51/17
discretion [2]   27/18 29/4
discriminate [1]   20/17
discriminatory [2]   22/1 22/2
discuss [1]   16/25
discussed [1]   67/11
discussing [1]   17/4
discussion [2]   5/18 57/5
discussions [2]   5/22 6/1
diseases [2]   53/11 72/2
disfigurement [7]   20/9 20/11
41/14 41/17 41/19 45/8 45/10
disorders [1]   71/21
dispute [7]   66/21 66/23 67/4
67/8 71/15 74/13 74/14
disputes [2]   67/1 67/5
distinction [1]   14/10
distract [1]   34/1
DISTRICT [5]   1/1 1/1 1/11
2/14 16/16
divert [1]   34/1
division [2]   1/2 15/23
DNA [2]   6/6 82/18
do [112]
doctor [5]   61/8 61/19 61/24
62/25 63/6
doctor's [1]   72/20
doctors [3]   38/11 41/11 61/21
document [1]   59/10
documentary [2]   51/23 55/4
documented [1]   59/6
documents [1]   59/2
does [21]   3/4 13/10 26/11
33/20 38/20 50/7 50/11 50/24
51/11 52/7 52/8 52/16 52/16
61/15 61/20 62/6 63/4 72/25
80/11 89/12 93/22
doesn't [17]   35/15 36/18
42/21 42/23 49/20 58/21
59/25 60/16 62/1 62/1 74/19
79/24 80/22 83/1 91/15 91/22
92/5
dog [1]   90/10
doing [7]   11/12 32/18 33/8
33/13 35/7 35/20 39/1
dollars [4]   20/1 25/3 28/1
29/11
don't [58]   3/7 5/7 8/7 8/13
8/18 8/19 9/23 16/2 30/23
31/12 31/14 32/3 33/22 35/10
35/23 36/4 37/18 38/14 39/11
40/6 42/22 42/22 43/10 45/13
46/5 48/5 48/19 53/21 54/5
54/22 59/18 63/12 63/25
64/24 75/4 79/22 80/21 80/22
86/21 87/7 87/22 88/13 88/21
89/1 89/7 89/14 89/15 90/6
90/10 91/7 92/1 92/9 93/9
94/2 94/18 95/22 95/25 96/17
done [8]   48/8 49/10 60/20
60/21 61/2 85/6 94/5 99/15

**door [5]**  39/7 55/20 55/24
  55/24 83/3
**dorm [2]**  55/20 64/8
**dose [1]**  60/9
**doubt [3]**  37/3 37/4 37/5
**down [25]**  30/11 33/1 34/4
  34/4 34/10 34/13 34/15 36/14
  36/15 38/15 38/16 38/17
  38/17 41/19 49/17 55/17 69/6
  78/13 79/15 80/21 80/21
  83/25 84/5 85/19 99/1
**downtown [1]**  30/11
**Dr [1]**  41/21
**Dr. [33]**  37/4 41/24 42/6
  43/21 43/21 45/14 55/2 55/9
  57/2 57/9 58/5 58/6 58/7
  59/14 60/6 62/2 62/5 62/7
  62/7 62/7 63/23 63/25 64/3
  68/14 69/11 70/13 71/14
  71/17 71/20 72/5 72/21 72/22
  82/7
**Dr. Jodi [3]**  68/14 69/11 72/5
**Dr. Jones [1]**  63/25
**Dr. Scarano [5]**  70/13 71/14
  71/17 71/20 72/21
**Dr. Schulz [6]**  37/4 55/2 55/9
  57/2 59/14 63/23
**Dr. Schulz' [2]**  57/9 64/3
**Dr. Scott [8]**  58/5 58/6 58/7
  62/2 62/5 62/7 72/22 82/7
**Dr. Scott's [2]**  62/7 62/7
**Dr. Steward [4]**  42/6 43/21
  43/21 45/14
**Dr. Steward's [1]**  41/24
**Dr. Tackett [1]**  60/6
**drank [2]**  69/18 69/19
**draw [2]**  13/19 13/23
**draws [1]**  92/16
**dressed [1]**  51/16
**drink [9]**  36/3 54/13 54/22
  55/21 56/2 56/7 57/23 69/12
  69/18
**drinks [3]**  61/25 62/10 72/25
**drop [1]**  55/17
**drug [4]**  36/23 51/24 60/8
  80/5
**drug-induced [1]**  51/24
**drugged [3]**  58/8 59/23 60/11
**Dubai [1]**  36/5
**due [1]**  70/5
**dune [1]**  83/23
**duplication [1]**  10/10
**duration [1]**  84/21
**during [11]**  5/14 12/21 13/7
  15/3 15/15 15/17 18/22 32/7
  39/8 63/18 68/2
**duty [2]**  11/21 16/25

## E

**E-G-G-E-R-S [1]**  6/5
**e-mail [8]**  52/6 52/9 52/14
  66/12 66/19 70/22 82/25 83/1
**e-mails [7]**  53/25 67/24 67/25
  68/3 71/1 82/21 83/2
**each [11]**  12/6 15/11 17/2
  19/17 25/24 30/4 39/17 47/22
  48/22 67/24 97/16
**earlier [3]**  26/13 46/24 87/13
**early [8]**  4/8 9/3 30/6 31/2
  34/20 41/2 49/6 84/19

**earning [2]**  20/14 42/5
**earnings [8]**  20/13 24/11
  41/20 41/25 42/4 42/4 42/8
  45/12
**easier [1]**  7/16
**easy [3]**  18/10 36/1 39/21
**economic [1]**  24/3
**education [1]**  41/25
**EEOC [1]**  67/9
**effectiveness [1]**  22/17
**effects [1]**  80/5
**effort [2]**  10/10 17/1
**Eggers [1]**  6/5
**eight [3]**  16/1 26/9 62/18
**eight-part [1]**  26/9
**either [4]**  16/7 38/14 58/3
  97/15
**ejaculate [1]**  82/12
**element [7]**  19/17 19/18 19/19
  25/24 25/25 26/1 44/23
**elements [5]**  19/16 24/2 25/23
  33/2 78/10
**ELLISON [4]**  1/10 16/15 65/11
  65/13
**else [12]**  8/25 33/12 33/14
  35/5 37/20 37/21 40/1 47/9
  58/21 76/12 76/19 85/13
**elsewhere [1]**  67/7
**emotional [3]**  24/5 25/5 43/23
**emphasize [1]**  15/24
**employed [1]**  86/24
**employee [6]**  20/18 24/9 66/11
  68/25 75/25 76/1
**employee's [1]**  20/18
**employees [8]**  66/2 66/2 66/6
  66/9 66/24 66/25 75/14 77/23
**employer [1]**  20/17
**employment [36]**  20/23 21/2
  22/2 22/6 25/9 34/10 44/3
  75/23 76/2 76/20 86/25 87/3
  87/4 88/11 88/16 88/23 90/19
  91/25 93/2 93/4 93/15 93/16
  93/20 93/21 94/7 94/22 95/21
  95/24 96/10 96/15 96/21 97/6
  98/5 98/14 98/18 98/21
**en [1]**  57/2
**encourage [4]**  8/6 8/13 8/21
  67/25
**end [3]**  39/14 39/14 58/2
**endeavor [1]**  85/1
**ends [1]**  29/15
**endured [2]**  51/19 51/20
**enemies [1]**  52/12
**enforce [4]**  31/1 35/10 39/10
  39/11
**enforced [1]**  47/5
**enforcement [1]**  63/9
**enforcing [4]**  30/21 30/23
  37/1 44/8
**enjoyment [3]**  24/6 25/6 43/24
**enormously [1]**  65/15
**enough [7]**  42/23 42/24 48/6
  52/21 60/9 88/14 90/23
**enter [14]**  25/8 44/3 44/16
  91/25 95/20 96/5 96/10 96/15
  96/20 96/24 97/5 97/8 98/5
  98/13
**entered [1]**  93/3
**entire [3]**  64/16 65/16 92/5
**entirely [1]**  84/14
**entitled [5]**  15/10 17/21 18/3

**entity [1]**  66/1
**entry [2]**  4/16 95/24
**environment [13]**  20/24 21/8
  21/13 31/16 32/19 42/17
  42/21 42/24 43/1 43/19 44/22
  47/3 77/15
**equal [1]**  17/14
**equally [1]**  73/12
**equals [1]**  17/14
**Eric [4]**  72/1 75/6 75/10 89/7
**errors [1]**  33/22
**established [4]**  13/23 26/22
  28/10 45/25
**Estefan [2]**  1/18 48/23
**et [1]**  24/11
**et cetera [1]**  24/11
**ethically [1]**  66/1
**even [24]**  4/9 8/12 13/25
  15/22 22/10 36/6 46/5 46/5
  47/4 52/8 64/10 64/23 66/17
  67/2 72/2 73/4 77/19 79/12
  79/12 79/13 80/6 82/4 82/9
  92/11
**evening [5]**  56/11 56/15 60/18
  69/4 69/6 69/17 69/24 79/14
  99/18
**event [3]**  18/2 52/15 60/19
**events [7]**  52/20 53/23 71/18
  87/15 95/3 95/9 95/24
**eventually [2]**  33/20 53/15
**ever [14]**  16/2 16/2 33/19
  35/21 48/15 50/3 53/23 59/13
  59/13 59/14 74/10 81/7 82/3
  93/13
**every [15]**  30/4 38/10 44/10
  47/4 48/22 49/16 63/1 63/6
  67/14 80/12 81/1 81/19 81/19
  82/2 83/24
**everybody [4]**  16/3 33/25
  47/25 49/24
**everyone [6]**  36/6 37/17 44/12
  47/9 76/12 76/19
**everything [6]**  3/19 33/12
  35/20 63/3 63/4 86/23
**everywhere [1]**  34/16
**evidence [85]**  4/17 5/10 6/7
  6/12 6/16 9/16 9/20 11/19
  12/3 12/4 12/11 12/12 12/13
  12/14 12/17 12/20 12/23
  12/24 13/3 13/5 13/18 13/24
  14/2 14/4 14/6 14/7 14/11
  14/12 14/23 14/25 15/6 15/8
  15/14 16/22 17/3 17/11 17/20
  18/7 18/8 21/9 21/12 21/14
  21/16 23/22 23/22 24/8 24/12
  26/18 26/20 28/6 28/8 42/7
  42/8 45/7 45/23 47/12 51/12
  51/23 52/17 52/20 54/10 55/4
  56/25 59/10 59/21 63/2 65/23
  66/8 67/16 67/17 67/25 71/6
  71/24 73/14 74/21 75/2 77/9
  77/17 78/3 78/9 78/11 80/11
  87/8 89/24 90/2
**evidentiary [1]**  9/7
**exact [1]**  24/14
**exactly [14]**  7/25 32/8 69/22
  70/8 76/15 81/3 81/8 83/9
  83/10 83/11 83/12 90/25 91/1
  95/15
**exam [1]**  57/2
**examination [3]**  5/15 58/24

**examination... [1]**  68/14
**examine [1]**  17/5
**examined [1]**  38/6
**example [1]**  39/2
**examples [1]**  61/4
**Except [1]**  12/10
**exception [1]**  76/16
**exchanged [1]**  67/24
**exchanging [1]**  68/3
**excuse [2]**  24/1 56/23
**executed [1]**  92/24
**execution [2]**  86/17 88/16
**executives [2]**  30/14 38/19
**exemplary [7]**  27/15 27/17
  27/20 29/1 29/3 29/5 45/15
**exercise [1]**  23/3
**exhibit [26]**  3/21 4/4 4/10
  4/14 5/14 6/17 7/7 9/7 9/9
  9/10 9/13 40/5 40/5 41/22
  66/20 66/20 66/20 66/21
  66/22 75/21 79/13 82/17 87/4
  87/7 96/18 96/18
**Exhibit 103 [1]**  40/5
**Exhibit 125 [1]**  75/21
**Exhibit 136 [1]**  66/21
**Exhibit 139 [1]**  66/22
**Exhibit 255 [2]**  9/7 9/13
**Exhibit 38 [3]**  87/4 87/7
  96/18
**Exhibit 5 [1]**  66/20
**Exhibit 87 [1]**  79/13
**exhibiting [1]**  51/17
**exhibits [10]**  3/18 5/17 7/2
  12/19 12/23 13/20 15/13
  63/16 75/24 85/20
**Exhibits 131 [1]**  75/24
**existed [1]**  21/9
**existence [2]**  14/9 14/9
**expect [1]**  51/18
**expected [2]**  30/5 73/21
**expenses [5]**  20/6 20/7 41/9
  41/13 45/5
**experience [3]**  13/21 14/16
  84/23
**experienced [1]**  64/2
**expert [11]**  14/16 14/22 14/24
  15/1 62/24 70/12 71/14 81/18
  81/18 82/2 82/5
**explain [4]**  59/19 72/19 73/13
  91/11
**explanation [1]**  91/18
**exposed [1]**  81/13
**expressed [1]**  8/23
**expressing [1]**  52/10
**expressly [1]**  5/11
**extent [2]**  27/23 29/9
**extreme [5]**  22/5 27/3 28/15
  46/7 47/1
**extremely [4]**  21/22 21/25
  64/18 64/18
**eye [1]**  52/5
**eyewitness [1]**  14/7

**F**

**fabricated [1]**  71/18
**face [5]**  61/12 73/6 73/8
  75/22 83/13
**facilitation [1]**  36/23
**fact [16]**  12/16 13/4 13/17
  13/25 17/22 18/8 25/18 39/7

**factoid [1]**  6/2
**factors [4]**  26/10 27/19 29/5
  46/19
**facts [11]**  11/22 11/25 12/6
  13/23 14/5 14/9 14/12 17/10
  22/16 53/16 53/19
**fail [2]**  23/11 43/4
**failed [4]**  13/6 18/10 32/21
  32/23
**fairly [4]**  19/23 24/16 24/24
  26/6
**faith [1]**  8/9
**faking [1]**  61/20
**false [4]**  25/17 78/3 78/4
  78/5
**falsehood [1]**  13/15
**falsely [2]**  13/4 18/8
**falsity [1]**  25/12
**fantastic [1]**  75/9
**far [4]**  31/3 38/13 38/14
  84/7
**fast [1]**  62/19
**Fastforward [1]**  54/16
**father [6]**  55/13 57/10 59/15
  68/21 69/11 72/19
**fault [2]**  44/18 61/21
**favors [1]**  22/3
**FBI [1]**  6/5
**FCRR [2]**  2/13 100/7
**fear [1]**  90/5
**feared [1]**  70/23
**federal [1]**  51/13
**feel [3]**  13/20 51/13 84/16
**few [4]**  61/25 62/10 67/10
  76/25
**fiber [1]**  80/12
**fiction [1]**  78/17
**field [1]**  14/16
**Fifth [1]**  63/11
**fight [1]**  90/10
**fighting [2]**  53/11 64/7
**figure [1]**  74/25
**file [1]**  34/9
**filed [1]**  67/8
**fill [2]**  15/19 33/16
**final [2]**  6/5 63/22
**finally [2]**  35/19 71/20
**find [19]**  4/16 12/6 14/11
  19/21 21/11 21/19 26/4 26/17
  28/5 39/5 39/9 40/5 41/22
  46/1 63/23 74/16 76/16 77/22
  94/9
**finding [2]**  14/5 46/24
**findings [2]**  6/10
**finds [1]**  50/19
**fine [5]**  7/3 47/25 92/1 93/22
  96/18
**finish [1]**  17/8
**finished [3]**  6/25 57/2 57/13
**fire [2]**  35/4 83/18
**fired [2]**  34/24 43/14
**firemen [2]**  54/12 69/11
**firm [4]**  1/15 26/21 28/9
  45/24
**first [26]**  12/7 16/9 17/17
  17/25 21/11 24/3 25/4 29/16
  31/4 35/21 35/21 42/25 54/21
  56/18 58/9 67/14 69/9 72/7
  73/11 77/6 82/20 84/22 86/8
  87/6 88/6 92/16

**fit [1]**  60/1
**five [15]**  16/2 36/11 47/21
  54/12 55/3 57/23 58/16 59/8
  71/12 77/1 77/18 81/13 82/8
  83/16 94/14
**five-minute [1]**  59/8
**fix [5]**  7/14 31/7 31/9 39/14
  44/11
**flashbacks [1]**  80/9
**flirted [1]**  69/15
**flirting [1]**  57/22
**floor [2]**  2/6 64/11
**flown [1]**  72/13
**flying [1]**  64/7
**focus [1]**  67/13
**focused [1]**  49/9
**fog [2]**  40/13 51/24
**folks [7]**  34/12 58/20 59/21
  60/5 60/17 60/25 62/22
**follow [8]**  11/21 15/16 76/12
  76/13 76/24 78/25 79/7 79/9
**followed [2]**  75/7 79/6
**following [12]**  24/2 25/3
  26/15 26/16 27/11 27/12 28/3
  28/22 28/23 29/12 79/3 91/24
**follows [3]**  79/20 98/4 98/12
**food [2]**  71/5 72/7
**forced [1]**  80/5
**forces [1]**  71/10
**forcing [1]**  72/1
**Ford [1]**  33/10
**foregoing [1]**  100/2
**foreperson [3]**  15/14 15/19
  29/14
**foreseeable [1]**  31/5
**forget [1]**  13/12
**form [5]**  15/19 18/17 29/15
  48/18 99/10
**former [3]**  66/2 71/9 75/25
**found [12]**  3/19 8/11 19/24
  23/17 24/25 25/1 26/7 26/14
  27/15 28/2 29/1 82/12
**foundation [2]**  80/22 81/1
**four [13]**  16/1 31/4 31/23
  36/11 41/23 54/12 54/21
  54/24 55/3 57/22 58/8 58/16
  95/7
**four-part [1]**  95/7
**fourth [1]**  42/3
**frame [1]**  57/1
**frankly [1]**  87/12
**fraud [15]**  25/7 25/10 32/5
  32/13 32/15 32/19 44/3 44/15
  78/1 81/4 91/24 95/23 97/4
  98/4 98/13
**fraudulently [1]**  97/13
**frequency [1]**  21/3
**friends [1]**  58/16
**fringe [1]**  24/9
**front [6]**  35/22 39/14 55/15
  65/19 81/15 83/14
**full [1]**  17/3
**fuller [1]**  95/2
**fully [2]**  89/12 93/23
**fun [2]**  62/9 70/23
**fund [1]**  64/3
**further [4]**  26/11 75/18 79/15
  90/24
**Furthermore [1]**  74/11
**future [12]**  20/5 20/8 20/12

**F**

future... [9]  20/15 41/8
  41/13 41/18 42/5 45/3 45/6
  45/11 45/13

**G**

Gabe [2]  68/16 76/14
gang [2]  71/13 78/15
gave [6]  13/7 18/11 41/21
  41/23 54/13 54/22
gender [4]  20/18 20/20 21/22
  21/24
gender-related [1]  21/24
general [3]  14/10 16/17 66/15
generally [1]  21/25
gentlemen [5]  64/21 65/10
  75/2 75/18 84/12
Germany [1]  60/5
get [40]  7/10 8/12 8/22 30/18
  32/17 33/20 34/11 34/16
  35/21 35/22 36/21 37/23
  37/24 38/14 38/24 41/20
  41/23 42/22 42/23 44/8 44/15
  45/21 47/10 49/1 49/25 55/14
  64/6 69/14 71/2 79/11 79/16
  79/17 79/19 79/25 80/2 82/19
  86/9 92/8 97/18 99/13
get-together [1]  69/14
gets [7]  34/8 35/19 36/9
  36/15 39/11 54/7 64/14
getting [5]  48/15 52/19 59/20
  62/15 72/17
GHB [1]  60/9
girlfriend [7]  51/7 51/8 70/5
  70/16 70/21 71/3 75/10
girls [1]  52/11
give [23]  7/19 11/21 16/5
  17/6 18/5 36/22 37/10 37/11
  37/13 37/15 40/24 41/5 48/8
  50/18 61/4 74/1 82/18 87/22
  94/10 99/3 99/8 99/10 99/16
given [8]  13/1 15/16 17/22
  36/23 45/22 48/7 60/10 86/1
giving [3]  36/24 57/23 72/2
go [34]  7/10 8/23 8/25 31/18
  33/21 33/21 34/11 34/16
  39/16 39/18 40/4 40/6 40/16
  43/12 43/18 45/15 47/7 47/8
  47/10 53/21 54/1 55/11 56/24
  62/21 65/18 77/13 78/7 83/18
  83/19 85/14 85/24 89/20
  92/17 94/7
go to [1]  47/10
goes [11]  4/25 31/16 32/10
  32/20 34/3 34/3 34/8 41/19
  55/2 55/3 62/19
going [71]  3/5 3/17 5/8 6/23
  7/10 7/19 7/21 8/21 8/22
  8/25 11/2 16/18 30/22 31/6
  31/17 31/22 32/1 33/10 33/15
  35/3 37/2 38/3 38/17 38/24
  39/17 40/5 40/7 44/7 44/17
  47/7 47/13 47/14 47/20 47/24
  48/16 49/21 51/7 53/8 53/15
  53/18 54/1 54/9 55/16 57/18
  57/24 61/9 62/21 64/11 67/10
  70/17 75/17 77/10 79/12
  79/16 79/16 79/17 79/18
  81/14 82/22 83/14 84/24
  84/25 86/5 88/11 91/10 92/10
  92/20 94/9 94/11 96/19 99/10

gene [3] ... Filed ... 13/14 (21/09 of 123) 90/4
  90/5
good [10]  8/9 8/11 30/1 30/2
  48/8 49/2 52/21 67/6 70/17
  82/25
good conscience [1]  48/8
Goodgine [3]  68/8 69/1 71/8
gosh [1]  40/18
gossip [2]  52/11 71/2
got [18]  3/7 5/15 30/20 30/20
  31/15 32/16 35/16 36/24
  36/25 39/7 50/10 56/18 58/4
  62/8 70/16 72/15 90/20 97/23
gotten [2]  38/13 59/11
govern [1]  16/19
grand [1]  9/18
grateful [1]  10/23
great [2]  51/25 68/2
greater [4]  12/12 14/1 15/10
  71/7
green [2]  47/6 53/3
Greenspoint [3]  31/19 31/20
  76/8
grounds [1]  69/8
grows [1]  30/14
guard [1]  34/23
guess [3]  43/5 90/12 99/4
guesswork [1]  23/23
guidance [1]  18/2
guide [1]  60/17
guiding [1]  11/2
guy [1]  43/9
guys [4]  36/11 85/22 94/4
  96/17
GYN [1]  58/7
gynecologist [1]  72/2

**H**

H-07-CV-2719 [1]  1/4
had [81]  3/18 5/10 8/7 9/13
  10/24 15/25 19/1 19/1 22/9
  24/8 27/5 28/17 34/21 34/22
  39/2 41/5 41/10 44/19 46/9
  47/2 50/5 50/15 51/4 51/19
  52/6 52/24 53/5 53/6 53/12
  53/12 53/13 54/4 54/14 55/18
  55/22 56/10 56/14 57/6 57/19
  58/7 58/8 58/15 58/5 58/16
  58/20 58/23 58/24 59/11
  59/11 59/15 61/25 62/1 62/9
  63/7 63/24 64/2 67/6 69/23
  70/11 70/12 70/20 70/21
  70/23 72/24 73/2 73/6 73/17
  73/24 74/9 75/7 76/12 76/21
  82/9 82/19 82/20 82/25 83/5
  83/18 84/13 86/17 95/22
hadn't [3]  44/20 87/12 87/20
hair [2]  51/16 58/11
half [7]  38/5 52/6 57/11 88/6
  88/7 95/7 95/8
halfway [1]  62/16
hall [1]  36/14
HALLIBURTON [2]  1/6 11/12
hand [4]  3/25 11/22 23/23
  69/12
hands [7]  67/24 36/3 39/17
  48/18 48/20 57/22 83/19
handwritten [1]  7/23
happen [6]  31/6 37/2 60/18
  71/23 81/14 83/2
happened [18]  35/16 35/25
  36/1 36/7 36/17 40/12 40/14
  43/14 50/6 54/4 54/23 54/25

happening [1]  52/16
happens [3]  35/24 37/19 37/20
happy [1]  91/13
harassed [12]  22/22 23/5
  34/21 42/10 42/11 42/25
  44/11 74/3 74/17 75/14 77/18
  77/24
harassing [3]  21/17 35/13
  42/15
harassment [17]  20/19 20/19
  20/21 21/20 21/21 22/8 22/9
  22/11 22/14 23/12 31/8 35/14
  42/10 43/7 76/3 77/14 83/6
hard [6]  11/5 30/5 51/22
  53/16 53/19 54/18
harm [6]  26/18 27/4 28/6
  28/16 44/1 46/9
has [79]  9/19 9/20 10/5 12/16
  13/13 14/15 14/24 15/7 15/14
  15/16 16/20 17/19 18/12
  19/11 23/18 24/16 30/10
  36/17 37/20 38/13 40/11
  40/14 40/18 40/22 41/25 42/2
  45/22 49/15 50/3 50/16 51/11
  53/1 57/19 58/9 59/22 60/24
  63/1 63/6 63/6 63/8 63/10
  63/11 63/13 63/14 63/19
  64/21 64/22 65/15 65/23 66/5
  66/7 66/8 66/22 67/15 67/17
  68/10 68/21 69/10 71/18
  71/21 74/15 77/3 77/6 77/15
  77/21 79/18 81/8 81/9 81/20
  81/20 83/9 87/11 87/21 89/18
  89/20 97/17 97/19 97/20
  99/13
hasn't [2]  81/13 92/10
hate [3]  52/11 85/22 94/4
hates [1]  82/22
have [148]
haven't [2]  34/19 86/3
having [6]  16/7 31/8 48/13
  59/18 75/10 77/23
he [78]  4/22 4/23 4/23 6/25
  7/1 13/11 14/25 18/11 19/6
  32/14 34/24 36/19 36/21
  36/22 36/24 36/24 36/25 37/1
  37/1 37/2 41/23 41/24 43/13
  43/14 43/14 43/15 43/22
  44/19 44/19 46/4 46/5 46/5
  46/12 46/21 50/6 51/1 51/8
  56/18 58/16 59/4 60/8 60/14
  60/15 60/16 63/3 63/3 63/4
  63/10 63/11 63/11 63/12
  64/14 71/11 71/11 71/17 73/5
  73/6 76/2 79/23 79/23 79/24
  79/24 79/25 79/25 80/2 82/18
  82/18 82/20 83/22 83/22
  83/24 84/2 84/3 84/5 84/6
  84/7 84/7 84/8
he's [5]  32/13 32/15 47/7
  62/25 63/2
headache [2]  31/13 31/15
headaches [1]  48/14
headquarters [1]  68/20
healed [1]  82/8
health [1]  24/10
hear [2]  12/1 43/8
heard [20]  11/19 16/23 31/2
  31/3 34/19 34/20 35/1 35/12
  41/8 41/11 47/12 50/25 51/22

**heard... [7]** 62/4 66/2 66/8
67/16 71/6 71/8 73/14
**heat [1]** 31/25
**Hedges [2]** 2/5 2/5
**Heidi [1]** 1/15
**help [3]** 38/16 66/12 66/13
**helpful [1]** 14/15
**henceforth [1]** 84/14
**her [183]**
**here [40]** 4/25 9/3 10/9 15/24
30/11 30/15 31/18 31/20
31/22 31/23 34/12 35/4 35/19
39/6 39/9 44/10 45/17 48/15
50/9 50/17 51/21 52/11 55/15
57/25 62/20 64/10 65/14
65/19 67/16 80/18 81/9 81/14
82/15 83/14 83/20 84/9 85/23
87/12 90/13 94/25
**here's [5]** 3/10 34/3 52/25
61/10 97/14
**hereby [1]** 10/7
**herpes [1]** 81/10
**herself [4]** 34/6 63/17 76/7
78/11
**hesitate [1]** 17/5
**Hey [1]** 42/22
**hid [1]** 82/16
**high [3]** 8/8 41/25 65/25
**high-profile [1]** 8/8
**higher [2]** 76/11 76/18
**highly [1]** 52/23
**him [16]** 32/14 35/14 37/2
55/7 57/22 60/6 68/5 69/24
70/19 72/2 73/7 80/16 82/21
82/22 83/7 84/3
**himself [2]** 34/23 76/2
**hire [1]** 81/18
**hired [4]** 31/7 71/14 82/5
90/20
**his [22]** 3/5 4/23 10/3 14/17
15/1 15/2 15/8 29/14 43/12
46/18 51/7 51/7 57/6 58/16
59/6 60/7 69/23 70/16 71/3
82/19 82/20 84/6
**history [2]** 33/17 65/25
**hit [4]** 73/6 73/6 73/8 73/9
**hitting [1]** 61/12
**Holcombe [1]** 2/4
**hold [9]** 44/21 48/18 57/24
73/13 73/14 80/11 82/1 99/4
99/7
**holding [2]** 38/21 57/22
**holds [1]** 39/17
**home [2]** 72/13 72/15
**honest [1]** 17/7
**honestly [1]** 87/20
**Honor [28]** 3/17 3/23 3/25 4/8
8/2 9/11 29/20 32/7 33/5
48/25 64/23 65/7 65/10 77/2
78/22 84/11 86/21 87/6 89/1
89/9 89/16 91/6 91/14 95/13
97/16 97/22 99/9 99/17
**HONORABLE [1]** 1/10
**hooch [4]** 50/22 57/3 68/24
71/11
**hope [17]** 22/22 23/6 23/13
52/21 53/3 59/21 60/25 65/22
66/19 68/9 71/9 74/4 74/6
74/7 74/8 75/14 76/13
**hoped [1]** 30/4

**honesty** **filed** **on** **07/07/**
**horrible [2]** 36/17 52/2
**horribly [1]** 63/20
**horrific [1]** 50/23
**horror [1]** 51/18
**hospital [4]** 61/7 61/17 68/13
68/23
**host [1]** 66/8
**hostile [6]** 20/23 21/8 42/17
42/23 43/19 77/14
**hotlines [2]** 66/12 66/13
**hour [2]** 52/6 52/14
**hours [1]** 94/14
**housing [4]** 68/24 69/7 76/9
76/13
**HOUSTON [28]** 1/2 1/4 2/7 2/11
2/15 16/14 30/11 56/19 64/7
75/1 76/1 83/4 83/6 86/16
86/19 86/24 88/7 88/8 88/25
89/3 89/23 89/25 90/20 92/25
93/1 93/5 93/12 93/15
**how [40]** 4/23 30/8 33/11
33/11 33/11 34/3 34/21 34/22
34/22 35/25 36/9 38/19 39/12
39/21 39/24 43/10 46/15 49/3
52/9 52/24 53/18 55/10 55/10
60/18 61/15 61/20 61/22
66/18 74/8 76/15 79/20 80/2
83/5 83/7 85/23 86/1 91/1
92/12 92/13 93/17
**however [4]** 9/20 14/18 17/6
75/8
**huge [2]** 10/10 48/3
**human [6]** 66/10 66/15 68/24
81/6 81/10
**humiliating [1]** 21/4
**hung [2]** 90/19 90/21
**hurt [2]** 30/18 39/12
**husband [8]** 38/11 61/11 61/13
61/13 61/15 73/4 73/7 73/9
**hysterical [1]** 54/15

**I**

**I'll [5]** 4/11 63/15 79/4 99/2
99/3
**I'm [48]** 3/5 3/6 4/16 5/9
5/11 5/16 7/10 7/21 8/8 8/14
8/21 8/22 8/25 9/6 10/12
29/24 32/7 36/11 38/11 38/1
39/17 41/4 41/6 41/8 42/6
44/1 44/17 44/25 49/21 52/19
54/1 55/15 56/20 62/12 64/11
78/16 79/15 81/23 82/22 85/6
87/22 88/4 88/11 88/19 90/13
92/1 95/10 97/25
**I've [14]** 10/24 15/24 26/10
36/4 37/16 48/7 48/8 50/2
52/12 74/10 83/17 84/13
89/11 97/23
**idea [1]** 52/24
**identify [1]** 76/10
**if [147]**
**ignore [1]** 16/21
**ii [1]** 27/5
**III [3]** 66/23 75/20 76/3
**Iler [3]** 72/1 75/6 89/7
**Iler's [1]** 75/10
**illness [1]** 61/20
**imagine [2]** 38/18 52/15
**immediately [1]** 29/15
**impairment [6]** 20/9 20/11
41/14 41/16 45/8 45/10

**implants [1]** 81/21
**implemented [1]** 66/22
**important [8]** 13/4 13/17 18/8
30/8 52/20 65/15 66/6 73/13
**importantly [1]** 60/3
**impression [1]** 15/11
**imprisoned [1]** 71/5
**inaccurately [1]** 13/13
**inadequate [1]** 92/23
**INC [5]** 1/7 11/13 11/14
11/15 11/16
**incapable [1]** 36/23
**incentives [1]** 31/22
**incident [1]** 73/5
**incidents [2]** 21/25 35/13
**inclined [2]** 5/16 74/1
**include [7]** 19/21 21/22 24/4
24/7 24/17 26/3 89/22
**includes [4]** 20/19 24/3 24/9
42/10
**including [5]** 14/23 16/23
21/3 69/10 76/2
**income [2]** 15/1 15/2
**inconsistencies [1]** 71/16
**inconvenience [3]** 24/5 25/5
43/24
**incorporated [1]** 91/19
**incorrect [1]** 72/5
**incur [1]** 20/8
**incurred [2]** 20/6 20/15
**independent [4]** 15/8 62/24
70/12 71/14
**index [1]** 85/6
**indicated [3]** 6/6 12/10 67/18
**indicates [1]** 14/8
**indication [4]** 11/24 17/23
85/21 86/1
**indifference [3]** 27/7 28/18
46/11
**indirect [1]** 14/7
**induce [2]** 88/1 97/1
**induced [11]** 51/24 95/20
96/15 96/24 96/25 97/5 97/7
97/9 97/11 97/11 97/12
**inducement [8]** 44/3 44/16
91/15 91/18 92/6 95/5 96/2
96/4
**inducements [1]** 31/22
**induces [1]** 60/9
**inducing [10]** 25/8 87/14
91/25 96/7 96/9 96/10 96/20
97/4 98/5 98/13
**inevitable [1]** 31/5
**infer [1]** 14/23
**inferences [2]** 13/19
**influenced [1]** 15/9
**information [8]** 32/5 36/2
63/1 64/3 64/4 66/18 72/6
90/24
**initial [1]** 93/8
**initially [1]** 65/13
**injuries [5]** 46/1 63/22 81/20
89/22 89/22
**injurious [1]** 21/7
**injury [20]** 24/16 25/16 26/24
28/12 46/4 78/8 82/2 86/18
86/20 88/8 88/17 88/24 89/6
89/24 90/3 90/7 93/25 94/2
94/2 95/9
**inner [1]** 64/5
**innocent [1]** 13/15

**I**

**insensitive [1]**  21/22
**inside [1]**  35/5
**insofar [1]**  18/25
**instruct [3]**  11/20 90/22 91/5
**instructed [2]**  12/18 12/22
**instructing [1]**  18/1
**instruction [9]**  43/17 43/17
  43/18 77/13 77/15 94/10 96/1
  97/15 98/16
**instructions [13]**  10/11 11/2
  11/24 12/3 15/16 16/14 16/17
  16/19 17/22 20/16 23/16
  29/15 39/18
**instructs [1]**  69/5
**insurance [3]**  24/10 33/18
  33/19
**insurgency [2]**  31/25 35/4
**integrity [1]**  9/24
**intended [2]**  12/4 79/7
**intensive [1]**  75/19
**intent [3]**  26/23 28/11 46/3
**intention [2]**  25/14 78/6
**intentional [1]**  13/14
**intentionally [1]**  19/6
**intercourse [4]**  62/2 62/12
  72/24 73/2
**interest [6]**  17/10 19/21
  24/17 26/3 92/8 92/14
**interesting [2]**  58/11 97/16
**interferes [1]**  21/6
**interim [1]**  24/13
**interject [1]**  94/5
**International [1]**  11/14
**Internet [1]**  16/24
**interpret [2]**  17/22 85/17
**interpretation [2]**  92/7 93/8
**interrupt [1]**  95/6
**interview [2]**  57/6 57/15
**interviewing [1]**  31/11
**intimidation [1]**  22/2
**into [37]**  5/10 6/12 6/16 9/19
  12/23 15/14 16/7 25/8 35/18
  35/21 36/18 40/4 50/14 52/13
  61/5 63/2 64/8 69/13 75/17
  84/1 84/7 90/18 91/2 91/4
  91/25 93/4 95/20 95/24 96/5
  96/10 96/15 96/21 96/24 97/5
  97/8 98/5 98/13
**investigate [1]**  57/15
**investigation [2]**  57/18 69/3
**invited [1]**  69/19
**involve [1]**  46/7
**involved [9]**  4/18 27/3 27/6
  27/21 28/14 28/17 29/7 39/25
  61/3
**involving [1]**  73/18
**Iraq [32]**  22/22 23/6 23/13
  34/4 35/17 49/25 53/4 53/14
  61/9 64/2 71/19 73/1 74/18
  75/17 76/1 76/21 77/19 78/7
  78/12 86/19 88/8 88/25 89/23
  90/7 90/21 93/1 93/11 93/13
  93/16 94/18 94/20 94/22
**Irish [1]**  69/13
**is [275]**
**isolated [1]**  21/24
**issue [7]**  3/3 5/10 5/13 32/15
  59/24 77/14 90/22
**issues [3]**  75/23 77/21 90/11
**it [225]**

4/10 4/12 4/14 4/21 6/18
  6/23 8/18 10/10 13/16 32/19
  33/13 34/24 35/25 38/22
  43/19 43/25 45/18 45/22
  46/23 47/6 47/6 47/23 47/23
  48/1 48/3 48/3 48/5 48/6
  48/20 52/12 52/23 53/19
  53/20 58/2 60/15 61/21 63/2
  68/20 80/17 81/18 82/2 82/17
  87/25 88/5 89/18 92/2 94/8
  94/9 94/11 95/3 95/5 95/9
  95/9 96/18 97/16 98/15
**items [1]**  25/4 67/15
**its [16]**  10/24 21/3 25/12
  27/2 28/14 30/10 38/12 48/13
  48/13 66/1 66/4 66/15 75/7
  77/23 91/17 98/9
**itself [5]**  40/7 66/1 87/16
  92/17 95/4
**IV [1]**  2/9

**J**

**JAMIE [154]**
**Jamie's [4]**  36/21 39/24 67/19
  80/5
**Jim [1]**  75/25
**Joanne [1]**  2/3
**job [2]**  52/21 97/10
**jobs [1]**  73/11
**Jodi [3]**  68/14 69/11 72/5
**join [1]**  65/11
**joint [13]**  4/10 9/7 40/5 59/7
  66/20 66/20 66/22 75/21
  75/23 82/17 87/4 87/7 96/18
**jokes [1]**  21/24
**JONES [137]**
**Jones' [15]**  50/5 50/23 55/12
  56/17 57/8 60/14 61/4 63/22
  71/8 71/17 71/24 73/21 73/24
  88/15 93/20
**judge [19]**  1/11 7/9 8/20 9/12
  10/3 16/16 45/1 45/22 65/11
  65/13 74/15 77/3 80/15 80/17
  82/15 90/11 92/9 93/17 95/12
**Judge's [1]**  73/12
**judged [1]**  18/24
**judges [3]**  11/22 17/10 17/10
**Julie [1]**  79/8
**JULY [35]**  1/5 16/15 19/4 19/5
  22/23 23/6 23/13 42/12 50/5
  55/18 67/13 67/17 67/23
  68/19 69/17 69/24 69/25
  70/19 74/18 75/15 81/12
  88/23 89/3 89/22 92/1 93/21
  96/1 96/16 96/21 96/24 98/2
  98/14 98/18 98/22 100/4
**July 15 [8]**  88/3 92/1 93/21
  96/1 96/16 98/6 98/14 98/22
**July 15th [5]**  88/23 89/22
  96/21 98/8 98/18
**July 27th [6]**  19/4 42/12
  55/18 69/17 69/24 81/12
**July 28th [3]**  19/5 69/25
  70/19
**June [4]**  5/20 6/4 65/18 74/5
**June 22nd [1]**  5/20
**juror [4]**  8/12 15/7 15/11
  29/13
**jurors [6]**  8/5 8/8 15/9 16/25
  49/3 65/14
**jury [59]**  1/10 3/2 9/5 9/18

9/18 10/18 10/20 11/20 10/24
  11/8 11/19 11/22 12/4 14/15
  15/25 17/4 19/3 19/22 22/18
  29/15 30/5 33/9 34/12 40/4
  41/24 46/14 47/22 48/18
  48/19 49/7 49/18 49/19 53/25
  65/2 65/4 65/5 77/20 77/25
  85/2 85/3 85/15 85/17 86/1
  86/8 87/2 87/14 88/24 89/5
  90/13 90/21 91/11 92/5 92/9
  92/12 92/17 92/24 93/20
  94/11 99/6
**jury's [2]**  8/13 52/18
**just [52]**  3/16 5/24 6/25 7/7
  7/16 8/11 8/18 10/9 12/13
  15/24 37/10 37/13 38/9 38/16
  38/22 39/13 41/25 42/22
  43/12 45/18 47/3 47/8 50/15
  51/19 56/17 60/25 61/22 62/5
  62/6 85/14 87/16 87/22 89/5
  90/11 90/21 92/5 92/8 92/10
  92/20 92/22 93/11 93/24
  93/24 94/1 94/25 95/3 95/9
  95/13 96/8 97/18 97/19 98/20
**justice [8]**  17/15 27/24 29/9
  37/23 37/24 48/19 65/17
  78/17
**justified [1]**  13/20

**K**

**Katz [3]**  31/4 79/5 83/10
**KBR [116]**
**KBR's [14]**  22/15 47/13 48/3
  66/3 66/14 66/15 66/18 66/25
  67/2 67/4 68/8 71/9 74/14
  75/4
**keep [8]**  11/6 13/9 35/20
  51/21 59/20 64/25 90/12
  95/14
**keeps [1]**  38/4
**KEITH [2]**  1/10 16/15
**KELLOGG [8]**  1/6 1/7 11/12
  11/13 11/13 11/14 11/14
  11/15
**Kelly [4]**  1/14 1/15 64/13
  97/25
**kept [1]**  62/10
**kicking [1]**  61/12
**kid [1]**  53/2
**kill [1]**  82/22
**Kimberly [5]**  74/4 74/6 74/9
  76/14 80/15
**kind [11]**  4/25 51/12 52/15
  52/17 54/4 58/11 61/3 61/5
  62/14 67/3 90/11
**kinds [3]**  16/19 40/19 40/20
**King [1]**  35/12
**kissed [1]**  79/25
**kit [3]**  6/7 68/14 69/5
**knew [32]**  22/7 31/2 37/1 37/1
  37/25 38/2 38/3 42/17 42/18
  43/1 44/6 44/8 47/8 47/9
  53/1 53/1 53/1 53/2 53/5
  53/6 53/8 53/10 53/12 53/13
  53/15 57/20 58/23 59/12
  59/15 59/16 59/17 69/22
**know [76]**  3/7 5/7 5/15 9/2
  9/23 10/10 11/3 23/3 30/8
  30/8 30/15 31/3 33/24 34/17
  35/10 35/10 35/24 35/25 36/1
  36/2 36/6 36/7 36/8 36/18
  36/21 38/22 39/6 39/13 39/15

**K**

know... **[47]** 39/21 39/23
  39/24 40/8 40/8 42/2 42/15
  42/16 43/10 44/4 44/5 44/6
  44/6 45/16 46/25 48/5 48/19
  48/20 53/1 53/18 54/12 59/2
  59/25 62/1 62/6 63/4 64/1
  68/1 69/6 70/8 78/13 79/22
  79/23 80/7 83/5 83/8 83/16
  84/16 84/25 85/23 92/9 92/12
  93/9 94/8 94/19 97/24 98/1
knowing **[2]** 78/4 78/5
knowingly **[1]** 19/7
knowledge **[4]** 14/14 25/12
  25/13 70/24
known **[7]** 22/8 22/9 22/12
  23/4 42/15 81/13 81/15
knows **[9]** 19/11 33/7 33/25
  34/17 49/24 63/3 63/4 80/23
  92/12
Kristen **[8]** 54/16 57/9 59/14
  68/6 68/7 68/12 69/11 72/5

**L**

lab **[1]** 6/5
label **[1]** 3/20
ladies **[5]** 64/21 65/10 75/2
  75/18 84/12
lady **[3]** 54/17 58/6 58/10
language **[12]** 21/24 88/21
  90/15 91/9 91/10 91/12 91/15
  91/16 91/19 91/20 92/3 96/8
Lannie **[1]** 1/14
lapse **[1]** 13/15
large **[3]** 47/15 60/9 67/2
last **[10]** 3/12 3/18 6/3 7/4
  36/11 53/10 54/13 55/21 56/8
  64/13
late **[8]** 22/23 23/6 23/13
  30/7 49/6 74/18 75/15 84/19
later **[8]** 6/16 47/17 52/2
  57/3 58/9 69/4 71/1 74/8
laughed **[1]** 84/3
law **[9]** 1/15 1/18 1/21 11/20
  11/21 12/3 14/10 17/14 63/9
lawsuit **[7]** 34/9 37/12 37/25
  38/2 38/21 65/16 74/21
lawyer **[3]** 8/11 84/23 85/23
lawyers **[6]** 8/4 8/8 38/12
  39/25 73/21 73/24
lay **[1]** 52/19
lead **[3]** 13/23 74/21 77/10
leaned **[1]** 84/5
learned **[1]** 92/13
leather **[1]** 30/13
leave **[3]** 5/16 6/19 86/9
leaving **[1]** 86/9
led **[2]** 8/10 70/9
left **[6]** 43/1 43/13 47/3
  69/16 73/1 90/6
legal **[1]** 66/16
LEIGH **[49]** 1/3 19/4 22/21
  23/4 23/12 25/8 26/18 26/24
  27/15 28/6 28/12 29/1 30/3
  34/18 34/24 35/16 42/9 46/4
  46/12 49/23 49/25 50/5 51/1
  51/8 51/19 53/22 55/7 55/9
  55/12 63/3 63/5 63/6 63/7
  63/15 63/23 67/18 68/10
  68/21 77/8 77/18 81/3 81/8
  83/9 91/24 95/23 96/9 96/14

lengthy **[2]** 72/20 77/15
less **[5]** 51/18 58/1 58/1
  72/13 74/5
let **[7]** 3/9 9/2 15/24 17/12
  17/16 32/17 78/13
let's **[11]** 5/23 32/11 32/11
  40/16 51/21 53/22 64/6 64/25
  82/16 82/25 96/8
letter **[1]** 45/2
letters **[1]** 72/16
level **[1]** 21/1
liable **[4]** 18/1 18/3 20/21
  44/21
lie **[1]** 81/4
lied **[1]** 79/5
life **[14]** 24/6 24/9 25/6
  33/17 33/19 43/25 52/25
  52/25 53/17 57/13 61/4 79/4
  81/12 81/15
lifting **[1]** 40/13
light **[2]** 13/21 47/6
like **[23]** 5/16 33/9 33/18
  34/17 35/15 38/19 40/4 40/18
  60/24 61/14 64/12 64/22
  64/23 66/5 67/5 71/21 75/18
  85/18 88/14 94/9 95/2 97/17
  99/9
likely **[2]** 12/15 45/19
limit **[1]** 95/18
limited **[2]** 12/23 12/24
limits **[1]** 91/16
Linda **[2]** 79/8 83/12
Lindsey **[1]** 83/12
line **[8]** 43/20 43/23 54/1
  54/1 80/18 80/20 89/17 89/19
lines **[2]** 66/12 66/13
list **[6]** 3/21 37/10 37/11
  37/13 37/15 37/17
listed **[2]** 4/7 19/16
listen **[1]** 80/14
listened **[1]** 81/9
literally **[2]** 38/3 72/14
literature **[1]** 60/10
little **[11]** 9/3 33/18 33/22
  37/14 37/22 37/22 45/18 48/6
  49/7 49/8 56/20
live **[3]** 76/8 95/25 96/6
lived **[2]** 74/6 74/8
lives **[1]** 72/15
LLC **[1]** 11/14
LLP **[1]** 2/10
locations **[1]** 73/18
lock **[1]** 79/12
locked **[3]** 34/22 34/23 78/16
Loewe **[2]** 99/3 99/16
LOGCAP **[3]** 66/23 75/20 76/3
LOGCAP III **[3]** 66/23 75/20
  76/3
Logistically **[1]** 7/15
LOL **[1]** 54/6
long **[9]** 10/25 42/22 42/24
  60/7 65/25 80/1 85/19 85/23
  86/2
look **[25]** 3/9 3/25 21/12
  22/16 38/8 39/2 39/4 41/24
  46/6 53/22 54/2 54/10 54/18
  61/4 63/18 63/20 66/19 68/1
  70/17 75/20 75/23 82/17 85/9
  86/13 97/22
looked **[5]** 39/3 61/3 63/1
  63/13 83/22

logging **[4]** 34/17 35/5
  39/5 39/9 44/25 52/4 83/13
  94/1
looks **[2]** 36/15 91/9
Lorenzo **[2]** 34/22 83/11
loss **[15]** 19/19 19/20 20/13
  20/14 24/3 24/5 25/6 26/2
  26/2 41/20 41/25 42/4 42/5
  42/8 43/24
losses **[2]** 23/24 24/6
lost **[2]** 42/4 42/8
lot **[13]** 11/5 37/23 37/24
  39/4 43/25 43/25 49/5 49/6
  53/19 58/3 62/20 64/12 95/1
loved **[1]** 82/21
lovingly **[1]** 80/1
low **[2]** 41/4 44/1
lower **[1]** 3/25
lying **[1]** 69/21

**M**

made **[28]** 7/15 7/25 11/23
  13/13 25/11 25/12 25/14
  29/17 30/25 31/1 36/23 42/18
  47/9 47/18 51/16 52/12 53/5
  59/3 66/10 68/10 76/5 77/3
  78/3 78/4 84/8 87/9 89/18
  89/19
magnitude **[3]** 27/4 28/16 46/8
mail **[9]** 52/6 52/9 52/14
  66/12 66/18 66/19 70/22
  82/25 83/1
mails **[7]** 53/25 67/24 67/25
  68/3 71/1 82/21 83/2
main **[2]** 2/6 92/8
majority **[1]** 67/5
make **[31]** 7/22 9/1 11/24
  13/21 31/21 31/23 35/3 37/6
  37/6 38/7 38/20 48/4 49/20
  50/24 51/11 52/7 52/16 61/14
  71/16 74/12 75/3 78/14 81/1
  84/4 84/9 84/10 84/24 84/25
  87/2 88/22 92/11
makes **[6]** 14/10 25/10 49/8
  49/20 50/18 69/9
making **[5]** 34/2 35/7 39/1
  49/1 70/5
malice **[6]** 26/19 26/23 28/7
  28/11 46/1 46/2
malingering **[2]** 61/19 72/20
Mall **[2]** 31/19 31/20
man **[10]** 36/2 36/10 36/20
  36/20 52/15 60/24 83/23 84/2
  84/3 84/7
manager **[1]** 68/17
manner **[1]** 66/7
manuscript **[1]** 78/14
many **[11]** 39/7 46/19 57/20
  57/20 66/24 70/25 71/18 74/9
  75/21 79/8 85/18
March **[1]** 47/17
March 31st **[1]** 47/17
Marie **[1]** 1/21
marines **[1]** 49/10
marked **[1]** 6/21
markers **[1]** 33/18
Master's **[2]** 42/1 42/2
material **[1]** 25/10
materials **[2]** 9/19 75/20
mathematical **[1]** 23/24
matter **[12]** 5/10 5/13 14/14
  37/9 37/19 38/7 51/10 54/17

**matter... [4]** 64/13 80/22
80/22 80/22
**matter-of-fact [2]** 51/10
54/17
**matters [4]** 37/22 37/23 48/1
75/11
**Matthew [2]** 80/9 80/11
**may [33]** 5/5 12/17 12/19
12/20 12/24 13/12 13/16
13/21 13/25 14/1 14/4 14/14
14/22 14/23 15/13 16/23
18/16 21/22 22/4 22/16 27/17
29/3 29/21 30/18 32/9 33/5
33/6 45/1 58/10 65/7 78/22
90/17 94/2
**maybe [3]** 5/24 44/1 97/22
**McKinney [7]** 2/9 2/10 6/9
10/3 77/6 82/15 96/13
**me [37]** 3/9 10/2 15/21 15/22
15/24 16/4 16/6 16/15 17/16
24/21 32/17 33/19 37/10
37/11 37/13 37/15 40/23 48/8
52/11 54/13 54/14 54/22
55/15 55/19 56/3 56/12 56/23
57/23 65/22 78/13 79/3 79/19
81/24 86/18 87/22 88/2 99/9
**meals [1]** 84/21
**mean [27]** 10/13 11/8 11/9
11/11 11/17 13/10 39/20
39/21 85/23 86/23 90/25 91/7
91/23 93/14 93/17 93/19 95/1
95/3 95/4 95/6 95/16 95/18
95/22 96/25 97/1 97/9 97/10
**meanest [1]** 50/21
**means [11]** 12/14 19/8 25/17
26/20 26/23 27/17 28/8 28/11
29/3 85/18 94/15
**meant [1]** 12/12
**measure [2]** 26/20 28/8
**mechanical [1]** 1/24
**media [6]** 9/13 9/14 9/21
16/23 34/16 81/9
**medical [10]** 20/6 20/7 41/9
41/13 45/5 61/19 64/1 68/18
72/6 72/23
**medium [1]** 60/4
**meet [1]** 45/20
**meeting [2]** 10/24 76/21
**meets [1]** 68/6
**member [1]** 71/9
**members [4]** 11/19 17/4 65/5
86/4
**memo [1]** 49/25
**memory [7]** 13/15 15/4 15/4
15/5 36/12 59/18 59/20
**men [8]** 37/15 54/21 54/24
55/20 55/24 57/23 58/8 90/6
**mental [9]** 20/2 20/4 24/5
25/5 41/1 41/7 43/24 44/23
45/3
**mentioned [1]** 94/18
**mere [1]** 21/5
**merely [1]** 17/8
**mess [1]** 49/1
**message [2]** 16/5 38/23
**met [1]** 40/18
**mid [1]** 69/1
**might [11]** 3/17 30/18 38/23
61/4 73/7 74/24 76/8 78/14
84/6 89/11 89/16

**million [4]** 41/8 44/24 45/4
47/18
**mind [9]** 7/16 11/6 13/9 17/5
26/11 38/16 51/4 51/21 64/24
**mine [1]** 82/23
**minus [1]** 24/11
**minute [6]** 30/25 31/1 44/8
52/1 59/8 59/12
**minutes [11]** 51/3 51/11 62/17
62/18 64/21 64/22 65/1 67/10
76/25 77/1 78/21
**misrepresentation [10]** 25/11
25/11 25/14 25/16 25/17 32/4
81/4 88/17 95/8 97/11
**misrepresentations [6]** 76/5
86/16 88/15 95/17 95/18
95/18
**misrepresented [2]** 75/17
76/16
**misrepresenting [2]** 32/19
33/12
**missed [1]** 59/5
**missing [3]** 44/7 48/10 64/3
**mission [1]** 72/14
**missionary [1]** 80/1
**misstatement [2]** 13/13 13/14
**mistake [3]** 13/10 45/1 70/5
**mistrials [1]** 15/25
**misunderstanding [1]** 55/6
**misunderstood [2]** 55/7 81/24
**mixing [1]** 36/3
**modifier [1]** 98/8
**modify [1]** 97/12
**money [16]** 18/3 19/18 19/19
19/22 24/23 25/25 26/1 26/5
27/13 28/24 40/21 40/21
40/24 43/25 46/13 48/14
**month [5]** 40/18 40/19 65/19
67/8 74/5
**months [9]** 43/13 47/17 47/18
48/4 53/10 61/9 61/23 64/1
73/1
**more [32]** 4/18 8/9 10/9 10/24
12/15 16/18 22/22 23/5 23/13
41/5 44/21 45/19 45/19 47/5
56/21 57/19 58/1 58/1 60/3
64/12 64/22 74/17 75/14 82/9
83/17 83/18 83/19 86/13
86/13 88/18 89/18 92/11
**Moreover [1]** 77/21
**morning [26]** 4/24 30/1 30/2
36/8 36/13 49/2 49/22 50/6
51/2 51/2 51/16 52/21 52/23
53/16 53/23 56/19 56/20
58/22 59/10 60/14 63/22
67/22 69/25 70/19 71/1 84/20
**morphs [1]** 58/3
**Morris [2]** 1/21 1/21
**mortar [1]** 35/4
**most [1]** 82/3
**mother [2]** 38/11 72/18
**motion [1]** 8/10
**motivated [1]** 21/21
**mouth [2]** 19/8 90/12
**move [1]** 51/24
**moved [1]** 69/7
**movie [1]** 78/14
**moving [3]** 64/8 64/8 92/14
**Mr. [28]** 4/21 6/9 9/2 10/3
35/14 36/7 44/18 44/18 44/21
46/18 46/20 46/22 47/5 48/23

58/15 59/9 59/12 60/13 60/24
77/6 82/15 96/13 97/25
**Mr. Adams [2]** 4/21 60/13
**Mr. Andino [2]** 35/14 47/5
**Mr. Arroyo [1]** 51/5
**Mr. Bagwell [1]** 9/2
**Mr. Bortz [12]** 36/7 44/18
44/18 44/21 46/18 46/20
46/22 50/10 58/15 59/9 59/12
60/24
**Mr. Bortz' [1]** 48/24
**Mr. Estefan [1]** 48/23
**Mr. Jones [2]** 55/19 57/5
**Mr. Kelly [1]** 97/25
**Mr. McKinney [5]** 6/9 10/3
77/6 82/15 96/13
**Mrs. [2]** 99/3 99/16
**Mrs. Loewe [2]** 99/3 99/16
**Ms [2]** 58/10 58/12
**Ms. [74]** 3/5 5/5 5/19 6/3
50/9 50/23 51/3 51/5 51/16
51/22 51/23 52/4 52/23 54/18
54/21 55/5 55/8 55/8 56/18
57/2 57/8 57/11 57/17 57/19
57/20 58/4 58/12 58/13 58/13
58/14 58/23 58/24 59/3 59/12
59/22 59/23 60/10 60/10
60/14 60/14 60/22 61/4 61/6
61/7 61/8 61/11 61/17 61/20
61/23 62/4 62/6 63/15 63/17
63/22 64/2 65/6 69/7 71/8
71/11 71/21 71/24 72/20 75/8
75/19 77/24 78/20 86/24
87/13 88/15 89/18 90/3 96/20
98/9 99/13
**Ms. Armstrong [1]** 57/17
**Ms. Barron [1]** 99/13
**Ms. Jones [53]** 3/5 5/15 50/9
51/3 51/5 51/16 51/22 51/23
52/4 52/23 54/21 55/5 56/18
57/2 57/11 57/19 57/20 58/4
58/12 58/13 58/14 58/23
58/24 59/3 59/12 59/22 59/23
60/10 60/10 60/14 60/22 61/6
61/7 61/8 61/11 61/17 61/20
61/23 62/4 62/6 63/15 63/17
64/2 69/7 71/11 71/21 72/20
75/8 75/19 77/24 86/24 90/3
96/20
**Ms. Jones' [8]** 50/23 57/8
60/14 61/4 63/22 71/8 71/24
88/15
**Ms. Nelson [1]** 58/13
**Ms. Rumba [2]** 55/8 55/8
**Ms. Rumba's [1]** 54/18
**Ms. Talla [2]** 5/19 6/3
**Ms. Vorpahl [5]** 65/6 78/20
87/13 89/18 98/9
**much [11]** 23/25 49/3 49/12
51/18 64/19 64/20 80/23
85/23 87/21 90/18 91/2
**multipart [1]** 88/5
**multiple [2]** 51/4 51/9
**multiple-assailant [1]** 51/9
**muscle [2]** 72/21 82/1
**muscles [1]** 81/25
**must [25]** 5/14 11/20 12/9
12/10 15/21 16/21 16/21 17/2
17/14 17/20 20/21 21/9 21/11
21/12 21/17 21/20 22/8 23/8
23/19 23/21 23/22 76/17

# M

**must... [3]** 86/16 88/7 94/15
**my [33]** 3/7 5/15 8/22 16/9
36/11 41/2 41/4 41/15 44/17
46/21 48/7 50/3 52/25 54/13
54/22 54/25 60/22 61/24
64/12 64/17 65/11 73/20
76/25 86/4 90/12 90/17 90/25
92/8 93/8 94/4 95/14 97/10
97/23
**myself [3]** 40/23 41/3 48/9
**MySpace [1]** 63/17
**mystery [1]** 59/16

# N

**naked [1]** 36/14
**name [1]** 29/14
**nature [3]** 22/4 27/21 29/6
**nearly [1]** 52/5
**necessarily [1]** 13/10
**need [31]** 7/22 7/25 9/6 13/14
21/21 23/23 30/15 30/15
30/15 30/17 30/17 31/12
31/14 31/24 31/25 36/2 39/16
40/8 40/10 45/17 54/5 60/17
62/21 74/25 84/20 85/13 86/8
88/18 88/23 90/23 91/22
**needed [3]** 8/18 36/24 86/14
**needs [2]** 41/12 91/17
**negative [2]** 60/5 97/1
**Nelson [4]** 58/10 58/10 58/12
58/13
**net [10]** 27/25 29/10 46/17
46/18 47/13 47/14 47/16
47/17 47/19 48/4
**never [22]** 6/21 10/24 15/22
21/16 30/4 37/17 40/12 40/14
50/2 55/9 63/8 63/10 63/11
70/8 71/22 79/7 80/7 81/5
82/16 82/16 83/17 83/17
**nevertheless [2]** 27/6 28/18
**new [8]** 8/10 45/21 53/2
61/25 64/8 70/3 72/24 73/3
**newspaper [1]** 16/23
**next [14]** 4/24 6/15 21/12
36/8 36/13 43/5 50/6 58/22
59/10 59/25 60/2 60/14 69/21
82/25
**nice [3]** 33/11 58/6 58/10
**nicely [1]** 51/16
**Nichols [3]** 74/6 76/14 80/15
**Nichols' [1]** 74/4
**night [18]** 3/19 35/25 36/11
50/4 50/7 53/5 53/7 54/4
54/13 55/18 57/21 58/17 59/3
59/15 59/24 70/23 80/1 84/19
**no [66]** 4/17 4/20 6/9 7/17
7/17 7/24 8/20 10/2 10/5
10/5 14/10 19/13 21/6 22/24
23/7 23/15 24/3 24/14 25/19
27/9 28/20 36/4 37/18 37/19
37/20 38/13 42/7 42/16 47/6
51/17 54/24 54/25 55/6 55/6
56/6 56/16 57/14 57/15 57/15
59/15 59/18 60/9 63/13 63/13
64/13 72/3 73/24 74/23 76/4
76/5 77/8 77/9 77/20 78/9
79/15 81/21 81/25 82/4 82/4
82/5 89/24 90/1 94/19 94/19
95/1 97/1
**non [4]** 14/9 24/6 32/14

**non-disclosure [2]** 32/14
32/15
**non-existence [1]** 14/9
**non-pecuniary [1]** 24/6
**none [4]** 19/17 25/4 25/24
75/11
**noon [2]** 57/1 68/19
**nor [2]** 21/15 50/3
**normal [1]** 70/1
**not [146]**
**note [8]** 3/17 16/1 63/22 85/5
90/23 92/4 92/8 92/12
**notes [11]** 15/3 15/5 15/6
15/6 15/7 15/9 15/9 29/23
54/2 56/22 85/17
**nothing [7]** 36/8 37/1 37/14
43/8 43/9 67/6 75/18
**notified [3]** 68/9 68/17 68/18
**notion [2]** 4/17 94/6
**now [39]** 7/11 11/20 19/23
20/16 24/23 26/5 27/13 28/24
30/11 30/11 35/15 36/20 39/4
40/15 40/22 41/20 43/3 43/9
44/4 45/20 46/13 52/16 52/25
56/20 57/11 57/19 58/14
58/20 61/14 62/18 62/21
64/11 71/4 75/16 77/25 84/12
84/13 94/13 99/2
**nude [1]** 69/21
**number [49]** 4/4 14/1 19/3
19/15 19/25 22/18 22/19
22/19 22/20 22/25 23/1 23/2
23/8 23/9 23/10 24/19 24/20
24/21 24/22 25/2 25/20 25/21
25/22 26/8 39/19 41/2 41/11
41/15 43/17 43/17 43/18 44/2
46/21 47/15 47/15 47/23
47/24 48/2 48/3 49/22 55/2
69/23 77/13 77/20 78/1 87/14
91/21 93/20 96/18
**Number 1 [5]** 19/3 19/25 22/19
39/19 49/22
**Number 2 [1]** 19/15
**Number 3 [6]** 22/18 22/19
22/20 22/25 25/2 77/20
**Number 4 [3]** 23/1 23/2 23/8
**Number 5 [4]** 23/9 23/10 24/19
24/21
**Number 6 [2]** 24/22 43/18
**Number 7 [3]** 25/20 78/1 91/21
**Number 8 [3]** 25/21 25/22
77/13
**Number 9 [1]** 43/17
**numbers [11]** 41/4 41/4 41/5
44/16 44/17 45/13 47/15 48/7
48/8 66/13 85/24
**numerical [1]** 15/22
**numerous [2]** 69/10 71/15
**nurse [1]** 61/19

# O

**o'clock [5]** 51/2 51/15 56/19
56/19 57/1
**oath [3]** 18/17 18/20 52/4
**OB [1]** 58/7
**OB-GYN [1]** 58/7
**object [3]** 32/7 34/2 87/24
**objected [1]** 95/22
**objection [4]** 7/17 10/5 10/5
95/14
**objectively [3]** 27/1 28/13

**obligations [1]** 10/25
**observed [3]** 52/1 52/3 61/18
**obtained [1]** 81/12
**obvious [1]** 22/12
**occasional [1]** 21/24
**occurred [2]** 89/23 89/23
**occurrence [3]** 27/2 28/14
47/1
**occurs [1]** 25/10
**ocean [2]** 84/1 84/7
**odds [2]** 50/20 71/8
**off [6]** 40/13 43/2 46/20
64/7 80/6 99/13
**off-the-chart-bad [1]** 46/20
**offended [1]** 21/16
**offends [2]** 27/24 29/9
**offensive [4]** 21/5 21/11
21/19 21/23
**offer [1]** 6/17
**offered [6]** 5/14 55/20 56/2
56/7 89/12 97/20
**offering [1]** 98/9
**offhand [1]** 21/23
**office [3]** 1/21 70/6 85/24
**offices [3]** 30/11 66/16 68/20
**official [4]** 2/12 7/19 7/21
100/7
**often [3]** 50/7 50/8 50/11
**Oh [2]** 3/9 47/25
**okay [33]** 3/9 6/2 6/19 7/3
7/9 7/10 7/12 8/25 9/6 10/9
16/4 20/16 22/18 26/9 26/12
26/14 32/11 32/17 37/8 47/24
55/23 56/10 64/25 85/5 85/6
86/11 90/8 94/6 95/10 95/11
96/19 98/16 99/3
**old [3]** 57/11 83/23 84/2
**Olsen [1]** 1/15
**omission [2]** 26/25 28/13
**on [144]**
**once [10]** 26/10 63/8 63/10
63/11 70/2 73/10 75/8 77/16
83/24 90/6
**one [76]** 1/16 1/19 3/4 3/6
3/16 4/18 5/6 5/23 6/13 7/7
8/9 10/9 14/6 17/1 22/22
23/5 23/13 29/23 30/4 33/7
33/18 34/23 36/10 37/18
37/20 38/13 39/21 39/22 40/7
42/3 46/23 48/22 49/15 49/21
50/21 51/18 52/6 53/13 54/24
56/21 56/21 57/15 57/15
58/18 58/24 63/13 63/13 67/5
67/8 67/14 70/25 73/13 74/10
74/17 74/21 75/14 76/4 76/5
81/11 81/24 82/4 82/4 82/6
84/8 84/17 85/16 85/18 85/20
88/6 90/11 90/19 90/20 92/7
94/10 94/15 99/12
**one-and-a-half-hour [1]** 52/6
**one-year [1]** 53/13
**ongoing [1]** 97/19
**only [39]** 4/6 5/6 12/4 12/24
13/17 13/18 15/4 16/21 17/3
17/10 18/1 23/25 38/7 40/21
40/22 42/20 45/20 48/12 49/2
49/21 58/15 60/8 62/25 62/25
62/25 63/7 63/15 67/8 73/1
73/2 74/16 74/21 86/3 86/4
87/10 88/7 94/15 98/9 98/15
**open [3]** 22/11 33/4 83/3

15

**opening [2]**  67/11 73/20
**operated [1]**  76/15
**opinion [5]**  11/25 14/17 14/18
14/22 17/5
**opposed [2]**  60/16 62/13
**option [1]**  66/23
**options [1]**  24/10
**or [144]**
**orally [1]**  16/8
**order [3]**  10/5 10/13 77/3
**orders [1]**  16/13
**ordinary [1]**  51/10
**organ [1]**  19/7
**organization [2]**  65/24 67/3
**orientations [1]**  31/17
**original [1]**  98/15
**originally [3]**  90/20 94/6
98/7
**other [60]**  9/19 11/22 12/13
13/12 13/21 14/2 14/7 14/9
14/19 15/9 17/3 17/13 18/9
19/10 19/11 19/12 19/17
19/19 22/3 22/17 23/23 24/6
25/4 25/15 25/15 25/24 26/1
33/17 39/22 42/7 42/7 45/18
46/19 47/22 49/12 49/14
49/16 55/4 60/21 61/4 61/11
67/24 73/16 73/18 73/18
73/18 73/22 73/22 73/22
73/23 73/25 74/9 74/11 74/20
77/5 81/19 87/10 94/10 94/11
99/16
**others [12]**  17/7 24/3 27/4
27/8 28/16 28/19 46/9 71/22
71/24 72/18 79/8 80/7
**otherwise [18]**  12/10 12/18
15/21 16/13 18/24 19/15
19/18 22/20 23/1 23/9 24/20
24/22 25/21 25/25 26/15
27/11 28/3 28/22
**ought [1]**  85/14
**ounce [1]**  69/13
**our [10]**  31/7 31/22 45/12
49/17 52/18 64/7 65/16 84/18
91/8 98/1
**out [41]**  5/4 8/17 8/18 16/1
17/17 30/7 33/16 34/8 34/16
35/4 36/9 39/2 39/3 39/5
39/8 39/9 40/2 40/11 49/5
52/19 53/15 54/24 54/25
55/20 56/22 60/18 61/25
65/14 71/15 72/13 72/25
74/25 82/3 86/10 87/12 90/23
92/13 94/12 94/25 98/16
99/15
**outlier [1]**  63/3
**outside [2]**  67/19 72/9
**outward [1]**  51/17
**over [17]**  8/19 31/25 35/3
35/8 35/9 35/9 47/7 49/1
50/17 58/3 62/20 68/5 82/13
83/23 84/13 90/7 93/18
**over-complicating [1]**  93/18
**overly [1]**  21/15
**overseas [15]**  11/16 31/18
87/4 88/16 91/25 93/7 93/21
94/7 96/10 96/15 96/21 97/6
98/5 98/14 98/16
**own [10]**  17/5 44/9 48/13 59/8
69/3 69/11 71/12 72/22 73/4

**P**

**p.m [7]**  69/2 69/6 69/17 85/4
85/4 86/7 86/7
**page [21]**  3/8 3/9 3/10 3/13
3/20 3/20 3/22 3/24 4/6 4/16
5/21 6/4 7/5 29/12 29/12
39/19 43/18 55/17 77/10
77/25 79/13
**Page 11 [1]**  39/19
**Page 18 [1]**  43/18
**Page 2 [1]**  79/13
**Page 20 [3]**  55/17 77/10 77/25
**Page 27 [1]**  29/12
**Page 31 [2]**  3/8 3/9
**Page 32 [3]**  3/24 6/4 7/5
**Page 977 [4]**  3/20 4/6 4/16
5/21
**pages [1]**  5/4 5/6 6/16
**paid [6]**  14/24 19/22 24/23
26/5 27/13 28/24
**pain [11]**  20/2 20/4 24/5 25/5
41/1 41/7 43/23 44/23 45/3
51/17 51/25
**panties [1]**  82/13
**Papilloma [1]**  81/11
**paragraph [10]**  3/4 3/6 3/11
3/12 3/14 3/16 6/3 6/14 7/4
7/7
**parents [1]**  61/21
**part [9]**  6/18 17/13 26/9
32/20 46/6 52/10 66/3 92/6
95/7
**particular [2]**  22/16 50/22
**parties [7]**  4/9 10/12 18/19
27/23 29/8 65/16 75/5
**parties' [1]**  12/5
**partner [2]**  61/25 72/24
**parts [1]**  95/7
**party [11]**  25/10 25/15 25/15
56/11 56/13 56/14 60/13
69/16 69/18 71/15 94/10
**pass [1]**  47/7
**passed [2]**  61/25 72/25
**passionate [1]**  80/1
**past [18]**  20/3 20/6 20/10
20/13 33/24 37/3 41/2 41/8
41/9 41/15 41/20 42/4 42/4
44/24 45/5 45/9 45/12 69/22
**path [1]**  54/20
**patience [1]**  78/18
**patient [1]**  54/19
**pause [1]**  15/24
**pay [8]**  24/7 24/17 24/18
25/4 31/23 33/23 38/20 43/20
**PC [1]**  1/15
**pectoral [2]**  81/25 82/1
**pecuniary [1]**  24/6
**penalty [2]**  27/18 29/4
**penetration [1]**  19/7
**Pennsylvania [1]**  1/22
**people [28]**  5/9 13/12 31/11
31/17 31/20 32/6 33/8 33/15
34/18 34/20 35/9 35/19 37/11
37/12 37/13 39/8 60/1 61/3
61/18 69/10 71/20 72/14
73/17 73/19 73/23 74/11
83/15 87/23
**percent [5]**  46/16 47/14 47/23
48/2 48/3
**percentage [1]**  48/1

**perfect [2]**  6/11 81/6
**performance [1]**  21/6
**perhaps [3]**  56/21 71/1 88/4
**permanently [1]**  63/20
**permit [1]**  24/1
**permitted [2]**  13/19 14/17
**person [17]**  4/18 5/23 14/15
19/6 19/8 19/10 19/11 19/12
21/10 21/15 21/18 22/9 22/11
34/6 61/5 74/20 76/18
**person's [2]**  19/8 21/13
**personality [1]**  71/21
**persons [1]**  17/13
**perspective [5]**  21/10 21/10
21/12 21/15 21/16
**persuades [1]**  12/14
**pervasive [1]**  20/22
**Pete [23]**  50/25 51/15 52/6
54/2 54/7 54/8 54/12 54/14
55/6 55/8 57/8 59/13 67/20
67/24 68/4 68/5 68/12 70/1
70/3 70/14 70/25 71/1 80/2
**phone [11]**  56/21 57/5 57/7
58/25 59/8 59/12 66/12 67/22
69/23 69/24 85/24
**physical [15]**  20/2 20/4 20/9
20/11 22/3 41/1 41/7 41/14
41/16 41/16 44/23 45/3 45/8
45/10 61/18
**physically [2]**  19/12 21/4
**physician [2]**  68/12 68/15
**physician's [1]**  54/16
**pick [1]**  89/7
**picked [1]**  84/5
**picking [2]**  51/1 80/3
**picture [1]**  60/1
**pictures [3]**  63/17 63/19
63/21
**piece [1]**  63/1
**piling [1]**  38/4
**Pinto [3]**  33/11 33/11 33/12
**Pintos [1]**  33/10
**place [5]**  38/16 51/17 82/13
86/16 87/12
**places [2]**  73/22 74/10
**plaintiff [25]**  1/3 10/5 11/17
11/17 17/19 17/21 18/3 19/23
20/5 20/8 21/11 21/19 22/8
23/21 23/23 24/8 24/12 24/16
24/24 25/1 26/6 29/17 29/19
64/22 87/18
**plaintiff's [10]**  17/23 20/20
20/23 21/2 21/6 21/9 23/18
86/18 95/2 95/10
**plaintiffs [4]**  1/13 7/17
89/19 90/2
**Plaintiffs' [1]**  41/22
**plan [3]**  11/3 31/11 70/9
**plate [1]**  53/19
**play [3]**  17/12 78/14 98/1
**playing [1]**  9/14
**please [15]**  10/20 10/22 16/5
19/13 29/21 40/16 54/1 54/2
65/2 65/5 65/7 78/22 84/17
85/2 89/13
**plenty [1]**  71/23
**PLLC [1]**  1/21
**pocket [1]**  33/18
**point [9]**  5/6 5/14 43/5 50/22
54/9 54/20 56/22 57/12 67/18
**pointed [3]**  8/17 8/18 71/15

**P**

policies [7]   8/4 30/15 30/19
 35/10 37/1 44/9 79/20
policy [6]   33/19 33/23 43/10
 75/4 75/7 83/3
popular [1]   53/5
Porter [1]   2/5
portion [7]   5/10 6/15 9/18
 9/20 15/2 76/2 76/3
posed [1]   92/3
posited [1]   70/13
position [5]   32/5 53/20 76/11
 76/18 80/1
positive [1]   25/13
possible [5]   16/7 18/25 54/14
 72/24 88/15
possibly [4]   49/13 49/14 84/4
 93/10
post [1]   89/22
posted [1]   63/17
potential [3]   27/4 28/16 46/9
poured [1]   69/13
pray [1]   80/15
prayer [1]   86/18
preceded [1]   57/6
precisely [1]   65/23
precision [1]   23/24
preclude [1]   42/21
predicated [1]   46/24
predicates [1]   7/13
predicted [1]   53/23
preference [1]   8/23
pregnant [2]   61/14 73/8
prejudice [1]   17/12
premises [1]   35/8
preponderance [7]   12/11 12/13
 12/17 14/12 17/20 23/21
 24/12
prerogative [1]   94/8
present [8]   3/2 6/6 9/5 10/21
 18/15 18/20 19/1 65/4
presentations [1]   76/8
presented [4]   16/22 18/12
 18/17 18/22
presents [1]   31/12
president [1]   66/15
presiding [1]   29/13
pretend [1]   75/10
pretending [1]   72/20
pretty [3]   4/16 49/12 54/17
prevent [1]   8/7
previous [1]   3/12
previously [1]   6/6
print [1]   29/15
prior [4]   7/6 72/11 86/17
 88/15
private [1]   83/4
probability [8]   20/5 20/8
 20/12 20/15 27/3 28/15 41/17
 46/8
probably [7]   42/16 45/19
 62/20 70/24 80/13 82/4 84/23
problem [11]   31/8 59/19 59/22
 60/12 60/19 66/9 90/14 91/12
 91/14 91/16 97/14
problems [2]   73/17 83/6
procedural [1]   8/2
procedure [1]   74/14
proceed [5]   29/18 29/19 33/5
 33/6 48/24
proceeded [2]   27/7 28/18

proceedings [3]   19/7 92/17
 100/2
produced [2]   1/24 12/20
produces [3]   26/21 28/9 45/24
professional [1]   62/25
professionally [1]   65/25
profile [1]   8/8
profits [1]   48/13
program [2]   66/21 67/4
progresses [1]   54/10
project [1]   68/16
promise [4]   78/25 79/1 79/2
 79/10
promised [1]   76/18
prompt [4]   22/13 22/15 23/11
 43/4
promptly [1]   16/6
prone [1]   82/9
proof [5]   14/8 26/21 28/9
 45/17 45/24
proper [3]   6/20 92/2 94/3
properly [2]   3/19 14/5
proposal [3]   89/18 89/19
 90/25
proposals [2]   97/20 97/21
propose [3]   88/20 89/11 89/19
proposed [5]   86/11 87/17
 87/18 91/9 98/10
proposing [1]   89/17
propriety [2]   27/25 29/10
proscribed [1]   9/16
protect [1]   79/4
protecting [1]   48/13
protection [1]   62/11
proud [2]   83/17 83/19
prove [7]   13/3 13/25 18/7
 22/8 23/21 23/24 80/8
proved [1]   12/16
proven [1]   17/19
proves [1]   24/12
provide [2]   85/11 85/12
provided [4]   6/4 8/15 66/24
 75/22
provides [1]   29/12
psychologically [2]   21/7 90/5
public [3]   27/24 29/9 70/24
publicity [1]   16/20
publicized [2]   66/8 66/13
pull [1]   47/7
punctuality [1]   10/23
punish [3]   47/21 80/25 81/1
punished [2]   46/20 79/2
punishment [2]   27/18 29/4
punitive [3]   77/12 32/20 45/16
purpose [3]   12/23 12/25 50/22
purposes [1]   11/7
push [1]   94/11
put [18]   32/16 33/17 34/5
 34/5 34/6 48/3 51/23 54/5
 55/11 56/24 60/24 67/12
 75/19 79/4 79/7 80/25 83/14
 89/14
putting [1]   43/6
puzzled [1]   92/25

**Q**

question [137]
Question 1 [3]   19/14 27/16
 41/1
Question 2 [4]   19/15 19/22
 26/14 40/16
Question 3 [1]   42/9

Question 9 [2]   27/10 46/24
questioned [3]   18/19 79/24
 80/4
questionnaires [1]   33/16
questions [14]   10/14 12/8
 12/11 15/20 18/14 18/21
 45/18 73/12 74/22 75/11 77/4
 77/4 77/6 92/3
quick [1]   85/9
quickly [2]   62/21 72/15
quite [3]   87/12 87/20 92/17
quote [2]   72/23 76/11

**R**

RA [1]   6/4
radio [1]   16/24
randomly [1]   69/12
rank [1]   74/8
rape [20]   6/7 19/4 19/6 19/10
 33/25 34/4 36/23 37/15 51/10
 63/19 63/20 68/13 68/14 69/5
 71/13 71/17 72/9 77/12 79/21
 83/6
raped [33]   34/1 36/20 37/6
 38/7 39/24 42/12 42/21 49/23
 49/25 50/15 50/17 50/17 51/4
 51/11 54/23 55/22 58/8 58/17
 59/11 61/24 63/15 68/11
 70/10 74/2 74/16 75/12 77/7
 78/15 79/11 80/6 80/7 80/10
 82/8
raping [1]   60/22
rapist [1]   50/12
rapists [3]   50/7 50/8 50/11
rather [7]   21/17 40/23 96/23
re [1]   17/5
re-examine [1]   17/5
reach [3]   13/22 17/1 77/19
reached [2]   15/18 16/11
reaction [1]   21/13
read [21]   5/10 6/12 6/16 6/17
 7/1 7/21 10/10 10/12 10/13
 11/3 16/18 16/23 26/10 40/3
 55/12 55/16 77/16 86/18 91/1
 93/17 98/12
reading [4]   11/4 85/20 90/18
 91/2
ready [8]   29/18 29/19 29/24
 29/25 38/25 50/10 52/19
 88/21
real [3]   17/9 36/1 59/22
realized [2]   51/3 55/22
realizing [1]   51/11
really [17]   8/16 8/19 37/14
 39/13 39/15 47/23 47/23
 47/24 47/24 50/11 50/20
 62/19 64/11 67/13 89/15
 90/12 91/8
reason [4]   13/22 87/10 92/19
 92/23
reasonable [9]   13/19 20/5
 20/7 20/12 21/10 21/13 21/18
 23/4 41/17
reasonably [4]   19/23 22/14
 24/24 26/6
recall [6]   4/9 12/21 56/17
 58/11 73/20 74/5
receive [1]   22/10
received [3]   12/20 24/13
 70/22
recess [6]   9/4 10/19 15/15

**R**

**recess... [3]** 65/3 85/4 86/7
**recessed [1]** 99/18
**recklessly [2]** 25/12 78/4
**recollection [3]** 4/15 15/8
15/10
**recommend [1]** 92/14
**reconstructive [1]** 41/10
**record [9]** 5/24 6/18 9/25
62/7 62/13 72/20 79/3 89/21
100/2
**recorded [3]** 1/24 18/13 18/21
**recording [2]** 72/5 72/23
**records [5]** 59/1 59/8 69/3
72/6 72/23
**recover [2]** 18/3 42/23
**redacted [6]** 3/19 6/24 7/11
9/18 10/1 10/4
**redaction [1]** 5/11
**redundancy [1]** 11/4
**refer [3]** 11/6 92/5 96/17
**reference [7]** 9/18 86/25 87/3
87/4 88/22 89/2 93/19
**referenced [1]** 87/7
**referred [2]** 88/3 88/11
**referring [1]** 94/23
**refers [8]** 88/15 92/5 96/3
96/7 96/8 96/9 96/14 96/20
**refused [1]** 63/8
**regard [2]** 32/9 75/5
**regarding [5]** 54/2 76/13 77/7
77/12 95/23
**regardless [2]** 12/19 12/20
**registered [1]** 61/19
**regularly [1]** 15/1
**reinforcing [1]** 92/3
**reject [1]** 78/17
**related [6]** 21/24 81/20 93/14
93/15 94/21 94/22
**relation [1]** 74/9
**relations [2]** 66/11 75/25
**relationship [2]** 70/4 70/24
**relationships [1]** 75/4
**released [1]** 68/22
**relies [1]** 25/15
**rely [4]** 14/19 14/21 15/5
15/7
**remain [2]** 7/1 10/23
**remained [1]** 24/8
**remaining [1]** 76/25
**remains [1]** 55/3
**remedial [4]** 22/13 22/15
23/11 43/4
**remedied [1]** 43/6
**remedy [4]** 22/14 40/22 43/1
43/15
**remember [22]** 4/2 4/23 13/12
17/9 31/6 40/17 41/21 52/1
52/5 54/6 54/22 57/24 58/6
58/10 58/21 60/6 60/6 60/16
62/1 62/5 72/25 81/11
**remembered [3]** 56/8 62/3
70/11
**remembers [4]** 13/11 36/8
36/10 55/21
**remind [1]** 39/22
**reminds [1]** 33/19
**remotely [1]** 52/8
**repeated [1]** 91/22
**report [10]** 5/2 6/5 22/10
34/3 54/18 57/9 57/9 59/1

**reported [3]** 35/13 72/4 81/10
**reporter [3]** 2/12 18/20 100/7
**Reporter's [1]** 100/1
**reporting [1]** 72/17
**reports [2]** 5/19 72/23
**represent [5]** 3/4 37/16 66/4
83/17 97/23
**represented [2]** 44/13 44/13
**representing [2]** 18/19 37/12
**represents [2]** 15/2 33/7
**request [1]** 22/3
**required [4]** 10/11 14/18
16/12 75/12
**requirement [1]** 21/7
**requires [3]** 11/4 11/5 14/11
**reserve [1]** 54/17
**resist [1]** 19/12
**resolution [5]** 66/21 66/23
66/25 67/4 74/14
**resolve [2]** 66/9 67/5
**resolved [2]** 67/7 74/13
**resources [3]** 66/11 66/15
68/25
**respectfully [1]** 94/24
**respond [5]** 16/6 59/4 61/16
61/20 64/14
**responded [1]** 80/16
**response [10]** 16/9 19/25 25/11
26/7 27/16 29/2 32/17 89/11
89/17 93/25
**responses [3]** 87/18 87/18
91/8
**responsible [2]** 77/23 77/23
**rest [3]** 3/6 16/18 71/22
**result [4]** 19/24 25/1 26/7
78/8
**resulted [3]** 26/19 28/7 46/1
**retire [2]** 15/12 73/10
**retirement [1]** 24/10
**retires [1]** 85/3
**return [2]** 72/12 78/12
**returned [1]** 69/17
**reveal [1]** 15/20
**review [1]** 71/6
**reviewed [1]** 59/1
**reviewing [1]** 14/24
**Richmond [1]** 1/17 1/20
**rid [1]** 31/15
**ride [3]** 54/6 67/20 94/15
**ridicule [1]** 22/2
**right [36]** 5/3 3/14 3/25 4/19
6/9 6/22 7/6 7/11 7/25 8/1
9/8 9/16 12/22 10/18 29/24
30/11 31/18 32/22 36/19
37/19 37/20 39/4 50/9 52/8
55/25 56/4 56/7 62/18 65/6
74/11 85/8 96/12 96/13 98/10
98/11 99/2
**right-hand [1]** 3/25
**rights [3]** 27/7 28/19 46/11
**ring [1]** 52/17
**ripped [1]** 81/15
**rise [3]** 10/20 65/2 85/2
**rises [1]** 21/1
**risk [6]** 27/3 27/6 28/15
28/17 46/8 47/1
**risked [1]** 72/14
**Riverway [3]** 1/16 1/19 2/10
**RL [1]** 11/15
**road [1]** 10/9
**Rohypnol [3]** 60/4 60/8 60/10

**romantic [1]** 75/4
**Ron [1]** 1/18
**room [25]** 6/8 30/10 33/25
36/21 37/2 40/4 41/24 49/6
50/5 54/1 54/13 54/22 55/20
55/25 56/5 57/23 60/14 64/8
67/19 69/12 69/19 69/23 74/7
81/2 84/24
**ROOT [8]** 1/6 1/7 11/13 11/13
11/13 11/14 11/15 11/15
**route [1]** 57/2
**row [1]** 17/17
**ruffies [1]** 36/4
**rule [4]** 10/9 14/10 47/5 47/6
**ruled [1]** 9/19
**rules [17]** 30/16 30/17 30/17
30/21 30/23 30/24 31/1 35/1
39/10 39/11 39/11 47/3 76/12
76/15 79/3 79/6 79/9
**rules.' [1]** 30/20
**ruling [1]** 9/7
**Rumba [9]** 54/16 55/8 55/8
59/14 68/6 68/7 68/12 69/11
72/5
**Rumba's [2]** 54/18 57/9
**Runions [2]** 2/4
**ruptured [1]** 81/21
**Rusk [1]** 2/14
**Ryan [2]** 80/9 80/11

**S**

**safe [4]** 31/21 33/11 35/7
44/13
**safety [6]** 27/7 28/19 32/19
46/11 68/18 71/12
**said [33]** 6/4 8/9 13/5 18/9
41/24 44/10 47/4 47/5 47/22
47/25 50/15 53/1 54/13 55/7
55/9 60/8 60/16 60/16 60/16
62/5 63/5 74/10 80/16 81/6
81/6 81/20 82/15 84/3 84/8
86/22 95/23 96/3 97/17
**said/she [2]** 60/16 60/16
**same [22]** 18/23 18/25 19/19
19/20 21/18 26/1 26/2 26/9
26/12 44/12 45/6 46/23 55/3
68/8 68/11 68/16 69/18 70/6
74/7 76/12 90/15 90/15
**sample [1]** 82/18
**samples [1]** 6/7
**San [3]** 61/6 61/11 73/5
**sanction [1]** 8/22
**sand [1]** 83/23
**Santuro [2]** 34/22 83/11
**Sara [7]** 53/6 70/22 79/21
82/21 82/24 83/5 83/7
**sat [5]** 69/15 81/9 81/10
81/12 81/14
**saved [1]** 36/4
**saw [10]** 4/24 38/5 52/3 57/21
57/21 59/13 60/1 67/19 83/22
83/24
**say [43]** 5/8 8/12 13/6 17/16
18/10 30/14 30/19 32/21
32/23 32/23 33/3 33/22 37/13
42/22 46/5 53/22 56/4 58/1
60/25 62/22 63/15 64/7 64/12
67/6 67/14 71/17 76/5 78/13
81/18 82/5 84/17 86/8 88/14
88/18 88/19 88/22 91/23
93/19 93/22 96/20 97/5 98/3

say... [1]   98/20

saying [12]   6/25 7/24 16/1
38/19 55/6 79/22 79/23 79/23
86/15 90/9 93/24 99/7

says [23]   34/10 34/11 36/4
36/7 40/10 42/3 50/16 51/3
51/10 51/19 52/3 52/11 52/12
54/19 54/19 54/21 61/24
64/13 65/20 65/24 76/11 82/2
95/21

Scarano [6]   62/24 70/13 71/14
71/17 71/20 72/21

scenarios [1]   41/23

schedule [2]   84/14 86/5

schedules [2]   84/17 84/18

school [1]   41/25

Schulz [9]   37/4 55/2 55/9
57/2 59/14 63/23 68/14 69/11
72/5

Schulz' [2]   57/9 64/3

scientific [2]   4/17 6/9

Scott [9]   58/5 58/6 58/7 61/8
62/2 62/5 62/7 72/22 82/7

Scott's [2]   62/7 62/7

scrapes [1]   64/10

scratch [2]   36/16 37/5

screen [2]   55/14 60/3

screenplay [1]   78/15

script [1]   11/6

scrupulous [1]   10/24

seashore [2]   83/21 83/22

seated [2]   10/22 65/5

seats [2]   11/1 17/16

second [14]   3/12 3/20 3/22
40/25 43/23 52/1 52/2 69/20
73/12 81/11 88/7 92/16 92/22
94/15

secondly [1]   25/4

secure [1]   68/23

security [3]   68/9 68/18 71/9

see [16]   9/25 30/12 33/22
39/3 40/6 51/18 54/3 56/25
58/5 60/7 61/22 72/15 83/24
92/4 92/16 97/14

seek [1]   17/10

seem [1]   4/9

seems [4]   40/18 86/18 88/2
94/1

seen [9]   9/20 37/17 39/23
59/21 63/6 71/6 71/23 73/14
82/3

sees [2]   36/15 55/2

seized [1]   6/7

Select [1]   15/14

selection [3]   33/9 46/14
47/22

Senator [1]   72/18

send [7]   79/16 89/13 90/23
92/12 93/23 94/12 99/4

sending [1]   38/23

sense [12]   13/22 17/9 27/24
29/9 49/20 49/20 50/18 50/24
51/12 52/7 52/16 65/14

sensibilities [1]   29/8

sensibility [1]   27/23

sensitive [2]   21/15 84/17

sent [5]   16/1 49/5 52/14 60/4
90/20

separate [1]   5/14

separately [2]   19/17 25/24

sequence [3]   10/10 10/25
52/20

series [1]   75/9

serious [1]   21/25

serve [1]   65/14

service [3]   49/3 64/19 65/12

SERVICES [4]   1/7 11/13 11/16
11/16

set [1]   26/9

setting [1]   65/25

settling [1]   85/19

seven [1]   16/2

several [3]   69/9 72/25 74/12

severe [1]   20/22

severity [1]   21/4

sex [10]   21/20 50/5 53/12
54/14 58/15 70/12 72/1 72/10
80/2 82/10

sexual [23]   19/7 20/19 20/19
20/21 21/21 21/21 21/21 22/2
22/3 22/4 23/12 31/7 31/8
35/14 42/10 42/10 43/7 62/1
72/24 73/2 76/3 77/14 83/5

sexually [18]   22/21 23/5
34/21 42/9 42/11 42/12 42/15
42/17 42/25 43/19 44/11
53/11 72/2 74/3 74/17 75/14
77/18 77/24

shake [1]   8/24

shall [4]   11/8 11/9 11/11
11/17

Sharon [1]   2/9

she [263]

she'll [3]   37/23 37/24 80/25

she's [18]   35/4 35/5 35/6
35/7 35/21 36/9 36/13 38/4
52/10 57/12 61/24 68/10
69/22 79/16 79/17 81/3 81/7
81/15

sheets [1]   82/14

shipping [2]   71/5 78/16

shock [1]   51/18

shorter [1]   92/15

shortly [1]   68/11

should [40]   9/19 9/25 11/1
12/7 13/2 13/9 13/18 15/4
15/5 15/7 15/8 17/22 17/24
17/24 18/6 21/2 22/7 22/12
23/4 24/2 25/14 27/14 27/19
28/25 29/14 32/4 42/14 45/1
52/17 72/12 77/12 77/19
77/20 77/22 78/6 87/7 94/1
95/25 97/5 97/12

shouldn't [2]   4/12 87/9

show [8]   38/20 39/22 55/4
59/8 61/2 63/18 90/3 99/15

showed [4]   57/8 58/25 58/25
59/4

shown [6]   3/18 61/6 61/6 61/7
61/10 61/10

shows [2]   24/8 52/20

shut [1]   90/12

sic [1]   63/25

sick [2]   30/7 61/22

side [1]   99/16

sides [1]   63/14

sideshow [1]   37/6

sign [3]   29/14 91/18 97/9

signed [20]   16/14 34/11 34/13
53/13 72/16 76/20 88/23 89/6
92/1 93/1 93/12 93/21 94/20
96/11 96/16 96/21 97/10 98/6

significance [1]   13/16

significant [1]   15/2

Significantly [1]   74/19

signing [1]   91/17

signs [2]   51/17 61/20

Simco [6]   53/6 79/21 82/21
82/24 83/5 83/7

Simco's [1]   70/22

similar [4]   21/13 21/14 21/18
69/7

simple [3]   13/9 21/23 49/18

simpler [1]   92/15

simply [6]   6/18 13/15 14/11
58/20 89/21 92/24

since [4]   9/17 26/10 88/17
92/9

single [3]   13/25 14/3 63/1

sips [2]   36/8 58/21

sir [2]   29/22 78/21

sit [3]   64/10 78/13 83/20

sitting [3]   40/10 57/21 62/20

situation [3]   22/15 27/22
29/8

six [4]   38/4 52/2 53/10 64/1

skin [1]   63/25

skip [2]   26/11 26/12 77/5
77/10

slept [2]   58/23 70/20

slight [1]   87/17

slower [1]   62/20

small [7]   53/3 53/14 63/24
63/25 64/9 64/9 64/9

smart [1]   87/23

snacks [1]   84/21

so [78]   5/5 5/9 5/16 6/13
6/23 8/13 8/21 10/25 13/13
16/8 17/2 18/1 22/11 22/11
23/19 31/10 31/16 33/22 37/8
37/22 38/24 39/7 40/5 40/11
40/16 41/4 41/23 42/2 42/8
42/18 42/23 43/18 44/14
44/20 45/15 45/23 46/3 46/19
46/19 46/20 47/8 47/10 47/10
47/18 50/17 51/8 51/25 54/2
54/7 55/10 55/23 57/25 59/12
60/20 61/2 62/9 62/10 63/25
64/19 68/20 73/16 76/16
77/19 80/23 83/8 84/16 86/5
86/9 87/2 87/15 88/11 88/19
95/9 95/25 96/3 96/19 97/10
99/14

solely [1]   17/7

some [34]   5/14 8/17 9/15 13/4
13/5 13/5 13/12 18/8 18/9
18/15 18/18 18/19 18/21
19/19 26/1 30/15 30/16 30/19
31/24 55/11 60/17 62/9 62/22
63/16 67/18 67/21 68/2 68/19
69/21 78/11 83/15 84/13
85/19 91/18

somebody [5]   8/22 30/18 33/20
42/24 46/15

somebody's [1]   46/17

someday [1]   30/18

somehow [1]   77/22

someone [11]   21/16 37/8 37/10
39/11 51/19 52/16 54/3 73/16
74/24 75/16 76/10

someone's [1]   53/19

something [29]   4/9 4/10 4/11
4/12 8/9 8/12 13/6 13/6 18/9

**S**

**something... [20]** 18/10 32/21 32/24 33/13 36/17 44/7 44/13 54/4 60/20 70/25 76/18 76/19 81/19 82/9 87/11 88/14 88/18 93/25 94/5 94/15
**Sometime [1]** 69/1
**somewhat [2]** 57/3 87/8
**soon [3]** 12/1 53/7 85/11
**soon-to-be [1]** 53/7
**sophisticated [1]** 57/12
**sorry [10]** 8/14 32/7 38/1 38/1 41/8 42/6 81/23 81/23 88/19 97/25
**sort [4]** 58/2 60/7 60/18 84/2
**Sotto [3]** 5/18 5/22 6/1
**sought [3]** 26/22 28/10 45/25
**sound [2]** 35/15 52/8
**sounds [1]** 85/18
**SOUTHERN [1]** 1/1
**speak [2]** 64/13 64/17
**special [2]** 14/15 71/10
**specific [8]** 12/24 16/18 26/23 28/11 32/16 46/3 66/23 75/22
**specifically [2]** 32/14 94/22
**speculation [1]** 23/23
**speeding [1]** 47/8
**spend [4]** 48/14 50/7 67/10 76/24
**spent [6]** 50/4 53/6 53/10 59/15 71/19 77/19
**spiders [2]** 32/1 35/5
**splits [1]** 63/24
**spoke [5]** 55/8 55/8 57/10 59/13 60/2
**sporadic [1]** 21/23
**square [1]** 83/13
**stacking [1]** 33/14
**staff [2]** 5/18 86/4
**stake [1]** 38/3
**stand [13]** 18/16 19/2 38/6 38/10 41/9 41/21 62/3 69/6 72/8 79/15 80/24 83/10 83/25
**standard [3]** 24/14 45/17 45/20
**standards [1]** 65/25
**standing [1]** 17/16
**standpoint [3]** 27/2 28/14 46/7
**stands [1]** 37/9
**stare [1]** 49/7
**starfish [5]** 83/23 83/25 84/4 84/6 84/6
**start [5]** 9/3 33/14 39/18 51/8 53/9
**started [1]** 65/18
**starting [1]** 33/1 59/2
**starts [5]** 4/25 30/9 31/11 36/16 36/16
**state [12]** 4/14 5/1 14/17 49/14 59/1 59/5 63/10 69/2 69/4 69/8 79/13 79/14
**State's [1]** 69/3
**statement [22]** 3/5 3/24 11/23 25/17 34/7 39/24 40/2 40/3 40/7 40/8 40/10 50/1 50/9 50/18 50/23 57/25 59/6 69/4 78/3 78/7 79/17 79/18
**statements [2]** 12/2 73/21
**states [10]** 1/1 1/11 16/16

58/5 58/19
**stay [16]** 34/4 34/4 34/10 34/13 34/15 36/21 38/15 38/16 38/17 38/17 53/14 80/21 80/21 84/19 85/22 86/2
**stayed [3]** 37/2 49/6 49/9
**STDs [1]** 62/10
**stenography [1]** 1/24
**Stephanie [4]** 1/21 1/21 2/4 85/12
**Steward [5]** 41/21 42/6 43/21 43/21 45/14
**Steward's [1]** 41/24
**still [4]** 40/13 57/14 60/17 97/21
**stock [1]** 24/10
**stomach [2]** 61/13 73/8
**stood [3]** 34/23 65/19 82/15
**stop [11]** 22/14 23/12 37/12 38/9 44/11 46/15 47/13 47/14 47/21 48/5 80/25
**stopped [2]** 9/13 47/10
**stopping [1]** 43/7
**stories [2]** 40/9 75/10
**story [26]** 30/9 40/1 40/11 40/15 44/12 54/8 54/9 54/11 54/24 55/3 57/15 58/1 58/2 58/2 58/3 58/17 58/20 59/20 61/14 68/5 68/7 71/17 72/17 78/15 82/19 83/21
**straight [2]** 59/21 82/20
**straighten [1]** 56/22
**strains [1]** 81/11
**stranger [2]** 69/21 76/22
**street [4]** 1/22 2/6 2/14 30/11
**strongly [1]** 92/13
**stuck [2]** 6/21 30/7
**stuff [3]** 4/22 31/21 33/17
**subject [2]** 5/11 14/14
**subject's [1]** 6/6
**subjective [4]** 27/6 28/17 46/10 47/2
**submit [4]** 77/8 77/17 78/9 78/10
**submitted [2]** 6/7 90/2
**subordinate [1]** 75/6
**subordinates [1]** 75/4
**substantial [4]** 9/20 26/24 28/12 46/4
**successfully [1]** 39/12
**such [9]** 12/24 13/19 14/6 15/1 15/20 21/17 24/9 27/24 29/9
**sucks [1]** 54/5
**sue [3]** 30/18 38/19 38/24
**suffer [2]** 86/20 90/3
**suffered [3]** 20/12 78/8 88/24
**suffering [3]** 24/5 25/5 43/24
**suffers [2]** 25/16 88/8
**sufficient [3]** 13/25 80/10 91/12
**sufficiently [2]** 20/21 22/5
**suggest [1]** 94/1
**suggesting [1]** 72/11
**suggests [1]** 75/16
**suing [1]** 38/23
**Suite [3]** 1/16 1/19 2/11
**sum [9]** 19/18 19/19 19/22 24/23 25/25 26/1 26/5 27/13 28/24

**superior [2]** 32/5 71/22
**supervisor [2]** 75/1 75/5
**supervisors [1]** 75/3
**supply [1]** 48/16
**support [4]** 4/17 51/13 52/18 72/3
**supported [2]** 60/9 67/15
**supposed [3]** 35/2 35/6 35/7
**supposedly [2]** 52/14 59/11
**sure [10]** 3/19 4/16 8/3 8/9 35/7 36/18 47/2 75/3 87/2 90/13
**surely [1]** 96/25
**surgery [3]** 41/10 41/12 41/18
**surrounded [1]** 87/23
**surrounding [5]** 87/16 87/25 95/3 95/10 95/24
**Susan [1]** 2/3
**sustain [1]** 20/5
**sustained [2]** 20/2 24/16
**swabs [1]** 82/13
**swear [1]** 82/22
**swears [1]** 79/25
**sworn [3]** 16/25 18/13 76/23
**sympathy [1]** 17/12
**system [1]** 65/17

**T**

**table [2]** 30/13 41/21
**Tackett [1]** 60/6
**take [15]** 10/3 15/13 23/11 32/2 32/3 34/6 37/20 40/25 43/4 54/18 75/20 75/23 78/6 84/21 98/16
**taken [14]** 5/4 9/4 10/19 15/3 15/7 22/17 63/10 65/3 68/23 71/10 71/12 85/4 86/7 86/16
**takes [3]** 36/7 68/6 69/5
**taking [3]** 29/23 50/23 85/9
**talk [11]** 8/22 8/24 16/12 32/14 45/17 46/18 54/3 85/13 86/3 91/15 95/8
**talked [10]** 8/8 32/8 33/9 40/19 46/14 46/15 46/16 47/22 59/14 82/2
**talking [11]** 4/21 5/23 5/24 32/13 57/13 61/8 76/25 88/17 91/11 95/16 95/17
**talks [2]** 4/22 95/8
**Talla [2]** 5/19 6/3
**task [1]** 17/25
**taught [1]** 76/2
**teasing [1]** 21/23
**technical [5]** 11/15 14/14 14/16 14/17 33/21
**telephone [1]** 66/19
**television [1]** 16/24
**tell [30]** 8/6 31/12 31/20 33/16 34/4 34/21 40/13 40/22 44/5 44/17 51/5 55/17 56/10 56/12 56/13 56/14 58/12 59/16 62/6 63/7 70/19 73/22 78/15 79/13 79/14 79/18 80/25 88/23 90/12 90/13
**telling [6]** 13/11 32/6 33/8 33/10 50/16 54/8
**tells [7]** 54/12 57/7 61/24 68/5 68/7 75/8 82/24
**ten [2]** 61/23 64/25
**tending [2]** 13/3 18/7
**tends [1]** 90/3

**tent [1]**  76/9
**Teresa [2]**  67/5 74/12
**terms [6]**  14/17 20/22 21/1
22/1 22/5 90/5
**Terri [1]**  61/8
**Terry [1]**  79/8
**tested [1]**  60/5
**testified [10]**  13/3 14/1 18/7
19/1 31/4 58/6 73/17 74/13
76/1 82/7
**testifies [2]**  4/23 14/25
**testify [2]**  18/16 66/3
**testifying [2]**  5/5 14/25
**testimony [31]**  12/18 12/22
13/2 13/7 13/20 13/24 13/24
14/6 15/2 15/11 18/6 18/11
18/12 18/16 18/21 18/22 41/9
50/25 51/22 54/3 55/12 55/15
56/17 60/7 62/5 62/7 62/14
71/24 74/1 74/4 80/14
**testing [1]**  60/4
**TEXAS [8]**  1/1 1/4 1/17 1/20
2/7 2/11 2/15 16/15
**than [27]**  4/18 12/15 15/10
34/17 34/24 39/6 39/14 40/24
42/7 44/18 44/21 45/19 45/19
47/6 56/21 72/13 74/5 74/20
76/19 80/23 81/2 81/19 83/18
83/19 84/10 88/18 94/11
**thank [20]**  7/9 10/22 10/25
29/20 30/4 48/22 48/23 48/25
49/11 64/19 64/20 65/7 77/2
78/18 78/20 78/22 84/11
86/11 89/9 99/17
**thanking [1]**  65/11
**that [564]**
**that's [107]**
**that's -- I [2]**  39/20 93/16
**their [35]**  7/22 31/18 33/17
33/18 34/2 35/1 35/1 35/10
36/25 37/1 37/14 38/11 39/10
39/11 44/9 47/16 47/17 48/16
50/7 61/21 62/11 62/11 62/12
72/15 73/3 74/12 79/9 79/20
82/4 86/5 86/19 88/3 92/14
93/11 97/18
**theirs [1]**  7/24
**them [44]**  7/19 8/9 8/23 9/2
12/7 12/19 12/20 26/10 26/11
26/12 31/7 31/18 32/5 33/10
33/15 33/16 33/16 33/17 36/4
37/16 38/16 48/5 48/7 48/16
49/8 54/1 63/8 63/18 68/1
68/1 74/12 79/7 81/1 82/10
85/11 86/4 89/14 90/6 90/22
91/4 91/5 94/14 99/8 99/11
**theme [1]**  97/19
**themselves [1]**  71/23
**then [54]**  6/19 6/21 12/7 15/5
16/6 19/14 22/19 22/25 23/8
23/17 24/19 25/20 26/9 26/15
27/10 28/2 28/21 31/15 31/16
34/8 34/23 35/18 36/13 37/22
37/23 40/15 41/12 43/19
44/15 45/12 45/15 45/25
46/10 46/15 47/12 52/4 54/14
55/2 55/7 55/8 59/10 69/7
69/18 73/8 74/4 77/10 82/12
92/1 92/25 93/7 93/21 94/7
94/18 97/12

**there [66]**  3/14 4/3 4/17 4/25
8/23 9/15 13/2 13/4 14/4
16/20 17/16 17/17 17/17 18/6
18/8 21/6 24/14 30/13 31/25
34/5 34/6 35/3 36/19 36/19
39/7 39/25 39/25 40/19 42/16
42/17 42/20 42/22 42/24
43/21 45/1 46/21 47/1 48/3
49/1 56/21 56/24 57/18 57/20
59/16 62/20 63/4 71/12 72/3
72/8 78/3 78/9 84/3 84/22
89/24 90/1 91/17 93/2 93/3
93/7 94/2 94/19 94/19 94/21
96/1 97/2 97/3
**there's [17]**  3/4 6/9 6/15
9/23 36/4 42/7 44/7 44/25
46/19 54/9 59/15 64/11 77/15
83/21 87/17 97/1 97/22
**thereafter [1]**  68/11
**thereby [2]**  25/16 88/8
**these [22]**  9/1 10/11 10/12
11/24 16/14 18/21 18/23
30/20 34/12 35/2 37/13 41/4
44/16 48/7 52/2 66/24 68/3
72/3 73/16 74/11 79/3 81/21
**they [150]**
**they'll [4]**  37/13 37/15 79/2
79/2
**they're [28]**  10/13 26/12
32/18 33/8 33/8 33/10 33/12
33/13 38/13 38/23 39/1 39/1
39/5 42/25 43/1 81/21 81/25
82/1 85/9 85/18 85/20 86/5
88/10 90/14 90/19 94/9 94/12
94/23
**they've [6]**  10/4 61/25 79/7
82/3 92/13 94/13
**thigh [1]**  64/5
**thing [12]**  5/5 33/7 39/23
48/10 49/2 49/15 56/8 86/3
86/4 86/8 87/10 98/9
**things [21]**  8/17 13/12 13/12
22/17 31/24 32/3 35/2 37/14
38/6 38/19 49/18 52/2 58/25
61/12 62/22 64/9 69/9 71/23
87/6 92/11 92/21
**think [63]**  3/4 4/8 5/1 5/5
6/20 7/18 9/23 9/24 11/4
12/7 17/7 38/20 38/23 39/6
44/25 46/16 49/8 50/20 52/17
53/21 54/5 54/23 57/19 81/13
85/17 86/2 86/9 86/15 87/7
87/8 88/10 88/13 88/16 88/18
88/22 90/1 90/6 90/18 91/1
91/6 91/7 91/8 91/10 92/14
92/20 92/23 93/17 93/22
93/24 94/2 94/18 94/23 94/24
95/3 95/22 95/25 96/1 96/5
96/12 97/2 97/3 97/5 99/6
**think -- I [1]**  95/22
**thinking [1]**  51/6
**thinks [1]**  50/18
**Third [1]**  70/1
**Thirty [1]**  62/17
**this [166]**
**those [32]**  11/3 14/17 16/17
23/19 33/1 33/18 37/12 40/6
40/7 45/13 48/11 50/23 52/13
53/16 53/19 59/5 59/6 59/6
60/23 63/18 63/20 66/7 67/3
67/25 74/22 76/15 79/6 81/25

**though [6]**  68/1 72/3 79/12
79/12 79/14 89/15
**thought [12]**  5/9 5/9 8/14
33/1 58/7 85/14 86/14 87/12
87/20 88/6 90/17 94/25
**thousands [3]**  83/22 83/23
84/3
**threatening [1]**  21/4
**three [13]**  2/10 31/23 35/17
38/5 42/20 47/16 47/18 48/4
52/12 58/18 61/18 65/16 95/7
**threw [1]**  84/6
**through [22]**  3/18 18/13 33/20
33/22 38/4 38/12 39/16 39/18
52/22 54/1 58/22 60/7 62/12
63/16 66/10 66/10 66/11
67/10 68/1 75/19 83/18 83/19
**throughout [2]**  49/17 64/16
**throw [1]**  83/25
**Thursday [3]**  67/13 67/17
68/19
**Thus [1]**  29/15
**ticket [1]**  54/25
**tie [1]**  55/10
**till [3]**  40/15 58/21 97/18
**time [40]**  5/23 13/5 15/20
16/5 18/9 18/18 27/2 28/14
46/25 50/22 51/21 53/22
54/20 54/21 56/19 56/20 57/1
57/13 57/19 58/3 58/3 60/7
62/14 62/19 64/2 64/17 66/6
66/6 67/21 68/8 68/11 68/16
68/19 72/8 78/19 82/25 85/23
88/6 92/16 97/16
**timeline [5]**  56/25 67/11
67/12 67/15 69/9
**times [4]**  15/25 31/23 73/18
73/22
**timing [1]**  84/13
**Title [1]**  23/17
**Title VII [1]**  23/17
**today [4]**  35/22 71/7 84/9
91/4
**Todd [2]**  1/14 64/13
**together [4]**  54/7 56/25 57/22
69/14
**told [48]**  7/7 9/6 31/14 32/14
37/18 40/22 41/2 42/6 44/12
45/14 49/24 51/15 51/23 52/5
55/19 55/23 56/3 58/7 58/15
58/18 61/13 65/13 65/20
69/10 70/3 70/14 71/11 71/20
72/8 73/7 73/20 73/23 76/7
76/11 76/14 79/6 79/21 80/24
81/3 81/8 83/9 83/10 83/11
83/12 84/22 85/6 86/3 86/4
**tolerance [5]**  35/12 35/15
35/16 35/17 43/10
**Tom [2]**  56/17 68/20
**tomorrow [2]**  99/4 99/8
**tone [1]**  51/10
**too [12]**  4/1 41/4 44/1 46/14
48/5 48/6 64/17 79/8 79/8
90/18 91/2 97/3
**took [5]**  38/10 41/21 49/5
80/24 83/10
**top [2]**  43/20 69/20
**torn [2]**  81/25 82/1
**town [4]**  53/2 53/3 53/3 55/1
**track [1]**  96/8
**tradition [2]**  11/4 29/16

**T**

trailer [6]  34/5 34/8 34/23 40/10 43/6 50/14
trailers [1]  34/22
training [6]  14/15 75/20 75/20 75/23 76/3 76/8
transcribed [1]  89/21
transcript [6]  1/10 1/24 6/18 7/1 91/10 100/2
transcription [1]  1/24
transmitted [2]  53/11 72/2
trauma [3]  81/20 82/4 82/5
travel [1]  68/13
traveled [1]  70/2
treading [1]  70/15
treated [1]  17/14
treater [2]  81/19 81/19
trial [21]  1/10 8/10 8/19 11/24 12/22 13/8 15/3 15/17 16/20 16/22 18/11 18/14 18/18 18/22 31/2 39/5 39/8 39/23 64/17 68/2 71/25
tricked [1]  75/17
tried [10]  31/10 44/11 44/11 49/13 49/16 50/3 50/3 62/12 83/3 83/4
tries [1]  75/3
trouble [3]  31/17 32/2 32/3
true [10]  12/15 12/15 45/19 45/19 49/19 49/20 51/13 52/17 78/5 80/12
truly [1]  81/23
trust [1]  48/21
truth [10]  13/11 14/5 17/11 25/13 26/22 28/10 40/12 40/14 45/24 75/19
try [6]  49/7 51/8 53/9 61/2 64/25 99/10
trying [4]  39/4 39/5 40/1 72/19
turn [2]  65/6 77/25
turned [2]  80/16 84/7
Twenty [2]  58/9 62/18
Twenty-eight [1]  62/18
twice [2]  19/20 26/2
two [27]  6/16 14/4 24/4 35/13 36/8 38/5 40/19 44/25 53/11 58/21 59/2 59/3 59/12 61/9 61/23 72/13 73/1 73/10 80/4 81/11 82/20 87/6 93/2 93/9 93/12 97/20 97/21
two-minute [1]  59/12
typed [1]  52/13
types [2]  14/4 64/6

**U**

U.S [1]  2/14
unable [1]  19/12
unanimous [2]  12/9 15/18
unbelievable [1]  75/9
unclear [1]  56/20
uncomfortable [1]  49/8
unconscious [1]  19/12
under [10]  18/15 18/17 18/20 19/18 21/13 26/1 49/3 50/23 52/4 60/23
understand [12]  10/11 16/3 32/25 53/20 61/22 79/19 88/2 89/9 91/14 93/6 95/14 98/2
understanding [1]  12/4
understands [1]  87/3

understood [1]  16/1
underwear [4]  62/11 62/11 62/12 73/3
unduly [1]  15/9
unfold [1]  52/25 53/23
unfortunately [2]  64/12 64/17
unidentified [3]  57/14 76/17 76/22
unimportant [1]  13/17
unison [1]  30/2
unit [3]  68/24 69/7 76/9
UNITED [8]  1/1 1/11 16/16 31/24 34/9 51/14 58/5 58/19
unknown [2]  57/14 71/13
unlawful [1]  20/17
unless [5]  12/17 15/21 16/12 21/25 48/8
unlikely [1]  52/24
unnamed [1]  57/14
unprotected [3]  53/12 58/15 70/12
Unquestionably [1]  42/11
unreasonably [1]  21/5
until [7]  15/20 36/8 36/18 57/3 60/13 74/5 84/13
unusual [1]  60/15
unwelcome [1]  20/19
unwitnessed [1]  60/19
up [55]  14/19 17/7 31/11 34/22 36/2 36/9 36/13 36/14 40/1 41/5 43/15 43/22 45/20 48/6 50/6 50/21 51/1 51/3 51/6 51/7 51/16 51/24 52/23 53/8 55/11 55/14 55/20 55/22 57/8 57/24 58/13 58/22 60/5 60/13 60/24 61/14 62/19 62/21 64/2 64/14 67/12 69/20 70/16 71/2 71/16 79/12 80/3 82/15 83/25 84/5 84/13 87/11 89/7 90/19 90/21
upon [3]  14/20 22/16 78/7
upset [2]  62/2 70/20
urge [1]  90/2
urine [1]  60/3
us [23]  7/7 9/2 10/23 30/9 38/19 38/24 39/6 41/23 42/6 45/14 50/18 56/22 57/7 71/22 78/18 79/13 79/14 84/10 84/25 85/1 87/15 90/17 98/25
use [7]  21/23 42/3 42/3 47/20 83/3 87/24 89/11
used [2]  8/6 62/11
useful [1]  8/15
uses [1]  66/22
using [1]  74/13
usual [1]  86/5
utterance [1]  21/5

**V**

vaginal [1]  82/13
vaginally [1]  58/16
vague [1]  93/25
value [1]  49/3
values [1]  66/4
variety [1]  66/11
various [1]  66/16
vast [1]  67/5
vehemently [1]  58/14
verb [3]  87/25 88/1 91/22
verbal [1]  22/4
verbiage [1]  89/20
verdict [12]  8/5 8/13 12/9

version [1]  95/10
versus [1]  87/18
very [20]  8/15 10/7 10/25 10/25 17/9 47/15 57/10 58/10 58/13 62/21 64/20 65/12 72/7 73/11 74/7 83/6 87/23 90/14 91/7 91/8
very -- I [1]  91/7
vice [1]  66/15
vice-president [1]  66/15
Vicknair [1]  1/15
victim [5]  51/9 63/19 72/9 81/4 81/7
victim's [1]  6/8
Victor [1]  62/24
Victory [1]  67/7
view [3]  21/14 21/15 43/6
viewed [2]  27/1 28/13
VII [1]  23/17
violate [1]  43/10
violated [1]  23/17
violates [1]  79/1
VIP [1]  71/10
Virus [1]  81/11
visit [2]  58/9 62/3
visiting [1]  8/5
voce [3]  5/18 5/22 6/1
voice [1]  51/10
voir [3]  33/9 40/17 49/10
voluntarily [2]  43/13 69/14
Vorpahl [6]  2/3 65/6 78/20 87/13 89/18 98/9

**W**

wages [1]  42/8
wagons [1]  48/13
waiting [1]  29/24
wake [1]  69/20
wakes [1]  36/13
waking [1]  51/24
walk [4]  50/3 50/4 50/14 63/12
walked [4]  36/2 50/10 63/11 82/16
walking [1]  5/11
walks [2]  36/14 36/18
want [38]  5/24 8/18 10/12 16/4 30/3 35/23 37/6 37/6 38/14 38/15 39/13 39/15 39/18 39/22 62/22 65/10 65/18 67/10 67/13 76/24 77/25 79/24 81/17 83/16 85/25 86/2 87/2 89/5 89/7 89/14 90/6 91/7 91/23 93/19 93/22 95/13 96/17 99/9
wanted [4]  34/1 54/3 62/9 62/9
wants [1]  34/9
warn [6]  31/24 31/25 32/1 32/2 32/3 83/7
warned [2]  70/4 71/1
warning [1]  32/4
was [183]
wasn't [8]  31/5 40/21 42/22 43/14 43/14 43/15 57/3 80/4
watch [2]  80/2 83/18
watched [3]  79/25 81/15 83/18
watching [3]  49/7 49/8 80/9
water [3]  70/15 71/6 72/7
way [27]  4/6 6/19 6/20 8/20

**way... [23]** 10/12 17/23 18/25
27/18 29/4 38/11 38/12 40/23
51/5 53/24 54/5 55/11 64/7
66/12 66/14 70/3 70/14 85/16
92/17 94/3 97/19 97/22 97/23
**ways [3]** 57/12 66/9 85/18
**we [147]**
**we'll [13]** 7/14 38/20 38/20
55/11 70/8 78/25 80/7 84/19
84/19 84/20 99/4 99/5 99/7
**we're [29]** 16/1 16/2 31/8
31/21 31/22 32/1 33/24 39/20
42/14 44/4 44/7 45/12 47/13
47/20 79/12 80/18 86/15
88/17 91/6 91/8 91/11 91/20
92/25 93/11 93/17 95/16
95/17 97/21 98/16
**we've [12]** 7/15 30/20 30/20
58/22 60/20 61/5 61/6 61/7
61/10 61/10 68/1 88/3
**weakness [1]** 72/21
**weather [1]** 96/23
**week [1]** 75/19
**weeks [4]** 31/4 35/17 58/18
72/13
**weighed [1]** 18/24
**weight [5]** 12/12 13/1 15/10
18/5 74/2
**welcome [1]** 17/17
**welfare [3]** 27/8 28/19 46/11
**well [39]** 5/8 6/25 10/7 15/13
30/17 32/2 33/24 42/2 43/5
48/1 51/16 55/11 57/20 58/23
59/25 59/25 66/8 66/20 85/1
85/6 85/8 87/6 88/5 88/17
88/21 89/1 89/14 89/16 90/1
91/3 92/7 94/4 94/13 95/1
95/13 96/25 97/9 97/14 99/4
**went [9]** 34/15 34/16 46/10
47/3 51/25 53/16 58/5 64/2
71/17
**were [38]** 5/4 5/5 5/7 12/23
18/22 22/15 33/1 35/2 36/25
39/7 39/25 39/25 40/20 44/10
44/18 46/5 47/15 49/24 53/16
57/20 58/25 60/14 65/13 73/3
76/15 76/15 81/5 81/9 82/9
83/10 83/11 83/11 83/12
92/24 93/12 94/6 94/17 95/19
**weren't [1]** 44/8
**West [1]** 1/22
**Westcott [2]** 67/6 74/13
**what [150]**
**what's [6]** 4/4 66/6 82/18
90/4 90/4 90/5
**whatever [8]** 35/5 46/17 64/19
79/18 84/18 84/20 85/25 89/8
**whatsoever [5]** 50/24 51/12
52/7 52/24 60/1
**when [54]** 3/17 4/2 4/22 8/23
9/2 14/14 15/12 25/10 27/1
28/13 30/7 32/2 33/7 33/20
33/20 34/24 36/9 36/25 37/25
38/2 40/4 41/23 42/11 44/5
44/15 45/21 46/6 50/20 52/23
53/15 57/17 57/25 58/24
62/19 62/20 64/14 70/8 70/11
70/14 70/18 70/22 71/1 72/17
72/19 74/8 79/10 80/17 80/19
80/24 80/25 83/3 83/7 94/4

**Whenever [1]** 29/24
**where [21]** 4/16 7/25 8/8
12/10 35/5 35/22 40/20 52/21
53/14 54/8 54/10 61/15 65/18
68/6 73/5 79/22 83/1 83/2
87/12 89/10 90/20
**whereas [1]** 88/7
**whether [40]** 12/16 13/2 13/4
13/14 13/16 14/19 14/21
17/25 18/6 18/8 20/25 21/4
21/5 21/8 22/7 22/15 23/18
35/9 38/7 39/10 49/23 56/4
56/10 56/20 62/1 63/2 70/23
72/12 74/2 74/3 74/15 74/17
75/12 75/13 77/7 78/5 89/23
96/14 97/5 97/7
**which [47]** 3/4 6/5 10/13
12/25 15/13 17/21 20/11
20/14 24/3 24/4 27/1 27/5
27/24 28/13 28/16 29/9 32/18
39/19 41/13 41/17 42/2 42/3
45/16 46/6 46/9 52/1 55/11
59/6 66/7 66/20 66/21 66/22
69/4 69/22 75/21 77/4 77/6
78/1 87/17 89/20 89/22 90/19
90/22 92/3 93/9 93/12 95/21
**while [9]** 13/18 17/4 35/3
40/9 40/13 60/15 73/2 83/24
86/24
**whim [1]** 65/14
**white [1]** 52/13
**who [55]** 12/7 12/19 12/20
14/15 15/7 16/6 21/16 22/9
31/4 31/17 33/8 33/9 33/15
36/20 37/11 37/13 37/16
38/10 38/20 38/23 41/21
44/10 49/18 49/19 50/13
50/13 50/15 50/16 50/18
50/19 51/19 57/20 58/23
59/15 60/1 61/14 63/1 63/13
63/19 65/20 65/21 65/23 66/4
67/6 69/22 72/14 74/20 76/1
76/10 76/10 81/5 81/9 82/21
82/24 84/24
**who's [2]** 3/7 44/12
**whole [2]** 5/5 34/19
**why [16]** 30/17 36/20 36/20
37/2 44/17 47/6 59/19 73/13
79/23 80/18 80/24 82/12
82/18 87/17 93/10 93/13
**will [54]** 7/1 8/12 8/23 10/10
11/3 11/20 12/1 12/21 14/24
16/6 16/6 16/8 18/1 20/5
20/8 20/12 20/14 21/25 24/15
26/12 41/17 48/5 49/13 56/22
60/6 64/18 67/14 68/8 69/1
71/6 71/8 73/10 73/11 73/13
73/20 74/4 74/5 75/9 76/4
77/4 77/5 77/9 77/13 77/22
79/3 79/4 79/10 79/13 79/14
84/20 84/21 85/8 90/23 93/3
**willing [2]** 41/3 41/6
**win [2]** 12/7 17/24
**wind [1]** 50/21
**window [1]** 61/5
**windows [2]** 39/3 39/3
**winning [1]** 73/9
**wish [5]** 37/8 40/21 48/24
84/18 85/1
**wishes [1]** 75/6
**withdraw [2]** 4/10 4/11

**without [25]** 17/11 19/6 19/10
25/12 43/1 47/3 49/1 76/16
78/5
**witness [31]** 13/2 13/3 13/5
13/7 13/10 13/10 13/13 13/25
14/3 14/16 14/19 14/22 14/23
14/24 15/1 18/6 18/7 18/9
18/14 18/15 18/16 19/1 19/1
31/4 38/6 38/10 44/10 62/2
62/24 62/25 72/8
**witness' [1]** 18/16
**witnesses [12]** 5/4 12/18 14/1
18/20 18/23 47/4 54/25 55/4
57/15 57/20 73/22 73/25
**woke [6]** 50/6 51/3 52/23
55/22 58/13 58/22
**woman [9]** 36/21 38/19 50/13
50/14 50/16 50/17 52/15 53/6
72/16
**women [3]** 35/13 37/15 50/21
**won't [4]** 37/16 46/21 79/9
82/18
**wonders [1]** 36/9
**word [7]** 10/3 31/3 34/16
87/13 87/25 97/13 98/16
**worded [1]** 98/8
**words [7]** 12/13 13/21 52/13
57/8 57/8 57/10 82/23
**work [29]** 20/23 21/6 21/8
30/5 30/6 33/15 35/3 42/17
42/23 42/25 43/19 50/10
50/10 51/1 51/6 53/16 59/11
65/15 67/6 67/20 67/21 70/2
70/2 70/3 70/15 70/16 70/19
72/13 77/14
**worked [6]** 30/5 30/7 74/9
74/10 76/1 86/10
**working [2]** 70/6 86/12
**workplace [1]** 22/4
**works [1]** 67/4
**world [2]** 50/21 57/12
**worldwide [1]** 66/16
**worn [1]** 80/6
**worried [1]** 82/19
**worry [2]** 30/23 36/4
**worst [2]** 52/15 82/3
**worth [12]** 27/25 29/10 46/17
46/18 47/13 47/14 47/16
47/17 47/19 48/4 94/25 95/1
**worthy [3]** 37/11 37/16 37/17
**would [63]** 3/24 4/17 7/16
7/16 10/13 10/13 10/20 19/23
21/19 24/8 24/24 26/5 30/10
36/20 36/20 37/8 37/10 37/11
37/12 39/3 40/3 40/23 40/25
50/12 50/13 50/21 51/13
51/18 52/25 53/23 53/23
60/21 61/14 64/12 64/14
64/22 64/23 65/2 70/6 72/21
73/24 74/8 75/18 75/22 76/20
81/5 81/16 83/24 84/16 85/2
85/16 90/18 92/13 92/25
93/10 93/13 94/3 94/18 95/22
96/23 97/17 98/20 99/1
**wouldn't [6]** 34/15 41/3 44/19
47/10 64/24 76/12
**wrap [1]** 62/21
**write [4]** 29/14 99/1 99/2
99/10
**writes [3]** 40/2 40/11 69/4
**writing [3]** 16/7 95/19 99/15
**written [3]** 10/13 16/5 43/15

**W**

**wrong [6]**   17/6  27/21  29/6
  62/8  72/17  81/14
**wrote [5]**   7/16  40/14  50/9
  82/21  82/24

**Y**

**yeah [10]**   5/3  5/19  42/17
  46/12  47/2  47/25  55/19  79/5
  80/6  98/20
**year [2]**   49/15  53/13
**years [7]**   38/4  48/11  52/2
  57/11  81/13  83/16  84/23
**yes [38]**   3/15  3/23  7/8  7/25
  10/17  19/13  19/14  22/19
  22/24  22/25  23/7  23/8  23/15
  24/19  25/19  25/20  27/9  27/10
  28/20  28/21  29/22  39/20
  39/20  42/13  42/19  43/16
  44/14  44/18  46/12  47/11  60/6
  85/7  85/15  89/4  96/5  96/12
  98/11  99/6
**yesterday [2]**   55/12  56/18
**yet [2]**   41/12  85/6
**yield [1]**   64/11
**you [428]**
**you'd [1]**   50/18
**you'll [10]**   4/16  9/2  48/21
  53/25  54/3  54/6  56/25  65/22
  66/19  67/25
**you're [22]**   6/9  7/19  17/17
  29/24  30/7  38/24  40/5  40/7
  48/15  48/16  62/16  62/19
  62/20  65/6  77/10  81/14  84/25
  92/20  96/12  99/10  99/15
  99/16
**you've [15]**   30/6  30/6  30/7
  49/10  49/10  62/14  66/2  66/8
  70/16  71/6  71/23  73/14  76/23
  80/14  86/22
**you-all [6]**   5/24  39/23  47/13
  67/16  94/6  95/10
**young [8]**   53/6  54/17  60/24
  83/21  83/24  83/25  84/3  84/5
**your [101]**
**yours [2]**   84/13  84/15
**yourself [6]**   13/2  17/2  18/6
  63/19  63/21  78/2
**yourselves [1]**   5/25

**Z**

**zero [5]**   35/12  35/15  35/15
  35/17  43/10
**Zone [1]**   53/4