1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3   JAMIE LEIGH JONES,            .
    PLAINTIFF,                     .
4                                  . H-07-CV-2719
          v.                       . HOUSTON, TEXAS
5                                  . JUNE 8, 2011
                                   . 2:46 P.M.
6   HALLIBURTON COMPANY D/B/A      .
    KBR KELLOGG BROWN & ROOT       .
7   (KBR); KELLOGG BROWN & ROOT    .
    SERVICES, INC.;                .
8   DEFENDANTS.                    .
    . . . . . . . . . . . . . .    .
9

10             TRANSCRIPT OF PRETRIAL CONFERENCE
             BEFORE THE HONORABLE KEITH P. ELLISON
11               UNITED STATES DISTRICT JUDGE

12
    A P P E A R A N C E S:
13
    FOR THE PLAINTIFFS:
14
         Lannie Todd Kelly
15       Heidi Olsen Vicknair
         The Kelly Law Firm PC
16       One Riverway
         Suite 1150
17       Richmond, Texas 77056

18       Ron Estefan
         Attorney at Law
19       One Riverway
         Suite 1150
20       Richmond, Texas 77056

21       Stephanie Marie Morris
         The Law Office of Stephanie M. Morris, PLLC
22       27 S. Darington Street
         West Chester, Pennsylvania 19382
23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                        - - - - -

```
1    A P P E A R A N C E S:   (Continued)

2    FOR DEFENDANT KBR:

3         Joanne Vorpahl
          Susan Cates
4         Stephanie Holcombe
          Daniel K. Hedges
5         Porter & Hedges
          1000 Main Street
6         36th Floor
          Houston, Texas 77002
7
     FOR DEFENDANT CHARLES BORTZ:
8
          Andrew T. McKinney, IV
9         Sharon Cullen
          McKinney Cooper LLP
10        Three Riverway
          Suite 500
11        Houston, Texas 77056

12   OFFICIAL COURT REPORTER:

13        Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
14        515 Rusk Street
          Houston, Texas  77002
15

16                           - - - - -

17

18

19

20

21

22

23

24

25
```

1                          P R O C E E D I N G S

2              THE COURT:  Could we have appearances, please?

3              MR. KELLY:  Todd Kelly on behalf of Jamie Leigh Jones.

4              MR. ESTEFAN:  Ron Estefan on behalf of Jamie Leigh

5   Jones.

6              MS. VICKNAIR:  Heidi Vicknair on behalf of Ms. Jones.

7              MS. MORRIS:  Stephanie Morris on behalf of Jamie

8   Leigh.

9              THE COURT:  Welcome all of you.

10                  And for defendants?

11             MS. VORPAHL:  Your Honor, Joanne Vorpahl here on

12  behalf of the corporate defendants.

13             MS. CATES:  Susan Cates for KBR.

14             MS. HOLCOMBE:  Stephanie Holcombe for KBR.

15             MR. HEDGES:  Dan Hedges for KBR.

16             MR. McKINNEY:  Andrew McKinney for Charles Bortz.

17             MS. CULLEN:  Sharon Cullen for Charles Bortz.

18             THE COURT:  All right.  Welcome to all of you.

19                  I have a number of issues I would like to cover

20  today.  Let's talk about maybe the most important, which I

21  guess I'm negligent in not asking about earlier.  What is the

22  current estimate as to how long this case is going to take?

23             MR. KELLY:  We're guessing three to four weeks, your

24  Honor.  It's probably going to take two weeks to put on the

25  plaintiffs' case, at a minimum.

02:47   1          MS. VORPAHL:  Your Honor, we had thought that two

     2   weeks was going to be the length of the trial.  And I don't

     3   think it's going to take us a week to put our case on, but it

     4   may take that long.

02:47   5          MR. McKINNEY:  I would say somewhere between two and

     6   four weeks.

     7          THE COURT:  Well, okay.  I just need to let you know

     8   that there is not a period of uninterrupted time on my docket

     9   that extends as long as four weeks, nor three.  So, once we get

02:47  10   through the first week, we may have some non-consecutive days.

    11          And that could change.  We could have some

    12   settlements in other cases, and your evidence could perhaps go

    13   on more quickly.  But you need to be at least alert to the

    14   possibility we'll have to try it over a much longer period of

02:48  15   time but with non-consecutive days.

    16          Okay.  I wanted to ask -- I think this came up

    17   orally in an inquiry to my case manager.  What is the story on

    18   this person that's in Germany?  Is that person going to testify

    19   or are we going to need to do a transatlantic hookup or --

02:48  20          MR. KELLY:  We've actually taken her off our witness

    21   list, your Honor.  So --

    22          THE COURT:  Okay.  Nobody in Germany?

    23          MS. VORPAHL:  Who's that?

    24          MR. ESTEFAN:  Shanna Lord.

02:48  25          THE COURT:  KBR brooked this with my case manager.

Cheryll K. Barron, CSR, CM, FCRR                      713.250.5585

02:48   1            MR. ESTEFAN:  Shanna Lord?

        2            MR. KELLY:  Oh, well, I'm sorry.  I thought you were

        3    talking about one of our witnesses.  If you're talking about a

        4    KBR witness, I don't know.

02:48   5            MS. VORPAHL:  Well, we didn't know anyone in Germany.

        6    What we said to your case manager was that based upon a comment

        7    that Mr. Kelly made at Dr. Scarano's deposition that Will

        8    Goodgine had crushed up pills and snorted them up his nose,

        9    that we might need to use Skype or some similar technique as --

02:49  10    to get Mr. Goodgine as a rebuttal witness.

       11            But he's not in Germany.  So -- yes, he's in

       12    Iraq.  And just so -- Shanna Lord is somebody that was on your

       13    list but is not now.

       14            THE COURT:  Well, he says she's not --

02:49  15            MR. KELLY:  She's not on our list anymore.

       16            MS. VORPAHL:  Okay.  Wonderful.  Thank you.

       17            THE COURT:  So, no foreign witnesses, right?

       18            MS. VORPAHL:  Only as I indicated.  It's possible that

       19    if they are going to try to establish that -- Mr. Kelly said

02:49  20    they have a witness who is coming to testify that he or she saw

       21    Will Goodgine do that.  And Mr. Goodgine, of course, would want

       22    an opportunity to rebut that.

       23            THE COURT:  Okay.  Now, on the jury questionnaire, I

       24    normally don't submit those unless the parties are in

02:50  25    agreement.  Have you come any closer to an agreement on the --

02:50  1   I mean, there is some reason for a questionnaire here; but I'm

       2   not sure we can properly ask a jury panel about the United

       3   States' war in Iraq or anything like that.

       4           MS. VORPAHL:  Your Honor, we're happy to take off any

02:50  5   questions that the Court finds objectionable.  The answer to

       6   your question about whether we're any closer is that Mr. Kelly

       7   has continued to take the position that a questionnaire is not

       8   necessary.  And we just don't believe that we're going to --

       9   well, for the reasons that we've indicated in our motion.

02:50  10          But we believe that members of the venire will be

       11  much more open with us if they're able to put their answers on

       12  paper and indicate that they would like to talk privately about

       13  some of these things than if we ask them in a group some of

       14  these very sensitive questions.  And so, if some of our

02:51  15  questions you find are inappropriate, we would most gladly take

       16  them off.

       17          MR. KELLY:  Your Honor, we tend to disagree with that.

       18  We're not opposed to any questionnaire.  We're opposed to any

       19  questionnaire other than the Court's normal.

02:51  20          As the Court has indicated on a couple of

       21  occasions, you've tried a number of sexual assaults and these

       22  types of cases using the Court's standard questionnaire.  We

       23  think that's appropriate.  We think anything that's more time

       24  consuming and burdensome on the jury is not appropriate and

02:51  25  just cuts into the trial time.  So, we remain opposed to it.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:51  1        MS. CULLEN:  Your Honor, we also filed a motion, in

2  effect, joining KBR's -- while we have no problem with any of

3  the questions KBR wants to ask, we do think it's particularly

4  important to be able to address in a private, comfortable

02:51  5  setting with folks who are on the panel who have got some sort

6  of contact or personal experience of abuse, sexual abuse,

7  harassment, or rape.  It's hard to raise your hand in a --

8        THE COURT:  Well, and I'm fine with the questions on

9  whether they've ever been an accused or an accuser or in a

02:52  10  sexual assault case or issues about, you know, gender

11  discrimination, gender harassment, all those kinds of issues.

12  I'm nervous when we work our way to US foreign policy and

13  things like that.  I don't know that anybody ought to be forced

14  to declare their view on that.

02:52  15        MR. HEDGES:  Your Honor, what might be a good sort of

16  middle ground with those things that you are comfortable with

17  is if we add them to your standard questionnaire and that's it.

18        MS. VORPAHL:  Or make a second page.  We're happy to

19  do that.  We're happy to do this any way that Court would like

02:52  20  to.  And if that question is not one that you're -- that you

21  want to submit, we'll gladly take it off.

22        THE COURT:  Okay.  We may communicate by e-mail to all

23  sides on that, as to questions we're concerned about, and see

24  if we can reformulate a questionnaire.

02:53  25        I'm not opposed to all questionnaires.  I'm

02:53  1    really not.  And it can help a little bit getting through voir

2    dire.

3                MS. VORPAHL:  We tried to word the questions so that

4    they provided information to both sides, and they would leave

02:53  5    us to do a shorter voir dire.  But if we've not done a perfect

6    job of that, we're --

7                THE COURT:  Well, you know, this is -- we're here and

8    we're in an area of judgment.  Reasonable people can disagree.

9    I'm not sure it's not -- it may be perfect.

02:53  10               MS. VORPAHL:  Well, we're happy to make any changes

11   the Court would allow.  And we'll be happy to work with --

12               THE COURT:  Okay.  We'll be in communication about

13   that, then.

14                    When we do have a list that's good to go, can you

02:53  15   send it to us in a Word format?

16               MS. VORPAHL:  Yes, certainly, your Honor, we can do

17   that.

18               THE COURT:  All right.  Let's talk now about

19   plaintiffs' motion to exclude Dr. Scarano's testimony.  Does

02:54  20   anybody want to add to what's in the papers on that?

21               MR. KELLY:  Your Honor, I think the papers pretty much

22   said it all, your Honor.  Obviously, if he's testifying to the

23   ultimate issue here -- and I think we've identified Rule 703

24   as --

02:54  25               THE COURT:  Yeah, I understand.

02:54   1            MR. KELLY:  So, I think our papers spell it out.

        2            MS. VORPAHL:  Your Honor, have you seen our responses

        3    filed only this morning?

        4            THE COURT:  Yes, ma'am.

02:54   5            MS. VORPAHL:  You know, I don't think I have anything

        6    to add other than the fact that we think that there is abundant

        7    case law that Dr. Scarano is, in fact, entitled to opine on his

        8    interview with the plaintiff and whether he found her truthful

        9    in that interview.

02:54  10            THE COURT:  But isn't that intruding on the province

       11    of the jury?

       12            MS. VORPAHL:  Your Honor, I don't think so.  And the

       13    cases that we've cited say the answer to that is no.

       14                Now, is there contrary authority?  There is an

02:55  15    Eighth Circuit -- I believe it's an Eighth Circuit case that

       16    we've cited as a CF or -- and so, there is a piece of contrary

       17    authority.  But the cases that we've cited have indicated that

       18    it's clearly within the province of a forensic psychiatrist to

       19    opine on whether an individual that he or she is evaluating

02:55  20    is -- if he believes that that person is telling the truth or

       21    not.

       22                And, you know, just as he could have opined that

       23    she provided him information and that he found that information

       24    to be believable, he can opine that she, during her interview,

02:55  25    provided him with information that he found not -- not

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:55   1   believable from her.

2                   And the cases that we've cited indicate that that

3   is precisely the role of a forensic psychiatrist.  And without

4   that power, the psychiatrist cannot use his training and

02:55   5   education.  And the jury is entitled to give that what weight

6   it wishes to, just as it is entitled to give any other evidence

7   the weight that it would wish to.

8                   THE COURT:  Right.

9                   MR. KELLY:  Your Honor --

02:56   10                  MS. CULLEN:  Your Honor, if I might respond?

11                  THE COURT:  I'm sorry.  I'll come back to you in a

12  second.

13                  MR. KELLY:  Yes, sir.

14                  MS. CULLEN:  This is not a situation where we're

02:56   15  trying to offer an expert to, in effect, play the role of a

16  human lie detector.  This is a unique sort of psychiatric

17  question in which the diagnosis PTSD can only be made if the

18  event that was traumatic is found to have happened.  That's

19  different.

02:56   20                  And the only way that he can look at her and

21  determine whether that's a valid diagnosis or what an

22  appropriate diagnosis for her might be is to look at all the

23  evidence, to interview her, and to determine is there a trauma

24  sufficient to give rise to a valid diagnosis of PTSD.  I think

02:57   25  that's a different situation from simply having an expert on

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

11

02:57  1    whether someone is telling the truth.

2                    THE COURT:  Okay.  Mr. Kelly.

3                    MR. KELLY:  Yes, sir.  First of all, if you look at

4    what the Court asked Dr. Scarano to do and you look at what

02:57  5    Dr. Scarano actually did, he went way beyond the Court's

6    direction and opined on things way beyond the Court's

7    direction, including the ultimate issue of fact in this case.

8    He opines on the credibility of each witness, not just on

9    Jamie.  He opines on whether or not Charles Bortz is a credible

02:57  10   witness.

11                   He opines whether or not Will Goodgine is a

12   credible witness.  In fact, I think he told me that because he

13   was a special operations Army guy that he was to be believed.

14   He goes so far in his credibility assessments of the witnesses

02:57  15   that he clearly invades the province of the jury.

16                   Furthermore, the one case that Ms. Vorpahl would

17   have you sort of say, "Well, it's against us, but it's not that

18   great," it's the only case that's been cited in this issue that

19   is really on point.  And that Eighth Circuit case really says

02:58  20   his testimony is not to be admitted because it goes to the

21   ultimate issue.

22                   And if any of his testimony is to be admitted,

23   then Rule 703 clearly says that the only thing he gets to say

24   is, "Here's my opinion.  She doesn't have PTSD."

02:58  25                   He can't talk about all the issues that make that

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

02:58  1   up because they do go to the ultimate issue of fact in the

       2   case.

       3          THE COURT:  Well, but how do we deal with the fact

       4   that he says she couldn't have PTSD because the event didn't

02:58  5   occur?  That is his core finding.  And how do we -- without

       6   completely emasculating him as a witness, how do we get to that

       7   without a little bit of that which you're concerned with?

       8          MR. KELLY:  Well, I think there's two answers to that,

       9   your Honor.  The first one is, if you look at what the Court

02:58 10   was asking him to do, it was, "Does she have PTSD," which is

      11   the first question.

      12          If he simply says "no," he doesn't even have to

      13   answer that question.

      14          THE COURT:  No.  You know, that kind of conclusory

02:59 15   testimony is just not very helpful to anybody.

      16          MR. KELLY:  Well, I understand, your Honor.  However,

      17   the -- I think you have to weigh the prejudicial effect of an

      18   expert standing up here and, in fact -- regardless of argument,

      19   in fact, becoming a human lie detector test.

02:59 20          What Dr. Scarano looked at -- and the Court will

      21   recall Dr. Scarano looked at thousands of pages.  But

      22   Dr. Scarano chose what to believe and what to disbelieve.

      23          Now, during his cross-examination, we did not

      24   cross-examine him with every item of evidence that we believe

02:59 25   would discredit those witnesses because we don't want to give

02:59   1    our case away to the defense.  But we shouldn't have to do

2    that.  Dr. Scarano, if he's going to read these things, has got

3    to -- he made an evaluation on his own, which I, frankly,

4    disagree with and I think reasonable minds can.  And that's the

02:59   5    whole point.

6            THE COURT:  I know.  I know reasonable minds can

7    disagree.  But that's why we have a jury.  And the jury will,

8    at some point, weigh what Dr. Scarano has said and what your

9    client has said and what a lot of other people have said.  But

03:00   10   not to be able to give some medical basis for a diagnosis as

11   important as the one he's making seems to -- seems very

12   constricting and a little bit artificial.

13           MR. KELLY:  But, your Honor, to be honest, he's truly

14   not making a medical diagnosis when he's evaluating the

03:00   15   truthfulness of witnesses who he's reading the depositions of.

16   That is a jury determination that he has chosen to make based

17   upon his assessment of the credibility of witnesses he's never

18   met.

19           THE COURT:  Well, doctors are often faced with a

03:00   20   patient whom they believe to be malingering, whether it's a

21   physical injury or a psychiatric one.

22               Yes, Ms. Vorpahl?

23           MS. VORPAHL:  Well, your Honor, I mean, I was just

24   going to say it is exactly the sort of thing that a forensic

03:01   25   psychiatrist does each and every time he's appointed, is to

03:01   1    determine, as -- as part and parcel of, as corollaries to,
        2    whether -- whether the person suffers from PTSD in this
        3    situation and/or other conditions, the facts, including a
        4    review of voluminous medical records that he is certainly
03:01   5    qualified by education, background, and experience to review,
        6    whether or not that person, in her interview with him, was
        7    truthful.  And he certainly is entitled to look at all of the
        8    evidence in order to come to that determination, and he's
        9    uniquely qualified to do it by virtue of his training and
03:01   10   education and experience.
        11          MS. CULLEN:  And, your Honor, what he's done is
        12   laboriously --
        13          THE COURT:  What, now?
        14          MS. CULLEN:  -- laboriously and in striking detail
03:02   15   gone through medical records, deposition testimony, other
        16   documents, comparing what Ms. Jones has said over the years to
        17   what all of the other players, witnesses -- whatever word we
        18   want to use -- to the various events have said about those same
        19   things and discovered that in every instance there is no
03:02   20   corroboration by anyone of Ms. Jones' stories.  It's not as
        21   though this is a stretch.
        22          MR. KELLY:  Except that, your Honor, he fails to take
        23   into account that all of the witnesses, every one of them, were
        24   tied to one another either as firefighters, as someone who
03:02   25   dated a firefighter, as someone who was represented by KBR's

03:02  1   counsel.  He doesn't factor any of that in.

2              THE COURT:  You can bring a lot out on cross, no

3   question.

4              MR. KELLY:  But the prejudicial effect will already be

03:03  5   there, your Honor, because he's cloaked with this "expert"

6   moniker.

7              THE COURT:  We're not going to refer to him as a

8   Court-appointed expert.  We're going to refer to him as an

9   independent expert.  I do agree that saying "Court-appointed"

03:03  10  gives him more status than he should have.

11             But I appointed him, looking for some help.  And

12  he's come in and said -- because -- you know, his testimony can

13  be constructed so he's not calling her a liar.  It's just

14  because she cannot remember, it couldn't be PTSD.  That's his

03:03  15  core finding, I think.  And that does not seem, to me, quite on

16  the ultimate issue.  It's an important issue.  But he's not

17  saying she's not telling the truth.

18             MR. KELLY:  And, your Honor, if he's limited to that,

19  that she can't remember, therefore, can't suffer PTSD, we're

03:03  20  fine with that.  It's when he gets into the evaluation of the

21  evidence and the testimony that we have our objection.

22             MS. VORPAHL:  But, your Honor, that -- it's not as

23  though these are all facts that he pieced together in some way

24  that is not going to come out at trial.  And I'm laying the 412

03:04  25  issue aside.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:04   1          I mean, these are all things that we have already
2     been asking Ms. Jones and others and establishing through
3     witnesses.  And all he is going to say is, "As a forensic
4     psychiatrist, this is what -- this is what my expert opinion is
03:04   5     of how those pieces fit together" --
6               MR. KELLY:  Ms. Vorpahl makes my point better than I
7     could.
8               THE COURT:  Just a second.  One at a time.
9               MS. VORPAHL:  -- they fit together, that she couldn't
03:04  10     have had -- she can't have post-traumatic stress disorder
11     because she claims she doesn't remember anything.  I believe
12     that she is malingering post-traumatic stress disorder, and I
13     believe that I can point to records that I can explain to a
14     jury why I believe that.
03:04  15          And I think those are things uniquely in the
16     province of an expert forensic psychiatrist to testify about.
17               MS. CULLEN:  And in particular with Ms. Jones, his
18     opinion -- I mean, you can call it "malingering PTSD," which
19     sounds nice but which, in effect, means she's faking it.  And
03:05  20     there's ample evidence in her medical records that this isn't
21     the first time she's faked it.
22          And it's not just witnesses who worked for KBR
23     who contradict her story.  There are numerous records where she
24     contradicts her own story.  And she has been contradicting her
03:05  25     own story for a very long time.  And that is established

03:05  1    through her own treating physicians -- like Dr. Scott, who

2    clearly wants to be helpful to her, but is unwilling to lie

3    under oath -- that Ms. Jones has a long history of telling

4    whatever story puts her in the best light.  And that is a

03:05  5    psychiatric condition, and it is one that Dr. Scarano can

6    explain.

7           And quite honestly, given that she's lied to

8    every single one of her treating therapists and physicians

9    post-Iraq, Dr. Scarano may be the only person in this courtroom

03:06  10   who can explain to the jury the significance of the discrepancy

11   between her history and what she's told these people.

12          THE COURT:  What I'm looking for is a structure that

13   allows Dr. Scarano to testify about why he believes she cannot

14   suffer from PTSD without his saying she's not telling the

03:06  15   truth, without his saying the rape didn't occur.  Because that

16   does seem to me to get very close to abrogating the

17   responsibilities of the jury.

18          Mr. Hedges?

19          MR. HEDGES:  Your Honor, what he can say --

03:06  20          THE COURT:  Maybe you better come a little closer.

21          MR. HEDGES:  I'm sorry.

22          THE COURT:  I have a hearing problem.  It's not your

23   fault.

24          MR. HEDGES:  Yes.  What he can certainly say and any

03:06  25   of the expert psychiatrists can say is the difference between a

03:06  1     treating psychiatrist and a forensic psychiatrist.  The

2     treating psychiatrist doesn't really particularly care what the

3     truth is.  They care how the patient feels and what's the best

4     way to make the patient better.

03:07  5         THE COURT:  That's true.

6         MR. HEDGES:  The forensic psychiatrist is supposed to

7     find out everything humanly possible about the facts of what

8     happened, every person who was there, every record that refers

9     to this person, and he can lay that out and then come to the

03:07  10    conclusions from that.

11        And I think you're right that he doesn't need to

12    call her a liar.  He says, "She reports that she got up in the

13    morning and was dripping blood and horribly bruised and

14    everything else.  She went to the hospital.  The doctor said, a

03:07  15    few light bruises, a few scratches, you're not admitted to the

16    hospital."

17        Then the jury can decide, you know, who's telling

18    the truth and whether the Army doctor is lying.

19        THE COURT:  I mean, ultimately it is -- I understand

03:07  20    what you're saying about the forensic psychiatrist.  But in the

21    game that we play, all of us, it's ultimately the jury's call

22    as to whether she was telling the truth.  And that's what I am

23    looking for a way to reconcile.

24        Mr. Kelly -- I'm sorry.  I'll let Mr. McKinney

03:07  25    speak, then you can have all the time you want.

03:08  1            MR. McKINNEY:  I won't be long, your Honor.

2                 The -- I understand the Court's concern.  But if

3       any plaintiff in a personal injury or mental anguish case comes

4       into court claiming to have --

03:08  5            THE COURT:  A sore back.

6            MR. McKINNEY:  -- a broad array of symptoms and is

7       tested objectively, whether it's an independent or a

8       party-chosen physician, and the physician says, "There's no

9       objective evidence whatsoever to back up what this witness

03:08  10      says.  I have looked at this witness' other medical records,

11      and none of the symptoms complained of by this person to other

12      doctors is at all consistent with what this person reported to

13      me.  I diagnose secondary gain syndrome and malingering, that

14      there is nothing objective to support what this person claims

03:09  15      to have wrong with them and, in fact, all of the medical

16      evidence goes the other way," that opinion would be received in

17      every court around the country without question.

18                 And what we are talking about here is the same

19      kind of medical opinion that is grounded on far more evidence

03:09  20      and goes to diagnoses of personality disorders, diagnoses and

21      findings of malingering, and the objective non-existence of the

22      events that bring us here today.

23                 And with all due respect to Ms. Jones, it isn't

24      just Dr. Scarano who disagrees with her story.  It is every

03:09  25      single person who has encountered her, up to and including her

03:09    1    mother, her father, and her husband.  They all disagree with

         2    some part of her story.  And that is a significant fact that

         3    only a forensic psychiatrist can delve into and determine by

         4    looking at the entire record in the case.

03:10    5            THE COURT:  I suspect father, mother, and husband will

         6    testify.  Can't we bring that out in their testimony?

         7            MR. McKINNEY:  It is something that we can bring out

         8    in the testimony.  But what we cannot do, unless the Court

         9    permits us, is have a qualified forensic psychiatrist say, "And

03:10   10    when you put all these pieces together, all of these

        11    1,020 puzzle pieces together, this is the picture you get."

        12            And the jury might get part of the picture.  But

        13    we have a qualified expert who can put the whole picture in

        14    front of the jury, subject to cross-examination; and the jury

03:10   15    can draw their conclusion.

        16            THE COURT:  Well, but that's kind of the model that

        17    I'm trying to avoid, of having an expert who is cloaked with

        18    that authority come in and say, "She was lying to X.  She was

        19    lying to Y.  She was lying to Z.  Therefore, she's lying."

03:11   20            I mean, once we've done that, I think we will

        21    have an expert who largely subsumes the jury's role.

        22            MR. McKINNEY:  Well, perhaps -- perhaps -- we're not

        23    allowed to contact Dr. Scarano.

        24            THE COURT:  That's right.

03:11   25            MR. McKINNEY:  So, perhaps the Court can instruct the

03:11   1   doctor not to use loaded terms such as "lying."  He can -- the

2   doctor could, I'm sure, express his opinions on

3   cross-examination or if -- if raised in redirect in terms of

4   conflicting, consistency, or inconsistencies.

03:11   5       THE COURT:  You anticipate a point that I think is

6   critical.  A lot of what anybody can testify to will be

7   determined by what Ms. Jones says on direct and what her other

8   witnesses say on direct.

9       I hope -- I will ask Dr. Scarano to be mindful of

03:12   10   my concerns.  But all of plaintiffs' witnesses need to be

11   mindful of them, too.  If we get a lot of testimony on why

12   people think it happened, a lot of testimony on any of these

13   issues -- never had an STD, never falsely reported a

14   non-consensual act of sex -- the more that that is brought out

03:12   15   by the plaintiffs' side, the more it's going to be appropriate

16   for the defendant to go into the rest of the story.

17       But I'm hoping we can avoid that.  I mean, 404(b)

18   is the choke point here.  It says, "No expert witness

19   testifying with respect to the mental state or condition of a

03:13   20   defendant in a criminal case may state an opinion or inference

21   as to whether the defendant did or did not have the mental

22   state or condition constituting an element of the crime charged

23   or of a defense thereto."

24       This is not a criminal case, but we're getting --

03:13   25   that is the -- that is the policy accommodation I'm trying to

03:13   1    make here.

2                     Okay.  Well, we may have said all we can say

3    about this.

4              MR. HEDGES:  Your Honor, can I just very, very

03:13   5    briefly?

6              THE COURT:  Yes, sir.

7              MR. HEDGES:  I see a difference between the doctor

8    saying, "I've looked at what Ms. Jones has said to a number of

9    other people in the record" -- on the record, not necessarily

03:13   10   from the witness stand, but from being interviewed by some

11   doctors -- I have never been raped or assaulted, I have never

12   had STDs -- "and as the expert witness, I went and looked at

13   all of her medical records, not what somebody said about her,

14   but what her medical records are.  And the medical records show

03:14   15   going to the hospital herself and claiming herself to have been

16   raped, getting extensive treatments from STDs."

17                   I don't think he needs to go on and say,

18   "Therefore, I conclude she was lying."  He can simply present

19   to the jury, "Here's what she told this doctor, and here's what

03:14   20   the records show."

21                   The jury then can do its job, which is to decide

22   which is truthful and which is not.  I don't think he tells the

23   jury how to decide that, but he's uniquely suited to present

24   those facts to the jury to let them make their choice.

03:14   25             MR. KELLY:  Your Honor, if I may?

03:14  1          THE COURT:  Yes.

2          MR. KELLY:  And I will be brief.

3               First of all, that obviously ties in Rule 412

4     that we've spent a lot of time already on.

03:14  5          THE COURT:  Yeah, we're going to spend more time on

6     that.

7          MR. KELLY:  But if you tie in with Rule 703, "facts or

8     data that are otherwise inadmissible shall not" --

9          THE COURT:  You're going way too fast, way too fast.

03:15  10         MR. KELLY:  My apologies.

11         THE COURT:  No.  We're not going to -- his report is

12    definitely not coming in because it includes so much that it's

13    inadmissible.

14         MR. KELLY:  I understand, but I'm talking about

03:15  15    facts -- it just says "facts or data."  It's not even talking

16    about report here, your Honor.  And the fact that -- what they

17    want to do is they want to bring in the facts as Dr. Scarano

18    views them -- and again, there's a lot of discrepancy over how

19    he views these facts.  But the facts as Dr. Scarano views them

03:15  20    is what they want to put before the jury.  And I think 703

21    specifically says that if those facts are not admissible -- and

22    of course, we're waiting on the Court's ruling on that -- then

23    they don't come in.

24              The *Nichols* case out of the Eighth Circuit, your

03:15  25    Honor, which is on all fours, I believe, paramount with this --

03:15   1    or on all fours square with this case, basically says that the

2    doctor's testimony about psychiatric credibility, malingering,

3    recall bias, and secondary gain --

4              THE COURT:  You're going way too fast.

03:15   5              MR. KELLY:  -- went beyond the permissible areas of

6    her testimony.  And the reason is that she used those terms to

7    indicate that the plaintiffs' version of the facts was

8    inconsistent and changed over time and that it was tainted by

9    bias and desire for financial gain.  That's exactly the

03:16   10   argument that the defense is making here.  And that does not

11   make the witness' testimony about those prior facts admissible.

12   In fact, *Nichols* says specifically it is still not admissible.

13             That's all I have, your Honor.

14             THE COURT:  I think we also are going to have to be

03:16   15   concerned about Dr. Scarano offering any testimony on medical

16   conditions that are outside the field of psychiatry.  We can't

17   have him testifying about lab results, because he's not a

18   toxicologist.  I don't think we should be able to -- I don't

19   think he should be able to talk about injuries to Ms. Jones'

03:17   20   breasts.

21             MR. McKINNEY:  Your Honor, may I point out that he's a

22   Board certified thoracic and general surgeon as well as being a

23   forensic psychiatrist?

24             THE COURT:  I know he is.  But he's not practicing in

03:17   25   that area at all now.

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

03:17   1          MS. VORPAHL:  And, your Honor, may I point out that he

2   is a Board certified OB-GYN and that certainly part of a

3   well-woman examination includes an examination of the breasts.

4   And I believe that he is qualified to talk about that issue and

03:17   5   that area.  And I think that I've put that in the --

6          THE COURT:  He's not a plastic surgeon.  I mean, we're

7   talking about the effects on breast implants, aren't we?

8   Aren't we talking about the effect on breast implants?  Isn't

9   that --

03:17  10          MS. VORPAHL:  Yes.  I think -- I think what he's

11   talking about -- and maybe I'm thinking of the Irwin

12   objection -- but the whole issue of whether there could have

13   been a torn pectoral muscle --

14          THE COURT:  Okay.

03:18  15          MS. VORPAHL:  -- I believe that's --

16          MR. KELLY:  For the record, your Honor, Dr. Scarano is

17   not -- or at least it hasn't been disclosed to us he's Board

18   certified as a OB-GYN.

19          MS. VORPAHL:  I -- I think it was Dr. Irwin, and I

03:18  20   apologize.

21          MR. KELLY:  Fair enough.

22          But even as to those specialties in which he may

23   hold a Board certification, if he's not currently practicing,

24   or hasn't done so in the last two years, he's not qualified to

03:18  25   testify to those things.

03:18   1          THE COURT:  Yeah.  Unless I hear other evidence, I

        2   don't think he should testify about the breasts or about

        3   toxicology.

        4          We can't have him testifying about evidence that

03:18   5   is inadmissible.  In other words, 703 does allow Scarano to

        6   rely on inadmissible evidence; but he can't introduce that

        7   inadmissible evidence in the trial, unless, you know,

        8   something -- unless there's a door opening exercised by the

        9   plaintiffs.

03:19  10          I don't think he ought to be allowed to testify

       11   about whether a sexual assault occurred.  I think his testimony

       12   ought to be in the nature of whether Jones suffers from

       13   psychiatric distress, what is the nature of her psychological

       14   disorder, and whether the psychological disorder has anything

03:19  15   to do that -- with the events in this lawsuit.

       16          The Court seemed to recognize the distinction

       17   between psychiatric experts who testify as to whether a victim

       18   displays the symptoms and traits of an individual who suffers

       19   from a psychological disorder, as opposed to experts who

03:19  20   testify as to whether the victim is telling the truth.

       21          Okay.  Let's talk a little bit about Dr. Meisner.

       22   Is it still defendants' intent to use him?

       23          MR. HEDGES:  It is, unless Dr. Scarano covers the

       24   waterfront so thoroughly there's nothing left to question him

03:20  25   about.

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

03:20  1          THE COURT:  Because I'm concerned it might be pretty

2   cumulative.

3          MR. HEDGES:  That's exactly what we intend not to do.

4   As I say, we may not even call him at all.  It all depends what

03:20  5   happens with Dr. Scarano.  I can't really answer the Court's

6   question until I know -- as I said, we're actually at trial.  I

7   would be perfectly happy if we didn't have to call him, if it's

8   not necessary.

9          THE COURT:  Okay.  Are you still planning to offer an

03:20  10   expert?

11          MR. KELLY:  We do still plan to offer both Dr. Blank

12   and Dr. Tackett, your Honor.

13          THE COURT:  So, plaintiffs' motion to exclude or limit

14   Dr. Meisner's testimony, I think we'll take that up after

03:20  15   Dr. Scarano testifies.

16          MR. KELLY:  That's fine, your Honor.

17          THE COURT:  Okay.  And the motion to exclude opinions

18   and testimony of Dr. John Irwin?

19          MS. VORPAHL:  Well, your Honor, it's not my motion;

03:21  20   but at least now I'm finally on the same page with everybody.

21          THE COURT:  Okay.  Good.

22          MS. VORPAHL:  Do you want them to present first or --

23          THE COURT:  Well, it's their motion.

24              So, anything you want to say?

03:21  25          MR. KELLY:  Actually, your Honor, I think most of our

03:21   1   opinions are in the written brief.  Predominantly, I think

     2   Dr. Irwin goes well beyond his credentials, as well.  In

     3   particular, I know he actually opines, at least in his written

     4   report that he provided, about the truthfulness, as well.  And

03:21   5   I don't know how you can tell whether or not Ms. Jones is

     6   truthful from an obstetrical standpoint.  But he certainly goes

     7   well beyond his credentials as an OB-GYN.  And, so, we would

     8   certainly ask the Court to limit his testimony in that regard.

     9          I don't know that his testimony is relevant as

03:22  10   far as what he gave, because I think, if memory serves -- it's

    11   been a little while since I've looked at this brief, your

    12   Honor, in fairness.  But I believe that the opinions that he

    13   gave, basically the -- his own opinions said he didn't have

    14   enough information to really form the opinion.

03:22  15          So, with the caveat that it's been a week or so

    16   since any of us on this side of the table have looked at that

    17   brief -- I'll leave it at that.

    18          MS. VORPAHL:  Can I respond briefly, your Honor?

    19          THE COURT:  Yes, you may.

03:22  20          MS. VORPAHL:  If you pull apart Dr. Irwin's opinions,

    21   I think they're all within his area of expertise.  I mean,

    22   first of all, he's a medical doctor.  You know, I won't go

    23   through his credentials with you.  But he says that the

    24   plaintiff misrepresented her medical history.  He is entitled

03:22  25   to review medical records, I think, and come to that opinion.

03:22   1            He's entitled to say that she has been treated

2       and even hospitalized for the sexually transmitted disease of

3       herpes and genital condyloma.  He is qualified to make those

4       determinations from the medical records and explain to the jury

03:23   5       what those -- what those illnesses are, again, laying aside the

6       Rule 412 issues.

7            His next opinion is that the plaintiff's

8       examination in Iraq by Dr. Schulz was compatible with

9       consensual vaginal and/or rectal intercourse, given her very

03:23   10      recent laser vaporization of genital condyloma.  He will

11      explain to the jury the effect of the very recent,

12      two-month-old surgery that she had had as to the -- being

13      responsible for the fissures that Dr. Schulz found.  He goes on

14      to say it is also compatible with the sexual assault.

03:23   15           His third finding is that displaced breast

16      implants are commonly seen in women without any history of

17      trauma.  This is where -- this is what I said before about a

18      breast examination being part of a well-woman gynecological

19      annual examination.  He has obviously done many such

03:24   20      examinations and I think is qualified to make that

21      determination, as well as the determination that he would have

22      expected bruising of the chest wall if there had been

23      sufficient trauma to tear a pectoral muscle.  There is no

24      evidence of torn pectoral muscles.

03:24   25           And finally, that plaintiff's pre-Iraq medical

03:24   1   history is different in the number of examinations and tests

2   for sexually transmitted diseases.  She was obviously very

3   concerned about the possibility of these diseases.  Again, an

4   obstetrician-gynecologist is uniquely qualified to say what is

03:24   5   a normal number and what is a highly abnormal, aberrant number

6   of such examinations and what that means.

7          So it's certainly our position that all of

8   Dr. Irwin's opinions ought to come in.

9          MR. KELLY:  Your Honor, if I may respond?

03:25   10          THE COURT:  Yes, you may.

11          MR. KELLY:  His first opinion is that Ms. Jones

12   misrepresented her medical records.  I think we just had that

13   discussion with respect to Dr. Scarano.  And it's inappropriate

14   to opine whether or not the witness is mischaracterizing or

03:25   15   misrepresenting evidence.

16          The fact that she may or may not have -- I think

17   it was -- the testimony was something along the lines of the

18   evidence was compatible with consensual sexual intercourse, was

19   also compatible with non consensual.  I don't understand, then,

03:25   20   what the relevance is if it's compatible with both.

21          What has to happen is the doctor has to be able

22   to offer his opinions to a reasonable medical probability,

23   which he can't do.  He's saying it could have been either.

24   It's really -- it's nonsensical evidence to bring it in and

03:25   25   say, "Well, it could have been" --

03:25    1              THE COURT:  Why is it damaging if it's nonsensical?

         2              MR. KELLY:  Well, if that's all he can say is that it

         3       could have been compatible with either, then I would say I

         4       don't care, if that's all he's limited to.

03:25    5              But he's also -- he opines in his report -- which

         6       I now have at least part of in front of me -- he says that she

         7       had been treated with drugs commonly used for anxiety.  He's

         8       not qualified to talk about anxiety medications and that sort

         9       of thing.  He's not been offered as an expert who treats

03:26   10       psychological disorders.

        11              He talks about the displaced breast implants.

        12       He's not been qualified as a plastic surgeon or a breast

        13       surgeon or anybody who deals with breast implants whatsoever.

        14       He's an OB-GYN.

03:26   15              The -- and then he talks about the urine and

        16       blood tests performed.  Again, he's talking about toxicological

        17       screens; and he's not been qualified as a toxicologist.

        18              So, for all those things, we think his testimony

        19       should be excluded, with a possible exception if he wants to

03:26   20       take the stand and say it could have been either.

        21              MS. VORPAHL:  Can I respond very briefly?

        22              THE COURT:  Yes, you may.

        23              MS. VORPAHL:  The point -- Mr. Kelly misses the point

        24       of what Dr. Irwin is saying there.  He is saying that,

03:26   25       consistent with either a sexual assault or consensual sex, the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:27   1   fissures that Ms. Jones -- that presented with -- to Dr. Schulz
        2   are consistent with the surgery she had two months before.
        3   That's the salient portion of that opinion on Dr. Irwin's part,
        4   not simply that it could have been either, but that the
03:27   5   condyloma vaporization that she had two months earlier
        6   caused -- would be a likely cause of the fissures either way.
        7         THE COURT:  Okay.  I am -- for now, I'm not going to
        8   allow conclusions to or for that she had been treated with
        9   drugs commonly used for anxiety and depression.  That's easily
03:27  10   proveable from other witnesses; and this doctor is not
       11   competent, to my best knowledge, in drugs used in psychiatry.
       12         I'm not ready, at this point, to allow the
       13   testimony, either, as to what the displaced breast implants
       14   might look like.  Because I don't think this witness thus far
03:28  15   is qualified on issues of plastic surgery.  You may be able to
       16   persuade me at trial that that's part and parcel of what
       17   OB-GYNs do these days, but I'm not persuaded yet.
       18         Okay.  Plaintiffs' motion to exclude or limit
       19   Dr. Stacy -- Dr. Stacy Mitchell's testimony, you want to speak
03:28  20   to that?
       21         Maybe you could come forward.
       22         Thank you.
       23         MS. MORRIS:  Good afternoon, your Honor.  It's not
       24   very clear actually why the defendants would be calling
03:29  25   Ms. Mitchell.  It seems as though her testimony would be

03:29    1    cumulative.  Her report, I believe, gives two opinions.  And

         2    one is that Dr. Schulz followed national protocol for the rape

         3    kit administration and that, when she did administer it, she

         4    did administer it properly.  We are not contending that she did

03:29    5    not administer the rape kit.

         6              THE COURT:  So, unnecessary is the --

         7              MS. MORRIS:  Right.

         8                 And, then, she also gave the opinion that the

         9    fissures are consistent with either non-consensual sex or

03:29   10    consensual sex.  And she is presented as an expert on rape kit

        11    administration.

        12              THE COURT:  But on the issue of consensual or

        13    non consensual, if your client is not going to argue that the

        14    fissures are indicative of non-consensual sex, can we take that

03:29   15    issue off the table, then?

        16              MS. MORRIS:  I'm sorry.  If our client is not going to

        17    argue --

        18              THE COURT:  That the fissures are a result of

        19    non-consensual sex.

03:30   20              MS. MORRIS:  So -- no --

        21              THE COURT:  Tell me what role the fissures play in

        22    this case.

        23              MS. MORRIS:  To show that it was non consensual.

        24              THE COURT:  Well, if you want to argue that, then it

03:30   25    seems to me that the defense can offer expert testimony to the

03:30   1   effect that it could be consistent with that or it could be
        2   consistent with something else in her recent history.
        3              MS. MORRIS:  Okay.
        4              THE COURT:  Is that your point, Ms. Vorpahl?
03:30   5              MS. VORPAHL:  That's precisely my point, Judge.
        6              MS. MORRIS:  But she is a nurse, I believe, who
        7   specializes in rape kit.  And we were just arguing that she is
        8   not qualified to give --
        9              THE COURT:  Because she's not a doctor?
03:30  10              MS. MORRIS:  I think she actually admits it in her
       11   report that she cannot opine as to whether or not the
       12   fissures -- if it was consensual sex, the fissures occurred
       13   because of the treatment in the months before.  We object to
       14   that.
03:30  15              THE COURT:  I think that's what defendant is trying to
       16   show, that this existence of fissures tells the jury nothing.
       17   I think that's what defendant wants to show and is entitled to
       18   show if your client is contending that fissures are evidence of
       19   rape.
03:31  20              MS. MORRIS:  Yes.  She is.
       21              THE COURT:  She is contending that?
       22              MS. MORRIS:  Yes.
       23              THE COURT:  Then I think this comes in.
       24                   And the fact that she may not be the best person
03:31  25   in the world to opine about, it goes to weight and not

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:31   1    admissibility.

2    MR. KELLY:  Your Honor, if I may just chime in very

3    briefly.

4    THE COURT:  She's doing fine without you.

03:31   5    MR. KELLY:  One sentence, I promise.

6    THE COURT:  Okay.

7    MR. KELLY:  She is a nurse offering causation

8    testimony, your Honor.

9    THE COURT:  That goes to weight, I think.  Okay.

03:31   10   MR. KELLY:  I know it's not admissible under -- in

11   Texas state law.  But the Court is going --

12   THE COURT:  Okay.

13   MS. MORRIS:  But she -- I'll rest with that, your

14   Honor.

03:31   15   THE COURT:  Okay.

16       Ms. Cates?

17   MS. CATES:  I just want to point out that she is a

18   qualified.  She's a sexual assault nurse examiner for

19   adolescents and adults.  She is the forensic program director

03:31   20   for the Harris County district hospitals.  She has summarized

21   and provides an analysis of the FBI records.  Her testimony --

22   THE COURT:  So, tragically, she sees rapes all the

23   time.

24   MS. CATES:  Yes.  And she teaches other doctors and

03:32   25   nurses how to perform the sexual assault exams where the rape

03:32    1    kit evidence is collected.  And, then, she's qualified to

         2    review the results from the DNA tests just to sort of summarize

         3    those.  And if you saw the DNA records, that I cannot read

         4    through very well at all, you'll know that her testimony is

03:32    5    necessary to help the jury with those DNA results.

         6          THE COURT:  Okay.  This is a different argument for

         7    admissibility, then, right?

         8          MS. CATES:  Yes.  I think it all comes in.

         9          THE COURT:  To give you a little more time, I thought

03:32   10    I -- I thought you would be happy with my ruling on --

        11          MS. CATES:  No.  I am happy with your ruling.  I

        12    wanted to make sure I address all the arguments in their

        13    written report.

        14          THE COURT:  Give it to me one more time.

03:32   15          MS. CATES:  She summaries some of the DNA results.

        16    And in their motion they've said that that's not relevant.  And

        17    I just want to make the point that it is relevant and it is

        18    useful for the jury because the DNA results are voluminous and

        19    difficult for us, as laypeople, to read through.

03:33   20          THE COURT:  What did the DNA results show about

        21    consensual or non-consensual sex?

        22          MS. CATES:  They can't say what's consensual or not

        23    consensual.

        24          THE COURT:  I wouldn't have thought.

03:33   25          MS. CATES:  What they say is where semen and blood

03:33   1    were found or not found.  And I think that is clearly relevant

2    and needs to come in.

3            THE COURT:  What does this have to do with DNA?

4            MS. CATES:  This is in her report.  I just wanted to

03:33   5    make sure I addressed all the arguments that were in their

6    motion.

7            MS. MORRIS:  Your Honor, if I could briefly address --

8            THE COURT:  Yes.  Come forward, please.

9            MS. MORRIS:  In Ms. Mitchell's report, she herself

03:33  10    admits that she's not able to render an opinion as to whether

11    or not the treatment for the sexually transmitted disease a

12    month prior could have been what made the area more sensitive

13    that caused the fissures.

14            THE COURT:  But I thought everybody was saying that.

03:34  15    I thought everybody was saying that we just don't know what

16    could have caused what, it could have been the treatment or it

17    could have been forcible sex.

18            MS. MORRIS:  Right.  And we're just arguing that,

19    based on her qualifications as a nurse specifically with regard

03:34  20    to rape kit analysis, she's not qualified to give an opinion on

21    causation of the fissures.

22            THE COURT:  I think you can bring out the reasons you

23    don't believe her to be competent.  My ruling now is she is and

24    her testimony will be allowed.

03:34  25            MS. CATES:  Thank you, your Honor.

03:34   1          THE COURT:  Okay.  Now we have the issue of KBR

2    defendants and Mr. Bortz on the basis that 17 witnesses that

3    plaintiff intends to present will be cumulative.

4          MR. McKINNEY:  There's probably a bit more to it than

03:34   5    that, Judge.

6          MS. VORPAHL:  Yeah, I was going to say, I don't think

7    it's just that they will be cumulative.

8          THE COURT:  Well, also irrelevant.  I understand.

9          MS. VORPAHL:  Well, your Honor, I think that's right.

03:35   10   I would like to start out by directing your attention to

11   Footnote 3 in our pleading.  And what it basically says is that

12   we think that these fraudulent inducement claims are no good

13   and that we're entitled to judgment as a matter of law on those

14   claims.

03:35   15         THE COURT:  Okay.  Now, this is fraud in the

16   inducement to enter the employment agreement and fraud in the

17   inducement to agree to arbitration?

18         MS. VORPAHL:  That's correct, your Honor.

19              It's pretty clear that this me-too evidence is

03:35   20   not admissible as to the sexual harassment/hostile work

21   environment claim.  So what the plaintiffs want to do is say

22   KBR had an obligation to tell Ms. Jones, as an employee, about

23   each and every time that someone reported sexual harassment

24   anywhere around the world or anywhere in the -- in this region.

03:36   25   We're not entirely sure.

*Cheryll K. Barron, CSR, CM, FCRR*                *713.250.5585*

03:36   1          We've gone through all of the witnesses that they

2    intend -- or have listed on their list.  Some of them were not

3    listed in response to discovery requests asking for people with

4    knowledge of relevant facts.  They would be excludable on that

03:36   5    basis.  But a number of them were listed.

6          But because their knowledge is not relevant, did

7    not occur at Camp Hope or don't -- in many cases they don't

8    have personal knowledge, we'll have to take all of these

9    witnesses on voir dire were they to be allowed.  And I think we

03:36   10   would be able to establish they don't have personal knowledge,

11   they weren't at Camp Hope, they weren't there at the relevant

12   time period, and most of the information they have is hearsay

13   and speculation.

14         I mean, I can go through each of the witnesses

03:36   15   and we can talk about them.  But this kind of evidence does not

16   render more likely than not any genuine issue of material fact

17   in this lawsuit.

18         THE COURT:  The judge needs to take a short break.

19   I'll be back.  No one need rise.

03:37   20     *(Recess was taken from 3:37 p.m. to 3:53 p.m.)*

21         THE COURT:  Please be seated.  I did read the

22   footnote.  And, of course, I did grant summary judgment to

23   defendants on a number of issues.

24         It looks to me like this is basically a request

03:54   25   for summary judgment, isn't it?

03:54    1          MS. VORPAHL:  Yes, your Honor, it is.  And if it's not

2    perfectly clear, I have a motion for summary judgment I can be

3    ready to file in about two hours.

4          THE COURT:  Well, it's not so much that as I just

03:54    5    think it's kind of late to be doing that.  There may come a

6    time at the end of the plaintiffs' evidence you can move for --

7          MS. VORPAHL:  And I'll be happy --

8          THE COURT:  In fact, that would be the appropriate

9    time.

03:54    10          MS. VORPAHL:  Of course, and I would be happy to do it

11    then.

12          THE COURT:  Okay.

13          MS. VORPAHL:  I did -- well, I'm happy to do it then.

14    I did anticipate this possibility.  You'll recall that you

03:54    15    did -- you've signed an order, in fact, saying that I could,

16    for a limited time period, file a motion for summary judgment.

17    The way time has fell with the plaintiffs' deposition, there

18    really wasn't that opportunity.

19          THE COURT:  I'm not criticizing you.

03:54    20          MS. VORPAHL:  If I could continue on the me-too?

21          THE COURT:  On me-too?  Okay.  Yeah.

22          MS. VORPAHL:  All right.  I think I told you -- and I

23    won't belabor the point -- that their testimony is not

24    relevant.  It's not at the same time or place.  It's largely

03:55    25    hearsay, and it's inadmissible lay opinion testimony.  But if

03:55   1    these witnesses, if these 17 witnesses --

2                 THE COURT:  Do you know whether they're going to be

3    called live or by deposition?

4                     Let me ask Mr. --

03:55   5                 MS. VORPAHL:  There's only one that's been deposed.

6    Amy Katz has been deposed.

7                 THE COURT:  Will they all be called live?

8                 MR. KELLY:  Every one of them that we bring will be

9    live, your Honor.

03:55   10                 THE COURT:  Go ahead.

11                 MS. VORPAHL:  Ms. Katz, in her deposition, she says,

12   "I wasn't there at the time.  Everything that I know is hearsay

13   about this.  It's just what someone has told me."  And we would

14   be happy to submit that deposition for you to look at and

03:55   15   decide, for starters, whether there's anything that you believe

16   is admissible in that.  We do not.

17                     But if these witnesses are permitted to testify,

18   your Honor, we have determined that there are approximately

19   five rebuttal experts -- I mean, rebuttal witnesses that we

03:55   20   will need for each of these witnesses.  And certainly, we would

21   have the right --

22                 THE COURT:  This is a serious threat.  So, we're going

23   to have 17 times five?

24                 MS. VORPAHL:  Well, your Honor, it is.  But, your

03:56   25   Honor, we're entitled to do that.  And what we're going to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:56   1   do --

        2          THE COURT:  I'm just kidding.

        3          MS. VORPAHL:  There's a bunch of trials within trials.

        4               None of this makes any of the issues that are

03:56   5   going to go to the jury more probable than not, because these

        6   people cannot talk about what happened at Camp Hope on July

        7   26th, 27th, 28th of 2005.

        8               A lot of -- there are people who have other

        9   lawsuits pending against KBR in among these 17 witnesses.

03:56  10   Those cases are in various stages of discovery.  In one case,

       11   for example, we've agreed to stand down on discovery, with a

       12   pending mediation in the next month.  We're going to have to --

       13          THE COURT:  Okay.  So, it's cumulative, it's hearsay,

       14   it is not relevant.  What else?

03:56  15          MS. VORPAHL:  It's inadmissible lay opinion.  It is --

       16   under Rule 404(a), it will result in confusion and a waste of

       17   time, more prejudicial than probative.

       18          THE COURT:  Okay.  I have your argument.  I really do.

       19          MS. VORPAHL:  All right.  Thank you.  I'm done.

03:57  20          MS. CULLEN:  Your Honor, if you would picture Charles

       21   Bortz sitting here through a week or more of 17 witnesses

       22   saying basically, "Some really bad guy at KBR did horrible

       23   things to me" or "I heard a story about bad guys at KBR raping

       24   a girl" or "I heard a story that the firemen are wild and

03:57  25   crazy" --

03:57  1          THE COURT:  Okay.  Hearsay.  I got that.  What about
       2  Mr. Bortz, though?
       3          MS. CULLEN:  It's highly prejudicial to Mr. Bortz.
       4  None of these people had anything to do with Charles Bortz or
03:57  5  Jamie Leigh Jones, but it's going to saturate the jury with
       6  horror story after horror story before --
       7          THE COURT:  So, it's inflammatory?
       8          MS. VORPAHL:  Yes, sir, it is.
       9          THE COURT:  Your response?
03:57 10          MR. ESTEFAN:  First of all, these are not witnesses
      11  that they have not known about.  They've been disclosed for
      12  three or four years, these witnesses, and so have their
      13  affidavits been on file.  If defendants chose not to depose
      14  them, that shouldn't hamper plaintiffs' presentation --
03:58 15          THE COURT:  I didn't hear that objection.  I have lots
      16  of other objections but not that one.
      17          MR. ESTEFAN:  Okay.  They said they would have to call
      18  rebuttal witnesses, as though they were surprised by the fact
      19  that these witnesses are going to come testify.  They've known
03:58 20  about these witnesses for years.  So --
      21          THE COURT:  Did they know you're going to call 17 of
      22  them?
      23          MR. ESTEFAN:  Well, I mean, we had them on lists of
      24  people who could be called.  We don't know who they're going to
03:58 25  call.  We don't know who we're going to call until we get

              *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:58   1  closer to trial.  That's one thing.

2              More importantly, Judge, KBR creates these

3  policies.  They create company policies; and they don't vary

4  them from one country to another, from one theater to another.

03:58   5  These are KBR policies.  And you don't need an expert to

6  know -- there's no such expert that says, "This is the company

7  policy against drinking," for example, "and I saw people

8  drinking."  There's no expert testimony required for that.  A

9  layperson can properly give that testimony if that's what it

03:59  10  is.

11             Most importantly, these things go right to the

12  fraud claim, what KBR knew, when KBR knew it, and what it did

13  with that information.  And if we are not allowed to present

14  that evidence, we can't make our fraud claims.  That's in the

03:59  15  definition.

16        THE COURT:  Okay.  The evidence will be KBR thought

17  there was no drinking but there was drinking?

18        MR. ESTEFAN:  Well, I'm using that as an example.  KBR

19  had an alcohol policy that -- it's called General Order

03:59  20  Number 1.  And they had suspended General Order Number 1; and

21  they said alcohol is allowed, for example.

22        THE COURT:  How does that advance your case, though?

23        MR. McKINNEY:  I'm not saying that, in itself, does,

24  Judge, the drinking.  I'm saying evidence of KBR's enforcement

03:59  25  or non-enforcement of its own policies, that goes to what KBR

03:59    1    knew, when it knew it --

         2              THE COURT:  But I'm asking for real world examples.

         3    What non-enforcement are we talking about?

         4              MR. ESTEFAN:  Mr. Kelly is dying to get up and help me

03:59    5    with this.  So, go ahead.

         6              MR. KELLY:  I'll use Amy Katz as an example, your

         7    Honor.  And Amy Katz was an HR person hired by KBR to go out

         8    and evaluate what their needs were.  Amy Katz came back and

         9    reported to Kara Hall, who actually was one of the people who

04:00   10    was in the meeting with Jamie Jones.  Her boss was Kara Hall.

        11    She reported to Mr. Hall --

        12              THE COURT:  Hold it.  Slowly, slowly.

        13              MR. KELLY:  She reported to Mr. Hall about the vast

        14    needs that they had for sexual harassment training.  And her

04:00   15    testimony, which KBR has, in her testimony she said she

        16    reported the need for sexual harassment training.  She tried to

        17    push for sexual harassment training.  And, ultimately, she was

        18    fired for that.

        19              In an e-mail where one of the supervisors

04:00   20    terminates her from her HR position and sends her to work for

        21    the Morale, Welfare and Recreation department in some pushed

        22    out-of-the-way thing, he sends an e-mail that says, quote, "I

        23    don't need that fucking maintenance headache."  That's how KBR

        24    viewed people who tried to make change.

04:00   25              There are witnesses that we are going to call who

04:01    1    have been locked in containers and locked in their rooms by

         2    armed guards, which KBR says, "Oh, we don't do that.  Ms. Jones

         3    is making that up."

         4                We have others who have been locked in with

04:01    5    guards because that was a KBR policy of how to treat people who

         6    complained about their misdeeds.  We have a man who is going to

         7    come in here who stood as an armed guard and will tell you what

         8    his instructions were.  These are the me-too witnesses.

         9                These aren't me-too, your Honor.  These are

04:01   10    told-you-so witnesses, these are warned-you witnesses, these

        11    are me-first witnesses, and you-created-the-environment -- one

        12    of the witnesses is going to come in and say, "Look, based on

        13    what we told them, Ms. Jones' rape was not only foreseeable, it

        14    was inevitable."  And so are the continuation of rapes that

04:01   15    keep going on.

        16          THE COURT:  This sounds like lawsuits.  And I guess

        17    some of them are.  Is that right?

        18          MR. ESTEFAN:  Only a handful are, Judge.

        19          THE COURT:  But it sounds like what we're going to

04:01   20    have, then, is a lawsuit over that lawsuit.  Each of these is

        21    going to be two or three days of testimony --

        22          MR. ESTEFAN:  Not at all.

        23          MR. KELLY:  No, your Honor.

        24          MR. ESTEFAN:  How are we going to establish our fraud

04:02   25    claims without --

04:02  1          THE COURT:  That's your side.  I'm talking about the

2    Court's need for efficiency.  How -- each of those is raising

3    issues that I feel sure will be controverted.

4          MR. KELLY:  Even if controverted, your Honor, it goes

04:02  5    to notice.  It just goes to notice.

6          THE COURT:  I understand what it goes to.  But we're

7    going to get testimony about highly -- highly contested facts

8    or allegations.  And I'm just concerned that the jury will lose

9    track of this case in hearing all the details of those cases.

04:02  10          MR. KELLY:  Your Honor, that shouldn't happen,

11    because, as Mr. Estefan just stated, KBR has known about these

12    witnesses.  Some of these witnesses they've known about since I

13    filed the complaint in the case, the original --

14          THE COURT:  I'm not disputing the notice.  I'm just

04:02  15    trying to imagine how the case is going to unfold.

16          MR. KELLY:  But there should be no, quote, unquote,

17    rebuttal witnesses allowed.  They've never named a witness on

18    any of these issues.  There's no witness on their witness list

19    about any of these issues.  This isn't rebuttal.  This is our

04:03  20    case in chief.  That would be their defense, not a rebuttal

21    case.

22          THE COURT:  Mr. Hedges?

23          MR. HEDGES:  Your Honor, I took Amy Katz's deposition.

24    Amy Katz was in Bosnia, Macedonia, and Hungary.  She was there

04:03  25    in 1998, and the only knowledge whatsoever that she had of any

04:03   1    sexual harassment was what other people told her.  She never

2    experienced it, she never witnessed it.

3              THE COURT:  Was she ever in Iraq?

4              MR. HEDGES:  No, never.

04:03   5              MS. CULLEN:  No.

6              MR. KELLY:  But she reported --

7              THE COURT:  Just a second.  Let me hear from the

8    defendant, and then we'll --

9              MS. CULLEN:  The comment made by Mr. Kelly that

04:03  10    galvanized my attention was that he has a witness who will

11    testify it was inevitable that Jamie Jones would be raped,

12    while at the same time complaining about allowing Dr. Scarano

13    to testify that she was not raped.  I don't think putting up a

14    witness to say it was inevitable that Charles Bortz was going

04:04  15    to rape Jamie Jones -- that's just way beyond the bounds, and

16    it's certainly prejudicial --

17              THE COURT:  I'm not going to allow that statement.

18    That's too much to the ultimate issue.  But if -- what I

19    understand plaintiff wants to do is testify about policies that

04:04  20    existed on the ground, but also the policy that existed in the

21    manuals.  And that's what I'm trying to sort through.  I think

22    that's what they want to testify about, which is not all that

23    unusual in a case like this.

24              Then we get into all these complicated arguments

04:04  25    about just because it was a policy doesn't mean it was

04:04   1   negligent not to enforce the policy; otherwise, nobody would

2   ever have policies.  I mean, I've been there before.  I

3   understand these arguments.

4          MS. CULLEN:  But I will say, based upon the affidavits

04:04   5   they provided to us and descriptions in their witness list,

6   they're not talking about policies and what policies were or

7   were not enforced.  They're talking about individual horror

8   stories.  "I heard about a girl who was raped.  I heard

9   about" --

04:05   10          THE COURT:  Well, I heard those stories; but they're

11   not coming in.  No doubt about that.

12          MS. CULLEN:  That's what virtually all of these are.

13          THE COURT:  How do we know, if we haven't deposed

14   them?

04:05   15          MS. CULLEN:  Based on their descriptions.

16          MR. McKINNEY:  And we have their statements.

17          MS. CULLEN:  And their --

18          MS. VORPAHL:  Well, we have some of their statements.

19          MS. CULLEN:  -- affidavits.

04:05   20          MS. VORPAHL:  Some of them have been disclosed, some

21   of them have not ever been disclosed as possible witnesses.  It

22   sounds to me like -- and, your Honor, respectfully, these

23   people weren't at Camp Hope.

24          And what good is it if somebody comes in, in a

04:05   25   sexual harassment case or even a fraudulent inducement case,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:05   1    and says, "I worked in Boston, and I have a witness who says

2    that in the San Francisco office they did this"?  And that's,

3    at best, what we've got here.  I mean, these people's testimony

4    is hearsay, but it's not even at Camp Hope.

04:06   5              THE COURT:  Well, what I understood plaintiffs to say

6    was that one person will claim that she was locked in a

7    container or something.  I mean, that's not hearsay.  I mean,

8    she -- you're not saying that's hearsay, are you?

9              MS. VORPAHL:  I don't believe there's anybody who is

04:06   10   going to say that she was locked in a container or witnessed

11   someone locked in a container at Camp Hope prior to the time

12   that Jamie Jones signed her employment agreement with KBR,

13   respectfully.

14             MR. KELLY:  Perhaps if she did believe that, your

04:06   15   Honor, we might not still be standing here.  But that is

16   exactly what these witnesses are going to say.

17             THE COURT:  Well, I don't know what to do except take

18   these witnesses one by one.

19             MR. McKINNEY:  There's actually one witness who has

04:06   20   hearsay knowledge -- or claims to have hearsay knowledge about

21   Ms. Jones' specific allegations against --

22             THE COURT:  Hold on just one second.

23             MR. KELLY:  Andrew, the marine?

24             MR. McKINNEY:  No.  The truck driver.

04:07   25             THE COURT:  Okay.  Go ahead.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:07    1        MR. McKINNEY:  There's one witness, whose name is

2   Weatherford, who alleges that he was a truck driver for KBR;

3   and he claims that he heard a statement from the fire chief

4   that some of his firemen had raped a young woman.  And he

04:07    5   alleges that the fire chief stated that -- to the effect, "I

6   don't know what I'm going to do with those crazy so-and so's,"

7   or something that --

8        MS. CULLEN:  You're conflating two witnesses, one is

9   Mr. Weatherford; the other is --

04:08   10        MR. McKINNEY:  All right.  We have two witnesses.  One

11   who is going to say that he heard someone say that the firemen

12   just raped a girl; and another is going to say that the fire

13   marshal commented to her, "I don't know what I'm going to do

14   with these guys.  They're young and wild," or something to that

04:08   15   effect.  That's hearsay.  It's prejudicial.

16        And let's leave all of that aside.  Ms. Jones'

17   claim, as I understand it, is for fraudulent inducement into

18   entering a contract, A, to put her in Iraq and, B, had an

19   arbitration clause.

04:08   20        Well, the contract had the arbitration clause.

21   So, you couldn't be fraudulently induced into that, as a matter

22   of law.  It was there in the contract.  So, that part should

23   play no role in the Court's analysis of what's relevant and

24   what's not.

04:09   25        So let's focus on "fraudulent inducement to get

04:09    1    me to go to Iraq."  That's essentially her claim.  If she had

         2    gone to Iraq and stayed there for two years and made $250,000

         3    and come home without incident, not only would there not be a

         4    fraudulent inducement claim, there would be no damages.  The

04:09    5    only damages that she can claim, which would then shoe-horn in,

         6    arguably, from their point of view -- we don't agree with it --

         7    all of these irrelevant witnesses is, "And after I got to Iraq,

         8    I was raped."

         9            Well, that's already in the case.  We're

04:09   10    litigating the rape issue.  We're litigating the hostile

        11    environment issue.  We're litigating everything bad that

        12    Ms. Jones said happened to her in Iraq already.  And in effect,

        13    all of her damage claims and all of the underpinning legal

        14    liability theories for those damage claims are already being

04:10   15    litigating.

        16            THE COURT:  Well, but a jury could reasonably come out

        17    and find Mr. Bortz liable and not find KBR liable, unless

        18    there's some broader theory.  I mean, that's -- and this is an

        19    attempt to tie KBR to a pattern that -- well beyond Mr. Bortz's

04:10   20    alleged misconduct.  I think that's the point.

        21            Is that the point?

        22            MR. ESTEFAN:  It is the point, your Honor.  And

        23    there's more to that.  But I'll let Mr. McKinney finish.

        24            MR. McKINNEY:  With all due respect, Judge, to try to

04:10   25    illustrate, if the damage -- if the fraudulent inducement was,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:10  1  "You will sleep in an air conditioned trailer," and in

2  effect -- and she wound up in a pup tent with no air

3  conditioning, that would not tie into a rape.

4        THE COURT:  No.  What they say they have -- I don't

04:11  5  know what they're going to produce.  But they say they have

6  evidence of overt sexual misconduct that was part of a broader

7  pattern and Halliburton or KBR knew about this and elected not

8  to do anything.  I don't know if that's what they're going to

9  come up with in truth, but that's the argument about where

04:11  10  they're heading.

11        MR. McKINNEY:  That begs the question, though, was

12  there even any sexual misconduct in this case.

13        THE COURT:  Well, we're trying to get this case tried

14  in full.  I would hate to have a trial after a trial.  I mean,

04:11  15  you know how that works, Mr. McKinney.  Sometimes the jury buys

16  some of a plaintiff's argument and not other parts of it.  We

17  don't want to have a trial that takes on whether there was

18  sexual misconduct and then later have another trial about

19  whether this was an atmosphere that KBR should have known

04:12  20  about.  I mean, we're trying to try all these questions.

21        MR. McKINNEY:  But the relevant atmosphere is the

22  atmosphere at Camp Hope.

23        THE COURT:  Well, possibly.

24        MR. McKINNEY:  Not the atmosphere in Bosnia or

04:12  25  Singapore or Houston.

*Cheryll K. Barron, CSR, CM, FCRR*        *713.250.5585*

04:12   1          THE COURT:  Well, the farther we go from Iraq, the

2       less relevant.  But I don't know.  There could be a million

3       different variations on, "This was a company-wide policy.  This

4       is a Europe-wide policy.  This was a Middle-Eastern policy."

04:12   5              I don't know.  I mean, I just -- I can't

6       speculate in such detail about what the evidence will show.

7              I'm very concerned about this many witnesses, but

8       I need to think about that some more.

9          MR. KELLY:  Your Honor, if I could --

04:13   10         MS. VORPAHL:  If I could just say one brief thing, and

11      then I'll completely turn the floor over.

12         THE COURT:  Okay.

13         MS. VORPAHL:  You know, even if the plaintiff has

14      someone who will say, "I was locked in a container at KBR," I'm

04:13   15      going to -- I'm going to harken back to what claims are left in

16      this lawsuit.  The retaliation claim, you granted summary

17      judgment on because the plaintiff didn't raise that with the

18      EEOC.  And, so, the fact that somebody was locked in a

19      container, that -- that issue is -- that retaliation issue

04:13   20      isn't before the jury for decision.

21             The only claims that are left are sexual

22      harassment as described to the EEOC and these fraudulent

23      inducement claims that I believe will be gone at the conclusion

24      of the plaintiffs' case.  And I don't believe that any of this

04:13   25      evidence has any relevance to that.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:13   1          I mean, one of the witnesses that they want --

2    that they want to bring is a blogger, is a person who has a

3    blog where she gathers information from disgruntled KBR

4    employees.  You know, surely that person --

04:14   5          THE COURT:  Well, I can't devise a ruling that

6    accounts for all 17 people, because I don't know what they're

7    going to say.  I mean, it sounds like we're going to have to go

8    through each one by one, maybe out of the presence of the jury.

9    It will be enormously costly in terms of the time we invest in

04:14  10   this case.

11         But I don't -- I don't hear plaintiff saying that

12   they're all going to say the same thing.  They're going to say

13   different things, apparently.  Some probably will be allowed to

14   testify and others not.

04:14  15         But if there were witnesses to show there were a

16   pattern of sexual harassment and people who complained about it

17   and got locked in a metal container, I guess it would be

18   relevant to this case.

19         Yes, sir.  You wanted to say something else?

04:15  20         MR. ESTEFAN:  Your Honor, I'm inclined not to, since I

21   see how the Court is leaning and in deference to the Court's

22   time.  We're at 4:15.  I think --

23         THE COURT:  Well, can you at least speak to the

24   question of whether we're going to have then miniature

04:15  25   evidentiary hearings to decide on the admissibility of any of

04:15   1   this testimony?

2        MR. ESTEFAN:  I can, your Honor.  Our intention is not

3   to just pile on one witness after another to say the same

4   thing.  We can't help that KBR is a multinational corporation.

04:15   5   It sends its employees all over the world, all over the globe,

6   and interchangeably.  And the policies of KBR are KBR's

7   policies.  So, Bosnia, Yugoslavia, whatever, that's their

8   policy.  Okay?

9        The relevant inquiry is whether -- knowing its

04:15   10   policies and whether it enforced its policies, whether that was

11   or should have been disclosed to Ms. Jones, because that's

12   where the fraud comes in.

13       Additionally, we have -- with all due respect to

14   Ms. Vorpahl, she's parsing out causes of action.  But there are

04:16   15   also subparts to these causes of action, one of which is

16   ratification of prior bad acts by the employer, so as to make

17   KBR liable for things like what one individual did in this

18   instance, perhaps.  So, unless we get to put on this evidence

19   of what KBR knew, when it knew it -- and, in addition, it goes

04:16   20   to a way to get the punitive damages established, which one of

21   the ways to do that is by fraud.

22       So, there are -- and we pled for punitives, and

23   they're still very much alive in this case.  And, so, those are

24   the reasons for our witnesses.  Our intention, your Honor, just

04:16   25   for the Court's knowledge is, we're not going to put one

04:16  1   witness a day or even half a day.  Our intention is to get

2   these witnesses on and off in short order.

3       THE COURT:  I suspect direct will be short.  I just

4   anticipate, to the extent these issues are as wide-ranging as

04:16  5   they may be, we're going to have an awful lot of evidence on

6   the other side of the ledger, I think.

7       MR. ESTEFAN:  Well, they are claiming that two -- I

8   believe two of the witnesses weren't disclosed prior.

9       MS. VORPAHL:  Four.

04:17  10      MR. ESTEFAN:  I don't know which other two.

11      MS. VORPAHL:  They would be Anna Mayo, Dawn Leamon,

12  Charlie Jett, and Debbie Crawford.

13      MR. ESTEFAN:  Okay.  Charlie Jett -- this isn't part

14  of what the Court was asking about.  But Charlie Jett just

04:17  15  contacted us day before yesterday or a week ago or something.

16  So, we couldn't have known about him sooner.  But that, in and

17  of itself, will cut down on the 17, down to some smaller

18  number, Judge.

19          And, so, we're -- our intention is not to prolong

04:17  20  this trial.  We recognize that it doesn't benefit us to just

21  drone on and on during this trial.

22      THE COURT:  But it's fair to think that there might be

23  differing objections to each one of the 17 --

24      MR. ESTEFAN:  True.

04:17  25      THE COURT:  -- or the 10 or --

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:17   1          MR. ESTEFAN:  True.

        2          THE COURT:  Okay.  Well, I don't know how to take -- I

        3   mean, I hate the idea of their coming to Houston and may not be

        4   allowed to testify, but what else are we going to do?

04:17   5          MR. KELLY:  Quickly on that point, too, your Honor,

        6   Mr. McKinney makes a point about some of the statements in some

        7   of these witnesses' affidavits.  Just because a statement here

        8   or there may be hearsay and may be construed by the witness

        9   doesn't mean the witness is untruthful.

04:18   10         THE COURT:  I understand that.  I understand that.

        11  Well, I mean, I don't know -- when will we get to the first of

        12  these witnesses, under your trial strategy?

        13         MR. ESTEFAN:  Tuesday morning.

        14         THE COURT:  Tuesday.  Okay.  We're going to take them

04:18   15  up one by one, I guess.  Okay.

        16         Okay.  We have remaining all these 412 issues.

        17  How does anybody propose we should proceed?

        18         Yes, Ms. Vorpahl.

        19         MS. VORPAHL:  Your Honor, if the Court would

04:19   20  entertain, I had a supplement.  And I decided, as much paper as

        21  everyone was filing, that I wouldn't file it.  But my

        22  supplement was simply some of the many ways, just examples of

        23  the many ways, since we left the courtroom the other day, last

        24  Friday, that we thought of that this evidence is relevant that

04:19   25  we didn't even talk about last Friday.  Would the Court be

04:19    1    interested in two or three examples?

         2              THE COURT:  All right.  All right.

         3              MS. VORPAHL:  And I'll try to be brief, your Honor.

         4              We've talked about one of them earlier today in

04:19    5    connection with some of the expert testimony.  And it's

         6    undisputed that the plaintiff had this laser surgery on May the

         7    25th to remove this condyloma.  The surgery was just two months

         8    prior to this purported rape.  And Dr. Irwin has concluded and

         9    certainly ought to be permitted to testify that the plaintiffs'

04:20   10    examination by Dr. Schulz was compatible with consensual

        11    intercourse, given that recent laser vaporization of genital

        12    condyloma.

        13              Next, a separate issue, in the plaintiffs' page

        14    and line designations for Dr. Schulz' deposition, they very

04:20   15    selectively designated testimony regarding the laser surgery

        16    and Dr. Schulz' opinion that if the skin had not recovered

        17    sexual intercourse would have been painful.  But the plaintiff

        18    does not designate Dr. Schulz' complete testimony about the

        19    surgery causing weakened tissue.

04:20   20              So, I mean, it raises the whole issue -- and I

        21    know that the Court is aware of this -- that the door is going

        22    to be opened on numerous occasions, and especially by that kind

        23    of testimony that would leave the wrong impression with the

        24    jury.

04:21   25              Similarly, in plaintiffs' proffered Exhibit 69,

1    they selectively --

2              THE COURT:  Slow down, now.  Slow down.

3              MS. VORPAHL:  -- they've selectively compiled several

4    pages of documents from Dr. Terri Scott's voluminous file.

5    Dr. Scott was the plaintiff's treating gynecologist both before

6    and after she went to Iraq.  Plaintiffs' Exhibit 69 suggests

7    that the plaintiff may testify or imply that she contracted

8    sexually transmitted diseases from Eric Iler or Charles Bortz,

9    a matter that she has sworn to in interrogatories since she got

10   back.

11             If the plaintiff does testify that she got

12   sexually transmitted diseases from either of these two people,

13   or even implies that, then certainly the defendants ought to be

14   entitled to fully discuss the plaintiff's history of sexually

15   transmitted diseases and the sexual partners from whom she

16   might have gotten those diseases.

17             And finally, the KBR defendants should certainly

18   be allowed to cross-examine the plaintiff regarding statements

19   that she made to her experts that conflict with statements that

20   she made to treating physicians prior to the time that she went

21   to Iraq in late July of 2005.  You know, I mean, her medical

22   records, including things in her own hand that she completed at

23   the doctors' offices, say that she has histories of all kinds

24   of problems that she disavows a prior history of to her own

25   experts, and on which her experts have either relied or the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:22   1    jury should be -- is entitled to know that the expert doesn't

2    think that it's relevant that Ms. Jones has told untrue things

3    to them.

4                THE COURT:  Okay.  All right.

04:22   5                MS. VORPAHL:  So, there's just a myriad of reasons

6    that this testimony is going to need to come in.  Thank you.

7                THE COURT:  Okay.  Yes, sir.

8                MR. McKINNEY:  The Court has said several times that

9    the scope of the testimony on 412 and other issues will be

04:23  10    determined by the evidence that comes from Ms. Jones herself.

11    And there are several reasons why I would ask the Court to

12    revisit that view.  Ms. Jones, as Dr. Scarano has

13    demonstrated -- whether it's admissible or not, it's certainly

14    credible.  Dr. Jones' report is certainly credible.  It has

04:23  15    more than the ring of truth, Dr. Scarano.

16                Ms. Jones tailors her story as needs to suit the

17    facts.  She has sworn under oath since coming back from Iraq

18    that she contracted one or both of her sexually transmitted

19    diseases from my client, Charles Bortz.  She can simply -- she

04:23  20    can avoid the effect of that patent perjury by simply not

21    bringing up the subject and avoiding having her credibility

22    called into question.  Likewise, she can avoid having her

23    credibility called into question by simply remaining silent on

24    the issue of her three prior, almost certainly false,

04:24  25    allegations of sexual assault.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:24    1          In other words, the Court is giving one side in
         2    this case the keys to the evidence and is permitting one side
         3    in this case, a side that the Court-appointed expert has
         4    already determined consciously and routinely slants the
04:24    5    evidence to the point of telling untruths, multiple untruths,
         6    to achieve her own ends.
         7          My client stands falsely accused of sexual
         8    assault.  She has falsely accused others of sexual assault on
         9    three prior occasions, has subsequently either falsely, or not
04:24   10    falsely, depending on which story you believe from her, accused
        11    her husband of multiple allegations of physical assault.  This
        12    is a woman who has tremendous problems keeping her story
        13    straight.
        14          The Court -- or the plaintiffs would have all of
04:25   15    this excluded from the jury's consideration.  Experts, every
        16    one of her treating physicians, has asked her, "Do you have a
        17    prior history of sexual assault or abuse?"  In every instance
        18    she has said no.
        19          Now --
04:25   20       THE COURT:  Mr. McKinney, you don't need to convince
        21    me that she's told a lot of different stories.  I mean, in
        22    her -- especially if we consider her story in the broad sense
        23    to include things she said to the press and things she said to
        24    Congress.  I mean, clearly, I know that.  I know that.
04:25   25          What I am dealing with, though, is a federal

04:26   1   standard on evidence.  And Rule 412 does make a very effective

     2   shield as to certain allegations.  And as I've gotten into the

     3   cases, it seems to be that if a prior allegation of rape bears

     4   significant indicia of falsity, then it can be introduced as

04:26   5   tending to show that the -- the extent allegation of rape is

     6   also false.  But if there are allegations of rape previously

     7   that do not have any clear indicia of falsity or recantation or

     8   whatever, then those previous allegations cannot be offered

     9   because it does not tend to show that the allegation of rape

04:27  10   was false.  And unless the allegation of rape was false,

    11   there's not a tendency to show that this allegation is false.

    12            Now, on that analysis, it seems to me that some

    13   of these allegations of rape come in and some don't.  I mean --

    14        MR. McKINNEY:  Well, let me take the three allegations

04:27  15   in order.

    16            The first allegation of sexual assault was in the

    17   year 2000.

    18        THE COURT:  Right.

    19        MR. McKINNEY:  She was 15 years old.  The record

04:27  20   that -- as taken down by the charge nurse clearly and

    21   unequivocally shows that they were reporting a sexual assault,

    22   and the options of -- they were told -- Mr. -- sorry --

    23   Mrs. Jones and Jamie Leigh Jones were told by the nurse that it

    24   was -- too much time had passed to do a rape kit, but they

04:28  25   would do one if she wanted.  And if Ms. Jones wanted, a doctor

04:28   1   would examine her for trauma.  And the note concludes the

2   options were communicated to mother and daughter, and they said

3   essentially they would get back to us --

4          THE COURT:  On that one, the 2000 rape, it seems to me

04:28   5   there's conflicting evidence.  But I thought in the deposition

6   we took in this courtroom that Ms. Jones was saying that was

7   the mother's allegation of rape and not the daughter's.

8          MR. McKINNEY:  That is the story that mother and

9   daughter are now telling.  But if you listen to all of her

04:28  10   testimony, and if you could hear her mother's testimony, which

11   we took elsewhere, she amplifies on what happened at the

12   doctor's -- at the hospital.  She says, "I told them repeatedly

13   I wasn't assaulted.  The doctor examined me and found my hymen

14   to be intact."

04:29  15          Judge, if that happened, what -- if those two

16   things that Ms. Jones described happened, you would not have a

17   nurse's note saying, "We offered them a physical exam and we

18   offered them a SANE kit and they said they would get back to

19   us."  The nurse would have written down, "The doctor examined

04:29  20   her and found that her hymen was intact.  And the patient

21   totally denies any sexual assault."  That's what healthcare

22   providers do.

23          So, what you have is a conflict between what

24   Ms. Jones apparently said, almost certainly said at the time,

04:29  25   and her explanation for it after the fact, in a court of law,

04:29  1    where, quite frankly, her history shows too much of a bad

2    thing.  That is an admitted -- if you look at the evidence from

3    Charles Bortz' standpoint, that is an admitted false report of

4    sexual assault.

04:29  5            THE COURT:  Well, what I understood her testimony to

6    be was that she -- her mother was very concerned and took the

7    lead in making her go to the doctor and what she told the

8    doctor, but that Ms. Jones never did claim that she had been

9    raped.  Is that your understanding?

04:30  10           MR. McKINNEY:  That's what she said.  No, I agree,

11   that's what she is saying today.

12           THE COURT:  Well, I know.  So --

13           MR. McKINNEY:  But that -- if she had said that then,

14   that's -- the record would have been different.  The record

04:30  15   would not have said, "This is a sexual assault.  It's too late

16   to do a rape kit.  We told them that.  We told if they want a

17   rape kit, they can come back."

18           Instead the record would say, "The mother

19   contends there was a sexual assault.  The daughter says there

04:30  20   wasn't.  The daughter was examined by the physician.  She

21   wasn't assaulted."  None of that happened.

22           THE COURT:  How would -- at the time, she was 15 or

23   so.  Is that right?

24           MR. McKINNEY:  She was 15, Judge.  But that doesn't

04:30  25   affect what the record says.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:30   1          THE COURT:  No.  No.  But I can well understand that a

        2   15-year-old, in front of her own mother, might not be fully

        3   forthcoming about the nature of the sexual contact between her

        4   and her boyfriend.

04:31   5          MR. McKINNEY:  Judge, it's not a question of that.

        6   It's not a question of a daughter's reticence to discuss her

        7   sexual life.  She was adamant, and her mother was adamant --

        8   and they tell essentially the same story -- that from the very

        9   moment the mother raised the question of sexual assault or

04:31  10   sexual activity, she denied it.  It's not -- and she denied it

       11   vehemently.  And then she offered Ms. -- Jamie Leigh Jones

       12   offered in this courtroom the testimony that the doctor

       13   examined her and found her hymen to be intact.

       14          In fact, the record is absolutely silent on that

04:31  15   particular activity.  The record is silent on what Ms. -- and

       16   Ms. Jones said in this courtroom that she specifically told the

       17   nurse and the doctor that she was not assaulted.  So, it's

       18   not -- there's no ambiguity here about what she claims to have

       19   told the doctor at the time, or the nurse at the time.

04:31  20          The problem here is that if she had done at the

       21   time what she claims she had done, taking her at her word

       22   today, the record would be completely different than it is.

       23   The record on its face shows a sexual assault.  The record on

       24   its face does not show anything that Ms. Jones is now claiming.

04:32  25   That is prime evidence for a jury to evaluate in considering

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

04:32  1   the veracity of these allegations.

2          THE COURT:  Okay.  Anything else on that -- on the

3   19 --

4          MR. McKINNEY:  That's it on the --

04:32  5          THE COURT:  On the 2000 record?

6          Okay.  Let me hear from Mr. Kelly.

7          MR. KELLY:  Your Honor, first of all, we said that it

8   was not an allegation, as the Court already pointed out, made

9   by Ms. Jones.  And frankly, I think there's a -- needs to be a

04:32  10  definition of what an allegation is because reporting to a

11  medical provider, we contend, is typically not an allegation

12  anyway.  But the cases interpreting these things are talking

13  about allegations made to law enforcement, which Ms. Jones has

14  never done.

04:32  15         But getting back to the 2000.  Mr. McKinney says

16  himself, as he was talking about this case, he says, "they were

17  reporting."  There is no evidence of what -- of what the nurse

18  heard.  The only evidence in this case whatsoever is coming

19  from Ms. Jones and her mother; and that evidence is that the

04:33  20  mother reported, Ms. Jones denied.  And if that's the case, you

21  have no allegation.

22         Certainly nothing that was said here, nothing

23  that -- about this incident would rise to the level where

24  introducing that evidence would substantially outweigh its

04:33  25  prejudicial effect.  And that's what they have to do.  The

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:33  1    probative value here is so minuscule that it certainly cannot

       2    be said to substantially outweigh the prejudicial effect that

       3    it would have to do under 412.  So --

       4            MR. McKINNEY:  Judge, I don't have the record here.

04:33  5    It is, however, one of the ones that we marked and were part of

       6    the offer of proof that we made at the 412 hearing.

       7            THE COURT:  Go ahead.

       8            MR. McKINNEY:  The record states -- and I'm quoting

       9    verbatim, quote, patient states, blah, blah, blah.

04:34  10           At the time Ms. Jones was reporting, according to

       11   the nurse, a sexual assault.  She has concocted a story after

       12   the fact to contradict her own statement to a doctor, exactly

       13   what Dr. Scarano says she does time and time and time again.

       14   And not just once or twice, Judge.  Her reinvention of history,

04:34  15   her rewriting of history -- and that's why the evidence

       16   substantially outweighs the prejudice -- is ubiquitous.  It is

       17   everywhere in this case.  She does it time and time again.  She

       18   tells seven different treaters, "I have no prior history of

       19   sexual assault."

04:34  20           That's seven separate lies.  Seven separate lies,

       21   after she has publicly claimed all this stuff against KBR and

       22   Bortz and is making claims for money damages.  She is tailoring

       23   her case as time goes by to suit the facts and is lying about

       24   it time and time again.

04:35  25           The second rape, the second rape is one that

04:35   1   simply doesn't make any sense.  It doesn't make any sense that

        2   a 16-year-old driving a Ford Focus would drive her boyfriend to

        3   Galveston, be raped in broad daylight, not return home until

        4   9:00 or 10:00 in the evening, driving this young man up to

04:35   5   Spring, Texas -- this is her testimony -- and then be raped

        6   again.  On its face -- on its face, that is an allegation of

        7   rape that would fairly be questioned in the minds of reasonable

        8   people.

        9           Then you come to Eric Iler.  Now, she has

04:35  10   multiple different spins and interpretations of her situation

       11   with Eric Iler.  But it cannot be denied -- it cannot be denied

       12   that in her own medical records she reports it as a sexual

       13   assault at work.  And then twice other recorders with

       14   different -- different healthcare providers quote her as

04:36  15   referring to what happened with Eric Iler as a rape.

       16           Now, we will have -- we've already shown the

       17   Court some evidence, the e-mail chains and whatnot, that call

       18   into question the entire validity of her story about Eric Iler.

       19           Eric Iler will testify in this case.  I previewed

04:36  20   his testimony for the Court the other day.  He is going to show

       21   that his relationship as friends continued with Ms. Jones even

       22   after she returned from Iraq.  And he has objective documentary

       23   proof of that fact.  He has things from Ms. Jones that only she

       24   could have sent him.  A self-portrait, for example, that she

04:36  25   drew during her therapy with Dawn Nelson, if I'm not mistaken.

04:36   1          Now, all of this, Judge, accumulates and shows a

2   broad scheme or plan or purpose to deny, to mislead, to shape,

3   to shade her history to achieve a given result.

4          Now, a young man's reputation is plainly in

04:37   5   issue --

6          THE COURT:  I understand that.

7          MR. McKINNEY:  -- for the rest of his life.

8          THE COURT:  I understand that.

9          MR. McKINNEY:  And forcing him to go to trial in this

04:37   10   case and try this on evidence that is artificially sculpted by

11   Ms. Jones on what she chooses to say and chooses to withhold is

12   completely unfair.  We don't have one or two isolated incidents

13   of prior sexual conduct here that we're talking about.

14          And, by the way, while I'm on the subject, an

04:37   15   allegation of sexual assault is not sexual conduct.  It's not

16   sexual predisposition.  It is an allegation of a criminal

17   wrong.  It doesn't prejudice her by -- a victim -- a true

18   victim of sexual assault is in no way having her morality or

19   integrity questioned.

04:38   20          THE COURT:  That's right.

21          MR. McKINNEY:  A true victim of sexual assault is the

22   object of everyone's concern --

23          THE COURT:  I agree.  I agree.

24          MR. McKINNEY:  -- and a grave concern.  So, these

04:38   25   allegations fall outside of 412 on their face.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:38    1                    But leaving that aside, Judge, we don't have one

         2    or two or three isolated incidents here of her shaping her

         3    sexual histories to suit the circumstances of the day.  And if

         4    we're not allowed to show the complete Jamie Leigh Jones

04:38    5    picture in her own words, in her own words, this trial will be

         6    a gross miscarriage of justice.

         7                    THE COURT:  I do understand that.  Okay.  Thank you.

         8                    Yes, Mr. Kelly.  Mr. Kelly, I do think it's very,

         9    very hard to keep out the evidence as to her relationship with

04:39   10    Mr. Iler.  She has repeatedly claimed this.  She's claimed it

        11    publicly.  I think the evidence of a rape or any kind of

        12    non-consensual sexual relationship is very strong.

        13                    I mean, I think the evidence is very strong.  She

        14    did not tell the truth about Mr. Iler.  That she is making

04:39   15    allegation after the fact of rape, or at least non-consensual

        16    sex, that is really preposterous.

        17                    MR. KELLY:  With due respect, your Honor, I would

        18    disagree with that characterization.  However --

        19                    THE COURT:  She was accompanying him to all these --

04:39   20    not all these -- but to out-of-town destinations.  Are we

        21    really to believe that's non consensual, that she got in a car

        22    and traveled a vast distance against her will?

        23                    MR. KELLY:  Well, consensual -- it depends on how you

        24    define "consent," your Honor.  She was certainly coerced.  She

04:40   25    was a 19-year-old girl who was working for a 36-year-old man.

                         *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:40    1    This was her boss.  She needed the job.  She couldn't afford

         2    not to have the job, as she testified to repeatedly from the

         3    stand.  And he really didn't give her any choice.

         4              So, how you characterize that and how she

04:40    5    characterized that did change.  It went from a disgusting

         6    relationship in her mind to sexual assault when he did give her

         7    the STD.  And that's the only thing that is -- the reporting is

         8    an STD, where she's actually hospitalized for the STD, where

         9    Mr. Iler comes in and apologizes for the STD.  Frankly, I don't

04:40   10    think that anything having to do with Mr. Iler is relevant any

        11    longer since the Court has dismissed the claims against

        12    Mr. Iler.

        13         THE COURT:  No, that's not right.  I mean, clearly, if

        14    she made a false allegation as to her sexual relationship with

04:41   15    Mr. Iler, that is definitely relevant to this case.

        16         MR. KELLY:  Well, your Honor, if I -- the only time

        17    that Ms. Jones ever said sexual assault, the only time they can

        18    point to is after she is given an STD.  And the failure to warn

        19    a sexual partner of an STD that you know you have and then

04:41   20    transmitting it is, in fact, a sexual assault.  Legally that is

        21    a sexual assault.  It's not a false report.

        22         THE COURT:  No, no, no.  But that -- someone could get

        23    an STD from a partner, and that does not change the nature of

        24    the consensual sex that preceded it.  I mean, there might be

04:41   25    liability and might be extensive damages based on the STD, but

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:41   1   that does not make the original sexual relationship

2   non consensual.  Maybe the STD was non consensual or the risk

3   of the STD was non consensual, but the original sexual

4   relationship was consensual.

04:42   5          MR. KELLY:  Sure.  But you consent -- an assault, your

6   Honor, as you know, is an unwanted touching.  And if the

7   touching is with a diseased sexual organ, that is sexual

8   assault.

9          THE COURT:  That was not my impression of her

04:42   10   testimony here.  I did not think that she was saying, "Because

11   I got this STD, therefore all of it was non consensual."  I did

12   not hear that at all.

13          MR. KELLY:  But the problem is, your Honor, again,

14   we're going to have to -- and that's one of the reasons 412

04:42   15   does exactly what it does, it prevents us from having to have

16   these mini trials to explain all of the side issues about the

17   victim's past sexual behavior.  I understand that.

18          THE COURT:  This is not a side issue.  This is a core

19   issue.  This is absolutely a core issue, whether she's given to

04:42   20   misrepresenting the nature of her relationship with men.

21          MR. KELLY:  Well, your Honor, I think that's

22   exactly -- I think 412 actually does address that, and the

23   cases address it in 412 --

24          THE COURT:  It would be inadmissible for defendants to

04:43   25   come in here and say, "She had a sexual relationship with Eric

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:43  1    Iler."

2              Clearly 412 blocks that.  But evidence that she

3    had a sexual relationship with Mr. Iler and then later

4    characterized it as non consensual when there's copious

04:43  5    evidence that it was consensual, that is admissible because

6    that goes to the issue of pattern and motive and absence of

7    mistake, all those issues that go beyond credibility.

8              No.  She -- they definitely -- 412 would exclude

9    any attempt to just come forward and say she slept with Eric

04:43  10   Iler and she slept with Joe Smith and she slept with David

11   Lopez.  That would be excluded.  But an after-the-fact

12   allegation of rape is right at the heart of what this case is

13   about.

14             MR. KELLY:  But, your Honor, there is no -- again,

04:44  15   first of all, there's no allegation.  There's a statement by

16   Ms. Jones in her medical records that she was sexually

17   assaulted after she's got the STD.  And then there is a note --

18   there's a note from some unknown person who answered the phone

19   at the doctor's office that says she would like a note to the

04:44  20   Air Force about --

21             THE COURT:  No --

22             MR. KELLY:  That's the only indication about rape

23   regarding Mr. Iler.

24             THE COURT:  No.  What -- well, I heard her testimony.

04:44  25   I heard her testimony in this very courtroom, and she was

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

04:44  1   saying it was non consensual.  I mean, it's not --

2            MR. KELLY:  I think she used the word "coerced," your

3   Honor.  And I don't think she said -- if she used the word

4   "non consensual," maybe she did.  But I think repeatedly she

04:44  5   also used the word --

6            THE COURT:  What turns on coerced or non consensual?

7   They seem the same thing me.

8            MR. KELLY:  Well, I think, for one thing, it's very

9   relevant in this case in that she never filed criminal

04:44  10   allegations against Eric Iler for rape.

11            THE COURT:  She never filed criminal allegations

12   against -- in Galveston either, did she?

13            MR. KELLY:  No, your Honor, she didn't.

14            THE COURT:  Or in 2000?

04:45  15            MR. KELLY:  She didn't.

16            Which is another reason why I say, truthfully,

17   these aren't allegations.  I think the allegations --

18            THE COURT:  I'm not inclined to allow the 2000 or --

19   the 2000 incident or the Galveston incident in.  But on Eric

04:45  20   Iler, that just -- I mean, that just seems to me right at the

21   core of what we're talking about.  And, I mean, I just do not

22   believe 412 meant to exclude that.  There's substantial

23   evidence that her claim of non-consensual sex, coerced sex,

24   unwanted sex, there's substantial evidence that's false.

04:45  25            And there we -- I mean, we have a -- it's around

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:45 1 the same time frame, with an employee of the same company,

2 older man.  I mean, the similarity is so stark that I really do

3 feel it would be an significant injustice to Mr. Bortz to keep

4 that out.  I really do.  I mean, she certainly can explain it,

04:46 5 explain why she thought from the beginning it was

6 non consensual or coerced.

7       MR. KELLY:  Well, I tell you, your Honor, it's our

8 understanding that the defense intends to offer -- and I've

9 talked to my client, and she doesn't give me any reason to

04:46 10 believe that it's truthful.  But it's our understanding that

11 the defense intends to offer some sort of proffer of evidence

12 that during the time that she was in this situation with

13 Mr. Iler, that she was having sex with other men.  And we would

14 like that to be --

04:46 15       THE COURT:  We talked about that.  I don't know --

16       MR. KELLY:  Well, I don't want -- because I'm going to

17 have to cross-examine Mr. Iler about what happened if the Court

18 is going to allow him to testify.

19       THE COURT:  Yeah.

04:46 20       MR. KELLY:  So, certainly we don't want to get into

21 other men --

22       THE COURT:  Let me ask the defendant.  Are you-all

23 going to introduce such testimony?

24       MR. McKINNEY:  I'm not going to offer --

04:46 25       MS. VORPAHL:  Go ahead.

04:46   1         MR. McKINNEY:  I know what's coming, and I'm not going

2    to offer any evidence of the dating issues that Mr. Iler and

3    Ms. Jones had.  But if -- you know, you be careful what you

4    cross-examine on because one thing that Mr. Iler told me, one

04:47   5    of the issues that started to push them apart was that she was

6    running up -- he gave her a gasoline credit card, because she

7    would go out to his house in Liberty and she couldn't afford

8    the gas.  And the gasoline charges were higher than they should

9    have been.

04:47   10        And he learned that she and another guy were out,

11   had a wreck, alcohol may have been involved.  And he was --

12   confronted her about, you know, "I thought we had an exclusive

13   relationship," something along those lines.

14        I don't plan to offer that.  I happen to know

04:48   15   that Eric told me that.

16        But, you know, go into it on cross-examination,

17   rough him up, you may get a -- you ask the wrong question, you

18   get the wrong answer.  I can't tell him not to answer --

19        THE COURT:  You're not going to offer it?

04:48   20        MR. McKINNEY:  Not going to offer it.

21        THE COURT:  Okay.  Ms. Vorpahl.

22        MS. VORPAHL:  Well, we have produced e-mails -- and I

23   don't have them here in the courtroom -- but during roughly the

24   same period -- you've got the e-mails -- where a fellow named

04:48   25   Norman Chu, who Ms. Jones testified about and said that they

04:48   1   had not had a sexual relationship, is saying things about, "I
        2   hope I didn't" -- and I may not have this exactly verbatim --
        3   "but I think I kept you awake in bed last night.  I'm sorry.
        4   We need to cuddle more."

04:48   5           I mean, things like that, I don't know whether
        6   that's going to come up, your Honor, but --

        7           THE COURT:  Why should it?  Why should it come up?

        8           MS. VORPAHL:  If she says that she had an exclusive
        9   relationship with him, if she lies about things that that would
04:49  10   go to, I certainly think it would come up.  And the issue of
       11   STDs, too.

       12           THE COURT:  Normally under 412, introducing sexual
       13   conduct to challenge credibility is not permitted.

       14           MS. VORPAHL:  But if she sits up there and lies about
04:49  15   it and says, "We had an exclusive relationship, Eric Iler and I
       16   did, from November to February," and we have these e-mails that
       17   suggest that she did not have an exclusive relationship, and
       18   Mr. McKinney's conversation with Eric Iler indicates that
       19   that's false, certainly we're entitled -- she doesn't get to
04:49  20   just say anything she wants --

       21           THE COURT:  I understand.

       22           MS. VORPAHL:  -- and we have no -- and we have to sit
       23   mute.  I mean --

       24           THE COURT:  Well, I would rather suspect Mr. Kelly is
04:49  25   not going to say that.

04:49  1            MR. KELLY:  Well, your Honor, this goes right to the

2      heart of 412.  And here's the issue.  Unless they have direct

3      evidence that she was having sexual intercourse with someone

4      else, then I do get to cross-examine Mr. Iler on the fact that

04:50  5      he gave Ms. Jones a sexually transmitted disease without them

6      being able to bring up some e-mails that may or may not mean

7      that she had --

8            THE COURT:  What if she got a sexually transmitted

9      disease from this other person?

04:50  10            MR. KELLY:  Well, the point is --

11            MS. VORPAHL:  Or somebody a month or a year ago?  And

12      I'm sorry, I shouldn't have interrupted you.

13            THE COURT:  No, Mr. Kelly has the floor right now.

14            MR. KELLY:  The point is, your Honor, that if she

04:50  15      testifies that she didn't have sexual intercourse with somebody

16      else during that time frame, unless they have direct evidence

17      and have produced it to us -- and even then I think it would be

18      barred by 412 -- but that's the whole point of 412.  That's why

19      we don't think Eric Iler should --

04:50  20            THE COURT:  Tell me how your client can believe that

21      she got a sexually transmitted disease from one person and not

22      another, since apparently it can be --

23            MS. VORPAHL:  Dormant.

24            THE COURT:  -- it can spread when a person does not

04:50  25      have active evidence of the disease.

04:50   1              MR. KELLY:  Without giving all of my cross-examination
        2     to the defense, your Honor, I will just say it this way.
        3     Ms. Jones was not having sexual intercourse with other people
        4     during that time frame and --

04:51   5              THE COURT:  You don't -- you can't -- you don't know
        6     that.

        7              MR. KELLY:  I know my client will testify to that,
        8     your Honor.

        9              THE COURT:  Okay.

04:51  10              MR. KELLY:  Obviously I can only represent the facts
       11     as I know them through my client.  And not one piece of
       12     evidence has come forward to say otherwise.

       13              THE COURT:  Well, I don't know what they have.  I
       14     don't know what they have.

04:51  15              MR. KELLY:  Well, and that's the point, your Honor.
       16     If they're going to bring in evidence -- if they think they're
       17     going to bring in evidence violative of 412, we certainly at
       18     least ought to know about it.

       19              THE COURT:  Why do you want to bring in sexually
04:51  20     transmitted disease anyway?  It seems to me that's going to
       21     hurt your client.

       22              MR. KELLY:  It's coming in through the defense, your
       23     Honor.  And so, we would just as soon go ahead and put it on
       24     the table ourselves.  They're going to bring it in.  It's one
04:51  25     of their theories of defense in the case.

04:51   1          They think that she lied about this whole thing

     2   so that her having STDs and possibly giving them to Mr. Bortz

     3   wouldn't be discovered.  This is coming in through the defense

     4   if I don't bring it in.

04:51   5          So, you know, if Mr. Iler is going to testify,

     6   then we're going to talk to him about how he gave Jamie an STD.

     7   But that shouldn't open the door to all sexual or possible

     8   sexual relationships.

     9          THE COURT:  Does the defense really intend to bring up

04:52  10   STD if the door is not opened?

    11          MR. McKINNEY:  It comes in the case in several

    12   reasons -- for several reasons.  One, it comes into the case to

    13   demonstrate -- the laser treatment that she got in late May,

    14   early June of 2005 was for a condyloma, which is one of the

04:52  15   symptoms of the Human Papilloma Virus.

    16          THE COURT:  I know about that.

    17          MR. McKINNEY:  That made her skin more friable and,

    18   thus, more susceptible to fissures, which is one of the

    19   possible explanations for the fissures.  So that comes into

04:52  20   evidence for that reason.

    21          It comes into evidence because she has sworn

    22   under oath that she contracted one or both of her STDs from my

    23   client, Charles Bortz.  She has done so in a case directly

    24   against KBR.  I plan to put that into evidence because it's

04:53  25   just perjury, and the jury is entitled to know that she will

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

04:53   1    perjure herself for money.

        2                It's not pleasant to contemplate, but that's what

        3    she's done.  It's under oath.  It's in the Base Defense Act or

        4    whatever they call it.

04:53   5                THE COURT:  The Base Defense Act.

        6                MR. McKINNEY:  I call it the Workers' Comp Act, the

        7    workers' Comp case.

        8                But in any event, it comes in also because, just

        9    like her sexual -- her history of prior sexual abuse, or lack

04:53  10    thereof, she denies a history of STDs to a variety of treaters

       11    where it's relevant information for the treater to have.  And

       12    it will come out on cross-examination, if the treaters are

       13    honest, You asked this question about X, prior sexual history,

       14    prior STDs, whatever.  You did that for a reason.  You weren't

04:54  15    just killing time.  What was the reason?

       16                "Well, because it's relevant to your treatment."

       17                "Is it relevant to your treatment if your patient

       18    lies about either of these two events?  Is that relevant to

       19    your treatment?"

04:54  20                "Well, of course, it is."

       21                So, most of this stuff comes in because of all

       22    the different fibs, untruths, et cetera, that she has told so

       23    many people who will be on the stand, who will be

       24    cross-examined as to their interactions and -- their

04:54  25    professional interactions with Ms. Jones.

04:54   1          But to answer your question about the STDs, it

2      comes in the case.

3          MR. KELLY:  Your Honor, if I may?  All of these issues

4      are really meant to, as we talked about the other day, muddy

04:54   5      her up.

6              This is a fairly simple case.  KBR created an

7      environment.  They ignored complaints.  They punished people

8      who complained about it.  They lied to Jamie about the

9      environment they created.  They sent her over to Iraq.  Third

04:55  10      day in the country, she is raped.

11          THE COURT:  Well, that's the issue.  Mr. Bortz says

12      she wasn't.

13          MR. KELLY:  I understand.  But the issues are not as

14      complicated as the defense would have them be.  They're just

04:55  15      not.

16          THE COURT:  Well, in most cases the plaintiff is

17      trying to make the case very simple and the defense is trying

18      to make it a little more complicated.  That's not unusual.  But

19      I don't think we can start off with the premise that we know

04:55  20      for a fact she was raped.  I think that's what we're having a

21      trial about.

22          MR. KELLY:  Well, I understand.  And I understand that

23      Mr. McKinney has stood up here and very adamantly said his

24      client is falsely accused.

04:55  25              Well, I can tell you that after representing

04:55   1   Jamie Leigh Jones for five years and being very, very close
        2   with that young woman, I don't believe that at all.  I think
        3   his client's a rapist, and I think that we're going to prove it
        4   in this courtroom.
04:55   5            THE COURT:  Your client has not made it easy for
        6   herself.  She has told various -- she had the rape kit that had
        7   been misused and abused and violated, and now she dropped that
        8   claim.
        9            MR. KELLY:  Well, your Honor, we dropped it because
04:55  10   ultimately the government turned it over.  But it was years
       11   later.  And we all believed that, including myself.  Because
       12   for years it was inessential.  And so, when she made those
       13   allegations, she believed them.  So did I.  We didn't learn
       14   that until very recently -- I don't want to say within the last
04:56  15   year, but I think it was within the last year -- did we learn
       16   that, in fact, the government did have parts of the rape kit
       17   that they were turning over.
       18            THE COURT:  What happened to the claim that she was
       19   gang raped?  She's dropped that, too.
04:56  20            MR. KELLY:  Well, you didn't allow us to drop that,
       21   your Honor, in the Fifth amended.  The problem was, your
       22   Honor -- we still believe to this day that she may have been
       23   gang raped.  The problem is that we understand that the
       24   evidence that we have to put that claim forward is probably not
04:56  25   going to meet our burden; and so, we would prefer not to weaken

04:56  1    the other claims, which is why we wanted --

2            THE COURT:  She's saying more than that.  She's saying

3    she can't even remember who she had sex with.  So, that is, in

4    fact, her position, that she doesn't remember.  Seems like a

04:56  5    huge jump to then argue that "I was gang raped."

6            MR. KELLY:  No, no.  What she said, your Honor -- and,

7    actually, we made the gang rape allegation as her attorneys.

8    She thought she may have been because she -- the last thing she

9    remembered before she lost consciousness was drinking with five

04:57  10   people.

11           THE COURT:  Okay.

12           MR. KELLY:  And then she also has -- recently has had

13   flashbacks to having somebody -- Bortz and somebody else, who

14   she kind of guesses may be Matthew Ryan, being in her room.

04:57  15           That's the extent of our evidence.  I believe

16   her.  I believe that likely there was somebody else in that

17   room.  Whether or not he actually had sex with her, I don't

18   know.  We can't prove it to the standard that would be required

19   to get a jury verdict; and so, we would like to have dropped

04:57  20   that allegation.  I know it's still in the Fourth amended and

21   we weren't allowed to drop it.  But that's the reason we wanted

22   to drop it, because we didn't feel we had the evidence to meet

23   our burden.

24           THE COURT:  Why wasn't that obvious a whole lot

04:57  25   earlier?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:57  1          MR. KELLY:  We hoped that it would come out through

2    discovery, your Honor, as simple as that.  And that was not

3    her.  That was me.  And if I delayed in modifying the

4    allegations as -- you know, for whatever reason, it wasn't

04:57  5    through any intent, and it certainly wasn't my client.  That's

6    why I attempted to tell the Court this was on me, not her.

7          THE COURT:  If you didn't have any evidence of a gang

8    rape, why was she saying that publicly?

9          MR. KELLY:  Because she believed it, your Honor.

04:58  10         THE COURT:  Why, if she didn't have any evidence,

11   couldn't even remember it?

12         MR. KELLY:  Because she knew that she hadn't given

13   consent to the one person that was in the room, and she knew

14   that the others were at least covering up for him.  She knew

04:58  15   that much.  And she put that together in her mind, and she

16   believed that she was gang raped.  She believes it today.

17              Can we prove it?  No.  I believe it today.

18         THE COURT:  Why does she believe that if she can't

19   remember anything?  Because she was drinking with some guys?

04:58  20         MR. KELLY:  Because she was drinking with some guys,

21   because one guy handed her the drink with the Rohypnol, the

22   GHB, whatever in it, and it wasn't Charles Bortz.  And she woke

23   up with Charles Bortz.

24         THE COURT:  That's a very weak premise for such a

04:58  25   damning charge.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:58    1         MR. KELLY:  In addition to that, she has the

2    flashbacks of another firefighter.  In addition to that, the

3    damages that her body did sustain.  And while they may have

4    been sensationalized to some degree, they were significant

04:59    5    damages to her body, are not done in the normal course of --

6    certainly of consensual sex.  And to this day she doesn't know

7    how the injuries to her chest could have occurred by one man.

8    Can't quite figure that one out.

9         THE COURT:  Okay.  Mr. McKinney?

04:59   10         MR. McKINNEY:  The Court raised an excellent question

11    on both the rape kit and Ms. Jones' inability to remember

12    anything between the two sips, waking up the next morning.  And

13    it is emblematic of her entire pattern of conduct throughout

14    her life, when she doesn't know, she assumes the worst about

04:59   15    others, the Army, the State Department, whoever.  If she's not

16    getting what she wants, she invents the most outlandish

17    statements, partially credible, throws anybody she has to under

18    the bus to get it to sound like it's her story and to make

19    herself sound the victim.  She did it on the rape kit.  She did

05:00   20    it on the very thing that brings us here today.

21         Which is why, Judge, if you go back and revisit

22    all of the things where she has tried to get out from under her

23    own words by subsequent self-serving statements, the evidence

24    in this case should be wide open for the jury's consideration,

05:00   25    not limited in any degree.


*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:00   1                      That's just the way this woman works.  She's --
        2      and Dr. Scarano testified to that.  She has histrionic
        3      disorder, which promotes -- promotes only befriending people
        4      who believe in her gross exaggeration and making stuff up, and
05:00   5      anybody who disagrees with her is the devil.  That's her story,
        6      and it's her story in almost every instance that we will review
        7      in this case.
        8                  MR. KELLY:  As to the rape kit, your Honor, the rape
        9      kit was missing for awhile.  And as I'm reminded by my
05:01   10     co-counsel, Ms. Morris -- well, she actually called and spoke
        11     with Special Agent Lynn Falanga.  And what -- she didn't remind
        12     me of it, but I recalled when she said it I actually had a
        13     conversation similar to this one with Ms. Falanga.
        14                     But there were screaming matches about this rape
05:01   15     kit where the State Department says, "It was never done.  We
        16     never took it.  It was never had."
        17                     And I can represent to the Court that both --
        18     well, I know that I did, and you can represent for yourself,
        19     had conversations with the special agent from the State
05:01   20     Department where it was represented to us that that rape kit
        21     was missing.  So, she didn't make that up, Judge.
        22                  THE COURT:  Even there, there's a big disconnect
        23     between something being missing and something having been
        24     tampered with.  I mean, the government -- believe me, I work
05:01   25     for the government.  All the time the government, because of a

                        *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:01   1    delay or insufficient attention, loses things and can't produce

        2    things.  That doesn't mean somebody is malevolent.

        3         MR. KELLY:  I understand, your Honor.  But the -- what

        4    I'm saying is that certainly explains why Ms. Jones would have

05:02   5    believed -- in light of the fact that the last person she saw

        6    with that rape kit in her hands was a KBR security guard, it

        7    certainly would explain -- or at least give her reason to

        8    believe that it had been tampered with.  And so, it's not --

        9    she doesn't make these things up out of whole cloth, your

05:02  10    Honor.  Is she wrong sometimes?  Sure.  But she's not out there

       11    making stories up out of whole cloth.

       12         MS. MORRIS:  Just to clarify, your Honor, Lynn

       13    Falanga, the agent, could not say that it was lost.  She said

       14    they never performed the rape kit on Jamie.  And Jamie kept

05:02  15    telling her, "No, you did," and she described it in detail.

       16    And Lynn kept saying no.

       17              I called Lynn Falanga.  I told her, "Jamie said

       18    this is what they did.  They made her stand on a piece of

       19    paper."

05:02  20              And she said, "Oh, let me double-check."

       21              It was a couple of weeks later I got a call back

       22    from them saying that -- and Jamie saying that all of the

       23    sudden she found it in her locker.  So, it was missing --

       24         MR. KELLY:  Parts of it.

05:02  25         MS. MORRIS:  Yes.  I'm sorry.  It was found in the

05:02    1   locker, but there weren't any pictures in the actual rape kit

         2   she found in her locker.

         3            We actually found -- or received the pictures,

         4   what, a week ago, from the FBI.

05:03    5            MR. KELLY:  In Jamie's deposition we received the

         6   photographs.  That's when we got the photos from the rape kit,

         7   with Jamie on the stand in this courtroom.

         8            MS. MORRIS:  So, she knows it was performed on her.

         9            MS. VORPAHL:  That's absolutely inaccurate.  Daniel Hu

05:03   10   produced those photographs.  They were very dark in the rape

        11   kit.  And you-all know full well those photographs were in the

        12   rape kit.  They were very dark.

        13            MR. KELLY:  You can scream at me all you want --

        14            MS. VORPAHL:  I'm not screaming.

05:03   15            THE COURT:  We don't need any of this.  We don't need

        16   any of this.

        17            Ms. Vorpahl, you go ahead, and then they'll have

        18   a chance to respond.

        19            MS. VORPAHL:  The photographs were in the documents

05:03   20   that were transmitted to us by Daniel Hu, as the agent of the

        21   Department of State.  We finally realized that they were very

        22   dark photographs and what they were.  We asked them if they

        23   could get us better copies of those photographs, and we turned

        24   them over the moment we received them.  They were -- they were

05:04   25   with those documents all along and -- and you-all know that.

05:04   1          MR. KELLY:  What I know is I saw those pictures for

       2     the first time sitting right there next to Jamie Jones.

       3          MS. VORPAHL:  Well, then you didn't look at what we

       4     had provided to you, Todd, which -- and respectfully, it

05:04   5     wouldn't be the first time that you've made a claim that we

       6     didn't provide you something.  Just until yesterday you told us

       7     that we didn't give you Stacy Mitchell's report, which was

       8     false.

       9          MR. KELLY:  Actually, I think if you look at the

05:04  10     transcript, I didn't say you didn't give it to me.  I said I

      11     hadn't seen it.  I wasn't sure.  I made it very clear that I

      12     wasn't sure.

      13          MS. VORPAHL:  Well, you said the same thing, that you

      14     hadn't seen the photographs.  We turned the photographs over to

05:04  15     you the moment we got them.

      16          MS. MORRIS:  No one is lying here, I don't think.  I

      17     think the problem is Lynn Falanga reported to us the rape kit

      18     didn't exist.  She found it.

      19               Then she reported to us there were no pictures,

05:04  20     though it indicated there should be pictures; and then she

      21     found them.  Now they were turned over to the Department of

      22     Justice.  Daniel Hu sent them to you and we received them; but

      23     they were not in the rape kit, according to Lynn Falanga.

      24          MS. VORPAHL:  Daniel Hu didn't send them to us.

05:05  25     Daniel Hu provided all of the contents to everybody.  There

05:05    1    were very dark squares in the rape kit.  We asked if he could

2    get better copies of those dark squares.  And they were the --

3    the photographs that show minute bruising.

4            They were immediately -- they were either

05:05    5    provided directly by Daniel Hu to all the parties or we

6    immediately turned them over when we obtained the better

7    copies.  I can figure out the answer to that.

8            But all of this testimony about -- and I don't

9    know what Lynn Falanga told you.  Ms. Falanga, as best I know,

05:05   10    isn't testifying.  She's outside of subpoena range.  So, I'm

11    not sure what any of this has to do with anything.

12         MR. KELLY:  It just has to do with --

13         THE COURT:  Well, it had to do with my -- I'm asking

14    why she made such strong claims without better evidence.  And

05:05   15    Mr. Kelly is explaining to me why she thought she had

16    sufficient evidence.  I think that's the origin of it.

17         MR. KELLY:  Your Honor, if I may, we've gotten, I

18    know, very far afield from what the Court was initially talking

19    to us about.  I think if we -- if this case is tried without

05:06   20    reference to the STDs, without reference to the prior sexual

21    partners and so forth, first of all, it's a much cleaner case.

22    It doesn't violate Rule 412.  And I think that it really goes

23    to allow the case to be tried in a much cleaner way about

24    whether or not this assault actually happened.

05:06   25            And I think that all of this stuff about bringing

05:06    1    in prior sex partners and trying to muddy up the water in that

        2    way, the reason it's being fought so hard is because the

        3    defense understands full well that the best way to win this

        4    rape case is to make Jamie out to be an unchaste woman.  And

05:06    5    that's exactly what they're doing.

        6        THE COURT:  Well, it's always hard to separate what's

        7    prejudicial and what's probative in a case of sexual assault.

        8    But here again, your client has made it very difficult on

        9    herself.  It's not a he said/she said.  It's a he said/she

05:07   10    can't remember.  And when you have somebody saying, "I don't

       11    remember, but I think X, Y, Z," then I can hardly conceive of a

       12    more appropriate case for testing that person's credibility.

       13        "I can't remember what happened, but I'm going to

       14    accuse somebody of something criminal," that -- you know, I

05:07   15    don't -- I don't say that she's not telling the truth on this;

       16    but it invites some other appropriate metric on her

       17    credibility.

       18        MR. KELLY:  Your Honor, what is uncontested -- what is

       19    uncontested and what she does remember is in the morning -- and

05:07   20    Mr. Bortz confirms it -- that she asked whether they had sex,

       21    and he confirms that they did.  She asks if it was protected,

       22    and he confirms that it was not.

       23        THE COURT:  Yes.

       24        MR. KELLY:  That, she remembers.  The fact that she

05:07   25    doesn't remember anything prior to that is simply a statement

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:07  1    on whether or not she even could have given consent.  She can't

2    help that she doesn't remember, Judge.  She was drugged.  She's

3    not conscious to remember, and not by her own doing.

4         THE COURT:  I understand that.  But to go from being

05:08  5    unaware of what happened to a criminal allegation is a very

6    serious step.

7         MR. HEDGES:  Your Honor, may I, very briefly?

8         THE COURT:  Yes, you may.  Go ahead.

9         MR. HEDGES:  When you said she's made it very hard on

05:08  10   herself, I thought you were going someplace a little different

11   from where you went.  Part of it is she has, in fact, made it

12   very difficult on herself, not by he said/she said; but she

13   said this person on one occasion, she said that to another

14   person on another occasion, and she said yet a third thing

05:08  15   to --

16        THE COURT:  I already said that.  I already said that

17   with the statements that she made and withdrew about the rape

18   kit, with the statement she made and withdrew about the gang

19   rape.

05:08  20        Well, for now I'm not going to let the evidence

21   of the 2000 incident in.  I'm not going to allow any evidence

22   as to the Galveston incident.  But Eric Iler, I think, is wide

23   open.  I just think there's so much evidence that that's an

24   allegation that was false when made that I just -- it goes

05:09  25   directly to the issue of whether she's in a habit of making

05:09    1    egregious allegations about men and then recanting them.

2         Is there anything else we can usefully take up?

3         I think most of these issues of evidence, as in

4    every trial, we're better off dealing with them when they come

05:09    5    up because I just don't know what's going to be said by

6    indirect.  I don't know.

7         MS. VORPAHL:  Your Honor, I think that's exactly right

8    because there are no cases that stand for the proposition that

9    Ms. Jones gets to get on the stand and say, "I had no other

05:09   10    sexual partners during this period," and we don't have a right

11    to test that.  Or, "I got STDs from Eric Iler," and we don't

12    have the right to test that.

13        So, I think a lot of it is going to depend upon

14    the testimony that Ms. Jones and the other witnesses on her

05:10   15    behalf advance.

16        We have a couple of -- I have a couple of

17    concerns.  And -- you know, we got plenty of concerns in this

18    case; and I don't mean to add to it.  There is so much on the

19    Internet.  I don't know if your Honor has ever looked at this

05:10   20    case on the Internet --

21        THE COURT:  No, I haven't.

22        MS. VORPAHL:  -- and Jamie Jones.

23        Jamie Jones has a foundation website where she

24    tells --

05:10   25        THE COURT:  I've heard that.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:10     1          MS. VORPAHL:  -- all the -- I mean, if you might go to

          2     the Internet and see --

          3          THE COURT:  No, no, no, no, no.

          4          MS. VORPAHL:  Well, here's my point, though, your

05:10     5     Honor.  If we have a jury here for a week, it's going to be

          6     hard enough every evening for them to keep themselves from

          7     going and looking at the Internet.  But if we let them go for a

          8     week at a time or we are only able to take the case for a

          9     couple of days, it's going to be highly prejudicial to -- at

05:10    10     least to KBR and to the corporate defendants that the jury is

         11     inevitably going to go and look at this information, a lot of

         12     which is inadmissible and self-serving.

         13          THE COURT:  Well, you know, I started off with this

         14     given.  I am very impressed with jurors.  I really am.  I've

05:11    15     been very impressed with them consistently before I had this

         16     job and the 12 years that I have had it.  And I found they obey

         17     very well the Court's instructions.

         18               I have some evidence of my own on that.  I was

         19     once a juror in state court; and I was really impressed that we

05:11    20     really did never, ever discuss the case, ever, throughout its

         21     duration.  And I think there's good evidence in the Enron case

         22     and the Vioxx case that jurors can discipline themselves and

         23     follow instructions.

         24               And I'm going to instruct them, as I always do,

05:11    25     to avoid news reports, newspaper coverage, and I'll add

05:12  1    whatever is available on the Internet.  And I'm going to assume

2    they follow those instructions.  If they don't, I'm not sure in

3    whose favor it cuts.  I mean, there's -- I would wager there's

4    lots of information of all sorts on the Internet.  The only

05:12  5    time I looked at it, I think, was after the original ruling on

6    arbitration, and that was sent to me by somebody.  I don't know

7    who.

8         MS. VORPAHL:  She's got this big Wikipedia -- and I'm

9    not saying she set it up.  I don't know how it got set up.  But

05:12  10   there is a huge body of information on the Internet.

11        THE COURT:  Well, if there's a lot of information on

12   the Internet that she cannot confirm in trial, it may cut very

13   sharply towards your client's point of view.

14        MR. McKINNEY:  There's not.  The Internet is totally

05:12  15   one-sided in this case.  And one of the issues that has been

16   visited on my client, for example, is he had a subsequent

17   arrest for simple assault.  Got a mug shot of him.  It's not a

18   pretty picture.  But it's all over the Internet, posted by

19   people sympathetic to Jamie.

05:13  20        THE COURT:  What do you suggest I do about this?

21        MR. McKINNEY:  Judge, I think an instruction with some

22   real teeth in it, not -- it would be probably hyperbolic in any

23   other case.  But simply instruct the jury that on pain of

24   contempt, the jury is ordered not to conduct any Internet

05:13  25   research or speak to anyone who has conducted any Internet or

05:13   1   other research about this case.  And if the Court learns that

2   any juror has violated the instructions, then the Court will

3   take the appropriate action.

4            And further instruct the jury that if any juror

05:13   5   learns that another juror has conducted research in violation

6   of the Court's order, that that juror is obligated to come

7   forward and report that to the Court.

8        THE COURT:  You don't need to worry about the strength

9   of my instruction.  It will be very strong indeed.  But, you

05:14   10   know, these are cases -- all these supernova cases are ones in

11   which we're required to trust the jury.  And in my experience,

12   jurors are pretty faithful to their duties.

13            I cannot prove the negative.  I cannot prove that

14   during the course of trial they will never vet a story or

05:14   15   listen to a news report.  But I do know my experience through

16   the years has been very reassuring with jurors.

17            I would sure rather trust my fate -- and I've

18   said this in open court many times -- to a jury rather than a

19   judge.

05:14   20        MS. VORPAHL:  And, Judge, my only --

21        MR. McKINNEY:  Present company excepted.  And I agree

22   with --

23        THE COURT:  No.  I think there's an enormous advantage

24   in the collective discipline on a jury that is not present when

05:14   25   an individual is entrusted with the same amount of authority.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:14  1          MS. VORPAHL:  And my only point through all of that

2     was that if there was a period of time, a way that we could try

3     this in the shortest possible time, it would certainly result

4     in the least prejudice to our client.

05:15  5          THE COURT:  Well, I mean, I've got other cases that

6     are also very important.  I mean, give me some options.  You

7     want to work Saturdays and Sundays?

8          MS. VORPAHL:  I would be willing to do that.  I would

9     certainly -- and we'll go back and think about some options.

05:15  10    Or work into the evening, if that suited the Court.

11         THE COURT:  Well, we have -- you know, there are other

12    people whose schedules are relevant.  We can't keep --

13         MS. VORPAHL:  Of course --

14         THE COURT:  I will have several court reporters

05:15  15    working and --

16         MS. VORPAHL:  No, of course, we --

17         MR. ESTEFAN:  And we'll have 12 jurors who probably

18    won't want to be here late.

19         THE COURT:  Well, they may not.  But jurors, there

05:15  20    again, will surprise you.  We've had them want to stay very

21    late.  We've had them wanting to come in very early to get the

22    case over with.

23         MR. ESTEFAN:  Some of us have other obligations, too,

24    you Honor, children and such.

05:16  25         THE COURT:  Well, I understand that.  This is one of

05:16   1   those instances where there is no perfect solution.  And I -- I

2   invite your thoughts on how we -- how we get it as close to

3   perfection as we can.  But it's --

4           MS. VORPAHL:  Your Honor, I think your ideas have been

05:16   5   good.  We'll go back and talk about it.  If we can come up with

6   some additional ideas, we'll copy everyone and float those

7   and --

8           THE COURT:  I hope you had some discussions about what

9   you can stipulate to.  Seems like some of these things can be

05:16   10  stipulated to.

11          MS. VORPAHL:  We'll work on that.  We've --

12          THE COURT:  Or put some things on by proffer.  If

13  witness X took the stand, she would testify to this, that, the

14  other.

05:16   15          MS. VORPAHL:  We certainly will do everything we can

16  to try to streamline.

17              In that vein, I would like to take up one final

18  issue, and that's this, we've got -- one, two, three, four,

19  five --

05:16   20          THE COURT:  Hold on just one second, Ms. Vorpahl.

21  Just a second.

22              Okay.  Don't go far.  I've got to deal with a

23  personal matter.  Just -- I'll be right back.

24      *(Recess was taken from 5:17 p.m. to 5:20 p.m.)*

05:20   25          THE COURT:  I'm sorry we had so many interruptions.  I

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:20   1   apologize.

2          MS. VORPAHL:  I'm going to let Ms. Cates talk about

3   these last couple of issues, which I think we can deal with

4   quick.

05:20   5          THE COURT:  Ms. Cates.

6          MS. CATES:  A couple of quick things.  The parties had

7   exchanged objections to the witnesses, exhibit list, and page

8   and line designations.  The page and line designations is

9   actually, I think, quite a big issue because we are presenting

05:20   10  eight people by deposition.  And we're just having a really

11  hard time.  We had to make a lot of objections to the

12  plaintiffs' designations.

13         THE COURT:  When is the depo testimony going to start?

14         MS. CATES:  That would be up to the plaintiffs.

05:20   15         THE COURT:  When is it going to start?

16         MR. ESTEFAN:  Maybe the first week.

17         MR. KELLY:  Off the top of my head, I can't think of

18  one in the first week, your Honor.  There may be one in the

19  first week, but I can't think of one.

05:21   20         THE COURT:  Okay.  We'll work on it.  But my overall

21  approach to these depositions is this.  If -- once you see the

22  designation -- is it a problem of completeness or hearsay?

23         MS. CATES:  It's not really hearsay.  It's more

24  completeness.  It will be like part of a question here and part

05:21   25  of an answer there.

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

05:21   1          THE COURT:  No, the rule is this.  No, we can't

2      excerpt from answers.  We can't excerpt from questions.  If one

3      side makes a designation, then the other side can

4      counter-designate depo testimony to be played at the same time.

05:21   5          MS. CATES:  That's what we would like.

6          THE COURT:  Okay.  Now, the evidence to be played at

7      the same time has to be limited to responsiveness to what the

8      other side -- if you have something totally different, it goes

9      to credibility of the witness, then you have to put that on in

05:21  10      your case in chief.  Do you understand the distinction?

11         MS. CATES:  Well, if that's how the Court wants to do

12     it, of course we'll do it.  We were sort of thinking that

13     there's a lot of duplication.  These are short depos, but very

14     duplicative page and line designations.  And for the time

05:22  15     effectiveness and cohesiveness and so the jury can follow

16     along, if we played all three parties' page and lines together,

17     consecutively -- or sequentially.

18         THE COURT:  The whole deposition?

19         MS. CATES:  No, just the page and line designations,

05:22  20     but as they appeared in the transcript.  So the jury would only

21     have to hear it once but would hear throughout each parties'

22     together.

23         MR. KELLY:  Your Honor, that's telling the plaintiff

24     how to put their case on.  We would object to that.  If they

05:22  25     want to offer their cuts after our cuts, that's different.  But

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:22  1   if -- and the rule of completeness we have to follow, I get

2   that.  I think we don't agree on everything is a rule of

3   completeness.  But that's telling us how to try our case, your

4   Honor, from the defense standpoint.

05:22  5       MS. CATES:  I just didn't want the jury to have to

6   hear everything twice.

7       THE COURT:  Why is anybody designating something

8   twice?  I don't --

9       MS. CATES:  Well, if we play the plaintiffs' clips

05:22  10  first and then defendants' clips, there's overlap, especially

11  because the plaintiffs have done so much, you know, two

12  sentences here, one question and answer here, and then the

13  defense would have to come back and fill in the full questions

14  and answers in between.  The page and lines have been difficult

05:23  15  from our perspective.

16          So, it would be more complete, instead of just

17  random pieces throughout or played twice eventually.

18      MS. VORPAHL:  Could you give an example?  Do you have

19  a marked example?

05:23  20      MS. CATES:  Yes.

21      MR. McKINNEY:  What we have, Judge, are part of a

22  question, part of an answer --

23      THE COURT:  No parts of questions.  The whole

24  question.

05:23  25      MS. CATES:  That is a huge problem.  I can show you

05:23   1   examples.

2              THE COURT:  No, the whole question.

3              MR. McKINNEY:  And then, as the Court knows, when you

4   get information from a witness, it's in the context of the ten

05:23   5   questions and answers before and the ten questions and answers

6   afterwards.

7              THE COURT:  Yeah, I know that.

8              MR. McKINNEY:  Well, when a question and answer is

9   taken out of context, the best way to fill in the context is

05:23   10  just blend both sides' offers and play the whole thing for the

11  jury at one time.  And that way we don't waste a bunch of

12  time --

13             THE COURT:  Submit a few examples and I'll try to rule

14  on these.

05:23   15             MS. CULLEN:  If I might, your Honor, here's one of

16  Mr. Kelly's excerpts from Dr. Jodi Schulz.

17             THE COURT:  Can I just look at it?

18             MS. CULLEN:  Certainly.

19             THE COURT:  Give it to Ms. Loewe, please.

05:24   20             MS. CULLEN:  Just the part in the blue box, your

21  Honor, is his designation.

22             THE COURT:  That's all that's being excerpted?

23             MS. CULLEN:  Yes, sir.  And the last sentence, as

24  you'll notice, of the answer, the last sentence has been

05:24   25  omitted from his designation.

05:24  1          MR. KELLY:  Can you give us a page and line, please?

2          THE COURT:  It's Page 26, Line 1 through 6 of Ms. --

3  of Dr. Schulz' deposition.

4               Okay.  The testimony is -- starts with an -- does

05:25  5  it start with "okay" or not?

6          MS. CULLEN:  He leaves out the "okay."

7          THE COURT:  Okay.  So, it starts --

8          MS. CULLEN:  I don't object to that.

9          THE COURT:  Then the answer is, "Complains of being

05:25  10  extremely sore vaginally.  No bleeding.

11          "QUESTION:  I may be jumping ahead of myself.

12  Did you notice any lacerations of the vagina" -- well, okay --

13  are the last few words then left out?

14          MS. CULLEN:  Yeah, the last --

05:25  15          THE COURT:  "Perineum or anus"?

16          MS. CULLEN:  Yeah.  It's the answer where she says

17  something about fissures, and then he leaves out the sentence

18  where she says, "but no lacerations."

19          THE COURT:  Oh, it includes "vagina, perineum or

05:25  20  anus?"

21          "ANSWER:  Only these fissures."

22          "There was no what I would call lacerations."

23          MS. CULLEN:  They left out that the "There was no what

24  I would call lacerations."

05:25  25          THE COURT:  No, that won't do, no.  Whole answer.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:25  1   Whole answer.

2              MS. CULLEN:  Yes, sir.

3              And then we have a second example where they've

4   taken lines spaced out within an answer.

05:26  5              THE COURT:  Okay.  This is Page 37, Line 21 through

6   24, "Who did the people work for who received the rape kit?

7              "I can't tell you for sure because I don't have

8   the chain of custody."

9              The rest of the answer is, "There was usually a

05:26  10   form that the person who received it would sign.  I can tell

11   you that the usual practice was, in civilian cases, it would go

12   to the security that accompanied them to the compound

13   hospital."

14              No, we need the -- no, the whole answer, whole

05:26  15   question.

16              Okay.  Here's one more.  This is also Dr. Schulz,

17   page 58, Lines 8 through 12, "Does a -- does the type of

18   friction which could -- produces a vaginal or perineal or an

19   anal fissure, can that be external friction; or is it typically

05:27  20   or generally or always -- I'm looking for kind of an informed

21   answer here -- is that due to penetration?"

22              Then the next line is left out.

23              "That is an external friction as opposed to

24   penetrative friction."

05:27  25              No, we can't -- the whole thing comes in.  No.

05:27   1            Okay.  Then we have Line 14 and 15, "I don't -- I
2      don't know that I could distinguish the two."

3            And then the next sentence is omitted.

4            "I think some sort of friction at the site of
05:27   5      fissure would cause that."

6            Again, we can't have these short answers that are
7      bifurcated like that.  The whole answer comes in.

8            The next is Line 17 on the same page, "With
9      respect to external penetration, would you expect to find other
05:27   10     if there was anal intercourse?

11           "Uh-huh.

12           "Would you expect to find other evidence of
13     penetration within 14 and a half hours of the event in addition
14     to fissures, such as muscular tearing, swelling, matters of
05:27   15     that nature?"

16           And then there's omission of an objection by
17     Mr. -- or question by Mr. Kelly, a response by Mr. McKinney.
18     And then Mr. McKinney closes.

19           I think it ought to go down to the end of
05:28   20     Mr. McKinney's examination where he says, "I believe that's all
21     I have.  Thank you very much," or least include that much.

22           MR. KELLY:  What page are you on, your Honor?

23           THE COURT:  I am on, most recently, Page 58, spillover
24     to 59.

05:28   25           MS. CATES:  I'll just say, your Honor, that's just

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:28   1   examples of -- and it's on every page of a stack of depositions
        2   this big (indicating).  And that's why we thought playing both
        3   sides' clips together would help automatically fill in some of
        4   those gaps, as well as doing things like including full answers
05:28   5   and questions.
        6        THE COURT:  Well, full answers and questions are
        7   absolutely necessary, unless there's a question that -- excuse
        8   me -- unless there's an answer that just goes off into
        9   something entirely different from what was asked.  But
05:29  10   generally, full questions, full answers.
       11             I'm not going to make them include your portions
       12   as part of their case in chief.  I don't think that's right.
       13   But I do expect good faith in excerpts.  I really do.
       14        MR. KELLY:  Your Honor, I have a question.  Because I
05:29  15   wasn't on the page when you were there.
       16        THE COURT:  I'm sorry.  Give these back.
       17             Okay.  Yes, sir.
       18        MR. KELLY:  If you look at Pages 58 and 59, and
       19   there's discussion between counsel.  Do you want discussions
05:29  20   between counsel included?  At Line 24?
       21        THE COURT:  Well, I think so, because what we have
       22   here is you and Mr. McKinney trying to further define the
       23   question.  So, I think yes.
       24        MR. KELLY:  Well, I think it was really an objection,
05:29  25   your Honor, on that page, because earlier in the deposition

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:29   1   there's a discussion about whether or not she's going to be

2   offering expert opinions.  And, so, my question is, to

3   Mr. McKinney, "Is that an expert opinion?"

4   Because he was -- it appeared to me that the

05:30   5   question asked for an expert opinion.  That's why the question.

6   So, it's really --

7   THE COURT:  Then he clarifies, he said, "I'm asking

8   what she would expect to find."

9   MR. KELLY:  Right.  I just -- normally when we do our

05:30   10   cuts -- if the Court tells us to do otherwise, we will -- but

11   we take out discussions among counsel because they're just not

12   relevant to the actual question and answer.

13   MS. CATES:  Your Honor, I'm fine with that, if it

14   looks like an objection.

05:30   15   THE COURT:  Well, if that's okay with you, that's fine

16   with me, too.  But I -- we have another important answer that I

17   think is shaped by the objections that precede it.  The doctor

18   says -- the question is, "Would you expect to find some of

19   those things?"

05:30   20   And she says, "Not necessarily, no."

21   MR. KELLY:  Right.

22   THE COURT:  But if you're okay with leaving that out,

23   if both sides -- sure, anything you agree on overrides what I'm

24   ruling on.

05:31   25   MR. KELLY:  I would like to approach just on one

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:31   1   issue, your Honor.  I know -- I think the Court's ruling

2   probably handled a lot of the other cuts; but I do have one

3   that I would like to take up with the Court, if I may.

4           THE COURT:  Okay.

05:31   5           MR. KELLY:  This is in the deposition of Kristen Rumba

6   at Page 42.

7           MS. CULLEN:  Whose designation is it, Todd?

8           MR. KELLY:  It's -- I believe that's yours.

9           MR. KELLY:  I believe it's yours.  I just want to make

05:31   10   sure that I'm -- I'm giving my only copy, so I want to make

11   sure.

12           In that cut, your Honor, I ask a question where I

13   misinterpret prior testimony.  I'm wrong.  Not intentionally

14   so, but I -- as it turns out, when I went back to check the

05:31   15   transcript, I was wrong.

16           THE COURT:  What question are you --

17           MR. KELLY:  It's the part that's highlighted in the

18   blue, Line 14.

19           THE COURT:  Okay.  We're on Page 42 of Dr. -- or --

05:32   20           MR. KELLY:  Of Kristen Rumba.

21           THE COURT:  Of Ms. Rumba's, R-U-M-B-A?

22           MR. KELLY:  Yes, sir.

23           THE COURT:  Okay.  And it begins with, "QUESTION:

24   Okay.  By the way, Dr. Schulz indicated that she never has her

05:32   25   patient's -- rape examination patient's take their top off.  Do

05:32   1   you disagree with her that Jamie did not, in fact, take her top

2   off in the examination?

3           "MR. HEDGES:  Objection, form.  That's a gross

4   misrepresentation of what she said.

05:32   5           "MS. CULLEN:  Join.

6           "MR. KELLY:  If I'm mistaken, the record speaks

7   for itself.

8           "ANSWER:  Her top was off.

9           "Are you absolutely certain of -- you're

05:32   10   absolutely certain of that?"

11           I don't have the rest of it.

12       MR. KELLY:  That's really -- you covered the part I'm

13   talking about, your Honor.  The purpose for putting that in, in

14   my opinion, is to make me out to be a bad person.  It's to

05:32   15   attack me, not necessarily to address the evidence in this

16   case.  I think that can be done cleaner.

17           I was wrong.  When I went back and checked the

18   transcript, I was clearly wrong.  But it wasn't intentional,

19   and I think it's intended to look that way.

05:33   20       THE COURT:  All right.  Mr. Hedges?

21       MR. HEDGES:  Mr. Kelly, throughout this case, in

22   deposition after deposition, has very knowingly misrepresented

23   the facts in the questions that he's asked of the witnesses.

24   In Ms. Rumba's, he said to Ms. Rumba, "Well, now, you know that

05:33   25   Ms. Jones showered before she went to the Army hospital, don't

05:33  1    you?"

2          Ms. Rumba says, "I don't know."

3          Dr. Schulz' form has a square, "showered," not

4    checked.  He knows that.  He -- it's a pattern.  It was not a

05:33  5    slip of the tongue or a mistake.

6          MS. CULLEN:  And, frankly, I'm the one who designated

7    this.  And for what it's worth, it was not my intention to

8    embarrass Mr. Kelly.

9          THE COURT:  What's it for?

05:33  10         MS. CULLEN:  There's been a lot of dispute that

11   surprises me that continues to occur from plaintiffs' side

12   about part of the proof of her having been raped was the

13   terrible trauma to her breasts, even though Dr. Schulz

14   testified she didn't see anything wrong with Ms. Jones'

05:34  15   breasts.  And this is the key testimony that Dr. Schulz gives

16   about having personally looked at her breasts and not seeing

17   anything wrong with them.

18         THE COURT:  Okay.  What you -- what I've been given

19   doesn't even deal with the condition of her breasts.  It just

05:34  20   deals with the preliminary sparring about whether she took her

21   top off and all that.

22         MS. CULLEN:  Well, but, I mean, what the plastic

23   surgeon and things have said, if she had had a ruptured

24   implant, it would have been completely flat like a water

05:34  25   balloon.  If she had torn muscles, there would have been

05:34  1   bruising.

2          THE COURT:  Tell me what follows this.  What comes

3   next?  This right here is no -- is no evidence at all, it's

4   just -- other than her top was off.  That's the only answer.

05:34  5          MS. CULLEN:  Oh, I'm sorry, your Honor.  May I show

6   you mine?  That's the rest of our designation on that page.

7          MR. KELLY:  That's -- okay.

8          MS. CATES:  And I have a full color-coded copy if you

9   want that.

05:35  10         THE COURT:  Okay.  "Are you absolutely certain?

11  You're absolutely certain of that?"  That's her top being off.

12              "ANSWER:  Yes.

13              "QUESTION:  Did you examine her breasts?

14              "ANSWER:  From a distance.

05:35  15         "Do you disagree with the plastic surgeon who

16  went back in and looked and said that her breast implants had

17  been ruptured?"

18              Mr. Hedges and Ms. Cullen:  "Objection, form."

19              "THE WITNESS:  "I don't know what the plastic

05:35  20  surgeon said.  Her breasts were intact when I saw her.

21              "QUESTION by Mr. Kelly:  And you know that from

22  your viewing of them from a distance?

23              "Yes.

24              "QUESTION:  Is that right?

05:35  25              "ANSWER:  Yes."

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:35   1          MS. CATES:  Your Honor, I passed up a copy, too.  And

2    if you'll notice, the yellow parts, within the yellow portions

3    are what plaintiffs have designated.  So, within this global

4    objection to our designation, they've actually cherrypicked a

05:35   5    few lines to keep in their side.

6          MR. KELLY:  Actually, we're not globally objecting to

7    that designation.  I'm objecting to the preliminary banter

8    between counsel.  That's all I'm objecting to.  The rest of it,

9    I don't have an objection to it.

05:36   10          MS. CULLEN:  Actually, the second question that he

11    asked, I mean, when he says, "Are you going to disagree with a

12    plastic surgeon who says the implants were ruptured," that's

13    also a mischaracterization of the evidence because

14    Dr. Ciaravino, who did the reconstruction, testified that, no,

05:36   15    they were absolutely not ruptured.

16          MR. KELLY:  Which goes to the whole point of my

17    intentional mischaracterization, your Honor?  No.

18              And actually, I can explain that up until I

19    actually took Dr. Ciaravino's deposition and understood what

05:36   20    was going on, I thought that they had been ruptured.  The

21    rupture part is another reason we wanted to change the

22    pleadings.  The rupture is me.  Jamie doesn't say her breast

23    implants were ruptured anywhere.  I said that.

24          MR. HEDGES:  That makes absolutely no sense

05:37   25    whatsoever.

05:37   1           MR. KELLY:  Could I please finish, sir?

2           THE COURT:  Okay.  Wait a minute.

3           MR. HEDGES:  I thought you were finished.

4           MR. KELLY:  I was still talking.  You interrupted me.

05:37   5           THE COURT:  Let Mr. Kelly finish, and then we'll have

6    Mr. Hedges.

7           MR. KELLY:  The representation that I have

8    intentionally misrepresented things in this case is wrong.

9    Have I made mistakes?  Have I made slips of the tongue?

05:37  10    Certainly.  My partner would be happy to stand up and say how

11    frequently I do that in my normal life.  That is not

12    intentional; but I've been accused of it here, Judge.

13           THE COURT:  I can't sort that out.  We're trying to

14    get deposition excerpts that make some sense.

05:37  15           MR. KELLY:  All I want them to do is take out the

16    stuff that attacks me.

17           THE COURT:  All right.

18           MR. HEDGES:  Your Honor, an individual knows whether

19    her breast implants have been ruptured or not.  An individual

05:37  20    knows whether she has copiously bled from her vagina or not.

21           For the attorney to come along some period of

22    time after the fact, "That's not her.  That's me.  I, the

23    attorney, decided that her breasts were ruptured and she was

24    bleeding voluminously," that makes no sense whatsoever, your

05:38  25    Honor.  That's sort of not possible.  How could the attorney

05:38   1   come up with such a thing if his client didn't tell him?

2        THE COURT:  Okay.  It doesn't seem to me that we need

3   any of this -- I mean, I don't know enough about any of the

4   attorneys in this case to say -- make any kind of statement

05:38   5   about their character.  I do think that the ball is not

6   advanced for the jury by sparring between attorneys on

7   depositions that took place some time ago.

8        I think what's relevant about this exchange is

9   that there was an examination done and that there was no

05:38  10  evidence of damage to the breasts.  I have to believe you're

11  able to make an excerpt that reflects that and not these other

12  things.

13       Now, are you also divided on the issue of

14  fissures and evidence of penetration?  Is that also a problem

05:39  15  or not?

16       MS. CULLEN:  On that particular page?  No, your Honor.

17  The -- that one segment that I have a written a bracket around

18  is the only one they objected to.  So, I assume they don't have

19  a problem with the other excerpt.

05:39  20       And, frankly, I have gotten e-mail from -- I

21  understand you guys were withdrawing the objection to the one

22  you're talking about.  Did I not?

23       MR. KELLY:  If you did, that was a miscommunication

24  between us because I've never intended to withdraw that

05:39  25  objection.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:39   1          THE COURT:  Okay.  We -- from 42 to -- well, it starts
        2   on 42.  From 42 to 44, the key issues are Ms. Rumba says that
        3   viewing the breasts from a distance, she saw them intact.  This
        4   evidence about her breasts being ruptured we can do without
05:40   5   because that's not what happened.
        6          The -- your objection, Mr. Hedges, about
        7   Dr. Schulz made the comment that she was quite torn up down
        8   there, referring to her vagina, is that -- is that also not
        9   consistent with the record, in your opinion?  Is that the
05:40  10   nature of your objection?
       11          MR. HEDGES:  That is something that Ms. Jones has said
       12   on numerous occasions that Dr. Schulz told her.  And, so, we
       13   are asking Dr. -- that whole line of questions is -- oh, I'm
       14   sorry.
05:40  15          MR. KELLY:  I don't think we objected to that
       16   designation, your Honor.  You're looking at Page 43 --
       17          THE COURT:  What I am wondering about is the lawyer
       18   exchange.  I mean, the question is, "Were you present when
       19   Dr. Schulz made the comment to Jamie that she was, quote,
05:41  20   'quite torn up down there'?
       21          "MR. HEDGES:  Objection, form.
       22          "MS. CULLEN:  Objection form.
       23          "THE WITNESS:  I would have been present.  I
       24   don't remember her saying that.
05:41  25          "MR. KELLY:  Do you remember words to that

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

05:41   1   effect?  Not specifically?  What do you remember generally?

2   "I remember her doing an examination.  I remember

3   her stating that there were fissures and there was evidence of

4   penetration."

05:41   5   That seems to me it should come in if anybody

6   wants it in.  And whether you want to delete Mr. Hedges'

7   objection or Ms. Cullen's objection --

8   MR. HEDGES:  I'm fine.  I'm fine.  We can take out the

9   objections, your Honor.

05:41   10   THE COURT:  All right.

11   MS. CATES:  Your Honor, can I ask one very quick

12   question about page and line designations?

13   Is it okay -- some of the videos were by Skype or

14   by telephoning in.  Is it okay if we cut out pauses that are

05:41   15   just delayed by communication as long as --

16   THE COURT:  Sure.  You-all can agree on that, can't

17   you?

18   MS. CATES:  We tried to have a call yesterday, and

19   they canceled it.  So, I don't -- we haven't been able to agree

05:42   20   on it.  But that's fine if you guys will agree.

21   MR. KELLY:  I have no problem with taking out pauses.

22   MS. CATES:  Great.  Thanks.

23   THE COURT:  And take them out for both sides, of

24   course.

05:42   25   All right.  I'll give this back to Mrs. Loewe and

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:42  1   she can --

2                MS. VORPAHL:  Could I ask your Honor to repeat --

3                THE COURT:  Here's more, Ms. Loewe.

4                MS. VORPAHL:  I'm sorry, your Honor.  Could I ask you

05:42  5   to repeat one thing that you said before?

6                THE COURT:  Yes, ma'am.

7                MS. VORPAHL:  Would you say again the circumstances

8   under which, in the plaintiffs' case in chief, we may play

9   portions of the deposition that -- I mean, we believe that if

05:42  10  the excerpt is misleading, we're entitled to at least --

11               THE COURT:  That's what I'm saying you can do.  But if

12  it goes off on a totally different issue, if we move from

13  breasts to arms or whatever, then it's not responsive.  It

14  belongs in your case in chief.

05:42  15              MR. McKINNEY:  It wouldn't come in as

16  cross-examination, Judge?

17               THE COURT:  Sorry?

18               MR. McKINNEY:  It wouldn't come in as

19  cross-examination?  If the witness was on the witness stand, we

05:42  20  would cover all that at that time.

21               THE COURT:  You can ask about it for sure.  You can

22  ask about it.  But your excerpt that is unrelated to the part

23  that plaintiff has played should come in in your case in chief.

24  Your excerpt that is responsive to what plaintiff has offered

05:43  25  comes in as part of plaintiffs' case.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:43   1          MR. McKINNEY:  Okay.

2          MS. VORPAHL:  Thank you, Judge.

3          THE COURT:  Okay.  Thank you all very much.

4      *(End of requested proceedings)*

5                    * * * * *

6              COURT REPORTER'S CERTIFICATION

7      I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled cause.

8

9   Date:  June 30, 2011

10

11                      /s/   Cheryll K. Barron

12                 Cheryll K. Barron, CSR, CMR, FCRR
                   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

**$**

**$250,000 [1]**  52/2

**'**

**'quite [1]**  117/20

**/**

**/s [1]**  120/11

**1**

**1,020 puzzle [1]**  20/11
**10 [1]**  57/25
**1000 [1]**  2/5
**10:00 [1]**  69/4
**1150 [2]**  1/16 1/19
**12 [3]**  96/16 99/17 106/17
**14 [3]**  107/1 107/13 110/18
**15 [4]**  63/19 65/22 65/24
107/1
**15-year-old [1]**  66/2
**16-year-old [1]**  69/2
**17 [10]**  38/2 41/1 41/23 42/9
42/21 43/21 55/6 57/17 57/23
107/8
**19 [1]**  67/3
**19-year-old [1]**  71/25
**19382 [1]**  1/22
**1998 [1]**  47/25

**2**

**2000 [8]**  63/17 64/4 67/5
67/15 75/14 75/18 75/19
94/21
**2005 [3]**  42/7 60/21 81/14
**2011 [2]**  1/5 120/9
**21 [1]**  106/5
**24 [2]**  106/6 108/20
**25th [1]**  59/7
**26 [1]**  105/2
**26th [1]**  42/7
**27 [1]**  1/22
**2719 [1]**  1/4
**27th [1]**  42/7
**28th [1]**  42/7
**2:46 [1]**  1/5

**3**

**30 [1]**  120/9
**36-year-old [1]**  71/25
**36th [1]**  2/6
**37 [1]**  106/5
**3:37 [1]**  39/20
**3:53 [1]**  39/20

**4**

**404 [2]**  21/17 42/16
**412 [21]**  15/24 23/3 29/6
58/16 61/9 63/1 68/3 68/6
70/25 73/14 73/22 73/23 74/2
74/8 75/22 78/12 79/2 79/18
79/18 80/17 92/22
**42 [4]**  110/6 110/19 117/2
117/2
**42 to [1]**  117/1
**43 [1]**  117/16
**44 [1]**  117/2
**4:15 [1]**  55/22

**5**

**500 [1]**  2/10
**515 [1]**  2/14
**58 [3]**  106/17 107/23 108/18

**5:17 [1]**  100/24
**5:20 [1]**  100/24

**6**

**69 [2]**  59/25 60/6

**7**

**703 [5]**  8/23 11/23 23/7
23/20 26/5
**77002 [2]**  2/6 2/14
**77056 [3]**  1/17 1/20 2/11

**9**

**9:00 [1]**  69/4

**A**

**aberrant [1]**  30/5
**able [13]**  6/11 7/4 13/10
24/18 24/19 30/21 32/15
37/10 39/10 79/6 96/8 116/11
118/19
**abnormal [1]**  30/5
**about [151]**
**above [1]**  120/7
**above-entitled [1]**  120/7
**abrogating [1]**  17/16
**absence [1]**  74/6
**absolutely [10]**  66/14 73/19
90/9 108/7 111/9 111/10
113/10 113/11 114/15 114/24
**abundant [1]**  9/6
**abuse [4]**  7/6 7/6 62/17 82/9
**abused [1]**  84/7
**accommodation [1]**  21/25
**accompanied [1]**  106/12
**accompanying [1]**  71/19
**according [2]**  68/10 91/23
**account [1]**  14/23
**accounts [1]**  55/6
**accumulates [1]**  70/1
**accuse [1]**  93/14
**accused [6]**  7/9 62/7 62/8
62/10 83/24 115/12
**accuser [1]**  7/9
**achieve [2]**  62/6 70/3
**act [4]**  21/14 82/3 82/5 82/6
**action [3]**  56/14 56/15 98/3
**active [1]**  79/25
**activity [2]**  66/10 66/15
**acts [1]**  56/16
**actual [2]**  90/1 109/12
**actually [24]**  4/20 11/5 27/6
27/25 28/3 32/24 34/10 45/9
50/19 72/8 73/22 85/7 85/17
88/10 88/12 90/3 91/9 92/24
101/9 114/4 114/6 114/10
114/18 114/19
**adamant [2]**  66/7 66/7
**adamantly [1]**  83/23
**add [5]**  7/17 8/20 9/6 95/18
96/25
**addition [4]**  56/19 87/1 87/2
107/13
**additional [1]**  100/6
**Additionally [1]**  56/13
**address [6]**  7/4 36/12 37/7
73/22 73/23 111/15
**addressed [1]**  37/5
**administer [3]**  33/3 33/4 33/5
**administration [2]**  33/3 33/11
**admissibility [3]**  35/1 36/7

**admissible [8]**  23/21 24/11
24/12 35/10 38/20 41/16
61/13 74/5
**admits [2]**  34/10 37/10
**admitted [5]**  11/20 11/22
18/15 65/2 65/3
**adolescents [1]**  35/19
**adults [1]**  35/19
**advance [2]**  44/22 95/15
**advanced [1]**  116/6
**advantage [1]**  98/23
**affect [1]**  65/25
**affidavits [4]**  43/13 49/4
49/19 58/7
**afford [2]**  72/1 77/7
**afield [1]**  92/18
**after [19]**  27/14 43/6 52/7
53/14 56/3 60/6 64/25 68/11
68/21 69/22 71/15 72/18
74/11 74/17 83/25 97/5
102/25 111/22 115/22
**after-the-fact [1]**  74/11
**afternoon [1]**  32/23
**afterwards [1]**  104/6
**again [14]**  23/18 29/5 30/3
31/16 68/13 68/17 68/24 69/6
73/13 74/14 93/8 99/20 107/6
119/7
**against [10]**  11/17 42/9 44/7
50/21 68/21 71/22 72/11
75/10 75/12 81/24
**agent [4]**  88/11 88/19 89/13
90/20
**ago [4]**  57/15 79/11 90/4
116/7
**agree [12]**  15/9 38/17 52/6
65/10 70/23 70/23 98/21
103/2 109/23 118/16 118/19
118/20
**agreed [1]**  42/11
**agreement [4]**  5/25 5/25 38/16
50/12
**ahead [9]**  41/10 45/5 50/25
68/7 76/25 80/23 90/17 94/8
105/11
**aided [1]**  1/24
**air [3]**  53/1 53/2 74/20
**alcohol [3]**  44/19 44/21 77/11
**alert [1]**  4/13
**alive [1]**  56/23
**all [124]**
**allegation [22]**  63/3 63/5
63/9 63/10 63/11 63/16 64/7
67/8 67/10 67/11 67/21 69/6
70/15 70/16 71/15 72/14
74/12 74/15 85/7 85/20 94/5
94/24
**allegations [19]**  47/8 50/21
61/25 62/11 63/2 63/6 63/8
63/13 63/14 67/1 67/13 70/25
75/10 75/11 75/17 75/17
84/13 86/4 95/1
**alleged [1]**  52/20
**alleges [2]**  51/2 51/5
**allow [10]**  8/11 26/5 32/8
32/12 48/17 75/18 76/18
84/20 92/23 94/21
**allowed [12]**  20/23 26/10
37/24 39/9 44/13 44/21 47/17
55/13 58/4 60/18 71/4 85/21
**allowing [1]**  48/12

**allows [1]** 17/13

**almost [3]** 61/24 64/24 88/6

**along [5]** 30/17 77/13 90/25 102/16 115/21

**already [11]** 15/4 16/1 23/4 52/9 52/12 52/14 62/4 67/8 69/16 94/16 94/16

**also [19]** 7/1 24/14 29/14 30/19 31/5 33/8 38/8 48/20 56/15 63/6 75/5 82/8 85/12 99/6 106/16 114/13 116/13 116/14 117/8

**always [3]** 93/6 96/24 106/20

**am [8]** 18/22 32/7 36/11 62/25 96/14 96/14 107/23 117/17

**ambiguity [1]** 66/18

**amended [2]** 84/21 85/20

**among [2]** 42/9 109/11

**amount [1]** 98/25

**ample [1]** 16/20

**amplifies [1]** 64/11

**Amy [6]** 41/6 45/6 45/7 45/8 47/23 47/24

**anal [2]** 106/19 107/10

**analysis [4]** 35/21 37/20 51/23 63/12

**and/or [2]** 14/3 29/9

**Andrew [3]** 2/8 3/16 50/23

**anguish [1]** 19/3

**Anna [1]** 57/11

**annual [1]** 29/19

**another [15]** 14/24 44/4 44/4 51/12 53/18 56/3 75/16 77/10 79/22 87/2 94/13 94/14 98/5 109/16 114/21

**answer [31]** 6/5 9/13 12/13 27/5 77/18 77/18 83/1 92/7 101/25 103/12 103/22 104/8 104/24 105/9 105/16 105/21 105/25 106/1 106/4 106/9 106/14 106/21 107/7 108/8 109/12 109/16 111/8 113/4 113/12 113/14 113/25

**answered [1]** 74/18

**answers [10]** 6/11 12/8 102/2 103/14 104/5 104/5 107/6 108/4 108/6 108/10

**anticipate [3]** 21/5 40/14 57/4

**anus [2]** 105/15 105/20

**anxiety [3]** 31/7 31/8 32/9

**any [55]** 5/25 6/4 6/6 6/18 6/18 7/2 7/19 8/10 10/6 11/22 15/1 17/24 19/3 21/12 24/15 28/16 29/16 39/16 42/4 47/18 47/19 47/25 53/12 54/24 54/25 55/25 63/7 64/21 69/1 69/1 71/11 72/3 72/10 74/9 76/9 77/2 82/8 86/5 86/7 86/10 87/25 90/1 90/15 90/16 92/11 94/21 97/22 97/24 97/25 98/2 98/4 105/12 116/3 116/3 116/4

**anybody [11]** 17/13 8/20 12/15 21/6 31/13 50/9 58/17 87/17 88/5 103/7 118/5

**anymore [1]** 5/15

**anyone [3]** 5/5 14/20 97/25

**anything [21]** 6/3 6/23 9/5

- - -

53/8 66/24 67/2 72/10 78/20 86/19 87/12 92/11 93/25 95/2 109/23 112/14 112/17

**anyway [2]** 67/12 80/20

**anywhere [3]** 38/24 38/24 114/23

**apart [2]** 28/20 77/5

**apologies [1]** 23/10

**apologize [2]** 25/20 101/1

**apologizes [1]** 72/9

**apparently [3]** 55/13 64/24 79/22

**appearances [1]** 3/2

**appeared [2]** 102/20 109/4

**appointed [5]** 13/25 15/8 15/9 15/11 62/3

**approach [2]** 101/21 109/25

**appropriate [8]** 6/23 6/24 10/22 21/15 40/8 93/12 93/16 98/3

**approximately [1]** 41/18

**arbitration [4]** 38/17 51/19 51/20 97/6

**are [98]** 4/19 5/19 5/24 6/15 7/5 7/16 13/19 15/23 16/1 16/15 16/23 19/18 22/14 23/8 23/21 24/14 24/16 27/9 28/1 29/5 29/16 32/2 33/4 33/9 33/14 33/18 34/18 36/18 38/12 41/17 41/18 42/4 42/8 42/10 42/24 43/10 43/19 44/5 44/13 45/3 45/25 45/25 46/8 46/9 46/10 46/11 46/14 46/17 46/18 46/24 49/12 50/8 50/16 52/14 54/15 54/21 54/21 56/6 56/14 56/22 56/23 57/4 57/7 58/4 61/11 63/6 64/9 67/12 71/20 76/22 82/12 83/4 83/13 87/5 95/8 96/8 98/10 98/10 98/12 99/6 99/11 99/12 101/9 102/13 103/21 105/13 107/6 107/22 108/6 110/16 111/9 113/10 114/3 114/11 116/13 117/2 117/13 118/14

**area [5]** 8/8 24/25 25/5 28/21 37/12

**areas [1]** 24/5

**aren't [4]** 25/7 25/8 46/9 75/17

**arguably [1]** 52/6

**argue [4]** 33/13 33/17 33/24 85/5

**arguing [2]** 34/7 37/18

**argument [6]** 12/18 24/10 36/6 42/18 53/9 53/16

**arguments [4]** 36/12 37/5 48/24 49/3

**armed [2]** 46/2 46/7

**arms [1]** 119/13

**Army [4]** 11/13 18/18 87/15 111/25

**around [4]** 19/17 38/24 75/25 116/17

**array [1]** 19/6

**arrest [1]** 97/17

**artificial [1]** 13/12

**artificially [1]** 70/10

**as [128]**

**aside [4]** 15/25 29/5 51/16 71/1

**ask [16]** 4/16 6/2 6/13 7/3

- - -

53/8 66/24 67/9 72/9 76/22 77/17 110/12 118/11 119/2 119/4 119/21 119/22

**asked [10]** 11/4 62/16 82/13 90/22 92/1 93/20 108/9 109/5 111/23 114/11

**asking [9]** 3/21 12/10 16/2 39/3 45/2 57/14 92/13 109/7 117/13

**asking Dr [1]** 117/13

**asks [1]** 93/21

**assault [34]** 7/10 26/11 29/14 31/25 35/18 35/25 61/25 62/8 62/8 62/11 62/17 63/6 63/21 64/21 65/4 65/15 65/19 66/9 66/23 68/11 68/19 69/13 70/15 70/18 70/21 72/6 72/17 72/20 72/21 73/5 73/8 92/24 93/7 97/17

**assaulted [5]** 22/11 64/13 65/21 66/17 74/17

**assaults [1]** 6/21

**assessment [1]** 13/17

**assessments [1]** 11/14

**assume [2]** 97/1 116/18

**assumes [1]** 87/14

**at [98]** 1/18 3/25 4/13 5/7 10/20 10/22 11/3 11/4 12/9 12/20 12/21 13/8 14/7 15/24 16/8 19/10 19/12 20/4 22/8 22/12 24/25 25/17 27/4 27/6 27/20 28/3 28/11 28/16 28/17 31/6 32/12 32/16 36/4 39/7 39/11 39/11 40/6 40/24 41/12 41/14 42/6 42/22 42/23 46/22 48/12 49/23 50/3 50/4 50/11 53/22 54/14 54/23 55/22 55/23 60/22 64/11 64/12 64/24 65/2 65/22 66/19 66/19 66/20 66/21 68/6 68/10 69/13 71/15 73/12 74/12 74/19 75/20 80/17 84/2 86/14 89/7 90/13 91/3 91/9 95/19 96/7 96/8 96/9 96/11 97/5 102/4 102/6 104/11 104/17 107/4 108/18 108/20 110/6 112/16 113/3 117/16 119/10 119/20

**atmosphere [4]** 53/19 53/21 53/22 53/24

**attack [1]** 111/15

**attacks [1]** 115/16

**attempt [2]** 52/19 74/9

**attempted [1]** 86/6

**attention [3]** 38/10 48/10 89/1

**attorney [4]** 1/18 115/21 115/23 115/25

**attorneys [3]** 85/7 116/4 116/6

**authority [4]** 9/14 9/17 20/18 98/25

**automatically [1]** 108/3

**available [1]** 97/1

**avoid [5]** 20/17 21/17 61/20 61/22 96/25

**avoiding [1]** 61/21

**awake [1]** 78/3

**aware [1]** 59/21

**away [1]** 13/1

**awful [1]** 57/5

**awhile [1]** 88/9

**B**

background [1] 14/5
bad [6] 42/22 42/23 52/11
  56/16 65/1 111/14
ball [1] 116/5
balloon [1] 112/25
banter [1] 114/7
barred [1] 79/18
Barron [3] 2/13 120/11 120/12
Base [2] 82/3 82/5
based [7] 5/6 13/16 37/19
  46/12 49/4 49/15 72/25
basically [5] 24/1 28/13
  38/11 39/24 42/22
basis [3] 13/10 38/2 39/5
be [154]
bears [1] 63/3
because [63] 11/12 11/20 12/1
  12/4 12/25 15/5 15/12 15/14
  16/11 17/15 23/12 24/17 27/1
  28/10 32/14 34/9 34/13 36/18
  39/6 42/5 46/5 47/11 48/25
  54/17 55/6 56/11 58/7 63/9
  67/10 73/10 74/5 76/16 77/4
  77/6 81/21 81/24 82/8 82/16
  82/21 84/9 84/11 85/8 85/22
  86/9 86/12 86/19 86/20 86/21
  88/25 93/2 95/5 95/8 101/9
  103/11 106/7 108/14 108/21
  108/25 109/4 109/11 114/13
  116/24 117/5
becoming [1] 12/19
bed [1] 78/3
been [63] 7/9 11/18 16/2
  16/24 22/11 22/15 25/13
  25/17 28/11 28/15 29/1 29/22
  30/23 30/25 31/3 31/7 31/9
  31/12 31/17 31/20 32/4 32/8
  37/12 37/16 37/17 41/5 41/6
  43/11 43/13 46/1 46/4 49/2
  49/20 49/21 56/11 59/17 65/8
  65/14 77/9 77/11 84/7 84/22
  85/8 87/4 88/23 89/8 96/15
  97/15 98/16 100/4 103/14
  104/24 112/10 112/12 112/18
  112/24 112/25 113/17 114/20
  115/12 115/19 117/23 118/19
before [15] 1/10 23/20 29/17
  32/2 34/13 43/6 49/2 54/20
  57/15 60/5 85/9 96/15 104/5
  111/25 119/5
befriending [1] 88/3
beginning [1] 76/5
begins [1] 110/23
begs [1] 53/11
behalf [6] 3/3 3/4 3/6 3/7
  3/12 95/15
behavior [1] 73/17
being [15] 22/10 24/22 29/12
  29/18 52/14 79/6 84/1 85/14
  88/23 93/2 94/4 104/22 105/9
  113/11 117/4
belabor [1] 40/23
believable [2] 9/24 10/1
believe [41] 6/8 6/10 9/15
  12/22 12/24 13/20 16/11
  16/13 16/14 23/25 25/4 25/15
  28/12 33/1 34/6 37/23 41/15
  50/9 50/14 54/23 54/24 57/8
  62/10 71/21 75/22 76/10
  79/20 84/2 84/22 85/15 85/16

believed [6] 11/13 84/11
  84/13 86/9 86/16 89/5
believes [3] 9/20 17/13 86/16
belongs [1] 119/14
benefit [1] 57/20
best [8] 17/4 18/3 32/11
  34/24 50/3 92/9 93/3 104/9
better [8] 16/6 17/20 18/4
  90/23 92/2 92/6 92/14 95/4
between [15] 4/5 17/11 17/25
  22/7 26/17 64/23 66/3 87/12
  88/23 103/14 108/19 108/20
  114/8 116/6 116/24
beyond [8] 11/5 11/6 24/5
  28/2 28/7 48/15 52/19 74/7
bias [2] 24/3 24/9
bifurcated [1] 107/7
big [4] 88/22 97/8 101/9
  108/2
bit [5] 8/1 12/7 13/12 26/21
  38/4
blah [3] 68/9 68/9 68/9
Blank [1] 27/11
bled [1] 115/20
bleeding [2] 105/10 115/24
blend [1] 104/10
blocks [1] 74/2
blog [1] 55/3
blogger [1] 55/2
blood [3] 18/13 31/16 36/25
blue [2] 104/20 110/18
Board [4] 24/22 25/2 25/17
  25/23
body [3] 87/3 87/5 97/10
BORTZ [22] 2/7 3/16 3/17 11/9
  38/2 42/21 43/2 43/3 43/4
  48/14 52/17 60/8 61/19 68/22
  76/3 81/2 81/23 83/11 85/13
  86/22 86/23 93/20
Bortz' [1] 65/3
Bortz's [1] 52/19
Bosnia [3] 47/24 53/24 56/7
boss [2] 45/10 72/1
Boston [1] 50/1
both [12] 8/4 27/11 30/20
  60/5 61/18 81/22 87/11 88/17
  104/10 108/2 109/23 118/23
bounds [1] 48/15
box [1] 104/20
boyfriend [2] 66/4 69/2
bracket [1] 116/17
break [1] 39/18
breast [11] 25/7 25/8 29/15
  29/18 31/11 31/12 31/13
  32/13 113/16 114/22 115/19
breasts [14] 24/20 25/3 26/2
  112/13 112/15 112/16 112/19
  113/13 113/23 116/10
  117/3 117/4 119/13
brief [6] 23/2 28/1 28/11
  28/17 54/10 59/3
briefly [6] 22/5 28/18 31/21
  35/3 37/7 94/7
bring [16] 15/2 19/22 20/6
  20/7 23/17 30/24 37/22 41/8
  55/2 79/6 80/16 80/17 80/19
  80/24 81/4 81/9
bringing [2] 61/21 92/25
brings [1] 87/20

eff [1] 88/4
...[1] 119/9
107/20 110/8 110/9 116/10
119/9
broader [2] 52/18 53/6
brooked [1] 4/25
brought [1] 21/14
BROWN [2] 1/6 1/7
bruised [1] 18/13
bruises [1] 18/15
bruising [3] 29/22 92/3 113/1
bunch [2] 42/3 104/11
burden [2] 84/25 85/23
burdensome [1] 6/24
bus [1] 87/18
but [172]
buys [1] 53/15

**C**

call [17] 16/18 18/12 18/21
  27/4 27/7 43/17 43/21 43/25
  43/25 45/25 69/17 82/4 82/6
  89/21 105/22 105/24 118/18
called [8] 41/3 41/7 43/24
  44/19 61/22 61/23 88/10
  89/17
calling [2] 15/13 32/24
came [2] 4/16 45/8
Camp [7] 39/7 39/11 42/6
  49/23 50/4 50/11 53/22
can [96] 6/2 7/24 8/1 8/8
  8/14 8/16 9/24 10/17 10/20
  13/4 13/6 15/2 15/12 16/13
  16/13 16/18 17/5 17/10 17/19
  17/24 17/25 18/9 18/17 18/25
  20/3 20/7 20/13 20/15 20/25
  21/1 21/6 21/17 22/2 22/4
  22/18 22/21 28/5 28/18 31/2
  31/21 33/14 33/25 37/22
  39/14 39/15 40/2 40/6 44/9
  52/5 55/23 56/2 61/19 61/20
  61/22 63/4 65/17 66/1 72/17
  76/4 79/20 79/22 79/24 80/10
  83/19 83/25 86/17 88/17
  88/18 90/13 92/7 93/11 95/2
  96/22 100/3 100/5 100/9
  100/9 100/15 101/3 102/3
  102/15 103/25 104/17 105/1
  106/10 106/19 111/16 114/18
  117/4 118/8 118/11 118/16
  119/1 119/11 119/21 119/21
can't [35] 11/25 15/19 15/19
  16/10 20/6 24/16 26/4 26/6
  27/5 30/23 36/22 44/14 54/5
  55/5 56/4 77/18 80/5 85/3
  85/18 86/18 87/8 89/1 93/10
  93/13 94/1 99/12 101/7
  101/19 102/1 102/2 106/7
  106/25 107/6 115/13 118/16
canceled [1] 118/19
cannot [14] 10/4 15/14 17/13
  20/8 34/11 36/3 42/6 63/8
  68/1 69/11 69/11 97/12 98/13
  98/13
car [1] 71/21
card [1] 77/6
care [3] 18/2 18/3 31/4
careful [1] 77/3
case [89] 3/22 3/25 4/3 4/17
  4/25 5/6 7/10 9/7 9/15 11/7
  11/16 11/18 11/19 12/2 13/1
  19/3 20/4 21/20 21/24 23/24
  24/1 33/22 42/10 44/22 47/9
  47/13 47/15 47/20 47/21

**case... [60]**  48/23 49/25
49/25 52/9 53/12 53/13 54/24
55/10 55/18 56/23 62/2 62/3
67/16 67/18 67/20 68/17
68/23 69/19 70/10 72/15
74/12 75/9 80/25 81/11 81/12
81/23 82/7 83/2 83/6 83/17
87/24 88/7 92/19 92/21 92/23
93/4 93/7 93/12 95/18 95/20
96/8 96/20 96/21 96/22 97/15
97/23 98/1 99/22 102/10
102/24 103/3 108/12 111/16
111/21 115/8 116/4 119/8
119/14 119/23 119/25
**cases [17]**  4/12 6/22 9/13
9/17 10/2 39/7 42/10 47/9
63/3 67/12 73/23 83/16 95/8
98/10 98/10 99/5 106/11
**Cates [5]**  2/3 3/13 35/16
101/2 101/5
**causation [2]**  35/7 37/21
**cause [3]**  32/6 107/5 120/7
**caused [3]**  32/6 37/13 37/16
**causes [2]**  56/14 56/15
**causing [1]**  59/19
**caveat [1]**  28/15
**certain [5]**  63/2 111/9 111/10
113/10 113/11
**certainly [34]**  8/16 14/4 14/7
17/24 25/2 28/6 28/8 30/7
41/20 48/16 59/9 60/13 60/17
61/13 61/14 61/24 64/24
67/22 68/1 71/24 76/4 76/20
78/10 78/19 80/17 86/5 87/6
89/4 89/7 99/3 99/9 100/15
104/18 115/10
**certification [2]**  25/23 120/6
**certified [3]**  24/22 25/2
25/18
**certify [1]**  120/7
**cetera [1]**  82/22
**CF [1]**  9/16
**chain [1]**  106/8
**chains [1]**  69/17
**challenge [1]**  78/13
**chance [1]**  90/18
**change [5]**  4/11 45/24 72/5
72/23 114/21
**changed [1]**  24/8
**changes [1]**  8/10
**character [1]**  116/5
**characterization [1]**  71/18
**characterize [1]**  72/4
**characterized [2]**  72/5 74/4
**charge [2]**  63/20 86/25
**charged [1]**  21/22
**charges [1]**  77/8
**CHARLES [13]**  2/7 3/16 3/17
11/9 42/20 43/4 48/14 60/8
61/19 65/3 81/23 86/22 86/23
**Charlie [3]**  57/12 57/13 57/14
**check [2]**  89/20 110/14
**checked [2]**  111/17 112/4
**cherrypicked [1]**  114/4
**Cheryll [3]**  2/13 120/11
120/12
**chest [2]**  29/22 87/7
**Chester [1]**  1/22
**chief [8]**  47/20 51/3 51/5
102/10 108/12 119/8 119/14

**children [1]**  99/24
**chime [1]**  35/2
**choice [2]**  22/24 72/3
**choke [1]**  21/18
**chooses [2]**  70/11 70/11
**chose [2]**  12/22 43/13
**chosen [2]**  13/16 19/8
**Chu [1]**  77/25
**Ciaravino [1]**  114/14
**Ciaravino's [1]**  114/19
**Circuit [4]**  9/15 9/15 11/19
23/24
**circumstances [2]**  71/3 119/7
**cited [5]**  9/13 9/16 9/17 10/2
11/18
**civilian [1]**  106/11
**claim [14]**  38/21 44/12 50/6
51/17 52/1 52/4 52/5 54/16
65/8 75/23 84/8 84/18 84/24
91/5
**claimed [3]**  68/21 71/10 71/10
**claiming [2]**  19/4 22/15 57/7
66/24
**claims [19]**  16/11 19/14 38/12
38/14 44/14 46/25 50/20 51/3
52/13 52/14 54/15 54/21
54/23 66/18 66/21 68/22
72/11 85/1 92/14
**clarifies [1]**  109/7
**clarify [1]**  89/12
**clause [2]**  51/19 51/20
**cleaner [3]**  92/21 92/23
111/16
**clear [5]**  32/24 38/19 40/2
63/7 91/11
**clearly [10]**  9/18 11/15 11/23
17/2 37/1 62/24 63/20 72/13
74/2 111/18
**client [19]**  13/9 33/13 33/16
34/18 61/19 62/7 76/9 79/20
80/7 80/11 80/21 81/23 83/24
84/5 86/5 93/8 97/16 99/4
116/1
**client's [2]**  84/3 97/13
**clips [3]**  103/9 103/10 108/3
**cloaked [2]**  15/5 20/17
**close [3]**  17/16 84/1 100/2
**closer [4]**  5/25 6/6 17/20
44/1
**closes [1]**  107/18
**cloth [2]**  89/9 89/11
**CM [1]**  2/13
**CMR [1]**  120/12
**co [1]**  88/10
**co-counsel [1]**  88/10
**coded [1]**  113/8
**coerced [5]**  71/24 75/2 75/6
75/23 76/6
**cohesiveness [1]**  102/15
**collected [1]**  36/1
**collective [1]**  98/24
**color [1]**  113/8
**color-coded [1]**  113/8
**come [44]**  5/25 10/11 14/8
15/12 15/24 17/20 18/9 20/18
23/23 28/25 30/8 32/21 37/2
37/8 40/5 43/19 46/7 46/12
52/3 52/16 53/9 61/6 63/13
65/17 69/9 73/25 74/9 78/6
78/7 78/10 80/12 82/12 86/1
95/4 98/6 99/21 100/5 103/13

**comes [18]**  19/3 34/23 36/8
49/24 56/12 61/10 72/9 81/11
81/12 81/19 81/21 82/8 82/21
83/2 106/25 107/7 113/2
119/25
**comfortable [2]**  7/4 7/16
**coming [9]**  5/20 23/12 49/11
58/3 61/17 67/18 77/1 80/22
81/3
**comment [4]**  5/6 48/9 117/7
117/19
**commented [1]**  51/13
**commonly [3]**  29/16 31/7 32/9
**communicate [1]**  7/22
**communicated [1]**  64/2
**communication [2]**  8/12 118/15
**Comp [2]**  82/6 82/7
**company [6]**  1/6 44/3 44/6
54/3 76/1 98/21
**company-wide [1]**  54/3
**comparing [1]**  14/16
**compatible [7]**  29/8 29/14
30/18 30/19 30/20 31/3 59/10
**competent [2]**  32/11 37/23
**compiled [1]**  60/3
**complained [4]**  19/11 46/6
55/16 83/8
**complaining [1]**  48/12
**Complains [1]**  105/9
**complaint [1]**  47/13
**complaints [1]**  83/7
**complete [3]**  59/18 71/4
103/16
**completed [1]**  60/22
**completely [5]**  12/6 54/11
66/22 70/12 112/24
**completeness [4]**  101/22
101/24 103/1 103/3
**complicated [3]**  48/24 83/14
83/18
**compound [1]**  106/12
**computer [1]**  1/24
**computer-aided [1]**  1/24
**conceive [1]**  93/11
**concern [3]**  19/2 70/22 70/24
**concerned [8]**  7/23 12/7 24/15
27/1 30/3 47/8 54/7 65/6
**concerns [3]**  21/10 95/17
95/17
**conclude [1]**  22/18
**concluded [1]**  59/8
**concludes [1]**  64/1
**conclusion [2]**  20/15 54/23
**conclusions [2]**  18/10 32/8
**conclusory [1]**  12/14
**concocted [1]**  68/11
**condition [4]**  17/5 21/19
21/22 112/19
**conditioned [1]**  53/1
**conditioning [1]**  53/3
**conditions [2]**  14/3 24/16
**conduct [5]**  70/13 70/15 78/13
87/13 97/24
**conducted [2]**  97/25 98/5
**condyloma [6]**  29/3 29/10 32/5
59/7 59/12 81/14
**CONFERENCE [1]**  1/10
**confirm [1]**  97/12
**confirms [3]**  93/20 93/21
93/22

**C**

**conflating [1]**  51/8
**conflict [2]**  60/19 64/23
**conflicting [2]**  21/4 64/5
**confronted [1]**  77/12
**confusion [1]**  42/16
**Congress [1]**  62/24
**connection [1]**  59/5
**conscious [1]**  94/3
**consciously [1]**  62/4
**consciousness [1]**  85/9
**consecutive [2]**  4/10 4/15
**consecutively [1]**  102/17
**consensual [36]**  21/14 29/9
30/18 30/19 31/25 33/9 33/10
33/12 33/13 33/14 33/19
33/23 34/12 36/21 36/21
36/22 36/23 59/10 71/12
71/15 71/21 71/23 72/24 73/2
73/2 73/3 73/4 73/11 74/4
74/5 75/1 75/4 75/6 75/23
76/6 87/6
**consent [4]**  71/24 73/5 86/13
94/1
**consider [1]**  62/22
**consideration [2]**  62/15 87/24
**considering [1]**  66/25
**consistency [1]**  21/4
**consistent [7]**  19/12 31/25
32/2 33/9 34/1 34/2 117/9
**consistently [1]**  96/15
**constituting [1]**  21/22
**constricting [1]**  13/12
**constructed [1]**  15/13
**construed [1]**  58/8
**consuming [1]**  6/24
**contact [3]**  7/6 20/23 66/3
**contacted [1]**  57/15
**container [6]**  50/7 50/10
50/11 54/14 54/19 55/17
**containers [1]**  46/1
**contemplate [1]**  82/2
**contempt [1]**  97/24
**contend [1]**  67/11
**contending [3]**  33/4 34/18
34/21
**contends [1]**  65/19
**contents [1]**  91/25
**contested [1]**  47/7
**context [3]**  104/4 104/9 104/9
**continuation [1]**  46/14
**continue [1]**  40/20
**continued [3]**  2/1 6/7 69/21
**continues [1]**  112/11
**contract [3]**  51/18 51/20
51/22
**contracted [3]**  60/7 61/18
81/22
**contradict [2]**  16/23 68/12
**contradicting [1]**  16/24
**contradicts [1]**  16/24
**contrary [2]**  9/14 9/16
**controverted [2]**  47/3 47/4
**conversation [2]**  78/18 88/13
**conversations [1]**  88/19
**convince [1]**  62/20
**Cooper [1]**  2/9
**copies [3]**  90/23 92/2 92/7
**copious [1]**  74/4
**copiously [1]**  115/20
**copy [4]**  100/6 110/10 113/8

**core [5]**  12/5 15/15 73/18
73/19 75/21
**corollaries [1]**  14/1
**corporate [2]**  3/12 96/10
**corporation [1]**  56/4
**correct [2]**  38/18 120/7
**corroboration [1]**  14/20
**costly [1]**  55/9
**could [44]**  3/2 4/11 4/11 4/12
9/22 16/7 21/2 25/12 30/23
30/25 31/3 31/20 32/4 32/21
34/1 34/1 37/7 37/12 37/16
37/16 37/17 40/15 40/20
43/24 52/16 54/2 54/9 54/10
64/10 69/24 72/22 87/7 89/13
90/23 92/1 94/1 99/2 103/18
106/18 107/2 115/1 115/25
119/2 119/4
**couldn't [8]**  12/4 15/14 16/9
51/21 57/16 72/1 77/7 86/11
**counsel [6]**  15/1 88/10 108/19
108/20 109/11 114/8
**counter [1]**  102/4
**counter-designate [1]**  102/4
**country [3]**  19/17 44/4 83/10
**County [1]**  35/20
**couple [7]**  6/20 89/21 95/16
95/16 96/9 101/3 101/6
**course [11]**  5/21 23/22 39/22
40/10 82/20 87/5 98/14 99/13
99/16 102/12 118/24
**court [52]**  1/1 2/12 2/13 6/5
6/20 7/19 8/11 11/4 12/9
12/20 15/8 15/9 19/4 19/17
20/8 20/25 26/16 28/8 35/11
55/21 57/14 58/19 58/25
59/21 61/8 61/11 62/1 62/3
62/14 64/25 67/8 69/17 69/20
72/11 76/17 86/6 87/10 88/17
92/18 96/19 98/1 98/2 98/7
98/18 99/10 99/14 102/11
104/3 109/10 110/3 120/6
120/12
**Court's [14]**  6/19 6/22 11/5
11/6 19/2 23/22 27/5 47/2
51/23 55/21 56/25 96/17 98/6
110/1
**Court-appointed [3]**  15/8 15/9
62/3
**courtroom [9]**  17/9 58/23 64/6
66/12 66/16 74/25 77/23 84/4
90/7
**cover [2]**  3/19 119/20
**coverage [1]**  96/25
**covered [1]**  111/12
**covering [1]**  86/14
**covers [1]**  26/23
**Crawford [1]**  57/12
**crazy [2]**  42/25 51/6
**create [1]**  44/3
**created [3]**  46/11 83/6 83/9
**creates [1]**  44/2
**credentials [3]**  28/2 28/7
28/23
**credibility [11]**  11/8 11/14
13/17 24/2 61/21 61/23 74/7
78/13 93/12 93/17 102/9
**credible [5]**  11/9 11/12 61/14
61/14 87/17
**credit [1]**  77/6
**crime [1]**  21/22

criminal [5]  69/24 70/4 70/24
70/16 79/9 75/11 93/14 94/5
**critical [1]**  21/6
**criticizing [1]**  40/19
**cross [15]**  12/23 12/24 15/2
20/14 21/3 60/18 76/17 77/4
77/16 79/4 80/1 82/12 82/24
119/16 119/19
**cross-examination [8]**  12/23
20/14 21/3 77/16 80/1 82/12
119/16 119/19
**cross-examine [5]**  12/24 60/18
76/17 77/4 79/4
**cross-examined [1]**  82/24
**crushed [1]**  5/8
**CSR [2]**  2/13 120/12
**cuddle [1]**  78/4
**Cullen [5]**  2/9 3/17 111/5
113/18 117/22
**Cullen's [1]**  118/7
**cumulative [5]**  27/2 33/1 38/3
38/7 42/13
**current [1]**  3/22
**currently [1]**  25/23
**custody [1]**  106/8
**cut [4]**  57/17 97/12 110/12
118/14
**cuts [6]**  6/25 97/3 102/25
102/25 109/10 110/2
**CV [1]**  1/4

**D**

**D/B/A [1]**  1/6
**damage [4]**  52/13 52/14 52/25
116/10
**damages [7]**  52/4 52/5 56/20
68/22 72/25 87/3 87/5
**damaging [1]**  31/1
**damning [1]**  86/25
**Dan [1]**  3/15
**Daniel [7]**  2/4 90/9 90/20
91/22 91/24 91/25 92/5
**Darington [1]**  1/22
**dark [5]**  90/10 90/12 90/22
92/1 92/2
**data [2]**  23/8 23/15
**Date [1]**  120/9
**dated [1]**  14/25
**dating [1]**  77/2
**daughter [4]**  64/2 64/9 65/19
65/20
**daughter's [2]**  64/7 66/6
**David [1]**  74/10
**Dawn [2]**  57/11 69/25
**day [10]**  57/1 57/1 57/15
58/23 69/20 71/3 83/4 83/10
84/22 87/6
**daylight [1]**  69/3
**days [5]**  4/10 4/15 32/17
46/21 96/9
**deal [4]**  12/3 100/22 101/3
112/19
**dealing [1]**  62/25 95/4
**deals [2]**  31/13 112/20
**Debbie [1]**  57/12
**decide [5]**  18/17 22/21 22/23
41/15 55/25
**decided [2]**  58/20 115/23
**decision [1]**  54/20
**declare [1]**  7/14
**defendant [9]**  2/2 2/7 21/16
21/20 21/21 34/15 34/17 48/8

**defendant...** [1]   76/22
**defendants** [11]   1/8 3/10 3/12
32/24 38/2 39/23 43/13 60/13
60/17 73/24 96/10
**defendants'** [2]   26/22 103/10
**defense** [19]   13/1 21/23 24/10
33/25 47/20 76/8 76/11 80/2
80/22 80/25 81/3 81/9 82/3
82/5 83/14 83/17 93/3 103/4
103/13
**deference** [1]   55/21
**define** [2]   71/24 108/22
**definitely** [3]   23/12 72/15
74/8
**definition** [2]   44/15 67/10
**degree** [2]   87/4 87/25
**delay** [1]   89/1
**delayed** [2]   86/3 118/15
**delete** [1]   118/6
**delve** [1]   20/3
**demonstrate** [1]   81/13
**demonstrated** [1]   61/13
**denied** [5]   66/10 66/10 67/20
69/11 69/11
**denies** [2]   64/21 82/10
**deny** [1]   70/2
**department** [6]   45/21 87/15
88/15 88/20 90/21 91/21
**depend** [1]   95/13
**depending** [1]   62/10
**depends** [2]   27/4 71/23
**depo** [2]   101/13 102/4
**depos** [1]   102/13
**depose** [1]   43/13
**deposed** [3]   41/5 41/6 49/13
**deposition** [20]   5/7 14/15
40/17 41/3 41/11 41/14 47/23
59/14 64/5 90/5 101/10
102/18 105/3 108/25 110/5
111/22 111/22 114/19 115/14
119/9
**depositions** [4]   13/15 101/21
108/1 116/7
**depression** [1]   32/9
**described** [3]   54/22 64/16
89/15
**descriptions** [2]   49/5 49/15
**designate** [2]   59/18 102/4
**designated** [3]   59/15 112/6
114/3
**designating** [1]   103/7
**designation** [9]   101/22 102/3
104/21 104/25 110/7 113/6
114/4 114/7 117/16
**designations** [7]   59/14 101/8
101/8 101/12 102/14 102/19
118/12
**desire** [1]   24/9
**destinations** [1]   71/20
**detail** [3]   14/14 54/6 89/15
**details** [1]   41/7
**detector** [2]   10/16 12/19
**determination** [4]   13/16 14/8
29/21 29/21
**determinations** [1]   29/4
**determine** [4]   10/21 10/23
14/1 20/3
**determined** [4]   21/7 41/18
61/10 62/4
**devil** [1]   88/5

**demise** [1]   11/18
**diagnose** [1]   19/13
**diagnoses** [2]   19/20 19/20
**diagnosis** [6]   10/17 10/21
10/22 10/24 13/10 13/14
**did** [49]   11/5 12/23 21/21
21/21 33/3 33/4 33/4 36/20
39/6 39/21 39/22 40/13 40/14
40/15 42/22 43/21 44/12 50/2
50/14 56/17 65/8 71/14 72/5
72/6 73/10 73/11 75/4 75/12
78/16 78/17 82/14 84/13
84/15 84/16 87/3 87/19 87/19
88/18 89/15 89/18 93/21
96/20 105/12 106/6 111/1
113/13 114/14 116/22 116/23
**didn't** [30]   5/5 12/4 17/15
27/7 28/13 43/15 54/17 58/25
72/3 75/13 75/15 78/2 79/15
84/13 84/20 85/22 86/7 86/10
88/11 88/21 91/3 91/6 91/7
91/10 91/10 91/18 91/24
103/5 112/14 116/1
**difference** [2]   17/25 22/7
**different** [19]   10/19 10/25
30/1 36/6 54/3 55/13 62/21
65/14 66/22 68/18 69/10
69/14 69/14 82/22 94/10
102/8 102/25 108/9 119/12
**differing** [1]   57/23
**difficult** [4]   36/19 93/8
94/12 103/14
**dire** [3]   8/2 8/5 39/9
**direct** [5]   21/7 21/8 57/3
79/2 79/16
**directing** [1]   38/10
**direction** [2]   11/6 11/7
**directly** [3]   81/23 92/5 94/25
**director** [1]   35/19
**disagree** [9]   6/17 8/8 13/4
13/7 20/1 71/18 111/1 113/15
114/11
**disagrees** [2]   19/24 88/5
**disavows** [1]   60/24
**disbelieve** [1]   12/22
**discipline** [2]   96/22 98/24
**disclosed** [6]   25/17 43/11
49/20 49/21 56/11 57/8
**disconnect** [1]   88/22
**discovered** [2]   14/19 81/3
**discovery** [4]   39/3 42/10
42/11 86/2
**discredit** [1]   12/25
**discrepancy** [2]   17/10 23/18
**discrimination** [1]   7/11
**discuss** [3]   60/14 66/6 96/20
**discussion** [3]   30/13 108/19
109/1
**discussions** [3]   100/8 108/19
109/11
**disease** [7]   29/2 37/11 79/5
79/9 79/21 79/25 80/20
**diseased** [1]   73/7
**diseases** [7]   30/2 30/3 60/8
60/12 60/15 60/16 61/19
**disgruntled** [1]   55/3
**disgusting** [1]   72/5
**dismissed** [1]   72/11
**disorder** [6]   16/10 16/12
26/14 26/14 26/19 88/3
**disorders** [2]   19/20 31/10
**displaced** [3]   29/15 31/11

**displays** [1]   26/18
**dispute** [1]   112/10
**disputing** [1]   47/14
**distance** [4]   71/22 113/14
113/22 117/3
**distinction** [2]   26/16 102/10
**distinguish** [1]   107/2
**distress** [1]   26/13
**district** [5]   1/1 1/1 1/11
2/13 35/20
**divided** [1]   116/13
**DIVISION** [1]   1/2
**DNA** [7]   36/2 36/3 36/5 36/15
36/18 36/20 37/3
**do** [90]   4/19 5/21 7/3 7/19
7/19 8/5 8/14 8/16 11/4 12/1
12/3 12/5 12/6 12/10 13/1
14/9 15/9 20/8 22/21 23/17
26/15 27/3 27/11 27/22 30/23
32/17 37/3 38/21 40/10 40/13
41/2 41/16 41/25 42/1 42/18
43/4 46/2 48/19 49/13 50/17
51/6 51/13 53/8 56/21 58/4
62/16 63/7 63/24 63/25 64/22
65/16 67/25 68/3 71/7 71/8
72/10 75/21 76/2 76/4 79/4
80/19 92/11 92/12 92/13
96/24 97/20 97/20 98/15 99/8
100/15 102/10 102/11 102/12
103/18 105/25 108/13 108/13
108/19 109/9 109/10 110/2
110/25 113/15 115/11 115/15
116/5 117/4 117/25 118/1
119/11
**docket** [1]   4/8
**doctor** [20]   18/14 18/18 21/1
21/2 22/7 22/19 28/22 30/21
32/10 34/9 63/25 64/13 64/19
65/7 65/8 66/12 66/17 66/19
68/12 109/17
**doctor's** [3]   24/2 64/12 74/19
**doctors** [4]   13/19 19/12 22/11
35/24
**doctors'** [1]   60/23
**documentary** [1]   69/22
**documents** [4]   14/16 60/4
90/19 90/25
**does** [31]   8/19 12/10 13/25
15/15 17/16 24/10 26/5 37/3
39/15 44/22 44/23 58/17
59/18 60/11 63/1 63/9 66/24
68/13 68/17 72/23 73/1 73/15
73/15 73/22 79/24 81/9 86/18
93/19 105/4 106/17 106/17
**doesn't** [27]   11/24 12/12 15/1
16/11 18/2 18/11 48/25 57/20
58/9 61/1 65/24 69/1 69/1
70/17 76/9 78/19 85/4 87/6
87/14 89/2 89/9 92/22 93/25
94/2 112/19 114/22 116/2
**doing** [6]   35/4 40/5 93/5 94/3
108/4 118/2
**don't** [109]   4/2 5/4 5/24 6/8
7/13 9/5 9/12 12/25 22/17
22/22 23/23 24/18 24/18 26/2
26/10 28/5 28/9 30/19 31/4
32/14 37/15 37/23 38/6 39/7
39/7 39/10 43/24 43/25 44/3
44/5 45/23 46/2 48/13 50/9
50/17 51/6 51/13 52/6 53/4
53/8 53/17 54/2 54/5 54/24

**D**

**don't... [65]** 55/6 55/11
55/11 57/10 58/2 58/11 62/20
63/13 68/4 70/12 71/1 72/9
75/3 76/15 76/16 76/20 77/14
77/23 78/5 79/19 80/5 80/5
80/13 80/14 81/4 83/19 84/2
84/14 85/17 90/15 90/15
91/16 92/8 93/10 93/15 93/15
95/5 95/6 95/10 95/11 95/18
95/19 97/2 97/6 97/9 98/8
100/22 103/2 103/8 104/11
105/8 106/7 107/1 107/2
108/12 111/11 111/25 112/2
113/19 114/9 116/3 116/18
117/15 117/24 118/19
**done [16]** 8/5 14/11 20/20
25/24 29/19 42/19 66/20
66/21 67/14 81/23 82/3 87/5
88/15 103/11 111/16 116/9
**door [4]** 26/8 59/21 81/7
81/10
**Dormant [1]** 79/23
**double [1]** 89/20
**double-check [1]** 89/20
**doubt [1]** 49/11
**down [10]** 42/11 57/17 57/17
60/2 60/2 63/20 64/19 107/19
117/7 117/20
**Dr [4]** 25/19 110/19 112/3
117/13
**Dr. [65]** 5/7 8/19 9/7 11/4
11/5 12/20 12/21 12/22 13/2
13/8 17/1 17/5 17/9 17/13
19/24 20/23 21/9 23/17 23/19
24/15 25/16 26/21 26/23 27/5
27/11 27/12 27/14 27/15
27/18 28/2 28/20 29/8 29/13
30/8 30/13 31/24 32/1 32/3
32/19 32/19 33/2 48/12 59/8
59/10 59/14 59/16 59/18 60/4
60/5 61/12 61/14 61/15 68/13
88/2 104/16 105/3 106/16
110/24 112/13 112/15 114/14
114/19 117/7 117/12 117/19
**Dr. Blank [1]** 27/11
**Dr. Ciaravino [1]** 114/14
**Dr. Ciaravino's [1]** 114/19
**Dr. Irwin [3]** 28/2 31/24 59/8
**Dr. Irwin's [3]** 28/20 30/8
32/3
**Dr. Jodi [1]** 104/16
**Dr. John [1]** 27/18
**Dr. Jones' [1]** 61/14
**Dr. Meisner [1]** 26/21
**Dr. Meisner's [1]** 27/14
**Dr. Scarano [27]** 9/7 11/4
11/5 12/20 12/21 12/22 13/2
13/8 17/5 17/9 17/13 19/24
20/23 21/9 23/17 23/19 24/15
25/16 26/23 27/5 27/15 30/13
48/12 61/12 61/15 68/13 88/2
**Dr. Scarano's [2]** 5/7 8/19
**Dr. Schulz [12]** 29/8 29/13
32/1 33/2 59/10 106/16
110/24 112/13 112/15 117/7
117/12 117/19
**Dr. Schulz' [4]** 59/14 59/16
59/18 105/3
**Dr. Scott [2]** 17/1 60/5
**Dr. Stacy [2]** 32/19 32/19

Dr. Terri [1] 60/4
**draw [1]** 20/15
**drew [1]** 69/25
**drink [1]** 86/21
**drinking [8]** 44/7 44/8 44/17
44/17 44/24 85/9 86/19 86/20
**dripping [1]** 18/13
**drive [1]** 69/2
**driver [2]** 50/24 51/2
**driving [2]** 69/2 69/4
**drone [1]** 57/21
**drop [3]** 84/20 85/21 85/22
**dropped [4]** 84/7 84/9 84/19
85/19
**drugged [1]** 94/2
**drugs [3]** 31/7 32/9 32/11
**due [5]** 19/23 52/24 56/13
71/17 106/21
**duplication [1]** 102/13
**duplicative [1]** 102/14
**duration [1]** 96/21
**during [10]** 9/24 12/23 57/21
69/25 76/12 77/23 79/16 80/4
95/10 98/14
**duties [1]** 98/12
**dying [1]** 45/4

**E**

**e-mail [5]** 7/22 45/19 45/22
69/17 116/20
**e-mails [4]** 77/22 77/24 78/16
79/6
**each [10]** 11/8 13/25 38/23
39/14 41/20 46/20 47/2 55/8
57/23 102/21
**earlier [5]** 3/21 32/5 59/4
85/25 108/25
**early [2]** 81/14 99/21
**easily [1]** 32/9
**Eastern [1]** 54/4
**easy [1]** 84/5
**education [3]** 10/5 14/5 14/10
**EEOC [2]** 54/18 54/22
**effect [16]** 7/2 10/15 12/17
15/4 16/19 25/8 29/11 34/1
51/5 51/15 52/12 53/2 61/20
67/25 68/2 118/1
**effective [1]** 63/1
**effectiveness [1]** 102/15
**effects [1]** 25/7
**efficiency [1]** 47/2
**egregious [1]** 95/1
**eight [1]** 101/10
**Eighth [4]** 9/15 9/15 11/19
23/24
**either [15]** 14/24 30/23 31/3
31/20 31/25 32/4 32/6 32/13
33/9 60/12 60/25 62/9 75/12
82/18 92/4
**elected [1]** 53/7
**element [1]** 21/22
**ELLISON [1]** 1/10
**else [11]** 18/14 34/2 42/14
55/19 58/4 67/2 79/4 79/16
85/13 85/16 95/2
**elsewhere [1]** 64/11
**emasculating [1]** 12/6
**embarrass [1]** 112/8
**emblematic [1]** 87/13
**employee [2]** 38/22 76/1
**employees [2]** 55/4 56/5

**employment [2]** 38/16 50/12
**encountered [1]** 19/25
**end [3]** 40/6 107/19 120/4
**ends [1]** 62/6
**enforce [1]** 49/1
**enforced [2]** 49/7 56/10
**enforcement [4]** 44/24 44/25
45/3 67/13
**enormous [1]** 98/23
**enormously [1]** 55/9
**enough [4]** 25/21 28/14 96/6
116/3
**Enron [1]** 96/21
**enter [1]** 38/16
**entering [1]** 51/18
**entertain [1]** 58/20
**entire [3]** 20/4 69/18 87/13
**entirely [2]** 38/25 108/9
**entitled [15]** 9/7 10/5 10/6
14/7 28/24 29/1 34/17 38/13
41/25 60/14 61/1 78/19 81/25
119/10 120/7
**entrusted [1]** 98/25
**environment [5]** 38/21 46/11
52/11 83/7 83/9
**Eric [16]** 60/8 69/9 69/11
69/15 69/18 69/19 73/25 74/9
75/10 75/19 77/15 78/15
78/18 79/19 94/2 95/11
**especially [3]** 59/22 62/22
103/10
**essentially [3]** 52/1 64/3
66/8
**establish [3]** 5/19 39/10
46/24
**established [2]** 16/25 56/20
**establishing [1]** 16/2
**Estefan [3]** 1/18 3/4 47/11
**estimate [1]** 3/22
**et [1]** 82/22
**Europe [1]** 54/4
**Europe-wide [1]** 54/4
**evaluate [2]** 45/8 66/25
**evaluating [2]** 9/19 13/14
**evaluation [2]** 13/3 15/20
**even [21]** 12/12 23/15 25/22
27/4 29/2 47/4 49/25 50/4
53/12 54/13 57/1 58/25 60/13
69/21 79/17 85/3 86/11 88/22
94/1 112/13 112/19
**evening [3]** 69/4 96/6 99/10
**event [4]** 10/18 12/4 82/8
107/13
**events [4]** 14/18 19/22 26/15
82/18
**eventually [1]** 103/17
**ever [8]** 7/9 48/3 49/2 49/21
72/17 95/19 96/20 96/20
**every [17]** 12/24 13/25 14/19
14/23 17/8 18/8 18/8 19/17
19/24 38/23 41/8 62/15 62/17
88/6 95/4 96/6 108/1
**everybody [4]** 27/20 37/14
37/15 91/25
**everyone [2]** 58/21 100/6
**everyone's [1]** 70/22
**everything [7]** 18/7 18/14
41/12 52/11 100/15 103/2
103/6
**everywhere [1]** 68/17
**evidence [87]** 4/12 10/6 10/23

**E**

**evidence... [84]** 12/24 14/8
15/21 16/20 19/9 19/16 19/19
26/1 26/4 26/6 26/7 29/24
30/15 30/18 30/24 34/18 36/1
38/19 39/15 40/6 44/14 44/16
44/24 53/6 54/6 54/25 56/18
57/5 58/24 61/10 62/2 62/5
63/1 64/5 65/2 66/25 67/17
67/18 67/19 67/24 68/15
69/17 70/10 71/9 71/11 71/13
74/2 74/5 75/23 75/24 76/11
77/2 79/3 79/16 79/25 80/12
80/16 80/17 81/20 81/21
81/24 84/24 85/15 85/22 86/7
86/10 87/23 92/14 92/16
94/20 94/21 94/23 95/3 96/18
96/21 102/6 107/12 111/15
113/3 114/13 116/10 116/14
117/4 118/3
**evidentiary [1]** 55/25
**exactly [10]** 13/24 24/9 27/3
50/16 68/12 73/15 73/22 78/2
93/5 95/7
**exaggeration [1]** 88/4
**exam [1]** 64/17
**examination [19]** 12/23 20/14
21/3 25/3 25/3 29/8 29/18
29/19 59/10 77/16 80/1 82/12
107/20 110/25 111/2 116/9
118/2 119/16 119/19
**examinations [3]** 29/20 30/1
30/6
**examine [7]** 12/24 60/18 64/1
76/17 77/4 79/4 113/13
**examined [5]** 64/13 64/19
65/20 66/13 82/24
**examiner [1]** 35/18
**example [10]** 42/11 44/7 44/18
44/21 45/6 69/24 97/16
103/18 103/19 106/3
**examples [6]** 45/2 58/22 59/1
104/1 104/13 108/1
**examples of [1]** 108/1
**exams [1]** 35/25
**excellent [1]** 87/10
**except [2]** 14/22 50/17
**excepted [1]** 98/21
**exception [1]** 31/19
**excerpt [7]** 102/2 102/2
116/11 116/19 119/10 119/22
119/24
**excerpted [1]** 104/22
**excerpts [3]** 104/16 108/13
115/14
**exchange [2]** 116/8 117/18
**exchanged [1]** 101/7
**excludable [1]** 39/4
**exclude [6]** 8/19 27/13 27/17
32/18 74/8 75/22
**excluded [3]** 31/19 62/15
74/11
**exclusive [4]** 77/12 78/8
78/15 78/17
**excuse [1]** 108/7
**exercised [1]** 26/8
**exhibit [3]** 59/15 60/6 101/7
**Exhibit 69 [1]** 59/25
**exist [1]** 91/18
**existed [2]** 48/20 48/20
**existence [2]** 19/21 34/16

109/5 [5]
108/13 109/8 109/18
**expected [1]** 29/22
**experience [5]** 7/6 14/5 14/10
98/11 98/15
**experienced [1]** 48/2
**expert [27]** 10/15 10/25 12/18
15/5 15/8 15/9 16/4 16/16
17/25 20/13 20/17 20/21
21/18 22/12 27/10 31/9 33/10
33/25 44/5 44/6 44/8 59/5
61/1 62/3 109/2 109/3 109/5
**expertise [1]** 28/21
**experts [7]** 26/17 26/19 41/19
60/19 60/25 60/25 62/15
**experts -- I [1]** 41/19
**explain [10]** 16/13 17/6 17/10
29/4 29/11 73/16 76/4 76/5
89/7 114/18
**explaining [1]** 92/15
**explains [1]** 89/4
**explanation [1]** 64/25
**explanations [1]** 81/19
**express [1]** 21/2
**extends [1]** 4/9
**extensive [2]** 22/16 72/25
**extent [3]** 57/4 63/5 85/15
**external [3]** 106/19 106/23
107/9
**extremely [1]** 105/10

**F**

**face [5]** 66/23 66/24 69/6
69/6 70/25
**faced [1]** 13/19
**fact [35]** 9/6 9/7 11/7 11/12
12/1 12/3 12/18 12/19 19/15
20/2 23/16 24/12 30/16 34/24
39/16 40/8 40/15 43/18 54/18
64/25 66/14 68/12 69/23
71/15 72/20 74/1 79/4 83/20
84/16 85/4 89/5 93/24 94/11
94/11 115/22
**factor [1]** 15/1
**facts [19]** 14/3 15/23 18/7
22/24 23/7 23/15 23/15 23/17
23/19 23/19 23/21 24/7 24/11
39/4 47/7 61/17 68/23 80/10
111/23
**fails [1]** 14/22
**failure [1]** 72/18
**fair [2]** 25/21 57/22
**fairly [2]** 69/7 83/6
**fairness [1]** 28/12
**faith [1]** 108/13
**faithful [1]** 98/12
**faked [1]** 16/21
**faking [1]** 16/19
**Falanga [8]** 88/11 88/13 89/13
89/17 91/17 91/23 92/9 92/9
**fall [1]** 70/25
**false [12]** 61/24 63/6 63/10
63/10 63/11 65/3 72/14 72/21
75/24 78/19 91/8 94/24
**falsely [6]** 21/13 62/7 62/8
62/9 62/10 83/24
**falsity [5]** 63/4 63/7
**far [6]** 11/14 19/19 28/10
32/14 92/18 100/22
**farther [1]** 54/1
**fast [3]** 23/9 23/9 24/4
**fate [1]** 98/17

**fault [1]** 17/23
**favor [1]** 97/3
**FBI [2]** 35/21 90/4
**FCRR [2]** 2/13 120/12
**February [1]** 78/16
**federal [1]** 62/25
**feel [3]** 47/3 76/3 85/22
**feels [1]** 18/3
**fell [1]** 40/17
**fellow [1]** 77/24
**few [5]** 18/15 18/15 104/13
105/13 114/5
**fibs [1]** 82/22
**field [1]** 24/16
**Fifth [1]** 84/21
**figure [2]** 87/8 92/7
**file [5]** 40/3 40/16 43/13
58/21 60/4
**filed [5]** 7/1 9/3 47/13 75/9
75/11
**filing [1]** 58/21
**fill [3]** 103/13 104/9 108/3
**final [1]** 100/17
**finally [4]** 27/20 29/25 60/17
90/21
**financial [1]** 24/9
**find [8]** 6/15 18/7 52/17
52/17 107/9 107/12 109/8
109/18
**finding [3]** 12/5 15/15 29/15
**findings [1]** 19/21
**finds [1]** 6/5
**fine [9]** 7/8 15/20 27/16 35/4
109/13 109/15 118/8 118/8
118/20
**finish [3]** 52/23 115/1 115/5
**finished [1]** 115/3
**fire [3]** 51/3 51/5 51/12
**fired [1]** 45/18
**firefighter [2]** 14/25 87/2
**firefighters [1]** 14/24
**firemen [3]** 42/24 51/4 51/11
**Firm [1]** 1/15
**first [22]** 4/10 11/3 12/9
12/11 16/21 23/3 27/22 28/22
30/11 43/10 46/11 58/11
63/16 67/7 74/15 91/2 91/5
92/21 101/16 101/18 101/19
103/10
**fissure [2]** 106/19 107/5
**fissures [20]** 29/13 32/1 32/6
33/9 33/14 33/18 33/21 34/12
34/12 34/16 34/18 37/13
37/21 81/18 81/19 105/17
105/21 107/14 116/14 118/3
**fit [2]** 16/5 16/9
**five [5]** 41/19 41/23 84/1
85/9 100/19
**flashbacks [2]** 85/13 87/2
**flat [1]** 112/24
**float [1]** 100/6
**floor [3]** 2/6 54/11 79/13
**focus [2]** 51/25 69/2
**folks [1]** 7/5
**follow [4]** 96/23 97/2 102/15
103/1
**followed [1]** 33/2
**follows [1]** 113/2
**footnote [2]** 38/11 39/22
**Force [1]** 74/20
**forced [1]** 7/13

**F**

forcible [1]   37/17
forcing [1]   70/9
Ford [1]   69/2
foregoing [1]   120/7
foreign [2]   5/17 7/12
forensic [12]   9/18 10/3 13/24
 16/3 16/16 18/1 18/6 18/20
 20/3 20/9 24/23 35/19
foreseeable [1]   46/13
form [7]   28/14 106/10 111/3
 112/3 113/18 117/21 117/22
format [1]   8/15
forth [1]   92/21
forthcoming [1]   66/3
forward [6]   32/21 37/8 74/9
 80/12 84/24 98/7
fought [1]   93/2
found [17]   9/8 9/23 9/25
 10/18 29/13 37/1 37/1 64/13
 64/20 66/13 89/23 89/25 90/2
 90/3 91/18 91/21 96/16
foundation [1]   95/23
four [6]   3/23 4/6 4/9 43/12
 57/9 100/18
fours [2]   23/25 24/1
Fourth [1]   85/20
frame [3]   76/1 79/16 80/4
Francisco [1]   50/2
frankly [6]   13/3 65/1 67/9
 72/9 112/6 116/20
fraud [7]   38/15 38/16 44/12
 44/14 46/24 56/12 56/21
fraudulent [7]   38/12 49/25
 51/17 51/25 52/4 52/25 54/22
fraudulently [1]   51/21
frequently [1]   115/11
friable [1]   81/17
friction [5]   106/18 106/19
 106/23 106/24 107/4
Friday [2]   58/24 58/25
friends [1]   69/21
front [3]   20/14 31/6 66/2
fucking [1]   45/23
full [9]   53/14 90/11 93/3
 103/13 108/4 108/6 108/10
 108/10 113/8
fully [2]   60/14 66/2
further [2]   98/4 108/22
Furthermore [1]   11/16

**G**

gain [3]   19/13 24/3 24/9
galvanized [1]   48/10
Galveston [4]   69/3 75/12
 75/19 94/22
game [1]   18/21
gang [7]   84/19 84/23 85/5
 85/7 86/7 86/16 94/18
gaps [1]   108/4
gas [1]   77/8
gasoline [2]   77/6 77/8
gathers [1]   55/3
gave [6]   28/10 28/13 33/8
 77/6 79/5 81/6
gender [2]   7/10 7/11
general [3]   24/22 44/19 44/20
generally [3]   106/20 108/10
 118/1
genital [3]   29/3 29/10 59/11
genuine [1]   39/16

Germany [1]   8/18 9/7
 5/11
get [36]   4/9 5/10 12/6 17/16
 20/11 20/12 21/11 43/25 45/4
 47/7 48/24 51/25 53/13 56/18
 56/20 57/1 58/11 64/3 64/18
 72/22 76/20 77/17 77/18
 78/19 79/4 85/19 87/18 87/22
 90/23 92/2 95/9 99/21 100/2
 103/1 104/4 115/14
gets [3]   11/23 15/20 95/9
getting [5]   8/1 21/24 22/16
 67/15 87/16
GHB [1]   86/22
girl [4]   42/24 49/8 51/12
 71/25
give [22]   10/5 10/6 10/24
 12/25 13/10 34/8 36/9 36/14
 37/20 44/9 72/3 72/6 76/9
 89/7 91/7 91/10 99/6 103/18
 104/19 105/1 108/16 118/25
given [10]   17/7 29/9 59/11
 70/3 72/18 73/19 86/12 94/1
 96/14 112/18
gives [3]   15/10 33/1 112/15
giving [4]   62/1 80/1 81/2
 110/10
gladly [2]   6/15 7/21
global [1]   114/3
globally [1]   114/6
globe [1]   56/5
go [37]   4/12 8/14 12/1 21/16
 22/17 28/22 39/14 41/10 42/5
 44/11 45/5 45/7 50/25 52/1
 54/1 55/7 65/7 68/7 70/9
 74/7 76/25 77/7 77/16 78/10
 80/23 87/21 90/17 94/4 94/8
 96/1 96/7 96/11 99/9 100/5
 100/22 106/11 107/19
goes [23]   11/14 11/20 19/16
 19/20 28/2 28/6 29/13 34/25
 35/9 44/25 47/4 47/5 47/6
 56/19 68/23 74/6 79/1 92/22
 94/24 102/8 108/8 114/16
 119/12
going [106]   3/22 3/24 4/2 4/3
 4/18 4/19 5/19 6/8 13/2
 13/24 15/7 15/8 15/24 16/3
 21/15 22/15 23/5 23/9 23/11
 24/4 24/14 32/7 33/13 33/16
 35/11 38/6 41/2 41/22 41/25
 42/5 42/12 43/5 43/19 43/21
 43/24 43/25 45/25 46/6 46/12
 46/15 46/19 46/21 46/24 47/7
 47/15 48/14 48/17 50/10
 50/16 51/6 51/11 51/12 51/13
 53/5 53/8 54/15 54/15 55/7
 55/7 55/12 55/12 55/24 56/25
 57/5 58/4 58/14 59/21 61/6
 69/20 73/14 76/16 76/18
 76/23 76/24 77/1 77/19 77/20
 78/6 78/25 80/16 80/17 80/20
 80/24 81/5 81/6 84/3 84/25
 93/13 94/10 94/20 94/21 95/5
 95/13 96/5 96/7 96/9 96/11
 96/24 97/1 101/2 101/13
 101/15 108/11 109/1 114/11
 114/20
gone [4]   14/15 39/1 52/2
 59/23
good [9]   7/15 8/14 27/21
 32/23 38/12 49/24 96/21

Goodgine [5]   5/8 5/10 5/21
 5/21 11/11
got [27]   7/5 13/2 18/12 43/1
 50/3 52/7 55/17 60/9 60/11
 71/21 73/11 74/17 77/24 79/8
 79/21 81/13 89/21 90/6 91/15
 95/11 95/17 97/8 97/9 97/17
 99/5 100/18 100/22
gotten [4]   60/16 63/2 92/17
 116/20
government [5]   84/10 84/16
 88/24 88/25 88/25
grant [1]   39/22
granted [1]   54/16
grave [1]   70/24
great [2]   11/18 118/22
gross [3]   71/6 88/4 111/3
ground [2]   7/16 48/20
grounded [1]   19/19
group [1]   6/13
guard [2]   46/7 89/6
guards [2]   46/2 46/5
guess [4]   3/21 46/16 55/17
 58/15
guesses [1]   85/14
guessing [1]   3/23
guy [4]   11/13 42/22 77/10
 86/21
guys [6]   42/23 51/14 86/19
 86/20 116/21 118/20
GYN [4]   25/2 25/18 28/7
 31/14
gynecological [1]   29/18
gynecologist [2]   30/4 60/5
GYNs [1]   32/17

**H**

H-07-CV-2719 [1]   1/4
habit [1]   94/25
had [71]   4/1 5/8 16/10 21/13
 22/12 29/12 29/12 29/22
 30/12 31/7 32/2 32/5 32/8
 38/22 43/4 43/23 44/19 44/20
 45/14 47/25 51/4 51/18 51/20
 52/1 58/20 59/6 59/16 63/24
 65/8 65/13 66/20 66/21 73/25
 74/3 77/3 77/11 77/12 78/1
 78/1 78/8 78/15 79/7 84/6
 84/6 85/3 85/12 85/17 85/22
 88/12 88/16 88/19 89/8 91/4
 92/13 92/15 93/20 95/9 96/15
 96/16 97/16 99/20 99/21
 100/8 100/25 101/6 101/11
 112/23 112/23 112/25 113/16
 114/20
hadn't [3]   86/12 91/11 91/14
half [2]   57/1 107/13
Hall [4]   45/9 45/10 45/11
 45/13
HALLIBURTON [2]   1/6 53/7
hamper [1]   43/14
hand [2]   7/7 60/22
handed [1]   86/21
handful [1]   46/18
handled [1]   110/2
hands [1]   89/6
happen [3]   30/21 47/10 77/14
happened [16]   10/18 18/8
 21/12 42/6 52/12 64/11 64/15
 64/16 65/21 69/15 76/17
 84/18 92/24 93/13 94/5 117/5

**happens [1]**  27/5
**happy [13]**  6/4 7/18 7/19 8/10
8/11 27/7 36/10 36/11 40/7
40/10 40/13 41/14 115/10
**harassment [11]**  7/7 7/11
38/20 38/23 45/14 45/16
45/17 48/1 49/25 54/22 55/16
**harassment/hostile [1]**  38/20
**hard [7]**  7/7 71/9 93/2 93/6
94/9 96/6 101/11
**hardly [1]**  93/11
**harken [1]**  54/15
**Harris [1]**  35/20
**has [83]**  6/7 6/20 13/2 13/8
13/9 13/16 14/16 16/24 17/3
19/25 22/8 26/14 29/1 29/19
30/21 30/21 35/20 40/17 41/6
41/13 45/15 47/11 48/10
50/19 54/13 54/25 55/2 59/8
60/9 60/23 61/2 61/8 61/12
61/14 61/17 62/3 62/8 62/9
62/12 62/16 62/18 67/13
68/11 68/21 69/9 69/22 69/23
71/10 72/11 79/13 80/12
81/21 81/23 82/22 83/23 84/5
84/6 85/12 85/12 87/1 87/17
87/22 88/2 92/11 92/12 93/8
94/11 95/19 95/23 97/15
97/25 98/2 98/5 98/16 102/7
104/24 110/24 111/22 112/3
115/20 117/11 119/23 119/24
**hasn't [2]**  25/17 25/24
**hate [2]**  53/14 58/3
**have [217]**
**have -- you [1]**  99/11
**haven't [3]**  49/13 95/21
118/19
**having [17]**  10/25 20/17 61/21
61/22 70/18 72/10 73/15
76/13 79/3 80/3 81/2 83/20
85/13 88/23 101/10 112/12
112/16
**he [112]**  5/14 5/20 9/8 9/19
9/20 9/22 9/23 9/24 9/25
10/20 11/5 11/8 11/9 11/11
11/12 11/12 11/13 11/14
11/15 11/23 11/25 12/4 12/12
12/12 13/3 13/16 14/4 14/7
14/22 15/1 15/10 15/20 15/23
16/3 17/13 17/19 17/24 18/9
18/11 18/12 21/1 22/17 22/18
22/22 23/19 24/19 24/24 25/1
25/4 25/22 26/2 26/6 26/10
28/3 28/4 28/6 28/10 28/12
28/13 28/23 28/24 29/3 29/10
29/13 29/19 29/21 30/23 31/2
31/5 31/6 31/11 31/15 31/19
31/24 45/22 48/10 51/2 51/3
51/3 51/4 51/11 67/16 67/16
69/20 69/22 69/23 72/3 72/6
77/6 77/10 77/11 79/5 81/6
85/17 92/1 93/9 93/9 93/21
93/22 94/12 97/16 105/6
105/17 107/20 109/4 109/7
109/7 111/24 112/4 112/4
114/10 114/11
**he's [38]**  5/11 5/11 8/22 13/2
13/11 13/13 13/14 13/15
13/17 13/25 14/8 14/11 15/5
15/12 15/13 15/16 15/18

25/10 25/17 25/23 25/24
28/22 29/1 30/23 31/4 31/5
31/7 31/9 31/12 31/14 31/16
31/17 111/23
**head [1]**  101/17
**headache [1]**  45/23
**heading [1]**  53/10
**healthcare [2]**  64/21 69/14
**hear [10]**  26/1 43/15 48/7
55/11 64/10 67/6 73/12
102/21 102/21 103/6
**heard [11]**  42/23 42/24 49/8
49/8 49/10 51/3 51/11 67/18
74/24 74/25 95/25
**hearing [3]**  17/22 47/9 68/6
**hearings [1]**  55/25
**hearsay [14]**  39/12 40/25
41/12 42/13 43/1 50/4 50/7
50/8 50/20 50/20 51/15 58/8
101/22 101/23
**heart [2]**  74/12 79/2
**Hedges [11]**  2/4 2/5 3/15
17/18 47/22 111/3 111/20
113/18 115/6 117/6 117/21
**Hedges' [1]**  118/6
**Heidi [2]**  1/15 3/6
**help [7]**  8/1 15/11 36/5 45/4
56/4 94/2 108/3
**helpful [2]**  12/15 17/2
**her [193]**
**here [39]**  3/11 6/1 8/7 8/23
12/18 19/18 19/22 21/18 22/1
23/16 24/10 42/21 46/7 50/3
50/15 58/7 66/18 66/20 67/22
68/1 68/4 70/13 71/2 73/10
73/25 77/23 83/23 87/20
91/16 93/8 96/5 99/18 101/24
103/12 103/12 106/21 108/22
113/3 115/12
**here's [8]**  11/24 22/19 22/19
79/2 96/4 104/15 106/16
119/3
**herpes [1]**  29/3
**herself [10]**  22/15 22/15 37/9
61/10 82/1 84/6 87/19 93/9
94/10 94/12
**higher [1]**  77/8
**highlighted [1]**  110/17
**highly [5]**  30/5 43/3 47/7
47/7 96/9
**him [28]**  9/23 9/25 12/6 12/10
12/24 14/6 15/7 15/8 15/10
15/11 24/17 26/4 26/22 26/24
27/4 27/7 57/16 69/24 70/9
71/19 76/18 77/17 77/18 78/9
81/6 86/14 97/17 116/1
**himself [1]**  67/16
**hired [1]**  45/7
**his [44]**  5/8 9/7 10/4 11/14
11/20 11/22 12/5 12/23 13/3
13/17 14/9 15/12 15/14 16/17
17/14 17/15 21/2 23/11 26/11
28/2 28/3 28/7 28/8 28/9
28/13 28/21 28/23 29/7 29/15
30/11 30/22 31/5 31/18 46/8
51/4 69/20 69/21 70/7 77/7
83/23 84/3 104/21 104/25
116/1
**histories [2]**  60/23 71/3
**history [17]**  17/3 17/11 28/24
29/16 30/1 34/2 60/14 60/24

70/3 82/9 82/10 82/13
**histrionic [1]**  88/2
**Holcombe [2]**  2/4 3/14
**hold [4]**  25/23 45/12 50/22
100/20
**home [2]**  52/3 69/3
**honest [2]**  13/13 82/13
**honestly [1]**  17/7
**Honor [132]**
**HONORABLE [1]**  1/10
**hookup [1]**  4/19
**hope [10]**  21/9 39/7 39/11
42/6 49/23 50/4 50/11 53/22
78/2 100/8
**hoped [1]**  86/1
**hoping [1]**  21/17
**horn [1]**  52/5
**horrible [1]**  42/22
**horribly [1]**  18/13
**horror [3]**  43/6 43/6 49/7
**hospital [6]**  18/14 18/16
22/15 64/12 106/13 111/25
**hospitalized [2]**  29/2 72/8
**hospitals [1]**  35/20
**hostile [2]**  38/20 52/10
**hours [2]**  40/3 107/13
**house [1]**  77/7
**HOUSTON [7]**  1/2 1/4 2/6 2/11
2/14 53/25 58/3
**how [36]**  3/22 12/3 12/5 12/6
16/5 18/3 22/23 23/18 28/5
35/25 44/22 45/23 46/5 46/24
47/2 47/15 49/13 53/15 55/21
58/2 58/17 65/22 71/23 72/4
72/4 79/20 81/6 87/7 97/9
100/2 100/2 102/11 102/24
103/3 115/10 115/25
**however [3]**  12/16 68/5 71/18
**HR [2]**  45/7 45/20
**Hu [6]**  90/9 90/20 91/22
91/24 91/25 92/5
**huge [3]**  85/5 97/10 103/25
**huh [1]**  107/11
**human [3]**  10/16 12/19 81/15
**humanly [1]**  18/7
**Hungary [1]**  47/24
**hurt [1]**  80/21
**husband [3]**  20/1 20/5 62/11
**hymen [3]**  64/13 64/20 66/13
**hyperbolic [1]**  97/22

**I**

**I'll [15]**  10/11 18/24 28/17
35/13 39/19 40/7 45/6 52/23
54/11 59/3 96/25 100/23
104/13 107/25 118/25
**I'm [89]**  3/21 5/2 6/1 7/8
7/12 7/25 7/25 8/9 10/11
15/24 17/12 17/21 18/24
20/17 21/2 21/17 21/25 23/14
25/11 27/1 27/20 32/7 32/12
32/17 33/16 40/13 40/19 42/2
42/19 44/18 44/23 44/24 45/2
47/1 47/8 47/14 47/14 48/17
48/21 51/6 51/13 54/7 54/14
54/15 55/20 68/8 69/25 70/14
75/18 76/16 76/24 77/1 78/3
79/12 88/9 89/4 89/25 90/14
92/10 92/13 92/13 94/20
94/21 96/24 97/1 97/2 97/8
100/25 101/2 106/20 108/11

**I**

I'm... **[18]** 108/16 109/7 109/13 109/23 110/10 110/10 110/13 111/6 111/12 112/6 113/5 114/7 114/8 117/13 118/8 118/8 119/4 119/11

I've **[14]** 22/8 25/5 28/11 49/2 63/2 76/8 95/25 96/14 98/17 99/5 100/22 112/18 115/12 116/24

idea **[1]** 58/3

ideas **[2]** 100/4 100/6

identified **[1]** 8/23

if **[162]**

ignored **[1]** 83/7

Iler **[29]** 60/8 69/9 69/11 69/15 69/18 69/19 71/10 71/14 72/9 72/10 72/12 72/15 74/1 74/3 74/10 74/23 75/10 75/20 76/13 76/17 77/2 77/4 78/15 78/18 79/4 79/19 81/5 94/22 95/11

illnesses **[1]** 29/5

illustrate **[1]** 52/25

imagine **[1]** 47/15

immediately **[2]** 92/4 92/6

implant **[1]** 112/24

implants **[10]** 25/7 25/8 29/16 31/11 31/13 32/13 113/16 114/12 114/23 115/19

implies **[1]** 60/13

imply **[1]** 60/7

important **[6]** 3/20 7/4 13/11 15/16 99/6 109/16

importantly **[2]** 44/2 44/11

impressed **[3]** 96/14 96/15 96/19

impression **[2]** 59/23 73/9

inability **[1]** 87/11

inaccurate **[1]** 90/9

inadmissible **[9]** 23/8 23/13 26/5 26/6 26/7 40/25 42/15 73/24 96/12

inappropriate **[2]** 6/15 30/13

INC **[1]** 1/7

incident **[6]** 52/3 67/23 75/19 75/19 94/21 94/22

incidents **[2]** 70/12 71/2

inclined **[2]** 55/20 75/18

include **[3]** 62/23 107/21 108/11

included **[1]** 108/20

includes **[3]** 23/12 25/3 105/19

including **[6]** 11/7 14/3 19/25 60/22 84/11 108/4

inconsistencies **[1]** 21/4

inconsistent **[1]** 24/8

indeed **[1]** 98/9

independent **[2]** 15/9 19/7

indicate **[3]** 6/12 10/2 24/7

indicated **[6]** 5/18 6/9 6/20 9/17 91/20 110/24

indicates **[1]** 78/18

indicating **[1]** 108/2

indication **[1]** 74/22

indicative **[1]** 33/14

indicia **[2]** 63/4 63/7

indirect **[1]** 95/6

individual **[7]** 9/19 26/18 49/7 56/17 98/25 115/18

induced **[1]** 51/21

inducement **[9]** 38/12 38/16 38/17 49/25 51/17 51/25 52/4 52/25 54/23

inessential **[1]** 84/12

inevitable **[3]** 46/14 48/11 48/14

inevitably **[1]** 96/11

inference **[1]** 21/20

inflammatory **[1]** 43/7

information **[14]** 8/4 9/23 9/23 9/25 28/14 39/12 44/13 55/3 82/11 96/11 97/4 97/10 97/11 104/4

informed **[1]** 106/20

initially **[1]** 92/18

injuries **[2]** 24/19 87/7

injury **[2]** 13/21 19/3

injustice **[1]** 76/3

inquiry **[2]** 4/17 56/9

instance **[4]** 14/19 56/18 62/17 88/6

instances **[1]** 100/1

instead **[2]** 65/18 103/16

instruct **[4]** 20/25 96/24 97/23 98/4

instruction **[2]** 97/21 98/9

instructions **[5]** 46/8 96/17 96/23 97/2 98/2

insufficient **[1]** 89/1

intact **[5]** 64/14 64/20 66/13 113/20 117/3

integrity **[1]** 70/19

intend **[3]** 27/3 39/2 81/9

intended **[2]** 111/19 116/24

intends **[3]** 38/3 76/8 76/11

intent **[2]** 26/22 86/5

intention **[5]** 56/2 56/24 57/1 57/19 112/7

intentional **[3]** 111/18 114/17 115/12

intentionally **[2]** 110/13 115/8

interactions **[2]** 82/24 82/25

interchangeably **[1]** 56/6

intercourse **[8]** 29/9 30/18 59/11 59/17 79/3 79/15 80/3 107/10

interested **[1]** 59/1

Internet **[12]** 95/19 95/20 96/2 96/7 97/1 97/4 97/10 97/12 97/14 97/18 97/24 97/25

interpretations **[1]** 69/10

interpreting **[1]** 67/12

interrogatories **[1]** 60/9

interrupted **[2]** 79/12 115/4

interruptions **[1]** 100/25

interview **[5]** 9/8 9/9 9/24 10/23 14/6

interviewed **[1]** 22/10

into **[22]** 6/25 14/23 15/20 19/4 20/3 21/16 48/24 51/17 51/21 53/3 61/22 61/23 63/2 69/18 76/20 77/16 81/12 81/19 81/21 81/24 99/10 108/8

introduce **[2]** 26/6 76/23

introduced **[1]** 63/4

introducing **[1]** 67/24 78/12

intruding **[1]** 9/10

invents **[1]** 87/16

invest **[1]** 55/9

invite **[1]** 100/2

invites **[1]** 93/16

involved **[1]** 77/11

Iraq **[17]** 5/12 6/3 17/9 29/8 29/25 48/3 51/18 52/1 52/2 52/7 52/12 54/1 60/6 60/21 61/17 69/22 83/9

irrelevant **[2]** 38/8 52/7

Irwin **[6]** 25/11 25/19 27/18 28/2 31/24 59/8

Irwin's **[3]** 28/20 30/8 32/3

is **[408]**

isn't **[9]** 9/10 16/20 19/23 25/8 39/25 47/19 54/20 57/13 92/10

isolated **[2]** 70/12 71/2

issue **[36]** 8/23 11/7 11/18 11/21 12/1 15/16 15/16 15/25 25/4 25/12 33/12 33/15 38/1 39/16 48/18 52/10 52/11 54/19 54/19 59/13 59/20 61/24 70/5 73/18 73/19 73/19 74/6 78/10 79/2 83/11 94/25 100/18 101/9 110/1 116/13 119/12

issues **[25]** 3/19 7/10 7/11 11/25 21/13 29/6 32/15 39/23 42/4 47/3 47/18 47/19 57/4 58/16 61/9 73/16 74/7 77/2 77/5 83/3 83/13 95/3 97/15 101/3 117/2

it **[305]**

it's **[113]** 3/24 4/3 5/18 7/3 7/7 8/9 9/15 9/18 11/17 11/17 11/18 13/20 14/20 15/13 15/16 15/20 15/22 16/22 17/22 18/21 19/7 21/15 23/12 23/15 27/7 27/19 27/23 28/10 28/15 30/7 30/13 30/20 30/24 30/24 31/1 32/23 35/10 38/7 38/19 40/1 40/4 40/5 40/24 40/24 40/25 41/13 42/13 42/13 42/15 43/3 43/5 43/7 44/19 48/16 50/4 51/15 57/22 59/5 61/2 61/13 61/13 65/15 66/5 66/6 66/10 66/17 70/15 71/8 72/21 75/1 75/8 75/25 76/7 76/10 76/10 80/22 80/24 81/24 82/2 82/3 82/3 82/11 82/16 85/20 87/18 88/6 89/8 92/21 93/2 93/6 93/9 93/9 96/5 96/9 97/17 97/18 100/3 101/23 101/23 104/4 105/2 105/16 108/1 109/6 110/8 110/17 111/14 111/19 112/4 112/7 113/3 119/13

item **[1]** 12/24

its **[11]** 22/21 44/25 56/5 56/9 56/10 66/23 66/24 67/24 69/6 69/6 96/20

itself **[3]** 44/23 57/17 111/7

IV **[1]** 2/8

**J**

JAMIE **[29]** 1/3 3/3 3/4 3/7 11/9 43/5 45/10 48/11 48/15 50/1 63/23 66/11 71/4 81/6 83/8 84/1 89/14 89/14 89/17

12

**J**

**JAMIE... [10]** 89/22 90/7 91/2
93/4 95/22 95/23 97/19 111/1
114/22 117/19
**Jamie's [1]** 90/5
**Jett [3]** 57/12 57/13 57/14
**Joanne [2]** 2/3 3/11
**job [5]** 8/6 22/21 72/1 72/2
96/16
**Jodi [1]** 104/16
**Joe [1]** 74/10
**John [1]** 27/18
**Join [1]** 111/5
**joining [1]** 7/2
**JONES [63]** 1/3 3/3 3/5 3/6
14/16 16/2 16/17 17/3 19/23
21/7 22/8 26/12 28/5 30/11
32/1 38/22 43/5 45/10 46/2
48/11 48/15 50/12 52/12
56/11 61/2 61/10 61/12 61/16
63/23 63/23 63/25 64/6 64/16
64/24 65/8 66/11 66/16 66/24
67/9 67/13 67/19 67/20 68/10
69/21 69/23 70/11 71/4 72/17
74/16 77/3 77/25 79/5 80/3
82/25 84/1 89/4 91/2 95/9
95/14 95/22 95/23 111/25
117/11
**Jones' [8]** 14/20 24/19 46/13
50/21 51/16 61/14 87/11
112/14
**judge [26]** 1/11 34/5 38/5
39/18 44/2 44/24 46/18 52/24
57/18 64/15 65/24 66/5 68/4
68/14 70/1 71/1 87/21 88/21
94/2 97/21 98/19 98/20
103/21 115/12 119/16 120/2
**judgment [7]** 8/8 38/13 39/22
39/25 40/2 40/16 54/17
**July [2]** 42/6 60/21
**jump [1]** 85/5
**jumping [1]** 105/11
**JUNE [3]** 1/5 81/14 120/9
**juror [5]** 96/19 98/2 98/4
98/5 98/6
**jurors [6]** 96/14 96/22 98/12
98/16 99/17 99/19
**jury [51]** 5/23 6/2 6/24 9/11
10/5 11/15 13/7 13/7 13/16
16/14 17/10 17/17 18/17
20/12 20/14 20/14 22/19
22/21 22/23 22/24 23/20 29/4
29/11 34/16 36/5 36/18 42/5
43/5 47/8 52/16 53/15 54/20
55/8 59/24 61/1 66/25 81/25
85/19 96/5 96/10 97/23 97/24
98/4 98/11 98/18 98/24
102/15 102/20 103/5 104/11
116/6
**jury's [4]** 18/21 20/21 62/15
87/24
**just [87]** 4/7 5/12 6/8 6/25
9/22 10/6 11/8 12/15 13/23
15/13 16/8 16/22 19/24 22/4
23/15 30/12 34/7 35/2 35/17
36/2 36/17 37/4 37/15 37/18
38/7 40/4 41/13 42/2 47/5
47/8 47/11 47/14 48/7 48/15
48/25 50/22 51/12 54/5 54/10
56/3 56/24 57/3 57/14 57/20
58/7 58/22 59/7 61/5 68/14

75/6 76/23 77/18 77/22 78/17
80/2 80/23 81/25 82/8 82/15
83/14 88/1 89/12 91/6 92/12
94/23 94/24 95/5 100/20
100/21 100/23 101/10 102/19
103/5 103/16 104/10 104/17
104/20 107/25 107/25 108/8
109/9 109/11 109/25 110/9
112/19 113/4 118/15
**justice [2]** 71/6 91/22

**K**

**Kara [2]** 45/9 45/10
**Katz [6]** 41/6 41/11 45/6 45/7
45/8 47/24
**Katz's [1]** 47/23
**KBR [46]** 1/6 1/7 2/2 3/13
3/14 3/15 4/25 5/4 7/3 16/22
38/1 38/22 42/9 42/22 42/23
44/2 44/5 44/12 44/12 44/16
44/18 44/25 45/7 45/15 45/23
46/2 46/5 47/11 50/12 51/2
52/17 52/19 53/7 53/19 54/14
55/3 56/4 56/6 56/17 56/19
60/17 68/21 81/24 83/6 89/6
96/10
**KBR's [4]** 7/2 14/25 44/24
56/6
**keep [6]** 46/15 71/9 76/3 96/6
99/12 114/5
**keeping [1]** 62/12
**KEITH [1]** 1/10
**KELLOGG [2]** 1/6 1/7
**Kelly [24]** 1/4 1/15 3/3 5/7
5/19 6/6 11/2 18/24 31/23
45/4 48/9 67/6 71/8 71/8
78/24 79/13 92/15 107/17
111/6 111/21 112/8 113/21
115/5 117/25
**Kelly's [1]** 104/16
**kept [3]** 78/3 89/14 89/16
**key [2]** 112/15 117/2
**keys [1]** 62/2
**kidding [1]** 42/2
**killing [1]** 82/15
**kind [10]** 12/14 19/19 20/16
39/15 40/5 59/22 71/11 85/14
106/20 116/4
**kinds [2]** 7/11 60/23
**kit [29]** 33/3 33/5 33/10 34/7
36/1 37/20 63/24 64/18 65/16
65/17 84/6 84/16 87/11 87/19
88/8 88/9 88/15 88/20 89/6
89/14 90/1 90/6 90/11 90/12
91/17 91/23 92/1 94/18 106/6
**knew [10]** 44/12 44/12 45/1
45/1 53/7 56/19 56/19 86/12
86/13 86/14
**know [101]** 4/7 5/4 5/5 7/10
7/13 8/7 9/5 9/22 12/14 13/6
13/6 15/12 18/17 24/24 26/7
27/6 28/3 28/5 28/9 28/22
35/10 36/4 37/15 41/2 41/12
43/21 43/24 43/25 44/6 49/13
50/17 51/6 51/13 53/5 53/8
53/15 54/2 54/5 54/13 55/4
55/6 57/10 58/2 58/11 59/21
60/21 61/1 62/24 62/24 65/12
72/19 73/6 76/15 77/1 77/3
77/12 77/14 77/16 78/5 80/5
80/7 80/11 80/13 80/14 80/18
81/5 81/16 81/25 83/19 85/18

90/11 90/25 91/1 92/9 92/9
92/18 93/14 95/5 95/6 95/17
95/19 96/13 97/6 97/9 98/10
98/15 99/11 103/11 104/7
107/2 110/1 111/24 112/2
113/19 113/21 116/3
**knowing [1]** 56/9
**knowingly [1]** 111/22
**knowledge [9]** 32/11 39/4 39/6
39/8 39/10 47/25 50/20 50/20
56/25
**known [6]** 43/11 43/19 47/11
47/12 53/19 57/16
**knows [5]** 90/8 104/3 112/4
115/18 115/20
**Kristen [2]** 110/5 110/20

**L**

**lab [1]** 24/17
**laboriously [2]** 14/12 14/14
**lacerations [4]** 105/12 105/18
105/22 105/24
**lack [1]** 82/9
**Lannie [1]** 1/14
**largely [2]** 20/21 40/24
**laser [5]** 29/10 59/6 59/11
59/15 81/13
**last [13]** 25/24 58/23 58/25
78/3 84/14 84/15 85/8 89/5
101/3 104/23 104/24 105/13
105/14
**late [6]** 40/5 60/21 65/15
81/13 99/18 99/21
**later [4]** 53/18 74/3 84/11
89/21
**law [9]** 1/15 1/18 1/21 9/7
35/11 38/13 51/22 64/25
67/13
**lawsuit [5]** 26/15 39/17 46/20
46/20 54/16
**lawsuits [2]** 42/9 46/16
**lawyer [1]** 117/17
**lay [3]** 18/9 40/25 42/15
**laying [2]** 15/24 29/5
**laypeople [1]** 36/19
**layperson [1]** 44/9
**lead [1]** 65/7
**Leamon [1]** 57/11
**leaning [1]** 55/21
**learn [2]** 84/13 84/15
**learned [1]** 77/10
**learns [2]** 98/1 98/5
**least [14]** 4/13 25/17 27/20
28/3 31/6 55/23 71/15 80/18
86/14 89/7 96/10 99/4 107/21
119/10
**leave [4]** 8/4 28/17 51/16
59/23
**leaves [2]** 105/6 105/17
**leaving [2]** 71/1 109/22
**ledger [1]** 57/6
**left [7]** 26/24 54/15 54/21
58/23 105/13 105/23 106/22
**legal [1]** 52/13
**Legally [1]** 72/20
**LEIGH [9]** 1/3 3/3 3/4 3/8
43/5 63/23 66/11 71/4 84/1
**length [1]** 4/2
**less [1]** 54/2
**let [14]** 4/7 18/24 22/24 41/4
48/7 52/23 63/14 67/6 76/22

**let...** [5]  89/20 94/20 96/7 101/2 115/5
**let's** [5]  3/20 8/18 26/21 51/16 51/25
**level** [1]  67/23
**liability** [2]  52/14 72/25
**liable** [3]  52/17 52/17 56/17
**liar** [2]  15/13 18/12
**Liberty** [1]  77/7
**lie** [3]  10/16 12/19 17/2
**lied** [3]  17/7 81/1 83/8
**lies** [5]  68/20 68/20 78/9 78/14 82/18
**life** [4]  66/7 70/7 87/14 115/11
**light** [3]  17/4 18/15 89/5
**like** [32]  3/19 6/3 6/12 7/13 7/19 17/1 32/14 38/10 39/24 46/16 46/19 48/23 49/22 55/7 56/17 74/9 76/14 78/5 82/9 85/4 85/19 87/18 100/9 100/17 101/24 102/5 107/7 108/4 109/14 109/25 110/3 112/24
**likely** [3]  32/6 39/16 85/16
**Likewise** [1]  61/22
**limit** [3]  27/13 28/8 32/18
**limited** [5]  15/18 31/4 40/16 87/25 102/7
**line** [15]  59/14 101/8 101/8 102/14 102/19 105/1 105/2 106/5 106/22 107/1 107/8 108/20 110/18 117/13 118/12
**lines** [7]  30/17 77/13 102/16 103/14 106/4 106/17 114/5
**list** [8]  4/21 5/13 5/15 8/14 39/2 47/18 49/5 101/7
**listed** [3]  39/2 39/3 39/5
**listen** [2]  64/9 98/15
**lists** [1]  43/23
**litigated** [1]  52/15
**litigating** [3]  52/10 52/10 52/11
**little** [9]  8/1 12/7 13/12 17/20 26/21 28/11 36/9 83/18 94/10
**live** [3]  41/3 41/7 41/9
**LLP** [1]  2/9
**loaded** [1]  21/1
**locked** [9]  46/1 46/1 46/4 50/6 50/10 50/11 54/14 54/18 55/17
**locker** [3]  89/23 90/1 90/2
**Loewe** [3]  104/19 118/25 119/3
**long** [7]  3/22 4/4 4/9 16/25 17/3 19/1 118/15
**longer** [2]  4/14 72/11
**look** [16]  10/20 10/22 11/3 11/4 12/9 14/7 32/14 41/14 46/12 65/2 91/3 91/9 96/11 104/17 108/18 111/19
**looked** [11]  12/20 12/21 19/10 22/8 22/12 28/11 28/16 95/19 97/5 112/16 113/16
**looking** [7]  15/11 17/12 18/23 20/4 96/7 106/20 117/16
**looks** [2]  39/24 109/14
**Lopez** [1]  74/11
**Lord** [3]  4/24 5/1 5/12
**lose** [1]  47/8

**Jones** [1]  84/1
**lost** [2]  85/9 89/13
**lot** [18]  13/9 15/2 21/6 21/11 21/12 23/4 23/18 42/8 57/5 62/21 85/24 95/13 96/11 97/11 101/11 102/13 110/2 112/10
**lots** [2]  43/15 97/4
**lying** [9]  18/18 20/18 20/19 20/19 20/19 21/1 22/18 68/23 91/16
**Lynn** [7]  88/11 89/12 89/16 89/17 91/17 91/23 92/9

**M**

**ma'am** [2]  9/4 119/6
**Macedonia** [1]  47/24
**made** [30]  5/7 10/17 13/3 37/12 48/9 52/2 60/19 60/20 67/8 67/13 68/6 72/14 81/17 84/5 84/12 85/7 89/18 91/5 91/11 92/14 93/8 94/9 94/11 94/17 94/18 94/24 115/9 115/9 117/7 117/19
**mail** [5]  7/22 45/19 45/22 69/17 116/20
**mails** [4]  77/22 77/24 78/16 79/6
**Main** [1]  2/5
**maintenance** [1]  45/23
**make** [34]  7/18 8/10 11/25 13/16 18/4 22/1 22/24 24/11 29/3 29/20 36/12 36/17 37/5 44/14 45/24 56/16 63/1 69/1 69/1 73/1 83/17 83/18 87/18 88/21 89/9 93/4 101/11 108/11 110/9 110/10 111/14 115/14 116/4 116/11
**makes** [6]  16/6 42/4 58/6 102/3 114/24 115/24
**making** [10]  13/11 13/14 24/10 46/3 65/7 68/22 71/14 88/4 89/11 94/25
**malevolent** [1]  89/2
**malingering** [6]  13/20 16/12 16/18 19/13 19/21 24/2
**man** [5]  46/6 69/4 71/25 76/2 87/7
**man's** [1]  70/4
**manager** [3]  4/17 4/25 5/6
**manuals** [1]  48/21
**many** [8]  29/19 39/7 54/7 58/22 58/23 82/23 98/18 100/25
**Marie** [1]  1/21
**marine** [1]  50/23
**marked** [2]  68/5 103/19
**marshal** [1]  51/13
**matches** [1]  88/14
**material** [1]  39/16
**matter** [4]  38/13 51/21 60/9 100/23
**matters** [1]  107/14
**Matthew** [1]  85/14
**may** [49]  4/4 4/10 7/22 8/9 17/9 21/20 22/2 22/25 24/21 25/1 25/22 27/4 28/19 30/9 30/10 30/16 30/16 31/22 32/15 34/24 35/2 40/5 57/5 58/3 58/8 58/8 59/6 60/7 77/11 77/17 78/2 79/6 79/6 81/13 83/3 84/22 85/8 85/14

**M-4** [1]  97/12
**99/19 101/18 105/11 110/3 113/5 119/8
**maybe** [8]  3/20 17/20 25/11 32/21 55/8 73/2 75/4 101/16
**Mayo** [1]  57/11
**McKinney** [15]  2/8 2/9 3/16 18/24 52/23 53/15 58/6 62/20 67/15 83/23 87/9 107/17 107/18 108/22 109/3
**McKinney's** [2]  78/18 107/20
**me** [60]  11/12 15/15 17/16 19/13 31/6 32/16 33/21 33/25 36/14 38/19 39/24 40/20 40/21 41/4 41/13 42/23 45/4 46/8 46/9 46/11 48/7 49/22 52/1 62/21 63/12 63/14 64/4 64/13 67/6 75/7 75/20 76/9 76/22 77/4 77/15 79/20 80/20 86/3 86/6 88/12 88/24 89/20 90/13 91/10 92/15 97/6 99/6 108/8 109/4 109/16 111/14 111/15 112/11 113/2 114/22 115/4 115/16 115/22 116/2 118/5
**me-first** [1]  46/11
**me-too** [5]  38/19 40/20 40/21 46/8 46/9
**mean** [55]  6/1 13/23 16/1 16/18 18/19 20/20 21/17 25/6 28/21 39/14 41/19 43/23 48/25 49/2 50/3 50/7 50/7 52/18 53/14 53/20 54/5 55/1 55/7 58/3 58/9 58/11 59/20 60/21 62/21 62/24 63/13 71/13 72/13 72/24 75/1 75/20 75/21 75/25 76/2 76/4 78/5 78/23 79/6 88/24 89/2 95/18 96/1 97/3 99/5 99/6 112/22 114/11 116/3 117/18 119/9
**means** [2]  16/19 30/6
**meant** [2]  75/22 83/4
**mechanical** [1]  1/24
**mediation** [1]  42/12
**medical** [23]  13/10 13/14 14/4 14/15 16/20 19/10 19/15 19/19 22/13 22/14 22/14 24/15 28/22 28/24 28/25 29/4 29/25 30/12 30/22 60/21 67/11 69/12 74/16
**medications** [1]  31/8
**meet** [2]  84/25 85/22
**meeting** [1]  45/10
**Meisner** [1]  26/21
**Meisner's** [1]  27/14
**members** [1]  6/10
**memory** [1]  28/10
**men** [4]  73/20 76/13 76/21 95/1
**mental** [3]  19/3 21/19 21/21
**met** [1]  13/18
**metal** [1]  55/17
**metric** [1]  93/16
**middle** [2]  7/16 54/4
**Middle-Eastern** [1]  54/4
**might** [15]  5/9 7/15 10/10 10/22 20/12 27/1 32/14 50/15 57/22 60/16 66/2 72/24 72/25 96/1 104/15
**million** [1]  54/2
**mind** [2]  72/6 86/15
**mindful** [2]  21/9 21/11

**M**

**minds [3]**  13/4 13/6 69/7
**mine [1]**  113/6
**mini [1]**  73/16
**miniature [1]**  55/24
**minimum [1]**  3/25
**minuscule [1]**  68/1
**minute [2]**  92/3 115/2
**miscarriage [1]**  71/6
**mischaracterization [2]**  114/13
 114/17
**mischaracterizing [1]**  30/14
**miscommunication [1]**  116/23
**misconduct [4]**  52/20 53/6
 53/12 53/18
**misdeeds [1]**  46/6
**misinterpret [1]**  110/13
**mislead [1]**  70/2
**misleading [1]**  119/10
**misrepresentation [1]**  111/4
**misrepresented [4]**  28/24
 30/12 111/22 115/8
**misrepresenting [2]**  30/15
 73/20
**misses [1]**  31/23
**missing [4]**  88/9 88/21 88/23
 89/23
**mistake [2]**  74/7 112/5
**mistaken [2]**  69/25 111/6
**mistakes [1]**  115/9
**misused [1]**  84/7
**Mitchell [1]**  32/25
**Mitchell's [3]**  32/19 37/9
 91/7
**model [1]**  20/16
**modifying [1]**  86/3
**moment [3]**  66/9 90/24 91/15
**money [2]**  68/22 82/1
**moniker [1]**  15/6
**month [4]**  29/12 37/12 42/12
 79/11
**months [4]**  32/2 32/5 34/13
 59/7
**Morale [1]**  45/21
**morality [1]**  70/18
**more [30]**  4/13 6/11 6/23
 15/10 19/19 21/14 21/15 23/5
 36/9 36/14 37/12 38/4 39/16
 42/5 42/17 42/21 44/2 52/23
 54/8 61/15 78/4 81/17 81/18
 83/18 85/2 93/12 101/23
 103/16 106/16 119/3
**morning [5]**  9/3 18/13 58/13
 87/12 93/19
**Morris [4]**  1/21 1/21 3/7
 88/10
**most [10]**  3/20 6/15 27/25
 39/12 44/11 82/21 83/16
 87/16 95/3 107/23
**mother [11]**  20/1 20/5 64/2
 64/8 65/6 65/18 66/2 66/7
 66/9 67/19 67/20
**mother's [2]**  64/7 64/10
**motion [12]**  6/9 7/1 8/19
 27/13 27/17 27/19 27/23
 32/18 36/16 37/6 40/2 40/16
**motive [1]**  74/6
**move [2]**  40/6 119/12
**Mr [5]**  41/4 63/22 81/2
 107/17 115/5
**Mr. [72]**  5/7 5/10 5/19 5/21

31/23 38/2 43/2 43/3 45/4
45/11 45/13 47/11 47/22 48/9
51/9 52/17 52/19 52/23 53/15
58/6 62/20 67/6 67/15 71/8
71/8 71/10 71/14 72/9 72/10
72/12 72/15 74/3 74/23 76/3
76/13 76/17 77/2 77/4 78/18
78/24 79/4 79/13 81/5 83/11
83/23 87/9 92/15 93/20
104/16 107/17 107/17 107/18
107/20 108/22 109/3 111/3
111/6 111/20 111/21 112/8
113/18 113/21 115/6 117/6
117/21 117/25 118/6
**Mr. Bortz [7]**  38/2 43/2 43/3
 52/17 76/3 83/11 93/20
**Mr. Bortz's [1]**  52/19
**Mr. Estefan [1]**  47/11
**Mr. Goodgine [2]**  5/10 5/21
**Mr. Hall [2]**  45/11 45/13
**Mr. Hedges [8]**  17/18 47/22
 111/3 111/20 113/18 115/6
 117/6 117/21
**Mr. Hedges' [1]**  118/6
**Mr. Iler [14]**  71/10 71/14
 72/9 72/10 72/12 72/15 74/3
 74/23 76/13 76/17 77/2 77/4
 79/4 81/5
**Mr. Kelly [20]**  5/7 5/19 6/6
 11/2 18/24 31/23 45/4 48/9
 67/6 71/8 71/8 78/24 79/13
 92/15 107/17 111/6 111/21
 112/8 113/21 117/25
**Mr. Kelly's [1]**  104/16
**Mr. McKinney [12]**  18/24 52/23
 53/15 58/6 62/20 67/15 83/23
 87/9 107/17 107/18 108/22
 109/3
**Mr. McKinney's [2]**  78/18
 107/20
**Mr. Weatherford [1]**  51/9
**Mrs. [2]**  63/23 118/25
**Mrs. Jones [1]**  63/23
**Mrs. Loewe [1]**  118/25
**Ms [6]**  35/16 66/11 66/15
 101/2 101/5 105/2
**Ms. [79]**  3/6 11/16 13/22
 14/16 14/20 16/2 16/6 16/17
 17/3 19/23 21/7 22/8 24/19
 28/5 30/11 32/1 32/25 34/4
 37/9 38/22 41/11 46/2 46/13
 50/21 51/16 52/12 56/11
 56/14 58/18 61/2 61/10 61/12
 61/16 63/25 64/6 64/16 64/24
 65/8 66/16 66/24 67/9 67/13
 67/19 67/20 68/10 69/21
 69/23 70/11 72/17 74/16 77/3
 77/21 77/25 79/5 80/3 82/25
 87/11 88/10 88/13 89/4 90/17
 92/9 95/9 95/14 100/20
 104/19 110/21 111/5 111/24
 111/24 111/25 112/2 112/14
 113/18 117/2 117/11 117/22
 118/7 119/3
**MS. CULLEN [3]**  111/5 113/18
 117/22
**Ms. Cullen's [1]**  118/7
**Ms. Falanga [2]**  88/13 92/9
**Ms. Jones [46]**  3/6 14/16 16/2
 16/17 17/3 19/23 21/7 22/8
 28/5 30/11 32/1 38/22 46/2

31/23 38/2 43/2 43/3 45/4
61/16 63/25 64/6 64/16 64/24
65/8 66/16 66/24 67/9 67/13
67/19 67/20 68/10 69/21
69/23 70/11 72/17 74/16 77/3
77/21 77/25 79/5 80/3 82/25
87/11 88/10 88/13 89/4 90/17
92/9 95/9 95/14 100/20
104/19 110/21 111/5 111/24
111/24 111/25 112/2 112/14
113/18 117/2 117/11 117/22
118/7 119/3
**Ms. Jones' [7]**  14/20 24/19
 46/13 50/21 51/16 87/11
 112/14
**Ms. Katz [1]**  41/11
**Ms. Loewe [2]**  104/19 119/3
**Ms. Mitchell [1]**  32/25
**Ms. Mitchell's [1]**  37/9
**Ms. Morris [1]**  88/10
**Ms. Rumba [3]**  111/24 112/2
 117/2
**Ms. Rumba's [2]**  110/21 111/24
**Ms. Vorpahl [9]**  11/16 13/22
 16/6 34/4 56/14 58/18 77/21
 90/17 100/20
**much [19]**  4/14 6/11 8/21
 23/12 40/4 48/18 56/23 58/20
 63/24 65/1 86/15 92/21 92/23
 94/23 95/18 103/11 107/21
 107/21 120/3
**muddy [2]**  83/4 93/1
**mug [1]**  97/17
**multinational [1]**  56/4
**multiple [3]**  62/5 62/11 69/10
**muscle [2]**  25/13 29/23
**muscles [2]**  29/24 112/25
**muscular [1]**  107/14
**mute [1]**  78/23
**my [45]**  4/8 4/17 4/25 11/24
 16/4 16/6 21/10 23/10 27/19
 32/11 34/5 36/10 37/23 48/10
 58/21 61/19 62/7 64/13 73/9
 76/9 80/1 80/7 80/11 81/22
 86/5 88/9 92/13 96/4 96/18
 97/16 98/9 98/11 98/15 98/17
 98/20 99/1 101/17 101/20
 109/2 110/10 111/14 112/7
 114/16 115/10 115/11
**myriad [1]**  61/5
**myself [2]**  84/11 105/11

**N**

**name [1]**  51/1
**named [2]**  47/17 77/24
**national [1]**  33/2
**nature [7]**  26/12 26/13 66/3
 72/23 73/20 107/15 117/10
**necessarily [3]**  22/9 109/20
 111/15
**necessary [4]**  6/8 27/8 36/5
 108/7
**need [21]**  4/7 4/13 4/19 5/9
 18/11 21/10 39/19 41/20 44/5
 45/16 45/23 47/2 54/8 61/6
 62/20 78/4 90/15 90/15 98/8
 106/14 116/2
**needed [1]**  72/1
**needs [7]**  22/1 37/2 39/18
 45/8 45/14 61/16 67/9
**negative [1]**  98/13
**negligent [3]**  3/21 49/1
**Nelson [1]**  69/25
**nervous [1]**  7/12
**never [21]**  13/17 21/13 21/13
 22/11 22/11 47/17 48/1 48/2
 48/4 65/8 67/14 75/9 75/11

never... **[8]**  88/15 88/16
88/16 89/14 96/20 98/14
110/24 116/24
news **[2]**  96/25 98/15
newspaper **[1]**  96/25
next **[9]**  29/7 42/12 59/13
87/12 91/2 106/22 107/3
107/8 113/3
nice **[1]**  16/19
Nichols **[2]**  23/24 24/12
night **[1]**  78/3
no **[93]**  5/17 7/2 9/13 12/12
12/14 14/19 15/2 19/8 21/18
23/11 29/23 33/20 36/11
38/12 39/19 44/6 44/8 44/17
46/23 47/16 47/18 48/4 48/5
49/11 50/24 51/23 52/4 53/2
53/4 62/18 65/10 66/1 66/1
66/18 67/17 67/21 68/18
70/18 72/13 72/22 72/22
72/22 74/8 74/14 74/15 74/21
74/24 75/13 78/22 79/13 85/6
85/6 86/17 89/15 89/16 91/16
91/19 95/8 95/9 95/21 96/3
96/3 96/3 96/3 96/3 98/23
99/16 100/1 102/1 102/1
102/19 103/23 104/2 105/10
105/18 105/22 105/23 105/25
105/25 106/14 106/14 106/25
106/25 109/20 113/3 113/3
114/14 114/17 114/24 115/24
116/9 116/16 118/21
nobody **[2]**  4/22 49/1
non **[26]**  4/10 4/15 19/21
21/14 30/19 33/9 33/13 33/14
33/19 33/23 36/21 44/25 45/3
71/12 71/15 71/21 73/2 73/2
73/3 73/11 74/4 75/1 75/4
75/6 75/23 76/6
non consensual **[4]**  33/13 73/2
75/4 76/6
non-consecutive **[2]**  4/10 4/15
non-consensual **[8]**  21/14 33/9
33/14 33/19 36/21 71/12
71/15 75/23
non-enforcement **[2]**  44/25
45/3
non-existence **[1]**  19/21
none **[4]**  19/11 42/4 43/4
65/21
nonsensical **[2]**  30/24 31/1
nor **[1]**  4/9
normal **[4]**  6/19 30/5 87/5
115/11
normally **[3]**  5/24 78/12 109/9
Norman **[1]**  77/25
nose **[1]**  5/8
not **[267]**
note **[5]**  64/1 64/17 74/17
74/18 74/19
nothing **[5]**  19/14 26/24 34/16
67/22 67/22
notice **[6]**  47/5 47/5 47/14
104/24 105/12 114/2
November **[1]**  78/16
now **[29]**  5/13 5/23 8/18 9/14
12/23 14/13 24/25 27/20 31/6
32/7 37/23 38/1 38/15 60/2
62/19 63/12 64/9 66/24 69/9
69/16 70/1 70/4 79/13 84/7

116/13
number **[11]**  3/19 6/21 22/8
30/1 30/5 30/5 39/5 39/23
44/20 44/20 57/18
Number 1 **[2]**  44/20 44/20
numerous **[3]**  16/23 59/22
117/12
nurse **[11]**  34/6 35/7 35/18
37/19 63/20 63/23 64/19
66/17 66/19 67/17 68/11
nurse's **[1]**  64/17
nurses **[1]**  35/25

# O

oath **[4]**  17/3 61/17 81/22
82/3
OB **[5]**  25/2 25/18 28/7 31/14
32/17
OB-GYN **[4]**  25/2 25/18 28/7
31/14
OB-GYNs **[1]**  32/17
obey **[1]**  96/16
object **[4]**  34/13 70/22 102/24
105/8
objected **[2]**  116/18 117/15
objecting **[3]**  114/6 114/7
114/8
objection **[18]**  15/21 25/12
43/15 107/16 108/24 109/14
111/3 113/18 114/4 114/9
116/21 116/25 117/6 117/10
117/21 117/22 118/7 118/7
objectionable **[1]**  6/5
objections **[6]**  43/16 57/23
101/7 101/11 109/17 118/9
objective **[4]**  19/9 19/14
19/21 69/22
objectively **[1]**  19/7
obligated **[1]**  98/6
obligation **[1]**  38/22
obligations **[1]**  99/23
obstetrical **[1]**  28/6
obstetrician **[1]**  30/4
obstetrician-gynecologist **[1]**
30/4
obtained **[1]**  92/6
obvious **[1]**  85/24
obviously **[5]**  8/22 23/3 29/19
30/2 80/10
occasion **[2]**  94/13 94/14
occasions **[4]**  6/21 59/22 62/9
117/12
occur **[4]**  12/5 17/15 39/7
112/11
occurred **[3]**  26/11 34/12 87/7
off **[18]**  4/20 6/4 6/16 7/21
33/15 57/2 83/19 95/4 96/13
101/17 108/8 110/25 111/2
111/8 112/21 113/4 113/11
119/12
offer **[14]**  10/15 27/9 27/11
30/22 33/25 68/6 76/8 76/11
76/24 77/2 77/14 77/19 77/20
102/25
offered **[7]**  31/9 63/8 64/17
64/18 66/11 66/12 119/24
offering **[3]**  24/15 35/7 109/2
offers **[1]**  104/10
office **[3]**  1/21 50/2 74/19
offices **[1]**  60/23
OFFICIAL **[2]**  2/12 120/12

oh **[6]**  5/2 46/2 89/20 105/19
113/5 117/13
okay **[76]**  4/7 4/16 4/22 5/16
5/23 7/22 8/12 11/2 22/2
25/14 26/21 27/9 27/17 27/21
32/7 32/18 34/3 35/6 35/9
35/12 35/15 36/6 38/1 38/15
40/12 40/21 42/13 42/18 43/1
43/17 44/16 50/25 54/12 56/8
57/13 58/2 58/14 58/15 58/16
61/4 61/7 67/2 67/6 71/7
77/21 80/9 85/11 87/9 100/22
101/20 102/6 105/4 105/5
105/6 105/7 105/12 106/5
106/16 107/1 108/17 109/15
109/22 110/4 110/19 110/23
110/24 112/18 113/7 113/10
115/2 116/2 117/1 118/13
118/14 120/1 120/3
old **[6]**  29/12 63/19 66/2
69/2 71/25 71/25
older **[1]**  76/2
Olsen **[1]**  1/15
omission **[1]**  107/16
omitted **[2]**  104/25 107/3
on **[188]**
once **[6]**  4/9 20/20 68/14
96/19 101/21 102/21
one **[98]**  1/16 1/19 5/3 7/20
11/16 12/9 13/11 13/21 14/23
14/24 16/8 17/5 17/8 33/2
35/5 36/14 39/19 41/5 41/8
42/10 43/16 44/1 44/4 44/4
45/9 45/19 46/11 50/6 50/18
50/18 50/19 50/22 51/1 51/8
51/10 54/10 55/1 55/8 55/8
56/3 56/15 56/17 56/20 56/25
57/23 58/15 58/15 59/4 61/18
62/1 62/2 62/16 63/25 64/4
68/5 68/25 70/12 71/1 73/14
75/8 77/4 77/4 79/21 80/11
80/24 81/12 81/14 81/18
81/22 86/13 86/21 87/7 87/8
88/13 91/16 94/13 97/15
97/15 99/25 100/17 100/18
100/20 101/18 101/18 101/19
102/2 103/12 104/11 104/15
106/16 109/25 110/2 112/6
116/17 116/18 116/21 118/11
119/5
one-sided **[1]**  97/15
ones **[2]**  68/5 98/10
only **[32]**  5/18 9/3 10/17
10/20 11/18 11/23 17/9 20/3
41/5 46/13 46/18 47/25 52/3
52/5 54/21 67/18 69/23 72/7
72/16 72/17 74/22 80/10 88/3
96/8 97/4 98/20 99/1 102/20
105/21 110/10 113/4 116/18
open **[5]**  6/11 81/7 87/24
94/23 98/18
opened **[2]**  59/22 81/10
opening **[1]**  26/8
operations **[1]**  11/13
opine **[6]**  9/7 9/19 9/24 30/14
34/11 34/25
opined **[2]**  9/22 11/6
opines **[5]**  11/8 11/9 11/11
28/3 31/5
opinion **[21]**  11/24 16/4 16/18
19/16 19/19 21/20 28/14

opinion... [14]   28/25 29/7
 30/11 32/3 33/8 37/10 37/20
 40/25 42/15 59/16 109/3
 109/5 111/14 117/9
opinion -- I [1]   16/18
opinions [10]   21/2 27/17 28/1
 28/12 28/13 28/20 30/8 30/22
 33/1 109/2
opportunity [2]   5/22 40/18
opposed [6]   6/18 6/18 6/25
 7/25 26/19 106/23
options [4]   63/22 64/2 99/6
 99/9
or [162]
orally [1]   4/17
order [7]   14/8 40/15 44/19
 44/20 57/2 63/15 98/6
ordered [1]   97/24
organ [1]   73/7
origin [1]   92/16
original [4]   47/13 73/1 73/3
 97/5
other [52]   4/12 6/19 9/6 10/6
 13/9 14/3 14/15 14/17 19/10
 19/11 19/16 21/7 22/9 26/1
 26/5 32/10 35/24 42/8 43/16
 48/1 51/9 53/16 57/6 57/10
 58/23 61/9 62/1 69/13 69/20
 76/13 76/21 79/9 80/3 83/4
 85/1 93/16 95/9 95/14 97/23
 98/1 99/5 99/11 99/23 100/14
 102/3 102/8 107/9 107/12
 110/2 113/4 116/11 116/19
others [6]   16/2 46/4 55/14
 62/8 86/14 87/15
otherwise [4]   23/8 49/1 80/12
 109/10
ought [8]   7/13 26/10 26/12
 30/8 59/9 60/13 80/18 107/19
our [35]   4/3 4/20 5/3 5/15
 6/9 6/14 7/12 9/1 9/2 13/1
 15/21 27/25 30/7 33/16 38/11
 44/14 46/24 47/19 56/2 56/24
 56/24 57/1 57/19 76/7 76/10
 84/25 85/15 85/23 99/4
 102/25 103/3 103/15 109/9
 113/6 114/4
ourselves [1]   80/24
out [51]   9/1 15/2 15/24 18/7
 18/9 20/6 20/7 21/14 23/24
 24/21 25/1 35/17 37/22 38/10
 45/7 45/22 52/16 55/8 56/14
 67/8 71/9 71/20 76/4 77/7
 77/10 82/12 86/1 87/8 87/22
 89/9 89/10 89/11 92/7 93/4
 104/9 105/6 105/13 105/17
 105/23 106/4 106/22 109/11
 109/22 110/14 111/14 115/13
 115/15 118/8 118/14 118/21
 118/23
out-of-the-way [1]   45/22
out-of-town [1]   71/20
outlandish [1]   87/16
outside [3]   24/16 70/25 92/10
outweigh [2]   67/24 68/2
outweighs [1]   68/16
over [17]   4/14 14/16 23/18
 24/8 46/20 54/11 56/5 56/5
 83/9 84/10 84/17 90/24 91/14
 91/21 92/6 97/18 99/22

overlap [1]   103/10
overrides [1]   109/23
overt [1]   53/6
own [17]   13/3 16/24 16/25
 17/1 28/13 44/25 60/22 60/24
 62/6 66/2 68/12 69/12 71/5
 71/5 87/23 94/3 96/18

P

p.m [5]   1/5 39/20 39/20
 100/24 100/24
page [25]   7/18 27/20 59/13
 101/7 101/8 102/14 102/16
 102/19 103/14 105/1 105/2
 106/5 106/17 107/8 107/22
 107/23 108/1 108/15 108/25
 110/6 110/19 113/6 116/16
 117/16 118/12
Page 26 [1]   105/2
Page 42 [2]   110/6 110/19
Page 43 [1]   117/16
Page 58 [2]   106/17 107/23
pages [3]   12/21 60/4 108/18
Pages 58 [1]   108/18
pain [1]   97/23
painful [1]   59/17
panel [2]   6/2 7/5
paper [3]   6/12 58/20 89/19
papers [3]   8/20 8/21 9/1
Papilloma [1]   81/15
paramount [1]   23/25
parcel [2]   14/1 32/16
parsing [1]   56/14
part [25]   14/1 20/2 20/12
 25/2 29/18 31/6 32/3 32/16
 51/22 53/6 57/13 68/5 94/11
 101/24 101/24 103/21 103/22
 104/20 108/12 110/17 111/12
 112/12 114/21 119/22 119/25
partially [1]   87/17
particular [4]   16/17 28/3
 66/15 116/16
particularly [2]   7/3 18/2
parties [3]   5/24 92/5 101/6
parties' [2]   102/16 102/21
partner [3]   72/19 72/23
 115/10
partners [4]   60/15 92/21 93/1
 95/10
parts [5]   53/16 84/16 89/24
 103/23 114/2
party [1]   19/8
party-chosen [1]   19/8
passed [2]   63/24 114/1
past [1]   73/17
patent [1]   61/20
patient [6]   13/20 18/3 18/4
 64/20 68/9 82/17
patient's [2]   110/25 110/25
pattern [6]   52/19 53/7 55/16
 74/6 87/13 112/4
pauses [2]   118/14 118/21
PC [1]   1/15
pectoral [3]   25/13 29/23
 29/24
pending [2]   42/9 42/12
penetration [5]   106/21 107/9
 107/13 116/14 118/4
penetrative [1]   106/24
Pennsylvania [1]   1/22
people [29]   8/8 13/9 17/11

43/4 43/24 44/7 45/9 45/24
 46/5 48/1 49/23 55/6 55/16
 60/12 69/8 80/3 82/23 83/7
 85/10 88/3 97/19 99/12
 101/10 106/6
people's [1]   50/3
perfect [3]   8/5 8/9 100/1
perfection [1]   100/3
perfectly [2]   27/7 40/2
perform [1]   35/25
performed [3]   31/16 89/14
 90/8
perhaps [6]   4/12 20/22 20/22
 20/25 50/14 56/18
perineal [1]   106/18
perineum [2]   105/15 105/19
period [8]   4/8 4/14 39/12
 40/16 77/24 95/10 99/2
 115/21
perjure [1]   82/1
perjury [2]   61/20 81/25
permissible [1]   24/5
permits [1]   20/9
permitted [3]   41/17 59/9
 78/13
permitting [1]   62/2
person [27]   4/18 4/18 9/20
 14/2 14/6 17/9 18/8 18/9
 19/11 19/12 19/14 19/25
 34/24 45/7 50/6 55/2 55/4
 74/18 79/9 79/21 79/24 86/13
 89/5 94/13 94/14 106/10
 111/14
person's [1]   93/12
personal [5]   7/6 19/3 39/8
 39/10 100/23
personality [1]   19/20
personally [1]   112/16
perspective [1]   103/15
persuade [1]   32/16
persuaded [1]   32/17
phone [1]   74/18
photographs [9]   90/6 90/10
 90/11 90/19 90/22 90/23
 91/14 91/14 92/3
photos [1]   90/6
physical [3]   13/21 62/11
 64/17
physician [3]   19/8 19/8 65/20
physicians [4]   17/1 17/8
 60/20 62/16
picture [6]   20/11 20/12 20/13
 42/20 71/5 97/18
pictures [5]   90/1 90/3 91/1
 91/19 91/20
piece [3]   9/16 80/11 89/18
pieced [1]   15/23
pieces [4]   16/5 20/10 20/11
 103/17
pile [1]   56/3
pills [1]   5/8
place [2]   40/24 116/7
plainly [1]   70/4
plaintiff [18]   1/3 9/8 19/3
 28/24 38/3 48/19 54/13 54/17
 55/11 59/6 59/17 60/7 60/11
 60/18 83/16 102/23 119/23
 119/24
plaintiff's [5]   29/7 29/25
 53/16 60/5 60/14
plaintiffs [8]   1/13 26/9

**P**

plaintiffs... [6]  38/21 50/5
62/14 101/14 103/11 114/3
plaintiffs' [20]  3/25 8/19
21/10 21/15 24/7 27/13 32/18
40/6 40/17 43/14 54/24 59/9
59/13 59/25 60/6 101/12
103/9 112/11 119/8 119/25
plan [4]  27/11 70/2 77/14
81/24
planning [1]  27/9
plastic [7]  25/6 31/12 32/15
112/22 113/15 113/19 114/12
play [7]  10/15 18/21 33/21
51/23 103/9 104/10 119/8
played [5]  102/4 102/6 102/16
103/17 119/23
players [1]  14/17
playing [1]  108/2
pleading [1]  38/11
pleadings [1]  114/22
pleasant [1]  82/2
please [6]  3/2 37/8 39/21
104/19 105/1 115/1
pled [1]  56/22
plenty [1]  95/17
PLLC [1]  1/21
point [33]  11/19 13/5 13/8
16/6 16/13 21/5 21/18 24/21
25/1 31/23 31/23 32/12 34/4
34/5 35/17 36/17 40/23 52/6
52/20 52/21 52/22 58/5 58/6
62/5 72/18 79/10 79/14 79/18
80/15 96/4 97/13 99/1 114/16
pointed [1]  67/8
policies [12]  44/3 44/3 44/5
44/25 48/19 49/2 49/6 49/6
56/6 56/7 56/10 56/10
policy [12]  7/12 21/25 44/7
44/19 46/5 48/20 48/25 49/1
54/3 54/4 54/4 56/8
Porter [1]  2/5
portion [1]  32/3
portions [3]  108/11 114/2
119/9
portrait [1]  69/24
position [4]  6/7 30/7 45/20
85/4
possibility [3]  4/14 30/3
40/14
possible [8]  5/18 18/7 31/19
49/21 81/7 81/19 99/3 115/25
possibly [2]  53/23 81/2
post [3]  16/10 16/12 17/9
post-Iraq [1]  17/9
post-traumatic [2]  16/10
16/12
posted [1]  97/18
power [1]  10/4
practice [1]  106/11
practicing [2]  24/24 25/23
pre [1]  29/25
pre-Iraq [1]  29/25
precede [1]  109/17
preceded [1]  72/24
precisely [2]  10/3 34/5
predisposition [1]  70/16
Predominantly [1]  28/1
prefer [1]  84/25
prejudice [3]  68/16 70/17
99/4

emprejudicial [10]... [6]
42/17 43/3 48/16 51/15 67/25
68/2 93/7 96/9
preliminary [2]  112/20 114/7
premise [2]  83/19 86/24
preposterous [1]  71/16
presence [1]  55/8
present [9]  22/18 22/23 27/22
38/3 44/13 98/21 98/24
117/18 117/23
presentation [1]  43/14
presented [2]  32/1 33/10
presenting [1]  101/9
press [1]  62/23
PRETRIAL [1]  1/10
pretty [5]  8/21 27/1 38/19
97/18 98/12
prevents [1]  73/15
previewed [1]  69/19
previous [1]  63/8
previously [1]  63/6
prime [1]  66/25
prior [21]  24/11 37/12 50/11
56/16 57/8 59/8 60/20 60/24
61/24 62/9 62/17 63/3 68/18
70/13 82/9 82/13 82/14 92/20
93/1 93/25 110/13
private [1]  7/4
privately [1]  6/12
probability [1]  30/22
probable [1]  42/5
probably [7]  3/24 38/4 55/13
84/24 97/22 99/17 110/2
probative [3]  42/17 68/1 93/7
problem [12]  7/2 17/22 66/20
73/13 84/21 84/23 91/17
101/22 103/25 116/14 116/19
118/21
problems [2]  60/24 62/12
proceed [1]  58/17
proceedings [3]  1/24 120/4
120/7
produce [2]  53/5 89/1
produced [4]  1/24 77/22 79/17
90/10
produces [1]  106/18
professional [1]  82/25
proffer [2]  76/11 100/12
proffered [1]  59/25
program [1]  35/19
prolong [1]  57/19
promise [1]  35/5
promotes [2]  88/3 88/3
proof [3]  68/6 69/23 112/12
properly [3]  6/2 33/4 44/9
propose [1]  58/17
proposition [1]  95/8
protected [1]  93/21
protocol [1]  33/2
prove [5]  84/3 85/18 86/17
98/13 98/13
proveable [1]  32/10
provide [1]  91/6
provided [8]  8/4 9/23 9/25
28/4 49/5 91/4 91/25 92/5
provider [1]  67/11
providers [2]  64/22 69/14
provides [1]  35/21
province [4]  9/10 9/18 11/15
16/16
psychiatric [6]  10/16 13/21
17/5 24/2 26/13 26/17

PSYchiatric... [4]  10/3
10/4 13/25 16/4 16/16 18/1
18/1 18/2 18/6 18/20 20/3
20/9 24/23
psychiatrists [1]  17/25
psychiatry [2]  24/16 32/11
psychological [4]  26/13 26/14
26/19 31/10
PTSD [10]  10/17 10/24 11/24
12/4 12/10 14/2 15/14 15/19
16/18 17/14
publicly [3]  68/21 71/11 86/8
pull [1]  28/20
punished [1]  83/7
punitive [1]  56/20
punitives [1]  56/22
pup [1]  53/2
purported [1]  59/8
purpose [2]  70/2 111/13
push [2]  45/17 77/5
pushed [1]  45/21
put [17]  3/24 4/3 6/11 20/10
20/13 23/20 25/5 51/18 56/18
56/25 80/23 81/24 84/24
86/15 100/12 102/9 102/24
puts [1]  17/4
putting [2]  48/13 111/13
puzzle [1]  20/11

**Q**

qualifications [1]  37/19
qualified [17]  14/5 14/9 20/9
20/13 25/4 25/24 29/3 29/20
30/4 31/8 31/12 31/17 32/15
34/8 35/18 36/1 37/20
question [47]  6/7 6/20 10/17
12/11 12/13 15/3 19/17 26/24
27/6 53/11 55/24 61/22 61/23
66/5 66/6 66/9 69/18 77/17
82/13 83/1 87/10 101/24
103/12 103/22 103/24 104/2
104/8 105/11 106/15 107/17
108/7 108/14 108/23 109/2
109/5 109/5 109/12 109/18
110/12 110/16 110/23 113/13
113/21 113/24 114/10 117/18
118/12
questioned [2]  69/7 70/19
questionnaire [8]  5/23 6/1
6/7 6/18 6/19 6/22 7/17 7/24
questionnaires [1]  7/25
questions [18]  6/5 6/14 6/15
7/3 7/8 7/23 8/3 53/20 102/2
103/13 103/23 104/5 104/5
108/5 108/6 108/10 111/23
117/13
quick [3]  101/4 101/6 118/11
quickly [2]  4/13 58/5
quite [6]  15/15 17/7 65/1
87/8 101/9 117/7
quote [5]  45/22 47/16 68/9
69/14 117/19
quoting [1]  68/8

**R**

R-U-M-B-A [1]  110/21
raise [2]  7/7 54/17
raised [3]  21/3 66/9 87/10
raises [1]  59/20
raising [1]  47/2
random [1]  103/17
range [1]  92/10

ranging [1]   57/4
rape [58]   7/7 17/15 33/2 33/5
  33/10 34/7 34/19 35/25 37/20
  46/13 48/15 52/10 53/3 59/8
  63/3 63/5 63/6 63/9 63/10
  63/13 63/24 64/4 64/7 65/16
  65/17 68/25 68/25 69/7 69/15
  71/11 71/15 74/12 74/22
  75/10 84/6 84/16 85/7 86/8
  87/11 87/19 88/8 88/8 88/14
  88/20 89/6 89/14 90/1 90/6
  90/10 90/12 91/17 91/23 92/1
  93/4 94/17 94/19 106/6
  110/25
raped [18]   22/11 22/16 48/11
  48/13 49/8 51/4 51/12 52/8
  65/9 69/3 69/5 83/10 83/20
  84/19 84/23 85/5 86/16
  112/12
rapes [2]   35/22 46/14
raping [1]   42/23
rapist [1]   84/3
rather [3]   78/24 98/17 98/18
ratification [1]   56/16
read [4]   13/2 36/3 36/19
  39/21
reading [1]   13/15
ready [2]   32/12 40/3
real [2]   45/2 97/22
realized [1]   90/21
really [27]   8/1 11/19 11/19
  18/2 27/5 28/14 30/24 40/18
  42/18 42/22 71/16 71/21 72/3
  76/2 76/4 81/9 83/4 92/22
  96/14 96/19 96/20 101/10
  101/23 108/13 108/24 109/6
  111/12
reason [12]   6/1 24/6 75/16
  76/9 81/20 82/14 82/15 85/21
  86/4 89/7 93/2 114/21
reasonable [5]   8/8 13/4 13/6
  30/22 69/7
reasonably [1]   52/16
reasons [8]   6/9 37/22 56/24
  61/5 61/11 73/14 81/12 81/12
reassuring [1]   98/16
rebut [1]   5/22
rebuttal [7]   5/10 41/19 41/19
  43/18 47/17 47/19 47/20
recall [3]   12/21 24/3 40/14
recalled [1]   88/12
recantation [1]   63/7
recanting [1]   95/1
received [7]   19/16 90/3 90/5
  90/24 91/22 106/6 106/10
recent [4]   29/10 29/11 34/2
  59/11
recently [3]   84/14 85/12
  107/23
Recess [2]   39/20 100/24
recognize [2]   26/16 57/20
reconcile [1]   18/23
reconstruction [1]   114/14
record [21]   18/8 20/4 22/9
  22/9 25/16 63/19 65/14 65/14
  65/18 65/25 66/14 66/15
  66/22 66/23 66/23 67/5 68/4
  68/8 111/6 117/9 120/7
recorded [1]   1/24
recorders [1]   69/13

sentence [1]   112/3
  16/20 16/23 19/10 22/13
  22/14 22/14 22/20 28/25 29/4
  30/12 35/21 36/3 60/22 69/12
  74/16
recovered [1]   59/16
Recreation [1]   45/21
rectal [1]   29/9
redirect [1]   21/3
refer [2]   15/7 15/8
reference [2]   92/20 92/20
referring [2]   69/15 117/8
refers [1]   18/8
reflects [1]   116/11
reformulate [1]   7/24
regard [2]   28/8 37/19
regarding [3]   59/15 60/18
  74/23
regardless [1]   12/18
region [1]   38/24
reinvention [1]   68/14
relationship [15]   69/21 71/9
  71/12 72/6 72/14 73/1 73/4
  73/20 73/25 74/3 77/13 78/1
  78/9 78/15 78/17
relationships [1]   81/8
relevance [2]   30/20 54/25
relevant [26]   28/9 36/16
  36/17 37/1 39/4 39/6 39/11
  40/24 42/14 51/23 53/21 54/2
  55/18 56/9 58/24 61/2 72/10
  72/15 75/9 82/11 82/16 82/17
  82/18 99/12 109/12 116/8
relied [1]   60/25
rely [1]   26/6
remain [1]   6/25
remaining [2]   58/16 61/23
remember [20]   15/14 15/19
  16/11 85/3 85/4 86/11 86/19
  87/11 93/10 93/11 93/13
  93/19 93/25 94/2 94/3 117/24
  117/25 118/1 118/2 118/2
remembered [1]   85/9
remembers [1]   93/24
remind [1]   88/11
reminded [1]   88/9
remove [1]   59/7
render [2]   37/10 39/16
repeat [2]   119/2 119/5
repeatedly [4]   64/12 71/10
  72/2 75/4
report [15]   23/11 23/16 28/4
  31/5 33/1 34/11 36/13 37/4
  37/9 61/14 65/3 72/21 91/7
  98/7 98/15
reported [11]   19/12 21/13
  38/23 45/9 45/11 45/13 45/16
  45/8 67/20 91/17 91/19
REPORTER [2]   2/12 120/12
Reporter's [1]   120/6
reporters [1]   99/14
reporting [5]   63/21 67/10
  67/17 68/10 72/7
reports [3]   18/12 69/12 96/25
represent [3]   80/10 88/17
  88/18
representation [1]   115/7
represented [2]   14/25 88/20
representing [1]   83/25
reputation [1]   70/4
request [1]   39/24
requested [1]   120/4

required [3]   44/8 85/18 98/11
research [3]   97/25 98/1 98/5
respect [7]   19/23 21/19 30/13
  52/24 56/13 71/17 107/9
respectfully [3]   49/22 50/13
  91/4
respond [5]   10/10 28/18 30/9
  31/21 90/18
response [3]   39/3 43/9 107/17
responses [1]   9/2
responsibilities [1]   17/17
responsible [1]   29/13
responsive [2]   119/13 119/24
responsiveness [1]   102/7
rest [7]   21/16 35/13 70/7
  106/9 111/11 113/6 114/8
result [4]   33/18 42/16 70/3
  99/3
results [6]   24/17 36/2 36/5
  36/15 36/18 36/20
retaliation [2]   54/16 54/19
reticence [1]   66/6
return [1]   69/3
returned [1]   69/22
review [5]   14/4 14/5 28/25
  36/2 88/6
revisit [2]   61/12 87/21
rewriting [1]   68/15
Richmond [2]   1/17 1/20
right [41]   3/18 5/17 8/18
  10/8 18/11 20/24 33/7 36/7
  37/18 38/9 40/22 41/21 42/19
  44/11 46/17 51/10 59/2 59/2
  61/4 63/18 65/23 70/20 72/13
  74/12 75/20 79/1 79/13 91/2
  95/7 95/10 95/12 100/23
  108/12 109/9 109/21 111/20
  113/3 113/24 115/17 118/10
  118/25
ring [1]   61/15
rise [3]   10/24 39/19 67/23
risk [1]   73/2
Riverway [3]   1/16 1/19 2/10
Rohypnol [1]   86/21
role [5]   10/3 10/15 20/21
  33/21 51/23
Ron [2]   1/18 3/4
room [3]   85/14 85/17 86/13
rooms [1]   46/1
ROOT [2]   1/6 1/7
rough [1]   77/17
roughly [1]   77/23
routinely [1]   62/4
rule [12]   8/23 11/23 23/3
  23/7 29/6 42/16 63/1 92/22
  102/1 103/1 103/2 104/13
Rule 412 [4]   23/3 29/6 63/1
  92/22
ruling [8]   23/22 36/10 36/11
  37/23 55/5 97/5 109/20 110/1
Rumba [5]   110/5 110/20 111/24
  112/2 117/2
Rumba's [2]   110/21 111/24
running [1]   77/6
rupture [2]   114/21 114/22
ruptured [9]   112/23 113/17
  114/12 114/15 114/20 114/23
  115/19 115/23 117/4
Rusk [1]   2/14
Ryan [1]   85/14

**said/she [3]**  93/9 93/9 94/12
**salient [1]**  32/3
**same [17]**  14/18 19/18 27/20
40/24 48/12 55/12 56/3 66/8
75/7 76/1 76/1 77/24 91/13
98/25 102/4 102/7 107/8
**San [1]**  50/2
**SANE [1]**  64/18
**saturate [1]**  43/5
**Saturdays [1]**  99/7
**saw [7]**  5/20 36/3 44/7 89/5
91/1 113/20 117/3
**say [65]**  4/5 9/13 11/17 11/23
13/24 16/3 17/19 17/24 17/25
20/9 20/18 21/8 22/2 22/17
27/4 27/24 29/1 29/14 30/4
30/25 31/2 31/3 31/20 36/22
36/25 38/6 38/21 46/12 48/14
49/4 50/5 50/10 50/16 51/11
51/11 51/12 53/4 53/5 54/10
54/14 55/7 55/12 55/12 55/19
56/3 60/23 65/18 70/11 73/25
74/9 75/16 78/20 78/25 80/2
80/12 84/14 89/13 91/10
93/15 95/9 107/25 114/22
115/10 116/4 119/7
**saying [34]**  15/9 15/17 17/14
17/15 18/20 22/8 30/23 31/24
31/24 37/14 37/15 40/15
42/22 44/23 44/24 50/8 55/11
64/6 64/17 65/11 73/10 75/1
78/1 85/2 85/2 86/8 89/4
89/16 89/22 89/22 93/10 97/9
117/24 119/11
**says [43]**  5/14 11/19 11/23
12/4 12/12 18/12 19/8 19/10
21/7 21/18 23/15 23/21 24/1
24/12 28/23 31/6 38/11 41/11
44/6 45/22 46/2 50/1 50/1
64/12 65/19 65/25 67/15
67/16 68/13 74/19 78/8 78/15
83/11 88/15 105/16 105/18
107/20 109/18 109/20 112/2
114/11 114/12 117/2
**Scarano [28]**  9/7 11/4 11/5
12/20 12/21 12/22 13/2 13/8
17/5 17/9 17/13 19/24 20/23
21/9 23/17 23/19 24/15 25/16
26/5 26/23 27/5 27/15 30/13
48/12 61/12 61/15 68/13 88/2
**Scarano's [2]**  5/7 8/19
**schedules [1]**  99/12
**scheme [1]**  70/2
**Schulz [13]**  29/8 29/13 32/1
33/2 59/10 104/16 106/16
110/24 112/13 112/15 117/7
117/12 117/19
**Schulz' [5]**  59/14 59/16 59/18
105/3 112/3
**scope [1]**  61/9
**Scott [2]**  17/1 60/5
**Scott's [1]**  60/4
**scratches [1]**  18/15
**scream [1]**  90/13
**screaming [2]**  88/14 90/14
**screens [1]**  31/17
**sculpted [1]**  70/10
**seated [1]**  39/21
**second [11]**  7/18 10/12 16/8
48/7 50/22 68/25 68/25

**secondary [2]**  19/13 24/3
**security [2]**  89/6 106/12
**see [6]**  7/23 22/7 55/21 96/2
101/21 112/14
**seeing [1]**  112/16
**seem [4]**  15/15 17/16 75/7
116/2
**seemed [1]**  26/16
**seems [12]**  13/11 13/11 32/25
33/25 63/3 63/12 64/4 75/20
80/20 85/4 100/9 118/5
**seen [4]**  9/2 29/16 91/11
91/14
**sees [1]**  35/22
**segment [1]**  116/17
**selectively [3]**  59/15 60/1
60/3
**self [3]**  69/24 87/23 96/12
**self-portrait [1]**  69/24
**self-serving [2]**  87/23 96/12
**semen [1]**  36/25
**send [2]**  8/15 91/24
**sends [3]**  45/20 45/22 56/5
**sensationalized [1]**  87/4
**sense [6]**  62/22 69/1 69/1
114/24 115/14 115/24
**sensitive [2]**  6/14 37/12
**sent [4]**  69/24 83/9 91/22
97/6
**sentence [5]**  35/5 104/23
104/24 105/17 107/3
**sentences [1]**  103/12
**separate [4]**  59/13 68/20
68/20 93/6
**sequentially [1]**  102/17
**serious [2]**  41/22 94/6
**serves [1]**  28/10
**SERVICES [1]**  1/7
**serving [2]**  87/23 96/12
**set [2]**  97/9 97/9
**setting [1]**  7/5
**settlements [1]**  4/12
**seven [3]**  68/18 68/20 68/20
**several [6]**  60/3 61/8 61/11
81/11 81/12 99/14
**sex [20]**  21/14 31/25 33/9
33/10 33/14 33/19 34/12
36/21 37/17 71/16 72/24
75/23 75/23 75/24 76/13 85/3
85/17 87/6 93/1 93/20
**sexual [75]**  6/21 7/6 7/10
26/11 29/14 30/18 31/25
35/18 35/25 38/20 38/23
45/14 45/16 45/17 48/1 49/25
53/6 53/12 53/18 54/21 55/16
59/17 60/15 61/25 62/7 62/8
62/17 63/16 63/21 64/21 65/4
65/15 65/19 66/3 66/7 66/9
66/10 66/23 68/11 68/19
69/12 70/13 70/15 70/15
70/16 70/18 70/21 71/3 71/12
72/6 72/14 72/17 72/19 72/20
72/21 73/1 73/3 73/7 73/7
73/17 73/25 74/3 78/1 78/12
79/3 79/15 80/3 81/7 81/8
82/9 82/9 82/13 92/20 93/7
95/10
**sexually [12]**  29/2 30/2 37/11
60/8 60/12 60/14 61/18 74/16
79/5 79/8 79/21 80/19
**shade [1]**  70/3

**Shanna [3]**  4/24 5/1 5/12
**shape [1]**  70/2
**shaped [1]**  109/17
**shaping [1]**  71/2
**Sharon [2]**  2/9 3/17
**sharply [1]**  97/13
**she [304]**
**she's [35]**  5/14 5/15 15/17
16/19 16/21 17/7 17/11 17/14
20/19 34/9 35/4 35/18 36/1
37/10 37/20 56/14 62/21
71/10 72/8 73/19 74/17 82/3
84/19 85/2 85/2 87/15 88/1
89/10 92/10 93/15 94/2 94/9
94/25 97/8 109/1
**shield [1]**  63/2
**shoe [1]**  52/5
**shoe-horn [1]**  52/5
**short [5]**  39/18 57/2 57/3
102/13 107/6
**shorter [1]**  8/5
**shortest [1]**  99/3
**shot [1]**  97/17
**should [20]**  15/10 24/18 24/19
26/2 31/19 47/16 51/22 53/19
56/11 58/17 60/17 61/1 77/8
78/7 78/7 79/19 87/24 91/20
118/5 119/23
**shouldn't [5]**  13/1 43/14
47/10 79/12 81/7
**show [18]**  22/14 22/20 33/23
34/16 34/17 34/18 36/20 54/6
55/15 63/5 63/9 63/11 66/24
69/20 71/4 92/3 103/25 113/5
**showered [2]**  111/25 112/3
**shown [1]**  69/16
**shows [4]**  63/21 65/1 66/23
70/1
**side [14]**  21/15 28/16 47/1
57/6 62/1 62/2 62/3 73/16
73/18 102/3 102/3 102/8
112/11 114/5
**sided [1]**  97/15
**sides [4]**  7/23 8/4 109/23
118/23
**sides' [2]**  104/10 108/3
**sign [1]**  106/10
**signed [2]**  40/15 50/12
**significance [1]**  17/10
**significant [4]**  20/2 63/4
76/3 87/4
**silent [3]**  61/23 66/14 66/15
**similar [2]**  5/9 88/13
**similarity [1]**  76/2
**Similarly [1]**  59/25
**simple [4]**  83/6 83/17 86/2
97/17
**simply [11]**  10/25 12/12 22/18
32/4 58/22 61/19 61/20 61/23
69/1 93/25 97/23
**since [9]**  28/11 28/16 47/12
55/20 58/23 60/9 61/17 72/11
79/22
**Singapore [1]**  53/25
**single [2]**  17/8 19/25
**sips [1]**  87/12
**sir [11]**  10/13 11/3 22/6 43/8
55/19 61/7 104/23 106/2
108/17 110/22 115/1
**sit [1]**  78/22
**site [1]**  107/4

**sits [1]**  78/14
**sitting [2]**  42/21 91/2
**situation [5]**  10/14 10/25 14/3 69/10 76/12
**skin [2]**  59/16 81/17
**Skype [2]**  5/9 118/13
**slants [1]**  62/4
**sleep [1]**  53/1
**slept [3]**  74/9 74/10 74/10
**slip [1]**  112/5
**slips [1]**  115/9
**Slow [2]**  60/2 60/2
**slowly [2]**  45/12 45/12
**smaller [1]**  57/17
**Smith [1]**  74/10
**snorted [1]**  5/8
**so [99]**  4/9 4/21 5/11 5/12 5/17 6/14 6/25 8/3 9/1 9/12 9/16 11/14 15/13 20/25 23/12 25/24 26/24 27/13 27/24 28/7 28/15 28/15 30/7 31/18 33/6 33/20 35/22 38/21 40/4 41/22 42/13 43/7 43/12 43/20 45/5 46/10 46/14 51/6 51/21 51/22 51/25 54/18 56/7 56/16 56/18 56/22 56/23 57/16 57/19 59/20 61/5 64/23 65/12 65/23 66/17 68/1 68/3 70/24 72/4 76/2 76/20 80/23 81/2 81/5 81/19 81/23 82/21 82/22 84/12 84/13 84/25 85/3 85/19 88/21 89/8 89/23 90/8 92/10 92/21 93/2 94/23 95/13 95/18 100/25 102/15 102/20 103/11 103/16 105/7 108/21 108/23 109/2 109/6 110/10 110/14 114/3 116/18 117/12 118/19
**so's [1]**  51/6
**so-and [1]**  51/6
**solution [1]**  100/1
**some [59]**  4/10 4/11 5/9 6/1 6/13 6/13 6/14 7/5 13/8 13/10 15/11 15/23 20/2 22/10 36/15 39/2 42/22 45/21 46/17 47/12 49/18 49/20 49/20 51/4 52/18 53/16 54/8 55/13 57/17 58/6 58/6 58/22 59/5 63/12 63/13 69/17 74/18 76/11 79/6 86/19 86/20 87/4 93/16 96/18 97/21 99/6 99/9 99/23 100/6 100/8 100/9 100/12 107/4 108/3 109/18 115/14 115/21 116/7 118/13
**somebody [13]**  5/12 22/13 49/24 54/18 79/11 79/15 85/13 85/13 85/16 89/2 93/10 93/14 97/6
**someone [10]**  11/1 14/24 14/25 38/23 41/13 50/11 51/11 54/14 72/22 79/3
**someplace [1]**  94/10
**something [19]**  20/7 26/8 30/17 34/2 50/7 51/7 51/14 55/19 57/15 77/13 88/23 88/23 91/6 93/14 102/8 103/7 105/17 108/19 117/11
**sometimes [2]**  53/15 89/10
**somewhere [1]**  4/5
**soon [1]**  80/23
**sooner [1]**  57/16

**sorry [15]**  5/2 10/11 17/21 18/24 33/16 63/22 78/3 79/12 89/25 100/25 108/16 113/5 117/14 119/4 119/17
**sort [13]**  7/5 7/15 10/16 11/17 13/24 31/8 36/2 48/21 76/11 102/12 107/4 115/13 115/25
**sorts [1]**  97/4
**sound [2]**  87/18 87/19
**sounds [5]**  16/19 46/16 46/19 49/22 55/7
**SOUTHERN [1]**  1/1
**spaced [1]**  106/4
**sparring [2]**  112/20 116/6
**speak [4]**  18/25 32/19 55/23 97/25
**speaks [1]**  111/6
**special [3]**  11/13 88/11 88/19
**specializes [1]**  34/7
**specialties [1]**  25/22
**specific [1]**  50/21
**specifically [5]**  23/21 24/12 37/19 66/16 118/1
**speculate [1]**  54/6
**speculation [1]**  39/13
**spell [1]**  9/1
**spend [1]**  23/5
**spent [1]**  23/4
**spillover [1]**  107/23
**spins [1]**  69/10
**spoke [1]**  88/10
**spread [1]**  79/24
**Spring [1]**  69/5
**square [2]**  24/1 112/3
**squares [2]**  92/1 92/2
**stack [1]**  108/1
**Stacy [3]**  32/19 32/19 91/7
**stages [1]**  42/10
**stand [12]**  22/10 31/20 42/11 72/3 82/23 89/18 90/7 95/8 95/9 100/13 115/10 119/19
**standard [4]**  6/22 7/17 63/1 85/18
**standing [2]**  12/18 50/15
**standpoint [3]**  28/6 65/3 103/4
**stands [1]**  62/7
**stark [1]**  76/2
**start [5]**  38/10 83/19 101/13 101/15 105/5
**started [2]**  77/5 96/13
**starters [1]**  41/15
**starts [3]**  105/4 105/7 117/1
**state [9]**  21/19 21/20 21/22 35/11 87/15 88/15 88/19 90/21 96/19
**stated [2]**  47/11 51/5
**statement [8]**  48/17 51/3 58/7 68/12 74/15 93/25 94/18 116/4
**statements [8]**  49/16 49/18 58/6 60/18 60/19 87/17 87/23 94/17
**states [4]**  1/1 1/11 68/8 68/9
**States' [1]**  6/3
**stating [1]**  118/3
**status [1]**  15/10
**stay [1]**  99/20
**stayed [1]**  52/2
**STD [15]**  21/13 72/7 72/8 72/8

72/25 73/2 73/3 73/11 74/17 81/6 81/10
**STDs [10]**  22/12 22/16 78/11 81/2 81/22 82/10 82/14 83/1 92/20 95/11
**stenography [1]**  1/24
**step [1]**  94/6
**Stephanie [5]**  1/21 1/21 2/4 3/7 3/14
**still [9]**  24/12 26/22 27/9 27/11 50/15 56/23 84/22 85/20 115/4
**stipulate [1]**  100/9
**stipulated [1]**  100/10
**stood [2]**  46/7 83/23
**stories [5]**  14/20 49/8 49/10 62/21 89/11
**story [24]**  4/17 16/23 16/24 16/25 17/4 19/24 20/2 21/16 42/23 42/24 43/6 43/6 61/16 62/10 62/12 62/22 64/8 66/8 68/11 69/18 87/18 88/5 88/6 98/14
**straight [1]**  62/13
**strategy [1]**  58/12
**streamline [1]**  100/16
**Street [3]**  1/22 2/5 2/14
**strength [1]**  98/8
**stress [2]**  16/10 16/12
**stretch [1]**  14/21
**striking [1]**  14/14
**strong [4]**  71/12 71/13 92/14 98/9
**structure [1]**  17/12
**stuff [5]**  68/21 82/21 88/4 92/25 115/16
**subject [3]**  20/14 61/21 70/14
**submit [4]**  5/24 7/21 41/14 104/13
**subparts [1]**  56/15
**subpoena [1]**  92/10
**subsequent [2]**  87/23 97/16
**subsequently [1]**  62/9
**substantial [2]**  75/22 75/24
**substantially [3]**  67/24 68/2 68/16
**subsumes [1]**  20/21
**such [11]**  21/1 29/19 30/6 44/6 54/6 76/23 86/24 92/14 99/24 107/14 116/1
**sudden [1]**  89/23
**suffer [2]**  15/19 17/14
**suffers [3]**  14/2 26/12 26/18
**sufficient [3]**  10/24 29/23 92/16
**suggest [2]**  78/17 97/20
**suggests [1]**  60/6
**suit [3]**  61/16 68/23 71/3
**Suite [3]**  1/16 1/19 2/10
**suited [2]**  22/23 99/10
**summaries [1]**  36/15
**summarize [1]**  36/2
**summarized [1]**  35/20
**summary [5]**  39/22 39/25 40/2 40/16 54/16
**Sundays [1]**  99/7
**supernova [1]**  98/10
**supervisors [1]**  45/19
**supplement [2]**  58/20 58/22
**support [1]**  19/14
**supposed [1]**  18/6

**sure [20]** 6/2 8/9 21/2 36/12
37/5 38/25 47/3 73/5 89/10
91/11 91/12 92/11 97/2 98/17
106/7 109/23 110/10 110/11
118/16 119/21
**surely [1]** 55/4
**surgeon [8]** 24/22 25/6 31/12
31/13 112/23 113/15 113/20
114/12
**surgery [7]** 29/12 32/2 32/5
59/6 59/7 59/15 59/19
**surprise [1]** 99/20
**surprised [1]** 43/18
**surprises [1]** 112/11
**Susan [2]** 2/3 3/13
**susceptible [1]** 81/18
**suspect [3]** 20/5 57/3 78/24
**suspended [1]** 44/20
**sustain [1]** 87/3
**swelling [1]** 107/14
**sworn [3]** 60/9 61/17 81/21
**sympathetic [1]** 97/19
**symptoms [4]** 19/6 19/11 26/18
81/15
**syndrome [1]** 19/13

**T**

**table [3]** 28/16 33/15 80/24
**Tackett [1]** 27/12
**tailoring [1]** 68/22
**tailors [1]** 61/16
**tainted [1]** 24/8
**take [29]** 3/22 3/24 4/3 4/4
6/4 6/7 6/15 7/21 14/22
27/14 31/20 33/14 39/8 39/18
50/17 58/2 58/14 63/14 95/2
96/8 98/3 100/17 109/11
110/3 110/25 111/1 115/15
118/8 118/23
**take -- I [1]** 58/2
**taken [6]** 4/20 39/20 63/20
100/24 104/9 106/4
**takes [1]** 53/17
**taking [2]** 66/21 118/21
**talk [14]** 2/20 6/12 8/18
11/25 24/19 25/4 26/21 31/8
39/15 42/6 58/25 81/6 100/5
101/2
**talked [4]** 59/4 76/9 76/15
83/4
**talking [21]** 5/3 5/3 19/18
23/14 23/15 25/7 25/8 25/11
31/16 45/3 47/1 49/6 49/7
67/12 67/16 70/13 75/21
92/18 111/13 115/4 116/22
**talks [2]** 31/11 31/15
**tampered [2]** 88/24 89/8
**teaches [1]** 35/24
**tear [1]** 29/23
**tearing [1]** 107/14
**technique [1]** 5/9
**teeth [1]** 97/22
**telephoning [1]** 118/14
**tell [15]** 28/5 33/21 38/22
46/7 66/8 71/14 76/7 77/18
79/20 83/25 86/6 106/7
106/10 113/2 116/1
**telling [14]** 9/20 11/1 15/17
17/3 17/14 18/17 18/22 26/20
62/5 64/9 89/15 93/15 102/23

**tells [5]** 22/22 34/16 68/18
95/24 109/10
**ten [2]** 104/4 104/5
**tend [2]** 6/17 63/9
**tendency [1]** 63/11
**tending [1]** 63/5
**tent [1]** 53/2
**terminates [1]** 45/20
**terms [4]** 21/1 21/3 24/6 55/9
**Terri [1]** 60/4
**terrible [1]** 112/13
**test [3]** 12/19 95/11 95/12
**tested [1]** 19/7
**testified [5]** 72/2 77/25 88/2
112/14 114/14
**testifies [2]** 27/15 79/15
**testify [27]** 4/18 5/20 16/16
17/13 20/6 21/6 25/25 26/2
26/10 26/17 26/20 41/17
43/19 48/11 48/13 48/19
48/22 55/14 58/4 59/9 60/7
60/11 69/19 76/18 80/7 81/5
100/13
**testifying [5]** 8/22 21/19
24/17 26/4 92/10
**testimony [63]** 8/19 11/20
11/22 12/15 14/15 15/12
15/21 20/6 20/8 21/11 21/12
24/2 24/6 24/11 24/15 26/11
27/14 27/18 28/8 28/9 30/17
31/18 32/13 32/19 32/25
33/25 35/8 35/21 36/4 37/24
40/23 40/25 44/8 44/9 45/15
45/15 46/21 47/7 50/3 56/1
59/5 59/15 59/18 59/23 61/6
61/9 64/10 64/10 65/5 66/12
69/5 69/20 73/10 74/24 74/25
76/23 92/8 95/14 101/13
102/4 105/4 110/13 112/15
**testing [1]** 93/12
**tests [3]** 30/1 31/16 36/2
**TEXAS [9]** 1/1 1/4 1/17 1/20
2/6 2/11 2/14 35/11 69/5
**than [15]** 6/13 6/19 9/6 15/10
16/6 38/4 39/16 42/5 42/17
61/15 66/22 77/8 85/2 98/18
113/4
**Thank [9]** 5/16 32/22 37/25
42/19 61/6 71/7 107/21 120/2
120/3
**Thanks [1]** 118/22
**that [794]**
**that -- I [1]** 119/9
**that -- you [1]** 93/14
**that's [125]**
**theater [1]** 44/4
**their [37]** 6/11 7/14 20/6
20/15 22/24 27/23 36/12
36/16 37/5 39/2 39/6 40/23
43/12 45/8 46/1 46/6 47/18
47/20 49/5 49/15 49/16 49/17
49/18 52/6 56/7 58/3 70/25
80/25 82/24 82/24 98/12
102/24 102/25 108/12 110/25
114/5 116/5
**them [63]** 5/8 6/13 6/16 7/17
14/23 19/15 21/11 22/24
23/18 23/19 27/22 39/2 39/5
39/15 41/8 43/14 43/22 43/23
44/4 46/13 46/17 49/14 49/20
49/21 58/14 59/4 61/3 64/12

79/5 80/11 81/2 83/14 84/13
89/22 90/22 90/24 90/24
91/15 91/21 91/22 91/22
91/24 92/6 95/1 95/4 96/6
96/7 96/15 96/24 99/20 99/21
106/12 108/11 112/17 113/22
115/15 117/3 118/23
**themselves [2]** 96/6 96/22
**then [65]** 8/13 11/23 18/9
18/17 18/25 22/21 23/22
30/19 31/3 31/15 33/8 33/15
33/24 34/23 36/1 36/7 40/11
40/13 46/20 48/8 48/24 52/5
53/18 54/11 55/24 60/13 63/4
63/8 65/13 66/11 69/5 69/9
69/13 72/19 74/3 74/17 79/4
79/17 81/6 85/5 85/12 90/17
91/3 91/19 91/20 91/11 95/1
98/2 102/3 102/9 103/10
103/12 104/3 105/9 105/13
105/17 106/3 106/22 107/1
107/3 107/16 107/18 109/7
115/5 119/13
**theories [2]** 52/14 80/25
**theory [1]** 52/18
**therapists [1]** 17/8
**therapy [1]** 69/25
**there [81]** 4/8 6/1 9/6 9/14
9/14 9/16 10/23 14/19 15/5
16/23 18/8 19/14 25/12 29/22
29/23 31/24 39/11 40/5 40/17
41/12 41/18 42/8 44/17 44/17
45/25 47/16 47/24 49/2 51/22
52/2 52/3 52/4 53/12 53/17
54/2 55/15 55/15 56/14 56/22
57/22 58/8 61/11 63/6 65/19
65/19 67/17 72/24 74/14
74/17 75/25 78/14 85/16
88/14 88/22 89/10 90/1 91/2
91/19 91/20 91/25 95/2 95/8
95/18 97/10 99/2 99/11 99/19
100/1 101/18 101/25 105/22
105/23 106/9 107/10 108/15
112/25 116/9 116/9 117/8
118/3 118/3
**there' [1]** 117/20
**there's [45]** 12/8 16/20 19/8
23/18 26/8 26/24 38/4 41/5
41/15 42/3 44/6 44/8 47/18
50/9 50/19 51/1 52/18 52/23
61/5 63/11 64/5 66/18 67/9
74/4 74/15 74/15 74/18 75/22
75/24 88/22 94/23 96/21 97/3
97/3 97/11 97/14 98/23
102/13 103/10 107/16 108/7
108/8 108/19 109/1 112/10
**therefore [4]** 15/19 20/19
22/18 73/11
**thereof [1]** 82/10
**thereto [1]** 21/23
**these [81]** 6/13 6/14 6/21
13/2 15/23 16/1 17/11 20/10
20/10 21/12 23/19 30/3 32/17
38/12 39/8 41/1 41/1 41/17
41/20 42/5 42/9 43/4 43/10
43/12 43/19 43/20 44/2 44/5
44/11 46/8 46/9 46/9 46/10
46/10 46/20 47/11 47/12
47/18 47/19 48/24 49/3 49/12
49/22 50/3 50/16 50/18 51/14
52/7 53/20 54/22 56/15 57/2

these... [29]  57/4 58/7 58/12
58/16 60/12 63/13 67/1 67/12
70/24 71/19 71/20 73/16
75/17 78/16 81/8 83/3 89/9
95/3 98/10 98/10 100/9 101/3
101/21 102/13 104/14 105/21
107/6 108/16 116/11
they [113]  5/19 5/20 6/12 8/4
8/4 12/1 13/20 16/9 18/3
20/1 23/16 23/17 23/20 23/23
36/22 36/25 38/7 39/1 39/4
39/7 39/9 39/10 39/11 39/11
39/12 41/7 43/11 43/17 43/17
43/18 43/21 44/3 44/3 44/20
44/21 45/14 48/22 49/5 50/2
53/4 53/4 53/5 53/5 55/1
55/2 57/5 57/7 57/11 59/14
60/1 63/21 63/22 63/24 64/2
64/3 64/18 64/18 65/16 65/17
66/8 67/16 67/25 72/17 74/8
75/7 77/8 77/25 79/2 79/16
80/13 80/14 80/16 81/1 82/4
83/7 83/7 83/8 83/9 83/9
84/17 87/3 87/4 89/14 89/18
89/18 90/10 90/12 90/21
90/22 90/22 90/24 90/24
91/21 91/23 92/2 92/4 92/4
93/20 93/21 95/4 96/16 97/2
97/2 98/14 99/19 102/20
102/24 105/23 114/15 114/20
116/18 116/18 118/19
they'll [1]  90/17
they're [21]  6/11 28/21 41/2
43/24 49/6 49/7 49/10 51/14
53/5 53/8 53/10 55/6 55/12
55/12 56/23 80/16 80/16
80/24 83/14 93/5 109/11
they've [9]  7/9 36/16 43/11
43/19 47/12 47/17 60/3 106/3
114/4
thing [22]  11/23 13/24 31/9
44/1 45/22 54/10 55/12 56/4
65/2 72/7 75/7 75/8 77/4
81/1 85/8 87/20 91/13 94/14
104/10 106/25 116/1 119/5
things [36]  6/13 7/13 7/16
11/6 13/2 14/19 16/1 16/15
25/25 31/18 42/23 44/11
55/13 56/17 60/22 61/2 62/23
62/23 64/16 67/12 69/23 78/1
78/5 78/9 87/22 89/1 89/2
89/9 100/9 100/12 101/6
108/4 109/19 112/23 115/8
116/12
think [129]
thinking [2]  25/11 102/12
third [3]  29/15 83/9 94/14
this [184]
thoracic [1]  24/22
thoroughly [1]  26/24
those [44]  5/24 7/11 7/16
12/25 14/18 16/5 16/15 22/24
23/21 24/6 24/11 25/22 25/25
29/3 29/5 29/5 31/18 36/3
36/5 38/13 42/10 47/2 47/9
49/10 51/6 52/14 56/23 60/16
63/8 64/15 74/7 77/13 84/12
90/10 90/11 90/23 90/25 91/1
92/2 97/2 100/1 100/6 108/4
109/19

thought [18]  4/1 5/2 36/9
36/10 36/24 37/14 37/15
44/16 58/24 64/5 76/5 77/12
85/8 92/15 94/10 108/2
114/20 115/3
thoughts [1]  100/2
thousands [1]  12/21
threat [1]  41/22
three [12]  2/10 3/23 4/9
43/12 46/21 59/1 61/24 62/9
63/14 71/2 100/18 102/16
through [23]  4/10 8/1 14/15
16/2 17/1 28/23 36/4 36/19
39/1 39/14 42/21 48/21 55/8
80/11 80/22 81/3 86/1 86/5
98/15 99/1 105/2 106/5
106/17
throughout [5]  87/13 96/20
102/21 103/17 111/21
throws [1]  87/17
thus [2]  32/14 81/18
tie [3]  23/7 52/19 53/3
tied [1]  14/24
ties [1]  23/3
time [67]  4/8 4/15 6/23 6/25
13/25 16/8 16/21 16/25 18/25
23/4 23/5 24/8 35/23 36/9
36/14 38/23 39/12 40/6 40/9
40/16 40/17 40/24 41/12
42/17 48/12 50/11 55/9 55/22
60/20 63/24 64/24 65/22
66/19 66/19 66/21 68/10
68/13 68/13 68/13 68/17
68/17 68/23 68/24 68/24
72/16 72/17 76/1 76/12 79/16
80/4 82/15 88/25 91/2 91/5
96/8 97/5 99/2 99/3 101/11
102/4 102/7 102/14 104/11
104/12 115/22 116/7 119/20
times [3]  41/23 61/8 98/18
tissue [1]  59/19
today [8]  3/20 19/22 59/4
65/11 66/22 86/16 86/17
87/20
Todd [4]  1/14 3/3 91/4 110/7
together [9]  15/23 16/5 16/9
20/10 20/11 86/15 102/16
102/22 108/3
told [26]  11/12 17/11 22/19
40/22 41/13 46/10 46/13 48/1
61/2 62/21 63/22 63/23 64/12
65/7 65/16 65/16 66/16 66/19
77/4 77/15 82/22 84/6 89/17
91/6 92/9 117/12
told-you-so [1]  46/10
tongue [2]  112/5 115/9
too [19]  21/11 23/9 23/9 24/4
38/19 40/20 40/21 46/8 46/9
48/18 58/5 63/24 65/1 65/15
78/11 84/19 99/23 109/16
114/1
took [9]  47/23 64/6 64/11
65/6 88/16 100/13 112/20
114/19 116/7
top [7]  101/17 110/25 111/1
111/8 112/21 113/4 113/11
torn [5]  25/13 29/24 112/25
117/7 117/20
totally [1]  64/21 97/14 102/8

touching [2]  73/6 73/7
towards [1]  97/13
town [1]  71/20
toxicological [1]  31/16
toxicologist [2]  24/18 31/17
toxicology [1]  26/3
track [1]  47/9
tragically [1]  35/22
trailer [1]  53/1
training [5]  10/4 14/9 45/14
45/16 45/17
traits [1]  26/18
transatlantic [1]  4/19
transcript [7]  1/10 1/24
91/10 102/20 110/15 111/18
120/7
transcription [1]  1/24
transmitted [12]  29/2 30/2
37/11 60/8 60/12 60/15 61/18
79/5 79/8 79/21 80/20 90/20
transmitting [1]  72/20
trauma [5]  10/23 29/17 29/23
64/1 112/13
traumatic [3]  10/18 16/10
16/12
traveled [1]  71/22
treat [1]  46/5
treated [3]  29/1 31/7 32/8
treater [1]  82/11
treaters [3]  68/18 82/10
82/12
treating [7]  17/1 17/8 18/1
18/2 60/5 60/20 62/16
treatment [7]  34/13 37/11
37/16 81/13 82/16 82/17
82/19
treatments [1]  22/16
treats [1]  31/9
tremendous [1]  62/12
trial [20]  4/2 6/25 15/24
26/7 27/6 32/16 44/1 53/14
53/14 53/17 53/18 57/20
57/21 58/12 70/9 71/5 83/21
95/4 97/12 98/14
trials [3]  42/3 42/3 73/16
tried [9]  6/21 8/3 45/16
45/24 53/13 87/22 92/19
92/23 118/18
truck [2]  50/24 51/2
true [5]  18/5 57/24 58/1
70/17 70/21
truly [1]  13/13
trust [2]  98/11 98/17
truth [12]  9/20 11/1 15/17
17/15 18/3 18/18 18/22 26/20
53/9 61/15 71/14 93/15
truthful [5]  9/8 14/7 22/22
28/6 76/10
truthfully [1]  75/16
truthfulness [2]  13/15 28/4
try [10]  4/14 5/19 52/24
53/20 59/3 70/10 99/2 100/16
103/3 104/13
trying [13]  10/15 20/17 21/25
34/15 47/15 48/21 53/13
53/20 83/17 83/17 93/1
108/22 115/13
Tuesday [2]  58/13 58/14
turn [1]  54/11
turned [5]  84/10 90/23 91/14
91/21 92/6

**T**

turning [1]  84/17
turns [2]  75/6 110/14
twice [5]  68/14 69/13 103/6
 103/8 103/17
two [28]  3/24 4/1 4/5 12/8
 25/24 29/12 32/2 32/5 33/1
 40/3 46/21 51/8 51/10 52/2
 57/7 57/8 57/10 59/1 59/7
 60/12 64/15 70/12 71/2 82/18
 87/12 100/18 103/11 107/2
two-month-old [1]  29/12
type [1]  106/17
types [1]  6/22
typically [2]  67/11 106/19

**U**

U.S [1]  2/13
ubiquitous [1]  68/16
Uh [1]  107/11
Uh-huh [1]  107/11
ultimate [6]  8/23 11/7 11/21
 12/1 15/16 48/18
ultimately [4]  18/19 18/21
 45/17 84/10
unaware [1]  94/5
unchaste [1]  93/4
uncontested [2]  93/18 93/19
under [12]  17/3 35/10 42/16
 58/12 61/17 68/3 78/12 81/22
 82/3 87/17 87/22 119/8
underpinning [1]  52/13
understand [28]  8/25 12/16
 18/19 19/2 23/14 30/19 38/8
 47/6 48/19 49/3 51/17 58/10
 58/10 66/1 70/6 70/8 71/7
 73/17 78/21 83/13 83/22
 83/22 84/23 89/3 94/4 99/25
 102/10 116/21
understanding [3]  65/9 76/8
 76/10
understands [1]  93/3
understood [3]  50/5 65/5
 114/19
undisputed [1]  59/6
unequivocally [1]  63/21
unfair [1]  70/12
unfold [1]  47/15
uninterrupted [1]  4/8
unique [1]  10/16
uniquely [4]  14/9 16/15 22/23
 30/4
UNITED [3]  1/1 1/11 6/2
unknown [1]  74/18
unless [13]  5/24 20/8 26/1
 26/7 26/8 26/23 52/17 56/18
 63/10 79/2 79/16 108/7 108/8
unnecessary [1]  33/6
unquote [1]  47/16
unrelated [1]  119/22
until [6]  27/6 43/25 69/3
 84/14 91/6 114/18
untrue [1]  61/2
untruthful [1]  58/9
untruths [3]  62/5 62/5 82/22
unusual [2]  48/23 83/18
unwanted [2]  73/6 75/24
unwilling [1]  17/2
up [49]  4/16 5/8 5/8 12/1
 12/18 18/12 19/9 19/25 27/14
 45/4 46/3 48/13 53/2 53/9

left [2]  61/23 ... 75/3  66/17
78/6 78/7 78/10 78/14 79/6
81/9 83/5 83/23 86/14 86/23
87/12 88/4 88/21 89/9 89/11
93/1 95/2 95/5 97/9 97/9
100/5 100/17 101/14 110/3
114/1 114/18 115/10 116/1
117/7 117/20
upon [4]  5/6 13/17 49/4 95/13
urine [1]  31/15
us [34]  4/3 6/11 7/12 8/5
 8/15 11/7 18/21 19/22 20/9
 25/17 28/16 36/19 49/5 57/15
 57/20 64/3 64/19 73/15 79/17
 84/20 87/20 88/20 90/20
 90/23 91/6 91/17 91/19 91/24
 92/19 99/23 103/3 105/1
 109/10 116/24
use [6]  5/9 10/4 14/18 21/1
 26/22 45/6
used [7]  24/6 31/7 32/9 32/11
 75/2 75/3 75/5
useful [1]  36/18
usefully [1]  95/2
using [2]  6/22 44/18
usual [1]  106/11
usually [1]  106/9

**V**

vagina [4]  105/12 105/19
 115/20 117/8
vaginal [2]  29/9 106/18
vaginally [1]  105/10
valid [2]  10/21 10/24
validity [1]  69/18
value [1]  68/1
vaporization [3]  29/10 32/5
 59/11
variations [1]  54/3
variety [1]  82/10
various [3]  14/18 42/10 84/6
vary [1]  44/3
vast [2]  45/13 71/22
vehemently [1]  66/11
vein [1]  100/17
venire [1]  6/10
veracity [1]  67/1
verbatim [2]  68/9 78/2
verdict [1]  85/19
version [1]  24/7
very [58]  6/14 12/15 13/11
 16/25 17/16 22/4 22/4 29/9
 29/11 30/2 31/21 32/24 35/2
 36/4 54/7 56/23 59/14 63/1
 65/6 66/8 71/8 71/9 71/12
 71/13 74/25 75/8 83/17 83/23
 84/1 84/1 84/14 86/24 87/20
 90/10 90/12 90/21 91/11 92/1
 92/18 93/8 94/5 94/7 94/9
 94/12 96/14 96/15 96/17
 97/12 98/9 98/16 99/6 99/20
 99/21 102/13 107/21 111/22
 118/11 120/3
vet [1]  98/14
Vicknair [2]  1/15 3/6
victim [6]  26/17 26/20 70/17
 70/18 70/22 89/19
victim's [1]  73/17
videos [1]  118/13
view [4]  7/14 52/6 61/12
 97/13
viewed [1]  45/24

views [3]  23/18 23/19 23/19
violate [1]  92/22
violated [2]  84/7 98/2
violation [1]  98/5
violative [1]  80/17
Vioxx [1]  96/22
virtually [1]  49/12
virtue [1]  14/9
Virus [1]  81/15
visited [1]  97/16
voir [3]  8/1 8/5 39/9
voluminous [3]  14/4 36/18
 60/4
voluminously [1]  115/24
Vorpahl [11]  2/3 3/11 11/16
 13/22 16/6 34/4 56/14 58/18
 77/21 90/17 100/20

**W**

wager [1]  97/3
Wait [1]  115/2
waiting [1]  23/22
waking [1]  87/12
wall [1]  29/22
want [37]  5/21 7/21 8/20
 12/25 14/18 18/25 23/17
 23/17 23/20 27/22 27/24
 32/19 33/24 35/17 36/17
 38/21 48/22 53/17 55/1 55/2
 65/16 76/16 76/20 80/19
 84/14 90/13 99/7 99/18 99/20
 102/25 103/5 108/19 110/9
 110/10 113/9 115/15 118/6
wanted [9]  4/16 36/12 37/4
 55/19 63/25 63/25 85/1 85/21
 114/21
wanting [1]  99/21
wants [9]  7/3 17/2 31/19
 34/17 48/19 78/20 87/16
 102/11 118/6
war [1]  6/3
warn [1]  72/18
warned [1]  46/10
warned-you [1]  46/10
was [190]
wasn't [14]  40/18 41/12 64/13
 65/20 65/21 83/12 85/24 86/4
 86/5 86/22 91/11 91/12
 108/15 111/18
waste [2]  42/16 104/11
water [2]  93/1 112/24
waterfront [1]  26/24
way [29]  7/12 7/19 10/20 11/5
 11/6 15/23 18/4 18/23 19/16
 23/9 23/9 24/4 32/6 40/17
 45/22 48/15 56/20 70/14
 70/18 80/2 88/1 92/23 93/2
 93/3 99/2 104/9 104/11
 110/24 111/19
ways [3]  56/21 58/22 58/23
we [247]
we -- I [1]  75/25
we'll [15]  4/14 7/21 8/11
 8/12 27/14 39/8 48/8 99/9
 99/17 100/5 100/6 100/11
 101/20 102/12 115/1
we're [61]  3/23 6/4 6/6 6/8
 6/18 6/18 7/18 7/19 7/23 8/6
 8/7 8/8 8/10 10/14 15/7 15/8
 15/19 20/22 21/24 23/5 23/11
 23/22 25/6 25/6 27/6 37/18 38/13

**we're... [35]**  38/25 41/22
41/25 41/25 42/12 43/25
46/19 47/6 52/9 52/10 52/11
53/13 53/20 55/7 55/22 55/24
56/25 57/5 57/19 58/14 70/13
71/4 73/14 75/21 78/19 81/6
83/20 84/3 95/4 98/11 101/10
110/19 114/6 115/13 119/10
**we've [20]**  4/20 6/9 8/5 8/23
9/13 9/16 9/17 10/2 20/20
23/4 39/1 42/11 50/3 59/4
69/16 92/17 99/20 99/21
100/11 100/18
**weak [1]**  86/24
**weaken [1]**  84/25
**weakened [1]**  59/19
**Weatherford [2]**  51/2 51/9
**website [1]**  95/23
**week [11]**  4/3 4/10 28/15
42/21 57/15 90/4 96/5 96/8
101/16 101/18 101/19
**weeks [6]**  3/23 3/24 4/2 4/6
4/9 89/21
**weigh [2]**  12/17 13/8
**weight [4]**  10/5 10/7 34/25
35/9
**Welcome [2]**  3/9 3/18
**Welfare [1]**  45/21
**well [108]**  4/7 5/2 5/5 5/14
6/9 7/8 8/7 8/10 11/17 12/3
12/8 12/16 13/19 13/23 20/16
20/22 22/2 24/22 25/3 27/19
27/23 28/2 28/2 28/4 28/7
29/18 29/21 30/25 31/2 33/24
36/4 38/8 38/9 40/4 40/13
41/24 43/23 44/18 49/10
49/18 50/5 50/17 51/20 52/9
52/16 52/19 53/13 53/23 54/1
55/5 55/23 57/7 58/2 58/11
63/14 65/5 65/12 66/1 71/23
72/16 73/21 74/24 75/8 76/7
76/16 77/22 78/24 79/1 79/10
80/13 80/15 82/16 82/20
83/11 83/16 83/22 83/25 84/9
84/20 88/10 88/18 90/11 91/3
91/13 92/13 93/3 93/6 94/20
96/4 96/13 96/17 97/11 99/5
99/11 99/19 99/25 102/11
103/9 104/8 105/12 108/4
108/6 108/21 108/24 109/15
111/24 112/22 117/1
**well-woman [2]**  25/3 29/18
**went [12]**  11/5 18/14 22/12
24/5 60/6 60/20 72/5 94/11
110/14 111/17 111/25 113/16
**were [56]**  5/2 14/23 34/7 37/1
37/5 39/2 39/5 39/9 43/18
45/8 46/8 49/6 49/7 55/15
55/15 63/21 63/22 63/23 64/2
67/16 68/5 77/8 77/10 84/17
86/14 87/4 88/14 90/10 90/11
90/12 90/19 90/20 90/21
90/22 90/24 90/24 91/19
91/21 91/23 92/1 92/2 92/4
92/4 94/10 102/12 108/15
113/20 114/12 114/15 114/23
115/3 115/23 116/21 117/18
118/3 118/13
**weren't [7]**  39/11 39/11 49/23
57/8 82/14 85/21 90/1

**what [190]**
**what's [11]**  8/20 18/3 36/22
51/23 51/24 77/1 93/6 93/7
95/5 112/9 116/8
**whatever [10]**  14/17 17/4 56/7
63/8 82/4 82/14 86/4 86/22
97/1 119/13
**whatnot [1]**  69/17
**whatsoever [6]**  19/9 31/13
47/25 67/18 114/25 115/24
**when [34]**  7/12 8/14 13/14
15/20 20/10 33/3 44/12 45/1
56/19 58/11 72/6 74/4 79/24
84/12 87/14 88/12 90/6 92/6
93/10 94/9 94/24 95/4 98/24
101/13 101/15 104/3 104/8
108/15 109/9 110/14 111/17
113/20 114/11 117/18
**where [26]**  10/14 16/23 29/17
35/25 36/25 45/19 53/9 55/3
56/12 65/1 67/23 72/8 72/8
77/24 82/11 87/22 88/15
88/20 94/11 95/23 100/1
105/16 105/18 106/3 107/20
110/12
**whether [47]**  6/6 7/9 9/8 9/19
10/21 11/1 11/9 11/11 13/20
14/2 14/2 14/6 18/18 18/22
19/7 21/21 25/12 26/11 26/12
26/14 26/17 26/20 28/5 30/14
34/11 37/10 41/2 41/15 53/17
53/19 55/24 56/9 56/10 56/10
61/13 73/19 78/5 85/17 92/24
93/20 94/1 94/25 109/1
112/20 115/18 115/20 118/6
**which [39]**  3/20 10/17 12/7
12/10 13/3 16/18 16/19 22/21
22/22 22/22 23/25 25/22
30/23 31/5 45/15 46/2 48/22
52/5 56/15 56/20 57/10 60/25
62/10 64/10 67/13 75/16
81/14 81/18 85/1 87/21 88/3
91/4 91/7 96/12 98/11 101/3
106/18 114/16 119/8
**while [5]**  7/2 28/11 48/12
70/14 87/3
**who [65]**  5/20 7/5 7/5 13/15
14/24 14/25 16/22 16/23 17/1
17/10 18/8 19/24 19/25 20/13
20/17 20/21 26/17 26/18
26/19 31/9 31/13 34/6 42/8
43/24 43/24 43/25 45/9 45/9
45/24 45/25 46/4 46/5 46/6
46/7 48/10 49/8 50/1 50/9
50/19 51/2 51/11 54/14 55/2
55/16 62/12 71/25 74/18
77/25 82/23 82/23 83/8 85/3
85/13 88/4 88/5 97/7 97/25
99/17 106/6 106/6 106/10
112/6 113/15 114/12 114/14
**who's [2]**  4/23 18/17
**whoever [1]**  87/15
**whole [21]**  13/5 20/13 25/12
59/20 79/18 81/1 85/24 89/9
89/11 102/18 103/23 104/2
104/10 105/25 106/1 106/14
106/14 106/25 107/7 114/16
117/13
**whom [2]**  13/20 60/15
**whose [4]**  51/1 97/3 99/12
110/7

**why [2]**  31/16 77/13
21/11 31/1 32/24 61/11 68/15
75/16 76/5 78/7 78/7 79/18
80/19 85/1 85/24 86/6 86/8
86/10 86/18 87/21 89/4 92/14
92/15 103/7 108/2 109/5
**wide [5]**  54/3 54/4 57/4 87/24
94/22
**wide-ranging [1]**  57/4
**Wikipedia [1]**  97/8
**wild [2]**  42/24 51/14
**will [57]**  5/7 5/21 6/10 11/11
12/20 13/7 15/4 20/5 20/20
21/6 21/9 23/2 29/10 37/24
38/3 38/7 41/7 41/8 41/20
42/16 44/16 46/7 47/3 47/8
48/10 49/4 50/6 53/1 54/6
54/14 54/23 55/9 55/13 57/3
57/17 58/11 61/9 69/16 69/19
71/5 71/22 80/2 80/7 81/25
82/12 82/23 82/23 88/6 98/2
98/9 98/14 99/14 99/20
100/15 101/24 109/10 118/20
**willing [1]**  99/8
**win [1]**  93/3
**wish [1]**  10/7
**wishes [1]**  10/6
**withdraw [1]**  116/24
**withdrawing [1]**  116/21
**withdrew [2]**  94/17 94/18
**withhold [1]**  70/11
**within [9]**  9/18 28/21 42/3
84/14 84/15 106/4 107/13
114/2 114/3
**without [16]**  10/3 12/5 12/7
17/14 17/15 19/17 29/16 35/4
46/25 52/3 79/5 80/1 92/14
92/19 92/20 117/4
**witness [34]**  4/20 5/4 5/10
5/20 11/8 11/10 11/12 12/6
19/9 21/18 22/10 22/12 30/14
32/14 47/17 47/18 47/18
48/10 48/14 49/5 50/1 50/19
51/1 56/3 57/1 58/8 58/9
100/13 102/9 104/4 113/19
117/23 119/19 119/19
**witness' [2]**  19/10 24/11
**witnessed [2]**  48/2 50/10
**witnesses [54]**  5/3 5/17 11/14
12/25 13/15 13/17 14/17
14/23 16/3 16/22 21/8 21/10
32/10 38/2 39/1 39/9 39/14
41/1 41/1 41/17 41/19 41/20
42/9 42/21 43/10 43/12 43/18
43/19 43/20 45/25 46/8 46/10
46/10 46/11 46/12 47/12
47/12 47/17 49/21 50/16
50/18 51/8 51/10 52/7 54/7
55/1 55/15 56/24 57/2 57/8
58/12 95/14 101/7 111/23
**witnesses' [1]**  58/7
**woke [1]**  86/22
**woman [7]**  25/3 29/18 51/4
62/12 84/2 88/1 93/4
**women [1]**  29/16
**won't [5]**  19/1 28/22 40/23
99/18 105/25
**Wonderful [1]**  5/16
**wondering [1]**  117/17
**word [7]**  8/3 8/15 14/17 66/21
75/2 75/3 75/5
**words [7]**  26/5 62/1 71/5 71/5

## W

**words... [3]**  87/23 105/13
 117/25
**work [11]**  7/12 8/11 38/20
 45/20 69/13 88/24 99/7 99/10
 100/11 101/20 106/6
**worked [2]**  16/22 50/1
**workers' [2]**  82/6 82/7
**working [2]**  71/25 99/15
**works [2]**  53/15 88/1
**world [4]**  34/25 38/24 45/2
 56/5
**worry [1]**  98/8
**worst [1]**  87/14
**worth [1]**  112/7
**would [114]**  3/19 4/5 5/21
 6/12 6/15 7/19 8/4 8/11 10/7
 11/16 12/25 19/16 27/7 28/7
 29/21 31/3 32/6 32/24 32/25
 36/10 38/10 39/4 39/10 40/8
 40/10 41/13 41/20 42/20
 43/17 47/20 48/11 49/1 52/3
 52/4 52/5 53/3 53/14 55/17
 57/11 58/19 58/25 59/17
 59/23 61/11 62/14 63/25 64/1
 64/3 64/16 64/18 64/19 65/14
 65/15 65/18 65/22 66/22
 67/23 67/24 68/3 69/2 69/7
 71/17 73/24 74/8 74/11 74/19
 76/3 76/13 77/7 78/9 78/10
 78/24 79/17 80/23 83/14
 84/25 85/18 85/19 86/1 89/4
 89/7 97/3 97/22 98/17 99/3
 99/8 99/8 100/13 100/17
 101/14 102/5 102/20 102/21
 102/24 103/13 103/16 105/22
 105/24 106/10 106/11 107/5
 107/9 107/12 108/3 109/8
 109/18 109/25 110/3 112/24
 112/25 115/10 117/23 119/7
 119/20
**wouldn't [6]**  36/24 58/21 81/3
 91/5 119/15 119/18
**wound [1]**  53/2
**wreck [1]**  77/11
**written [5]**  28/1 28/3 36/13
 64/19 116/17
**wrong [13]**  19/15 59/23 70/17
 77/17 77/18 89/10 110/13
 110/15 111/17 111/18 112/14
 112/17 115/8

## Y

**Yeah [9]**  8/25 23/5 26/1 38/6
 40/21 76/19 104/7 105/14
 105/16
**year [8]**  63/17 66/2 69/2
 71/25 71/25 79/11 84/15
 84/15
**years [11]**  14/16 25/24 43/12
 43/20 52/2 63/19 84/1 84/10
 84/12 96/16 98/16
**yellow [2]**  114/2 114/2
**yes [37]**  5/11 8/16 9/4 10/13
 11/3 13/22 17/24 22/6 23/1
 25/10 28/19 30/10 31/22
 34/20 34/22 35/24 36/8 37/8
 40/1 43/8 55/19 58/18 61/7
 71/8 89/25 93/23 94/8 103/20
 104/23 106/2 108/17 108/23
 110/22 113/12 113/23 113/25

**yesterday [3]**  57/15 91/6
 118/18
**yet [2]**  32/17 94/14
**you [219]**
**you'll [4]**  36/4 40/14 104/24
 114/2
**you're [18]**  5/3 7/20 12/7
 18/11 18/15 18/20 23/9 24/4
 43/21 50/8 51/8 77/19 109/22
 111/9 113/11 116/10 116/22
 117/16
**you've [4]**  6/21 40/15 77/24
 91/5
**you-all [4]**  76/22 90/11 90/25
 118/16
**you-created-the-environment [1]**
 46/11
**young [5]**  51/4 51/14 69/4
 70/4 84/2
**your [172]**
**yours [2]**  110/8 110/9
**yourself [1]**  88/18
**Yugoslavia [1]**  56/7